IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ESCO GROUP LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 1:20-1679-RGA-JLH |
| v. | ) | |
| | ) | |
| DEERE & COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**JOINT CLAIM CONSTRUCTION BRIEF**

**TABLE OF CONTENTS**

I.      AGREED-UPON CONSTRUCTIONS ..................................................................... 1

II.     DISPUTED TERMS FOR CONSTRUCTION ........................................................ 1

        A.      "a front end" ('662 Patent, Claims 8 and 21) ......................................... 1

                (i)     ESCO's Opening Position .............................................................. 1

                (ii)    Deere's Answering Position ......................................................... 7

                (iii)   ESCO's Reply Position ............................................................... 15

                (iv)    Deere's Sur-reply Position ......................................................... 20

        B.      "a front surface" ('662 Patent, Claims 8 and 21) ............................... 23

                (i)     ESCO's Opening Position ........................................................... 23

                (ii)    Deere's Answering Position ....................................................... 24

                (iii)   ESCO's Reply Position ............................................................... 26

                (iv)    Deere's Sur-reply Position ......................................................... 27

        C.      "a top stabilizing surface and a bottom stabilizing surface" ............... 27

                (i)     ESCO's Opening Position ........................................................... 27

                (ii)    Deere's Answering Position ....................................................... 28

                (iii)   ESCO's Reply Position ............................................................... 31

                (iv)    Deere's Sur-reply Position ......................................................... 34

        D.      "generally transverse to the longitudinal axis" ('175 Patent, Claims 4 and 6)
                ............................................................................................................... 34

                (i)     ESCO Opening ............................................................................ 34

                (ii)    Deere's Answering Position ....................................................... 36

                (iii)   ESCO's Reply Position ............................................................... 43

                (iv)    Deere's Sur-reply Position ......................................................... 50

        E.      "a transverse inward projection" ('175 Patent, Claims 4, 15, and 19) ................. 53

                (i)     ESCO's Opening Position ........................................................... 53

        (ii)     Deere's Answering Position ...................................................................... 54

        (iii)    ESCO's Reply Position...................................................................... 55

        (iv)    Deere's Sur-reply Position ............................................................. 56

F.     "substantially parallel to the longitudinal axis" ('662 Patent, Claims 8 and 21; '175 Patent, Claims 4, 6, 13, and 17)............................................................. 56

        (i)      ESCO's Opening Position.................................................................. 56

        (ii)     Deere's Answering Position ...................................................................... 58

        (iii)    ESCO's Reply Position...................................................................... 60

        (iv)    Deere's Sur-reply Position ............................................................. 60

G.    "substantially along an entire length of the socket" ('175 Patent, Claim 6)......... 62

        (i)      ESCO's Opening Position.................................................................. 62

        (ii)     Deere's Answering Position ...................................................................... 63

        (iii)    ESCO Rely...................................................................... 67

        (iv)    Deere's Sur-reply Position ............................................................. 68

H.    "to resist both vertical and horizontal loads" ('662 Patent, Claims 8 and 21) ............................................................................................ 69

        (i)      ESCO's Opening Position.................................................................. 69

        (ii)     Deere's Answering Position ...................................................................... 71

        (iii)    ESCO's Reply Position...................................................................... 73

        (iv)    Deere's Sur-reply Position ............................................................. 75

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Aerospace Tech.*,
   124 Fed. Cl. at 292 ................................................................................................72

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
   314 F.3d 1313 (Fed. Cir. 2003) ..............................................................................7

*Antares Pharma, Inc. v. Medac Pharma Inc.*,
   771 F.3d 1354 (Fed. Cir. 2014) ............................................................................22

*Apple, Inc. v. Samsung Elecs. Co., Ltd.*,
   786 F.3d 983 (Fed. Cir. 2015), *rev'd on other grounds*, 137 S. Ct. 429 (2016) ...............57, 61

*Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*,
   359 F.3d 1367 (Fed. Cir. 2004) ............................................................................46

*BASF Corp. v. Johnson Matthey Inc.*,
   875 F.3d 1360 (Fed. Cir. 2017) ..............................................................................5

*Berkheimer v. HP Inc.*,
   881 F.3d 1360 (Fed. Cir. 2018) .................................................................... *passim*

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
   713 F.3d 1090 (Fed. Cir. 2013) ............................................................................13

*Conoco, Inc. v. Energy & Env't Int'l, L.C.*,
   460 F.3d 1349 (Fed. Cir. 2006) ......................................................................19, 26

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
   880 F.3d 1356 (Fed. Cir. 2018) ............................................................................50

*Cox Comms., Inc. v. Sprint Comm. Co. LP*,
   838 F.3d 1224 (Fed. Cir. 2016) ............................................................................70

*Datamize, LLC v. Plumtree Software, Inc.*,
   417 F.3d 1342 (Fed. Cir. 2005) ..................................................................71, 72, 74

*DePuy Synthes Products, LLC v. Globus Medical, Inc.*,
   2013 WL 1897833 (D. Del. May 7, 2013) ...........................................................34

*Ecolab, Inc. v. Envirochem, Inc.*,
   264 F.3d 1358 (Fed. Cir. 2001) ......................................................................35, 45

*Edwards Lifesciences LLC v. Cook Inc.*,
  582 F.3d 1322 (Fed. Cir. 2009)...............................................................................9, 14, 17

*Edwards v. Aetna Life Ins. Co.*,
  690 F.2d 595 (6th Cir. 1982) ...............................................................................................14

*Elm 3DS Innovations, LLC v. Samsung Elecs. Co., Ltd.*,
  C.A. No. 14-130-LPS, 2021 WL 2070338 (D. Del. May 24, 2021)...............................20, 21

*Enzo Biochem, Inc. v. Applera Corp.*,
  599 F.3d 1325 (Fed. Cir. 2010)....................................................................................66, 68, 74

*Epistar Corp. v. Int'l Trade Com'n*,
  566 F.3d 1321 (Fed. Cir. 2009)................................................................................4, 15, 26, 28

*Finjan, Inc. v. Cisco Sys., Inc.*,
  837 F. App'x 799 (Fed. Cir. 2020).......................................................................................28

*GE Lighting Solutions, LLC v. AgiLight, Inc.*,
  750 F.3d 1304 (Fed. Cir. 2014)..............................................................................................6

*Genentech, Inc. v. Aurobindo Pharma Ltd.*,
  2020 WL 6144696 (D. Del. Oct. 20, 2020) ....................................................................35, 37

*Halliburton Energy Servs., Inc. v. M-I LLC*,
  514 F.3d 1244 (Fed. Cir. 2008)..............................................................................................71

*Hill-Rom Services, Inc. v. Stryker Corp.*,
  755 F.3d 1367 (Fed. Cir. 2014).................................................................................. *passim*

*Honeywell Int'l, Inc. v. ITT Indus., Inc.*,
  452 F.3d 1312 (Fed. Cir. 2006)........................................................................................22, 29

*Huvepharma EOOD and Huevepharma, Inc. v. Associated British Foods, PLC*,
  2019 WL 2571167 (D. Del. Jun. 21, 2019) ...........................................................................6

*ICU Medical Inc. v. Alaris Medical Systems Inc.*,
  558 F.3d 1368 (Fed. Cir. 2009)........................................................................................31, 33

*Intellectual Ventures I LLC v. T-Mobile USA, Inc.*,
  902 F.3d 1372 (Fed. Cir. 2018)..............................................................................................72

*Interactive Gift Exp., Inc. v. Compuserve Inc.*,
  256 F.3d 1323 (Fed. Cir. 2001)....................................................................................17, 18, 26

*Interval Licensing LLC v. AOL, Inc.*,
  766 F.3d 1364 (Fed. Cir. 2014)................................................................................... *passim*

iv

*Kinetic Concepts, Inc. v. Blue Sky Med. Grp. Inc.*,
554 F.3d 1010 (Fed. Cir. 2009)................................................................31, 33

*Laitram Corp. v. Morehouse Indus., Inc.*,
143 F.3d 1456 (Fed. Cir. 1998)......................................................................22

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004)..............................................................4, 6, 7, 24

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
481 F.3d 1371 (Fed. Cir. 2007)................................................................29, 30

*Manufacturing Resources Int'l, Inc. v. Civiq Smartscapes, LLC*,
2018 WL 4627661 (D. Del. Sept. 27, 2018).........................................56, 57, 61, 63

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
357 F.3d 1340 (Fed. Cir. 2004)......................................................................22

*Montrose Med. Grp. Participating Sav. Plan v. Bulger*,
243 F.3d 773 (3d Cir. 2001)....................................................................14, 23

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014).......................................................................... *passim*

*Nevro Corp. v. Boston Scientific Corp.*,
955 F.3d 35 (Fed. Cir. 2020)..................................................................70, 74, 75

*New Hampshire v. Maine*,
532 U.S. 742 (2001)..................................................................................13

*Nystrom v. Trex Co.*,
424 F.3d 1136 (Fed. Cir. 2005)................................................................31, 33

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008)......................................................................23

*Oakley, Inc. v. Sunglass Hut Intern.*,
316 F.3d 1331 (Fed. Cir. 2003)................................................................56, 60, 61

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003)................................................................12, 13

*In re Papst Licensing Digital Camera Patent Litigation*,
778 F.3d 1255 (Fed. Cir. 2015)......................................................................16

*Perfectvision Mfg., Inc. v. PPC Broadband, Inc.*,
2014 WL 4285786 (E.D. Ark. Aug. 29, 2014) .......................................................74

*Personalized Media Communications, LLC v. International Trade Com'n*,
 161 F.3d 696 (Fed. Cir. 1998) .......................................................................56, 61

*Pfizer, Inc. v. Teva Pharmaceuticals, Inc.*,
 429 F.3d 1364 (Fed. Cir. 2005) ................................................................................17

*Phillips v. AWH Corp.*,
 415 F.3d 1303 (Fed. Cir. 2005) ...................................................................4, 31, 51

*Poly-America, L.P. v. API Industries, Inc.*,
 839 F.3d 1131 (Fed. Cir. 2016) ...............................................................................14

*Power-One, Inc. v. Artesyn Techs., Inc.*,
 599 F.3d 1343 (Fed. Cir. 2010) ...................................................................48, 57, 61

*Princeton Digital Image Corp. v. Amazon.com, Inc.*,
 2019 WL 351258 (D. Del. Jan. 29, 2019) ................................................................35

*Prolifiq Software Inc. v. Veeva Sys. Inc.*,
 No. C 13-03644, 2014 WL 3870016 (N.D. Cal. Aug. 6, 2014) ........................51, 60

*Rembrandt Patent Innovations, LLC v. Apple Inc.*,
 716 Fed. App'x 965 (Fed. Cir. 2017) ......................................................30, 32, 61

*Renishaw PLC v. Marposs Societa'*,
 158 F.3d 1243 (Fed. Cir. 1998) ...............................................................................30

*Retractable Techs., Inc. v. Becton*,
 653 F.3d 1296 (Fed. Cir. 2011) ...................................................................14, 31, 34

*Samuels v. TriVascular Corp.*,
 2015 WL 7015330 (N.D. Cal. Nov. 12, 2015) .........................................................13

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
 242 F.3d 1337 (Fed. Cir. 2001) ...............................................................................30

*Secor View Techs. LLC v. Nissan North Amer., Inc.*,
 2013 WL 6147788 (D.N.J. Nov. 21, 2013) ..............................................................35

*SkinMedia, Inc. v. Histogen Inc.*,
 727 F.3d 1187 (Fed. Cir. 2013) ...................................................................12, 30, 32

*Sonix Tech. Co., Ltd. v. Publ'ns Int'l, Ltd.*,
 844 F.3d 1370 (Fed. Cir. 2017) ..................................................................... *passim*

*Southwall Techs., Inc. v. Cardinal IG Co.*,
 54 F.3d 1570 (Fed. Cir. 1995) .....................................................................13, 21

*Sport Dimension, Inc. v. Coleman Co., Inc.*,
   820 F.3d 1316 (Fed. Cir. 2016)......................................................................45

*Standard Oil Co. v. Am. Cyanamid Co.*,
   774 F.2d 448 (Fed. Cir. 1985).................................................................12, 21

*Summit 6, LLC v. Samsung Elecs. Co., Ltd.*,
   802 F.3d 1283 (Fed. Cir. 2015)............................................................5, 23, 26

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
   299 F.3d 1313 (Fed. Cir. 2002)........................................................................4

*Thorner v. Sony Computer Enter. Am. LLC*,
   669 F.3d 1362 (Fed. Cir. 2012)............................................................4, 5, 24

*TI Group Auto. Sys. (North Am.), Inc. v. VDO North Am., LLC*,
   375 F.3d 1126 (Fed. Cir. 2004)......................................................................32

*Tinnus Enterprises, LLC v. Telebrands Corp.*,
   846 F.3d 1190 (Fed. Cir. 2017)..................................................................57, 61

*U.S. Surgical Corp. v. Ethicon, Inc.*,
   103 F.3d 1554 (Fed. Cir. 1997)......................................................................23

*In re Varma*,
   816 F.3d 1353 (Fed. Cir. 2016)......................................................................51

*Versata Software, Inc. v. Zoho Corp.*,
   213 F. Supp. 3d 829 (W.D. Tex. 2016)......................................................51, 75

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996)........................................................................29

**Statutes**

35 U.S.C. § 112.................................................................................... *passim*

## I.    AGREED-UPON CONSTRUCTIONS

The parties have not stipulated to the constructions of any terms or phrases.

## II.    DISPUTED TERMS FOR CONSTRUCTION[1]

### A.    "a front end" ('662 Patent, Claims 8 and 21)

#### (i)    ESCO's Opening Position

| ESCO's Construction | Deere's Construction |
|---|---|
| Plain and ordinary meaning, *e.g.*, "a front end that is separate from a rear end." | An oval-shaped front end. |

### Introduction[2]

Plaintiff ESCO Group LLC ("ESCO") is an industry leader in the design and manufacture of excavating equipment and tools for industrial applications, such as used in the mining and construction industries.  For more than 100 years, ESCO has designed and developed a wide variety of products to improve the productivity of its customers' excavation operations, and protected such products through an expansive and global patent portfolio.  In this patent infringement lawsuit, ESCO alleges that Defendant Deere & Co. ("Deere") infringes two of

---

[1] As set forth in the Joint Claim Construction Chart (D.I. 42), the parties originally disputed the construction of 10 terms set forth in the Asserted Patents.  ESCO addressed all 10 terms in its opening claim construction brief.  In its responsive claim construction brief, Deere withdrew its indefiniteness challenge to two of the disputed terms (terms 6 and 7 in D.I. 42), stating that "[t]o narrow the claim construction issues for the Court, Deere withdraws [these phrases] but reserves the right to argue later (including at summary judgment and trial) how the phrase renders certain asserted claims indefinite."  The parties continue to dispute the constructions of eight claim terms which are identified and discussed here (terms 1–5, 8–10 in D.I. 42).

[2] In its opening brief, ESCO provided a short introduction and legal standards section to be included at the front of this submission.  During compilation of this joint brief, Deere objected to those sections because they allegedly were not allowed under the Court's scheduling order, and thus Deere would not agree to their inclusion except in ESCO's discussion of the disputed terms.  In the spirit of compromise, ESCO agreed, and therefore includes them here.  ESCO's position regarding the first disputed claim term begins at page 5.

ESCO's patents through the sale and manufacture of its TK Series tooth assemblies, which compete with ESCO in certain markets.

The asserted patents, U.S. Patent Nos. 8,844,175 ("the '175 Patent") and 10,273,662 ("the '662 Patent"), relate to wear assemblies and wear components for use with excavating equipment and reflect ESCO's innovation to enhance the stability, strength, durability and digging penetration of such products. The claims in these patents use ordinary English words that can be readily understood by a person of ordinary skill in the art. As a result, no terms require a specialized construction. Deere, however, urges this Court to violate Supreme Court and Federal Circuit precedent in a litigation-driven effort to manufacture non-infringement positions or invalidate asserted claims by adding unnecessary complexity to straightforward terms that require no construction. A proper application of the law, taking into account the relevant intrinsic evidence, supports that all the disputed terms are definite and require no separate construction. As a result, they should be given their plain and ordinary meanings.

## Technical Background

### *The Asserted Patents and ESCO Products Utilizing the Technology*

The '662 and '175 Patents, generally stated, disclose an excavating wear assembly that comprises a base for attaching to the excavation bucket (*e.g.*, an adapter), a wear member that mounts to the base (*e.g.*, a digging tooth), and a lock that releasably holds the base and wear member together. As their name implies, wear assemblies are used to protect the excavating equipment from wear and to enhance the efficiency of excavating operations. The inventors of the '662 and '175 Patents, generally stated, conceived of adding complementary stabilizing surfaces of certain configurations between the wear member and base that would improve the wear assembly's stability, strength, durability, and digging penetration. The complementary stabilizing

surfaces claimed in the '662 and '175 Patents are unique and achieved a stronger and longer-lasting wear member by, among other things, allowing high loads generated during excavation to be carried by more robust portions of the wear assembly.

ESCO manufactures and sells commercial products that use the claimed wear assembly technology. For example, ESCO's Three-Piece Nemisys system, which embodies claims of the '662 Patent, was first offered for sale in 2012 and is widely accepted as the industry leader for large mining systems. Additionally, ESCO's GeoVor dredge tooth system, which embodies claims of the '175 Patent, was first offered for sale in 2009 and is the market-leader in the cutter-suction dredging industry. Both products offer customers improved digging penetration and system life.

***Deere Products Infringing the Asserted Patents***

Deere offers excavation-related products for use in the construction industry, including products that are used in earthmoving and roadbuilding applications. One of the products Deere offers for these applications is its TK Series Tooth assembly, pictured below:



Deere's TK Series tooth assemblies, which compete directly with products that ESCO sells to the construction industry, infringe specific claims of the '662 and '175 Patents by, among other things, including complementary stabilizing surfaces on the nose and socket of the products. Notably, Deere's TK Series tooth assemblies have a generally rectangular shaped nose and socket. One of

Deere's claim construction positions is to narrowly construe certain of the asserted claims to require an oval shaped nose.

### Presumption of Plain Meaning

There is a "heavy presumption" that "claim terms carry their full ordinary and customary meaning," which can be rebutted only by proving that "the patentee expressly relinquished claim scope." *Epistar Corp. v. Int'l Trade Com'n*, 566 F.3d 1321, 1334 (Fed. Cir. 2009) (citation omitted). Only two things constitute such proof: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Computer Enter. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

It is also well-settled that claims are not confined to specific embodiments disclosed. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005). "[E]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'" *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (quoting *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313 (Fed. Cir. 2002)).

### Indefiniteness

Because patents are presumed valid, Deere bears the burden of proving indefiniteness by clear and convincing evidence. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 911–12 n.10 (2014). A claim is indefinite only if, when read in light of the specification and the prosecution history, it "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Id.* at 901. "'Reasonable certainty' does not require 'absolute or

mathematical precision.'" *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017) (citation omitted).

*     *     *

Deere's demand that the Court construe "a front end" is exemplary of its approach to claim construction in that it asks the Court to add unnecessary complexity to straightforward and easily understood terms. The '662 Patent does not create or specify a unique definition for this well-understood term, and there is nothing preventing a lay jury from understanding this term. Therefore, no construction is needed for the claim term "a front end" because it contains non-technical words that are commonly used and easily understood. *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015) (finding no construction necessary for a phrase that was "comprised of commonly used terms; each is used in common parlance and has no special meaning in the art"). To the extent a construction is desired, it should be a straightforward statement of its plain meaning, *e.g.*, "a front end that is separate from a rear end."

Deere's proposed construction, which seeks to limit "a front end" to the "oval-shaped" embodiment discussed in the specification, cannot be adopted because the patentee did not "set out a definition and act[] as his own lexicographer," nor did the patentee clearly "disavow[] the full scope of a claim term either in the specification or during prosecution." *See Thorner*, 669 F.3d at 1365. First, the intrinsic evidence does not support a specialized definition of "a front end" that would limit it to an oval shape. To the contrary, the '662 Patent's specification makes clear that the discussion of a front end with an oval shape is only one embodiment for the claimed invention. *See* D.I. 42-1 at 3:39–44. In fact, the specification expressly shows a clear intent for the claimed invention to include front ends of many shapes. After discussing the front end embodiment with an oval shape, the specification provides: "***[n]evertheless, the front end and body of the nose***

***could have other shapes***; for example, the nose and socket could be more angular and define a generally parallelepiped front end with generally rectangular stabilizing surfaces and/or generally flat and angular top, bottom and side walls as the body of the nose." *Id*. at 3:53–57 (emphasis added).

Second, there is no support in the intrinsic record that the patentee expressly disavowed shapes for the front end beyond an oval shape.  Deere nonetheless seems to contend that the patentee limited the claim invention to an oval-shaped front end because the specification discloses some potential advantages of using such a shape. *See id*. at 3:44–53.  To start, as discussed above, the specification expressly discloses that the "the front end … could have other shapes," showing no intent to limit the claimed invention to this one embodiment. *See id.* at 3:53–57.  Further, there is no language in the intrinsic record that the oval shape, while even if a preferred embodiment, is "essential" or "necessary" to the invention, nor is there language disparaging non-oval shaped front ends. *See, e.g.*, *GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309–10 (Fed. Cir. 2014) ("[The specifications] do not describe the depicted IDC connector … as the present invention, as essential, or as important.  Nor do they disparage other IDC connectors.  This is simply not a case where the patentee has disavowed the plain meaning of the term IDC connector.")  As the Federal Circuit has routinely held, "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a ***clear*** indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim*, 358 F.3d at 913 (emphasis added); *see also Huvepharma EOOD and Huevepharma, Inc. v. Associated British Foods, PLC*, 2019 WL 2571167, at \*6 (D. Del. Jun. 21, 2019) (declining to "import[] a purity limitation from a preferred embodiment into the claim language).

Moreover, similar to the specification, the prosecution history of the '662 Patent likewise shows that the patentee did not intend the "front end" to be limited to an oval configuration and instead could encompass numerous shapes.  For example, the initial claims submitted to the patent office by the patentee included a claim with "a front end" that was *not* limited to any particular shape (*see* Claim 18, D.I. 42-3 at 22), and a separate claim with "a front end" where the socket *was* limited to "a generally oval transverse shape" (*see* Claim 22, D.I. 42-3 at 23).  Under the doctrine of claim differentiation, when one claim does not recite a particular limitation that is recited in another claim, "that limitation cannot be read into the former claim."  *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1326 (Fed. Cir. 2003).  The fact that an oval shape term was included in one claim that included "a front end" *and not* another during prosecution further shows that there was no intent to limit "a front end" to any particular shape.  *See Liebel-Flarsheim*, 358 F.3d at 906.

Because the patentee did not act as its own lexicographer or show a clear intent to disavow non-oval shaped front ends (and indeed, showed a clear intent to include multiple different shapes), the Court should not limit the term "a front end" to being "oval-shaped" and should afford the term its plain and ordinary meaning.  *Hill-Rom Services, Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372–73 (Fed. Cir. 2014).

### (ii)     Deere's Answering Position

The '175 and '662 Patents do not exist in a vacuum.  Although they are in separate patent families, ESCO repeatedly referenced the invention of the '662 Patent during prosecution of the '175 Patent.  In those statements to the USPTO, ESCO repeatedly characterized the nose and front end as ***oval***, expressly relinquishing any greater claim scope.  In fact, Deere recently reminded ESCO of those statements in a petition for *inter partes* review.  Now, however, ESCO is

conveniently ignoring those statements of disclaimer and improperly attempting to recapture relinquished claim scope for infringement purposes.

**Background: The '662 Patent Repeatedly and Consistently Emphasized that the "Nose" and "Front End" Are _Oval_.** The '662 Patent is directed to cutting teeth for excavating equipment. (_See_ D.I. 42-1, 2:60-64.) And, as shown in the below figure, each tooth **12** (blue) of the '662 Patent is removably attached to a base **15** (green), and that base, in turn, is fixedly attached directly to an excavator bucket **13**:



(_Id._, Fig. 1A.)

As described in the written description—and as shown in the below figure—the base's nose (green) has an **_"oval"_** front end **24** (red) with an **_"oval"_** front wall **36**. (_See id._, _e.g._, 3:39-53.)

8

25      In one other aspect of the invention, the front end and/or body of the nose and socket are formed with a generally oval configuration. This construction provides high strength and a longer nose life, omits distinct corners to reduce concentrations of stress, and presents a reduced thickness for
30    enhanced penetration in the ground.

* * *

In the illustrated embodiment, front end **24** has generally an oval transverse shape with an oval front wall **36**. Similarly, the body **25** of nose **14** also has a generally oval    40
transverse shape except for stabilizing recesses **127**, **129**. As seen in FIG. **3**, body **25** expands rearward from front end **24** over much of its length. The use of an oval-shaped nose forms high strength nose sections that result in a longer nose    45
life. An oval shape also lessens the presence of corners and, thus, reduces stress concentrations along the outer edges of the nose. The oval shape also presents a streamlined profile that improves penetration into the ground during a digging    50
operation; i.e., the wear member is formed with an oval-shaped socket for receiving the nose which, in turn, allows



Oval Shaped

FIG.3

(*Id.*, 2:25-30; 3:39-50; Fig. 3.)

Importantly, the written description uses "i.e." to define the "nose" and "front end" as

***"oval" shaped***: "The general configuration of the nose (***i.e., the oval shape***) can vary

considerably."  (*Id.*, 3:58-59.)  *See, e.g., Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322,

1334 (Fed. Cir. 2009) ("As the court correctly reasoned, the specification's use of 'i.e.' signals an intent to define the word to which it refers.").  Although the written description states "the front end and body of the nose could have other shapes; for example, the nose and socket could be more angular and define a generally parallelepiped front end," (*id.*, 3:53-54), the same paragraph nevertheless makes clear that while the shape can vary considerably, its overall "general configuration" is *oval* (*id.*, 3:53-54).  Indeed, the written description references this "oval" shape no fewer than *nine* times, emphasizing the importance of this particular feature.

**Background: During Prosecution, ESCO Represented that the Front End Is *Oval*.**
During prosecution of *the '175 Patent*, ESCO represented to the USPTO Examiner that *both* the *front end* **24** of the base and the *front surface* **98** of the wear member of the invention disclosed in *the '662 Patent* are *oval*.  That is, to overcome rejections issued by the Examiner during prosecution of the '175 Patent, ESCO at least twice characterized the front end and the front surface claimed in the '662 Patent as having an "oval shape."  (*See, e.g.*, D.I. 42-12 at 20 (representing to the USPTO that the nose "has an oval front end" and stating the "oval shape also lessens the presence of corners and, thus, reduces stress concentrations along the outer edges of the nose").)
*And it worked.*  Relying upon ESCO's arguments characterizing the invention of the '662 Patent, the Examiner *withdrew the rejections and issued the '175 Patent* to ESCO.  Having received the benefit of its characterizations, i.e., the issuance of the '175 Patent, ESCO should not now be permitted to walk back its prior admissions about its own invention in the '662 Patent.

ESCO made those characterizations and admissions regarding the grandparent of the '662 Patent—i.e., U.S. Patent No. 7,730,651 ("Carpenter '651")—which, as a continuation application of a continuation application, shares the *same* written description, disclosure, and *invention* as the '662 Patent.  Like the '662 Patent, ESCO is the assignee of Carpenter '651 and was the assignee at

the time of the '175 Patent's prosecution.  In an office action issued on July 18, 2013, the Examiner applied Carpenter '651 as the primary reference in obviousness combination with U.S. Patent No. 3,444,633 ("Hensley") for all then-pending claims 1-20 of the '175 Patent.  (*See* D.I. 42-12 at 4.) The Examiner relied on Carpenter '651 for its disclosure of each limitation of the invention claimed in the application, except for "transverse inward projections in either the top or bottom surface of the front of the socket."  (*See id*. at 5.)  For that disclosure, the Examiner cited Hensley.  (*See id*.)

In response to the rejection, ESCO amended its claims to include, *inter alia*, limitations that placed side surfaces with transverse inward projections of the claimed invention in the "front end" of the socket.  (*See id*. at 11-15.)  In conjunction with those amendments, ESCO argued that its own invention from "Carpenter ['651] does not disclose ***any*** inward projections in the front end that define bearing surfaces that are adjacent to and extend from the front thrust surface substantially parallel to the longitudinal axis as recited in independent claims 1, 6, 8, 12, and 19." (*Id*. at 18 (emphasis in original).)

ESCO also argued "[i]t would ***not*** have been obvious to extend the stabilizing surfaces 110-117 from the rear end of the socket to the front end 94 of the socket when Carpenter ['651] teaches that the protrusions are most valuable at the rear end [because] Carpenter ['651] ***has an oval front end 24 and 98*** [that] form a high strength nose section." (*Id*. at 20 (emphasis added).) ESCO further stated that the "'***oval shape*** also lessens the presence of corners and, thus, reduces stress concentrations along the outer edges of the nose' (Column 3, lines 34-36)."  (*Id*. (emphasis added).)  And "***[i]f the stabilizing surfaces 110-117 and corresponding stabilizing surfaces 40-47 on the nose extended onto front ends 24 and 98 the corners of the stabilizing surfaces 40-47 would increase the stress in the front of the nose***." (*Id*. (emphasis added).)

Again, ESCO's representations worked.  In the subsequent office action, dated December 24, 2013, the Examiner abandoned the § 103 rejection based on Carpenter '651 in view of Hensley in favor of a § 103 rejection based on JP 50-132703 ("JP") in view of Carpenter '651.  (*See* D.I. 42-13 at 4.)  ESCO again distinguished the invention it claimed in the '175 Patent from its own invention in Carpenter '651, stating "Carpenter ['651] teaches the use of inward projection ***only in the rear end*** of the socket and used with a ***front end that is oval shaped*** to 'reduce stress concentrations along the outer edges of the nose' (col. 3, lines 34-36)." (*Id*. at 26 (emphasis added).)

ESCO's characterization of the invention of the '662 Patent benefited ESCO.  Shortly after that response, the Examiner issued a notice of allowance, dated July 8, 2014.  And the Examiner relied on ESCO's characterization of Carpenter '651—and therefore, also its grandchild, the '662 Patent—as having an oval shaped front end **24** and front surface **98** to distinguish the invention of the '175 Patent.  The '662 Patent issued nearly five years later, on April 30, 2019.

**The Jury Instructions in This Case Should Inform the Jury of the Proper and Disclaimed Claim Scope.**  As demonstrated above, the written description and ESCO's representations to the USPTO make it clear that the "front end" of the '662 Patent is indeed ***oval***, and, for multiple reasons, jury instructions must reflect that specific configuration.

As an initial matter, ESCO's statements constitute disclaimer, which "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g, Inc. v. Raytek Corp*., 334 F.3d 1314, 1323 (Fed. Cir. 2003).  Disclaimer can occur through amendment or argument, including "all express representations" made to an examiner. *Standard Oil Co. v. Am. Cyanamid Co*., 774 F.2d 448, 452 (Fed. Cir. 1985).  And disclaimer likewise can be found where there are "clear, repeated, and consistent statements in the specification."  *SkinMedia, Inc. v. Histogen Inc*., 727 F.3d 1187, 1203 (Fed. Cir. 2013).

When present, disclaimer "narrows the meaning of the claim consistent with the scope of the claim surrendered." *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013). Disclaimer has become "a fundamental precept in our claim construction jurisprudence," which "**protects the public's reliance on definitive statements made during prosecution**." *Omega Eng'g*, 334 F.3d at 1323-24 (emphasis added).

Here, ESCO knows full well that it repeatedly represented to the USPTO that the front end is ***oval***, and ESCO cannot deny that it made the admissions for the purpose of obtaining a patent. Nor can ESCO deny that its efforts were successful. Nonetheless, ESCO asks this Court to now ignore these binding representations and admissions before the USPTO and allow the front end to be ***any*** shape at all. Why? Because, as ESCO hints above, the front end of the accused products ***is not oval.***

As such, ESCO is engaging in the very chicanery that disclaimer seeks to prevent: patent owners characterizing inventions one way to obtain a patent "and in a different way against accused infringers." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995). Because ESCO's statements to the USPTO are clear and unambiguous, ESCO has disclaimed non-oval shapes of the front end.

**Moreover, although Disclaimer Alone Is Enough, Judicial Estoppel Likewise Prohibits ESCO from Changing Its Position and Undermining the Integrity of Both This Court and the USPTO.** Disclaimer "is analogous to judicial estoppel." *Samuels v. TriVascular Corp.*, 2015 WL 7015330, at *6 n.3 (N.D. Cal. Nov. 12, 2015) (finding disclaimer where the PTAB adopted the patent owner's statements regarding the scope of a claim term to avoid prior art during an IPR proceeding). That is, judicial estoppel is "an equitable doctrine invoked by a court at its discretion" where necessary "to prevent improper use of judicial machinery." *New Hampshire v.*

*Maine*, 532 U.S. 742, 750 (2001).  The doctrine "addresses the incongruity of allowing a party to assert a position in one tribunal and the opposite in another tribunal.  If the second tribunal adopted the party's inconsistent position, then at least one court has probably been misled."  *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 782 (3d Cir. 2001) (quoting *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 599 (6th Cir. 1982)).

Here, ESCO cannot deny that its current position is irreconcilably inconsistent with its previous representations to the USPTO that the front end is "oval."  And ESCO cannot argue that it failed to realize the inconsistency; Deere expressly referenced ESCO's representations in a petition for *inter partes* review in November 2021.  (*See*, *e.g.*, IPR2022-00186 at 74-75, 78.)  For at least these reasons, and in addition to disclaimer, judicial estoppel prevents ESCO from reneging on its representations to the USPTO.  *Montrose Med. Grp.*, 243 F.3d at 777-78.

**Claim Differentiation Does Not Apply.**  Lastly, ESCO erroneously asserts that the doctrine of claim differentiation prevents the Court from recognizing ESCO's disavowal of claim scope.  The Federal Circuit has been clear on this issue: ***disavowal trumps claim differentiation***.  *See Retractable Techs., Inc. v. Becton,* 653 F.3d 1296, 1305 (Fed. Cir. 2011) ("Claim language must always be read in view of the written description, and any presumption created by the doctrine of claim differentiation 'will be overcome by a contrary construction dictated by the written description or prosecution history.'") (citations omitted); *Poly-America, L.P. v. API Industries, Inc.*, 839 F.3d 1131, 1137 (Fed. Cir. 2016) ("[C]laim differentiation does not serve to broaden claims beyond their meaning in light of the patent as a whole, and it cannot override clear statements of claim scope found in the specification and prosecution history"); *Edwards Lifesciences*, 582 F.3d at 1332.  None of the cases cited by ESCO concerning claim differentiation suggests otherwise.

14

In short, ESCO's arguments above are correct in **one** respect: the "inventors of the ['662 Patent] conceived of adding complementary stabilizing surfaces of **certain configurations**." (Emphasis added.)   And, as ESCO represented to the USPTO, those "certain configurations" include **an oval front end.**   For all of the above reasons, the Court should construe "front end" as **oval**, i.e., as an "oval-shaped front end."

### (iii)   ESCO's Reply Position

Deere argues the claim term "a front end" of the '662 Patent should be limited to an oval-shaped embodiment.  This proposed construction is motivated by its desire to manufacture a non-infringement position. S*ee* Answering Claim Construction Brief ("Deere's Answering Position") at 13 ("[T]he front end of the accused products is not oval.").[3]  But Deere presents no legitimate basis for deviating from the "heavy presumption" that "a front end" should be construed according to its plain and ordinary meaning.  *Epistar Corp. v. Int'l Trade Com'n*, 566 F.3d 1321, 1334 (Fed. Cir. 2009).  Nothing in the intrinsic records shows that the inventor disavowed subject matter or acted as a lexicographer.

### (a) The Intrinsic Record Does Not Support Deere's Construction

Deere contends that a "front end" must be limited to an oval shape because the patent specification discloses certain figures and embodiments with an oval-shaped front end.  Deere's Answering Position at 7–10.  But this is a classic example of improperly limiting the claims to a specific embodiment of the patent specification.  Deere's own citations to the '662 Patent— including Figure 3 and the "nine" "oval" references in the specification—expressly demonstrate

---

[3] Notably, in its *inter partes* review petition regarding the '662 Patent, Deere stated that the Patent Trial and Appeal Board "**need not construe any terms** of the Challenged Claims." Ex. 1, IPR2022-00187, Pet. 4.  In other words, Deere conceded that all claim terms at issue here should be given their plain and ordinary meaning in related proceedings.

that an "oval" shaped front end is only *one embodiment* of the claimed invention.  *See, e.g.,* D.I.

42-1 at 2:25–30 ("[i]n *one other aspect of the invention*, the front end and/or body of the nose and

socket are formed with a generally oval configuration.")[4], 3:39–53 ("[i]n the *illustrated*

*embodiment*, front end 24 has generally an oval transverse shape with an oval front wall 36."),

3:53–54 ("the front end and body of the nose could have *other shapes*), 3:58–59 ("[t]he general

configuration of the nose (i.e., the oval shape) *can vary considerably*.").  Importantly, the '662

Patent explicitly discloses that "a front end" can have "other shapes" than oval:

> In the illustrated embodiment, front end has generally an oval
> transverse shape with an oval front wall. . . . Nevertheless, *the front*
> *end and body of the nose could have other shapes; for example,*
> *the nose and socket could be more angular and define a generally*
> *parallelepiped front end* with generally rectangular stabilizing
> surfaces and/or generally flat and angular top, bottom and side walls
> as the body of the nose.  The general configuration of the nose (i.e.,
> the oval shape) can vary considerably.

*Id.* at 3:39–59. The "usual rule [is] that claims are generally not limited to features found in what

the written description present[ed] as mere embodiments, where the claim language is plainly

broader."  *In re Papst Licensing Digital Camera Patent Litigation*, 778 F.3d 1255, 1265 (Fed. Cir.

2015).  Here, the "front end" is recited in the claims as just that: a "front end."  The claims do not

define or otherwise limit the shape of the front end.

Deere says the specification passage quoted above refers to the "general configuration" of

the nose for that embodiment as "i.e., the oval shape."  Deere's Answering Position at 9–10 (citing

D.I. 42-1 at 3:58–59 ("The *general configuration* of the nose (i.e., the oval shape) can vary

considerably.").  This passage, however, focuses on one "illustrated embodiment," and therefore

the "general configuration" for this one embodiment cannot limit the claims.   If this passage

---

[4]   All emphasis added unless otherwise indicated.

defined the front end as only an oval shape, as Deere argues, it would render meaningless the disclosure of "other shapes" in the same passage, including the reference to a "parallelepiped front end." D.I. 42-1 at 3:54–56. As such, Deere's proposed construction is unsupported by the patent specification and would improperly limit the claims to a preferred embodiment. *See, e.g., Pfizer, Inc. v. Teva Pharmaceuticals, Inc.*, 429 F.3d 1364, 1375 (Fed. Cir. 2005).

Deere relies on *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1334 (Fed. Cir. 2009) to argue that the use of "i.e." when referencing the "general configuration" limits the term to an oval-shaped embodiment. Not so. In *Edwards*, the Federal Circuit considered whether "malleable wires and resilient wires are mutually exclusive" in light of the specification disclosing that "wires 'are [malleable] and may be bent into any desired shape, ie, they are not resilient ….'" *Id.* Reasoning that "'i.e.' signals an intent to define the word to which it refers, 'malleable,' and that definition was not limited to the embodiment being discussed," the Court held that that "malleable" and "resilient" wires were indeed mutually exclusive. *Id.* But unlike *Edwards*, the use of "i.e." here **is** limited to "the embodiment being discussed." Again, the passage cited by Deere explicitly states that "[i]n the **illustrated embodiment**, front end has generally an oval transverse shape with an oval front wall." D.I. 41-2 at 3:39–40. And "i.e." refer backs to the "**general configuration** of the nose" described in that illustrated embodiment, not the "nose" or "front end" for all embodiments.

### (b) Reliance On Extrinsic Evidence Is Procedurally Flawed And Misplaced.

Because nothing in the '662 Patent calls for limiting the claims to an oval shaped "front end," Deere resorts to extrinsic evidence for its narrow construction. But, as a threshold matter, this is procedurally flawed. Because the intrinsic record for the '662 Patent makes clear that "front end" should have the presumption of a plain and ordinary meaning, the claim construction inquiry

should end there.  *See Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1332 (Fed. Cir. 2001) (reiterating that "[i]f the meaning of the claim limitations is apparent from the totality of the intrinsic evidence, then the claim has been construed.").  If no genuine ambiguity exists, it is improper to resort to extrinsic evidence to construe a claim.  *Id.*  Nonetheless, Deere asks this Court to do exactly that, inviting it to construe the "front end" claim term of the '662 Patent based on statements from the prosecution history of the '175 Patent.

Deere argues the '662 Patent should be limited to an oval-shaped front surface based on representations made in the prosecution history of the '175 Patent: "ESCO represented to the USPTO Examiner that both the front end 24 of the base and the front surface 98 of the wear member of the invention disclosed in the '662 Patent are oval."  Deere's Answering Position at 10.  Deere mischaracterizes the '175 Patent prosecution history—the statements on which it relies related to U.S. Patent No. 7,730,651, a grandparent to the '662 Patent, not the subject '662 Patent itself.  Based on statements associated with a ***different*** patent from a ***different*** patent's prosecution history, Deere argues that "the Examiner relied on ESCO's characterization of Carpenter '651— and therefore, also its grandchild, the '662 Patent—as having an oval shaped front end 24."  *Id.* at 5.  That is, Deere argues that any statements relating to the '651 Patent during the prosecution of the '175 Patent must carry forward to the "front end" term of the '662 Patent simply because the '651 Patent is a grandparent of the '662 Patent.  Not surprisingly, Deere cites no case support for this novel proposition.  Deere attempts to sidestep this disconnect by suggesting that any statements made with respect to the '651 Patent must have been "relied upon" by the examiner in prosecuting the '662 Patent.  But that allegation is entirely speculative.  In fact, the '175 Patent and '662 Patent were actually examined by ***different*** patent examiners.  *Compare* D.I. 42-12 at 7 *with* D.I. 42-9 at 16.

In any event, none of these statements associated with the grandparent of the '662 Patent during prosecution of the '175 Patent "evince a clear and unmistakable surrender" of embodiments without an oval-shaped front end. *Conoco, Inc. v. Energy & Env't Int'l, L.C.*, 460 F.3d 1349, 1364 (Fed. Cir. 2006) ("[W]e do not presume a patentee's arguments to surrender an entire field of equivalents through simple arguments and explanations to the patent examiner."). In the '175 Patent prosecution history, the applicant argued that the embodiment of the '651 Patent referenced by the examiner teaches away from providing protrusions to its front end, as was proposed in the obviousness rejection. D.I. 42-12 at 20. Specifically, the applicant pointed out that the '651 Patent discloses its "oval" shape embodiment as "lessen[ing] the presence of corners and, thus, reduc[ing] stress concentrations," and then noted that the protrusions "would increase the stress in the front of the nose," contrary to the purpose of the referenced embodiment of the '651 Patent. *Id.* In other words, the applicant explained that the examiner's proposed modification of the '651 Patent would contravene the benefit of the embodiment the examiner relied upon for its obviousness rejection. There was no "clear and unmistakable surrender of subject matter" to distinguish the "front end" of the '651 Patent from the prior art, as Deere argues. Even if Deere could rely on extrinsic evidence (which it cannot), and even if the applicant made statements about the '662 Patent during prosecution of the '175 Patent (which it did not), no statements in the '175 Patent prosecution history support limiting the "front end" of the '662 patent to an oval shape.

### *(c) Judicial Estoppel is Inapplicable.*

Deere argues alternatively that judicial estoppel should apply because "ESCO cannot deny that its current position is irreconcilably inconsistent with its previous representations to the USPTO that the front end is 'oval.'" Deere's Answering Position at 14. But as shown above, ESCO made no "irreconcilable" representation that a "front end" requires an "oval" shape, and certainly not in relation to the claimed invention of the '662 Patent. As a result, judicial estoppel

does not apply. *Elm 3DS Innovations, LLC v. Samsung Elecs. Co., Ltd.*, C.A. No. 14-130-LPS, 2021 WL 2070338, at *2 (D. Del. May 24, 2021) (stating "[j]udicial estoppel is only appropriate when [] the party to be estopped is asserting a position that is irreconcilably inconsistent with one she previously asserted").

### (iv)    Deere's Sur-reply Position

ESCO is wrong—its statements ***are inconsistent***.  ESCO repeatedly told the USPTO that the front end and front surface must be oval, and now ESCO is arguing they are ***not*** oval.

The facts are incontrovertible.  ESCO cannot deny that the only shape shown in the '662 Patent is oval, that ESCO repeatedly emphasized the importance of the oval shape in the patent (oval was an "aspect of the invention"), that ESCO repeatedly emphasized the importance of the oval shape of Carpenter '651 (and thus the '662 Patent) during prosecution of the '175 Patent, or that the USPTO issued the '175 Patent as a result of those representations.  Because ESCO cannot genuinely dispute these facts, ESCO instead picks a fight with a straw man, makes specious arguments, and suggests (but is careful not to state) false propositions of law.

**ESCO Repeatedly Represented to the USPTO that the "Front End" Is Oval.**  Despite devoting nearly five pages to this claim term, ESCO's argument can be summarized as follows: ESCO's statements about the oval shape relate only to a single embodiment, and the front end can take shapes other than oval.  ESCO's argument, however, is the ***very*** argument considered by the Examiner during prosecution:

surface contact to withstand vertical and lateral forces on the tooth.  ==Since Carpenter teaches that the shape of the base (and therefore the socket) can take shapes other than an oval as pictured, it would have been obvious to one of ordinary skill in the art at the time the invention was made to include the inward projections of Hensley on the front of the top and/or bottom surfaces of the socket of Carpenter== as the use of a known technique to improve similar devices in the same way.

(D.I. 42-12 at 5.)  And how did ESCO respond?  ESCO assured the Examiner that the shape of both the front end and front surface is *only oval*.  That is, ESCO represented to the USPTO that Carpenter '651 (and thus the '662 Patent) "has an *oval* front end **24** and [front surface] **98**," and, as such, a POSITA would *not* include the inward projections of Hensley because doing so would create *corners* (absent from an oval shape), thereby increasing "stress."  (*Id*. at 20.)

And ESCO later doubled down.  After the Examiner concluded it would have been obvious to combine inward projections "as taught by Carpenter ['651]" with the surfaces of another reference, (D.I. 42-13 at 5), ESCO rebuffed any such combination because of the specific *oval shape* of Carpenter '651 (and thus the '662 Patent): "The front end **94** includes top and bottom stabilizing surfaces **90**, **92** and a *generally elliptical front surface* **98**" (*id*. at 25); and "Carpenter teaches the use of inward projection only in the rear end of the socket and used with a front end that is *oval shaped* to 'reduce stress concentrations along the outer edges of the nose'" (*id*. at 26).  In other words, ESCO argued to the USPTO that inward projections in the front end that deviated from the oval shape "will increase stress considerably."  (*Id*. at 26.)  ESCO's argument was disclaimer, and the Court should not allow ESCO now to characterize the '662 Patent "in a different way against accused infringers."  *Southwall Techs.,* 54 F.3d at 1576.

**ESCO Erroneously Suggests That Its Representations to the USPTO Are Irrelevant.** The remainder of ESCO's argument consists primarily of variations on a theme: that ESCO's statements to the USPTO do not have consequences because they are outside prosecution of the '662 Patent.  ESCO begins by attacking a straw man: that all extrinsic evidence is irrelevant here because the term "front end" is not ambiguous.  ESCO is partly correct: the meaning of "front end" is not ambiguous because ESCO told the USPTO that its shape must be *oval*.  *Standard Oil,* 774 F.2d at 452 (disclaimer includes "all express representations" made to an examiner).  The dispute

here is not about ascertaining the ordinary and customary meaning of "front end"; rather, the dispute relates to ESCO's ***disavowal*** of the full scope of that meaning—as Deere has demonstrated.

ESCO then implies that only statements made during prosecution of an ***asserted patent*** are relevant. Any such implication is false. *See, e.g., Microsoft Corp. v. Multi-Tech Sys., Inc*., 357 F.3d 1340, 1350 (Fed. Cir. 2004) (finding patentee's statement about its disclosed invention during prosecution of another of its patents was relevant because the statement "was made in an official proceeding in which the patentee had every incentive to exercise care in characterizing the scope of its invention"). Disclaimer based on ESCO's statements is eminently reasonable and fair because the invention of Carpenter '651 and the '662 Patent is the ***same***. *Antares Pharma, Inc. v. Medac Pharma Inc*., 771 F.3d 1354, 1358 (Fed. Cir. 2014) (A continuation application is "a second application for the same invention claimed in a prior nonprovisional application."). And, as the Federal Circuit has indicated, "[t]he public is entitled to take the patentee at his word[.]" *Honeywell*, 452 F.3d at 1318.

**ESCO's Peripheral Arguments Are Equally Weak.** For example, ESCO falsely implies that disclaimer requires reliance by the USPTO. *See, e.g., Laitram Corp. v. Morehouse Indus., Inc*., 143 F.3d 1456, 1462 (Fed. Cir. 1998) ("The fact that an examiner placed no reliance on an applicant's statement … does not mean that the statement is inconsequential for purposes of claim construction."). In fact, ESCO cannot genuinely dispute that its representations convinced the Examiner: the Examiner ***withdrew the rejections and issued the '175 Patent*** to ESCO. Next, ESCO incorrectly states that "i.e." in the '662 Patent merely refers to an ***embodiment***, but any sensible reading reveals that "i.e." is referring to the oval shape of the ***invention***. (D.I. 42-1, 3:53-59.) And last, rather ironically, ESCO suggests in a footnote that ***Deere*** is inconsistent because it did not request the construction of any term in a petition for *inter partes* review, ignoring, of

course, that courts (and PTAB) "are not (and should not be) required to construe every limitation present in a patent's asserted claims." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co*., 521 F.3d 1351, 1362 (Fed. Cir. 2008).  Rather, "[c]laim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).

In short, ESCO repeatedly characterized the front end as "oval" before the USPTO. ESCO's representations constitute disclaimer, and they also require judicial estoppel. *Bulger*, 243 F.3d at 782 ("If the second tribunal adopted the party's inconsistent position, then at least one court has probably been misled.").  For at least these reasons, the Court should construe "front end" as ***oval***, i.e., as an "oval-shaped front end."

## B.    "a front surface" ('662 Patent, Claims 8 and 21)

### (i)    ESCO's Opening Position

| ESCO's Construction | Deere's Construction |
|---|---|
| Plain and ordinary meaning, *e.g.*, "a front surface of a wear member to bear against a front wall on the base." | An oval-shaped front surface. |

Like the term "a front end," the intrinsic evidence does not create or support a unique definition for the well-understood term "a front surface," and there is nothing preventing a lay jury from understanding this term.  No construction therefore is needed. *Summit 6, LLC*, 802 F.3d at 1291.  To the extent a construction is desired, it should be a straightforward statement of its plain meaning, *e.g.*, "a front surface of a wear member to bear against a front wall on the base."

Deere's proposed construction again attempts to improperly read a limitation from the specification onto a claim term, namely, limiting the front surface of the wear member's socket to an oval-shaped embodiment.  But for the same reasons discussed above for "a front end," the

patentee did not act as his own lexicographer for this term, nor was there any clear disavowal of claim scope to support deviating from the term's plain and ordinary meaning. *See Thorner*, 669 F.3d at 1365. And although the specification provides an embodiment where there is "a generally elliptical front surface 98 to match front end 24 of the nose," (*see* D.I. 42-1 at 4:18–19), it is well-established that "even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'" *Liebel-Flarsheim*, 358 F.3d at 906. Here, "a front surface" is part of the "front end" of the wear member's socket. D.I. 42-1, Cls. 8, 21 ("a front end with a front surface transverse to the longitudinal axis to bear against the front wall on the base"). As discussed above, the specification and prosecution history of the '662 Patent expressly contemplate that the front end "could have other shapes," and therefore, so too could the corresponding "front surface." *See id.* at 3:53–59; D.I. 42-3 at 22–23. Therefore, the claim term "front surface" should similarly have its plain and ordinary meaning and not be limited to an oval shape. *Hill-Rom*, 755 F.3d at 1372–73.

        **(ii)**      **Deere's Answering Position**

As with "front end," disclaimer and judicial estoppel both require a construction of "front surface" that reflects ESCO's representations and positions to the USPTO concerning the scope of the invention of the '662 Patent. That is, as ESCO repeatedly represented to the USPTO, the "front surface" of the socket is *oval*. For example, as discussed above, ESCO described the "front surface" as *oval* in the following excerpt:

stabilizing surfaces taper to a point in Carpenter. As can be seen in Figs. 2, 3, and 5-7 the point

does not extend to the front end 24 and 94. Further, Carpenter has an oval front end 24 and 98 to

form a high strength nose section. The "oval shape also lessens the presence of corners and, thus,

reduces stress concentrations along the outer edges of the nose" (Column 3, lines 34-36). If the

stabilizing surfaces 110-117 and corresponding stabilizing surfaces 40-47 on the nose extended

(*See* D.I. 42-12 at 20.)

For context, Figs. 7 and 3 of the '662 Patent below are the same as used in Carpenter '651.

The disclaimed *"front surface"* 98 and *"front end"* 24—both *oval*—are shown in red:



As discussed above, ESCO relied on the "oval" shape of the front surface of Carpenter '651

(and thus the '662 Patent) during prosecution of the '175 Patent and convinced the USPTO that the

shape was oval to overcome at least two rejections. For all of the reasons discussed above, the

doctrines of disclaimer and judicial estoppel both prohibit ESCO from taking one position during

patent prosecution to obtain a patent and then another, irreconcilably inconsistent position against

accused infringers. The Court should thus construe "front surface" as *oval*, i.e., as "oval-shaped

front surface."

25

### (iii)    ESCO's Reply Position

Because it is "comprised of commonly used terms" such that it would be readily understood, the term "a front surface" requires no special construction.  *Summit 6, LLC v. Samsung Electronics Co., Ltd.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015); *see also Epistar*, 566 F.3d at 1334. Deere erroneously argues that "disclaimer and judicial estoppel both require a construction" in which "the 'front surface' . . . is oval."  Deere's Answering Position at 24–25.  Deere again alleges that ESCO "relied on the 'oval' shape of the front surface of Carpenter '651 (and thus the '662 Patent) during prosecution of the '175 Patent and convinced the USPTO that the shape was oval to overcome at least two rejections."  *Id.* at 25.  Deere merely repeats the same flawed arguments addressed above for the claim term "front end."

Deere does not, and cannot, cite anything in the intrinsic record that renders "a front surface" ambiguous.  And there is certainly no basis to resort to extrinsic evidence—here, the record for *a different patent*—to argue for a narrowed claim scope because that term is clear from the intrinsic record.  *See Interactive Gift Exp.*, 256 F.3d at 1332 ("If the meaning of the claim limitations is apparent from the totality of the intrinsic evidence, then the claim has been construed.").

In any event, Deere is wrong in asserting that there was "rel[iance] on the 'oval' shape of the front surface of Carpenter '651" to "overcome at least two rejections."  Deere's Answering Position at 25.  Rather, as explained above, the applicant noted that the examiner's determination of obviousness was contrary to the teachings and benefits of the embodiment of the '651 Patent (grandparent to the '662 Patent) cited in the examiner's rejection.  There was no statement disavowing subject matter, and certainly no "clear and unmistakable surrender."  *Conoco*, 460 at 1364.

### (iv)   Deere's Sur-reply Position

ESCO *did* disavow subject matter and did so clearly and repeatedly.  For the reasons discussed above, including in connection with "front end," ESCO is wrong: (1) the issue here is *disclaimer*, not ascertaining the plain and ordinary meaning of "front surface"; and (2) the Court can and should consider representations that ESCO made during prosecution of the '175 Patent because those representations relate to the *same invention* as in the '662 Patent.

ESCO incorrectly asserts that its arguments to the USPTO related merely to an embodiment.  As discussed above, in an office action, the Examiner stated that it would be obvious to modify the "shape of the base (and therefore the socket)" *because* the written description provides that it "can take shapes other than oval as pictured." (D.I. 42-12 at 5.)  In response, ESCO argued the *opposite*, representing that Carpenter '651 (and thus the '662 Patent) "has an *oval* front end **24** and [front surface] **98**." (*Id.* at 20.)  As such, both the doctrines of disclaimer and judicial estoppel require construction of "front surface" as "oval-shaped front surface."

### C.   "a top stabilizing surface and a bottom stabilizing surface"

### (i)   ESCO's Opening Position

| ESCO's Construction | Deere's Construction |
|---|---|
| Plain and ordinary meaning, *e.g.*, "a top stabilizing surface and a bottom stabilizing surface." | A top stabilizing surface and a bottom stabilizing surface, each adjacent to the [oval-shaped] front surface. |

This term needs no further clarification, can easily be understood by a jury, and needs no construction.  Indeed, Deere's construction includes the term itself, merely adding new "adjacent to" language as a limitation.  The specification does not explicitly restrict the scope of this term, nor has the patentee acted as his own lexicographer by clearly setting forth a definition other than its plain meaning.  At bottom, Deere's proposed construction improperly narrows the scope of "a

top stabilizing surface and a bottom stabilizing surface" by adding the limitation that they be

"*adjacent to* the [oval-shaped] front surface."

As an initial matter, Deere's proposed construction for "a front surface" to be oval-shaped

is improper and unsupported for the reasons discussed above.  With respect to the "adjacent to"

limitation that Deere proposes adding, the intrinsic record does not support this construction.

Tellingly, the word "adjacent" appears nowhere within the specification or claims of the '662

Patent.  By the straightforward claim language in both Claims 8 and 21, the claim term simply

requires that a wear member include "a top stabilizing surface and a bottom stabilizing surface to

bear against the front bearing surfaces on the base."  D.I. 42-1 at 11:33–35, 12:51–53.  Nowhere

in the claims is there a requirement that "a top stabilizing surface and a bottom stabilizing surface"

be located *adjacent to* the front surface, nor does the specification or prosecution history provide

any support for reading this limitation into the claim term.  *See Finjan, Inc. v. Cisco Sys., Inc.*, 837

F. App'x 799, 805 (Fed. Cir. 2020) (affirming PTAB's refusal to limit the scope of the term

"information re-communicator" to a device that received downloadable-information from an

external network).  Because this is not the case where the patentee has "expressly relinquished

claim scope," Deere cannot overcome the "heavy presumption that claim terms carry their full

ordinary and customary meaning."  *Epistar*, 566 F.3d at 1334.  Deere's request to add an "adjacent

to" limitation to the claim term of "a top stabilizing surface and a bottom stabilizing surface" is

unsupported and should be rejected.

### (ii)    Deere's Answering Position

Deere's accused products lack multiple necessary claim elements, and so—again—ESCO

must seek a broad understanding of the claim language to try to capture material outside the scope

of the claims.  This time, ESCO attempts to decouple the claimed "top" and "bottom" stabilizing

surfaces from the "front surface."  The Court should reject ESCO's attempt for multiple reasons.

**ESCO's Approach Is Inconsistent with the Intrinsic Evidence.** First, ESCO's position should be rejected because it inconsistent with the intrinsic evidence. *Hill-Rom Services, Inc. v. Stryker Corp.*, 755 F.3d 1367, 1379 (Fed. Cir. 2014) (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996)). The claims, figures, and language of the written description consistently and repeatedly disclose only one configuration: the "front end" **94** of the socket consists of (i) a "front surface" **98** (red) and (ii) "top" and "bottom" stabilizing surfaces **90**, **92** (dark blue), which *are adjacent to* the front surface.



Indeed, no other configuration is taught—much less enabled—by the written description. *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1380 (Fed. Cir. 2007). For example, the written description explains: "In one embodiment (FIG. 7), socket **70** includes a front end **94** with top and bottom stabilizing surfaces **90**, **92** and a generally elliptical front surface **98** to match front end **24** of the nose." (D.I. 42-1, 4:16-19.) In other words, the "front end" has two—and exactly two—types of components: the front surface **98** and the adjacent, surrounding stabilizing surfaces **90**, **92**.

29

Moreover, the written description explains that the socket, including its "front end," is shaped "complementary" to fit the nose.  (*See id.*, *e.g.*, 1:48-53; 2:12-16; 4:12-15.)  Importantly, the written description identifies only two components that "form" the corresponding "front end" of the nose: an "oval front wall" **36** and "top and bottom stabilizing surfaces" **30**, **32**.  (*Id.*, 3:20-40.)  In fact, these top and bottom stabilizing surfaces "are formed around ***the entire front end* 24** of the nose **14**."  (*Id.*, 3:35-37 (emphasis added).)

The patent does not disclose, contemplate, or enable any other configuration of "front end." Deere's proposed construction, on the other hand, "stays true to the claim language and most naturally aligns with the patent's description of the invention."  *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

**The Intrinsic Evidence Is Consistent with and Requires Deere's Proposed Construction.**  As with "front end" and "front surface," disclaimer equally applies here.  The doctrine "requires that the specification or prosecution history makes clear that the invention does not include a particular feature or is clearly limited to a particular form of the invention."  *Hill-Rom Servs.,* 755 F.3d at 1372.  An explicit re-definition, however, is not necessary.  *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc*., 242 F.3d 1337, 1344 (Fed. Cir. 2001).

As discussed above, disclaimer likewise applies where there are "clear, repeated, and consistent statements in the specification."  *SkinMedia,* 727 F.3d at 1203; *see also Rembrandt Patent Innovations, LLC v. Apple Inc*., 716 Fed. App'x 965, 972 (Fed. Cir. 2017) (limiting scope of claims to "[t]he clear, repetitive, and uniform nature of the [] patent's description of the automated recovery process" even though "[t]he asserted claims do not recite the word 'automatic' or any variation thereof").

Indeed, consistent usage of a claim term in the specification can be definitional *even without such disavowal*. *See, e.g., Nystrom v. Trex Co.*, 424 F.3d 1136, 1145 (Fed. Cir. 2005) (limiting "board" to wooden boards because the specification repeatedly referred to claimed boards as made from wood); *ICU Medical Inc. v. Alaris Medical Systems Inc.*, 558 F.3d 1368, 1376 (Fed. Cir. 2009) (affirming construction of "spike" because "the specification never suggests that the spike can be anything other than pointed"); *Kinetic Concepts, Inc. v. Blue Sky Med. Grp. Inc.*, 554 F.3d 1010, 1018-19 (Fed. Cir. 2009) (construing "wound" to exclude pus pockets and infections in glands when "all of the examples described in the specification involve skin wounds").

Here, again, the specification consistently and *only* discloses a certain configuration of the recited "front end"—i.e., a front end having a "front surface" with adjacent "top" and "bottom" stabilizing surfaces. That is what the inventors disclosed, that is what the inventors arguably enabled, and that is what the inventors *"actually invented."* *Retractable Techs.*, 653 F.3d at 1305 (emphasis added). The Court should not allow the asserted claims of the '662 Patent to capture content beyond that scope, and the Court likewise should reject ESCO's overly broad construction.

### (iii)    ESCO's Reply Position

The scope of "a top stabilizing surface and a bottom stabilizing surface" is apparent from the term itself—all that is required is a top surface and a bottom surface, each of which stabilize. *See* D.I. 42-1, 2:1–6. Because the term requires nothing "more than the application of the widely accepted meaning of commonly understood words," *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005), there is no reason to adopt anything other than the plain meaning.

Deere, however, argues that the "top" and "bottom stabilizing surface[s]" must be construed as being "each adjacent to the [oval-shaped] front surface," requiring that the stabilizing surfaces and the front surface to be adjacent to each other. Deere relies once more on embodiments disclosed in the specification, arguing that the "claims, figures, and language of the written

31

description consistently and repeatedly disclose only one configuration," namely "'top' and 'bottom' stabilizing surfaces . . . which are adjacent to the front surface." Deere's Answering Position at 29. Deere also argues that the '662 Patent disclaims any embodiment beyond one where the stabilizing surfaces are "adjacent to" the front surface, noting that "the socket, including its 'front end,' is shaped 'complementary' to fit the nose. . . . [T]hese top and bottom stabilizing surfaces 'are formed around the entire front end 24 of the nose 14.'" *Id.* at 30. Neither argument has merit.

Deere's argument that the "claims" and "language of the written description" supports its narrow interpretation is wrong. The word "adjacent" does not appear in the claims or the specification of the '662 Patent. And even if the figure cited by Deere did show an embodiment with this "adjacent to" configuration, the '662 Patent specification explicitly states that it is only one embodiment: "[i]n *one embodiment* (FIG. 7), socket 70 includes a front end 94 with top and bottom stabilizing surfaces 90, 92 and a generally elliptical front surface 98 to match front end 24 of the nose." D.I. 42-1, 4:16–19. Deere's attempt (again) to limit the claimed scope to an embodiment shown in the patent figures ignores Federal Circuit precedent that "the fact that the drawings are limited to a particular embodiment does not similarly limit the scope of the claims." *TI Group Auto. Sys. (North Am.), Inc. v. VDO North Am., LLC,* 375 F.3d 1126, 1138 (Fed. Cir. 2004).

The cases Deere cites are inapposite. In *SkinMedica, Inc. v. Histogen, Inc.*, 727 F.3d 1187 (Fed. Cir. 2013), the Federal Circuit refused to construe a claim term more broadly than its ordinary meaning where the "patentee's repeated and definitive statements clearly indicated that they disclaimed the ordinary meaning" of the term. *Id.* at 1203. Here, ESCO is not construing the claim terms beyond their ordinary meaning, and there are no statements in the '662 Patent that

"clearly" evince disclaimer.  In *Rembrandt Patent Innovations, LLC v. Apple Inc.*, 716 Fed. App'x 965 (Fed. Cir. 2017), the Federal Circuit refused to construe a claim term more broadly than its ordinary meaning so as to capture "prior art methods" because the specification "disparages [such] prior art."  *Id.* at 927.  Here, Deere fails to supply any statement disparaging or criticizing "top" and "bottom stabilizing surfaces" at any locations not "adjacent" to the front wall.

Deere's reliance on its "definitional" cases is similarly misplaced.  In *Nystrom v. TREX Co., Inc.*, 424 F.3d 1136 (Fed. Cir. 2005), the Federal Circuit refused to construe "boards" as including materials other than wood, because the patent only referred to wood for the claimed boards ***and*** the patentee adopted that scope during prosecution "when arguing against an obviousness rejection."  *Id.* at 1144.  Here, ESCO has never referred to the "top" and "bottom stabilizing surface[s]" as requiring them to be "adjacent" to the front end, much less adopt that scope during prosecution.  And in *ICU Medical, Inc. v. Alaris Med. Systems, Inc.*, 558 F.3d 1368 (Fed. Cir. 2009), the Federal Circuit construed a "spike" as being "pointed" because there was no basis to conclude "that the ordinary meaning of spike would include a non-pointed structure such as a tube or a straw."  *Id.* at 1375.  The situation here is precisely the opposite.  Whereas the patentee in *ICU Medical* pressed for a construction more expansive than the plain meaning of a "spike" (a pointed body), ESCO proposes the ordinary meaning of "top" and "bottom stabilizing surface[s]," namely a top surface and a bottom surface, each of which provide stabilization.  And while a pointed spike was necessary to "pierce a seal" to practice the claimed invention in *ICU Medical*, *id.* at 1375, nothing in the '662 Patent requires the "top" and "bottom stabilizing surface[s]" to be "adjacent" to the "front surface."  Finally, in *Kinetic Concepts*, the Federal Circuit refused to adopt an interpretation of "wounds" as including anything other than skin wounds, because "the specification in no way suggests [that internal wounds] can be treated according to

the claimed invention." *Kinetic Concepts, Inc. v. Blue Sky Med. Grp. Inc.*, 554 F.3d 1010, 1018–19 (Fed. Cir. 2009).  But there is nothing here that requires the "top" and "bottom stabilizing surfaces" to be "adjacent" to the "front surface" to practice the claimed invention.  Instead, the '662 Patent simply describes that the "top" and "bottom stabilizes surfaces" must, as the terms naturally suggest, stabilize.  *See, e.g.,* D.I. 42-1 at 2:1–6.

### (iv)   Deere's Sur-reply Position

Although ESCO unsuccessfully tries to distinguish the relevant case law, ESCO never denies the dispositive issue—that the claims, figures, and language of the written description consistently disclose only *one* configuration: the "front end" of the socket (shown in dark blue in Fig. 7 above) consists of (i) a "front surface" (red) and (ii) "top" and "bottom" stabilizing surfaces, which are *adjacent* to the front surface.  *No other configuration is disclosed,* and ESCO does not even argue, consistent with pre-AIA 35 U.S.C. § 112, that the inventor possessed the scope of ESCO's proposed construction.  As such, the Court should construe the term consistent with what the inventors *"actually invented,"* *Retractable Techs.*, 653 F.3d at 1305, i.e., "a top stabilizing surface and a bottom stabilizing surface, each adjacent to the [oval-shaped] front surface."

### D.   "generally transverse to the longitudinal axis" ('175 Patent, Claims 4 and 6)

### (i)   ESCO Opening

| ESCO's Construction | Deere's Construction |
|---|---|
| Not indefinite. | Deere contends this term is indefinite under 35 U.S.C. § 112. |

The term "generally transverse to the longitudinal axis," when read in conjunction with the subject claims, is straightforward and requires no construction.  *See DePuy Synthes Products, LLC v. Globus Medical, Inc.*, 2013 WL 1897833, at *5  (D. Del. May 7, 2013) (declining to construe the term "plate top surface located generally on the upper plane" reasoning that "replacing

'generally' with 'most or all' or 'approximately' is neither helpful nor necessary").  To the extent the Court wishes to construe the term, it should be a statement consistent with its plain and ordinary meaning, *e.g.*, "approximately transverse to the longitudinal axis of the wear member."  *See Secor View Techs. LLC v. Nissan North Amer., Inc.*, 2013 WL 6147788, at *8 (D.N.J. Nov. 21, 2013) (construing "generally rearward" as "mostly toward the rear").

Despite the straightforward language, Deere contends this term is indefinite.  As an initial matter, to the extent Deere argues that the term "generally" renders the claims indefinite, the Federal Circuit has "rejected the proposition that claims involving terms of degree are inherently indefinite," especially when the patentee provides guidance and examples in the specification regarding the disputed term.  *Sonix Tech. Co., Ltd. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377–79 (Fed. Cir. 2017) (finding a term of degree not indefinite where there are "examples and criteria from the written description" to guide a skilled artisan).  Indeed, this Court routinely finds claims reciting the term "generally," such as here, to be definite.  *See, e.g.*, *Princeton Digital Image Corp. v. Amazon.com, Inc.*, 2019 WL 351258, at *7–8 (D. Del. Jan. 29, 2019) (rejecting defendant's argument that claims using the term "generally" are indefinite).  The term "generally" is a descriptive term "commonly used in patent claims to avoid a strict numerical boundary to the specified parameter."  *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1367 (Fed. Cir. 2001) (internal citations and quotations omitted).

Here, the intrinsic evidence fully informs a person of ordinary skill in the art with reasonable certainty about the scope of the claim.  *Nautilus*, 572 U.S. at 901.  First, the claim language itself is sufficient to act as a guide.  *See Genentech, Inc. v. Aurobindo Pharma Ltd.*, 2020 WL 6144696, at *3 (D. Del. Oct. 20. 2020) (stating "proposition that claims themselves give important context to the dispute").  For example, Claim 4 of the '175 Patent uses the term to explain

that "the front stabilizing end" includes "a front thrust surface extending generally transverse to the longitudinal axis [of the wear member]."  D.I. 42-2 at 15:37–39.  "[G]enerally transverse to the longitudinal axis" therefore simply explains how the "front thrust surface" of the invention must be oriented with respect to the wear member as a whole, *i.e.*, generally transverse to its longitudinal axis.  Second, the specification also informs one of ordinary skill in the art as to the meaning of this term and provides relevant examples.  The specification explains that "[t]he term 'transverse configuration' is used herein to refer to the two-dimensional configuration along a plane perpendicular to the longitudinal axis 128 of wear member 104."  D.I. 42-2 at 6:22–25.  The specification also provides the below figure regarding a wear member's longitudinal axis.



*Id*. at FIG. 7 (highlighting added).

Based on the claims and specification, the intrinsic evidence "inform[s], with reasonable certainty," a person of ordinary skill in the art about the scope of the term "generally transverse to the longitudinal axis."  *Nautilus*, 572 U.S. at 910; *see also Sonix*, 844 F.3d at 1379.  Deere cannot show that this term is indefinite, let alone by clear and convincing evidence.

### (ii)    Deere's Answering Position

A claim is indefinite if, together with the specification and prosecution history, it fails "to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc*., 572 U.S. 898, 901 (2014).  Thus, it is not enough to "ascribe **some** meaning" to a claim limitation; rather, "a patent must be precise enough to afford

*clear notice* of what is claimed, thereby 'appris[ing] the public of what is ***still open*** to them.'"  *Id.* at 909 (emphasis added).  And while "claims themselves give important context to the dispute," *Genetech, Inc. Aurobindo Pharma Ltd.*, 2020 WL 6144696, at *3 (D. Del Oct. 20, 2020), claims—to be definite—must "particularly point[] out and distinctly claim[] the subject matter which the inventor . . . regards as the invention." 35 U.S.C. § 112.

Here, based on the specification and prosecution history of the '175 Patent, the scope of the phrase "generally transverse to the longitudinal axis" is not reasonably certain to a POSITA.  (Stern Decl. ¶ 26.)[5]  As an initial matter, a POSITA would understand from reading the claims that the phrase describes the "front thrust surface" of the "front stabilizing end" of the "wear member."  (*Id.* ¶ 27.)  That is it—nothing more.  And ESCO all but concedes this when it above states, "'[g]enerally transverse to the longitudinal axis' therefore simply explains how the 'front thrust surface' of the invention must be oriented with respect to the wear member as a whole, i.e., generally transverse to its longitudinal axis."  Yet, the claims fail to inform with reasonable certainty ***what it means*** for the "front thrust surface" to be "generally transverse to the longitudinal axis," as required by 35 U.S.C. § 112.

The remainder of the specification provides no further clarity but convolutes the scope of this phrase by: (1) failing to define what "generally transverse" means for purposes of the claims (*id.* ¶ 28); (2) using "transverse" in relation to terms other than the "front thrust surface" (*id.* ¶¶ 29, 35); and (3) providing a definition for "transverse configuration" to mean "perpendicular," which aligns with statements made during prosecution about the "front thrust surface" not being a part of a socket that extends forward at an "acute angle" (i.e., the "front thrust surface" is perpendicular)

_____

[5] The Stern Declaration is attached hereto as Exhibit 2.

but contradicts ESCO's opening position that the "front thrust surface" is "approximately" perpendicular (i.e., an acute angle) (*id*. ¶¶ 30-31, 40).

First, ***nowhere*** in the remainder of the specification is the phrase "generally transverse to the longitudinal axis"—or even the term "transverse"—used to describe the "front thrust surface" (which is designated with reference numeral **152**).  (*Id*. ¶¶ 28-29).  In fact, ***nowhere*** in the specification, including in the claims, is the phrase "generally transverse to the longitudinal axis" particularly pointed out and distinctly described.  (*Id*.)

Second, while the specification ***does not*** use "transverse" to describe the "front thrust surface," it ***does*** repeatedly use "transverse" with two separate terms: the "working section" of the "wear member" (*id*. ¶ 35) and the "first side surface and the second side surface" of the "front stabilizing end" of the "wear member" (*id*. ¶ 37).  Thus, although a POSITA may understand "transverse" to describe other aspects of the invention—she finds no guidance for the front thrust surface **152**. (*Id*.)

For example, a POSITA would understand "transverse" to describe the working section **112** of wear member **104** having preferably a generally trapezoidal transverse configuration. The specification states "[t]he term ***'transverse configuration'*** is used herein to refer to the two-dimensional configuration along a ***plane perpendicular to the longitudinal axis*** 128 of wear member 104." (*Id*. ¶ 35 (citing D.I. 42-2, 6:19-25) (emphasis added.)  Moreover, a POSITA would understand the specification frequently to describe the first side surface and the second side surface of the front stabilizing end of wear member **104** as having "transverse, inward projections." (Stern Decl. ¶ 37 (citing, *e.g*., D.I. 42-2, claims 1, 4, 10, and 19; 10:1-3; 12:13-21).)

After reading the specification as a whole, a POSITA thus is unable to reconcile how the term "transverse" as used with these two other aspects of the invention could ***also*** be used to

describe how the "front thrust surface" is "generally transverse to the longitudinal axis." (Stern Decl. ¶¶ 26-41.) Specifically, a POSITA would not understand the use of the term "transverse" to describe the "transverse, inward projections" of the "first side surface and the second side surface" to align with the use of "transverse" with respect to the "front thrust surface." (*Id*. ¶ 37.) Nor would a POSITA understand "transverse" as used to describe the "transverse, inward projections" to align with how "transverse" is used to describe the generally trapezoidal transverse configuration of the working section **112** of the wear member **104**, i.e., falling in a plane perpendicular to the longitudinal axis. (*Id*.) Using Figure 4 below to illustrate, the "transverse, inward projections" of the wear member, which would align with the yellow highlighted section of the base, ***does not*** fall within a plane perpendicular to the longitudinal axis. (*Id*. ¶ 38.)



FIG. 4

Similarly, a POSITA would not understand "transverse" as used to describe the "front thrust surface" in claims 1, 4, 6, and 9 to align with the concept of falling in a plane perpendicular to the longitudinal axis disclosed in the specification and as further evidenced in the prosecution history (explained more fully below). (*Id*. ¶ 37.) The specification describes that front thrust

surface **152** may be shaped to match or substantially match the shape of corresponding thrust surface of the nose **142** (highlighted in purple in Figure 4 above) and ***may be any desired shape*** such as any shape between hemispherical to flat or even concave, including matching rounded (e.g., spherical arc) shaped thrust surfaces **142** and **152**. (*Id*. ¶ 33 (citing D.I. 42-2 at 8:3-21).)  The specification fails to indicate, however, just how (or where) the relationship between the front thrust surface of such varied shapes and the longitudinal axis is to be measured.  (Stern Decl. ¶ 33.)  With curved surfaces especially, the point at which the angle between the front thrust surface and the longitudinal axis is measured would be critical.  (*Id*. ¶ 36.)  And as illustrated in Figure 7 below—which shows an embodiment of a curved front thrust surface **152** (highlighted in green)— the front thrust surface ***does not*** fall within a plane perpendicular to the longitudinal axis.  (*Id*.)



FIG. 7

(D.I. 42-2, Fig. 7.)  Thus, a POSITA would not understand the use of the term "transverse" as used to describe the "front thrust surface" in claims 1, 4, 6, and 9 to align with the concept of falling in a plane perpendicular to the longitudinal axis disclosed in the specification. (Stern Decl. ¶ 37.)

Finally, the prosecution history further muddies the already uncertain waters surrounding the phrase "generally transverse to the longitudinal axis" from the patent's disclosure. Specifically, the claims of the application that issued as the '175 Patent, as originally filed, did not include the limitation that the "front thrust surface" be "generally transverse to the longitudinal axis." (*Id.* ¶ 30.) But in an amendment dated January 3, 2013, ESCO distinguished the thrust face of the claimed invention from the thrust face asserted by the Examiner from U.S. Patent No. 3,444,633 ("Hensley"), which is depicted in Figure 1 of Hensley as follows (*id.*):



$$F i g. \quad l$$

In distinguishing the "front thrust face" of the '175 Patent, ESCO stated "[a] thrust face configured to absorb axial loads to the wear member requires a ***transverse*** face of the socket to abut the front face of the nose." (*Id.* (citing D.I. 42-11 at 28 (emphasis added).) ESCO also stated, "[i]n Fig. 1 [of Hensley] top and bottom lines 41 define the socket and extend forward of the nose of the adapter to converge at an ***acute angle***." (*Id.* (emphasis added).) "The tip of the adapter nose is shown as truncated," ESCO continued, "and stopping short of the forward extent of the socket."

(*Id.*)  "If the socket extends forward to an ***acute angle*** as depicted," ESCO concluded, "it ***cannot form a thrust face***."  (*Id.* (emphasis added).)

From these statements, a POSITA would understand ESCO to have distinguished the transverse front thrust face of the claimed invention from the front of the wear member shown in Hensley, which forms an acute angle.  (Stern Decl. ¶ 31.)  A POSITA would understand ESCO to have expressly defined the front thrust face of the invention as precisely perpendicular to the longitudinal axis.  (*Id.*)  A POSITA would also understand ESCO to have represented to the Examiner that any surface not precisely perpendicular to the longitudinal axis could not form, or function, as a thrust face.  (*Id.*)[6]  In other words, ESCO made statements during prosecution that prevents the "front thrust surface" from being any angle less than 90 degrees.  (*Id.*)

Yet, despite such statements to the Examiner to distinguish its front thrust surface from Hensley, ESCO later amended the claims to recite "generally transverse."  (*Id.* ¶ 32 (citing D.I. 42-12 at 11-12).)  And ESCO now similarly argues that the "front thrust surface" is "approximately transverse."  (Stern Decl. ¶ 40).  But, as discussed above, the specification defines "transverse configuration" to mean "the two-dimensional configuration along a ***plane perpendicular to the longitudinal axis*** **128** of wear member **104**."  (*Id.* (citing D.I. 42-2, 6:19-25).)  Thus, according to the disclosure of the '175 Patent and prosecution history, "generally" and "approximately" transverse would mean "generally" and "approximately" perpendicular, which could result in the "front thrust surface" being at an angle less than 90 degrees (i.e., an acute angle), directly

---

[6] The prosecution arguments made to distinguish the "front thrust surface" of the claimed invention from Hensley likely amount to disavowal of any scope of "front thrust surface" that is not precisely perpendicular to the longitudinal axis.  Deere reserves the right to raise a disclaimer or estoppel argument in this respect, if necessary, notwithstanding its indefiniteness arguments here.

contradicting the statements ESCO made to the Examiner to distinguish the thrust face of the claimed invention from the thrust face in Hensley.

For all of these reasons, a POSITA would not be reasonably certain of the scope of "generally transverse" in light of ESCO's inconsistencies and lack of clarity. *See Berkheimer v. HP Inc.*, 881 F.3d 1360, 1363-1364 (Fed. Cir. 2018) (holding that inconsistencies in the specification and prosecution history provided no objective boundaries to the indefinite term in dispute). A POSITA cannot be reasonably certain whether the "front thrust surface" of the "front stabilizing end" of the "wear member" was required to be: (1) actually perpendicular to the longitudinal axis as required by ESCO when it distinguished the "front thrust surface" of the alleged invention from the corresponding component of Hensley that formed an acute angle; (2) actually perpendicular to the longitudinal axis as defined by the specification's explicit statement (on which ESCO relies in its brief) that "transverse configuration" means a "two-dimensional configuration along a plane perpendicular to the longitudinal axis"; (3) approximately perpendicular as ESCO posits in its opening brief and as suggested in the amendment to the original claims that inserted the language "generally transverse," despite the earlier prosecution argument that an acute angle could not form a thrust face; or (4) not perpendicular to or even intersecting the longitudinal axis as the term "transverse" is used with respect to the claimed "transverse, inward projections." (Stern Decl. ¶ 40.)

As such, the phrase "generally transverse to the longitudinal axis" is indefinite because the '175 Patent and its prosecution history do not inform a POSITA of the scope of the claim with reasonable certainty.

### (iii)    ESCO's Reply Position

Deere argues that the term "generally transverse to the longitudinal axis," as used in relation to the "front thrust surface" of claims 4 and 6 of the '175 Patent, is indefinite because the

the term would not be understood by a person of ordinary skill in the art (POSITA) with reasonable certainty.  Deere relies on the declaration of an expert witness who does not meet the proper POSITA standard and mischaracterizes the intrinsic record.  As such, its argument has no merit.

### (a) Deere's Expert Declaration Should Be Disregarded

Deere submits a declaration from Elliott Stern, Ph.D., in which he opines on how one of ordinary skill in the art would understand certain terms of the asserted patents.  Dr. Stern is a mechanical engineer whose professional experience, as set forth in his CV, is focused on the machinery and tooling industry.  *See* Stern Decl. at Ex. 1.  For example, he has spent 25 years working on "design, analysis, fabrication, testing, manufacturing, and regulatory compliance of engines, dynamically tuned tooling for *machining*."  Stern Decl. ¶ 10 (emphasis added).  Dr. Stern, however, has no professional experience working in the technical field that is associated with the asserted patents—wear assemblies used in the earthmoving industry for excavation operations associated with mining, dredging and construction.  As the patents explain, there are specific considerations with the use of wear assemblies with excavation operations, such as "stability in resisting vertical and side loads" under "harsh conditions and heavy loading" and manufacturing considerations. D.I. 42-1 at 1:35, 2:3–4, 3:30.  A POSITA for these patents must have experience with the earthmoving industry, including an understanding of the considerations in designing, developing and using wear assemblies in excavation operations.  As a result, a POSITA should be defined as having at least a Bachelor's degree in Mechanical Engineering *and* at least three years of experience designing, developing and/or implementing wear assemblies in excavation operations for the earthmoving industry.  Holland Decl. ¶ 29.[7]

---

[7] The Holland Declaration is attached hereto as Exhibit 3.

In an effort to overcome Dr. Stern's qualification issues, Deere broadens its proposed POSITA definition by claiming that, in lieu of experience "working with wear assemblies for excavating equipment," a POSITA also may have experience with "similar brush cutters, drilling heads and cutting tools." Stern Decl. ¶ 21. Although it is not entirely clear what, if any, experience Dr. Stern has with brush cutters, drilling heads and cutting tools, this experience would not qualify him as a POSITA for the Asserted Patents. Holland Decl. ¶ 29. Brush cutters, drilling heads and cutting tools relate to a different technical field than excavating equipment, and involve materially different technical considerations. Holland Decl. ¶¶ 30–32. As a result, Dr. Stern does not have the requisite experience for a POSITA; his declaration, which mostly offers conclusory positions that mimic Deere's arguments in its answering brief, thus has no probative value and should be excluded. *See Sport Dimension, Inc. v. Coleman Co., Inc.*, 820 F.3d 1316, 1323 (Fed. Cir. 2016) (affirming exclusion of expert testimony in light of his "inexperience and unfamiliarity" with the subject matter).

### (b) Deere Mischaracterizes The Intrinsic Record.

Claim terms do not need to define their scope with mathematical precision, and it is sufficient, when read in light of the intrinsic evidence, that a POSITA would understand with reasonable certainty the claimed scope. Courts routinely hold that terms of degree, such as "generally" and "substantially," are permissible as claim terms and "commonly used in patent claims to avoid a strict numerical boundary to the specified parameter." *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1367 (Fed. Cir. 2001) (internal citation omitted). Mr. Holland, who is a degreed mechanical engineer with more than three-years of experience in the earthmoving industry working with wear assemblies for excavating, explains how a POSITA would understand that "generally transverse" in this context simply means that the claimed "front thrust surface" is approximately perpendicular to the longitudinal axis of the wear member. Terms of orientation

45

and direction, such as "transverse," "axial" and "longitudinal," are commonly used in the earthmoving industry to describe the structure of excavation wear components, and such terms are used to orient structural features with respect to each other.  Holland Decl ¶ 36.  Thus, a POSITA would readily understand the terms of orientation and direction as used in the Asserted Patents.

Deere agrees that "transverse" when used with the terms "working section" and the "first side surface and the second side surface" would be understood to a POSITA, but argues that it would not be understood to reasonable certainty when used with "front thrust surface."  Deere's Answering Position at 38–39.  Deere says a POSITA would not understand the term because the '175 Patent specification does not use "generally transverse" when describing the "front thrust surface."  *Id*. at 39.  The claim language, however, provides sufficient detail for a POSITA to understand the term, explaining how the "front thrust surface" must be oriented with respect to the wear member by being generally transverse to the longitudinal axis of the wear member.  Holland Decl. ¶¶ 37–38.  The fact that the specification does not use "generally transverse" with "front thrust surface," or provide any explicit definition of it, has no consequence when the words of the claim provide reasonable certainty of its scope to a POSITA.  *See Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1373 (Fed. Cir. 2004) ("The failure to define [a] term is, of course, not fatal, for if the meaning of the term is fairly inferable from the patent, an express definition is not necessary.").

Deere next argues that the claim term is indefinite because a POSITA would be "unable to reconcile" the use of "transverse" with respect to a "front surface" with the use of "transverse" with respect to other disclosed features, such as the "working section," the "first side surface and the second side surface," and "inward projection."  Deere's Answering Position at 39.  To start, the use of the word "transverse" to orient other structural features of the patent has no bearing on

46

whether a POSITA understands to reasonable certainty the term "generally transverse to a longitudinal axis" in relation to a "front thrust surface." As discussed above, a POSITA would understand this term with reasonable certainty.  Holland Decl. ¶¶ 36–38.  Regardless, there is no inconsistency between the '175 Patent's use of "transverse" as used with "front thrust surface" and with other features disclosed in the '175 Patent.  As shown in the figure below, the "generally trapezoidal transverse configuration" (shown in FIG. 7A) of the "working section" (112) and the "front thrust surface extending generally transverse to the longitudinal axis" (152) both extend in the plane perpendicular to the longitudinal axis, which is consistent with the specification's discussion of a "transverse configuration."  *See* D.I. 42-2 at 6:22–25 ("The term 'transverse configuration' is used herein to refer to the two-dimensional configuration along a plane perpendicular to the longitudinal axis 128 of wear member 104.").



D.I. 42-2 at FIGS. 7 and 7A (annotations added).

There is no discrepancy between the '175 Patent's use of "transverse" to describe the "transverse, inward projections" of the "first side surface and the second side surface" and the "front thrust surface."  As illustrated in the figure below, the "inward projections" enter inward

along the "transverse" plane, the transverse plane crossing or intersecting the longitudinal axis of

the wear member, just as the "front thrust surface" crosses or intersects the longitudinal axis.



FIG. 4

D.I. 42-2 at FIG. 4 (annotations added).

Deere further alleges that "the specification describes that the front thrust surface . . . may

be any desired shape," but that it does not "indicate [] just how (or where) the relationship between

the front thrust surface of such varied shapes and the longitudinal axis is to be measured."  Deere's

Answering Position at 40.  In particular, Deere argues that "[w]ith curved surfaces especially, the

point at which the angle between the front thrust surface and the longitudinal axis is measured

would be critical."  *Id*.  But the claim language provides that the "front thrust surface" "extend[s]

***generally*** transverse to the longitudinal axis."  D.I. 42-2, Cls. 4, 6.  "The fact that the claim is not

defined using a precise numerical measurement does not render it incapable of providing

meaningful guidance to the jury because the claim language, when taken in context of the entire

patent, provides a sufficiently reasonable meaning to one skilled in the art of [excavating

equipment]."  *Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1349 (Fed. Cir. 2010); *see

also* Holland Decl. ¶ 37.  Further, Deere's argument that the "front thrust surface" depicted in the

figure below "does not fall within a plane perpendicular to the longitudinal axis" is without merit

because it disregards the claim language.  Deere's Answering Position at 39–40.  The claims disclose that the "front thrust surface" "***extend[s] generally*** transverse to the longitudinal axis," not that it falls with mathematical precision exactly within the "transverse" plane.  D.I. 42-2, Cls. 4, 6.  A POSITA would understand that the "front thrust surface," even with the curved embodiment shown, "extend[s] generally transverse" to the longitudinal axis.  Holland Decl. ¶ 37.

Finally, Deere's argument that "ESCO made statements during prosecution that prevents the 'front thrust surface' from being any angle less than 90 degrees" mischaracterizes the prosecution history.  Deere's Answering Position at 42.  In response to the examiner's rejection of certain claims as anticipated by U.S. Patent No. 3,444,633 ("Hensley"), the applicant explained Hensley did not disclose a "front thrust surface" because "[a] thrust face configured to absorb axial loads to the wear member requires a transverse face of the socket to abut the front face of the nose."  D.I. 42-11 at 28.  For the figure below, the applicant further clarified that because the "top and bottom lines 41 define the socket and extend forward of the nose of the adapter to converge at an acute angle[,] [t]he tip of the adapter nose is shown as truncated and stopping short of the forward extent of the socket."  *Id.*



*Fig. I*

Deere's Answering Position at 41 (annotations added).  A POSITA would understand that Hensley has a different design, a "wedge" design, than the one disclosed in the '175 Patent, which is

generally referred to as a "butt-fit" design.  Holland Decl. ¶¶ 40–41.  A POSITA would appreciate that the well-known "wedge" design disclosed in Hensley relies upon the top and bottom surfaces to resist axial forces, rather than a "front thrust surface" as the '175 Patent discloses.  *Id*. ¶¶ 38– 41.  Patentee's mention of "an acute angle" during prosecution was in reference to the top and bottom surfaces of the socket in Hensley, rather than the shape of the tip of the adapter, let alone the shape of any front surface.  *Id*. ¶¶ 40–41.   Thus, "[t]he patentee's statements during prosecution do not amount to a clear and unmistakable disclaimer restricting the meaning of '[generally transverse to the longitudinal axis]' only to [an angle of exactly 90 degrees]."  *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1367 (Fed. Cir. 2018).

(iv)    **Deere's Sur-reply Position**

**Dr. Stern's Experience Satisfies *Either* Parties' Definition of a POSITA.**  As an initial matter, the Court should reject ESCO's attempt to disqualify Deere's expert, Dr. Stern, from offering his opinions.  The parties agree that the level of skill for a POSITA is a mechanical engineer with three years of experience working with wear assemblies, but ESCO and its expert[8] wrongly assert that such experience can *only* relate to the "earthmoving industry" and not other, diverse backgrounds.  As Dr. Stern explains in his surreply declaration, a mechanical engineer working with brush cutters, drill heads, and cutting tools tackles similar problems and requires a similar skill set as those working with earthmoving equipment.  (Stern Surreply Decl. ¶¶ 6-13.)[9]

Moreover, professionals in each of these industries have the experience with "unique" skills (e.g., failure and competitive analyses, and designing replaceable wear parts), special design needs

---

[8] Mr. Holland was an ESCO employee for 17 years and is a named inventor on U.S. Patent No. 5,653,048 that relates to a wear assembly for the digging edge of an excavator assigned to ESCO.

[9] The Stern Surreply Declaration is attached hereto as Exhibit 4.

(e.g., heavy or high impact loading), and rare applications within harsh environments that ESCO and its expert allege are exclusive to wear assemblies for excavating equipment.  (*Id.*)  Dr. Stern, therefore, has the requisite background to opine from the perspective of a POSITA.

**"Generally Transverse to the Longitudinal Axis" is Unclear.**  Inconsistencies in ESCO's use of the term "transverse" throughout the '175 Patent and its prosecution history render claims 4 and 6 indefinite.  *See Berkheimer*, 881 F.3d at 1363-1364.  ESCO concedes that the specification fails to describe ***what it means*** for the front thrust surface **112** to be "generally transverse to the longitudinal axis" or ***how to differentiate between*** a front thrust surface that is generally transverse and one that is not.  *See, e.g.*, *Prolifiq Software Inc. v. Veeva Sys. Inc.*, No. C 13-03644, 2014 WL 3870016, *6 (N.D. Cal. Aug. 6, 2014) (intrinsic evidence must demonstrate what falls within the scope of the claim and what falls outside the scope of the claim); *Versata Software, Inc. v. Zoho Corp.*, 213 F. Supp. 3d 829, 836 (W.D. Tex. 2016) (same).  And although ESCO alleges that this phrase is clear from the claims, it is hornbook law that a POSITA does not read the claims in a vacuum but rather "in the context of the entire patent, including the specification."  *Phillips*, 415 F.3d at 1313-14.  Moreover, the principle that ***"claim terms are normally used consistently throughout the patent"*** is a strong one.  *Id.* at 1314 (emphasis added); *see also In re Varma*, 816 F.3d 1353, 1363 (Fed. Cir. 2016).

The two blue lines ESCO drew on Figure 7 (shown below) illustrate their inconsistent use of "transverse" with respect to the front thrust surface **152** as compared to its use with the "transverse" working section **112**.  Figure 7 provides an example of what a "transverse" working section **112** means by identifying where on wear member **104** the perpendicular plane lies in relation to longitudinal axis **128** (as shown below underneath the blue line on the right).  There,

working section **112** is a two-dimensional configuration falling along a demonstrable plane precisely perpendicular to longitudinal axis **128**:



FIG. 7

The front thrust surface, though, is not so clear.  ESCO's attorneys arbitrarily drew a blue line on the left with no guidance from the specification and then declared that front thrust surface **152** "extends generally transverse to the longitudinal axis."  In fact, the curved front thrust surface may be at other locations and—as three-dimensional—could fall within an ***infinite*** number of planes perpendicular to longitudinal axis **128,** illustrated by the red lines above.

Moreover, the specification and ESCO are silent as to where to draw the blue line, when numerous options exist (as shown by the yellow line or the red line on Figure 7 below). The possibilities are virtually endless with no objective boundaries leaving a POSITA simply to guess.



FIG. 7

Therefore, this phrase is unclear, and claims 4 and 6 are thus indefinite.

**E.    "a transverse inward projection" ('175 Patent, Claims 4, 15, and 19)**

      **(i)    ESCO's Opening Position**

| ESCO's Construction | Deere's Construction |
|---|---|
| Not indefinite. | Deere contends this term is indefinite under 35 U.S.C. § 112. |

This term uses straightforward language that can be understood by a lay jury and needs no construction.  To the extent the Court wishes to construe the term, it should construe it in accordance with its plain and ordinary meaning, *e.g.*, "an inward projection transverse to the longitudinal axis of the wear member."

Deere's contention that the term is indefinite is unsupported.  This claim term refers to side surfaces on "the front stabilizing end" that have "a transverse, inward projection."  *See, e.g.*, D.I. 42-2 at 2:20–24.  As with the term "generally transverse to the longitudinal axis" discussed above, the term "a transverse inward projection" is viewed in relation to the longitudinal axis of the wear member.  *See id.* at 6:22–25, FIG. 7.  The specification describes that "[f]ront stabilizing surfaces 202 on front end 140 of the nose 108 are preferably each provided with a transverse, inward recess in a transverse direction."  *Id.* at 10:1–6.  The specification also describes, with respect to one

embodiment, that "at the front end 140 of the nose 108 and the front end 150 of the socket 120" there are "[a]t least some of the surfaces having this curved configuration or construction may include a curved inward projection (e.g., so that the corners of that surface lie outward from the center of that surface with respect to a center of the front end 140 and 150 of the nose 108 and socket 120, respectively)."  *Id.* at 9:22–27.  Exemplary images in the specification also depict transverse, inward projections to the side surfaces on a front stabilizing end:



FIG. 4

*Id.* at FIG. 4 (highlighting added); *see also id.* at FIG. 8.  These descriptions and examples in the specification provide ample guidance showing the plain meaning of "a transverse inward projection," and render the term definite.  *See Nautilus*, 572 U.S. at 910; *see also Sonix*, 844 F.3d at 1379.

### (ii)    Deere's Answering Position

For similar reasons discussed in detail above with respect to the phrase "generally transverse to the longitudinal axis," the scope of "transverse, inward projection" is likewise not reasonably certain.  (*Id.* ¶ 42.)  As noted above, during prosecution (and again in ESCO's arguments above), ESCO defined "transverse" to be perpendicular to the longitudinal axis or configured within a plane perpendicular to the longitudinal axis.  (*Id.* ¶ 43.)  Yet, the term "transverse"—as used in the term "transverse, inward projection"—***does not*** mean perpendicular to the longitudinal axis because the inward projections do not intersect the longitudinal axis and

are not configured in a plane perpendicular to the longitudinal axis. (*Id*. ¶ 44.) This inconsistency within the '175 Patent and its prosecution history renders the scope of the term "transverse" uncertain and thus fails to inform a POSITA of the scope of the claim with reasonable certainty. (*Id*. ¶¶ 44-45.) Thus, the term "transverse, inward projection" is indefinite. (*Id*. ¶ 45.)

### (iii) ESCO's Reply Position

The term "a transverse, inward projection" of claims 4, 15 and 19 of the '175 Patent has a plain and ordinary meaning to a POSITA and needs no construction. ESCO's Op. Claim Construction Br. ("ESCO's Opening Position") at 53. Despite conceding that "a POSITA would understand the specification frequently to describe the first side surface and the second side surface of the front stabilizing end of wear member 104 as having 'transverse, inward projections,'" (Deere's Answering Position at 38), Deere argues that this term is indefinite due to an alleged "inconsistency within the '175 Patent and its prosecution history." *Id*. at 54-55. Deere argues that a POSITA would understand the patentee disclaimed, or expressly defined, "transverse" to exclude any angle less than 90 degrees. As explained above, Deere misinterprets the statements related to Hensley.

Deere also argues that a POSITA would be confused as to the meaning of "transverse" as used with "inward projection" because "inward projections do not intersect the longitudinal axis and are not configured in a plane perpendicular to the longitudinal axis." Deere's Answering Position at 54-55. There is no inconsistency with the use of "transverse" as used with the claimed "inward projections" of the "first side surface and the second side surface" and the specification's description of "transverse configuration" as "perpendicular to the longitudinal axis." D.I. 42-2 at 6:22–25. As described above, the '175 Patent uses the term "transverse" to explain that the "inward projections" enter inward along the "transverse" plane, which crosses or intersects the longitudinal axis of the wear member. Further, a POSITA would not be confused as to the meaning

of "transverse inward projection," especially because the '175 patent provides examples of embodiments with this claimed feature. *See, e.g.,* D.I. 42-2, FIGS. 2, 4, 5, 7C, 8; Holland Decl. ¶¶ 42–44.

        **(iv)**     **Deere's Sur-reply Position**

ESCO's explanation here suffers from the same flaws as the others. Nowhere in the specification does the patent explain how the inward projections are "transverse" when they do not cross the longitudinal axis, and the examples on which ESCO relies fail to delineate objective boundaries of the term, which is, therefore, unclear and thus renders claims 4, 15, and 19 indefinite.

    **F.**    **"substantially parallel to the longitudinal axis" ('662 Patent, Claims 8 and 21; '175 Patent, Claims 4, 6, 13, and 17)**

        **(i)**     **ESCO's Opening Position**

| ESCO's Construction | Deere's Construction |
|---|---|
| Not indefinite. | Deere contends this term is indefinite under 35 U.S.C. § 112. |

The term "substantially parallel to the longitudinal axis," when read in conjunction with the claim language and in light of the specification, is straightforward and requires no construction. To the extent the Court wishes to construe the term, it should construe the term in accordance with its plain and ordinary meaning, *e.g.*, "approximately parallel to the longitudinal axis." *See Manufacturing Resources Int'l, Inc. v. Civiq Smartscapes, LLC*, 2018 WL 4627661, at *6 (D. Del. Sept. 27, 2018) (construing "substantially parallel" as "approximately parallel").

The specifications of both the '662 and '175 Patents expressly provide guidance as to the meaning of the term, such that it is not indefinite. *See Personalized Media Communications, LLC v. International Trade Com'n*, 161 F.3d 696, 705–06 (Fed. Cir. 1998) (finding claim to a "digital detector" sufficiently definite because it was defined in the specification). The '175 Patent states that "[t]he term 'substantially parallel[]' … is intended to include parallel surfaces as well as those

that diverge rearwardly from axis 128 at a small angle (e.g., of about 1-7°) for manufacturing or other purposes." D.I. 42-2 at 9:54–61. Likewise, the '662 Patent explains that "[t]he term 'substantially parallel' is intended to include parallel surfaces as well as those that diverge rearwardly from axis 34 at a small angle (e.g., of about 1-7 degrees) for manufacturing purposes." D.I. 42-1 at 3:27–33. "[A] patentee need not define his invention with mathematical precision in order to comply with the definiteness requirement." *Oakley, Inc. v. Sunglass Hut Intern.*, 316 F.3d 1331, 1341 (Fed. Cir. 2003). Here, the intrinsic evidence provides "guidance to those skilled in the art as to the scope of" the term (*i.e.*, "parallel surfaces as well as those that diverge…at a small angle (e.g., of about 1-7°)" (D.I. 42-2 at 9:54–61; D.I. 42-1 at 3:27–33)). *Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010).

Deere cannot argue that the term "substantially parallel to the longitudinal axis" is indefinite simply because it contains a term of degree. *See Sonix*, 844 F.3d at 1377. Courts consistently find claims terms using the word "substantially" to be sufficiently definite. *See, e.g.*, *Tinnus Enterprises, LLC v. Telebrands Corp.*, 846 F.3d 1190, 1206 (Fed. Cir. 2017) (finding "it difficult to believe that a [POSA] who had read the specification and relevant prosecution history would be unable to determine with reasonable certainty when a water balloon is 'substantially filled.'"); *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 786 F.3d 983, 1003 (Fed. Cir. 2015), *rev'd on other grounds*, 137 S. Ct. 429 (2016) (affirming district court's finding that the term "substantially centered" is not indefinite). Here, Deere has no support for deviating from the well-established case precedent from this Court and others holding that use of a term of degree, such as "substantially," does not render a claim term indefinite. *See, e.g., Manufacturing Resources*, 2018 WL 4627661, at *6–7 (rejecting defendant's argument that the term "substantially parallel" is indefinite).

(ii)     **Deere's Answering Position**

A POSITA would not be able to discern with reasonable certainty the scope of the phrase "substantially parallel to the longitudinal axis" based on the respective claims and specifications of the '662 and '175 Patents.  (Stern Decl. ¶ 46.).  According to ESCO, "substantially parallel to the longitudinal axis" is not indefinite under § 112 because: (1) courts have found terms of degree, such as those containing "substantially," not indefinite; and (2) the specifications of the Asserted Patents "expressly provide guidance as to the meaning of the term."  ESCO is wrong, however, for multiple reasons.

Although terms of degree are not inherently indefinite, they may be indefinite depending on the circumstances in which the term is claimed and described.  *See Berkheimer*, 881 F.3d at 1364.  The key consideration is whether the intrinsic evidence defines objective boundaries from which to discern the proper scope.  *See id.* ("Our case law is clear that the objective boundaries requirement applies to terms of degree.").  Indeed, the Supreme Court's mandate from *Nautilus* requires the particular patent's specification and prosecution file to be taken into consideration when determining indefiniteness questions.  *See Nautilus*, 572 U.S. at 901.

Contrary to ESCO's contention that the specifications "expressly provide guidance," a careful read demonstrates that they provide ***no guidance at all***.  In both specifications, ESCO attempted to define the term "substantially parallel" but did so in a way that left the scope of the term virtually without limits.  (Stern Decl. ¶¶ 48, 50-51.)

With respect to the specification of the '662 Patent, it states "[t]he term 'substantially parallel' is intended to include parallel surfaces as well as those that diverge rearwardly from [longitudinal] axis 34 at a ***small*** angle ***(e.g., of about 1-7 degrees)*** for manufacturing purposes." (*Id*. ¶ 48 (citing D.I. 42-1, 3:27-30 (emphasis added)).)  And the specification of the '175 Patent states "[t]he term 'substantially parallel,' as used herein in this context, is intended to include

parallel surfaces as well as those that diverge rearwardly from [longitudinal] axis 128 at a ***small*** angle ***(e.g., of about 1-7°)*** for manufacturing or other purposes." (*Id.* (citing D.I. 42-2, 9:54-58 (emphasis added)).)  No other guidance, express or otherwise, is provided for the meaning of this claim term in the specification or prosecution history.  (*Id.* ¶ 49.)

Accordingly, all a POSITA has to go on is these definitions from the specifications.

But they do more harm than good, further muddying already murky waters. A POSITA would find the scope of the term even less certain in view of ESCO's attempt to expressly define "substantially parallel" with equally relative terms, such as diverging from parallel by a "***small*** angle," which is a relative term, which could be "(e.g., of ***about*** 1-7 degrees)," which is another relative term.  (*Id.* ¶¶ 50-51.)

Perhaps more significant is that ESCO provided only an ***example*** of what a small angle could be, rather than defining or approximating what a small angle actually is.  (*Id.* ¶ 51.)  That is, to a POSITA, the use of "e.g." instead of "i.e." means that "about 1-7 degrees" is just an example of what a small angle could be but fails to define it in any concrete sense.  (*Id.*)  For example, in *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364 (Fed. Cir. 2014), the Federal Circuit agreed that a disputed term was indefinite in part because the specification attempted to define it with "e.g." instead of "i.e."  *Id.* at 1374.  "Had the phrase been cast as a definition instead of as an example—if the phrase had been preceded by 'i.e.,' instead of 'e.g.'—then it would help provide the clarity that the specification lacks."  *Id.* at 1373.

The same is true here.  To a POSITA, using "e.g." merely provides an example of what the "small angle" ***could be***—and correspondingly what "substantially parallel" means—but it provides no actual limitation or objective guidepost.  (Stern Decl. ¶ 51.)  Put differently, using "e.g." instead

59

of "i.e." leaves the scope of the term "substantially parallel to the longitudinal axis" entirely subject to guesswork and thus indefinite.  (*See id.*)

In short, the disclosure of Asserted Patents provides no reasonably certain limitations or bounds to the scope of "substantially parallel to the longitudinal axis," and, as such, the phrase is indefinite.

### (iii)    ESCO's Reply Position

Deere contends that the specifications "provide no guidance at all" as to the meaning of the term "substantially parallel to the longitudinal axis," while at the same time acknowledging that both specifications explain that the term "is intended to include parallel surfaces as well as those that diverge rearwardly from axis 128 at a small angle (e.g., of about 1-7°) for manufacturing [] purposes." Deere's Answering Position at 56–57 (citing D.I. 42-1 at 3:27–30; D.I. 42-2 at 9:54–58).  Despite this express guidance in the intrinsic evidence, Deere alleges that a POSITA "would find the scope of the term even less certain" because the specifications use "relative terms" (*i.e.*, "small" and "about") and fail to "provide [an] actual limitation or objective guidepost."  *Id.* at 59–60.  Again, "mathematical precision" is not required.  *Oakley, Inc. v. Sunglass Hut Intern.*, 316 F.3d 1331, 1341 (Fed. Cir. 2003).  Further, a POSITA would understand that the use of the term "substantially" is meant to account for variations introduced through the manufacturing process, which is called out by the specifications expressly.  Holland Decl. ¶¶ 45–46; *see also* D.I. 42-1 at 3:27–30 ("for manufacturing purposes"); D.I. 42-2 at 9:54–58 ("for manufacturing or other purposes").  The casting and forging manufacturing practices typically used for wear assembly parts simply cannot account for the absolute numerical precision Deere calls for here and a POSITA would understand as such.  Holland Decl. ¶ 46.

### (iv)    Deere's Sur-reply Position

Though ESCO need not define this phrase with absolute numerical precision, ESCO has failed to provide any ***objective boundaries***.  *Berkheimer*, 881 F.3d at 1364.  ESCO provides no objective guidance for the outer limit of a "small angle," allowing ESCO to allege infringement against products with angles of 7, 15, or 20 degrees—or ***more***.  (Stern Decl. ¶ 51.)  Thus, ESCO fails to inform ***"not only what falls inside the scope of the claim term, but also what falls outside of it."*** *Prolifiq Software*, 2014 WL 3870016 at *6 (emphasis added); s*ee also Interval Licensing*, 766 F.3d at 1373 ("[W]e decline to cull out a single 'e.g.' phrase from a lengthy written description to serve as the exclusive definition of a facially subjective claim term.").

The cases ESCO cites do not support its position. *Personalized Media*, 161 F.3d at 706, and *Power-One*, 599 F.3d at 1348, did not involve terms of degree.  In *Oakley*, the "specification presents examples of numerical values of the differential effect that either qualify as vivid or do not." 316 F.3d at 1341.  In *Sonix*, "an accused infringer could compare the examples and criteria from the written description . . . to determine whether an indicator is visually negligible." 844 F.3d at 1379.  In *Tinnus*, the claims provided "specific parameters" defining the term "substantially filled."  846 F.3d at 1206.  And in *Apple*, "substantially centered" was described with reference to a "predefined amount of padding along the sides of the display."  786 F.3d at 1003.

For *Manufacturing Resources Int'l*, ESCO sets aside its aversion to extrinsic evidence, ironically asking the Court to adopt a construction of "substantially parallel" from a ***different patent*** in a ***different case***, without regard to any facts, right after it had asked the Court to ignore ESCO's ***own*** statements of ***disavowal*** about its ***own inventions*** from a different patent's file history.

Mr. Holland's declaration fails to cure ESCO's problem.  Even assuming everything Mr. Holland says in paragraphs 45 and 46 of his declaration to be true, nothing in the Asserted Patents informs a POSITA what is within the scope of the term "substantially parallel" and what is not.

(Stern Decl. ¶¶ 46-52.)[10]   Mr. Holland's conclusion that a POSITA would understand the stabilizing features to be "close to parallel" still begs the question: How close?  ESCO points to nothing from which a POSITA could answer this question with reasonable certainty, and, thus, this phrase is unclear, making claims 8 and 21 indefinite.

### G.   "substantially along an entire length of the socket" ('175 Patent, Claim 6)

#### (i)   ESCO's Opening Position

| ESCO's Construction | Deere's Construction |
| --- | --- |
| Not indefinite. | Deere contends this term is indefinite under 35 U.S.C. § 112. |

The term "substantially along an entire length of a socket," when read in conjunction with the claims and in light of the specification, is straightforward and requires no construction.  To the extent the Court wishes to construe the term, it should construe the term in accordance with its plain and ordinary meaning, *e.g.*, "largely along the entire length of the socket."

Contrary to Deere's contention, this term is not indefinite.  The specification provides numerous examples and detailed guidance to inform one of skill in the art as to the scope of the invention with reasonable certainty.  *Nautilus*, 572 U.S. at 910.  As one example, as shown in Figure 8 below, the "inward projections" (192) extend from the "thrust face" (152) to the "rear end" (136) of the "wear member."  *See, e.g.*, D.I. 42-2 at 7:39–42, 8:49–51, 9:20–22.

---

[10] The Court should not accept as true everything Mr. Holland states.  His conclusory assertions about a POSITA's understanding of "substantially parallel to the longitudinal axis" is based entirely on three words in the '662 Patent ("for manufacturing purposes") and five words in the '175 Patent ("for manufacturing or other purposes") without any factual analysis for his conclusions.



*Id*. at FIG. 2 (highlighting added).   Further, the specification describes that "[t]he use of such corresponding recesses and projections at the front end also enhances installation of the wear members on the bases in the same way as discussed above for the troughs and projections rearward of the front ends."  *Id*. at 10:13–17.

As discussed above with respect to the term "substantially parallel to the longitudinal axis," Deere cannot argue that the term "substantially along an entire length of the socket" is indefinite simply because it uses a term of degree, such as the word "substantially."  *See, e.g.*, *Manufacturing Resources*, 2018 WL 4627661, at *6.

### (ii)   Deere's Answering Position

Similarly, a POSITA would not understand with reasonable certainty the scope of the phrase "substantially along the entire length of the socket."  (*Id*. ¶ 53.)  This phrase is recited in claim 6 of the '175 Patent, which states the "inward projections" extend from the "front thrust surface . . . *into* the rear end of the socket and ***substantially along an entire length of the socket***[.]"  (*Id*. ¶ 54 (citing D.I. 42-2, 16:1-3 (emphasis added)).)   Notably, the claim recites that the projections extend "***into***" the rear end, and not, "***to*** the rear end."  (*Id*.)  Accordingly, a POSITA would understand that the rear end **136** is an area of the socket and not the rear edge of the socket.  (*Id*.)

For this phrase, ESCO again rests its argument on two premises, that (1) terms of degree are not foreclosed by the definiteness requirement, and (2) the specification, according to ESCO, "provides numerous examples and detailed guidance" to define the scope of this limitation with reasonable certainty. The first premise was dispatched above. Although terms of degree are not **inherently** indefinite, they may, of course, be found indefinite where warranted depending on the specification and prosecution history. *See e.g. Berkheimer*, 881 F.3d at 1364 ("We do not hold that all terms of degree are indefinite. We only hold that the term 'minimal redundancy' is indefinite in light of the evidence of this case."); *Interval Licensing*, 766 F.3d at 1371 (holding "unobtrusive manner" indefinite for lacking objective boundaries).

ESCO's second premise is also unavailing. Despite promising **numerous** examples and **detailed** guidance regarding the scope of this phrase, ESCO can muster only a handful of inapt references to the specification. For example, ESCO states "as shown in Figure 8 below, the 'inward projections' (192) extend from the 'thrust face' (152) to the 'rear end' (136) of the 'wear member.'" Even had ESCO reproduced Figure 8 with its argument (which it did not), Figure 8 fails to demonstrate with reasonable certainty that the inward projection extends substantially along the **entire length** of the socket. Figure 8 (which is actually reproduced below) is not sufficient to fully demonstrate the length of the inward projections:



**FIG. 8**

Moreover, Figure 2, which ESCO did reproduce (highlighted and annotated as shown below) with it argument, shows the base within the wear member and not the socket of the wear member itself:



**FIG. 2**

Other passages on which ESCO relies similarly miss the target:

**Col. 7, ll. 39-42**, which states, "[i]f desired, in at least some example structures in accordance with this invention, the tapering of sidewalls **130**, **132** continues from front end **134** to rear end **136** of wear member **104**," is a reference to the "working section" **112** of the "wear member" **104** and not the mounting section **114** of the wear member **104** which contains the internal socket **120**.

**Col. 8, ll. 49-51**, which states, "Likewise, socket walls **182-188** are preferably convex and curved across substantially their entire widths to define projections **192** received into troughs **172**," is a reference to the curvature of the inward projections across their widths and not the extent of their lengths.

**Col. 9, ll. 20-22**, which is a portion of a sentence from the specification, states "curved configuration or construction (e.g., continuously curved from one corner to the next at or near the thrust faces **142** and **152**), and the corners also may be rounded," fails to address in any respect the inward projections and the lengths to which they extend.

And, finally **Col. 10, ll. 13-17**, which states, "[t]he use of such corresponding recesses and projections at the front end also enhances installation of the ear members on the bases in the same way as discussed above for the troughs and projections rearward at the front ends," also fails to address the lengths to which the inward projections extend.

In short, nothing in the specification elaborates on the meaning of "substantially along the entire length of the socket." That ESCO itself cannot cite a single applicable passage from the specification demonstrates that a POSITA similarly would be unable to discern the scope of this phrase with reasonable certainty. (Stern Decl. ¶¶ 55-57.) The only relevant portions of the specification, e.g., col. 2, ll. 31-36, and col. 12, ll. 18-21, merely parrot the language of the claim without providing further guidance. (*Id*. ¶ 55.) Moreover, the specification fails to provide any

test or measurement to aid in determining whether an inward projection meets this limitation, leaving a determination of infringement entirely an exercise in guesswork.  (*Id.*)

In sum, the '175 Patent and its prosecution history fail to inform a POSITA of the scope of "substantially along the entire length of the socket" with reasonable certainty, and the phrase is therefore indefinite.  (*Id.* ¶ 57.)

### (iii)   ESCO Rely

This term is not indefinite because "the intrinsic record provide[s] guidance as to the scope of the claims, including, *inter alia*, examples" of inward projections that extend substantially along an entire length of the socket.  *See Sonix Tech. Co., Ltd. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017) (citing *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1334–35 (Fed. Cir. 2010)).  As shown in ESCO's opening brief, FIG. 2 in the '175 patent specification shows an inward projection extending substantially along an entire length of the socket.[11]  ESCO's Opening Position at 63.  This is so because "[s]ocket 120 has a main portion 180 rearward of front end 150 to receive body 160" and that the walls of the socket and body "***generally conform***" with one another.  D.I. 42-2 at 8:31–34.  Therefore, as depicted in the highlighted portion of FIG. 2 in the opening brief, because the body of the nose has an inward projection extending from the front thrust surface to the rear end of the socket, the "generally conform[ing]" inward projections on the socket likewise extend from the front thrust surface to the rear end of the socket, *i.e.*, "substantially along an entire length of the socket."  *See id.* at FIG. 4.

FIG. 8 provides an example of an inward projection that extends "substantially along an entire length of the socket."  In that figure, which has a view looking "into" the socket 120 of wear member 104, an inward projection extends from the front thrust surface to the end of the socket.

---

[11]   In its opening brief, ESCO erroneously referred to Figure 2 as Figure 8.



FIG. 8

*Id.* at FIG. 8.  Indeed, the inward projection in the socket begins at thrust face 152, *i.e.*, the front stabilizing surface 212c.  *See id.* at 9:42–46.  The inward projection then extends along the side wall through rear stabilizing surface 210c up to rear end 136.  *See id.* at 10:31–34.  Contrary to Deere's contentions, FIG. 8 provides a clear example of an inward projection that extends "substantially along an entire length of the socket"—in this example, it extends the entire length. Based on the plain language of the claim term and examples in the specification, a POSITA would understand with reasonable certainty whether inward projections of an embodiment fall within the claimed scope.  Holland Decl. ¶¶ 48–50.

The Federal Circuit has held that similar terms of degree are definite and permissible.  In *Enzo*, the court found the term "not interfering substantially" definite even though construction of the term would "define[] the term without reference to a precise numerical measurement."  599 F.3d at 1335.  This was so because the specification provided "a general guideline and examples" to guide a POSITA.  *Id.*  So too here.  *See, e.g., Sonix*, 844 F.3d at 1379 (finding term of degree "visually negligible" definite when specification provided "a general exemplary design" and "two specific examples").

       **(iv)**     **Deere's Sur-reply Position**

ESCO concedes that none of its cited specification passages provides any guidance as to the scope of this phrase.  Rather, ESCO now appears to rely solely on patent figures.  In so doing, ESCO admits that Figure 8 shows inward projections that extend the entire length of the socket. ESCO also appears to concede that the same is true of Figure 2, inasmuch as it shows no indication of any length of the socket without the projections. As such, neither figure provides any guidance regarding when this limitation is *not* met.  (Stern Decl. ¶¶ 53-57.)

And Mr. Holland again fails to help ESCO.  He asserts a POSITA would understand "substantially" to "allow for minor interruptions in a wear member feature," but his conclusion is unsupported by any disclosure from the '175 Patent and merely serves to substitute one subjective term ("substantially") with another ("minor interruption").  Even if "substantially" allows for "minor interruptions," neither the '175 Patent nor ESCO provides any objective boundary or test regarding such a "minor interruption."  As such, claims 4, 6, 13, and 17 are indefinite.

### H.    "to resist both vertical and horizontal loads" ('662 Patent, Claims 8 and 21)

### (i)    ESCO's Opening Position

| ESCO's Construction | Deere's Construction |
|---|---|
| Not indefinite. | Deere contends this term is indefinite under 35 U.S.C. § 112. |

The term "to resist both vertical and horizontal loads" uses straightforward language that needs no construction.  To the extent the Court wishes to construe the term, it should in accordance with its plain and ordinary meaning, *e.g.*, "capable of resisting horizontal and vertical loads."

Contrary to Deere's contention, this term is not indefinite because the intrinsic evidence informs a person of ordinary skill in the art with reasonable certainty about the scope of this claim term.  The specification explains that "[i]t is advantageous for the same surfaces resisting vertical loading to also resist side loading because loads are commonly applied to points in shifting

directions as the bucket or other excavating equipment is forced through the ground." D.I. 42-1 at

5:36–40. The specification further states that "[t]he angled orientation of stabilizing surfaces 44-

47 [(depicted in Figure 2 below)] enable these side stabilizing surfaces to bear against stabilizing

surfaces 114-117 in socket 70 to resist side and vertical loading." *Id*. at 7:49–52.



*Id*. at FIG. 2 (highlighting added). Additionally, the specification describes that "[w]hen loads

having vertical components (herein called vertical loads) are applied along the digging edge 66 of

point 12, the point is urged to roll forward off the nose." *Id*. at 4:62–64. The specification also

describes "[t]his transverse inclination enables stabilizing surfaces 40-43 to engage stabilizing

surfaces 110-113 in socket 70 and resist loads with side or lateral components (herein called side

loads), such as load L2 (FIG. 1)." *Id*. at 5:33–36. As illustrated in Figure 1 below, "downward

load L1" is an example of a "vertical load" and "load L2" is an example of a "horizontal load."

*Id*. at 4:62–5:2, 5: 33–36.



*Id.* at FIG. 1 (highlighting added).  As a result, one of ordinary skill in the art would understand that this term means that the surfaces to which it is applied are capable of resisting loads in the horizontal and vertical direction in relation to the longitudinal axis.

Deere may attempt to argue that this term is "per se indefinite merely because [it] contain[s] functional language," but that is not a basis for indefiniteness.  *Cox Comms., Inc. v. Sprint Comm. Co. LP*, 838 F.3d 1224, 1232 (Fed. Cir. 2016).  As is the case here, "functional language can promote definiteness because it helps bound the scope of the claims by specifying the operations that the claimed invention must undertake."  *Nevro Corp. v. Boston Scientific Corp.*, 955 F.3d 35, 39 (Fed. Cir. 2020) (internal citations and quotations omitted).  As described above, the specification describes a configuration (*e.g.*, angled orientation of stabilizing surfaces) that teaches how to achieve resistance of both horizontal and vertical loads.  Thus, "the patent[] provide[s] reasonable certainty about the claimed inventions' scope by giving detailed guidance and examples of systems and devices that" resist both horizontal and vertical loads.  *See id*.

### (ii)    Deere's Answering Position

ESCO is wrong.  Both claims 8 and 21 are indeed invalid because one cannot determine whether a product sufficiently "resist[s] both vertical and horizontal loads during excavating."

The vague phrase appears in both independent claims 8 and 21 of the '662 Patent.  They each recite:

> a wear member [the tooth, shown in blue, above] [with] a rearward-opening socket for receiving the base [shown in green, above] … the socket … including … a rear end with … side walls … each including a pair of side stabilizing surfaces … [to] bear against complementary surfaces [on] the base ***to resist both vertical and horizontal loads during excavating***.

As explained by Deere's expert, the scope of the claims is not reasonably certain because the '662 Patent and its prosecution history fails to inform a POSITA about what it means to "resist"

loads and what test may be used to determine whether such loads are, in fact, ***resisted***.  (Stern Decl. ¶¶ 58-61.)

Even before *Nautilus* changed the standard of indefiniteness, Courts have held that claim limitations that require a determination of whether a product performs a function (or a purely subjective opinion to determine infringement) are more likely to be indefinite.  *See, e.g.*, *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1250 (Fed. Cir. 2008) (applying the more restrictive "insolably ambiguous" standard abrogated by *Nautilus* and finding functional claim limitation "fragile gel" indefinite because it was ambiguous as to requisite degree of fragileness, gel strength, or combination of two); *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005) ("The scope of claim language cannot depend solely on the unrestrained, subjective opinion of a particular individual purportedly practicing the invention.") (applying the more restrictive "insolably ambiguous" standard abrogated by *Nautilus*).  Here, whether a product sufficiently "resist[s] both vertical and horizontal loads during excavating" is left to one's purely subjective opinion, and the claims are therefore invalid.

In response, ESCO merely asserts, "this term means that the surfaces to which it is applied are ***capable*** of resisting loads in the horizontal and vertical direction in relation to the longitudinal axis."  (Emphasis added.)  Not only does ESCO rely entirely on attorney argument, but ESCO simply replaces "to resist" with "capable of resisting," which fails to address the relevant issue.

In other words, ESCO fails to argue (let alone demonstrate) how a POSITA would be able to determine when the "side stabilizing surfaces" in the socket and the "complementary surfaces" in the base sufficiently "resist both vertical and horizontal loads."  *See, e.g.*, *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1363-64 (Fed. Cir. 2018) (finding the term "minimal redundancy" indefinite because it was not clear from the claim language, the specification, or extrinsic evidence what

level of redundancy was acceptable); *Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, 902 F.3d 1372, 1381 (Fed. Cir. 2018) (noting "a term of degree that is 'purely subjective' and depends 'on the unpredictable vagaries of any one person's opinion' is indefinite" and finding a term requiring "optimiz[ing] . . . QoS" to be a purely subjective term of degree relating to the end user experience) (quoting *Datamize*, 417 F.3d at 1350-51); *Advanced Aerospace Tech.*, 124 Fed. Cl. at 292 (finding "near the point of engagement" indefinite because there was no reasonably certain standard for measuring when the centers were "near" the point of engagement); *Interval Licensing*, 766 F.3d at 1371-73 (finding "unobtrusive manner" highly subjective and indefinite).

Nothing in the specification provides any assistance in determining objective boundaries of the claim language.  (Stern Decl. ¶ 60.)  Instead, the written description merely touts how the purported invention "provide[s] enhanced stability in resisting vertical and side loads" (D.I. 42-1, 2:3-4) and parrots the vague language recited in the claims.  The specification simply provides no information how one determines the boundaries of sufficiently "resisting" that would infringe the limitation.  Again, the test for indefiniteness is whether an accused infringer can determine what infringes with reasonable certainty, and even ESCO does not argue how one can determine—with reasonable certainty—what infringes.  *See Nautilus*, 572 U.S. at 901.  Consequently, claims 8 and 21 of the '662 Patent are indefinite as a matter of law.  (Stern Decl. ¶ 61.)

### (iii)    ESCO's Reply Position

Deere argues that this term is indefinite because "the '662 Patent and its prosecution history fails (sic) to inform a POSITA about what it means to 'resist' loads and what test may be used to determine whether such loads are, in fact, resisted."  Deere's Answering Position at 71–72.  Deere is incorrect.

The claim language provides reasonable certainty to a POSITA as to the structure "to resist both vertical and horizontal loads," identifying the side stabilizing surfaces as resisting those loads and providing structural detail:

> … the side walls each ***including a pair of side stabilizing surfaces*** inclined relative to each other in different transverse directions so as to laterally converge inward toward a central location along the respective side wall and positioned to bear against complementary surfaces in respective side recesses in the base ***to resist both vertical and horizontal loads*** during excavating … (D.I. 42-1, Claim 8).

The '662 Patent specification also provides several embodiments with stabilizing surfaces to resist both vertical and horizontal loads, *see, e.g.,* D.I. 42-1 at 7:49–58.  For example, the specification explains that, in one embodiment, the side stabilizing surfaces should have an "angled orientation" similar to that depicted in FIG. 2, and that such a configuration will "resist side and vertical loading."  *See id.* at 7:49–52.  The specification also provides additional clarity as to possible "angled orientation[s]" of the stabilizing surfaces, explaining they "are preferably set at an angle [] between about 90° and 180°, and most preferably at about 120 degrees."  D.I. 42-1 at 7:16–22. A POSITA would understand that, when a wear member is subjected to vertical and horizontal loads, the stabilizing surfaces depicted in FIG. 2 and the variations described in the specification would be capable of resisting those loads.  Holland Decl. ¶ 52–54; *see also* D.I. 42-1 at 5:5–25.

Moreover, the specification goes into greater detail to explain how the side stabilizing surfaces can be oriented to resist various magnitudes of vertical and horizontal loading.  If the wear member experiences increased horizontal loads, the specification teaches that the "angled orientation" of "[s]ide stabilizing surfaces 44-47, 114-117 [could be] oriented closer to vertical than horizontal to primarily resist side loading and secondarily resist vertical loading."  *Id*. at 7:55–57.  A POSITA would understand that the described shape would achieve that goal.  Holland Decl. ¶ 53.  In yet another embodiment, the specification describes that "in heavy loading conditions[]

all the stabilizing surfaces 40-47, 110-117 may be more horizontal than vertical." D.I. 42-1 at 7:58–60.

The Federal Circuit has repeatedly held functional claim terms are definite "where the patent '***provides a general guideline and examples*** sufficient to enable a person of ordinary skill in the art to determine the scope of the claims.'" *Nevro Corp v. Boston Scientific Corp.*, 955 F.3d 35, 39 (Fed. Cir. 2020) (quoting *Enzo*, 599 F.3d at 1335). Other courts have found similar terms definite for the same reason. *See, e.g.*, *Perfectvision Mfg., Inc. v. PPC Broadband, Inc.*, 2014 WL 4285786, at *20 (E.D. Ark. Aug. 29, 2014) (finding "resist degradation and rust" definite).

Deere's expert's conclusory observation that the intrinsic record fails "to inform a POSITA about what it means to 'resist' loads" is unsupported and contradicted by the specification. Deere's cited cases have no relevance. For example, *Datamize, LLC v. Plumtree Software, Inc.* involved the term "aesthetically pleasing," which the court found to be a "purely subjective" term that "depend[ed] solely on the unrestrained, subjective opinion of a particular individual." 417 F.3d 1342, 1350 (Fed. Cir. 2005). The term "to resist both vertical and horizontal loading" is not purely subjective and is supported by the intrinsic record, which provides specific guidance as to the term's claim scope to a POSITA. *See* D.I. 42-1 at 7:16–22, 7:49–52, 7:55–57.

### (iv)   Deere's Sur-reply Position

ESCO again misses the point. As with the other unclear claim limitations discussed above, the issue is ***not*** whether the written description provides examples of a recited limitation. That is because the basis for invalidity here is ***indefiniteness*** under pre-AIA § 112, second paragraph— not lack of written description support under pre-AIA § 112, first paragraph.

In other words, as is clear even from the case law ESCO cites, examples can save ESCO only if those examples provide ***sufficient guidance*** to determine the scope of the claims with ***reasonable certainty***. *Nautilus*, 572 U.S. at 901; *see also Nevro Corp.*, 955 F.3d at 39 ("[T]he

ambiguity inherent in functional terms may be resolved where the patent 'provides a general guideline and examples ***sufficient*** to enable a person of ordinary skill in the art ***to determine the scope*** of the claims.'").  Stated differently, examples provide the requisite "reasonable certainty" only if they provide sufficiently definite boundaries for infringement.  *Interval Licensing*, 766 F.3d at 1373; *see also Versata Software*, 213 F. Supp. 3d at 836 (finding claim indefinite because specification's examples were "insufficient to show with reasonable certainty the scope of the claims because they provide no information as to what falls outside the boundaries of the claims").

Yet neither ESCO nor its expert attempts to articulate any such boundaries.  How, exactly, can a competitor determine if its product sufficiently "resist[s] both vertical and horizontal loads during excavating"?  ***ESCO is conspicuously silent***.  Because the specification fails to provide enough information to determine objective boundaries of the claim language with reasonable certainty, claims 8 and 21 of the '662 Patent are invalid.  *Nautilus*, 572 U.S. at 901.

Dated: February 11, 2022

/s/ *Nathan R. Hoeschen*                                                                                                                  

/s/ *Charles E. Davis*

Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
nhoeschen@shawkeller.com

James D. Taylor, Jr. (#4009)
Charles E. Davis (#6402)
SAUL EWING ARNSTEIN & LEHR LLP
1201 N. Market Street, Suite 2300
Wilmington, Delaware 19801
(302) 421-6800
james.taylor@saul.com
chad.davis@saul.com

OF COUNSEL:

Brian D. Sieve, P.C.
Paul D. Collier
Jeremy D. Roux
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

OF COUNSEL:

John F. Bennett (admitted pro hac vice)
Paul M. Ulrich (admitted pro hac vice)
Paul J. Linden (admitted pro hac vice)
ULMER & BERNE LLP
600 Vine Street, Suite 2800
Cincinnati, Ohio 45202-2409
(513) 698-5000

*Counsel for Plaintiff ESCO Group LLC*             *Counsel for Defendant Deere & Company*