# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **ESCO GROUP LLC,** | |
| Plaintiff, | C.A. No. 1:20-CV-01679-RGA-JLH |
| v. | |
| **DEERE & COMPANY,** | |
| Defendant. | |

**DECLARATION OF ELLIOT L. STERN, PH.D., IN SUPPORT OF**
**DEFENDANT'S ANSWERING CLAIM CONSTRUCTION BRIEF**

I, Elliot L. Stern, declare as follows:

1.      I submit this declaration in connection with Defendant Deere & Company's ("Deere") answering claim construction brief in the case above. In particular, I submit this declaration to offer an expert opinion regarding the understanding of a person of ordinary skill in the art ("POSITA") of certain claim terms in United States Patent Nos. 10,273,662 ("the '662 Patent") and 8,844,175 ("the '175 Patent") (collectively, the "Asserted Patents").

2.      I have been asked to provide an opinion regarding certain terms in the Asserted Patents that Deere alleges are indefinite. In particular, I have been asked to provide opinions regarding whether a POSITA at the time of the alleged inventions would be able to ascertain the scope of certain terms with reasonable certainty in view of the relevant patent claims, specifications, and prosecution histories.

3.      I am being compensated at my normal consulting rate of $400/hour for my work in this case. My compensation does not depend on the Court's construction of any terms of the Asserted Patents or the outcome of this litigation.

4.      As explained below, it is my opinion that a POSITA would find the following terms

1

indefinite: "generally transverse to the longitudinal axis," "a transverse inward projection," "a pair of side stabilizing surfaces inclined relative to each other in different transverse directions so as to laterally converge inward toward a central location along the respective sidewall," "substantially parallel to the longitudinal axis," "substantially along an entire length of socket," and "to resist both vertical and horizontal loads."

5.      If requested or called, I am prepared to testify regarding the opinions I express in this declaration.

## I.      QUALIFICATIONS

6.      In my opinion, I possess the knowledge, skills, experience, training, and education to qualify as an expert in this matter, form an expert opinion regarding the questions presented in this declaration, and offer opinions and testify as an expert before the Court.

7.      I have a Bachelor of Science in Mechanical Engineering from Purdue University in 1983.  I have both a Master of Science and Doctor of Philosophy in Mechanical Engineering from University of Florida in 1985 and 1989, respectively, where my research dealt with the design, development, and performance monitoring of machine tools and robotic systems.

8.      Since 2004, I have been the president of Florida Forensic Engineering, Inc., where I assist industry and the litigation community with analyzing and understanding complex technical problems. My particular focus in this role is determining the cause of accidents and product failures, and conducting patent analysis.

9.      Since 1989, I have been an independent consultant specializing in failure analysis, technical solutions, and training in product design, machining, manufacturing processes and controls, and similar testing and analysis. In this role, I have focused on medical devices, automotive and aerospace products, consumer products, and machine tools.

2

10.     In addition to the roles above, I was the president of Design & Manufacturing Solutions, Inc., where I had worked and performed research over the past 25 years in several areas, including design, analysis, fabrication, testing, manufacturing, and regulatory compliance of engines, dynamically tuned tooling for machining, and providing solutions to industry.

11.     I have been involved in researching and developing mechanical systems and designing and developing machine tools and related instrumentation, including applying associated information and computing technologies such as developing hardware, software, and algorithms for instrumentation, signal processing, data analytics, artificial intelligence, machine learning, and data interpretation.  I am familiar with their practical aspects and applications.

12.     Additional details of my education and employment history, as well as a list of my publications and past expert engagements, may be found in my curriculum vitae, which is submitted with this declaration as Exhibit 1.

13.     In sum, I am a mechanical engineer with over 35 years of experience with machine tools and other devices. Accordingly, it is my opinion that I am qualified to offer opinions as to the understanding of the alleged inventions, state of the art of the alleged inventions, and claim terms used in the Asserted Patents from the perspective of a POSITA.

## II.     MATERIALS REVIEWED

14.     In formulating my opinions, I reviewed the following list of materials:

| United States Patent No. 8,844,175 and its patent file history |
| United States Patent No. 10,273,662 and its patent file history |
| Plaintiff ESCO Group, LLC'S Opening Claim Construction Brief |

### III.    LEGAL PRINCIPLES

15.    I am not a lawyer, but my opinion necessarily involves understanding and following certain legal principles. In forming my opinions and preparing this declaration, I have been informed of and asked to apply certain relevant legal principles in addition to general patent law principles I have retained from my work on prior patent cases.

16.    I understand that generally patents are to be understood from the perspective of a POSITA at the time of the claimed invention. I understand that claim terms of a patent are to be given their plain and ordinary meaning, which is generally derived from the description of the claimed invention in the patent and its prosecution history, as well as other evidence if it is of record, including evidence of the knowledge of a POSITA.

17.    I understand that the appropriate level of skill of a POSITA is determined from the following considerations: (a) the types of problems encountered by those working in the field and prior art solutions to those problems; (b) the sophistication of the technology in question and the rapidity with which innovations occur in the field; (c) the educational level of active workers in the field; and (d) the educational level of the inventor.

18.    I have been informed that, under 35 U.S.C. § 112, a claim term is considered indefinite if, when read in light of the specification and prosecution history, a claim term fails to inform those skilled in the art of the scope and meaning of the claim with reasonable certainty.

19.    I have also been informed that certain factual considerations may be taken into account when determining whether a claim term is indefinite, including the perspective and knowledge of a POSITA at the time the patent application was filed.

20.    Other legal principles of which I have been informed and have applied when forming my opinions and preparing this declaration are noted below where appropriate.

## IV.    DISCUSSION OF OPINIONS

21.    For the Asserted Patents, the relevant technology field relates to wear assemblies and, in particular, wear assemblies for securing wear members to excavating equipment. In my opinion, a POSITA at the time of the alleged invention of the Asserted Patents would have at least a Bachelor's degree in Mechanical Engineering, or related discipline, and would have at least three years of experience working with wear assemblies for excavating equipment or similar brush cutters, drilling heads, and cutting tools.  This opinion is based on my assessment of the technology and alleged inventions described in the Asserted Patents in view of the considerations stated above. I understand that the factual record regarding those considerations has not been fully developed and I reserve the right to revise my opinion on the appropriate level of skill should additional factual circumstances relevant to those considerations arise during discovery.

22.    I have personal knowledge of and experience with the degree of knowledge and expertise of individuals with the level of skill described above from working with people of that level skill and from my own work in this and related fields of technology.

23.    I have been asked to assume February 17, 2006 as the date of invention for purposes of forming my opinions and preparing this declaration as that date corresponds to the earliest arguable priority date for the invention claimed in the '662 Patent, by virtue of the filing of U.S. Provisional Application No. 60/774,401. I express no opinion regarding whether this date is the appropriate date of invention or whether the application that issued as the '662 Patent is entitled to claim priority to the provisional application No. 60/774,401. If warranted, I may form an opinion regarding the appropriateness of this date at a later time.

24.    I have been asked to use October 30, 2009 as the date of invention for purposes of forming my opinions and preparing this declaration as that date corresponds to the earliest arguable

5

priority date for the invention claimed in the '175 Patent, by virtue of the filing of U.S. Provisional Application No. 61/256,561. I express no opinion regarding whether this date is the appropriate date of invention or whether the application that issued as the '175 Patent is entitled to claim priority to the provisional application No. 61/256,561. If warranted, I may form an opinion regarding the appropriateness of this date at a later time.

25.     In my opinion, each of the terms discussed below is indefinite because, when read in light of the specification and prosecution history, each term fails to inform those skilled in the art of the scope and meaning of the claim with reasonable certainty.

**A.     "generally transverse to the longitudinal axis"**

26.     It is my opinion that the scope of the term "generally transverse to the longitudinal axis" is not reasonably certain to a POSITA based on the disclosure and prosecution history of the '175 Patent.

27.     A POSITA would understand that this term is used in the claims of the '175 Patent to describe the "front thrust surface" of the "front stabilizing end" of the "wear member." For instance, each of claims 1, 4, 6, and 9 recite that the wear member has a "front stabilizing end including a front thrust surface extending generally transverse to the longitudinal axis, and a top surface, a bottom surface, a first side surface, and a second side surface, each said top surface, bottom surface, first side surface, and second side surface extending rearwardly from the front thrust surface."

28.     A POSITA would understand that the term "generally transverse" is not described in the specification of the '175 Patent. In other words, nowhere in the specification does the inventor define what "generally transverse" means for purposes of the claims.

29.     A POSITA would understand that, while the term "transverse" does appear in the specification in several places, none of those instances are in relation to the "front thrust surface,"

which is designated with reference numeral 152 in the specification.

30.    A POSITA would understand that the claims of the application that issued as the '175 Patent, as originally filed, did not include the limitation that the "front thrust surface" of the "wear member" be "generally transverse to the longitudinal axis." But in an Amendment, dated January 3, 2013, the applicant distinguished the thrust face of the claimed invention from the thrust face asserted by the Examiner from U.S. Patent No. 3,444,633 ("Hensley"), which is depicted in Figure 1 of Hensley as follows:



In distinguishing the "front thrust face" of the '175 Patent, the applicant stated "[a] thrust face configured to absorb axial loads to the wear member requires a ***transverse*** face of the socket to abut the front face of the nose." (Dkt. 42-11 at 28 (emphasis added).) The applicant also stated "[i]n Fig. 1 [of Hensley] top and bottom lines 41 define the socket and extend forward of the nose of the adapter to converge at an ***acute angle***." (*Id.* (emphasis added).) "The tip of the adapter nose is shown as truncated," the applicant continued, "and stopping short of the forward extent of the socket." (*Id.*) "If the socket extends forward to an ***acute angle*** as depicted," the applicant concluded, "it ***cannot form a thrust face***." (*Id.* (emphasis added).)

31.     In my opinion, a POSITA would understand the applicant's argument to distinguish the transverse front thrust face of the claimed invention from the front of the wear member shown in Hensley, which forms an acute angle. In so doing, the applicant expressly distinguishes transverse surfaces from ones that form acute angles.  In my opinion, a POSITA understands that the plain and ordinary meaning of "acute" is less than 90 degrees.  In this way, in my opinion, a POSITA would understand the applicant to have described the front thrust face of the invention of the '175 Patent as perpendicular to the longitudinal axis. It is also my opinion that a POSITA would understand the applicant to have represented to the Examiner that any surface not perpendicular to the longitudinal axis could not form, or function, as a thrust face.

32.     A POSITA would understand that the applicant submitted an Amendment, dated October 9, 2013, wherein the applicant amended then-claims 1, 6, and 8 to include a limitation reciting a "front thrust surface extending generally transverse to the longitudinal axis." (Dkt. 42-12 at 11-12.)

33.     A POSITA would understand that the specification describes the thrust surface 152 in varied terms, stating "the thrust faces 142, 152 may be *any desired shape* (such as any shape between hemispherical to flat or even concave)[.]" (Dkt. 42-2 at 8:3-7.) The specification also discloses the "thrust face 152 may be shaped to match or substantially match the shape of the face 142." (*Id*. at 8:13-14.) "Matching rounded (e.g., spherical arc) shaped thrust surfaces 142 and 152 for primary load bearing," the specification states, "helps keep the faces 142 and 152 in contact without tipping or shifting as the load on the working section 112 changes[.]" (*Id*. at 8:14-17.) And, the specification notes, the thrust faces 142, 152 may be flat, recessed or have other shapes so long as they adequately resist the anticipated thrust loads for the intended use." (*Id*. at 8:18-21.)

34.     A POSITA would understand that none of the claims that recite a "front thrust

8

surface" that is "generally transverse to the longitudinal axis" also recite a configuration for the corresponding thrust surface of the nose 142.

35.     A POSITA would understand that "transverse" is used in the specification to describe other aspects of the alleged invention. For example, in the context of describing the working section 112 of wear member 104 having preferably a generally trapezoidal transverse configuration, the specification states "[t]he term *'transverse configuration'* is used herein to refer to the two-dimensional configuration along a *plane perpendicular to the longitudinal axis* 128 of wear member 104." (*Id*. at 6:19-25.)  In my opinion, a POSITA would understand that the inventor defined "transverse configuration" as perpendicular and not "generally" perpendicular.

36.     In its opening brief, ESCO cited this particular passage (in the above paragraph) as evidence that the "specification also inform one of ordinary skill in the art as to the meaning of this term and provides relevant examples." ESCO then reproduces Figure 7 of the '175 Patent, below, to support its position.



FIG. 7

But, in my opinion, Figure 7 does not clarify the scope of the term. In Figure 7, the front thrust surface 152 is curved and does not fall within a plane perpendicular to the longitudinal axis.

A POSITA would understand that the specification provides no indication of how (or where) the relationship between the front thrust surface and the longitudinal axis is to be measured. With curved surfaces especially, the point at which the angle between the front thrust surface and the longitudinal axis is measures is critical.

37.    A POSITA would further understand that the claims and specification frequently reference "transverse, inward projections" in the "first side surface and the second side surface" of the "front stabilizing end" of the "wear member." (*See e.g.*, *id.* at claims 1, 4, 10, and 19, 10:1-3, 12:13-21.) However, in my opinion, a POSITA would not understand the use of the term "transverse" to describe this feature of the purported invention to align with the use of "transverse" with respect to the "front thrust surface." Nor would it align, in my opinion, with the concept above of falling in a plane perpendicular to the longitudinal axis. (*Id.* at 6:19-25.)

38.    In its opening brief, ESCO attempted to demonstrate the "transverse, inward projections" in the side surfaces by reproducing Figure 4 of the '175 Patent, below:



FIG. 4

It is my opinion that a POSITA would not understand the surface (highlighted in yellow by ESCO in its opening brief) to fall within a plane perpendicular to the longitudinal axis.

39.     In my opinion, a POSITA would understand that a word should be understood to have the same meaning throughout the patent.

40.     It is my opinion that the disclosure and prosecution history of the '175 Patent fails to inform a POSITA of the scope of the term "generally transverse to the longitudinal axis" with reasonable certainty. Based on the foregoing, it is my opinion that a POSITA would not be reasonably certain whether the "front thrust surface" of the "front stabilizing end" of the "wear member" was required to be: (a) actually perpendicular to the longitudinal axis as required by the applicant when it distinguished the "front thrust surface" of the alleged invention from the corresponding component of the Hensley reference that formed an acute angle; (b) actually perpendicular to the longitudinal axis as defined by the specification's explicit statement (on which ESCO relies in its brief) that "transverse configuration" means a "two-dimensional configuration along a plane perpendicular to the longitudinal axis"; (c) approximately perpendicular as ESCO puts forward in its opening brief and as suggested in the amendment to the original claims that inserted the language "generally transverse," despite the earlier prosecution argument that an acute angle could not form a thrust face; or (d) not perpendicular to or even intersecting the longitudinal axis as the term "transverse" is used with respect to the claimed "transverse, inward projections." It is my opinion that the specification's disclosure that the front thrust surface 152 could be any shape including, for example, spherical arcs and other curved surfaces, but lack of disclosure on how to measure the relationship of such curved surfaces to the longitudinal axis further convolutes the scope of this term.

41.     In sum, it is my opinion that the term "generally transverse to the longitudinal axis" is indefinite because the '175 Patent and its prosecution history do not inform a POSITA of the scope of the claim with reasonable certainty.

**B.      "a transverse, inward projection"**

42.     In my opinion, the scope of the term "transverse, inward projection" is not reasonably certain based on the disclosure and prosecution history of the '175 Patent.

43.     As discussed in detail above with respect to the term "generally transverse to the longitudinal axis," it is my opinion that the term "transverse" is not used consistently throughout the '175 Patent and its prosecution history. As noted above, the applicant during prosecution and ESCO in its opening brief define "transverse" to be perpendicular to the longitudinal axis or configured within a plane perpendicular to the longitudinal axis.

44.     Regarding the term "transverse, inward projection," it is my opinion that a POSITA would expect that the term "transverse" would be given the same meaning throughout the patent. But as used in "transverse, inward projection," the term "transverse" does not mean perpendicular to the longitudinal axis as the inward projections do not intersect the longitudinal axis and are not configured in a plane perpendicular to the longitudinal axis. In my opinion, this inconsistency within the '175 Patent renders the scope of the term "transverse" uncertain.

45.      In sum, it is my opinion that the term "transverse, inward projection" is indefinite because the '175 Patent and its prosecution history do not inform a POSITA of the scope of the claim with reasonable certainty.

**C.      "substantially parallel to the longitudinal axis"**

46.     It is my opinion that the scope of the term "substantially parallel to the longitudinal axis" is not reasonably certain based on the disclosures of the '175 Patent and the '662 Patent and their respective prosecution histories.

47.     A POSITA would understand "substantially parallel to the longitudinal axis" to refer to the configuration of the "stabilizing surface," as recited in the '662 Patent (*see e.g.*, Dkt.

42-1, claims 1, 8, and 21), and the "bearing surfaces," as recited in the '175 Patent (*see e.g.*, Dkt. 42-2, claims 1, 4, 6, 9, 13, and 17).

48.     A POSITA would understand the respective specifications of the '662 Patent and the '175 Patent to attempt to define "substantially parallel." The specification of the '662 Patent states "[t]he term 'substantially parallel' is intended to include parallel surfaces as well as those that diverge rearwardly from [longitudinal] axis 34 at a *small* angle (*e.g., of about 1-7 degrees*) for manufacturing purposes." (Dkt. 42-1 at 3:27-30 (emphasis added).) The specification of the '175 Patent states "[t]he term 'substantially parallel,' as used herein in this context, is intended to include parallel surfaces as well as those that diverge rearwardly from [longitudinal] axis 128 at a *small* angle (*e.g., of about 1-7•*) for manufacturing or other purposes." (Dkt. 42-2 at 9:54-58 (emphasis added).)

49.     A POSITA would understand that the claims, specifications, and prosecution histories of the '662 Patent and the '175 Patent provide no additional guidance regarding the scope of this term beyond the passages from the specification quoted in the paragraph above. In its opening brief, ESCO cites no other guidance regarding the scope of the "substantially parallel" term.

50.     It is my opinion that the patents and their respective prosecution histories fail to inform a POSITA of the scope of "substantially parallel to the longitudinal axis" with reasonable certainty. To a POSITA, the "guidance" provided by the specification is no guidance at all. The specification fails to provide any real limitation or bounds to the scope of the term. Describing "substantially parallel" to mean either "parallel" to the longitudinal axis or diverging from the longitudinal axis at a "small angle" provides no guidance because it merely attempts to define one relative term, "substantially," with another relative term, "small."  Also, in my opinion, a POSITA

13

would not necessarily understand from the patent how to measure this purported small angle. Although the Figures of the patent show a longitudinal axis, which happens to be drawn as a horizontal line in the cross section view, the components of devices like this will not necessarily be symmetric along an easily defined axis. In my opinion, it is not clear from the patent how to determine the orientation of the longitudinal axis from which to measure the "small angle."

51.     In my opinion, a POSITA would find the scope of the term even less certain because the inventor attempted to further define the term by stating that a small angle could be "(e.g., of about 1-7 degrees)." In providing this "guidance," the inventor again used a relative term: "about." Perhaps more importantly, the inventor merely provided an ***example*** of what a small angle could be, rather than defining or approximating what the small angle actually is. In other words, to a POSITA, using "e.g." instead of "i.e." means that "about 1-7 degrees" is just an example of what a small angle could be. To a POSITA, using "e.g." instead of "i.e." could mean that the small angle could also be "about 7-10 degrees," or "about 10-20 degrees," or "about 20-30 degrees," and so forth. To a POSITA, in my opinion, using "e.g." instead of "i.e." to define small angle leaves the limits of what a small angle is, and by extension, what the scope of the term "substantially parallel to the longitudinal axis" is, entirely to the subjective view of the reader.

52.     In sum, it is my opinion that the term "substantially parallel to the longitudinal axis" is indefinite because neither the '175 Patent, and its prosecution history, nor the '662 Patent, and its prosecution history, inform a POSITA of the scope of the term with reasonable certainty.

**D.     "substantially along an entire length of the socket"**

53.     It is my opinion that the scope of the term "substantially along the entire length of the socket" is not reasonably certain based on the disclosure of the '175 Patent its prosecution history.

54.     A POSITA would understand that claim 6 of the '175 Patent recites that the "inward projection extends into the rear end of the socket and substantially along an entire length of the socket." (Dkt. 42-2 at 16:1-3.)  The claim recites that the projection extend "into" the rear end, and not, "to the rear end."  A POSITA would understand that the rear end 136 is an area of the socket and not the rear edge of the socket.

55.     A POSITA would understand that although the specification references this claim language (*see id*. at 2:31-36, 12:18-21), it does not provide any further guidance as to the meaning of "substantially along the entire length of the socket" and fails to provide any test or measurement to aid in determining whether an inward projection meets this limitation.

56.     It is my opinion, therefore, that the scope of the term "substantially along the entire length of the socket" is not reasonably certain and is left solely to the subjective interpretation of the reader.

57.     It is my opinion, therefore, that the term "substantially along the entire length of the socket" is indefinite because the '175 Patent and its prosecution history does not inform a POSITA of the scope of the term with reasonable certainty.

**E.     "to resist both vertical and horizontal loads"**

58.     In my opinion, the scope of the term "to resist both vertical and horizontal loads" is not reasonably certain because the '662 Patent and its prosecution history fail to inform a POSITA about what it means to "resist" loads and what test may be used to determine whether such loads are, in fact, resisted.

59.     A POSITA would understand this claim term to require that stabilizing surfaces in the socket or wear member are positioned to bear against complementary surfaces in in the base "to resist both vertical and horizontal loads." (Dkt. 42-1 at claims 8 and 21.) A POSITA would

further understand this limitation to be functional language that imposes a requirement of the alleged invention. In its opening brief, ESCO concedes that this limitation is functional and "specif[ies] the operations that the claimed invention must undertake."

60.    Despite several references throughout the specification to this claim language and the advantages of resisting loads (*see e.g.*, *id.* at 2:1-18, 4:1-3, 5:35-40), the specification provides no guidance on the how a POSITA is to determine when the stabilizing surfaces are, in fact, resisting loads. No objective test for determining whether this limitation is satisfied is present in the claims, specification, or prosecution history of the '662 Patent. Put differently, although ESCO agrees that this claim term is functional language that specifies the operations the claimed invention must undertake, the patent fails to describe how to measure when the operations are in fact performed.

61.    Accordingly, it is my opinion that the term "to resist both vertical and horizontal loads" is indefinite because the '662 Patent and its prosecution history fail to inform a POSITA of the scope of the term with reasonable certainty.

## V.    CONCLUSION

62.    In sum, in my opinion, each of the terms discussed above is indefinite because, when read in light of the specification and prosecution history, each term fails to inform those skilled in the art of the scope and meaning of the claim with reasonable certainty.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on January 7, 2022         *Elliot L Stern*

                                                            Elliot L. Stern, Ph.D.

**Exhibit 1 - Elliot L. Stern, Ph.D.  Curriculum Vitae**

## Expertise

- Forensic Engineering
- Machine and Product design & analysis
- Manufacturing processes measurement, analysis, monitoring and controls
- Multi-discipline engineering solutions
- Patent analysis
- Accident Reconstruction/vehicle & occupant dynamics Human factors

- System modeling & analysis
- Failure analysis
- Engine design, modeling and testing
- Machining processes & dynamics
- Design & safety Analysis
- Premise design and safety
- Human factors
- Slip, trip & fall dynamics

## Education

| Year | College/University | Degree |
|------|--------------------|--------|
| 1989 | University of Florida, Gainesville, FL | Ph.D., Mechanical Engineering |
| 1985 | University of Florida, Gainesville, FL | MS, Mechanical Engineering |
| 1983 | Purdue University, West Lafayette, IN | BS, Mechanical Engineering |

## Professional Summary

Extensive experience in the design, engineering, manufacturing, testing, patenting, process optimization and failure analysis of aerospace, automotive, consumer products and medical devices as well as experience in manufacturing, analysis, automation, improvement, management and regulatory compliance. A multi-disciplined engineering approach is employed to assist attorneys, companies and individuals in the analysis and understanding of complex, technical issues involving products, premise, accident reconstruction, manufacturing, testing and patents.

## Employment History

| From: | 08/2004 | **Florida Forensic Engineering, Inc.** |
|-------|---------|----------------------------------------|
| To: | Present | Tampa, FL |
| | Position: | *President, Consulting Engineer* |

Florida Forensic Engineering, Inc. is dedicated to assisting industry and the litigation community in analyzing and understanding complex technical problems and determining the cause of accidents, product failures and patent analysis.

| From: | 08/1989 | **Independent Consultant** |
|-------|---------|---------------------------|
| To: | Present | Tampa, FL |
| | Position: | |

Specialized in rapid, cost-effective, failure analysis, technical solutions and training in product design, machining, manufacturing processes and controls, data acquisition and testing, and design through theoretical and experimental-based modeling, testing, analysis, and design. Applications in medical, automotive, aerospace products, consumer products and machine tools. Numerous multi-million dollar savings through applied solutions.

## Elliot L. Stern, Ph.D.  Curriculum Vitae

From:  05/1994  **Design & Manufacturing Solutions, Inc.**
To:    Present  Tampa, FL
       Position:  *President*

> A technology development company utilizing research and engineering sciences to apply deep-level understanding to rapidly deliver viable, cost-effective solutions to industry problems. Design & Manufacturing Solutions, Inc. maintains exclusive ownership of derived intellectual property producing revenue from technical services, licensing and royalties.

### *Synopsis of Duties*

As president of Design & Manufacturing Solutions, Inc. I formulated, directed and managed business strategies and plans, personnel, engineering and product development programs. I drafted and negotiated technical service, research, licensing and marketing agreements. My responsibilities included financial management of the company, all projects and programs. I directed intellectual property activities, drafted patents, worked with patent attorneys regarding office actions, patent management and maintenance. In addition to executive management duties, I performed engineering research, product development including hardware and software, and applications based technical services. I was responsible for the design, analysis, fabrication, testing, manufacturing and regulatory compliance of internal combustion engines, dynamically tuned tooling for machining, electronic products for real-time and off-line process monitoring, status and condition determination and corrective actions.

### *Significant Achievements of Design & Manufacturing Solutions, Inc.*

- Alliance Partner for the National Center for Defense Manufacturing & Machining, Latrobe, PA, 2004
- 84 active patents world-wide
- world-class engine laboratory recognized by industries, research laboratories and government regulatory agencies
- Nominated in both 2001and 2002 for The National Medal of Technology, the United States highest honor for technological innovation in the area of engine technologies.
- Design & Manufacturing Solutions, Inc. received the first Clean Air Excellence Award for Technology from the United States Environmental Protection Agency for the development of Compression Wave Injection$^{TM}$, 2000 for SI engines.
- Compression Wave Injection$^{TM}$ honored in the Netherlands with the Richard Huberts Innovation Award, 2000

## Elliot L. Stern, Ph.D.  Curriculum Vitae

*Product and Technology Programs at Design & Manufacturing Solutions, Inc.*

Meeting strict emissions regulations worldwide, **Compression Wave Injection™** technology for two-stroke engines reduces emissions by 75% and fuel consumption by 40% compared to current engines. DMS engine technologies include CWI, carburetor innovations, real-time engine performance and combustion data acquisition and analysis hardware and software.

**Chatter-Free Tooling™**  provides the answer for metal cutting applications limited by chatter, vibration, tool overhang, tolerance and surface finish yielding productivity gains in excesses of 20x. Chatter-Free Tooling™ reliably outperforms standard and carbide tooling through *tuned damping technology* by suppressing the tools natural vibration response. Chatter-Free Tooling™  provides stable machining at longer overhang and deeper DOC and minimizes vibration due to surface interruptions, entry and exit.

The portable **SweetSpot Chatter Analyzer™** provides both measurement and analysis of chatter noise to systematically determine dynamically preferred speed recommendations for eliminating chatter vibration.

The **MAP – Machining Analysis Package™** is a multipurpose modal analysis system designed specifically for the measurement and analysis of machining processes and associated equipment, including tooling, spindles, fixtures and work pieces. The MAP system is a combination of data acquisition and signal conditioning hardware, sensors, and a Windows-based software program. The package is designed for rapid measurement and results even for the novice user while providing the necessary facilities for advanced structural and machining analysis.

The **ChipS™ Chip-in-Spindle** system employs a subset of DMS machine and tool monitoring technologies to determine in real-time when chips get trapped between the cutting tool holder and the spindle during an automatic tool change in CNC machining centers.  The system effectively identifies dynamics characteristic of tool and spindle problems prior to machining features. Both standalone and networked configurations provide real-time and historic monitoring of machine tools. ChipS™ systems are used world-wide for the machining monitoring of anti-lock braking system control manifolds.

3

## Elliot L. Stern, Ph.D.  Curriculum Vitae

From:     08/1989     **Auburn University**
To:       05/1994     Auburn, AL
          Position:   *Assistant Professor, Department of Mechanical Engineering*
                      Taught senior and new graduate level courses focused on the effective
                      application of engineering sciences to design innovative products and solve
                      real industry problems subject to engineering, economics, and product
                      liability constraints.

                      Instructor and Developer including the following courses:
                      - ME 480  Mechanical Engineering Design
                      - ME 485  Manufacturing Processes and Systems
                      - ME 562  Modal Analysis in Design Applications
                      - ME 493, 494 Advanced Projects(Capstone Design project advisor)
                      - MFE 686 Control of Manufacturing Processes

From:     08/1990     **Machining Dynamics Laboratory**
To:       05/1994     Auburn, AL
          Position:   *Director, Advanced Manufacturing Technologies Center*
                      Founded and funded through research grants for which E. Stern was
                      Principal Investigator, and directed research of machining processes,
                      controls and dynamic process stability. Equipped with machine tools,
                      measurement systems CMM, robots, high speed video, and other systems
                      through cooperative agreements proposed to and negotiated with industry
                      companies providing applied solutions in conjunction with fundamental
                      research in return for capital equipment.

From:     1983-85     **Machine Tool Laboratory, University of Florida**
To:       1987-89     Gainesville, FL
          Position:   *1987-1989:  Research Assistant*
                      Designed and developed an intelligent computer program for the design of
                      high-speed, machine tool spindles. The modeling and analysis
                      subprograms were based on machine tool component, system and
                      machining process research including experimental modal analysis coupled
                      with analytical, lumped parameter dynamics models. Expert systems
                      regarding ambulation, visual analysis & recognition, medical products.
                      *1983-1985:  Research Assistant and Graduate Teaching Assistant*
                      Designed and fabricated a high-speed control system and deflection
                      compensation of a robot edge milling aircraft panels. The system was
                      based on a modal analysis model of a Cincinnati Milacron T3-776
                      industrial robot, calculating predicted machining forces and resultant robot
                      deflections, real-time inverse kinematic solutions of the 6 DOF robot by
                      passively monitoring the robot controller, and finally executing feed-
                      forward control to an independent single degree of freedom slide.
                      Research in pedestrian ambulation, bio-dynamics, internal body stresses,
                      instrumentation and measurements.

**Elliot L. Stern, Ph.D.  Curriculum Vitae**

From:    12/1985    **General Motors Technical Center**
To:    06/1987    Warren, MI
        Position:    *Senior Project Engineer, Advanced Manufacturing Engineering,*
            *Equipment Technology Development*
            Responsible for identification, financial justification and management of cost-savings projects in process and equipment technology development, automated design, and the manufacturing of engine components and advanced machine tools. Developed advanced modeling, analysis and simulation systems, vehicle and systems analysis. Specialized in project identification with rapid and high ROI, with focus on manufacturing processes, and automated design and analysis of engine components.

            Product, component, machine and process failure analysis and remedy, avoidance testing and design including CMM, mapping, object/features. General Motors Technical Center representative on the C3 Computer Technologies Committee, Artificial Intelligence Programs Committee and Finite Element Analysis and Modeling Programs Review Committee.

From:    05/1985    **McDermott, Inc.**
To:    12/1985    Lynchburg, VA
        Position:    *Automation Specialist, Advanced Technology Division*
            Analyzed and coordinated the design and manufacturing systems of North American, McDermott companies and divisions and formulated pilot projects utilizing computer-based automation including Group Technology, Material Resource Planning, CAD, CAM, CNC, Robotics, Articulated Measurements for Adaptive Processing, CMM, Artificial Intelligence and Workstation specification.
            Lead rapid solution projects at McDermott Marine Construction, Babcock & Wilcox, Diamond Power, Diamond Shamrock, and Bailey Controls.

From:    05/1982    **Honeywell, Inc.**
To:    08/1983    Tampa, FL
        Position:    *Printed Circuit Board Designer*
            CAD layout and analysis of commercial and military printed circuit board used in medical and communications equipment, respectively. Additionally responsible for documentation and compliance of military specifications.

From:    05/1981    **Ware Construction**
To:    08/1981    Tampa, FL
        Position:    *Commercial Building Layout and Design*
            Layout and designed Emergency Walk-in Clinics, responsible for complete building details, foundation, framing, lighting, plumbing, innovative captured polystyrene, blown concrete wall design, elevations, drainage, code compliance.

**Elliot L. Stern, Ph.D.  Curriculum Vitae**

## Consulting History

Partial List:

- Boeing Aircraft, St. Louis, MO
- Chrysler Corporation, Auburn Hills, MI
- Elmore Machine Tools, Salisbury, NC
- EZGO/Textron, Augusta, GA
- Emak, Piano, Italy
- Fanuc Robotics, Auburn Hills MI
- Ford Motor Company, Dearborn, MI
- Gardner Denver, Peachtree City, GA
- General Engineering Services, Inc, Atlanta, GA
- General Motors Corporation, GM Powertrain Group, Livonia, MI
- General Motors Corporation, GM Powertrain Group, Buffalo, NY
- Giddins & Lewis, Fraser, MI
- Gluckman, Newman & LeVine, PA, Tampa. FL
- Goodrich, Airframe Systems, Landing Gear Div., Cleveland, OH and Tullahuma, TN
- Homelite/Textron, Greer, SC
- Ingersoll Milling Machine Company, Rockford, IL
- J&H Machine Tools, Inc., Charlotte, NC
- John Deere, Worldwide Commercial & Consumer Equipment Division, Charlotte, NC
- Kennametal, Inc. Latrobe, PA
- Kennametal Hertel, Germany
- Kinsey, Troxel, Johnson & Walborsky, P.A., Pensacola, FL
- Mazak Corp., Florence, KY
- McCulloch Corp., Lake Havasu City, AZ
- McDonnell Douglas Aerospace, St. Louis, MO
- Mitsui Seiki, Franklin Lakes, NJ
- Orthotic Rehabilitation Products, Inc, Tampa, FL
- Robert Bosch Corporation, Automotive Group, Charleston, SC / Immenstadt, Germany
- Romi, Brazil
- Sunnen Products Company, St. Louis, MO
- Tecumseh Products Company, Grafton, Wisconsin
- Toolcraft, Morganton, NC
- United Technologies, Pratt & Whitney Canada, Quebec, Canada
- Westinghouse Electric Corporation, Winston-Salem, NC
- Whittelsey, Whaley & Whittelsey, PC, Opelika, AL

**Elliot L. Stern, Ph.D.  Curriculum Vitae**

## Patents

| Patent Number | Title |
|---|---|
| 6,443,673 | Tunable boring bar for suppressing vibrations and method thereof  (co-inventor) AU772398, WO0153025, CA2396366, EP1248692 |
| 6,085,121 | Device and method for recommending dynamically preferred speeds for machining CN1271305, CN1096336, WO9915310, EP1017535, ES2149150, AU7281618 |
| 5,700,116 | Tuned damping system for suppressing vibrations during machining (co-developed) |
| 5,518,347 | Tuned Damping System for Suppressing Vibrations During Machining (co-developed) CA2220938, WO9637338, EP0827440, RU2127180, ES2114838 |
| 5,593,369 | Inflatable Hand Orthosis |
| 5,437,611 | Dynamic Brace Joint |
| 5,383,827 | Inflatable Hand Orthosis |

***Design & Manufacturing Solutions, Inc.*** (total of 84 patents world-wide)
***U.S. Patents***   (Development Programs Managed and co-developed)

6,484,695 Engine having compressed air assisted injection with secondary high speed fuel carburetor sandwich
6,460,494 Compressed air assisted fuel injection system with reflection wave and variable restriction injection port
6,443,673 Tunable boring bar for suppressing vibrations and method thereof
6,382,176 Method for injecting and combusting fuel with a piston head having a top surface recess
6,295,957 Compressed air assisted fuel injection system
6,293,235 Compressed air assisted fuel injection system with variable effective reflection length
6,286,469 Pneumatically controlled compressed air assisted fuel injection system
6,273,037 Compressed air assisted fuel injection system
6,085,121 Device and method for recommending dynamically preferred speeds for machining
6,079,379 Pneumatically controlled compressed air assisted fuel injection system
5,700,116 Tuned damping system for suppressing vibrations during machining

## Publications (Selected)

- Scott S. Katz, Esq. and Elliot L. Stern, Ph.D., P.E., "Daubert in the 21st Century and Computer Simulation," Subrogator, National Association of Subrogation Professionals, Spring/Summer, 2008, (presentation NASP Annual Conference, Nov. 2007, New Orleans, LA)

- E. Stern, "The Forensic Advantage," Claims Magazine, 12/1/2006

- E. Stern, Compression Wave Injection: a mixture injection method for two-stroke engines based on unsteady gas dynamics (multiple publications, seminars and presentations).
- E. Stern, Understanding and Applying Machining Process Dynamics Next Generation Products Come On-Line (publications, seminars, training short courses and presentations).

## Elliot L. Stern, Ph.D.  Curriculum Vitae

- E. Stern, Use of Vibrations and Modal Analysis for Machining (multiple publications).
- E. Stern, 21.8 Mechanics of Machining (Dynamics), <u>Materials and Processes in Manufacturing</u>, Ninth Edition, Degarmo, et al., ISBN 0-471-03306-5, John Wiley & Sons, Inc., 2003.
- J T. Black and Elliot Stern, Symposia – "History of Manufacturing, Metal Cutting: 1907 – 1997," American Society of Mechanical Engineers / Manufacturing Engineering Division, International Mechanical Engineering Courses and Exposition, "Intelligent and Flexible Symptoms," November 16-21, 1997.
- E. Stern, "Good Vibrations," Cutting Tool Engineering, Volume 47, Number 9, December, 1995, pp39-44.
- E.L. Stern and G. Carmichael, "Honing Comes Full Circle, Cutting Tool Engineering, April, 1995.
- E.L. Stern and R.P. Pellini, "A Study on the Effect of Tool Wear on Machining Forces," Symposium on Modeling, Monitoring and Control in Machining Processes, ASME/WAM, New Orleans, LA, November 28, 1993 – December 3, 1993.
- E.L. Stern and V.R. Govande, "The Use of Modeling and Simulation for Control of Single Point Machining Processes," Symposium on Modeling, Monitoring and Control in Machining Processes, ASME/WAM, New Orleans, LA, November 28, 1993 – December 3, 1993.
- Elliot L. Stern, "Comprehensive Control for Turning Centers," NSF Grantees Conference on Design and Manufacturing, University of North Carolina at Charlotte, Charlotte, NC, January 6-8, 1993, pp. 1673-1676.
- E.L. Stern and S. Kadiyala, "A Knowledge-Based Control Strategy for Single Point Machining," Manufacturing Review.
- E.L. Stern and S. Kadiyala, "A Comprehensive Control Strategy for Turning," Manufacturing International 1992, ASME, 1992, pp. 77-83.
- E.L. Stern, V. Govande, and S. Kadiyala, "A Feedforward Simulation for Strategic Knowledge-Based Control of Machining Process," Proceedings of the 22nd Annual Conf on Modeling and Simulation, pp. 857-864, 1991.
- E.L. Stern and S. Kadiyala, "A System Configuration for Knowledge-Based Control of Machining Centers," Proceedings of the 22nd Annual Conf on Modeling and Simulation, pp. 865-872, 1991.
- Elliot L. Stern, "Use of Modeling and Simulation for Conceptual Design," Proceedings of the 21st Annual Conf on Modeling and Simulation, pp. 1817-1823, 1990.
- E.Stern and J. Tlusty, "A Knowledge-Based Approach to High-Speed Spindle Design," Symposium on Concurrent Product and Process Design, ASME/WAM, DE-Vol. 21, PED Vol. 36, pp. 219-226, 1989.
- Jiri Tlusty, Elliot Stern, "Use of a Structural Model in Compensation for Robot Deflections," Annals of the CIRP, Vol. 34/1/1985, pp 357-363.

**Elliot L. Stern, Ph.D.  Curriculum Vitae**

## Professional Associations

- Senior Member, National Academy of Forensic Engineers
- Associate Member, American Society of Mechanical Engineers, (ASME)
- Senior Member, Society of Automotive Engineers (SAE)
- Member, National Society of Professional Engineers (NSPE)
- Member, Florida Engineering Society (FES)
- Member, National Fire Protection Association (NFPA)
- Member, The Scientific Research Society, Sigma Xi