# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ESCO GROUP LLC,                        )
                                       )
            Plaintiff,                 )
                                       )   C.A. No. 1:20-1679-RGA-JLH
v.                                     )
                                       )
DEERE & COMPANY,                       )
                                       )
            Defendant.                 )

## DECLARATION OF KY HOLLAND IN SUPPORT OF
## ESCO'S REPLY CLAIM CONSTRUCTION BRIEF

I, Hezekiah "Ky" Holland, hereby declare as follows:

1.      I am over eighteen years of age, have personal knowledge of the facts stated herein, and if called upon to do so, could and would testify competently thereto.

2.      I have been retained on behalf of Plaintiff ESCO Group LLC to offer my expert opinions concerning certain claim terms from U.S. Patent Nos. 8,844,175 ("the '175 patent") and 10,273,662 ("the '662 patent") which were identified by Deere as requiring construction.  I refer to these two patents as the asserted patents in this declaration.  The specific claim terms I address in this declaration are set forth below.

3.      I am being compensated at my standard consulting rate of $295 per hour plus expenses.  No part of my compensation depends on the outcome of this litigation.

## I.      BACKGROUND AND QUALIFICATIONS

4.      I summarize in this section my educational background, career history, and other relevant qualifications.  My full resume is attached as Exhibit A to this declaration.

5.      I earned a Bachelor of Science in Mechanical Engineering from Oregon State University in 1985.  I also earned a Master of Business Administration, focusing in Technology Management, from the University of Phoenix in 2000.

6.      I have been a Registered Professional Mechanical Engineer, licensed by the State of Oregon.  That license is currently inactive because I no longer work in Oregon.

7.      From the time I completed my bachelor's degree (in 1985) until 1999, I worked for ESCO in various engineering and management roles related to the earthmoving industry.  From 1985 to 1990, I was a Design/Project Engineer for the light mining and construction wear products divisions of ESCO.  From 1990 to 1995, I was a Marketing Manager for the same divisions.  From 1995 to 1999, I was a Site Manager in ESCO's San Diego machining and fabrication plant.

8.      In my tenure with ESCO, I developed significant experience in many aspects relating to wear assemblies for excavation operations, including designing excavating systems and wear assemblies, analyzing tolerances and designs for manufacturing and performance optimization, implementing computer simulating modeling of excavating systems, designing and managing testing programs of excavating systems, conducting failure analysis, performing on-site visits to inspect ESCO and competitive products and understand customer objectives, and define functional specifications for new products which included analysis and benchmarking of excavating systems.

9.      Based on designs of earthmoving systems that I developed while at ESCO, I was awarded U.S. Patent No. 5,653,048, which relates to a wear assembly for the digging edge of an excavator.

10.     I have held, or currently hold, professional memberships in the Institute of Electrical and Electronics Engineers, the Society of Automotive Engineers, the American Society of Non-Destructive Testing, the American Society for Quality, and ASTM International.

11.     After leaving employment with ESCO, I established Holland Consulting in 1999. I provide consulting services, including assessing new manufacturing enterprises in Alaska and recommending process design, product design, and workforce preparation strategies.

12.     From 2000 to 2003, I was also employed by the University of Alaska Anchorage as the Director of Applied Technologies.  My role included teaching courses in Technology and Career and Technical Education (CTE).  From 2013 to 2017, I was an Assistant Professor at Alaska Pacific University, where I taught undergraduate and graduate coursework, and courses for professional certifications.  Before my appointment as an Assistant Professor, I was an Adjunct Professor at the University from 2000–2013.  Throughout my time with the University, I held various board and committee positions.

13.     Since leaving ESCO's employment in 1999, I have continued to be involved in the earthmoving industry by reviewing trade articles and materials related to the field and working on engineering consulting projects for ESCO.  My resume summarizes my technical work in industrial manufacturing and engineering since leaving ESCO.

## II.     LEGAL STANDARD

14.     I have been instructed by counsel for ESCO on the law regarding claim construction.  I provide below my understanding based on those instructions.

15.     When construing patent claims, I have been informed that claim terms are ordinarily given their plain and ordinary meaning as understood by a person of ordinary skill in the art at the time of the invention.

16.     To determine what a person of ordinary skill in the art at the time of the invention would have understood, I understand that one of ordinary skill can consider the claims, the patent specification, the prosecution history, and, under certain circumstances, extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.

17.     In construing a claim limitation, I understand that I am to evaluate the claim in light of the specification.  The specification provides context for understanding the scope of the claims, but I understand that limitations from the specification are not to be read into the claims.

18.     I also understand that a patent's prosecution history can inform the meaning of the claim language, as it may provide support for how the patent examiner and the inventors understood the patent.  The claims, the specification, and the prosecution history comprise the "intrinsic evidence."

19.     I further understand that I may consider "extrinsic evidence" under certain circumstances.  For example, "extrinsic evidence" may include dictionaries, treatises, academic journal articles, testimony, or other documentary evidence.

20.     I understand that the requirement that claims be definite stems from statutory law found in Title 35 of the United States Code.  Under 35 U.S.C. § 112 ¶ 2, a patent specification "shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."[1]  A claim which fails to meet this standard is invalid as indefinite. I understand that patent claims are presumed valid, and clear and convincing evidence is required to establish that a patent is invalid because it is indefinite.

21.     I understand that because a patent is presumed valid, the alleged infringer bears the burden of proving indefiniteness by clear and convincing evidence.  I further understand that

---

[1]     I have provided a citation to § 112 ¶ 2 as it existed as of the priority dates of the asserted patents.

indefiniteness is to be evaluated from the perspective of a person of ordinary skill in the art at the time of the invention.  I understand that a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

22.     I understand that absolute or mathematical precision in claim language is not required.  Further, I further understand that claims that use terms of degree, such as generally and substantially, are not inherently indefinite, especially when the patentee provides guidance and examples in the specification that provide guidance to a person of ordinary skill the art as to the scope of the claimed invention.

## III.    MATERIALS CONSIDERED

23.     My opinions in this declaration are based on my knowledge and experience of the design, development, and implementation of wear assemblies for excavation operations in the earthmoving industry.  Further, I reviewed the asserted patents and their prosecution histories, the claim construction briefs exchanged to date, and related material submitted in the lawsuit.

## IV.    OVERVIEW OF THE ASSERTED PATENTS

24.     I understand the asserted patents relate to wear assemblies and components for use in excavation, and claim features that, among other things, protect the excavating equipment from wear and enhance the efficiency of excavating operations.  Based on my professional experience, I am familiar with the subject matter of the asserted patents, having worked on the design, development and implementation of similar wear member technology for use in excavation operations in the earthmoving industry.

25.     One claimed feature of the asserted patents is the disclosure of stabilizing surfaces of certain configurations between the wear member and base.  This feature would improve the wear assembly's stability, strength, durability, and reliability. Design of stabilizing surfaces is a

unique aspect of mechanically attached earthmoving wear parts because of the substantial dynamic loads bearing surfaces must carry in conditions that can result in permanent deformation due to contact stresses that exceed the yield strength of the materials, the presence of abrasive fines that abrade and damage the surfaces, and the manufacturing tolerances and gradual wear of mating surfaces that result in increasing movement between the mating parts under dynamic loading. The stabilizing surfaces claimed in the asserted patents achieve a stronger and longer-lasting wear member by, among other things, allowing high loads generated during excavation to be carried by portions of the wear assembly which are oriented such that the reactions from digging loads on mating surfaces do not result in significant movement between the mating wear parts or secondary induced loading on the locking system securing the wear parts that would reduce system reliability or strength.

## V.     APPLICABLE LEVEL OF ORDINARY SKILL IN THE ART

26.     I believe that the level of ordinary skill in the art relevant to the asserted patents would have education and several years of experience in the field of wear assemblies for excavating equipment in the earthmoving industry.  Such a person of ordinary skill in the art would have a Bachelor of Science degree in Mechanical Engineering and at least 3 years of professional experience working with wear assemblies for excavating equipment in the earthmoving industry, such as assessing the performance of the excavating equipment and the wear assemblies in the field through failure analysis, competitive analysis, or designing and developing wear assemblies to address field issues.

27.     Based on that level of ordinary skill, I have been qualified as at least a person of ordinary skill in the art since at least 1988.  Each of my opinions set forth in this report are presented from the standpoint of one skilled in the art.  Thus, where I specify in the analysis below that I am rendering my opinion, it should be understood that my opinion is from the perspective

of a person having the level of ordinary skill in the art that I have described at the time of the invention.

28.     I have reviewed the declaration of Elliot Stern, Ph.D., which was offered along with Deere's Claim Construction Brief.  Dr. Stern opined that a person of ordinary skill in the art would "have at least a Bachelor's degree in Mechanical Engineering, or related discipline, and would have at least three years of experience working with wear assemblies for excavating equipment or similar brush cutters, drilling heads, and cutting tools."  Stern Decl. ¶ 21.

29.     In my opinion, Dr. Stern incorrectly defines the level of ordinary skill in the art.  I do agree with Dr. Stern that a person of ordinary skill in the art would have had a Bachelor of Science degree in Mechanical Engineering and at least three years of experience working with wear assemblies for excavating equipment.  I disagree with Dr. Stern's opinion that as an alternative to working with wear assemblies for excavation, a person of ordinary skill in the art could obtain comparable professional experience working on "similar brush cutters, drilling heads, and cutting tools."  Stern. Decl. ¶ 21.

30.     In my view, brush cutters, drilling heads and cutting tools are not similar technology to wear assemblies for excavation.  Each of these tools perform a substantially different function from wear assemblies used with excavation earthmoving equipment, which are some of the largest and most powerful mechanical equipment ever designed.  Excavating equipment and the digging cycles create highly dynamic loading, including full reversal of extreme impact loads, embedding of fines or abrasive slurries between mating components, assembly with relatively loose as-manufactured mating surfaces that are further damaged and worn during use, and the use of unique locking devices for ease and safety of removal in harsh environments, and as a result have substantially different design considerations and features.  Further, it has been my experience that

7

the design of wear parts that are expected to perform equally effectively in a new and a fully worn condition and with locking systems that must be both easy to change and robust under extreme loading, as well as design for failure in a way that does not compromise the integrity of mating surfaces, the excavating machine, or downstream material processing equipment is a unique skill set that does not come solely from academic studies.  This experience is unique to the field, as it requires an attention to the intentional design of parts that are expected to function while being completely worn away or to retain their full rated strength without any resulting digging load on the locking system. The unique situation where the mating support surfaces are damaged during high impact loading, subjected to abrasive fines between the mating surfaces, and expected to perform reliably over the life of 10-20 wear part changes before the support surface is rebuilt or replaced is unique.

31.     As a designer of machine components and manager of a manufacturing facility including CNC machining equipment, I found only the most basic of material cutting theories applicable between machine tools applications and earthmoving excavating methods.  There was no similarity to the design of metal cutting tooling and replaceable components and the joining of and securing of parts and dynamic loading found in the environment that an earthmoving wear part was expected to function reliably in over the life of the wear part.  One having actual experience in the field of excavating equipment for the earthmoving industry, like myself, would recognize unidirectional cutting systems such as "brush cutters" (designed to cut, e.g., vegetation), "drilling heads" (e.g., drill bits), or "cutting tools" more broadly (e.g., knife blades) are not technically "similar" to wear members for excavating equipment.  While dredge cutterheads and bucket wheel excavators used for underwater applications offer a potential similar rotational cutting system, the

unique underwater, abrasive, and dynamic loading while excavating and moving material makes these the most unusual and challenging of wear part design challenges I have ever tried to solve.

32. Earthmoving equipment and wear assemblies must be designed for very unique operating demands and exposure to harsh environments during digging operations. Both of the asserted patents describe some of the distinctive challenges of designing wear members for excavating equipment. For example, the '662 patent describes that wear members "are commonly subjected to harsh conditions and heavy loading" and that "[m]any designs have been developed in an effort to enhance the strength, stability, durability, penetration, safety, and ease of replacement of such wear members with varying degrees of success." ('662 patent, 1:34–40). Similarly, the '175 patent also discusses "the heavy loads and severe environments in which dredging equipment operates." ('175 patent, 1:44–57). The '175 patent also describes attempts in the industry to minimize the considerable power requirements of driving dredging cutterheads, including by providing dredge points "with elongate, slender bits for easier penetration of the ground." As bits wore, mounting sections tended to "engage the ground in the cutting operation," which would result in increased cutting drag. ('175 patent, 1:44–57). Consequently, points required frequent replacement, often before the points were fully worn, in order to minimize mounting section contact and drag.

## VI.   DEERE'S ALLEGATIONS OF INDEFINITENESS

33. I have reviewed Deere's answering claim construction brief and the declaration of Dr. Stern submitted in support of it. I therefore understand that Deere contends that one of ordinary skill in the art would find certain claim terms of the asserted patents to be indefinite, meaning that those terms would not be understood to one of ordinary skill in the art to reasonable certainty. Those terms are the following: (1) "generally transverse to the longitudinal axis;" (2) "a transverse inward projection;" (3) "substantially parallel to the longitudinal axis;" (4) "substantially along an

entire length of socket;" and (5) "to resist both vertical and horizontal loads." I discuss each of these terms below.

### A. "generally transverse to the longitudinal axis" ('175 patent, claims 4 and 6)

34.    Claims 4 and 6 of the '175 patent use the term "generally transverse to the longitudinal axis." Both claims recite "a front thrust surface extending *generally transverse to the longitudinal axis*."

35.    A person of ordinary skill in the art would have understood the term "generally transverse to the longitudinal axis" as used in the '175 patent to have its plain and ordinary meaning.  I disagree with Deere that this term is indefinite.

36.    A person of ordinary skill in the art would understand that terms such as "transverse," "axial," and longitudinal" can be used to describe orientation and direction and would be, in my opinion, well versed to understand the terms as they are used in the asserted patents.  In my experience, these terms are commonly used in the earthmoving industry to describe the structure of excavation wear components and how structural features of the wear components are oriented towards each other.

37.    The claim language of the '175 patent provides that the "front thrust surface" "extend[s] *generally* transverse to the longitudinal axis."  In my opinion, this language, taken in context of the entire patent, provides reasonable certainty of its meaning to a person of ordinary skill in the art.  Further, a person of ordinary skill in the art would understand, as illustrated in the figure below, that the "front thrust surface" as depicted with a curved embodiment, "extend[s] generally transverse" to the longitudinal axis.



'175 patent, Figure 7 (annotations added).

38.    For excavating equipment used in the earthmoving industry, there have traditionally been two primary classifications of how the base or nose fits within the socket of the tooth.  The first is referred in the industry as a "wedge" design.  "Wedge" designs typically have a nose with flat upper and lower surfaces that taper towards the front of the nose, and a tooth that has a cavity with corresponding tapered upper and lower surfaces.  "Wedge" design noses are inserted into the cavity of the tooth and pushed together so the opposing angled surfaces sit against one another.  "Wedge" design systems are typically designed to have a gap between the front of the nose and the front of the cavity of the tooth.  This gap ensures that the opposed angled surfaces would bear against one another, allowing for differences in exact locations in relation to each other due to wear, and to allow for manufacturing tolerances.  The second classification is typically referred to in the industry as a "butt-fit."  "Butt-fit" designs have a transverse front face (often referred to as a thrust face) in the cavity that bears against a mating, transverse front face on the front of the nose.  In this way, the front surfaces "butt" against one another.  This type of fit locates the corresponding locking surfaces of the base and wear part more precisely and does not have the same issues with lock location that a wedge design does. The wedge design component's

11

corresponding lock locations are subject to much greater relative variation due to manufacturing and wear of the surfaces. This greater variation reduces the reliability of the locking system. A "butt-fit" design also provides stabilization to the tooth against horizontal loads. Due to the addition of transverse front bearing surfaces in butt fit designs, thrust loads applied to the front of butt fit design systems translate directly into the end of the nose, rather than further up the nose where the lock is located. The additional stabilization provided by butt fit designs reduce loads imparted on the lock due to digging and the relative displacement of the lock and the locking features and therefore makes the lock less likely to fail.

39.     I have reviewed the prosecution history of the '175 patent, and I understand that during prosecution, the examiner rejected certain claims as anticipated by U.S. Patent No. 3,444,633 ("Hensley"). In response, the applicant explained that Hensley did not disclose a "front thrust surface" because "[a] thrust face configured to absorb axial loads to the wear member requires a transverse face of the socket to abut the front face of the nose." ('175 patent Prosecution History at 1/3/2013 Office Action Response at 8). With reference to the figure below, the applicant further clarified that because the "top and bottom lines 41 define the socket and extend forward of the nose of the adapter to converge at an acute angle," "[t]he tip of the adapter nose is shown as truncated and stopping short of the forward extent of the socket." ('175 patent prosecution history at 1/3/2013 Office Action Response at 8).



Deere Brief at 17 (annotations added).

40.    A person of ordinary skill in the art would understand that Hensley is an example of a "wedge" design.  As is typical with a "wedge" design, a person of ordinary skill in the art would understand that Hensley has a nose with a generally flat top and bottom surfaces that taper towards the front of the nose, and a tooth that has a cavity with corresponding tapered top and bottom surfaces.  Further, a person of ordinary skill in the art would appreciate that Hensley has a gap between the front of the nose and the front of the cavity of the tooth, which is also characteristic of a "wedge" design.

41.    A person of ordinary skill in the art would understand that the '175 patent, generally stated, is an example of a "butt-fit" design.  The statements made during prosecution of the '175 patent were made to explain that Hensley's "wedge" design could not have a "front thrust surface" because of Hensley's gap between the front of the nose and the front of the cavity of the tooth.  A person of ordinary skill in the art would appreciate that Hensley's wedge fit relies upon the top and bottom surfaces to resist axial forces, rather than a "front thrust surface," as disclosed by the '175 patent.  The reference to "an acute angle" during prosecution was in reference to the top and

13

bottom surfaces of the socket in Hensley, rather than the shape of the tip of the adapter.  A person

of ordinary skill in the art would also understand that patentee's statements were made with respect

to the shape of the socket, rather than the shape of the nose on the adapter.

> **B.** **"a transverse, inward projection" ('175 patent, claims 4, 15, and 19)**

42.     Based on the claim language and the specification, a person of ordinary skill in the

art would understand the claim term "a transverse, inward projection" to be clear and definite.  The

specification and figures of the '175 patent offer clear guidance to a person of ordinary skill in the

art, as they would be familiar with mating wear parts and the way these parts may be fit together

and stabilized during operation.

43.     In my opinion, there is no ambiguity based on the disclosures and embodiments in

the specification.  For example, the specification discloses:

> Front stabilizing surfaces 202 on front end 140 of the nose 108 are preferably each
> provided with *a transverse, inward recess in a transverse direction* (see FIGS. 2
> and 5). Likewise, front stabilizing surfaces 212 on front end 150 of the socket 120
> are preferably each provided with a *corresponding transverse, inward projection*.
> The corresponding inward recesses and projections enable each of the stabilizing
> surfaces 202, 212 to resist all applied loads irrespective of whether the loads are
> applied vertically or horizontally (e.g., resist vertical and side loading).

(10:1–10).  A person of ordinary skill in the art would find guidance on the meaning of "a

transverse, inward projection" by referring to this portion of the specification and the figures

below.



44.     Accordingly, in my opinion, a person of ordinary skill in the art would understand the meaning of the claim term "a transverse, inward projection" based on the claim language and these exemplary disclosures and figures in the specification.

      C.    **"substantially parallel to the longitudinal axis" ('662 patent, claims 8 and 21; '175 Patent, claims 4, 6, 13, and 17)**

45.     A person of ordinary skill in the art would have understood the term "substantially parallel to the longitudinal axis" as used in the asserted patents to have its plain and ordinary meaning.  I disagree with Deere that this term is indefinite.

15

46.     A person of ordinary skill in the art would understand that the referenced stabilizing features are close to parallel to the longitudinal axis within practical considerations to enhance the benefit of reducing movement and reactive loads between the mating surfaces. The use of the term "substantially" is meant to account for the inherent need for draft, variations introduced through the manufacturing process for wear assemblies, and slight tapering of the nose and socket fit to aid in installation and removal of the mating parts, particularly in the presence of fines that may be trapped between the mating parts during use.  The specifications of the asserted patents expressly disclose manufacturing considerations as a design feature for the claimed wear assemblies.  ('662 patent, 3:27–30 ("for manufacturing purposes"); '175 patent, 9:54–58 ("for manufacturing or other purposes")).  The casting and forging manufacturing practices used for the parts discussed in the patents cannot account for the absolute numerical precision Deere calls for here, and a person of ordinary skill in the art would understand as such.

>       **D.     "substantially along an entire length of the socket" ('175 patent, claim 6)**

47.     A person of ordinary skill in the art would have understood the term "substantially along an entire length of the socket" as used in the '175 patent to have its plain and ordinary meaning.  I disagree with Deere that this term is indefinite.

48.     A person of ordinary skill in the art would understand that Figure 2 in the '175 patent shows an inward projection extending substantially along an entire length of the socket.



FIG. 2

(Figure 2).  "Substantially," as used in the context of this term, to a person of ordinary skill in the art allows for minor interruptions in a wear member feature that might be required for geometric form transitions, blending from the main surface to the ends smoothly to reduce stress concentrations, manufacturing requirements, or interruption for locking features.  In this particular case, this is so because "[s]ocket 120 has a main portion 180 rearward of front end 150 to received body 160" and that the walls of the socket and body "generally conform" with one another.  (8:31–34).  Therefore, as Figure 2 of the '175 patent shows, because the body of the nose has an inward projection extending from the front thrust surface to the rear end of the socket, the "generally conform[ing]" inward projections on the socket likewise extend from the front thrust surface to the rear end of the socket, *i.e.*, "substantially along an entire length of the socket."

49.    Figure 8 also provides another example of an inward projection that extends "substantially along an entire length of the socket."  In that figure, which depicts a view looking "into" the socket 120 of wear member 104, an inward projection extends from the front thrust surface to the end of the socket.



FIG. 8

(Figure 8).

50.     A person of ordinary skill in the art would understand that the inward projection in the socket begins at thrust face 152, *i.e.*, the front stabilizing surface 212c. (9:42–46). The inward projection then extends along the side wall through rear stabilizing surface 210c up to rear end 136. (10:31–34). Figure 8 also shows an embodiment where the inward projection extends "substantially along an entire length of the socket," showing specifically in this embodiment that it extends the entire length. Based on the plain language of the term and these examples in the specification, a person of ordinary skill in the art would have sufficient guidance to understand with reasonable certainty whether an inward projection extends "substantially along an entire length of the socket."

### E.     "to resist both vertical and horizontal loads" ('662 patent, claims 8 and 21)

51.     A person of ordinary skill in the art would have understood the term "to resist both vertical and horizontal loads" as used in the '662 patent to have its plain and ordinary meaning. I disagree with Deere that this term is indefinite.

18

52. The claim term "to resist both vertical and horizontal loads" (*i.e.*, supporting loads from different directions) would be understood by a person of ordinary skill in the art as a feature of wear part design. Additionally a person of ordinary skill in the art would understand that this type of approach has significant recognized benefits in enhancing the stabilization and positioning of the mating parts in a way that reduces the loading on the locking system and reduces the movement of the mating parts, resulting in longer life and greater strength of the mating surfaces that are subject to wear from relative movement and impact loading. In the case of the asserted patents, the claim term "to resist both vertical and horizontal loads" is in reference to the claimed "side stabilizing surfaces:"

> including a pair of side stabilizing surfaces inclined relative to each other in different transverse directions so as to laterally converge inward toward a central location along the respective side wall and positioned to bear against complementary surfaces in respective side recesses in the base to resist both vertical and horizontal loads during excavating

('662 patent, claim 8). This claim language also provides guidance to a person of ordinary skill in the art as to the structure that would resist both vertical and horizontal loads, disclosing that the side stabilizing surfaces are "inclined relative to each other in different transverse directions so as to laterally converge inward toward a central location along the respective side wall and positioned to bear against complementary surfaces in respective side recesses in the base."

53. Additionally, the '662 patent specification discloses several embodiments with side stabilizing surfaces to resist vertical and horizontal loads. For example, the specification discloses an embodiment with side stabilizing surfaces that have an angled orientation and will "resist side and vertical loading." ('662 patent, 7:49-52). The specification also provides that there are various angled orientations for the stabilizing surfaces. ('662 patent, 7:16-22). A person of ordinary skill in the art would understand that the stabilizing surfaces depicted in Figure 2 and other

embodiments of the '662 patent specification would be capable of resisting vertical and horizontal loads.  ('662 patent, 5:5-25).

54.      Through the claim language and embodiments disclosed in the '662 patent specification, a person of ordinary skill in the art would understand the structure of the claimed stabilizing surfaces "to resist both vertical and horizontal loads." No further information, such as a test to determine whether such loads are resisted, would be necessary to inform one of ordinary skill in the art with reasonable certainty as to the claimed structure.

*      *      *

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

By:      _____

Hezekiah "Ky" Holland
January 21, 2022

# EXHIBIT A

**Hezekiah "Ky" R. Holland III**
14020 Stover Place, Anchorage, AK 99516   (907) 727 2735   ky@kyholland.com

## Professional Experience, Leadership and Skills:

**Consultant & Innovation Economist – Holland Consulting, Anchorage, AK 1999 – Present**

- Consulting and coordination of economic development projects and innovation initiatives.
- Assess new manufacturing enterprises in Alaska and recommend process design and workforce preparation strategies.
- New venture startup assistance.
- Alaska Startup Ecosystem– Curator of the Alaska Startup Digest, Organizer of nine Startup Weekend events, Organizer and Co-Chair of six Alaska Startup Week and Alaska Entrepreneurship Week events.
- Consulting on construction and mining product patent litigation in the US and Australia as an expert witness.
- Executive Director of the Alaska Process Industry Careers Consortium and manager of the NSTC Safety Program 2004-2007.

**Technology Commercialization Officer – University of Alaska Fairbanks, Anchorage, AK. 5/2018-5/2020. Technology transfer and commercialization.** https://www.uaf.edu/oipc/

- Technology Evaluation and IP management of disclosures with faculty, student and staff leading to licensing. Guest lecturing on IP and entrepreneurship at UAF, UAS and UAA.
- Mentoring university startups and assistance with business planning, finance, and team

**CTO & CEO – IA3 Inc., Anchorage, AK.  6/2016 – 12/2019.  Industrial Internet of Things technology startup.** www.ia3.io

- Leadership of all aspects of a technology startup including fund raising, team building and supervision, strategic planning, manufacturing, sales and marketing, and external partnership development.

**Partner, Cofounder, Angel Investor – Alyeska Venture Management, Anchorage, AK. 1/2014 – present.** www.akacceleratorfund.com

- Organized and raised private funding for Alaska's first seed venture fund, the Alaska Accelerator Fund and deployed $2.4M to early stage startup businesses in three years.
- Managed portfolio company investments including board and advisory positions, and as needed, filled in as an acting executive of portfolio companies.
- Placed personal angel investments and active member of the Alaska Investors Network

**Assistant Professor – Alaska Pacific University, Anchorage, AK. Adjunct 2000-2013. Full time appointment 7/2013 – 6/2017. Business Administration Department.** www.alaskapacific.edu

- Teaching – Undergraduate AA/BA and graduate certificate and MBA courses in a variety of business subjects with a focus on entrepreneurship, business operations, quality management and quantitative analysis.
- Service – Chair of the statewide Entrepreneurial Edge committee, a collaboration of the universities and economic development offices and host of the annual Alaska Business Plan Competition and Edge speaker series and Startup Weekend events.  Member of the APU marketing committee and undergraduate curriculum committee.  Vice Chair of the Faculty Assembly.
- Research – Current projects focus on business metrics and Alaska Native Corporation best practices, effectiveness of business plan competitions on new venture success, and modeling new business success based on economic statistical data.

**Hezekiah "Ky" R. Holland III**

14020 Stover Place, Anchorage, AK 99516   (907) 727 2735   ky@kyholland.com

**Sales Representative – Frontier Sales, Inc., Salt Lake City, UT. Based in Anchorage, AK 7/2004 – 3/2007, 8/2013- 7/2018.**  www.frontiersales.com

- Industrial Product Sales and Field Engineering of above and underground fuel and water storage tanks, pumps, controls and monitoring systems; sewer and water pipelines; oil-water separator systems; and custom backup generator and boiler fuel management systems.

**General Manager – Envision CmosXray LLC. Anchorage, AK. 2/2007 – 12/2011; Operations Manager – QSA Global Inc. 1/2012 – 5/2013 – (Post Acquisition)**

- Managed design, manufacturing, distribution and sales of industrial digital radiographic systems and growth of over 300% in sales from 2007 to 2012. Organized the business for sale, completed 12/2010 sale to ITW/QSA Global. Established annual and strategic financial and business plans, implemented plans, supervised operations and sales employees, vendors, appointed domestic and international sales representatives and dealers.

- Created quality control procedures, procurement, and production processes for production of OpenVision LT X-ray systems. Managed introduction and growth to a 25% U.S. market share before acquisition. Developed diverse new market opportunities with the US Government and international markets.

**Director of Applied Technologies - University of Alaska Anchorage, Anchorage, AK 7/2000 –6/2003.  (Term Contract)**

- Assistant Professor – Career and Technical Education, Technology.  Taught courses in Technology and CTE, advised students in all programs with emphasis in the degree completion BS Technology program including credit for prior learning, alternative assessment and academic, industry and military credit transfer. Designed new courses and academic programs including major redesign of the BS Technology (2+2 degree completion program).
- Administrative and academic manager. Hired and assessed faculty and staff. Developed and managed annual and project budgets. Facilitated assessment, design and launch of new and revised programs. Developed industry advisory groups.  Designed and managed web pages and advising materials for students.
- Coauthored study of construction management skills and workforce preparation needs in Alaska leading to a 2005 launch of a new Associate Degree Program.

**Design/Project Engineer, Marketing Manager, Plant Manager – ESCO Corporation; Portland, OR and San Diego, CA 1985 – 1999.**

- Designed steel castings, forgings and plate steel fabrications. Analyzed tolerances, optimized design for manufacturability and improved earthmoving bucket system performance.  Managed redesign of hydraulic hammer products, implemented computer simulation modeling techniques, and designed and managed rapid product testing programs.  Traveled extensively providing technical support to end users and dealers.
- Designed and implemented domestic and international product development and market growth strategies. (Helilok, Vertalok, Super V, Load-Master, Kwik-Lok II) Awarded US Patent # 5,653,048 – Wear Assembly for a Digging Edge of an Excavator.
- Implemented global Core Group Leadership Program, Dealer Market Planning System, and Customer Relationship Management Computer System.
- Managed manufacturing assembly, fabrication, CNC machining, and implementation of a QS9000 quality management system with completion of Case Corporation vendor certification of the Esco San Diego plant.

**Hezekiah "Ky" R. Holland III**
14020 Stover Place, Anchorage, AK 99516   (907) 727 2735   ky@kyholland.com

- Responsible for product line and business unit financial plans and budgets. Recruitment, hiring and evaluation of engineering, administrative staff and manufacturing technicians.
- Implemented a "Kaizen Blitz" style quality improvement program and implementation of Lean strategies that reduced working capital by 50% and doubled production output with a 30% reduction in labor hours at the San Diego hammer manufacturing facility.

## Professional - Certification, Memberships, Recognition

- Registered Professional Mechanical Engineer - OR License #14528PE.  (Inactive)
- Member: Angel Capital Association; past member of various academic and professional organizations based on domain focus of past positions.
- Awards: Top 40 under 40 – Anchorage Chamber of Commerce, Spirit of Portland - City of Portland

## Community Experience, Leadership and Skills:

- Over 35 years of experience leading non-profit community and industry trade groups serving on boards and organizing community planning projects, industry/community engagement, low-income housing development, and post-secondary technical training and education programs.
- 2014-2020 - Founding board member of Launch Alaska business accelerator

## Education

- M.B.A. Technology Management - University of Phoenix, San Diego, 2000.
    - Project – Constraint based analysis of manufacturing in Alaska.

- B.S. Mechanical Engineering - Oregon State University, Corvallis, OR. 1985.
    - Focus – Robotics, Dynamic systems analysis, Heat transfer