**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ESCO GROUP LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     C.A. No. 20-1679-RGA-JLH |
| | ) |
| DEERE & COMPANY, | ) |
| | ) |
| Defendant. | ) |

**REPORT AND RECOMMENDATION**

Pending before the Court are the parties' claim construction disputes related to terms in

United States Patent Nos. 8,844,175 and 10,273,662. I held a *Markman* hearing on March 7, 2022.

I recommend that the Court adopt the constructions set forth below:

| | **Term** | **Court** |
|---|---|---|
| 1 | "a front end"<br><br>('662 Patent, Claims 8 and 21) | Plain and ordinary meaning (*i.e.*, does not have to be "oval shaped"). |
| 2 | "a front surface"<br><br>('662 Patent, Claims 8 and 21) | Plain and ordinary meaning (*i.e.*, does not have to be "oval shaped"). |
| 3 | "a top stabilizing surface and a bottom stabilizing surface"<br><br>('662 Patent, Claims 8 and 21) | Plain and ordinary meaning (*i.e.*, the top stabilizing surface and bottom stabilizing surface are not required to be "adjacent to" the front surface, and the front surface does not have to be "oval shaped"). |
| 4 | "generally transverse to the longitudinal axis"<br><br>('175 Patent, Claims 4 and 6) | Not indefinite. |
| 5 | "a transverse inward projection"<br><br>('175 Patent, Claims 4, 15, and 19) | Not indefinite. |
| 6 | "substantially parallel to the longitudinal axis"<br><br>('662 Patent, Claims 8 and 21; '175 Patent, Claims 4, 6, 13, and 17) | Not indefinite. |

| 7 | "substantially along an entire length of the socket"<br><br>('175 Patent, Claim 6) | Not indefinite. |
|---|---|---|
| 8 | "to resist both vertical and horizontal loads"<br><br>('662 Patent, Claims 8 and 21) | Not indefinite. |

## I.    LEGAL STANDARDS

### A.    Claim Construction

The purpose of the claim construction process is to "determin[e] the meaning and scope of the patent claims asserted to be infringed." *Markman v. Westview Instruments*, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). When the parties have an actual dispute regarding the proper scope of claim terms, their dispute must be resolved by the judge, not the jury. *Id.* at 979. The Court only needs to construe a claim term if there is a dispute over its meaning, and it only needs to be construed to the extent necessary to resolve the dispute. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

"[T]here is no magic formula or catechism for conducting claim construction." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1324 (Fed. Cir. 2005). But there are guiding principles. *Id.*

"The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation." *Id.* at 1313. In some cases, the ordinary meaning of a claim term, as understood by a person of ordinary skill in the art, is readily apparent even to a lay person and requires "little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. Where the meaning is not readily apparent, however, the court may look to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." *Innova/Pure Water, Inc.*

*v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004). Those sources include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.*

"The claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. For example, "the context in which a term is used in the asserted claim can be highly instructive." *Id.* Considering other, unasserted, claims can also be helpful. *Id.* "For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314–15.

In addition, the "claims must be read in view of the specification, of which they are a part." *Id.* at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). The specification "is always highly relevant to the claim construction analysis." *Id.* (quoting *Vitronics*, 90 F.3d at 1582). The specification may contain a special definition given to a claim term by the patentee, in which case, the patentee's lexicography governs. *Id.* at 1316. The specification may also reveal an intentional disclaimer or disavowal of claim scope. *Id.* However, "even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) (internal marks omitted).

Courts should also consider the patent's prosecution history. *Phillips*, 415 F.3d at 1317. It may inform "the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making

the claim scope narrower than it would otherwise be." *Id.* Statements made by a patentee or patent owner during inter partes review may also be considered. *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1362 (Fed. Cir. 2017).

In appropriate cases, courts may also consider extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. For example, dictionaries, especially technical dictionaries, can be helpful resources during claim construction by providing insight into commonly accepted meanings of a term to those of skill in the art. *Phillips*, 415 F.3d at 1318. Expert testimony can also be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.*; *see also Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331–32 (2015).

**B.     Indefiniteness**

Section 112 of Title 35 imposes a definiteness requirement on patent claims. 35 U.S.C. § 112(b) (requiring that the claims "particularly point[] out and distinctly claim[] the subject matter which the inventor . . . regards as the invention"). "The primary purpose of the definiteness requirement is to ensure that the claims are written in such a way that they give notice to the public of the extent of the legal protection afforded by the patent, so that interested members of the public, *e.g.*, competitors of the patent owner, can determine whether or not they infringe." *All Dental Prodx, LLC v. Advantage Dental Prod., Inc.*, 309 F.3d 774, 779–80 (Fed. Cir. 2002).

"A patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572

U.S. 898, 901 (2014).  Definiteness, like claim construction, should be assessed from the viewpoint of a person of ordinary skill in the art at the time the patent was filed, and it should be considered in view of the patent's specification and prosecution history.  *Id.* at 908.

The party asserting indefiniteness has the burden to prove it by clear and convincing evidence.  *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017).

## II.    RECOMMENDED CONSTRUCTIONS

My Report and Recommendation regarding the disputed claim terms of the '662 and '175 Patents was announced from the bench at the conclusion of the hearing as follows:

> At issue in this case are two patents. The parties originally requested that the Court construe ten disputed terms but have subsequently agreed to only pursue constructions on eight terms at this stage of the case.[1]  The two patents are U.S. Patent Nos. 8,844,175 (the "'175 patent") and 10,273,662 (the "'662 patent"). Both relate to wear assemblies and wear components for use with excavating equipment. . . .

> I will not be issuing a separate written report and recommendation, but I will issue a written version of the statements I make today.  I want to emphasize before I announce my decisions that while I am not issuing a separate written opinion, we have followed a full and thorough process before making the decisions I am about to state.  We have reviewed the patents-in-suit.  There was also full briefing on each of the disputed terms.  The parties submitted their briefing in accordance with my procedures, so each side had the opportunity to submit two briefs, and they were combined into one joint claim construction brief incorporating all arguments—that is arguments from plaintiff's opening brief, defendant's answering brief, plaintiff's reply, and defendant's surreply.

> The parties also submitted several exhibits.  Those exhibits included portions of the prosecution histories relied on by the parties as well as two expert declarations from Elliot L. Stern, Ph.D., and one expert declaration from Ky Holland.  Neither party elected to put on live expert testimony.  The Court permitted lengthy oral argument.

---

[1] (*See* D.I. 53 at 1, n.1.)

All of that has been carefully considered.  To be clear, while my oral recommendation will cite to the evidence that I conclude best supports my recommended constructions, my failure to cite to other evidence provided by the parties does not mean that I ignored or failed to consider it.  As I stated, I have considered all of the arguments and evidence cited by the parties.

Now as to my recommendations.  As an initial matter, I am not going to read into the record my understanding of the general legal principles of claim construction.  I set forth the legal standard in my opinion in *3Shape A/S v. Align Tech., Inc.*,[2] and incorporate that articulation by reference.  Defendant has argued that a number of the disputed terms are indefinite.  My understanding of the law of indefiniteness was also set forth in the *3Shape* case.[3]

**["a front end"]**

The first term to be construed is "a front end."  This term is found in claims 8 and 21 of the '662 patent.[4]

---

[2] C.A. No. 18-886, 2020 WL 2188857, at *1–2 (D. Del. May 6, 2020).

[3] *Id.* at *2.

[4] Claim 8 recites:

A wear assembly for excavating equipment comprising:
    a base secured to the excavating equipment, the base including a front end with a front wall and front bearing surfaces, a rear end having opposite sides with a side recess in each of the sides, and a lock bearing surface;
    a wear member including a rearward-opening socket for receiving the base, and an opening, the socket having a longitudinal axis and including (i) a front end with a front surface transverse to the longitudinal axis to bear against the front wall on the base, and a top stabilizing surface and a bottom stabilizing surface to bear against the front bearing surfaces on the base, and (ii) a rear end with a top wall, a bottom wall and side walls extending rearward from the front end, the side walls each including a pair of side stabilizing surfaces inclined relative to each other in different transverse directions so as to laterally converge inward toward a central location along the respective

ESCO argues that the term needs no construction and should be given its plain and ordinary meaning.  Deere argues that the term should be construed as "an oval-shaped front end."  The crux of the dispute is whether the front end of the base and the front end of the socket have to be oval shaped.

I agree with ESCO that the front end does not have to be oval shaped. There is nothing in the claims suggesting that the front end must be oval shaped.

---

side wall and positioned to bear against complementary surfaces in respective side recesses in the base to resist both vertical and horizontal loads during excavating, said top stabilizing surface, said bottom stabilizing surface, and each said side stabilizing surface axially extending substantially parallel to the longitudinal axis; and
a lock received into the opening of the wear member and in contact with the lock bearing surface on the base to hold the wear member to the excavating equipment.

Claim 21 recites:

A wear member for excavating equipment comprising a rearward-opening socket for receiving a base fixed to the excavating equipment, and an opening for receiving a base fixed to the excavating equipment, and an opening for receiving a lock to releasably hold the wear member to the base, the socket having a longitudinal axis and including (i) a front end with a front surface transverse to the longitudinal axis to bear against a front wall on the base, and a top stabilizing surface and a bottom stabilizing surface to bear against front bearing surfaces on the base, and (ii) a rear end with a top wall, a bottom wall and side walls extending rearward from the front end, the side walls each including a pair of side stabilizing surfaces inclined relative to each other in different transverse directions so as to laterally converge inward toward a central location along the respective side wall to define an inward projection and bear against complementary surfaces on the base to resist both vertical and horizontal loads during excavating, said top stabilizing surface, said bottom stabilizing surface, and each said side stabilizing surface axially extending substantially parallel to the longitudinal axis.

Turning to the specification, it supports the conclusion that a person of ordinary skill in the art would understand that the phrase "front end" could encompass a front end that is not oval shaped. While it is true that the embodiments illustrated in the figures have oval-shaped front ends and the specification touts the benefits of an oval shape,[5] the specification goes on to state that, "[n]evertheless, the front end and body of the nose could have other shapes; for example, the nose and socket could be more angular and define a generally parallelepiped front end with generally rectangular stabilizing surfaces and/or flat and angular top, bottom and side walls as the body of the nose."[6]

Deere argues that the prosecution of an unrelated patent, the '175 patent, also assigned to ESCO, informs the construction of "front end" in the '662 patent-in-suit. The '175 patent is not related to the '662 patent and it has a different inventor. During prosecution of the '175 patent, the then-pending claims were rejected in view of the '651 patent [U.S. Patent No. 7,730,651], which is a grandparent of the '662 patent-in-suit. In response to the rejection, the '175 patent applicant made some statements about what the '651 patent does and does not disclose that, according to Deere, amount to a disclaimer of '662 patent scope.

I reject Deere's argument that statements made during the prosecution of the unrelated '175 patent could effect a disclaimer of '662 patent scope. Deere's briefing cited no case standing for the proposition that statements made during prosecution of one patent could result in a disclaimer of claim scope in a completely unrelated patent (with a different inventor), and I am unaware of any.

During oral argument, Deere cited the *Pfizer*[7] and *Hill-Rom*[8] cases, but neither of those cases support that proposition. Indeed, the *Pfizer* case cites other cases for the proposition that statements made during unrelated patent applications are not relevant to claim construction, even if the unrelated patents are commonly owned.[9]

---

[5] ('662 patent, 3:39–46.)

[6] (*Id.*, 3:53–58.)

[7] *Pfizer, Inc. v. Ranbaxy Labs. Ltd.*, 457 F.3d 1284, 1290 (Fed. Cir. 2006).

[8] *Hill-Rom Servs.*, 755 F.3d at 1380–81.

[9] *See Pfizer*, 457 F.3d at 1290 (citing *Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1167–68 (Fed. Cir. 2004); *Abbott Labs. v. Dey L.P.*, 287 F.3d 1097, 1104–05 (Fed. Cir. 2002)).

Regardless, even if I agreed with Deere that it were possible [for statements made during prosecution of one patent to constitute a disclaimer of claim scope in another unrelated patent], the '175 [patent] applicant's statements are not "clear and unmistakable" as to the scope of the term "front end."[10]  The '175 patent applicant argued to the examiner that the '651 patent disclosed an oval shape to form a high strength nose section, but it was in the context of explaining why the '651 patent did not disclose the '175 patent's claimed front end with an inward projection defined by bearing surfaces that extend from the front thrust surface.  I agree with ESCO that the '175 [patent] applicant did not take the position that the '651 patent was limited to an oval-shaped surface.  Rather, read in context, the '175 [patent] applicant's argument was less about the front-end shape being oval than it was about the front end lacking inward projections.[11]

In sum, even if I agreed with Deere that statements made during prosecution of an unrelated patent could effect a disclaimer, this was not a disclaimer.  Nor do those statements—which amount to extrinsic evidence—otherwise trump the clear statement in the specification that the front end can have different shapes.

Deere alternatively argues that, since ESCO is the assignee of the '175 patent for which the allegedly-disclaiming statements were made, the doctrine of judicial estoppel prevents ESCO from obtaining a claim construction of front end that does not require an oval-shaped front end.  I reject that argument as well.  For one thing, Deere has cited no authority supporting [the application of] judicial estoppel in this situation.  I am unaware of any such authority, and I decline Deere's invitation to create what I believe would essentially amount to a new canon of claim construction under the guise of judicial estoppel.[12]

Moreover, for the reasons already stated, I reject Deere's contention that the positions taken before the patent office during prosecution of the '175 patent are "irreconcilably inconsistent" with the position it is taking before this Court.  Accordingly, I reject Deere's proposal to construe "front end" as "an oval-shaped front

---

[10] *See Opticurrent, LLC v. Power Integrations, Inc.*, No. 2021-1712, 2022 WL 539158, at *5 (Fed. Cir. Feb. 23, 2022).

[11] (D.I. 42-12 at 3, 20–21; *see also* D.I. 42-13 at 5, 25–26.)

[12] *Cf. Pfizer*, 457 F.3d at 1290; *Hill-Rom*, 755 F.3d at 1381 ("[S]tatements made during prosecution of a later, unrelated patent cannot form the basis for judicial estoppel.").

end." As there are no other disputes regarding this phrase, it will be given its plain and ordinary meaning.

**["a front surface"]**

The second term to be construed is "a front surface." This term is also found in claims 8 and 21 of the '662 patent.

This dispute is essentially the same as the one I just resolved for "a front end." The crux of the dispute is whether the phrase is limited to front surfaces that are oval shaped. Deere advances the same arguments as it did for "a front end."

For the same reasons that I declined to adopt the "oval-shaped" limitation for the "a front end" term, I decline to adopt it for the "a front surface" term. As there are no other disputes regarding this phrase, it will be given its plain and ordinary meaning.

**["a top stabilizing surface and a bottom stabilizing surface"]**

The third limitation to be construed is "a top stabilizing surface and a bottom stabilizing surface." This term is also found in claims 8 and 21 of the '662 patent.

Deere wants the term to be construed as "a top stabilizing surface and a bottom stabilizing surface, each adjacent to the [oval-shaped] front surface." ESCO argues that the phrase doesn't need further construction and that Deere is inappropriately importing limitations from the specification into the claims.

The disputes here are essentially two: first, whether the construction should make clear that the top and bottom surfaces have to be "adjacent" to the front surface and, second, whether the construction should include the fact that the front surface is oval shaped. The latter is rejected for the reasons already stated.

As to the former, it wasn't entirely clear from the briefing what the argument is about here or how including the word adjacent into the construction is going to resolve that argument. [T]he claims at issue require that the top stabilizing surface and the bottom stabilizing surface have to be on the front end of the socket, and they have to bear against the front bearing surfaces on the base. In other words, the claim already puts some restrictions on where the top and bottom stabilizing surfaces are located.

Deere's proposed construction essentially adds a further restriction on the top and bottom stabilizing surface[s]—that they are "adjacent" to the front surface. Deere explained during the hearing that its construction is intended to capture the idea that the top and bottom surfaces have to be "adjoining" or "abutting" the front surfaces and/or that the front end can only have two types of surfaces: the front surface and the top/bottom surfaces.

The word adjacent does not appear anywhere in the '662 patent, but Deere points out that the claims, figures, and language of the specification describe only embodiments wherein top and bottom stabilizing surfaces are adjacent to the front surface. However, "even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction."[13]  There are no words or expressions of manifest exclusion or restriction here.

Deere also suggests that the concept of disclaimer applies here, but Deere points to nothing in the specification that even comes close to a disavowal of claim scope. The cases Deere cites in support of its position are distinguishable. For example, in the *ICU* case, the Federal Circuit held that the claim term "spike" required something to be pointed. The specification examples were consistent with the common understanding that a spike has to be pointy.[14]

That case and the others Deere cites fall on the side of the line of construing the claims in light of the specification. Deere's argument here falls on the side of improperly importing limitations from the specification into the claims. As there are no other disputes regarding this phrase, it will be given its plain and ordinary meaning.

---

[13] *Hill-Rom Services*, 755 F.3d at 1372 (quotation omitted).

[14] *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1375 (Fed. Cir. 2009) ("The specification never suggests that the spike can be anything other than pointed. . . .  Moreover, ICU offers no support from any intrinsic or extrinsic source in support of its claim that the ordinary meaning of spike would include a non-pointed structure such as a tube or a straw.")

**["generally transverse to the longitudinal axis"]**

The fourth term is "generally transverse to the longitudinal axis." This phrase is found in claims 4 and 6 of the '175 patent.[15]

Deere contends that the phrase is indefinite because "the scope of the phrase 'generally transverse to the longitudinal axis' is

---

[15] Claim 4 recites:

A wear assembly for excavating equipment comprising: a base fixed to the excavating equipment; a wear member comprising a working section and a mounting section extending generally along a longitudinal axis of the wear member, the mounting section including a socket having a front stabilizing end and a rear stabilizing end, the front stabilizing end is forward of the rear stabilizing end, the rear stabilizing end including a plurality of rear stabilizing surfaces, the front stabilizing end including a front thrust surface extending generally transverse to the longitudinal axis, and a top surface, a bottom surface, a first side surface, and a second side surface, each said top surface, bottom surface, first side surface, and second side surface extending rearwardly from the front thrust surface, wherein each of the first side surface and the second side surface has a transverse, inward projection in the front stabilizing end defined by bearing surfaces that are adjacent to and extend from the front thrust surface substantially parallel to the longitudinal axis in an axial direction; and an engagement system for releasably holding the wear member to the base.

Claim 6 recites:

A wear member for excavating equipment comprising a working section and a mounting section extending generally along a longitudinal axis, the mounting section including a socket for receiving a base fixed to the excavating equipment, and the socket having a front end and a rear end, the front end is forward of the rear end, the rear end including a plurality of rear stabilizing surfaces, the front end including a front thrust surface extending generally transverse to the longitudinal axis and a top surface, a bottom surface, a first side surface, and a second side surface, each said top surface, bottom surface, first side surface, and a second side surface, each said top surface, bottom surface, first side surface, and second side surface extending rearwardly from the front thrust surface, wherein each of the first side surface and the second side surface has an inward projection in the front end axially extending from the front thrust surface, and wherein the inward projection extends into the rear end of the socket and substantially along an entire length of the

12

not reasonably certain to a POSITA."[16]   For a claim to be held invalid for indefiniteness, there must be clear and convincing evidence.  Deere has not met its burden on this record.

Both sides submitted expert declarations regarding this phrase.[17]   One point made by Deere and its expert, Dr. Elliot L. Stern, appears to be that, notwithstanding the claim language specifying that the surface is generally transverse to the longitudinal axis, a person of skill in the art reading the specification and prosecution history would not understand what the disputed claim phrase means by transverse.[18]   I am unpersuaded.  The claim itself specifies what the front surface is generally transverse to: it is generally transverse to the longitudinal axis.

The real dispute here is whether the word "generally," a word of degree, renders claims in which it appears indefinite.  Deere contends that, if transverse means a 90-degree angle, the specification fails to describe what it means to be generally transverse.  During oral argument, Deere's counsel emphatically agreed that there is no requirement for a patent to set forth with numerical precision a range of degrees off of perpendicular that the surface can be.  Yet Deere essentially maintains that the term generally is indefinite because the patent doesn't set forth boundaries such as numerical ranges.

The Federal Circuit has instructed that "[c]laim language employing terms of degree has long been found definite where it provided enough certainty to one of skill in the art when read in the context of the invention."[19]   The Federal Circuit has also repeatedly confirmed that "a patentee need not define his invention with mathematical precision in order to comply with the definiteness

---

socket, the inward projection having front bearing surfaces in the front end adjacent to the front thrust surface and rear bearing surfaces in the rear end that each axially extend substantially parallel to the longitudinal axis.

[16] (D.I. 53 at 37.)

[17] ESCO disputes that Deere's expert is a POSITA.  For purposes of the argument, I'll assume without deciding that he is, since I find that Deere has otherwise failed to meet its burden to show indefiniteness.

[18] (*See* D.I. 53 at 38; D.I. 54-2 ¶¶ 26–41.)

[19] *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015) (quoting *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370 (Fed. Cir. 2014)).

requirement."[20]   Terms like generally and substantially are permissible as claim terms and are commonly used in patent claims to avoid a strict numerical boundary to a specified parameter.[21]

In this case, ESCO points to evidence in the form of a declaration from its expert, Mr. Ky Holland, that a person of skill in the art would understand what generally transverse means, and that it means that the front surface of the claimed invention is approximately perpendicular to the longitudinal axis of the wear member, in contrast to a wedge design that was distinguished in the prosecution history, which has a cavity with corresponding tapered top and bottom surfaces and no front thrust surface.[22]

Mr. Holland's declaration also points out that the word generally takes into account the fact that the front thrust surface may be curved and that a person of skill in the art would understand that a curved front thrust surface as depicted in figure 7 is generally transverse to the longitudinal axis.[23]

I find the declaration of Mr. Holland to be persuasive.  And I do not think there is clear and convincing evidence at this stage of the proceedings and on this record to conclude that the phrase "generally transverse to the longitudinal axis" would not be

---

[20] *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017) (quoting *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1384 (Fed. Cir. 2005)).

[21] *See, e.g.*, *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1359 (Fed. Cir. 2012) ("This court has repeatedly confirmed that relative terms such as 'substantially' do not render patent claims so unclear as to prevent a person of skill in the art from ascertaining the scope of the claim."); *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1310–11 (Fed. Cir. 2003) ("While the term 'generally parallel,' as the district court noted, is mathematically imprecise, we note that words of approximation, such as 'generally' and 'substantially,' are descriptive terms 'commonly used in patent claims to avoid a strict numerical boundary to the specified parameter.'" (quoting *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1367 (Fed. Cir. 2001))); *Mfg. Res. Int'l, Inc. v. Civiq Smartscapes, LLC*, No. 17-269-RGA, 2018 WL 4627661, at *7 (D. Del. Sept. 27, 2018) (construing "substantially parallel" to mean "approximately parallel," noting that "[t]he Federal Circuit has upheld the use of 'substantially' as a term of degree in several post-*Nautilus* cases" and "has also previously held the phrase 'generally parallel' is not indefinite and that it 'envisions some amount of deviation from exactly parallel'" (quoting *Anchor Wall*, 340 F.3d at 1311)).

[22] (D.I. 54-3 ¶¶ 38, 40–41.)

[23] (*Id.* ¶ 37.)

understood with reasonable certainty by a person of skill in the art. Accordingly, I reject Deere's indefiniteness argument.

**["a transverse inward projection"]**

The next claim is "a transverse inward projection." That phrase is found in claims 4, 15, and 19 of the '175 patent.[24]

Deere again argues that the term is indefinite. And, again, both sides submitted expert testimony on this term. Deere's expert, Dr. Stern, essentially says that, in his opinion, a person of skill in the art would not understand what the term "transverse" means in this context because another portion of the '175 patent describes a different set of planes as being transverse to the longitudinal axis.[25] Dr. Stern points out that the claimed transverse inward projections are not perpendicular to the longitudinal axis.

ESCO's expert says that a person of skill in the art would understand what transverse means in this context with reasonable certainty, and he points to the disclosures and embodiments in the specification, including at column 10, lines 1–10, and figures 2, 5, and 8.[26]

---

[24] Claim 15 recites:

A wear member according to claim 13 wherein the rear end is defined by a top side, a bottom side and opposite lateral sides each of which extend rearward from the front end, and each of the lateral sides of the rear end include a transverse, inward projection defined by bearing surfaces to contact and bear against the base that are aligned and contiguous with the projections in the front end.

Claim 19 recites:

A wear assembly according to claim 17 wherein the rear end is defined by a top side, a bottom side and opposite lateral sides each of which extend rearward from the front end, and each of the lateral sides of the rear end include a transverse, inward projection defined by bearing surfaces to contact and bear against the base that are aligned and contiguous with the projections in the front end.

[25] (D.I. 54-2 ¶¶ 43–45.)

[26] (D.I. 54-3 ¶¶ 42–43.)

Deere has not persuaded me on this record that the term transverse has, in fact, been used in different ways throughout the '175 patent such that a person of skill in the art would be unable to understand what it means in this context with reasonable certainty.

Accordingly, I reject Deere's indefiniteness argument.

**["substantially parallel to the longitudinal axis"]**

The next phrase to be construed is "substantially parallel to the longitudinal axis." This phrase is found in claims 8 and 21 in the '662 patent and claims 4, 6, 13, and 17 in the '175 patent.

Both sides appear to suggest that this phrase should be treated the same in these unrelated patents. The dispute here is whether the word "substantially," a word of degree, renders claims in which it appears indefinite. Deere says yes. ESCO says no. I conclude that Deere hasn't met its burden to establish indefiniteness.

The '662 patent states: "The term 'substantially parallel' is intended to include parallel surfaces as well as those that diverge rearwardly from axis 34 at a small angle (e.g., of about 1–7 degrees) for manufacturing purposes."[27]  The '175 patent contains similar language.[28]

Here, again, Deere denies that it seeks to impose a standard that would require numerical precision. Yet, its position is, essentially, that the claim or specification needs to provide an exact numerical range of angles that could constitute substantially parallel so that a person of skill in the art will know "just how much" they can deviate from parallel and still fall within the scope of the claim. According to Deere and its expert, the guidance in the specification about what substantially means is unhelpful in informing the public about the scope of the invention because it replaces one relative term, "substantially," with another, "small."[29]  Dr. Stern also

---

[27] ('662 patent, 3:27–30.)

[28] ('175 patent, 9:54–58.)  I note that both specifications contain additional guidance beyond that discussed above.  For example, both patents state, in reference to a preferred embodiment, that "each stabilizing surface 30, 32 diverges rearwardly at an angle to axis 34 of no more than about 5 degrees and most preferably at about 2–3 degrees." ('662 patent, 3:30–33; '175 patent, 9:58–61.)

[29] (*See* D.I. 54-2 ¶ 50; D.I. 53 at 59.)

explains that including the phrase "e.g., of about 1–7 degrees" is similarly unhelpful because (1) "about" is also a relative term and (2) "using 'e.g.' instead of 'i.e.' means that 'about 1–7 degrees' is just an example of what a small angle could be" and "leaves the limits of what a small angle is" entirely subjective to the view of the reader.[30]

ESCO's expert Mr. Holland counters that a person of skill in the art would understand the term substantially as meant to account for the variability associated with the casting and forging manufacturing practices and that such practices cannot obtain absolute numerical precision.[31]  I find Mr. Holland's declaration persuasive and I find that Deere has not met its burden on this record to show by clear and convincing evidence that the phrase is indefinite.

Deere cites the *Interval Licensing* case, but that case is distinguishable as it dealt with a "highly subjective" claim term and the only clue about the scope of that term came from a single example from the specification.[32]  Unlike the claim term at issue in *Interval Licensing*, the question of whether something is parallel or not is not a subjective inquiry.  Moreover, in this case, Mr. Holland's opinion that a person of skill in the art would understand the term substantially to take into account manufacturing variability is consistent with the specification, which explains that "substantially parallel" encompasses small deviations resulting from manufacturing constraints.  Moreover, other courts have construed the term "substantially parallel" in similar ways and have declined to find such terms indefinite.[33]

**["substantially along an entire length of the socket"]**

The next phrase is "substantially along an entire length of the socket."  This phrase is found in claim 6 of the '175 patent.

The parties advance similar arguments as they did for the previous terms concerning indefiniteness.  And again, each side

---

[30] (D.I. 54-2 ¶ 51.)

[31] (D.I. 54-3 ¶ 46.)

[32] *Interval Licensing*, 766 F.3d at 1371–72.

[33] *See supra* note 21.

submitted expert testimony.  Deere argues that a person of skill in the art would not understand the phrase with reasonable certainty. According to Deere, nothing in the specification elaborates on the meaning of the phrase.

ESCO contends that the phrase is not indefinite, and that the word "substantially" would be understood by a person of skill in the art in its ordinary sense to mean largely.  In support of its position, ESCO points to the declaration of its expert, Mr. Holland, who explains that, "'[s]ubstantially,' as used in the context of this term, to a person of ordinary skill in the art allows for minor interruptions in a wear member feature that might be required for geometric form transitions, blending from the main surface to the ends smoothly to reduce stress concentrations, manufacturing requirements, or interruption for locking features."[34]

Mr. Holland also points to figures 2 and 8 as examples of an inward projection extending along an entire length of the socket.[35] According to Mr. Holland, those figures inform a person of skill in the art about what it means for an inward projection to extend along an entire length of the socket, and a person of skill in the art would be able to understand that in conjunction with the term of degree substantially.

Having examined the record before the Court, I'm unpersuaded on this record that a person of skill in the art would not understand with reasonable certainty what is meant by substantially in this context.

**["to resist both vertical and horizontal loads"]**

I now turn to the final term, "to resist both vertical and horizontal loads."  That phrase is found in claims 8 and 21 of the '662 patent.

Deere again contends the phrase is indefinite, and both parties submitted expert testimony in support of their position. According to Deere, a person of skill in the art would not understand what it means to "resist."  Dr. Stern opines that the '662 patent and its prosecution history fail to inform a person of skill in the art about the scope of the term with reasonable certainty because they disclose

---

[34] (D.I. 54-3 ¶ 48.)

[35] (D.I. 54-3 ¶¶ 48–50.)

no objective test for determining whether vertical and horizontal loads are in fact resisted.[36]

ESCO argues that a person of skill in the art would understand the phrase to mean "capable of resisting." Mr. Holland identifies several portions of the specification that describe the angled orientation of the side stabilizing surfaces that allow them to resist vertical and horizontal loads.[37] According to Mr. Holland, the claim language and examples in the written description are sufficient to inform a person of skill in the art of what the term resist means with reasonable certainty.

I agree with ESCO. I reject Deere's suggestion that a particular test or a mathematical amount of resistance needs to be identified for a person of skill in the art to understand what the phrase "to resist both vertical and horizontal loads" means.

I also note that the functional requirement that the surfaces resist both vertical and horizontal loads does not stand alone as it is not the only claim limitation relating to the stabilizing surfaces.[38] The claims also contain significant structural limitations regarding the surfaces, namely, that they are "inclined relative to each other in different transverse directions so as to laterally converge inward toward a central location along the respective side wall and [are] positioned to bear against complementary surfaces in respective side recesses in the base to resist both vertical and horizontal loads during excavating" and that they "axially extend[] substantially parallel to the longitudinal [axis]."[39] And Mr. Holland explains that a person of skill in the art would understand from the specification that such stabilizing surfaces would be capable of resisting vertical and horizontal loads.

Accordingly, I find that Deere has not demonstrated by clear and convincing evidence that the phrase is indefinite.

---

[36] (D.I. 54-2 ¶¶ 58–61.)

[37] (D.I. 54-3 ¶¶ 52–53 (citing the '662 patent, 5:5–25, 7:16–22, and 7:49–52).)

[38] "[F]unctional language can 'promote[ ] definiteness because it helps bound the scope of the claims by specifying the operations that the [claimed invention] must undertake.'" *Nevro Corp. v Bos. Sci. Corp.*, 955 F.3d 35, 39 (Fed. Cir. 2020) (quoting *Cox Commc'ns, Inc. v. Sprint Commc'n Co. LP*, 838 F.3d 1224, 1232 (Fed. Cir. 2016)).

[39] ('662 patent, claims 8, 21.)

And that concludes my report and recommendation.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B),(C), Federal Rule of Civil Procedure 72(b)(1), and District of Delaware Local Rule 72.1. Any objections to the Report and Recommendation shall be filed within fourteen days and limited to ten pages. Any response shall be filed within fourteen days thereafter and limited to ten pages. The failure of a party to object to legal conclusions may result in the loss of the right to *de novo* review in the district court.

The parties are directed to the Court's "Standing Order for Objections Filed Under Fed. R. Civ. P. 72," dated March 7, 2022, a copy of which can be found on the Court's website.

Dated: April 6, 2022

The Honorable Jennifer L. Hall
United States Magistrate Judge