### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

ESCO GROUP LLC,                )
                                  )
           Plaintiff,           )
                                  )
           v.                   )      C.A. No. 20-1679-WCB-MPT
                                  )
DEERE & COMPANY.         )      PUBLIC VERSION FILED
                                  )      MAY 2, 2023
           Defendant.        )
                                  )

### DEFENDANT DEERE & COMPANY'S COMBINED OPENING BRIEF IN SUPPORT OF ITS MOTIONS FOR SUMMARY JUDGMENT OF <u>NONINFRINGEMENT AND INVALIDITY</u>

**SAUL EWING LLP**

OF COUNSEL:

John F. Bennett (*pro hac vice*)
Paul M. Ulrich (*pro hac vice*)
Rachael L. Rodman (*pro hac vice*)
Paul J. Linden (*pro hac vice*)
Ava M. Abner (*pro hac vice*)
ULMER & BERNE LLP
312 Walnut Street, Suite 1400
Cincinnati, Ohio 45202-4029
(513) 698-5000
jbennett@ulmer.com
pulrich@ulmer.com
rrodman@ulmer.com
plinden@ulmer.com
aabner@ulmer.com

Dated: March 22, 2023

James D. Taylor, Jr. (#4009)
Michelle C. Streifthau-Livizos (#6584)
SAUL EWING LLP
1201 N. Market Street, Suite 2300
Wilmington, Delaware 19801
(302) 421-6800
james.taylor@saul.com
michelle.streifthau-livizos@saul.com

*Attorneys for Defendant*
*DEERE & COMPANY*

**<u>TABLE OF CONTENTS</u>**

TABLE OF AUTHORITIES ................................................................................... iv

I.      STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ............. 1

II.     SUMMARY OF THE ARGUMENTS ....................................................... 1

III.    STATEMENT OF FACTS.................................................................. 2

    A.    Background Facts Relevant to Noninfringement.................................. 2

    B.    Background Facts Relevant to Indefiniteness.................................... 4

    C.    Background Facts Relevant to Anticipation ..................................... 5

IV.    LEGAL STANDARD ....................................................................... 5

V.     DEERE DID NOT DIRECTLY INFRINGE ANY CLAIMS OF THE '175 PATENT
      ........................................................................................ 6

    A.    No Literal Infringement ............................................................. 6

    B.    No Infringement under Doctrine of Equivalents ............................... 9

VI.    DEERE DID NOT INDIRECTLY INFRINGE ANY CLAIMS OF THE '175 OR
      '662 PATENTS ........................................................................... 13

    A.    No Pre-suit Knowledge, No Indirect Infringement............................ 13

    B.    No Contributory Infringement for Locks or Adapters......................... 14

VII.   THE ASSERTED CLAIMS OF THE '175 AND '662 PATENTS ARE INDEFINITE
      ........................................................................................ 16

    A.    The Law of Indefiniteness ......................................................... 16

    B.    Indefinite: Claims from Both Patents with "Substantially Parallel"............. 17

    C.    Indefinite: Claims from the '662 Patent with "To Resist Both Vertical and Horizontal
       Loads During Excavating".......................................................... 20

VIII.  THE ASSERTED CLAIMS OF THE '662 PATENT ARE ANTICIPATED ........... 23

    A.    The Law of Anticipation............................................................. 23

    B.    Carpenter '771 Anticipates the Asserted Claims of the '662 Patent............. 24

    1.    Claim 8 [pre]: A wear assembly for excavating equipment comprising ...... 24

i

2.    [8.1] a base secured to the excavating equipment ........................................................ 24

3.    [8.2] the base including a front end with a front wall and front bearing surfaces ......... 25

4.    [8.3] a rear end having opposite sides with a side recess in each of the sides ............... 26

5.    [8.4] a lock bearing surface ......................................................................................... 26

6.    [8.5] a wear member including a rearward-opening socket for receiving the base ....... 27

7.    [8.6] an opening ........................................................................................................... 27

8.    [8.7] the socket having a longitudinal axis ................................................................. 28

9.    [8.8] including (i) a front end with a front surface transverse to the longitudinal axis to
bear against the front wall on the base ........................................................................ 28

10.    [8.9] a top stabilizing surface and a bottom stabilizing surface to bear against the front
bearing surfaces on the base ....................................................................................... 29

11.    [8.10] (ii) a rear end with a top wall, a bottom wall and side walls extending rearward
from the front end ...................................................................................................... 29

12.    [8.11] the side walls each including a pair of side stabilizing surfaces inclined relative
to each other in different transverse directions so as to laterally converge inward toward
a central location along the respective side wall.......................................................... 29

13.    [8.12] positioned to bear against complementary surfaces in respective side recesses in
the base to resist both vertical and horizontal loads during excavating......................... 32

14.    [8.13] said top stabilizing surface, said bottom stabilizing surface, and each said side
stabilizing surface axially extending substantially parallel to the longitudinal axis...... 33

15.    [8.14] a lock received into the opening of the wear member and in contact with the lock
bearing surface on the base to hold the wear member to the excavating equipment..... 35

16.    Claim 9: A wear assembly in accordance with claim 8 wherein each said pair of side
stabilizing surfaces of the wear member collectively defines a V-shaped formation.... 35

17.    Claim 12: A wear assembly in accordance with claim 8 wherein the side stabilizing
surfaces of the wear member are located near the rear end of the wear member .......... 36

18.    Claim 13: A wear assembly in accordance with claim 8 wherein each said side
stabilizing surface axially extends at an angle of no more than about five degrees to the
longitudinal axis......................................................................................................... 36

19.    Claim 21[pre]: A wear member for excavating equipment comprising ....................... 36

20.    [21.1] a rearward-opening socket for receiving a base fixed to the excavating equipment ................................................................................................ 36

21.    [21.2] an opening for receiving a lock to releasably hold the wear member to the base 37

22.    [21.3] the socket having a longitudinal axis ................................................. 37

23.    [21.4] including (i) a front end with a front surface transverse to the longitudinal axis to bear against a front wall on the base ............................................... 37

24.    [21.5] and a top stabilizing surface and a bottom stabilizing surface to bear against front bearing surfaces on the base ........................................................... 37

25.    [21.6] (ii) a rear end with a top wall, a bottom wall and side walls extending rearward from the front end ............................................................................... 37

26.    [21.7] the side walls each including a pair of side stabilizing surfaces inclined relative to each other in different transverse directions so as to laterally converge inward toward a central location along the respective side wall to define an inward projection .......... 37

27.    [21.8] and bear against complementary surfaces on the base to resist both vertical and horizontal loads during excavating ............................................... 37

28.    [21.9] said top stabilizing surface, said bottom stabilizing surface, and each said side stabilizing surface axially extending substantially parallel to the longitudinal axis...... 38

29.    Claim 22: A wear assembly in accordance with claim 21 wherein said pair of side stabilizing surfaces collectively defines a V-shaped formation..................................... 38

30.    Claim 25: A wear assembly in accordance with claim 21 wherein the side stabilizing surfaces are located near the rear end ........................................................... 38

31.    Claim 26: A wear assembly in accordance with claim 21 wherein said top stabilizing surface, said bottom stabilizing surface, and each said side stabilizing surface axially extends at an angle of no more than about five degrees to the longitudinal axis .......... 38

IX.    **CONCLUSION** ................................................................................. **38**

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
365 U.S. 336 (1961) (Brennan, J., concurring)........................................................15

*Berkheimer v. HP Inc.*,
881 F.3d 1360 (Fed. Cir. 2018)...............................................................................17

*Blue Calypso, LLC v. Groupon, Inc.*,
815 F.3d 1331 (Fed. Cir. 2016)...............................................................................23

*Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*,
460 F.3d 1349 (Fed. Cir. 2006)...............................................................................11

*Conroy v. Reebok Int'l, Ltd.*,
14 F.3d 1570 (Fed. Cir. 1994)...................................................................................1

*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
363 F.3d 1263 (Fed. Cir. 2004)...............................................................................13

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*,
535 U.S. 722 (2002).................................................................................................11

*Freedman Seating Co. v. American Seating Co.*,
420 F.3d 1350 (Fed. Cir. 2005)...............................................................................11

*Horizon Pharma, Inc. v. Dr. Reddy's Lab'ys Inc.*,
839 F. App'x 500 (Fed. Cir. 2021) ..........................................................................12

*InQuisient Inc. v. ServiceNow, Inc.*,
No. 1-22-cv-00900 (D. Del. Feb. 22, 2023) (Burke, Mag. J.) .................................13

*Interval Licensing LLC v. AOL, Inc.*,
766 F.3d 1364 (Fed. Cir. 2014)...................................................................16, 17, 22

*Invitrogen Corp. v. Clontech Lab'ys, Inc.*,
429 F.3d 1052 (Fed. Cir. 2005)...............................................................................12

*Lundbeck v. Lupin Limited*,
No. 18-cv-88-LPS, 2021 WL 4944963 (D. Del. Sept. 30, 2021) ............................14

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)...................................................................................................5

*Microsoft Corp. v. Biscotti, Inc.*,
  878 F.3d 1052 (Fed. Cir. 2017)....................................................................................2, 23

*MONEC Holding AG v. Motorola Mobility, Inc*.,
  897 F. Supp. 2d 225 (D. Del. 2012)..................................................................................14

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  572 U.S. 898 (2014)................................................................................2, 16, 20, 23

*Nevro Corp v. Boston Scientific Corp.*,
  955 F.3d 35 (Fed. Cir. 2020)............................................................................................22

*Podobnik v. U.S. Postal Serv.*,
  409 F.3d 584 (3d Cir. 2005)...............................................................................................5

*Princeton Digital Image Corp. v. Ubisoft Ent. SA*,
  No. CV 13-335-LPS-CJB, 2017 WL 6337188 (D. Del. Dec. 12, 2017) ...............................13

*Sage Products, Inc. v. Devon Industries, Inc.*,
  126 F.3d 1420 (Fed. Cir. 1997)........................................................................................11

*Valinge Innovation AB v. Halstead New England Corp.*,
  No. 16-1082-LPS-CJB, 2017 WL 5196379 (D. Del. Nov. 9, 2017) ....................................13

*Versata Software, Inc. v. Zoho Corp.*,
  213 F. Supp. 3d 829 (W.D. Tex. 2016)............................................................................22

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
  520 U.S. 17 (1997)...................................................................................................9, 11

*ZapFraud, Inc. v. Barracuda Networks, Inc.*,
  528 F. Supp. 3d 247 (D. Del. 2021)..............................................................................1, 13

**STATUTES**

35 U.S.C. § 102(b) ..............................................................................................................23, 24

35 U.S.C. § 271(c) ..........................................................................................................1, 14, 15

America Invents Act ...............................................................................................................23

**RULES**

Fed. R. Civ. P.  56 ...................................................................................................................5

## I.   STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

ESCO brought this case on December 10, 2020, and amended the complaint on April 7, 2021, asserting two patents against Deere: the '175 and '662 Patents.  (D.I. 1, 11.)  The discovery period has closed.  Trial is set for September 18, 2023.  (D.I. 24.)

## II.   SUMMARY OF THE ARGUMENTS

The following four issues in this case can be resolved without the need for a jury:

1.   **Noninfringement of the '175 Patent.**  Deere is entitled to summary judgment on ESCO's infringement claims of the '175 Patent at least because there can be no genuine dispute that Deere's accused products have four large, beveled planar facets ***in between*** the accused front thrust surface and the accused side surfaces/projections; as such, the accused products lack claimed surfaces/projections that "extend ***from*** the front thrust surface" as required by claim limitations 4.8, 4.10, 6.6, 6.7, 13.8, and 17.10.  *Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1573 (Fed. Cir. 1994) ("[T]he patentee must prove that the accused device embodies every limitation in the claim.").

2.   **No Indirect Infringement of the '175 or '662 Patents**.  Deere is entitled to summary judgment on ESCO's indirect infringement claims of the '175 and '662 Patents at least because there can be no genuine dispute that Deere lacked pre-suit knowledge of the both patents. *See, e.g., ZapFraud, Inc. v. Barracuda Networks, Inc*., 528 F. Supp. 3d 247, 252 (D. Del. 2021). Moreover, Deere is entitled to summary judgment with respect to the accused locks and adapters because, for both patents, neither accused component is a "material part of the invention … especially made or especially adapted for use in an infringement," and both components are "suitable for substantial noninfringing use."  35 U.S.C. § 271(c).

3.   **The Asserted Claims of the '175 and '662 Patents Are Indefinite.**  The asserted claims from both the '175 and '662 Patents recite one or more surfaces in the tooth's socket that

1

extend "substantially parallel to [its] longitudinal axis."  The patents, however, provide that "substantially parallel" includes "small" angles that deviate from parallel because of "manufacturing" or "other purposes."  Similarly, the claims of the '662 Patent require "a pair of side stabilizing surfaces" on the tooth's socket that "bear against complementary surfaces" on the base "to resist both vertical and horizontal loads during excavating"; yet the patent likewise fails to provide any numerical examples of loads a product must be able "to resist."  Because the patents fail to provide objective boundaries for "substantially parallel" or "resist[ed]" loads, none of the Asserted Claims are "precise enough to afford clear notice of what is claimed" or "of what is still open."  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).  The claims are therefore indefinite and thus invalid.

4.     **The Asserted Claims of the '662 Patent Are Anticipated.**  The claim limitations of the '662 Patent were disclosed in prior art reference U.S. Patent Application Publication No. 2004/0093771 ("Carpenter '771").  The claims are anticipated and therefore invalid.  *Microsoft Corp. v. Biscotti, Inc.*, 878 F.3d 1052, 1068 (Fed. Cir. 2017).

## III.    STATEMENT OF FACTS

### A.    Background Facts Relevant to Noninfringement

Both the '175 and '662 Patents are directed to cutting teeth for excavating equipment.  Such teeth have openings—or sockets—that allow the teeth to slide over and attach to an adapter, which in turn, is attached to excavating equipment.  Both the '175 and '662 Patents recite claims either for (1) a cutting tooth alone or (2) an assembly including the cutting tooth, a base (adapter), and a lock.

With respect to both patents, as shown in the below exemplary figures, each tooth (blue) is removably attached to a base (adapter) (green), and that adapter, in turn, is fixedly attached directly to an excavator bucket:

2

**Base and Tooth of the '662 Patent (Figs. 1A, 3, 7, Ex. F, at 93-94, 96—Annotated by Deere)**



**Base and Tooth of the '175 Patent (Fig. 2, Ex. D, at 65—Annotated by Deere)**



With respect to the '175 Patent specifically, when the tooth and adapter are assembled, the "forward-facing bearing or thrust face **142**" of the adapter sets against a complementary shaped "thrust face" of the socket.  ('175 Patent, col. 7, l. 61-col. 8, l. 4, Ex. D, at 76.)  In the claims, the socket's "thrust face" is recited as a "front thrust surface." (*See, e.g.*, *id.* claims 4, 6, 13, 17, Ex. D, at 80-81.)

3

Every claim of the '175 Patent recites the socket's having two "projections"—one on each side of the socket's front end.  Depending on the claim, either (1) the projections themselves extend "from" the socket's front thrust surface or (2) the projections are "defined by bearing surfaces" that extend "from" the front thrust surface.  (*Id*.)

The sockets of Deere's accused teeth, however, have four large, beveled planar facets ***in between*** the accused front thrust surfaces and the accused side surfaces/projections, such that accused surfaces/projections do not extend ***from*** the accused front thrust surface.

With respect to ESCO's indirect infringement claims, none of the patent claims is directed to either an adapter or a lock alone.  Although ESCO is seeking damages based on sales of adapters and locks under a theory of contributory infringement, Deere did not have pre-suit knowledge of either Asserted Patent.  (Deere's Resp. to Interrog. 9, Ex. H, at 115-16; Verification, Ex. Y, at 400.)

Moreover, the locks recited in the asserted claims can be used in noninfringing base and tooth assemblies.  (Holland Dep., 128:16-25, Ex. U, at 343.)  And the recited locks are "generic term[s] used to describe a component 'used to releasably secure' a wear member to the nose of an adapter." (*See e.g.*, Holland Rpt., Appx A, at 15, Ex. N, at 202.)

With respect to the accused adapters, Deere has recently designed and implemented noninfringing replacements for the accused teeth, known here as "Rev. A1," which are ████████ ██████████████████████████████████ (Klopp Dep. 102:6-22, Ex. V, at 383.)

## B.   Background Facts Relevant to Indefiniteness

The asserted claims of both patents all recite surfaces that extend "substantially parallel to the longitudinal axis" of the tooth.  The patents and prosecution histories, however, do not provide (1) an upper limit for an angle to be considered "substantially parallel" or (2) examples that are too large to be considered "substantially parallel."  (*See* generally '175 and '662 Patents, Exs. D, F.)

Similarly, in the '662 Patent, every claim recites "a pair of side stabilizing surfaces" on the tooth's socket that "bear against complementary surfaces" on the base "to resist both vertical and horizontal loads during excavating."  But the patent fails to provide any numerical examples of loads a product must be able to "resist … during excavating" to meet the limitation.  ('662 Patent, Ex. F.)

### C.    Background Facts Relevant to Anticipation

Carpenter '771 is prior art to the '662 Patent.  Below are exemplary figures from the '662 Patent and Carpenter '771, colored by Deere:



| Carpenter '771, Fig. 12, Ex. A, at 11 | '662 Patent, Fig. 3, Ex. F, at 94 |

As discussed in detail below, Carpenter's teachings significantly overlap with the '662 Patent and anticipate the asserted claims in particular.

## IV.    LEGAL STANDARD

The moving party bears the burden of proof to show there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 n.10 (1986); Fed. R. Civ. P. 56.  To defeat such a motion, the non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue."  *Podobnik v. U.S. Postal Serv.*,

5

409 F.3d 584, 594 (3d Cir. 2005) (internal quotation marks omitted).

## V.     DEERE DID NOT DIRECTLY INFRINGE ANY CLAIMS OF THE '175 PATENT

As discussed above, every claim of the '175 Patent recites a "projection" on each side of the socket's front end.  Depending on the claim, either (1) each projection itself extends "from" the front thrust surface of the socket or (2) each projection is "defined by bearing surfaces" that extend "from" the front thrust surface.  Specifically, claim 6 requires that each projection itself ***extends from*** the front thrust surface, while claims 4, 13, 17 recite projections defined by bearing surfaces that ***extend from*** the front thrust surface.

In fact, claim 6 further recites that each projection is on a side surface that ***extends from*** the front thrust surface.  Regardless of the claim, then, the surfaces containing and defining the claimed projections must ***extend from*** the front thrust surface.

### A.     No Literal Infringement

The Accused Products do not contain this claim element, and, therefore, Deere has not infringed any of claim of the '175 Patent.  That is, as shown in the below images, the accused socket has four large, beveled planar facets ***in between*** the accused front thrust surface and the accused side surfaces/projections:

**Accused Product with Beveled Facts (Purple, Annotated by Deere)[1]**



Beveled Planar Facets

---

[1] DEERE_0004692, Ex. B, at 35.

**Accused Product with Accused Front Thrust Surface (Annotated by H. Holland)[2]**



front thrust surface

**Accused Product with Accused Side Surfaces/Projection (Annotated by H. Holland)[3]**



first and second side surfaces        top and bottom surfaces

transverse, inward projections
defined by bearing surfaces

---

[2] Holland Rpt., Appx. B, at 12, Ex. O, at 215.
[3] Holland Rpt., Appx. B, at 17, 22, Ex. O, at 220, 225.

Deere's expert—Dr. Klopp—explained what is obvious even to a layperson: "the surfaces that Mr. Holland identifies cannot practice claim limitation 4.8 because they do not 'extend rearwardly *from* the front thrust surface.'"  (Emphasis added.)  The same is true with respect to each of limitations 4.10, 6.6, 6.7, 13.8, and 17.10, as shown in the below images of the correspondingly shaped base:

**Accused Adapter with Accused Front Thrust and Other Surfaces[4]**



*Figure 26.   The nose of the Accused Products. As shown, the surfaces identified by Mr. Holland (red) extend from the boundary of the bevel (white dotted line) substantially rearward of the front thrust surface, and not from the surface identified by Mr. Holland as the front thrust surface (blue).*

**Accused Adapter with Unclaimed Beveled Surfaces in Purple (Annotated by Deere)[5]**



[4] Klopp Rebuttal ¶¶ 145-46, Fig. 26 (Annotated by R. Klopp), Ex. R, at 316.
[5] DEERE_0000406.

As Dr. Klopp explained in his deposition, the plain and ordinary meaning of "from" as used in the claims is neither controversial nor in genuine dispute:

> Q        And how do you define the term "from" as it relates to this claim limitation?
>
> A        Well—"extending rearwardly from" means it—I think a PHOSITA would agree that that ***means it starts***, you know, from, at the front thrust surface. And then that's somewhat educated by the adjacent "to" language, that these two things "extending from" and "adjacent to" have to mean two different things.
>
> And if it—you know, my neighbor's house is adjacent to mine, it doesn't touch, but—so "extending from" must mean something different than "adjacent to," I think.  And so "extending from" means it extends from the front thrust surface.

(Klopp Dep. 241:13-242:3, Ex. V, at 387-88 (emphasis added; objection omitted).)

Neither party sought construction of "from" during *Markman*, and, indeed, "from" requires no construction.   Nevertheless, Dr. Klopp's application of the plain and ordinary meaning is consistent with contemporary dictionary definitions, such as Webster's Ninth New Collegiate Dictionary, "as a function word to indicate a ***starting point***."  (Abner Decl. ¶ 2, Ex. W, at 394; Webster's Ninth New Collegiate Dictionary, 1987, Ex. X, at 398 (emphasis added).)  As such, there can be no genuine dispute that the accused surfaces fail to extend rearwardly ***from*** the front thrust surface, and the Court should therefore grant summary judgment that Deere did not literally infringe the '662 Patent.

**B.       No Infringement under Doctrine of Equivalents**

The Accused Products likewise do not satisfy this "extending from" limitation under the doctrine of equivalents.  As an initial matter, "[e]ach element contained in a patent claim is deemed material to defining the scope of the patented invention," and that the doctrine of equivalents "must be applied to individual elements of the claim, not to the invention as a whole."  *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997).

Here, ESCO's expert did not provide ***any opinion*** regarding the applicability of the doctrine of equivalents to the "extending from" limitation.  Instead, he purported to collectively analyze ***multiple claim elements and limitations.***  The entirety of his analysis is below:

> In addition, and to the extent that Deere argues that the TK System's does not literally include **transverse, inward projections in the front stabilizing end *adjacent to* and extending from the front thrust surface**, because Deere contends the projections must somehow be *immediately* adjacent to the front thrust surface—which is a construction of claim terms that I disagree with—it my opinion that the TK System would still infringe under the doctrine of equivalents based on a function-way-result analysis. Specifically, the transverse, inward projections of the TK System function to resist horizontal and vertical loads (as detailed above), and do so by providing inclined bearing surfaces between a base and wear member in the front end of the TK System (as shown above), with the result of providing stabilization of the TK System during excavation operations (as shown above, and described in Deere and Black Cat documents). As such, the TK System would, at the very least, infringe under the doctrine of equivalents because the transverse, inward projections have the same function and same result, in the same way, as the '175 Patent.

(Holland Rpt., Appx. B, at 30, Ex. O, at 233 (emphasis in original).)

Because ESCO's expert failed to apply the doctrine of equivalents to the individual elements of the claim, the above analysis is improper.  In fact, not only did ESCO's expert concede during his deposition that his equivalents opinion did not "parse" out each claim element, but his analysis also did not include "extending from"—only "adjacent to" and "inward projections":

> Q.    On page 30 for your doctrine of equivalence analysis, is it merely the term "adjacent to" that you've applied the doctrine of equivalence to?
>
> A.    I'm sorry.  I'm reading through here to see if it is limited in the way you're asking me. I'm sorry.  You know, this test and what we put together here, it seems to be looking at both the adjacent to and the transverse inward projection side surfaces and testing for the equivalent functionality in the TK system of the side surfaces and their being adjacent to the front thrust surface.
>
> So I don't think I intended to parse this out in exactly the way you suggested that it was a limited function way result of the adjacent-to test.  I think it also incorporates the side inward projections.

(Holland Dep. 323:15-324:7, Ex. U, at 378-79.)

10

In addition, in considering infringement under the doctrine of equivalents, there should be "[a] focus on individual elements and a special vigilance against allowing the concept of equivalence to **eliminate completely** any such elements."   *Warner-Jenkinson*, 520 U.S. at 40 (reversing finding of infringement under doctrine of equivalents) (emphasis added).   Here, the asserted claims contain separate, material elements in "adjacent to" and "extending from," such that any potential equivalents argument broad enough for "extending from" (though yet unasserted) that cover the accused products would completely vitiate the claim element.   *See, e.g., Sage Products, Inc. v. Devon Industries, Inc.*, 126 F.3d 1420, 1424-25 (Fed. Cir. 1997) (affirming summary judgment of noninfringement under doctrine of equivalents); *Freedman Seating Co. v. American Seating Co*., 420 F.3d 1350, 1361-62 (Fed. Cir. 2005) (reversing summary judgment).

Perhaps ESCO's expert did not provide an equivalents argument to "extending from" because he knew the doctrine is unavailable for this limitation under **prosecution history estoppel**, which "arises when an amendment is made to secure the patent and the amendment narrows the patent's scope."   *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd*., 535 U.S. 722, 736 (2002).   In fact, both **amendment-based** and **argument-based** estoppel apply in this case because ESCO amended the independent claims to include "adjacent to" and "extending from" in response to an Office Action, arguing that the cited prior art "does not disclose any inward projections in the front end that define bearing surfaces that are **adjacent to and extend from the front thrust surface**."   (ESCO-00000720-21, Ex. C, at 54-55; *see generally* ESCO-00000705-24, Ex. C, at 39-58.)   Because ESCO disclaimed "the territory between the original claim and the amended claim," ESCO cannot now argue doctrine of equivalents for either "adjacent to" *or* "extending from."   *Festo*, 535 U.S. at 736, 740-41; *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1363 (Fed. Cir. 2006).

Nevertheless, even if the Court were to allow it, the analysis is insufficient because it fails to compare the function, way, or result of the ***gap caused by the beveled planar facets*** against the ***projections that would have been present in the gap*** as recited in the claims.  ESCO's and its expert's conclusory statements regarding equivalence simply are insufficient to defeat summary judgment.  *Horizon Pharma, Inc. v. Dr. Reddy's Lab'ys Inc*., 839 F. App'x 500, 503-04 (Fed. Cir. 2021); *Invitrogen Corp. v. Clontech Lab'ys, Inc*., 429 F.3d 1052, 1080 (Fed. Cir. 2005) ("A party does not manufacture more than a merely colorable dispute simply by submitting an expert declaration asserting that something is black when the moving party's expert says it is white; there must be some foundation or basis for the opinion.").

Moreover, as explained by Dr. Klopp, the accused claim elements (the beveled planar facets) are simply ***not equivalent*** to the claim limitation:

> Mr. Holland provides no basis for this opinion. For one, as discussed above at ¶¶39-43 and 98-102, he is incorrect, and the angled side surfaces cannot resist vertical loads because the side gaps are larger in the vertical direction than the gaps on the top and bottom stabilizing surfaces. For example, to show that the interior surfaces of the Accused Products that he identifies provide the same function and result as the claimed surfaces of the '175 Patent, Mr. Holland must, at the very least, show that the fact that the surfaces in the Accused Products (which are decidedly are neither adjacent to nor extending from the front thrust surface, being separated by a beveled edge) react to horizontal and vertical loads in the same way that the claimed surfaces of the '175 Patent do. Mr. Holland provides no such data or analysis to support his conclusions, and, therefore, fails to establish that the surfaces he identifies in the interior of the socket of the Accused Products provide the same function as the bearing surfaces recited in claim limitation 4.10.

(Klopp Rebuttal ¶ 157, Ex. R, at 320-21.)

Indeed, not only does ESCO's expert fail to provide any testing or data to show equivalence, the inventor of the '175 Patent testified that it was ***important*** and functionally mattered to bring the projections "all the way to the front thrust surface" rather than simply have them further back in the front portion of the socket.  (Snyder Dep. 79:22-83:9, Ex. L, at 181-85.)  For all of these reasons, ESCO cannot demonstrate a genuine issue of material fact that this claim element is

present either literally or under the doctrine of equivalents, and summary judgment is appropriate.

## VI.   DEERE DID NOT INDIRECTLY INFRINGE ANY CLAIMS OF THE '175 OR '662 PATENTS

As discussed above, Deere has not infringed either of the Asserted Patents.  As a matter of law, then, ESCO's indirect infringement claims also must fail.  *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1272–73 (Fed. Cir. 2004).  Nevertheless, the indirect infringement claims fail for two other reasons: (1) Deere had no pre-suit knowledge of the patents; and (2) with respect to contributory infringement, the accused adapters and locks are not "material part[s] of the invention" or "especially made … for use in an infringement" but rather "suitable for substantial noninfringing use."

### A.    No Pre-suit Knowledge, No Indirect Infringement

To demonstrate indirect infringement, whether contributory or by inducement, a plaintiff must prove that a defendant not only had knowledge of the asserted patent but also knowledge of how it infringed those patents ***prior to the date of the complaint's filing***.  *ZapFraud, Inc. v. Barracuda Networks, Inc.*, 528 F. Supp. 3d 247, 252 (D. Del. 2021) (dismissing claims for post-suit indirect infringement) (Connolly, J.); *Valinge Innovation AB v. Halstead New England Corp.*, No. 16-1082-LPS-CJB, 2017 WL 5196379, at *2 (D. Del. Nov. 9, 2017), report and recommendation adopted, 2018 WL 11013902 (D. Del. Jan. 18, 2018) (Stark, J.); *Princeton Digital Image Corp. v. Ubisoft Ent. SA*, No. CV 13-335-LPS-CJB, 2017 WL 6337188, at *1 (D. Del. Dec. 12, 2017) (Stark, J.); *InQuisient Inc. v. ServiceNow, Inc.*, No. 1-22-cv-00900 (D. Del. Feb. 22, 2023) (oral order) (Burke, Mag. J.).

Here, ESCO has not pleaded any pre-suit knowledge of either asserted patent, and Deere's interrogatory responses demonstrate that it did not have any such pre-suit knowledge.  (Deere's Resp. to Interrog. 9, Ex. H, at 115-16; Verification, Ex. Y, at 400.)  The Court should therefore

13

grant summary judgment as to ESCO's indirect infringement claims.

## B.   No Contributory Infringement for Locks or Adapters

All of the asserted patent claims are directed either to teeth alone or to assemblies of teeth with adapters and other components.  ESCO nonetheless seeks damages from sales of locks and adapters of the accused assemblies under a contributory infringement theory.  Although Deere's lack of pre-suit knowledge of the Asserted Patents precludes ESCO's claim for indirect infringement generally, ESCO's contributory infringement claim regarding locks and adapters fails for additional reasons:  locks and adapters are not a "material part of the invention … especially made or especially adapted for use in an infringement," and both are "suitable for substantial noninfringing use."  35 U.S.C. § 271(c).

To prove contributory infringement, ESCO must show that Deere (1) offered to sell, sold, or imported (2) a component or material for use with the patented assemblies constituting a material part of the invention (3) with knowledge that the component is especially made or especially adapted for use to infringe the Asserted Patents, and (4) the component is not a staple article or commodity suitable for non-infringing use.  *Lundbeck v. Lupin Limited,* No. 18-cv-88-LPS, 2021 WL 4944963, *85 (D. Del. Sept. 30, 2021).

"Contributory infringement imposes liability on one who embodies in a non-staple device the ***heart*** of the patented [invention] and supplies the device to others to complete the process and appropriate the benefit of the patented invention."  *MONEC Holding AG v. Motorola Mobility, Inc.*, 897 F. Supp. 2d 225, 231 (D. Del. 2012) (emphasis added)).  ESCO bears the burden of proving the elements of contributory infringement, including that the Accused Products have no substantial non-infringing uses.  *See id.*  ESCO cannot do so regarding either locks or adapters.

First, with respect to the accused locks, ESCO has not produced or otherwise provided any

14

Rule 56 evidence showing that the locks lack substantial noninfringing uses.  On the contrary, ESCO's technical expert admitted during his deposition that the locks recited in the asserted claims can be used in noninfringing base and tooth assemblies.  (Holland Dep. 128:16-25, Ex. U, at 343 ("Q: Sticking with the '175 patent for now here.  The lock claimed in the '175 patent could be used with other wear assemblies besides the one claimed in the '175 patent, correct?  A: It could be …" (objection omitted); *id*. at 146:8-14, Ex. U, at 346 ("Q: Is it true that the lock claimed in the '662 patent could be used with other wear assemblies besides the wear assembly claimed in the '662 patent? A: Yes. The lock in the '662 could be used in other wear assemblies." (objection omitted).)

Moreover, Mr. Holland has characterized the locks of the Asserted Claims as "generic term[s] used to describe a component 'used to releasably secure' a wear member to the nose of an adapter." (*See e.g.*, Holland Rpt., Appx. A, at 15, Ex. N, at 202.) Such genericness forecloses the notion that the lock components of the Accused Products were "especially made or especially adapted for use in an infringement." 35 U.S.C. § 271(c).  Again, liability for contributory infringement is reserved for those that provide the "heart" of the patented invention. *See Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 365 (1961) (Brennan, J., concurring) ("One who makes a special device constituting the heart of a patented machine and supplies it to others with directions (specific or implied) to complete the machine is obviously appropriating the benefit of the patented invention.") (quotation omitted).

Second, with respect to the accused adapters, ESCO likewise has not produced or otherwise provided any evidence showing the adapters are a material part of the invention, especially made or adapted for the infringement, and lack substantial noninfringing uses.  Nor can ESCO do so, because Deere has provided evidence of such substantial noninfringing use: the design and recent implementation of the ***noninfringing replacement*** for the accused tooth, known here as "Rev.

A1." Deere's expert, Dr. Klopp, demonstrates that Rev. A1 does not infringe any Asserted Claim at least because Rev. A1 lacks the claimed ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

(Klopp Rebuttal ¶ 202, Ex. R, at 322-23.) ESCO's expert, Mr. Holland, concedes non-infringement of the Rev. A1.  (Holland Rpt. ¶ 80, Ex. M, at 195-96; Holland Reply ¶ 95, Ex. S, at 329-30.)

For all these reasons, ESCO cannot demonstrate a genuine issue concerning either indirect infringement generally or contributory infringement regarding the accused locks and adapters.

## VII.   THE ASSERTED CLAIMS OF THE '175 AND '662 PATENTS ARE INDEFINITE

Every asserted claim of both patents recites the same limitation: surfaces that extend "substantially parallel to the longitudinal axis."   The patents and prosecution histories, however, fail to provide any guidance to potential infringers as to the scope of "substantially parallel." Consequently, the claims are indefinite and therefore invalid.

### A.     The Law of Indefiniteness

A claim is indefinite if, together with the specification and prosecution history, it fails "to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).  Thus, "a patent must be precise enough to afford clear notice of what is claimed, thereby 'appris[ing] the public of what is still open to them.'"  *Id*. at 909.  As the Federal Circuit explained:

> ***Although absolute or mathematical precision is not required***, it is not enough, as some of the language in our prior cases may have suggested, to identify "some standard for measuring the scope of the phrase." The Supreme Court explained that a patent does not satisfy the definiteness requirement of § 112 merely because "a court can ascribe some meaning to a patent's claims." ***The claims***, when read in light of the specification and the prosecution history, ***must provide objective boundaries*** for those of skill in the art.

*Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370-71 (Fed. Cir. 2014) (emphasis added).

To be sure, claims are not inherently indefinite simply because they recite terms of degree, such as "substantially."   But such claims must—as all claims—provide ***objective boundaries***. *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014); *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1364 (Fed. Cir. 2018) ("Our case law is clear that the objective boundaries requirement applies to terms of degree.").   Again, "[t]his standard 'mandates clarity, while recognizing that absolute precision is unattainable.'" *Berkheimer*, 881 F.3d at 1364 (quoting *Nautilus*, 572 U.S. at 910).

### B.    Indefinite: Claims from Both Patents with "Substantially Parallel"

Here, all of the asserted claims from both patents recite one or more surfaces in the tooth's socket that extend "substantially parallel to [its] longitudinal axis."   For example, below is an exemplary figure from the '662 patent, annotated by ESCO's expert, showing such surfaces in green, with a longitudinal axis inserted by Deere in blue:

**Claimed Tooth's "Side Stabilizing Surfaces" with "Longitudinal Axis"[6]**



The  Asserted  Patents  disclose  that  "substantially  parallel"  does  not  simply  mean "approximately  parallel"—but  rather  "small"  angles  that  deviate  from  parallel  because  of

---

[6] '662 Patent, Fig. 7, from Holland Rpt. ¶ 41, Ex. M, at 190-91 (green Annotations by H. Holland; Blue by Deere.)

*manufacturing or other purposes*.  For example, the '175 written description provides:

> Front stabilizing surfaces **202**, **212** preferably axially extend substantially parallel to longitudinal axis **128**. The term "substantially parallel," as used herein in this context, is intended to include parallel surfaces as well as those that diverge rearwardly from axis **128** at a *small angle (e.g., of about 1-7°) for manufacturing or other purposes*. In one preferred embodiment, each front stabilizing surface **202**, **212** diverges axially rearward at an angle to axis **128** of no more than about 5°, and in some instances, by about 2-3°.

('175 Patent col. 9 ll. 53-61, Ex. D, at 77.)  And the written description of the '662 Patent provides:

> The front end **24** is formed with top and bottom stabilizing surfaces **30**, **32** that are substantially parallel to the longitudinal axis **34**. The term "substantially parallel" is intended to include parallel surfaces as well as those that diverge rearwardly from axis **34** at a *small angle (e.g., of about 1-7 degrees) for manufacturing purposes*. In one preferred embodiment, each stabilizing surface **30**, **32** diverges rearwardly at an angle to axis **34** of no more than about 5 degrees and most preferably at about 2-3 degrees.

('662 Patent col. 3 ll. 25-33, Ex. F, at 102.)

As Deere's expert—Dr. Klopp—explained in his report, a "small angle (e.g., of about 1-7 degrees)" merely provides an example without providing any real guidance as to the upper boundary for vague "manufacturing" or "other purposes": "The specification gives values of 0, 5, 1-7, and preferably 2-3 degrees divergence from truly parallel as substantially parallel, but there is no upper limit."  (Klopp Rpt. ¶¶ 65, 74, Ex. P, at 251, 256.)  And while ESCO's expert offers *no opinion at all* in his reports regarding the indefiniteness of "substantially parallel," (Holland Rebuttal ¶¶ 112, 127, Ex. Q, at 299, 302), he conceded in his deposition that the patents do not rule out *any* angle:

> Q.   So based on the patent's disclosure, what angle would not infringe claim 8?
>
> A.   I don't—I'm not going to offer an angle.  I mean, if you want a number here, I'd tell you that if that angle was at, you know, 45 or 60 degrees or something there, that's probably not substantially parallel, but I'm not going to parse out eight—you know, seven versus eight.

Q.    What about 33?

A.    33.  33 would probably be hard to justify.  But, again, we're going to—we're going to—we're going to negotiate down to some number and I'm going to try to avoid getting pinned down on any particular number because of what we discussed already.

Q.    So you said not seven or eight, but we've already thrown out 12.  It depends on the application.  Does it depend on the application for 11?

A.    Yeah, I mean, it would be more fun if we were negotiating over a car sale and trying to come up with a price.

Q.    I'm just troubled by whether you won't tell me what the upper limit is or you cannot tell me what the upper limit is. Can you tell me what the upper limit is?

A.    ***I'm telling you there isn't an upper limit.***

(Holland Dep. 206:16-207:21, Ex. U, at 361-62 (emphasis added; objections omitted); *see also id*.

at 209:16-210:5, Ex. U, at 364-65.)

The patents provide no such upper limit because, as the patents themselves explain, "substantially parallel" depends on vague "manufacturing" ('175 Patent col. 9 ll. 53-61, Ex. D, at 77; '662 Patent col. 3 ll. 25-33, Ex. F, at 102.)  As such, neither ESCO nor the patents can provide any advance notice to a potential infringer whether its products may infringe.  As ESCO's expert testified:

Q.    Tell me more about that.  How does it depend on the part and the design?

A.    I'd be looking at how their loading is intended to be imparted on the, on the wear part and how that surface at that angle, whether it's 12 or 20 or 7 or 5, how that angle relates to the reaction that the part is going to be loaded by.

And I'm looking for the question of if I know something about the angle of the load on the part and I then look at the reaction loads on the bearing surfaces, I'm looking for whether or not those reactions are going to have a significant normal component, that is, a sliding action that is going on with those surfaces or not to decide whether or not that angle is one that is going to start contributing to a

significant amount of sliding or jacking-type motion.

The intent of these stabilizing surfaces and being substantially parallel is to limit that jacking motion that would damage or dislodge the lock. So I'd have to know the angle of the load and the orientation of the surfaces with respect to the angle of the load to answer that more completely.

(Holland Dep. 198:14-199:12, Ex. U, at 353-54.)

In short, a PHOSITA would be unable to glean even an approximate upper boundary concerning the scope of "substantially parallel." Consequently, none of the Asserted Claims are "precise enough to afford clear notice of what is claimed" and "of what is still open to them.'" *Nautilus*, 572 U.S. at 901. All of the Asserted Claims are thus indefinite and invalid.

### C. Indefinite: Claims from the '662 Patent with "To Resist Both Vertical and Horizontal Loads During Excavating"

In the '662 Patent, every asserted claim recites "a pair of side stabilizing surfaces" on the tooth's socket that "bear against complementary surfaces" on the base "to resist both vertical and horizontal loads during excavating." Each claim in the patent is indefinite at least because the patent fails to provide sufficient guidance to determine whether a product "resist[s] both vertical and horizontal loads during excavating."

For context, below are exemplary figures from the '662 patent, annotated by ESCO's expert, showing in green both the "side stabilizing surfaces" of the socket and the "complementary surfaces" on the adapter:

**Claimed Tooth's "Side Stabilizing Surfaces" and Base's "Complementary Surfaces"[7]**



That is, when assembled, the socket of the tooth (left) mates with the adapter (right).  The claims require that the green, side stabilizing surfaces of the socket (left) "resist both vertical and horizontal loads during excavating."

As Dr. Klopp explained in his opening invalidity report, however, "there is no objective measure or test in the '662 Patent from which a PHOSITA could determine, with reasonable certainty, whether an accused product meets this limitation."  (Klopp Rpt. ¶ 68, Ex. P, at 253.)  In other words, because the side stabilizing surfaces must resist vertical and horizontal loads "during excavating," the claims require something more than the ability to resist *nominal* loads.  But the '662 Patent fails to explain how great a load the stabilizing surfaces must be able to "resist."  What if an accused product has side surfaces that bear *some* vertical and horizontal loads, but those loads are comparatively small compared to other surfaces on the product that are designed (and indeed) bear the vast majority of loads?  Is it enough for surfaces on an accused product to bear 20 pounds per square inch?  The patent, ESCO, and ESCO's expert are all silent, leaving competitors guessing as to what loads such surfaces must be able to bear to infringe the patent.

Although ESCO's expert did not offer an opinion regarding this indefiniteness in his expert

---

[7] '662 Patent, Figs. 2 and 7, from Holland Rpt. ¶ 41, Ex. M, at 190-91 (Annotated by H. Holland).

reports, (Holland Rebuttal ¶ 116, Ex. Q, at 301), he conceded during his deposition that the patent

provides no such answers:

> Q.    What magnitude of force does resisting a load require?
>
> Q.    Is it .1 pounds per square inch?  100 pounds per square inch?
>
> A.    I don't know of a quantitative answer to your question.  I certainly acknowledge that we discussed previously that there can be cases where—and I think of this particularly in light of how locks are designed and how they function when they're installed that they can be in contact with a bearing surface.  But if all is working correctly, there shouldn't be any digging loads in those surfaces. So this issue of magnitude is one that I'm not aware of anybody ever drawing a line that differentiates contact versus some threshold or bar at which that's load carrying.  Yeah, so...

(Holland Dep. 169:12-170:5, Ex. U, at 349-50 (objections omitted).)

ESCO will likely argue that such uncertainty is permissible because the patent describes

and shows an example of what such side stabilizing surfaces could look like.  Such examples are

only helpful, though, if they sufficiently inform a PHOSITA as to both (1) what ***practices*** the claim

limitation and (2) ***what does not***.  *Nevro Corp v. Boston Scientific Corp.*, 955 F.3d 35, 39 (Fed.

Cir. 2020) ("[T]he ambiguity inherent in functional terms may be resolved where the patent

'provides a general guideline and examples ***sufficient*** to enable a person of ordinary skill in the art

***to determine the scope*** of the claims.'").

That is, examples will provide the requisite "reasonable certainty" ***only*** if they provide

sufficiently definite boundaries for infringement.  *Interval Licensing*, 766 F.3d at 1373; *see also*

*Versata Software, Inc. v. Zoho Corp.*, 213 F. Supp. 3d 829, 836 (W.D. Tex. 2016) (finding claim

indefinite because specification's examples were "insufficient to show with reasonable certainty

the scope of the claims because they provide no information as to what falls outside the boundaries

of the claims").  Because the specification fails to provide enough information to determine

objective boundaries with reasonable certainty, the claims of the '662 Patent are all invalid.

*Nautilus*, 572 U.S. at 901.

## VIII.  THE ASSERTED CLAIMS OF THE '662 PATENT ARE ANTICIPATED

The invention of the '662 Patent has already been described in Carpenter '771, the publication of an application submitted to the USPTO by Christopher Carpenter – the same inventor named on the '662 Patent.

### A.  The Law of Anticipation

"A person shall be entitled to a patent unless – the invention was patent or described in a printed publication in this or foreign country … more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b) (Pre-AIA).[8] "In order to anticipate the claimed invention, a prior art reference must 'disclose all elements of the claim within the four corners of the document,' and it must 'disclose those elements 'arranged as in the claim.'" *Microsoft Corp. v. Biscotti, Inc.*, 878 F.3d 1052, 1068 (Fed. Cir. 2017) (quoting *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008)).  "However, a reference can anticipate a claim even if it 'd[oes] not expressly spell out' all the limitations arranged or combined as in the claim, if a person of skill in the art, reading the reference, would 'at once envisage' the claimed arrangement or combination." *Id.* (quoting *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1381 (Fed. Cir. 2015) (alteration in original)); *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1344 (Fed. Cir. 2016) ("[A] reference may still anticipate if that reference teaches that the disclosed components or functionalities may be combined and one of skill in the art would be able to implement the combination.") (citing *Kennametal*, 780 F.3d at 1383)).

---

[8] The '662 Patent is governed by the law of patentability as it existed prior to the passage of the America Invents Act ("AIA") because each claim of the '662 Patent claims priority to a provisional application filed February 17, 2006.

**B.      Carpenter '771 Anticipates the Asserted Claims of the '662 Patent**

Carpenter '771 is prior art to the '662 Patent because it published May 20, 2004 (Carpenter

'771, cover page, Ex. A, at 2), more than one year before February 17, 2006, the earliest priority

date ESCO could claim for the '662 Patent. 35 U.S.C. § 102(b) (pre-AIA); (ESCO's Resp. Req.

Admis. 26, Ex. I, at 120.)  ESCO attempts to create a genuine issue of material fact regarding just

two limitations of the Asserted Claims—relying on the opinion of Mr. Holland, who challenges

whether Carpenter '771 discloses (i) a pair of side stabilizing surfaces that laterally converge

toward a central location and (ii) the "substantially parallel" limitation. (Holland Rebuttal ¶¶ 80-

87, Ex. Q, at 304-11.)  But, as explained below Mr. Holland's opinions are based on an improper

construction of "central location" and a misreading of Carpenter '771.[9]

**1.      Claim 8 [pre]: A wear assembly for excavating equipment comprising**

To the extent the preamble of claim 8 is argued or found to be limiting, Carpenter '771

discloses it.  Deere's expert, Dr. Klopp, opines that Carpenter '771 discloses "a wear assembly for

excavating equipment" at least in ¶ [0001], which states that Carpenter '771 "pertains to a wear

assembly, and assembly for use with mining, excavating and earthmoving equipment."  (Klopp

Rpt. ¶ 201, Ex. P, at 257.)  ESCO has provided no evidence to the contrary.

**2.      [8.1] a base secured to the excavating equipment**

Dr. Klopp opines that Carpenter '771 discloses this limitation at least in ¶ [0051], which

states with reference to Figs. 1-10 that "[t]he adapter 14 preferably includes … rearwardly

extending legs 22 ... adapted to straddle the digging edge 23 or an excavator and be welded in

---

[9] In his Opening Report, Dr. Klopp broke down the Asserted Claims of the '662 Patent on a
limitation-by-limitation basis.  (Klopp Rpt., 10-12, Ex. P, at 243-45.)  Mr. Holland followed the
convention used by Dr. Klopp to identify the individual limitations of the Asserted Claims, e.g.,
"Claim 8 [pre]," "[8.1]," "[8.2]."  (Holland Rebuttal ¶ 66, Ex. Q, at 284 ("For simplicity, I follow
the same labeling as that adopted by Dr. Klopp.").)

place." (Klopp Rpt. ¶ 202, Ex. P, at 257-58.)  Dr. Klopp depicts the portion of the base of Carpenter

'771 that attaches to the excavating equipment in Figure 26 of his opening report: (*Id.*)



Figure 26.   Annotated figures from the '662 Patent (left) and Carpenter '771 (right) which show the
base (adapter) of each disclosure (blue highlights). Both the nose 18 and mounting
end 21 of the adapter 14 in Carpenter '771 are shown.

ESCO has provided no evidence to the contrary. ESCO's expert, Mr. Holland, has provided

no opinion to contradict the clear factual support for Dr. Klopp's conclusion that Carpenter '771

discloses the limitations of [8.1].  (Holland Rebuttal ¶¶ 162-73, Ex. Q, at 304-11.)

### 3.      [8.2] the base including a front end with a front wall and front bearing surfaces

Dr. Klopp opines that Carpenter '771 discloses this limitation at least in ¶¶ [0052], [0064]

and Fig. 12, 13.  (Klopp Rpt. ¶¶ 203-206, Ex. P, at 258-59.)  Dr. Klopp further depicts a "base

including a front end with a front wall and front bearing surfaces" disclosed in Carpenter '771 in

Figure 27 of his opening report, reproduced below.  (*Id.* at ¶ 205, Ex. P, at 259.)



Figure 17.   Annotated figures from the '662 Patent (left) and Carpenter '771 (right) which show the
front wall and front bearing surfaces indicated in blue highlights in each disclosure.

ESCO has provided no evidence to contradict Dr. Klopp's conclusion that Carpenter '771 discloses the limitations of [8.1].  (Holland Rebuttal ¶¶ 162-73, Ex. Q, at 304-11.)

**4.     [8.3] a rear end having opposite sides with a side recess in each of the sides**

Dr. Klopp opines that Carpenter '771 discloses this limitation at least in ¶¶ [0053], [0055] and Fig. 12 (Klopp Rpt. ¶¶ 207-209, Ex. P, at 260-61)  and depicts "a rear end having opposite sides with a side recess in each of the sides" disclosed in Carpenter '771 in Figure 28 of his opening report, reproduced below.  (*Id.* at ¶ 205, Ex. P, at 259.)



*Figure 28.   Annotated figures from the '662 Patent (left) and Carpenter '771 (right) which show the rear end comprising sidewalls which include recesses in each side wall (recesses indicated in blue highlights).*

ESCO has provided no evidence to contradict Dr. Klopp's conclusion that Carpenter '771 discloses the limitations of [8.1].  (Holland Rebuttal ¶¶ 162-73, Ex. Q, at 304-11.)

**5.     [8.4] a lock bearing surface**

ESCO does not dispute that Carpenter '771 discloses this limitation.  (Holland Rebuttal Rpt. ¶¶ 162-73, Ex. Q, at 304-11.)  Dr. Klopp opines that Carpenter '771 discloses "a lock bearing surface" at least in ¶ [0072], which states that Fig. 2, for example, shows a lock 16 in the form of a drive through lock pin that is received in a vertical channel 89 in the side of the nose and depicts the lock bearing surface disclosed by Carpenter '771 in Figure 29 of his report.  (Klopp Rpt. ¶¶

210-212, Ex. P, at 261-62.)



Figure 29.   Annotated figures from the '662 Patent (left) and Carpenter '771 (right) showing the
lock bearing surfaces of each disclosure in green highlighting.

### 6.    [8.5] a wear member including a rearward-opening socket for receiving the base

ESCO has provided no evidence to dispute that Carpenter '771 describes limitation [8.5].

(Holland Rebuttal ¶¶ 162-73, Ex. Q, at 304-11.)  Dr. Klopp concludes that Carpenter '771 discloses

the limitations of [8.5] at least in ¶ [0056], which states, inter alia, that the point has a "rearwardly

opening socket 53 … to receive the adapter nose 18."  (Klopp Rpt. ¶ 213, Ex. P, at 262.)  Dr. Klopp

further demonstrates disclosure of this limitation if Figure 30 of his report.



Figure 30.   Annotated figures from the '662 Patent (left) and Carpenter '771 (right) showing wear
member comprising a rearward-facing socket in each disclosure (red highlights).

### 7.    [8.6] an opening

ESCO has provided any competent evidence to dispute that Carpenter '771 discloses

limitation [8.6].  (Holland Rebuttal ¶¶ 162-73, Ex. Q, at 304-11.)   Dr. Klopp establishes that

27

Carpenter '771 discloses an opening in the wear member or point at least in ¶ [0072], which provides that "the point is provided with at least one rearwardly extending ear 91 and lug 93 to engage the rear side of the pin and retain the point to the adapter," that works in combination with the channel 89 in the nose.  (Klopp Rpt. ¶ 215-16, Ex. P, at 263.)  Dr. Klopp further shows the disclosure of an opening in Carpenter '771 in Figure 31 of his report.



*Figure 31.   Annotated figures from the '662 Patent (left) and Carpenter '771 (right) showing the openings disposed on the wear members of each disclosure.*

### 8. [8.7] the socket having a longitudinal axis

Carpenter '771 discloses this limitation at least in ¶ [0059], which states "the point is slid onto the nose, the point is rotated about the longitudinal axis X." (Klopp Rpt. ¶ 218, Ex. P, at 264.) ESCO has provided no evidence to the contrary. (Holland Rebuttal ¶¶ 162-73, Ex. Q, at 304-11.)

### 9. [8.8] including (i) a front end with a front surface transverse to the longitudinal axis to bear against the front wall on the base

Carpenter '771 discloses this limitation in ¶ [0057] as the socket 52 of Carpenter '771 has a front surface 63 that bears against the front wall of the base 32, as shown in Figure 27, above, and "is preferably shaped to matingly receive the adapter nose 18 … [and] adapted to abut bearing surface 32 during axial loading."  (Klopp Rpt. ¶ 221-22 & Figure 32, Ex. P, at 264-66.)  ESCO has provided no evidence to the contrary. (Holland Rebuttal ¶¶ 162-73, at 304-11.)

10.     **[8.9] a top stabilizing surface and a bottom stabilizing surface to bear against the front bearing surfaces on the base**

Carpenter '771 discloses this limitation at least because—as described in ¶ [0064]—"the socket 53a of point 12a includes a pair of front end stabilizing flats 78, 79 that engage flats 44, 46 on the adapter nose 18a." (Klopp Rpt. ¶ 224, Ex. P, at 265.)  Again, ESCO provides no evidence to the contrary. (Holland Rebuttal ¶¶ 162-73, Ex. Q, at 304-11.)

11.     **[8.10] (ii) a rear end with a top wall, a bottom wall and side walls extending rearward from the front end**

Carpenter '771 discloses this limitation at least because—as described in ¶ [0057]—"the socket is defined by converging surfaces 55, 57, side surfaces 59, 61, and a front surface 63." (Klopp Rpt. ¶ 227, Ex. P, at 266.)



*Figure 32.   Annotated Figure 5 of Carpenter '771 showing the rear end of the wear member socket which includes top and bottom walls 55 and 57, as well as side surfaces 59 and 61. The front transverse surface 63 is shown in red highlighting along with the longitudinal axis (red dashed line) which the surface 63 is transverse to.*

ESCO provides no contrary evidence. (Holland Rebuttal ¶¶ 162-73, Ex. P, at 304-11.)

12.     **[8.11] the side walls each including a pair of side stabilizing surfaces inclined relative to each other in different transverse directions so as to laterally converge inward toward a central location along the respective side wall**

Carpenter '771 discloses the limitations of [8.11]. As Dr. Klopp opines "Carpenter '771 discloses these [side] surfaces also in lateral surfaces 69 and inner surface 71 which form an inwardly projecting ridge (emphasis and ellipses added): 'Each side surface 59, 61 is formed with

a groove 65 and **inwardly projecting ridge or protrusion 67** …. The protrusions 67 each define

a lateral surface 69 and an inner surface 1 that oppose and bear against lateral surface 37 and flank

34, respectively.'"  (Klopp Rpt. ¶ 230, Ex. P, at 267-68 (quoting Carpenter '771, at ¶ [0057], Ex.

A, at 25).)  Dr. Klopp further demonstrates Carpenter '771's disclosure of this limitations of [8.11]

using Figure 33 of his report:



Figure 33.  Annotated figures from the '662 Patent (left) and Carpenter '771 (right) showing side
stabilizing surfaces of each disclosure indicated in red highlighting. It should be noted
that for the figure showing Carpenter '771 on the right, the longitudinal axis of the wear
member is orthogonal to the plane of the page.

Dr. Klopp further opines that "Carpenter '771 discloses that these surfaces (and the surfaces

which they mate to on the nose) can be generally parallel to each other (ellipses added): "As

another alternative, the nose can be provided with longitudinally extending rails 80 that include

outer faces 81 and lateral bearing faces 83 (FIG. 14).  The lateral bearing surfaces 83 are generally

parallel to each other and to the longitudinal axis of the tooth … the rails could have a constant

depth and simply be spaced from the respective converging wall.  Without the divergence of the

rails, the point is not rotated onto the adapter nose."  (*id.* (quoting Carpenter '771, at ¶ [0069], Ex.

A, at 26.)  "A PHOSITA would thus interpret this passage of Carpenter '771 and Figure 33 as

disclosing limitation [8.11]." (*Id.*)[10]

---

[10] Figure 33 of Dr. Klopp's Report depicts Figure 8 of Carpenter '771 on the right, described as "a
cross-sectional view of the tooth system taken along line 8-8 of FIG. 7."  (Carpenter '771, at ¶
[0029], Ex. A, at 23.)

ESCO's expert, Mr. Holland attempts to create a question of fact regarding Carpenter '771's disclosure of limitation [8.11] by alleging that flank 34 and lateral surface 37 as shown above on the right of Figure 33 of Dr. Klopp's report are "converging at an off-center location." (Holland Rebuttal ¶ 165, Ex. Q, at 305.) During his deposition, Mr. Holland made clear that he read the claim term "central location," as used in the claims of the '662 Patent, to mean the "midpoint" of side wall. (Holland Dep. 284:9-285:3, Ex. U, at 369-70.) Mr. Holland, however, could point to no disclosure in the '662 Patent that would support his understanding that "central location" means "midpoint." (*Id*. at 288:9-14, Ex. U, at 373.) This interpretation improperly reads a limitation into the claims.

According to Mr. Holland, however, a POSITA understands that wear assemblies are symmetrical, which required the "midpoint" interpretation. (*Id*. at 285:15-288:8, Ex. U, at 370-73; 286:7-8, Ex. U, at 371 ("Symmetry is all important with these systems."); 288:21-23, Ex. U, at 373 ("[T]here's I think an assumption that a person of ordinary skill in this, these designs are generally symmetric…."); 287:4-13, Ex. U, at 372 ("So the point being here, if these things converged into a location that was not at the midpoint, we're now going to have an asymmetrical side which is going to mean the tooth can't be rotated over and fit on there. *So if we assume* what somebody would assume in these kind of construction grade products that *are reversible*, then a person of ordinary skill would expect that this would, in fact, be exactly the midpoint.") (emphasis added).)

Mr. Holland's interpretation of the "central location," is not only unsupported by the specification of the '662 Patent (Klopp Reply ¶ 81, Ex. T, at 335), it is directly contradicted by the '662 Patent. With reference to the cooperative surfaces of the nose and socket that complete the limitations of [8.11], the specification of the '662 Patent *does state:* "[p]referably, stabilizing

31

surfaces 44-47 are angled equally relative to a horizontal plane extending through [longitudinal] axis 34." ('662 Patent, col. 8, ll. 1-2, Ex. F, at 104.) But the specification *goes on to state:* "Nevertheless, *asymmetric arrangements* are possible, particularly if higher upward vertical loads are expected as compared to downward vertical loads or vice versa. As discussed above for rear stabilizing surfaces 40-43, side stabilizing surfaces 44-47 can be formed with a *variety of different shapes*. For example, while surfaces 44-47 are preferably planar, they can be convex, concave, curved or consisting of angular segments." ('662 Patent, col. 8, ll. 2-10, Ex. F, at 104 (emphasis added).) Thus, Mr. Holland's understanding of "central location" fails to create an issue of fact.

Even if Mr. Holland's understanding of "central location" were correct (which it is not), he ignores other alternative disclosure a POSITA would envisage implementing. For example, Figure 14, allows for convergence of the side stabilizers, which include "lateral bearing surfaces 83 are generally parallel to each other and the longitudinal axis … the rails could have a constant depth and simply be spaced from the respective converging wall." (Klopp Rpt. ¶ 230, Ex. P, at 267-68; Klopp Reply ¶ 82, Ex. T, at 336.) And Carpenter '771 discloses "the rails may be spaced from the converging walls such that they could have a second lateral surface (not shown) apart from the converging walls 24, 26. (Carpenter '771, at ¶ [0054], Ex. A, at 24.)

Mr. Holland's unsupported interpretation of "central location" as a "midpoint" fails to create a dispute of material fact or rebut Carpenter '771's clear disclosure of limitation [8.11].

### 13. [8.12] positioned to bear against complementary surfaces in respective side recesses in the base to resist both vertical and horizontal loads during excavating

Carpenter '771 describes "the protrusions 67 each define a lateral surface 69 and an inner surface 71 that oppose and bear against lateral surface 37 and flank 34, respectively," as shown in Figure 33 above. Carpenter '771 further states that "lateral surface 37 and flank 34 each present a transverse surface area that each form primary bearing surfaces for vertical and lateral loads

applied to the point 12." (Klopp Rpt. ¶ 231, Ex. P, at 268 (citing Carpenter '771, at ¶¶ [0057], Ex. A, at 25).) Again, ESCO and its expert failed to provide or produce any competent evidence to the contrary. (Holland Rebuttal ¶¶ 162-73, Ex. Q, at 304-11.)

>    **14.** **[8.13] said top stabilizing surface, said bottom stabilizing surface, and each said side stabilizing surface axially extending substantially parallel to the longitudinal axis**

Carpenter '771 discloses the limitations of [8.13]. Dr. Klopp opines that "as shown in Figure 33, [above], Carpenter '771 discloses rails on the nose which are parallel to each other and the longitudinal axis: (ellipses added): "As another alternative, the nose can be provided with longitudinally extending rails 80 that includes outer faces 81 and lateral bearing faces 83 (FIG. 14). The lateral bearing surfaces 83 are generally parallel to each other and to the longitudinal axis of the tooth … the rails could have a constant depth and simply be spaced from the respective converging wall. Without the divergence of the rails, the point is not rotated onto the adapter nose." (Klopp Rpt. ¶ 233, Ex. P, at 269 (quoting Carpenter '771, at ¶ [0069], Ex. A, at 26).) Dr. Klopp concludes, with reference to Figure 33, "[a]s the rails on the nose are parallel to each other and to the longitudinal axis, the converging wide stabilizing surfaces shown in Figure 33 would also be parallel to the longitudinal axis." (*Id.*)



*Figure 33.  Annotated figures from the '662 Patent (left) and Carpenter '771 (right) showing side stabilizing surfaces of each disclosure indicated in red highlighting. It should be noted that for the figure showing Carpenter '771 on the right, the longitudinal axis of the wear member is orthogonal to the plane of the page.*

Mr. Holland attempts to create an issue of fact by misconstruing the disclosure of Carpenter '771, alleging that (i) only a single surface on the side of the point—the lateral bearing surface 83—is generally parallel to the longitudinal axis, and (ii) the top and bottom stabilizing surfaces are "wedge-shaped configuration," and, therefore, not parallel to the longitudinal axis.  (Holland Rebuttal ¶¶ 171-72, Ex. Q, at 309-11.)

Regarding the side surfaces, however, Mr. Holland overlooks the disclosure from Carpenter '771 that "***the rails*** could have a constant depth and simply be spaced from the respective converging wall. Without the divergence of ***the rails***, the point is not rotated onto the adapter nose."  (Klopp Reply ¶ 85, Ex. T, at 337 (quoting Carpenter '771, at ¶ [0069], Ex. A, at 26 (emphasis added).)  Mr. Holland would have the Court focus on the disclosure about the lateral surface 83 and ignore the disclosure about the rails 80 themselves.  As Dr. Klopp opines "both the description of the rails as having constant depth, not diverging, and resulting in a configuration that doesn't need to rotate when being installed would inform a PHOSITA that the side stabilizing surfaces (accommodating the rails) would need to axially extend substantially parallel to the longitudinal axis." (*Id.*)

Moreover, regarding the top and bottom stabilizing surfaces, Mr. Holland overlooks the disclosure depicted in Carpenter '771, Figure 12, which clearly demonstrates top and bottom stabilizing surfaces in the front end substantially parallel to the longitudinal axis.



Figure 2.    *Annotated figures from the '662 Patent (left) and Carpenter '771 (right) which show the front wall and front bearing surfaces indicated in blue highlights in each disclosure.*

34

Dr. Klopp ultimately opines that a POSITA would recognize each limitation from claim 8 to be disclosed in Carpenter '771 and would readily envisage how the alternative disclosures could be arranged as recited in the claims without loss of function or incompatibility of components.

Mr. Holland again fails to create an issue of fact regarding whether Carpenter '771 describes the limitations of [8.13].

15.   **[8.14] a lock received into the opening of the wear member and in contact with the lock bearing surface on the base to hold the wear member to the excavating equipment**

Carpenter '771 describes "a tapered locking pin 16' is provided to secure the point to the adapter" and includes Figs. 15-18 that demonstrate the locking pin 16' being received into the opening of the war member and channel of the base to hold the wear member to the excavating equipment.  (Klopp Rpt. ¶ 237, Ex. P, at 270 (citing Carpenter '771, at ¶¶ [0073], [0074], Ex. A, at 26-27).)  ESCO failed to provide any evidence to the contrary. (Holland Rebuttal ¶¶ 162-73, Ex. Q, at 304-11.)

16.   **Claim 9: A wear assembly in accordance with claim 8 wherein each said pair of side stabilizing surfaces of the wear member collectively defines a V-shaped formation**

Dr. Klopp demonstrates that Carpenter '771 discloses the limitations of claim 9 for the reasons set forth above regarding the limitations of independent claim 8 and because the Carpenter '771 states "[t] protrusions 67 each define a lateral surface 69 and an inner surface 71 that oppose and bear against lateral surface 37 and flank 34" and "[p]referably, the lateral surface 37 and flank 34 are inclined to form a generally V-shaped recess 40 (FIGS. 3 and 8)."  (Klopp Rpt. ¶ 242, Ex. P, at 271 (citing Carpenter '771, ¶¶ [0055], [0057], Figs. 3, 8, Ex. A, at 5, 7, 24-25).)  ESCO has not offered any evidence to the contrary regarding claim 9. (Holland Rebuttal ¶ 174, Ex. Q, at 311.)

17. **Claim 12: A wear assembly in accordance with claim 8 wherein the side stabilizing surfaces of the wear member are located near the rear end of the wear member**

Dr. Klopp demonstrates that Carpenter '771 discloses each limitation of independent claim 8 and the limitations of dependent claim 12 because—as can be seen in Figure 32 of Dr. Klopp's report—the lateral surface 69 and an inner surface 71 are disposed near the rear end of the wear member socket. (Klopp Rpt. ¶ 246 & Figure 32, Ex. P, at 266, 272.)  ESCO failed to offer any evidence to the contrary regarding the limitations of claim 12. (Holland Rebuttal ¶ 174, Ex. Q, at 311.)

18. **Claim 13: A wear assembly in accordance with claim 8 wherein each said side stabilizing surface axially extends at an angle of no more than about five degrees to the longitudinal axis**

Dr. Klopp demonstrates that Carpenter '771  describes: "As another alternative, the nose can be provided with longitudinally extending rails 80 that include outer faces 81 and lateral bearing faces 83 (FIG. 14) The lateral bearing surfaces 83 are generally parallel to each other and to the longitudinal axis of the tooth[.]"  (Klopp Rpt. ¶ 248, Ex. P, at 272-73 (citing Carpenter '771, at ¶ [0069], Ex. A, at 26.)  ESCO failed to offer any evidence to the contrary regarding the limitations of claim 13. (Holland Rebuttal ¶ 174, Ex. Q, at 311.)

19. **Claim 21[pre]: A wear member for excavating equipment comprising**

To the extent that claim 21[pre] is argued or found to be limiting, the relevant arguments and evidence would be the same as those discussed above regarding claim limitation [8.5], which recites the same claim language.  *See*, *supra*, at 27.

20. **[21.1] a rearward-opening socket for receiving a base fixed to the excavating   equipment**

The arguments and evidence regarding limitation [21.1] correspond to those discussed above regarding limitations [8.1] and [8.5], which recite the same claim language.  *See*, *supra*, at

24, 27.

**21.    [21.2] an opening for receiving a lock to releasably hold the wear member to the base**

The arguments and evidence regarding limitation [21.1] correspond to those discussed above regarding limitations [8.6] and [8.14].  *See*, *supra*, at 27, 35.

**22.    [21.3] the socket having a longitudinal axis**

The arguments and evidence regarding limitation [21.3] correspond to those discussed above regarding limitation [8.7].  *See*, *supra*, at 28.

**23.    [21.4] including (i) a front end with a front surface transverse to the longitudinal axis to bear against a front wall on the base**

The arguments and evidence regarding limitation [21.3] correspond to those discussed above regarding limitation [8.8].  *See*, *supra*, at 28.

**24.    [21.5] and a top stabilizing surface and a bottom stabilizing surface to bear against front bearing surfaces on the base**

The arguments and evidence regarding limitation [21.5] correspond to those discussed above regarding limitation [8.9].  *See*, *supra*, at 28.

**25.    [21.6] (ii) a rear end with a top wall, a bottom wall and side walls extending rearward from the front end**

The arguments and evidence regarding limitation [21.6] correspond to those discussed above regarding limitation [8.10].  *See*, *supra*, at 29.

**26.    [21.7] the side walls each including a pair of side stabilizing surfaces inclined relative to each other in different transverse directions so as to laterally converge inward toward a central location along the respective side wall to define an inward projection**

The arguments and evidence regarding limitation [21.7] correspond to those discussed above regarding limitation [8.11] above.  *See*, *supra*, at 29.

**27.    [21.8] and bear against complementary surfaces on the base to resist both vertical and horizontal loads during excavating**

The arguments and evidence regarding limitation [21.8] correspond to those discussed above regarding limitation [8.12].  *See*, *supra*, at 32.

    28.    **[21.9] said top stabilizing surface, said bottom stabilizing surface, and each said side stabilizing surface axially extending substantially parallel to the longitudinal axis**

The arguments and evidence regarding limitation [21.9] correspond to those discussed above regarding limitation [8.13].  *See*, *supra*, at 33.

    29.    **Claim 22: A wear assembly in accordance with claim 21 wherein said pair of side stabilizing surfaces collectively defines a V-shaped formation**

The arguments and evidence regarding the additional limitations of claim 22 are the same as those discussed above with respect to claim 9.  *See*, *supra*, at 35.

    30.    **Claim 25: A wear assembly in accordance with claim 21 wherein the side stabilizing surfaces are located near the rear end**

The arguments and evidence regarding the additional limitations of claim 25 are the same as those discussed above with respect to claim 12.  *See*, *supra*, at 35.

    31.    **Claim 26: A wear assembly in accordance with claim 21 wherein said top stabilizing surface, said bottom stabilizing surface, and each said side stabilizing surface axially extends at an angle of no more than about five degrees to the longitudinal axis**

The arguments and evidence regarding the additional limitations of claim 26 are the same as those discussed above with respect to claim 13.  *See*, *supra*, at 36.

Based on the foregoing, Carpenter '771 anticipates the Asserted Claims of the '662 Patent and the Court should enter judgement in Deere's favor as to Count One of ESCO's Amended complaint (Doc. 11) and First Claim for Relief and Second Claim for Relief of Deere's counterclaims (Doc. 15).

## IX.   **CONCLUSION**

For all the foregoing reasons, the Court should grant Deere's summary judgment motions.

OF COUNSEL:

John F. Bennett (*pro hac vice*)
Paul M. Ulrich (*pro hac vice*)
Rachael L. Rodman (*pro hac vice*)
Paul J. Linden (*pro hac vice*)
Ava M. Abner (*pro hac vice*)
ULMER & BERNE LLP
312 Walnut Street, Suite 1400
Cincinnati, Ohio 45202-4029
(513) 698-5000
jbennett@ulmer.com
pulrich@ulmer.com
rrodman@ulmer.com
plinden@ulmer.com
aabner@ulmer.com

Dated: March 22, 2023

/s/ Michelle C. Streifthau-Livizos
James D. Taylor, Jr. (#4009)
Michelle C. Streifthau-Livizos (#6584)
SAUL EWING LLP
1201 N. Market Street, Suite 2300
Wilmington, Delaware 19801
(302) 421-6800
james.taylor@saul.com
michelle.streifthau-livizos@saul.com

*Attorneys for Defendant*
*DEERE & COMPANY*