**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ESCO GROUP LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 20-1679-WCB-MPT |
| | ) | |
| DEERE & COMPANY. | ) | **PUBLIC VERSION FILED** |
| | ) | **MAY 10, 2023** |
| Defendant. | ) | |
| | ) | |

**APPENDIX IN SUPPORT OF DEFENDANT DEERE & COMPANY'S**
**MOTION TO EXCLUDE EXPERT TESTIMONY OF THOMAS R. VARNER, PH.D.**
**AND TISO PANAPA**

| Exhibit | Pages | Description |
|---------|-------|-------------|
| A | 1-21 | U.S. Patent No. 8,844,175 to Christopher Snyder, issued on September 30, 2014 ("the '175 Patent") |
| B | 22-40 | U.S. Patent No. 10,273,662 to Christopher Carpenter, issued on April 30, 2019 ("the '662 Patent") |
| C | 41-47 | Selected Portions of Plaintiff ESCO Group LLC's Responses to Defendant Deere & Company's First Set of Interrogatories (Nos. 1-15), served on July 28, 2021 |
| D | 48-53 | Selected Portions of Plaintiff ESCO Group LLC's Responses to Defendant Deere & Company's Second Set of Interrogatories (Nos. 16-20), served on May 13, 2022 |
| E | 54-59 | Selected Portions of Plaintiff ESCO Group LLC's Responses to Defendant Deere & Company's Third Set of Interrogatories (Nos. 21-25), served on October 19, 2022 |

| Exhibit | Pages | Description |
|---------|-------|-------------|
| F | 60-65 | Selected Portions of the Deposition Transcript of Michael Budan, taken on November 9, 2022 ("Budan Dep.") |
| G | 66-83 | Selected Portions of the Deposition Transcript of Adam Stitzel, taken on December 16, 2022 ("Stitzel Dep.") |
| H | 84-97 | Selected Portions of the Expert Report of Thomas R. Varner, PH.D., submitted on January 13, 2023 ("Varner Rpt.") |
| I | 98-111 | Selected Portions of the Expert Report of Holland, submitted on January 13, 2023 ("Holland Rpt.") |
| J | 112-118 | Expert Report of Panapa, submitted on January 13, 2023 ("Panapa Rpt.") |
| K | 119-127 | Errata to the Expert Report of Thomas R. Varner, PH.D., submitted on January 16, 2023 ("Varner Jan. Errata") |
| L | 128-134 | Selected Portions of the Expert Report of Stephen L. Becker, submitted on February 8, 2023 ("Becker Rpt.") |
| M | 135-156 | Selected Portions of the Expert Report of Klopp, submitted on February 8, 2023 ("Klopp Rpt.") |
| N | 157-161 | Selected Portions of the Reply Expert Report of Thomas R. Varner, PH.D., submitted on March 3, 2023 ("Varner Reply Rpt.") |
| O | 162-167 | Selected Portions of the Reply Expert Report of Holland, submitted on March 3, 2023 ("Holland Reply Rpt.") |
| P | 168-181 | Selected Portions of the Reply Expert Report of Panapa, submitted on March 3, 2023 ("Panapa Reply Rpt.") |

| Exhibit | Pages | Description |
|---------|-------|-------------|
| Q | 182-218 | Selected Portions of the Deposition Transcript of Thomas R. Varner, PH.D., taken on March 13, 2023 ("Varner Dep.") |
| R | 219-224 | Selected Portions of the Deposition Transcript of Panapa, taken on March 14, 2023 ("Panapa Dep.") |
| S | 225-229 | Selected Portions of the Errata to the Expert Report of Thomas R. Varner, PH.D., submitted on March 19, 2023 ("Varner March Errata") |
| T | 230-233 | Declaration of Rachael L. Rodman, executed on March 28, 2023 |
| U | 234-238 | Email correspondence from Deere's counsel to ESCO's counsel, sent on March 16, 2023 |
| V | 239-240 | Email correspondence from ESCO's counsel to Deere's counsel, sent on March 19, 2023 |

OF COUNSEL:

John F. Bennett (*pro hac vice*)
Paul M. Ulrich (*pro hac vice*)
Rachael L. Rodman (*pro hac vice*)
Paul J. Linden (*pro hac vice*)
Ava M. Abner (*pro hac vice*)
ULMER & BERNE LLP
312 Walnut Street, Suite 1400
Cincinnati, Ohio 45202-4029
(513) 698-5000
jbennett@ulmer.com
pulrich@ulmer.com
rrodman@ulmer.com
plinden@ulmer.com
aabner@ulmer.com

Dated: March 28, 2023

*/s/ Michelle C. Streifthau-Livizos*
James D. Taylor, Jr. (#4009)
Michelle C. Streifthau-Livizos (#6584)
SAUL EWING LLP
1201 N. Market Street, Suite 2300
Wilmington, Delaware 19801
(302) 421-6800
james.taylor@saul.com
michelle.streifthau-livizos@saul.com

*Attorneys for Defendant*
*DEERE & COMPANY*

iv

# EXHIBIT A



US008844175B2

| (12) **United States Patent** | | (10) **Patent No.:** | **US 8,844,175 B2** |
|---|---|---|---|
| Snyder | | (45) **Date of Patent:** | **Sep. 30, 2014** |

(54) **WEAR ASSEMBLY FOR EXCAVATING EQUIPMENT**

(75) Inventor: **Christopher D. Snyder**, Portland, OR (US)

(73) Assignee: **ESCO Corporation**, Portland, OR (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 447 days.

(21) Appl. No.: **12/913,071**

(22) Filed: **Oct. 27, 2010**

(65) **Prior Publication Data**

US 2011/0099862 A1    May 5, 2011

**Related U.S. Application Data**

(60) Provisional application No. 61/256,561, filed on Oct. 30, 2009.

(51) **Int. Cl.**
*E02F 9/28* (2006.01)

(52) **U.S. Cl.**
CPC ............. *E02F 9/2858* (2013.01); *E02F 9/2866* (2013.01); *E02F 9/2833* (2013.01); *E02F 9/2825* (2013.01)
USPC ............................................. **37/452**; 37/455

(58) **Field of Classification Search**
USPC ............................. 37/452, 453, 455; 172/713
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 784,116 | A | 3/1905 | McCaskey |
| 1,218,841 | A | 3/1917 | Dietz |
| 1,438,001 | A | 12/1922 | Buskirk et al. |
| 1,685,196 | A * | 9/1928 | Gilbert ........................ 172/703 |
| 2,040,085 | A | 5/1936 | Fykse et al. |
| 2,050,014 | A | 8/1936 | Morrison |
| 2,167,425 | A | 7/1939 | Page |
| 2,256,488 | A * | 9/1941 | Murtaugh ........................ 37/455 |
| 2,689,419 | A | 9/1954 | Daniels et al. |
| 2,738,602 | A | 3/1956 | Meeks |
| 2,874,491 | A | 2/1959 | Larsen |
| 2,904,909 | A | 9/1959 | Ratkowski |
| 2,915,290 | A | 12/1959 | Petersen |
| 2,919,506 | A | 1/1960 | Larsen |
| 3,012,346 | A | 12/1961 | Larsen |
| 3,079,710 | A | 3/1963 | Larsen et al. |
| 3,196,956 | A * | 7/1965 | Ratkowski ................... 172/713 |
| 3,331,637 | A | 7/1967 | Krekeler |
| 3,444,633 | A * | 5/1969 | Hensley ......................... 37/452 |
| 3,455,040 | A | 7/1969 | Ratkowski |
| 3,530,601 | A | 9/1970 | Steil |
| 3,623,247 | A | 11/1971 | Stepe |
| 3,624,827 | A * | 11/1971 | Liess et al. ....................... 37/92 |
| 3,774,324 | A | 11/1973 | Lafond |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 50-132703 | 10/1975 |
| JP | 61176724 | 8/1986 |

(Continued)

*Primary Examiner* — Jamie L McGowan

(74) *Attorney, Agent, or Firm* — Steven P. Schad

(57) **ABSTRACT**

Wear members for use in excavating include a socket having a front stabilizing end that includes a top surface, a bottom surface and side surfaces. At least one of these surfaces is formed with a transverse, inward projection and extends axially substantially parallel to the longitudinal axis of the socket. The socket may include surfaces that generally correspond to exterior surfaces of a nose on which it may be mounted and on which it may be connected to excavating equipment.

**21 Claims, 9 Drawing Sheets**



DEERE EX. A
PAGE 2

**US 8,844,175 B2**

Page 2

(56)                   **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 3,897,642 | A | 8/1975 | Helton et al. |
| 3,959,901 | A | 6/1976 | Klett |
| 3,982,339 | A | 9/1976 | Nilsson |
| 4,027,408 | A | 6/1977 | Ramella et al. |
| 4,317,300 | A | 3/1982 | Emrich et al. |
| 4,319,415 | A | 3/1982 | Mayerbock et al. |
| 4,335,532 | A | 6/1982 | Hahn et al. |
| 4,404,760 | A | 9/1983 | Hahn et al. |
| D274,434 | S | 6/1984 | Nilsson |
| 4,470,210 | A | 9/1984 | Hahn |
| D275,859 | S | 10/1984 | Nilsson |
| 4,481,728 | A | 11/1984 | Mulder et al. |
| 4,510,706 | A | 4/1985 | Berchem |
| 4,577,423 | A | 3/1986 | Hahn |
| 4,611,418 | A | 9/1986 | Launder |
| 4,625,439 | A | 12/1986 | Johansson et al. |
| 4,727,663 | A | 3/1988 | Hahn |
| 4,744,692 | A | 5/1988 | Olsen et al. |
| D296,442 | S * | 6/1988 | Broomhall ...................... D15/29 |
| 4,751,785 | A | 6/1988 | Johansson et al. |
| 5,074,062 | A | 12/1991 | Hahn et al. |
| 5,152,088 | A | 10/1992 | Hahn et al. |
| 5,177,886 | A | 1/1993 | Klett |
| 5,350,022 | A | 9/1994 | Launder et al. |
| D354,291 | S | 1/1995 | Edwards |
| 5,653,048 | A | 8/1997 | Jones et al. |
| D389,844 | S | 1/1998 | Moreno |
| D414,193 | S | 9/1999 | Launder et al. |
| D417,877 | S | 12/1999 | Launder et al. |
| 6,047,487 | A | 4/2000 | Clendenning |
| 6,240,663 | B1 | 6/2001 | Robinson |
| 6,247,255 | B1 | 6/2001 | Clendenning |
| D466,224 | S | 8/2001 | Clendenning |
| D447,154 | S | 8/2001 | Clendenning |
| 6,321,471 | B2 | 11/2001 | Fernandez et al. |
| 6,385,871 | B1 * | 5/2002 | Quarfordt ...................... 37/457 |
| 6,393,739 | B1 | 5/2002 | Shamblin et al. |
| 6,430,851 | B1 | 8/2002 | Clendenning |
| 6,439,796 | B1 | 8/2002 | Ruvang et al. |
| 6,477,796 | B1 | 11/2002 | Cornelius |
| 6,619,883 | B2 * | 9/2003 | Livesay et al. ................. 404/124 |
| 6,675,509 | B2 | 1/2004 | Bierwith |
| 6,729,052 | B2 | 5/2004 | Ollinger, IV et al. |
| 6,735,890 | B2 | 5/2004 | Carpenter et al. |
| 6,745,503 | B1 | 6/2004 | Moreno et al. |
| 6,836,983 | B2 | 1/2005 | Moreno et al. |
| 6,839,990 | B2 | 1/2005 | Leslie et al. |
| 6,865,828 | B1 | 3/2005 | Molino et al. |
| 6,976,325 | B2 | 12/2005 | Robinson et al. |
| 7,523,572 | B2 | 4/2009 | Pasqualini |
| 7,703,224 | B2 * | 4/2010 | Karlsson et al. ................. 37/457 |
| 7,730,651 | B2 | 6/2010 | Carpenter |
| 7,762,015 | B2 * | 7/2010 | Smith et al. ................... 37/455 |
| 7,980,011 | B2 * | 7/2011 | Ruvang ........................ 37/452 |
| 8,061,064 | B2 * | 11/2011 | Ollinger et al. ............... 37/453 |
| 2001/0001352 | A1 | 5/2001 | Fernandez et al. |
| 2003/0005606 | A1 | 1/2003 | Carpenter et al. |
| 2003/0024139 | A1 | 2/2003 | Jones et al. |
| 2003/0089003 | A1 | 5/2003 | Ollinger, IV et al. |
| 2003/0101627 | A1 | 6/2003 | Robinson et al. |
| 2004/0093771 | A1 | 5/2004 | Carpenter et al. |
| 2004/0118021 | A1 | 6/2004 | Renski |
| 2005/0050775 | A1 | 3/2005 | Clendenning et al. |
| 2005/0055853 | A1 | 3/2005 | Livesay et al. |
| 2005/0120596 | A1 | 6/2005 | Kasim |
| 2005/0132619 | A1 | 6/2005 | Robinson |
| 2006/0013648 | A1 | 1/2006 | Bernstein |
| 2007/0193075 | A1 | 8/2007 | Carpenter |
| 2007/0227051 | A1 | 10/2007 | Carpenter et al. |
| 2008/0000114 | A1 | 1/2008 | Bentley |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| JP | | 04306329 | A | 10/1992 |
| JP | | 10183698 | A | 7/1998 |
| WO | WO 8703316 | A1 | 6/1987 |
| WO | WO 2004035945 | A1 | 4/2004 |
| WO | WO 2008/140993 | | 11/2008 |

* cited by examiner

DEERE EX. A
PAGE 3

**U.S. Patent**     Sep. 30, 2014     Sheet 1 of 9     **US 8,844,175 B2**



FIG. 1
(Prior Art)

DEERE EX. A
PAGE 4

U.S. Patent        Sep. 30, 2014        Sheet 2 of 9        US 8,844,175 B2



FIG. 2

DEERE EX. A
PAGE 5



FIG. 3

DEERE EX. A
PAGE 6



FIG. 4

DEERE EX. A
PAGE 7



FIG. 5

DEERE EX. A
PAGE 8

U.S. Patent          Sep. 30, 2014          Sheet 6 of 9          US 8,844,175 B2



FIG. 6

DEERE EX. A
PAGE 9



FIG. 7A

FIG. 7

DEERE EX. A
PAGE 10



FIG. 7C

DEERE EX. A
PAGE 11



FIG. 7B

FIG. 8

DEERE EX. A
PAGE 12

US 8,844,175 B2

1

## WEAR ASSEMBLY FOR EXCAVATING EQUIPMENT

### RELATED APPLICATION DATA

This application claims priority benefits to U.S. Provisional Patent Application No. 61/256,561 filed Oct. 30, 2009 in the name of Christopher Snyder and entitled "Wear Assembly for Excavating Equipment, which application is entirely incorporated herein by reference.

### FIELD OF THE INVENTION

The present invention pertains to wear assemblies for securing wear members to excavating equipment, such as wear assemblies that are suited for attachment to and use on a dredge cutterhead.

### BACKGROUND

Dredge cutterheads are used for excavating earthen material that is underwater, such as a riverbed. In general, a dredge cutterhead **1** includes several arms **2** that extend forward from a base ring **3** to a hub **4** (FIG. **1**). The arms **2** are spaced about the base ring **3** and formed with a broad spiral about the central axis of the cutterhead **1**. Each arm **2** is provided with a series of spaced apart teeth **5** to dig into the ground. The teeth **5** are composed of adapters or bases **6** that are fixed to the arms **2**, and points **7** that are releasably attached to the bases **6** by locks **8**.

In use, the cutterhead **1** is rotated about its central axis to excavate the earthen material. A suction pipe is provided near the ring **3** to remove the dredged material. To excavate the desired swath of ground, the cutterhead **1** is moved side-to-side as well as forward. On account of swells and other movement of the water, the cutterhead **1** also tends to move up and down, and periodically impacts the bottom surface. Further difficulties are caused by the operator's inability to see the ground that is being excavated underneath the water; i.e., unlike most other excavating operations, the dredge cutterhead **1** cannot be effectively guided by the operator along a path to best suit the terrain to be excavated.

During a dredging operation, the cutterheads **1** are rotated such that the teeth **5** are driven into and through the ground at a rapid rate. Consequently, considerable power is needed to drive the cutterhead **1**, particularly when excavating in rock. In an effort to minimize the power requirements, dredge points **7** are typically provided with elongate, slender bits for easier penetration of the ground. However, as the bit becomes shorter due to wear, the mounting sections of the points **7** will begin to engage the ground in the cutting operation. The mounting section is wider than the bit and is not shaped for reduced drag. On account of the resulting increased drag the mounting sections impose on the cutterhead **1**, the points **7** usually are changed at this time before the bits are fully worn away.

In view of the heavy loads and severe environments in which dredging equipment operates, the point **7** and base **6** interconnection for the teeth **5** needs to be stable and secure. Unstable and insecure engagement between the points **7** and their bases **6** may result in undesired disengagement of the points **7** from the base **6**, which increases time and expense in the dredging operation, e.g., due to lost parts, downtime for replacement of the points, etc. Accordingly, improved point and base interconnections in dredging and other excavating equipment would be a welcome advance in the art.

2

### SUMMARY OF THE INVENTION

The following presents a general summary of aspects of the present invention in order to provide a basic understanding of the invention and various example features of it. This summary is not intended to limit the scope of the invention in any way, but it simply provides a general overview and context for the more detailed description that follows.

Aspects of this invention relate to wear members for use in excavating equipment, assemblies including a wear member engaged with a base for use with a piece of excavating equipment, and excavating equipment that includes wear members and/or assemblies in accordance with this invention. More specific example aspects of this invention are described in more detail below.

In accordance with one aspect of the invention, a wear member for excavating equipment includes a front surface for engaging the material to be excavated and a rear socket for receiving a base secured to the excavating equipment. The socket has a front stabilizing end that includes a top surface, a bottom surface and side surfaces. At least one of these surfaces is formed with a transverse, inward projection. In some example structures according to this invention, the transverse, inward projection(s) will extend axially substantially parallel to the longitudinal axis of the socket. Additionally, in some structures according to the invention, at least the top surface and the bottom surface will include the transverse, inward projections and/or the substantially parallel axial extension direction.

In accordance with another aspect of the invention, the wear member includes a socket for receiving a base, wherein the socket has top, bottom and side surfaces, and wherein at least one of the surfaces is formed with a transverse inward projection extending substantially along the entire length of the socket.

In accordance with another aspect of the invention, the wear member includes a socket for receiving a base, wherein the socket has top, bottom and side surfaces, wherein at least one of the surfaces includes a first axial portion at a front end of the socket and a second axial portion proximate a rear end of the socket, and wherein each axial portion is formed with a transverse inward projection and extends axially substantially parallel to the longitudinal axis of the socket.

In accordance with another aspect of the invention, the wear member includes a socket for receiving a base fixed to the excavating equipment, and the socket has a front stabilizing end that includes a top surface, a bottom surface, a first side surface, and a second side surface. At least one of the top surface, the bottom surface, the first side surface, and the second side surface has a curved construction, e.g., a curved construction including a curved inward projection.

In accordance with one aspect of this invention, a wear member for excavating equipment is provided with a socket that includes a pair of axially spaced apart stabilizing bands that extend substantially around the perimeter of the socket, with one band near the front end of the socket and another band near the rear end. The stabilizing bands are defined by stabilizing surfaces that each extends substantially parallel to the longitudinal axis of the wear member and/or the assembly in which it is included. In one preferred embodiment, each of the stabilizing bands defines a generally trapezoidal shape.

In accordance with another aspect of the invention, a wear member for excavating equipment is formed to minimize the drag associated with the digging operation and, in turn, minimize the power need to drive the equipment. Reduced power consumption, in turn, leads to a more efficient operation.

DEERE EX. A
PAGE 13

US 8,844,175 B2

**3**

In one other aspect of the invention, the wear member is provided with side relief not only in the working end, but also in the mounting end, to reduce drag, require less digging power, and provide a longer useable life for the wear member.

In another aspect of the invention, the wear member has a transverse configuration where the width of the leading side is larger than the width of the corresponding trailing side so that the sidewalls of the wear member follow in the shadow of the leading side to decrease drag. This use of a smaller trailing side is provided not only through the working end of the wear member but also at least partially into its mounting end. As a result, the drag experienced by a worn wear member is less than that of a conventional wear member. Less drag translates into less power consumption and a longer use of the wear member before it needs to be replaced. Accordingly, the working ends of the wear member can be fully or nearly worn away before replacement is needed.

The wear member may have a profile that is defined by the collective transverse configuration of that portion of the wear member that is driven through the ground in any one digging pass. In one other aspect of the present invention, the profile is widest at the leading face and generally narrows rearward of the leading face for the portions of the wear member that will engage the ground during the life of the wear member.

In another aspect of the invention, the exterior transverse profile of the wear member may be generally trapezoidal with the leading side defusing the larger width. The trapezoidal shape continues through the working end and at least through the front portion of the mounting end.

The socket of the wear member is provided to receive a nose of a base member that may be fixed to the excavating equipment. In another aspect of the invention, the socket is formed with a transverse generally trapezoidal exterior shape to generally correspond to the exterior profile of the wear member. This general matching of the socket to the exterior of the mounting section eases manufacture, maximizes the size of the nose for a given outer profile, and enhances the strength to weight ratio.

In a preferred construction, one or more of the top, bottom or side surfaces of a trapezoidal shaped nose and the corresponding walls of the socket are each bowed to fit together. These surfaces and walls have a gradual curvature to ease installation, enhance stability of the wear member, and resist rotation of the wear member about the longitudinal axis during use.

In accordance with another aspect of the invention, both the socket and nose include front and rear stabilizing surfaces (e.g., stabilizing bands, as described above) that extend substantially parallel to the longitudinal axis of the wear member and substantially around the perimeter of the socket and nose to resist rearward loads applied in all directions.

In accordance with another aspect of the invention, the socket and nose are formed with complementary front bearing faces (or thrust faces) that may constitute an arc or section of a sphere to lessen stress in the components and to better control the rattle that occurs between the wear member and the base.

In another aspect of the invention, the socket and nose are formed with front curved bearing faces at their front ends, and with generally trapezoidal transverse shapes rearward of the front ends to improve stability, ease manufacture, maximize the size of the nose, reduce drag, stress and wear, and enhance the strength to weight ratio.

In accordance with another aspect of the invention, a wear assembly is provided that includes a base, a wear member that mounts to the base, and a lock or engagement system that holds the wear member to the base in a manner that is secure,

**4**

easy to use, and readily manufactured. The lock or engagement system may be axially oriented that, in a compressive state, it holds the wear member to the base and can tighten the fit of the wear member on the base. In one preferred example structure, the wear assembly includes an adjustable axial lock.

In another aspect of the invention, the wear member includes an opening into which the lock or engagement system is received, and a hole that is formed in a rear wall of the opening to accommodate passage of a lock to stabilize the lock and to facilitate easy tightening of the lock.

In another aspect of the invention, the base interacts with the lock solely through the use of a projecting stop. As a result, there is no need for a hole, recess or passage in the nose such as is typically provided to receive a lock. The nose strength is thus enhanced.

In another aspect of the invention, the locking arrangement for securing the wear member to the base can be adjusted to consistently apply a predetermined force to the wear member irrespective of the amount of wear that may exist in the base and/or wear member.

In another aspect of the invention, the wear member includes a marker that can be used to identify when the lock has been adequately tightened.

In another aspect of the invention, the wear member is installed and secured to the base through an easy to use process involving an axial lock. The wear member fits over a nose of a base fixed to the excavating equipment. The base includes a stop that projects outward from the nose. An axial lock is received into an opening in the wear member and extends between the stop and a bearing surface on the wear member to releasably hold the wear member to the nose.

In another aspect of the invention, the wear member is first slid over a base fixed to the excavating equipment. An axially oriented lock is positioned with one bearing face against a stop on the base and another bearing face against a bearing wall on the wear member such that the lock is in axial compression. The lock is adjusted to move and hold the wear member tightly onto the base.

In another aspect of the invention, a lock to releasably hold a wear member to a base includes a threaded linear shaft, with a bearing end and a tool engaging end, a nut threaded onto the shaft, and a spring including a plurality of alternating annular elastomeric disks and annular spacers fit about the threaded shaft between the bearing end and the nut.

Other aspects, advantages, and features of the invention will be described in more detail below and will be recognizable from the following detailed description of example structures in accordance with this invention.

BRIEF DESCRIPTION OF THE DRAWINGS

The present invention is illustrated by way of example and not limited in the accompanying figures, in which like reference numerals indicate the same or similar elements throughout, and in which:

FIG. **1** is a side view of a conventional dredge cutterhead;
FIG. **2** is a side perspective view of an example wear member in accordance with this invention;
FIG. **3** is a side view of an example base for mounting a wear member in accordance with this invention;
FIG. **4** is a perspective view of an example nose of a base for mounting a wear member in accordance with this invention;
FIG. **5** is a front view of an example nose of a base for mounting a wear member in accordance with this invention;

DEERE EX. A
PAGE 14

US 8,844,175 B2

5

FIG. **6** is a vertical cross sectional view along line **6-6** in FIG. **2** showing the wear member mounted on a nose of a base in accordance with one example of this invention;

FIG. **7** is a cross sectional view similar to that shown in FIG. **6** except that this example wear member is shown without the base member and the lock, to better illustrate the internal structures of the socket in this example wear member;

FIG. **7**A is a cross sectional view taken along line **7**A-**7**A in FIG. **7** and illustrates a cross section of the working section of the wear member;

FIG. **7**B is a cross sectional view taken along line **7**B-**7**B in FIG. **7** and illustrates a cross section of the wear member as it contacts ground during a digging operation;

FIG. **7**C is a cross sectional view taken along line **7**C-**7**C in FIG. **7** and illustrates a cross section of the mounting section of the wear member; and

FIG. **8** is an end view of an example wear member in accordance with this invention, looking into the socket.

The reader is advised that the various parts shown in these drawings are not necessarily drawn to scale.

DETAILED DESCRIPTION

The following description and the accompanying figures disclose example features of excavating equipment, including wear member structures for excavating equipment in accordance with examples of the present invention as well as structures for mounting such wear members.

Some aspects of the present invention pertain to wear assemblies **100** for excavating equipment, and these wear assemblies may be particularly well suited for dredging operations. In this application, the invention is described primarily in terms of a dredge tooth adapted for attachment to a dredge cutterhead. Nevertheless, the different aspects of the invention can be used in conjunction with other kinds of wear assemblies (e.g., shrouds) and for other kinds of excavating equipment (e.g., buckets or the like for construction or mining equipment, etc.).

The assembly **100** and/or portions thereof are at times described in relative terms such as "up," "down," "horizontal," "vertical," "front" and "rear," and the like. Such terms are not considered essential and are provided simply to ease the description. The orientation of a wear assembly **100** in an excavating operation, and particularly in a dredge operation, can change considerably. These relative terms should be understood with reference to the orientation of wear assembly **100** as illustrated in FIG. **2** unless otherwise stated.

Wear assembly **100** includes a base **102** secured to a dredge cutterhead (or other excavating equipment), a wear member **104**, and a lock or engagement system **106** to releasably hold the wear member **104** to base **102** (FIGS. **2** and **6**). The lock or engagement system could be in the form of a known retainer or pin (not shown), but preferably has a construction as described below.

Base **102** (which also may be referred to herein as an "adapter") includes a forwardly projecting nose **108** onto which wear member **104** is mounted, and a mounting end **110** (see FIG. **3**) that is fixed to an arm of a dredge cutterhead (or other excavating equipment). The base **102** may be cast as part of the arm, welded to the arm, or attached by mechanical means. As examples only, the base **102** may be formed and mounted to the cutterhead such as disclosed in U.S. Pat. No. 4,470,210 or U.S. Pat. No. 6,729,052, each of which is entirely incorporated herein by reference. The mounting end **110** may be sized and shaped to prevent rotation with respect to the cutterhead arm and to prevent the assembly **100** from unintentionally separating from the cutterhead arm.

6

In a dredge tooth, wear member **104** (which also may be referred to herein as a "point") is provided with a working section **112** (also referred to herein as a "bit") in the form of an elongate slender bit and a mounting section **114** that defines a socket **120** to receive nose **108** of the base member **102**. Wear member **104** is rotated by the cutterhead such that it engages the ground in generally the same way with each digging pass. As a result, wear member **104** includes a leading side **122** and a trailing side **124**. Leading side **122** is the side that first engages and leads the penetration of the ground with each rotation of the cutterhead. In the present invention, trailing side **124** has a smaller width than leading side **122** (i.e., along a plane perpendicular to the longitudinal axis **128** of wear member **104**, see FIGS. **7** and **7**A) through the working section **112** and at least partially through mounting section **114** (see also FIGS. **7**B and **7**C). In some embodiments, trailing side **124** has a smaller width than leading side **122** throughout the entire length of the wear member **104**.

As shown in FIGS. **2** and **7**A, at least the working section **112** of wear member **104** preferably has a generally trapezoidal transverse configuration with a leading side **122** that is wider than trailing side **124**. The term "transverse configuration" is used herein to refer to the two-dimensional configuration along a plane perpendicular to the longitudinal axis **128** of wear member **104**. On account of this narrowing of the wear member **104**, sidewalls **130** and **132** follow in the shadow of leading side **122** during digging and thereby create little drag on the cutting operation (this reduction in drag feature is also called "side relief" in this specification). In some constructions, sidewalls **130**, **132** converge toward trailing side **124** at an angle θ of about 16 degrees (see FIG. **7**A); however, other angular configurations are possible. The leading side **122**, trailing side **124** and sidewalls **130**, **132** can be planar, curved or irregular. Moreover, shapes other than trapezoidal can be used that provide side relief.

In use, the dredge wear member **104** penetrates the ground to a certain depth with each digging pass (i.e., with each rotation of the cutterhead). During much of the wear member's useful life, the working end **112** alone penetrates the ground. As one example, the ground level in one digging cycle extends generally along line **7**B-**7**B in FIG. **7** at the center point of a digging pass. Because only the working end **112** penetrates the ground and because the working end **112** is relatively thin, the drag placed on the digging operation is within manageable limits. Nevertheless, with many dredge teeth being constantly driven through the ground at a rapid rate, power requirements are always high and reducing the drag even in the bit portion **112** of the wear member **104** is beneficial to the operation, especially when digging through rock.

In some preferred constructions, sidewalls **130**, **132** not only converge toward trailing side **124**, but they also are configured so that the sidewalls **130**, **132** lie within the shadow of the leading side **122** in the digging profile (FIG. **7**B). The term "digging profile" is used herein to mean the cross-sectional configuration of the portion of wear member **104** that penetrates the ground along a plane that is (i) parallel to the direction of travel at the center point of a digging pass through the ground and (ii) laterally perpendicular to the longitudinal axis. The digging profile is a better indication of the drag to be imposed on the wear member **104** during use than a true transverse cross section. The provision of side relief in the digging profile is dependent on the angle at which the sidewalls converge toward the trailing side and the axial slope or expansion of the wear member surfaces in a rearward direction. The intention is to provide a width that generally narrows from the leading side **122** to the trailing side **124**

DEERE EX. A

PAGE 15

US 8,844,175 B2

7

8

when considered from the perspective of the digging profile. Side relief in the digging profile preferably extends across the expected cutterhead digging angles, but benefit can still be obtained if such side relief exists in at least one digging angle. As one example only, the cross-sectional configuration illustrated in FIG. 7B represents one digging profile for a portion of wear member 104 being driven through the ground. As can be seen, the working end 112 is still provided with side relief even in the digging profile as sidewalls 130, 132 converge toward trailing side 124 for reduced drag.

As the working section 112 wears away, the ground level gradually creeps rearward so that more rearward, thicker portions of the wear member 104 are pushed through the ground with each digging cycle. More power is therefore required to drive the cutterhead as the working members wear. Eventually, enough of the working section 112 wears away such that the mounting section 114 of the wear member 104 is being driven through the ground with each digging pass. In at least some example structures in accordance with the present invention, the mounting section 114 continues to include side relief at least at the front end of the mounting section (FIG. 7C), and preferably throughout the mounting section 114.

As seen in FIGS. 2, 6, and 7, mounting section 114 is larger than working section 112 to accommodate the receipt of nose 108 into socket 120 and to provide ample strength for the interconnection between the wear member 104 and the base 102. Sidewalls 130, 132 are inclined so as to converge toward trailing side 124. The inclination of sidewalls 130, 132 along line 7C-7C is, in this one example, at an angle α of about 26 degrees (FIG. 7B), but other inclinations can also be used. As discussed above, the desired side relief in the digging profile depends on the relation between the transverse inclination of the sidewalls 130, 132 and the axial expansion of the wear member 104.

As noted above, in use, the working section 112 may be worn down to an extent where a portion of mounting section 114 may be driven through the ground during rotation of a cutterhead. If desired, in at least some example structures in accordance with this invention, the tapering of sidewalls 130, 132 continues from front end 134 to rear end 136 of wear member 104. The presence of side relief in the mounting section 114 imposes less drag and, hence, requires less power to be driven through the ground. The reduced drag, in turn, enables the cutterhead to continue to operate with wear members 104 worn to the point where the mounting section 114 penetrates the ground. This more conventional wear members, the mounting section does not have a trapezoidal transverse configuration with sidewalls that converge toward trailing side. The lack of side relief in the digging profile imposes a heavy drag on the conventional wear member as it is driven through the ground especially as compared to the present inventive wear member 104. With the heavy drag produced by conventional wear members in this condition, many operators will replace the wear members when their mounting sections begin to be driven through the ground even though the working sections may not be fully worn out. With at least some examples of the present invention, wear members 104 can stay on bases 102 until working sections 112 are further worn out as compared with many conventional wear members.

The use of a wear member 104 with side relief in the working section 112 and the mounting section 114 as described above can be used with a wide variety of nose and socket configurations. Nonetheless, in at least some example constructions in accordance with this invention, the front end 140 of nose 108 includes a forward-facing bearing or thrust face 142 that is trapezoidally shaped in cross section (FIGS.

2–6). Likewise, the front end 150 of socket 120 formed in the wear member 104 is formed with a complementary trapezoidally shaped bearing or thrust face 152 to set against thrust face 142 (FIGS. 6, 7, 7C, and 9). While the thrust faces 142, 152 may be any desired shape (such as any shape between hemispherical to flat or even concave), in some example structures according to this invention, the thrust face 142 may gently curve outward (e.g., as a portion or arc (or segment) of a sphere) such that its center point (or near its center point) is the forwardmost point of the face 142. In other examples, the thrust face 142 will be convex and curved about two perpendicular axes. The thrust face 152 may be shaped to match or substantially match the shape of the face 142. Matching rounded (e.g., spherical arc) shaped thrust faces 142 and 152 for primary load bearing helps keep the faces 142 and 152 in contact without tipping or shifting as the load on the working section 112 changes over the course of a digging operation (e.g., changes from an axial to a non-axial load, etc.). The thrust faces 142, 152 may be flat, recessed or have other shapes so long as they adequately resist the anticipated thrust loads for the intended use.

Nose 108 includes a body 160 rearward of front end 140 (FIGS. 3-5). Body 160 is defined by an upper surface 162, a lower surface 164 and side surfaces 166, 168. In some example constructions, body surfaces 162-168 diverge rearwardly so that nose 108 expands outward from front end 140 to provide a more robust nose to withstand the rigors of digging. Nevertheless, it is possible for only the upper and lower surfaces 162, 164 to diverge from each other and for the side surfaces 166, 168 to axially extend substantially parallel to each other. Socket 120 has a main portion 180 rearward of front end 150 to receive body 160. Main portion 180 includes an upper wall 182, lower wall 184 and sidewalls 186, 188 that generally conform to body surfaces 162-168, respectively. In at least some preferred example configurations according to this invention, body 160 and main portion 180 each have a trapezoidal transverse configuration. The use of a trapezoidal shape predominantly along the length of nose 108 and socket 120 provides four corners 170, 190, which act as spaced ridges to resist turning of wear member 104 about axis 128.

Also, in at least some example constructions in accordance with this invention, at least one of the body surfaces 162-168 and socket walls 182-188 (and preferably all of them) will have mutually bowed configurations (see FIGS. 4, 5, 7, 7C, and 8). In other words, in some example structures according to this invention, body surfaces 162-168 are preferably concave and curved across substantially their entire widths to define a trough 172 on each of the four sides of body 160. Likewise, socket walls 182-188 are preferably convex and curved across substantially their entire widths to define projections 192 received into troughs 172. The preferred bowing of nose surfaces 162-168 and socket walls 182-188 across substantially their entire widths provides increased resistance to the rotation of wear member 104 about base 102 during operation and increases the resistance to vertical and side loading of the point during digging. The troughs and projections will also reduce rotational rattle of the wear member 104 on the base 102. While the bowed surfaces 162-168 and walls 182-188 are preferred, other trough and projection configurations such as disclosed in U.S. patent application Ser. No. 11/706,592, which is incorporated herein by reference, could also be used without departing from the invention. Other rotation resisting constructions could also be used without departing from this invention.

The use of troughs 172 and projections 192, and particularly those that are gradually curved and extending substantially across the entire widths of the surfaces 162-168 and

DEERE EX. A
PAGE 16

US 8,844,175 B2

9

walls **182-188** eases the assembly of wear member **104** onto nose **108**; i.e., the troughs **172** and projections **192** cooperatively direct wear member **104** into the proper assembled position on nose **108** during assembly. For example, if wear member **104** is initially installed on nose **108** out of proper alignment with the nose **108** as it is fit onto the nose **108**, the engagement of projections **192** being received into the troughs **172** will tend to rotate the wear member **104** into proper alignment as the wear member is fed rearward onto nose **108**. This cooperative effect of troughs **172** and projections **192** greatly eases and speeds installation and the setting of corners **170** into corners **190**. Some variations could also be used between the shapes of the socket **120** and the nose **108** so long as the socket **120** predominantly matches the shape of the nose **108**.

As shown in various figures (e.g., FIGS. **2**, **4**, **5**, **7**, 7C, and **8**), one or more of the surfaces (e.g., top surface, bottom surface, and side surfaces) at the front end **140** of the nose **108** and the front end **150** of the socket **120** may have a generally curved configuration or construction (e.g., continuously curved from one corner to the next at or near the thrust faces **142** and **152**), and the corners also may be rounded. At least some of the surfaces having this curved configuration or construction may include a curved inward projection (e.g., so that the corners of that surface lie outward from the center of that surface with respect to a center of the front end **140** and **150** of the nose **108** and socket **120**, respectively). Additional or alternative example features of the nose **108** and socket **120** in accordance with this invention are described in more detail below.

The front end **140** of the nose **108** includes front stabilizing surfaces **202**, and more specifically including an upper stabilizing surface **202**a, a lower stabilizing surface **202**b and two side stabilizing surfaces **202**c that collectively extend around the perimeter of front end **140** of nose **108**. These stabilizing surfaces **202**a, **202**b, **202**c preferably define a generally trapezoidal configuration though other shapes can be used. In a preferred construction, upper stabilizing surface **202**a has a shorter width than lower stabilizing surface **202**b to match the outer profile of wear member **104**. Of course, the orientation could be reversed, or other relative sizing options may be provided, as desired for certain applications. Similarly, the interior side walls defining front end **150** of socket **120** include similarly shaped and situated stabilizing surfaces **212**a through **212**c that match with and contact stabilizing surfaces **202**a through **202**c, respectively. In this illustrated example arrangement, the front stabilizing surfaces on the nose **108** and in the socket **120** provide a front stabilizing end located adjacent the thrust faces **142** and **152** of the nose **108** and socket **120**. The top and bottom stabilizing surfaces **202**a, **202**b, **212**a, and **212**b extend rearward from their respective thrust faces **142** and **152**.

Front stabilizing surfaces **202**, **212** preferably axially extend substantially parallel to longitudinal axis **128**. The term "substantially parallel," as used herein in this context, is intended to include parallel surfaces as well as those that diverge rearwardly from axis **128** at a small angle (e.g., of about 1-7°) for manufacturing or other purposes. In one preferred embodiment, each front stabilizing surface **202**, **212** diverges axially rearward at an angle to axis **128** of no more than about 5°, and in some instances, by about 2-3°. The front stabilizing surfaces **202**, **212** also preferably encircle (or at least substantially encircle) nose **108** and socket **120** to better resist non-axial loads. However, benefits can be achieved by forming only one or more of the upper surfaces **202**a, **212**a, bottom surfaces **202**b, **212**b, and side surfaces **202**c, **212**c to extend axially substantially parallel to longitudinal axis **128**.

10

Front stabilizing surfaces **202** on front end **140** of the nose **108** are preferably each provided with a transverse, inward recess in a transverse direction (see FIGS. **2** and **5**). Likewise, front stabilizing surfaces **212** on front end **150** of the socket **120** are preferably each provided with a corresponding transverse, inward projection. The corresponding inward recesses and projections enable each of the stabilizing surfaces **202**, **212** to resist all applied loads irrespective of whether the loads are applied vertically or horizontally (e.g., resist vertical and side loading). For example, when an upward load is vertically applied to the bit of the point, the load is at least in part resisted by lower stabilizing surface **212**b contacting lower stabilizing surface **202**b. The use of such corresponding recesses and projections at the front end also enhances installation of the wear members on the bases in the same way as discussed above for the troughs and projections rearward of the front ends **140**, **150**.

The rear of the nose **108** includes rear stabilizing surfaces **200**, and more specifically including an upper stabilizing surface **200**a, a lower stabilizing surface **200**b and two side stabilizing surfaces **200**c that collectively extend around the perimeter of rear end of nose **108**. Rear stabilizing surfaces **200** are able to well resist vertical and side loads applied to wear member **104** without tending to push the wear member **104** from base member **102**. These stabilizing surfaces **200**a, **200**b, **200**c preferably define a generally trapezoidal configuration around the perimeter of the nose **108**, though other shapes could be used. In a preferred construction, upper stabilizing surface **200**a is narrower than lower stabilizing surface **200**b to match the outer profile of wear member **104**. Similarly, the interior side walls of socket **120** include similarly shaped and situated stabilizing surfaces **210**a through **210**c that match with and contact stabilizing surfaces **200**a through **200**c, respectively. Of course, the orientation could be reversed, or other relative sizing options may be provided, as desired for certain applications. Further, front and rear stabilizing surfaces **200**, **202**, **210**, **212** preferably form spaced apart bands of stabilizing surfaces that each extends about the entire perimeter of nose **108** and the socket or at least substantially about the entire perimeter, as will be described in more detail below.

More specifically, nose surfaces **162-168** with troughs **172** are each preferably inclined axially to expand outward as they extend rearward to provide strength to nose **108** until reaching the rear stabilizing surfaces **200** of nose **108**. Likewise, socket walls **182-188** with projections **192** also each expand to conform to surfaces **162-168**. Socket walls **182-188** also define the rear stabilizing surfaces **210** to bear against rear stabilizing surfaces **200**. Rear stabilizing surfaces **200**, **210** are substantially parallel to longitudinal axis **128**. As noted above, the term "substantially parallel," as used herein in this context, is intended to include parallel surfaces as well as those that diverge rearwardly from axis **128** at a small angle (e.g., of about 1-7°) for manufacturing or other purposes. In one preferred embodiment, each rear stabilizing surface **200**, **210** diverges axially rearward at an angle to axis **128** of no more than about 7°, and in some instances, by about 2-3°. The rear stabilizing surfaces **200**, **210** also preferably encircle (or at least substantially encircle) nose **108** and socket **120** to better resist non-axial loads. Nevertheless, benefits can be realized by including such stabilizing surfaces **200**, **210** on only one or more of the upper, lower and side surfaces of the nose **108** and socket **120**.

While contact between the various socket **120** surfaces and the nose **108** will likely occur during an excavating operation, contact between the thrust faces **142**, **152**, the corresponding front stabilizing surfaces **202**, **212**, and the corresponding

DEERE EX. A
PAGE 17

US 8,844,175 B2

11

rear stabilizing surfaces 200, 210 is intended to provide primary resistance to the applied loads on the tooth and thereby provide the desired stability. While these stabilizing surfaces 200, 202, 210, 212 may be formed with relatively short axial extensions in the longitudinal direction 128, they could have longer or different constructions. The presence of the stabilizing surfaces, particularly front stabilizing surfaces 202 and 212, helps align the wear member 104 as it is installed on the nose 108.

Front stabilizing surfaces 202, 212 and rear stabilizing surfaces 200, 210 are provided to stabilize the wear member 104 on the nose 108 and to lessen stress in the components. The front stabilizing surfaces 202, 212 at the front ends 140, 150 of the nose 108 and socket 120, respectively, are able to stably resist axial and non-axial rearward forces in direct opposition to the loads irrespective of their applied directions. Rear stabilizing surfaces 200, 210 complement the front stabilizing surfaces 202, 212 by reducing the rattle at the rear of the wear member 104 and providing stable resistance to the rear portions of the wear member 104, as described in U.S. Pat. No. 5,709,043 incorporated herein by reference. With stabilizing surfaces 200, 202, 210, and 212 extending about the entire perimeter of nose 108 and socket 120 (or at least substantially about the entire perimeters of these members), they are also able to resist the non-axially directed loads applied in any direction.

The main portion of socket 120 preferably has a generally trapezoidal transverse configuration to receive a matingly shaped nose 108 (see FIGS. 7C and 8). The generally trapezoidal transverse configuration of socket 120 generally follows the generally trapezoidal transverse configuration of the exterior of nose 108. This cooperative shaping of the socket 120 and the exterior of nose 108 maximizes the size of the nose 108 that can be accommodated within wear member 104, eases the manufacturing of wear member 104 in a casting process, and enhances the strength to weight ratio. However, a variety of different configurations could be used.

While the nose walls 162-168 and socket walls 182-188 may be generally shaped to match and mate with one another along substantially their entire lengths, there are preferably one or more gaps 220 along a medial portion of the length of nose walls 162-168 and socket walls 182-188, e.g., as shown in FIG. 6 to better ensure contact under load along the front and rear stabilizing surfaces. Gaps may also be provided along other portions of the fit as well. In the example structure shown in FIG. 6, a gap 220 is provided in a central section of the nose and socket, between stabilizing surfaces 200, 202, 210, 212 along each of the upper, lower and side surfaces. These gaps 220 can also help make the nose 108 fit more easily into the socket 120, help ease removal of the nose 108 from the socket 120, and reduce the need for high tolerances and/or precision in the overall manufacture of the nose 108 and socket 120. Because of the presence of the front and rear stabilizing surfaces 200, 202, 210, 212, the gap(s) 220 can be made relatively large to assure that no undesired contact is made (thereby maintaining desired lever arm distances between contacts). The presence of the stabilizing surfaces 200, 202, 210, 212 at both the front and the rear of the nose 108 and within the socket 120 of the working member 104 decreases relative motion between the wear member 104 and the nose 108 and increases the usable lives of these parts.

The spaced bands of front and rear stabilizing surfaces 200, 210 (and the corresponding surfaces in the socket 120) enable the assembly 100 to effectively resist loads applied from all directions. For example, a downward load L1 applied to the front end 134 of wear member 104 (see FIG. 2) will tend to rotate wear member 104 forwardly off nose 108 if not suffi-

12

ciently resisted. Such loads in assembly 100 are generally resisted by front stabilizing surface 202 (e.g., top surface 202a) and rear stabilizing surface 200 (e.g., bottom surface 200b) (and the corresponding stabilizing surfaces 212 and 210 provided within the socket 120). Likewise, side loads L2 applied to front end 134 are generally resisted by front stabilizing surface 202c on one side and rear stabilizing surface 200c on the opposite side (and the corresponding stabilizing surfaces 212 and 210 provided within the socket 120). The use of stabilizing surfaces 200, 202, 210, 212 provides stable resistance to such loads without an undue reliance on lock 106. The use of stabilizing surface bands around the entire or most of the perimeter enables enhanced support in virtually all directions, which is particularly important in a dredging operation. Nevertheless, the stabilizing surfaces need not be formed about the entire perimeter, if desired.

In a preferred embodiment, the upper, lower and side surfaces of the nose 108 and socket 120 are preferably provided with transverse inward recesses on the nose 108 and transverse inward projections on the socket 120 along their entire lengths. However, stability, strength and/or installation benefits can be achieved by providing such a configuration only on the front ends 140, 150 of the nose 108 and socket 120, i.e., with a different shaped nose and socket rearward of the front ends. The front ends 140, 150 preferably are also, as discussed above, formed with stabilizing surfaces that extend axially substantially parallel to the longitudinal axis 128 along with having the transverse inward recesses and projections, but some benefits are achieved even without this preferred axial extension.

A wide variety of different locks can be used to releasably secure wear member 104 to base 102. Nonetheless, in a preferred embodiment, lock 106 is received into an opening 300 in wear member 104, preferably formed in trailing wall 124 though it could be formed elsewhere. Opening 300 preferably has an axially elongated shape and includes a front wall 302, a rear wall 304, and sidewalls 306, 308. As will be described in more detail below, the lock 106 will be engaged to press against rear wall 304 of the opening 300. A rim 310 is built up around opening 300 for protection of the lock 106 and for additional strength. Rim 310 is also enlarged along rear wall 304 to extend farther outward of the exterior surface and to define a hole 312 for passage of lock 106. The hole 312 stabilizes the position of lock 106 and permits easy access to it by the operator.

Nose 108 includes a stop 320 that projects outward from upper side 162 of nose 108 to engage lock 106. Stop 320 preferably has a rear face with a concave, curved recess into which a front end of lock 106 is received and retained during use (see FIG. 6), but other arrangements could be used to engage the lock 106 with the stop 320. In one example construction, opening 300 is long enough and trailing wall 124 sufficiently inclined to provide clearance for stop 320 when wear member 104 is installed onto nose 108. Nevertheless, a relief or other forms of clearance could be provided in socket 120, if needed, for the passage of stop 320. Further, the projection of stop 320 is preferably limited by the provision of a depression 322 to accommodate a portion of lock 106. Preferably, the stop 320 does not include an opening in the nose 108, in order to maintain a stronger and more robust nose construction.

Lock 106 of this example construction may be a linear lock oriented generally axially to hold wear member 104 onto base 102, and to tighten the fit of wear member 104 onto nose 108. The use of a linear lock oriented axially increases the capacity of the lock 106 to tighten the fit of the wear member 104 on the nose 108; i.e., it provides for a greater length of take up and

US 8,844,175 B2

13

firmly holds the thrust faces **142** and **152** against one another (this face **142** to face **152** contact is one of the primary contact modes between the wear member **104** and the nose **108**). In one preferred structural arrangement, lock **106** includes a threaded shaft **324** having a front end and a rear end with head **326**, a nut **328** threaded to shaft **324**, and a spring **330**. Spring **330** is preferably formed of a series of elastomeric disks **332** composed of foam, rubber or other resilient material, separated by spacers **334** which are preferably in the form of washers. Multiple disks **332** may be used to provide sufficient force, resiliency and take up. The spacers **334** isolate the elastomeric disks **332** so that they operate as a series of individual spring members. Spacers **334** are preferably composed of metal or metal alloys, but they could be made of other materials, such as plastic, if desired. Moreover, the spring **330** of the preferred construction is economical to make and assemble on shaft **324**. Nevertheless, other kinds of springs could be used. A thrust washer **336** or other means is preferably provided at the rear end of the spring **330** to provide ample support against rear wall **304**.

Shaft **324** extends centrally through spring **330** to engage nut **328**. The front end of shaft **324** fits into the recess of the stop **320** so that the shaft **324** is set against stop **320** for support. The rear end of lock **106** extends through hole **312** in wear member **104** to enable a user to access the lock **106** outside of opening **300**. The shaft **324** is preferably set at an angle to axis **128** so that head **326** is more easily accessed. Spring **330** sets between rear wall **304** and nut **328** so that it can apply a biasing force to the wear member **104** when the lock **106** is tightened. Hole **312** is preferably larger than head **326** to permit its passage during installation of lock **106** into assembly **100**. Hole **312** also could be formed as an open slot to accommodate insertion of shaft **324** simply from above. Other tool engaging structures could be used in lieu of the illustrated head **326**.

In use, wear member **104** is slid over nose **108** so that nose **108** is fit into socket **120** (FIGS. **2** and **6**). The lock **106** can be temporarily held in hole **312** for shipping, storage and/or installation by a releasable retainer (e.g., a simple twist tie), fit around shaft **324** outside of opening **300**, or it can be installed after the wear member **104** is fit onto the nose **108**. In any event, shaft **324** is inserted through hole **312** and its front end is set in the recess of the stop **320**. Lock **106** is positioned to lie along the exterior of nose **108** so that no holes, slots or the like need to be formed in the nose **108** to contain the lock **106** for resisting the loads. Head **326** is engaged and turned by a tool to tighten the lock **106** to a compressive state to hold the wear member **104** (i.e., shaft **324** is turned relative to nut **328** so that front end presses against stop **320**). This movement, in turn, draws nut **328** rearward against spring **330**, which is compressed between nut **328** and rear wall **304**. This tightening of lock **106** pulls wear member **104** tightly onto nose **108** (i.e., with front thrust faces **142**, **152** engaged) for a snug fit and less wear during use. Continued turning of shaft **324** further compresses spring **330**. The compressed spring **330** then urges wear member **104** rearward as the nose **108** and socket **120** begin to wear. The stability of this preferred nose **108** and wear member **104** arrangement enables the use of an axial lock **106**, i.e., no substantial bending forces will be applied to the lock **106** so that the high axial compressive strength of the bolt can be used to hold the wear member **104** to the base **102**. Lock **106** is lightweight, hammerless, easy to manufacture, does not consume much space, and does not require any openings in the nose **108**.

In one preferred example construction according to this invention, lock **106** also includes an indicator **340** fit onto shaft **324** in association with nut **328**. Indicator **340** may be,

14

for example, a plate formed of steel or other rigid material that has side edges that fit closely to sidewalls of opening **300**, but not tightly into opening **300**. Indicator **340** includes an opening that fully or partially receives nut **328** to prevent rotation of the nut **328** when shaft **324** is turned. The close receipt of side edges of indicator **340** to the sidewalls of the opening **300** prevents the indicator **340** from turning. Alternatively, if desired, the indicator **340** could have a threaded bore to function as the nut **328**, and other means could be provide to hold nut **328** and prevent it from turning. Indicator **340** could also be discrete from nut **328**, if desired.

Indicator **340** provides a visual indication of when shaft **324** has been suitably tightened to apply the desired pressure to the wear member **104** without placing undue stress on shaft **324** and/or spring **330**. In one potential construction in accordance with this invention, indicator **340** cooperates with a marker **342** formed along opening **300**, e.g., along rim **310** and/or the opening's interior sidewalls. Marker **342** is preferably on rim **310** along one or both sidewalls, but it could have other constructions. Marker **342** may be, for example, a ridge or some structure that is more than mere indicia so that it can be used when retightening lock **106** after wear begins to develop, as well as at the time of initial tightening when all of the parts are new.

When shaft **324** is turned and nut **328** is drawn rearward, indicator **340** moves rearward with nut **328** within opening **300**. When indicator **340** aligns with marker **342**, the operator knows that tightening can be stopped. At this position, lock **106** applies a predetermined pressure on wear member **104** irrespective of the wear on the nose **108** and/or in the socket **120**. Hence, both under-tightening and over-tightening of the lock **106** can be easily avoided. As an alternative, indicator **340** can be omitted and shaft **324** may be tightened to a predetermined amount of torque.

The large thrust face (**142**, **152**) contact, along with the front and rear stabilizing surfaces (**200**, **202**, **210**, **212**) and contact between these surfaces and the lock features **106** (e.g., as described above) allow the wear member **104** and nose **108** to wear back much further than many currently available systems (including wear into the thrust face areas) without the need for interim weld repairs. In many instances, an end user can rebuild the nose **108**, if desired, in lieu or replacing the entire mounting base **102**. Moreover, regardless of wear on the nose **108**, the lock **106** helps maintain relatively constant wear member **104** on nose **108** preload forces when a wear member **104** is installed. Aspects of this invention, including the thrust faces **142**, **152**, the front and rear stabilizing surfaces **200**, **202**, **210**, **212**, and/or the lock features **106** (e.g., as described above) increase wear member **104** stability on the nose **108** and lessen movement of the wear member **104** on the nose, thereby reducing wear on the nose and extending its life.

The various aspects of the invention are preferably used together for optimal performance and advantage. Nevertheless, the different aspects can be used individually to provide the benefits they each provide.

CONCLUSION

The present invention is described above and in the accompanying drawings with reference to a variety of example structures, features, elements, and combinations of structures, features, and elements. The purpose served by the disclosure, however, is to provide examples of the various features and concepts related to the invention, not to limit the scope of the invention. One skilled in the relevant art will recognize that numerous variations and modifications may be

DEERE EX. A
PAGE 19

US 8,844,175 B2

15

16

made to the example structures described above without departing from the scope of the present invention.

The invention claimed is:

**1**. A wear member for excavating equipment comprising a working section and a mounting section extending generally along a longitudinal axis, the mounting section including a socket for receiving a base fixed to the excavating equipment, and the socket having a front stabilizing end and a rear stabilizing end, the front stabilizing end is forward of the rear stabilizing end, the rear stabilizing end including a plurality of rear stabilizing surfaces, the front stabilizing end including a front thrust surface extending generally transverse to the longitudinal axis, and a top surface, a bottom surface, a first side surface, and a second side surface, each said top surface, bottom surface, first side surface, and second side surface extending rearwardly from the front thrust surface, wherein at least one of the top surface and the bottom surface and each of the first side surface and the second side surface has a transverse, inward projection in the front stabilizing end defined by bearing surfaces that are adjacent to and extend from the front thrust surface substantially parallel to the longitudinal axis in an axial direction.

**2**. A wear member according to claim **1**, wherein the top surface and the bottom surface each has a transverse, inward projection defined by bearing surfaces that are adjacent to and extend axially substantially parallel to the longitudinal axis.

**3**. A wear member according to claim **1**, wherein each of the inward projections is curved and extends substantially across the width of the front stabilizing end.

**4**. A wear assembly for excavating equipment comprising: a base fixed to the excavating equipment; a wear member comprising a working section and a mounting section extending generally along a longitudinal axis of the wear member, the mounting section including a socket having a front stabilizing end and a rear stabilizing end, the front stabilizing end is forward of the rear stabilizing end, the rear stabilizing end including a plurality of rear stabilizing surfaces, the front stabilizing end including a front thrust surface extending generally transverse to the longitudinal axis, and a top surface, a bottom surface, a first side surface, and a second side surface, each said top surface, bottom surface, first side surface, and second side surface extending rearwardly from the front thrust surface, wherein each of the first side surface and the second side surface has a transverse, inward projection in the front stabilizing end defined by bearing surfaces that are adjacent to and extend from the front thrust surface substantially parallel to the longitudinal axis in an axial direction; and an engagement system for releasably holding the wear member to the base.

**5**. A wear assembly according to claim **4**, wherein the base includes a nose having a front end with an exterior configuration shaped to substantially conform to a shape of the front stabilizing end of the socket.

**6**. A wear member for excavating equipment comprising a working section and a mounting section extending generally along a longitudinal axis, the mounting section including a socket for receiving a base fixed to the excavating equipment, and the socket having a front end and a rear end, the front end is forward of the rear end, the rear end including a plurality of rear stabilizing surfaces, the front end including a front thrust surface extending generally transverse to the longitudinal axis and a top surface, a bottom surface, a first side surface, and a second side surface, each said top surface, bottom surface, first side surface, and second side surface extending rearwardly from the front thrust surface, wherein each of the first side surface and the second side surface has an inward projection in the front end axially extending from the front

thrust surface, and wherein the inward projection extends into the rear end of the socket and substantially along an entire length of the socket, the inward projection having front bearing surfaces in the front end adjacent to the front thrust surface and rear bearing surfaces in the rear end that each axially extend substantially parallel to the longitudinal axis.

**7**. A wear member according to claim **6**, wherein each of the top surface, the bottom surface, the first side surface, and the second side surface has a transverse, inward projection extending from the front thrust face and substantially along the entire length of the socket.

**8**. A wear member according to claim **7**, wherein each of the inward projections is curved and extending substantially across the width of the front end.

**9**. A wear assembly for excavating equipment comprising: a base fixed to the excavating equipment; a wear member comprising a working section and a mounting section extending generally along a longitudinal axis of the wear member, the mounting section including a socket having a front end and a rear end, the front end is forward of the rear end, the rear end including a plurality of rear stabilizing surfaces, the front end including a front thrust surface extending generally transverse to the longitudinal axis, and a top surface, a bottom surface, a first side surface, and a second side surface, each said top surface, bottom surface, first side surface, and second side surface extending rearwardly from the front thrust surface, wherein at least one of the top surface and the bottom surface and each of the first side surface and the second side surface has an inward projection in the front end axially extending from the front thrust surface and wherein the inward projection extends into the rear end of the socket and substantially along an entire length of the socket, the inward projection having front bearing surfaces in the front end adjacent to the front thrust surface and rear bearing surfaces in the rear end that each axially extend substantially parallel to the longitudinal axis; and an engagement system for releasably holding the wear member to the base.

**10**. A wear assembly according to claim **9**, wherein the base includes a nose having a front end with an exterior configuration including a trough shaped to receive each of the transverse, inward projections of the socket.

**11**. A wear member according to claim **9**, wherein each of the inward projections is curved and extending substantially across the width of the front stabilizing end.

**12**. A wear assembly according to claim **11**, wherein the base includes a nose having a front end with an exterior configuration including a trough shaped to receive each of the transverse, inward projections of the socket.

**13**. A wear member for excavating equipment comprising a working section and a mounting section, the mounting section including a socket open rearwardly to receive a base secured to the excavating equipment, the socket having a longitudinal axis and including a front end and a rear end, the front end including a front thrust surface, a top side, a bottom side and opposite lateral sides, each of the top, bottom and lateral sides extending rearward of the front thrust face, each of the lateral sides including an inward, axially extending projection defined by bearing surfaces to contact and bear against the base, the bearing surfaces being adjacent to and extend rearward from the front thrust surface in an axial orientation that is substantially parallel to the longitudinal axis, wherein the rear end of the socket is rearward of the top, bottom and lateral sides of the front end.

**14**. A wear member according to claim **13** wherein each said projection has a generally V-shaped configuration defined by a pair of the bearing surfaces.

DEERE EX. A
PAGE 20

US 8,844,175 B2

17

**15**. A wear member according to claim **13** wherein the rear end is defined by a top side, a bottom side and opposite lateral sides each of which extend rearward from the front end, and each of the lateral sides of the rear end include a transverse, inward projection defined by bearing surfaces to contact and bear against the base that are aligned and contiguous with the projections in the front end.

**16**. A wear member according to claim **13** wherein at least one of the top side and the bottom side includes an inward, axially extending projection defined by bearing surfaces to contact and bear against the base, and the bearing surfaces are adjacent to and extend rearward from the front thrust surface in an axial orientation that is substantially parallel to the longitudinal axis.

**17**. A wear assembly for excavating equipment comprising:

a base secured to the excavating equipment;

a wear member for excavating equipment comprising a working section and a mounting section, the mounting section including a socket open rearwardly to receive a base secured to the excavating equipment, the socket having a longitudinal axis and including a front end and a rear end, the front end including a front thrust surface, a top side, a bottom side and opposite lateral sides, each of the top, bottom and lateral sides extending rearward of the front thrust face, each of the lateral sides including an inward, axially extending projection defined by bearing surfaces to contact and bear against the base, the bearing surfaces being adjacent to and extend rearward

18

from the front thrust surface in an axial orientation that is substantially parallel to the longitudinal axis, wherein the rear end of the socket is rearward of the top, bottom and lateral sides of the front end; and

a lock to contact the base and the wear member and releasably hold the wear member to the base.

**18**. A wear assembly according to claim **17** wherein each said projection has a generally V-shaped configuration defined by a pair of the bearing surfaces.

**19**. A wear assembly according to claim **17** wherein the rear end is defined by a top side, a bottom side and opposite lateral sides each of which extend rearward from the front end, and each of the lateral sides of the rear end include a transverse, inward projection defined by bearing surfaces to contact and bear against the base that are aligned and contiguous with the projections in the front end.

**20**. A wear assembly according to claim **17** wherein the base includes a top wall, a bottom wall and opposite sidewalls, and each of the sidewalls includes a slot corresponding in shape with and receiving the respective projection in the socket.

**21**. A wear assembly according to claim **17** wherein at least one of the top side and the bottom side includes an inward, axially extending projection defined by bearing surfaces to contact and bear against the base, and the bearing surfaces are adjacent to and extend rearward from the front thrust surface in an axial orientation that is substantially parallel to the longitudinal axis.

*   *   *   *   *

DEERE EX. A
PAGE 21

# EXHIBIT B



US010273662B2

(12) **United States Patent**
Carpenter

(10) **Patent No.:** **US 10,273,662 B2**
(45) **Date of Patent:** *Apr. 30, 2019

(54) **WEAR ASSEMBLY**

(71) Applicant: **ESCO Corporation**, Portland, OR (US)

(72) Inventor: **Christopher M. Carpenter**, Tualatin, OR (US)

(73) Assignee: **ESCO GROUP LLC**, Portland, OR (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 224 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/746,210**

(22) Filed: **Jan. 21, 2013**

(65) **Prior Publication Data**

US 2014/0026450 A1   Jan. 30, 2014

**Related U.S. Application Data**

(63) Continuation of application No. 12/792,999, filed on Jun. 3, 2010, now Pat. No. 8,356,432, which is a continuation of application No. 11/706,592, filed on Feb. 14, 2007, now Pat. No. 7,730,651.

(60) Provisional application No. 60/774,401, filed on Feb. 17, 2006.

(51) **Int. Cl.**
*E02F 9/28*   (2006.01)

(52) **U.S. Cl.**
CPC ............. *E02F 9/2833* (2013.01); *E02F 9/28* (2013.01); *E02F 9/2825* (2013.01); *E02F 9/2883* (2013.01)

(58) **Field of Classification Search**
CPC ..... E02F 9/2883; E02F 9/2808; E02F 9/2816; E02F 9/2825; E02F 9/2833; E02F 9/2858

USPC ................... 37/446, 450, 452–456; 172/719
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 1,384,701 | A | 7/1921 | McMonegal | |
| 1,916,354 | A | 7/1933 | Barber | |
| 2,040,085 | A | * 5/1936 | Fykse ................... | E02F 9/2825 37/452 |
| 2,256,488 | A | * 9/1941 | Murtaugh ............. | E02F 9/2825 37/455 |
| 2,921,391 | A | * 1/1960 | Opsahl ............................. | 37/454 |
| 3,079,710 | A | 3/1963 | Larsen et al. | |
| 3,444,633 | A | 5/1969 | Hensley | |
| 3,496,658 | A | * 2/1970 | Eyolfson ................. | E02F 9/28 37/455 |
| 3,624,827 | A | * 11/1971 | Liess et al. ....................... | 37/92 |
| 3,675,350 | A | * 7/1972 | Mulcahy et al. .............. | 37/457 |
| 3,704,753 | A | 12/1972 | Hasforth et al. | |
| 3,774,324 | A | * 11/1973 | Lafond ................. | E02F 9/2841 172/713 |
| 3,881,262 | A | 5/1975 | Cullen | |
| 4,136,469 | A | 1/1979 | Zepf | |
| 4,233,761 | A | 11/1980 | Ryerson | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| GB | 1597554 | 9/1981 |
| JP | 50132703 | 10/1975 |
| JP | 410183698 A | 7/1998 |

*Primary Examiner* — Thomas B Will
*Assistant Examiner* — Joan D Misa
(74) *Attorney, Agent, or Firm* — John Anderton

(57) **ABSTRACT**

A wear assembly for securing a wear member to excavating equipment that includes a base having a nose and a wear member having a socket. The nose and socket are each provided with one or more complementary stabilizing surfaces in central portions thereof.

**26 Claims, 9 Drawing Sheets**



DEERE EX. B
PAGE 23

**US 10,273,662 B2**

Page 2

---

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,404,760 A * | 9/1983 | Hahn et al. ..................... 37/459 |
| 4,476,642 A * | 10/1984 | Hemphill .............. E02F 9/2816 |
| | | | 279/102 |
| 4,577,423 A | 3/1986 | Hahn |
| 5,144,762 A | 9/1992 | Robinson |
| 5,177,886 A | 1/1993 | Klett |
| 5,386,653 A | 2/1995 | Cornelius |
| 5,456,029 A | 10/1995 | Cornelius |
| 5,564,206 A | 10/1996 | Ruvang |
| 5,709,043 A * | 1/1998 | Jones ................... E02F 9/2825 |
| | | | 37/458 |
| 5,765,301 A | 6/1998 | Clendenning |
| 5,778,571 A * | 7/1998 | Pasqualini et al. ............ 37/455 |
| D410,657 S | 6/1999 | Launder |
| 5,956,874 A | 9/1999 | Ianello et al. |
| 5,987,787 A | 11/1999 | Mack |
| 5,992,063 A | 11/1999 | MacK |
| 6,047,487 A | 4/2000 | Clendenning |
| 6,079,132 A | 6/2000 | Clendenning |
| 6,108,950 A | 8/2000 | Ruvang et al. |
| 6,247,255 B1 | 6/2001 | Clendenning |
| 6,321,471 B2 | 11/2001 | Munoz et al. |
| 6,735,890 B2 * | 5/2004 | Carpenter ................. E02F 9/28 |
| | | | 172/713 |
| 6,865,828 B1 | 3/2005 | Molino et al. |
| 7,100,315 B2 * | 9/2006 | Carpenter ................. E02F 9/28 |
| | | | 37/446 |
| 2001/0001352 A1 * | 5/2001 | Fernandez Munoz ....................... |
| | | | E02F 9/2825 |
| | | | 37/455 |

* cited by examiner

DEERE EX. B
PAGE 24



FIG.1

DEERE EX. B
PAGE 25



FIG.1A

DEERE EX. B

PAGE 26



FIG.2



FIG.3

DEERE EX. B
PAGE 27



FIG.4

FIG.5

FIG.6

DEERE EX. B
PAGE 28



FIG.7

FIG.8



FIG.9

FIG.10

FIG.11

FIG.12



FIG.13

DEERE EX. B
PAGE 31



FIG.14



**FIG.15**

DEERE EX. B
PAGE 33

US 10,273,662 B2

**1**

## WEAR ASSEMBLY

This application is a continuation of co-pending application Ser. No. 12/792,999 filed Jun. 3, 2010, which is a continuation of patent application Ser. No. 11/706,592 filed Feb. 14, 2007, now U.S. Pat. No. 7,730,651, which is a non-provisional application based on provisional patent application Ser. No. 60/774,401 filed Feb. 17, 2006.

### FIELD OF THE INVENTION

The present invention pertains to a wear assembly for securing a wear member to excavating equipment.

### BACKGROUND OF THE INVENTION

Wear parts are commonly attached along the front edge of excavating equipment, such as excavating buckets or cutterheads, to protect the equipment from wear and to enhance the digging operation. The wear parts may include excavating teeth, shrouds, etc. Such wear parts typically include a base, a wear member and a lock to releasably hold the wear member to the base.

In regard to excavating teeth, the base includes a nose which is fixed to the front edge of the excavating equipment (e.g., a lip of a bucket). The nose may be formed as an integral part of the front edge or as part of one or more adapters that are fixed to the front edge by welding or mechanical attachment. A point is fit over the nose. The point narrows to a front digging edge for penetrating and breaking up the ground. The assembled nose and point cooperatively define an opening into which the lock is received to releasably hold the point to the nose.

These kinds of wear parts are commonly subjected to harsh conditions and heavy loading. Accordingly, the wear members wear out over a period of time and need to be replaced. Many designs have been developed in an effort to enhance the strength, stability, durability, penetration, safety, and ease of replacement of such wear members with varying degrees of success.

### SUMMARY OF THE INVENTION

The present invention pertains to an improved wear assembly for securing wear members to excavating equipment for enhanced stability, strength, durability, penetration, safety, and ease of replacement.

In accordance with one aspect of the invention, the base and wear member define a nose and socket, which are formed with complementary stabilizing surfaces extending substantially parallel to the longitudinal axis of the assembly to provide a stronger and more stable construction. One or more of the stabilizing surfaces are formed generally along central portions of the nose and socket, and away from the outer edges of these components. As a result, the high loads anticipated during use are primarily carried by the more robust portion of the nose, and not on the extreme bending fibers, for a stronger and longer lasting base structure. This construction further reduces the formation of high stress concentrations along the components.

In another aspect of the invention, the wear member includes a socket opening in the rear end to receive a supporting nose. The socket is defined by top, bottom and side walls and has a longitudinal axis. At least one of the top and bottom walls includes a stabilizing projection, each of which has bearing surfaces facing in different directions to bear against opposite sides of a V-shaped recess in the nose.

**2**

In another aspect of the invention, pairs of stabilizing surfaces in each component are formed at a transverse angle to each other to provide enhanced stability in resisting vertical and side loads. In one exemplary embodiment, the stabilizing surfaces form a V-shaped configuration on at least one side of the nose and the socket.

In one other aspect of invention, the stabilizing surfaces are recessed in the nose to protect these base surfaces from damage and wear caused by the mounting of successive wear members or due to excessive wearing of the wear members.

In another aspect of the invention, the nose and socket are formed with complementary recesses and projections on all sides (i.e., top, bottom and side walls) in order to maximize the stabilizing surfaces available to resist the heavy loads that can occur during use.

In another aspect of the invention, the nose and socket are each formed to have a generally X-shaped, transverse, cross-section for enhanced stability. While the recesses and projections forming these configurations are preferably defined by stabilizing surfaces, benefits can still be achieved with the use of bearing surfaces that are not substantially parallel to the longitudinal axis of the assembly.

In one other aspect of the invention, the front end and/or body of the nose and socket are formed with a generally oval configuration. This construction provides high strength and a longer nose life, omits distinct corners to reduce concentrations of stress, and presents a reduced thickness for enhanced penetration in the ground.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. **1** and **1**A are perspective views of a wear assembly in accordance with the present invention.

FIG. **2** is a rear perspective view of a nose of the present wear assembly.

FIG. **3** is a front perspective view of the nose.

FIG. **4** is a front view of the nose.

FIG. **5** is a top view of the nose.

FIG. **6** is a side view of the nose.

FIG. **7** is a partial, rear perspective view of a wear member of the present wear assembly.

FIG. **8** is a partial perspective view of the wear assembly cut-away along a transverse plane immediately rearward of the lock.

FIGS. **9-12** are transverse cross sections along the top wall of the wear member illustrating different examples of stabilizing projections.

FIG. **13** is a perspective view of a wear assembly of the present invention with an alternative locking arrangement.

FIG. **14** is a partial, axial cross-sectional view of the alternative wear assembly.

FIG. **15** is an exploded perspective view of the lock of the alternative wear assembly.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The present invention pertains to a wear assembly **10** for releasably attaching a wear member **12** to excavating equipment. In this application, wear member **12** is described in terms of a point for an excavating tooth that is attached to a lip **13** of an excavating bucket. However, the wear member could be in the form of other kinds of products (e.g., shrouds) or attached to other equipment (e.g., dredge cutterheads). Moreover, relative terms such as forward, rear-

DEERE EX. B
PAGE 34

US 10,273,662 B2

3

ward, up, down, vertical or horizontal are used for convenience of explanation with reference to FIG. 1; other orientations are possible.

In one embodiment (FIGS. 1 and 1A), point 12 is adapted to fit on nose 14 fixed to a bucket lip 13 or other excavating equipment (not shown). In this embodiment, the nose is the front part of a base 15 that is fixed to an excavating bucket. The rear mounting end of the base (not shown in FIG. 1) can be fixed to the bucket lip 13 in a number of ways. For example, the nose can be formed as an integral portion of the lip, such as by being cast with the lip, or otherwise fixed by welding or mechanical attachment. When the base is welded or secured to the lip by a locking mechanism, the base 15 will include one or two rearward legs 17, 18 that extend over the lip 13. In these situations, the base is typically called an adapter. The base can also consist of a plurality of interconnected adapters. The point includes a socket to receive the nose. The point and nose are then secured together by a lock 16.

Nose 14 has a body 25 with top and bottom walls 20, 21 that converge toward a front end 24, and opposite sidewalls 22, 23 (FIGS. 2-6). The rear portion of the sidewalls are generally parallel to each other (i.e., with a slight forward convergence); of course, other configurations are possible. The front end 24 is formed with top and bottom stabilizing surfaces 30, 32 that are substantially parallel to the longitudinal axis 34. The term "substantially parallel" is intended to include parallel surfaces as well as those that diverge rearwardly from axis 34 at a small angle (e.g., of about 1-7 degrees) for manufacturing purposes. In one preferred embodiment, each stabilizing surface 30, 32 diverges rearwardly at an angle to axis 34 of no more than about 5 degrees and most preferably at about 2-3 degrees. In the illustrated embodiment, stabilizing surfaces 30, 32 are laterally curved so as to meet along the sides of the nose. In this way, stabilizing surfaces are formed around the entire front end 24 of the nose 14. Of course, other configurations are possible.

In the illustrated embodiment, front end 24 has generally an oval transverse shape with an oval front wall 36. Similarly, the body 25 of nose 14 also has a generally oval transverse shape except for stabilizing recesses 127, 129. As seen in FIG. 3, body 25 expands rearward from front end 24 over much of its length. The use of an oval-shaped nose forms high strength nose sections that result in a longer nose life. An oval shape also lessens the presence of corners and, thus, reduces stress concentrations along the outer edges of the nose. The oval shape also presents a streamlined profile that improves penetration into the ground during a digging operation; i.e., the wear member is formed with an oval-shaped socket for receiving the nose which, in turn, allows the wear member to have a slimmer profile for better penetration. Nevertheless, the front end and body of the nose could have other shapes; for example, the nose and socket could be more angular and define a generally parallelepiped front end with generally rectangular stabilizing surfaces and/or generally flat and angular top, bottom and side walls as the body of the nose. The general configuration of the nose (i.e., the oval shape) can vary considerably.

In one embodiment (FIGS. 2-6), the top, bottom and side walls 20-23 of nose 14 each includes a pair of stabilizing surfaces 40-47 that are each substantially parallel to axis 34. As noted with front stabilizing surfaces 30, 32, these rear stabilizing surfaces 40-47 are preferably angled relative to the longitudinal axis 34 by no more than about 5 degrees, and most preferably at about 2-3 degrees to axis 34. While any portion of the nose may at times bear loads from the

4

point, the stabilizing surfaces are intended to be primary surfaces for resisting loads that are applied to the nose by the point.

Wear member 12 comprises top, bottom and side portions to define a front working end 60 and a rear mounting end 62 (FIGS. 1, 7 and 8). In regard to a point, the working end is a bit with a front digging edge 66. While the digging edge is shown as a linear segment, the bit and digging edge could have any of the shapes that are used in digging operations. The mounting end 62 is formed with a socket 70 that receives nose 14 for supporting the point on the excavating equipment (not shown). Socket 70 is formed by interior walls of the top, bottom and side portions 50-53 of point 12. Preferably, socket 70 has a shape that is complementary to nose 14, though some variations could be included.

In one embodiment (FIG. 7), socket 70 includes a front end 94 with top and bottom stabilizing surfaces 90, 92 and a generally elliptical front surface 98 to match front end 24 of the nose. Top, bottom and side walls 100-103 of the socket extend rearward from front end 94 to complement top, bottom and side walls 20-23 of nose 14. Each of these walls 100-103 are preferably formed with stabilizing surfaces 110-117 that bear against stabilizing surfaces 40-47 on the nose. As with the stabilizing surfaces 30, 32, 40-47 of the nose, stabilizing surfaces 90, 92, 110-117 in socket 70 are substantially parallel to longitudinal axis 34. Preferably, the stabilizing surfaces in the point are designed to match those in the nose; that is, if the stabilizing surfaces in the nose diverge at an angle of about 2 degrees relative to axis 34, then, the stabilizing surfaces of the socket also diverge at an angle of about 2 degrees to axis 34. However, the stabilizing surfaces 110-117 in socket 70 could be inclined to axis 34 at a slightly smaller angle (e.g., a degree or two) as compared to stabilizing surfaces 40-47 on nose 14 to force a tight engagement between the opposed stabilizing surfaces at a particular location(s), for example, along the rear portions of the nose and socket.

Stabilizing surfaces 40-43 in top and bottom walls 20, 21 are each formed in a central portion of the nose so as to be located in the thickest, most robust portion of the nose. These stabilizing surfaces are preferably limited to the central portions rather than extending entirely across the nose. In this way, the loads are not primarily carried by the outer portions of the nose where the most bending occurs. Moreover, keeping the stabilizing surfaces 40-43 away from the outer edges can also be used to reduce the creation of high stress concentrations in the transition between nose 14 and the mounting portion of base 15. The side portions 119 of nose 14 to each side of stabilizing surfaces 40-43 preferably diverge relative to axis 34 at a steeper angle than stabilizing surfaces 40-43 to provide strength and at times a smoother transition between nose 14 and the rear mounting portion of base 15. Nonetheless, stabilizing surfaces 40-43, 110-113 could extend the entire width and depth of the nose and socket.

Stabilizing surfaces 30, 32, 40-43, 90, 92, 110-113 stably support the point on the nose even under heavy loading. The rear stabilizing surfaces 40-43, 110-113 are preferably tiered (i.e., vertically spaced) relative to front stabilizing surfaces 30, 32, 90, 92 for enhanced operation, but such tiers are not necessary.

When loads having vertical components (herein called vertical loads) are applied along the digging edge 66 of point 12, the point is urged to roll forward off the nose. For example, when a downward load L1 is applied to the top of digging edge 66 (FIG. 1), point 12 is urged to roll forward on nose 14 such that front stabilizing surface 90 in socket 70

DEERE EX. B
PAGE 35

US 10,273,662 B2

5

bears against stabilizing surface 30 at front end 24 of nose 14. The bottom, rear portion 121 of point 12 is also drawn upward against the bottom rear portion of nose 14 such that rear stabilizing surfaces 112, 113 in the socket bear against stabilizing surfaces 42, 43 on the nose. The substantially parallel stabilizing surfaces provide a more stable support for the point as compared to converging surfaces, with less reliance on the lock. For instance, if load L1 was applied to a nose and socket defined by converging top and bottom walls without stabilizing surfaces 42, 43, 112, 113, the urge to roll the point on the nose is resisted in part by the abutting of rear portions of the bottom converging walls. Since these walls are inclined, their abutment tends to urge the point in a forward direction, which must be resisted by the lock. Accordingly, in such constructions, a larger lock is needed to hold the point to the nose. A larger lock, in turn, requires larger openings in the nose and point, thus, reducing the overall strength of the assembly. In the present invention, stabilizing surfaces 30, 42, 43, 90, 112, 113 are substantially parallel to longitudinal axis 34 to lessen this forward urging of the point. As a result, the point is stably supported on the nose, which increases the strength and stability of the mount, reduces wear, and enables the use of smaller locks. Stabilizing surfaces 32, 40, 41, 92, 110, 111 function in the same manner for upwardly-directed vertical loads.

In the illustrated embodiment (FIGS. 2-6), stabilizing surfaces 40, 41 on top wall 20 are inclined to each other in a transverse direction (FIGS. 2-4). In the same way, stabilizing surfaces 42, 43 are set at a transverse angle to each other. Preferably, angled stabilizing surfaces 40-43 are symmetrical. Likewise, stabilizing surfaces 110-113 form inclined surfaces to bear against stabilizing surfaces 40-43 of nose 14. This transverse inclination enables stabilizing surfaces 40-43 to engage stabilizing surfaces 110-113 in socket 70 and resist loads with side or lateral components (herein called side loads), such as load L2 (FIG. 1). It is advantageous for the same surfaces resisting vertical loading to also resist side loading because loads are commonly applied to points in shifting directions as the bucket or other excavating equipment is forced through the ground. With the laterally inclined surfaces, bearing between the same surfaces can continue to occur even if a load shifts, for example, from more of a vertical load to more of a side load. With this arrangement, movement of the point and wearing of the components can be reduced.

The stabilizing surfaces 40-41 and 42-43 are preferably oriented relative to each other at an angle φ between about 90° and 180°, and most preferably at about 160 degrees (FIG. 4). The angle is generally chosen based on a consideration of the expected loads and operation of the machine. As a general rule, though there could be exceptions, angle φ would preferably be large when heavy vertical loads are expected and smaller when heavier side loading is expected. Since heavy vertical loading is common, the angle between the stabilizing surfaces will generally be a large one. However, this transverse angle φ may vary considerably and be smaller than 90° in certain circumstances, such as in light duty operations or those with exceptionally high side loading.

As seen in FIGS. 2 and 3, rear stabilizing surfaces 40-41 and 42-43 are preferably planar and oriented to form V-shaped recesses 127 in the nose. However, these rear stabilizing surfaces could have a myriad of different shapes and orientations. While the objectives of the invention may not be fully met in each different shape, the variations are still able to achieve certain aspects of the invention. For example, the rear stabilizing surfaces need not be planar and

6

could be formed with convex or concave curves. The rear stabilizing surfaces could be formed to define a shallow U-shaped continuous curve so that the inclined stabilizing surfaces flow uninterrupted into each other. The rear stabilizing surfaces could form a generally trapezoidal recess having a central stabilizing surface with generally no transverse inclination and two side stabilizing surfaces at virtually any obtuse angle to the central surface to resist side loading. The rear stabilizing surfaces could be inclined to each other at varying angles. The formation of stabilizing recesses in the nose and complementary projections in the socket is preferred to reduce the risk of wearing or deforming the nose surfaces by the mounting of multiple points or on account of holes being worn through the point. Nevertheless, the recesses and projections could be reversed. Also, since vertical loading is often much more significant than side loading, the stabilizing surfaces could be centrally positioned on the nose in spaced relation to the side edges but with no transverse inclination.

The rear stabilizing surfaces 40-43 are generally most effective when located at or near the rear end of the nose. Hence, in the illustrated embodiment (FIGS. 2-6), front portions 123 of stabilizing surfaces 40-43 taper to a front point. Of course, front portions 123 could have other narrowing shapes, non-converging shapes, or be eliminated entirely. Although stabilizing surfaces 40-41 are preferably the mirror images of stabilizing surfaces 42-43, it is not required that they be so.

In each of these orientations, the stabilizing surfaces 110-113 of the point preferably complement the stabilizing surfaces on the nose, however, variations could be used. Accordingly, as illustrated, stabilizing surfaces 110, 111 complement stabilizing surfaces 40, 41, and stabilizing surfaces 112, 113 complement stabilizing surfaces 42, 43. Hence, in the illustrated embodiment, stabilizing surfaces 110, 111 in the top wall 100 of socket 70 are formed to define a generally V-shaped stabilizing projection 125 with the stabilizing surfaces inclined to each other at an angle λ of about 160 degrees to fit into stabilizing recess 127 formed by stabilizing surfaces 40, 41 on nose 14 (FIG. 7). Likewise, stabilizing surfaces 112, 113 in bottom surface 101 of socket 70 form a V-shaped stabilizing projection 125 to matingly fit within the stabilizing recess 127 formed by stabilizing surfaces 42, 43 on the nose. Nevertheless, the lateral angle λ between each of pair of stabilizing surfaces (such as between surfaces 110 and 111) in socket 70 could be slightly varied relative to the angle φ between each pair of the corresponding stabilizing surfaces on the nose (such as between surfaces 40 and 41) to ensure a tight fit at a certain location (e.g., along the center of the stabilizing recesses 127, 129).

As alternatives, the stabilizing projections of socket 70 could have other shapes or forms to fit within stabilizing recesses 127. For example, the stabilizing projections 125a could have a curved (e.g., hemispherical) configuration (FIG. 9) to fit within the V-shaped stabilizing recess 127, a complementary curved recess or other recess shape adapted to receive the projection. Also, the stabilizing projections 125b (FIG. 10) could be thinner than the stabilizing recess 127 into which it is received. Stabilizing projections may have a shorter length than the recesses 127 and extend only partially along the length of the recess (FIG. 11) or have an interrupted length with gaps in between segments. Stabilizing projections may also be provided by a separate component such as a spacer that is held in place by a bolt, the lock, or other means. Further a plurality of stabilizing projections 125d (FIG. 12) may be provided in place of a single central

DEERE EX. B
PAGE 36

US 10,273,662 B2

7

projection. Also, in certain circumstances, e.g., in light duty operations, a limited benefit can be achieved through the use of, for example, recesses and projections in the top and bottom walls of the nose and socket that are defined by bearing surfaces that are not substantially parallel to longitudinal axis 34, in lieu of stabilizing surfaces 40-43, 110-113.

Sidewalls 22, 23 of nose 14 are also preferably formed with stabilizing surfaces 44-47 (FIGS. 2-6). These stabilizing surfaces 44-47 are also substantially parallel to longitudinal axis 34. In the illustrated embodiment, stabilizing surfaces 44, 45 are oriented at an angle θ to each other so as to define a longitudinal recess or groove 129 along sidewall 22 of nose 14 (FIG. 4). Likewise, stabilizing surfaces 46, 47 are oriented at an angle θ to each other to define a recess or groove 129 along sidewall 23 as well. These stabilizing surfaces 44, 45 and 46, 47 are preferably set at an angle θ between about 90° and 180°, and most preferably at about 120 degrees. Nonetheless, other angles could be selected including those substantially smaller than 90° and even to a parallel relationship in certain circumstances, such as heavy vertical loading or light duty operations. Stabilizing recesses 129 along sidewalls 22, 23 are adapted to receive complementary stabilizing projections 131 formed in socket 70. Stabilizing projections 131 are defined by stabilizing surfaces 114-117 forming inclined surfaces to bear against stabilizing surfaces 44-47 of nose 14 (FIG. 7). The lateral angle α between side stabilizing surfaces 114, 115 and 116, 117 preferably matches the angle α of surfaces 44, 45 and 46, 47. Nevertheless as discussed for rear stabilizing surfaces 110-113, the angle between each pair of side stabilizing surfaces in socket 70 could be varied slightly from the side stabilizing surfaces on nose 14 to form a tight fit at a particular location (e.g., along the center of the stabilizing recesses 129). Also, the variations in shapes for stabilizing recesses 127 and stabilizing projections 125 discussed above are equally applicable for recesses 129 and projections 131.

Front stabilizing surfaces 30, 32 work in conjunction with side stabilizing surfaces 44-47 to resist side loads such as L2. For example, the application of side load L2 causes point 12 to cant on nose 14. The side portions of front stabilizing surfaces 90, 92 on the side load L2 is applied are pushed laterally inward to bear against front stabilizing surfaces 30, 32 on the nose. The rear portion of the opposite sidewall 52 of point 12 is drawn inward such that stabilizing surfaces 114, 115 bear against 44, 45. Stabilizing surfaces 30, 32, 46, 47, 90, 92, 116, 117 function in the same way for oppositely directed side loads.

The angled orientation of stabilizing surfaces 44-47 enable these side stabilizing surfaces to bear against stabilizing surfaces 114-117 in socket 70 to resist side and vertical loading. In the preferred construction, rear stabilizing surfaces 40-43, 110413 are oriented closer to horizontal than vertical to primarily resist vertical loads and secondarily resist side loads. Side stabilizing surfaces 44-47, 114-117 are oriented closer to vertical than horizontal to primarily resist side loading and secondarily resist vertical loading. However, alternative orientations are possible. For example, in heavy loading conditions, all the stabilizing surfaces 40-47, 110-117 may be more horizontal than vertical. In use, then, in the preferred construction, vertical and side loads are each resisted by front stabilizing surfaces 30, 32, 90, 92, rear stabilizing surfaces 40-43, 110-113, and side stabilizing surfaces 44-47, 114-117. The provision of stabilizing surfaces on each of the top, bottom and side walls of the nose and socket maximizes the area that can be used to support the point.

8

Preferably, stabilizing surfaces 44-47 are angled equally relative to a horizontal plane extending through axis 34. Nevertheless, asymmetric arrangements are possible, particularly if higher upward vertical loads are expected as compared to downward vertical loads or vice versa. As discussed above for rear stabilizing surfaces 40-43, side stabilizing surfaces 44-47 can be formed with a variety of different shapes. For example, while surfaces 44-47 are preferably planar, they can be convex, concave, curved or consisting of angular segments. Grooves 129 could also be formed with generally U-shaped or trapezoidal cross sections. Also, stabilizing recesses 129 could be formed in the side walls 102, 103 of socket 70 and stabilizing projections 131 in sidewalls 22, 23 of nose 14.

In the preferred wear assembly, stabilizing surfaces 40-47 define a stabilizing recess 127, 129 in each of the top, bottom and side walls 20-23 of nose 14 such that those portions of the nose with the recesses have a generally X-shaped cross-sectional configuration (FIGS. 2 and 8). Socket 70 has complementary stabilizing projections 125, 131 along each of the top, bottom and side walls 100-103 to fit into recesses 127, 129 and, thus, define an X-shaped socket. While generally V-shaped recesses 127, 129 are preferred, stabilizing recesses and projections of other shapes can be used to form the generally X-shaped nose and socket. This configuration stably mounts the point against vertical and side loading, supports high loading via the strongest and most robust portions of the nose, and avoids relying primarily on side portions of the nose where bending is greatest to reduce stress concentrations. The X-shaped cross-sectional nose and socket can also be used with limited benefit in certain applications with similar recesses in each of the top, bottom and side walls 20-23 but without the use of stabilizing surfaces extending substantially parallel to axis 34.

The nose can also be formed with configurations other than an X-shaped cross-section. For example, the nose and point may include top and bottom stabilizing surfaces 40-43, 110-113, but no side stabilizing surfaces 44-47, 114-117. In another alternative, the nose may be formed with side stabilizing surfaces 44-47, 114-117, but without stabilizing recesses 127 in the top and bottom walls. The nose and point may also be provided with only one set of stabilizing surfaces, such as rear stabilizing surfaces only along the bottom walls. Also, while front stabilizing surfaces 30, 32, 90, 92 could be omitted, it is preferred that they be used with whichever variation of rear and side stabilizing surfaces that are used.

As noted above, lock 16 is used to releasably secure wear member 12 to nose 14 (FIGS. 1 and 8). In one embodiment, nose 14 defines a channel 140 in sidewall 22 (FIGS. 2-6). Channel 140 is open on its outer side and on each end, and otherwise is defined by a base or side wall 142, a front wall 144 and a rear wall 146. Wear member 12 includes a complementary passage 150 to generally align with channel 140 when point 12 is assembled onto nose 14 to collectively define an opening 160 for receiving lock 16 (FIGS. 1 and 7-8). Passage 150 includes an open end 151 in top wall 50 of point 12 for receiving lock 16. Within socket 70, passage 150 is open on its inner side and otherwise defined by a base or side wall 152, a front wall 154, and a rear wall 156. Due to side stabilizing surfaces 44-47, 114-117, the front and rear walls 144, 146, 154, 156 of channel 140 and passage 150 have complementary undulating configurations. Front wall 144 on nose 14 and rear wall 156 on wear member 12 are the surfaces that primarily engage lock 16. Passage 150 is preferably open in bottom wall 51, but it could be closed if desired.

DEERE EX. B
PAGE 37

US 10,273,662 B2

9

Although point **12** is secured by only one lock **16**, the point preferably includes two passages **150**, **150'**, one along each sidewall **52**, **53**. Passages **150**, **150'** are identical except that passage **150** opens for receipt of lock **16** in top wall **50** and extends along sidewall **52**, and passage **150'** opens for receipt of lock **16** in bottom wall **51** and extends along sidewall **53**. With two passages, the point can be reversed (i.e., rotated 180° about axis **34**) and locked in place in either orientation.

When lock **16** is inserted into hole **160**, it opposes front wall **144** of nose **14** and rear wall **156** of point **12** to prevent release of point **12** from nose **14**. Accordingly, in an assembled condition, channel **140** is offset rearward of passage **150** so that front wall **144** is rearward of front wall **154**, and rear wall **146** is rearward of rear wall **156**. In the preferred construction, hole **160** narrows at it extends from open end **151**; that is, front wall **144** converges toward rear wall **156**, and side wall **142** converges toward side wall **152**, each as they extend away from open end **151**. Preferably, channel **140** and passage **150** also converge as they extend from open end **151** so that front wall **144** converges toward rear wall **146**, and front wall **154** converges toward rear wall **156**.

Lock **16** has a tapering construction with a latch such as disclosed in U.S. Pat. No. 6,993,861, incorporated herein by reference. In general, lock **16** includes a body **165** for holding point **12** to nose **14**, and a latch (not shown) for engaging stop **166** in point **12** for securing lock **16** in hole **160**. Body **165** includes an insertion end **169** that is first passed into hole **160**, and a trailing end **171**. Lock body **165** preferably tapers toward insertion end **169** with the front and rear walls converging toward each other, and sidewalls converging toward each other. This narrowing of lock **16** matches the shape of hole **160** to provide a lock that can be pried into and out of the assembly. A gap **183** is formed near trailing end **171** for insertion of a pry tool for removing lock **16** from opening **160**. A clearance space **184** is also formed in point **12** forward of open end **151** to enable a pry tool to access gap **183**.

In a second embodiment of the invention (FIGS. **13-15**), a wear assembly **210** includes a base having a nose **214** and a wear member **212** having a socket **270** for receiving the nose **214**. The nose and socket of wear assembly **210** is the same as wear assembly **10** except for the locking arrangement. In wear assembly **210**, lock **216** is received in a central passage **220** in nose **214** and corresponding holes **222** in wear member **212**. As seen in FIG. **9**, passage **220** opens in stabilizing recess **227**. A hole **222** is formed in each of the top and bottom portions of wear member **212**, in vertical alignment, to engage the lock and/or permit the wear member to be reversed on nose **214**. Alternatively, passage **220** and holes **222** could extend horizontally through the nose **214** and wear member **212**.

Lock **216** includes a wedge **224** and a spool **226** as described in U.S. Pat. No. 7,171,771, incorporated herein by reference. The wedge **224** has a rounded narrowing exterior, a helical thread **234**, and a tool engaging cavity **236**. The spool **226** is formed with arms **246** that set outside passage **220**. Each arm preferably includes an outstanding lip **247** at its outer end that fits under a relief **249** in point **212** to project ejection of the lock during use. Spool **226** includes a thread formation **242** preferably in the form a series of helical ridge segments to mate with the helical thread **234** on wedge **224**. Spool **226** has a trough **239** with a concave inner surface **240** to partially wrap around and receive wedge **224**. A resilient plug (not shown) composed of a rubber, foam or other resilient material may be provided in a hole in trough **239** to

10

press against wedge **224** and prevent loosening if desired. The spool preferably tapers toward its lower end to accommodate the preferred tapering of passage **220**. The spool may also be formed with a reduced leading end to better fit through the bottom end of passage **220** and into lower hole **222**.

In use, spool **226** presses against front wall **228** of passage **220**, and the ends of arms **246** press against the rear walls **256** in the top and bottom portions of wear member **212**. A gap normally exists between spool **226** and rear wall **230** of passage **220**. The land **258** extending between helical groove **234** of wedge **224** sets against the front wall **228** of passage **220**. An insert (not shown) may be placed between the wedge and front wall **228**. Alternatively, the insert could be placed against front wall **228** and wedge against rear walls **256**. To install lock **216**, the spool **226** and the leading end **252** of wedge **224** are loosely inserted through top hole **222** and into passage **220**. A wrench or other suitable tool is inserted into cavity **236** at the trailing end **254** of wedge **224** to turn the wedge and draw the wedge farther into the passage **220**.

Many other lock designs could be used to secure the wear member to the nose. For example, lock **16** may be a conventional sandwich pin construction, which is hammered into the assembly. Such a lock could also pass through holes in the centers of the nose and point, either vertically or horizontally, in a well-known manner.

The invention claimed is:

**1**. A wear assembly for excavating equipment comprising:

a base secured to the excavating equipment, the base including a front end with a front wall and a pair of front bearing surfaces, a rear end with at least one recess defining a pair of rear bearing surfaces, and a lock bearing surface;

a wear member including a rearward-opening socket for receiving the base, and an opening, the socket having a longitudinal axis and including (i) a front end with a front surface transverse to the longitudinal axis to bear against the front wall on the base, and a top stabilizing surface and a bottom stabilizing surface to bear against the front bearing surfaces on the base, and (ii) a rear end with a top wall, a bottom wall and side walls extending rearward from the front end, at least one of the top and bottom walls including a pair of rear stabilizing surfaces inclined relative to each other in different transverse directions so as to laterally converge inward toward a central location along the respective top or bottom wall to define an inward projection and positioned to bear against the rear bearing surfaces in the at least one recess in the base to resist both vertical and horizontal loads during excavating, said top stabilizing surface, said bottom stabilizing surface, and each said rear stabilizing surface axially extending substantially parallel to the longitudinal axis; and

a lock received into the opening of the wear member and in contact with the lock bearing surface on the base to hold the wear member to the excavating equipment.

**2**. A wear assembly in accordance with claim **1** wherein the base includes a plurality of the recesses each with a pair of the rear bearing surfaces, and the top and bottom walls of the wear member each includes a pair of said rear stabilizing surfaces to define one said projection and to bear against the rear stabilizing faces in one said recess in the base.

**3**. A wear assembly in accordance with claim **1** wherein said pair of rear stabilizing surfaces of the wear member collectively defines a V-shaped formation.

DEERE EX. B
PAGE 38

US 10,273,662 B2

11

**4**. A wear assembly in accordance with claim **1** wherein said pair of rear stabilizing surfaces of the wear member collectively defines a curved formation.

**5**. A wear assembly in accordance with claim **1** wherein the base includes a plurality of side recesses each with a pair of side stabilizing faces, and each said side wall of the wear member includes a pair of side stabilizing surfaces inclined relative to each other in different transverse directions so as to laterally converge inward toward a central location along the respective side wall and positioned to define an inward projection and bear against a respective pair of the side stabilizing faces on the nose to resist both vertical and horizontal loads during excavating, and each said side stabilizing face and each said side stabilizing surface axially extends substantially parallel to the longitudinal axis.

**6**. A wear assembly in accordance with claim **1** wherein said pair of rear stabilizing surfaces of the wear member extends from one of the side walls to the other side wall of the socket.

**7**. A wear assembly in accordance with claim **1** wherein said top stabilizing surface, said bottom stabilizing surface, and each said rear stabilizing surface axially extends at angle of no more than about five degrees to the longitudinal axis.

**8**. A wear assembly for excavating equipment comprising:
a base secured to the excavating equipment, the base including a front end with a front wall and front bearing surfaces, a rear end having opposite sides with a side recess in each of the sides, and a lock bearing surface;
a wear member including a rearward-opening socket for receiving the base, and an opening, the socket having a longitudinal axis and including (i) a front end with a front surface transverse to the longitudinal axis to bear against the front wall on the base, and a top stabilizing surface and a bottom stabilizing surface to bear against the front bearing surfaces on the base, and (ii) a rear end with a top wall, a bottom wall and side walls extending rearward from the front end, the side walls each including a pair of side stabilizing surfaces inclined relative to each other in different transverse directions so as to laterally converge inward toward a central location along the respective side wall and positioned to bear against complementary surfaces in respective side recesses in the base to resist both vertical and horizontal loads during excavating, said top stabilizing surface, said bottom stabilizing surface, and each said side stabilizing surface axially extending substantially parallel to the longitudinal axis; and
a lock received into the opening of the wear member and in contact with the lock bearing surface on the base to hold the wear member to the excavating equipment.

**9**. A wear assembly in accordance with claim **8** wherein each said pair of side stabilizing surfaces of the wear member collectively defines a V-shaped formation.

**10**. A wear assembly in accordance with claim **8** wherein each said pair of side stabilizing surfaces of the wear member collectively defines a curved formation.

**11**. A wear assembly in accordance with claim **8** wherein each said pair of side stabilizing surfaces of the wear member extends from the top wall to the bottom wall.

**12**. A wear assembly in accordance with claim **8** wherein the side stabilizing surfaces of the wear member are located near the rear end of the wear member.

**13**. A wear assembly in accordance with claim **8** wherein each said side stabilizing surface axially extends at an angle of no more than about five degrees to the longitudinal axis.

**14**. A wear member for excavating equipment comprising a rearward-opening socket for receiving a base secured to

12

the excavating equipment, and an opening for receiving a lock to releasably hold the wear member to the base, the socket having a longitudinal axis and including (i) a front end with a front surface transverse to the longitudinal axis to bear against a front wall on the base, and a top stabilizing surface and a bottom stabilizing surface to bear against front bearing surfaces on the base, and (ii) a rear end with a top wall, a bottom wall and side walls extending rearward from the front end, at least one of the top and bottom walls including a pair of rear stabilizing surfaces inclined relative to each other in different transverse directions so as to laterally converge inward toward a central location along the respective top or bottom wall to define an inward projection and bear against complementary surfaces in a recess in the base to resist both vertical and horizontal loads during excavating, said top stabilizing surface, said bottom stabilizing surface, and each said rear stabilizing surface axially extending substantially parallel to the longitudinal axis.

**15**. A wear member in accordance with claim **14** wherein the top and bottom walls each includes a pair of said rear stabilizing surfaces.

**16**. A wear member in accordance with claim **14** wherein said pair of rear stabilizing surfaces collectively defines a V-shaped formation.

**17**. A wear member in accordance with claim **14** wherein said pair of rear stabilizing surfaces collectively defines a curved formation.

**18**. A wear member in accordance with claim **14** wherein said pair of rear stabilizing surfaces extends from one of the side walls to the other side wall.

**19**. A wear member in accordance with claim **14** wherein each said side wall includes a pair of side stabilizing surfaces inclined relative to each other in different transverse directions so as to laterally converge inward toward a central location along the respective side wall to define an inward projection and bear against complementary surfaces in a recess in the base to resist both vertical and horizontal loads during excavating, and wherein each said side stabilizing surface axially extends substantially parallel to the longitudinal axis.

**20**. A wear member in accordance with claim **14** wherein each said rear stabilizing surface axially extends at an angle of no more than about five degrees to the longitudinal axis.

**21**. A wear member for excavating equipment comprising a rearward-opening socket for receiving a base fixed to the excavating equipment, and an opening for receiving a lock to releasably hold the wear member to the base, the socket having a longitudinal axis and including (i) a front end with a front surface transverse to the longitudinal axis to bear against a front wall on the base, and a top stabilizing surface and a bottom stabilizing surface to bear against front bearing surfaces on the base, and (ii) a rear end with a top wall, a bottom wall and side walls extending rearward from the front end, the side walls each including a pair of side stabilizing surfaces inclined relative to each other in different transverse directions so as to laterally converge inward toward a central location along the respective side wall to define an inward projection and bear against complementary surfaces on the base to resist both vertical and horizontal loads during excavating, said top stabilizing surface, said bottom stabilizing surface, and each said side stabilizing surface axially extending substantially parallel to the longitudinal axis.

**22**. A wear member in accordance with claim **21** wherein said pair of side stabilizing surfaces collectively defines a V-shaped formation.

DEERE EX. B
PAGE 39

US 10,273,662 B2

13

14

**23**. A wear member in accordance with claim **21** wherein said pair of side stabilizing surfaces collectively defines a curved formation.

**24**. A wear member in accordance with claim **21** wherein said pair of side stabilizing surfaces extends from the top wall to the bottom wall.

**25**. A wear member in accordance with claim **21** wherein the side stabilizing surfaces are located near the rear end.

**26**. A wear member in accordance with claim **21** wherein said top stabilizing surface, said bottom stabilizing surface, and each said side stabilizing surface axially extends at an angle of no more than about five degrees to the longitudinal axis.

\* \* \* \* \*

DEERE EX. B
PAGE 40

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **ESCO GROUP LLC**, | |
| Plaintiff, | |
| v. | C.A. No. 1:20-cv-01679-RGA |
| **DEERE & COMPANY**, | |
| Defendant | |

**PLAINTIFF ESCO GROUP LLC'S RESPONSES TO DEFENDANT DEERE &
COMPANY'S FIRST SET OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the Local Rules of the District of Delaware, Plaintiff ESCO Group LLC ("ESCO") by and through its counsel, hereby submits its responses to Defendant Deere & Company's ("Deere") First Set of Interrogatories.

**SPECIFIC OBJECTIONS AND RESPONSES**

ESCO's investigation of the facts relevant to this litigation is ongoing. ESCO's Responses herein are based on its knowledge to date following a reasonable investigation under the circumstances, and are given without prejudice to ESCO's right to amend or supplement these Responses as permitted by the Federal Rules of Civil Procedure, the Local Rules of the U.S. District Court for the District of Delaware, any applicable orders of this Court, or as a result of any agreement reached in the course of this litigation.

Subject to and without waiving its General Objections, and based upon current information and belief as a result of reasonable searches and inquiries, ESCO responds as follows:

Subject to and without waiving its general and specific objections, ESCO responds as follows: ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████ Chilean Patent No. 49151 is related to the '662 patent.

ESCO further states that pursuant to Federal Rule of Civil Procedure Rule 33(d), information responsive to this Interrogatory may be found in documents produced by ESCO in response to Deere's Request for Production No. 28 in this case.  ESCO will supplement this response in accordance with the Federal Rules and any other applicable rule or order.

ESCO otherwise objects to this Interrogatory as vague as to the term "ESCO's licensing activities."   ESCO objects to this Interrogatory as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks Plaintiffs to identify "ESCO's licensing activities relating to patents and patent applications that you contend are owned by ESCO" without restriction; ESCO limits its response to information regarding the Asserted Patents and Related Patents.   ESCO objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege and/or attorney work product immunity, or other applicable protection or privilege.

**INTERROGATORY NO. 5:**

Identify every device, product, system, method, or combination thereof researched, designed, developed, made, sold, offered for sale, used, provided or otherwise distributed by ESCO, including prototypes, unsuccessful attempts to make and non-commercialized devices, products, systems, methods, or combination thereof, that ESCO contends are covered by any of the claims of the Asserted Patents, identify each of the claims that covers each such device,

product, system, method or combination thereof, state the date(s) on which each such device, product, system, method, or combination thereof was first researched, designed, developed, made, sold, used, provided or otherwise distributed and was first offered for sale, and identify all documents relating to same.

**RESPONSE TO INTERROGATORY NO. 5:**

Subject to and without waiving its general and specific objections, ESCO responds as follows:   ESCO's Three-Piece Nemisys System is covered by the '662 patent (*see* www.escoip.com).  The Three-Piece Nemisys System began development in ███████ ███ and was first offered for sale and/or publically available in approximately September 2012.

ESCO's GeoVor System is covered by the '662 and '175 patents (*see* www.escoip.com). The GeoVor System began development in ████████ and was first offered for sale and/or publically available in approximately Q4 2009.

ESCO further states that pursuant to Federal Rule of Civil Procedure Rule 33(d), information responsive to this Interrogatory may be found in documents produced by ESCO in response to Deere's Request for Production No. 31, 40, 44, and, 46 in this case.  ESCO will supplement this response in accordance with the Federal Rules and any other applicable rule or order.

ESCO otherwise objects to this Interrogatory as overbroad, unduly burdensome, and not proportional to the needs of the case in that it seeks ESCO to identify "every device, product, system, method, or combination thereof researched, designed, developed, made, sold, offered for sale, used, provided or otherwise distributed by ESCO, including prototypes, unsuccessful attempts to make and non-commercialized devices, products, systems, methods, or combination thereof."  ESCO also objects to this Interrogatory as overbroad, unduly burdensome and premature

DEERE EX. C
PAGE 44

to the extent it seeks to impose obligations on ESCO above and beyond those set forth in the scheduling order.  ESCO objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege and/or attorney work product immunity, or other applicable protection or privilege.

**INTERROGATORY NO. 6:**

Identify each person who has participated in or contributed to the research, design, development, engineering, testing, manufacture, marketing, or sale of each ESCO device, product, system, method, or combination thereof identified in response to the preceding Interrogatory, and for each such person, state the nature and extent of his participation or contribution, and the time period or periods during which he so participated or contributed.

**RESPONSE TO INTERROGATORY NO. 6:**

Subject to and without waiving its general and specific objections, ESCO responds as follows:

Three-Piece Nemisys System

- Kevin Stangeland: Involved in research, design, development, engineering, testing, and manufacturing from █████████████████████

- Craig Wihtol: Involved in marketing and sales from approximately 2014 to present.

GeoVor System

- Christopher Snyder: Involved in research, design, development, engineering, testing, and manufacturing from ████████████████

- Adam Stitzel: Involved in engineering, marketing, and sales from approximately May 2013 to present.

ESCO will supplement this response as necessary in accordance with the Federal Rules and any other applicable rule or order.  In accordance with Federal Rule 33(d), ESCO may identify

11

Dated: July 28, 2021

*/s/ Jeremy D. Roux*
Karen E. Keller (No. 4489)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com

OF COUNSEL:
Brian D. Sieve, P.C.
Paul D. Collier
Jeremy D. Roux
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

*Counsel for Plaintiff ESCO Group LLC*

DEERE EX. C
PAGE 46

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 28, 2021, the foregoing was served on counsel of record by electronic mail to:

James D. Taylor, Jr.
Charles E. Davis
SAUL EWING ARNSTEIN & LEHR LLP
1201 N. Market Street, Suite 2300
Wilmington, Delaware 19801
(302) 421-6800
james.taylor@saul.com
chad.davis@saul.com

John F. Bennett
Paul M. Ulrich
Paul J. Linden
ULMER & BERNE LLP
600 Vine Street, Suite 2800
Cincinnati, Ohio 45202-2409
(513) 698-5000
jbennett@ulmer.com
pulrich@ulmer.com
plinden@ulmer.com


*/s/ Sheryl Brongiel*

# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| **ESCO GROUP LLC**, | |
| Plaintiff, | |
| v. | C.A. No. 1:20-cv-01679-RGA |
| **DEERE & COMPANY**, | |
| Defendant | |

### PLAINTIFF ESCO GROUP LLC'S RESPONSES TO DEFENDANT DEERE & COMPANY'S SECOND SET OF INTERROGATORIES (NOS. 16– 20)

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and the Local Rules for the U.S. District Court for the District of Delaware, Plaintiff, ESCO Group LLC ("ESCO"), hereby provides its objections and responses to Defendant, Deere & Company's ("Deere") Second Set of Interrogatories.

### SPECIFIC OBJECTIONS AND RESPONSES

ESCO's investigation of the facts relevant to this litigation is ongoing. ESCO's Responses herein are based on its knowledge to date following a reasonable investigation under the circumstances, and are given without prejudice to ESCO's right to amend or supplement these Responses as permitted by the Federal Rules of Civil Procedure, the Local Rules of the U.S. District Court for the District of Delaware, any applicable orders of this Court, or as a result of any agreement reached in the course of this litigation.

Subject to and without waiving its General Objections, and based upon current information and belief as a result of reasonable searches and inquiries, ESCO responds as follows:

1

DEERE EX. D
PAGE 49

**INTERROGATORY NO. 16:**

Describe all facts supporting that ESCO has complied with Section 287(a) and identify all documents that show such compliance, all evidence upon which ESCO may rely to demonstrate such compliance, and the person(s) most knowledgeable about such compliance.

**RESPONSE TO INTERROGATORY NO. 16:**

Subject to and without waiving its general and specific objections, ESCO responds as follows:

Section 287(a) provides that "no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice.  Filing of an action for infringement shall constitute such notice."  35 U.S.C. § 287(a).  ESCO provided Deere notice of infringement of the '662 Patent on December 10, 2020 (D.I. 1) and of infringement of the '175 Patent on April 7, 2021 (D.I. 11).

ESCO otherwise objects to this Interrogatory as overbroad, unduly burdensome, not relevant, and not proportional to the needs of the case to the extent it asks ESCO to identify "all facts supporting that ESCO has complied with Section 287(a)" and "all documents that show such compliance, all evidence upon which ESCO may rely to demonstrate such compliance, and the person(s) most knowledgeable about such compliance" at least because ESCO is not seeking damages for infringement by Deere of the '662 Patent prior to December 10, 2020 and infringement by Deere of the '175 Patent prior to April 7, 2021.

**INTERROGATORY NO. 17:**

Describe the events and circumstances during the period between the alleged date of conception and the alleged date of actual reduction to practice for the invention claimed in the

DEERE EX. D
PAGE 50

Dated: May 13, 2022

*/s/ Jeremy D. Roux*
Brian D. Sieve, P.C.
Paul D. Collier
Jeremy D. Roux
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000
brian.sieve@kirkland.com
paul.collier@kirkland.com
jeremy.roux@kirkland.com

*Counsel for Plaintiff ESCO Group LLC*

## **VERIFICATION**

I, Adam Stitzel, am Director, Infrastructure Products of ESCO Group LLC ("ESCO") and am authorized to make this verification for and on ESCO's behalf. I have read the foregoing Plaintiff ESCO Group LLC's Responses to Defendant Deere & Company's Second Set of Interrogatories.

Based upon my knowledge and information provided to me, I believe the operative response to each interrogatory is true and accurate. In accordance with Rule 33(b)(3) of the Federal Rules of Civil Procedure, I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge, information and belief.

Dated: 13-May-2022

_____

Adam D Stitzel

Director, Infrastructure Products

ESCO Group LLC

## CERTIFICATE OF SERVICE

I hereby certify that on May 13, 2022, the foregoing was served on counsel of record by electronic mail to:

James D. Taylor, Jr.
Charles E. Davis
SAUL EWING ARNSTEIN & LEHR LLP
1201 N. Market Street, Suite 2300
Wilmington, Delaware 19801
(302) 421-6800
james.taylor@saul.com
chad.davis@saul.com

John F. Bennett
Paul M. Ulrich
Paul J. Linden
ULMER & BERNE LLP
600 Vine Street, Suite 2800
Cincinnati, Ohio 45202-2409
(513) 698-5000
jbennett@ulmer.com
pulrich@ulmer.com
plinden@ulmer.com

*/s/ Sheryl Brongiel*

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ESCO GROUP LLC,<br><br>                    Plaintiff,<br><br>v.<br><br>DEERE & COMPANY,<br><br>                    Defendant | C.A. No. 1:20-cv-01679-RGA |

**PLAINTIFF ESCO GROUP LLC'S RESPONSES TO DEFENDANT DEERE & COMPANY'S THIRD SET OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the Local Rules of the District of Delaware, Plaintiff ESCO Group LLC ("ESCO") by and through its counsel, hereby submits its responses to Defendant Deere & Company's ("Deere") Third Set of Interrogatories.

**SPECIFIC OBJECTIONS AND RESPONSES**

ESCO's investigation of the facts relevant to this litigation is ongoing. ESCO's Responses herein are based on its knowledge to date following a reasonable investigation under the circumstances, and are given without prejudice to ESCO's right to amend or supplement these Responses as permitted by the Federal Rules of Civil Procedure, the Local Rules of the U.S. District Court for the District of Delaware, any applicable orders of this Court, or as a result of any agreement reached in the course of this litigation.

Subject to and without waiving its General Objections, and based upon current information and belief as a result of reasonable searches and inquiries, ESCO responds as follows:

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

by the Court.  ESCO may provide further information regarding this Interrogatory during expert discovery, to the extent necessary.  ESCO further objects to this Interrogatory to the extent it calls for a legal conclusion.

**INTERROGATORY NO. 24:**

In response to Deere's Interrogatory No. 5, ESCO identified the Three-Piece Nemisys System and the GeoVor System as products that practice claims of either the '662 Patent or the '175 Patent, but ESCO did not identify its UltraLok tooth system; describe in detail the reason(s) why ESCO's UltraLok tooth system is not covered by any claim of the Asserted Patents, including the identification of each element in each claim of the '662 and '175 Patents that ESCO contends is not present literally or under the doctrine of equivalents and the reason(s) that ESCO contends that each such element is missing.

**RESPONSE TO INTERROGATORY NO. 24:**

ESCO objects to this Interrogatory as overbroad, unduly burdensome, not likely to lead to the discovery of admissible evidence, and not proportional to the needs of the case.  First, Deere has never contended that ESCO's Ultralok Construction system is an "unmarked 'patented article[]' subject to § 287."  *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1367 (Fed. Cir. 2017).  Regardless, ESCO is not seeking damages for infringement by Deere of the '662 Patent prior to December 10, 2020 and infringement by Deere of the '175 Patent prior to April 7, 2021.  *See* 35 U.S.C. § 287(a) ("[N]o damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice.  Filing of an action for infringement shall constitute such notice.").  Second, ESCO has already informed Deere of every ESCO product that practices the Asserted

47

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

Patents and which Asserted Claims each practices.  *See* ESCO's Resp. and Obj. to Deere's ROG No. 5 ("ESCO's Three-Piece Nemisys System is covered by asserted claims 8–9, 12–13, 21–22, and 25–26 of the '662 patent. ESCO's GeoVor System is covered by asserted claims 8, 12–13, 21, and 25–26 of the '662 patent and asserted claims 4–6, 13, 15, 17, and 19–20 of the '175 patent.; *Leader Techs., Inc. v. Facebook Inc.*, 2009 WL 3021168, at *2 (D. Del. Sep. 4, 2009) ("Facebook is entitled to know every Leader product or service that Leader contends practices any of the asserted claims of the patent-in-suit. Facebook is also entitled to know which claims are practiced by which of Leader's products and services. However, a proper weighing of the relative burdens on the parties, as well as the relevance of the discovery Facebook seeks, leads me to conclude that Facebook is entitled to nothing more than this in response to Interrogatory No. 9.").  ESCO further objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege and/or attorney work product immunity, or other applicable protection or privilege.

If Deere is able to explain what discoverable information responsive to this request exists, ESCO is willing to meet and confer with Deere about the scope and relevance of this Interrogatory.

**INTERROGATORY NO. 25:**

Describe the date and manner in which ESCO first learned that Deere was selling or offering for sale the Accused Products in the United States, and identify the current or former ESCO employee most knowledgeable about when and how ESCO first learned about Deere's sale or offer for sale of the Accused Products.

**RESPONSE TO INTERROGATORY NO. 25:**

Subject to and without waiving its general and specific objections, ESCO responds as follows: ███████████████████████████████████████████████████

███████████████████████████████████████████████   See ESCO-

48

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

Dated: October 19, 2022

/s/Jeremy D. Roux
Brian D. Sieve, P.C.
Paul D. Collier
Jeremy D. Roux
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000
brian.sieve@kirkland.com
paul.collier@kirkland.com
jeremy.roux@kirkland.com

*Counsel for Plaintiff ESCO Group LLC*

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

DEERE EX. E

PAGE 58

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on October 19, 2022, the foregoing was served on counsel of record by electronic mail to:

      James D. Taylor, Jr.
      Charles E. Davis
      SAUL EWING ARNSTEIN & LEHR LLP
      1201 N. Market Street, Suite 2300
      Wilmington, Delaware 19801
      (302) 421-6800
      james.taylor@saul.com
      chad.davis@saul.com

      John F. Bennett
      Paul M. Ulrich
      Paul J. Linden
      ULMER & BERNE LLP
      600 Vine Street, Suite 2800
      Cincinnati, Ohio 45202-2409
      (513) 698-5000
      jbennett@ulmer.com
      pulrich@ulmer.com
      plinden@ulmer.com

                             */s/Sheryl A. Brongiel*
                             Sheryl A. Brongiel

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

# EXHIBIT F

Page 1

1                     UNITED STATES DISTRICT COURT

                    FOR THE DISTRICT OF DELAWARE

2

3

4

5     ESCO GROUP LLC,                    )

                                         )

6        Plaintiff,                      )

                                         )

7     vs.                                ) Case No.

                                         ) 20-1679-RGA-JLH

8                                        )

      DEERE & COMPANY,                   )

9                                        )

8        Defendant.                      )

10

11

12

13

14              The Zoom video deposition of MICHAEL

      BUDAN,

16        taken before Richard Derrick Ehrlich, Registered

17        Merit Reporter, Certified Realtime Reporter,

      taken

18        pursuant to the Federal Rules of Civil Procedure,

19        commencing at 10:00 a.m., on the 9th day of

20        November, 2022.

21

22

23

24

Page 20

```
 1              1   BY MS. GIROUD:

 2              2   Q   So other than -- strike that.

 3              3          Is ESCO one of the primary competitors

 4  that

 5              4       competes with the TK-Series System products?

 6              5          MS. RODMAN:  Objection to form.

 7              6          You can answer.

 8              7          THE DEPONENT:  Yes.

 9              8   BY MS. GIROUD:

10              9   Q   So just to recap, the primary competitors for

11             10       the Deere TK-Series System products are

12             11       Caterpillar, Hensley, and ESCO; is that right?

13             12          MS. RODMAN:  Objection to form.

14             13          You can answer.

15             14          THE DEPONENT:  Yes.

16             15   BY MS. GIROUD:

17             16   Q   Other than the ESCO Ultralok and Super V

18             17       products, are you aware of any other products

19             18       that ESCO offers that compete with the Deere

20             19       TK-Series System products?

21             20          MS. RODMAN:  Objection to form.

22             21          You can answer.

23             22          THE DEPONENT:  I am not.

24             23   BY MS. GIROUD:

25             24   Q   Okay.  In the market in which the Deere
```

Page 21

1        1        TK-Series System competes, what market share

         2        does Deere have?

2        3            MS. RODMAN:  Objection.  Form and

3        4        foundation.

4        5            You can answer.

5        6            THE DEPONENT:  I don't know.

6        7    BY MS. GIROUD:

7        8    Q    Do you know approximately what market share

8        9        Deere has in the market in which the Deere

9        10       TK-Series System competes?

10       11           MS. RODMAN:  Objection to form.

11       12           You can answer.

12       13           THE DEPONENT:  I would estimate ███████

13       14       ████████████

14       15   BY MS. GIROUD:

15       16   Q    And what is that estimation based on?

16       17   A    It's based on our machine population and

17       18       estimated consumption or usage patterns of

18   those

19       19       machines.

20       20   Q    And when you say "machine population," what do

21       21       you mean?

22       22   A    Whole good machines, such as excavators or

23       23       backhoes or loaders.

24       24   Q    And when you say "estimated consumption or

25   usage

Page 22

1       patterns of those machines," what do you mean?

2    A  Based on our test data of -- with similar

3       machines, estimating how many hours an average

4       tooth would last and then expanding that over

5       the life of the machine.

6    Q  And when you reference ████████, that's

7       Deere's current market share, right?

8          MS. RODMAN:  Objection to form.

9          You can answer.

10          THE DEPONENT:  Estimated, correct.

11          MS. RODMAN:  Xavi, I'm sorry to interrupt.

12       I keep getting this Zoom message that says, Zoom

13       Apps has been disabled.  Zoom Apps has been

14       enabled.

15          I just want to confirm with the Veritext

16       people that I can ignore that, that that's not

17       anything that is in any way impacting our

18       deposition.

19          CONCIERGE:  What was the message?

20          MS. RODMAN:  It keeps saying, Zoom Apps

21       has been disabled, for the little pop-up in the

22       corner.  And then, like, after a little bit,

23       it'll say, Zoom Apps have been enabled.  And

24       it's done that probably five times over the

Page 23

```
 1                  1    last --
 2                  2            CONCIERGE:  I am not familiar with that
 3                  3    error.
 4                  4            MS. RODMAN:  It's like we've got all kinds
 5                  5    of ghosts in the machine today.
 6                  6            CONCIERGE:  It sounds like it's an app
 7                  7    within the Zoom.  Zoom does have apps that you
 8                  8    can --
 9                  9            MS. RODMAN:  I'm not aware of us using any
10                 10    apps.
11                 11            CONCIERGE:  Let's wait for the first break
12                 12    and we'll work on it.  Okay?
13                 13            MS. RODMAN:  Okay.  I just want to make
14                 14    sure everything is still good from a video
15                 15    perspective.
16                 16            CONCIERGE:  Yeah, you're looking good.
17                 17            MS. RODMAN:  Perfect.
18                 18            Sorry, Xavi.
19                 19            MS. GIROUD:  That's okay.  It's probably
20                 20    the same ghost in my speaker on Zoom.
21                 21            MS. RODMAN:  Whatever is causing you to --
22                 22    BY MS. GIROUD:
23                 23    Q   Okay.  Let's see.  Has Deere's market share in
24                 24        the market in which the TK-Series System
25
```

DEERE EX. F
PAGE 65

# EXHIBIT G

HIGHLY CONFIDENTIAL

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF DELAWARE

3                          *   *   *

4    ESCO GROUP LLC,

5           Plaintiff,

6           vs.                    CASE NO. 20-1679-RGA

7    DEERE & COMPANY,

8           Defendant.

9                          *   *   *

10          Remote video-taped deposition of ADAM D.

11   STITZEL, Witness herein, called by the Defendant

12   for cross-examination pursuant to the Rules of

13   Civil Procedure, taken before me, Kathy S. Wysong,

14   a Notary Public in and for the State of Ohio, at

15   2141 NW 25th Avenue, Portland, Oregon, on Friday,

16   December 16, 2022, at 1:56 p.m.

17                          *   *   *

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL

Page 38

```
 1              MR. COLLIER:  No, no, that's okay.  I
 2    was just going to caution you to limit your answer
 3    to a yes or no, Mr. Stitzel.  That's fine.
 4    BY MS. RODMAN:
 5         Q.   Yes.  I never want to know what
 6    you discussed with counsel so those are good
 7    instructions.
 8              Have you had communications about
 9    this lawsuit with anyone other than counsel?
10         A.   Yes.
11              MR. COLLIER:  And, Rachel, maybe if I
12    can just ask for clarification.  Are you talking
13    about in preparation for the deposition today?
14              MS. RODMAN:  I was just asking
15    generally.
16              MR. COLLIER:  Generally, okay.  No
17    worries.  Understood.
18    BY MS. RODMAN:
19         Q.   Yeah.  And I should clarify,
20    communications with anyone other than counsel
21    during which counsel was not present.
22         A.   Yes, and it's in the context of
23    preparations.
24         Q.   Okay.  We'll talk about that in a
25    minute.  So the only communications you've had
```

HIGHLY CONFIDENTIAL

Page 39

1   with anyone at ESCO about this lawsuit, other

2   than communications with counsel, were in

3   preparation for this deposition?

4          A.   That's correct.

5          Q.   Okay.  All right.  We're going to

6   be talking about a number of products today and

7   I'd like to start by just making sure that we

8   have a basic understanding -- I have a basic

9   understanding of the products and the terms

10  surrounding them.

11          So I'd like to start by talking

12  about the GeoVor product.  Are you familiar

13  with ESCO's GeoVor product?

14          A.   Yes.

15          Q.   And what type of product is that?

16          A.   GeoVor is a point adapter system

17  for dredging offshore infrastructure for cutter

18  section dredges, cutter heads.

19          Q.   Okay.  It's not used in

20  construction?

21          A.   Correct.

22          Q.   And it's not used in mining?

23          A.   Correct.

24          Q.   Generally, who are the customers

25  for the GeoVor product?  And I'm not looking

HIGHLY CONFIDENTIAL

Page 40

1  for specific names, I'm looking for certain

2  types of entities.

3           A.   The customers are large global

4  dredging companies and midsize regional

5  dredging companies.  Contractors.

6           Q.   And have you personally been

7  involved with the GeoVor product?

8           A.   Yes.

9           Q.   And what has your involvement been

10  in the GeoVor product?

11          A.   Well, I served as the product

12  manager for GeoVor, as well as the director

13  of -- for that line, so been involved in

14  engineering, problem solving, marketing, as

15  well as sales.

16          Q.   When did you serve as the product

17  manager or director of GeoVor?

18          A.   That was the start of two

19  thousand -- May of 2013 was when I first --

20  moving from that regional technical job to the

21  product manager.  So I started in May of 2013.

22          Q.   And who did you report to as

23  the -- specifically as the product manager of

24  GeoVor?

25          A.   That was Ermanno Simonutti, Ian

HIGHLY CONFIDENTIAL

Page 41

```
 1   Bingham.
 2        Q.   Okay.  Were you involved in
 3   development of GeoVor?
 4        A.   No.
 5        Q.   Were you involved at all in the
 6   patent prosecution for GeoVor?
 7        A.   No.
 8        Q.   Were you involved in the initial
 9   commercial -- commercialization of GeoVor?
10        A.   No.
11        Q.   But you were involved in sales for
12   GeoVor?
13        A.   Yes.
14        Q.   And marketing?
15        A.   Yes.
16        Q.   And then you said engineering,
17   correct?
18        A.   Correct.
19        Q.   What was your involvement in the
20   engineering for GeoVor?
21        A.   The team I -- that I led was
22   responsible for the ongoing development of
23   GeoVor, so not the core, like the fundamental
24   technology, but the improvements.  Problem
25   solving, making minor improvements to the
```

HIGHLY CONFIDENTIAL

Page 42

1   system, new shapes, problem solving, things

2   like that.

3           Q.   Okay.  And what was your

4   involvement in marketing for GeoVor?

5           A.   We would release brochures.  We

6   would create presentations, customer-facing

7   presentations.  You know, maybe the occasional

8   LinkedIn post.  Parts lit -- spec books, user

9   manuals, maintenance manuals.  Any

10  customer-facing document that, you know,

11  promoted the product or helped them use it.

12          Q.   And what was your involvement in

13  sales for GeoVor?

14          A.   Meeting with the customer, making

15  quotations, resolving any type of issues with

16  the product, giving updates on status of

17  orders.

18          Q.   What is the -- well, sorry, strike

19  that.

20               You're familiar with the Nemisys

21  three-piece system?

22          A.   Yes.

23          Q.   And what type of product is that?

24          A.   That falls under ESCO's mining

25  expendables product range.

HIGHLY CONFIDENTIAL

Page 43

```
 1          Q.   Is Nemisys three-piece used in
 2    construction?
 3          A.   No, not as ESCO defines it.
 4          Q.   So generally, who are the
 5    customers for the Nemisys three-piece system?
 6          A.   Primarily direct mines.
 7          Q.   Have you been personally involved
 8    with the Nemisys three-piece system?
 9          A.   I've been involved more recently
10    in my new position with the Nemisys three-piece
11    system.
12          Q.   And what is that involvement?
13          A.   Sales.
14          Q.   Okay.  And you're familiar --
15    well, I know you are because you've told me
16    about it -- with ESCO's Ultralok product?
17          A.   Yeah.  Yes.
18          Q.   What is the Ultralok product?
19          A.   The Ultralok product is a tooth
20    adapter lock system for construction size
21    excavators, loaders.
22          Q.   And generally, who are the
23    customers for Ultralok?
24          A.   Generally the customers -- well,
25    they -- primarily I would say distributors,
```

HIGHLY CONFIDENTIAL

Page 44

```
 1   dealers, bucket manufacturers.  We have OEMs
 2   that are customers of Ultralok.  Mines.  The
 3   mines will use Ultralok on their smaller
 4   equipment.  We've used Ultralok on dredge as
 5   well on just some very small cases.
 6           Q.   Who are the end users for
 7   Ultralok?
 8           A.   The end users are construction
 9   contractors, quarries, mines, and, again, we've
10   seen it on dredge as well, dredgers.
11           Q.   Have you been personally involved
12   with the Ultralok system?
13           A.   Yes.
14           Q.   And how so?
15           A.   Well, at that -- in the director
16   position I managed the teams that -- the team
17   that -- two teams that utilized Ultralok.  So I
18   was responsible for directing kind of the
19   strategy and the engineering, as well as some
20   customer visits, a little bit of sales support
21   on Ultralok.  The position in Europe, I was
22   responsible even a little bit on the technical
23   side for Ultralok as well traveling with the
24   sales team at the site level.
25           Q.   And then currently for sales?
```

DEERE EX. G

PAGE 74

HIGHLY CONFIDENTIAL

Page 99

1    be low, correct?

2          A.    That's right.  Yes.

3          Q.    Okay.  Okay.  How does ESCO

4    advertise its GeoVor system?

5          A.    Much the same way as Nemisys.

6    We're -- they're promoting the -- you know, the

7    stability of the nose, which the stability

8    translates to reliability of the system.  It

9    translates to having the highest wear metal, so

10   long wear life.  The stability translates to

11   the reduced maintenance on the nose as well.

12          We promote the hammerless portion

13   of GeoVor, the safest system.  And there's some

14   other minor things that are -- that are

15   promoted in relationship to the nose on, like,

16   cutting relief, you know, just the shape so

17   that it -- and reduced wear and things like

18   that from the shape of the nose.

19          Q.    So in that premier, moderate,

20   legacy classification, do you have an

21   understanding of where GeoVor would fall?

22          A.    Premier.

23          Q.    Okay.  Let's look at Topic 13,

24   which is on page five.

25          A.    Okay.

HIGHLY CONFIDENTIAL

Page 100

```
 1              Q.    All right.  And you've been
 2    designated to testify on behalf of ESCO for
 3    Topic 14 as it relates to --
 4              A.    Oh.
 5              Q.    Topic -- sorry.  Topic 13.  Sorry.
 6              A.    Okay.
 7              Q.    No, I misspoke.  You've been
 8    designated to testify on behalf of ESCO
 9    regarding Topic 13 as it relates to Subpart 1,
10    the GeoVor system; Subpart 3, the Ultralok
11    system; and Subpart 4, the products of ESCO
12    that compete with the accused products,
13    correct?
14              A.    Correct.
15              Q.    And, again, those products that
16    would fall into that bucket of four would be
17    Ultralok, Super V, MaxDRP, MaxDRP Plus, and
18    then the BB DRP system, correct?
19              A.    With the exception of Ultralok.
20              Q.    Oh, because -- yes, because
21    Ultralok has its own -- its own --
22              A.    Yeah, sorry.  Sorry.  But yes.
23    Yeah.
24              Q.    We agree that ESCO believes
25    Ultralok competes with the TK Series, correct?
```

HIGHLY CONFIDENTIAL

Page 101

1           A.   Correct.  Yes.  That's correct.

2           Q.   Okay.  All right.  Let's start

3    with GeoVor.  Has ESCO conducted any evaluation

4    of the market in which the GeoVor system

5    competes?

6           A.   Yes.

7           Q.   Okay.  And what evaluation has

8    ESCO conducted on the market in which the

9    GeoVor system competes?

10          A.   Well, we're monitoring the

11   competitors in the space.  We're monitoring the

12   customer profiles.  There's a few different

13   customer profiles.  We're monitoring the market

14   potential and our market share.  And the

15   industry spend as a whole.

16          Q.   And for customer profiles, you

17   said there's a few different customer profiles.

18   What are those?

19          A.   That team groups it into three

20   profiles that I can recall; the global

21   contractors, the regional contractors, and then

22   the construction conglomerates.

23          Q.   Do those three profiles of

24   customers have different buying habits?

25          A.   Slightly.  It -- it has -- really

HIGHLY CONFIDENTIAL

Page 102

1   has more to do with the size of the equipment.

2   So the global contractors have the largest

3   equipment and the most advanced equipment,

4   which would prioritize, you know, the premier,

5   and then it kind of goes down from there.  The

6   mid regional dredgers, kind of they -- there

7   are some that have some advanced equipment.

8   But, yeah, it really comes down to the number

9   of dredge assets that they have.

10          Q.   So are the construction

11  conglomerates less likely to buy premier

12  products?

13              MR. COLLIER:  Objection.  Form.

14              THE WITNESS:  The construction

15  conglomerates are less likely to measure -- or

16  because they -- they're not utilizing the dredges,

17  like, as their premier -- like that's not their

18  number one business, it's kind of auxiliary

19  equipment for them, it's not what's really

20  producing their money, they might be less -- no,

21  they're not less likely to buy GeoVor but

22  they're -- they're just less likely to need --

23  need upgrades on cutters and things like that.

24  So, no, not necessarily.

25  BY MS. RODMAN:

HIGHLY CONFIDENTIAL

Page 103

1          Q.   Okay.   Okay.   What is the market

2     in which the GeoVor system competes?

3          A.   GeoVor is -- GeoVor is utilized in

4     offshore infrastructure so we're competing, you

5     know, with other players that are in the

6     offshore infrastructure, cutter section dredge

7     work.

8          Q.   Okay.  Are you aware of any Deere

9     products that compete in the offshore

10    infrastructure market?

11         A.   I don't know.

12         Q.   Okay.  What other competitive

13    products compete in the offshore infrastructure

14    market?

15         A.   There are some players -- some

16    competitors that will offer, like, old systems

17    that are -- you know, older systems that just

18    make copies.

19              I'm sorry, could you repeat that

20    question one more time?  I just lost my train

21    of thought for some reason.

22         Q.   That's okay.  I'm trying to figure

23    out what other products, other than ESCO,

24    compete in the offshore infrastructure market

25    with GeoVor.

HIGHLY CONFIDENTIAL

Page 104

1          A.   Okay.  We see some mining --

2     mining -- or other GET suppliers that we

3     compete with on construction and mining also in

4     the offshore infrastructure.

5               So MTG is an example, StarMet,

6     they compete in the offshore infrastructure,

7     same along with us in construction and mining.

8               Bradken also competes in offshore

9     infrastructure, along with construction and

10    mining.

11              And then there's another player

12    called VOSTA that just competes exclusively

13    in -- in the offshore infrastructure.

14              We have Combi that competes in

15    offshore infrastructure, mining and

16    construction.

17              And then we have finally the --

18    IHC is a company that makes the dredges.  They

19    just compete in offshore infrastructure.

20              So several that compete with us

21    from dredge, mining, and construction, and a

22    couple that are just offshore infrastructure,

23    dredge.

24          Q.   Okay.  Are there any other ESCO

25    products that compete with GeoVor in the

DEERE EX. G
PAGE 80

HIGHLY CONFIDENTIAL

Page 130

1    the Ultralok system in the construction

2    expendables market?

3            A.    I'm sorry, could you repeat that

4    one more time, please?

5            Q.    What is ESCO's market share for

6    the Ultralok system in the construction

7    expendables market?

8            A.    I cannot remember the global

9    number off the top of my head.  We've got

10   ███████████████████████████████ market share

11   in North America and we have ████████████████

     █  ██████████████████ market share in Europe, but I

13   can't remember the global, like for the whole

14   world number.

15           Q.    Okay.  Does ESCO have an

16   understanding of Deere's market share in the

17   construction expendables market?

18           A.    I know there's been attempts --

19   there's been some analysis on -- on -- on that,

20   yes.

21           Q.    Do you know if there have been any

22   conclusions reached from that analysis?

23           A.    Yes, there has been.

24           Q.    And what were those conclusions?

25           A.    It's -- I'm trying to -- you know,

HIGHLY CONFIDENTIAL

Page 131

1   it's hard to keep all these things in my head,

2   but we've done some analysis looking at, like,

3   what the market share -- I'm sorry, could you

4   repeat the question one more time, the original

5   one?

6            Q.   Yes.  The original question that

7   led us here was whether ESCO has an

8   understanding of Deere's market share in the

9   construction expendables market.

10           A.   Construction expendables.  I

11  believe that we put the market share of Deere

12  ████████████████████████████████████████████

13           Q.   And would that ███████████████████

█   ████████████ include TK and other construction

15  expendables products?

16           A.   I believe that would -- that

17  number was just TK.

18           MS. RODMAN:  For the concierge, if we

19  could -- actually, I think I've lost my -- I've

20  lost my Exhibit Share.  Could you drop a link to

21  the Exhibit Share in the chat so I can get back

22  there quickly.  And then we're going to turn FF

23  into Exhibit 4, please.  Thank you.

24           (Exhibit 4, ESCO-00055684-55703, was

25  marked for purposes of identification.)

HIGHLY CONFIDENTIAL

Page 132

1    BY MS. RODMAN:

2           Q.    Okay.  I think it's in there now.

3    All right.  Exhibit 4 is ESCO-00055684.  Have

4    you seen Exhibit 4 before?

5           A.    I'm sorry, if I may clarify, so I

6    should exit this exhibit and go back?

7           Q.    Oh, yes.  Yes.

8           A.    Sorry.

9           Q.    You can close Exhibit 3 and open

10   Exhibit 4.

11          A.    Okay.  On my way.  One second.

12   Yes.

13          Q.    Okay.  Yes, you have seen Exhibit

14   4 before?

15          A.    That's correct.  Yes.

16          Q.    Okay.  What is Exhibit 4?

17          A.    Exhibit 4 is a -- well, a product

18   line review specific to construction

19   expendables.  So these normally would capture

20   just, again, some market data and probably a

21   little bit of strategy and then, you know,

22   where we're at financially and just some high

23   level -- it's meant to be a high level

24   communication tool for the product.

25          Q.    Okay.  And this specific one is

# EXHIBIT H

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ESCO GROUP LLC,

    *Plaintiff*,

v.

DEERE & COMPANY

    *Defendant*.

C.A. No. 1:20-cv-01679-RGA

## EXPERT REPORT OF

## THOMAS R. VARNER, PH.D.

Dated:  January 13, 2023

Respectfully submitted,

Thomas R. Varner, Ph.D.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

DEERE EX. H

purposes of my damages analysis that the Court finds these allegations to be true.  I understand that if the Court finds Deere's products infringe either of the ESCO patents at issue in this case, then ESCO is entitled to recover lost profits resulting from the claimed infringement, but in no event less than a reasonable royalty for use made of the invention by the infringer.[4]

9.    My opinions are based on the above materials and discussions, as well as my professional experience.  This report reflects my opinions at the present time related to ESCO's allegations against Deere.  I may revise or supplement my opinions after I review other expert reports submitted in this matter, additional documents, testimony, or other information that comes to my attention.

## II.    SUMMARY OF OPINIONS

10.   I understand that if the Court finds that Deere's TK Series System components infringe either of ESCO's patents-in-suit, then ESCO is entitled to recover lost profits or an amount no less than reasonable royalties in lieu of lost profits.

11.   I calculate damages from December 10, 2020, the date of the original Complaint in this matter (*i.e.*, date of first notice) up to September 18, 2023, the scheduled trial date, and an alternative damages period if damages begin on April 7, 2021, the date of the First Amended Complaint.  I reserve the right to revise my calculation if Deere provides actual sales data for its fiscal year 2023 (which I understand has not been produced to date).

12.   Deere's accused TK Series System and ESCO's Ultralok system both sell in the premium segment of the U.S. market for bucket tooth systems used in construction equipment. Deere's sale of its TK Series System products resulted in ESCO losing sales of its Ultralok bucket

---

[4] 35 U.S. Code § 284 – Damages.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. H
PAGE 86

tooth system.  I find that all of the *Panduit* factors are met and that ESCO's lost profits can be

calculated.  If the '662 Patent is found to be (or both '662 and '175 Patents are found to be) valid,

enforceable, and infringed, then ESCO's lost profits over the damage period ███████ and

residual reasonable royalties ███████.  If only the '175 Patent is found to be valid,

enforceable, and infringed, then ESCO's lost profits for a damages period beginning on April 7,

2021 ███████ and residual reasonable royalties ███████.

13.     If the Court finds that ESCO is entitled to lost profits from lost future sales of its

Ultralok tooth components, I calculate such lost profits ███████ if either or both of the patents-

in-suit are found to be valid, enforceable, and infringed.

14.     If the Court finds that ESCO is not entitled to lost profit damages, then I find that

the parties would have agreed to a reasonable royalty rate of 8% applied to net sales of Deere's

accused TK Series System product over the damages period.  I find that the total amount of

reasonable royalty damages ███████ if the '662 Patent is found to be (or both '662 and '175

Patents are found to be) valid, enforceable and infringed.  If only the '175 Patent is found to be

valid, enforceable and infringed then ESCO's reasonable royalty damages ███████

15.     Exhibit 1 is a summary of lost profit and reasonable royalty damages.

16.     I understand from counsel that the Court may at its discretion award the Plaintiff

prejudgment interest on damages that have accrued over time.  If asked to do so, I will provide

such analysis using established methodologies.

## III.   BACKGROUND

### A.     Introduction

17.     The technology at issue in this case relates to bucket tooth systems used on

construction excavation equipment, referred to as ground extraction (or engaging) tools ("GETs").

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. H
PAGE 87

Deere's FY 2010) to October 31, 2021 (the end of Deere's FY 2021).  Exhibit 3.1 shows that Deere sold over 1.9 million TK Series System adapter and tooth components for over $39 million (net sales), with gross profits of over $12.6 million.

46.     Recognizing that ESCO and Deere each have sold millions of components totaling tens of millions of dollars in sales that are covered by at least one of the patents-in-suit, demand for patented products is established and *Panduit* Factor 1 is met.  Demand for a product that directly competes with the allegedly infringing TK Series System, in this case, the Ultralok product, is also established, further supporting *Panduit* Factor 1.

### 2.    *Panduit* Factor 2: There Are No Acceptable Non-Infringing Substitutes

47.     *Panduit* Factor 2 requires that there are no acceptable non-infringing substitutes available in the market.  I understand that this factor has been modified by *State Industries*, such that if there are non-infringing substitutes in the market, then infringing product sales need to be apportioned among the remaining competitors in the market.[81]

48.     As an initial matter, and as discussed in Sections IV.E.4.j and IV.E.4.n, I note that Deere has not yet redesigned the TK Series System to develop a substitute itself, which tends to show a lack of acceptable and available non-infringing alternatives.

49.     Deere alleged that there are several non-infringing alternatives to the TK Series System, including: (1) proposed design changes to the patents-in-suit; (2) Black Cat's proposed design changes to the TK Series System products; (3) certain commercially available products;

---

[81] *State Industries v. Mor-Flo Industries*, 883 F2d 1573 (Fed. Cir. 1989).

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

**DEERE EX. H
PAGE 88**

and (4) various "prior art" references dating back to 1982.[82]  Section IX of the Expert Report of

Hezekiah Holland Regarding Infringement (the "Holland Expert Report") addresses why Deere's

proposed design changes to the patents-in-suit, Black Cat's proposed design changes to the TK

Series System products, the Caterpillar J and K Series products, and other competitor products,

and the prior art patents are not acceptable alternatives to the patents-in-suits.  (Furthermore, I

understand that, "if a device is not available for purchase, a defendant cannot argue that the device

is an acceptable non-infringing alternative for the purposes of avoiding a lost profits award."[83])

    50.    Deere alleged in its response to ESCO's Interrogatory No. 11 that the following

products are commercially available, non-infringing alternatives: Caterpillar's J Series, K Series,

and Advansys systems; ESCO's Super V system; Hensley/Komatsu's Smartfit and XS systems;

MTG's Starmet system; BYG Futura's J-Clack and Futura II systems; and Liebherr's Z-System.[84]

As I discuss below, many of these products are not substitutes for the accused TK Series System

because they had different features and are sold in different segments of the U.S. market for bucket

tooth systems for construction equipment.

    51.    Documents and testimony in this matter demonstrate that bucket tooth systems used

in the construction industry are viewed by both Deere and ESCO as being divided into three

different segments.  A Deere presentation describes these segments as "Good," "Better," and

---

[82] Defendant Deere & Company's Third Supplemental Objections And Answers to ESCO Group LLC's First Set of Interrogatories (Nos. 1-17) (Supplementing Nos. 2, 5-10, 13-15, and 17), 11/17/22, Response to Interrogatory No. 10, pp. 14-17.

[83] *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1571 (Fed. Cir. 1996); *see also*, *Grain Processing Corp. v. American Maize-Products Co.*, 185 F.3d 1341, 1353 (Fed. Cir. 1999) ("Acceptable substitutes that the infringer proves were available during the accounting period can preclude or limit lost profits; substitutes only theoretically possible will not.").

[84] Defendant Deere & Company's Third Supplemental Objections And Answers to ESCO Group LLC's First Set of Interrogatories (Nos. 1-17) (Supplementing Nos. 2, 5-10, 13-15, and 17), 11/17/22, pp. 14-17.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

"Best," with Deere's TK Series System, Caterpillar's K-Series System, Komatsu's K-Max System, Hensley's XS Series System, and ESCO's Ultralok system in the "Best" segment.[85, 86]  In addition to other performance features, a common feature of bucket tooth systems in this top segment is that they are marketed as "hammerless" systems for changing the tooth components, that is, not requiring a hammer to remove a securing pin, making for a safer and faster tooth replacement process.  Mr. Christopher Carpenter, the V.P. of Innovation and Technology at ESCO, testified that customers appreciate the added safety of a hammerless system.[87]  Deere's Program Manager for Attachment and Compact Loaders testified that the hammerless feature of the TK Series

---

[85] DEERE_0005839-874 (Deere presentation, "Ground Engaging Tools," Aftermarket Regional Sales Training, 2017), -845.  This document also lists ESCO's SV2, Nemisys, and Posilok tooth systems in the "Best Category," however these are designed for use in the mining industry not the construction industry. *See* ESCO SV2 Product Brochure, https://g9m3s3z2.rocketcdn.me/wp-content/uploads/2022/04/P5180MIN-ENG-L.pdf, accessed 12/28/22, "ESCO SV2® Replacement Parts For Mining and Aggregate Applications."  *See* https://www.esco.weir/mining-tooth-systems/, accessed 12/28/22, "Nemisys® Mining Tooth System."  *See* https://www.directindustry.com/prod/weir-esco/product-52982-1666417.html, accessed 12/28/22, "The S-Series Posilok tooth system is specifically designed for draglines, cable shovels, large hydraulic face shovels and hoe buckets."

[86] The Deere Presentation, "Ground Engaging tools," Aftermarket Regional Sales Training, 2017, DEERE 0005839-874 at 845, also includes the MTG KingMet in the "Best" Segment.  However, Mr. Stitzel testified (Deposition of Adam Stitzel, 12/16/22, p. 69) that the MTG Liebherr system "lock is promoted as hammerless but yet you need a hammer to knock the lock out, and that given that it's a side lock, the customers talk about accessibility issues because sometimes the protection that goes between the teeth get in the way and so it's difficult to remove."

[87] Deposition of Christopher Carpenter, 12/5/22, pp. 28-29, "Q.  Was a hammerless system something that customers specifically wanted when you launched Ultralok?  A.  …So mixed.  I would say that there are…some customers that…had a high concern with safety,…but ESCO…took the position both on the mining and construction space that we wanted to create the safest systems on earth so…we essentially were pretty focused on creating locking systems that did not require a hammer.  So I would say that there were some customers that…were asking for that.  I think that when we launched this, I think they overwhelmingly accepted and appreciated the fact that we were providing a safer system.  So they may not have known that they wanted a hammerless system, but they appreciated the fact that we gave them a hammerless system."

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. H
PAGE 90

System is the only distinguishing feature of the TK Series System over other bucket tooth systems on the market.[88]

52.    ESCO also describes the market for bucket tooth systems as being comprised of three segments: premium (or premier), moderate, and legacy,[89] with Ultralok being in the premier segment.[90] Mr. Stitzel testified that ESCO's Ultralok system competes with the TK Series System in the premier segment,[91] along with the Hensley XS, the Komatsu K-Max,[92] the Caterpillar Advansys,[93] and the MTG KingMet tooth systems.[94]

53.    Caterpillar's J Series and ESCO's Super V bucket tooth systems are considered legacy products that do not compete in the premium segment.[95] Mr. Stitzel testified that the

---

[88] Deposition of Jason Simmons, 12/14/22, pp. 45-46, "Q.  Is the hammerless feature of the TK series tooth one of the advantages of the TK series tooth over other teeth on the market?  A.  Yes….Q.  Does the TK teeth other than the hammerless feature have any other features that makes customers [buy] the TK series teeth now because it is on market over those teeth?  A.  No."

[89] Deposition of Adam Stitzel, 12/16/22, p. 97, "Q.  …Have you seen any ESCO documents categorizing expendable products into buckets of premier, moderate, and legacy?  A.  Yes."

[90] Deposition of Adam Stitzel, 12/16/22, pp. 97-98, "Q.  Okay.  And Nemisys would be a premier system in that type of classification, correct?  A.  Yes….Q.  And Ultralok would also be a  premier system in that type of classification,  correct?  A.  That's right.  Correct.  Q.  And Super V would be like a legacy system in that type of classification?  A.  That's correct."

[91]Deposition of Adam Stitzel, 12/16/22, p. 116, "Q.  Does the Deere TK Series compete with Ultralok in the premium market?  A.  Yes….I would…say Deere TK…would fall into the  premium space because they have…a pretty stable nose.  They've got hammerless -- I mean, there's some things that Ultralok offers that…the TK system doesn't; but I would say yes, they would compete in that space."

[92] Deposition of Adam Stitzel, 12/16/22, p. 117, "Q.  The Hensley XS system, does that compete with Ultralok in the premium market?  A.  Yes.  Q.  The Komatsu Kmax, does that compete with Ultralok in the premium market?  A.  Yes, I would say that competes with Ultralok in the premium market."

[93] Deposition of Adam Stitzel, 12/16/22, p. 118.

[94] Deposition of Adam Stitzel, 12/16/22, p. 119.  *See also*, p. 69, MTG Liebherr (or KingMet) system, "…the lock is promoted as hammerless but yet you need a hammer to knock the lock out, and that given that it's a side lock, the customers talk about accessibility issues because sometimes the protection that goes between the teeth get in the way and so it's difficult to remove."

[95] Deposition of Adam Stitzel, 12/16/22, p. 113, "Q.  So the Super V doesn't compete in the premium category—A.  No.  Q.  –with Ultralok, correct?  A.  Not really.  Q.  And that would also be true for MaxDRP, that it doesn't compete in the premium category with Ultralok?  A.  Not really, right.  Correct.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. H
PAGE 91

Hensley/Komatsu Smartfit and XS systems are relatively small participants in the market,[96] that

MTG's Starmet system and BYG Futura's J-Clack and Futura II systems lacked a fully

hammerless system,[97] and that Liebherr's Z-System was similar to MTG's Starmet system (*i.e.*,

lacked a fully hammerless system).[98, 99]

      54.    ESCO estimates that Ultralok's share of the total construction expendables

market[100] in North America ███████████████████[101] and that the premium segment of

construction expendables ██████████ of the total market.[102] Exhibit 6 summarizes the market

share apportionment methodology. Price differences between the products that compete in the

premium segment of the U.S. construction equipment market for bucket tooth systems are

---

Q. Okay. And then MaxDRP Plus, does it compete with Ultralok? A. Not -- no, it doesn't have the
same features. It doesn't have the same benefit. So it can -- it is a product that will fit on an excavator,
but it lacks -- it lacks a lot." P. 311, "Q. Would the Caterpillar J Series be an acceptable alternative to the
TK Series? A. No, I would not say so. Q. Why? A. Well, the J Series has a -- no stability at all on the
nose."

[96] Deposition of Adam Stitzel, 12/16/22, pp. 68-69, 311-313.

[97] Deposition of Adam Stitzel, 12/16/22, pp. 69-70, 311-313.

[98] Deposition of Adam Stitzel, 12/16/22, p. 312.

[99] See also Holland Expert Report, 1/13/23, Section IX.

[100] Deposition of Adam Stitzel, 12/16/22, p. 129, "Q. So would it be fair to say that the Ultralok system
competes in the construction expendables market generally? A. Yes, Ultralok is in our construction
expendables space. Yes."

[101] Deposition of Adam Stitzel, 12/16/22, pp. 129-130, "Q. What is ESCO's market share for the Ultralok
system in the construction expendables market? A. I cannot remember the global number off the top of
my head. We've got ███████ market share in North America and we have
█████████████ market share in Europe, but I can't remember the global, like for the whole
world number."

[102] Deposition of Adam Stitzel, 12/16/22, p. 184, "Q. Okay. What is the market potential for Ultralok in
the construction expendables market? A. The -- going off of memory here, we've -- we put the -- I mean,
there's segmentation that happens. So I believe we put the total construction expendables at ████████
████████████████████████; but then we do some further segmentation based on
those customers that we think respond to premium products versus those that might just prefer like a copy
and something inexpensive, low price, and so ████████████████ So we assume that
there's maybe ████████████ in premium – premium potential, which is the area that Ultralok
would play in."

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

accounted for in the existing market shares.[103]  I assume no product price changes among the remaining competing products in the premium market segment but-for market analysis.

55.     Mr. Budan, the Aftermarket Business Manager for Deere's Construction and Forestry Division, testified that the primary competitors to Deere's TK Series System are Caterpillar, Hensley (XS and Go Pro systems), and ESCO.[104, 105]  Mr. Budan testified that he believes Deere ████████ share of the segment in which TK Series System competes[106] and that ████████████████████████████████████████████████[107]  Mr. Budan also testified that the key

---

[103] *See also*, Deposition of Kevin Stangeland, 12/14/22, p. 143, "We strive to be the highest performing product with the lowest total cost of ownership to operate your piece of equipment.  So a lot of things go into total cost of ownership, but it's typically tied into wear life, reliability, downtime events, machine uptime, ability to penetrate the bank and being low profile but still strong and tough.  We believe that we're the best lowest cost -- total cost of ownership, but oftentimes the component prices are much higher than our competitors.  We're a price leader in the market."

[104] Deposition of Michael Budan, 11/9/22, p. 20, "Q.  So just to recap, the primary competitors for the Deere TK-Series System products are Caterpillar, Hensley, and ESCO; is that right?  A.  Yes.  Q.  Other than the ESCO Ultralok and Super V products, are you aware of any other products that ESCO offers that compete with the Deere TK-Series System products?  A.  I am not."

[105] Deposition of Michael Budan, 11/9/22, p. 14, Q.  And are you familiar with ESCO's Ultralok product?  A.  Could you clarify what you mean by "familiar"?  Q.  Are you aware that ESCO offers a product called Ultralok to customers?  A.  Yes.  Q.  Okay.  And is the ESCO Ultralok product a competitor in the market to the Deere TK-Series System products?  A.  Yes."

[106] Deposition of Michael Budan, 11/9/22, pp. 21-22, "Q.  Do you know approximately what market share Deere has in the market in which the Deere TK-Series System competes?  A.  I would estimate ██████ ██████  Q.  And what is that estimation based on?  A.  It's based on our machine population and estimated consumption or usage patterns of those machines.  Q.  And when you say "machine population," what do you mean?  A.  Whole good machines, such as excavators or backhoes or loaders.  Q.  And when you say "estimated consumption or usage patterns of those machines," what do you mean?  A  Based on our test data…with similar machines, estimating how many hours an average tooth would last and then expanding that over the life of the machine.  Q.  And when you reference ████████████ that's Deere's current market share, right?  A.  Estimated, correct."

[107] Deposition of Michael Budan, 11/9/22, p. 28,  "

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. H
PAGE 93

competitors for Deere's TK Series System have not changed over the last decade.[108]  Mr. Budan stated that ESCO's Ultralok competes with the TK Series System.[109]

56.     The documents and testimony show that Deere's TK Series System competes in the top, or "Premium," segment of the North American market for bucket tooth systems for construction equipment, along with Caterpillar's Advansys and K-Series, Komatsu's K-Max, Hensley's XS Series, and ESCO's Ultralok systems.

57.     Exhibit 6 shows existing market shares of the premium segment of the market for bucket tooth systems in construction equipment in the U.S.  I calculate the but-for market share allocation in Exhibit 6 and use these shares to calculate ESCO's lost Ultralok sales.

### 3.     *Panduit* Factor 3: The Patent Owner Had the Manufacturing and Marketing Capacity to Exploit the Demand

58.     Exhibit 2.1 shows that ESCO sold ██████████████ Ultralok adapter and tooth components ████████████████████ ESCO also sold ████████ Ultralok adapter and tooth components ██████████████████████████, or an annualized amount of ████████ components.  The claimed lost sales shown in Exhibit 9.1 are ██████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████

---

[108] Deposition of Michael Budan, 11/9/22, p. 43, "A.  My understanding is that the key competitors are the same competitors that they've been over the last decade."

[109] Deposition of Michael Budan, 11/9/22, pp. 13-14, "Is ESCO a competitor in the market to the TK-Series System products?  A.  Yes…. Q.  And are you familiar with ESCO's Ultralok product?  A.  Could you clarify what you mean by "familiar"?  Q.  Are you aware that ESCO offers a product called Ultralok to customers?  A.  Yes.  Q.  Okay.  And is the ESCO Ultralok product a competitor in the market to the Deere TK-Series System products?  A.  Yes."

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. H
PAGE 94

68.     Mr. Jones and Mr. Huget stated that ESCO typically ships product within one day and that ESCO can provide products to any part of the U.S.[128]  They also stated that ESCO provides customer support primarily through phone support, and that District Managers in ESCO's dealership network provide in-person support to end customers when necessary.  Mr. Jones and Mr. Huget also stated that ESCO had only minor disruptions to its construction expendables sales process during the Covid pandemic, that no sales were lost over that period due to those disruptions, and that ESCO performed as well as, or better than, competitors in delivering product during the pandemic.  They said that ESCO had the sales and marketing capacity to accommodate ▮▮▮▮▮ increased sales of Ultralok from 2019 to the present.

69.     Based on this analysis and ESCO testimony, ESCO would have had the manufacturing and marketing capacity to make the additional sales calculated in Exhibit 9.1, and *Panduit* Factor 3 is met.

### 4.     *Panduit* Factor 4: The Amount of Profit the Patent Owner would have Made Absent the Infringing Conduct

70.     *Panduit* Factor 4 requires that a patent owner demonstrate the amount of profit it would have made on lost sales.  ESCO's gross profit margins on its Ultralok adapter and tooth components are shown in in Exhibit 2.1.  Although Mr. Stitzel testified that ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ reflected in Exhibit 2.1, I have conservatively used the average gross margins shown in Exhibit 2.1 in calculating ESCO's lost profits.

### D.     Calculation of Lost Profits

---

[128] Video interview with Randy Jones and Pete Huget, 1/6/23.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. H
PAGE 95

71.     Exhibit 11 presents ESCO's SGA Expenses (sales, general and administrative operating expenses) from Q4 2020 through Q4 2021.  I performed a statistical regression analysis, an established and widely accepted methodology, that looked at ESCO's sales and operating (SG&A) expenses in relation to ESCO's sales revenues.  Exhibit 11 shows that ESCO's incremental, or variable, operating expenses ███████████████ of net sales, that is, ████ ████████████████████

72.     In Exhibit 8.1, I calculate ESCO's lost sales by multiplying the lost number of Ultralok adapter and tooth components by the average sales prices of those components, and by ESCO's incremental operating profit margins to arrive at total lost profits ████████

73.     Next, I consider ESCO's lost profits on future lost sales, that is, from ESCO's lost Ultralok tooth component sales after the date of trial because of the stock of infringing TK Series System adapter components sold prior to the trial and in use as of the trial date.

74.     I understand from Mr. Stangeland that ESCO's hardness tests on Ultralok products and TK Series System products indicate that the Ultralok product is harder than the TK Series System product, and component hardness is generally correlated with a longer component life span.  However, Mr. Stangeland also said that the life of a bucket tooth system component is highly variable and dependent on the tooth shape, the type of material engaged by the equipment, and the frequency and intensity of use.  Mr. Stangeland provided estimates of adapter and tooth component life spans as shown in Exhibit 8.3 for different categories of Ultralok components.  This exhibit shows the number of TK Series System adapters in use as of September 2023, then subsequently declining over time using the expected life spans of Ultralok components.  I calculate the number of Ultralok tooth components needed for buckets installed with these adapters over time.  Exhibit 8.4 shows that profits on lost future sales ████████████

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. H
PAGE 96



## Exhibit 6  Market Share Analysis
### Premium Market (Deere TK, ESCO UL, Hensley XS, Caterpillar Advansys)
Source: [1]



|  | Market Shares [1] | Adj. Shares | Market Shares |
|---|---|---|---|
| Deere TK |  |  |  |
| ESCO UL |  |  |  |
| Other |  |  |  |
|  | 100% | 80% | 100% |

Notes:

[1]  Adam Stitzel testified that ESCO has ████████ of North American market for construction expendables.  See also, ESCO_00140132-163.  ████████████ of ESCO's current market share is for Super V products and the remaining portion is for Ultralok products ██████████████████ (see Exhibits 2.1 and 2.2).  Ultralok share would be █████████████ of overall construction expendables market. Adam Stitzel testified that ████ of the construction expendables market is in the premium segment, resulting in ███████████████████ market share for Ultralok in the premium segment.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. H
PAGE 97

# EXHIBIT I

DEERE EX. I

PAGE 98

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ESCO GROUP LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 1:20-1679-RGA-JLH |
| v. | ) | |
| | ) | |
| DEERE & COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**EXPERT REPORT OF HEZEKIAH HOLLAND**
**REGARDING INFRINGEMENT**

DATED: January 13, 2023

DEERE EX. I
PAGE 99



**E.  Scanning and 3D Analysis of the TK Series Tooth System**

       *i.*    <u>*Scanning Methodology*</u>

52.    On August 16-17, 2022 I inspected three sets of TK Series Tooth sample parts at ESCO's Plant 3 Gage/Inspection Department in Portland, Oregon.  It is my understanding that Deere provided ESCO three samples of its TK Series Tooth product as part of this litigation.  The sizes of those samples are TK 250, TK 400, and TK 450.  I understand that Deere sent those samples to Kirkland & Ellis, and that the samples were then forwarded to ESCO.  I was assisted in my inspection by ESCO employees Tyler Griffin and Tiso Panapa.  Both work in the Dimensional Gaging Engineering department at ESCO.

53.    When I initially arrived at ESCO to inspect the samples, I was able to physically inspect the parts and take pictures that are provided with this report.  I first confirmed that the

DEERE EX. I
PAGE 100

product sizes at the inspection were the same as those that Deere had provided ESCO as part of this litigation. I also confirmed with Tyler Griffin, the ESCO employee that received the samples from Kirkland & Ellis, that the samples had not been altered in any way since ESCO received them. After confirming they had not been altered, I assembled the parts to clarify my understanding of the design of the nose, the point, the lock, and the lock insert. My visual inspection of the points and adapters confirmed that the parts fit properly and would be acceptable for a more detailed examination.

54. My visual inspection was also intended to identify any processing that may have been performed during the manufacturing process. It is common for cast parts such as these to be ground on and fit to quality control gauging in order to ensure that the parts meet design standards and interchangeably fit together with mating parts including locking components, replacement parts; and, parts made from various manufacturing facilities. As shown in the below figure, and also in my inspection notes provided as Appendices to this report, I observed several places where the adapter noses had been ground. This grinding indicated a finishing and fitting activity that would have been typical of a quality control procedure to make sure that the nose met dimensional quality control requirements for a given size. As disclosed by Mr. Ruvang in 77_BC-0077 the requirement of this rework grinding and fitting was expected in the production of the TK parts.

DEERE EX. I
PAGE 101



55.     During my inspection of the parts I found the pins could all be installed but, in some instances, the point remained very loose, and in other cases, the point movement was limited and not representative of the full range of point movement on the mating nose during actual loading in the field.  Based on this finding I instructed that the scans be made with the point seated on the end of the nose, but the pin not installed to ensure that in the various loading orientations, the point was fully oriented to determine the location and extent of any mating stabilizing surface interactions.  I found this approach was consistent with the instructions found in 34_BC-0034-3 in Mr. John Ruvang's field report.

56.     The scanning work began once I finished my visual inspection.  Mr. Griffin conducted the scanning work under the supervision of Mr. Panapa.  The scanning involved first scanning each individual tooth and adapter from each sample, and then scanning each combined assembly in various loading states.  I understand that Mr. Panapa is submitting an expert report explaining the equipment, software, and methodology employed to scan the three samples.

DEERE EX. I
PAGE 102



57.     As described in more detail below, I provided input on how to orient the combined assemblies in different loading states when scanning for purposes of analyzing fit between the tooth and adapter. This method of analysis between two mating parts is something I did for many years at ESCO. The method then involved putting a point on a nose or gage and pouring a flexible latex material inside the point cavity in order to create a flexible skin that would cure and be left when we disassembled the point from the adapter. These skins were extremely important because they allowed us to see gaps and areas of contact between the nose and the adapter. We used these skins to understand the fit between a tooth and adapter in various load states to improve component tooling and adjust fits to reduce the need for grinding required to meet quality control standards.

58.     In my time at ESCO I frequently conducted this type of fit analysis in ESCO's three US manufacturing plants, two Canadian manufacturing plants, its Australian licensee, and ESCO's European operations.   My analysis and conclusions allowed manufacturing technicians to determine the fit conditions of their products and make necessary adjustments to tooling.   For example, in order to account for process variation we would line up a number of adapters and

DEERE EX. I
PAGE 103

points from various casting heat lots to get a collection of skins to analyze. We would take measurements of the thickness of the skins in different locations to determine how parts fit and perform a statistical analysis across the sample of skins. This detailed analysis allowed us to improve the fit of the systems and speed up the final finishing of parts.

59.     For purposes of inspecting the Deere samples and understanding how they fit and interact under load, I utilized 3D scanning techniques.  These 3D scanning techniques allow for the same analysis I previously utilized by using latex skins, but is much quicker and more accurate. I discussed these 3D scanning techniques with Mr. Panapa, who explained that ESCO utilizes scanning equipment and software consistent with best industry practices for conducting fit analysis on large, steel casted ground gaging tools.

60.     The 3D scanning process began by scanning the adapters of each sample.  Multiple scans were made of these surfaces on these components and combined by software so a final detailed and complete surface was created.  (*See* Figs. 7, 8 in Attached Scanning Summaries.)  Mr. Panapa utilized Polyworks software to create best fit planes on the XY, YZ, and ZX planes of the nose of the samples so that a planar analysis could be conducted.  (*See* Figs. 3, 4 in Attached Scanning Summaries.)  Next, the points of each sample were scanned.  Each point was mounted, and the interior of the point cavity scanned as well as the outside of the point to create rear and exterior surfaces that could be used to align the interior scan with the exterior of the part. Multiple scans were made of the surfaces and combined by the software to fill in any scanning gaps so a final detailed and complete surface was created.

61.     After all individual adapters and points were scanned, the next step was to take the point and place it on the nose of the adapter and scan the point and adapter together.  As explained above, the purpose of scanning the point and adapter together was to understand how the

24

components fit together, particularly under different loading conditions.  This is consistent with the work I previously conducted as an engineer at ESCO and while working at its worldwide manufacturing facilities.  Under my direction, scanning was conducted such that the point was always seated on the end of the nose, but adjusted to four unique positions to replicate three primary loading situations: thrust only, horizontal, vertical loading (top). We used the weight of the cantilevered point as a load for the horizontal and vertical orientations.  This approach was appropriate based on my inspection of the parts and years of experience in fit analysis methods, and allowed for accurate and stable part positioning in a controlled inspection environment.  For the thrust load, the point was oriented vertically and was centered on the nose to minimize any rotational orientation to the tooth to minimize any horizontal or vertical displacement.

62.    Once the assembled samples were scanned under each given load condition, Mr. Panapa utilized Polyworks software to create a gap analysis between the nose and point cavity. The software tool produced a color-coded heat map indicating gaps between each component and the size of those gaps.  I confirmed with Mr. Panapa that the software and methods he used to create the gap analysis were consistent with current best industry standards and sound engineering principles.

*ii.    Inspection and Testing Conclusions*

63.    After reviewing the gap and planar analysis created by Mr. Panapa, I was able to draw the below conclusions about the three TK Series samples provided by Deere.  A more detailed set of conclusions for each sample that was scanned and inspected are provided in scanning summaries, which are provided with this report.  I also include with this report the 3D scan files provided to me by Mr. Panapa, which I confirmed with him were checked for completeness and accuracy.

DEERE EX. I
PAGE 105

• The scans confirm that the three samples constitute a butt fit design, and that when the wear member is seated on the adapter the front surfaces of the nose and socket both bear directly against one another. This is significant because it established both that the parts supplied were properly fitting together; and, that the location of the stabilizing surfaces along the sides, top and bottom would be correctly oriented for any conclusions about the gaps and mating surface interactions.

• The top and bottom surfaces at the front and rear of the adapter nose and wear member socket are nearly parallel to the component's longitudinal axis. Likewise, the side surfaces of the adapter nose and wear member socket are nearly parallel to the component's longitudinal axis. Based on my analysis, the side surfaces are approximately 2° from alignment to the longitudinal axis, and the top and bottom surfaces are generally less than 5° from alignment to the longitudinal axis. An example of my analysis and measurements are reflected in the images below. The first image represents the 3D scan of the TK 450 adapter. The second image reflects the best fit planes for the top, bottom, and side surfaces that were analyzed with respect to the longitudinal axis. Finally, the third image summarizes the measured angles between those given planes and the component's longitudinal axis. Although the 3D scan's planar analysis was only conducted on the adapter nose, my conclusions similarly apply to the geometry of the wear member socket. This is because the profile of the mating parts as shown in the sectioned analysis found in Figures 19 and 20 confirmed that the socket profile matched the nose profile, and the gap analysis that showed generally uniform gaps between the mating stabilizing surfaces as found in figures 9-16. The natural variation in castings, the orientation in a loading condition and the grinding on the parts all account for the gaps not being exactly uniform. In my experience designing two part cast wear part systems, the resulting mating fits were expected and necessary for providing sufficient bearing surface areas to avoid surface damage from loading.



DEERE EX. I
PAGE 106



| 450 Summary of Angles | | | |
|---|---|---|---|
| | Included Angle | Angle from X Plane (incline) | Angle of surface from Y Longitudinal Axis |
| Rear Bearing Surface - Direct Measurement | 7.169 | | **3.585** |
| Front Bearing Surface - Direct Measurement | 9.791 | | **4.896** |
| Front Bearing Surface - Plane 2 | | | **3.652** |
| Front Bearing Surface - Plane 3 | | | **3.652** |
| Left Side Upper Bearing Surface Plane 4 | | 20.269 | **2.038** |
| Left Side Lower Bearing Surface Plane 5 | | 19.330 | **2.406** |
| Right Side Upper Bearing Surface Plane 6 | | 21.064 | **2.097** |
| Right Side Lower Bearing Surface Plane 7 | | 20.519 | **2.327** |
| Angle of inside of point at Z=0 (average) | 3.866 | | **1.933** |

• Under vertical loading, the side surfaces of the adapter nose and wear member socket interacted and carried loads. This is reflected in the gap analysis and related heat maps provided in scanning summaries provided with this report. For example, for the TK 450 assembly, when subjected to a vertical load applied to the top of the wear member the nose and socket experienced contact at the front, top surface as well as portions of the side surfaces. Those areas of contact are reflected by the red portions of the heat map, which I have circled in the below image. The color red and pink indicates that those portions of the adapter and wear member were close or contacting during the given loading orientation. I expect that under additional loading, including typical loading in the field, the loading contact areas would increase.

DEERE EX. I
PAGE 107



- Under side loading, the side surfaces of the adapter nose and wear member socket interacted and carried loads.  This is reflected in the gap analysis and related heat maps provided in scanning summaries provided with this report.  For example, for the TK 450 assembly, when subjected to side loads the side surfaces of the wear member socket and adapter nose experienced contact. Those areas of contact are reflected by the red and pink portions of the heat map, which I provide below.  The color red and pink indicates that those portions of the adapter and wear member were in close or actual contact during side loading orientation. I expect that under additional loading, including typical loading in the field, the loading areas would have increased.

DEERE EX. I
PAGE 108



Figure 13 – Side Load – Right – top view

Figure 14 – Side Load – Right – bottom view

64.     Although my detailed testing only involved the three samples provided by Deere, my review of those samples and Deere's documents, including drawings and 3D CAD model renderings, confirm that my planar analysis and loading conclusions discussed above apply to all TK Series products. I make this conclusion first based on the grinding performed on each sample I was able to inspect, it is apparent that Deere and/or Black Cat has a quality control system in which adapters and wear members, regardless of size and point/adapter style, will only be released to customers after the nose and socket meet strict dimensional criteria.  This is consistent with my experience in the GET industry, and is meant to ensure that equipment fits properly and functions

29

DEERE EX. I
PAGE 109

in the field as intended.  Second, Deere's engineering drawings confirm that all sizes and styles of its TK Series product line are intended to have the same nose and socket geometry. (DEERE_0004791.)  In other words, although different adapters come in different sizes and may attach to buckets in different ways (e.g., bolt vs. weld), the geometry of the nose on each adapter is the same.  (*Compare* DEERE_0004660, DEERE_0004542, DEERE_0004891, DEERE_0004548, DEERE_0004919, DEERE_0004725.)  Likewise, TK Series wear members come in different sizes and are sold with different point designs, but the socket geometry that mates with the nose of a corresponding TK Series adapter is common across point designs.  (*Compare* DEERE_0004723, DEERE_0004879, DEERE_0004669, DEERE_0004822, DEERE_0004494, DEERE_0004499.)  Finally, my review of gauging reports for the TK Series System products shows that Deere utilizes a sophisticated manufacturing quality control system to ensure that as-manufactured adapters and wear members are manufactured consistently and within tight tolerances of its design drawings.  (E.g., DEERE_0004832; DEERE_0004730.)

## VIII.   INFRINGEMENT OF THE ASSERTED CLAIMS

### A.   Direct Infringement

65.   It is my opinion that Deere directly infringes the asserted claims in the Asserted Patents by at least selling and offering to sell the TK Series Tooth products in the United States,[1] both literally and under the doctrine of equivalents.  My detailed direct infringement analysis for each asserted claim of the Asserted Patents is set forth in claim charts provided with this report.

---

[1]   DEERE_0015370 at 400 ("TK Adapters and teeth available to OEM Bucket manufacturers across US/CA")

30

**DEERE EX. I**

**PAGE 110**

DATED:  January 13, 2023

_____

HEZEKIAH HOLLAND

DEERE EX. I
PAGE 111

# EXHIBIT J

DEERE EX. J
PAGE 112

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ESCO GROUP LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 1:20-cv-01679-RGA |
| v. | ) | |
| | ) | |
| DEERE & COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**Expert Report of Tiso Panapa**

**A.    Introduction**

1.    I have been an employee of ESCO Group LLC ("ESCO") since 2012.  I currently serve as the Dimensional Gaging Engineering Team Lead.

2.    I have extensive experience and expertise in the 3D scanning of large and small steel casted ground engaging tools, including scan data acquisition, data processing, and dimensional analysis, and I routinely perform and oversee 3D scans of such products in my role with ESCO Group.  Over 10 years in this role, I have conducted 3D scans and analyses of hundreds of ground engaging tools products, and those scans and scan analyses have been used by others at ESCO in performing various engineering activities.

3.    My qualifications and training are more fully described in my curriculum vitae, which is attached to this report at Exhibit A.

4.    I was asked to 3D scan certain exemplary ground engaging tools provided to ESCO by Deere & Company ("Deere") using the scanning protocols described below, and to prepare those scans for dimensional analysis.

5.    Under my direct supervision, the exemplar ground engaging tools described in Section B were 3D scanned by Tyler Griffin, an Inspection Technician at ESCO that works for me in the Dimensional Gaging Engineering group.  I witnessed the work Mr. Griffin performed and it was consistent with industry standards and sound engineering principles.  Additionally, following 3D scanning, I prepared the scans for dimensional analysis.   The dimensional analysis work I performed was consistent with industry standards and sound engineering principles.

DEERE EX. J
PAGE 113

**B.      Handling and Description of Samples**

6.      I understand that Deere provided three sample wear assemblies from its TK Series product line, where each assembly included a wear member, adapter, and locking mechanism.

7.      I have been informed that the samples originated from Deere and were received by Kirkland & Ellis's Chicago office, and that the samples were then forwarded to ESCO.

8.      The samples were received in ESCO's Portland office on approximately May 16, 2022.  They were received by Tyler Griffin.  ESCO received TK Series wear assemblies of the following sizes: TK225, TK400, and TK450.

**C.      Materials and Methods**

9.      Consistent with industry standards and my typical process for scanning ground engaging tools in my role at ESCO Group, the following equipment and software was utilized to 3D scan the three TK Series wear assembly samples provided by Deere and also to prepare dimensional analyses of those scans:

- Make: Hexagon Romer Absolute Arm
- Software: Polyworks 2021 IR6; RDS v6.0.1.12747
- Scanner model: RA7525SEI (with upgraded RS3 scanning head)
- Scanner resolution settings: mid range 0.014mm
- Mesh profile (software processing the data):
    - Standard profile, 0.250mm sampling step
    - Noise reduction LOW (.005mm tolerance)
- Scanner accuracy:
    - Point repeatability spec: .027mm, Point repeatability attained: 0.015mm
    - Length accuracy spec: ±0.038mm, Length Accuracy attained: ±0.027mm

10.     All of the equipment and software used is available to me at ESCO, and is equipment that I use routinely for other scanning-related projects at ESCO, including the scanning of ground engaging tools.  The scanning equipment was last calibrated on September 4, 2019 and is routinely verified for accuracy using sphere and length bar artifacts consistent with accepted industry practices; the last sphere and length bar verification was performed January 11, 2023.

11.     The adapters and wear members for each the TK225, TK400, and TK450 samples were first individually scanned by Mr. Griffin with the Hexagon Romer Absolute Arm.  Polyworks software created full surface 3D models of the scanned adapters and wear members.  Those 3D model scan files are provided with this report.

12.     After each individual adapter and wear member from the samples was scanned, the TK225, TK400, and TK450 adapters and wear members were assembled in and scanned by Mr. Griffin with the Hexagon Romer Absolute Arm while the adapters

DEERE EX. J
PAGE 114

and wear members were positioned for various loading conditions. Ky Holland, who I understand is an outside expert for ESCO in its litigation with Deere, directed the loading conditions to be applied for purposes of scanning the assembled components. In all, Mr. Griffin performed four scans of each assembled sample: one scan of a thrust load applied to the assembly, two scans of a side load applied to the assembly, and one scan of a vertical load applied to the assembly. The TK225 scans in the side load applications were also done both with and without lock pins installed. Polyworks software created 3D models of the scanned assemblies that were subjected to these loading conditions. Those 3D model scan files are provided with this report.

13.    After scanning was complete, I used Polyworks, which I use routinely in my role at ESCO, to align the full surface scans of individual adapters and wear members to the scans of the assembled samples and then create a gap analysis for each load condition applied to the assembled TK225, TK400, and TK450 samples. The gap analysis for each loading condition is reflected by a color map. Additionally, I used Polyworks to measure several planes on the adapter and wear member samples. The gap analysis and planar analysis are reflected in the files provided with this report. In my work at ESCO, I routinely conduct similar gap and planar analysis on large ground engaging tools, and the analysis performed here was conducted consistent with industry best practices and sound engineering principles.

14.    I reviewed the gap and planar analysis I created to confirm that they were complete and that the information conveyed was accurate. I then made those files available to Mr. Holland and reviewed the files with Mr. Holland in person and via video conference. I informed Mr. Holland that the scanning process used on the Deere samples and dimensional analysis I performed were done consistent with typical procedures that I use at ESCO and industry best practices.

**D.    Compensation and Prior Testimony**

15.    I am a current employee of ESCO and therefore do not have an hourly fee for providing testimony and consultation. I am not receiving any payment or compensation other than my normal salary for purposes of this case.

16.    I have not testified as an expert at trial or by deposition in the previous four years.

**EXECUTED ON JANUARY 12, 2023.**

_____
**TISO PANAPA**

3

# EXHIBIT A

# Tiso Panapa

Dimensional Gaging Engineering Team Leader at ESCO Corporation
Portland, Oregon, United States

## Contact

www.linkedin.com/in/tiso-
panapa-2652a918 (LinkedIn)

## Top Skills

Engineering
Manufacturing
Solidworks

## Summary

Experienced Engineering Team Lead with a demonstrated history of
working in engineering design and manufacturing support roles with
a focus on dimensional quality. Skilled in CMM programming, 3D
Scanning, Polyworks, GD&T, custom gage design, team & project
management, and problem solving techniques. Strong engineering
professional with leadership experience and a BSME in Mechanical
Engineering from University of Portland.

——————

## Experience

**ESCO Corporation**
10 years 4 months

Dimensional Gaging Engineering Team Lead
June 2016 - Present (6 years 8 months)
Portland, Oregon Area

Manages an engineering team responsible for designing and managing
custom physical gaging, developing CMM and 3D scanning inspection
routines, and consulting on dimensional analysis and controls of small to large
sized steel castings.

Design Engineer
October 2012 - June 2016 (3 years 9 months)

Provide dimensional gage designs and services, develop 3d scanning
techniques, and manage CMM inspection practices to ensure ESCO products
are globally interchangeable while meeting product specifications at the least
cost.

**Isspro, Inc.**
Mechanical Engineer
June 2008 - October 2012 (4 years 5 months)

Primary duty designing and customizing fuel senders for heavy diesel
automotive applications.

DEERE EX. J
PAGE 117

Purdy Corp
Engineering Intern
2007 - 2008 (1 year)

Assist engineering team in duties related to modeling products, maintaining/repairing manufacturing machines, and improving manufacturing processes.

———

## Education

University of Portland
BSME, Mechanical Engineering · (2005 - 2009)

DEERE EX. J
PAGE 118

# EXHIBIT K

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| ESCO GROUP LLC,<br><br>    *Plaintiff*,<br><br>v.<br><br>DEERE & COMPANY<br><br>    *Defendant*. | C.A. No. 1:20-cv-01679-RGA |

**ERRATA FOR EXPERT REPORT OF**

**THOMAS R. VARNER, PH.D. DATED JANUARY 13, 2023**

DATED:  January 16, 2023

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' AND EXPERTS EYES ONLY

1

DEERE EX. K
PAGE 120

Changed portions of report are underlined.  None of the summary damages calculations in Varner Expert Report dated January 13, 2023 are affected by these errata.

1.  Par. 21, last sentence

    Currently reads:

    Exhibit 13 is a summary of Weir's Income Statements from 2018 to H2 of 2022.

    Change to:

    Exhibit 11.1 is a summary of Weir's Income Statements from 2018 to H2 of 2022.

2.  Par. 22, last sentence

    Currently reads:

    Exhibit 3.2 is a summary of ESCO's income statements from 2018 to H2 of 2022.

    Change to:

    Exhibit 11.2 is a summary of ESCO's income statements from 2018 to H2 of 2022.

3.  Par. 44, last sentence

    Currently reads:      …ESCO has sold ███████████ …

    Change to:            …ESCO has sold ███████████ …

4.  Par. 45, last sentence

    Currently reads:

    Exhibit 3.1 shows that Deere sold ███████████ TK Series System adapter and tooth components for ███████████ (net sales), with gross profits of ███████████

    Change to:

    DEERE_0048761 and DEERE_0004659 show that Deere sold ███████████ TK Series System adapter, tooth and pin components for ███████████ (net sales), with gross profits of ███████████

5.  Par. 58

    Currently reads:

    Exhibit 2.1 shows that ESCO sold ███████████ Ultralok adapter and tooth components ███████████ ESCO also sold ███████████ Ultralok adapter and tooth components ███████████, or an annualized amount of ███████████ components.  The claimed lost sales shown in Exhibit 9.1 are ███████████



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' AND EXPERTS EYES ONLY

**DEERE EX. K**
**PAGE 121**

████████████████████████████

Change to:

Exhibit 2.1 shows that ESCO sold ██████████ Ultralok adapter
and tooth components ████████ ESCO also sold
████ Ultralok adapter and tooth components ████. The claimed lost
sales shown in Exhibits 8.1(A) and 8.1(T) are
████████████████████████████████

Par. 65, second and third sentences

Currently reads:

Exhibits 8.1(A) and 8.1(T) shows that ESCO's lost sales
████████████ Ultralok adapter components and ████ Ultralok
tooth components, while Exhibit 2.1 shows that
ESCO sold ████ Ultralok adapter components and ████ Ultralok
tooth components.  The but-for lost sales amount to
the number of Ultralok adapter components and ████ the
number of Ultralok tooth components.

Change to:

Exhibits 8.1(A) and 8.1(T) shows that ESCO's lost sales
████████████ Ultralok adapter components and ████ Ultralok
tooth components, while Exhibit 2.1 shows that
ESCO sold ████ Ultralok adapter components and 0 Ultralok
tooth components.  The but-for lost sales amount to
the number of Ultralok adapter components and ████ the
number of Ultralok tooth components.

6.  Par. 71, first and last sentence

Currently reads:

Exhibit 11 presents ESCO's SGA Expenses… Exhibit 11 shows…

Change to:

Exhibit 10 presents ESCO's SGA Expenses... Exhibit 10 shows…

7.  Par. 72

Currently reads:      In Exhibit 8.1… total lost profits ████████.

Change to:      In Exhibit 8.2… total lost profits ████████.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' AND EXPERTS EYES ONLY

DEERE EX. K
PAGE 122

8. Par. 74, last sentence

   Currently reads:

   Exhibit 8.4 shows that profits on lost future sales amount ██████ .

   Change to:

   Exhibit 8.4 shows <u>lost future sales</u> amount ██████ .

9. Par 75, last sentence

   Currently reads:     ESCO's lost profits on future lost sales ██████ .

   Change to:           ESCO's lost profits on future lost sales ██████ .

10. Par. 106, second and third sentences

   Currently reads:

   Exhibit 3.1 shows that Deere has had <u>gross sales of</u> ██████ , net <u>sales of</u> ██████ , and <u>gross profits of</u> ██████ for its TK Series System products.  Exhibit 3.1 also shows <u>gross profit margins of the accused products over the damages period</u> ██████ ██████ .

   Change to:

   Exhibit 3.1 shows that Deere has had <u>gross sales of</u> ██████ , net <u>sales of</u> ██████ , and <u>gross profits of</u> ██████ for its TK Series System products.  Exhibit 3.1 also shows <u>gross profit margins of the accused products over the damages period</u> ██████ ██████ .

11. Par. 125

   Currently reads:

   I first analyze ESCO's sales of bucket tooth products to Deere.  Exhibit 4 is a <u>summary of ESCO sales of Ultralok and Super V tooth components to Deere</u> ██████ I understand that the last ESCO patent that covered the Super V bucket tooth system expired in 2013.  Exhibit 4 shows that the <u>gross profit margin premium for Ultralok over Super V tooth components</u> ██████ ██████ This results in an average gross profit margin ██████ ██████ .

   Change to:

   I first analyze ESCO's sales of bucket tooth products to Deere.  Super V <u>gross profit margins</u> ██████ <u>whereas Ultralok gross profit margins</u> ██████ ██████ <u>(Sales Cube John Deere.xlsx - ESCO-00196190 and REV_ESCO00000768.1.xlsx).  This is an average difference gross profit margin of Ultralok above Super V</u> ██████ .

4

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' AND EXPERTS EYES ONLY

12. Par. 126, second sentence

  Currently reads:

  The gross profit margins of its Super V tooth components ████████████

  ████████████████████████████████ Deere TK Series System gross margins

  are ████████████ █ ████████████

  ████████████████████████████████████

  Change to:

  The gross profit margins of its Super V tooth components ████████████

  ████████████████████████████████████████████

  ████████████ Deere TK Series System gross margins are ████████

  ████████████████████████████████████

  ██████████

13. Par 127

  Currently reads:

  I also note in Exhibit 3.1 that Deere's average gross profit margin on sales
  of its TK Series System ████████ Thus, Deere would have been able to pay a
  reasonable royalty of 8% and still achieve gross profit margins ████████

  ████████████████████████

  Change to:

  I also note in Exhibit 3.1 that Deere's average gross profit margin on sales
  of its TK Series System ████████████ Thus, Deere would have been able to
  pay a reasonable royalty of 8% and still achieve gross profit margins ████

  ████████████████████████████

14. Par 128

  Currently reads:

  …Exhibit 91A is a summary….of reasonable royalty damages of
  ████████

  Change to:

  …Exhibits 9.2(A), 9.2(T), and 9.3(P) are a summary…of reasonable
  royalty damages of ████████ .

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' AND EXPERTS EYES ONLY

DEERE EX. K

PAGE 124

15. Exhibits 2.1 and 2.5, Note [1]

        Currently reads:      Sales Cube John Deere.xlsx

        Change to:          Sales Cube John Deere.xlsx - ESCO-00196190

16. Exhibit 2.2, 2022 Q1-Q3 data revised, see attached

17. Exhibit 2.3, Section on gross profits revised, see attached

18. Exhibit 2.4, Note [2]

        Currently reads:

                ESCO 3PC Nemisys_Geovor 2014-2022.xlsx &
                Nemisys_Sales_3Q21_to_Present_09622.xlsx

        Change to:

                ESCO 3PC Nemisys_Geovor 2014-2022.xlsx - ESCO-00017044 &
                Nemisys_Sales_3Q21_to_Present_09622.xlsx - ESCO-00017181

19. Exhibits 7.1(A), 7.1(T), 7.2(A), 7.2(T), 8.1(A), 8.1(T), 8.2(A), 8.2(T), 9.1(A), 9.1(T), 9.2(A), 9.2(T), and 9.3(P)

        Currently reads:      Jan 1 to Sep 28 2023 (Est.) [5]

        Change to:          Jan 1 to Sep 18 2023 (Est.) [5]

Executed on January 16, 2023, in Oakland, California.

Signature: _____

Thomas R. Varner, Ph.D.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' AND EXPERTS EYES ONLY

6



**Exhibit 2.2  ESCO Super V Sales**



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. K
PAGE 126



**Exhibit 2.3  ESCO GeoVor Sales**



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. K
PAGE 127

# EXHIBIT L

DEERE EX. L
PAGE 128

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ESCO GROUP LLC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Case No. 1:20-cv-01679-RGA-JLH |
| | § | |
| DEERE & COMPANY, | § | |
| | § | |
| *Defendant*. | § | |

**EXPERT REPORT OF STEPHEN L. BECKER, Ph.D.**

_____

STEPHEN L. BECKER, Ph.D.

2/8/2023
_____
DATE

HIGHLY CONFIDENTIAL

DEERE EX. L
PAGE 129

HIGHLY CONFIDENTIAL

to demonstrate that the proposed A1 non-infringing alternative design lacks any specific feature or characteristic that would render it unacceptable to Deere's customers.  As noted above, none of the products that compete with the TK Series utilizes the Patents-in-Suit. Thus, it is unreasonable for Dr. Varner to assume that Deere's proposed re-design would not also be acceptable to the market and to Deere's customers.

**2.    Dr. Varner incorrectly assumes that ESCO would have obtained "but-for" sales in the same manner as the actual market**

282.   As discussed above, I disagree with Dr. Varner's assumption/conclusion that Deere would exit the bucket tooth market and simply cede its market share to the remaining players in the market, including ESCO. The foundation of Dr. Varner's argument to get to that point, namely that Deere had no acceptable non-infringing alternatives, is contradicted by the very fact that literally every other player in the market that Dr. Varner is considering – including ESCO – is <u>not</u> using the Patents-in-Suit. Thus, it cannot be the case, as Dr. Varner assumes, that the Patents-in-Suit are necessary or even important for the success of a product in this particular market.

283.   Setting aside the issues with Dr. Varner's foundational assumption that "but-for" the alleged infringement, Deere would stop selling the accused TK Series products, Dr. Varner's assumptions regarding the portion of Deere's accused infringing sales that ESCO would capture is flawed and unreliable.

284.   As described earlier in this rebuttal section, Dr. Varner uses the following market share assumptions as the basis for his *State Industries* market reconstruction:



285.   As shown in the table, Dr. Varner assumes that Deere's relevant market share ███████████ ███████████████████████████████████████████████████████████████████████████ ████████ As discussed below, these market share numbers are highly speculative and unreliable. In

particular, Dr. Varner's assumption that Deere's share ████ is not only speculative but also demonstrably overstated and inconsistent with his other assumptions.

286.  As noted in Dr. Varner's Exhibit 6, he relies on a statement from Mr. Budan at his deposition that the TK Series system ████ market share" based on "machine population and estimated consumption or usage patterns of those machines."[396] I discussed the nature of this estimate with Mr. Budan.  Based on my discussion with Mr. Budan, I understand that Dr. Varner has misinterpreted his testimony.  Based on my discussion, I understand that Mr. Budan's reference ████ was not an estimate of the TK Series <u>overall</u> market share but was Mr. Budan's estimate of the portion of the Deere "machine population" that is being served with TK Series products.  Stated another way, Mr. Budan estimated that Deere is capturing ████ of the "market" for teeth on its own Deere machines. Since Deere equipment (such as excavators and loaders) represent less than 100% of their respective markets, it must follow that the TK Series share of the overall market ████████████ ████████████████████.

287.  Moreover, numerous documents and evidence in the record contradict Dr. Varner's assumptions or, at a minimum, demonstrate the highly speculative nature of his assumed shares. In particular, Dr. Varner's assumption that Deere ████████ market share is contradicted by numerous pieces of evidence and by the testimony of ESCO itself.  Through the proper lens, this evidence is consistent with Mr. Budan's testimony.

288.  For example, a 2010 Deere presentation noted that Deere's bucket tooth historical market share was ████████.[397] As of November 2016, ESCO noted that ████████████████████████ ████[398]  An April 2017 ESCO Strategic Plan presentation ████████████████████████ ████████████████████[399]

---

[396] Dr. Varner relies on a statement from Mr. Budan at his deposition that the TK Series system ████ market share based on "machine population and estimated consumption or usage patterns of those machines."  Mr. Budan testified that the former related to "[w]hole good machines, such as excavators or backhoes or loaders" and the latter related to "test data … estimating how many hours an average tooth would last and then expanding that over the life of the machine."  Mr. Budan's estimate appears to be based on some combination of excavator units and tooth lifespan as of an unspecified time.  See Deposition of Michael Budan, November 9, 2022, pages 21-22.
[397] DEERE_0005125.
[398] ESCO-00138154-163; at -163.
[399] ESCO-00054783-814; at -787.

HIGHLY CONFIDENTIAL



289. ███████████████████████ a 2019 ESCO Construction Expendable Roadmap presentation ████████████████████████████████████████
███████████████████.[400]



---

[400] ESCO-00140132-163; at -137.

HIGHLY CONFIDENTIAL

290. A 2019 ESCO Construction Attachments Roadmap presentation ██████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████ ███ ██
████████████████████████████████████████████

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

291. Dr. Varner ignores (or discounts) other testimony that Deere's share is, in fact, at or below five percent. ██████████████████████████████████████████████████████
██████████████████████████████████████████████

292. Even setting aside the entirety of the foregoing, the implications of Dr. Varner's market share analysis yield results inconsistent with the parties' actual sales.  If Dr. Varner's assumed Ultralok market share of ████ of the "premium market" is reliable, then the sales data evidences that the share held by Deere's TK Series products must ██████████ consistent with the documents and testimony discussed above.

---

[401] ESCO-00085978-053; at -989.  See, also, ESCO-00161427-405; at -428.
[402] ESCO-00085978-053; at -989.  See, also, ESCO-00161427-405; at -428.
[403] Deposition of Adam Stitzel, December 16, 2022, page 131.

DEERE EX. L
PAGE 133

HIGHLY CONFIDENTIAL



| Time Period | Ultralok Sales[404] | Dr. Varner's Market Share of Ultralok[405] | Accused Product Net Sales[406] | Implied Market Share of Accused Products |
|---|---|---|---|---|
| | | | | |

293. As shown in the table above, the sales numbers demonstrate that Ultralok sales are ███████ ████████████████████████ If Ultralok ███████████ share of the relevant market, as Dr. Varner explicitly assumes, then it follows that <u>in the relevant market</u> Deere's TK Series products command a share that is ████████████ ██████████████████████████[407]

294. This error alone causes Dr. Varner to overstate his alleged lost profits damages. As noted at the outset of this rebuttal section, Dr. Varner claims ESCO's alleged lost profits of its non-covered Ultralok product over the damages period are ██████████████████[408] Correcting Dr. Varner's lost profits calculations with this alternative market share assumption, keeping all else equal, Dr. Varner's lost profits is reduced to ███████████████[409] I note that such an alternative market share assumption would also reduce Dr. Varner's "future" lost profits calculations.

**3. Dr. Varner's "lost profits on future lost sales" is speculative**

295. Dr. Varner extends his analysis beyond the terminus of the produced Deere sales data and projects lost profits damages accruing through 2027.[410] Dr. Varner estimates future lost profits damages "from ESCO's lost Ultralok tooth component sales after the date of trial because of the stock of infringing TK Series System adapter components sold prior to the trial and in use as of the trial date."[411]

---

[404] Exhibits SLB-9A and SLB-9B; Varner Report, Exhibit 2.5.
[405] Varner Report, Exhibit 6.
[406] Exhibits SLB-3A and SLB-3B; Varner Report, Exhibit 3.1. These sales do not include those made by Deere in the "first fit" channel.
[407] Over this period, as shown above, Ultralok generated sales of ██████████████████, and the Accused Products generated net sales of ███████████████. This implies an ███████████.
[408] Varner Report, page 5, Exhibit 1. As discussed, Dr. Varner also calculated residual reasonable royalties and "future" lost profits.
[409] Exhibit SLB-10.
[410] Varner Report, Exhibits 1, 8.4.
[411] Varner Report, page 33.

DEERE EX. L
PAGE 134

# EXHIBIT M

DEERE EX. M
PAGE 135

ATTORNEYS' EYES ONLY

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ESCO GROUP LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 1:20-1679-RGA-MPT |
| | ) | |
| DEERE & COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**REBUTTAL EXPERT REPORT OF DR. RICHARD W. KLOPP, P.E., F.A.S.M.E.**

DEERE EX. M
PAGE 136

ATTORNEYS' EYES ONLY

## IV.    Holland's Methodology

34.    Mr. Holland relies on three-dimensional scans of single samples of three sizes of adapters and Fanggs™ teeth of the Accused Products. In my opinion, the conclusions he draws from the scans are fatally flawed for at least the following reasons:

(1) he relies on scans done without Deere's retention pin in place;

(2) the analysis allows for mating surfaces of the nose and socket to interpenetrate significantly, which is nonphysical;

(3) the longitudinal axis is defined circularly and in relation to nose planar surfaces and associated axes in a way that violates well-known precepts of Cartesian coordinate systems;

(4) he has failed to disclose fully and properly the methods of plane fitting and axis determination sufficiently to allow others to reproduce his results and test the reliability of his findings; and

(5) the methods he has disclosed appear to be arbitrary with respect to plane fitting and axis determination.

35.    The above issues render the following conclusions of Mr. Holland unreliable:

(1) "[t]he scans confirm that the three samples [of the Accused Products] constitute a butt fit design;"[3]

(2) the scans "confirmed that the socket profile matched the nose profile;"[4]

(3) "the gap analysis … showed generally uniform gaps between mating stabilizing surfaces;"[5]

---

[3]    Holland Opening Report, ¶63.
[4]    *Ibid.*
[5]    *Ibid.*

DEERE EX. M
PAGE 137

**ATTORNEYS' EYES ONLY**

(4) "[u]nder vertical loading, the side surfaces of the adapter nose and wear member socket interacted and carried loads;"[6]

(5) the Accused Products include a longitudinal axis as used in the Asserted Claims; and

(6) the Accused Products contain features transverse to the longitudinal axis as used in the Asserted Claims.

36.   Mr. Holland used these conclusions to support his infringement opinions that the Accused Products infringe Claims 8, 9, 12, 13, 21, 22, 25, and 26 of the '662 Patent and Claims 4-6, 13-15, and 17-20 of the '175 Patent. These infringement opinions are flawed because the conclusions are flawed.

37.   First, Mr. Holland's opinions are flawed because he relies on scans and contact analysis done without the retention pin in place. Mr. Holland states:

> *During my inspection of the parts I found the pins could all be installed but, in some instances, the point remained very loose, and in other cases, the point movement was limited and not representative of the full range of point movement on the mating nose during actual loading in the field. Based on this finding I instructed that the scans be made with the point seated on the end of the nose, but the pin not installed to ensure that in the various loading orientations, the point was fully oriented to determine the location and extent of any mating stabilizing surface interactions. I found this approach was consistent with the instructions found in 34_BC-0034-3 in Mr. John Ruvang's field report.*[7]

38.   By omitting the pin, Mr. Holland has skewed his test results, altering the gap values and obtaining contact between the surfaces of the nose and socket where it would not exist if the pin were in place. At best, Mr. Holland has analyzed infringement for the case of excavation with the retention pins missing, which is unreasonable and contrary to the use of the claimed invention outlined in the claims of the Asserted Patents. It is nonsensical to

---

[6]   *Ibid.*
[7]   Holland Opening Report, ¶55.

2207813.000 - 3800

DEERE EX. M
PAGE 138

suggest that removing the pin would create conditions "representative of the full range of point movement on the mating nose during actual loading in the field."[8] Mr. Holland's reliance on Mr. Ruvang's field report[9] is improper because it cannot be read to suggest that excavating without a pin—much less scanning without a pin—reflects a realistic use condition.

39.    Second, absent pin notwithstanding, Mr. Holland's and Mr. Panapa's scanning process fails to distinguish surfaces that merely contact each other from those that bear against each other and resist loads. Mr. Holland only attempted to assess mere contact between the surfaces of the nose and socket because he did not apply or simulate any forces approaching actual excavation working loads. Instead, Mr. Holland only tested the Accused Product by applying the self-weight of the tooth (Figure 4).



Figure 4.    *Photographs showing that adapters and wear members of the Accused Products were loaded only by self-weight during scanning [IMG_1153 (left); IMG_1164 (right)].*

---

[8]    *Ibid.*
[9]    34_BC-0034.

15

DEERE EX. M
PAGE 139

ATTORNEYS' EYES ONLY

40.    Surfaces can make contact, but that does not mean they bear excavating loads. For example, if vertical downward excavating load is applied at the tip of the tooth while the assembly is horizontal, the opposed top stabilizing surfaces forward on the nose will bear against each other and resist load, as will the bottom stabilizing surfaces rearward on the nose. Mr. Holland's scanning summary images in Figures 15 and 16 in the "Deere 225 Scanning Report Holland 2022 01 12," which I have copied below as Figure 5, indicate as much.



Figure 5.    *"Heat map" showing closest distances between corresponding surfaces on a Deere TK225 assembly under vertical downward gravity loading.[10] The red zones on the top and bottom surfaces are consistent with zones that would bear and resist loads during excavation. That is not the case of the red zone on the right side, due to the definite gap on the left side. [Annotations added.]*

---

[10]    Deere 225 Scanning Report Holland 2022 01 12, p. 9.

DEERE EX. M
PAGE 140

ATTORNEYS' EYES ONLY

41.     If the TK225 tooth is centered on the nose laterally, Mr. Panapa's own data (upon which Mr. Holland relies) shows that there would be clearance between the side stabilizing surfaces under vertical loads. While Mr. Panapa apparently allowed the wear member to skew toward the left to cause possible contact on the forward right side at the location indicated in Figure 5, the opposite side shows a gap of roughly 1.5 mm.[11] Mr. Holland's notes record that this skewing was not prevented.[12] Thus, if the wear member were skewed approximately 0.75 mm to the right, there would be an approximately 0.75-mm gap on both sides. There would be no contact on the side surfaces near the front end, and no evidence that the side surfaces would bear against each other to resist vertical loads. Even with the wear member skewed to the left as in Figure 5, there are gaps on both sides toward the rear, amounting to at least 0.25 mm on the right and 0.125 mm on the left.

42.     Mr. Panapa apparently did not skew the TK400 point right or left, as indicated by gaps that he reported on both sides of the assembly while under vertical loading from the wear member's self-weight. See Figure 6, which is a copy of Figures 15 and 16 in Mr. Panapa's "Deere 400 Scanning Report Holland 2022 01 12." Mr. Panapa's data indicate that he skewed the TK450 to the left because there is possible contact on the right and an approximately 2-mm gap on the left toward the front under vertical loading (Figure 7).

---

[11]   Mr. Holland states in reference to the three Scanning Reports, "[T]he gap analysis … showed generally uniform gaps between the mating stabilizing surfaces as found in figures 9-16." [Holland Opening Report, p. 26.] That statement obviously is false; the gaps are not at all uniform.
[12]   Deere Part Scanning Notes 2023 01 12, p. 2.

DEERE EX. M
PAGE 141

ATTORNEYS' EYES ONLY



*Figure 6.*   *"Heat map" showing closest distances between corresponding surfaces on a Deere TK400 assembly under vertical downward gravity loading.[13] The pink area represents interpenetration of socket and nose surfaces, which obviously is nonphysical and corrupts the other gap values. [Annotations added.]*

---

[13]   Deere 400 Scanning Report Holland 2022 01 12, p. 9.

DEERE EX. M
PAGE 142

ATTORNEYS' EYES ONLY



*Figure 7.    "Heat map" showing closest distances between corresponding surfaces on a Deere TK450 assembly under vertical downward gravity loading.[14] [Annotations added.]*

43.     Mr. Holland's analysis reported the gap as the closest distance between two opposed surfaces. The closest distance is not the relevant distance controlling whether side gaps would close under loads that are not perpendicular to said surfaces. The closest distance generally would be the distance locally perpendicular to the surfaces, but the gap distance to be closed under vertical loading is the vertical distance, for example, which is much greater for a steeply inclined plane. Consider the case of planes inclined 20° from vertical, as is nominally the case for planes 4–7 for the TK450 measured by Mr. Panapa and reported in "Deere 450 Scanning Report Holland 2022 01 12" at page 4 (copied as Figure 8 below).

---

[14]   Deere 450 Scanning Report Holland 2022 01 12, p. 9.

DEERE EX. M
PAGE 143

ATTORNEYS' EYES ONLY

The situation is shown schematically in Figure 9. The relevant gap is Mr. Holland's measured value multiplied by the cosecant of 20°, which is 2.92. Therefore, if, as is apparent from colorings in Figure 7, the space between the bottom rear mating surfaces and the upper rear side mating surfaces are similar, the relevant gap at the side surfaces under vertical loading is approximately 2.9 times larger than the gap at the bottom surfaces.



Figure 8. *Data showing the angles of planes that Messrs. Holland and Panapa fitted to the TK450 scan data for the vertical downward loading scenario, showing that the side surfaces are oriented approximately 20° off of vertical.*[15]

---

[15]   Deere 450 Scanning Report Holland 2022 01 12, p. 4.

2207813.000 - 3800

DEERE EX. M
PAGE 144

**ATTORNEYS' EYES ONLY**



*Figure 9.     Mr. Holland's analysis ignores the fact that the steep incline of the side surfaces amplify the relevant gap under vertical loading by the cosecant of the angle from vertical. This schematic shows that, if the angle is 20°, the relevant gap is 2.92 times Mr. Holland's reported gap.*

44.     Even if a tooth is skewed left or right so that one of the angled side surfaces makes contact and vertical load is applied (as in Mr. Panapa's situations in TK225 and TK450 measurements), the contacting side surfaces would not bear against each other and resist load. The gap on the opposing side would prevent it. The steep incline is such that the contacting surfaces would slide past each other and any tendency for the sliding to affect the lateral skew would be accommodated by the open gap on the opposing side (Figure 10).

2207813.000 - 3800

**DEERE EX. M**
**PAGE 145**

ATTORNEYS' EYES ONLY



Figure 10.   *Schematic showing that, with gaps as measured by Mr. Panapa, even when the tooth is skewed on the nose, vertical loading merely causes the steeply angled surfaces to slide past each other. They cannot bear against each other to resist load. The horizontal stabilizing surfaces, not shown in the schematic, limit the vertical motion so that the left gap remains open.*

45.     Also apparent from Figure 8 is that Mr. Holland had characterized the angles of the surfaces he identifies according to the vectors normal (perpendicular) to those surfaces, i.e., the surface normal. This will be relevant to the discussion below regarding the claim term "transverse."

46.     Mr. Holland's "heat maps" for the top front TK400 (Figure 6) and bottom rear TK450 gaps (Figure 11) shows a pink zone in the middle of the red zone. According to Mr. Holland, pink represents negative gap, i.e., interpenetration of surfaces, by up to 1.000 mm. This is nonphysical and means all the other gap measurements are corrupted for this loading condition, which is for the TK450 assembly under vertical downward self-weight. Positive gaps adjacent to the interpenetrated areas are smaller than they would be in reality, and gaps on opposite sides are larger than they would be in reality.

DEERE EX. M
PAGE 146

ATTORNEYS' EYES ONLY



Figure 11.   *Mr. Holland has allowed the bottom rear socket and nose surfaces to interpenetrate, as indicated by the pink zone at the arrow on the right. This is not a physical possibility, and the error corrupts all the gap measurements on the TK450 assembly under a top load.*

47.     Mr. Holland provided his underlying scan data, and we can replot it to show more clearly the areas where he has allowed the surfaces of the nose and socket to interpenetrate contrary to physical reality.  These are shown for the TK225, TK400, and TK450 assemblies in Figure 12, Figure 13, and Figure 14, respectively. The maximum interpenetration shown is 0.6 mm (0.024 in.), which is substantial and physically impossible.

2207813.000 - 3800

DEERE EX. M
PAGE 147

ATTORNEYS' EYES ONLY



*Figure 12.   "Heat map" from Mr. Holland's data replotted on a scale showing only interpenetrated areas on the TK225 assembly (with the wear member hidden) under side load and without a pin.*



*Figure 13.   "Heat map" from Mr. Holland's data replotted on a scale showing only interpenetrated areas on the TK400 assembly (with the wear member hidden) under top load and without a pin.*

24

DEERE EX. M
PAGE 148

**ATTORNEYS' EYES ONLY**



*Figure 14.   "Heat map" from Mr. Holland's data replotted on a scale showing only interpenetrated areas on the TK450 assembly (with the wear member hidden) under thrust load and without a pin.*

48.    Surfaces with clearance between them cannot bear load. If the tooth is pushed to one side before substantial vertical load is applied, as Mr. Holland and Mr. Panapa have done, side surfaces may make contact but they cannot support substantial vertical load because of the unfavorable, nearly vertical orientation of the contacting surfaces, which would slide past each other.

49.    If the side surface gaps like those shown in Figure 9 were narrower in the vertical direction than the gaps between the top and bottom horizontal surfaces, then, under vertical loading, the side gaps would close before the horizontal gaps, and the side surfaces would bear load. This would be undesirable, because the steep slant of the contacting side surfaces would tend to wedge the socket sides apart, potentially breaking the socket or jamming the socket

2207813.000 - 3800

**DEERE EX. M
PAGE 149**

ATTORNEYS' EYES ONLY

on the nose, making removal difficult. Mr. Ruvang testified as much.[16] This likely explains why the Accused Products and ESCO's own Nemisys and GeoVor do not exhibit this behavior because the side gaps (in the vertical direction) are larger than the horizontal top and bottom surface gaps.

50.   Mr. Holland relies on his nose scans to fit various mathematical planes that he claims represent front thrust surfaces, front top and bottom stabilizing surfaces, and side stabilizing surfaces. He then defines nose vertical and horizontal mid-planes based on the fitted planes. His method is arbitrary and, as far as I can determine from the available disclosures, neither reproducible nor reliable.

51.   For example, Mr. Holland apparently selected the red points on the TK225 nose surface, shown in Figure 15, and then calculated the best-fit plane to the red points. Mr. Holland fails to disclose the fitting method, which could be a least-squares method as one possibility among many, any one of which could result in identification of a different fitted plane.

---

[16]   Ruvang Deposition Transcript, 83:16-84:2.

DEERE EX. M
PAGE 150

ATTORNEYS' EYES ONLY



*Figure 15.   Red dots indicate the points that Mr. Holland selected for plane fitting on the TK225 adapter nose. He has not disclosed why he chose so many more points over a significantly larger area on the bottom right surface than any other surface, nor has he disclosed his plane-fitting method.*

52.    However, it is even more egregious that Mr. Holland has not explained the rationale for choosing the points to fit. Based on views such as that shown in Figure 15, fitted areas varied greatly in size for no apparent reason, and fitted points were not uniformly distributed over the fit area; my experience with analyzing experimental data suggests that certain areas where points are clustered have more influence on the resultant choice of plane. It appears that the points are clustered in areas where the scanned surfaces have greater curvature—that is, they are less planar. Thus, it appears that Mr. Holland allowed less planar areas to more strongly influence the resultant choice of plane fitted to the data,

2207813.000 - 3800

DEERE EX. M
PAGE 151

ATTORNEYS' EYES ONLY

meaning that the fitted planes captured the non-planar features more than the planar features.

53.     Mr. Holland defines the longitudinal axis based on his scans of the adapter noses. His definition violates the precept that the axes in a Cartesian coordinate system, which is the type of coordinate system upon which his scanning data and its analysis is based, must be orthogonal—that is, at 90° to each other. In each scanning report, he locates an X-Y-Z coordinate system at the tip of the nose.[17] (Figure 16 below is a reproduction of Figure 4 from Mr. Holland's report.) He defines the Z axis as the normal to a best-fit mid-plane between the scanned top and bottom front bearing surfaces. He defines the X axis as the normal to the mid-plane between the best-fit side surface scans. These planes and axes are shown in each scanning report.[18]

---

[17]   Deere 225 [400, 450] Scanning Report Holland 2022 01 12, p. 2.
[18]   Deere 225 [400, 450] Scanning Report Holland 2022 01 12, p. 3.

2207813.000 - 3800

DEERE EX. M
PAGE 152

ATTORNEYS' EYES ONLY



Figure 4 – Display of the X, Y, Z planes with the adapter not shown.

*Figure 16.   X-Y-Z planes and coordinate system shown in Mr. Holland's scanning report for the TK450 product. Similar figures are found in the reports for the TK225 and TK400 products.[19] The line at the intersection of the X and Z planes would be adequate to define the Y axis, but Mr. Holland has defined it as the normal to the fitted front plane.*

54.    To be consistent with a rectangular Cartesian coordinate system demanding that the X and

Z axes be perpendicular, Mr. Holland's axis-finding exercise must rely on an additional,

unstated constraint that the mid-plane between the sides is orthogonal (oriented at 90°) to

the mid-plane fitted between the top and bottom front bearing surfaces. Otherwise, the X

and Z axes would not necessarily be perpendicular. The outcome if no verticality constraint

is applied is illustrated schematically in Figure 17. Given the apparent arbitrariness of the

selection of red fitting points and their non-uniform distribution (Figure 15), there is a high

---

19    Deere 225 [400, 450] Scanning Report Holland 2022 01 12, p. 3.

2207813.000 - 3800

DEERE EX. M
PAGE 153

ATTORNEYS' EYES ONLY

degree of certainty that the allegedly vertical mid-plane between the fitted side planes would not in fact be vertical, so Mr. Holland very likely has somehow applied an unstated constraint to enforce verticality.



*Figure 17.   Schematic representation showing how a skewed vertical mid-plane would result from the apparently arbitrary set of points that Mr. Holland selected for fitting side planes (Figure 15). I have exaggerated the amount of skew for purposes of visualizing the issue. A longitudinal axis is obviously definable as the line at the intersection of the mid-planes.*

55.     Regardless of whether the X and Z axes are perpendicular, the X and Z fitted planes alone would be sufficient to define the longitudinal axis in a self-consistent manner as the line at the intersection of the two fitted mid-planes. This is the green line in Figure 17. However, Mr. Holland has not done this. Instead, he defines the Y axis, which he relies on as the longitudinal axis in his analysis, as "based on scanning the end of the nose to find the end plane."[20] There is no guarantee that a plane fitted to the flat on the end of the nose would be perpendicular to the other fitted planes unless there is another constraint that Mr. Holland has failed to disclose. If we take Mr. Holland at his word and he has defined

---

[20]     Deere 225 [400, 450] Scanning Report Holland 2022 01 12, p. 2.

2207813.000 - 3800

ATTORNEYS' EYES ONLY

the Y (longitudinal) axis as he states, then the Y axis is not necessarily perpendicular to the X and Z axes, which themselves are not necessarily perpendicular.

56.   If Mr. Holland did not apply undisclosed constraints to force his analysis to provide a proper Cartesian coordinate system, then his conclusion that the front thrust surface is transverse to the longitudinal axis is circular. This is because he used the surface to define a best-fit plane and its normal, and then effectively declared that the surface is transverse to its own normal.

57.   On the other hand, if Mr. Holland has applied undisclosed constraints enforcing perpendicularity, then he has failed to provide proper evidence that the front thrust surface is indeed perpendicular to the longitudinal axis, which logically is the line of intersection between the X and Z fitted mid-planes. Mr. Holland has not ruled out the possibility that the front thrust surface is significantly skewed with respect to the longitudinal axis, because it appears that he force-fit a best-fit plane with a constraint that it be perpendicular to the longitudinal axis defined from the X and Z axes. That is, Mr. Holland has not tested whether a front surface fit done without any constraints would indeed result in a plane that is transverse to the longitudinal axis.

## V.   Alleged Infringement

58.   It is my opinion, as explained below, that the Accused Products do not practice each and every limitation of any of the Asserted Claims of either of the Asserted Patents. Accordingly, the Accused Products do not infringe any of the Asserted Claims of the Asserted Patents.

59.   Furthermore, in my opinion, as explained below, Mr. Holland fails to demonstrate that the Accused Products practice each and every limitation of any Asserted Claim of the Asserted

DEERE EX. M
PAGE 155

ATTORNEYS' EYES ONLY

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on February 8, 2023, at Menlo Park, California

Richard W. Klopp, Ph.D.

2207813.000 - 3800

DEERE EX. M
PAGE 156

# EXHIBIT N

DEERE EX. N
PAGE 157

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

---

ESCO GROUP LLC,

    *Plaintiff,*

v.

DEERE & COMPANY

    *Defendant.*

C.A. No. 1:20-cv-01679-WCB

**REPLY EXPERT REPORT OF**

**THOMAS R. VARNER, PH.D.**

Dated: March 3, 2023

Respectfully submitted,

_____

Tho   as R. Varner, Ph.D.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. N
PAGE 158

Patents-in-Suit provides powerful market evidence that commercially acceptable non-infringing alternatives do, in fact, exist.   Dr. Varner has simply assumed (unreasonably) that while such alternatives were clearly available to everyone else in the marketplace, Deere somehow would not have been able to implement such a design."[82]

54.     The documents and testimony from both Deere and ESCO show that there are alternatives for bucket tooth systems in the premium segment of the market for construction expendables.  However, Deere admits that it does not have a non-infringing alternative to its TK Series System available to consumers, and according to what was told to Dr. Becker, Deere may not have one available for at least another 12 months.   There is also no testimony or documents I am aware of indicating that Deere has contracted with, negotiated with, or even contacted, any other manufacturer of bucket tooth systems in the premium segment of the market to obtain the rights to use their proprietary systems for Deere's TK Series System products. Even if Deere had decided to license-in another manufacturer's proprietary bucket tooth system, there is no indication that the royalties for such a license would be any less than the reasonable royalties I calculate in this matter.

### 2.      "Dr. Varner incorrectly assumes that ESCO would have obtained `but-for' sales in the same manner as the actual market."'

55.     Dr. Becker states that "[t]he foundation of Dr. Varner's argument to get to that point, namely that Deere had no acceptable non-infringing alternatives, is contradicted by the very fact that literally every other player in the market that Dr. Varner is considering — including ESCO — is not using the Patents-in-Suit.   Thus, it cannot be the case, as Dr. Varner assumes, that the

---

[82]  *Becker Expert Report,* 2/8/23, ¶ 280, p. 81.

*83 Becker Expert Report,* 2/8/23, ¶¶ 282-94, pp. 82-86.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. N
PAGE 159

Patents-in-Suit are necessary or even important for the success of a product in this particular market."[84]

56.     Dr. Becker misrepresents my report.   I did not assume the Patents-in-Suit are necessary for a successful product; my report states that the Patents-in-Suit enable features that consumers demand in the premium segment of the market for bucket tooth systems, that there are alternatives  in  that  market,  and that I account for those alternatives in my market share apportionment analysis in calculating lost profit damages (see *Varner Expert Report,* Exhibit 6 Market Share Analysis).

57.     Dr.  Becker states, "Based on my discussion, I understand that Mr. Budan's reference ███ was not an estimate of the TK Series overall market share but was Mr. Budan's estimate of the portion of the Deere `machine population' that is being served with TK Series products.   Stated another way, Mr. Budan estimated that Deere is capturing ███ of the "market" for teeth on its own Deere machines.   Since Deere equipment (such as excavators and loaders) represent less than 100% of their respective markets, it must follow that the TK Series share of the overall market ████████████████████."[85]

58.     ESCO's lost profits relate to Deere's sale of TK Series  Systems on Deere equipment, and according to Mr. Budan, Deere ███ market share of those sales. My market share analysis is based on "Mr. Budan's estimate of the portion of the Deere `machine population' that is being served with TK Series products,"[86] *i.e.,* ███ of the Deere "machine population." The remaining ███ of those sales are divided among the other manufacturers of premium bucket tooth

---

[84] *Becker Expert Report,* 2/8/23, ¶ 282, p. 82.

*85 Becker Expert Report,* 2/8/23, ¶ 286, p. 83.

[86] *Becker Expert Report,* 2/8/23, ¶ 286, p. 83.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. N
PAGE 160

systems based on testimony and documents produced by both parties, and that is the analysis I perform in Exhibit 6 of *Varner Expert Report.*

59. Mr. Budan's statement that Deere █████ share of the bucket tooth systems that Deere sells on its products to dealers is corroborated with a breakdown of tooth systems summarized in a Deere document.[87]   This documents shows that Deere's TK Series System sales comprise ███████████ share of bucket tooth systems Deere sells on its products. Using this table as a basis for a market share apportionment results ████████ share apportionment to ESCO Ultralok (see Exhibit R6 in this reply report).  This value of ██████████████ I used as a basis to calculate lost profits in *Varner Expert Report.*  If the █████ value is used for the market share apportionment analysis, then the lost profits damages are ███████████████ ██████ shown in *Varner Expert Report.*

### 3. "Dr. Varner's `lost profit on future lost sales' is speculative."'

60. Dr. Becker comments on my future lost profits damages analysis, but does not take objection with my methodology for calculating future lost profits, that is, there would be future sales of TK Series System components on the remaining stock of TK Series System adapters on buckets.   Dr. Becker only restates his opinion that there would not be any lost profits because Deere would have stayed in the market with a non-infringing alternative.  If the Court finds that ESCO is entitled to lost profits, then Dr. Becker has offered no criticism to my calculation of future lost profits.

---

[87]  "John Deere, TK Teeth Summary," dated 2018, DEERE_0005175 at 179.

88 *Becker Expert Report,* 2/8/23, ¶¶ 295-296, pp. 86-87.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. N
PAGE 161

# EXHIBIT O

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ESCO GROUP LLC,                    )
                                   )
            Plaintiff,             )
                                   )   C.A. No. 1:20-1679-WCB
v.                                 )
                                   )
DEERE & COMPANY,                   )
                                   )
            Defendant.             )

**REPLY EXPERT REPORT OF HEZEKIAH HOLLAND
REGARDING INFRINGEMENT**

DATED: March 3, 2023

example) be carried by ***both*** the top and bottom stabilizing surfaces ***and*** the side stabilizing surfaces.

33.    Separately, as it relates to ESCO's GeoVor and Nemisys systems, I am unaware of any analysis performed by Dr. Klopp of those systems.  I see no basis for Dr. Klopp's opinion relating to the gaps or fitments of ESCO's products.

34.    Perhaps the most important evidence contradicting Dr. Klopp's opinions concerning the functionality of the TK System are numerous Deere and Black Cat documents that establish that contact and load bearing ***does*** occur on the side surfaces of the TK System, documents which I cite throughout my opening report. *See* Holland Op. Report, Appx. A–B.  It is surprising that Dr. Klopp would criticize my analysis and repeatedly opine that the side stabilizing surfaces of the TK System do not bear loads when his opinion is disproven by statements in Deere and Black Cat documents.  In fact, I see nothing in Dr. Klopp's report attempting to explain why those documents do not show that load bearing is provided by the side stabilizing surfaces of the TK System.

35.    ***Fifth***, Dr. Klopp faults my reliance on several aspects of Mr. Panapa's 3D scans, including his planar and gap analysis.  To start, it is common in the industry for engineers of wear parts to rely on the expertise of scanning and dimensional specialists like Mr. Panapa.  In working with Mr. Panapa, I confirmed with him that the methods he used to scan the subject components and create the

DEERE EX. O
PAGE 164

planar and gap analysis was consistent with industry standards and sound engineering principles.  I understand that Mr. Panapa is separately submitting a reply report to address Dr. Klopp's criticisms regarding the methodology underlying his planar and gap analysis.

## VI.    THE TK SYSTEM INFRINGES THE ASSERTED CLAIMS

36.     Dr. Klopp opines that the TK System does not infringe the Asserted Claims, either directly or indirectly.  I disagree with Dr. Klopp's opinions.

37.     Before addressing the limitations of the Asserted Claims, Dr. Klopp writes that my report fails to show that Deere induces others to infringe the Asserted Claims based on my "opinion seem[ing] to suggest that Mr. Holland has knowledge of Deere's state of mind." Klopp Reb. ¶ 60.  According to Dr. Klopp, my opinion also "seems to be a legal opinion rather than an engineering opinion, and is, therefore, in my view, outside his expertise and the purview of a technical expert." *Id.*  Dr. Klopp is mistaken, and I, as a POSITA, do not believe that it is within Dr. Klopp's technical purview to determine what is a "legal opinion" and what relates to "Deere's state of mind."

38.     Nevertheless, as I noted in my opening report, Deere has admitted that it was aware of the '662 Patent since at least December 20, 2020 and the '175 Patent since at least April 7, 2021.  Further, Deere has continued to sell components of the TK System while providing instructions to its customers of how to infringe the

16

76.     Dr. Klopp further states that the TK System does not infringe claim 4 of the '175 Patent because the term "'substantially parallel' is not described with sufficient clarity.  Klopp Reb. ¶¶ 152–153.  Dr. Klopp continues by contending that "Mr. Holland's own data show that the base side surfaces are substantially non-planar" and I "force[] a planar fit to selected side surface points." *Id.* ¶ 154.   I disagree with Dr. Klopp.  First, the Court has already determined that this claim term is not indefinite, and it appears that Dr. Klopp simply repeats the arguments that Deere already made during claim construction proceedings.  Second, as noted above, there is no error in my "own data," much less anything that shows that the TK System surfaces are "substantially non-planar."  To the contrary, my fitment analysis shows that the TK System has "side surfaces" at angles that meet those described in the '175 Patent.

77.     Dr. Klopp then takes issue with my analysis of "claim limitation 4.10" under the doctrine of equivalents because, according to Dr. Klopp, the side surfaces of the TK System "cannot resist vertical loads" and thereby do not "provide the same function and result as the claimed surfaces in the '175 Patent." Klopp Reb. ¶¶ 156–157.  However, as I describe above and in my opening report, the side surfaces of the TK System *do* resist vertical loads, and Dr. Klopp is incorrect in assuming otherwise.  In fact, I note that Dr. Klopp has offered no analysis of his own to show that there is no vertical load bearing by the TK System's side surfaces, and his theory

36

## IX.   COMPENSATION AND PRIOR TESTIMONY

104.   I am being compensated for my work as an expert with respect to this litigation at my customary hourly rate of $295/hr.   My compensation is not contingent and does not depend upon the content of my opinions or the outcome of this case.

105.   I have not testified as an expert at trial or by deposition in the previous four years.

DATED:  March 3, 2023

_____

HEZEKIAH HOLLAND

DEERE EX. O
PAGE 167

# EXHIBIT P

DEERE EX. P

PAGE 168

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ESCO GROUP LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 1:20-cv-01679-RGA |
| v. | ) | |
| | ) | |
| DEERE & COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**Reply Report of Tiso Panapa**

**A.     Introduction**

1.     I have reviewed the February 8, 2023 rebuttal report of Richard Klopp, which was submitted on behalf of Deere & Company.  In the report, Dr. Klopp criticized several aspects of the 3D scanning undertaken in this case, including the gap and planar analyses I created.  As explained below, I disagree with Dr. Klopp's opinions. Dr. Klopp's criticisms are not well founded, and I note that he did not perform any of his own scanning.

2.     My qualifications and CV are provided with my initial expert report, and I incorporate those by reference here.

**B.     Planar Analysis**

3.     Dr. Klopp had several criticisms of the planar analysis I created.  For example, Dr. Klopp stated that I "fail[ed] to disclose the fitting method, which could be a least-squares method as one possibility among many, any one of which could result in identification of a different fitted plain."  Klopp Rpt. ¶ 51.  He also criticized the planar analysis because it appeared to him that "less planar areas [] more strongly influence the resultant choice of plane fitted to the data, meaning that the fitted planes captured the non-planar features more than the planar features." Id. ¶ 52.  I disagree with Dr. Klopp's criticisms.   The planar analysis in question was performed consistent with industry standards and sound engineering principles.  In doing the analysis, I used industry standard software tools that I routinely use as part of my daily responsibilities as the Team Lead, Dimensional Gaging Engineering.[1]

---

[1] I also note that Dr. Klopp could have conducted the same analysis I performed to confirm my results, but did not.  For example, with my initial report I provided to Deere the raw scan files I utilized to calculate the best-fit planes.  Dr. Klopp, like me, could have used those scans to calculate

4.      First, regarding fit method, planes in this case were measured using built-in functions in the Polyworks software designed for extracting features from scan data without CAD models.  This is necessary because 3D scans reflect as-manufactured products that will have manufacturing variations across their surfaces, whereas CAD models typically contain nominal design features.  In other words, the goal of using this functionality in Polyworks was to create a best fit plane for a real-world product that takes into account surface variations inherent in the manufacturing process of cast metal wear parts.  Polyworks is routinely used for this purpose both at ESCO and within the wear part industry.

5.      With this plane measuring function in Polyworks, a user selects one or multiple zones of points that the software then uses to find connected data points that correspond to a specified shape (in this case a plane) by analyzing the surrounding data coordinates and surface curvature, resulting in data points matching the specified shape, which is then best fit via a standard least squares calculation to the found data points.  An example of this process as it was applied to the TK225 product in this case is shown below:



Figure 1 - Mid process of extracting planes from the TK225 nose using built in Polyworks function. Dark green shows points in areas selected by me via circle selector, and the light green points and resulting plane is calculated by Polyworks from analyzing the data points and curvature surrounding the dark green selected points. Optional filters can be applied. This example is showing a plane that was fit and then is refit after filtering out data points that deviated from the

---

his own best-fit planes to confirm that the planes I calculated accurately reflect the scan data.  It appears he did not do so.

DEERE EX. P
PAGE 170

plane beyond 2.5 standard deviations. The filtering and refitting, which I applied here, helps to reduce or eliminate the effects of defects and anomalies in scan data.

6.  In the function shown in the above figure, which was utilized when scanning the samples in this case in creating best fit planes, the software finds connecting data points that also fit the specified shape (i.e. a plane) next to the user defined areas; this can result in a measured plane extending farther beyond the original selected areas. While creating these planes, the software previews the resulting plane calculation visually (as shown in above figure) and provides max deviations and standard deviations statistics which I reviewed to confirm they were consistent with other plane measurements and common sand casting part deviations.

7.  Dr. Klopp criticized some of the side surface planes because they did not extend from the front of the nose to the rear lock area, and because he could not discern the "goodness of fit." Id. ¶¶ 52, 113. Contrary to Dr. Klopp's assertions, the planar analysis in my original report did accurately reflect the relevant planes, and the "goodness of fit" was apparent. Nonetheless, new measurements were taken on all side surface planes in which I extend the measurement from the front of the nose to behind the lock hole. Those planes are provided below. These new refined measurements also had the data points subsampled at 1mm to further reduce any effect of defects and anomalies (see later figure for an example of subsampling on plane 5). These results confirm that the originally calculated planes accurately represented the as-manufactured parts that were scanned.

DEERE EX. P
PAGE 171



Figure 2 - TK225 with new refined planes values, all extending full length of sides to behind the lock.

4

DEERE EX. P
PAGE 172



Figure 3 - TK400 with new refined planes values, all extending full length of sides to behind the lock.



5

DEERE EX. P
PAGE 173

Figure 4 - TK450 with new refined planes values, all extending full length of sides to behind the lock.

8.    Second, regarding the point density of points used to measure the planes, a normal result of the data meshing and combination of scans into a final single polygonal model is that more curved areas may have more data points than flat areas to more accurately represent the surface with less aliasing. Near the edges of any feature as it transitions to another feature there are often blends that have more data points, but this is also true around any surface imperfections such as are common in castings. Blends and surface imperfections can go up and down throughout a feature (somewhat cancelling out), and more data does not necessarily mean that deviations from a nominal CAD surface are significantly higher. A review of the feature deviations and standard deviations, as well as looking for patterns or irregularities in the color maps, are often used to assess the need for additional filtering and datapoint scrutiny. In this case I deemed it unnecessary to add additional filtering. I reached this conclusion based on my experience conducting this type of analysis over the course of my career at ESCO.  This conclusion is also consistent with sound engineering principles and industry standards.

9.    Although it was not necessary in this case to illustrate what effect filtering can have, I reopened the project and created a new version of plane 5, but with subsampling to more evenly spread out the data points; this new plane is called 'plane 5 subsampled'. You can compare the planes and see the distance between the subsampled and original plane 5 is only 0.028mm. The resulting planes from each approach (i.e., filtering data points v. using data points collected from the original scan) is not material, and confirms that adding such filtering was not necessary here.

DEERE EX. P
PAGE 174



Figure 5 - showing a subsampled version of plane 5 compared to the original plane 5.

## C.  Longitudinal Axis

10.   Dr. Klopp had several criticisms of how I calculated the x, y, and z planes for the 3D models, including the longitudinal axis.  For example, Dr. Klopp criticized calculation of the longitudinal axis because it purportedly "violates the precept that the axes in a Cartesian coordinate system . . . must be orthogonal."  Klopp Rpt. ¶ 53.  Dr. Klopp also opined that "it appears that [Mr. Holland] force-fit a best-fit plane with a constraint that it be perpendicular to the longitudinal axis defined from the X and Z axes."  Id ¶ 57.  Dr. Klopp's criticisms have no merit.  Similar to creating best-fit planes, calculation of the x, y, and z planes and longitudinal axis for the 3D scans in this case was done consistent with industry standards and sound engineering principles.  In doing the analysis, I used industry standard software tools that I routinely use as part of my daily responsibilities as the Team Lead, Dimensional Gaging Engineering.[2]

---

[2] Dr. Klopp again appears to have not used the 3D scans I provided Deere to calculate his own planes or the longitudinal axis.

DEERE EX. P
PAGE 175

11.    Contrary to Dr. Klopp's observations, naming the planes 'plane x', 'plane y', and 'plane z' *does* correctly imply these features are related to the rectangular Cartesian coordinate system.  Dr. Klopp's statement in ¶ 53 of his report makes incorrect assumptions about how these planes were used to align the coordinate system. The axes were aligned in a level-rotate-translate (sometimes called "3-2-1") order of aligning the planes.  This process, which is common in metrology, entails (1) leveling and translating z axis = 0 plane to plane z, (2) rotating about z axis and translating in x axis to fit the plane x/plane z intersection line to be at x=0, and (3) translating the plane x/plane y/plane z intersection point along the y axis to y = 0 point.  Observing the xyz coordinates and angles of plane x, plane y, and plane z can confirm this (see plane z has centroid at z=0 and angles (X,Y,Z) being perfect (90, 90, 0) and plane X is orthogonal to Y axes with Y angle = 90). Most importantly, the Y angles of plane z and plane x are both 90 degrees, showing that the Y axis travels right down the intersection of plane z and plane x, which are the mid planes of top/bottom surfaces and angled side surfaces respectively.



12.    Further verification of this alignment can be seen in the top, bottom, and side planes as shown in the relative vertical and horizontal symmetry of key xyz centroid values and xyz angles of these planes, planes 2-7, seen in the figure below.

DEERE EX. P
PAGE 176



## D.    Gap Analysis

Dr. Klopp refers to "skewing" the TK450 data to the left in his ¶ 42, specifically noting that there are different gap values and possible contact points compared to the TK400.  To start, I did not "skew" any products during the scanning process.  Different pieces and samples will naturally vary depending on manufacturing process controls, and some parts, even of the same part size, will have variation in their gaps.  These unavoidable deviations caused by the manufacturing process results in pieces that fit together in ways that cannot be accounted for by their nominal designs.  For example, the TK 450 was not skewed, and any asymmetry noted by Dr. Klopp is the result of the manufacturing process.  In fact, it was noted that there was a large defect to the front of the nose on the positive X side (see where color map turns to grey because the gap is beyond the color scale).

DEERE EX. P
PAGE 177



Figure 7 - TK450 in top load, front view. Note manufacturing defect on left front side of this view.

13. Dr. Klopp also pointed out several examples of localized "interpenetration" that he claims is physically "impossible" in the real world, and he highlighted several examples. Dr. Klopp's criticism is misplaced, and fails to recognize that the tools utilized to create a gap analysis cannot perfectly re-create the as-manufactured product; instead, those tools seek to re-create components in digital form so that they can be analyzed. In doing so, the final digital scan file will not perfectly match the real world product. This is well understood in the industry.

14. For example, in the type of analysis conducted here, some amount of "interpenetration" is expected, due to the expectation of real world contact where clearance would be "0.00mm" and combined with physical limitations on scanner accuracy (sub .002" or ~0.050mm). Moreover, when combining two to three mating scans, the scanner accuracy limitations compound and can result in reported intersectionality of 0.005" (or about 0.127mm) from scanner accuracy limitations alone. This amounts to approximately the thickness of a human hair.

15. The various clearance colormaps produced in this case typically show minimum gaps ranging from +0.111mm (not "interpenetration") to -0.163mm (slight "interpenetration"). As discussed above, those values are generally within the error band to be expected when scanning these types of components. Dr. Klopp points out three examples, however, where there was additional, localized "interpenetration." But the presence of this "interpenetration" in those scans does not alter the validity of the gap analysis. For example, based on my years of experience and industry standards it is common when utilizing Polyworks software and Romer scanning tools to create a gap analysis where there is overlap between components, and sometimes there is localized overlap between components that exceeds the scanner accuracy limitations of approximately 0.127mm. The presence

10

DEERE EX. P
PAGE 178

of such localized areas of overlap does not reduce the validity of an overall scan or its usefulness in drawing engineering conclusions.

16.     To demonstrate that Dr. Klopp's criticisms were misplaced, I reanalyzed the two largest examples of "interpenetration" to show that such "interpenetration" had no material impact on the analysis that was conducted here (the TK400 top load with ~0.6mm intersectionality and TK225 side load no pin with ~0.4mm intersectionality). The assembly scan data that were used to align the mating parts together was carefully reviewed for any scan noise; having found some between mating parts, this data was removed. Next the fitting algorithm to fit the nose adapter to the assembly scan and the mating point scan to the assembly scan had its parameters iteratively fine-tuned to further reduce the ability of any scan noise that was not found (subsampling was changed from default 1/4 to 100%, fitting max distance reduced from default 4.0mm to 0.2 or 0.25mm, max angle reduced from default 45degrees to 20degrees). In the below figures the results show the original alignment colormap and this new refined alignment colormap. It can be seen that the "interpenetration" was removed and that the resulting colormaps provide the same material results: the points of contact and gaps are consistent between both colormaps.



Figure 8 - Top view of TK400 top load clearance showing original (left) and refined (right) alignment to remove intersectionality.

11



Figure 9 - Bottom view of TK400 top load clearance showing original (left) and refined (right) alignment to remove intersectionality.



Figure 10 - Top view of TK225 side load no pin- clearance showing original (left) and refined (right) alignment to remove intersectionality.



Figure 11 - Bottom view of TK225 side load no pin- clearance showing original (left) and refined (right) alignment to remove intersectionality.

12

DEERE EX. P
PAGE 180

**EXECUTED ON MARCH 3, 2023.**

**TISO PANAPA**

13

DEERE EX. P
PAGE 181

# EXHIBIT Q

Page 1

1             IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF DELAWARE

3

4

5    ESCO GROUP LLC,                    )

6                      Plaintiff,      )

7         VS.                          )   NO. 20-1679-WCB-MPT

8    DEERE & COMPANY,                   )

9                      Defendant.      )

10   _____)

11

12

13   VIDEOCONFERENCE DEPOSITION OF:

14                 THOMAS VARNER, PH.D.

15                 MONDAY, MARCH 13, 2023

16                 9:01 A.M.

17

18

19

20   REPORTED BY:

21                 Sari M. Knudsen

22                 CSR No. 13109

23

24

25

Page 9

```
 1   sounding a little better.
 2        THE VIDEOGRAPHER:  We are off the record at
 3   9:05 A.M.
 4             (Whereupon a recess was taken)
 5        THE VIDEOGRAPHER:  We are back on the record at
 6   9:09 A.M.
 7   BY MS. RODMAN:
 8        Q    Okay.  Dr. Varner, you were telling me
 9   about the documents that you have there in front of
10   you.  And you said you have a binder with both of
11   your reports and then a binder with Dr. Becker's
12   report.  And then you said you have a -- your list
13   of additional materials that you considered since
14   your first report.  Is that correct?
15        A    No.  It's not additional materials since
16   the second report.
17        Q    Okay.
18        A    When the second report was submitted, that
19   included an appendix that had documents considered,
20   and that was updated as of the date of the second
21   report.
22        Q    Okay.  So your list is things that you have
23   considered since your second report?
24        A    Correct.
25        Q    So the reports that you have in front of
```

Page 10

1    you, your two reports, you have all of the exhibits

2    to those reports in your binders as well?

3        A    Yes.  It's the entire submittal.

4        Q    Okay.  So all of the exhibits and the

5    appendices.  Is that correct?

6        A    Correct.

7        Q    Okay.  And then for Dr. Becker's report, do

8    you also have all of his exhibits and appendices?

9        A    I believe I do.

10       Q    Okay.

11       A    Yes, I do.

12       Q    Okay.  So the list of additional materials

13   that you considered since your second report, what

14   is on that list?

15       A    So there are about ten things here.

16            So I notice that Dr. Becker has a few

17   additional depositions that I -- I hadn't seen yet.

18   So that would be the deposition of Beeler Keiser,

19   K-E-I-S-E-R, and John Anderton, A-N-D-E-R-T-O-N,

20   and John Ruvang, R-U-V-A-N-G.

21            And then I also received the rough

22   transcript of Mr. Holland and rough transcript of

23   the deposition of Dr. Becker and a rough transcript

24   of the deposition of Dr. Klopp, K-L-O-P-P.

25            And then I also received Mr. Holland's

Page 11

1   reply infringement report and the reply report of

2   Mr. Panapa, P-A-N-A-P-A.  And then the investigative

3   report of -- I don't know if it's Dr. or

4   Mr. Umberger, U-M-B-E-R-G-E-R, and the reply report

5   of -- I believe it's Dr. Klopp.

6           And then the last thing is I looked at

7   Deere's 10Q SEC filing for quarter one, fiscal year

8   2023.  That's it.

9      Q   Okay.  So all of the documents on this list

10  were documents that you had not reviewed prior to

11  submitting your second report?

12     A   Correct.

13     Q   So you did not review them for your first

14  report.  Correct?

15     A   Correct.

16     Q   And you did not review them for your second

17  report?

18     A   I think that's the first question you

19  asked.  That is correct.

20     Q   Did you ask for these additional documents?

21     A   Yes.

22     Q   All right.  And I should have been more

23  precise.

24          After you submitted your second report, did

25  you ask for these additional documents?

Page 142

1  up.

2          But there was -- one of the Deere deponents

3  talked about it's going to take ten months to bring

4  a product to market once it decides.

5          So if, in fact, Deere decided about the

6  time of Dr. Becker's report, that would be ten

7  months from then.  So it would be after the trial.

8          So for purposes of this analysis, I just

9  said, well, let's just go to the end of the year

10  just for convenience.  It's conservative.

11          (Whereupon the reporter asked for

12          clarification)

13      MS. RODMAN:  That's okay.  I should have noted

14  that we were on the second page of that exhibit.

15      Q    Okay.  So for purposes of your lost profits

16  analysis, you assumed that ESCO would have been able

17  to make sales of its Ultralok product at the same

18  rate as its market share in the premium segment.

19  Correct?

20      A    Oh, that was confusing.  I didn't

21  understand.

22      Q    It was confusing.  And as I was saying it,

23  I was realizing it was confusing.  So let me try

24  that again.

25          So for your lost profits opinion, you

Page 143

1    assumed that --

2         A    Wait a minute.  Are you talking about past

3    lost profits or the future lost profits?

4         Q    I'm sorry.  I'm talking about past lost

5    profits.

6         A    Okay.

7         Q    So we can ignore Exhibit 8.3 to your

8    opening report.

9         A    Okay.  Got it.

10        Q    Starting fresh.

11             For your lost profits opinion, you assumed

12   that the infringing TK sales would have gone to the

13   ESCO Ultralok product at the same rate as ESCO's

14   share of the premium segment of the market.

15   Correct?

16        A    I think so.  And the calculation is spelled

17   out in my Exhibit 6.  But I think you are describing

18   correctly unless I missed something.

19        Q    So you assumed that the Ultralok product

20   would be acceptable to purchasers of TK as an

21   alternative.  Correct?

22        A    I didn't just assume it.  It's based on the

23   testimony from Deere and ESCO saying that these are

24   competing products or substitutes.  And also the

25   documents from both Deere and ESCO talking about

Page 144

1   which products compete with their own products.

2           So it wasn't an assumption.  It was, I

3   guess you call it, a presumption based on the

4   testimony and documents.

5       Q    Okay.  So that was my next question was

6   what was the basis of that.  And we can call it a

7   presumption.

8           So the basis of your presumption that the

9   Ultralok product would have been acceptable to TK

10  purchasers was that Ultralok was a competing product

11  in the market?

12      A    In the premium segment of the bucket tooth

13  market for construction of expendables in the U.S.

14      Q    So because Ultralok is a competitor in the

15  premium segment of the market for bucket expendables

16  in the U.S., that to you necessarily means that

17  Ultralok would be acceptable to TK customers?

18      A    Yes.

19      Q    Did you have any conversations with anyone

20  to determine whether Ultralok would be acceptable to

21  TK customers?

22      A    In my conversations with ESCO, I talked

23  about what they viewed as competing products to

24  the -- the Ultralok and that those conversations --

25  again, they are documented in my report.  But they

Page 148

1      A     Correct.

2      Q     Do you have an understanding of why they

3  the purchasers of TK chose to purchase the TK

4  instead of the Ultralok for a different tooth

5  system?

6      A     Well, there could have been many reasons.

7            We know that both ESCO and Deere feel that

8  these are competing products.  So it -- it's

9  probably logical to think that consumers would view

10  these as competing products.

11           And there may be on an individual case

12  specific reasons for purchasing one versus the

13  other.  The shapes are a little bit different.

14  There's some slight variety or differences in the

15  actual tooth exterior shapes.  And perhaps there's

16  some reason why one would favor the other.

17     Q     Did you consider those reasons why a

18  consumer might favor -- sorry.  Strike that.

19           Did you consider the reasons why a consumer

20  might choose not to purchase the Ultralok tooth in

21  considering lost profits in this case?

22     A     I looked at overall market shares.  I

23  looked at testimony on documents stating that these

24  are viewed as competing products.  And then I looked

25  at the actual market shares.  That's how I did my

Page 149

1   analysis.

2       Q    The market shares reflect the actual rates

3   at which customers purchased Ultralok with TK in --

4   sorry.  That's a horrible question.  Let's just

5   strike that and move on.  We'll come at that in a

6   different way that isn't a bad question.

7           Let's talk about market share.

8           So your calculation of lost profits in this

9   case is set forth in your Exhibit 8.1 to your

10  report.  Correct?

11      A    So I do use market share -- market shares

12  in Exhibit 8.1.  But the -- I thought your question

13  was asking where do you calculate market shares.

14  And that's in Exhibit 6.  So maybe I just

15  misunderstood the question.

16      Q    We're getting to the same place.

17          My question was that you calculated your

18  lost profits in Exhibit 8.1.

19      A    No.

20      Q    But my follow-up --

21      A    No.  I calculated --

22      Q    No.  You --

23      A    -- lost sales in 8.1.  I calculated lost

24  profits in 8.2.

25      Q    Fair.

```
                                        Page 150

 1          So you calculated lost sales in 8.1.
 2    Correct?
 3       A    Right.
 4       Q    And as part of that calculation of lost
 5    sales, you relied upon your market share analysis in
 6    Exhibit 6 to your report.  Correct?
 7       A    That's correct.
 8       Q    So can we look at Exhibit 6 to your report?
 9          All right.  So in Exhibit 6 to your report,
10    you determined that ESCO ███████████ of the
11    market.  Correct?
12       A    Of the premium segment of this market.  So
13    this is a very conservative calculation.
14       Q    Okay.  So we're looking here at the premium
15    segment of the construction expendable market in the
16    U.S.  Correct?
17       A    For bucket teeth, yes.
18       Q    Bucket teeth.
19          And you determined that ESCO ████████████
20    of that market.  Correct?
21       A    Correct.
22       Q    And you determined that from testimony of
23    Adam Stitzel?
24          Which is, for the court reporter,
25    S-T-I-T-Z-E-L.  You can see the exhibit.  It's on
```

Page 151

1   there.

2           You determined that from the testimony of

3   Adam Stitzel.  Correct?

4       A    In part.

5           The other part comes from ESCO documents

6   talking about their overall -- ESCO's overall share

7   of the North American market for construction

8   expendables.

9       Q    So you looked at Mr. Stitzel's testimony,

10  and you looked at ESCO documents talking about its

11  market share --

12      A    Correct.

13      Q    -- for North American expendables?

14      A    That's right.  Correct.

15      Q    And based upon those sources, you

16  determined that ESCO -- ESCO's share of the premium

17  market for bucket expendables in the U.S. ███

    ███████████?

19      A    Correct.

20      Q    And then you also determined that Deere's

21  share of that market ████████████.  Correct?

22      A    Based on Deere's testimony.

23      Q    Based on the testimony of Mr. Budan.

24  Correct?

25      A    Correct.

1  confusing, and I went back and looked at one of the

2  Deere documents that actually has a breakout of

3  percentages and -- don't remember the exact number.

4  May have been ████████████ for Deere.  But that is

5  for all of the tooth systems on Deere's equipment.

6          So I -- I think this really is

7  conservative, ████████████ for the premium

8  segment.  I really think it should be higher.  But

9  this is the one I went with.  It's the most

10 conservative.

11    Q    Okay.  So your testimony, as you sit here

12 today, is you believe Deere has ███████████████████

13 of the premium segment of the U.S. bucket

14 expendables market?

15    A    That's my belief.  But I went ahead with

16 this calculation as it is.

17    Q    What is that belief based on?

18    A    Well, it's based on the fact that the

19 premium segment is a subset of the total market for

20 bucket tooth systems.  At least according to

21 Mr. Stitzel.  That's ██████████████ the -- the

22 premium segment is ███████████████ the total market.

23          So you -- again, you could interpret ████

████   ███████████ as being just the premium segment.  Maybe

25 that's what Mr. Budan was talking about.  Or he

Page 156

1  could have been talking about all the components

2  that are put on Deere's equipment.

3          I took the lower estimate, which results in

4  a lower apportionment.

5      Q    The ESCO ████████ that you have in

6  Exhibit 6 is ESCO's percentage of the premium

7  segments of the construction expendables market.

8  Correct?

9      A    No.  It's ESCO's Ultralok percentage.  And

10  that's -- I explain that in one there.

11     Q    That's what I meant.  Thank you for that

12  clarification.

13          So ████████████ in Exhibit 6 is

14  representing Ultralok's share of the premium

15  market -- premium segment U.S. market for

16  construction expendables.  Correct?

17     A    Correct.

18     Q    So your understanding is that Deere's

19  TK Series share of the premium segment of the U.S.

20  market for construction expendables is ████████

████  ████████ the Ultralok share?

22     A    ████████████

23     Q    And you base that on Mr. Budan's testimony?

24     A    I based it on everything I just talked

25  about.

Page 157

1     Q     So ███████████     for Ultralok, you relied

2   on Mr. Stitzel.  Correct?

3     A     It's Mr. Stitzel and also the -- the ESCO

4   documents that talk about market share.  There are

5   many, many presentations that talk about just what

6   their percentage is.

7     Q     And you read Mr. Stitzel's deposition?

8     A     Yes.

9     Q     And you are aware that Mr. Stitzel

10  testified that ESCO believed Deere's share of the

11  premium segment of the U.S. market for construction

12  expendables to be ███████████?

13    A     Could you repeat that?

14    Q     You are aware that Mr. Stitzel testified on

15  behalf of ESCO that ESCO believed Deere's share of

16  the premium segment of the U.S. construction

17  expendables market ███████████████?

18    A     I don't recall that.

19    Q     If he did testify to that, would you credit

20  that testimony?

21    A     I'd have to see it.

22    Q     You assumed he was correct about ████

      ███████████?

24    A     Yes, and ███████████.

25    Q     So if he testified that Deere's share was

Page 161

1     Q   ██████████████████████████████████

██████████████████████████████████████████

████   how do you come to the conclusion that they

4   have ███████████████████████████

5     A   Well, the reason is that for purposes of

6   this analysis, we're looking at people who purchased

7   TK Series products.  We are not looking at the

8   overall market share.  We are looking at those

9   people who purchased TK Series products.

10        And so --

11    Q   All right.

12    A   -- people are not purchasing TK Series --

13  what that means is that people are purchasing the

14  TK Series products in a different proportion than

15  the overall population.

16        But for purposes of the market share

17  analysis, we want to know who is getting the market

18  shares of the TK Series products for people who

19  purchased the TK Series products.

20        And the most reliable way to do that is to

21  look at ████████████ estimate that Mr. Budan

22  gained.  That would mean ███████████ of the market is

23  split among other people, one of which is Ultralok.

24    Q   All right.  We'll talk about the market for

25  specifically Deere machines in a minute.

**DEERE EX. Q**

**PAGE 197**

Page 162

1        But right now, looking at your Exhibit 6,
2   your Exhibit 6 purports to identify the market share
3   of the entire premium segment of the U.S.
4   construction expendables market.  Correct?
5        A    That's what I'm trying to estimate here.
6        Q    So Exhibit 6 --
7        A    Again, counsel, the whole exercise here is
8   who would be purchasing the products that -- who
9   would be purchasing the TK Series products if they
10  were not in the market.  And the most accurate way
11  of looking at that is to say, well, okay.  How many
12  TK Series products were purchased and how large was
13  the size of that market.
14        And Mr. Budan said, well, we've got
15  ██████████.  So that means ███████████ is left over
16  from other people.
17        And so the whole point of this exercise is
18  to come up with an estimate between the Ultralok and
19  the other people.  And that's --
20        Q    Again, we'll get to --
21        A    That's reflected here.  It's also reflected
22  in the Deere document talking about how many bucket
23  teeth are sold on their equipment.
24        Q    We'll talk about the market that is the
25  Deere machines in a minute.  Okay?  Right now I want

Page 163

1    to talk about your Exhibit 6.

2        A    Yes.

3             (Whereupon the reporter asked for

4             clarification)

5    BY MS. RODMAN:

6        Q    Looking at Exhibit 6 -- your Exhibit 6 and

7    only your Exhibit 6 -- your Exhibit 6 purports to

8    tell me what the share -- what each -- so Deere,

9    ESCO and then other, what the shares are of the

10   entire premium segment of the U.S. construction

11   expendables market.  Correct?

12       A    Well, as I said, the exercise is how do you

13   split up people who purchased the Deere TK Series

14   product.  And Mr. Budan was very -- well, maybe he

15   wasn't so clear.  But he said ███████ of their

16   equipment sales include TK Series products.  That's

17   also similar to the Deere document that shows the

18   actual breakdown of what components were sold.

19            Now, I -- I tried to take the most

20   conservative approach as I could.  Perhaps that

21   ███████ really should be ███████ for the

22   construction of the premium segment.  I didn't take

23   that.  I took a lower number.

24            And then I looked at --

25       Q    Dr. Varner?

Page 164

1    A    Excuse me.  This is an important point to

2  make for me.

3         The next question is, well, okay.  How much

4  more does -- for that remaining ███████, which is

5  really -- for the remaining ███████, what portion

6  would Ultralok have.

7         And the best information I had was for the

8  whole market.  Because there are -- well, both Deere

9  and ESCO documents talk about the overall market.

10         But for ESCO's overall share, that is --

11  that's the ███████ and then an adjustment

12  for the Super V in there and then an adjustment to

13  look at just the premium segment.  That's how I

14  arrived at that, these numbers.

15         Again, I could have taken a different tact

16  and said, no.  The ███████ should really be

17  ███████.  Maybe I should have looked at -- at

18  different sources for the ESCO perhaps specific to

19  the Deere equipment.  But I took a more conservative

20  approach meaning resulting in lower damages.

21    Q    Are you done?

22    A    I am.

23    Q    Okay.  I appreciate that response.  But

24  Dr. Varner, if you could answer the question I'm

25  actually asking, I would appreciate it.

Page 165

1          Looking at your Exhibit 6, what market is

2     this market share analysis reflecting?

3          MS. GIROUD:  Objection.  Form.

4          THE WITNESS:  This is attempting to look at the

5     premium segment of the market.  That's what the

6     ████████████  reflects.

7          And I acknowledge that that relates to the

8     overall construction market or, as Mr. Budan is

9     referring to, the Deere TK, referring to the Deere

10    bucket -- I'll call it the Deere bucket equipment

11    market.  But reconciling the two, I took a

12    conservative approach, and it resulted in this.

13    BY MS. RODMAN:

14    Q     Deere does not have ███████████ of the

15    premium segment of the U.S. bucket tooth -- or

16    bucket expendable market.  Correct?

17    A     I'm sure it's much less than that.

18    Q     It's ███████████.  Correct?

19    A     I don't know those numbers off the top of

20    my head.

21    Q     And Mr. Stitzel testified to that.

22    A     Okay.  I would have to see his testimony

23    again.

24    Q     Okay.  And your own sales numbers reflect

25    that Deere would have a ███████████ share of the

Page 166

1    premium segment of the construction expendables

2    market segment.  Correct?

3        A    I don't see where I -- where that

4    calculation is.

5        Q    Well, it's in Dr. Becker's report.

6             Would you like to look at Dr. Becker's

7    report?  Or you could compare your Exhibit 3.1 to

8    your Exhibit 2.1.

9             (Whereupon the reporter asked for

10            clarification)

11       MS. GIROUD:  I said objection.  Form.

12       THE WITNESS:  I'm sorry.  What is the question?

13   BY MS. RODMAN:

14       Q    Looking at -- let's look at your

15   Exhibit 2.1.

16       A    Okay.

17       Q    Actually, let's come at this a different

18   way.

19            Let's look at -- we are going to mark --

20   what we have in our folder as N, as in Nancy, will

21   become Exhibit 5.

22            (Whereupon Defendant's Exhibit 5

23            was marked for identification)

24   BY MS. RODMAN:

25       Q    Let me know when you are able to open

Page 167

1    Exhibit 5, Dr. Varner.

2         A    Okay.  And I also have a hard copy of

3    Dr. Becker's report.

4         Q    Okay.  So you recognize Exhibit 5 as

5    Dr. Becker's rebuttal report in this case --

6    correct? -- with all the exhibits and appendices

7    thereto?

8         A    Looks like it.

9         Q    And you reviewed Dr. Becker's rebuttal

10   report --

11        A    That's right.

12        Q    -- that is represented in Exhibit 5.

13   Correct?

14        A    That's correct.

15        Q    Okay.  If you could please turn to

16   paragraph 292, which is on page 86.

17        A    Okay.

18        Q    Do you see that chart right there at the

19   top that says -- it has time period and then fiscal

20   years ███████████

21             Do you see that?

22        A    I do.

23        Q    Do you -- sorry.  Strike that.

24             Take your time to look at this.

25             But are the numbers reflected in the

DEERE EX. Q

PAGE 203

Page 168

1    Ultralok sales column of this chart accurate?

2        A    I have to check it.

3        Q    Please do.  You can check against your

4    Exhibit 2.5, I guess it is.

5        A    Okay.

6        Q    Okay.  And then the "Dr. Varner's market

7    share of Ultralok, ███████," that is what you

8    determined to be the market share of Ultralok for

9    the premium segment of the U.S. construction

10   expendables market.  Correct?

11       A    Yes.

12       Q    Okay.  And then the accused product net

13   sales in the next column where it says ███████

███████████████████████████████████████

███    ███    -- those numbers are accurate.  Correct?

16       A    They look to be about accurate.

17       Q    So you see here that Dr. Becker concludes

18   that based upon a comparison of the Ultralok sales

19   to the TK sales, the share for TK of the premium

20   segment of the U.S. construction expendables market

21   would be ████████████████████████████

███    ███████████

23       A    There I was just dividing the ███████

███    ███████  Okay.

25       Q    So his calculations there are correct.

Page 169

1    Right?

2         A    Looks like the math is right.  He got the

3    wrong concept though.

4         Q    Okay.  So if Ultralok has ████████ of the

5    premium segment of the construction expendables

6    market, then the TK products have ██████████████

7    of that market.  Correct?

8         A    If these calculations are right.  But it's

9    irrelevant for my damages analysis.

10        Q    No.  I understand that, Dr. Varner.  We'll

11   get to that.

12            Let's go back to your opening report,

13   Exhibit 2.

14        A    Okay.

15        Q    Okay.  And Exhibit 6.

16            (Whereupon Defendants' Exhibit 6

17            was marked for identification)

18   BY MS. RODMAN:

19        Q    So in Exhibit 6, you are comparing ESCO's

20   ████████ of the premium segment of the U.S.

21   construction expendables market with the ████████

22   for the Deere TK Series for the same market.

23        A    No.  So this is what I explained to you

24   before.  So let me go over it again.  It seems to be

25   a confusing point.

Page 170

1          So what we are interested in is how many

2     sales did the -- how many sales were there of the

3     TK Series product and what percentage does that

4     comprise of all of the teeth -- tooth systems put on

5     Deere equipment.  That's the real market we are

6     looking at.

7          Then we go in.  And I went in and said,

8     okay.  It's ████████████.  Deere has ███████████ of

9     that.  That's what Mr. Budan says.  And that's

10    verified by the Deere documents.  It talks about all

11    of the products that it sold.  All of the bucket

12    teeth products that it sold.  So we are talking

13    about the ███████████ that Deere is selling.

14         Now where are those going to go.  If they

15    are not in the market, where does the ███████████ go.

16    It was going to go to the other ███████████.

17         So now I'm trying to figure out, well, what

18    portion of that other ███████████ does ESCO have.

19    Again, I'm being very conservative here and saying,

20    okay.  They are going to have ███████████ of the ██

██    ███████████████████████████  That's where the █████ comes

22    from.

23         The problem with the analysis that you were

24    just talking about, Dr. Becker's analysis, is that

25    it directly contradicts the Deere TK Series

1    ███████████ estimate from Dr. Becker's own client.

2    So it really is a question of mixing apples and

3    oranges here.

4        Q    It is indeed a question of mixing apples

5    and oranges.  But I don't think we agree on

6    precisely how.

7            So where in your opening report --

8    actually, strike that.  We'll...

9            You would agree with me, I think, that if

10   we are looking at Deere's share of the total premium

11   segment of the U.S. construction expendables market,

12   that it is ███████████████.  Correct?

13       A    ██████████████

14       Q    Okay.  All right.  So let's look at -- give

15   me one second.

16           Let's look -- I'm going to mark a new

17   exhibit which is going to be -- what we have as T,

18   as in Tom, will become Exhibit 6.

19           (Whereupon Defendant's Exhibit 6

20           was marked for identification)

21       THE WITNESS:  Okay.

22   BY MS. RODMAN:

23       Q    Okay.  I lost my Exhibit 6.

24           Do you recognize Exhibit 6?

25       A    It's one of the many documents that Deere

1    produced about its TK Series teeth.

2         Q    Okay.  You looked at this document and

3    discuss it in your reply report.  Correct?

4         A    I believe it is.

5              If you go to -- what is that?  The fourth

6    page.  Can you go to the fourth page of that

7    document?

8         Q    Yeah.  Sorry.  I am.  I'm on the fourth

9    page.

10        A    Okay.  Can you go to the next page then.

11        Q    Oh, you are talking about the --

12        A    There we go.

13        Q    There we go.

14             All right.  So what -- what did you

15   determine from this document was relevant to

16   considering your market share analysis?

17        A    We can look at year-to-date sales, and we

18   can see that TK up there.  It says -- well, it

19   doesn't have the percent.  It has percent changed.

20             So the first column that says "year-to-date

21   sales," that would be the third column.  And it has

22   TK -- not sure what the units are here.  But it says

23   "█████."  And then it has ESCO, Hensley and so on.

24        Q    All right.  So you looked at this page to

25   determine Deere's percentage of the market for

DEERE EX. Q
PAGE 208

Page 173

1  replacement parts on -- replacement expendables on

2  Deere equipment.  Correct?

3      A    That's what I understood this -- this to

4  represent.  I'm looking in my report -- my reply

5  report where I discuss it.  There it is.

6          This is paragraph 59.  So here I'm

7  referring to that -- that document we have in front

8  of us here.

9          (Whereupon the reporter asked for

10          clarification)

11     THE WITNESS:  The 5175.  Is that the -- yes,

12  it's the same document.

13          So in my paragraph 59 on page 29 of my

14  reply report, I'm referring to that here.

15  BY MS. RODMAN:

16     Q    Right.  So looking at this document, you

17  determined that Deere had ███████████ of the share of

18  replacement expendables on its own products.

19  Correct?

20     A    Yes.  At least according to this document.

21  And this might relate to just one weight.  But it's

22  still for that.  It's a cross-section across all the

23  other products.

24          And so if you take the ███████ -- and of

25  course, it may be ███████████.  But take that

Page 174

1    number, divide it by the total at the bottom,

2    ██████.  It's ██████████.  So that's within the

3    ballpark of what Mr. Budan testified to about

4    being, okay, ████████ of all of the systems sold

5    on the Deere equipment.  At least that's how I

6    interpreted Mr. Budan's testimony and reconciled

7    that with this document.

8         Q    Looking at Exhibit 6, what share of the

9    market for replacement expendables on Deere

10   equipment does ESCO have?

11        A    It has -- oh, wait.  Okay.

12             So it has ████████████████████.  So

13   whatever that number is.

14        Q    Roughly ████████?

15        A    Yeah.  There we go.  It's roughly

16   ██████████ which is right along the lines of what

17   Adam Stitzel said.  ██████████  So for both, you take

18   off ████████ for Super V, ██████████.  So almost

19   spot on.

20        Q    And if we took TK out of the analysis in

21   Exhibit 6, not your Exhibit 6, but Exhibit 6 to the

22   deposition, this teeth commodity breakdown page,

23   then that would make ESCO's share of this market

24   roughly ████████.  Correct?

25        A    Yes.  But we know that this market is

Page 175

1    segmented.  In fact, TK Ultralok and some of the

2    Hensley are part of the premium segment.  So that is

3    the relevant market that we are interested in.  So

4    if you take that -- what did we just say?  ██ --

5    what was the percentage you gave?  ████████?

6        Q    ██.

7        A    Yeah, you double -- so if you double the --

8    if you look at these numbers, and you say, okay.

9    Let's consider the ESCO, Hensley and the Cat as

10   being part of the premium segment, that would be

11   ████████, which is again what Mr. Stitzel

12   testified to.

13           So if that's the -- the -- the competitors

14   that are selling competing products and you take the

15   ████████ and divide it by ████████ -- because we

16   are only interested in the premium segment -- hence

17   the ████████.  And that -- so this document would

18   reflect ████████.  And my analysis before in

19   Exhibit 6 was at ████████.

20           I think if you actually go through the

21   numbers -- well, in fact, on my page 29 of paragraph

22   59, if you go through those numbers, it's not about

23   ████████.  It's ████████.  And that's a

24   little higher than the ████████ that I actually

25   use.  My number is, in fact, a little more

1   conservative.  But it's very close to Deere's own

2   documents, which is roughly consistent with Mr. --

3   what Mr. Budan said.

4        Q    So your analysis for loss of profits took

5   the Deere's percentage of the market for its own

6   equipment --

7        A    That's the only place they are selling

8   them, as I understand it.  You know, that's the --

9   the testimony is that's where they are only selling

10  it.

11       Q    And you took -- and Deere's percentage of

12  the market for its equipment is ███████████████

13  than its percentage of the entire premium segment of

14  the market.  Correct?

15       A    Correct.  Could be many reasons for that.

16       Q    And then you took ESCO's percentage of the

17  entire premium segment of the market?

18       A    Correct.

19       Q    Which is ██████████████  than its

20  percentage of the market for Deere equipment?

21       A    No.  Oh, well, if you are talking about,

22  you know, all three tiers in this market -- the low,

23  mid and premium -- yes.  Deere's -- ESCO's Ultralok

24  percentage is ██████ if you want to throw in the

25  lower, middle and upper tier.

Page 177

1         But that isn't the market that is viewed as

2    substitutes.  And Dr. Becker agrees that both these

3    products are in the premium segment.  And I agree

4    with it, and the documents agree with it, and the

5    testimony agrees with it.

6        Q    All right.  And you've agreed with me that

7    if you used -- get back to your Exhibit 6.

8         If you used the ███████ of the market --

9    ████████████ of the market for Deere in your

10   calculations, instead of ██████████, you would end

11   up with a much lower lost profit reward.  Correct?

12       A    Mathematically, if you lower the ███████████

13   to something else, it's just math.  It's the wrong

14   analysis.  It's not consistent with what I've done

15   or Dr. Becker has done nor what the exhibits show

16   nor what the documents show.

17       Q    Well, the █████████████ is consistent with

18   what the exhibits show is Deere's share of the

19   premium segment of the U.S. construction expendables

20   market.

21       A    But we don't care about that.  We only care

22   about the actual sales that Deere made.  And they

23   only made sales on their bucket tooth systems -- on

24   their Deere equipment products.  So that's the

25   market shares you need to look at to do a market

Page 178

1    share apportionment.

2          So I don't care about someone, a customer

3    who bought a competing product outside of the Deere

4    equipment.  That's irrelevant to me.  I care about

5    who would have purchased the Ultralok product if

6    Deere had not been selling its products on its

7    equipment.

8          That's the relevant question.

9       MS. GIROUD:  Counsel, we've been going for over

10   an hour or so.  Whenever is a good place for a break

11   would be good.

12      MS. RODMAN:  We can take a break.

13      THE VIDEOGRAPHER:  We are off the record at

14   3:13 P.M.

15          (Whereupon a recess was taken)

16      THE VIDEOGRAPHER:  We are back on the record at

17   3:36 P.M.

18   BY MS. RODMAN:

19      Q    Okay.  Dr. Varner, I want to spend a little

20   bit of time with your reply report as it relates to

21   lost profits.  That is our Exhibit 4 in this

22   deposition.

23          And I know you have a hard copy.  And of

24   course you are welcome to look at that.

25          But I want to start with paragraph 13 of

Page 179

1   your reply report.

2       A    Okay.

3       Q    Nice and big.  Okay.

4            All right.  In paragraph 13, you are

5   talking about Dr. Becker's analysis that the

6   hammerless design is important to consumers.

7   Correct?

8       A    Let me just read this.

9            Oh, the first sentence is talking about the

10  hammerless feature being an important -- important

11  feature.  Okay.

12      Q    But then you go on to say that it's

13  contradictory because Dr. Becker says that the

14  claimed invention is not an important driver of

15  customer demand.

16      A    I see that.

17      Q    Okay.  Do you understand the asserted

18  patents to have invented hammerless lock-based

19  bucket systems?

20      A    No.  I don't believe they invented it.  And

21  as I say in my report, the patents relate to the

22  hammerless system and that they provide a geometry

23  that -- I don't remember the exact words, but it

24  provides the geometry for a hammerless system.

25      Q    Do you have an understanding that in order

DEERE EX. Q

PAGE 215

Page 190

1   BY MS. RODMAN:

2       Q    All right.  Let's look at paragraph 32 of

3   your reply.

4       A    Okay.

5       Q    So for purposes of your -- we're talking in

6   paragraph 32 about what we call the first fit data.

7   Correct?

8       A    You said paragraph 32?

9       Q    Paragraph 32.  So you are -- where it's

10  talking about OEM sales.

11      A    Oh, okay.  All right.  I see it.

12      Q    So when you talk about OEM sales in

13  paragraph 32, we've also seen that referred to as

14  first fit data.  Correct?  Or first fit sales?

15      A    Correct.

16      Q    So in paragraph 32, you are opining that

17  the first fit sales made by Deere of the TK Series

18  products would also have been lost sales of the

19  Ultralok products to ESCO.  Correct?

20      A    Correct.

21      Q    And so we discussed earlier -- and to do

22  that, you considered the -- sorry.  Strike that.

23          To do that, would you consider the same

24  market percentages that we discussed earlier, the

25  ███████████ for ESCO and ███████████ for Deere?

Page 191

1      A    So for my calculations, I used the

2  ██████████.  So it's -- I used the same overall

3  market shares.

4      Q    So you got to that ████████ by looking at

5  ████████ for ESCO and ████████ for Deere.

6  Correct?

7      A    Yes.  That comes from Exhibit 6 -- my

8  Exhibit 6.

9      Q    Why would ESCO's shares -- sorry.  Strike

10  that.

11           Why would you look at ESCO's shares of the

12  total premium segment of the U.S. bucket expendables

13  market instead of ESCO's share of the Deere

14  equipment market for this analysis?

15      A    Well, you need to repeat that.

16      Q    Let's move on, and we'll see if we come

17  back to that.

18      A    Okay.

19      Q    All right.  We are going to switch gears

20  and talk about your reasonable royalty opinions now.

21      A    Okay.

22      Q    So back to your Exhibit 2, starting --

23      A    Talking my first report here?

24      Q    Yes.  Exhibit 2, your opening report, yes.

25  Sorry.  Starting at paragraph 76 on page 34.

1          All right.  You conclude in your reasonable

2     royalty analysis that a hypothetical negotiation

3     between the parties in 2014 would have resulted in a

4     royalty rate of 8 percent.  Correct?

5         A    That's the conclusion of this whole

6     section.

7         Q    How did you determine that reasonable

8     royalty rate of 8 percent?

9         A    Well, I lay that out in some detail in my

10    report.  I looked at all of the Georgia-Pacific

11    Factors and then I looked at -- I'll get to it.

12         I looked at in the end, this -- those are

13    the general Georgia-Pacific Factors And then I

14    looked at case-specific factors near the end of that

15    section, page 53 through 57, and reached an opinion

16    that 8 percent would be a reasonable royalty.

17         Excuse me.

18         Q    And where did the 8 percent come from?

19         A    Can you hear me now?

20         Q    Yes.

21         A    Okay.  So the 8 percent -- again, it comes

22    from looking at all the Georgia-Pacific Factors And

23    I looked at some other checks on what the parties

24    might have agreed to, what the parties would have

25    looked at -- and that's on pages 53 through

# EXHIBIT R

```
                                            Page 1

 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF DELAWARE
 3        ESCO GROUP LLC,                    )
                                             )
 4                   Plaintiff,              )
                                             )  Case No.
 5               vs.                         )  20-1679-WCB-MPT
                                             )
 6        DEERE & COMPANY,                   )
                                             )
 7                   Defendant.              )
                                             )
 8
 9
10        VIDEO-RECORDED VIDEOCONFERENCE DEPOSITION OF
11                  TISO WHITMAN PANAPA
12              Taken in behalf of Defendant
13                        * * *
14                   March 14, 2023
15                  Portland, Oregon
16
17
18
19
20
21
22
23
24        SINEAD R. WILDER, RPR, CSR, CCR
25        Court Reporter
```

1   interpenetration; is that right?

2        A.   In the scanning equipment, the accuracy

3   of the scan, which is produced by the -- the

4   hardware and the software all together.

5        Q.   Is it possible to do a 3D scan like you

6   did, or Mr. Griffin did, that would not result in

7   any interpenetration?

8             MR. ALOSH:  Objection.  Form.

9             THE WITNESS:  It is possible to

10  fine-tune things to show less.  One could manually

11  move the data, but that would not be

12  representative of what was -- what is shown.

13            And as shown in, I think, my reply to

14  this, certain efforts can be used to refine some

15  of the positioning algorithms that then showed

16  that the interpenetration was slightly less.

17            But the same general conclusions, and

18  the same general color map were -- were presented.

19  And those images, then, were shown in my response.

20       Q.   (By Mr. Linden) And what were some of

21  those fine-tunings?

22       A.   A closer inspection of some of the

23  assembly scans showed that there was some noise in

24  some small cracks of the assembly, which is not

25  unheard of.

1          Some of that noise was removed.  Some

2     other settings that the software uses to best fit

3     one scan on top of themselves were refined to be

4     much more smaller, so that it only considered

5     reducing the chance of any extra noise that might

6     have been inherent in those -- those cracks in

7     those other areas, would be less likely to be

8     involved in the software calculation.

9          And the resulting -- resulting

10    repositioning did reduce and/or eliminate the

11    interpenetration that was showing.

12         Q.   Why didn't you do that on --

13         A.   The --

14         Q.   -- your -- your initial report?

15         A.   Yes.

16         Their data here was reviewed with --

17    with Mr. Ky Holland, and this was pointed out, as

18    well as what it may or may not mean as to how the

19    software and the scanner was performing.

20         We also pointed out that we often look

21    at this.  And the amount of effort that it would

22    take to refine that was somewhat substantial.

23         And so I did not take it at that time,

24    because this is something that we would normally

25    look at in our own day-to-day operations, and live

Page 97

1   with this amount of small variation, and make our

2   conclusions, taking this into account, without

3   taking the immense extra effort taken to find any

4   small amounts of noise or fine-tune the settings

5   in an iterative process and taking extra time.

6           And it was taken afterwards, after it

7   was pointed out.

8           And in this report and beforehand, as I

9   mentioned, it was shown that what this was, what

10  it meant, and that the conclusions we would

11  normally draw from this with that in mind, is part

12  of how we normally would do things when we're

13  looking at this kind of data here at ESCO.

14      Q.   When you say, Immense amount of work,

15  how much work are you talking about?

16          MR. ALOSH:  Objection.  Form.

17          THE WITNESS:  Duration of work.  I -- I

18  took my time over a few weeks to put in multiple

19  hours a day just to refine this and -- and make

20  sure that it was that much better.

21          And the total sum hour, it could --

22  would have maybe summed up to close to maybe a

23  week worth -- worth of effort.  We don't

24  normally -- we would not normally do that amount,

25  even if we did want to refine it in our normal

Page 98

1    day-to-day operations.

2         But once this was pointed out, extra

3    effort was put in to recall -- or to refine

4    this -- this alignment.

5         Q.   (By Mr. Linden) And by refining the

6    alignment, isn't it true that you affected the

7    other values of your testing?

8              MR. ALOSH:  Objection.  Form.

9              THE WITNESS:  The values were shown, how

10   much they were changed and reported on, and deemed

11   that they were, as anticipated, very small.

12        The numbers of the actual change in the

13   alignment was also reported and shown that it was,

14   as anticipated, small.

15        And so in a technical sense, yes, the

16   numbers changed.  In a practical sense, based off

17   of how we normally would look at this data, it did

18   not.

19        Q.   (By Mr. Linden) And did Mr. Holland

20   ultimately review what you did to refine the

21   values and determine that it was sufficient for

22   the purposes of this case?

23             MR. ALOSH:  Objection.  Form.

24             THE WITNESS:  Sorry.  Please repeat the

25   question one more time.

DEERE EX. R
PAGE 224

# EXHIBIT S

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ESCO GROUP LLC, | C.A. No. 1:20-cv-01679-WCB |
| *Plaintiff,* | |
| v. | |
| DEERE & COMPANY | |
| *Defendant.* | |

### ERRATA FOR EXPERT REPORTS OF
### THOMAS R. VARNER, PH.D.
### DATED JANUARY 13, 2023 AND MARCH 3, 2023

Dated: March 19, 2023

Respectfully submitted,

Thomas R. Varner, Ph.D.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

DEERE EX. S
PAGE 226

1.      I previously submitted *Varner Expert Report* in this matter on January 13, 2023 with an Errata on January 16, 2023, and *Varner Reply Expert Report* on March 3, 2023.  This errata relates to a numerical change to Exhibit 6 in my previous reports and modifying the format to the PDF of Exhibit R3.1 to *Varner Reply Expert Report*.

2.      Attached is Exhibit 6R to *Varner Expert Report* showing a market apportionment calculation indicating that ESCO's Ultralok product would be ▮▮▮▮▮▮ of Deere's accused TK Series products if they are not available for sale.  This market share results in ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ in calculated lost profits on lost historical and future sales of Ultralok products.[1]

3.      Some values in Exhibit R3.1 to *Varner Reply Expert Report* as submitted on March 3, 2023, were inadvertently not shown in the PDF version of *Varner Reply Expert Report*. Attached is a PDF version of Exhibit R3.1 with all values shown.  No changes other than the noted formatting change were made to this exhibit.

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge, information and belief.

Executed on March 19, 2023, in Oakland, California.

Signature:                                   
Thomas R. Varner, Ph.D.

---

[1] *Becker Expert Report*, 2/8/23, p. 86, shows "Implied Market Share of Accused Products" of ▮▮▮▮ however, these values do not include "first fit" sales.  If Deere's "first fit" sales are included in this calculation the "Implied Market Share of Accused Products" becomes ▮▮▮▮▮▮ Using these revised values results in a market apportionment calculation allocating Ultralok ▮▮▮▮ of Deere's accused TK Series products.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. S
PAGE 227



## Exhibit 6R  Market Share Analysis

**Premium Market (Deere TK, ESCO UL, Hensley XS, Caterpillar Advansys)**

Source: [1]

| | Market Shares | | |
|---|---|---|---|
| | Construction Expendables Top Tier | Deere Machines | But-For Market Shares |
| **Deere TK** | | | |
| **ESCO UL** | | | |
| **Other** | | | |
| | 100% | 100% | 100% |



Notes:

[1]  Adam Stitzel testified that ESCO has ███████ of North American market for construction expendables.  See also, ESCO_00140132-163. ████████████ ESCO's current market share is for Super V products and the remaining portion is for Ultralok products ████████████ (see Exhibits 2.1 and 2.2).  Ultralok share would be ████████ of overall construction expendables market. Adam Stitzel testified that ██ of the construction expendables market is in the premium segment, resulting in ████████████ market share for Ultralok in the premium segment.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

**DEERE EX. S**
**PAGE 228**



**Exhibit R3.1 Non-OEM  Deere Sales of TK Products**



DEERE EX. S
PAGE 229

# EXHIBIT T

DEERE EX. T

PAGE 230

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **ESCO GROUP LLC,** | |
| Plaintiff, | C.A. No. 1:20-cv-01679-WCB |
| v. | |
| **DEERE & COMPANY,** | |
| Defendant. | |

**DECLARATION OF RACHAEL L. RODMAN IN SUPPORT OF DEFENDANT DEERE**
**& COMPANY'S MOTION TO STRIKE EXPERT TESTIMONY OF**
**THOMAS R. VARNER, PH.D. AND TISO PANAPA**

I, Rachael L. Rodman, declare as follows:

1.      I am a partner with the law firm Ulmer & Berne LLP, and I am one of the attorneys representing Defendant Deere & Company in the above-captioned action.  I am over the age of eighteen and competent to make this declaration, and I make this declaration based on my own knowledge.

2.      I am admitted to practice law in the State of Ohio and have been admitted pro hac vice in the above-captioned litigation.

3.      On March 16, 2023, Deere counsel emailed ESCO's counsel setting forth several bases for Daubert motions on which a meet and confer was requested.  Exhibit U of the appendix in support of Deere's Motion to Strike is a true and correct copy of that email.

4.      On March 19, 2023, shortly after it was sent at approximately 5:27pm, I received an email from ESCO's counsel serving the March 19, 2023 Errata to Dr. Varner's opening and reply reports.  Exhibit V of the appendix in support of Deere's Motion to Strike is a true and correct copy of that email, without the attachment.

5.      I responded to that email on March 19, 2023, indicating that the Errata was inappropriate and requesting that ESCO be prepared to address it at a meet and confer already scheduled by the parties for March 20, 2023.

6.      On March 20, 2023, the parties had a meet and confer on various issues, including, *inter alia*, Deere's planned *Daubert* motion relating to ESCO damages expert, Thomas R. Varner, Ph.D. and the Motion to Strike Expert Testimony of Thomas R. Varner, Ph.D.

7.      During that March 20, 2023 meet and confer, I articulated Deere's position regarding why Dr. Varner's March 19, 2023 Errata should be withdrawn by ESCO or stricken by the Court, including at a high level the points included in Deere's Motion to Strike.

8.      In response, Xavi Giroud, one of the attorneys for ESCO, indicated that ESCO disagreed.  She further articulated ESCO's position that the Errata simply made "mathematical" changes and that ESCO had served the Errata as soon as it could.  She also indicated that ESCO was willing to allow a one-hour deposition of Dr. Varner.

9.      I responded, pointing out that the changes were not simply mathematical and that it was unclear why ESCO could not have made these edits earlier.  I also articulated Deere's concerns with the lack of any articulated basis for the new numbers included in Dr. Varner's Errata and how the lack of any such bases violated Fed. R. Civ. P. 26 and made it impossible for Deere to take a fair deposition of Dr. Varner on his Errata.  To illustrate my point, I asked Ms. Giroud if ESCO knew the source for Dr. Varner's assigning Deere an 8% share of the premium segment of the U.S. construction expendables market.

10.      Ms. Giroud responded by indicating that there were a lot of documents discussing market share and that she was unable to specifically identify which of those documents may have been the source for the 8%.  She indicated that was precisely the type of question that Deere

DEERE EX. T
PAGE 232

could ask Dr. Varner in a deposition.

11.     I disagreed again that a deposition could cure the issues with Dr. Varner's Errata, both because of the timing of the Errata and upcoming deadlines, and because of the failure of Dr. Varner to disclose the bases for his new opinions.

12.     The parties then agreed that an impasse had been reached.

13.     In response to Deere's concern that Mr. Panapa's attempt to minimize or eliminate the interpenetration present in his 3D scans for purposes of his reply was an improper new opinion, ESCO's counsel stated that doing so was what reply reports are for.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 28, 2023.

_____
Rachael L. Rodman

DEERE EX. T
PAGE 233

# EXHIBIT U

**Abner, Ava**

| | |
|---|---|
| **From:** | Abner, Ava |
| **Sent:** | Thursday, March 16, 2023 9:51 AM |
| **To:** | Roux, Jeremy D.; #ESCO_Deere KE Team; kkeller@shawkeller.com; nhoeschen@shawkeller.com |
| **Cc:** | james.taylor@saul.com; Streifthau-Livizos, Michelle C.; Deere-DDEL |
| **Subject:** | ESCO v. Deere - Exclusion of Expert Testimony |

Jeremy,

Deere will oppose any attempt by ESCO to preclude Dr. Klopp from relying on his clearance testing of the accused products to rebut ESCO's expert's opinions on infringement.  The exclusion of such evidence would be extreme and not warranted under the circumstances—especially because Dr. Klopp provided a reasonable explanation for the timing of his testing.  Specifically, Dr. Klopp testified during his deposition that he requested samples of the accused products before submitting his opening invalidity report, but—due to an inadvertent shipping mix-up—he received the samples after his rebuttal non-infringement report and before his reply invalidity report.  (Klopp Rough Dep. Tr. 71:18-75:6.)  Given the circumstances, Dr. Klopp conducted and disclosed his clearance testing to ESCO as soon as reasonably possible after he received the samples of the accused products. Because he did so before the end of expert discovery, ESCO had the opportunity to—and, in fact, did—depose Dr. Klopp regarding his clearance testing and Dr. Klopp provided his relevant opinions in response to ESCO's counsel's questions.  As such, ESCO has not—and will not—suffer any prejudice or surprise at trial related to Dr. Klopp's clearance testing.

Deere will also oppose any attempt by ESCO to compel production of draft .inp files that Dr. Klopp did not consider in forming the opinions contained in his rebuttal noninfringement report. As we previously explained—and as Dr. Klopp's deposition testimony confirmed—such drafts are not discoverable and do not constitute "facts or data" that he "considered" in forming the opinions in his report. (Klopp Rough Dep. Tr. 252:22-253:4 (Q. Do you recall you were asked some questions about versions one and two of certain INP files?  A. Yes.  Q. Would you consider those versions one and two as drafts?  A. Yeah.  I think that's fair, yes.) (objection omitted); 253:7-16 (Q. You were asked some questions about Version three. Do you remember that?  A. A bunch.  Q. Yeah.  A. Yeah. A bunch of questions.  Q. And the Version three files were used ultimately in forming certain of your opinions. Was that your testimony?  A. Well, that is correct.); 253:25-254:6 (Q. Did you consider versions one or two of the INP files in forming your opinions?  A. I did not.  Q. Did you consider any of the output OBD files from versions one or two of the INP files in forming your opinions?  A. I did not.).)

We are not available to meet and confer today or tomorrow to discuss the two above matters presented by ESCO.  But we are available any time on Monday, March 20 (except for 10:30 a.m. – 11:30 a.m. ET) or Tuesday, March 21, to discuss these matters along with the issues set forth below by Deere.

Deere intends to ask the Court to preclude Mr. Panapa from testifying about his efforts to minimize interpenetration present in the dimensional analysis that he first offered in his reply report.  (Panapa Reply, Section D, ¶¶ 13-16.)  Mr. Panapa conceded during his deposition that he could have made these efforts to minimize or eliminate interpenetration when he initially conducted his testing for his opening report.  (Panapa Rough Dep. Tr. 100:23—105:4.)

Deere also intends to ask the Court to exclude the expert testimony of Dr. Varner regarding his opinions that a reasonable royalty rate in this case would be 8% because he does not use a reliable methodology or rely on generally accepted accounting principles.  For example, Dr. Varner does not apply the *Georgia-Pacific* factors, analytical approach, market approach, or cost approach.  Additionally, Deere seeks to exclude Dr. Varner's opinions regarding his market share analysis because he did not base such opinions on reliable data.  More specifically, Dr. Varner conceded during his deposition to applying an apples-to-oranges analysis by picking and choosing shares from different markets, rather than analyzing a single relevant market.  Dr. Varner also conceded that the damages amount is lower if he compared the shares within a

**DEERE EX. U**
**PAGE 235**

single relevant market.  Finally, to the extent ESCO intends for Dr. Varner to rely on the licenses contained in his reports at trial, Deere intends to exclude those licenses because ESCO offered no evidence that they are technically comparable to subject matter of the patents-in-suit.

Finally, Deere may seek to exclude some or all of Dr. Umberger's expert report, but reserves its right to identify the complete grounds after Dr. Umberger's March 17 deposition.

Please advise of your availability to meet and confer on Monday or Tuesday regarding all of the above issues.

Regards,
Ava

------
Ava Abner
Ulmer & Berne LLP
513.698.5022

**From:** Roux, Jeremy D. <jeremy.roux@kirkland.com>
**Sent:** Wednesday, March 15, 2023 3:35 PM
**To:** james.taylor@saul.com; Linden, Paul <plinden@ulmer.com>; Streifthau-Livizos, Michelle C. <michelle.streifthau-livizos@saul.com>; Deere-DDEL <Deere-DDEL@ulmer.com>
**Cc:** #ESCO_Deere KE Team <ESCO_Deere_KE_Team@kirkland.com>; kkeller@shawkeller.com; nhoeschen@shawkeller.com
**Subject:** RE: ESCO v. Deere - Late Disclosure of Dr. Klopp's Testing

Counsel – Please let us know when you are available to meet and confer on these issues.  We are still available the rest of today or generally tomorrow afternoon.

Jeremy

**Jeremy Roux**

**KIRKLAND & ELLIS LLP**
300 North LaSalle, Chicago, IL 60654
**T** +1 312 862 3435  **M** +1 847 736 9514

**F** +1 312 862 2200

jeremy.roux@kirkland.com

**From:** Roux, Jeremy D. <jeremy.roux@kirkland.com>
**Sent:** Tuesday, March 14, 2023 1:25 PM
**To:** james.taylor@saul.com; Linden, Paul <plinden@ulmer.com>; Streifthau-Livizos, Michelle C. <michelle.streifthau-livizos@saul.com>; Deere-DDEL <Deere-DDEL@ulmer.com>

**DEERE EX. U**
**PAGE 236**

**Cc:** #ESCO_Deere KE Team <ESCO_Deere_KE_Team@kirkland.com>; kkeller@shawkeller.com; nhoeschen@shawkeller.com
**Subject:** ESCO v. Deere - Late Disclosure of Dr. Klopp's Testing

Counsel,

ESCO seeks to preclude Dr. Klopp from relying on and offering opinions related to his late produced "Clearance Evaluation on TK Teeth" testing.  Pursuant to the Scheduling Order, any opinions Dr. Klopp intended to offer that "contradict or rebut evidence" regarding Mr. Holland's opening infringement report were required to be disclosed in Dr. Klopp's rebuttal report.  There can be no dispute that Dr. Klopp did not conduct his testing until after his rebuttal report, or that he did not disclose the testing until his reply report, which under the Protective Order was to be limited to his invalidity opinions.  Dr. Klopp also has no legitimate reason for not conducting his testing in a timely manner, especially considering the components used in his testing are Deere's own products.  (Klopp Dep. Tr. at 203:16-21.)  Given the late disclosure of Dr. Klopp's testing, ESCO was unable to address it in Mr. Holland's reply report.  In fact, ESCO was unaware of what opinions Dr. Klopp held regarding his testing until deposition since none of his testing related opinions were disclosed in the body of his reply report.  Unless Deere agrees that Dr. Klopp will not offer opinions regarding his clearance testing at trial, please let us know what time you are available to meet and confer tomorrow or Thursday.

Additionally, ESCO again requests that Deere provide all versions of Dr. Klopp's INP files, including initial versions that formed the basis of the "v3" files included in his rebuttal report.  These initial versions clearly constitute "facts or data considered by the witness in forming" his opinions, and are required to be disclosed.  (Klopp Dep. Tr. at 176:6-13 ("Q. Did those initial runs on the INPs that didn't converge, did those help inform you and your team in developing the v3 files that you ultimately produced in this case?  A. Of course.  Of course.  You learn from – you know, sort of learn from mistakes, I guess, is the way you put it.").)  If Deere will not agree to produce this material, we likewise intend to meet and confer on the issue.

Jeremy

**Jeremy Roux**

**KIRKLAND & ELLIS LLP**
300 North LaSalle, Chicago, IL 60654
**T** +1 312 862 3435  **M** +1 847 736 9514

**F** +1 312 862 2200

jeremy.roux@kirkland.com

DEERE EX. U
PAGE 237

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

4

DEERE EX. U

PAGE 238

# EXHIBIT V

**Abner, Ava**

| | |
|---|---|
| **From:** | Giroud, Xavi <xaviere.giroud@kirkland.com> |
| **Sent:** | Sunday, March 19, 2023 5:26 PM |
| **To:** | james.taylor@saul.com; Linden, Paul; Streifthau-Livizos, Michelle C.; Deere-DDEL |
| **Cc:** | Nate Hoeschen; #ESCO_Deere KE Team; kkeller@shawkeller.com |
| **Subject:** | ESCO v. Deere |
| **Attachments:** | Varner Errata 3-19-23, Signed.pdf |

Counsel,

Please find the attached Errata to the Expert Report of Thomas Varner.  If necessary, Dr. Varner is available for a one hour follow-up deposition this week.

Best,

**Xavi Giroud**

**She/Her/Hers**

------------------------------------

**KIRKLAND & ELLIS LLP**

300 North LaSalle, Chicago, IL 60654

**T** +1 312 862 4105  **M** +1 520 834 6878

**F** +1 312 862 2200

------------------------------------

xaviere.giroud@kirkland.com

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

DEERE EX. V

PAGE 240