**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ESCO GROUP LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 20-1679-WCB-MPT |
| | ) | |
| DEERE & COMPANY. | ) | **PUBLIC VERSION FILED** |
| | ) | **MAY 10, 2023** |
| Defendant. | ) | |
| | ) | |

**APPENDIX IN SUPPORT OF DEFENDANT DEERE & COMPANY'S
MOTION TO EXCLUDE EXPERT TESTIMONY OF THOMAS R. VARNER, PH.D.**

| Exhibit | Pages | Description |
|---|---|---|
| A | 1-22 | U.S. Patent No. 8,844,175 to Christopher Snyder, issued on September 30, 2014 ("the '175 Patent") (D.I. 11-2) |
| B | 23-42 | U.S. Patent No. 10,273,662 to Christopher Carpenter, issued on April 30, 2019 ("the '662 Patent") (D.I. 11-2) |
| C | 43-49 | Selected Portions of Plaintiff ESCO Group LLC's Responses to Defendant Deere & Company's First Set of Interrogatories (Nos. 1-15), served on July 28, 2021 |
| D | 50-55 | Selected Portions of Plaintiff ESCO Group LLC's Responses to Defendant Deere & Company's Second Set of Interrogatories (Nos. 16-20), served on May 13, 2022 |
| E | 56-61 | Selected Portions of Plaintiff ESCO Group LLC's Responses to Defendant Deere & Company's Third Set of Interrogatories (Nos. 21-25), served on October 19, 2022 |

| Exhibit | Pages | Description |
|---|---|---|
| F | 62-70 | Selected Portions of the Deposition Transcript of Michael Budan, taken on November 9, 2022 ("Budan Dep.") |
| G | 71-85 | Selected Portions of the Deposition Transcript of Adam Stitzel, taken on December 16, 2022 ("Stitzel Dep.") |
| H | 86-96 | Selected Portions of the Expert Report of Stephen L. Becker, submitted on January 13, 2023 ("Becker Rpt.") |
| I | 97-142 | Selected Portions of the Expert Report of Thomas R. Varner, PH.D., submitted on January 13, 2023 ("Varner Rpt.") |
| J | 143-148 | Selected Portions of the Errata to the Expert Report of Thomas R. Varner, PH.D., submitted on January 16, 2023 ("Varner Jan. Errata") |
| K | 149-162 | Selected Portions of the Reply Expert Report of Thomas R. Varner, PH.D., submitted on March 3, 2023 ("Varner Reply Rpt.") |
| L | 163-226 | Selected Portions of the Deposition Transcript of Thomas R. Varner, PH.D., taken on March 13, 2023 ("Varner Dep.") |
| M | 227-231 | Selected Portions of the Errata to the Expert Report of Thomas R. Varner, PH.D., submitted on March 19, 2023 ("Varner March Errata") |

OF COUNSEL:

John F. Bennett (*pro hac vice*)
Paul M. Ulrich (*pro hac vice*)
Rachael L. Rodman (*pro hac vice*)
Paul J. Linden (*pro hac vice*)
Ava M. Abner (*pro hac vice*)
ULMER & BERNE LLP
312 Walnut Street, Suite 1400
Cincinnati, Ohio 45202-4029
(513) 698-5000
jbennett@ulmer.com
pulrich@ulmer.com
rrodman@ulmer.com
plinden@ulmer.com
aabner@ulmer.com

Dated: March 22, 2023

<u>/s/ Michelle C. Streifthau-Livizos</u>
James D. Taylor, Jr. (#4009)
Michelle C. Streifthau-Livizos (#6584)
SAUL EWING LLP
1201 N. Market Street, Suite 2300
Wilmington, Delaware 19801
(302) 421-6800
james.taylor@saul.com
michelle.streifthau-livizos@saul.com

*Attorneys for Defendant*
*DEERE & COMPANY*

# EXHIBIT A

DEERE EX. A

PAGE 1

# EXHIBIT B

DEERE EX. A
PAGE 2

US008844175B2

## (12) United States Patent
### Snyder

(10) Patent No.: **US 8,844,175 B2**
(45) Date of Patent: **Sep. 30, 2014**

(54) **WEAR ASSEMBLY FOR EXCAVATING EQUIPMENT**

(75) Inventor: **Christopher D. Snyder**, Portland, OR (US)

(73) Assignee: **ESCO Corporation**, Portland, OR (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 447 days.

(21) Appl. No.: **12/913,071**

(22) Filed: **Oct. 27, 2010**

(65) **Prior Publication Data**

US 2011/0099862 A1    May 5, 2011

**Related U.S. Application Data**

(60) Provisional application No. 61/256,561, filed on Oct. 30, 2009.

(51) **Int. Cl.**
*E02F 9/28* (2006.01)

(52) **U.S. Cl.**
CPC ............. *E02F 9/2858* (2013.01); *E02F 9/2866* (2013.01); *E02F 9/2833* (2013.01); *E02F 9/2825* (2013.01)
USPC ............................................. **37/452**; 37/455

(58) **Field of Classification Search**
USPC ............................. 37/452, 453, 455; 172/713
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

|   |   |   |   |   |
|---|---|---|---|---|
| 784,116 | A | | 3/1905 | McCaskey |
| 1,218,841 | A | | 3/1917 | Dietz |
| 1,438,001 | A | | 12/1922 | Buskirk et al. |
| 1,685,196 | A | * | 9/1928 | Gilbert ......................... 172/703 |
| 2,040,085 | A | | 5/1936 | Fykse et al. |
| 2,050,014 | A | | 8/1936 | Morrison |
| 2,167,425 | A | | 7/1939 | Page |
| 2,256,488 | A | * | 9/1941 | Murtaugh ....................... 37/455 |
| 2,689,419 | A | | 9/1954 | Daniels et al. |
| 2,738,602 | A | | 3/1956 | Meeks |
| 2,874,491 | A | | 2/1959 | Larsen |
| 2,904,909 | A | | 9/1959 | Ratkowski |
| 2,915,290 | A | | 12/1959 | Petersen |
| 2,919,506 | A | | 1/1960 | Larsen |
| 3,012,346 | A | | 12/1961 | Larsen |
| 3,079,710 | A | | 3/1963 | Larsen et al. |
| 3,196,956 | A | * | 7/1965 | Ratkowski ................... 172/713 |
| 3,331,637 | A | | 7/1967 | Krekeler |
| 3,444,633 | A | * | 5/1969 | Hensley ........................ 37/452 |
| 3,455,040 | A | | 7/1969 | Ratkowski |
| 3,530,601 | A | | 9/1970 | Steil |
| 3,623,247 | A | | 11/1971 | Stepe |
| 3,624,827 | A | * | 11/1971 | Liess et al. ...................... 37/92 |
| 3,774,324 | A | | 11/1973 | Lafond |

(Continued)

FOREIGN PATENT DOCUMENTS

| JP | 50-132703 | 10/1975 |
|---|---|---|
| JP | 61176724 | 8/1986 |

(Continued)

*Primary Examiner* — Jamie L McGowan

(74) *Attorney, Agent, or Firm* — Steven P. Schad

(57)    **ABSTRACT**

Wear members for use in excavating include a socket having a front stabilizing end that includes a top surface, a bottom surface and side surfaces. At least one of these surfaces is formed with a transverse, inward projection and extends axially substantially parallel to the longitudinal axis of the socket. The socket may include surfaces that generally correspond to exterior surfaces of a nose on which it may be mounted and on which it may be connected to excavating equipment.

**21 Claims, 9 Drawing Sheets**



DEERE EX. A
PAGE 3

US 8,844,175 B2

Page 2

(56)        References Cited

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,897,642 | A | 8/1975 | Helton et al. |
| 3,959,901 | A | 6/1976 | Klett |
| 3,982,339 | A | 9/1976 | Nilsson |
| 4,027,408 | A | 6/1977 | Ramella et al. |
| 4,317,300 | A | 3/1982 | Emrich et al. |
| 4,319,415 | A | 3/1982 | Mayerbock et al. |
| 4,335,532 | A | 6/1982 | Hahn et al. |
| 4,404,760 | A | 9/1983 | Hahn et al. |
| D274,434 | S | 6/1984 | Nilsson |
| 4,470,210 | A | 9/1984 | Hahn |
| D275,859 | S | 10/1984 | Nilsson |
| 4,481,728 | A | 11/1984 | Mulder et al. |
| 4,510,706 | A | 4/1985 | Berchem |
| 4,577,423 | A | 3/1986 | Hahn |
| 4,611,418 | A | 9/1986 | Launder |
| 4,625,439 | A | 12/1986 | Johansson et al. |
| 4,727,663 | A | 3/1988 | Hahn |
| 4,744,692 | A | 5/1988 | Olsen et al. |
| D296,442 | S * | 6/1988 | Broomhall ..................... D15/29 |
| 4,751,785 | A | 6/1988 | Johansson et al. |
| 5,074,062 | A | 12/1991 | Hahn et al. |
| 5,152,088 | A | 10/1992 | Hahn et al. |
| 5,177,886 | A | 1/1993 | Klett |
| 5,350,022 | A | 9/1994 | Launder et al. |
| D354,291 | S | 1/1995 | Edwards |
| 5,653,048 | A | 8/1997 | Jones et al. |
| D389,844 | S | 1/1998 | Moreno |
| D414,193 | S | 9/1999 | Launder et al. |
| D417,877 | S | 12/1999 | Launder et al. |
| 6,047,487 | A | 4/2000 | Clendenning |
| 6,240,663 | B1 | 6/2001 | Robinson |
| 6,247,255 | B1 | 6/2001 | Clendenning |
| D446,224 | S | 8/2001 | Clendenning |
| D447,154 | S | 8/2001 | Clendenning |
| 6,321,471 | B2 | 11/2001 | Fernandez et al. |
| 6,385,871 | B1 * | 5/2002 | Quarfordt ..................... 37/457 |
| 6,393,739 | B1 | 5/2002 | Shamblin et al. |
| 6,430,851 | B1 | 8/2002 | Clendenning |
| 6,439,796 | B1 | 8/2002 | Ruvang et al. |
| 6,477,796 | B1 | 11/2002 | Cornelius |
| 6,619,883 | B2 * | 9/2003 | Livesay et al. ................ 404/124 |
| 6,675,509 | B2 | 1/2004 | Bierwith |
| 6,729,052 | B2 | 5/2004 | Ollinger, IV et al. |
| 6,735,890 | B2 | 5/2004 | Carpenter et al. |
| 6,745,503 | B1 | 6/2004 | Moreno et al. |
| 6,836,983 | B2 | 1/2005 | Moreno et al. |
| 6,839,990 | B2 | 1/2005 | Leslie et al. |
| 6,865,828 | B1 | 3/2005 | Molino et al. |
| 6,976,325 | B2 | 12/2005 | Robinson et al. |
| 7,523,572 | B2 | 4/2009 | Pasqualini |
| 7,703,224 | B2 * | 4/2010 | Karlsson et al. ............... 37/457 |
| 7,730,651 | B2 | 6/2010 | Carpenter |
| 7,762,015 | B2 * | 7/2010 | Smith et al. ................... 37/455 |
| 7,980,011 | B2 * | 7/2011 | Ruvang ........................ 37/452 |
| 8,061,064 | B2 * | 11/2011 | Ollinger et al. ............... 37/453 |
| 2001/0001352 | A1 | 5/2001 | Fernandez et al. |
| 2003/0005606 | A1 | 1/2003 | Carpenter et al. |
| 2003/0024139 | A1 | 2/2003 | Jones et al. |
| 2003/0089003 | A1 | 5/2003 | Ollinger, IV et al. |
| 2003/0101627 | A1 | 6/2003 | Robinson et al. |
| 2004/0093771 | A1 | 5/2004 | Carpenter et al. |
| 2004/0118021 | A1 | 6/2004 | Renski |
| 2005/0050775 | A1 | 3/2005 | Clendenning et al. |
| 2005/0055853 | A1 | 3/2005 | Livesay et al. |
| 2005/0120596 | A1 | 6/2005 | Kasim |
| 2005/0132619 | A1 | 6/2005 | Robinson |
| 2006/0013648 | A1 | 1/2006 | Bernstein |
| 2007/0193075 | A1 | 8/2007 | Carpenter |
| 2007/0227051 | A1 | 10/2007 | Carpenter et al. |
| 2008/0000114 | A1 | 1/2008 | Bentley |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 04306329 A | 10/1992 |
| JP | 10183698 A | 7/1998 |
| WO | WO 8703316 A1 | 6/1987 |
| WO | WO 2004035945 A1 | 4/2004 |
| WO | WO 2008/140993 | 11/2008 |

* cited by examiner

DEERE EX. A
PAGE 4



FIG. 1
(Prior Art)

DEERE EX. A
PAGE 5

Case 1:20-cv-01679-WCB-MPD Document 25-1 Filed 05/10/22 Page 9 of 234 PageID #: 989



FIG. 2

DEERE EX. A
PAGE 6



FIG. 3

DEERE EX. A
PAGE 7



FIG. 4

DEERE EX. A
PAGE 8



FIG. 5

DEERE EX. A
PAGE 9



FIG. 6

DEERE EX. A
PAGE 10

Case: 20-cv-01679-WCB-MPT Document 25-11 Filed 05/04/07 Page 14 of 234 PageID #: 9144



FIG. 7A

FIG. 7

DEERE EX. A
PAGE 11



FIG. 7C

DEERE EX. A
PAGE 12

Case 2:20-cv-01679-WCB-BMP Document 251-11 Filed 05/10/07 Page 16 of 234 PageID #989346



FIG. 7B

FIG. 8

DEERE EX. A
PAGE 13

US 8,844,175 B2

1

# WEAR ASSEMBLY FOR EXCAVATING EQUIPMENT

## RELATED APPLICATION DATA

This application claims priority benefits to U.S. Provisional Patent Application No. 61/256,561 filed Oct. 30, 2009 in the name of Christopher Snyder and entitled "Wear Assembly for Excavating Equipment, which application is entirely incorporated herein by reference.

## FIELD OF THE INVENTION

The present invention pertains to wear assemblies for securing wear members to excavating equipment, such as wear assemblies that are suited for attachment to and use on a dredge cutterhead.

## BACKGROUND

Dredge cutterheads are used for excavating earthen material that is underwater, such as a riverbed. In general, a dredge cutterhead 1 includes several arms 2 that extend forward from a base ring 3 to a hub 4 (FIG. 1). The arms 2 are spaced about the base ring 3 and formed with a broad spiral about the central axis of the cutterhead 1. Each arm 2 is provided with a series of spaced apart teeth 5 to dig into the ground. The teeth 5 are composed of adapters or bases 6 that are fixed to the arms 2, and points 7 that are releasably attached to the bases 6 by locks 8.

In use, the cutterhead 1 is rotated about its central axis to excavate the earthen material. A suction pipe is provided near the ring 3 to remove the dredged material. To excavate the desired swath of ground, the cutterhead 1 is moved side-to-side as well as forward. On account of swells and other movement of the water, the cutterhead 1 also tends to move up and down, and periodically impacts the bottom surface. Further difficulties are caused by the operator's inability to see the ground that is being excavated underneath the water; i.e., unlike most other excavating operations, the dredge cutterhead 1 cannot be effectively guided by the operator along a path to best suit the terrain to be excavated.

During a dredging operation, the cutterheads 1 are rotated such that the teeth 5 are driven into and through the ground at a rapid rate. Consequently, considerable power is needed to drive the cutterhead 1, particularly when excavating in rock. In an effort to minimize the power requirements, dredge points 7 are typically provided with elongate, slender bits for easier penetration of the ground. However, as the bit becomes shorter due to wear, the mounting sections of the points 7 will begin to engage the ground in the cutting operation. The mounting section is wider than the bit and is not shaped for reduced drag. On account of the resulting increased drag the mounting sections impose on the cutterhead 1, the points 7 usually are changed at this time before the bits are fully worn away.

In view of the heavy loads and severe environments in which dredging equipment operates, the point 7 and base 6 interconnection for the teeth 5 needs to be stable and secure. Unstable and insecure engagement between the points 7 and their bases 6 may result in undesired disengagement of the points 7 from the base 6, which increases time and expense in the dredging operation, e.g., due to lost parts, downtime for replacement of the points, etc. Accordingly, improved point 7 and base interconnections in dredging and other excavating equipment would be a welcome advance in the art.

2

## SUMMARY OF THE INVENTION

The following presents a general summary of aspects of the present invention in order to provide a basic understanding of the invention and various example features of it. This summary is not intended to limit the scope of the invention in any way, but it simply provides a general overview and context for the more detailed description that follows.

Aspects of this invention relate to wear members for use in excavating equipment, assemblies including a wear member engaged with a base for use with a piece of excavating equipment, and excavating equipment that includes wear members and/or assemblies in accordance with this invention. More specific example aspects of this invention are described in more detail below.

In accordance with one aspect of the invention, a wear member for excavating equipment includes a front surface for engaging the material to be excavated and a rear socket for receiving a base secured to the excavating equipment. The socket has a front stabilizing end that includes a top surface, a bottom surface and side surfaces. At least one of these surfaces is formed with a transverse, inward projection. In some example structures according to this invention, the transverse, inward projection(s) will extend axially substantially parallel to the longitudinal axis of the socket. Additionally, in some structures according to the invention, at least the top surface and the bottom surface will include the transverse, inward projections and/or the substantially parallel axial extension direction.

In accordance with another aspect of the invention, the wear member includes a socket for receiving a base, wherein the socket has top, bottom and side surfaces, and wherein at least one of the surfaces is formed with a transverse inward projection extending substantially along the entire length of the socket.

In accordance with another aspect of the invention, the wear member includes a socket for receiving a base, wherein the socket has top, bottom and side surfaces, wherein at least one of the surfaces includes a first axial portion at a front end of the socket and a second axial portion proximate a rear end of the socket, and wherein each axial portion is formed with a transverse inward projection and extends axially substantially parallel to the longitudinal axis of the socket.

In accordance with another aspect of the invention, the wear member includes a socket for receiving a base fixed to the excavating equipment, and the socket has a front stabilizing end that includes a top surface, a bottom surface, a first side surface, and a second side surface. At least one of the top surface, the bottom surface, the first side surface, and the second side surface has a curved construction, e.g., a curved construction including a curved inward projection.

In accordance with one aspect of this invention, a wear member for excavating equipment is provided with a socket that includes a pair of axially spaced apart stabilizing bands that extend substantially around the perimeter of the socket, with one band near the front end of the socket and another band near the rear end. The stabilizing bands are defined by stabilizing surfaces that each extends substantially parallel to the longitudinal axis of the wear member and/or the assembly in which it is included. In one preferred embodiment, each of the stabilizing bands defines a generally trapezoidal shape.

In accordance with another aspect of the invention, a wear member for excavating equipment is formed to minimize the drag associated with the digging operation and, in turn, minimize the power need to drive the equipment. Reduced power consumption, in turn, leads to a more efficient operation.

DEERE EX. A
PAGE 14

US 8,844,175 B2

**3**

In one other aspect of the invention, the wear member is provided with side relief not only in the working end, but also in the mounting end, to reduce drag, require less digging power, and provide a longer useable life for the wear member.

In another aspect of the invention, the wear member has a transverse configuration where the width of the leading side is larger than the width of the corresponding trailing side so that the sidewalls of the wear member follow in the shadow of the leading side to decrease drag. This use of a smaller trailing side is provided not only through the working end of the wear member but also at least partially into its mounting end. As a result, the drag experienced by a worn wear member is less than that of a conventional wear member. Less drag translates into less power consumption and a longer use of the wear member before it needs to be replaced. Accordingly, the working ends of the wear member can be fully or nearly worn away before replacement is needed.

The wear member may have a profile that is defined by the collective transverse configuration of that portion of the wear member that is driven through the ground in any one digging pass. In one other aspect of the present invention, the profile is widest at the leading face and generally narrows rearward of the leading face for the portions of the wear member that will engage the ground during the life of the wear member.

In another aspect of the invention, the exterior transverse profile of the wear member may be generally trapezoidal with the leading side defusing the larger width. The trapezoidal shape continues through the working end and at least through the front portion of the mounting end.

The socket of the wear member is provided to receive a nose of a base member that may be fixed to the excavating equipment. In another aspect of the invention, the socket is formed with a transverse generally trapezoidal exterior shape to generally correspond to the exterior profile of the wear member. This general matching of the socket to the exterior of the mounting section eases manufacture, maximizes the size of the nose for a given outer profile, and enhances the strength to weight ratio.

In a preferred construction, one or more of the top, bottom or side surfaces of a trapezoidal shaped nose and the corresponding walls of the socket are each bowed to fit together. These surfaces and walls have a gradual curvature to ease installation, enhance stability of the wear member, and resist rotation of the wear member about the longitudinal axis during use.

In accordance with another aspect of the invention, both the socket and nose include front and rear stabilizing surfaces (e.g., stabilizing bands, as described above) that extend substantially parallel to the longitudinal axis of the wear member and substantially around the perimeter of the socket and nose to resist rearward loads applied in all directions.

In accordance with another aspect of the invention, the socket and nose are formed with complementary front bearing faces (or thrust faces) that may constitute an arc or section of a sphere to lessen stress in the components and to better control the rattle that occurs between the wear member and the base.

In another aspect of the invention, the socket and nose are formed with front curved bearing faces at their front ends, and with generally trapezoidal transverse shapes rearward of the front ends to improve stability, ease manufacture, maximize the size of the nose, reduce drag, stress and wear, and enhance the strength to weight ratio.

In accordance with another aspect of the invention, a wear assembly is provided that includes a base, a wear member that mounts to the base, and a lock or engagement system that holds the wear member to the base in a manner that is secure,

**4**

easy to use, and readily manufactured. The lock or engagement system may be axially oriented that, in a compressive state, it holds the wear member to the base and can tighten the fit of the wear member on the base. In one preferred example structure, the wear assembly includes an adjustable axial lock.

In another aspect of the invention, the wear member includes an opening into which the lock or engagement system is received, and a hole that is formed in a rear wall of the opening to accommodate passage of a lock to stabilize the lock and to facilitate easy tightening of the lock.

In another aspect of the invention, the base interacts with the lock solely through the use of a projecting stop. As a result, there is no need for a hole, recess or passage in the nose such as is typically provided to receive a lock. The nose strength is thus enhanced.

In another aspect of the invention, the locking arrangement for securing the wear member to the base can be adjusted to consistently apply a predetermined force to the wear member irrespective of the amount of wear that may exist in the base and/or wear member.

In another aspect of the invention, the wear member includes a marker that can be used to identify when the lock has been adequately tightened.

In another aspect of the invention, the wear member is installed and secured to the base through an easy to use process involving an axial lock. The wear member fits over a nose of a base fixed to the excavating equipment. The base includes a stop that projects outward from the nose. An axial lock is received into an opening in the wear member and extends between the stop and a bearing surface on the wear member to releasably hold the wear member to the nose.

In another aspect of the invention, the wear member is first slid over a base fixed to the excavating equipment. An axially oriented lock is positioned with one bearing face against a stop on the base and another bearing face against a bearing wall on the wear member such that the lock is in axial compression. The lock is adjusted to move and hold the wear member tightly onto the base.

In another aspect of the invention, a lock to releasably hold a wear member to a base includes a threaded linear shaft, with a bearing end and a tool engaging end, a nut threaded onto the shaft, and a spring including a plurality of alternating annular elastomeric disks and annular spacers fit about the threaded shaft between the bearing end and the nut.

Other aspects, advantages, and features of the invention will be described in more detail below and will be recognizable from the following detailed description of example structures in accordance with this invention.

## BRIEF DESCRIPTION OF THE DRAWINGS

The present invention is illustrated by way of example and not limited in the accompanying figures, in which like reference numerals indicate the same or similar elements throughout, and in which:

FIG. **1** is a side view of a conventional dredge cutterhead;

FIG. **2** is a side perspective view of an example wear member in accordance with this invention;

FIG. **3** is a side view of an example base for mounting a wear member in accordance with this invention;

FIG. **4** is a perspective view of an example nose of a base for mounting a wear member in accordance with this invention;

FIG. **5** is a front view of an example nose of a base for mounting a wear member in accordance with this invention;

DEERE EX. A
PAGE 15

**5**

FIG. **6** is a vertical cross sectional view along line **6-6** in FIG. **2** showing the wear member mounted on a nose of a base in accordance with one example of this invention;

FIG. **7** is a cross sectional view similar to that shown in FIG. **6** except that this example wear member is shown without the base member and the lock, to better illustrate the internal structures of the socket in this example wear member;

FIG. **7**A is a cross sectional view taken along line **7**A-**7**A in FIG. **7** and illustrates a cross section of the working section of the wear member;

FIG. **7**B is a cross sectional view taken along line **7**B-**7**B in FIG. **7** and illustrates a cross section of the wear member as it contacts ground during a digging operation;

FIG. **7**C is a cross sectional view taken along line **7**C-**7**C in FIG. **7** and illustrates a cross section of the mounting section of the wear member; and

FIG. **8** is an end view of an example wear member in accordance with this invention, looking into the socket.

The reader is advised that the various parts shown in these drawings are not necessarily drawn to scale.

DETAILED DESCRIPTION

The following description and the accompanying figures disclose example features of excavating equipment, including wear member structures for excavating equipment in accordance with examples of the present invention as well as structures for mounting such wear members.

Some aspects of the present invention pertain to wear assemblies **100** for excavating equipment, and these wear assemblies may be particularly well suited for dredging operations. In this application, the invention is described primarily in terms of a dredge tooth adapted for attachment to a dredge cutterhead. Nevertheless, the different aspects of the invention can be used in conjunction with other kinds of wear assemblies (e.g., shrouds) and for other kinds of excavating equipment (e.g., buckets or the like for construction or mining equipment, etc.).

The assembly **100** and/or portions thereof are at times described in relative terms such as "up," "down," "horizontal," "vertical," "front" and "rear," and the like. Such terms are not considered essential and are provided simply to ease the description. The orientation of a wear assembly **100** in an excavating operation, and particularly in a dredge operation, can change considerably. These relative terms should be understood with reference to the orientation of wear assembly **100** as illustrated in FIG. **2** unless otherwise stated.

Wear assembly **100** includes a base **102** secured to a dredge cutterhead (or other excavating equipment), a wear member **104**, and a lock or engagement system **106** to releasably hold the wear member **104** to base **102** (FIGS. **2** and **6**). The lock or engagement system could be in the form of a known retainer or pin (not shown), but preferably has a construction as described below.

Base **102** (which also may be referred to herein as an "adapter") includes a forwardly projecting nose **108** onto which wear member **104** is mounted, and a mounting end **110** (see FIG. **3**) that is fixed to an arm of a dredge cutterhead (or other excavating equipment). The base **102** may be cast as part of the arm, welded to the arm, or attached by mechanical means. As examples only, the base **102** may be formed and mounted to the cutterhead such as disclosed in U.S. Pat. No. 4,470,210 or U.S. Pat. No. 6,729,052, each of which is entirely incorporated herein by reference. The mounting end **110** may be sized and shaped to prevent rotation with respect to the cutterhead arm and to prevent the assembly **100** from unintentionally separating from the cutterhead arm.

**6**

In a dredge tooth, wear member **104** (which also may be referred to herein as a "point") is provided with a working section **112** (also referred to herein as a "bit") in the form of an elongate slender bit and a mounting section **114** that defines a socket **120** to receive nose **108** of the base member **102**. Wear member **104** is rotated by the cutterhead such that it engages the ground in generally the same way with each digging pass. As a result, wear member **104** includes a leading side **122** and a trailing side **124**. Leading side **122** is the side that first engages and leads the penetration of the ground with each rotation of the cutterhead. In the present invention, trailing side **124** has a smaller width than leading side **122** (i.e., along a plane perpendicular to the longitudinal axis **128** of wear member **104**, see FIGS. **7** and **7**A) through the working section **112** and at least partially through mounting section **114** (see also FIGS. **7**B and **7**C). In some embodiments, trailing side **124** has a smaller width than leading side **122** throughout the entire length of the wear member **104**.

As shown in FIGS. **2** and **7**A, at least the working section **112** of wear member **104** preferably has a generally trapezoidal transverse configuration with a leading side **122** that is wider than trailing side **124**. The term "transverse configuration" is used herein to refer to the two-dimensional configuration along a plane perpendicular to the longitudinal axis **128** of wear member **104**. On account of this narrowing of the wear member **104**, sidewalls **130** and **132** follow in the shadow of leading side **122** during digging and thereby create little drag on the cutting operation (this reduction in drag feature is also called "side relief" in this specification). In some constructions, sidewalls **130**, **132** converge toward trailing side **124** at an angle θ of about 16 degrees (see FIG. **7**A); however, other angular configurations are possible. The leading side **122**, trailing side **124** and sidewalls **130**, **132** can be planar, curved or irregular. Moreover, shapes other than trapezoidal can be used that provide side relief.

In use, the dredge wear member **104** penetrates the ground to a certain depth with each digging pass (i.e., with each rotation of the cutterhead). During much of the wear member's useful life, the working end **112** alone penetrates the ground. As one example, the ground level in one digging cycle extends generally along line **7**B-**7**B in FIG. **7** at the center point of a digging pass. Because only the working end **112** penetrates the ground and because the working end **112** is relatively thin, the drag placed on the digging operation is within manageable limits. Nevertheless, with many dredge teeth being constantly driven through the ground at a rapid rate, power requirements are always high and reducing the drag even in the bit portion **112** of the wear member **104** is beneficial to the operation, especially when digging through rock.

In some preferred constructions, sidewalls **130**, **132** not only converge toward trailing side **124**, but they also are configured so that the sidewalls **130**, **132** lie within the shadow of the leading side **122** in the digging profile (FIG. **7**B). The term "digging profile" is used herein to mean the cross-sectional configuration of the portion of wear member **104** that penetrates the ground along a plane that is (i) parallel to the direction of travel at the center point of a digging pass through the ground and (ii) laterally perpendicular to the longitudinal axis. The digging profile is a better indication of the drag to be imposed on the wear member **104** during use than a true transverse cross section. The provision of side relief in the digging profile is dependent on the angle at which the sidewalls converge toward the trailing side and the axial slope or expansion of the wear member surfaces in a rearward direction. The intention is to provide a width that generally narrows from the leading side **122** to the trailing side **124**

DEERE EX. A
PAGE 16

7

when considered from the perspective of the digging profile. Side relief in the digging profile preferably extends across the expected cutterhead digging angles, but benefit can still be obtained if such side relief exists in at least one digging angle. As one example only, the cross-sectional configuration illustrated in FIG. 7B represents one digging profile for a portion of wear member **104** being driven through the ground. As can be seen, the working end **112** is still provided with side relief even in the digging profile as sidewalls **130**, **132** converge toward trailing side **124** for reduced drag.

As the working section **112** wears away, the ground level gradually creeps rearward so that more rearward, thicker portions of the wear member **104** are pushed through the ground with each digging cycle. More power is therefore required to drive the cutterhead as the working members wear. Eventually, enough of the working section **112** wears away such that the mounting section **114** of the wear member **104** is being driven through the ground with each digging pass. In at least some example structures in accordance with the present invention, the mounting section **114** continues to include side relief at least at the front end of the mounting section (FIG. 7C), and preferably throughout the mounting section **114**.

As seen in FIGS. **2**, **6**, and **7**, mounting section **114** is larger than working section **112** to accommodate the receipt of nose **108** into socket **120** and to provide ample strength for the interconnection between the wear member **104** and the base **102**. Sidewalls **130**, **132** are inclined so as to converge toward trailing side **124**. The inclination of sidewalls **130**, **132** along line 7C-7C is, in this one example, at an angle α of about 26 degrees (FIG. 7B), but other inclinations can also be used. As discussed above, the desired side relief in the digging profile depends on the relation between the transverse inclination of the sidewalls **130**, **132** and the axial expansion of the wear member **104**.

As noted above, in use, the working section **112** may be worn down to an extent where a portion of mounting section **114** may be driven through the ground during rotation of a cutterhead. If desired, in at least some example structures in accordance with this invention, the tapering of sidewalls **130**, **132** continues from front end **134** to rear end **136** of wear member **104**. The presence of side relief in the mounting section **114** imposes less drag and, hence, requires less power to be driven through the ground. The reduced drag, in turn, enables the cutterhead to continue to operate with wear members **104** worn to the point where the mounting section **114** penetrates the ground. In most conventional wear members, the mounting section does not have a trapezoidal transverse configuration with sidewalls that converge toward trailing side. The lack of side relief in the digging profile imposes a heavy drag on the conventional wear member as it is driven through the ground especially as compared to the present inventive wear member **104**. With the heavy drag produced by conventional wear members in this condition, many operators will replace the wear members when their mounting sections begin to be driven through the ground even though the working sections may not be fully worn out. With at least some examples of the present invention, wear members **104** can stay on bases **102** until working sections **112** are further worn out as compared with many conventional wear members.

The use of a wear member **104** with side relief in the working section **112** and the mounting section **114** as described above can be used with a wide variety of nose and socket configurations. Nonetheless, in at least some example constructions in accordance with this invention, the front end **140** of nose **108** includes a forward-facing bearing or thrust face **142** that is trapezoidally shaped in cross section (FIGS.

8

2-6). Likewise, the front end **150** of socket **120** formed in the wear member **104** is formed with a complementary trapezoidally shaped bearing or thrust face **152** to set against thrust face **142** (FIGS. **6**, **7**, 7C, and **9**). While the thrust faces **142**, **152** may be any desired shape (such as any shape between hemispherical to flat or even concave), in some example structures according to this invention, the thrust face **142** may gently curve outward (e.g., as a portion or arc (or segment) of a sphere) such that its center point (or near its center point) is the forwardmost point of the face **142**. In other examples, the thrust face **142** will be convex and curved about two perpendicular axes. The thrust face **152** may be shaped to match or substantially match the shape of the face **142**. Matching rounded (e.g., spherical arc) shaped thrust faces **142** and **152** for primary load bearing helps keep the faces **142** and **152** in contact without tipping or shifting as the load on the working section **112** changes over the course of a digging operation (e.g., changes from an axial to a non-axial load, etc.). The thrust faces **142**, **152** may be flat, recessed or have other shapes so long as they adequately resist the anticipated thrust loads for the intended use.

Nose **108** includes a body **160** rearward of front end **140** (FIGS. **3-5**). Body **160** is defined by an upper surface **162**, a lower surface **164** and side surfaces **166**, **168**. In some example constructions, body surfaces **162-168** diverge rearwardly so that nose **108** expands outward from front end **140** to provide a more robust nose to withstand the rigors of digging. Nevertheless, it is possible for only the upper and lower surfaces **162**, **164** to diverge from each other and for the side surfaces **166**, **168** to axially extend substantially parallel to each other. Socket **120** has a main portion **180** rearward of front end **150** to receive body **160**. Main portion **180** includes an upper wall **182**, lower wall **184** and sidewalls **186**, **188** that generally conform to body surfaces **162-168**, respectively. In at least some preferred example configurations according to this invention, body **160** and main portion **180** each have a trapezoidal transverse configuration. The use of a trapezoidal shape predominantly along the length of nose **108** and socket **120** provides four corners **170**, **190**, which act as spaced ridges to resist turning of wear member **104** about axis **128**.

Also, in at least some example constructions in accordance with this invention, at least one of the body surfaces **162-168** and socket walls **182-188** (and preferably all of them) will have mutually bowed configurations (see FIGS. **4**, **5**, **7**, 7C, and **8**). In other words, in some example structures according to this invention, body surfaces **162-168** are preferably concave and curved across substantially their entire widths to define a trough **172** on each of the four sides of body **160**. Likewise, socket walls **182-188** are preferably convex and curved across substantially their entire widths to define projections **192** received into troughs **172**. The preferred bowing of nose surfaces **162-168** and socket walls **182-188** across substantially their entire widths provides increased resistance to the rotation of wear member **104** about base **102** during operation and increases the resistance to vertical and side loading of the point during digging. The troughs and projections will also reduce rotational rattle of the wear member **104** on the base **102**. While the bowed surfaces **162-168** and walls **182-188** are preferred, other trough and projection configurations such as disclosed in U.S. patent application Ser. No. 11/706,592, which is incorporated herein by reference, could also be used without departing from the invention. Other rotation resisting constructions could also be used without departing from this invention.

The use of troughs **172** and projections **192**, and particularly those that are gradually curved and extending substantially across the entire widths of the surfaces **162-168** and

DEERE EX. A
PAGE 17

9

walls **182-188** eases the assembly of wear member **104** onto nose **108**; i.e., the troughs **172** and projections **192** cooperatively direct wear member **104** into the proper assembled position on nose **108** during assembly. For example, if wear member **104** is initially installed on nose **108** out of proper alignment with the nose **108** as it is fit onto the nose **108**, the engagement of projections **192** being received into the troughs **172** will tend to rotate the wear member **104** into proper alignment as the wear member is fed rearward onto nose **108**. This cooperative effect of troughs **172** and projections **192** greatly eases and speeds installation and the setting of corners **170** into corners **190**. Some variations could also be used between the shapes of the socket **120** and the nose **108** so long as the socket **120** predominantly matches the shape of the nose **108**.

As shown in various figures (e.g., FIGS. **2**, **4**, **5**, **7**, **7C**, and **8**), one or more of the surfaces (e.g., top surface, bottom surface, and side surfaces) at the front end **140** of the nose **108** and the front end **150** of the socket **120** may have a generally curved configuration or construction (e.g., continuously curved from one corner to the next at or near the thrust faces **142** and **152**), and the corners also may be rounded. At least some of the surfaces having this curved configuration or construction may include a curved inward projection (e.g., so that the corners of that surface lie outward from the center of **25** that surface with respect to a center of the front end **140** and **150** of the nose **108** and socket **120**, respectively). Additional or alternative example features of the nose **108** and socket **120** in accordance with this invention are described in more detail below.

The front end **140** of the nose **108** includes front stabilizing surfaces **202**, and more specifically including an upper stabilizing surface **202a**, a lower stabilizing surface **202b** and two side stabilizing surfaces **202c** that collectively extend around the perimeter of front end **140** of nose **108**. These stabilizing surfaces **202a**, **202b**, **202c** preferably define a generally trapezoidal configuration though other shapes can be used. In a preferred construction, upper stabilizing surface **202a** has a shorter width than lower stabilizing surface **202b** to match the outer profile of wear member **104**. Of course, the orientation could be reversed, or other relative sizing options may be provided, as desired for certain applications. Similarly, the interior side walls defining front end **150** of socket **120** include similarly shaped and situated stabilizing surfaces **212a** through **212c** that match with and contact stabilizing surfaces **202a** through **202c**, respectively. In this illustrated example arrangement, the front stabilizing surfaces on the nose **108** and in the socket **120** provide a front stabilizing end located adjacent the thrust faces **142** and **152** of the nose **108** and socket **120**. The top and bottom stabilizing surfaces **202a**, **202b**, **212a**, and **212b** extend rearward from their respective thrust faces **142** and **152**.

Front stabilizing surfaces **202**, **212** preferably axially extend substantially parallel to longitudinal axis **128**. The term "substantially parallel," as used herein in this context, is intended to include parallel surfaces as well as those that diverge rearwardly from axis **128** at a small angle (e.g., of about 1-7°) for manufacturing or other purposes. In one preferred embodiment, each front stabilizing surface **202**, **212** diverges axially rearward at an angle to axis **128** of no more than about 5°, and in some instances, by about 2-3°. The front stabilizing surfaces **202**, **212** also preferably encircle (or at least substantially encircle) nose **108** and socket **120** to better resist non-axial loads. However, benefits can be achieved by forming only one or more of the upper surfaces **202a**, **212a**, bottom surfaces **202b**, **212b**, and side surfaces **202c**, **212c** to extend axially substantially parallel to longitudinal axis **128**.

10

Front stabilizing surfaces **202** on front end **140** of the nose **108** are preferably each provided with a transverse, inward recess in a transverse direction (see FIGS. **2** and **5**). Likewise, front stabilizing surfaces **212** on front end **150** of the socket **120** are preferably each provided with a corresponding transverse, inward projection. The corresponding inward recesses and projections enable each of the stabilizing surfaces **202**, **212** to resist all applied loads irrespective of whether the loads are applied vertically or horizontally (e.g., resist vertical and side loading). For example, when an upward load is vertically applied to the bit of the point, the load is at least in part resisted by lower stabilizing surface **212b** contacting lower stabilizing surface **202b**. The use of such corresponding recesses and projections at the front end also enhances installation of the wear members on the bases in the same way as discussed above for the troughs and projections rearward of the front ends **140**, **150**.

The rear of the nose **108** includes rear stabilizing surfaces **200**, and more specifically including an upper stabilizing surface **200a**, a lower stabilizing surface **200b** and two side stabilizing surfaces **200c** that collectively extend around the perimeter of rear end of nose **108**. Rear stabilizing surfaces **200** are able to well resist vertical and side loads applied to wear member **104** without tending to push the wear member **104** from base member **102**. These stabilizing surfaces **200a**, **200b**, **200c** preferably define a generally trapezoidal configuration around the perimeter of the nose **108**, though other shapes could be used. In a preferred construction, upper stabilizing surface **200a** is narrower than lower stabilizing surface **200b** to match the outer profile of wear member **104**. Similarly, the interior side walls of socket **120** include similarly shaped and situated stabilizing surfaces **210a** through **210c** that match with and contact stabilizing surfaces **200a** through **200c**, respectively. Of course, the orientation could be reversed, or other relative sizing options may be provided, as desired for certain applications. Further, front and rear stabilizing surfaces **200**, **202**, **210**, **212** preferably form spaced apart bands of stabilizing surfaces that each extends about the entire perimeter of nose **108** and the socket or at least substantially about the entire perimeter, as will be described in more detail below.

More specifically, nose surfaces **162-168** with troughs **172** are each preferably inclined axially to expand outward as they extend rearward to provide strength to nose **108** until reaching the rear stabilizing surfaces **200** of nose **108**. Likewise, socket walls **182-188** with projections **192** also each expand to conform to surfaces **162-168**. Socket walls **182-188** also define the rear stabilizing surfaces **210** to bear against rear stabilizing surfaces **200**. Rear stabilizing surfaces **200**, **210** are substantially parallel to longitudinal axis **128**. As noted above, the term "substantially parallel," as used herein in this context, is intended to include parallel surfaces as well as those that diverge rearwardly from axis **128** at a small angle (e.g., of about 1-7°) for manufacturing or other purposes. In one preferred embodiment, each rear stabilizing surface **200**, **210** diverges axially rearward at an angle to axis **128** of no more than about 7°, and in some instances, by about 2-3°. The rear stabilizing surfaces **200**, **210** also preferably encircle (or at least substantially encircle) nose **108** and socket **120** to better resist non-axial loads. Nevertheless, benefits can be realized by including such stabilizing surfaces **200**, **210** on only one or more of the upper, lower and side surfaces of the nose **108** and socket **120**.

While contact between the various socket **120** surfaces and the nose **108** will likely occur during an excavating operation, contact between the thrust faces **142**, **152**, the corresponding front stabilizing surfaces **202**, **212**, and the corresponding

US 8,844,175 B2

11 12

rear stabilizing surfaces **200**, **210** is intended to provide primary resistance to the applied loads on the tooth and thereby provide the desired stability. While these stabilizing surfaces **200**, **202**, **210**, **212** may be formed with relatively short axial extensions in the longitudinal direction **128**, they could have longer or different constructions. The presence of the stabilizing surfaces, particularly front stabilizing surfaces **202** and **212**, helps align the wear member **104** as it is installed on the nose **108**.

Front stabilizing surfaces **202**, **212** and rear stabilizing surfaces **200**, **210** are provided to stabilize the wear member **104** on the nose **108** and to lessen stress in the components. The front stabilizing surfaces **202**, **212** at the front ends **140**, **150** of the nose **108** and socket **120**, respectively, are able to stably resist axial and non-axial rearward forces in direct opposition to the loads irrespective of their applied directions. Rear stabilizing surfaces **200**, **210** complement the front stabilizing surfaces **202**, **212** by reducing the rattle at the rear of the wear member **104** and providing stable resistance to the rear portions of the wear member **104**, as described in U.S. Pat. No. 5,709,043 incorporated herein by reference. With stabilizing surfaces **200**, **202**, **210**, and **212** extending about the entire perimeter of nose **108** and socket **120** (or at least substantially about the entire perimeters of these members), they are also able to resist the non-axially directed loads applied in any direction.

The main portion of socket **120** preferably has a generally trapezoidal transverse configuration to receive a matingly shaped nose **108** (see FIGS. **7**C and **8**). The generally trapezoidal transverse configuration of socket **120** generally follows the generally trapezoidal transverse configuration of the exterior of nose **108**. This cooperative shaping of the socket **120** and the exterior of nose **108** maximizes the size of the nose **108** that can be accommodated within wear member **104**, eases the manufacturing of wear member **104** in a casting process, and enhances the strength to weight ratio. However, a variety of different configurations could be used.

While the nose walls **162-168** and socket walls **182-188** may be generally shaped to match and mate with one another along substantially their entire lengths, there are preferably one or more gaps **220** along a medial portion of the length of nose walls **162-168** and socket walls **182-188**, e.g., as shown in FIG. **6** to better ensure contact under load along the front and rear stabilizing surfaces. Gaps may also be provided along other portions of the fit as well. In the example structure shown in FIG. **6**, a gap **220** is provided in a central section of the nose and socket, between stabilizing surfaces **200**, **202**, **210**, **212** along each of the upper, lower and side surfaces. These gaps **220** can also help make the nose **108** fit more easily into the socket **120**, help ease removal of the nose **108** from the socket **120**, and reduce the need for high tolerances and/or precision in the overall manufacture of the nose **108** and socket **120**. Because of the presence of the front and rear stabilizing surfaces **200**, **202**, **210**, **212**, the gap(s) **220** can be made relatively large to assure that no undesired contact is made (thereby maintaining desired lever arm distances between contacts). The presence of the stabilizing surfaces **200**, **202**, **210**, **212** at both the front and the rear of the nose **108** and within the socket **120** of the working member **104** decreases relative motion between the wear member **104** and the nose **108** and increases the usable lives of these parts.

The spaced bands of front and rear stabilizing surfaces **200**, **210** (and the corresponding surfaces in the socket **120**) enable the assembly **100** to effectively resist loads applied from all directions. For example, a downward load L1 applied to the front end **134** of wear member **104** (see FIG. **2**) will tend to rotate wear member **104** forwardly off nose **108** if not suffi-

ciently resisted. Such loads in assembly **100** are generally resisted by front stabilizing surface **202** (e.g., top surface **202**a) and rear stabilizing surface **200** (e.g., bottom surface **200**b) (and the corresponding stabilizing surfaces **212** and **210** provided within the socket **120**). Likewise, side loads L2 applied to front end **134** are generally resisted by front stabilizing surface **202**c on one side and rear stabilizing surface **200**c on the opposite side (and the corresponding stabilizing surfaces **212** and **210** provided within the socket **120**). The use of stabilizing surfaces **200**, **202**, **210**, **212** provides stable resistance to such loads without an undue reliance on lock **106**. The use of stabilizing surface bands around the entire or most of the perimeter enables enhanced support in virtually all directions, which is particularly important in a dredging operation. Nevertheless, the stabilizing surface bands need not be formed about the entire perimeter, if desired.

In a preferred embodiment, the upper, lower and side surfaces of the nose **108** and socket **120** are preferably provided with transverse inward recesses on the nose **108** and transverse inward projections on the socket **120** along their entire lengths. However, stability, strength and/or installation benefits can be achieved by providing such a configuration only on the front ends **140**, **150** of the nose **108** and socket **120**, i.e., with a different shaped nose and socket rearward of the front ends. The front ends **140**, **150** preferably are also, as discussed above, formed with stabilizing surfaces that extend axially substantially parallel to the longitudinal axis **128** along with having the transverse inward recesses and projections, but some benefits are achieved even without this preferred axial extension.

A wide variety of different locks can be used to releasably secure wear member **104** to base **102**. Nonetheless, in a preferred embodiment, lock **106** is received into an opening **300** in wear member **104**, preferably formed in trailing wall **124** though it could be formed elsewhere. Opening **300** preferably has an axially elongated shape and includes a front wall **302**, a rear wall **304**, and sidewalls **306**, **308**. As will be described in more detail below, the lock **106** will be engaged to press against rear wall **304** of the opening **300**. A rim **310** is built up around opening **300** for protection of the lock **106** and for additional strength. Rim **310** is also enlarged along rear wall **304** to extend farther outward of the exterior surface and to define a hole **312** for passage of lock **106**. The hole **312** stabilizes the position of lock **106** and permits easy access to it by the operator.

Nose **108** includes a stop **320** that projects outward from upper side **162** of nose **108** to engage lock **106**. Stop **320** preferably has a rear face with a concave, curved recess into which a front end of lock **106** is received and retained during use (see FIG. **6**), but other arrangements could be used to engage the lock **106** with the stop **320**. In one example construction, opening **300** is long enough and trailing wall **124** sufficiently inclined to provide clearance for stop **320** when wear member **104** is installed onto nose **108**. Nevertheless, a relief or other forms of clearance could be provided in socket **120**, if needed, for the passage of stop **320**. Further, the projection of stop **320** is preferably limited by the provision of a depression **322** to accommodate a portion of lock **106**. Preferably, the stop **320** does not include an opening in the nose **108**, in order to maintain a stronger and more robust nose construction.

Lock **106** of this example construction may be a linear lock oriented generally axially to hold wear member **104** onto base **102**, and to tighten the fit of wear member **104** onto nose **108**. The use of a linear lock oriented axially increases the capacity of the lock **106** to tighten the fit of the wear member **104** on the nose **108**; i.e., it provides for a greater length of take up and

DEERE EX. A
PAGE 19

US 8,844,175 B2

13

firmly holds the thrust faces 142 and 152 against one another (this face 142 to face 152 contact is one of the primary contact modes between the wear member 104 and the nose 108). In one preferred structural arrangement, lock 106 includes a threaded shaft 324 having a front end and a rear end with head 326, a nut 328 threaded to shaft 324, and a spring 330. Spring 330 is preferably formed of a series of elastomeric disks 332 composed of foam, rubber or other resilient material, separated by spacers 334 which are preferably in the form of washers. Multiple disks 332 may be used to provide sufficient force, resiliency and take up. The spacers 334 isolate the elastomeric disks 332 so that they operate as a series of individual spring members. Spacers 334 are preferably composed of metal or metal alloys, but they could be made of other materials, such as plastic, if desired. Moreover, the spring 330 of the preferred construction is economical to make and assemble on shaft 324. Nevertheless, other kinds of springs could be used. A thrust washer 336 or other means is preferably provided at the rear end of the spring 330 to provide ample support against rear wall 304.

Shaft 324 extends centrally through spring 330 to engage nut 328. The front end of shaft 324 fits into the recess of the stop 320 so that the shaft 324 is set against stop 320 for support. The rear end of lock 106 extends through hole 312 in wear member 104 to enable a user to access the lock 106 outside of opening 300. The shaft 324 is preferably set at an angle to axis 128 so that head 326 is more easily accessed. Spring 330 sets between rear wall 304 and nut 328 so that it can apply a biasing force to the wear member 104 when the lock 106 is tightened. Hole 312 is preferably larger than head 326 to permit its passage during installation of lock 106 into assembly 100. Hole 312 also could be formed as an open slot to accommodate insertion of shaft 324 simply from above. Other tool engaging structures could be used in lieu of the illustrated head 326.

In use, wear member 104 is slid over nose 108 so that nose 108 is fit into socket 120 (FIGS. 2 and 6). The lock 106 can be temporarily held in hole 312 for shipping, storage and/or installation by a releasable retainer (e.g., a simple twist tie), fit around shaft 324 outside of opening 300, or it can be installed after the wear member 104 is fit onto the nose 108. In any event, shaft 324 is inserted through hole 312 and its front end is set in the recess of the stop 320. Lock 106 is positioned to lie along the exterior of nose 108 so that no holes, slots or the like need to be formed in the nose 108 to contain the lock 106 for resisting the loads. Head 326 is engaged and turned by a tool to tighten the lock 106 to a compressive state to hold the wear member 104 (i.e., shaft 324 is turned relative to nut 328 so that front end presses against stop 320). This movement, in turn, draws nut 328 rearward against spring 330, which is compressed between nut 328 and rear wall 304. This tightening of lock 106 pulls wear member 104 tightly onto nose 108 (i.e., with front thrust faces 142 and 152 engaged) for a snug fit and less wear during use. Continued turning of shaft 324 further compresses spring 330. The compressed spring 330 then urges wear member 104 rearward as the nose 108 and socket 120 begin to wear. The stability of this preferred nose 108 and wear member 104 arrangement enables the use of an axial lock 106, i.e., no substantial bending forces will be applied to the lock 106 so that the high axial compressive strength of the bolt can be used to hold the wear member 104 to the base 102. Lock 106 is lightweight, hammerless, easy to manufacture, does not consume much space, and does not require any openings in the nose 108.

In one preferred example construction according to this invention, lock 106 also includes an indicator 340 fit onto shaft 324 in association with nut 328. Indicator 340 may be,

14

for example, a plate formed of steel or other rigid material that has side edges that fit closely to sidewalls of opening 300, but not tightly into opening 300. Indicator 340 includes an opening that fully or partially receives nut 328 to prevent rotation of the nut 328 when shaft 324 is turned. The close receipt of side edges of indicator 340 to the sidewalls of the opening 300 prevents the indicator 340 from turning. Alternatively, if desired, the indicator 340 could have a threaded bore to function as the nut 328, and other means could be provide to hold nut 328 and prevent it from turning. Indicator 340 could also be discrete from nut 328, if desired.

Indicator 340 provides a visual indication of when shaft 324 has been suitably tightened to apply the desired pressure to the wear member 104 without placing undue stress on shaft 324 and/or spring 330. In one potential construction in accordance with this invention, indicator 340 cooperates with a marker 342 formed along opening 300, e.g., along rim 310 and/or the opening's interior sidewalls. Marker 342 is preferably on rim 310 along one or both sidewalls, but it could have other constructions. Marker 342 may be, for example, a ridge or some structure that is more than mere indicia so that it can be used when retightening lock 106 after wear begins to develop, as well as at the time of initial tightening when all of the parts are new.

When shaft 324 is turned and nut 328 is drawn rearward, indicator 340 moves rearward with nut 328 within opening 300. When indicator 340 aligns with marker 342, the operator knows that tightening can be stopped. At this position, lock 106 applies a predetermined pressure on wear member 104 irrespective of the wear on the nose 108 and/or in the socket 120. Hence, both under-tightening and over-tightening of the lock 106 can be easily avoided. As an alternative, indicator 340 can be omitted and shaft 324 may be tightened to a predetermined amount of torque.

The large thrust face (142, 152) contact, along with the front and rear stabilizing surfaces (200, 202, 210, 212) and contact between these surfaces and the lock features 106 (e.g., as described above) allow the wear member 104 and nose 108 to wear back much further than many currently available systems (including wear into the thrust face areas) without the need for interim weld repairs. In many instances, an end user can rebuild the nose 108, if desired, in lieu or replacing the entire mounting base 102. Moreover, regardless of wear on the nose 108, the lock 106 helps maintain relatively constant wear member 104 on nose 108 preload forces when a wear member 104 is installed. Aspects of this invention, including the thrust faces 142, 152, the front and rear stabilizing surfaces 200, 202, 210, 212, and/or the lock features 106 (e.g., as described above) increase wear member 104 stability on the nose 108 and lessen movement of the wear member 104 on the nose, thereby reducing wear on the nose and extending its life.

The various aspects of the invention are preferably used together for optimal performance and advantage. Nevertheless, the different aspects can be used individually to provide the benefits they each provide.

CONCLUSION

The present invention is described above and in the accompanying drawings with reference to a variety of example structures, features, elements, and combinations of structures, features, and elements. The purpose served by the disclosure, however, is to provide examples of the various features and concepts related to the invention, not to limit the scope of the invention. One skilled in the relevant art will recognize that numerous variations and modifications may be

DEERE EX. A
PAGE 20

15

made to the example structures described above without departing from the scope of the present invention.

The invention claimed is:

**1**. A wear member for excavating equipment comprising a working section and a mounting section extending generally along a longitudinal axis, the mounting section including a socket for receiving a base fixed to the excavating equipment, and the socket having a front stabilizing end and a rear stabilizing end, the front stabilizing end is forward of the rear stabilizing end, the rear stabilizing end including a plurality of rear stabilizing surfaces, the front stabilizing end including a front thrust surface extending generally transverse to the longitudinal axis, and a top surface, a bottom surface, a first side surface, and a second side surface, each said top surface, bottom surface, first side surface, and second side surface extending rearwardly from the front thrust surface, wherein at least one of the top surface and the bottom surface and each of the first side surface and the second side surface has a transverse, inward projection in the front stabilizing end defined by bearing surfaces that are adjacent to and extend from the front thrust surface substantially parallel to the longitudinal axis in an axial direction.

**2**. A wear member according to claim **1**, wherein the top surface and the bottom surface each has a transverse, inward projection defined by bearing surfaces that are adjacent to and extend axially substantially parallel to the longitudinal axis.

**3**. A wear member according to claim **1**, wherein each of the inward projections is curved and extends substantially across the width of the front stabilizing end.

**4**. A wear assembly for excavating equipment comprising: a base fixed to the excavating equipment; a wear member comprising a working section and a mounting section extending generally along a longitudinal axis of the wear member, the mounting section including a socket having a front stabilizing end and a rear stabilizing end, the front stabilizing end is forward of the rear stabilizing end, the rear stabilizing end including a plurality of rear stabilizing surfaces, the front stabilizing end including a front thrust surface extending generally transverse to the longitudinal axis, and a top surface, a bottom surface, a first side surface, and a second side surface, each said top surface, bottom surface, first side surface, and second side surface extending rearwardly from the front thrust surface, wherein each of the first side surface and the second side surface has a transverse, inward projection in the front stabilizing end defined by bearing surfaces that are adjacent to and extend from the front thrust surface substantially parallel to the longitudinal axis in an axial direction; and an engagement system for releasably holding the wear member to the base.

**5**. A wear assembly according to claim **4**, wherein the base includes a nose having a front end with an exterior configuration shaped to substantially conform to a shape of the front stabilizing end of the socket.

**6**. A wear member for excavating equipment comprising a working section and a mounting section extending generally along a longitudinal axis, the mounting section including a socket for receiving a base fixed to the excavating equipment, and the socket having a front end and a rear end, the front end is forward of the rear end, the rear end including a plurality of rear stabilizing surfaces, the front end including a front thrust surface extending generally transverse to the longitudinal axis and a top surface, a bottom surface, a first side surface, and a second side surface, each said top surface, bottom surface, first side surface, and second side surface extending rearwardly from the front thrust surface, wherein each of the first side surface and the second side surface has an inward projection in the front end axially extending from the front

16

thrust surface, and wherein the inward projection extends into the rear end of the socket and substantially along an entire length of the socket, the inward projection having front bearing surfaces in the front end adjacent to the front thrust surface and rear bearing surfaces in the rear end that each axially extend substantially parallel to the longitudinal axis.

**7**. A wear member according to claim **6**, wherein each of the top surface, the bottom surface, the first side surface, and the second side surface has a transverse, inward projection extending from the front thrust face and substantially along the entire length of the socket.

**8**. A wear member according to claim **7**, wherein each of the inward projections is curved and extending substantially across the width of the front end.

**9**. A wear assembly for excavating equipment comprising: a base fixed to the excavating equipment; a wear member comprising a working section and a mounting section extending generally along a longitudinal axis of the wear member, the mounting section including a socket having a front end and a rear end, the front end is forward of the rear end, the rear end including a plurality of rear stabilizing surfaces, the front end including a front thrust surface extending generally transverse to the longitudinal axis, and a top surface, a bottom surface, a first side surface, and a second side surface, each said top surface, bottom surface, first side surface, and second side surface extending rearwardly from the front thrust surface, wherein at least one of the top surface and the bottom surface and each of the first side surface and the second side surface has an inward projection in the front end axially extending from the front thrust surface and wherein the inward projection extends into the rear end of the socket and substantially along an entire length of the socket, the inward projection having front bearing surfaces in the front end adjacent to the front thrust surface and rear bearing surfaces in the rear end that each axially extend substantially parallel to the longitudinal axis; and an engagement system for releasably holding the wear member to the base.

**10**. A wear assembly according to claim **9**, wherein the base includes a nose having a front end with an exterior configuration including a trough shaped to receive each of the transverse, inward projections of the socket.

**11**. A wear member according to claim **9**, wherein each of the inward projections is curved and extending substantially across the width of the front stabilizing end.

**12**. A wear assembly according to claim **11**, wherein the base includes a nose having a front end with an exterior configuration including a trough shaped to receive each of the transverse, inward projections of the socket.

**13**. A wear member for excavating equipment comprising a working section and a mounting section, the mounting section including a socket open rearwardly to receive a base secured to the excavating equipment, the socket having a longitudinal axis and including a front end and a rear end, the front end including a front thrust surface, a top side, a bottom side and opposite lateral sides, each of the top, bottom and lateral sides extending rearward of the front thrust face, each of the lateral sides including an inward, axially extending projection defined by bearing surfaces to contact and bear against the base, the bearing surfaces being adjacent to and extend rearward from the front thrust surface in an axial orientation that is substantially parallel to the longitudinal axis, wherein the rear end of the socket is rearward of the top, bottom and lateral sides of the front end.

**14**. A wear member according to claim **13** wherein each said projection has a generally V-shaped configuration defined by a pair of the bearing surfaces.

DEERE EX. A
PAGE 21

US 8,844,175 B2

**17**

**15**. A wear member according to claim **13** wherein the rear end is defined by a top side, a bottom side and opposite lateral sides each of which extend rearward from the front end, and each of the lateral sides of the rear end include a transverse, inward projection defined by bearing surfaces to contact and bear against the base that are aligned and contiguous with the projections in the front end.

**16**. A wear member according to claim **13** wherein at least one of the top side and the bottom side includes an inward, axially extending projection defined by bearing surfaces to contact and bear against the base, and the bearing surfaces are adjacent to and extend rearward from the front thrust surface in an axial orientation that is substantially parallel to the longitudinal axis.

**17**. A wear assembly for excavating equipment comprising:

a base secured to the excavating equipment;

a wear member for excavating equipment comprising a working section and a mounting section, the mounting section including a socket open rearwardly to receive a base secured to the excavating equipment, the socket having a longitudinal axis and including a front end and a rear end, the front end including a front thrust surface, a top side, a bottom side and opposite lateral sides, each of the top, bottom and lateral sides extending rearward of the front thrust face, each of the lateral sides including an inward, axially extending projection defined by bearing surfaces to contact and bear against the base, the bearing surfaces being adjacent to and extend rearward

**18**

from the front thrust surface in an axial orientation that is substantially parallel to the longitudinal axis, wherein the rear end of the socket is rearward of the top, bottom and lateral sides of the front end; and

a lock to contact the base and the wear member and releasably hold the wear member to the base.

**18**. A wear assembly according to claim **17** wherein each said projection has a generally V-shaped configuration defined by a pair of the bearing surfaces.

**19**. A wear assembly according to claim **17** wherein the rear end is defined by a top side, a bottom side and opposite lateral sides each of which extend rearward from the front end, and each of the lateral sides of the rear end include a transverse, inward projection defined by bearing surfaces to contact and bear against the base that are aligned and contiguous with the projections in the front end.

**20**. A wear assembly according to claim **17** wherein the base includes a top wall, a bottom wall and opposite sidewalls, and each of the sidewalls includes a slot corresponding in shape with and receiving the respective projection in the socket.

**21**. A wear assembly according to claim **17** wherein at least one of the top side and the bottom side includes an inward, axially extending projection defined by bearing surfaces to contact and bear against the base, and the bearing surfaces are adjacent to and extend rearward from the front thrust surface in an axial orientation that is substantially parallel to the longitudinal axis.

\* \* \* \* \*

DEERE EX. A
PAGE 22

# EXHIBIT B

# EXHIBIT A

DEERE EX. B
PAGE 24

US010273662B2

## (12) United States Patent
### Carpenter

(10) Patent No.: **US 10,273,662 B2**
(45) Date of Patent: **\*Apr. 30, 2019**

(54) **WEAR ASSEMBLY**

(71) Applicant: **ESCO Corporation**, Portland, OR (US)

(72) Inventor: **Christopher M. Carpenter**, Tualatin, OR (US)

(73) Assignee: **ESCO GROUP LLC**, Portland, OR (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 224 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/746,210**

(22) Filed: **Jan. 21, 2013**

(65) **Prior Publication Data**

US 2014/0026450 A1     Jan. 30, 2014

**Related U.S. Application Data**

(63) Continuation of application No. 12/792,999, filed on Jun. 3, 2010, now Pat. No. 8,356,432, which is a continuation of application No. 11/706,592, filed on Feb. 14, 2007, now Pat. No. 7,730,651.

(60) Provisional application No. 60/774,401, filed on Feb. 17, 2006.

(51) **Int. Cl.**
*E02F 9/28*          (2006.01)

(52) **U.S. Cl.**
CPC .............. *E02F 9/2833* (2013.01); *E02F 9/28* (2013.01); *E02F 9/2825* (2013.01); *E02F 9/2883* (2013.01)

(58) **Field of Classification Search**
CPC ..... E02F 9/2883; E02F 9/2808; E02F 9/2816; E02F 9/2825; E02F 9/2833; E02F 9/2858

USPC .................... 37/446, 450, 452–456; 172/719
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,384,701 A | 7/1921 | McMonegal | |
| 1,916,354 A | 7/1933 | Barber | |
| 2,040,085 A * | 5/1936 | Fykse ................... | E02F 9/2825 37/452 |
| 2,256,488 A * | 9/1941 | Murtaugh ............ | E02F 9/2825 37/455 |
| 2,921,391 A * | 1/1960 | Opsahl ............................ | 37/454 |
| 3,079,710 A | 3/1963 | Larsen et al. | |
| 3,444,633 A | 5/1969 | Hensley | |
| 3,496,658 A * | 2/1970 | Eyolfson ................. | E02F 9/28 37/455 |
| 3,624,827 A * | 11/1971 | Liess et al. ........................ | 37/92 |
| 3,675,350 A * | 7/1972 | Mulcahy et al. .............. | 37/457 |
| 3,704,753 A | 12/1972 | Hasforth et al. | |
| 3,774,324 A * | 11/1973 | Lafond ................. | E02F 9/2841 172/713 |
| 3,881,262 A | 5/1975 | Cullen | |
| 4,136,469 A | 1/1979 | Zepf | |
| 4,233,761 A | 11/1980 | Ryerson | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| GB | 1597554 | 9/1981 |
| JP | 50132703 | 10/1975 |
| JP | 410183698 A | 7/1998 |

*Primary Examiner* — Thomas B Will
*Assistant Examiner* — Joan D Misa
(74) *Attorney, Agent, or Firm* — John Anderton

(57) **ABSTRACT**

A wear assembly for securing a wear member to excavating equipment that includes a base having a nose and a wear member having a socket. The nose and socket are each provided with one or more complementary stabilizing surfaces in central portions thereof.

**26 Claims, 9 Drawing Sheets**



US 10,273,662 B2

Page 2

(56)     **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,404,760 A * | 9/1983 | Hahn et al. | 37/459 |
| 4,476,642 A * | 10/1984 | Hemphill | E02F 9/2816 |
| | | | 279/102 |
| 4,577,423 A | 3/1986 | Hahn | |
| 5,144,762 A | 9/1992 | Robinson | |
| 5,177,886 A | 1/1993 | Klett | |
| 5,386,653 A | 2/1995 | Cornelius | |
| 5,456,029 A | 10/1995 | Cornelius | |
| 5,564,206 A | 10/1996 | Ruvang | |
| 5,709,043 A * | 1/1998 | Jones | E02F 9/2825 |
| | | | 37/458 |
| 5,765,301 A | 6/1998 | Clendenning | |
| 5,778,571 A * | 7/1998 | Pasqualini et al. | 37/455 |
| D410,657 S | 6/1999 | Launder | |
| 5,956,874 A | 9/1999 | Ianello et al. | |
| 5,987,787 A | 11/1999 | Mack | |
| 5,992,063 A | 11/1999 | MacK | |
| 6,047,487 A | 4/2000 | Clendenning | |
| 6,079,132 A | 6/2000 | Clendenning | |
| 6,108,950 A | 8/2000 | Ruvang et al. | |
| 6,247,255 B1 | 6/2001 | Clendenning | |
| 6,321,471 B2 | 11/2001 | Munoz et al. | |
| 6,735,890 B2 * | 5/2004 | Carpenter | E02F 9/28 |
| | | | 172/713 |
| 6,865,828 B1 | 3/2005 | Molino et al. | |
| 7,100,315 B2 * | 9/2006 | Carpenter | E02F 9/28 |
| | | | 37/446 |
| 2001/0001352 A1 * | 5/2001 | Fernandez Munoz | |
| | | | E02F 9/2825 |
| | | | 37/455 |

* cited by examiner

DEERE EX. B
PAGE 26



FIG.1

DEERE EX. B
PAGE 27



FIG.1A

DEERE EX. B
PAGE 28



FIG.2



FIG.3

DEERE EX. B
PAGE 29



FIG.4

FIG.5

FIG.6

DEERE EX. B
PAGE 30

Case 1:20-cv-00699-WCB Document 251 Filed 05/10/23 Page 34 of 234 PageID 99123



FIG.7

FIG.8

Case 1:20-cv-00669-WCB-MPT Document 251 Filed 06/10/22 Page 35 of 234 PageID #: 9124



FIG.9

FIG.10

FIG.11

FIG.12

DEERE EX. B
PAGE 32



FIG.13

Case 2:20-cv-01679-WCB-MPD   Document 25-11   Filed 05/10/20   Page 37 of 234 PageID #: 9126



FIG.14

DEERE EX. B
PAGE 34



FIG.15

**1**

## WEAR ASSEMBLY

This application is a continuation of co-pending application. Ser. No. 12/792,999 filed Jun. 3, 2010, which is a continuation of patent application Ser. No. 11/706,592 filed Feb. 14, 2007, now U.S. Pat. No. 7,730,651, which is a non-provisional application based on provisional patent application Ser. No. 60/774,401 filed Feb. 17, 2006.

### FIELD OF THE INVENTION

The present invention pertains to a wear assembly for securing a wear member to excavating equipment.

### BACKGROUND OF THE INVENTION

Wear parts are commonly attached along the front edge of excavating equipment, such as excavating buckets or cutterheads, to protect the equipment from wear and to enhance the digging operation. The wear parts may include excavating teeth, shrouds, etc. Such wear parts typically include a base, a wear member and a lock to releasably hold the wear member to the base.

In regard to excavating teeth, the base includes a nose which is fixed to the front edge of the excavating equipment (e.g., a lip of a bucket). The nose may be formed as an integral part of the front edge or as part of one or more adapters that are fixed to the front edge by welding or mechanical attachment. A point is fit over the nose. The point narrows to a front digging edge for penetrating and breaking up the ground. The assembled nose and point cooperatively define an opening into which the lock is received to releasably hold the point to the nose.

These kinds of wear parts are commonly subjected to harsh conditions and heavy loading. Accordingly, the wear members wear out over a period of time and need to be replaced. Many designs have been developed in an effort to enhance the strength, stability, durability, penetration, safety, and ease of replacement of such wear members with varying degrees of success.

### SUMMARY OF THE INVENTION

The present invention pertains to an improved wear assembly for securing wear members to excavating equipment for enhanced stability, strength, durability, penetration, safety, and ease of replacement.

In accordance with one aspect of the invention, the base and wear member define a nose and socket, which are formed with complementary stabilizing surfaces extending substantially parallel to the longitudinal axis of the assembly to provide a stronger and more stable construction. One or more of the stabilizing surfaces are formed generally along central portions of the nose and socket, and away from the outer edges of these components. As a result, the high loads anticipated during use are primarily carried by the more robust portion of the nose, and not on the extreme bending fibers, for a stronger and longer lasting base structure. This construction further reduces the formation of high stress concentrations along the components.

In another aspect of the invention, the wear member includes a socket opening in the rear end to receive a supporting nose. The socket is defined by top, bottom and side walls and has a longitudinal axis. At least one of the top and bottom walls includes a stabilizing projection, each of which has bearing surfaces facing in different directions to bear against opposite sides of a V-shaped recess in the nose.

**2**

In another aspect of the invention, pairs of stabilizing surfaces in each component are formed at a transverse angle to each other to provide enhanced stability in resisting vertical and side loads. In one exemplary embodiment, the stabilizing surfaces form a V-shaped configuration on at least one side of the nose and the socket.

In one other aspect of invention, the stabilizing surfaces are recessed in the nose to protect these base surfaces from damage and wear caused by the mounting of successive wear members or due to excessive wearing of the wear members.

In another aspect of the invention, the nose and socket are formed with complementary recesses and projections on all sides (i.e., top, bottom and side walls) in order to maximize the stabilizing surfaces available to resist the heavy loads that can occur during use.

In another aspect of the invention, the nose and socket are each formed to have a generally X-shaped, transverse, cross-section for enhanced stability. While the recesses and projections forming these configurations are preferably defined by stabilizing surfaces, benefits can still be achieved with the use of bearing surfaces that are not substantially parallel to the longitudinal axis of the assembly.

In one other aspect of the invention, the front end and/or body of the nose and socket are formed with a generally oval configuration. This construction provides high strength and a longer nose life, omits distinct corners to reduce concentrations of stress, and presents a reduced thickness for enhanced penetration in the ground.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. **1** and **1**A are perspective views of a wear assembly in accordance with the present invention.

FIG. **2** is a rear perspective view of a nose of the present wear assembly.

FIG. **3** is a front perspective view of the nose.

FIG. **4** is a front view of the nose.

FIG. **5** is a top view of the nose.

FIG. **6** is a side view of the nose.

FIG. **7** is a partial, rear perspective view of a wear member of the present wear assembly.

FIG. **8** is a partial perspective view of the wear assembly cut-away along a transverse plane immediately rearward of the lock.

FIGS. **9-12** are transverse cross sections along the top wall of the wear member illustrating different examples of stabilizing projections.

FIG. **13** is a perspective view of a wear assembly of the present invention with an alternative locking arrangement.

FIG. **14** is a partial, axial cross-sectional view of the alternative wear assembly.

FIG. **15** is an exploded perspective view of the lock of the alternative wear assembly.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The present invention pertains to a wear assembly **10** for releasably attaching a wear member **12** to excavating equipment. In this application, wear member **12** is described in terms of a point for an excavating tooth that is attached to a lip **13** of an excavating bucket. However, the wear member could be in the form of other kinds of products (e.g., shrouds) or attached to other equipment (e.g., dredge cutterheads). Moreover, relative terms such as forward, rear-

DEERE EX. B
PAGE 36

US 10,273,662 B2

3

ward, up, down, vertical or horizontal are used for convenience of explanation with reference to FIG. **1**; other orientations are possible.

In one embodiment (FIGS. **1** and **1**A), point **12** is adapted to fit on nose **14** fixed to a bucket lip **13** or other excavating equipment (not shown). In this embodiment, the nose is the front part of a base **15** that is fixed to an excavating bucket. The rear mounting end of the base (not shown in FIG. **1**) can be fixed to the bucket lip **13** in a number of ways. For example, the nose can be formed as an integral portion of the lip, such as by being cast with the lip, or otherwise fixed by welding or mechanical attachment. When the base is welded or secured to the lip by a locking mechanism, the base **15** will include one or two rearward legs **17**, **18** that extend over the lip **13**. In these situations, the base is typically called an adapter. The base can also consist of a plurality of interconnected adapters. The point includes a socket to receive the nose. The point and nose are then secured together by a lock **16**.

Nose **14** has a body **25** with top and bottom walls **20**, **21** that converge toward a front end **24**, and opposite sidewalls **22**, **23** (FIGS. **2**-**6**). The rear portion of the sidewalls are generally parallel to each other (i.e., with a slight forward convergence); of course, other configurations are possible. The front end **24** is formed with top and bottom stabilizing surfaces **30**, **32** that are substantially parallel to the longitudinal axis **34**. The term "substantially parallel" is intended to include parallel surfaces as well as those that diverge rearwardly from axis **34** at a small angle (e.g., of about 1-7 degrees) for manufacturing purposes. In one preferred embodiment, each stabilizing surface **30**, **32** diverges rearwardly at an angle to axis **34** of no more than about 5 degrees and most preferably at about 2-3 degrees. In the illustrated embodiment, stabilizing surfaces **30**, **32** are laterally curved so as to meet along the sides of the nose. In this way, stabilizing surfaces are formed around the entire front end **24** of the nose **14**. Of course, other configurations are possible.

In the illustrated embodiment, front end **24** has generally an oval transverse shape with an oval front wall **36**. Similarly, the body **25** of nose **14** also has a generally oval transverse shape except for stabilizing recesses **127**, **129**. As seen in FIG. **3**, body **25** expands rearward from front end **24** over much of its length. The use of an oval-shaped nose forms high strength nose sections that result in a longer nose life. An oval shape also lessens the presence of corners and, thus, reduces stress concentrations along the outer edges of the nose. The oval shape also presents a streamlined profile that improves penetration into the ground during a digging operation; i.e., the wear member is formed with an oval-shaped socket for receiving the nose which, in turn, allows the wear member to have a slimmer profile for better penetration. Nevertheless, the front end and body of the nose could have other shapes; for example, the nose and socket could be more angular and define a generally parallelepiped front end with generally rectangular stabilizing surfaces and/or generally flat and angular top, bottom and side walls as the body of the nose. The general configuration of the nose (i.e., the oval shape) can vary considerably.

In one embodiment (FIGS. **2**-**6**), the top, bottom and side walls **20**-**23** of nose **14** each includes a pair of stabilizing surfaces **40**-**47** that are each substantially parallel to axis **34**. As noted with front stabilizing surfaces **30**, **32**, these rear stabilizing surfaces **40**-**47** are preferably angled relative to the longitudinal axis **34** by no more than about 5 degrees, and most preferably at about 2-3 degrees to axis **34**. While any portion of the nose may at times bear loads from the

4

point, the stabilizing surfaces are intended to be primary surfaces for resisting loads that are applied to the nose by the point.

Wear member **12** comprises top, bottom and side portions to define a front working end **60** and a rear mounting end **62** (FIGS. **1**, **7** and **8**). In regard to a point, the working end is a bit with a front digging edge **66**. While the digging edge is shown as a linear segment, the bit and digging edge could have any of the shapes that are used in digging operations. The mounting end **62** is formed with a socket **70** that receives nose **14** for supporting the point on the excavating equipment (not shown). Socket **70** is formed by interior walls of the top, bottom and side portions **50**-**53** of point **12**. Preferably, socket **70** has a shape that is complementary to nose **14**, though some variations could be included.

In one embodiment (FIG. **7**), socket **70** includes a front end **94** with top and bottom stabilizing surfaces **90**, **92** and a generally elliptical front surface **98** to match front end **24** of the nose. Top, bottom and side walls **100**-**103** of the socket extend rearward from front end **94** to complement top, bottom and side walls **20**-**23** of nose **14**. Each of these walls **100**-**103** are preferably formed with stabilizing surfaces **110**-**117** that bear against stabilizing surfaces **40**-**47** on the nose. As with the stabilizing surfaces **30**, **32**, **40**-**47** of the nose, stabilizing surfaces **90**, **92**, **110**-**117** in socket **70** are substantially parallel to longitudinal axis **34**. Preferably, the stabilizing surfaces in the point are designed to match those in the nose; that is, if the stabilizing surfaces in the nose diverge at an angle of about 2 degrees relative to axis **34**, then, the stabilizing surfaces of the socket also diverge at an angle of about 2 degrees to axis **34**. However, the stabilizing surfaces **110**-**117** in socket **70** could be inclined to axis **34** at a slightly smaller angle (e.g., a degree or two) as compared to stabilizing surfaces **40**-**47** on nose **14** to force a tight engagement between the opposed stabilizing surfaces at a particular location(s), for example, along the rear portions of the nose and socket.

Stabilizing surfaces **40**-**43** in top and bottom walls **20**, **21** are each formed in a central portion of the nose so as to be located in the thickest, most robust portion of the nose. These stabilizing surfaces are preferably limited to the central portions rather than extending entirely across the nose. In this way, the loads are not primarily carried by the outer portions of the nose where the most bending occurs. Moreover, keeping the stabilizing surfaces **40**-**43** away from the outer edges can also be used to reduce the creation of high stress concentrations in the transition between nose **14** and the mounting portion of base **15**. The side portions **119** of nose **14** to each side of stabilizing surfaces **40**-**43** preferably diverge relative to axis **34** at a steeper angle than stabilizing surfaces **40**-**43** to provide strength and at times a smoother transition between nose **14** and the rear mounting portion of base **15**. Nonetheless, stabilizing surfaces **40**-**43**, **110**-**113** could extend the entire width and depth of the nose and socket.

Stabilizing surfaces **30**, **32**, **40**-**43**, **90**, **92**, **110**-**113** stably support the point on the nose even under heavy loading. The rear stabilizing surfaces **40**-**43**, **110**-**113** are preferably tiered (i.e., vertically spaced) relative to front stabilizing surfaces **30**, **32**, **90**, **92** for enhanced operation, but such tiers are not necessary.

When loads having vertical components (herein called vertical loads) are applied along the digging edge **66** of point **12**, the point is urged to roll forward off the nose. For example, when a downward load L1 is applied to the top of digging edge **66** (FIG. **1**), point **12** is urged to roll forward on nose **14** such that front stabilizing surface **90** in socket **70**

DEERE EX. B
PAGE 37

5

bears against stabilizing surface **30** at front end **24** of nose **14**. The bottom, rear portion **121** of point **12** is also drawn upward against the bottom rear portion of nose **14** such that rear stabilizing surfaces **112**, **113** in the socket bear against stabilizing surfaces **42**, **43** on the nose. The substantially parallel stabilizing surfaces provide a more stable support for the point as compared to converging surfaces, with less reliance on the lock. For instance, if load L**1** was applied to a nose and socket defined by converging top and bottom walls without stabilizing surfaces **42**, **43**, **112**, **113**, the urge to roll the point on the nose is resisted in part by the abutting of rear portions of the bottom converging walls. Since these walls are inclined, their abutment tends to urge the point in a forward direction, which must be resisted by the lock. Accordingly, in such constructions, a larger lock is needed to hold the point to the nose. A larger lock, in turn, requires larger openings in the nose and point, thus, reducing the overall strength of the assembly. In the present invention, stabilizing surfaces **30**, **42**, **43**, **90**, **112**, **113** are substantially parallel to longitudinal axis **34** to lessen this forward urging of the point. As a result, the point is stably supported on the nose, which increases the strength and stability of the mount, reduces wear, and enables the use of smaller locks. Stabilizing surfaces **32**, **40**, **41**, **92**, **110**, **111** function in the same manner for upwardly-directed vertical loads.

In the illustrated embodiment (FIGS. **2**-**6**), stabilizing surfaces **40**, **41** on top wall **20** are inclined to each other in a transverse direction (FIGS. **2**-**4**). In the same way, stabilizing surfaces **42**, **43** are set at a transverse angle to each other. Preferably, angled stabilizing surfaces **40**-**43** are symmetrical. Likewise, stabilizing surfaces **110**-**113** form inclined surfaces to bear against stabilizing surfaces **40**-**43** of nose **14**. This transverse inclination enables stabilizing surfaces **40**-**43** to engage stabilizing surfaces **110**-**113** in socket **70** and resist loads with side or lateral components (herein called side loads), such as load L**2** (FIG. **1**). It is advantageous for the same surfaces resisting vertical loading to also resist side loading because loads are commonly applied to points in shifting directions as the bucket or other excavating equipment is forced through the ground. With the laterally inclined surfaces, bearing between the same surfaces can continue to occur even if a load shifts, for example, from more of a vertical load to more of a side load. With this arrangement, movement of the point and wearing of the components can be reduced.

The stabilizing surfaces **40**-**41** and **42**-**43** are preferably oriented relative to each other at an angle φ between about 90° and 180°, and most preferably at about 160 degrees (FIG. **4**). The angle is generally chosen based on a consideration of the expected loads and operation of the machine. As a general rule, though there could be exceptions, angle φ would preferably be large when heavy vertical loads are expected and smaller when heavier side loading is expected. Since heavy vertical loading is common, the angle between the stabilizing surfaces will generally be a large one. However, this transverse angle φ may vary considerably and be smaller than 90° in certain circumstances, such as in light duty operations or those with exceptionally high side loading.

As seen in FIGS. **2** and **3**, rear stabilizing surfaces **40**-**41** and **42**-**43** are preferably planar and oriented to form V-shaped recesses **127** in the nose. However, these rear stabilizing surfaces could have a myriad of different shapes and orientations. While the objectives of the invention may not be fully met in each different shape, the variations are still able to achieve certain aspects of the invention. For example, the rear stabilizing surfaces need not be planar and

6

could be formed with convex or concave curves. The rear stabilizing surfaces could be formed to define a shallow U-shaped continuous curve so that the inclined stabilizing surfaces flow uninterrupted into each other. The rear stabilizing surfaces could form a generally trapezoidal recess having a central stabilizing surface with generally no transverse inclination and two side stabilizing surfaces at virtually any obtuse angle to the central surface to resist side loading. The rear stabilizing surfaces could be inclined to each other at varying angles. The formation of stabilizing recesses in the nose and complementary projections in the socket is preferred to reduce the risk of wearing or deforming the nose surfaces by the mounting of multiple points or on account of holes being worn through the point. Nevertheless, the recesses and projections could be reversed. Also, since vertical loading is often much more significant than side loading, the stabilizing surfaces could be centrally positioned on the nose in spaced relation to the side edges but with no transverse inclination.

The rear stabilizing surfaces **40**-**43** are generally most effective when located at or near the rear end of the nose. Hence, in the illustrated embodiment (FIGS. **2**-**6**), front portions **123** of stabilizing surfaces **40**-**43** taper to a front point. Of course, front portions **123** could have other narrowing shapes, non-converging shapes, or be eliminated entirely. Although stabilizing surfaces **40**-**41** are preferably the mirror images of stabilizing surfaces **42**-**43**, it is not required that they be so.

In each of these orientations, the stabilizing surfaces **110**-**113** of the point preferably complement the stabilizing surfaces on the nose, however, variations could be used. Accordingly, as illustrated, stabilizing surfaces **110**, **111** complement stabilizing surfaces **40**, **41**, and stabilizing surfaces **112**, **113** complement stabilizing surfaces **42**, **43**. Hence, in the illustrated embodiment, stabilizing surfaces **110**, **111** in the top wall **100** of socket **70** are formed to define a generally V-shaped stabilizing projection **125** with the stabilizing surfaces inclined to each other at an angle λ of about 160 degrees to fit into stabilizing recess **127** formed by stabilizing surfaces **40**, **41** on nose **14** (FIG. **7**). Likewise, stabilizing surfaces **112**, **113** in bottom surface **101** of socket **70** form a V-shaped stabilizing projection **125** to matingly fit within the stabilizing recess **127** formed by stabilizing surfaces **42**, **43** on the nose. Nevertheless, the lateral angle λ between each of pair of stabilizing surfaces (such as between surfaces **110** and **111**) in socket **70** could be slightly varied relative to the angle φ between each pair of the corresponding stabilizing surfaces on the nose (such as between surfaces **40** and **41**) to ensure a tight fit at a certain location (e.g., along the center of the stabilizing recesses **127**, **129**).

As alternatives, the stabilizing projections of socket **70** could have other shapes or forms to fit within stabilizing recesses **127**. For example, the stabilizing projections **125***a* could have a curved (e.g., hemispherical) configuration (FIG. **9**) to fit within the V-shaped stabilizing recess **127**, a complementary curved recess or other recess shape adapted to receive the projection. Also, the stabilizing projections **125***b* (FIG. **10**) could be thinner than stabilizing recesses **127** into which it is received. Stabilizing projections may have a shorter length than the recesses **127** and extend only partially along the length of the recess (FIG. **11**) or have an interrupted length with gaps in between segments. Stabilizing projections may also be provided by a separate component such as a spacer that is held in place by a bolt, the lock, or other means. Further a plurality of stabilizing projections **125***d* (FIG. **12**) may be provided in place of a single central

DEERE EX. B
PAGE 38

7

projection. Also, in certain circumstances, e.g., in light duty operations, a limited benefit can be achieved through the use of, for example, recesses and projections in the top and bottom walls of the nose and socket that are defined by bearing surfaces that are not substantially parallel to longitudinal axis **34**, in lieu of stabilizing surfaces **40-43**, **110-113**.

Sidewalls **22**, **23** of nose **14** are also preferably formed with stabilizing surfaces **44-47** (FIGS. **2-6**). These stabilizing surfaces **44-47** are also substantially parallel to longitudinal axis **34**. In the illustrated embodiment, stabilizing surfaces **44**, **45** are oriented at an angle θ to each other so as to define a longitudinal recess or groove **129** along sidewall **22** of nose **14** (FIG. **4**). Likewise, stabilizing surfaces **46**, **47** are oriented at an angle θ to each other to define a recess or groove **129** along sidewall **23** as well. These stabilizing surfaces **44**, **45** and **46**, **47** are preferably set at an angle θ between about 90° and 180°, and most preferably at about 120 degrees. Nonetheless, other angles could be selected including those substantially smaller than 90° and even to a parallel relationship in certain circumstances, such as heavy vertical loading or light duty operations. Stabilizing recesses **129** along sidewalls **22**, **23** are adapted to receive complementary stabilizing projections **131** formed in socket **70**. Stabilizing projections **131** are defined by stabilizing surfaces **114-117** forming inclined surfaces to bear against stabilizing surfaces **44-47** of nose **14** (FIG. **7**). The lateral angle α between side stabilizing surfaces **114**, **115** and **116**, **117** preferably matches the angle α of surfaces **44**, **45** and **46**, **47**. Nevertheless as discussed for rear stabilizing surfaces **110-113**, the angle between each pair of side stabilizing surfaces in socket **70** could be varied slightly from the side stabilizing surfaces on nose **14** to form a tight fit at a particular location (e.g., along the center of the stabilizing recesses **129**). Also, the variations in shapes for stabilizing recesses **127** and stabilizing projections **125** discussed above are equally applicable for recesses **129** and projections **131**.

Front stabilizing surfaces **30**, **32** work in conjunction with side stabilizing surfaces **44-47** to resist side loads such as L**2**. For example, the application of side load L**2** causes point **12** to cant on nose **14**. The side portions of front stabilizing surfaces **90**, **92** on the side load L**2** is applied are pushed laterally inward to bear against front stabilizing surfaces **30**, **32** on the nose. The rear portion of the opposite sidewall **52** of point **12** is drawn inward such that stabilizing surfaces **114**, **115** bear against **44**, **45**. Stabilizing surfaces **30**, **32**, **46**, **47**, **90**, **92**, **116**, **117** function in the same way for oppositely directed side loads.

The angled orientation of stabilizing surfaces **44-47** enable these side stabilizing surfaces to bear against stabilizing surfaces **114-117** in socket **70** to resist side and vertical loading. In the preferred construction, rear stabilizing surfaces **40-43**, **110413** are oriented closer to horizontal than vertical to primarily resist vertical loads and secondarily resist side loads. Side stabilizing surfaces **44-47**, **114-117** are oriented closer to vertical than horizontal to primarily resist side loading and secondarily resist vertical loading. However, alternative orientations are possible. For example, in heavy loading conditions, all the stabilizing surfaces **40-47**, **110-117** may be more horizontal than vertical. In use, then, in the preferred construction, vertical and side loads are each resisted by front stabilizing surfaces **30**, **32**, **90**, **92**, rear stabilizing surfaces **40-43**, **110-113**, and side stabilizing surfaces **44-47**, **114-117**. The provision of stabilizing surfaces on each of the top, bottom and side walls of the nose and socket maximizes the area the stabilizing surfaces that can be used to support the point.

8

Preferably, stabilizing surfaces **44-47** are angled equally relative to a horizontal plane extending through axis **34**. Nevertheless, asymmetric arrangements are possible, particularly if higher upward vertical loads are expected as compared to downward vertical loads or vice versa. As discussed above for rear stabilizing surfaces **40-43**, side stabilizing surfaces **44-47** can be formed with a variety of different shapes. For example, while surfaces **44-47** are preferably planar, they can be convex, concave, curved or consisting of angular segments. Grooves **129** could also be formed with generally U-shaped or trapezoidal cross sections. Also, stabilizing recesses **129** could be formed in the side walls **102**, **103** of socket **70** and stabilizing projections **131** in sidewalls **22**, **23** of nose **14**.

In the preferred wear assembly, stabilizing surfaces **40-47** define a stabilizing recess **127**, **129** in each of the top, bottom and side walls **20-23** of nose **14** such that those portions of the nose with the recesses have a generally X-shaped cross-sectional configuration (FIGS. **2** and **8**). Socket **70** has complementary stabilizing projections **125**, **131** along each of the top, bottom and side walls **100-103** to fit into recesses **127**, **129** and, thus, define an X-shaped socket. While generally V-shaped recesses **127**, **129** are preferred, stabilizing recesses and projections of other shapes can be used to form the generally X-shaped nose and socket. This configuration stably mounts the point against vertical and side loading, supports high loading via the strongest and most robust portions of the nose, and avoids relying primarily on side portions of the nose where bending is greatest to reduce stress concentrations. The X-shaped cross-sectional nose and socket can also be used with limited benefit in certain applications with similar recesses in each of the top, bottom and side walls **20-23** but without the use of stabilizing surfaces extending substantially parallel to axis **34**.

The nose can also be formed with configurations other than an X-shaped cross-section. For example, the nose and point may include top and bottom stabilizing surfaces **40-43**, **110-113**, but no side stabilizing surfaces **44-47**, **114-117**. In another alternative, the nose may be formed with side stabilizing surfaces **44-47**, **114-117**, but without stabilizing recesses **127** in the top and bottom waifs. The nose and point may also be provided with only one set of stabilizing surfaces, such as rear stabilizing surfaces only along the bottom walls. Also, while front stabilizing surfaces **30**, **32**, **90**, **92** could be omitted, it is preferred that they be used with whichever variation of rear and side stabilizing surfaces that are used.

As noted above, lock **16** is used to releasably secure wear member **12** to nose **14** (FIGS. **1** and **8**). In one embodiment, nose **14** defines a channel **140** in sidewall **22** (FIGS. **2-6**). Channel **140** is open on its outer side and on each end, and otherwise is defined by a base or side wall **142**, a front wall **144** and a rear wall **146**. Wear member **12** includes a complementary passage **150** to generally align with channel **140** when point **12** is assembled onto nose **14** to collectively define an opening **160** for receiving lock **16** (FIGS. **1** and **7-8**). Passage **150** includes an open end **151** in top wall **50** of point **12** for receiving lock **16**. Within socket **70**, passage **150** is open on its inner side and otherwise defined by a base or side wall **152**, a front wall **154**, and a rear wall **156**. Due to side stabilizing surfaces **44-47**, **114-117**, the front and rear walls **144**, **146**, **154**, **156** of channel **140** and passage **150** have complementary undulating configurations. Front wall **144** on nose **14** and rear wall **156** on wear member **12** are the surfaces that primarily engage lock **16**. Passage **150** is preferably open in bottom wall **51**, but it could be closed if desired.

DEERE EX. B
PAGE 39

US 10,273,662 B2

Although point **12** is secured by only one lock **16**, the point preferably includes two passages **150**, **150'**, one along each sidewall **52**, **53**. Passages **150**, **150'** are identical except that passage **150** opens for receipt of lock **16** in top wall **50** and extends along sidewall **52**, and passage **150'** opens for receipt of lock **16** in bottom wall **51** and extends along sidewall **53**. With two passages, the point can be reversed (i.e., rotated 180° about axis **34**) and locked in place in either orientation.

When lock **16** is inserted into hole **160**, it opposes front wall **144** of nose **14** and rear wall **156** of point **12** to prevent release of point **12** from nose **14**. Accordingly, in an assembled condition, channel **140** is offset rearward of passage **150** so that front wall **144** is rearward of front wall **154**, and rear wall **146** is rearward of rear wall **156**. In the preferred construction, hole **160** narrows at it extends from open end **151**; that is, front wall **144** converges toward rear wall **156**, and side wall **142** converges toward side wall **152**, each as they extend away from open end **151**. Preferably, channel **140** and passage **150** also converge as they extend from open end **151** so that front wall **144** converges toward rear wall **146**, and front wall **154** converges toward rear wall **156**.

Lock **16** has a tapering construction with a latch such as disclosed in U.S. Pat. No. 6,993,861, incorporated herein by reference. In general, lock **16** includes a body **165** for holding point **12** to nose **14**, and a latch (not shown) for engaging stop **166** in point **12** for securing lock **16** in hole **160**. Body **165** includes an insertion end **169** that is first passed into hole **160**, and a trailing end **171**. Lock body **165** preferably tapers toward insertion end **169** with the front and rear walls converging toward each other, and sidewalls converging toward each other. This narrowing of lock **16** matches the shape of hole **160** to provide a lock that can be pried into and out of the assembly. A gap **183** is formed near trailing end **171** for insertion of a pry tool for removing lock **16** from opening **160**. A clearance space **184** is also formed in point **12** forward of open end **151** to enable a pry tool to access gap **183**.

In a second embodiment of the invention (FIGS. **13-15**), a wear assembly **210** includes a base having a nose **214** and a wear member **212** having a socket **270** for receiving the nose **214**. The nose and socket of wear assembly **210** is the same as wear assembly **10** except for the locking arrangement. In wear assembly **210**, lock **216** is received in a central passage **220** in nose **214** and corresponding holes **222** in wear member **212**. As seen in FIG. **9**, passage **220** opens in stabilizing recess **227**. A hole **222** is formed in each of the top and bottom portions of wear member **212**, in vertical alignment, to engage the lock and/or permit the wear member to be reversed on nose **214**. Alternatively, passage **220** and holes **222** could extend horizontally through the nose **214** and wear member **212**.

Lock **216** includes a wedge **224** and a spool **226** as described in U.S. Pat. No. 7,171,771, incorporated herein by reference. The wedge **224** has a rounded narrowing exterior, a helical thread **234**, and a tool engaging cavity **236**. The spool **226** is formed with arms **246** that set outside passage **220**. Each arm preferably includes an outstanding lip **247** at its outer end that fits under a relief **249** in point **212** to project ejection of the lock during use. Spool **226** includes a thread formation **242** preferably in the form a series of helical ridge segments to mate with the helical thread **234** on wedge **224**. Spool **226** has a trough **239** with a concave inner surface **240** to partially wrap around and receive wedge **224**. A resilient plug (not shown) composed of a rubber, foam or other resilient material may be provided in a hole in trough **239** to

press against wedge **224** and prevent loosening if desired. The spool preferably tapers toward its lower end to accommodate the preferred tapering of passage **220**. The spool may also be formed with a reduced leading end to better fit through the bottom end of passage **220** and into lower hole **222**.

In use, spool **226** presses against front wall **228** of passage **220**, and the ends of arms **246** press against the rear walls **256** in the top and bottom portions of wear member **212**. A gap normally exists between spool **226** and rear wall **230** of passage **220**. The land **258** extending between helical groove **234** of wedge **224** sets against the front wall **228** of passage **220**. An insert (not shown) may be placed between the wedge and front wall **228**. Alternatively, the spool could be placed against front wall **228** and wedge against rear walls **256**. To install lock **216**, the spool **226** and the leading end **252** of wedge **224** are loosely inserted through top hole **222** and into passage **220**. A wrench or other suitable tool is inserted into cavity **236** at the trailing end **254** of wedge **224** to turn the wedge and draw the wedge farther into the passage **220**.

Many other lock designs could be used to secure the wear member to the nose. For example, lock **16** may be a conventional sandwich pin construction, which is hammered into the assembly. Such a lock could also pass through holes in the centers of the nose and point, either vertically or horizontally, in a well-known manner.

The invention claimed is:

**1.** A wear assembly for excavating equipment comprising:
a base secured to the excavating equipment, the base including a front end with a front wall and a pair of front bearing surfaces, a rear end with at least one recess defining a pair of rear bearing surfaces, and a lock bearing surface;
a wear member including a rearward-opening socket for receiving the base, and an opening, the socket having a longitudinal axis and including (i) a front end with a front surface transverse to the longitudinal axis to bear against the front wall on the base, and a top stabilizing surface and a bottom stabilizing surface to bear against the front bearing surfaces on the base, and (ii) a rear end with a top wall, a bottom wall and side walls extending rearward from the front end, at least one of the top and bottom walls including a pair of rear stabilizing surfaces inclined relative to each other in different transverse directions so as to laterally converge inward toward a central location along the respective top or bottom wall to define an inward projection and positioned to bear against the rear bearing surfaces in the at least one recess in the base to resist both vertical and horizontal loads during excavating, said top stabilizing surface, said bottom stabilizing surface, and each said rear stabilizing surface axially extending substantially parallel to the longitudinal axis; and
a lock received into the opening of the wear member and in contact with the lock bearing surface on the base to hold the wear member to the excavating equipment.

**2.** A wear assembly in accordance with claim **1** wherein the base includes a plurality of the recesses each with a pair of the rear bearing surfaces, and the top and bottom walls of the wear member each includes a pair of said rear stabilizing surfaces to define one said projection and to bear against the rear stabilizing faces in one said recess in the base.

**3.** A wear assembly in accordance with claim **1** wherein said pair of rear stabilizing surfaces of the wear member collectively defines a V-shaped formation.

DEERE EX. B
PAGE 40

US 10,273,662 B2

**11**

4. A wear assembly in accordance with claim 1 wherein said pair of rear stabilizing surfaces of the wear member collectively defines a curved formation.

5. A wear assembly in accordance with claim 1 wherein the base includes a plurality of side recesses each with a pair of side stabilizing faces, and each said side wall of the wear member includes a pair of side stabilizing surfaces inclined relative to each other in different transverse directions so as to laterally converge inward toward a central location along the respective side wall and positioned to define an inward projection and bear against a respective pair of the side stabilizing faces on the nose to resist both vertical and horizontal loads during excavating, and each said side stabilizing face and each said side stabilizing surface axially extends substantially parallel to the longitudinal axis.

6. A wear assembly in accordance with claim 1 wherein said pair of rear stabilizing surfaces of the wear member extends from one of the side walls to the other side wall of the socket.

7. A wear assembly in accordance with claim 1 wherein said top stabilizing surface, said bottom stabilizing surface, and each said rear stabilizing surface axially extends at angle of no more than about five degrees to the longitudinal axis.

8. A wear assembly for excavating equipment comprising:
   a base secured to the excavating equipment, the base including a front end with a front wall and front bearing surfaces, a rear end having opposite sides with a side recess in each of the sides, and a lock bearing surface;
   a wear member including a rearward-opening socket for receiving the base, and an opening, the socket having a longitudinal axis and including (i) a front end with a front surface transverse to the longitudinal axis to bear against the front wall on the base, and a top stabilizing surface and a bottom stabilizing surface to bear against the front bearing surfaces on the base, and (ii) a rear end with a top wall, a bottom wall and side walls extending rearward from the front end, the side walls each including a pair of side stabilizing surfaces inclined relative to each other in different transverse directions so as to laterally converge inward toward a central location along the respective side wall and positioned to bear against complementary surfaces in respective side recesses in the base to resist both vertical and horizontal loads during excavating, said top stabilizing surface, said bottom stabilizing surface, and each said side stabilizing surface axially extending substantially parallel to the longitudinal axis; and
   a lock received into the opening of the wear member and in contact with the lock bearing surface on the base to hold the wear member to the excavating equipment.

9. A wear assembly in accordance with claim 8 wherein each said pair of side stabilizing surfaces of the wear member collectively defines a V-shaped formation.

10. A wear assembly in accordance with claim 8 wherein each said pair of side stabilizing surfaces of the wear member collectively defines a curved formation.

11. A wear assembly in accordance with claim 8 wherein each said pair of side stabilizing surfaces of the wear member extends from the top wall to the bottom wall.

12. A wear assembly in accordance with claim 8 wherein the side stabilizing surfaces of the wear member are located near the rear end of the wear member.

13. A wear assembly in accordance with claim 8 wherein each said side stabilizing surface axially extends at an angle of no more than about five degrees to the longitudinal axis.

14. A wear member for excavating equipment comprising a rearward-opening socket for receiving a base secured to

**12**

the excavating equipment, and an opening for receiving a lock to releasably hold the wear member to the base, the socket having a longitudinal axis and including (i) a front end with a front surface transverse to the longitudinal axis to bear against a front wall on the base, and a top stabilizing surface and a bottom stabilizing surface to bear against front bearing surfaces on the base, and (ii) a rear end with a top wall, a bottom wall and side walls extending rearward from the front end, at least one of the top and bottom walls including a pair of rear stabilizing surfaces inclined relative to each other in different transverse directions so as to laterally converge inward toward a central location along the respective top or bottom wall to define an inward projection and bear against complementary surfaces in a recess in the base to resist both vertical and horizontal loads during excavating, said top stabilizing surface, said bottom stabilizing surface, and each said rear stabilizing surface axially extending substantially parallel to the longitudinal axis.

15. A wear member in accordance with claim 14 wherein the top and bottom walls each includes a pair of said rear stabilizing surfaces.

16. A wear member in accordance with claim 14 wherein said pair of rear stabilizing surfaces collectively defines a V-shaped formation.

17. A wear member in accordance with claim 14 wherein said pair of rear stabilizing surfaces collectively defines a curved formation.

18. A wear member in accordance with claim 14 wherein said pair of rear stabilizing surfaces extends from one of the side walls to the other side wall.

19. A wear member in accordance with claim 14 wherein each said side wall includes a pair of side stabilizing surfaces inclined relative to each other in different transverse directions so as to laterally converge inward toward a central location along the respective side wall to define an inward projection and bear against complementary surfaces in a recess in the base to resist both vertical and horizontal loads during excavating, and wherein each said side stabilizing surface axially extends substantially parallel to the longitudinal axis.

20. A wear member in accordance with claim 14 wherein each said rear stabilizing surface axially extends at an angle of no more than about five degrees to the longitudinal axis.

21. A wear member for excavating equipment comprising a rearward-opening socket for receiving a base fixed to the excavating equipment, and an opening for receiving a lock to releasably hold the wear member to the base, the socket having a longitudinal axis and including (i) a front end with a front surface transverse to the longitudinal axis to bear against a front wall on the base, and a top stabilizing surface and a bottom stabilizing surface to bear against front bearing surfaces on the base, and (ii) a rear end with a top wall, a bottom wall and side walls extending rearward from the front end, the side walls each including a pair of side stabilizing surfaces inclined relative to each other in different transverse directions so as to laterally converge inward toward a central location along the respective side wall to define an inward projection and bear against complementary surfaces on the base to resist both vertical and horizontal loads during excavating, said top stabilizing surface, said bottom stabilizing surface, and each said side stabilizing surface axially extending substantially parallel to the longitudinal axis.

22. A wear member in accordance with claim 21 wherein said pair of side stabilizing surfaces collectively defines a V-shaped formation.

DEERE EX. B
PAGE 41

US 10,273,662 B2

**13**                                           **14**

**23**. A wear member in accordance with claim **21** wherein said pair of side stabilizing surfaces collectively defines a curved formation.

**24**. A wear member in accordance with claim **21** wherein said pair of side stabilizing surfaces extends from the top wall to the bottom wall.

**25**. A wear member in accordance with claim **21** wherein the side stabilizing surfaces are located near the rear end.

**26**. A wear member in accordance with claim **21** wherein said top stabilizing surface, said bottom stabilizing surface, and each said side stabilizing surface axially extends at an angle of no more than about five degrees to the longitudinal axis.

\*  \*  \*  \*  \*

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| **ESCO GROUP LLC**, <br><br> Plaintiff, <br><br> v. <br><br> **DEERE & COMPANY**, <br><br> Defendant | C.A. No. 1:20-cv-01679-RGA |

### PLAINTIFF ESCO GROUP LLC'S RESPONSES TO DEFENDANT DEERE & COMPANY'S FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the Local Rules of the District of Delaware, Plaintiff ESCO Group LLC ("ESCO") by and through its counsel, hereby submits its responses to Defendant Deere & Company's ("Deere") First Set of Interrogatories.

### SPECIFIC OBJECTIONS AND RESPONSES

ESCO's investigation of the facts relevant to this litigation is ongoing. ESCO's Responses herein are based on its knowledge to date following a reasonable investigation under the circumstances, and are given without prejudice to ESCO's right to amend or supplement these Responses as permitted by the Federal Rules of Civil Procedure, the Local Rules of the U.S. District Court for the District of Delaware, any applicable orders of this Court, or as a result of any agreement reached in the course of this litigation.

Subject to and without waiving its General Objections, and based upon current information and belief as a result of reasonable searches and inquiries, ESCO responds as follows:

Subject to and without waiving its general and specific objections, ESCO responds as follows: ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

ESCO further states that pursuant to Federal Rule of Civil Procedure Rule 33(d), information responsive to this Interrogatory may be found in documents produced by ESCO in response to Deere's Request for Production No. 28 in this case.  ESCO will supplement this response in accordance with the Federal Rules and any other applicable rule or order.

ESCO otherwise objects to this Interrogatory as vague as to the term "ESCO's licensing activities."   ESCO objects to this Interrogatory as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks Plaintiffs to identify "ESCO's licensing activities relating to patents and patent applications that you contend are owned by ESCO" without restriction; ESCO limits its response to information regarding the Asserted Patents and Related Patents.   ESCO objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege and/or attorney work product immunity, or other applicable protection or privilege.

**INTERROGATORY NO. 5:**

Identify every device, product, system, method, or combination thereof researched, designed, developed, made, sold, offered for sale, used, provided or otherwise distributed by ESCO, including prototypes, unsuccessful attempts to make and non-commercialized devices, products, systems, methods, or combination thereof, that ESCO contends are covered by any of the claims of the Asserted Patents, identify each of the claims that covers each such device,

9

product, system, method or combination thereof, state the date(s) on which each such device, product, system, method, or combination thereof was first researched, designed, developed, made, sold, used, provided or otherwise distributed and was first offered for sale, and identify all documents relating to same.

**RESPONSE TO INTERROGATORY NO. 5:**

Subject to and without waiving its general and specific objections, ESCO responds as follows:   ESCO's Three-Piece Nemisys System is covered by the '662 patent (*see* www.escoip.com).  The Three-Piece Nemisys System began development in ███████████ ██ and was first offered for sale and/or publically available in approximately September 2012.

ESCO's GeoVor System is covered by the '662 and '175 patents (*see* www.escoip.com). The GeoVor System began development in ███████████ and was first offered for sale and/or publically available in approximately Q4 2009.

ESCO further states that pursuant to Federal Rule of Civil Procedure Rule 33(d), information responsive to this Interrogatory may be found in documents produced by ESCO in response to Deere's Request for Production No. 31, 40, 44, and, 46 in this case.  ESCO will supplement this response in accordance with the Federal Rules and any other applicable rule or order.

ESCO otherwise objects to this Interrogatory as overbroad, unduly burdensome, and not proportional to the needs of the case in that it seeks ESCO to identify "every device, product, system, method, or combination thereof researched, designed, developed, made, sold, offered for sale, used, provided or otherwise distributed by ESCO, including prototypes, unsuccessful attempts to make and non-commercialized devices, products, systems, methods, or combination thereof."  ESCO also objects to this Interrogatory as overbroad, unduly burdensome and premature

DEERE EX. C
PAGE 46

to the extent it seeks to impose obligations on ESCO above and beyond those set forth in the scheduling order.  ESCO objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege and/or attorney work product immunity, or other applicable protection or privilege.

**INTERROGATORY NO. 6:**

Identify each person who has participated in or contributed to the research, design, development, engineering, testing, manufacture, marketing, or sale of each ESCO device, product, system, method, or combination thereof identified in response to the preceding Interrogatory, and for each such person, state the nature and extent of his participation or contribution, and the time period or periods during which he so participated or contributed.

**RESPONSE TO INTERROGATORY NO. 6:**

Subject to and without waiving its general and specific objections, ESCO responds as follows:

Three-Piece Nemisys System

- Kevin Stangeland: Involved in research, design, development, engineering, testing, and manufacturing from ███████████████████████████.

- Craig Wihtol: Involved in marketing and sales from approximately 2014 to present.

  GeoVor System

- Christopher Snyder: Involved in research, design, development, engineering, testing, and manufacturing from ████████████████████.

- Adam Stitzel: Involved in engineering, marketing, and sales from approximately May 2013 to present.

ESCO will supplement this response as necessary in accordance with the Federal Rules and any other applicable rule or order.  In accordance with Federal Rule 33(d), ESCO may identify

11

Dated: July 28, 2021

/s/ Jeremy D. Roux
Karen E. Keller (No. 4489)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com

OF COUNSEL:
Brian D. Sieve, P.C.
Paul D. Collier
Jeremy D. Roux
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

*Counsel for Plaintiff ESCO Group LLC*

DEERE EX. C
PAGE 48

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 28, 2021, the foregoing was served on counsel of record by electronic mail to:

James D. Taylor, Jr.
Charles E. Davis
SAUL EWING ARNSTEIN & LEHR LLP
1201 N. Market Street, Suite 2300
Wilmington, Delaware 19801
(302) 421-6800
james.taylor@saul.com
chad.davis@saul.com

John F. Bennett
Paul M. Ulrich
Paul J. Linden
ULMER & BERNE LLP
600 Vine Street, Suite 2800
Cincinnati, Ohio 45202-2409
(513) 698-5000
jbennett@ulmer.com
pulrich@ulmer.com
plinden@ulmer.com


*/s/ Sheryl Brongiel*

DEERE EX. C
PAGE 49

# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **ESCO GROUP LLC**, <br><br> Plaintiff, <br><br> v. <br><br> **DEERE & COMPANY**, <br><br> Defendant | C.A. No. 1:20-cv-01679-RGA |

**PLAINTIFF ESCO GROUP LLC'S RESPONSES TO DEFENDANT DEERE &
COMPANY'S SECOND SET OF INTERROGATORIES (NOS. 16– 20)**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and the Local Rules

for the U.S. District Court for the District of Delaware, Plaintiff, ESCO Group LLC ("ESCO"),

hereby provides its objections and responses to Defendant, Deere & Company's ("Deere") Second

Set of Interrogatories.

**SPECIFIC OBJECTIONS AND RESPONSES**

ESCO's investigation of the facts relevant to this litigation is ongoing. ESCO's Responses

herein are based on its knowledge to date following a reasonable investigation under the

circumstances, and are given without prejudice to ESCO's right to amend or supplement these

Responses as permitted by the Federal Rules of Civil Procedure, the Local Rules of the U.S.

District Court for the District of Delaware, any applicable orders of this Court, or as a result of any

agreement reached in the course of this litigation.

Subject to and without waiving its General Objections, and based upon current information

and belief as a result of reasonable searches and inquiries, ESCO responds as follows:

1

**INTERROGATORY NO. 16:**

Describe all facts supporting that ESCO has complied with Section 287(a) and identify all documents that show such compliance, all evidence upon which ESCO may rely to demonstrate such compliance, and the person(s) most knowledgeable about such compliance.

**RESPONSE TO INTERROGATORY NO. 16:**

Subject to and without waiving its general and specific objections, ESCO responds as follows:

Section 287(a) provides that "no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice.  Filing of an action for infringement shall constitute such notice."  35 U.S.C. § 287(a).  ESCO provided Deere notice of infringement of the '662 Patent on December 10, 2020 (D.I. 1) and of infringement of the '175 Patent on April 7, 2021 (D.I. 11).

ESCO otherwise objects to this Interrogatory as overbroad, unduly burdensome, not relevant, and not proportional to the needs of the case to the extent it asks ESCO to identify "all facts supporting that ESCO has complied with Section 287(a)" and "all documents that show such compliance, all evidence upon which ESCO may rely to demonstrate such compliance, and the person(s) most knowledgeable about such compliance" at least because ESCO is not seeking damages for infringement by Deere of the '662 Patent prior to December 10, 2020 and infringement by Deere of the '175 Patent prior to April 7, 2021.

**INTERROGATORY NO. 17:**

Describe the events and circumstances during the period between the alleged date of conception and the alleged date of actual reduction to practice for the invention claimed in the

DEERE EX. D
PAGE 52

Dated: May 13, 2022

/s/ Jeremy D. Roux
Brian D. Sieve, P.C.
Paul D. Collier
Jeremy D. Roux
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000
brian.sieve@kirkland.com
paul.collier@kirkland.com
jeremy.roux@kirkland.com

*Counsel for Plaintiff ESCO Group LLC*

## **<u>VERIFICATION</u>**

I, Adam Stitzel, am Director, Infrastructure Products of ESCO Group LLC ("ESCO") and am authorized to make this verification for and on ESCO's behalf. I have read the foregoing Plaintiff ESCO Group LLC's Responses to Defendant Deere & Company's Second Set of Interrogatories.

Based upon my knowledge and information provided to me, I believe the operative response to each interrogatory is true and accurate. In accordance with Rule 33(b)(3) of the Federal Rules of Civil Procedure, I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge, information and belief.

Dated: 13-May-2022

_____

Adam D Stitzel

Director, Infrastructure Products

ESCO Group LLC

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 13, 2022, the foregoing was served on counsel of record by electronic mail to:

James D. Taylor, Jr.
Charles E. Davis
SAUL EWING ARNSTEIN & LEHR LLP
1201 N. Market Street, Suite 2300
Wilmington, Delaware 19801
(302) 421-6800
james.taylor@saul.com
chad.davis@saul.com

John F. Bennett
Paul M. Ulrich
Paul J. Linden
ULMER & BERNE LLP
600 Vine Street, Suite 2800
Cincinnati, Ohio 45202-2409
(513) 698-5000
jbennett@ulmer.com
pulrich@ulmer.com
plinden@ulmer.com

*/s/ Sheryl Brongiel*

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ESCO GROUP LLC, <br><br>                      Plaintiff, <br><br> v. <br><br> DEERE & COMPANY, <br><br>                      Defendant | C.A. No. 1:20-cv-01679-RGA |

**PLAINTIFF ESCO GROUP LLC'S RESPONSES TO DEFENDANT DEERE & COMPANY'S THIRD SET OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the Local Rules of the District of Delaware, Plaintiff ESCO Group LLC ("ESCO") by and through its counsel, hereby submits its responses to Defendant Deere & Company's ("Deere") Third Set of Interrogatories.

**SPECIFIC OBJECTIONS AND RESPONSES**

ESCO's investigation of the facts relevant to this litigation is ongoing. ESCO's Responses herein are based on its knowledge to date following a reasonable investigation under the circumstances, and are given without prejudice to ESCO's right to amend or supplement these Responses as permitted by the Federal Rules of Civil Procedure, the Local Rules of the U.S. District Court for the District of Delaware, any applicable orders of this Court, or as a result of any agreement reached in the course of this litigation.

Subject to and without waiving its General Objections, and based upon current information and belief as a result of reasonable searches and inquiries, ESCO responds as follows:

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

DEERE EX. E
PAGE 57

by the Court.  ESCO may provide further information regarding this Interrogatory during expert discovery, to the extent necessary.  ESCO further objects to this Interrogatory to the extent it calls for a legal conclusion.

**INTERROGATORY NO. 24:**

In response to Deere's Interrogatory No. 5, ESCO identified the Three-Piece Nemisys System and the GeoVor System as products that practice claims of either the '662 Patent or the '175 Patent, but ESCO did not identify its UltraLok tooth system; describe in detail the reason(s) why ESCO's UltraLok tooth system is not covered by any claim of the Asserted Patents, including the identification of each element in each claim of the '662 and '175 Patents that ESCO contends is not present literally or under the doctrine of equivalents and the reason(s) that ESCO contends that each such element is missing.

**RESPONSE TO INTERROGATORY NO. 24:**

ESCO objects to this Interrogatory as overbroad, unduly burdensome, not likely to lead to the discovery of admissible evidence, and not proportional to the needs of the case.  First, Deere has never contended that ESCO's Ultralok Construction system is an "unmarked 'patented article[]' subject to § 287."  *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1367 (Fed. Cir. 2017).  Regardless, ESCO is not seeking damages for infringement by Deere of the '662 Patent prior to December 10, 2020 and infringement by Deere of the '175 Patent prior to April 7, 2021.  *See* 35 U.S.C. § 287(a) ("[N]o damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice.  Filing of an action for infringement shall constitute such notice.").  Second, ESCO has already informed Deere of every ESCO product that practices the Asserted

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

DEERE EX. E
PAGE 58

Patents and which Asserted Claims each practices.  *See* ESCO's Resp. and Obj. to Deere's ROG No. 5 ("ESCO's Three-Piece Nemisys System is covered by asserted claims 8–9, 12–13, 21–22, and 25–26 of the '662 patent. ESCO's GeoVor System is covered by asserted claims 8, 12–13, 21, and 25–26 of the '662 patent and asserted claims 4–6, 13, 15, 17, and 19–20 of the '175 patent.; *Leader Techs., Inc. v. Facebook Inc.*, 2009 WL 3021168, at *2 (D. Del. Sep. 4, 2009) ("Facebook is entitled to know every Leader product or service that Leader contends practices any of the asserted claims of the patent-in-suit. Facebook is also entitled to know which claims are practiced by which of Leader's products and services. However, a proper weighing of the relative burdens on the parties, as well as the relevance of the discovery Facebook seeks, leads me to conclude that Facebook is entitled to nothing more than this in response to Interrogatory No. 9.").  ESCO further objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege and/or attorney work product immunity, or other applicable protection or privilege.

If Deere  is able to explain what  discoverable information responsive to this request exists, ESCO is willing to meet and confer with Deere about the scope and relevance of this Interrogatory.

## INTERROGATORY NO. 25:

Describe the date and manner in which ESCO first learned that Deere was selling or offering for sale the Accused Products in the United States, and identify the current or former ESCO employee most knowledgeable about when and how ESCO first learned about Deere's sale or offer for sale of the Accused Products.

## RESPONSE TO INTERROGATORY NO. 25:

Subject to and without waiving its general and specific objections, ESCO responds as follows: ███████████████████████████████████████████████████

███████████████████████████████████████████████ See ESCO-

48

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

Dated: October 19, 2022

/s/Jeremy D. Roux
Brian D. Sieve, P.C.
Paul D. Collier
Jeremy D. Roux
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000
brian.sieve@kirkland.com
paul.collier@kirkland.com
jeremy.roux@kirkland.com

*Counsel for Plaintiff ESCO Group LLC*

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

**DEERE EX. E**

**PAGE 60**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on October 19, 2022, the foregoing was served on counsel of record by electronic mail to:

James D. Taylor, Jr.
Charles E. Davis
SAUL EWING ARNSTEIN & LEHR LLP
1201 N. Market Street, Suite 2300
Wilmington, Delaware 19801
(302) 421-6800
james.taylor@saul.com
chad.davis@saul.com

John F. Bennett
Paul M. Ulrich
Paul J. Linden
ULMER & BERNE LLP
600 Vine Street, Suite 2800
Cincinnati, Ohio 45202-2409
(513) 698-5000
jbennett@ulmer.com
pulrich@ulmer.com
plinden@ulmer.com

*/s/Sheryl A. Brongiel*
Sheryl A. Brongiel

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

# EXHIBIT F

Page 1

1          1                    UNITED STATES DISTRICT COURT

                               FOR THE DISTRICT OF DELAWARE

2          2

           3

3          4

           5     ESCO GROUP LLC,                    )

4                                                   )

           6        Plaintiff,                      )

5                                                   )

           7     vs.                                ) Case No.

6                                                   ) 20-1679-RGA-JLH

           8                                        )

7                DEERE & COMPANY,                   )

           9                                        )

8                   Defendant.                      )

9          10

10         11

11         12

12         13

13         14

14         15             The Zoom video deposition of MICHAEL

15   BUDAN,

16         16     taken before Richard Derrick Ehrlich, Registered

17         17     Merit Reporter, Certified Realtime Reporter,

18   taken

19         18     pursuant to the Federal Rules of Civil Procedure,

20         19     commencing at 10:00 a.m., on the 9th day of

21         20     November, 2022.

22         21

23         22

24         23

25         24

Page 19

1    competitors that competes with the TK-Series

2    System products?

3        MS. RODMAN:  Objection to form.

4        You can answer.

5        THE DEPONENT:  Yes.

6    BY MS. GIROUD:

7    Q   And what products does Hensley offer that

8        compete with the TK-Series System products?

9        MS. RODMAN:  Objection to form.

10       You can answer.

11       THE DEPONENT:  They offer a full line of

12       replacement teeth and adapter systems similar to

13       what we have.

14   BY MS. GIROUD:

15   Q   Is there a trade name for that line of

16       replacement teeth and adapters systems?

17   A   The XS system and the Go Pro system are the two

18       ones that I recall.

19   Q   So other than the XS and Go Pro systems from

20       Hensley, you don't recall any other replacement

21       teeth and adapter systems that Hensley offers?

22       MS. RODMAN:  Objection to form.

23       You can answer.

24       THE DEPONENT:  I do not.

DEERE EX. F
PAGE 64

Page 20

1    BY MS. GIROUD:

2    Q   So other than -- strike that.

3            Is ESCO one of the primary competitors that

4        competes with the TK-Series System products?

5            MS. RODMAN:  Objection to form.

6            You can answer.

7            THE DEPONENT:  Yes.

8    BY MS. GIROUD:

9    Q   So just to recap, the primary competitors for

10       the Deere TK-Series System products are

11       Caterpillar, Hensley, and ESCO; is that right?

12           MS. RODMAN:  Objection to form.

13           You can answer.

14           THE DEPONENT:  Yes.

15   BY MS. GIROUD:

16   Q   Other than the ESCO Ultralok and Super V

17       products, are you aware of any other products

18       that ESCO offers that compete with the Deere

19       TK-Series System products?

20           MS. RODMAN:  Objection to form.

21           You can answer.

22           THE DEPONENT:  I am not.

23   BY MS. GIROUD:

24   Q   Okay.  In the market in which the Deere

Page 21

1          TK-Series System competes, what market share

2          does Deere have?

3              MS. RODMAN:  Objection.  Form and

4          foundation.

5              You can answer.

6              THE DEPONENT:  I don't know.

7      BY MS. GIROUD:

8      Q   Do you know approximately what market share

9          Deere has in the market in which the Deere

10         TK-Series System competes?

11             MS. RODMAN:  Objection to form.

12             You can answer.

13             THE DEPONENT:  I would estimate about

14         ██████████

15     BY MS. GIROUD:

16     Q   And what is that estimation based on?

17     A   It's based on our machine population and

18         estimated consumption or usage patterns of those

19         machines.

20     Q   And when you say "machine population," what do

21         you mean?

22     A   Whole good machines, such as excavators or

23         backhoes or loaders.

24     Q   And when you say "estimated consumption or usage

Page 22

```
 1          1     patterns of those machines," what do you mean?

            2   A  Based on our test data of -- with similar

 2          3      machines, estimating how many hours an average

 3          4      tooth would last and then expanding that over

 4          5      the life of the machine.

 5          6   Q  And when you reference ███████████, that's

 6          7      Deere's current market share, right?

 7          8          MS. RODMAN:  Objection to form.

 8          9          You can answer.

 9         10          THE DEPONENT:  Estimated, correct.

10         11          MS. RODMAN:  Xavi, I'm sorry to interrupt.

11         12      I keep getting this Zoom message that says,

12 Zoom

13         13      Apps has been disabled.  Zoom Apps has been

14         14      enabled.

15         15          I just want to confirm with the Veritext

16         16      people that I can ignore that, that that's not

17         17      anything that is in any way impacting our

18         18      deposition.

19         19          CONCIERGE:  What was the message?

20         20          MS. RODMAN:  It keeps saying, Zoom Apps

21 has

22         21      been disabled, for the little pop-up in the

23         22      corner.  And then, like, after a little bit,

24         23      it'll say, Zoom Apps have been enabled.  And

25         24      it's done that probably five times over the
```

Page 23

```
 1            1   last --
 2            2        CONCIERGE:  I am not familiar with that
 3            3   error.
 4            4        MS. RODMAN:  It's like we've got all kinds
 5            5   of ghosts in the machine today.
 6            6        CONCIERGE:  It sounds like it's an app
 7            7   within the Zoom.  Zoom does have apps that you
 8            8   can --
 9            9        MS. RODMAN:  I'm not aware of us using any
10           10   apps.
11           11        CONCIERGE:  Let's wait for the first break
12           12   and we'll work on it.  Okay?
13           13        MS. RODMAN:  Okay.  I just want to make
14           14   sure everything is still good from a video
15           15   perspective.
16           16        CONCIERGE:  Yeah, you're looking good.
17           17        MS. RODMAN:  Perfect.
18           18        Sorry, Xavi.
19           19        MS. GIROUD:  That's okay.  It's probably
20           20   the same ghost in my speaker on Zoom.
21           21        MS. RODMAN:  Whatever is causing you to --
22           22   BY MS. GIROUD:
23           23   Q   Okay.  Let's see.  Has Deere's market share in
24           24       the market in which the TK-Series System
25
```

DEERE EX. F
PAGE 68

```
                                                      Page 24

 1           1      products compete changed since the introduction

 2           2      of the TK-Series System products?

 3           3          MS. RODMAN:  Objection.  Form and

 4           4      foundation.

 5           5          THE DEPONENT:  I do not know.

 6           6   BY MS. GIROUD:

 7           7   Q   Do you know who at Deere would know?

 8           8   A   No, I do not.

 9           9   Q   Do you know if Deere's market share in the

10          10      market in which the TK-Series System products

11          11      compete has changed since you took your current

12          12      role at Deere?

13          13          MS. RODMAN:  Objection to form.

14          14          You can answer.

15          15          THE DEPONENT:  I do not.

16          16   BY MS. GIROUD:

17          17   Q   Okay.  Approximately what market share does

18          18      Hensley have in the market in which the Deere

19          19      TK-Series System competes?

20          20          MS. RODMAN:  Objection to form and

21          21      foundation.

22          22          You can answer.

23          23          THE DEPONENT:  I do not know.

24          24      \\\

25
```

```
                                                              Page 25
 1                    1  BY MS. GIROUD:

                      2  Q   Do you know who at Deere would know?

 2                    3  A   No, I do not.

 3                    4  Q   Does Deere conduct market share analyses to

 4                    5      estimate the share in the market that other

 5                    6      competitors have?

 6                    7          MS. RODMAN:  Objection to form.

 7                    8          You can answer.

 8                    9          THE DEPONENT:  No, we do not.

 9                   10  BY MS. GIROUD:

10                   11  Q   Okay.  Approximately what market share does

11  ESCO

12                   12      have in the market in which the Deere TK-Series

13                   13      Systems compete?

14                   14          MS. RODMAN:  Objection to form.

15                   15          You can answer.

16                   16          THE DEPONENT:  I do not know.

17                   17  BY MS. GIROUD:

18                   18  Q   Other than MTG, BYG, First, are there any other

19                   19      companies that compete in the market in which

20                   20      the Deere TK-Series System products compete?

21                   21          MS. RODMAN:  Objection to form.

22                   22          You can answer.

23                   23          THE DEPONENT:  I am sure there are a

24  number

25                   24      of other competitors.  I don't know them all by
```

# EXHIBIT G

HIGHLY CONFIDENTIAL

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF DELAWARE

3                        *   *   *

4   ESCO GROUP LLC,

5          Plaintiff,

6        vs.                   CASE NO. 20-1679-RGA

7   DEERE & COMPANY,

8          Defendant.

9                        *   *   *

10          Remote video-taped deposition of ADAM D.

11   STITZEL, Witness herein, called by the Defendant

12   for cross-examination pursuant to the Rules of

13   Civil Procedure, taken before me, Kathy S. Wysong,

14   a Notary Public in and for the State of Ohio, at

15   2141 NW 25th Avenue, Portland, Oregon, on Friday,

16   December 16, 2022, at 1:56 p.m.

17                        *   *   *

18

19

20

21

22

23

24

25

DEERE EX. G

PAGE 72

HIGHLY CONFIDENTIAL

Page 38

```
 1              MR. COLLIER:  No, no, that's okay.  I
 2   was just going to caution you to limit your answer
 3   to a yes or no, Mr. Stitzel.  That's fine.
 4   BY MS. RODMAN:
 5         Q.   Yes.  I never want to know what
 6   you discussed with counsel so those are good
 7   instructions.
 8              Have you had communications about
 9   this lawsuit with anyone other than counsel?
10         A.   Yes.
11              MR. COLLIER:  And, Rachel, maybe if I
12   can just ask for clarification.  Are you talking
13   about in preparation for the deposition today?
14              MS. RODMAN:  I was just asking
15   generally.
16              MR. COLLIER:  Generally, okay.  No
17   worries.  Understood.
18   BY MS. RODMAN:
19         Q.   Yeah.  And I should clarify,
20   communications with anyone other than counsel
21   during which counsel was not present.
22         A.   Yes, and it's in the context of
23   preparations.
24         Q.   Okay.  We'll talk about that in a
25   minute.  So the only communications you've had
```

HIGHLY CONFIDENTIAL

Page 39

1  with anyone at ESCO about this lawsuit, other

2  than communications with counsel, were in

3  preparation for this deposition?

4          A.    That's correct.

5          Q.    Okay.  All right.  We're going to

6  be talking about a number of products today and

7  I'd like to start by just making sure that we

8  have a basic understanding -- I have a basic

9  understanding of the products and the terms

10  surrounding them.

11                So I'd like to start by talking

12  about the GeoVor product.  Are you familiar

13  with ESCO's GeoVor product?

14          A.    Yes.

15          Q.    And what type of product is that?

16          A.    GeoVor is a point adapter system

17  for dredging offshore infrastructure for cutter

18  section dredges, cutter heads.

19          Q.    Okay.  It's not used in

20  construction?

21          A.    Correct.

22          Q.    And it's not used in mining?

23          A.    Correct.

24          Q.    Generally, who are the customers

25  for the GeoVor product?  And I'm not looking

HIGHLY CONFIDENTIAL

Page 40

1   for specific names, I'm looking for certain

2   types of entities.

3           A.    The customers are large global

4   dredging companies and midsize regional

5   dredging companies.  Contractors.

6           Q.    And have you personally been

7   involved with the GeoVor product?

8           A.    Yes.

9           Q.    And what has your involvement been

10  in the GeoVor product?

11          A.    Well, I served as the product

12  manager for GeoVor, as well as the director

13  of -- for that line, so been involved in

14  engineering, problem solving, marketing, as

15  well as sales.

16          Q.    When did you serve as the product

17  manager or director of GeoVor?

18          A.    That was the start of two

19  thousand -- May of 2013 was when I first --

20  moving from that regional technical job to the

21  product manager.  So I started in May of 2013.

22          Q.    And who did you report to as

23  the -- specifically as the product manager of

24  GeoVor?

25          A.    That was Ermanno Simonutti, Ian

HIGHLY CONFIDENTIAL

Page 41

1    Bingham.

2          Q.    Okay.  Were you involved in

3    development of GeoVor?

4          A.    No.

5          Q.    Were you involved at all in the

6    patent prosecution for GeoVor?

7          A.    No.

8          Q.    Were you involved in the initial

9    commercial -- commercialization of GeoVor?

10         A.    No.

11         Q.    But you were involved in sales for

12   GeoVor?

13         A.    Yes.

14         Q.    And marketing?

15         A.    Yes.

16         Q.    And then you said engineering,

17   correct?

18         A.    Correct.

19         Q.    What was your involvement in the

20   engineering for GeoVor?

21         A.    The team I -- that I led was

22   responsible for the ongoing development of

23   GeoVor, so not the core, like the fundamental

24   technology, but the improvements.  Problem

25   solving, making minor improvements to the

DEERE EX. G
PAGE 76

Page 42

1    system, new shapes, problem solving, things

2    like that.

3           Q.    Okay.  And what was your

4    involvement in marketing for GeoVor?

5           A.    We would release brochures.  We

6    would create presentations, customer-facing

7    presentations.  You know, maybe the occasional

8    LinkedIn post.  Parts lit -- spec books, user

9    manuals, maintenance manuals.  Any

10   customer-facing document that, you know,

11   promoted the product or helped them use it.

12          Q.    And what was your involvement in

13   sales for GeoVor?

14          A.    Meeting with the customer, making

15   quotations, resolving any type of issues with

16   the product, giving updates on status of

17   orders.

18          Q.    What is the -- well, sorry, strike

19   that.

20                You're familiar with the Nemisys

21   three-piece system?

22          A.    Yes.

23          Q.    And what type of product is that?

24          A.    That falls under ESCO's mining

25   expendables product range.

HIGHLY CONFIDENTIAL

Page 43

```
 1          Q.   Is Nemisys three-piece used in
 2    construction?
 3          A.   No, not as ESCO defines it.
 4          Q.   So generally, who are the
 5    customers for the Nemisys three-piece system?
 6          A.   Primarily direct mines.
 7          Q.   Have you been personally involved
 8    with the Nemisys three-piece system?
 9          A.   I've been involved more recently
10    in my new position with the Nemisys three-piece
11    system.
12          Q.   And what is that involvement?
13          A.   Sales.
14          Q.   Okay.  And you're familiar --
15    well, I know you are because you've told me
16    about it -- with ESCO's Ultralok product?
17          A.   Yeah.  Yes.
18          Q.   What is the Ultralok product?
19          A.   The Ultralok product is a tooth
20    adapter lock system for construction size
21    excavators, loaders.
22          Q.   And generally, who are the
23    customers for Ultralok?
24          A.   Generally the customers -- well,
25    they -- primarily I would say distributors,
```

**DEERE EX. G**
**PAGE 78**

HIGHLY CONFIDENTIAL

Page 44

```
 1   dealers, bucket manufacturers.  We have OEMs

 2   that are customers of Ultralok.  Mines.  The

 3   mines will use Ultralok on their smaller

 4   equipment.  We've used Ultralok on dredge as

 5   well on just some very small cases.

 6        Q.   Who are the end users for

 7   Ultralok?

 8        A.   The end users are construction

 9   contractors, quarries, mines, and, again, we've

10   seen it on dredge as well, dredgers.

11        Q.   Have you been personally involved

12   with the Ultralok system?

13        A.   Yes.

14        Q.   And how so?

15        A.   Well, at that -- in the director

16   position I managed the teams that -- the team

17   that -- two teams that utilized Ultralok.  So I

18   was responsible for directing kind of the

19   strategy and the engineering, as well as some

20   customer visits, a little bit of sales support

21   on Ultralok.  The position in Europe, I was

22   responsible even a little bit on the technical

23   side for Ultralok as well traveling with the

24   sales team at the site level.

25        Q.   And then currently for sales?
```

HIGHLY CONFIDENTIAL

Page 99

1    be low, correct?

2         A.    That's right.  Yes.

3         Q.    Okay.  Okay.  How does ESCO

4    advertise its GeoVor system?

5         A.    Much the same way as Nemisys.

6    We're -- they're promoting the -- you know, the

7    stability of the nose, which the stability

8    translates to reliability of the system.  It

9    translates to having the highest wear metal, so

10   long wear life.  The stability translates to

11   the reduced maintenance on the nose as well.

12             We promote the hammerless portion

13   of GeoVor, the safest system.  And there's some

14   other minor things that are -- that are

15   promoted in relationship to the nose on, like,

16   cutting relief, you know, just the shape so

17   that it -- and reduced wear and things like

18   that from the shape of the nose.

19        Q.    So in that premier, moderate,

20   legacy classification, do you have an

21   understanding of where GeoVor would fall?

22        A.    Premier.

23        Q.    Okay.  Let's look at Topic 13,

24   which is on page five.

25        A.    Okay.

HIGHLY CONFIDENTIAL

Page 100

1        Q.   All right.  And you've been

2   designated to testify on behalf of ESCO for

3   Topic 14 as it relates to --

4        A.   Oh.

5        Q.   Topic -- sorry.  Topic 13.  Sorry.

6        A.   Okay.

7        Q.   No, I misspoke.  You've been

8   designated to testify on behalf of ESCO

9   regarding Topic 13 as it relates to Subpart 1,

10  the GeoVor system; Subpart 3, the Ultralok

11  system; and Subpart 4, the products of ESCO

12  that compete with the accused products,

13  correct?

14       A.   Correct.

15       Q.   And, again, those products that

16  would fall into that bucket of four would be

17  Ultralok, Super V, MaxDRP, MaxDRP Plus, and

18  then the BB DRP system, correct?

19       A.   With the exception of Ultralok.

20       Q.   Oh, because -- yes, because

21  Ultralok has its own -- its own --

22       A.   Yeah, sorry.  Sorry.  But yes.

23  Yeah.

24       Q.   We agree that ESCO believes

25  Ultralok competes with the TK Series, correct?

HIGHLY CONFIDENTIAL

Page 101

```
 1              A.    Correct.   Yes.   That's correct.
 2              Q.    Okay.   All right.   Let's start
 3     with GeoVor.   Has ESCO conducted any evaluation
 4     of the market in which the GeoVor system
 5     competes?
 6              A.    Yes.
 7              Q.    Okay.   And what evaluation has
 8     ESCO conducted on the market in which the
 9     GeoVor system competes?
10              A.    Well, we're monitoring the
11     competitors in the space.   We're monitoring the
12     customer profiles.   There's a few different
13     customer profiles.   We're monitoring the market
14     potential and our market share.   And the
15     industry spend as a whole.
16              Q.    And for customer profiles, you
17     said there's a few different customer profiles.
18     What are those?
19              A.    That team groups it into three
20     profiles that I can recall; the global
21     contractors, the regional contractors, and then
22     the construction conglomerates.
23              Q.    Do those three profiles of
24     customers have different buying habits?
25              A.    Slightly.   It -- it has -- really
```

HIGHLY CONFIDENTIAL

Page 102

1   has more to do with the size of the equipment.

2   So the global contractors have the largest

3   equipment and the most advanced equipment,

4   which would prioritize, you know, the premier,

5   and then it kind of goes down from there.  The

6   mid regional dredgers, kind of they -- there

7   are some that have some advanced equipment.

8   But, yeah, it really comes down to the number

9   of dredge assets that they have.

10          Q.   So are the construction

11  conglomerates less likely to buy premier

12  products?

13              MR. COLLIER:  Objection.  Form.

14              THE WITNESS:  The construction

15  conglomerates are less likely to measure -- or

16  because they -- they're not utilizing the dredges,

17  like, as their premier -- like that's not their

18  number one business, it's kind of auxiliary

19  equipment for them, it's not what's really

20  producing their money, they might be less -- no,

21  they're not less likely to buy GeoVor but

22  they're -- they're just less likely to need --

23  need upgrades on cutters and things like that.

24  So, no, not necessarily.

25  BY MS. RODMAN:

HIGHLY CONFIDENTIAL

Page 103

1          Q.   Okay.  Okay.  What is the market

2    in which the GeoVor system competes?

3          A.   GeoVor is -- GeoVor is utilized in

4    offshore infrastructure so we're competing, you

5    know, with other players that are in the

6    offshore infrastructure, cutter section dredge

7    work.

8          Q.   Okay.  Are you aware of any Deere

9    products that compete in the offshore

10   infrastructure market?

11         A.   I don't know.

12         Q.   Okay.  What other competitive

13   products compete in the offshore infrastructure

14   market?

15         A.   There are some players -- some

16   competitors that will offer, like, old systems

17   that are -- you know, older systems that just

18   make copies.

19              I'm sorry, could you repeat that

20   question one more time?  I just lost my train

21   of thought for some reason.

22         Q.   That's okay.  I'm trying to figure

23   out what other products, other than ESCO,

24   compete in the offshore infrastructure market

25   with GeoVor.

HIGHLY CONFIDENTIAL

Page 104

1          A.    Okay.  We see some mining --

2     mining -- or other GET suppliers that we

3     compete with on construction and mining also in

4     the offshore infrastructure.

5               So MTG is an example, StarMet,

6     they compete in the offshore infrastructure,

7     same along with us in construction and mining.

8               Bradken also competes in offshore

9     infrastructure, along with construction and

10    mining.

11              And then there's another player

12    called VOSTA that just competes exclusively

13    in -- in the offshore infrastructure.

14              We have Combi that competes in

15    offshore infrastructure, mining and

16    construction.

17              And then we have finally the --

18    IHC is a company that makes the dredges.  They

19    just compete in offshore infrastructure.

20              So several that compete with us

21    from dredge, mining, and construction, and a

22    couple that are just offshore infrastructure,

23    dredge.

24          Q.    Okay.  Are there any other ESCO

25    products that compete with GeoVor in the

DEERE EX. G

PAGE 85

# EXHIBIT H

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ESCO GROUP LLC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Case No. 1:20-cv-01679-RGA-JLH |
| | § | |
| DEERE & COMPANY, | § | |
| | § | |
| *Defendant*. | § | |

**EXPERT REPORT OF STEPHEN L. BECKER, Ph.D.**

STEPHEN L. BECKER, Ph.D.

2/8/2023

DATE

HIGHLY CONFIDENTIAL

DEERE EX. H
PAGE 87

HIGHLY CONFIDENTIAL



**2.   ESCO Bucket Tooth Systems**

38.   ESCO has sold several distinct bucket tooth systems over the damages period.  ESCO claims that it competes with Deere "for the same customers, particularly in the ground engaging tool market."[73] ESCO further claims that it "has or had competing products with the Accused Products, such as the Ultralok, Super-V, Max DRP, and Max DRP Plus products, which have been impacted or are expected to be impacted by Deere's infringement."[74]

39.   The timeline below, depicted in a November 2017 ESCO presentation, outlines certain of its product portfolio over time:[75]

---

[73] Plaintiff ESCO Group LLC's Supplemental Responses to Defendant Deere & Company's First Set of Interrogatories, dated December 16, 2022, No. 3.
[74] Plaintiff ESCO Group LLC's Supplemental Responses to Defendant Deere & Company's First Set of Interrogatories, dated December 16, 2022, No. 3.
[75] ESCO-00001145-214; at -147.

**DEERE EX. H**
**PAGE 88**

HIGHLY CONFIDENTIAL



40. According to this same November 2017 presentation, ESCO claimed that its ███████████ ████████████████████ are "where ESCO separates itself from the competition."[76]  This slide also noted that this was "generically about all ESCO tooth castings" including the Super V, MaxDRP and Ultralok.[77]

41. It is important to note (as described in more detail later in this report) that none of the products that ESCO claims compete with Deere's accused TK Series bucket teeth practice the claims of the Patents-in-Suit.[78] For example, as described in the Lost Profits section of this report, ESCO, through its expert Dr. Varner, claims that the accused TK Series bucket teeth compete with ESCO's "Ultralok" tooth system.[79] ESCO considers the Ultralok system to be part of the "premium" segment of the bucket tooth market.[80]

42. An October 2016 ESCO correspondence addressed the nature of this categorization.[81]  It described the (i) then-latest premium products as ████████████████████████████████ ████████████████████████████████[82] (ii) the moderate, tier two products for ████████████████████████████████████████[83]

---

[76] ESCO-00001145-214; at -149.
[77] ESCO-00001145-214; at -149.
[78] Plaintiff ESCO Group LLC's Responses to Defendant Deere & Company's First Set of Interrogatories, dated July 28, 2021, No. 9.
[79] See, for example, Varner Report, pages 20, 24, 27.
[80] See, for example, ESCO-00014614-618; at -617; Deposition of Adam Stitzel, December 16, 2022, pages 109-110, 116, 196; Deposition of Craig Wihtol, December 8, 2022, pages 114-115.
[81] ESCO-00159166-167.
[82] ESCO-00159166-167; at -166.
[83] ESCO-00159166-167; at -166.

DEERE EX. H
PAGE 89

HIGHLY CONFIDENTIAL

and (iii) the legacy, tier three products as ███████████████████████████████████
█████████████████████████████████████[84]

43.  The features of Ultralok that allow it to compete in the "premium" segment of the bucket tooth market, however, are not related to or driven in any way by the Patents-in-Suit since ESCO acknowledges that Ultralok does not practice the Patents-in-Suit.

*ESCO Products that Practice the Patents-in-Suit*

44.  GeoVor System ("GeoVor"). ESCO stated that the GeoVor product is covered by the '662 Patent and the '175 Patent.[85]  GeoVor was developed ███████████████ and was first offered for sale in Q4 2009.[86]  ESCO acknowledged that GeoVor does not compete with the Accused Products.  As shown in Exhibit SLB-6, GeoVor generated sales ███████████████████████████████████████
██████

45.  GeoVor is offered in various tooth shapes as shown below:[87]



46.  GeoVor's adapter and locking functionality are shown below:[88]

---

[84] ESCO-00159166-167; at -166.
[85] Plaintiff ESCO Group LLC's Responses to Defendant Deere & Company's First Set of Interrogatories, dated July 28, 2021, No. 5; ESCO's Responses and Objections to Deere's First Set of Requests for Admission (Nos. 1-12), dated May 10, 2022, No. 5, No. 7.
[86] Plaintiff ESCO Group LLC's Responses to Defendant Deere & Company's First Set of Interrogatories, dated July 28, 2021, No. 5.
[87] GeoVor Tooth System, esco.weir.com, 2020.
[88] GeoVor Tooth System, esco.weir.com, 2020.

HIGHLY CONFIDENTIAL

55.  Ultralok is offered in various nose sizes and tooth shapes.[110]  As shown in Exhibits SLB-9A and 9B, Ultralok generated sales ███████████████████████████████████

## III.  LOST PROFITS DAMAGES OPINIONS

56.  A plaintiff may be entitled to lost profit damages on the defendant's sales to the extent that the plaintiff could reasonably have made the accused sales "but-for" the alleged infringement.[111]  ESCO, through its damages expert Dr. Varner, claims that it meets the criteria for lost profits.[112] Dr. Varner offers the opinion that ESCO has suffered lost profits of ███████[113]  As discussed below, I disagree with Dr. Varner's opinion regarding lost profits. It is my opinion that the facts of this case do not support a claim for lost profits.

57.  Guidance relating to the proper determination of lost profits damages is provided by the ruling in *Panduit Corp. v. Stahlin Bros. Fibre Works*.[114]  The *Panduit* factors, however, are not the exclusive test of whether a particular plaintiff has met its burden for recovering lost profits, nor do the *Panduit* factors replace or supersede the overarching requirement that the plaintiff demonstrate, through sound economic evidence, that in a market with the alleged infringement factored out, the plaintiff would have reasonably made additional sales and profits.  Later rulings have provided insight to practitioners and courts regarding proper determination of lost sales.[115]

58.  In reaching my conclusions regarding lost profit damages in this case, I have considered the four factors identified in the *Panduit* case.  According to *Panduit*, for a plaintiff to be entitled to lost profits damages, the patent holder must demonstrate:

1)  Demand for the patented product;

2)  Absence of acceptable non-infringing substitutes;

---

[110] ESCO-00001145-214; at -154; ESCO-00007700-707; at -703.  I understand these nose sizes correlate to certain TK Series models in terms of size (see, for example, DEERE_005839-874; at -853).

[111] Roman L. Weil, Daniel G. Lentz, and Elizabeth A. Evans, *Litigation Services Handbook, Sixth Edition*, §20.5.

[112] See Varner Report.

[113] Varner Report, page 5.  Dr. Varner also opined to residual reasonable royalties totaling ████████

[114] *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 197 U.S.P.Q. 726 (6th Cir. Mich. 1978).

[115] See, for example, *State Industries v. Mor-Flo Industries*, 883 F.2d 1573, 1577-80 (Fed. Cir. 1993); *BIC Leisure Products Inc. v. Windsurfing International, Inc.*, 1 F.3d 1214 (Fed. Cir. 1993); *Grain Processing Corp. v. American Maize Products Co.*, 185 F.3d 1341 (Fed. Cir. 1999); *Electro-Mechanical Corp. v. Power Distribution Prods. Inc.*, 926 F. Supp. 2d 822 (W.D. Va. 2013); *Ericsson, Inc., et al. v. D-Link Systems, Inc., et al.*, 733 F.3d 1201, 1226 (Fed. Cir. 2014); *Good Tech. Corp., et al. v. MobileIron, Inc.*, Case No. 5:12-cv-05826-PSG, 2015 WL 3882608 (N.D. Cal. June 23, 2015).

DEERE EX. H
PAGE 91

HIGHLY CONFIDENTIAL

3)  Manufacturing and marketing capability to exploit the demand; and

4)  The amount of profit the patent holder would have made.

59.  It is my opinion that ESCO fails to satisfy the general "but-for" test that is a central requirement of every lost profits claim.  As described below, there is no sound economic basis to conclude that with the alleged infringement factored out, ESCO reasonably would have made additional sales and profits.  In particular, Deere had at least one commercially acceptable non-infringing alternative that was available in September 2014, to which it could have (and would have) switched rather than simply exiting the market. This non-infringing alternative product would have allowed Deere to remain in the market and retain the alleged infringing sales without infringing the Patents-in-Suit.

60.  In the sections below, I discuss each of the four *Panduit* factors.

**1.  *Panduit* Factor 1: Demand for the Patented Product**

61.  *Panduit* Factor 1 contemplates whether there is demand for the patented product(s).  To answer this question, I first observe that ESCO has generated revenue from the sale of GeoVor and Nemisys systems, which I understand ESCO contends are embodiments of the claimed inventions of the Patents-in-Suit.  That fact, however, must be considered within the larger context of the structure of the market in which ESCO and Deere compete.

62.  ESCO claims the GeoVor product line is covered by the '662 Patent and the '175 Patent.[116]  GeoVor was developed ████████████ and was first offered for sale in Q4 2009.[117]  GeoVor competes in the dredging offshore infrastructure market and is not used in construction or mining.[118]  Additionally, ESCO claims the Nemisys product line is covered by the '662 Patent.[119]  Nemisys was developed ████████████ and was first offered for sale in September 2012.[120]  Nemisys

---

[116] Plaintiff ESCO Group LLC's Responses to Defendant Deere & Company's First Set of Interrogatories, dated July 28, 2021, No. 5; ESCO's Responses and Objections to Deere's First Set of Requests for Admission (Nos. 1-12), dated May 10, 2022, No. 5, No. 7.

[117] Plaintiff ESCO Group LLC's Responses to Defendant Deere & Company's First Set of Interrogatories, dated July 28, 2021, No. 5.

[118] Deposition of Adam Stitzel, December 16, 2022, pages 39, 103.

[119] Plaintiff ESCO Group LLC's Responses to Defendant Deere & Company's First Set of Interrogatories, dated July 28, 2021, No. 5; ESCO's Responses and Objections to Deere's First Set of Requests for Admission (Nos. 1-12), dated May 10, 2022, No. 1.

[120] Plaintiff ESCO Group LLC's Responses to Defendant Deere & Company's First Set of Interrogatories, dated July 28, 2021, No. 5.

competes in the mining expendables market and is not used in construction.[121]  Consistent with this evidence, ESCO confirmed that neither GeoVor nor Nemisys compete against the Accused Products in this matter.[122]

63.   Thus, while sales of GeoVor and Nemisys may demonstrate that demand for the patented products exists in some markets (*i.e.,* the dredging offshore infrastructure market and mining expendables market), these sales do not demonstrate that demand for the patented products exists in the relevant market, namely the market in which the accused infringing sales were made. Specifically, courts have noted that the "first *Panduit* factor, demand for the product, may be established either by demonstrating demand for the patentee's specific product or by demand arising from a product that directly competes with the infringing device."[123]  Indeed, I understand courts have stated that:

> *"If the products are not sufficiently similar to compete in the same market for the same customers, the infringer's customers would not necessarily transfer their demand to the patent owner's product in the absence of the infringer's product. In such circumstances, as in this case, the first Panduit factor does not operate to satisfy the elemental 'but for' test."[124]*

64.   Despite the fact that ESCO does not claim to have a product that practices the Patents-in-Suit and competes with the accused infringing TK Series products, ESCO does have a product that competes with the accused infringing devices and for which demand clearly exists. Courts have noted this expanded view of the first *Panduit* factor, stating that "a plaintiff must have made a competitive product in order to be entitled to damages seeking to rectify any potential lost sales of that product," such that the "patentee needs to have been selling some item, the profits of which have been lost due to infringing sales."[125]

65.   It is uncontested that the Patents-in-Suit do not cover the Ultralok system. Dr. Thomas Varner, ESCO's damages expert in this matter, conceded that "ESCO's Ultralok system does not practice the patents-in-suit...."[126]  As discussed throughout this report, however, the evidence indicates that

---

[121] Deposition of Adam Stitzel, December 16, 2022, pages 42-43; Deposition of Craig Wihtol, December 8, 2022, page 108.
[122] ESCO's Responses and Objections to Deere's Second Set of Requests for Admission (Nos. 13-40), dated October 11, 2022, No. 30.
[123] *Magna Mirrors of America Inc. v. Samvardhana Motherson Reflectec Group Holdings Limited,* Case No. 1:17-cv-00077-RJJ-PJG, Opinion and Order filed September 30, 2020.
[124] *BIC Leisure Products Inc. v. Windsurfing International, Inc.,* 1 F.3d 1214 (Fed. Cir. 1993).
[125] *ICM Controls Corp. v. Honeywell International, Inc*., Case No. 5:12-cv-01766, 2021 WL 3032697 (N.D.N.Y. July 19, 2021).  See, also, *Poly-America L.P. v. GSE Lining Tech., Inc*., 383 F.3d 1303, 1311 (Fed. Cir. 2004).
[126] Varner Report, page 20.

DEERE EX. H
PAGE 93

HIGHLY CONFIDENTIAL

Ultralok competes in the same market with the Accused Products.  Furthermore, as shown in Exhibits SLB-9A and 9B, sales revenues for Ultralok demonstrate that demand exists for this competing product.

66.    Given the foregoing considerations, it is my opinion that *Panduit* Factor 1 is met in this case.

**2.    *Panduit* Factor 2: Absence of Acceptable Non-Infringing Alternatives**

67.    *Panduit* Factor 2 considers the availability of commercially acceptable, non-infringing alternatives to the products that utilize the Patents-in-Suit.  In a market where there is demonstrated demand for the patented product or for a product that directly competes with the accused infringing product (*i.e.*, *Panduit* Factor 1 is met), the question of whether non-infringing alternatives exist is important to the determination of whether the patent holder would have made additional sales "but-for" the alleged infringement. In particular, the analysis must consider whether the accused infringer, Deere, could have remained in the market for the Accused Products and satisfied that demand with a non-infringing product rather than being forced to exit the market and cede those sales to ESCO and/or other market participants.[127] If such alternatives were available to the accused infringer, then it may be reasonable to conclude that the infringer would have switched to the non-infringing alternative, and, in doing so, maintained some or all of the accused infringing sales.  Accordingly, *Panduit* Factor 2 "exists because, if the customer might have purchased a different, non-infringing product, the patentee cannot establish entitlement to lost profits for that particular sale."[128]

68.    As a threshold matter, there is no evidence that the technology claimed in the Patents-in-Suit is a requirement, or even an important element, of the demand for products in the relevant bucket tooth market. Numerous products have been (and remain) successful in the market without use of the technology allegedly disclosed in the Patents-in-Suit. The most notable products that demonstrate this fact are ESCO's own Super V and Ultralok systems.[129] As described earlier, neither of these products practice the Patents-in-Suit. There are also numerous other products that compete with the Accused Products in the bucket tooth market, including products such as the (i) Smartfit by Hensley/Komatsu, (ii) XS System by Hensley/Komatsu, (iii) Starmet System by MTG (Metalogenia), (iv) J Series, K Series, and Advansys by Caterpillar, (v) J-Clack and Futura II by BYG

---

[127] *Grain Processing Corp. v. American Maize Products Co.*, 185 F.3d 1341 (Fed. Cir. 1999).
[128] *360Heros, Inc. v. GoPro, Inc.*, 1-17-cv-01302, Slip Op. (D. Del. August 8, 2022).
[129] Discussion with Dr. Klopp.

HIGHLY CONFIDENTIAL

**The Opinion Testimony of Qualified Experts – Factor 14**

218.  I have discussed technical subjects regarding the Patents-in-Suit with Dr. Klopp. To the extent that I have relied on Dr. Klopp, I have specifically noted such reliance in my report.

**Results of the Hypothetical Negotiation – Factor 15**

219.  The central construct of a *Georgia-Pacific* analysis of the reasonable royalty is a hypothetical negotiation between the patent holder as licensor and the accused infringer as licensee. Each party is assumed to enter the hypothetical negotiation as a willing party to a license for the Patents-in-Suit. Each party is assumed to consider the Patents-in-Suit to be valid, enforceable and infringed by the accused infringer.

220.  In arriving at a reasonable royalty for a license to the Patents-in-Suit, ESCO and Deere would have considered many of the points discussed earlier in this report as well as several of the issues addressed in *Georgia-Pacific* Factors 1 through 13.  I have based my opinion about the outcome of hypothetical negotiation between ESCO and Deere on my review of documents and testimony produced in this case; discussions with Dr. Richard Klopp (Deere's technical expert); John Ruvang (Design Manager at Black Cat); Michael Budan (Aftermarket Business Manager for Deere's Construction and Forestry Division at Deere); Jason Simmons (Program Manager for Attachments and Compact Wheel Loaders at Deere); and Steva Judge (Blades, Knives, and Wear Component Supply Base Manager at Deere); independent research conducted by my staff and me; the aforementioned Analytical Approach and *Georgia-Pacific* factors analysis; and my own experience in valuation of patent damages.

**A.    Timing of and Parties to the Hypothetical Negotiation**

221.  Under the *Georgia-Pacific* framework, the hypothetical negotiation is assumed to take place on or just before the date of first infringement.[339] That date is triggered by the later to occur of the issuance of the patent and the first sale or use of an infringing device or practice of an infringing method. The timing of the hypothetical negotiation then determines the parties to the negotiation.

222.  In this case, the Accused Products were being sold by Deere prior to the issuance of the Patents-in-Suit.[340]  Thus, the date of first infringement is triggered by issuance of the '175 Patent on September

---

[339] *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 75 (Fed. Cir. 2012) (citing 35 U.S.C. § 286).
[340] Exhibits SLB-3 and SLB-3B.

DEERE EX. H
PAGE 95

HIGHLY CONFIDENTIAL

30, 2014.[341] Accordingly, the hypothetical negotiation occurs on, or around, September 30, 2014. U.S. Patent Application No. 13/746,210 that issued as the '662 patent was filed on January 12, 2013.[342]  It is my view that ESCO and Deere would have negotiated for a license to both Patents-in-Suit at the September 2014 hypothetical negotiation.  At the time of hypothetical negotiation, ESCO was the holder of the '175 patent.[343]  Therefore, ESCO is the licensor and Deere is the licensee in the hypothetical negotiation for a license that grants rights to the Patents-in-Suit.

223. I understand that ESCO is not seeking damages for infringement of the '662 Patent prior to December 10, 2020, nor is ESCO seeking damages for infringement of the '175 Patent prior to April 7, 2021.[344]  Thus, the damages period in this case begins no earlier than December 10, 2020.

**B.    Royalty Structure**

224. The structure of the royalty should be determined with reference to the circumstances of the hypothetical negotiation and, in particular, the unique circumstances of the parties to that negotiation. There are two primary forms of a reasonable royalty: the lump-sum and the running royalty.

225. A lump-sum royalty is typically a single payment that is made at the time of the execution of a patent license that provides for rights to use the licensed patent for the entire term of the patent license (which often is for the life of the patent covered under the license). This type of royalty structure serves to reduce the downside risk for the licensor by removing any concern over uncertainty regarding the level of licensed sales over the duration of the license. This structure also provides payment certainty and administrative convenience for the licensor, as there is no need for royalty audits or disputes over accounting for sales made pursuant to grants made under the patent license. As to the licensee, a lump-sum structure provides certainty as to the amount of its royalty obligation as well as freedom to operate.

226. Under a running royalty structure, a licensee makes continuing, periodic payments based on the extent of use of the licensed patent during a specified period.  The extent of use during each accounting period can be measured either by the number of licensed units made or sold, by the

---

[341] U.S. Patent No. 8,844,175.
[342] U.S. Patent No. 10,273,662.
[343] U.S. Patent No. 8,844,175 – Assignments, uspto.gov.
[344] ESCO's Responses and Objections to Deere's First Set of Requests for Admission (Nos. 1-12), dated May 10, 2022, No. 2, No. 8; Plaintiff ESCO Group's First Supplemental Responses to Defendant Deere & Company's First Set of Interrogatories (Nos. 2, 4-7, and 11), dated July 28, 2022, No. 2.

DEERE EX. H
PAGE 96

# EXHIBIT I

DEERE EX. I

PAGE 97

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

ESCO GROUP LLC,

    *Plaintiff*,

v.

DEERE & COMPANY

    *Defendant*.

C.A. No. 1:20-cv-01679-RGA

**EXPERT REPORT OF**

**THOMAS R. VARNER, PH.D.**

Dated:  January 13, 2023

Respectfully submitted,

_____
Thomas R. Varner, Ph.D.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

DEERE EX. I
PAGE 98

purposes of my damages analysis that the Court finds these allegations to be true.  I understand that if the Court finds Deere's products infringe either of the ESCO patents at issue in this case, then ESCO is entitled to recover lost profits resulting from the claimed infringement, but in no event less than a reasonable royalty for use made of the invention by the infringer.[4]

9.      My opinions are based on the above materials and discussions, as well as my professional experience.  This report reflects my opinions at the present time related to ESCO's allegations against Deere.  I may revise or supplement my opinions after I review other expert reports submitted in this matter, additional documents, testimony, or other information that comes to my attention.

## II.    SUMMARY OF OPINIONS

10.     I understand that if the Court finds that Deere's TK Series System components infringe either of ESCO's patents-in-suit, then ESCO is entitled to recover lost profits or an amount no less than reasonable royalties in lieu of lost profits.

11.     I calculate damages from December 10, 2020, the date of the original Complaint in this matter (*i.e.*, date of first notice) up to September 18, 2023, the scheduled trial date, and an alternative damages period if damages begin on April 7, 2021, the date of the First Amended Complaint.  I reserve the right to revise my calculation if Deere provides actual sales data for its fiscal year 2023 (which I understand has not been produced to date).

12.     Deere's accused TK Series System and ESCO's Ultralok system both sell in the premium segment of the U.S. market for bucket tooth systems used in construction equipment. Deere's sale of its TK Series System products resulted in ESCO losing sales of its Ultralok bucket

---

[4] 35 U.S. Code § 284 – Damages.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. I
PAGE 99

tooth system.  I find that all of the *Panduit* factors are met and that ESCO's lost profits can be calculated.  If the '662 Patent is found to be (or both '662 and '175 Patents are found to be) valid, enforceable, and infringed, then ESCO's lost profits over the damage period ███████ and residual reasonable royalties ███████  If only the '175 Patent is found to be valid, enforceable, and infringed, then ESCO's lost profits for a damages period beginning on April 7, 2021 ███████ and residual reasonable royalties ███████

13.    If the Court finds that ESCO is entitled to lost profits from lost future sales of its Ultralok tooth components, I calculate such lost profits ███████ if either or both of the patents-in-suit are found to be valid, enforceable, and infringed.

14.    If the Court finds that ESCO is not entitled to lost profit damages, then I find that the parties would have agreed to a reasonable royalty rate of 8% applied to net sales of Deere's accused TK Series System product over the damages period.  I find that the total amount of reasonable royalty damages ███████ if the '662 Patent is found to be (or both '662 and '175 Patents are found to be) valid, enforceable and infringed.  If only the '175 Patent is found to be valid, enforceable and infringed then ESCO's reasonable royalty damages ███████

15.    Exhibit 1 is a summary of lost profit and reasonable royalty damages.

16.    I understand from counsel that the Court may at its discretion award the Plaintiff prejudgment interest on damages that have accrued over time.  If asked to do so, I will provide such analysis using established methodologies.

## III.    BACKGROUND

### A.    Introduction

17.    The technology at issue in this case relates to bucket tooth systems used on construction excavation equipment, referred to as ground extraction (or engaging) tools ("GETs").

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. I
PAGE 100

37.      ESCO alleges that Deere's TK Series System infringes the '662 and '175 Patents.[66]

## IV.    ANALYSIS AND OPINIONS OF DAMAGES

### A.    Introduction: Damages Methodologies and Analyses

38.      I have been asked for purposes of this report to consider damages based on ESCO's claims of patent infringement against Deere.  I understand that if the Court finds that Deere's TK Series System infringes at least one of the patents-in-suit then, as a matter of law, ESCO is entitled to recover lost profits, or an amount no less than reasonable royalties in lieu of lost profits.  Lost profits are calculated as the profits that the patent holder would have made on sales it lost as a result of the patent infringement.

### B.    Basis for Lost Profits

39.      I understand that courts rely on the decision in *Panduit*,[67] as modified by decisions in *Mor-Flo*,[68] *BIC Leisure*,[69] and others, to determine if a patent holder is entitled to lost profit damages.  I understand that under *Panduit*, to be entitled to lost profit damages the patent holder must demonstrate that it meets the following four "*Panduit* Factors": (1) there is a demand for the patented product; (2) there are no acceptable non-infringing substitutes; (3) the patent owner had the manufacturing and marketing capacity to exploit the demand; and (4) the amount of profit the patent owner would have made absent the infringing conduct.[70]  Several cases since *Panduit* (such

---

[66] First Amended Complaint, 4/7/21, pp, 4-7, Count I, Infringement of U.S. Patent No. 10,273,662 and Count II, Infringement of U.S. Patent No. 8,844,175.

[67] *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152 (6th Cir. 1978).

[68] *State Industries, Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573 (Fed. Cir. 1989), cert. denied, 493 U.S. 1022 (1990).

[69] *BIC Leisure Products, Inc. v. Windsurfing International, Inc.*, 27 U.S.P.Q. 2d 1671 (Fed Cir. 1993).

[70] *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc*., 575 F.2d 1152 (6th Cir. 1978).

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. I
PAGE 101

as *State Industries*) have modified the *Panduit* Factors to require a market share apportionment among competitors if there are non-infringing substitutes.[71]

40.     I also understand that the Court in *Grain Processing* stated that "[c]onsumer demand defines the relevant market and relative substitutability among products;" thus, products manufactured using different technologies may be viewed as substitutes if there is sufficient evidence to demonstrate consumer demand for such products.[72]

41.     I evaluate in this case whether ESCO is entitled to lost profits due to lost sales of its Ultralok bucket tooth system due to sales of Deere's accused TK Series System components.

### C.     Analysis of Lost Profits

#### 1.     *Panduit* Factor 1: Demand for the Patented Product

42.     *Panduit* Factor 1 requires that there is demand for the patented product.  In this case, ESCO claims that two of its product lines practice at least one of the patents-in-suit.  The GeoVor system, which was first offered for sale in Q4 2009, practices the '662 and '175 Patents.[73,74] The GeoVor system is designed for use in dredging applications.[75]  The Three-Piece Nemisys

---

[71] *See State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.3d 1573, 1577–78 (Fed. Cir. 1989).

[72] *Grain Processing Corporation, v. American Maize-Products Company*, 185 F.3d 1341 (Fed. Cir. 1999), "Consumer demand defines the relevant market and relative substitutability among products therein…. Important factors shaping demand may include consumers' intended use for the patentee's product, similarity of physical and functional attributes of the patentee's product to alleged competing products, and price….Where the alleged substitute differs from the patentee's product in one or more of these respects, the patentee often must adduce economic data supporting its theory of the relevant market in order to show 'but for' causation."

[73] Plaintiff ESCO Group LLC's First Supplemental Responses to Defendant Deere & Company's First Stet of Interrogatories (Nos. 2, 4-7, and 11), 7/28/22, pp. 7-8, Response to Interrogatory No. 5.

[74] *See* https://www.esco.weir/patents/.

[75] *See* https://www.esco.weir/waterway-dredging/.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. I
PAGE 102

system, which was first offered for sale in approximately September 2012, practices the '662 Patent.[76, 77] The Three-Piece Nemisys system is designed for use in mining applications.[78]

43.     Exhibit 2.3 is a summary of GeoVor system sales ███████████████████████. Exhibit 2.3 shows that the GeoVor system tooth components (or points) and adapters had over this period ███████████ in sales and ███████████ in gross profits, and that all GeoVor system components had ███████████ in sales and ███████████ in gross profits. Exhibit 2.4 is a summary of the Three-Piece Nemisys system sales ███████████████████. Exhibit 2.4 shows that the Three-Piece Nemisys system had ███████████ in sales and ██████████ in gross profits.

44.     While ESCO's Ultralok system does not practice the patents-in-suit, documents and testimony, as detailed below, confirm that ESCO's Ultralok system competes with the allegedly infringing TK Series System. I understand that "the demand in question in the first *Panduit* factor is not limited to demand for the patented products" and that "demand may also arise from a product that directly competes with the infringing device."[79] Exhibit 2.1 shows that ███████████, ESCO has sold ███████████ Ultralok adapter and tooth components ███████████████████ in net sales.

45.     Deere's TK Series System is alleged to infringe both of the patents-in-suit.[80] Exhibit 3.1 is a summary of Deere's TK Series System sales ██████████████████████████.

---

[76] Plaintiff ESCO Group LLC's First Supplemental Responses to Defendant Deere & Company's First Stet of Interrogatories (Nos. 2, 4-7, and 11), 7/28/22, pp. 7-8, Response to Interrogatory No. 5.

[77] *See* https://www.esco.weir/patents/.

[78] *See* https://www.esco.weir/mining-tooth-systems/.

[79] *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1360 (Fed. Cir. 2012).

[80] First Amended Complaint, 4/7/21, pp. 4-7, Count I, Infringement of U.S. Patent No. 10,273,662 and Count II, Infringement of U.S. Patent No. 8,844,175.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. I
PAGE 103

███████████████████████████████████████ Exhibit 3.1 shows that Deere

sold ██████████ TK Series System adapter and tooth components for ████████ (net

sales), with gross profits of █████████.

46.     Recognizing that ESCO and Deere each have sold ████████████████████

██████████████████ in sales that are covered by at least one of the patents-in-suit, demand

for patented products is established and *Panduit* Factor 1 is met.  Demand for a product that directly

competes with the allegedly infringing TK Series System, in this case, the Ultralok product, is also

established, further supporting *Panduit* Factor 1.

### 2.     *Panduit* Factor 2: There Are No Acceptable Non-Infringing Substitutes

47.     *Panduit* Factor 2 requires that there are no acceptable non-infringing substitutes

available in the market.  I understand that this factor has been modified by *State Industries*, such

that if there are non-infringing substitutes in the market, then infringing product sales need to be

apportioned among the remaining competitors in the market.[81]

48.     As an initial matter, and as discussed in Sections IV.E.4.j and IV.E.4.n, I note that

Deere has not yet redesigned the TK Series System to develop a substitute itself, which tends to

show a lack of acceptable and available non-infringing alternatives.

49.     Deere alleged that there are several non-infringing alternatives to the TK Series

System, including: (1) proposed design changes to the patents-in-suit; (2) Black Cat's proposed

design changes to the TK Series System products; (3) certain commercially available products;

---

[81] *State Industries v. Mor-Flo Industries*, 883 F2d 1573 (Fed. Cir. 1989).

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. I
PAGE 104

and (4) various "prior art" references dating back to 1982.[82]  Section IX of the Expert Report of

Hezekiah Holland Regarding Infringement (the "Holland Expert Report") addresses why Deere's

proposed design changes to the patents-in-suit, Black Cat's proposed design changes to the TK

Series System products, the Caterpillar J and K Series products, and other competitor products,

and the prior art patents are not acceptable alternatives to the patents-in-suits.  (Furthermore, I

understand that, "if a device is not available for purchase, a defendant cannot argue that the device

is an acceptable non-infringing alternative for the purposes of avoiding a lost profits award."[83])

50.     Deere alleged in its response to ESCO's Interrogatory No. 11 that the following

products are commercially available, non-infringing alternatives: Caterpillar's J Series, K Series,

and Advansys systems; ESCO's Super V system; Hensley/Komatsu's Smartfit and XS systems;

MTG's Starmet system; BYG Futura's J-Clack and Futura II systems; and Liebherr's Z-System.[84]

As I discuss below, many of these products are not substitutes for the accused TK Series System

because they had different features and are sold in different segments of the U.S. market for bucket

tooth systems for construction equipment.

51.     Documents and testimony in this matter demonstrate that bucket tooth systems used

in the construction industry are viewed by both Deere and ESCO as being divided into three

different segments.  A Deere presentation describes these segments as "Good," "Better," and

---

[82] Defendant Deere & Company's Third Supplemental Objections And Answers to ESCO Group LLC's First Set of Interrogatories (Nos. 1-17) (Supplementing Nos. 2, 5-10, 13-15, and 17), 11/17/22, Response to Interrogatory No. 10, pp. 14-17.

[83] *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1571 (Fed. Cir. 1996); *see also*, *Grain Processing Corp. v. American Maize-Products Co.*, 185 F.3d 1341, 1353 (Fed. Cir. 1999) ("Acceptable substitutes that the infringer proves were available during the accounting period can preclude or limit lost profits; substitutes only theoretically possible will not.").

[84] Defendant Deere & Company's Third Supplemental Objections And Answers to ESCO Group LLC's First Set of Interrogatories (Nos. 1-17) (Supplementing Nos. 2, 5-10, 13-15, and 17), 11/17/22, pp. 14-17.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. I
PAGE 105

"Best," with Deere's TK Series System, Caterpillar's K-Series System, Komatsu's K-Max System, Hensley's XS Series System, and ESCO's Ultralok system in the "Best" segment.[85, 86]  In addition to other performance features, a common feature of bucket tooth systems in this top segment is that they are marketed as "hammerless" systems for changing the tooth components, that is, not requiring a hammer to remove a securing pin, making for a safer and faster tooth replacement process.  Mr. Christopher Carpenter, the V.P. of Innovation and Technology at ESCO, testified that customers appreciate the added safety of a hammerless system.[87]  Deere's Program Manager for Attachment and Compact Loaders testified that the hammerless feature of the TK Series

---

[85] DEERE_0005839-874 (Deere presentation, "Ground Engaging Tools," Aftermarket Regional Sales Training, 2017), -845.  This document also lists ESCO's SV2, Nemisys, and Posilok tooth systems in the "Best Category," however these are designed for use in the mining industry not the construction industry.  *See* ESCO SV2 Product Brochure, https://g9m3s3z2.rocketcdn.me/wp-content/uploads/2022/04/P5180MIN-ENG-L.pdf, accessed 12/28/22, "ESCO SV2® Replacement Parts For Mining and Aggregate Applications."  *See* https://www.esco.weir/mining-tooth-systems/, accessed 12/28/22, "Nemisys® Mining Tooth System."  *See* https://www.directindustry.com/prod/weir-esco/product-52982-1666417.html, accessed 12/28/22, "The S-Series Posilok tooth system is specifically designed for draglines, cable shovels, large hydraulic face shovels and hoe buckets."

[86] The Deere Presentation, "Ground Engaging tools," Aftermarket Regional Sales Training, 2017, DEERE 0005839-874 at 845, also includes the MTG KingMet in the "Best" Segment.  However, Mr. Stitzel testified (Deposition of Adam Stitzel, 12/16/22, p. 69) that the MTG Liebherr system "lock is promoted as hammerless but yet you need a hammer to knock the lock out, and that given that it's a side lock, the customers talk about accessibility issues because sometimes the protection that goes between the teeth get in the way and so it's difficult to remove."

[87] Deposition of Christopher Carpenter, 12/5/22, pp. 28-29, "Q.  Was a hammerless system something that customers specifically wanted when you launched Ultralok?  A.  …So mixed.  I would say that there are…some customers that…had a high concern with safety,…but ESCO…took the position both on the mining and construction space that we wanted to create the safest systems on earth so…we essentially were pretty focused on creating locking systems that did not require a hammer.  So I would say that there were some customers that…were asking for that.  I think that when we launched this, I think they overwhelmingly accepted and appreciated the fact that we were providing a safer system.  So they may not have known that they wanted a hammerless system, but they appreciated the fact that we gave them a hammerless system."

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. I
PAGE 106

System is the only distinguishing feature of the TK Series System over other bucket tooth systems on the market.[88]

52.     ESCO also describes the market for bucket tooth systems as being comprised of three segments: premium (or premier), moderate, and legacy,[89] with Ultralok being in the premier segment.[90] Mr. Stitzel testified that ESCO's Ultralok system competes with the TK Series System in the premier segment,[91] along with the Hensley XS, the Komatsu K-Max,[92] the Caterpillar Advansys,[93] and the MTG KingMet tooth systems.[94]

53.     Caterpillar's J Series and ESCO's Super V bucket tooth systems are considered legacy products that do not compete in the premium segment.[95]  Mr. Stitzel testified that the

---

[88] Deposition of Jason Simmons, 12/14/22, pp. 45-46, "Q.  Is the hammerless feature of the TK series tooth one of the advantages of the TK series tooth over other teeth on the market?  A.  Yes….Q.  Does the TK teeth other than the hammerless feature have any other features that makes customers [buy] the TK series teeth now because it is on market over those teeth?  A.  No."

[89] Deposition of Adam Stitzel, 12/16/22, p. 97, "Q.  …Have you seen any ESCO documents categorizing expendable products into buckets of premier, moderate, and legacy?  A.  Yes."

[90] Deposition of Adam Stitzel, 12/16/22, pp. 97-98, "Q.  Okay.  And Nemisys would be a premier system in that type of classification, correct?  A.  Yes….Q.  And Ultralok would also be a  premier system in that type of classification,  correct?  A.  That's right.  Correct.  Q.  And Super V would be like a legacy system in that type of classification?  A.  That's correct."

[91]Deposition of Adam Stitzel, 12/16/22, p. 116, "Q.  Does the Deere TK Series compete with Ultralok in the premium market?  A.  Yes….I would…say Deere TK…would fall into the  premium space because they have…a pretty stable nose.  They've got hammerless -- I mean, there's some things that Ultralok offers that…the TK system doesn't; but I would say yes, they would compete in that space."

[92] Deposition of Adam Stitzel, 12/16/22, p. 117, "Q.  The Hensley XS system, does that compete with Ultralok in the premium market?  A.  Yes.  Q.  The Komatsu Kmax, does that compete with Ultralok in the premium market?  A.  Yes, I would say that competes with Ultralok in the premium market."

[93] Deposition of Adam Stitzel, 12/16/22, p. 118.

[94] Deposition of Adam Stitzel, 12/16/22, p. 119.  *See also*, p. 69, MTG Liebherr (or KingMet) system, "…the lock is promoted as hammerless but yet you need a hammer to knock the lock out, and that given that it's a side lock, the customers talk about accessibility issues because sometimes the protection that goes between the teeth get in the way and so it's difficult to remove."

[95] Deposition of Adam Stitzel, 12/16/22, p. 113, "Q.  So the Super V doesn't compete in the premium category—A.  No.  Q.  –with Ultralok, correct?  A.  Not really.  Q.  And that would also be true for MaxDRP, that it doesn't compete in the premium category with Ultralok?  A.  Not really, right.  Correct.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. I
PAGE 107

Hensley/Komatsu Smartfit and XS systems are relatively small participants in the market,[96] that

MTG's Starmet system and BYG Futura's J-Clack and Futura II systems lacked a fully

hammerless system,[97] and that Liebherr's Z-System was similar to MTG's Starmet system (*i.e.*,

lacked a fully hammerless system).[98, 99]

54.     ESCO estimates that Ultralok's share of the total construction expendables

market[100] in North America ██████████████████,[101] and that the premium segment of

construction expendables ██████ of the total market.[102] Exhibit 6 summarizes the market

share apportionment methodology. Price differences between the products that compete in the

premium segment of the U.S. construction equipment market for bucket tooth systems are

---

Q.  Okay.  And then MaxDRP Plus, does it compete with Ultralok?  A.  Not -- no, it doesn't have the
same features.  It doesn't have the same benefit.  So it can -- it is a product that will fit on an excavator,
but it lacks -- it lacks a lot."  P. 311, "Q.  Would the Caterpillar J Series be an acceptable alternative to the
TK Series?  A.  No, I would not say so.  Q.  Why?  A.  Well, the J Series has a -- no stability at all on the
nose."

[96] Deposition of Adam Stitzel, 12/16/22, pp. 68-69, 311-313.

[97] Deposition of Adam Stitzel, 12/16/22, pp. 69-70, 311-313.

[98] Deposition of Adam Stitzel, 12/16/22, p. 312.

[99] See also Holland Expert Report, 1/13/23, Section IX.

[100] Deposition of Adam Stitzel, 12/16/22, p. 129, "Q.  So would it be fair to say that the Ultralok system
competes in the construction expendables market generally?  A.  Yes, Ultralok is in our construction
expendables space.  Yes."

[101] Deposition of Adam Stitzel, 12/16/22, pp. 129-130, "Q.  What is ESCO's market share for the Ultralok
system in the construction expendables market?  A.  I cannot remember the global number off the top of
my head.  We've got ████████████ market share in North America and we have
██████████████ market share in Europe, but I can't remember the global, like for the whole
world number."

[102] Deposition of Adam Stitzel, 12/16/22, p. 184, "Q.  Okay.  What is the market potential for Ultralok in
the construction expendables market?  A.  The -- going off of memory here, we've -- we put the -- I mean,
there's segmentation that happens.  So I believe we put the total construction expendables at ██████
████████████████████████; but then we do some further segmentation based on
those customers that we think respond to premium products versus those that might just prefer like a copy
and something inexpensive, low price, and so ██████████████████.  So we assume that
there's maybe ██████████████ in premium – premium potential, which is the area that Ultralok
would play in."

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. I
PAGE 108

accounted for in the existing market shares.[103]  I assume no product price changes among the

remaining competing products in the premium market segment but-for market analysis.

55.    Mr. Budan, the Aftermarket Business Manager for Deere's Construction and

Forestry Division, testified that the primary competitors to Deere's TK Series System are

Caterpillar, Hensley (XS and Go Pro systems), and ESCO.[104, 105]  Mr. Budan testified that he

believes Deere ████████ share of the segment in which TK Series System competes[106] and that

████████████████████████████████████████████████.[107]  Mr. Budan also testified that the key

---

[103] *See also*, Deposition of Kevin Stangeland, 12/14/22, p. 143, "We strive to be the highest performing product with the lowest total cost of ownership to operate your piece of equipment.  So a lot of things go into total cost of ownership, but it's typically tied into wear life, reliability, downtime events, machine uptime, ability to penetrate the bank and being low profile but still strong and tough.  We believe that we're the best lowest cost -- total cost of ownership, but oftentimes the component prices are much higher than our competitors.  We're a price leader in the market."

[104] Deposition of Michael Budan, 11/9/22, p. 20, "Q.  So just to recap, the primary competitors for the Deere TK-Series System products are Caterpillar, Hensley, and ESCO; is that right?  A.  Yes.  Q.  Other than the ESCO Ultralok and Super V products, are you aware of any other products that ESCO offers that compete with the Deere TK-Series System products?  A.  I am not."

[105] Deposition of Michael Budan, 11/9/22, p. 14, Q.  And are you familiar with ESCO's Ultralok product?  A.  Could you clarify what you mean by "familiar"?  Q.  Are you aware that ESCO offers a product called Ultralok to customers?  A.  Yes.  Q.  Okay.  And is the ESCO Ultralok product a competitor in the market to the Deere TK-Series System products?  A.  Yes."

[106] Deposition of Michael Budan, 11/9/22, pp. 21-22, "Q.  Do you know approximately what market share Deere has in the market in which the Deere TK-Series System competes?  A.  I would estimate ████ ██████  Q.  And what is that estimation based on?  A.  It's based on our machine population and estimated consumption or usage patterns of those machines.  Q.  And when you say "machine population," what do you mean?  A.  Whole good machines, such as excavators or backhoes or loaders.  Q.  And when you say "estimated consumption or usage patterns of those machines," what do you mean?  A Based on our test data…with similar machines, estimating how many hours an average tooth would last and then expanding that over the life of the machine.  Q.  And when you reference ████████████ that's Deere's current market share, right?  A.  Estimated, correct."

[107] Deposition of Michael Budan, 11/9/22, p. 28, ██████████████████████████████████ ████████████████████████████████████████████████"



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. I
PAGE 109

competitors for Deere's TK Series System have not changed over the last decade.[108]  Mr. Budan
stated that ESCO's Ultralok competes with the TK Series System.[109]

56.     The documents and testimony show that Deere's TK Series System competes in the
top, or "Premium," segment of the North American market for bucket tooth systems for
construction equipment, along with Caterpillar's Advansys and K-Series, Komatsu's K-Max,
Hensley's XS Series, and ESCO's Ultralok systems.

57.     Exhibit 6 shows existing market shares of the premium segment of the market for
bucket tooth systems in construction equipment in the U.S.  I calculate the but-for market share
allocation in Exhibit 6 and use these shares to calculate ESCO's lost Ultralok sales.

### 3.     *Panduit* Factor 3: The Patent Owner Had the Manufacturing and Marketing Capacity to Exploit the Demand

58.     Exhibit 2.1 shows that ESCO sold ███████████████ Ultralok adapter and tooth
components ███████████████████████ ESCO also sold ███████ Ultralok adapter and tooth
components ████████████████████████████████, or an annualized amount of ███████
components.  The claimed lost sales shown in Exhibit 9.1 are ████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

---

[108] Deposition of Michael Budan, 11/9/22, p. 43, "A.  My understanding is that the key competitors are the same competitors that they've been over the last decade."

[109] Deposition of Michael Budan, 11/9/22, pp. 13-14, "Is ESCO a competitor in the market to the TK-Series System products?  A.  Yes.... Q.  And are you familiar with ESCO's Ultralok product?  A.  Could you clarify what you mean by "familiar"?  Q.  Are you aware that ESCO offers a product called Ultralok to customers?  A.  Yes.  Q.  Okay.  And is the ESCO Ultralok product a competitor in the market to the Deere TK-Series System products?  A.  Yes."

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. I
PAGE 110

68.     Mr. Jones and Mr. Huget stated that ESCO typically ships product within one day and that ESCO can provide products to any part of the U.S.[128]  They also stated that ESCO provides customer support primarily through phone support, and that District Managers in ESCO's dealership network provide in-person support to end customers when necessary.  Mr. Jones and Mr. Huget also stated that ESCO had only minor disruptions to its construction expendables sales process during the Covid pandemic, that no sales were lost over that period due to those disruptions, and that ESCO performed as well as, or better than, competitors in delivering product during the pandemic.  They said that ESCO had the sales and marketing capacity to accommodate ██████████ increased sales of Ultralok from 2019 to the present.

69.     Based on this analysis and ESCO testimony, ESCO would have had the manufacturing and marketing capacity to make the additional sales calculated in Exhibit 9.1, and *Panduit* Factor 3 is met.

### 4.     *Panduit* Factor 4: The Amount of Profit the Patent Owner would have Made Absent the Infringing Conduct

70.     *Panduit* Factor 4 requires that a patent owner demonstrate the amount of profit it would have made on lost sales.  ESCO's gross profit margins on its Ultralok adapter and tooth components are shown in in Exhibit 2.1.  Although Mr. Stitzel testified that ██████████████ ████████████████████████████████████████████████████ reflected in Exhibit 2.1, I have conservatively used the average gross margins shown in Exhibit 2.1 in calculating ESCO's lost profits.

### D.     Calculation of Lost Profits

---

[128] Video interview with Randy Jones and Pete Huget, 1/6/23.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. I
PAGE 111

71.     Exhibit 11 presents ESCO's SGA Expenses (sales, general and administrative operating expenses) from Q4 2020 through Q4 2021. I performed a statistical regression analysis, an established and widely accepted methodology, that looked at ESCO's sales and operating (SG&A) expenses in relation to ESCO's sales revenues. Exhibit 11 shows that ESCO's incremental, or variable, operating expenses ███████████████ of net sales, that is, ██████ ████████████████████████████

72.     In Exhibit 8.1, I calculate ESCO's lost sales by multiplying the lost number of Ultralok adapter and tooth components by the average sales prices of those components, and by ESCO's incremental operating profit margins to arrive at total lost profits ████████

73.     Next, I consider ESCO's lost profits on future lost sales, that is, from ESCO's lost Ultralok tooth component sales after the date of trial because of the stock of infringing TK Series System adapter components sold prior to the trial and in use as of the trial date.

74.     I understand from Mr. Stangeland that ESCO's hardness tests on Ultralok products and TK Series System products indicate that the Ultralok product is harder than the TK Series System product, and component hardness is generally correlated with a longer component life span. However, Mr. Stangeland also said that the life of a bucket tooth system component is highly variable and dependent on the tooth shape, the type of material engaged by the equipment, and the frequency and intensity of use. Mr. Stangeland provided estimates of adapter and tooth component life spans as shown in Exhibit 8.3 for different categories of Ultralok components. This exhibit shows the number of TK Series System adapters in use as of September 2023, then subsequently declining over time using the expected life spans of Ultralok components. I calculate the number of Ultralok tooth components needed for buckets installed with these adapters over time. Exhibit 8.4 shows that profits on lost future sales ████████████

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. I
PAGE 112

75.     I calculate Weir's weighted average cost of capital in Exhibit 8.5 using publicly available information about Weir's cost of equity and cost of debt, among other factors.  I also include similar analyses of Caterpillar's and Deere's weighted average cost of capital for reference. Using a discount factor of ███████, I calculate the discounted cash flows of ESCO's lost profits on future lost sales ████████.

### E.     Reasonable Royalty Damages from Infringement of Patents-in-Suit

#### 1.     Hypothetical Negotiation

76.     I understand that if a patent is found to be valid, enforceable, and infringed, a patent holder may be entitled to damages "in no event less than a reasonable royalty for the use made of the invention by the infringer."[129]  I understand that case law has established that an appropriate method to estimate this amount involves consideration of a hypothetical negotiation between the patent holder and the alleged infringer.  The hypothetical negotiation assumes a willing licensor and a willing licensee and is deemed to occur just prior to the date of first infringement.  The parties assume that the patents are valid and would be infringed by the licensee's products.  The parties are assumed to be in possession of business information such as existed at the time of the hypothetical negotiation, but courts have allowed consideration of events subsequent to the hypothetical negotiation (referring to the "Book of Wisdom" learned from future events).[130]

77.     A well-established way of considering the relevant factors for determining a reasonable royalty for a license for the patents-in-suit, and arising from a hypothetical negotiation between the parties, is to consider the factors set forth in *Georgia-Pacific*.[131]  While not necessarily

---

[129] 35 U.S.C. § 284.

[130] *E.g.*, *Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698 (1933).

[131] *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, (S.D.N.Y. 1970), modified and affirmed, 443 F. 2d 295 (2d Cir. 1971) (*Georgia-Pacific*).

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. I
PAGE 113

a complete list of the relevant factors for every negotiation, it does provide a framework from which to begin the analysis.  I consider each of these *Georgia-Pacific* factors in turn, with each factor quoted from the original case citation.

## 2.     Date of Hypothetical Negotiation

78.     I understand that the date of the hypothetical negotiation for ESCO and Deere to enter into a hypothetical license for the patents-in-suit is taken as the later of: (1) Deere's first sale of infringing bucket tooth system, *i.e.*, 2010, or (2) the earliest issue date of the patents-in-suit, *i.e.*, September 2014.  If the Court finds that the '175 Patent is invalid, unenforceable, or not infringed, then the date of the hypothetical negotiation is the issue date of the '662 Patent, *i.e.*, April 2019.  I understand that Courts permit consideration of events occurring after the date of the hypothetical negotiation in determining a reasonable royalty rate.[132]   Many elements of a hypothetical negotiation in September 2014 would be similar to a hypothetical negotiation in April 2019, *e.g.*, the parties' bucket tooth systems, the nature of the parties' businesses, and the other competitors in the market for premium bucket tooth systems, remain similar.[133]  Also, as I discuss above in Section IV.C above, the Covid-19 pandemic had a relatively minor impact on ESCO's bucket tooth production.  For these reasons, the outcome of the hypothetical negotiation on reasonable royalties would be the same if the date of the negotiation were in September 20014 or in April 2019.

79.     I understand that the damages period begins on the date of first notice for the patents-in-suit, which is the date of the original Complaint, *i.e.*, December 10, 2020.[134]  If the '662

---

[132] *See, e.g.*, *Sinclair Refining Co.*, 289 U.S. at 698.

[133] Deposition of Michael Budan, 11/9/22, p. 43, "My understanding is that the key competitors are the same competitors that they've been over the last decade."

[134] Complaint, 12/10/20; *see also*, ESCO's Responses and Objections to Deere's First Set of Requests for Admissions (Nos. 1-12), Response to Requests for Admission No. 9, "ESCO admits that it provided actual notice of infringement of the '662 Patent to Deere on December 10, 2020.  *See also*, Response to

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. I
PAGE 114

Patent is found to be invalid, unenforceable, or not infringed, then the damages period begins on the date of first notice for the '175 Patent, which I understand is the date of the First Amended Complaint, *i.e.*, April 7, 2021.

80.     As a willing licensor, ESCO is assumed to be willing to make legitimate offers, and likewise, as a willing licensee, Deere is assumed to be willing to make legitimate bids.  In the hypothetical negotiation, the parties assume that the patents-in-suit are valid and enforceable, and that the accused bucket tooth systems infringe the patents-in-suit.

81.     Forms of payment of the negotiated reasonable royalty can be in the form of an up-front lump sum payment, a stream of royalty payments based on the volume of units or sales over the period of the agreement (a "running royalty"), or some combination of the two.  I discuss below

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

### 3.     Determination of a Reasonable Royalty Base

82.     The allegedly infringing products in this matter are bucket tooth systems used on equipment in the construction industry, and I understand that the patents-in-suit cover the complete bucket tooth system.  Consequently, I include Deere's sale of all TK Series System components in the reasonable royalty base.  Mr. Dellett also testified that Deere ███████████████

████████████████████████████████████████████████████████

███████ 135,136 ███████████████████████████████████████

---

Requests for Admission No. 10, "ESCO admits that it provided actual notice of infringement of the '175 Patent to Deere on April 7, 2021."

[135] Deposition of Stephen Dellett, 10/19/22, pp. 21-22.

[136] Deposition of Stephen Dellett, 10/19/22, p. 38, ████████████████████████████

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. I
PAGE 115



83.     Determination of the running royalty base would have been part of the hypothetical negotiation between ESCO and Deere.  I conservatively use a running royalty base of accused product net sales, that is, the sales amount that would result in the lower sales of the two forms of royalty base specified in the parties' agreements.

4.     ***Georgia-Pacific* Factor Analysis**

a.     *"The royalties received by the patentee for the licensing of the patent-in-suit, proving or tending to prove an established royalty."*

84.

(Listed in chronological order.)

i.



137 DEERE-0048720-735 (                              ); DEERE_0048736-760 (
                         ); DEERE_0048766-789 (                              ).
138 *See, e.g.*, DEERE-0048720-735 (                         ), -721.
139 Deposition of Kevin Stangeland, 12/14/22, pp. 43-44,

     *See also*, pp. 48-49.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. I
PAGE 116

85. 

86.

ii.



---

[140] ESCO-00195996-6029 (⬛⬛⬛⬛⬛⬛).
[141] ESCO-00195996 (⬛⬛⬛⬛⬛⬛), -5997 (⬛⬛⬛).
[142] ESCO-00195996 (⬛⬛⬛⬛⬛⬛), -6003 (⬛⬛⬛⬛
⬛⬛⬛).
[143] ESCO-00195996 (⬛⬛⬛⬛⬛⬛), -5998 (⬛⬛⬛⬛⬛)
⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛
, -6026 (⬛⬛⬛).
[144] ESCO-00195996 (⬛⬛⬛⬛⬛⬛), -6004 (⬛⬛⬛).
[145] ESCO-00195996 (⬛⬛⬛⬛⬛⬛), -6026 (⬛⬛⬛), -6027
(⬛⬛⬛).

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. I
PAGE 117



87. ███████████████████████████████████

████████████ ██████████████████████████

█████████████████████████████████████

██████████████████ █████████████████████

███████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████

███████████ █████████████████████████

████████████████████████████

      iii.    ████████████████████████

88. ██████████████████ █████████████████

██████████████████████ █████████████████

---

[146] ESCO-00196076-6094 (████████████████████████████████).

[147] ESCO-00196076 (█████████████████████████████), -6076 (███████).

[148] ESCO-00196076 (█████████████████████████████), -6076 (███████).

[149] ESCO-00196076 (█████████████████████████████), -6081 (█████████), -6091 (█████████).

[150] *See* ESCO-00196053-6075 (███████████████████████████████), -6054 ("████████████████████████████████████████████████████████).

[151] ESCO Corporation became ESCO Group, LLC after Weir Group PLC acquired ESCO Corporation. https://www.global.weir/newsroom/news-articles/weir-completes-acquisition-of-esco-corporation/, accessed 1/12/23.

[152] "ESCO® Corporation Announces Acquisition of Austcast and Newlcast," 12/1/10, https://news.thomasnet.com/companystory/esco-corporation-announces-acquisition-of-austcast-and-newlcast-839668.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. I
PAGE 118



iv.

89.

---

[153] ESCO-00196174-182 (█████████████████████████████), -174 (███).
[154] Video interview with Steve Schad, 1/5/23.
[155] ESCO-00196174-182 (█████████████████████████████), -175 (███).
[156] ESCO-00196174-182 (█████████████████████████████), -176 (███).
[157] Video interview with Steve Schad, 1/5/23.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY



90.

91.

92.

---

[158] ESCO-00195650-5709 (

).

[159] ESCO-00195650

, -5662 ( ).

[160] ESCO-00195650

, -5664-666.

[161] ESCO-00195649 (

).

[162] Video interview with Mr. Steve Schad, 1/5/23.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY



v. ████████████████████

93. ████████████████████████████

██████████████████ ████████████████████

████████████████████████████

██████████████████ ████████████████

██████████████████████

94. ████████████████████████

████████████████ ████████████████

████████████████████████████

██████████████████████████

vi. ████████████████████

95. ████████████████████████

████████████████████████████



[163] ESCO-00195710-5730 (████████████████████).

[164] ESCO-00195710 (████████████████████), -5711-712 (████████).

[165] ESCO-00195710 (████████████████████), -5710 (████████), -5724 (████████).

[166] ESCO-00195710 (████████████████████), -5715-716 (████████).

[167] ESCO-00195732-735 (████████████), pp. 1-2. -5732-733. ████

████████████████████████

*Id.*

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. I
PAGE 121



96.

97.

---

[168] ESCO-00196183 ████████████████ ; Australian Registered Patent No. 2003264586.

[169] Video Interview with Steve Schad, 1/5/23.

[170] ESCO-00196183 ██████████████████ .

[171] Plaintiff ESCO Group LLC's Responses to Defendant Deere & Company's First Set of Interrogatories, 7/28/21, Response to Interrogatory No. 4, pp. 8-9.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. I
PAGE 122



*b.*    *"The rates paid by the licensee for the use of other patents comparable to the patent-in-suit."*

98.

---

[172] DEERE_0048676-8710 (⬛); *see also,* -48702-705 (⬛), -48704 (⬛).

[173] DEERE_0048676-8710 (⬛), -48678 (⬛); *see also,* -48678-679 (⬛) (⬛)

[174] Deposition of Stephen Dellett, 10/19/22, pp. 70-71,

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. I
PAGE 123



99. [REDACTED]

    c.    *"The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold."*

---

[175] Deposition of Stephen Dellett, 10/19/22, p. 69, [REDACTED]

[176] Defendant Deere & Company's Third Supplemental Objections and Answers to ESCO Group LLC's First Set of Interrogatories (Nos. 1-17)  (Supplementing Nos. 2, 5-10, 13-15, and 17), 11/17/22, Answer to Interrogatory No. 3, pp. 6-7, "Deere states…one or more of the following patents cover the Accused Products:  US 7,980,011; US 8,261,472; US 8,307,474; US 8,429,838."  Patent No. 8,307,474 appears to be in error, uspto.gov website shows that this patent number refers to a patient "Transfer trolley."  Patent No. 7,980, 011, "Fully stabilized excavator tooth attachment," was issued 7/19/11, and expires 3/23/29, (https://patents.google.com/patent/US7980011B2/en?oq=7%2c980%2c011).  Patent No. 8,261,472, "Retrofitted excavator tooth attachment," was issued 9/11/12, and expires 10/10/31, (https://patents.google.com/patent/US8261472B2/en?oq=8%2c261%2c472).  Patent No. 8,429,838, "Retrofitted excavator tooth attachment," was issued 4/30/13, and expires 3/23/29.

[177] Deposition of Stephen Dellett, 10/19/22, p. 57, [REDACTED]

[178] Defendant Deere & Company's Third Supplemental Objections and Answers to ESCO Group LLC's First Set of Interrogatories (Nos. 1-17)  (Supplementing Nos. 2, 5-10, 13-15, and 17), 11/17/22, First Supplemental Answer to Interrogatory No. 4, pp. 7-8, [REDACTED]

[179] Deposition of Stephen Dellett, 10/19/22, p. 73, " [REDACTED]

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. I
PAGE 124

100.    I assume that the hypothetical license to Deere for the patents-in-suit arising from the hypothetical negotiation would be on a non-exclusive basis.  All other factors being equal, a non-exclusive license would tend to reduce the reasonable royalties.

101.    I assume that the territory specified in a license arising from the hypothetical negotiation would be U.S. territory.  Because the patents-in-suit are U.S. patents, this factor would not have an effect on the reasonable royalties.

> d.    *"The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special circumstances designed to preserve that monopoly."*

102.    

Therefore, this factor will tend to increase the reasonable royalty rate.

> e.    *"The commercial relationship between the licensor and the licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter."*

103.    ESCO is a supplier to Deere of bucket tooth systems, including the Ultralok and the Super V systems, but ESCO and Deere both agree that: (1) Deere's TK Series System and ESCO's Ultralok bucket tooth system are competing products; and (2) both compete in the premium segment of the bucket tooth market in the U.S.  (See discussion of competitive

---

[180] Plaintiff ESCO Group LLC's Responses to Defendant Deere & Company's First Set of Interrogatories, 7/28/21, Response to Interrogatory No. 4, pp. 8-9.

Chilean Patent No. 49151 is related to the '662 patent."

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. I
PAGE 125

relationship between ESCO and Deere in regards to their bucket tooth products in Section IV.C.2 above.  Therefore, this factor will tend to increase the reasonable royalty rate.)

> f.     *"The effect of selling the patented specialty in promoting the sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales."*

104.    I am not aware of any derivative or convoyed products that Deere sells that are generated by use of patented technology.

> g.     *"The duration of the patent and the term of the license."*

105.    I understand that the '662 Patent expires September 26, 2027 and the '175 Patent expires January 17, 2032.  I consider this factor and its effect on the reasonable royalties below.

> h.     *"The established profitability of the product; its commercial success; and its current popularity."*

106.    Exhibit 3.1 is a summary of TK Series System product sales and gross profits                                                Exhibit 3.1 shows that Deere has had gross sales             , net sales                 , and gross profits                     for its TK Series System products.  Exhibit 3.1 also shows                                                                                                                           I consider the established profitability of the Deere's TK Series System, its commercial success, and continued popularity in my analysis of reasonable royalties below.

> i.     *"The utility and advantages of the patent property over the old modes and devices; if any, that had been used for working out similar results."*

> j.     *"The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention."*

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. I
PAGE 126

107.    I understand from Messrs. Carpenter and Bearden that ██████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████ [181]  The configuration of tooth components incorporating the technology from the

patents-in-suit: ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

According to Messrs. Carpenter and Bearden, these factors ███████████████████

████████████████████████████████████████████████████████████████

██████████████████

108.    Messrs. Carpenter and Bearden also stated that ESCO's GeoVor dredging tooth

system and Three-Piece Nemisys dry mining bucket tooth system practice the patents-in-suit. Both

the GeoVor and Three-Piece Nemisys bucket tooth systems have been highly successful and

profitable since they were introduced, with GeoVor sales ███████████ and gross profits ██

██████████ in gross profits (see Exhibit 2.3), and with Nemisys sales of █████████████ and

gross profits of ██████████████ (see Exhibit 2.4).

---

[181] Video interview with Chris Carpenter and Jim Bearden, 1/9/23.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. I
PAGE 127

109.    Mr. Ky Holland states in his expert report that both the '175 Patent and the '665

"disclose configurations of complementary stabilizing surfaces on the wear member (tooth

component) and base (adapter component).[182]  In regards to the '175 Patent, the Holland Expert

Report states:

> Specifically, the '175 Patent discloses inventive stabilizing surfaces which bear
> against each other during excavation operations to provide increased efficiency and
> improved load resistance, which in turn enhances the connections between a wear
> assembly and its base, among other benefits…. [T]he features achieve a stronger
> and longer-lasting wear member by, among other things, allowing the loads
> generated during excavation to be carried at optimal portions of the wear
> assembly.[183]

110.    The Holland Expert Report states that the stabilizing features "improve the wear

assembly's stability, strength, durability, and reliability," and that these "improvements, in turn,

permit the use of an easily installed lock with does not compromise the strength of the wear

assembly."[184]

111.    In regards to the '662 Patent, Mr. Ky Holland states in his expert report:

> Specifically, the '662 Patent discloses inventive stabilizing surfaces which bear
> against each other during excavation operations to provide improved load
> resistance, among other benefits….The '662 Patent discloses rear stabilizing
> surfaces which converge central to a nose and socket which are "more robust"
> regions, thus minimizing the formation of stress concentrations in the nose and
> socket.[185]

---

[182] Expert Report of Hezekiah Holland Regarding Infringement ("Holland Expert Report"), 1/13/23, Section VI.A. The '175 Patent and Section VI.AB. The '662 Patent.

[183] Expert Report of Hezekiah Holland Regarding Infringement, 1/13/23, Section VI.A. The '175 Patent.

[184] Expert Report of Hezekiah Holland Regarding Infringement, 1/13/23, Section VI.A. The '175 Patent.

[185] Expert Report of Hezekiah Holland Regarding Infringement, 1/13/23, Section VI.B. The '662 Patent.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. I
PAGE 128

112.    Mr. Holland states that the stabilizing features "improve the wear assembly's stability, strength, durability, and reliability," and that these improvements, in turn, permit the use of an easily installed lock with does not compromise the strength of the wear assembly.[186]

113.    Mr. Stitzel testified that the patented technology, as used in ESCO's GeoVor tooth system, provides for a stable nose, an improved wear life and space for a hammerless lock, so it improves "safety, reliability, wear life, and maintenance" of the system.[187, 188]   Mr. Stangeland testified that the advantages of the patented technology "protects the lock, the configuration of the protected bearing surfaces, the structural areas not being in load bearing areas.[189]   Mr. Stangeland also testified that the patents-in-suit creates a bucket tooth system, that, as it "wears back, it increases and keeps the fits tight…."[190]

---

[186] Expert Report of Hezekiah Holland Regarding Infringement, 1/13/23, Section VI.A. The '175 Patent.

[187] Deposition of Adam Stitzel, 12/16/22, pp. 272-273, "Q.  Okay.  What are the advantages of the GeoVor system as compared to prior art  systems?...A.  GeoVor offers a hammerless lock.  GeoVor offers take-up, which means the lock itself kind of  pulls it back.  GeoVor has the most stable nose in the market which allows it to be very reliable.  It also has very long nose life because the nose is very stable, and so we can reduce the rattling on the nose and it keeps the nose -- the fits good.  Because of the stability of that nose, we also have the longest point length so -- which means the longest wear metal.  Those are the key advantages.  So safety, reliability, wear life, and maintenance.  Q.  Does ESCO market those key advantages of the GeoVor system?  A.  Yes."

[188] *See also*, First Amended Complaint, 4/7/21, p. 3, "The inventors of the '662 and '175 patents recognized that, among other features, adding complementary stabilizing surfaces to the nose and socket of a wear assembly could improve the wear assembly's stability, strength, durability, penetration, safety, and ease of replacement. The complementary stabilizing surfaces described in the '662 and '175 patents achieved a stronger and longer-lasting wear member by, among other things, allowing high loads generated during excavation to be carried by robust portions of the wear assembly's nose and not on its extreme bending fibers."

[189] Deposition of Kevin Stangeland, 12/14/22, pp. 184-185.

[190] Deposition of Kevin Stangeland, 12/14/22, pp. 185-186, "My understanding is it's the relationship with bearing surfaces in the rear and the combination of the front curved section. There's some values there from both a design aspect but also from a manufacturability and as the system wears back, it increases and keeps the fits tight for that dredge system so I think that's why they're using that technology."

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. I
PAGE 129

114. From Deere's perspective, Deere executives testified about the steps involved in developing another bucket tooth system to replace the TK Series System. Mr. Jason Simmons testified that Deere has not attempted to perform a redesign of their TK Series System in house.[191] Ms. Steva Judge testified that the TK Series System hasn't changed since 2010,[192] ███████████

███████████████████████████████████████████[193] Ms.

Judge testified that ██████████████████████████████████████████

██████████████████████████████████████████████████████████

████████[195] Mr. Simmons testified that it would take 10 months after a design is selected by Deere to develop a redesigned tooth.[196] The fact that Deere has not yet developed a non-infringing bucket tooth system for its TK Series System, or adopted another manufacturer's bucket tooth system, indicates the value to Deere of using ESCO's patented technology in its TK Series System. I also

---



[191] Deposition of Jason Simmons, 12/14/22, p. 83, "Q. Has Deere attempted to perform redesigns in house? A. No."

[192] Deposition of Steva Judge, 10/21/22, p. 61, "Q. To your knowledge has the general design of the TK Series system teeth changed since 2010?...A. There's no change to date to my knowledge."

[193] Deposition of Steva Judge, 10/21/22, pp. 87-88, "███████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

[194] Deposition of Steva Judge, 10/21/22, pp. 101-102, ███████████████████████████████

█████████████████████████████████

[195] Deposition of Steva Judge, 10/21/22, p. 95, █████████████████████████████████████

████████████

[196] Deposition of Jason Simmons, 12/14/22, p. 83, "Q. If Deere adopts one of the redesigns from Black Cat do you know how long it would take Deere to roll out that redesign to the market? A. Ten months, as an estimate."

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. I
PAGE 130

note that a Deere document, ███████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████[197]

115.    Given the importance of the patents-in-suit to the TK Series System, this factor would increase the reasonable royalties in this matter.

> k.    *"The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use."*

116.    I discuss the extent of sales of the TK Series System above.  Section VIII of the Holland Expert Report documents how Deere made use of the patents-in-suit in its TK Series System and Section VII.D discusses the importance of the patented "stabilization features in the TK Series Tooth System."  The Holland Expert Report also discusses in Section VI the benefits the patents-in-suit, that is, improving the wear assembly's stability, strength, durability, and reliability.  This factor would tend to increase the reasonable royalties in this matter.

> l.    *"The portion of profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions."*

117.    I am not aware of a portion of the profit or the selling price that is customary for use of the patents-in-suit.  Deere's Senior IP Counsel, Mr. Dellett, also testified that ███████

███████████████████████████████████████████[198]  This factor would thus have a neutral effect on reasonable royalties.

> m.    *"The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the*

---

[197] DEERE_0042486 (FY21 Bucket Teeth Review), pp. 18-19.

[198] Deposition of Stephen Dellett, 10/19/22, p. 49, "████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

> *manufacturing process, business risks, or significant features or improvements added by the infringer."*

118.    As discussed in *Georgia-Pacific* factors 9 & 10 above, the nature of the patents-in-suit go to the overall stability, strength, reliability, and safety (by increasing the usable area in which to install a hammerless locking mechanism) of the bucket tooth systems covered by the patents.  These are key attributes of bucket tooth systems as reflect in marketing literature from bucket tooth manufacturers.  I understand from Messrs. Carpenter and Bearden that, without these features, demand for the bucket tooth systems would be significantly diminished.[199]  I am not aware of any testimony from Deere indicating "significant features or improvements added by the infringer."  Consequently, this factor would tend to increase the reasonable royalty rate.

> *n.        "The opinion of qualified experts"*

119.    I have considered the expert report of Mr. Holland and have incorporated his opinions where appropriate into my analysis.

> *o.        "The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee – who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license."*

120.    ███████████████████████████████████████████████████

██████████████████████████████████████  I find that the parties would have agreed

to a hypothetical license that would have specified a reasonable royalty in the form of a running

---

[199] Video interview with Chris Carpenter and Jim Bearden, 1/9/10.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. I
PAGE 132

royalty rate applied to accused product sales. ████████████████████████

████████████████ I conservatively use accused product net sales as the royalty base.

121.    I next consider Deere's options for not taking a license from ESCO for the patents-in-suit and instead working with Black Cat to develop a non-infringing substitute bucket tooth system technology.  I note in Section III.C.1 above that Deere does not have patents related to bucket tooth technology.  The design for Deere's TK Series System products was developed in conjunction with Black Cat, and subsequently licensed by Black Cat to Deere.  Ms. Judge testified that Deere's TK Series System hasn't changed since 2010.[200]

122.    Deere testimony and documents indicate that ████████████████████████

████████████████████████████ Mr. Jason Simmons testified that Deere has not attempted to perform a tooth system redesign in-house.[201]  I also note that a Deere document,



████████████████[202]  Mr. Simmons further testified that Deere has received proposals from Black Cat concerning redesigns of the TK Series System.[203]  Separately, Ms. Judge testified that ████████

████████████████████████████████████████████

████████████████[204]

---

[200] Deposition of Steva Judge, 10/21/22, p. 61, "Q.  To your knowledge has the general design of the TK Series system teeth changed since 2010?...A.  There's no change to date to my knowledge."

[201] Deposition of Jason Simmons, 12/14/22, p. 83, "Q.  Has Deere attempted to perform redesigns in house?  A.  No."

[202] DEERE_0042486 (████████████████████), pp. 18-19.

[203] Deposition of Jason Simmons, 12/14/22, pp. 80-83.

[204] Deposition of Steva Judge, 10/21/22, pp. 87-88, ████████████████████████

████████████████████████████████████████████

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. I
PAGE 133

123.    The amount of time needed for Deere to bring a redesigned TK Series System to

market is ███████████████████████[205] Mr. Simmons testified that it would take 10

months after a decision to proceed with a redesigned tooth to bring a product to market.[206] Ms.

Judge also testified that, ████████████████████████████████████████

████████████████████████████████████████████ ██████████████████████

████████████████████[208, 209] Deere's inability to develop a non-infringing alternative to

its TK Series System indicates that Deere would have been motivated to enter into a hypothetical

license with ESCO for the patents-in-suit.

124.    Mr. Dellett also testified that Deere would ███████████████████████

████████████████████████████████████████████████████████████████



─────────────────

[205] DEERE_0042486 (███████████████████), p. 19.

[206] Deposition of Jason Simmons, 12/14/22, p. 83, "Q.  If Deere adopts one of the redesigns from Black
Cat do you know how long it would take Deere to roll out that redesign to the market?  A.  Ten months,
as an estimate."

[207] Deposition of Steva Judge, 10/21/22, p. 95, ███████████████████████████████
████████████

[208] Deposition of Steva Judge, 10/21/22, p. 104, ████████████████████████████
███████████████████████████████

[209] Deposition of Steva Judge, 10/21/22, pp. 101-102, ████████████████████████
██████████████████

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY



███████ [210] Mr. Dellett also testified that ████████████████████

████████████████████████████████████ [211, 212]

125.    I first analyze ESCO's sales of bucket tooth products to Deere.  Exhibit 4 is a summary of ESCO sales of Ultralok and Super V tooth components to Deere ████████████ I understand that the last ESCO patent that covered the Super V bucket tooth system expired in 2013.[213]  Exhibit 4 shows that the gross profit margin premium for Ultralok over Super V tooth components ████████████████████████████ This results in an average gross profit margin of ████████████████

126.    I understand that ESCO's Super V tooth system went off patent in 2013.  The gross profit margins of its Super V tooth components ████████████████████████ ████████████████████████ Exhibit 3.1 shows that the

---

[210] Deposition of Stephen Dellett, 10/19/22, pp. 41-42, ████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

[211] Deposition of Stephen Dellett, 10/19/22, p. 43, ████████████
████████████████████████████████████
████████████████████████████████████

[212] Deposition of Stephen Dellett, 10/19/22, p. 42, ████████████
████████████████████████████████████
████████████████████████████████████

[213] *See* U.S. Patent No. 5,469,648.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. I
PAGE 135

Deere TK Series System gross margins ███████████████████████████

███████████████████████████████████

127.    I also note in Exhibit 3.1 that Deere's average gross profit margin on sales of its

TK Series System ███████████████████████████████████████

Thus, Deere would have been able to pay a reasonable royalty of 8% and still achieve gross profit

margins ████████████████████████████████

128.    Considering all of the *Georgia-Pacific* factors and factors specific to this matter, I

find that the parties would have agreed to a reasonable royalty rate of 8% of net sales of accused

TK Series System products.  Exhibit 91A is a summary of reasonable royalty damages in lieu of

lost profits.  Applying a reasonable royalty rate of 8% to net sales of Deere's accused TK Series

System products results in reasonable royalty damages ████████████

129.    I understand that both of the patents-in-suit enable the benefits discussed in the

analysis above, that is, they improve the wear assembly's stability, strength, durability, and

reliability;[214] consequently, the reasonable royalty rate would be the same if both of the patents-in-

suit are found to be valid and infringed by the TK Series System, or if only one of the patents-in-

suit is found to be valid and infringed by the TK Series System.

## F.    Prejudgment Interest

130.    I understand from counsel that the Court may at its discretion award the Plaintiffs

prejudgment interest on damages that have accrued over time.  If asked to do so I will provide such

analysis using established methodologies.

---

[214] *See also*, Holland Expert Report, 1/13/23, Sections VI.A The '175 Patent, and VI.B '662 Patent.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

## V.    SIGNATURE

I declare under penalty of perjury that the forgoing is true and correct to the best of my

knowledge, information and belief.

Executed on January 13, 2023, in Oakland, California.


Signature: _____

Thomas R. Varner, Ph.D.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. I
PAGE 137



## Exhibit 6  Market Share Analysis

### Premium Market (Deere TK, ESCO UL, Hensley XS, Caterpillar Advansys)

Source: [1]



Notes:

[1]  Adam Stitzel testified that ESCO has ████████ of North American market for construction expendables.  See also, ESCO_00140132-163.  ████████████ of ESCO's current market share is for Super V products and the remaining portion is for Ultralok products ███████████████ (see Exhibits 2.1 and 2.2).  Ultralok share would be ████████████ of overall construction expendables market. Adam Stitzel testified that ████ of the construction expendables market is in the premium segment, resulting in ████████████████ market share for Ultralok in the premium segment.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY



**Exhibit 7.1(A)  Deere Infringing TK Series Adapter Sales (Qty)**



**Exhibit 7.2(A)  Deere Infringing TK Series Adapter Sales ($)**



DEERE EX. I
PAGE 140



**Exhibit 8.1(A)  ESCO's Lost Sales of Adapter Components**



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY



**Exhibit 8.2(A)  ESCO's Lost Sales of Ultralok Adapter Components**



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

# EXHIBIT J

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ESCO GROUP LLC,

    *Plaintiff*,

v.

DEERE & COMPANY

    *Defendant*.

C.A. No. 1:20-cv-01679-RGA

# ERRATA FOR EXPERT REPORT OF
# THOMAS R. VARNER, PH.D. DATED JANUARY 13, 2023

DATED:  January 16, 2023

1

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' AND EXPERTS EYES ONLY

DEERE EX. J
PAGE 144

Changed portions of report are underlined.  None of the summary damages calculations in Varner Expert Report dated January 13, 2023 are affected by these errata.

1. Par. 21, last sentence

   Currently reads:

   > Exhibit 13 is a summary of Weir's Income Statements from 2018 to H2 of 2022.

   Change to:

   > Exhibit 11.1 is a summary of Weir's Income Statements from 2018 to H2 of 2022.

2. Par. 22, last sentence

   Currently reads:

   > Exhibit 3.2 is a summary of ESCO's income statements from 2018 to H2 of 2022.

   Change to:

   > Exhibit 11.2 is a summary of ESCO's income statements from 2018 to H2 of 2022.

3. Par. 44, last sentence

   Currently reads:        …ESCO has sold ███████████…

   Change to:              …ESCO has sold ████████…

4. Par. 45, last sentence

   Currently reads:

   > Exhibit 3.1 shows that Deere sold ████████ TK Series System adapter and tooth components for ████████ (net sales), with gross profits of ███████████.

   Change to:

   > DEERE_0048761 and DEERE_0004659 show that Deere sold ██████ TK Series System adapter, tooth and pin components for ████ (net sales), with gross profits of ████████.

5. Par. 58

   Currently reads:

   > Exhibit 2.1 shows that ESCO sold ████████████ Ultralok adapter and tooth components ████████████ ESCO also sold ██████ Ultralok adapter and tooth components from ████████████, or an annualized amount of ██████ components.  The claimed lost sales shown in Exhibit 9.1 are ████████████████ ████████████████████



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' AND EXPERTS EYES ONLY

**DEERE EX. J**
**PAGE 145**

8. Par. 74, last sentence

    Currently reads:

        Exhibit 8.4 shows that profits on lost future sales ███████████

    Change to:

        Exhibit 8.4 shows <u>lost future sales</u> ███████████

9. Par 75, last sentence

    Currently reads:    ESCO's lost profits on future lost sales ██████████

    Change to:    ESCO's lost profits on future lost sales ██████████

10. Par. 106, second and third sentences

    Currently reads:

        Exhibit 3.1 shows that Deere has had gross sales of ████████████, net sales of ███████████, and gross profits of ████████████ for its TK Series System products.  Exhibit 3.1 also shows gross profit margins of the accused products over the damages period █████████████ ██████████████

    Change to:

        Exhibit 3.1 shows that Deere has had gross sales of ████████████ net sales of ███████████ and gross profits of ████████████ for its TK Series System products.  Exhibit 3.1 also shows gross profit margins of the accused products over the damages period █████████████ ██████████████

11. Par. 125

    Currently reads:

        I first analyze ESCO's sales of bucket tooth products to Deere.  Exhibit 4 is a summary of ESCO sales of Ultralok and Super V tooth components to Deere ███████████.  I understand that the last ESCO patent that covered the Super V bucket tooth system expired in 2013.  Exhibit 4 shows that the gross profit margin premium for Ultralok over Super V tooth components ███████████████████ ███████████ This results in an average gross profit margin ████████ ██████████

    Change to:

        I first analyze ESCO's sales of bucket tooth products to Deere.  <u>Super V gross profit margins</u> ███████████████████████ <u>whereas Ultralok gross profit margins</u> ███████ ████████████████████████████ <u>(Sales Cube John Deere.xlsx - ESCO-00196190 and REV_ESCO00000768.1.xlsx).  This is an average difference</u> ███████ <u>gross profit margin of Ultralok above Super V</u> ████████████

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' AND EXPERTS EYES ONLY

DEERE EX. J

PAGE 146

12. Par. 126, second sentence

  Currently reads:

  The gross profit margins of its Super V tooth components ██████  ██████. Deere TK Series System gross margins are ████████. ████████

  Change to:

  The gross profit margins of its Super V tooth components ████  ___Deere TK Series System gross margins are ████████ ████████

13. Par 127

  Currently reads:

  I also note in Exhibit 3.1 that Deere's average gross profit margin on sales of its TK Series System ████████ Thus, Deere would have been able to pay a reasonable royalty of 8% and still achieve gross profit margins ████ ████████

  Change to:

  I also note in Exhibit 3.1 that Deere's average gross profit margin on sales of its TK Series System ████████ Thus, Deere would have been able to pay a reasonable royalty of 8% and still achieve gross profit margins █ ████████.

14. Par 128

  Currently reads:

  …Exhibit 91A is a summary….of reasonable royalty damages of ████████

  Change to:

  …Exhibits 9.2(A), 9.2(T), and 9.3(P) are a summary…of reasonable royalty damages of ████████

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' AND EXPERTS EYES ONLY

15. Exhibits 2.1 and 2.5, Note [1]

    Currently reads:    Sales Cube John Deere.xlsx

    Change to:    Sales Cube John Deere.xlsx - ESCO-00196190

16. Exhibit 2.2, 2022 Q1-Q3 data revised, see attached

17. Exhibit 2.3, Section on gross profits revised, see attached

18. Exhibit 2.4, Note [2]

    Currently reads:

        ESCO 3PC Nemisys_Geovor 2014-2022.xlsx &
        Nemisys_Sales_3Q21_to_Present_09622.xlsx

    Change to:

        ESCO 3PC Nemisys_Geovor 2014-2022.xlsx - ESCO-00017044 &
        Nemisys_Sales_3Q21_to_Present_09622.xlsx - ESCO-00017181

19. Exhibits 7.1(A), 7.1(T), 7.2(A), 7.2(T), 8.1(A), 8.1(T), 8.2(A), 8.2(T), 9.1(A), 9.1(T), 9.2(A), 9.2(T), and 9.3(P)

    Currently reads:    Jan 1 to Sep 28 2023 (Est.) [5]

    Change to:    Jan 1 to Sep 18 2023 (Est.) [5]

Executed on January 16, 2023, in Oakland, California.

    Signature:

Thomas R. Varner, Ph.D.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' AND EXPERTS EYES ONLY

# EXHIBIT K

DEERE EX. K
PAGE 149

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

---

ESCO GROUP LLC,

    *Plaintiff,*

v.

DEERE & COMPANY

    *Defendant.*

---

C.A. No. 1:20-cv-01679-WCB

**REPLY EXPERT REPORT OF**

**THOMAS R. VARNER, PH.D.**

Dated: March 3, 2023

Respectfully submitted,

Thomas R. Varner, Ph.D.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

**5.    Dr. Becker did not consider whether Black Cat (or Deere) would seek patents for the "Al design."**

47.    Dr. Becker did not discuss whether Black Cat (or Deere) is seeking, or plans to seek, patent protection for the "Al design." If Black Cat (or Deere) does not seek patent protection for the "Al design," then manufacturers of competing products would be free to incorporate the "Al design" into their own bucket tooth products.   These additional competing products would increase the level of competition in the market and consequently lower profit margins. Dr. Becker did not include any allowance for lower profit margins of the TK Series System products in his "Indifference Rate" methodology.   The effect of lower profit margins for the TK Series System products in Dr. Becker's but-for analysis would be to increase the reasonable royalty rates in *Becker Expert Report.*

## III.    REPLY TO COMMENTS ON *VARNER EXPERT REPORT* IN *BECKER EXPERT REPORT* (SECTION VII)

48.    Dr. Becker offers several comments on my lost profits and reasonable royalty damages opinions in *Varner Expert Report.*   I address each of these criticisms in the order Dr. Becker presents his rebuttal opinions in *Becker Expert Report.*

### A.    Comments on Dr. Varner's Lost Profits Opinions

#### 1.    "Dr. Varner fails to account for available and commercially acceptable non-infringing alternatives."[74]

49.    Dr. Becker states that "[t]he relevant testimony cited by Dr. Varner *(e.g.,* `Deere executives testified about ███████████████████████████████

███████████████') was not testimony in response to questions about the minor design changes needed to avoid the Patents-in-Suit, ███████████████████████████████

---

[74] *Becker Expert Report,* 2/8/23, ¶¶ 269-281, pp. 78-82.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. K
PAGE 151

█████████████████████████████████████████████████████████

████████████████████████████████████████, "[75]

50.     I am not aware of deposition testimony from Deere personnel that refers to non-infringing design alternatives that Deere was considering for the TK Series System products as being "minor design changes."[76]  For example, when asked about the "Al design," Mr. Simmons testified that Deere did not know the reasoning behind certain features of the design, that no testing had been performed on the design, and that the design had not been adopted "as an alternative design to the TK Series tooth."[77]  Mr. Simmons similarly testified that Deere did not know the reasoning behind certain features of the other proposed designs, that no testing had been performed on those designs, and that the designs had not been adopted.[78]  Furthermore, in the deposition testimony of Ms. Steva Judge, ██████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████ would only be talking about the development of non-infringing



---

[75] *Becker Expert Report,* 2/8/23, ¶ 274, pp. 79-80.

[76]  There is no mention in the depositions ofJason Simmons, Michael Budan, Stephen Dellett, or Steva Judge of design changes to the TK Series products that are "minor" or synonyms such as small, insignificant, negligible, inconsequential, trivial or minimal.

[77]  *Deposition ofJason Simmons,* 12/14/22, pp. 77-79,

[78]  *Deposition ofJason Simmons,* 12/14/22, pp. 75—83.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. K
PAGE 152

alternative designs.[79]  The basis for my opinions, which are supported by deposition testimony of Deere personnel, relate to Deere's efforts to develop a design-around alternative to the TK Series System products.   Thus, Dr. Becker's assumptions about the availability to Deere of a design-around alternative are contradicted by testimony from Deere's witnesses.

51.    Dr. Becker states, "Dr. Varner's opinion is also contradicted by the market evidence in this case.   As discussed throughout this report, there is no market evidence that indicates that the claimed invention is in any way required by customers, nor is the inclusion of the claimed invention necessary for commercial success in the bucket tooth market.   Indeed, Jc]onsumer demand defines the relevant market and relative substitutability among products therein.'"[80]

52.    As I state in my discussion of lost profits above, I describe in *Varner Expert Report* features that consumers for bucket tooth systems in the premium segment of the market demand that are enabled by the Patents-in-Suit, including improved tooth stability, reduced stresses on locking mechanism, reduces stress from bending forces, reduced component wear, increased usable area in which to install a hammerless locking mechanism, and reduced rattling of components.[81]   Both Deere's and ESCO's marketing materials emphasize that there is consumer demand for these features (see discussion in Section II.A.a above).

53.    Dr. Becker states, "[Dr. Varner's] acknowledgement that ███ of the relevant market is held by companies with products that do not practice the claimed invention of the

---



[79] *Deposition of Steva Judge,* 10/21/22, pp. 72-73, ████████████████████████████████████████████████████████████████████████████████████████████████████████████

[80] *Becker Expert Report,* 2/8/23, ¶ 279, p. 81.

[81] *Varner Expert Report,* 1/13/23, ¶ 107, p. 48.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. K
PAGE 153

Patents-in-Suit provides powerful market evidence that commercially acceptable non-infringing alternatives do, in fact, exist.   Dr. Varner has simply assumed (unreasonably) that while such alternatives were clearly available to everyone else in the marketplace, Deere somehow would not have been able to implement such a design."[82]

54.      The documents and testimony from both Deere and ESCO show that there are alternatives for bucket tooth systems in the premium segment of the market for construction expendables.  However, Deere admits that it does not have a non-infringing alternative to its TK Series System available to consumers, and according to what was told to Dr. Becker, Deere may not have one available for at least another 12 months.   There is also no testimony or documents I am aware of indicating that Deere has contracted with, negotiated with, or even contacted, any other manufacturer of bucket tooth systems in the premium segment of the market to obtain the rights to use their proprietary systems for Deere's TK Series System products. Even if Deere had decided to license-in another manufacturer's proprietary bucket tooth system, there is no indication that the royalties for such a license would be any less than the reasonable royalties I calculate in this matter.

### 2.      "Dr. Varner incorrectly assumes that ESCO would have obtained `but-for' sales in the same manner as the actual market."'

55.      Dr. Becker states that "[t]he foundation of Dr. Varner's argument to get to that point, namely that Deere had no acceptable non-infringing alternatives, is contradicted by the very fact that literally every other player in the market that Dr. Varner is considering — including ESCO — is not using the Patents-in-Suit.   Thus, it cannot be the case, as Dr. Varner assumes, that the

---

[82] *Becker Expert Report,* 2/8/23, ¶ 280, p. 81.

*83 Becker Expert Report,* 2/8/23, ¶¶ 282-94, pp. 82-86.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. K
PAGE 154

Patents-in-Suit are necessary or even important for the success of a product in this particular market."[84]

56.     Dr. Becker misrepresents my report.   I did not assume the Patents-in-Suit are necessary for a successful product; my report states that the Patents-in-Suit enable features that consumers demand in the premium segment of the market for bucket tooth systems, that there are alternatives  in  that  market,  and that I account for those alternatives in my market share apportionment analysis in calculating lost profit damages (see *Varner Expert Report,* Exhibit 6 Market Share Analysis).

57.     Dr.  Becker states, "Based on my discussion, I understand that Mr. Budan's reference ▮▮▮▮ was not an estimate of the TK Series overall market share but was Mr. Budan's estimate of the portion of the Deere `machine population' that is being served with TK Series products.   Stated another way, Mr. Budan estimated that Deere is capturing ▮▮▮▮ of the "market" for teeth on its own Deere machines.   Since Deere equipment (such as excavators and loaders) represent less than 100% of their respective markets, it must follow that the TK Series share of the overall market ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"[85]

58.     ESCO's lost profits relate to Deere's sale of TK Series  Systems on Deere equipment, and according to Mr. Budan, Deere ▮▮▮▮ market share of those sales. My market share analysis is based on "Mr. Budan's estimate of the portion of the Deere `machine population' that is being served with TK Series products,"[86] *i.e.,* ▮▮▮ of the Deere "machine population." The remaining ▮▮▮ of those sales are divided among the other manufacturers of premium bucket tooth

---

[84] *Becker Expert Report,* 2/8/23, ¶ 282, p. 82.

[85] *Becker Expert Report,* 2/8/23, ¶ 286, p. 83.

[86] *Becker Expert Report,* 2/8/23, ¶ 286, p. 83.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. K
PAGE 155

systems based on testimony and documents produced by both parties, and that is the analysis I perform in Exhibit 6 of *Varner Expert Report.*

59.     Mr. Budan's statement that Deere ████████ share of the bucket tooth systems that Deere sells on its products to dealers is corroborated with a breakdown of tooth systems summarized in a Deere document.[87]   This documents shows that Deere's TK Series System sales comprise ██████████████ share of bucket tooth systems Deere sells on its products. Using this table as a basis for a market share apportionment results ████████ share apportionment to ESCO Ultralok (see Exhibit R6 in this reply report).   This value of █████████████████████ I used as a basis to calculate lost profits in *Varner Expert Report.*   If the ██████ value is used for the market share apportionment analysis, then the lost profits damages are █████████████████████ ████ shown in *Varner Expert Report.*

### 3.     "Dr. Varner's `lost profit on future lost sales' is speculative."'

60.     Dr. Becker comments on my future lost profits damages analysis, but does not take objection with my methodology for calculating future lost profits, that is, there would be future sales of TK Series System components on the remaining stock of TK Series System adapters on buckets.   Dr. Becker only restates his opinion that there would not be any lost profits because Deere would have stayed in the market with a non-infringing alternative.   If the Court finds that ESCO is entitled to lost profits, then Dr. Becker has offered no criticism to my calculation of future lost profits.

---

[87]   "John Deere, TK Teeth Summary," dated 2018, DEERE_0005175 at 179.

*88 Becker Expert Report,* 2/8/23, ¶¶ 295-296, pp. 86-87.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. K
PAGE 156

### B.      Comments on Dr. Varner's Reasonable Royalty Opinions

#### 1.      "Dr. Varner fails to account for available and commercially acceptable non-infringing alternatives."[89]

61.      Dr. Becker states that "Dr. Varner's damages opinions are based on the assumption that there were no alternatives to the claimed invention.   This incorrect assumption impacts not only the lost profits opinions discussed above, but also Dr. Varner's assessment of the reasonable royalty."

62.      As I discuss in Section III.A.1.a above, it has been 26 months since the original Complaint in this matter was filed and Deere admits it still does not have a non-infringing alternative to its accused TK Series System available to consumers, and according to what was told to Dr. Becker, Deere may not have one available for another 12 months.   There is also no testimony or documents I am aware of indicating that Deere has contracted with, negotiated with, or even contacted, any other manufacturer of bucket tooth systems in the premium segment of the market to obtain the rights to use their proprietary system in Deere's TK Series System products. Even if Deere had decided to license-in another manufacturer's proprietary bucket tooth system, and the other manufacture had to license its technology, there is no indication that the royalties for such a license would be any less than the reasonable royalties I calculate in this matter.

#### 2.      "Dr. Varner's 8% royalty rate for a non-exclusive bare patent license is inconsistent with the evidence of ESCO's licensing practices."[90]

63.      Dr. Becker stated, ███████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[89] *Becker Expert Report,* 2/8/23, ¶ 298, p. 87.

[90] *Becker Expert Report,* 2/8/23, ¶ 299-302, pp. 87-89.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

30

DEERE EX. K

PAGE 157

 He later ignored that fact (or is less than precise) when he implies that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.["91]

64.     I discuss ▮▮▮▮▮▮▮▮ in *Varner Expert Report* ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮[92] After describing details of ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮, I state, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮[93] I then do not refer to these rates or this range in my summary of the *Georgia-Pacific* factors in Section IV.D.4.o.[94]   Thus, Dr. Becker is mistaken that my opinion on a reasonable royalty rate in this matter is based on ▮▮▮▮▮▮▮▮.

   **3.     "Dr. Varner's `profit premium' analysis is flawed and unreliable."[95]**

65.     Dr. Becker states that "Dr. Varner's 8% royalty rate appears to be derived primarily from his observation/analysis that when the Super V product "went off patent" in 2013, the gross margins on the product ▮▮▮▮▮▮▮▮▮▮▮▮"   Dr. Becker misstates my opinion.   I state in *Varner Expert Report* that I considered "all of the *Georgia-Pacific* factors and factors specific to this matter" in analyzing and selecting the appropriate reasonable royalty in this matter.[96]

---

[91] *Becker Expert Report*, 2/8/23, ¶ 301, p. 88.

[92] *Varner Expert Report*, ¶¶ 84-97, pp. 37-44.

[93] *Varner Expert Report*, ¶ 97, pp. 43-44.

[94] *Varner Expert Report*, ¶¶ 120-129, pp. 53-57.

[95] *Becker Expert Report*, 2/8/23, ¶¶ 303-305, pp. 89-91.

[96] *Varner Expert Report*, 1/13/23, ¶ 24, p. 10

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. K
PAGE 158

66.     Dr. Becker states that "Dr. Varner's calculation implicitly assumes that the portion of the profitability of the accused TK Series products that can be attributed to the Patents-in-Suit is the same as the patent(s) that were providing patent protection on the Super V product until expiration in 2013."[97]

67.     As I stated in *Varner Expert Report,* managers from ESCO testified that the ESCO Super V product is a legacy bucket tooth system that is still sold by ESCO, but the patents covering its design have expired and "will-fitters" sell similar products.[98]   I understand from ESCO that the Super V patents blocked manufacturers from copying and selling competing products with similar technology, at least until the patents expired, and that without patent protection ███████████ ████████████████████[99]   I understand that the Patents-in-Suit also are blocking patents that, prior to their expirations dates, would prevent a manufacturer from using the subject technology in a competing product.

---

[97]  *Becker Expert Report,* 2/8/23, ¶ 304, 1), p. 89.

[98]  *See Varner Expert Report,* 1/13/23, ¶ 24, p. 10, and Deposition of Christopher Carpenter, 12/5/22, pp. 64-65, "Q. Does ESCO still sell the Super V? A. Yes.  … Q. Are there any other companies besides ESCO that are making a bucket tooth that models the Super V design? A.  …I don't know that I can specifically point to a specific make, model of GET, but we do see a lot of will-fitters, primarily out of China, that essentially are copying our parts. And Super V is off patent so it wouldn't surprise me if there are will-fitters out there.  I don't know all of them, but in general, when our… systems come close to end of patent, there's a lot of people that do jump in and want to make those parts." *See also,* Deposition of Kevin Stangeland, 12/14/22, pp. 112-113, "Q. What is the Super V? A.  …Conical was the predecessor to Super V.  So Super V was after Conical. And it's a twist-on style component that has a drive-through pin that you hammer in through the top with some rubber elastomer and some clipping mechanisms inside….It's symmetric so you can flip the teeth over.  There's a retaining slide on both sides of the tooth so it can still be pinned after you flip it, if that makes sense."

[99]  Video interview with Rodrigo Sanchez, ESCO Director of Marketing for Construction Expendables, and Michael Roska, ESCO Director of Construction Products, on 2/16/23, with Todd Steimer, ESCO Director of Sales, Central Region, and Pete Huget, Managing Director of North American Sales on 2/17/23, and with Steve Schad, ESCO Chief Technology Counsel on 2/16/23 and 2/17/23. The two Super V patents were U.S. Pat. No. 4,965,945, "Excavating Tooth," which expired in 2007, and U.S. Pat. No. 5,469,648, "Excavating Tooth," which expired 2/2/13. Both of the Super V patents relate to the configuration of the adapter-tooth configurations and the locking mechanisms.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. K
PAGE 159

68.     Dr. Becker states that "[t]he margin premium that Dr. Varner imputed to the Super V patents was for exclusive rights....The license to the Patents-in-Suit that would be granted to Deere in the hypothetical negotiation is a non-exclusive U.S. license. Dr. Varner fails to adjust his apportionment factor in any way to account for this difference.',100

69.     ██████████████████████████████████████████ that would offer insight into what "apportionment factor" would be appropriate to account for conversion of royalty rates in an exclusive license to a non-exclusive license.[101]   Nor does Dr. Becker offer any opinion on what he would consider an acceptable methodology to determine such factor, or even what impact such a factor would have on the analysis.  Furthermore, my analysis showed that after the last Super V patent expired, its gross profit margins ███████████████████[102]  Thus, I did not calculate the difference in profit margins, but rather I calculated the percentage at which ███ ████████████ Dr. Becker did not provide any reason to believe ██████████████ for licenses granted on an exclusive basis would be significantly different from ██████████████ for licenses granted on a non-exclusive basis.

70.     Dr. Becker states, "Dr. Varner assumed that the only factor driving the change in the gross margin on the Super V system over the 2010-2012 and 2014-2016 time period was the loss of patent protection. Margins in the industry, however, can vary significantly for reasons unrelated to patented technology."103

---

*100 Becker Expert Report,* 2/8/23, ¶ 304, 2), p. 90.

[101] ████████████████████████████████████████████████

[102] *Errata for Expert Report of Thomas R. Varner, Ph.D.,* dated January 16, 2023, p. 5 (referring to ¶ 126 in *Varner Expert Report).* ████████████████████████████

[103] *Becker Expert Report,* 2/8/23, ¶ 304, 3), p. 90.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

33

**DEERE EX. K**

**PAGE 160**

71.    I examined the profit margins of the Super V sales to Deere before and after the last

patent expired in 2013 and compared those profit margins against the profit margins of the Ultralok

sales to Deere and stated, "Super V gross profit margins were ███████████████████

███████████████████ whereas Ultralok gross profit margins ████████████████

███████████████████████ (Sales Cube John Deere.xlsx - ESCO-

00196190 and REV   ESCO00000768.1).[104]  Contrary to Dr. Becker's characterization that this

"analysis assumed that the only factor driving the change in the gross margin... was the loss of

patent protection," I controlled for many factors by comparing ESCO's sales to Deere of Super V

bucket tooth products in the construction expendables market in the U.S. to sales of Ultralok bucket

tooth products in the construction expendables market in the U.S. *(i.e.,* the analysis controlled for

market, geographic region, selling firm, and buying firm).

72.    Dr. Becker states, "[i]f Dr. Varner's assumption ████████ of the available margin

on the products was attributable to the Patents-in-Suit (or a margin premium ████████), then ESCO

is being completely irrational to not use its own patents to enhance its competitive position and the

profitability of the Ultralok product."[105]

73.    I discuss in Section III.B.2 in *Varner Expert Report*[106]  the technology used in

ESCO's GeoVor, Nemisys and Ultralok products, and stated, ██████████████████████

████████████████████████████████████████████████████

---

[104]  *Errata for Expert Report of Thomas R. Varner, Ph.D.,* dated January 16, 2023, p. 4 (referring to ¶ 125 in *Varner Expert Report).*

[105] *Becker Expert Report,* 2/8/23, ¶ 304, 4), pp. 90-91.

[106]  *Varner Expert Report,* 1/13/23, ¶ 26, pp. 11-12.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. K
PAGE 161



.[109]   Thus, contrary to Dr. Becker's statement that "ESCO is being completely irrational to not use its own patents to enhance its competitive position and the profitability of the Ultralok product," ESCO did select its own patents for the Ultralok product—███████████████—because they felt this technology was the best choice for the Ultralok system.

74.   Dr. Becker states, "Furthermore, Ultralok profits ███████████████ Deere's profits on the accused TK Series products.... This demonstrates that features/factors other than the contribution of the Patents-in-Suit are driving profitability of the products in the relevant market, including the Accused Products."[11°]

75.   As I mention above, ESCO selected the ██████ system technology for its Ultralok product based on ESCO's view that it was a better fit for its Ultralok product compared to the ██████ system technology that ESCO selected for its GeoVor and Nemisys products. Dr. Becker is incorrect in saying that Ultralok's ██████ profit margins demonstrate "that features/factors other

---

107 Video interview with Chris Carpenter and Jim Bearden, 1/9/23. *See also,* Deposition of Christopher Carpenter, 12/5/22, p. 30.

[108]  https://www.esco.weir/waterway-dredging/,  accessed 12/13/22. *See also,* Deposition of Christopher Carpenter, 12/5/22, p. 46, "Q. Who does ESCO sell the GeoVor dredge to, what type of customer? A. So you'll probably get a more discrete answer from the commercial side of our business if you're talking to any of those folks, but dredge... customers that they're using underwater dredge cutter heads."

[109]  https://www.esco.weir/mining-tooth-systems/,  accessed 12/13/22. The ESCO MaxDRP and MaxDRP Plus are also marketed by ESCO for mining applications.

[11°] *Becker Expert Report,* 2/8/23, ¶ 304, 5), p. 91.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. K
PAGE 162

# EXHIBIT L

DEERE EX. L

PAGE 163

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF DELAWARE

3

4

5   ESCO GROUP LLC,                    )

6                    Plaintiff,     )

7        VS.                          )   NO. 20-1679-WCB-MPT

8   DEERE & COMPANY,                  )

9                    Defendant.     )

10  _____)

11

12

13  VIDEOCONFERENCE DEPOSITION OF:

14              THOMAS VARNER, PH.D.

15              MONDAY, MARCH 13, 2023

16              9:01 A.M.

17

18

19

20  REPORTED BY:

21              Sari M. Knudsen

22              CSR No. 13109

23

24

25

Page 161

1    Q   ███████████████████████████████

███████████████████████████████████████

████████ how do you come to the conclusion that they

4    have similar market shares?

5    A   Well, the reason is that for purposes of

6    this analysis, we're looking at people who purchased

7    TK Series products.  We are not looking at the

8    overall market share.  We are looking at those

9    people who purchased TK Series products.

10       And so --

11   Q   All right.

12   A   -- people are not purchasing TK Series --

13   what that means is that people are purchasing the

14   TK Series products in a different proportion than

15   the overall population.

16       But for purposes of the market share

17   analysis, we want to know who is getting the market

18   shares of the TK Series products for people who

19   purchased the TK Series products.

20       And the most reliable way to do that is to

21   look at ███████████ estimate that Mr. Budan

22   gained.  That would mean ███████ of the market is

23   split among other people, one of which is Ultralok.

24   Q   All right.  We'll talk about the market for

25   specifically Deere machines in a minute.

Page 162

1          But right now, looking at your Exhibit 6,

2     your Exhibit 6 purports to identify the market share

3     of the entire premium segment of the U.S.

4     construction expendables market.  Correct?

5     A    That's what I'm trying to estimate here.

6     Q    So Exhibit 6 --

7     A    Again, counsel, the whole exercise here is

8     who would be purchasing the products that -- who

9     would be purchasing the TK Series products if they

10    were not in the market.  And the most accurate way

11    of looking at that is to say, well, okay.  How many

12    TK Series products were purchased and how large was

13    the size of that market.

14          And Mr. Budan said, well, we've got

15    ████████.  So that means ████████████ is left over

16    from other people.

17          And so the whole point of this exercise is

18    to come up with an estimate between the Ultralok and

19    the other people.  And that's --

20    Q    Again, we'll get to --

21    A    That's reflected here.  It's also reflected

22    in the Deere document talking about how many bucket

23    teeth are sold on their equipment.

24    Q    We'll talk about the market that is the

25    Deere machines in a minute.  Okay?  Right now I want

Page 163

1    to talk about your Exhibit 6.

2         A    Yes.

3              (Whereupon the reporter asked for

4              clarification)

5    BY MS. RODMAN:

6         Q    Looking at Exhibit 6 -- your Exhibit 6 and

7    only your Exhibit 6 -- your Exhibit 6 purports to

8    tell me what the share -- what each -- so Deere,

9    ESCO and then other, what the shares are of the

10   entire premium segment of the U.S. construction

11   expendables market.  Correct?

12        A    Well, as I said, the exercise is how do you

13   split up people who purchased the Deere TK Series

14   product.  And Mr. Budan was very -- well, maybe he

15   wasn't so clear.  But he said ████████ of their

16   equipment sales include TK Series products.  That's

17   also similar to the Deere document that shows the

18   actual breakdown of what components were sold.

19              Now, I -- I tried to take the most

20   conservative approach as I could.  Perhaps that

21   ████████ really should be ████████ for the

22   construction of the premium segment.  I didn't take

23   that.  I took a lower number.

24              And then I looked at --

25        Q    Dr. Varner?

Page 164

1      A     Excuse me.  This is an important point to

2  make for me.

3            The next question is, well, okay.  How much

4  more does -- for that remaining ████████, which is

5  really -- for the remaining ████████, what portion

6  would Ultralok have.

7            And the best information I had was for the

8  whole market.  Because there are -- well, both Deere

9  and ESCO documents talk about the overall market.

10           But for ESCO's overall share, that is --

11 that's the ████████████ and then an adjustment

12 for the Super V in there and then an adjustment to

13 look at just the premium segment.  That's how I

14 arrived at that, these numbers.

15           Again, I could have taken a different tact

16 and said, no.  The ██████████ should really be

17 ████████.  Maybe I should have looked at -- at

18 different sources for the ESCO perhaps specific to

19 the Deere equipment.  But I took a more conservative

20 approach meaning resulting in lower damages.

21     Q     Are you done?

22     A     I am.

23     Q     Okay.  I appreciate that response.  But

24 Dr. Varner, if you could answer the question I'm

25 actually asking, I would appreciate it.

Page 165

1            Looking at your Exhibit 6, what market is
2      this market share analysis reflecting?
3         MS. GIROUD:  Objection.  Form.
4         THE WITNESS:  This is attempting to look at the
5      premium segment of the market.  That's what the
6      ███████████  reflects.
7            And I acknowledge that that relates to the
8      overall construction market or, as Mr. Budan is
9      referring to, the Deere TK, referring to the Deere
10     bucket -- I'll call it the Deere bucket equipment
11     market.  But reconciling the two, I took a
12     conservative approach, and it resulted in this.
13     BY MS. RODMAN:
14        Q    Deere does not have ████████████ of the
15     premium segment of the U.S. bucket tooth -- or
16     bucket expendable market.  Correct?
17        A    I'm sure it's much less than that.
18        Q    It's ████████████.  Correct?
19        A    I don't know those numbers off the top of
20     my head.
21        Q    And Mr. Stitzel testified to that.
22        A    Okay.  I would have to see his testimony
23     again.
24        Q    Okay.  And your own sales numbers reflect
25     that Deere would have a ████████████ share of the

```
                                          Page 166
```

1   premium segment of the construction expendables

2   market segment.  Correct?

3        A    I don't see where I -- where that

4   calculation is.

5        Q    Well, it's in Dr. Becker's report.

6             Would you like to look at Dr. Becker's

7   report?  Or you could compare your Exhibit 3.1 to

8   your Exhibit 2.1.

9             (Whereupon the reporter asked for

10            clarification)

11       MS. GIROUD:  I said objection.  Form.

12       THE WITNESS:  I'm sorry.  What is the question?

13  BY MS. RODMAN:

14       Q    Looking at -- let's look at your

15  Exhibit 2.1.

16       A    Okay.

17       Q    Actually, let's come at this a different

18  way.

19            Let's look at -- we are going to mark --

20  what we have in our folder as N, as in Nancy, will

21  become Exhibit 5.

22            (Whereupon Defendant's Exhibit 5

23            was marked for identification)

24  BY MS. RODMAN:

25       Q    Let me know when you are able to open

Page 167

1   Exhibit 5, Dr. Varner.

2       A    Okay.  And I also have a hard copy of

3   Dr. Becker's report.

4       Q    Okay.  So you recognize Exhibit 5 as

5   Dr. Becker's rebuttal report in this case --

6   correct? -- with all the exhibits and appendices

7   thereto?

8       A    Looks like it.

9       Q    And you reviewed Dr. Becker's rebuttal

10  report --

11      A    That's right.

12      Q    -- that is represented in Exhibit 5.

13  Correct?

14      A    That's correct.

15      Q    Okay.  If you could please turn to

16  paragraph 292, which is on page 86.

17      A    Okay.

18      Q    Do you see that chart right there at the

19  top that says -- it has time period and then fiscal

20  years ███████████

21           Do you see that?

22      A    I do.

23      Q    Do you -- sorry.  Strike that.

24           Take your time to look at this.

25           But are the numbers reflected in the

Page 168

```
 1    Ultralok sales column of this chart accurate?

 2         A     I have to check it.

 3         Q     Please do.  You can check against your

 4    Exhibit 2.5, I guess it is.

 5         A     Okay.

 6         Q     Okay.  And then the "Dr. Varner's market

 7    share of Ultralok, ████████," that is what you

 8    determined to be the market share of Ultralok for

 9    the premium segment of the U.S. construction

10    expendables market.  Correct?

11         A     Yes.

12         Q     Okay.  And then the accused product net

13    sales in the next column where it says ████████

      ██████████████████████████████████████████████

      ████   -- those numbers are accurate.  Correct?

16         A     They look to be about accurate.

17         Q     So you see here that Dr. Becker concludes

18    that based upon a comparison of the Ultralok sales

19    to the TK sales, the share for TK of the premium

20    segment of the U.S. construction expendables market

21    would be ████████████████████████████████████

      ██████████████████

23         A     There I was just dividing the ██████████

      ██████   Okay.

25         Q     So his calculations there are correct.
```

Page 169

1    Right?

2        A    Looks like the math is right.  He got the

3    wrong concept though.

4        Q    Okay.  So if Ultralok has ███████ of the

5    premium segment of the construction expendables

6    market, then the TK products have ████████████

7    of that market.  Correct?

8        A    If these calculations are right.  But it's

9    irrelevant for my damages analysis.

10       Q    No.  I understand that, Dr. Varner.  We'll

11   get to that.

12            Let's go back to your opening report,

13   Exhibit 2.

14       A    Okay.

15       Q    Okay.  And Exhibit 6.

16            (Whereupon Defendants' Exhibit 6

17            was marked for identification)

18   BY MS. RODMAN:

19       Q    So in Exhibit 6, you are comparing ESCO's

20   ███████ of the premium segment of the U.S.

21   construction expendables market with the ████████

22   for the Deere TK Series for the same market.

23       A    No.  So this is what I explained to you

24   before.  So let me go over it again.  It seems to be

25   a confusing point.

1              So what we are interested in is how many

2       sales did the -- how many sales were there of the

3       TK Series product and what percentage does that

4       comprise of all of the teeth -- tooth systems put on

5       Deere equipment.  That's the real market we are

6       looking at.

7              Then we go in.  And I went in and said,

8       okay.  It's ██████████.  Deere has ███████████ of

9       that.  That's what Mr. Budan says.  And that's

10      verified by the Deere documents.  It talks about all

11      of the products that it sold.  All of the bucket

12      teeth products that it sold.  So we are talking

13      about the ████████████ that Deere is selling.

14             Now where are those going to go.  If they

15      are not in the market, where does the █████████ go.

16      It was going to go to the other ███████████.

17             So now I'm trying to figure out, well, what

18      portion of that other ███████████ does ESCO have.

19      Again, I'm being very conservative here and saying,

20      okay.  They are going to have ████████████ of the ██

21      ██████████████████████████  That's where the ██████ comes

22      from.

23             The problem with the analysis that you were

24      just talking about, Dr. Becker's analysis, is that

25      it directly contradicts the Deere TK Series

Page 171

1      ████████ estimate from Dr. Becker's own client.

2      So it really is a question of mixing apples and

3      oranges here.

4          Q    It is indeed a question of mixing apples

5      and oranges.  But I don't think we agree on

6      precisely how.

7               So where in your opening report --

8      actually, strike that.  We'll...

9               You would agree with me, I think, that if

10     we are looking at Deere's share of the total premium

11     segment of the U.S. construction expendables market,

12     that it is ████████████████.  Correct?

13         A    ████████████████.

14         Q    Okay.  All right.  So let's look at -- give

15     me one second.

16              Let's look -- I'm going to mark a new

17     exhibit which is going to be -- what we have as T,

18     as in Tom, will become Exhibit 6.

19              (Whereupon Defendant's Exhibit 6

20              was marked for identification)

21         THE WITNESS:  Okay.

22     BY MS. RODMAN:

23         Q    Okay.  I lost my Exhibit 6.

24              Do you recognize Exhibit 6?

25         A    It's one of the many documents that Deere

1   produced about its TK Series teeth.

2        Q    Okay.  You looked at this document and

3   discuss it in your reply report.  Correct?

4        A    I believe it is.

5             If you go to -- what is that?  The fourth

6   page.  Can you go to the fourth page of that

7   document?

8        Q    Yeah.  Sorry.  I am.  I'm on the fourth

9   page.

10       A    Okay.  Can you go to the next page then.

11       Q    Oh, you are talking about the --

12       A    There we go.

13       Q    There we go.

14            All right.  So what -- what did you

15   determine from this document was relevant to

16   considering your market share analysis?

17       A    We can look at year-to-date sales, and we

18   can see that TK up there.  It says -- well, it

19   doesn't have the percent.  It has percent changed.

20            So the first column that says "year-to-date

21   sales," that would be the third column.  And it has

22   TK -- not sure what the units are here.  But it says

23   "████."  And then it has ESCO, Hensley and so on.

24       Q    All right.  So you looked at this page to

25   determine Deere's percentage of the market for

DEERE EX. L

PAGE 176

Page 173

1    replacement parts on -- replacement expendables on

2    Deere equipment.   Correct?

3        A    That's what I understood this -- this to

4    represent.   I'm looking in my report -- my reply

5    report where I discuss it.   There it is.

6              This is paragraph 59.   So here I'm

7    referring to that -- that document we have in front

8    of us here.

9              (Whereupon the reporter asked for

10             clarification)

11       THE WITNESS:   The 5175.   Is that the -- yes,

12   it's the same document.

13             So in my paragraph 59 on page 29 of my

14   reply report, I'm referring to that here.

15   BY MS. RODMAN:

16       Q    Right.   So looking at this document, you

17   determined that Deere had ▮▮▮▮▮▮ of the share of

18   replacement expendables on its own products.

19   Correct?

20       A    Yes.   At least according to this document.

21   And this might relate to just one weight.   But it's

22   still for that.   It's a cross-section across all the

23   other products.

24             And so if you take the ▮▮▮▮ -- and of

25   course, it may be ▮▮▮▮▮▮▮.   But take that

```
                                            Page 174
 1   number, divide it by the total at the bottom,

 2   ████████.  It's  ████████████.  So that's within the

 3   ballpark of what Mr. Budan testified to about

 4   being, okay, ██████████ of all of the systems sold

 5   on the Deere equipment.  At least that's how I

 6   interpreted Mr. Budan's testimony and reconciled

 7   that with this document.

 8       Q    Looking at Exhibit 6, what share of the

 9   market for replacement expendables on Deere

10   equipment does ESCO have?

11       A    It has -- oh, wait.  Okay.

12            So it has ████████████████████████.  So

13   whatever that number is.

14       Q    Roughly ██████████?

15       A    Yeah.  There we go.  It's roughly

16   ████████████ which is right along the lines of what

17   Adam Stitzel said.  ████████████.  So for both, you take

18   off ██████████ for Super V, ████████████████.  So almost

19   spot on.

20       Q    And if we took TK out of the analysis in

21   Exhibit 6, not your Exhibit 6, but Exhibit 6 to the

22   deposition, this teeth commodity breakdown page,

23   then that would make ESCO's share of this market

24   roughly ██████████.  Correct?

25       A    Yes.  But we know that this market is
```

Page 175

1    segmented.  In fact, TK Ultralok and some of the

2    Hensley are part of the premium segment.  So that is

3    the relevant market that we are interested in.  So

4    if you take that -- what did we just say?  ███ --

5    what was the percentage you gave?  ███████████?

6        Q    ███.

7        A    Yeah, you double -- so if you double the --

8    if you look at these numbers, and you say, okay.

9    Let's consider the ESCO, Hensley and the Cat as

10   being part of the premium segment, that would be

11   ███████████, which is again what Mr. Stitzel

12   testified to.

13           So if that's the -- the -- the competitors

14   that are selling competing products and you take the

15   ███████████ and divide it by ███████████ -- because we

16   are only interested in the premium segment -- hence

17   the ███████████.  And that -- so this document would

18   reflect ███████████.  And my analysis before in

19   Exhibit 6 was at ███████████.

20           I think if you actually go through the

21   numbers -- well, in fact, on my page 29 of paragraph

22   59, if you go through those numbers, it's not about

23   ███████████.  It's ███████████.  And that's a

24   little higher than the ███████████ that I actually

25   use.  My number is, in fact, a little more

Page 176

1    conservative.  But it's very close to Deere's own

2    documents, which is roughly consistent with Mr. --

3    what Mr. Budan said.

4        Q    So your analysis for loss of profits took

5    the Deere's percentage of the market for its own

6    equipment --

7        A    That's the only place they are selling

8    them, as I understand it.  You know, that's the --

9    the testimony is that's where they are only selling

10   it.

11       Q    And you took -- and Deere's percentage of

12   the market for its equipment is ███████████████████

13   than its percentage of the entire premium segment of

14   the market.  Correct?

15       A    Correct.  Could be many reasons for that.

16       Q    And then you took ESCO's percentage of the

17   entire premium segment of the market?

18       A    Correct.

19       Q    Which is ████████████████████ than its

20   percentage of the market for Deere equipment?

21       A    No.  Oh, well, if you are talking about,

22   you know, all three tiers in this market -- the low,

23   mid and premium -- yes.  Deere's -- ESCO's Ultralok

24   percentage is ███████ if you want to throw in the

25   lower, middle and upper tier.

Page 177

1          But that isn't the market that is viewed as
2    substitutes.  And Dr. Becker agrees that both these
3    products are in the premium segment.  And I agree
4    with it, and the documents agree with it, and the
5    testimony agrees with it.
6        Q    All right.  And you've agreed with me that
7    if you used -- get back to your Exhibit 6.
8          If you used the ████████ of the market --
9    ████████████ of the market for Deere in your
10   calculations, instead of ████████, you would end
11   up with a much lower lost profit reward.  Correct?
12       A    Mathematically, if you lower the ████████
13   to something else, it's just math.  It's the wrong
14   analysis.  It's not consistent with what I've done
15   or Dr. Becker has done nor what the exhibits show
16   nor what the documents show.
17       Q    Well, the ████████████ is consistent with
18   what the exhibits show is Deere's share of the
19   premium segment of the U.S. construction expendables
20   market.
21       A    But we don't care about that.  We only care
22   about the actual sales that Deere made.  And they
23   only made sales on their bucket tooth systems -- on
24   their Deere equipment products.  So that's the
25   market shares you need to look at to do a market

Page 178

1    share apportionment.

2          So I don't care about someone, a customer

3    who bought a competing product outside of the Deere

4    equipment.  That's irrelevant to me.  I care about

5    who would have purchased the Ultralok product if

6    Deere had not been selling its products on its

7    equipment.

8          That's the relevant question.

9       MS. GIROUD:  Counsel, we've been going for over

10   an hour or so.  Whenever is a good place for a break

11   would be good.

12      MS. RODMAN:  We can take a break.

13      THE VIDEOGRAPHER:  We are off the record at

14   3:13 P.M.

15          (Whereupon a recess was taken)

16      THE VIDEOGRAPHER:  We are back on the record at

17   3:36 P.M.

18   BY MS. RODMAN:

19      Q    Okay.  Dr. Varner, I want to spend a little

20   bit of time with your reply report as it relates to

21   lost profits.  That is our Exhibit 4 in this

22   deposition.

23          And I know you have a hard copy.  And of

24   course you are welcome to look at that.

25          But I want to start with paragraph 13 of

Page 179

1    your reply report.

2         A    Okay.

3         Q    Nice and big.  Okay.

4              All right.  In paragraph 13, you are

5    talking about Dr. Becker's analysis that the

6    hammerless design is important to consumers.

7    Correct?

8         A    Let me just read this.

9              Oh, the first sentence is talking about the

10   hammerless feature being an important -- important

11   feature.  Okay.

12        Q    But then you go on to say that it's

13   contradictory because Dr. Becker says that the

14   claimed invention is not an important driver of

15   customer demand.

16        A    I see that.

17        Q    Okay.  Do you understand the asserted

18   patents to have invented hammerless lock-based

19   bucket systems?

20        A    No.  I don't believe they invented it.  And

21   as I say in my report, the patents relate to the

22   hammerless system and that they provide a geometry

23   that -- I don't remember the exact words, but it

24   provides the geometry for a hammerless system.

25        Q    Do you have an understanding that in order

Page 180

```
 1   to have a hammerless system, a product has to
 2   practice the intention in the asserted patent?
 3       A    The paragraph 14, that's what I was
 4   thinking about.
 5            But no.  It doesn't.  You don't have to
 6   practice the patent to have a hammerless locking
 7   system.
 8       Q    So you would agree with me that it's
 9   possible to have a hammerless design that does not
10   infringe the asserted patents.  Correct?
11       A    That's my understanding.
12       Q    And in fact, the Ultralok product itself is
13   hammerless.  Correct?
14       A    Correct.
15       Q    And also does not practice the asserted
16   patented invention.  Correct?
17       A    That's correct.
18       Q    All right.  In paragraph 14, you say that
19   you understand from Carpenter, Bearden and Stitzel
20   that the features in the Patents-In-Suit increase
21   the usage area for hammerless locking mechanisms.
22   Correct?
23       A    Correct.
24       Q    And then you go on to say that you
25   understand that the hammerless lock feature is
```

1   enabled by the use of the technology claimed in the

2   Patents-In-Suit?

3        A    Correct.

4        Q    What is the basis of your understanding

5   that the hammerless lock feature is enabled by the

6   use of the technology claimed in the

7   Patents-In-Suit?

8        A    That would be the previous sentence.

9        Q    So that understanding comes from Carpenter,

10  Bearden and Stitzel?

11       A    Correct.

12       Q    Did you speak to Mr. Holland or

13  Dr. Umberger about whether the technology claimed in

14  the Patents-In-Suit enabled a hammerless lock

15  feature?

16       A    I didn't talk to them in person.  I read

17  their reports though.

18       Q    All right.  In paragraph 15, in the second

19  sentence, you acknowledge that there are alternative

20  competing products in the market with hammerless

21  locks.  Correct?

22       A    That's the first phrase.

23       Q    But you say that you understand that those

24  technologies are based on patents owned by other

25  manufacturers.

Page 182

1      A     That's my understanding.

2      Q     What is the basis to that understanding?

3      A     I believe I talked to people at ESCO,

4   engineers at ESCO, just talking about what other

5   systems are out there.  What other patented systems

6   there are out there.

7      Q     And did you discuss each of the competing

8   hammerless systems with people at ESCO?

9      A     I believe we did cover the ones in the

10   premium segment.

11      Q     And they identified to you that each of

12   those was covered by another company's patents?

13      A     I remember having the discussion about what

14   other systems that were out there, how they were

15   different.  I remember talking about patented

16   technologies.

17           I'm not sure, just sitting here, trying to

18   remember those conversations, whether I specifically

19   asked about patent protection on the hammerless

20   systems.  But we generally talked about patented

21   technologies.

22      Q     If there were competing system -- competing

23   hammerless system that was not covered by a patent,

24   then that would be an available alternative system

25   for Deere.  Correct?

Page 183

1      A     From a technical standpoint, it may have
2  been available.  I don't know if it would have fit
3  in with the TK Series design.
4           But it -- there was no indication that
5  Deere even initiated discussions with a
6  competitor -- a direct competitor to get some of
7  their technology as it related to the locking
8  mechanism.
9      Q     For purposes of your lost profits analysis,
10  if there were competing hammerless designs that were
11  not patented, would that impact your lost profits
12  analysis?
13      A     If there were competing non-patented
14  designs, how would that affect my damages analysis?
15  That's your question?
16      Q     Yes.  Specifically your lost profits
17  analysis.
18      A     Yeah.  Well, I would want to know how that
19  related to the Patents-In-Suit.  Because the locking
20  mechanism itself is not the focus of these patents.
21  They enable hammerless locking systems which is what
22  I talked about.
23           So I think I would want to know a lot more.
24  I don't believe Dr. Becker mentioned anything about
25  alternate systems that Deere had available to it.

Page 184

1     Q   All right.  I want to go to paragraph 24 of

2  your reply report, Exhibit 4.

3     A   24.  Okay.

4     Q   You say in the first sentence there that

5  you understand that ESCO's technical experts,

6  Mr. Holland and Dr. Umberger, disagreed with Deere's

7  characterization that the A1 design does not require

8  any changes to the adapter.

9       Do you see that?

10    A   That's the first phrase.  And it does go on

11  from there.

12    Q   Right.

13      And so also that they disagree that the A1

14  non-infringing teeth are fully compatible with

15  existing TK Series adapters in the field?

16    A   I see that.

17    Q   And then that they disagree that the A1

18  non-infringing teeth provide the same functionality

19  as the accused products.

20    A   That's right.

21    Q   What is the basis of your understanding set

22  forth in the first sentence of paragraph 24?

23    A   So I would have had Mr. Holland's and

24  Mr. -- I'm trying to remember the timing here.  But

25  I believe I would have had Mr. Holland and Mr. --

DEERE EX. L
PAGE 188

Page 185

1   and Dr. Umberger's reports at that point.

2        Q    Okay.  So --

3        A    Just a moment here.

4             So I'm quoting -- I'm quoting Becker.  If

5   you just hold on a minute, I'm going to look at

6   Becker's report.

7             Okay.  So -- so I'm quoting Dr. Becker's

8   statements and that I understand that Mr. Holland

9   and Dr. Umberger disagree with those particular

10  statements.

11       Q    Correct.

12            And so my question is what's the basis of

13  your understanding that Mr. Holland and Dr. Umberger

14  disagree with those statements?

15       A    I believe this came from counsel.  I

16  said -- I believe I asked ESCO's counsel, well, what

17  does Mr. Holland -- or what does -- yeah.  What do

18  Mr. Holland and Dr. Umberger have to say about the

19  characterizations that Dr. Becker is making in his

20  statement, in his report.  And that the answer --

21       Q    You --

22       A    The answer that I got was, well, they

23  disagree with those characterizations.

24       Q    Right.

25            So when you wrote this reply report, you

Page 186

1    had never spoken to Mr. Holland.  Correct?

2         A    Correct.

3         Q    You had never spoken to Dr. Umberger.

4    Correct?

5         A    Correct.

6         Q    You had not reviewed Mr. Holland's reply

7    report.  Correct?

8         A    Not at this point.

9         Q    You had not reviewed Dr. Umberger's reply

10   report?

11        A    No.  I don't believe so.

12        Q    So all of the statements in paragraph 24

13   regarding your understanding of what Mr. Holland and

14   Dr. Umberger believed came from ESCO's counsel?

15        A    Yes.  Outside counsel.

16        Q    Did you -- sorry.  Strike that.

17             And you did not feel it was necessary to

18   check counsel's statements with Dr. Umberger or

19   Mr. Holland directly?

20        A    I didn't see any reason for that.

21        Q    So you are relying here in your report on

22   your understanding of what Mr. Holland and

23   Dr. Umberger are going to say about the A1 design.

24   Correct?

25        A    Correct.

Page 187

1      Q    And in order to understand what they are
2   going to say, you only spoke to ESCO's counsel?
3      A    Correct.
4      Q    Do you typically, in preparing opinions,
5   rely solely on statements from counsel?
6      A    Do I typically rely solely on statements
7   from counsel?  Is that your question?
8      Q    That is my question.
9      A    So when it comes from -- a statement from
10  counsel as in regards to another expert's report,
11  and I haven't seen that report, and I ask the
12  counsel generally what are they going to say, have
13  they made up an opinion about this yet, and counsel
14  says yeah.  This is what they have -- have
15  determined up to this point.  Then I'll rely on
16  counsel's representation for that.  And I made it
17  clear that this is something that I just understand.
18     Q    And you could have spoken to Mr. Holland.
19  Correct?
20     A    I could have.  Didn't think it was
21  necessary though.
22     Q    You could have spoken to Dr. Umberger.
23  Correct?
24     A    Correct.  I didn't think it was necessary.
25  Sometimes I talk to experts.  Sometimes I don't.

Page 194

```
 1        A    Correct.

 2        Q    Why is the difference in profit between

 3   Super V and Ultralok in 2020, 2021 and 2022 relevant

 4   to a hypothetical negotiation in 2014?

 5        A    Well, it's my understanding that you can

 6   look at future events.  This is the Sinclair

 7   Refining case.  It goes back decades where I believe

 8   it was the Supreme Court said it's reasonable to

 9   consider future events.

10             And so looking back at 2014, the most

11   reasonable time to look at comparing these two is

12   over the damages period, which is 20 -- 2020 to

13   2022.

14             So just seemed to make sense to look at

15   those -- those periods to see what sort of a profit

16   difference there was between a product that was --

17   between those two products as it relates to whether

18   it was on-patent or off-patent.

19        Q    Do you have an understanding of what types

20   of information after the hypothetical negotiation

21   could be considered?

22        A    Well, I've seen all sorts of types.

23             So I -- I've never seen a restriction on

24   information that can be considered.  But I don't

25   know the body of case law as it relates to what can
```

Page 195

 1   be considered and what cannot.

 2        This seemed like a very useful comparison,

 3   looking at a product that was on-patent versus

 4   off-patent over the damages period.  So for me, it

 5   seemed relevant to do that analysis.

 6        Q    You had data to compare the profitability

 7   of Super V and Ultralok in 2014.  Correct?

 8        A    Yes.  We did have that data.

 9        Q    Why didn't you consider a comparison in

10   2014 as opposed to a comparison in 2020, '21 and

11   '22?

12        A    Well, first, it's over the damages period.

13   And market conditions can change over time.

14        The most important question here is related

15   to damages.  The other is the profitability of the

16   Ultralok product.  It's a more mature product when

17   you get further out in time.

18        So I -- again, I would have to go back and

19   look at the specific profitability numbers to see if

20   those leveled out at an earlier period or not.

21        Q    You understand that the damages period in

22   this case is determined by solely when ESCO filed

23   the Complaint.  Correct?

24        A    That's what I understand.  That relates to

25   market.

Page 196

1     Q    So you understand that the damages period
2  being limited to 20 -- to December 10, 2020 and
3  after doesn't have anything to do with the economic
4  considerations that would have impacted the
5  parties --
6     MS. GIROUD:  Objection.  Form.
7  BY MS. RODMAN:
8     Q    -- at any point?
9     A    I -- I'm not sure of that.  It sounds like
10  a legal question.
11     Q    Would the parties to a hypothetical
12  negotiation in 2014 have known the difference in
13  profitability between Super V and Ultralok in 2020,
14  2021 and 2022?
15     A    My understanding is that they could have
16  looked into the future.  Again, it's per the
17  Sinclair Refining case.  And they would have known
18  what profitability was for these products.  And
19  that --
20     Q    And that's your understanding --
21     A    And that would have informed them about a
22  reasonable royalty.
23     Q    You would agree with me though that in
24  actuality, in reality in 2014, ESCO and Deere would
25  not have known anything about the difference in

Page 197

1    profitability between Ultralok and Super V in 2020,

2    2021 and 2022?

3        A    They may have been able to make inferences

4    based on data up to that point.  But if they didn't

5    have that data, I guess you would have to say you

6    didn't have any sales data.  You wouldn't even know

7    what the sales were going to be for the TK or the

8    Ultralok or anything about the market shares.

9        Q    Have you seen any information in what you

10   looked at in this case that would indicate to you

11   that ESCO or Deere was making inferences about the

12   difference in profitability between Ultralok and

13   Super V in 2014 as to what that would be in '20, '21

14   and '22?

15       A    Well, I'm sure that as part of a

16   hypothetical negotiation, the question of

17   profitability of these products would have been a

18   topic of discussion and part of the negotiations.

19       Q    Why?

20       A    Because reasonable royalties relate to

21   profitability.  There's no reason to exclude

22   information about profitability as part of a

23   hypothetical negotiation.

24       Q    Reasonable royalties relate to

25   profitability of what products?

Page 198

1      A    Well, it would relate to the TK Series

2   certainly because the parties would want to know the

3   impact on the TK Series products.  The impact of

4   profitability on TK Series products due to paying a

5   royalty rate, receiving a royalty rate.

6            And as far as profitability of the ESCO

7   products, well, just a general understanding of a

8   competing product in the market, how that might

9   affect it.

10           And then finally the discussion could have

11  been around, okay.  What is patent protection worth,

12  and do we have any metrics to analyze that?  And in

13  this case, we did.

14     Q    The Super V product does not practice the

15  asserted patents.  Correct?

16     A    That's my understanding.

17     Q    And the Ultralok product doesn't practice

18  the asserted patents?

19     A    Correct.

20     Q    But in your opinion, at a hypothetical

21  negotiation in 2014, the parties would have

22  considered the profitability of the Super V and

23  Ultralok products?

24     A    I think they would have considered the

25  value of patent protection for products in this

Page 199

1    market.  And we know that because both ESCO and

2    Deere -- there's testimony from both ESCO and Deere

3    about when different products go off-patent.  So

4    that's an important part of their consideration and

5    their strategic planning.

6              So I think there's very good to reason that

7    they would have been thinking about, okay, what do

8    you really get from patent protection in this

9    market.

10   Q    Okay.  But you didn't consider the value of

11   the asserted patents.  You considered the value of

12   the Super V patents.

13   A    I've looked at the ESCO Ultralok patents

14   and the Super V patents as a benchmark for measuring

15   patent protection.  And by extension, that also

16   makes competition in the market.

17   Q    You understand that the Nemisys three-piece

18   system practices at least one of the asserted

19   patents.  Correct?

20   A    Correct.

21   Q    And you understand that the Nemisys

22   three-piece system was replacing a prior legacy

23   product of ESCO's.  Correct?

24   A    Yeah.  I don't remember the specifics of

25   which product or products the Nemisys system was

Page 200

```
1   replacing.
2       Q    Did you consider a comparison of the
3   profitability of the Nemisys system to the products
4   that it replaced?
5       A    Well, it's getting pretty far afield from
6   the products that we're talking about.
7            If you've -- the Nemisys -- the three-piece
8   Nemisys relates to mining operations.  And for that
9   matter, the GeoVor relates to dredging.  Those are
10  different physical markets.  They are different
11  economic markets.
12      Q    But it's the same technology.  Correct?
13      A    It is the same technology.  But I didn't
14  give -- I didn't look at the dynamics of those two
15  markets to determine whether there was a price
16  premium or to what degree there is a price premium
17  for patent protection.
18           Instead, it makes more sense to look at the
19  actual market and look at a competing product to see
20  the effects the patent protection.
21      Q    And then you also considered that after
22  Super V went off-patent in 2013, that the gross
23  profit margins █████████████████████████
24  Correct?
25      A    I believe that was --
```

Page 201

1    Q    That's at 126?

2    A    Yeah.  Paragraph 126.

3    Q    Oh, you are right.  That is one that you

4    changed.

5         So it changed it in your errata to

6    ████████.  Correct?

7    A    Yes.  That's what I was checking.

8    Q    I had a note.  And I had forgotten about it

9    anyway.

10   A    It says,

11            "Applying the ████████ factor to

12            ████████ results in a royalty of

13            approximately 8.2 percent for patent

14            protection."

15   Q    So for purposes of your analysis, you

16   assumed that the entirety of the ████████ in

17   profitability of Super V was attributable to the

18   patent protection.  Correct?

19   A    Yes.  After controlling for all the other

20   factors I talk about.  Especially in the reply

21   report.

22   Q    Did you consider any other reasons why

23   there might have been a ████████ in the gross

24   profit margins of Super V after 2013?

25   A    Well, I did think about what other products

Page 202

1    are in the market, what has changed over time.  And

2    this market is relatively stable in terms of who is

3    competing for what.

4             So if you go back in time and look at

5    marketing materials for both ESCO -- not marketing

6    materials.  Excuse me -- market information

7    materials, these are internal presentations by ESCO

8    and Deere.  The -- the competitors don't change much

9    over time.

10            So I didn't see any reason to -- I didn't

11   see any reason to believe that there were other

12   factors at play over this time frame.

13   Q    You understand that after 2013, the

14   Ultralok product replaced the Super V product.

15   Correct?

16   A    Not entirely.  It was an additional product

17   on the market.  But even -- even today, there are

18   Super V sales.  So the Ultralok has not completely

19   replaced the Super V.  There's still --

20   Q    So after --

21   A    -- a market for the lower tier in this

22   segment.

23   Q    After 2013, do you have an understanding of

24   whether ESCO marketed the Super V as aggressively as

25   it had before 2013?

Page 203

```
1        MS. GIROUD:  Objection.  Form.

2        THE WITNESS:  So I recall -- I recall some

3    testimony about -- this may be too far afield.  But

4    I recall testimony from ESCO about transitioning in

5    terms of products that were manufactured, and this

6    related to a discussion of any delays or

7    disturbances in ESCO's supply chain for the Ultralok

8    product.  And I think I -- I think I mentioned that

9    in my first report.

10            So there was a transition period to what

11   effect that was a result of additional marketing or

12   increased competition because the patent had

13   expired.  It doesn't -- you know, I can't imagine

14   marketing would have made that much of a difference.

15   BY MS. RODMAN:

16       Q    And you didn't consider any changes to how

17   ESCO marketed Super V after 2013?

18       A    I did consider it, and I just -- I just

19   can't see how that -- that change would result in a

20   ███████   in profitability.

21       Q    You understand that the Super V is not

22   hammerless.  Correct?

23       A    Correct.

24       Q    And you would agree with me that the market

25   after 2013 has moved to preferring a hammerless
```

Page 204

1   design?

2       A    I think over time, that's true.  Certainly

3   for the premium segment.  But they -- Super V is not

4   part of the premium segment.

5       Q    You understand that the Super V tooth --

6   teeth -- sorry -- the Super V products prior to 2013

7   were among the best selling products in the market?

8       A    We have a record of the Super V sales.  So

9   I don't -- I just don't recall offhand seeing the

10  phrase "best selling product in the market."  But we

11  have a record of their sales.

12      Q    Do you recall seeing ESCO documents that

13  described ESCO as being No. 1 or 2 in the market

14  when it has a Super V as its lead product?

15      A    Just sitting here, I can't recall that.

16  I'm not disputing that that's the case.

17      Q    Did you do any analysis of the patents that

18  covered the Super V product?

19      A    I looked at them.

20      Q    How many were there?

21      A    I don't recall right now.  It's more than

22  one.

23      Q    If you look at your Appendix B to your

24  report, Exhibit 2?

25      A    To the first report.

Page 205

1       Q    Your list of materials considered.

2       A    Okay.  Got it.

3       Q    On page 2 of that, you have a list of

4    patents that you considered.  Correct?

5       A    Yes.

6       Q    There are seven?

7       A    Yes.

8       Q    Two of those are the Patents-In-Suit in

9    this case.  Correct?

10      A    I see the 662 and the 175.  Correct.

11      Q    The other five patents, what did they

12   relate to?

13      A    I believe I had asked for information about

14   the other Ultralok patents.  And I believe I asked

15   for information about the Super V patents.  But

16   sitting here, I can't remember which is which, aside

17   from the 175 and the 662.

18      Q    Do you know how many different patented

19   inventions were incorporated into the Super V

20   products?

21      A    I -- as I said, I don't know the number of

22   patents.  It's just -- sitting here, I can't

23   remember.  I may have at one point over the course

24   of this case.  Just sitting here, I can't remember.

25      Q    So you don't know if there was more than

DEERE EX. L
PAGE 203

Page 206

1    one patented invention reflected in the Super V

2    patent?

3        A    My recollection is a little vague at this

4    point in time and this stage of the case.  But I

5    thought it was more than one.  But again, I'm -- my

6    memory is not that great on this one point.

7        Q    So you concluded that the ███ in

8    profitability of Super V after 2013 was entirely

9    attributable to the loss of patent protection.

10   Correct?

11       A    I think as part of the hypothetical

12   negotiation, the parties would have thought about

13   that, would have tried to find some way to measure

14   the value of the patent protection to keep other

15   products out of the market.

16       Q    So is that correct that you assumed the

17   ██████████████ profitability for Super V after

18   2013 was attributable to the loss of patent

19   protection?

20       A    I didn't have a good reason to find another

21   factor.  I talked to the ESCO people about the

22   trajectory of sales of the Super V and the

23   profitability of the Super V.  There was nothing in

24   there -- in those discussions or any of the

25   documents that I know that would -- would suggest

1   that there's another major factor in there

2   accounting for that.

3       Q    Where in your report does it tell me that

4   you spoke to ESCO personnel about the reasons for

5   ███████████   profitability at the Super V?

6       A    I talked in general to the salespeople

7   about which products were sold over which time.  I

8   had the data on the profitability.  I asked them

9   just generally, you know, what affects profitability

10  of these products.

11      Q    Where is that discussion in your report?

12      A    It was just part of the overall

13  discussions.

14      Q    It's not reflected in your report.  Is that

15  correct?

16      A    My report talks about several conversations

17  with ESCO salespeople.  I'm not sure I cited that

18  point to one specific discussion.  But we did talk

19  in general about, you know, the trajectory of sales

20  and profitability of their products.

21      Q    I won't find anywhere in your report a

22  statement that ESCO sales personnel told you that

23  the job and profitability of Super V after 2013 was

24  attributable to the loss of patent protection.

25  Correct?

Page 208

1      A    I don't believe I made that statement.
2  Again, my findings suggest that there is no other
3  basis for changes in profitability for these
4  products.
5      Q    I won't find that discussion in your report
6  either, will I?
7      A    No.  I didn't think that was necessary.
8      Q    So in paragraph 126 of your report, you say
9  that the gross profit margins of Super V ████████
   ██████████████████, which, as we know from the errata,
11 is ████████.  Correct?
12     A    Yes.
13     Q    You attribute that ████████ entirely to
14 patent protection.  Correct?
15     A    For this one analysis for the Super V over
16 that period of time, I couldn't find any other
17 reason, any other major factor for ████████
18 profitability over that time.
19     Q    And nothing in your report describes to me
20 any analysis that you undertook to try to find any
21 other reason for ████████ profitability.
22 Correct?
23     A    Again, I had conversations with the ESCO
24 personnel talking about the trajectory of sales and
25 the profitability of products and what relates to

Page 209

1    that.  I didn't think it was necessary to cite to

2    that in this one section.

3         Q    You understand that your report is supposed

4    to tell me the bases of your opinions.  Correct?

5         A    Yes.  And I provided that.

6         Q    Did those ESCO sales personnel tell you

7    that ███████████ Super V profitability after 2013

8    was entirely attributable to the loss of patent

9    protection?

10        A    We talked again in general about the value

11   of patent protection, about ██████████

12   profitability of products when a product goes

13   off-patent.  We talked about the change of prices.

14   We talked about the increased competition.  We

15   talked about them knowing when different competing

16   products were going off-patent.

17        Q    So no, they did not tell you that ██████

██   ██ profitability of Super V after 2013 was

19   attributable entirely to the loss of patent

20   protection?  Nobody told you that.  Correct?

21        A    No one specifically said that they believe

22   it's entirely attributable to patent protection.

23             But as I said before, we talked at length

24   about the trajectory of prices, the importance of

25   patent protection, their impact on profits.  And

Page 210

```
 1    there was no -- no indication from anyone that there
 2    was another factor that related to this.
 3        Q    Well, for purposes of your opinion, you
 4    understand that ESCO has the burden of proof to
 5    prove damages.  Correct?
 6        A    As a legal matter, that's my understanding.
 7    But that's a legal question.
 8        Q    So if you are going to rely on ██████████
 9    profitability of Super V after 2013 being entirely
10    attributable to the loss of patent protection, is
11    that something that ESCO would have to establish --
12    forget that.  Forget that question.  Let's try this
13    again.
14             You assumed that ████████ profit margin
15    for Super V after 2013 was entirely attributable to
16    the loss of patent protection because nobody proved
17    to you otherwise?
18        A    I didn't assume anything.
19        Q    Is that what you are telling me?
20        A    I did not assume it.
21             But what I'm saying is I talked at some
22    length with the ESCO salespeople about how prices
23    change when products go off-patent, about
24    profitability, about the number of competitors.  The
25    profitability of these products are pretty stable
```

Page 211

1    over time until they go off-patent.  Based on --

2         Q    What is that based on?

3         A    Excuse me.

4              Based on all of that information, I think

5    it's reasonable to rely on this analysis, and it's

6    consistent with the other analyses in this action on

7    a reasonable royalty.

8         Q    Okay.  Let's talk about another one of

9    these analyses.

10             So you also in paragraph 127 note that

11   Deere's average gross profit margin on sales of TK

12   in 2019, 2020 and 2021 was -- and I apologize

13   because I think is one of the things you changed on

14   your errata.

15        A    Yeah.  The numbers are slightly different

16   in the errata.  So --

17        Q    You looked at --

18        A    -- fiscal years 2020, 2021 and 2022.

19        Q    Okay.  So you looked at Deere's average

20   gross profit margin on sales of TK in 2020, 2021 and

21   2022.  Correct?

22        A    Correct.

23        Q    In order to determine that Deere would have

24   been able to pay a reasonable royalty of 8 percent?

25        A    Yes.  And still make a profit.

Page 212

```
 1      Q    Why didn't you consider Deere's profit
 2  margin in 2014?
 3      A    Just a moment, counsel.
 4           So I looked at the profit margins over
 5  time.  I thought this was the most relevant, given
 6  that this is the damages period.
 7      Q    And you understand again that the
 8  hypothetical negotiation would have happened in
 9  2014?
10      A    That's right.  And damages began in 2020
11  for fiscal year --
12      Q    Again, because -- what you understand to be
13  because that's when ESCO gave notice of
14  infringement.  Correct?
15      A    That's my understanding.
16      Q    Are you assuming that the parties would
17  have known that a hypothetical negotiation in 2014,
18  that ESCO was not going to sue Deere until 2020?
19      A    Again, I -- I don't know what the legal
20  basis should be.  I don't think it would make much
21  difference.  And I think I say in my report whether
22  the hypothetical negotiation occurred in 2014 or
23  later would not have made much of a difference.
24      Q    Okay.  So you -- your opinion is that in
25  2014, the parties would have had a hypothetical
```

Page 213

1    negotiation and agreed on an 8 percent royalty rate.

2    Correct?

3         A    Correct.

4         Q    And the parties in 2014 would have agreed

5    on that 8 percent royalty rate by considering the

6    difference in profitability between Ultralok and

7    Super V in 2020, 2021 and 2022, ███████████████

8    Super V profits after 2013 and Deere's gross margins

9    in 2020, 2021 and 2022?

10        A    Among all the other factors that we've

11   talked about and are part of the Georgia-Pacific

12   Factor analysis.

13        Q    Okay.  How did your Georgia-Pacific Factor

14   analysis change your 8 percent?

15        A    Well, the parties are competitors.  And

16   that certainly would have increased the royalty

17   rate.  And I could well have increased that

18   8 percent to reflect that.  I chose not to be

19   conservative.

20             I looked at the utility and advantage.

21   That was an important factor.  I looked at the

22   extent of the use of the technology.  All of those

23   really indicate increasing the royalty rate.

24             And I thought that these particular metrics

25   were a good place to start.  And I could well have

Page 214

1    come up with a higher royalty rate but thought that

2    this was a good, conservative approach that

3    certainly both parties would have agreed to.

4        Q    Which Georgia-Pacific Factor does the

5    consideration of the difference in profitability

6    between Ultralok and Super V in 2020, 2021 and 2022

7    fall under?

8        A    Georgia-Pacific, as I understand it, are

9    meant to be general areas of investigation.  And I

10   think even the Georgia-Pacific ruling talks about

11   facts that are specific to a case.

12            Most experts, my experience, that they will

13   do an analysis of the specific factors of the case

14   and weigh those against the Georgia-Pacific Factors,

15   and that's what I've done.

16       Q    You would agree with me that there's not a

17   Georgia-Pacific Factor that would suggest that you

18   look at the difference in profitability of Ultralok

19   and Super V in 2020, 2021 and 2022?

20       A    It's been a while since I read the

21   Georgia-Pacific ruling.

22            But my recollection is they talk about

23   factors specific to a case being important.  And in

24   this case, I thought that that was a -- and still

25   think that looking at the change in profitability,

DEERE EX. L

PAGE 212

```
 1   at least paragraphs 125 and 126, are irrelevant and
 2   would have been part of the hypothetical negotiation
 3   specific to this case.
 4        Q    Which Georgia-Pacific Factor would tell you
 5   to look at ███████████ profitability of Super V,
 6   a product that does not practice the patented
 7   invention?
 8        A    Again, the Georgia-Pacific Factors are not
 9   meant to be exhaustive.  And I believe that ruling
10   actually says something to that effect, if not those
11   exact words.
12             They also talk about factors specific to a
13   case.  And that's what I've considered here.
14   Factors that are specific to this case that the
15   parties would have looked to to inform them about a
16   reasonable royalty.
17             And that is part of the hypothetical
18   negotiation outline in Georgia-Pacific.
19        Q    Let's talk a little bit quickly about the
20   Georgia-Pacific Factors.
21             Georgia-Pacific Factor 1 is -- let me find
22   it in your report.
23             On page 37, starting at paragraph 84 of
24   your opening report.
25             And you would agree with me that
```

Page 216

1    Georgia-Pacific Factor 1 looks at the royalties

2    received by the patentee for the licensing of the

3    Patents-In-Suit.  Correct?

4        A    Yes.  That is correct.  That's what G-P

5    Factor 1 is.

6        Q    Okay.  And you discuss ████████████████

     ████████████████████  in your analysis of

8    Georgia-Pacific Factor 1.  Correct?

9        A    Right.

10       Q    ████████████████████████████████████████

     ████████████████████████████████████████████

     ████████████████████

13       A    As I say in paragraph 97, ███████████████

     ██████████████████████████████████

     ██████████████

16            And then I go on and --

17       Q    Okay.

18       A    -- on page 44.  It's still the same

19   paragraph.  And I say -- why don't you flip to that

20   page.  I don't want to read too fast.

21            Next page.  Next page please.  There we go.

22            So the last sentence of paragraph 98, it

23   says -- you went too far.  There.  Stop right there.

24            It says,

25                       ████████████████████████

Page 217



1

7        So I didn't -- I didn't factor that in for

8    this reason.

9        Q    Okay.  So you would agree with me that

DEERE EX. L
PAGE 215

Page 218



20    Q    And you and Dr. Becker agree that a

21  reasonable royalty in this case would be calculated

22  on the basis of a royalty on -- a running royalty on

23  net sales.  Correct?

24    A    I believe with both sides.  So that's not a

25  contested point at all.

Page 219

████ █ ████████████████████████████

████ ██████████████████████████████

████ ███████████████████████

████ █ ████████████████████████████

████ ███████████████████████████████████

████ ████████████████████████████████████████

████ ██████████████

8      Q    If you testify at the trial of this matter,

9    do you intend to testify that these royalty rates

10   were relevant in any way to your reasonable royalty

11   analysis?

12       A    Not the number.  But again, the form is --

13   is somewhat relevant.  But it's not a contested

14   point between me and Dr. Becker.

15   █ ██████████████████████████████

████ ████████████████████████████████████████

████ ████████

████ █ ████████████████████████████

████ ████████████████████████████████████████

████ ██████████████████

21      Q    Let's take a break.  Let me figure out what

22   else -- I am not telling you that I'm five minutes

23   away from being done.  But let's take a break and

24   let me figure out what else I need to do.  Maybe

25   take five minutes or so?

Page 220

```
 1      A    Five minutes is fine with me.
 2      THE VIDEOGRAPHER:  We are off the record at
 3   4:50 P.M.
 4           (Whereupon a recess was taken)
 5      THE VIDEOGRAPHER:  We are back on the record at
 6   5:04 P.M.
 7   BY MS. RODMAN:
 8      Q    All right, Dr. Varner.  Just a quick
 9   follow-up question on the -- ████████████████
██   ██████████████████████████████████████████
██   ████████████████████████████████████████
██   ██████████
██            ██████████████████████████████
██   ████████████████████████████████
██   ██████████████████████████████████
██   ████████████████████████████████████████████
██   ████████████████████████████████
██        █ ████████████████████████████████████████
██   ██████████████████████████████
██   ████████████████████████████████████
██            ██████████████████████████████
██   ████████████████████████████████████
██   ████████████████████████
24            So to the extent that --
25            (Whereupon the reporter asked for
```

DEERE EX. L
PAGE 218



Page 221

1        clarification)

8   BY MS. RODMAN:

9        Q    Yeah.  I think that's what -- I think that

10  that answers my question, but let's just be sure.

11            You have -- well, let me strike that.

12

25            So if I use the word "representative," I

Page 222

```
 1   think I could switch out comparable. It means the
 2   same thing.  Or economic reasons.
 3        Q    All right.  Let's mark a couple things that
 4   I think will be pretty quick.  So our S, as in
 5   snake, is going to be Exhibit 7.
 6             (Whereupon Defendant's Exhibit 7
 7             was marked for identification)
 8   BY MS. RODMAN:
 9        Q    And then you could go ahead and mark our
10   Y -- Y, as in yak, as our Exhibit 8.  I never
11   learned the actual ones that you are supposed to
12   use.
13             All right.  And Dr. Varner, as soon as you
14   can open Exhibit 7, if you will go ahead and pop
15   that open for me.
16        A    I believe Y is Yankee.
17        Q    Yankee.  That's much better than yak.
18        A    So I'm looking at --
19        Q    I kind of like yak.
20        A    I'm looking at Appendix B.  Okay.
21        Q    Okay.  And I know it could be potentially a
22   little bit hard to tell, but do you recognize this
23   as exhibit -- sorry.
24             Do you recognize Exhibit 7 as Appendix B as
25   it was included in your reply report?
```

Page 223

1       A     Well --

2       Q     If it helps -- if you look at page 2, you

3   are referencing, for example, the expert report of

4   Dr. Becker.

5       A     Okay.  That is helpful.  Let me just get

6   the hard copy in front of me.

7       Q     Yeah.  If you want to compare.  I could

8   represent to you that it is the list of materials

9   considered that we received with your reply report.

10  But I'd like you to be able to confirm that for me.

11      A     It looks -- it looks like it.

12      Q     And then what we've marked as Exhibit 8 --

13  let me know when you have Exhibit 8 open.

14            (Whereupon Defendant's Exhibit 8

15            was marked for identification)

16      THE WITNESS:  Okay.

17  BY MS. RODMAN:

18      Q     I will represent to you that we received

19  Exhibit 8 today.  And I want to ask if you recognize

20  that as what would be a complete list of the

21  materials you considered, including those items you

22  considered since your reply report that we discussed

23  at the beginning of the deposition?

24      A     Well, I'm just scrolling down it.

25            So there were the ten or so things.  I'm

Page 224

1    looking for the 10Q, and I don't see that.  The

2    10K's, S1 --

3         Q    Under "financial data" on page 6 maybe?

4         A    Oh, yeah.  Yeah.  There it is.  There's the

5    Deere SEC filing 10Q.  Okay.  And then the others --

6    just give me a moment.

7              Well, I'll just take your word for it that

8    this is the additional ten or so documents.  I know

9    we haven't talked about the 10Q yet.

10        Q    Do you have an understanding of whether

11   your office put together an updated list of

12   materials you considered today?

13        A    Yes.

14        Q    So as you sit here today, do you have any

15   reason to doubt that this is, in fact, that updated

16   list of materials considered that your office put

17   together today?

18        A    Yes.  I have no reason to doubt that.  I

19   just haven't back-checked it myself.  No reason --

20        Q    That is fair.  I understand it's new.

21             All right.  I want to go, for our last

22   couple topics, back to your reply report, which is

23   Exhibit 4 in our exhibits.

24             And let's see if I can acclimate us --

25             (Whereupon the reporter asked for

Page 225

```
 1          clarification)
 2      MS. RODMAN:  I said acclimate us which I don't
 3   think it's the word that I meant to say, but that is
 4   what I said.  So that's what the record should
 5   reflect.
 6      Q    I'm looking, Dr. Varner, for your
 7   discussion of that profit premium for Ultralok
 8   versus Super V.
 9      A    It's in the first report.  Not the reply
10   report.  And that --
11      Q    No.  Your reply report also discusses it
12   briefly.  So I'm looking for the discussion about it
13   in your reply to --
14      Q    Oh, that's right.  That's right.  I
15   remember responding to Dr. Becker
16      Q    So he's at -- starting maybe at
17   paragraph -- here it is.  On page 31, page 65.
18      A    Okay.
19      Q    All right.  That's where it starts.
20          But I actually want to look at
21   paragraph 67.  All right.
22          So in paragraph 67, you say that you
23   understand from ESCO that the Super V patents
24   blocked manufacturers from copying and selling
25   competing products with similar technology.
```

DEERE EX. L
PAGE 223

Page 226

1    Correct?

2         A    Yes.

3         Q    And then in the next sentence, you say that

4    you understand that the Patents-In-Suit are also

5    blocking patents.

6              Do you see that?

7         A    Yes.

8         Q    What is your understanding of what a

9    blocking patent is?

10        A    So my understanding is that if I have a

11   product and you have a patent that effectively

12   prevents me from selling that product, then it's

13   often referred to as a blocking patent.

14        Q    Are all patents blocking patents in your

15   understanding?

16        A    No.

17        Q    So in order to be a blocking patent,

18   what -- what is required?

19        A    That the -- well, it could be that the

20   patent relates to a feature that is a major part of

21   the product.  It could relate to a patent that is

22   difficult to design around without becoming

23   impractical or infeasible to do that.

24             So a blocking patent will -- will prevent

25   you from selling a product.

DEERE EX. L
PAGE 224

1    Q    All right.  And you say that you understand

2    the Patents-in-suit to be blocking patents?

3    A    Yes.

4    Q    What is the basis of that understanding?

5    A    Well, it's based on -- in part, on the

6    opinions of other experts in this matter.

7         It's based on the fact that Deere has not

8    come up with a -- Deere has not provided evidence

9    that there is a commercially-acceptable

10   non-infringing design around yet.

11        It's based on the fact that the technology

12   at issue here relates to features that are a big

13   part of consumer demand for the products at issue.

14   And that would be strength, reliability, durability,

15   safety and so on.

16   Q    So you said you base that on the opinion of

17   other experts.

18        Which other experts said the

19   Patents-In-Suit are blocking patents?

20   A    I don't think they used that particular

21   term.  I don't remember seeing blocking.  It may

22   have been in the other reports, but I'm using that

23   to characterize the importance of this technology.

24   Q    So it's your understanding that the

25   patented technology at issue in this case is a major

Page 228

1    part of customer demand in the market?

2        A    I would say that the Patents-In-Suit relate

3    to major features that are the basis of consumer

4    demand of these products.

5        Q    We had previously discussed -- and I think

6    you agreed with me -- that 80 percent at least of

7    the market did not utilize the patented invention.

8    Correct?

9        A    Correct.

10       Q    Do you have an understanding that that

11   80 percent of the market still provides these

12   desired features to customers -- strength,

13   reliability, durability, and safety?

14       A    They do provide certainly those features.

15   They do provide features that consumers demand.

16   Otherwise they wouldn't be buying them.

17       Q    So the patented technology at issue in this

18   case is not required to provide strength,

19   reliability, durability and safety to customers?

20       A    There are alternatives in the market

21   that -- based on the evidence of what consumers are

22   buying, that there are other technologies.

23       Q    Including the ESCO Ultralok product.

24   Correct?

25       A    And that would include the ESCO Ultralok.

# EXHIBIT M

DEERE EX. M
PAGE 227

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

ESCO GROUP LLC,

    *Plaintiff,*

v.

DEERE & COMPANY

    *Defendant.*

C.A. No. 1:20-cv-01679-WCB

**ERRATA FOR EXPERT REPORTS OF**

**THOMAS R. VARNER, PH.D.**

**DATED JANUARY 13, 2023 AND MARCH 3, 2023**

Dated: March 19, 2023

Respectfully submitted,

Thomas R. Varner, Ph.D.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1.     I previously submitted *Varner Expert Report* in this matter on January 13, 2023 with an Errata on January 16, 2023, and *Varner Reply Expert Report* on March 3, 2023. This errata relates to a numerical change to Exhibit 6 in my previous reports and modifying the format to the PDF of Exhibit R3.1 to *Varner Reply Expert Report*.

2.     Attached is Exhibit 6R to *Varner Expert Report* showing a market apportionment calculation indicating that ESCO's Ultralok product would be ▇▇▇▇▇▇ of Deere's accused TK Series products if they are not available for sale. This market share results in ▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇ in calculated lost profits on lost historical and future sales of Ultralok products.[1]

3.     Some values in Exhibit R3.1 to *Varner Reply Expert Report* as submitted on March 3, 2023, were inadvertently not shown in the PDF version of *Varner Reply Expert Report*. Attached is a PDF version of Exhibit R3.1 with all values shown. No changes other than the noted formatting change were made to this exhibit.

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge, information and belief.

Executed on March 19, 2023, in Oakland, California.

Signature:

Thomas R. Varner, Ph.D.

---

[1] *Becker Expert Report*, 2/8/23, p. 86, shows "Implied Market Share of Accused Products" of ▇▇▇▇▇▇ however, these values do not include "first fit" sales. If Deere's "first fit" sales are included in this calculation the "Implied Market Share of Accused Products" becomes ▇▇▇▇▇▇ Using these revised values results in a market apportionment calculation allocating Ultralok ▇▇▇▇▇▇ of Deere's accused TK Series products.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. M
PAGE 229



## Exhibit 6R  Market Share Analysis
**Premium Market (Deere TK, ESCO UL, Hensley XS, Caterpillar Advansys)**

Source: [1]



| | Construction Expendables Top Tier | Deere Machines | But-For Market Shares |
|---|---|---|---|
| | **Market Shares** | | |
| **Deere TK** | | | |
| **ESCO UL** | | | |
| **Other** | | | |
| | 100% | 100% | 100% |

Notes:

[1]  Adam Stitzel testified that ESCO has ███████ of North American market for construction expendables.  See also, ESCO_00140132-163.  ██████████ ESCO's current market share is for Super V products and the remaining portion is for Ultralok products ██████████ (see Exhibits 2.1 and 2.2).  Ultralok share would be ████████ of overall construction expendables market. Adam Stitzel testified that ██ of the construction expendables market is in the premium segment, resulting in ██████████ market share for Ultralok in the premium segment.



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

**DEERE EX. M**

**PAGE 230**



**Exhibit R3.1 Non-OEM  Deere Sales of TK Products**



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

DEERE EX. M
PAGE 231