**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ESCO GROUP LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 20-1679-WCB-MPT |
| | ) | |
| DEERE & COMPANY. | ) | **PUBLIC VERSION FILED** |
| | ) | **MAY 10, 2023** |
| Defendant. | ) | |
| | ) | |

**APPENDIX IN SUPPORT OF DEFENDANT DEERE & COMPANY'S OPPOSITION TO
ESCO'S MOTION TO STRIKE LATE DISCLOSED OPINIONS OF DR. RICHARD
KLOPP AND TO COMPEL PRODUCTION OF MATERIALS CONSIDERED**

| Exhibit | Pages | Description |
|---------|-------|-------------|
| A | 1-21 | U.S. Patent No. 8,844,175 to Christopher Snyder, issued on September 30, 2014 ("the '175 Patent") |
| B | 22-40 | U.S. Patent No. 10,273,662 to Christopher Carpenter, issued on April 30, 2019 ("the '662 Patent") |
| C | 41-44 | Selected Portions of the Expert Report of Tiso Panapa, submitted on January 13, 2023 ("Panapa Rpt.") |
| D | 45-59 | Selected Portions of the Expert Report of Hezekiah Holland Regarding Infringement, submitted on January 13, 2023 ("Holland Rpt.") |
| E | 60-94 | Selected Portions of the Rebuttal Expert Report of Dr. Richard W. Klopp, P.E., F.A.S.M.E., submitted on February 8, 2023 ("Klopp Rebuttal") |
| F | 95-109 | Selected Portions of the Reply Expert Report of Hezekiah Holland Regarding Infringement, submitted on March 3, 2023 ("Holland Reply") |

| Exhibit | Pages | Description |
|---|---|---|
| G | 110-116 | Selected Portions of the Reply Report of Tiso Panapa, submitted on March 3, 2023 ("Panapa Reply") |
| H | 117-129 | Selected Portions of the Investigative Report of Dr. Pierce Umberger, Ph.D., P.E., submitted on March 3, 2023 ("Umberger Rpt.") |
| I | 130-141 | Clearance testing performed by Dr. Richard W. Klopp, P.E., F.A.S.M.E., submitted on March 3, 2023 ("Klopp Clearance Testing") |
| J | 142-148 | Selected Portions of the Deposition Transcript of Hezekiah R. Holland, III, taken on March 8, 2023 ("Holland Dep.") |
| K | 149-256 | Selected Portions of the Deposition Transcript of Richard Klopp, Ph.D., P.E., F.A.S.M.E., taken on March 9, 2023 ("Klopp Dep.") |
| L | 257-264 | Selected Portions of the Deposition Transcript of Pierce Umberger, Ph.D., P.E., taken on March 17, 2023 ("Umberger Dep.") |
| M | 265-267 | Declaration of Ava M Abner, executed on April 5, 2023 |

OF COUNSEL:

John F. Bennett (*pro hac vice*)
Paul M. Ulrich (*pro hac vice*)
Rachael L. Rodman (*pro hac vice*)
Paul J. Linden (*pro hac vice*)
Ava M. Abner (*pro hac vice*)
ULMER & BERNE LLP
312 Walnut Street, Suite 1400
Cincinnati, Ohio 45202-4029
(513) 698-5000
jbennett@ulmer.com
pulrich@ulmer.com
rrodman@ulmer.com
plinden@ulmer.com
aabner@ulmer.com

Dated: April 5, 2023

*/s/ Michelle C. Streifthau-Livizos*
James D. Taylor, Jr. (#4009)
Michelle C. Streifthau-Livizos (#6584)
SAUL EWING LLP
1201 N. Market Street, Suite 2300
Wilmington, Delaware 19801
(302) 421-6800
james.taylor@saul.com
michelle.streifthau-livizos@saul.com

*Attorneys for Defendant*
*DEERE & COMPANY*

# EXHIBIT A



US008844175B2

(12) **United States Patent**
Snyder

(10) **Patent No.:** **US 8,844,175 B2**
(45) **Date of Patent:** **Sep. 30, 2014**

(54) **WEAR ASSEMBLY FOR EXCAVATING EQUIPMENT**

(75) Inventor: **Christopher D. Snyder**, Portland, OR (US)

(73) Assignee: **ESCO Corporation**, Portland, OR (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 447 days.

(21) Appl. No.: **12/913,071**

(22) Filed: **Oct. 27, 2010**

(65) **Prior Publication Data**
US 2011/0099862 A1    May 5, 2011

**Related U.S. Application Data**

(60) Provisional application No. 61/256,561, filed on Oct. 30, 2009.

(51) **Int. Cl.**
*E02F 9/28* (2006.01)

(52) **U.S. Cl.**
CPC ............. *E02F 9/2858* (2013.01); *E02F 9/2866* (2013.01); *E02F 9/2833* (2013.01); *E02F 9/2825* (2013.01)
USPC ............................................. **37/452**; 37/455

(58) **Field of Classification Search**
USPC ............................. 37/452, 453, 455; 172/713
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 784,116 | A | 3/1905 | McCaskey |
| 1,218,841 | A | 3/1917 | Dietz |
| 1,438,001 | A | 12/1922 | Buskirk et al. |
| 1,685,196 | A * | 9/1928 | Gilbert ................. 172/703 |
| 2,040,085 | A | 5/1936 | Fykse et al. |
| 2,050,014 | A | 8/1936 | Morrison |
| 2,167,425 | A | 7/1939 | Page |
| 2,256,488 | A * | 9/1941 | Murtaugh ................. 37/455 |
| 2,689,419 | A | 9/1954 | Daniels et al. |
| 2,738,602 | A | 3/1956 | Meeks |
| 2,874,491 | A | 2/1959 | Larsen |
| 2,904,909 | A | 9/1959 | Ratkowski |
| 2,915,290 | A | 12/1959 | Petersen |
| 2,919,506 | A | 1/1960 | Larsen |
| 3,012,346 | A | 12/1961 | Larsen |
| 3,079,710 | A | 3/1963 | Larsen et al. |
| 3,196,956 | A * | 7/1965 | Ratkowski ................. 172/713 |
| 3,331,637 | A | 7/1967 | Krekeler |
| 3,444,633 | A * | 5/1969 | Hensley ................. 37/452 |
| 3,455,040 | A | 7/1969 | Ratkowski |
| 3,530,601 | A | 9/1970 | Steil |
| 3,623,247 | A | 11/1971 | Stepe |
| 3,624,827 | A * | 11/1971 | Liess et al. ................. 37/92 |
| 3,774,324 | A | 11/1973 | Lafond |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 50-132703 | 10/1975 |
| JP | 61176724 | 8/1986 |

(Continued)

*Primary Examiner* — Jamie L McGowan

(74) *Attorney, Agent, or Firm* — Steven P. Schad

(57) **ABSTRACT**

Wear members for use in excavating include a socket having a front stabilizing end that includes a top surface, a bottom surface and side surfaces. At least one of these surfaces is formed with a transverse, inward projection and extends axially substantially parallel to the longitudinal axis of the socket. The socket may include surfaces that generally correspond to exterior surfaces of a nose on which it may be mounted and on which it may be connected to excavating equipment.

**21 Claims, 9 Drawing Sheets**



DEERE EX. A
PAGE 2

**US 8,844,175 B2**

Page 2

(56)                    **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 3,897,642 | A | 8/1975 | Helton et al. |
| 3,959,901 | A | 6/1976 | Klett |
| 3,982,339 | A | 9/1976 | Nilsson |
| 4,027,408 | A | 6/1977 | Ramella et al. |
| 4,317,300 | A | 3/1982 | Emrich et al. |
| 4,319,415 | A | 3/1982 | Mayerbock et al. |
| 4,335,532 | A | 6/1982 | Hahn et al. |
| 4,404,760 | A | 9/1983 | Hahn et al. |
| D274,434 | S | 6/1984 | Nilsson |
| 4,470,210 | A | 9/1984 | Hahn |
| D275,859 | S | 10/1984 | Nilsson |
| 4,481,728 | A | 11/1984 | Mulder et al. |
| 4,510,706 | A | 4/1985 | Berchem |
| 4,577,423 | A | 3/1986 | Hahn |
| 4,611,418 | A | 9/1986 | Launder |
| 4,625,439 | A | 12/1986 | Johansson et al. |
| 4,727,663 | A | 3/1988 | Hahn |
| 4,744,692 | A | 5/1988 | Olsen et al. |
| D296,442 | S * | 6/1988 | Broomhall ..................... D15/29 |
| 4,751,785 | A | 6/1988 | Johansson et al. |
| 5,074,062 | A | 12/1991 | Hahn et al. |
| 5,152,088 | A | 10/1992 | Hahn et al. |
| 5,177,886 | A | 1/1993 | Klett |
| 5,350,022 | A | 9/1994 | Launder et al. |
| D354,291 | S | 1/1995 | Edwards |
| 5,653,048 | A | 8/1997 | Jones et al. |
| D389,844 | S | 1/1998 | Moreno |
| D414,193 | S | 9/1999 | Launder et al. |
| D417,877 | S | 12/1999 | Launder et al. |
| 6,047,487 | A | 4/2000 | Clendenning |
| 6,240,663 | B1 | 6/2001 | Robinson |
| 6,247,255 | B1 | 6/2001 | Clendenning |
| D446,224 | S | 8/2001 | Clendenning |
| D447,154 | S | 8/2001 | Clendenning |
| 6,321,471 | B2 | 11/2001 | Fernandez et al. |
| 6,385,871 | B1 * | 5/2002 | Quarfordt ..................... 37/457 |
| 6,393,739 | B1 | 5/2002 | Shamblin et al. |
| 6,430,851 | B1 | 8/2002 | Clendenning |
| 6,439,796 | B1 | 8/2002 | Ruvang et al. |
| 6,477,796 | B1 | 11/2002 | Cornelius |
| 6,619,883 | B2 * | 9/2003 | Livesay et al. ................. 404/124 |
| 6,675,509 | B2 | 1/2004 | Bierwith |
| 6,729,052 | B2 | 5/2004 | Ollinger, IV et al. |
| 6,735,890 | B2 | 5/2004 | Carpenter et al. |
| 6,745,503 | B1 | 6/2004 | Moreno et al. |
| 6,836,983 | B2 | 1/2005 | Moreno et al. |
| 6,839,990 | B2 | 1/2005 | Leslie et al. |
| 6,865,828 | B1 | 3/2005 | Molino et al. |
| 6,976,325 | B2 | 12/2005 | Robinson et al. |
| 7,523,572 | B2 | 4/2009 | Pasqualini |
| 7,703,224 | B2 * | 4/2010 | Karlsson et al. ............... 37/457 |
| 7,730,651 | B2 | 6/2010 | Carpenter |
| 7,762,015 | B2 * | 7/2010 | Smith et al. ................... 37/455 |
| 7,980,011 | B2 * | 7/2011 | Ruvang ......................... 37/452 |
| 8,061,064 | B2 * | 11/2011 | Ollinger et al. ............... 37/453 |
| 2001/0001352 | A1 | 5/2001 | Fernandez et al. |
| 2003/0005606 | A1 | 1/2003 | Carpenter et al. |
| 2003/0024139 | A1 | 2/2003 | Jones et al. |
| 2003/0089003 | A1 | 5/2003 | Ollinger, IV et al. |
| 2003/0101627 | A1 | 6/2003 | Robinson et al. |
| 2004/0093771 | A1 | 5/2004 | Carpenter et al. |
| 2004/0118021 | A1 | 6/2004 | Renski |
| 2005/0050775 | A1 | 3/2005 | Clendenning et al. |
| 2005/0055853 | A1 | 3/2005 | Livesay et al. |
| 2005/0120596 | A1 | 6/2005 | Kasim |
| 2005/0132619 | A1 | 6/2005 | Robinson |
| 2006/0013648 | A1 | 1/2006 | Bernstein |
| 2007/0193075 | A1 | 8/2007 | Carpenter |
| 2007/0227051 | A1 | 10/2007 | Carpenter et al. |
| 2008/0000114 | A1 | 1/2008 | Bentley |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| JP | | 04306329 A | 10/1992 |
| JP | | 10183698 A | 7/1998 |
| WO | WO | 8703316 A1 | 6/1987 |
| WO | WO | 2004035945 A1 | 4/2004 |
| WO | WO | 2008/140993 | 11/2008 |

* cited by examiner



FIG. 1
(Prior Art)

DEERE EX. A
PAGE 4



FIG. 2

DEERE EX. A
PAGE 5



FIG. 3

DEERE EX. A
PAGE 6



FIG. 4

DEERE EX. A
PAGE 7



FIG. 5

DEERE EX. A
PAGE 8



FIG. 6

DEERE EX. A
PAGE 9



FIG. 7A

FIG. 7

DEERE EX. A
PAGE 10



FIG. 7C

DEERE EX. A
PAGE 11



FIG. 7B

FIG. 8

DEERE EX. A
PAGE 12

US 8,844,175 B2

<div style="display:flex">
<div>

**1**

WEAR ASSEMBLY FOR EXCAVATING
EQUIPMENT

RELATED APPLICATION DATA

This application claims priority benefits to U.S. Provisional Patent Application No. 61/256,561 filed Oct. 30, 2009 in the name of Christopher Snyder and entitled "Wear Assembly for Excavating Equipment, which application is entirely incorporated herein by reference.

FIELD OF THE INVENTION

The present invention pertains to wear assemblies for securing wear members to excavating equipment, such as wear assemblies that are suited for attachment to and use on a dredge cutterhead.

BACKGROUND

Dredge cutterheads are used for excavating earthen material that is underwater, such as a riverbed. In general, a dredge cutterhead 1 includes several arms 2 that extend forward from a base ring 3 to a hub 4 (FIG. 1). The arms 2 are spaced about the base ring 3 and formed with a broad spiral about the central axis of the cutterhead 1. Each arm 2 is provided with a series of spaced apart teeth 5 to dig into the ground. The teeth 5 are composed of adapters or bases 6 that are fixed to the arms 2, and points 7 that are releasably attached to the bases 6 by locks 8.

In use, the cutterhead 1 is rotated about its central axis to excavate the earthen material. A suction pipe is provided near the ring 3 to remove the dredged material. To excavate the desired swath of ground, the cutterhead 1 is moved side-to-side as well as forward. On account of swells and other movement of the water, the cutterhead 1 also tends to move up and down, and periodically impacts the bottom surface. Further difficulties are caused by the operator's inability to see the ground that is being excavated underneath the water; i.e., unlike most other excavating operations, the dredge cutterhead 1 cannot be effectively guided by the operator along a path to best suit the terrain to be excavated.

During a dredging operation, the cutterheads 1 are rotated such that the teeth 5 are driven into and through the ground at a rapid rate. Consequently, considerable power is needed to drive the cutterhead 1, particularly when excavating in rock. In an effort to minimize the power requirements, dredge points 7 are typically provided with elongate, slender bits for easier penetration of the ground. However, as the bit becomes shorter due to wear, the mounting sections of the points 7 will begin to engage the ground in the cutting operation. The mounting section is wider than the bit and is not shaped for reduced drag. On account of the resulting increased drag the mounting sections impose on the cutterhead 1, the points 7 usually are changed at this time before the bits are fully worn away.

In view of the heavy loads and severe environments in which dredging equipment operates, the point 7 and base 6 interconnection for the teeth 5 needs to be stable and secure. Unstable and insecure engagement between the points 7 and their bases 6 may result in undesired disengagement of the points 7 from the base 6, which increases time and expense in the dredging operation, e.g., due to lost parts, downtime for replacement of the points, etc. Accordingly, improved point and base interconnections in dredging and other excavating equipment would be a welcome advance in the art.

</div>
<div>

**2**

SUMMARY OF THE INVENTION

The following presents a general summary of aspects of the present invention in order to provide a basic understanding of the invention and various example features of it. This summary is not intended to limit the scope of the invention in any way, but it simply provides a general overview and context for the more detailed description that follows.

Aspects of this invention relate to wear members for use in excavating equipment, assemblies including a wear member engaged with a base for use with a piece of excavating equipment, and excavating equipment that includes wear members and/or assemblies in accordance with this invention. More specific example aspects of this invention are described in more detail below.

In accordance with one aspect of the invention, a wear member for excavating equipment includes a front surface for engaging the material to be excavated and a rear socket for receiving a base secured to the excavating equipment. The socket has a front stabilizing end that includes a top surface, a bottom surface and side surfaces. At least one of these surfaces is formed with a transverse, inward projection. In some example structures according to this invention, the transverse, inward projection(s) will extend axially substantially parallel to the longitudinal axis of the socket. Additionally, in some structures according to the invention, at least the top surface and the bottom surface will include the transverse, inward projections and/or the substantially parallel axial extension direction.

In accordance with another aspect of the invention, the wear member includes a socket for receiving a base, wherein the socket has top, bottom and side surfaces, and wherein at least one of the surfaces is formed with a transverse inward projection extending substantially along the entire length of the socket.

In accordance with another aspect of the invention, the wear member includes a socket for receiving a base, wherein the socket has top, bottom and side surfaces, wherein at least one of the surfaces includes a first axial portion at a front end of the socket and a second axial portion proximate a rear end of the socket, and wherein each axial portion is formed with a transverse inward projection and extends axially substantially parallel to the longitudinal axis of the socket.

In accordance with another aspect of the invention, the wear member includes a socket for receiving a base fixed to the excavating equipment, and the socket has a front stabilizing end that includes a top surface, a bottom surface, a first side surface, and a second side surface. At least one of the top surface, the bottom surface, the first side surface, and the second side surface has a curved construction, e.g., a curved construction including a curved inward projection.

In accordance with one aspect of this invention, a wear member for excavating equipment is provided with a socket that includes a pair of axially spaced apart stabilizing bands that extend substantially around the perimeter of the socket, with one band near the front end of the socket and another band near the rear end. The stabilizing bands are defined by stabilizing surfaces that each extends substantially parallel to the longitudinal axis of the wear member and/or the assembly in which it is included. In one preferred embodiment, each of the stabilizing bands defines a generally trapezoidal shape.

In accordance with another aspect of the invention, a wear member for excavating equipment is formed to minimize the drag associated with the digging operation and, in turn, minimize the power need to drive the equipment. Reduced power consumption, in turn, leads to a more efficient operation.

</div>
</div>

DEERE EX. A
PAGE 13

US 8,844,175 B2

3

In one other aspect of the invention, the wear member is provided with side relief not only in the working end, but also in the mounting end, to reduce drag, require less digging power, and provide a longer useable life for the wear member.

In another aspect of the invention, the wear member has a transverse configuration where the width of the leading side is larger than the width of the corresponding trailing side so that the sidewalls of the wear member follow in the shadow of the leading side to decrease drag. This use of a smaller trailing side is provided not only through the working end of the wear member but also at least partially into its mounting end. As a result, the drag experienced by a worn wear member is less than that of a conventional wear member. Less drag translates into less power consumption and a longer use of the wear member before it needs to be replaced. Accordingly, the working ends of the wear member can be fully or nearly worn away before replacement is needed.

The wear member may have a profile that is defined by the collective transverse configuration of that portion of the wear member that is driven through the ground in any one digging pass. In one other aspect of the present invention, the profile is widest at the leading face and generally narrows rearward of the leading face for the portions of the wear member that will engage the ground during the life of the wear member.

In another aspect of the invention, the exterior transverse profile of the wear member may be generally trapezoidal with the leading side defusing the larger width. The trapezoidal shape continues through the working end and at least through the front portion of the mounting end.

The socket of the wear member is provided to receive a nose of a base member that may be fixed to the excavating equipment. In another aspect of the invention, the socket is formed with a transverse generally trapezoidal exterior shape to generally correspond to the exterior profile of the wear member. This general matching of the socket to the exterior of the mounting section eases manufacture, maximizes the size of the nose for a given outer profile, and enhances the strength to weight ratio.

In a preferred construction, one or more of the top, bottom or side surfaces of a trapezoidal shaped nose and the corresponding walls of the socket are each bowed to fit together. These surfaces and walls have a gradual curvature to ease installation, enhance stability of the wear member, and resist rotation of the wear member about the longitudinal axis during use.

In accordance with another aspect of the invention, both the socket and nose include front and rear stabilizing surfaces (e.g., stabilizing bands, as described above) that extend substantially parallel to the longitudinal axis of the wear member and substantially around the perimeter of the socket and nose to resist rearward loads applied in all directions.

In accordance with another aspect of the invention, the socket and nose are formed with complementary front bearing faces (or thrust faces) that may constitute an arc or section of a sphere to lessen stress in the components and to better control the rattle that occurs between the wear member and the base.

In another aspect of the invention, the socket and nose are formed with front curved bearing faces at their front ends, and with generally trapezoidal transverse shapes rearward of the front ends to improve stability, ease manufacture, maximize the size of the nose, reduce drag, stress and wear, and enhance the strength to weight ratio.

In accordance with another aspect of the invention, a wear assembly is provided that includes a base, a wear member that mounts to the base, and a lock or engagement system that holds the wear member to the base in a manner that is secure,

4

easy to use, and readily manufactured. The lock or engagement system may be axially oriented that, in a compressive state, it holds the wear member to the base and can tighten the fit of the wear member on the base. In one preferred example structure, the wear assembly includes an adjustable axial lock.

In another aspect of the invention, the wear member includes an opening into which the lock or engagement system is received, and a hole that is formed in a rear wall of the opening to accommodate passage of a lock to stabilize the lock and to facilitate easy tightening of the lock.

In another aspect of the invention, the base interacts with the lock solely through the use of a projecting stop. As a result, there is no need for a hole, recess or passage in the nose such as is typically provided to receive a lock. The nose strength is thus enhanced.

In another aspect of the invention, the locking arrangement for securing the wear member to the base can be adjusted to consistently apply a predetermined force to the wear member irrespective of the amount of wear that may exist in the base and/or wear member.

In another aspect of the invention, the wear member includes a marker that can be used to identify when the lock has been adequately tightened.

In another aspect of the invention, the wear member is installed and secured to the base through an easy to use process involving an axial lock. The wear member fits over a nose of a base fixed to the excavating equipment. The base includes a stop that projects outward from the nose. An axial lock is received into an opening in the wear member and extends between the stop and a bearing surface on the wear member to releasably hold the wear member to the nose.

In another aspect of the invention, the wear member is first slid over a base fixed to the excavating equipment. An axially oriented lock is positioned with one bearing face against a stop on the base and another bearing face against a bearing wall on the wear member such that the lock is in axial compression. The lock is adjusted to move and hold the wear member tightly onto the base.

In another aspect of the invention, a lock to releasably hold a wear member to a base includes a threaded linear shaft, with a bearing end and a tool engaging end, a nut threaded onto the shaft, and a spring including a plurality of alternating annular elastomeric disks and annular spacers fit about the threaded shaft between the bearing end and the nut.

Other aspects, advantages, and features of the invention will be described in more detail below and will be recognizable from the following detailed description of example structures in accordance with this invention.

BRIEF DESCRIPTION OF THE DRAWINGS

The present invention is illustrated by way of example and not limited in the accompanying figures, in which like reference numerals indicate the same or similar elements throughout, and in which:

FIG. **1** is a side view of a conventional dredge cutterhead;

FIG. **2** is a side perspective view of an example wear member in accordance with this invention;

FIG. **3** is a side view of an example base for mounting a wear member in accordance with this invention;

FIG. **4** is a perspective view of an example nose of a base for mounting a wear member in accordance with this invention;

FIG. **5** is a front view of an example nose of a base for mounting a wear member in accordance with this invention;

DEERE EX. A
PAGE 14

5

FIG. **6** is a vertical cross sectional view along line **6-6** in FIG. **2** showing the wear member mounted on a nose of a base in accordance with one example of this invention;

FIG. **7** is a cross sectional view similar to that shown in FIG. **6** except that this example wear member is shown without the base member and the lock, to better illustrate the internal structures of the socket in this example wear member;

FIG. **7**A is a cross sectional view taken along line **7**A-**7**A in FIG. **7** and illustrates a cross section of the working section of the wear member;

FIG. **7**B is a cross sectional view taken along line **7**B-**7**B in FIG. **7** and illustrates a cross section of the wear member as it contacts ground during a digging operation;

FIG. **7**C is a cross sectional view taken along line **7**C-**7**C in FIG. **7** and illustrates a cross section of the mounting section of the wear member; and

FIG. **8** is an end view of an example wear member in accordance with this invention, looking into the socket.

The reader is advised that the various parts shown in these drawings are not necessarily drawn to scale.

DETAILED DESCRIPTION

The following description and the accompanying figures disclose example features of excavating equipment, including wear member structures for excavating equipment in accordance with examples of the present invention as well as structures for mounting such wear members.

Some aspects of the present invention pertain to wear assemblies **100** for excavating equipment, and these wear assemblies may be particularly well suited for dredging operations. In this application, the invention is described primarily in terms of a dredge tooth adapted for attachment to a dredge cutterhead. Nevertheless, the different aspects of the invention can be used in conjunction with other kinds of wear assemblies (e.g., shrouds) and for other kinds of excavating equipment (e.g., buckets or the like for construction or mining equipment, etc.).

The assembly **100** and/or portions thereof are at times described in relative terms such as "up," "down," "horizontal," "vertical," "front" and "rear," and the like. Such terms are not considered essential and are provided simply to ease the description. The orientation of a wear assembly **100** in an excavating operation, and particularly in a dredge operation, can change considerably. These relative terms should be understood with reference to the orientation of wear assembly **100** as illustrated in FIG. **2** unless otherwise stated.

Wear assembly **100** includes a base **102** secured to a dredge cutterhead (or other excavating equipment), a wear member **104**, and a lock or engagement system **106** to releasably hold the wear member **104** to base **102** (FIGS. **2** and **6**). The lock or engagement system could be in the form of a known retainer or pin (not shown), but preferably has a construction as described below.

Base **102** (which also may be referred to herein as an "adapter") includes a forwardly projecting nose **108** onto which wear member **104** is mounted, and a mounting end **110** (see FIG. **3**) that is fixed to an arm of a dredge cutterhead (or other excavating equipment). The base **102** may be cast as part of the arm, welded to the arm, or attached by mechanical means. As examples only, the base **102** may be formed and mounted to the cutterhead such as disclosed in U.S. Pat. No. 4,470,210 or U.S. Pat. No. 6,729,052, each of which is entirely incorporated herein by reference. The mounting end **110** may be sized and shaped to prevent rotation with respect to the cutterhead arm and to prevent the assembly **100** from unintentionally separating from the cutterhead arm.

6

In a dredge tooth, wear member **104** (which also may be referred to herein as a "point") is provided with a working section **112** (also referred to herein as a "bit") in the form of an elongate slender bit and a mounting section **114** that defines a socket **120** to receive nose **108** of the base member **102**. Wear member **104** is rotated by the cutterhead such that it engages the ground in generally the same way with each digging pass. As a result, wear member **104** includes a leading side **122** and a trailing side **124**. Leading side **122** is the side that first engages and leads the penetration of the ground with each rotation of the cutterhead. In the present invention, trailing side **124** has a smaller width than leading side **122** (i.e., along a plane perpendicular to the longitudinal axis **128** of wear member **104**, see FIGS. **7** and **7**A) through the working section **112** and at least partially through mounting section **114** (see also FIGS. **7**B and **7**C). In some embodiments, trailing side **124** has a smaller width than leading side **122** throughout the entire length of the wear member **104**.

As shown in FIGS. **2** and **7**A, at least the working section **112** of wear member **104** preferably has a generally trapezoidal transverse configuration with a leading side **122** that is wider than trailing side **124**. The term "transverse configuration" is used herein to refer to the two-dimensional configuration along a plane perpendicular to the longitudinal axis **128** of wear member **104**. On account of this narrowing of the wear member **104**, sidewalls **130** and **132** follow in the shadow of leading side **122** during digging and thereby create little drag on the cutting operation (this reduction in drag feature is also called "side relief" in this specification). In some constructions, sidewalls **130**, **132** converge toward trailing side **124** at an angle θ of about 16 degrees (see FIG. **7**A); however, other angular configurations are possible. The leading side **122**, trailing side **124** and sidewalls **130**, **132** can be planar, curved or irregular. Moreover, shapes other than trapezoidal can be used that provide side relief.

In use, the dredge wear member **104** penetrates the ground to a certain depth with each digging pass (i.e., with each rotation of the cutterhead). During much of the wear member's useful life, the working end **112** alone penetrates the ground. As one example, the ground level in one digging cycle extends generally along line **7**B-**7**B in FIG. **7** at the center point of a digging pass. Because only the working end **112** penetrates the ground and because the working end **112** is relatively thin, the drag placed on the digging operation is within manageable limits. Nevertheless, with many dredge teeth being constantly driven through the ground at a rapid rate, power requirements are always high and reducing the drag even in the bit portion **112** of the wear member **104** is beneficial to the operation, especially when digging through rock.

In some preferred constructions, sidewalls **130**, **132** not only converge toward trailing side **124**, but they also are configured so that the sidewalls **130**, **132** lie within the shadow of the leading side **122** in the digging profile (FIG. **7**B). The term "digging profile" is used herein to mean the cross-sectional configuration of the portion of wear member **104** that penetrates the ground along a plane that is (i) parallel to the direction of travel at the center point of a digging pass through the ground and (ii) laterally perpendicular to the longitudinal axis. The digging profile is a better indication of the drag to be imposed on the wear member **104** during use than a true transverse cross section. The provision of side relief in the digging profile is dependent on the angle at which the sidewalls converge toward the trailing side and the axial slope or expansion of the wear member surfaces in a rearward direction. The intention is to provide a width that generally narrows from the leading side **122** to the trailing side **124**

DEERE EX. A
PAGE 15

US 8,844,175 B2

7

when considered from the perspective of the digging profile. Side relief in the digging profile preferably extends across the expected cutterhead digging angles, but benefit can still be obtained if such side relief exists in at least one digging angle. As one example only, the cross-sectional configuration illustrated in FIG. 7B represents one digging profile for a portion of wear member 104 being driven through the ground. As can be seen, the working end 112 is still provided with side relief even in the digging profile as sidewalls 130, 132 converge toward trailing side 124 for reduced drag.

As the working section 112 wears away, the ground level gradually creeps rearward so that more rearward, thicker portions of the wear member 104 are pushed through the ground with each digging cycle. More power is therefore required to drive the cutterhead as the working members wear. Eventually, enough of the working section 112 wears away such that the mounting section 114 of the wear member 104 is being driven through the ground with each digging pass. In at least some example structures in accordance with the present invention, the mounting section 114 continues to include side relief at least at the front end of the mounting section (FIG. 7C), and preferably throughout the mounting section 114.

As seen in FIGS. 2, 6, and 7, mounting section 114 is larger than working section 112 to accommodate the receipt of nose 108 into socket 120 and to provide ample strength for the interconnection between the wear member 104 and the base 102. Sidewalls 130, 132 are inclined so as to converge toward trailing side 124. The inclination of sidewalls 130, 132 along line 7C-7C is, in this one example, at an angle α of about 26 degrees (FIG. 7B), but other inclinations can also be used. As discussed above, the desired side relief in the digging profile depends on the relation between the transverse inclination of the sidewalls 130, 132 and the axial expansion of the wear member 104.

As noted above, in use, the working section 112 may be worn down to an extent where a portion of mounting section 114 may be driven through the ground during rotation of a cutterhead. If desired, in at least some example structures in accordance with this invention, the tapering of sidewalls 130, 132 continues from front end 134 to rear end 136 of wear member 104. The presence of side relief in the mounting section 114 imposes less drag and, hence, requires less power to be driven through the ground. The reduced drag, in turn, enables the cutterhead to continue to operate with wear members 104 worn to the point where the mounting section 114 penetrates the ground. This more conventional wear members, the mounting section does not have a trapezoidal transverse configuration with sidewalls that converge toward trailing side. The lack of side relief in the digging profile imposes a heavy drag on the conventional wear member as it is driven through the ground especially as compared to the present inventive wear member 104. With the heavy drag produced by conventional wear members in this condition, many operators will replace the wear members when their mounting sections begin to be driven through the ground even though the working sections may not be fully worn out. With at least some examples of the present invention, wear members 104 can stay on bases 102 until working sections 112 are further worn out as compared with many conventional wear members.

The use of a wear member 104 with side relief in the working section 112 and the mounting section 114 as described above can be used with a wide variety of nose and socket configurations. Nonetheless, in at least some example constructions in accordance with this invention, the front end 140 of nose 108 includes a forward-facing bearing or thrust face 142 that is trapezoidally shaped in cross section (FIGS.

8

2-6). Likewise, the front end 150 of socket 120 formed in the wear member 104 is formed with a complementary trapezoidally shaped bearing or thrust face 152 to set against thrust face 142 (FIGS. 6, 7, 7C, and 9). While the thrust faces 142, 152 may be any desired shape (such as any shape between hemispherical to flat or even concave), in some example structures according to this invention, the thrust face 142 may gently curve outward (e.g., as a portion or arc (or segment) of a sphere) such that its center point (or near its center point) is the forwardmost point of the face 142. In other examples, the thrust face 142 will be convex and curved about two perpendicular axes. The thrust face 152 may be shaped to match or substantially match the shape of the face 142. Matching rounded (e.g., spherical arc) shaped thrust faces 142 and 152 for primary load bearing helps keep the faces 142 and 152 in contact without tipping or shifting as the load on the working section 112 changes over the course of a digging operation (e.g., changes from an axial to a non-axial load, etc.). The thrust faces 142, 152 may be flat, recessed or have other shapes so long as they adequately resist the anticipated thrust loads for the intended use.

Nose 108 includes a body 160 rearward of front end 140 (FIGS. 3-5). Body 160 is defined by an upper surface 162, a lower surface 164 and side surfaces 166, 168. In some example constructions, body surfaces 162-168 diverge rearwardly so that nose 108 expands outward from front end 140 to provide a more robust nose to withstand the rigors of digging. Nevertheless, it is possible for only the upper and lower surfaces 162, 164 to diverge from each other and for the side surfaces 166, 168 to axially extend substantially parallel to each other. Socket 120 has a main portion 180 rearward of front end 150 to receive body 160. Main portion 180 includes an upper wall 182, lower wall 184 and sidewalls 186, 188 that generally conform to body surfaces 162-168, respectively. In at least some preferred example configurations according to this invention, body 160 and main portion 180 each have a trapezoidal transverse configuration. The use of a trapezoidal shape predominantly along the length of nose 108 and socket 120 provides four corners 170, 190, which act as spaced ridges to resist turning of wear member 104 about axis 128.

Also, in at least some example constructions in accordance with this invention, at least one of the body surfaces 162-168 and socket walls 182-188 (and preferably all of them) will have mutually bowed configurations (see FIGS. 4, 5, 7, 7C, and 8). In other words, in some example structures according to this invention, body surfaces 162-168 are preferably concave and curved across substantially their entire widths to define a trough 172 on each of the four sides of body 160. Likewise, socket walls 182-188 are preferably convex and curved across substantially their entire widths to define projections 192 received into troughs 172. The preferred bowing of nose surfaces 162-168 and socket walls 182-188 across substantially their entire widths provides increased resistance to the rotation of wear member 104 about base 102 during operation and increases the resistance to vertical and side loading of the point during digging. The troughs and projections will also reduce rotational rattle of the wear member 104 on the base 102. While the bowed surfaces 162-168 and walls 182-188 are preferred, other trough and projection configurations such as disclosed in U.S. patent application Ser. No. 11/706,592, which is incorporated herein by reference, could also be used without departing from the invention. Other rotation resisting constructions could also be used without departing from this invention.

The use of troughs 172 and projections 192, and particularly those that are gradually curved and extending substantially across the entire widths of the surfaces 162-168 and

DEERE EX. A
PAGE 16

US 8,844,175 B2

9

walls **182-188** eases the assembly of wear member **104** onto nose **108**; i.e., the troughs **172** and projections **192** cooperatively direct wear member **104** into the proper assembled position on nose **108** during assembly. For example, if wear member **104** is initially installed on nose **108** out of proper alignment with the nose **108** as it is fit onto the nose **108**, the engagement of projections **192** being received into the troughs **172** will tend to rotate the wear member **104** into proper alignment as the wear member is fed rearward onto nose **108**. This cooperative effect of troughs **172** and projections **192** greatly eases and speeds installation and the setting of corners **170** into corners **190**. Some variations could also be used between the shapes of the socket **120** and the nose **108** so long as the socket **120** predominantly matches the shape of the nose **108**.

As shown in various figures (e.g., FIGS. **2**, **4**, **5**, **7**, **7C**, and **8**), one or more of the surfaces (e.g., top surface, bottom surface, and side surfaces) at the front end **140** of the nose **108** and the front end **150** of the socket **120** may have a generally curved configuration or construction (e.g., continuously curved from one corner to the next at or near the thrust faces **142** and **152**), and the corners also may be rounded. At least some of the surfaces having this curved configuration or construction may include a curved inward projection (e.g., so that the corners of that surface lie outward from the center of that surface with respect to a center of the front end **140** and **150** of the nose **108** and socket **120**, respectively). Additional or alternative example features of the nose **108** and socket **120** in accordance with this invention are described in more detail below.

The front end **140** of the nose **108** includes front stabilizing surfaces **202**, and more specifically including an upper stabilizing surface **202**$a$, a lower stabilizing surface **202**$b$ and two side stabilizing surfaces **202**$c$ that collectively extend around the perimeter of front end **140** of nose **108**. These stabilizing surfaces **202**$a$, **202**$b$, **202**$c$ preferably define a generally trapezoidal configuration though other shapes can be used. In a preferred construction, upper stabilizing surface **202**$a$ has a shorter width than lower stabilizing surface **202**$b$ to match the outer profile of wear member **104**. Of course, the orientation could be reversed, or other relative sizing options may be provided, as desired for certain applications. Similarly, the interior side walls defining front end **150** of socket **120** include similarly shaped and situated stabilizing surfaces **212**$a$ through **212**$c$ that match with and contact stabilizing surfaces **202**$a$ through **202**$c$, respectively. In this illustrated example arrangement, the front stabilizing surfaces on the nose **108** and in the socket **120** provide a front stabilizing end located adjacent the thrust faces **142** and **152** of the nose **108** and socket **120**. The top and bottom stabilizing surfaces **202**$a$, **202**$b$, **212**$a$, and **212**$b$ extend rearward from their respective thrust faces **142** and **152**.

Front stabilizing surfaces **202**, **212** preferably axially extend substantially parallel to longitudinal axis **128**. The term "substantially parallel," as used herein in this context, is intended to include parallel surfaces as well as those that diverge rearwardly from axis **128** at a small angle (e.g., of about 1-7°) for manufacturing or other purposes. In one preferred embodiment, each front stabilizing surface **202**, **212** diverges axially rearward at an angle to axis **128** of no more than about 5°, and in some instances, by about 2-3°. The front stabilizing surfaces **202**, **212** also preferably encircle (or at least substantially encircle) nose **108** and socket **120** to better resist non-axial loads. However, benefits can be achieved by forming only one or more of the upper surfaces **202**$a$, **212**$a$, bottom surfaces **202**$b$, **212**$b$, and side surfaces **202**$c$, **212**$c$ to extend axially substantially parallel to longitudinal axis **128**.

10

Front stabilizing surfaces **202** on front end **140** of the nose **108** are preferably each provided with a transverse, inward recess in a transverse direction (see FIGS. **2** and **5**). Likewise, front stabilizing surfaces **212** on front end **150** of the socket **120** are preferably each provided with a corresponding transverse, inward projection. The corresponding inward recesses and projections enable each of the stabilizing surfaces **202**, **212** to resist all applied loads irrespective of whether the loads are applied vertically or horizontally (e.g., resist vertical and side loading). For example, when an upward load is vertically applied to the bit of the point, the load is at least in part resisted by lower stabilizing surface **212**$b$ contacting lower stabilizing surface **202**$b$. The use of such corresponding recesses and projections at the front end also enhances installation of the wear members on the bases in the same way as discussed above for the troughs and projections rearward of the front ends **140**, **150**.

The rear of the nose **108** includes rear stabilizing surfaces **200**, and more specifically including an upper stabilizing surface **200**$a$, a lower stabilizing surface **200**$b$ and two side stabilizing surfaces **200**$c$ that collectively extend around the perimeter of rear end of nose **108**. Rear stabilizing surfaces **200** are able to well resist vertical and side loads applied to wear member **104** without tending to push the wear member **104** from base member **102**. These stabilizing surfaces **200**$a$, **200**$b$, **200**$c$ preferably define a generally trapezoidal configuration around the perimeter of the nose **108**, though other shapes could be used. In a preferred construction, upper stabilizing surface **200**$a$ is narrower than lower stabilizing surface **200**$b$ to match the outer profile of wear member **104**. Similarly, the interior side walls of socket **120** include similarly shaped and situated stabilizing surfaces **210**$a$ through **210**$c$ that match with and contact stabilizing surfaces **200**$a$ through **200**$c$, respectively. Of course, the orientation could be reversed, or other relative sizing options may be provided, as desired for certain applications. Further, front and rear stabilizing surfaces **200**, **202**, **210**, **212** preferably form spaced apart bands of stabilizing surfaces that each extends about the entire perimeter of nose **108** and the socket or at least substantially about the entire perimeter, as will be described in more detail below.

More specifically, nose surfaces **162-168** with troughs **172** are each preferably inclined axially to expand outward as they extend rearward to provide strength to nose **108** until reaching the rear stabilizing surfaces **200** of nose **108**. Likewise, socket walls **182-188** with projections **192** also each expand to conform to surfaces **162-168**. Socket walls **182-188** also define the rear stabilizing surfaces **210** to bear against rear stabilizing surfaces **200**. Rear stabilizing surfaces **200**, **210** are substantially parallel to longitudinal axis **128**. As noted above, the term "substantially parallel," as used herein in this context, is intended to include parallel surfaces as well as those that diverge rearwardly from axis **128** at a small angle (e.g., of about 1-7°) for manufacturing or other purposes. In one preferred embodiment, each rear stabilizing surface **200**, **210** diverges axially rearward at an angle to axis **128** of no more than about 7°, and in some instances, by about 2-3°. The rear stabilizing surfaces **200**, **210** also preferably encircle (or at least substantially encircle) nose **108** and socket **120** to better resist non-axial loads. Nevertheless, benefits can be realized by including such stabilizing surfaces **200**, **210** on only one or more of the upper, lower and side surfaces of the nose **108** and socket **120**.

While contact between the various socket **120** surfaces and the nose **108** will likely occur during an excavating operation, contact between the thrust faces **142**, **152**, the corresponding front stabilizing surfaces **202**, **212**, and the corresponding

DEERE EX. A
PAGE 17

US 8,844,175 B2

11

rear stabilizing surfaces 200, 210 is intended to provide primary resistance to the applied loads on the tooth and thereby provide the desired stability. While these stabilizing surfaces 200, 202, 210, 212 may be formed with relatively short axial extensions in the longitudinal direction 128, they could have longer or different constructions. The presence of the stabilizing surfaces, particularly front stabilizing surfaces 202 and 212, helps align the wear member 104 as it is installed on the nose 108.

Front stabilizing surfaces 202, 212 and rear stabilizing surfaces 200, 210 are provided to stabilize the wear member 104 on the nose 108 and to lessen stress in the components. The front stabilizing surfaces 202, 212 at the front ends 140, 150 of the nose 108 and socket 120, respectively, are able to stably resist axial and non-axial rearward forces in direct opposition to the loads irrespective of their applied directions. Rear stabilizing surfaces 200, 210 complement the front stabilizing surfaces 202, 212 by reducing the rattle at the rear of the wear member 104 and providing stable resistance to the rear portions of the wear member 104, as described in U.S. Pat. No. 5,709,043 incorporated herein by reference. With stabilizing surfaces 200, 202, 210, and 212 extending about the entire perimeter of nose 108 and socket 120 (or at least substantially about the entire perimeters of these members), they are also able to resist the non-axially directed loads applied in any direction.

The main portion of socket 120 preferably has a generally trapezoidal transverse configuration to receive a matingly shaped nose 108 (see FIGS. 7C and 8). The generally trapezoidal transverse configuration of socket 120 generally follows the generally trapezoidal transverse configuration of the exterior of nose 108. This cooperative shaping of the socket 120 and the exterior of nose 108 maximizes the size of the nose 108 that can be accommodated within wear member 104, eases the manufacturing of wear member 104 in a casting process, and enhances the strength to weight ratio. However, a variety of different configurations could be used.

While the nose walls 162-168 and socket walls 182-188 may be generally shaped to match and mate with one another along substantially their entire lengths, there are preferably one or more gaps 220 along a medial portion of the length of nose walls 162-168 and socket walls 182-188, e.g., as shown in FIG. 6 to better ensure contact under load along the front and rear stabilizing surfaces. Gaps may also be provided along other portions of the fit as well. In the example structure shown in FIG. 6, a gap 220 is provided in a central section of the nose and socket, between stabilizing surfaces 200, 202, 210, 212 along each of the upper, lower and side surfaces. These gaps 220 can also help make the nose 108 fit more easily into the socket 120, help ease removal of the nose 108 from the socket 120, and reduce the need for high tolerances and/or precision in the overall manufacture of the nose 108 and socket 120. Because of the presence of the front and rear stabilizing surfaces 200, 202, 210, 212, the gap(s) 220 can be made relatively large to assure that no undesired contact is made (thereby maintaining desired lever arm distances between contacts). The presence of the stabilizing surfaces 200, 202, 210, 212 at both the front and the rear of the nose 108 and within the socket 120 of the working member 104 decreases relative motion between the wear member 104 and the nose 108 and increases the usable lives of these parts.

The spaced bands of front and rear stabilizing surfaces 200, 210 (and the corresponding surfaces in the socket 120) enable the assembly 100 to effectively resist loads applied from all directions. For example, a downward load L1 applied to the front end 134 of wear member 104 (see FIG. 2) will tend to rotate wear member 104 forwardly off nose 108 if not suffi-

12

ciently resisted. Such loads in assembly 100 are generally resisted by front stabilizing surface 202 (e.g., top surface 202a) and rear stabilizing surface 200 (e.g., bottom surface 200b) (and the corresponding stabilizing surfaces 212 and 210 provided within the socket 120). Likewise, side loads L2 applied to front end 134 are generally resisted by front stabilizing surface 202c on one side and rear stabilizing surface 200c on the opposite side (and the corresponding stabilizing surfaces 212 and 210 provided within the socket 120). The use of stabilizing surfaces 200, 202, 210, 212 provides stable resistance to such loads without an undue reliance on lock 106. The use of stabilizing surface bands around the entire or most of the perimeter enables enhanced support in virtually all directions, which is particularly important in a dredging operation. Nevertheless, the stabilizing surface bands need not be formed about the entire perimeter, if desired.

In a preferred embodiment, the upper, lower and side surfaces of the nose 108 and socket 120 are preferably provided with transverse inward recesses on the nose 108 and transverse inward projections on the socket 120 along their entire lengths. However, stability, strength and/or installation benefits can be achieved by providing such a configuration only on the front ends 140, 150 of the nose 108 and socket 120, i.e., with a different shaped nose and socket rearward of the front ends. The front ends 140, 150 preferably are also, as discussed above, formed with stabilizing surfaces that extend axially substantially parallel to the longitudinal axis 128 along with having the transverse inward recesses and projections, but some benefits are achieved even without this preferred axial extension.

A wide variety of different locks can be used to releasably secure wear member 104 to base 102. Nonetheless, in a preferred embodiment, lock 106 is received into an opening 300 in wear member 104, preferably formed in trailing wall 124 though it could be formed elsewhere. Opening 300 preferably has an axially elongated shape and includes a front wall 302, a rear wall 304, and sidewalls 306, 308. As will be described in more detail below, the lock 106 will be engaged to press against rear wall 304 of the opening 300. A rim 310 is built up around opening 300 for protection of the lock 106 and for additional strength. Rim 310 is also enlarged along rear wall 304 to extend farther outward of the exterior surface and to define a hole 312 for passage of lock 106. The hole 312 stabilizes the position of lock 106 and permits easy access to it by the operator.

Nose 108 includes a stop 320 that projects outward from upper side 162 of nose 108 to engage lock 106. Stop 320 preferably has a rear face with a concave, curved recess into which a front end of lock 106 is received and retained during use (see FIG. 6), but other arrangements could be used to engage the lock 106 with the stop 320. In one example construction, opening 300 is long enough and trailing wall 124 sufficiently inclined to provide clearance for stop 320 when wear member 104 is installed onto nose 108. Nevertheless, a relief or other forms of clearance could be provided in socket 120, if needed, for the passage of stop 320. Further, the projection of stop 320 is preferably limited by the provision of a depression 322 to accommodate a portion of lock 106. Preferably, the stop 320 does not include an opening in the nose 108, in order to maintain a stronger and more robust nose construction.

Lock 106 of this example construction may be a linear lock oriented generally axially to hold wear member 104 onto base 102, and to tighten the fit of wear member 104 onto nose 108. The use of a linear lock oriented axially increases the capacity of the lock 106 to tighten the fit of the wear member 104 on the nose 108; i.e., it provides for a greater length of take up and

DEERE EX. A
PAGE 18

US 8,844,175 B2

13

firmly holds the thrust faces **142** and **152** against one another (this face **142** to face **152** contact is one of the primary contact modes between the wear member **104** and the nose **108**). In one preferred structural arrangement, lock **106** includes a threaded shaft **324** having a front end and a rear end with head **326**, a nut **328** threaded to shaft **324**, and a spring **330**. Spring **330** is preferably formed of a series of elastomeric disks **332** composed of foam, rubber or other resilient material, separated by spacers **334** which are preferably in the form of washers. Multiple disks **332** may be used to provide sufficient force, resiliency and take up. The spacers **334** isolate the elastomeric disks **332** so that they operate as a series of individual spring members. Spacers **334** are preferably composed of metal or metal alloys, but they could be made of other materials, such as plastic, if desired. Moreover, the spring **330** of the preferred construction is economical to make and assemble on shaft **324**. Nevertheless, other kinds of springs could be used. A thrust washer **336** or other means is preferably provided at the rear end of the spring **330** to provide ample support against rear wall **304**.

Shaft **324** extends centrally through spring **330** to engage nut **328**. The front end of shaft **324** fits into the recess of the stop **320** so that the shaft **324** is set against stop **320** for support. The rear end of lock **106** extends through hole **312** in wear member **104** to enable a user to access the lock **106** outside of opening **300**. The shaft **324** is preferably set at an angle to axis **128** so that head **326** is more easily accessed. Spring **330** sets between rear wall **304** and nut **328** so that it can apply a biasing force to the wear member **104** when the lock **106** is tightened. Hole **312** is preferably larger than head **326** to permit its passage during installation of lock **106** into assembly **100**. Hole **312** also could be formed as an open slot to accommodate insertion of shaft **324** simply from above. Other tool engaging structures could be used in lieu of the illustrated head **326**.

In use, wear member **104** is slid over nose **108** so that nose **108** is fit into socket **120** (FIGS. **2** and **6**). The lock **106** can be temporarily held in hole **312** for shipping, storage and/or installation by a releasable retainer (e.g., a simple twist tie), fit around shaft **324** outside of opening **300**, or it can be installed after the wear member **104** is fit onto the nose **108**. In any event, shaft **324** is inserted through hole **312** and its front end is set in the recess of the stop **320**. Lock **106** is positioned to lie along the exterior of nose **108** so that no holes, slots or the like need to be formed in the nose **108** to contain the lock **106** for resisting the loads. Head **326** is engaged and turned by a tool to tighten the lock **106** to a compressive state to hold the wear member **104** (i.e., shaft **324** is turned relative to nut **328** so that front end presses against stop **320**). This movement, in turn, draws nut **328** rearward against spring **330**, which is compressed between nut **328** and rear wall **304**. This tightening of lock **106** pulls wear member **104** tightly onto nose **108** (i.e., with front thrust faces **142**, **152** engaged) for a snug fit and less wear during use. Continued turning of shaft **324** further compresses spring **330**. The compressed spring **330** then urges wear member **104** rearward as the nose **108** and socket **120** begin to wear. The stability of this preferred nose **108** and wear member **104** arrangement enables the use of an axial lock **106**, i.e., no substantial bending forces will be applied to the lock **106** so that the high axial compressive strength of the bolt can be used to hold the wear member **104** to the base **102**. Lock **106** is lightweight, hammerless, easy to manufacture, does not consume much space, and does not require any openings in the nose **108**.

In one preferred example construction according to this invention, lock **106** also includes an indicator **340** fit onto shaft **324** in association with nut **328**. Indicator **340** may be,

14

for example, a plate formed of steel or other rigid material that has side edges that fit closely to sidewalls of opening **300**, but not tightly into opening **300**. Indicator **340** includes an opening that fully or partially receives nut **328** to prevent rotation of the nut **328** when shaft **324** is turned. The close receipt of side edges of indicator **340** to the sidewalls of the opening **300** prevents the indicator **340** from turning. Alternatively, if desired, the indicator **340** could have a threaded bore to function as the nut **328**, and other means could be provide to hold nut **328** and prevent it from turning. Indicator **340** could also be discrete from nut **328**, if desired.

Indicator **340** provides a visual indication of when shaft **324** has been suitably tightened to apply the desired pressure to the wear member **104** without placing undue stress on shaft **324** and/or spring **330**. In one potential construction in accordance with this invention, indicator **340** cooperates with a marker **342** formed along opening **300**, e.g., along rim **310** and/or the opening's interior sidewalls. Marker **342** is preferably on rim **310** along one or both sidewalls, but it could have other constructions. Marker **342** may be, for example, a ridge or some structure that is more than mere indicia so that it can be used when retightening lock **106** after wear begins to develop, as well as at the time of initial tightening when all of the parts are new.

When shaft **324** is turned and nut **328** is drawn rearward, indicator **340** moves rearward with nut **328** within opening **300**. When indicator **340** aligns with marker **342**, the operator knows that tightening can be stopped. At this position, lock **106** applies a predetermined pressure on wear member **104** irrespective of the wear on the nose **108** and/or in the socket **120**. Hence, both under-tightening and over-tightening of the lock **106** can be easily avoided. As an alternative, indicator **340** can be omitted and shaft **324** may be tightened to a predetermined amount of torque.

The large thrust face (**142**, **152**) contact, along with the front and rear stabilizing surfaces (**200**, **202**, **210**, **212**) and contact between these surfaces and the lock features **106** (e.g., as described above) allow the wear member **104** and nose **108** to wear back much further than many currently available systems (including wear into the thrust face areas) without the need for interim weld repairs. In many instances, an end user can rebuild the nose **108**, if desired, in lieu or replacing the entire mounting base **102**. Moreover, regardless of wear on the nose **108**, the lock **106** helps maintain relatively constant wear member **104** on nose **108** preload forces when a wear member **104** is installed. Aspects of this invention, including the thrust faces **142**, **152**, the front and rear stabilizing surfaces **200**, **202**, **210**, **212**, and/or the lock features **106** (e.g., as described above) increase wear member **104** stability on the nose **108** and lessen movement of the wear member **104** on the nose, thereby reducing wear on the nose and extending its life.

The various aspects of the invention are preferably used together for optimal performance and advantage. Nevertheless, the different aspects can be used individually to provide the benefits they each provide.

CONCLUSION

The present invention is described above and in the accompanying drawings with reference to a variety of example structures, features, elements, and combinations of structures, features, and elements. The purpose served by the disclosure, however, is to provide examples of the various features and concepts related to the invention, not to limit the scope of the invention. One skilled in the relevant art will recognize that numerous variations and modifications may be

DEERE EX. A
PAGE 19

US 8,844,175 B2

15                                                                                    16

made to the example structures described above without departing from the scope of the present invention.

The invention claimed is:

**1**. A wear member for excavating equipment comprising a working section and a mounting section extending generally along a longitudinal axis, the mounting section including a socket for receiving a base fixed to the excavating equipment, and the socket having a front stabilizing end and a rear stabilizing end, the front stabilizing end is forward of the rear stabilizing end, the rear stabilizing end including a plurality of rear stabilizing surfaces, the front stabilizing end including a front thrust surface extending generally transverse to the longitudinal axis, and a top surface, a bottom surface, a first side surface, and a second side surface, each said top surface, bottom surface, first side surface, and second side surface extending rearwardly from the front thrust surface, wherein at least one of the top surface and the bottom surface and each of the first side surface and the second side surface has a transverse, inward projection in the front stabilizing end defined by bearing surfaces that are adjacent to and extend from the front thrust surface substantially parallel to the longitudinal axis in an axial direction.

**2**. A wear member according to claim **1**, wherein the top surface and the bottom surface each has a transverse, inward projection defined by bearing surfaces that are adjacent to and extend axially substantially parallel to the longitudinal axis.

**3**. A wear member according to claim **1**, wherein each of the inward projections is curved and extends substantially across the width of the front stabilizing end.

**4**. A wear assembly for excavating equipment comprising: a base fixed to the excavating equipment; a wear member comprising a working section and a mounting section extending generally along a longitudinal axis of the wear member, the mounting section including a socket having a front stabilizing end and a rear stabilizing end, the front stabilizing end is forward of the rear stabilizing end, the rear stabilizing end including a plurality of rear stabilizing surfaces, the front stabilizing end including a front thrust surface extending generally transverse to the longitudinal axis, and a top surface, a bottom surface, a first side surface, and a second side surface, each said top surface, bottom surface, first side surface, and second side surface extending rearwardly from the front thrust surface, wherein each of the first side surface and the second side surface has a transverse, inward projection in the front stabilizing end defined by bearing surfaces that are adjacent to and extend from the front thrust surface substantially parallel to the longitudinal axis in an axial direction; and an engagement system for releasably holding the wear member to the base.

**5**. A wear assembly according to claim **4**, wherein the base includes a nose having a front end with an exterior configuration shaped to substantially conform to a shape of the front stabilizing end of the socket.

**6**. A wear member for excavating equipment comprising a working section and a mounting section extending generally along a longitudinal axis, the mounting section including a socket for receiving a base fixed to the excavating equipment, and the socket having a front end and a rear end, the front end is forward of the rear end, the rear end including a plurality of rear stabilizing surfaces, the front end including a front thrust surface extending generally transverse to the longitudinal axis and a top surface, a bottom surface, a first side surface, and a second side surface, each said top surface, bottom surface, first side surface, and second side surface extending rearwardly from the front thrust surface, wherein each of the first side surface and the second side surface has an inward projection in the front end axially extending from the front

thrust surface, and wherein the inward projection extends into the rear end of the socket and substantially along an entire length of the socket, the inward projection having front bearing surfaces in the front end adjacent to the front thrust surface and rear bearing surfaces in the rear end that each axially extend substantially parallel to the longitudinal axis.

**7**. A wear member according to claim **6**, wherein each of the top surface, the bottom surface, the first side surface, and the second side surface has a transverse, inward projection extending from the front thrust face and substantially along the entire length of the socket.

**8**. A wear member according to claim **7**, wherein each of the inward projections is curved and extending substantially across the width of the front end.

**9**. A wear assembly for excavating equipment comprising: a base fixed to the excavating equipment; a wear member comprising a working section and a mounting section extending generally along a longitudinal axis of the wear member, the mounting section including a socket having a front end and a rear end, the front end is forward of the rear end, the rear end including a plurality of rear stabilizing surfaces, the front end including a front thrust surface extending generally transverse to the longitudinal axis, and a top surface, a bottom surface, a first side surface, and a second side surface, each said top surface, bottom surface, first side surface, and second side surface extending rearwardly from the front thrust surface, wherein at least one of the top surface and the bottom surface and each of the first side surface and the second side surface has an inward projection in the front end axially extending from the front thrust surface and wherein the inward projection extends into the rear end of the socket and substantially along an entire length of the socket, the inward projection having front bearing surfaces in the front end adjacent to the front thrust surface and rear bearing surfaces in the rear end that each axially extend substantially parallel to the longitudinal axis; and an engagement system for releasably holding the wear member to the base.

**10**. A wear assembly according to claim **9**, wherein the base includes a nose having a front end with an exterior configuration including a trough shaped to receive each of the transverse, inward projections of the socket.

**11**. A wear member according to claim **9**, wherein each of the inward projections is curved and extending substantially across the width of the front stabilizing end.

**12**. A wear assembly according to claim **11**, wherein the base includes a nose having a front end with an exterior configuration including a trough shaped to receive each of the transverse, inward projections of the socket.

**13**. A wear member for excavating equipment comprising a working section and a mounting section, the mounting section including a socket open rearwardly to receive a base secured to the excavating equipment, the socket having a longitudinal axis and including a front end and a rear end, the front end including a front thrust surface, a top side, a bottom side and opposite lateral sides, each of the top, bottom and lateral sides extending rearward of the front thrust face, each of the lateral sides including an inward, axially extending projection defined by bearing surfaces to contact and bear against the base, the bearing surfaces being adjacent to and extend rearward from the front thrust surface in an axial orientation that is substantially parallel to the longitudinal axis, wherein the rear end of the socket is rearward of the top, bottom and lateral sides of the front end.

**14**. A wear member according to claim **13** wherein each said projection has a generally V-shaped configuration defined by a pair of the bearing surfaces.

**DEERE EX. A**
**PAGE 20**

US 8,844,175 B2

**17**

**15**. A wear member according to claim **13** wherein the rear end is defined by a top side, a bottom side and opposite lateral sides each of which extend rearward from the front end, and each of the lateral sides of the rear end include a transverse, inward projection defined by bearing surfaces to contact and bear against the base that are aligned and contiguous with the projections in the front end.

**16**. A wear member according to claim **13** wherein at least one of the top side and the bottom side includes an inward, axially extending projection defined by bearing surfaces to contact and bear against the base, and the bearing surfaces are adjacent to and extend rearward from the front thrust surface in an axial orientation that is substantially parallel to the longitudinal axis.

**17**. A wear assembly for excavating equipment comprising:

a base secured to the excavating equipment;

a wear member for excavating equipment comprising a working section and a mounting section, the mounting section including a socket open rearwardly to receive a base secured to the excavating equipment, the socket having a longitudinal axis and including a front end and a rear end, the front end including a front thrust surface, a top side, a bottom side and opposite lateral sides, each of the top, bottom and lateral sides extending rearward of the front thrust face, each of the lateral sides including an inward, axially extending projection defined by bearing surfaces to contact and bear against the base, the bearing surfaces being adjacent to and extend rearward

**18**

from the front thrust surface in an axial orientation that is substantially parallel to the longitudinal axis, wherein the rear end of the socket is rearward of the top, bottom and lateral sides of the front end; and

a lock to contact the base and the wear member and releasably hold the wear member to the base.

**18**. A wear assembly according to claim **17** wherein each said projection has a generally V-shaped configuration defined by a pair of the bearing surfaces.

**19**. A wear assembly according to claim **17** wherein the rear end is defined by a top side, a bottom side and opposite lateral sides each of which extend rearward from the front end, and each of the lateral sides of the rear end include a transverse, inward projection defined by bearing surfaces to contact and bear against the base that are aligned and contiguous with the projections in the front end.

**20**. A wear assembly according to claim **17** wherein the base includes a top wall, a bottom wall and opposite sidewalls, and each of the sidewalls includes a slot corresponding in shape with and receiving the respective projection in the socket.

**21**. A wear assembly according to claim **17** wherein at least one of the top side and the bottom side includes an inward, axially extending projection defined by bearing surfaces to contact and bear against the base, and the bearing surfaces are adjacent to and extend rearward from the front thrust surface in an axial orientation that is substantially parallel to the longitudinal axis.

\*   \*   \*   \*   \*

DEERE EX. A
PAGE 21

# EXHIBIT B

DEERE EX. B
PAGE 22

US010273662B2

(12) **United States Patent**

Carpenter

(10) Patent No.: **US 10,273,662 B2**

(45) Date of Patent: *** Apr. 30, 2019**

(54) **WEAR ASSEMBLY**

(71) Applicant: **ESCO Corporation**, Portland, OR (US)

(72) Inventor: **Christopher M. Carpenter**, Tualatin, OR (US)

(73) Assignee: **ESCO GROUP LLC**, Portland, OR (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 224 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/746,210**

(22) Filed: **Jan. 21, 2013**

(65) **Prior Publication Data**

US 2014/0026450 A1      Jan. 30, 2014

**Related U.S. Application Data**

(63) Continuation of application No. 12/792,999, filed on Jun. 3, 2010, now Pat. No. 8,356,432, which is a continuation of application No. 11/706,592, filed on Feb. 14, 2007, now Pat. No. 7,730,651.

(60) Provisional application No. 60/774,401, filed on Feb. 17, 2006.

(51) **Int. Cl.**
   *E02F 9/28*          (2006.01)

(52) **U.S. Cl.**
   CPC .............. *E02F 9/2833* (2013.01); *E02F 9/28* (2013.01); *E02F 9/2825* (2013.01); *E02F 9/2883* (2013.01)

(58) **Field of Classification Search**
   CPC ..... E02F 9/2883; E02F 9/2808; E02F 9/2816; E02F 9/2825; E02F 9/2833; E02F 9/2858

USPC ................... 37/446, 450, 452–456; 172/719
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,384,701 A | 7/1921 | McMonegal | |
| 1,916,354 A | 7/1933 | Barber | |
| 2,040,085 A * | 5/1936 | Fykse | E02F 9/2825 37/452 |
| 2,256,488 A * | 9/1941 | Murtaugh | E02F 9/2825 37/455 |
| 2,921,391 A * | 1/1960 | Opsahl | 37/454 |
| 3,079,710 A | 3/1963 | Larsen et al. | |
| 3,444,633 A | 5/1969 | Hensley | |
| 3,496,658 A * | 2/1970 | Eyolfson | E02F 9/28 37/455 |
| 3,624,827 A * | 11/1971 | Liess et al. | 37/92 |
| 3,675,350 A * | 7/1972 | Mulcahy et al. | 37/457 |
| 3,704,753 A | 12/1972 | Hasforth et al. | |
| 3,774,324 A * | 11/1973 | Lafond | E02F 9/2841 172/713 |
| 3,881,262 A | 5/1975 | Cullen | |
| 4,136,469 A | 1/1979 | Zepf | |
| 4,233,761 A | 11/1980 | Ryerson | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| GB | 1597554 | 9/1981 |
| JP | 50132703 | 10/1975 |
| JP | 410183698 A | 7/1998 |

*Primary Examiner* — Thomas B Will
*Assistant Examiner* — Joan D Misa
(74) *Attorney, Agent, or Firm* — John Anderton

(57)      **ABSTRACT**

A wear assembly for securing a wear member to excavating equipment that includes a base having a nose and a wear member having a socket. The nose and socket are each provided with one or more complementary stabilizing surfaces in central portions thereof.

**26 Claims, 9 Drawing Sheets**



**US 10,273,662 B2**

Page 2

(56)                    **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,404,760 | A  * | 9/1983 | Hahn et al. .................... 37/459 |
| 4,476,642 | A  * | 10/1984 | Hemphill .............. E02F 9/2816 |
| | | | 279/102 |
| 4,577,423 | A | 3/1986 | Hahn |
| 5,144,762 | A | 9/1992 | Robinson |
| 5,177,886 | A | 1/1993 | Klett |
| 5,386,653 | A | 2/1995 | Cornelius |
| 5,456,029 | A | 10/1995 | Cornelius |
| 5,564,206 | A | 10/1996 | Ruvang |
| 5,709,043 | A  * | 1/1998 | Jones ................... E02F 9/2825 |
| | | | 37/458 |
| 5,765,301 | A | 6/1998 | Clendenning |
| 5,778,571 | A  * | 7/1998 | Pasqualini et al. ............. 37/455 |
| D410,657 | S | 6/1999 | Launder |
| 5,956,874 | A | 9/1999 | Ianello et al. |
| 5,987,787 | A | 11/1999 | Mack |
| 5,992,063 | A | 11/1999 | MacK |
| 6,047,487 | A | 4/2000 | Clendenning |
| 6,079,132 | A | 6/2000 | Clendenning |
| 6,108,950 | A | 8/2000 | Ruvang et al. |
| 6,247,255 | B1 | 6/2001 | Clendenning |
| 6,321,471 | B2 | 11/2001 | Munoz et al. |
| 6,735,890 | B2 * | 5/2004 | Carpenter ................. E02F 9/28 |
| | | | 172/713 |
| 6,865,828 | B1 | 3/2005 | Molino et al. |
| 7,100,315 | B2 * | 9/2006 | Carpenter ................. E02F 9/28 |
| | | | 37/446 |
| 2001/0001352 | A1 * | 5/2001 | Fernandez Munoz ...................... |
| | | | E02F 9/2825 |
| | | | 37/455 |

* cited by examiner

**DEERE EX. B**
**PAGE 24**



FIG.1

DEERE EX. B
PAGE 25



FIG.1A

DEERE EX. B
PAGE 26



FIG.2



FIG.3

DEERE EX. B
PAGE 27



FIG.4

FIG.5

FIG.6

DEERE EX. B
PAGE 28



FIG.7

FIG.8

DEERE EX. B
PAGE 29



FIG.9

FIG.10

FIG.11

FIG.12

DEERE EX. B
PAGE 30



FIG.13

DEERE EX. B
PAGE 31



FIG.14



FIG.15

US 10,273,662 B2

1

## WEAR ASSEMBLY

This application is a continuation of co-pending application. Ser. No. 12/792,999 filed Jun. 3, 2010, which is a continuation of patent application Ser. No. 11/706,592 filed Feb. 14, 2007, now U.S. Pat. No. 7,730,651, which is a non-provisional application based on provisional patent application Ser. No. 60/774,401 filed Feb. 17, 2006.

### FIELD OF THE INVENTION

The present invention pertains to a wear assembly for securing a wear member to excavating equipment.

### BACKGROUND OF THE INVENTION

Wear parts are commonly attached along the front edge of excavating equipment, such as excavating buckets or cutterheads, to protect the equipment from wear and to enhance the digging operation. The wear parts may include excavating teeth, shrouds, etc. Such wear parts typically include a base, a wear member and a lock to releasably hold the wear member to the base.

In regard to excavating teeth, the base includes a nose which is fixed to the front edge of the excavating equipment (e.g., a lip of a bucket). The nose may be formed as an integral part of the front edge or as part of one or more adapters that are fixed to the front edge by welding or mechanical attachment. A point is fit over the nose. The point narrows to a front digging edge for penetrating and breaking up the ground. The assembled nose and point cooperatively define an opening into which the lock is received to releasably hold the point to the nose.

These kinds of wear parts are commonly subjected to harsh conditions and heavy loading. Accordingly, the wear members wear out over a period of time and need to be replaced. Many designs have been developed in an effort to enhance the strength, stability, durability, penetration, safety, and ease of replacement of such wear members with varying degrees of success.

### SUMMARY OF THE INVENTION

The present invention pertains to an improved wear assembly for securing wear members to excavating equipment for enhanced stability, strength, durability, penetration, safety, and ease of replacement.

In accordance with one aspect of the invention, the base and wear member define a nose and socket, which are formed with complementary stabilizing surfaces extending substantially parallel to the longitudinal axis of the assembly to provide a stronger and more stable construction. One or more of the stabilizing surfaces are formed generally along central portions of the nose and socket, and away from the outer edges of these components. As a result, the high loads anticipated during use are primarily carried by the more robust portion of the nose, and not on the extreme bending fibers, for a stronger and longer lasting base structure. This construction further reduces the formation of high stress concentrations along the components.

In another aspect of the invention, the wear member includes a socket opening in the rear end to receive a supporting nose. The socket is defined by top, bottom and side walls and has a longitudinal axis. At least one of the top and bottom walls includes a stabilizing projection, each of which has bearing surfaces facing in different directions to bear against opposite sides of a V-shaped recess in the nose.

2

In another aspect of the invention, pairs of stabilizing surfaces in each component are formed at a transverse angle to each other to provide enhanced stability in resisting vertical and side loads. In one exemplary embodiment, the stabilizing surfaces form a V-shaped configuration on at least one side of the nose and the socket.

In one other aspect of invention, the stabilizing surfaces are recessed in the nose to protect these base surfaces from damage and wear caused by the mounting of successive wear members or due to excessive wearing of the wear members.

In another aspect of the invention, the nose and socket are formed with complementary recesses and projections on all sides (i.e., top, bottom and side walls) in order to maximize the stabilizing surfaces available to resist the heavy loads that can occur during use.

In another aspect of the invention, the nose and socket are each formed to have a generally X-shaped, transverse, cross-section for enhanced stability. While the recesses and projections forming these configurations are preferably defined by stabilizing surfaces, benefits can still be achieved with the use of bearing surfaces that are not substantially parallel to the longitudinal axis of the assembly.

In one other aspect of the invention, the front end and/or body of the nose and socket are formed with a generally oval configuration. This construction provides high strength and a longer nose life, omits distinct corners to reduce concentrations of stress, and presents a reduced thickness for enhanced penetration in the ground.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. **1** and **1**A are perspective views of a wear assembly in accordance with the present invention.

FIG. **2** is a rear perspective view of a nose of the present wear assembly.

FIG. **3** is a front perspective view of the nose.

FIG. **4** is a front view of the nose.

FIG. **5** is a top view of the nose.

FIG. **6** is a side view of the nose.

FIG. **7** is a partial, rear perspective view of a wear member of the present wear assembly.

FIG. **8** is a partial perspective view of the wear assembly cut-away along a transverse plane immediately rearward of the lock.

FIGS. **9-12** are transverse cross sections along the top wall of the wear member illustrating different examples of stabilizing projections.

FIG. **13** is a perspective view of a wear assembly of the present invention with an alternative locking arrangement.

FIG. **14** is a partial, axial cross-sectional view of the alternative wear assembly.

FIG. **15** is an exploded perspective view of the lock of the alternative wear assembly.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The present invention pertains to a wear assembly **10** for releasably attaching a wear member **12** to excavating equipment. In this application, wear member **12** is described in terms of a point for an excavating tooth that is attached to a lip **13** of an excavating bucket. However, the wear member could be in the form of other kinds of products (e.g., shrouds) or attached to other equipment (e.g., dredge cutterheads). Moreover, relative terms such as forward, rear-

DEERE EX. B
PAGE 34

US 10,273,662 B2

3

ward, up, down, vertical or horizontal are used for convenience of explanation with reference to FIG. 1; other orientations are possible.

In one embodiment (FIGS. 1 and 1A), point 12 is adapted to fit on nose 14 fixed to a bucket lip 13 or other excavating equipment (not shown). In this embodiment, the nose is the front part of a base 15 that is fixed to an excavating bucket. The rear mounting end of the base (not shown in FIG. 1) can be fixed to the bucket lip 13 in a number of ways. For example, the nose can be formed as an integral portion of the lip, such as by being cast with the lip, or otherwise fixed by welding or mechanical attachment. When the base is welded or secured to the lip by a locking mechanism, the base 15 will include one or two rearward legs 17, 18 that extend over the lip 13. In these situations, the base is typically called an adapter. The base can also consist of a plurality of interconnected adapters. The point includes a socket to receive the nose. The point and nose are then secured together by a lock 16.

Nose 14 has a body 25 with top and bottom walls 20, 21 that converge toward a front end 24, and opposite sidewalls 22, 23 (FIGS. 2-6). The rear portion of the sidewalls are generally parallel to each other (i.e., with a slight forward convergence); of course, other configurations are possible. The front end 24 is formed with top and bottom stabilizing surfaces 30, 32 that are substantially parallel to the longitudinal axis 34. The term "substantially parallel" is intended to include parallel surfaces as well as those that diverge rearwardly from axis 34 at a small angle (e.g., of about 1-7 degrees) for manufacturing purposes. In one preferred embodiment, each stabilizing surface 30, 32 diverges rearwardly at an angle to axis 34 of no more than about 5 degrees and most preferably at about 2-3 degrees. In the illustrated embodiment, stabilizing surfaces 30, 32 are laterally curved so as to meet along the sides of the nose. In this way, stabilizing surfaces are formed around the entire front end 24 of the nose 14. Of course, other configurations are possible.

In the illustrated embodiment, front end 24 has generally an oval transverse shape with an oval front wall 36. Similarly, the body 25 of nose 14 also has a generally oval transverse shape except for stabilizing recesses 127, 129. As seen in FIG. 3, body 25 expands rearward from front end 24 over much of its length. The use of an oval-shaped nose forms high strength nose sections that result in a longer nose life. An oval shape also lessens the presence of corners and, thus, reduces stress concentrations along the outer edges of the nose. The oval shape also presents a streamlined profile that improves penetration into the ground during a digging operation; i.e., the wear member is formed with an oval-shaped socket for receiving the nose which, in turn, allows the wear member to have a slimmer profile for better penetration. Nevertheless, the front end and body of the nose could have other shapes; for example, the nose and socket could be more angular and define a generally parallelepiped front end with generally rectangular stabilizing surfaces and/or generally flat and angular top, bottom and side walls as the body of the nose. The general configuration of the nose (i.e., the oval shape) can vary considerably.

In one embodiment (FIGS. 2-6), the top, bottom and side walls 20-23 of nose 14 each includes a pair of stabilizing surfaces 40-47 that are each substantially parallel to axis 34. As noted with front stabilizing surfaces 30, 32, these rear stabilizing surfaces 40-47 are preferably angled relative to the longitudinal axis 34 by no more than about 5 degrees, and most preferably at about 2-3 degrees to axis 34. While any portion of the nose may at times bear loads from the

4

point, the stabilizing surfaces are intended to be primary surfaces for resisting loads that are applied to the nose by the point.

Wear member 12 comprises top, bottom and side portions to define a front working end 60 and a rear mounting end 62 (FIGS. 1, 7 and 8). In regard to a point, the working end is a bit with a front digging edge 66. While the digging edge is shown as a linear segment, the bit and digging edge could have any of the shapes that are used in digging operations. The mounting end 62 is formed with a socket 70 that receives nose 14 for supporting the point on the excavating equipment (not shown). Socket 70 is formed by interior walls of the top, bottom and side portions 50-53 of point 12. Preferably, socket 70 has a shape that is complementary to nose 14, though some variations could be included.

In one embodiment (FIG. 7), socket 70 includes a front end 94 with top and bottom stabilizing surfaces 90, 92 and a generally elliptical front surface 98 to match front end 24 of the nose. Top, bottom and side walls 100-103 of the socket extend rearward from front end 94 to complement top, bottom and side walls 20-23 of nose 14. Each of these walls 100-103 are preferably formed with stabilizing surfaces 110-117 that bear against stabilizing surfaces 40-47 on the nose. As with the stabilizing surfaces 30, 32, 40-47 of the nose, stabilizing surfaces 90, 92, 110-117 in socket 70 are substantially parallel to longitudinal axis 34. Preferably, the stabilizing surfaces in the point are designed to match those in the nose; that is, if the stabilizing surfaces in the nose diverge at an angle of about 2 degrees relative to axis 34, then, the stabilizing surfaces of the socket also diverge at an angle of about 2 degrees to axis 34. However, the stabilizing surfaces 110-117 in socket 70 could be inclined to axis 34 at a slightly smaller angle (e.g., a degree or two) as compared to stabilizing surfaces 40-47 on nose 14 to force a tight engagement between the opposed stabilizing surfaces at a particular location(s), for example, along the rear portions of the nose and socket.

Stabilizing surfaces 40-43 in top and bottom walls 20, 21 are each formed in a central portion of the nose so as to be located in the thickest, most robust portion of the nose. These stabilizing surfaces are preferably limited to the central portions rather than extending entirely across the nose. In this way, the loads are not primarily carried by the outer portions of the nose where the most bending occurs. Moreover, keeping the stabilizing surfaces 40-43 away from the outer edges can also be used to reduce the creation of high stress concentrations in the transition between nose 14 and the mounting portion of base 15. The side portions 119 of nose 14 to each side of stabilizing surfaces 40-43 preferably diverge relative to axis 34 at a steeper angle than stabilizing surfaces 40-43 to provide strength and at times a smoother transition between nose 14 and the rear mounting portion of base 15. Nonetheless, stabilizing surfaces 40-43, 110-113 could extend the entire width and depth of the nose and socket.

Stabilizing surfaces 30, 32, 40-43, 90, 92, 110-113 stably support the point on the nose even under heavy loading. The rear stabilizing surfaces 40-43, 110-113 are preferably tiered (i.e., vertically spaced) relative to front stabilizing surfaces 30, 32, 90, 92 for enhanced operation, but such tiers are not necessary.

When loads having vertical components (herein called vertical loads) are applied along the digging edge 66 of point 12, the point is urged to roll forward off the nose. For example, when a downward load L1 is applied to the top of digging edge 66 (FIG. 1), point 12 is urged to roll forward on nose 14 such that front stabilizing surface 90 in socket 70

DEERE EX. B
PAGE 35

US 10,273,662 B2

5                                                                                    6

bears against stabilizing surface 30 at front end 24 of nose 14. The bottom, rear portion 121 of point 12 is also drawn upward against the bottom rear portion of nose 14 such that rear stabilizing surfaces 112, 113 in the socket bear against stabilizing surfaces 42, 43 on the nose. The substantially parallel stabilizing surfaces provide a more stable support for the point as compared to converging top and bottom walls. For instance, if load L1 was applied to a nose and socket defined by converging top and bottom walls without stabilizing surfaces 42, 43, 112, 113, the urge to roll the point on the nose is resisted in part by the abutting of rear portions of the bottom converging walls. Since these walls are inclined, their abutment tends to urge the point in a forward direction, which must be resisted by the lock. Accordingly, in such constructions, a larger lock is needed to hold the point to the nose. A larger lock, in turn, requires larger openings in the nose and point, thus, reducing the overall strength of the assembly. In the present invention, stabilizing surfaces 30, 42, 43, 90, 112, 113 are substantially parallel to longitudinal axis 34 to lessen this forward urging of the point. As a result, the point is stably supported on the nose, which increases the strength and stability of the mount, reduces wear, and enables the use of smaller locks. Stabilizing surfaces 32, 40, 41, 92, 110, 111 function in the same manner for upwardly-directed vertical loads.

In the illustrated embodiment (FIGS. 2-6), stabilizing surfaces 40, 41 on top wall 20 are inclined to each other in a transverse direction (FIGS. 2-4). In the same way, stabilizing surfaces 42, 43 are set at a transverse angle to each other. Preferably, angled stabilizing surfaces 40-43 are symmetrical. Likewise, stabilizing surfaces 110-113 form inclined surfaces to bear against stabilizing surfaces 40-43 of nose 14. This transverse inclination enables stabilizing surfaces 40-43 to engage stabilizing surfaces 110-113 in socket 70 and resist loads with side or lateral components (herein called side loads), such as load L2 (FIG. 1). It is advantageous for the same surfaces resisting vertical loading to also resist side loading because loads are commonly applied to points in shifting directions as the bucket or other excavating equipment is forced through the ground. With the laterally inclined surfaces, bearing between the same surfaces can continue to occur even if a load shifts, for example, from more of a vertical load to more of a side load. With this arrangement, movement of the point and wearing of the components can be reduced.

The stabilizing surfaces 40-41 and 42-43 are preferably oriented relative to each other at an angle φ between about 90° and 180°, and most preferably at about 160 degrees (FIG. 4). The angle is generally chosen based on a consideration of the expected loads and operation of the machine. As a general rule, though there could be exceptions, angle φ would preferably be large when heavy vertical loads are expected and smaller when heavier side loading is expected. Since heavy vertical loading is common, the angle between the stabilizing surfaces will generally be a large one. However, this transverse angle φ may vary considerably and be smaller than 90° in certain circumstances, such as in light duty operations or those with exceptionally high side loading.

As seen in FIGS. 2 and 3, rear stabilizing surfaces 40-41 and 42-43 are preferably planar and oriented to form V-shaped recesses 127 in the nose. However, these rear stabilizing surfaces could have a myriad of different shapes and orientations. While the objectives of the invention may not be fully met in each different shape, the variations are still able to achieve certain aspects of the invention. For example, the rear stabilizing surfaces need not be planar and

could be formed with convex or concave curves. The rear stabilizing surfaces could be formed to define a shallow U-shaped continuous curve so that the inclined stabilizing surfaces flow uninterrupted into each other. The rear stabilizing surfaces could form a generally trapezoidal recess having a central stabilizing surface with generally no transverse inclination and two side stabilizing surfaces at virtually any obtuse angle to the central surface to resist side loading. The rear stabilizing surfaces could be inclined to each other at varying angles. The formation of stabilizing recesses in the nose and complementary projections in the socket is preferred to reduce the risk of wearing or deforming the nose surfaces by the mounting of multiple points or on account of holes being worn through the point. Nevertheless, the recesses and projections could be reversed. Also, since vertical loading is often much more significant than side loading, the stabilizing surfaces could be centrally positioned on the nose in spaced relation to the side edges but with no transverse inclination.

The rear stabilizing surfaces 40-43 are generally most effective when located at or near the rear end of the nose. Hence, in the illustrated embodiment (FIGS. 2-6), front portions 123 of stabilizing surfaces 40-43 taper to a front point. Of course, front portions 123 could have other narrowing shapes, non-converging shapes, or be eliminated entirely. Although stabilizing surfaces 40-41 are preferably the mirror images of stabilizing surfaces 42-43, it is not required that they be so.

In each of these orientations, the stabilizing surfaces 110-113 of the point preferably complement the stabilizing surfaces on the nose, however, variations could be used. Accordingly, as illustrated, stabilizing surfaces 110, 111 complement stabilizing surfaces 40, 41, and stabilizing surfaces 112, 113 complement stabilizing surfaces 42, 43. Hence, in the illustrated embodiment, stabilizing surfaces 110, 111 in the top wall 100 of socket 70 are formed to define a generally V-shaped stabilizing projection 125 with the stabilizing surfaces inclined to each other at an angle λ of about 160 degrees to fit into stabilizing recess 127 formed by stabilizing surfaces 40, 41 on nose 14 (FIG. 7). Likewise, stabilizing surfaces 112, 113 in bottom surface 101 of socket 70 form a V-shaped stabilizing projection 125 to matingly fit within the stabilizing recess 127 formed by stabilizing surfaces 42, 43 on the nose. Nevertheless, the lateral angle λ between each of pair of stabilizing surfaces (such as between surfaces 110 and 111) in socket 70 could be slightly varied relative to the angle φ between each pair of the corresponding stabilizing surfaces on the nose (such as between surfaces 40 and 41) to ensure a tight fit at a certain location (e.g., along the center of the stabilizing recesses 127, 129).

As alternatives, the stabilizing projections of socket 70 could have other shapes or forms to fit within stabilizing recesses 127. For example, the stabilizing projections 125a could have a curved (e.g., hemispherical) configuration (FIG. 9) to fit within the V-shaped stabilizing recess 127, a complementary curved recess or other recess shape adapted to receive the projection. Also, the stabilizing projections 125b (FIG. 10) could be thinner than the stabilizing recess 127 into which it is received. Stabilizing projections may have a shorter length than the recesses 127 and extend only partially along the length of the recess (FIG. 11) or have an interrupted length with gaps in between segments. Stabilizing projections may also be provided by a separate component such as a spacer that is held in place by a bolt, the lock, or other means. Further a plurality of stabilizing projections 125d (FIG. 12) may be provided in place of a single central

DEERE EX. B
PAGE 36

US 10,273,662 B2

7

projection. Also, in certain circumstances, e.g., in light duty operations, a limited benefit can be achieved through the use of, for example, recesses and projections in the top and bottom walls of the nose and socket that are defined by bearing surfaces that are not substantially parallel to longitudinal axis 34, in lieu of stabilizing surfaces 40-43, 110-113.

Sidewalls 22, 23 of nose 14 are also preferably formed with stabilizing surfaces 44-47 (FIGS. 2-6). These stabilizing surfaces 44-47 are also substantially parallel to longitudinal axis 34. In the illustrated embodiment, stabilizing surfaces 44, 45 are oriented at an angle θ to each other so as to define a longitudinal recess or groove 129 along sidewall 22 of nose 14 (FIG. 4). Likewise, stabilizing surfaces 46, 47 are oriented at an angle θ to each other to define a recess or groove 129 along sidewall 23 as well. These stabilizing surfaces 44, 45 and 46, 47 are preferably set at an angle θ between about 90° and 180°, and most preferably at about 120 degrees. Nonetheless, other angles could be selected including those substantially smaller than 90° and even to a parallel relationship in certain circumstances, such as heavy vertical loading or light duty operations. Stabilizing recesses 129 along sidewalls 22, 23 are adapted to receive complementary stabilizing projections 131 formed in socket 70. Stabilizing projections 131 are defined by stabilizing surfaces 114-117 forming inclined surfaces to bear against stabilizing surfaces 44-47 of nose 14 (FIG. 7). The lateral angle α between the side stabilizing surfaces 114, 115 and 116, 117 preferably matches the angle α of surfaces 44, 45 and 46, 47. Nevertheless as discussed for rear stabilizing surfaces 110-113, the angle between each pair of side stabilizing surfaces in socket 70 could be varied slightly from the side stabilizing surfaces on nose 14 to form a tight fit at a particular location (e.g., along the center of the stabilizing recesses 129). Also, the variations in shapes for stabilizing recesses 127 and stabilizing projections 125 discussed above are equally applicable for recesses 129 and projections 131.

Front stabilizing surfaces 30, 32 work in conjunction with side stabilizing surfaces 44-47 to resist side loads such as L2. For example, the application of side load L2 causes point 12 to cant on nose 14. The side portions of front stabilizing surfaces 90, 92 on the side load L2 is applied are pushed laterally inward to bear against front stabilizing surfaces 30, 32 on the nose. The rear portion of the opposite sidewall 52 of point 12 is drawn inward such that stabilizing surfaces 114, 115 bear against 44, 45. Stabilizing surfaces 30, 32, 46, 47, 90, 92, 116, 117 function in the same way for oppositely directed side loads.

The angled orientation of stabilizing surfaces 44-47 enable these side stabilizing surfaces to bear against stabilizing surfaces 114-117 in socket 70 to resist side and vertical loading. In the preferred construction, rear stabilizing surfaces 40-43, 110413 are oriented closer to horizontal than vertical to primarily resist vertical loads and secondarily resist side loads. Side stabilizing surfaces 44-47, 114-117 are oriented closer to vertical than horizontal to primarily resist side loading and secondarily resist vertical loading. However, alternative orientations are possible. For example, in heavy loading conditions, all the stabilizing surfaces 40-47, 110-117 may be more horizontal than vertical. In use, then, in the preferred construction, vertical and side loads are each resisted by front stabilizing surfaces 30, 32, 90, 92, rear stabilizing surfaces 40-43, 110-113, and side stabilizing surfaces 44-47, 114-117. The provision of stabilizing surfaces on each of the top, bottom and side walls of the nose and socket maximizes the area the stabilizing surfaces that can be used to support the point.

8

Preferably, stabilizing surfaces 44-47 are angled equally relative to a horizontal plane extending through axis 34. Nevertheless, asymmetric arrangements are possible, particularly if higher upward vertical loads are expected as compared to downward vertical loads or vice versa. As discussed above for rear stabilizing surfaces 40-43, side stabilizing surfaces 44-47 can be formed with a variety of different shapes. For example, while surfaces 44-47 are preferably planar, they can be convex, concave, curved or consisting of angular segments. Grooves 129 could also be formed with generally U-shaped or trapezoidal cross sections. Also, stabilizing recesses 129 could be formed in the side walls 102, 103 of socket 70 and stabilizing projections 131 in sidewalls 22, 23 of nose 14.

In the preferred wear assembly, stabilizing surfaces 40-47 define a stabilizing recess 127, 129 in each of the top, bottom and side walls 20-23 of nose 14 such that those portions of the nose with the recesses have a generally X-shaped cross-sectional configuration (FIGS. 2 and 8). Socket 70 has complementary stabilizing projections 125, 131 along each of the top, bottom and side walls 100-103 to fit into recesses 127, 129 and, thus, define an X-shaped socket. While generally V-shaped recesses 127, 129 are preferred, stabilizing recesses and projections of other shapes can be used to form the generally X-shaped nose and socket. This configuration stably mounts the point against vertical and side loading, supports high loading via the strongest and most robust portions of the nose, and avoids relying primarily on side portions of the nose where bending is greatest to reduce stress concentrations. The X-shaped cross-sectional nose and socket can also be used with limited benefit in certain applications with similar recesses in each of the top, bottom and side walls 20-23 but without the use of stabilizing surfaces extending substantially parallel to axis 34.

The nose can also be formed with configurations other than an X-shaped cross-section. For example, the nose and point may include top and bottom stabilizing surfaces 40-43, 110-113, but no side stabilizing surfaces 44-47, 114-117. In another alternative, the nose may be formed with side stabilizing surfaces 44-47, 114-117, but without stabilizing recesses 127 in the top and bottom walls. The nose and point may also be provided with only one set of stabilizing surfaces, such as rear stabilizing surfaces only along the bottom walls. Also, while front stabilizing surfaces 30, 32, 90, 92 could be omitted, it is preferred that they be used with whichever variation of rear and side stabilizing surfaces that are used.

As noted above, lock 16 is used to releasably secure wear member 12 to nose 14 (FIGS. 1 and 8). In one embodiment, nose 14 defines a channel 140 in sidewall 22 (FIGS. 2-6). Channel 140 is open on its outer side and on each end, and otherwise is defined by a base or side wall 142, a front wall 144 and a rear wall 146. Wear member 12 includes a complementary passage 150 to generally align with channel 140 when point 12 is assembled onto nose 14 to collectively define an opening 160 for receiving lock 16 (FIGS. 1 and 7-8). Passage 150 includes an open end 151 in top wall 50 of point 12 for receiving lock 16. Within socket 70, passage 150 is open on its inner side and otherwise defined by a base or side wall 152, a front wall 154, and a rear wall 156. Due to side stabilizing surfaces 44-47, 114-117, the front and rear walls 144, 146, 154, 156 of channel 140 and passage 150 have complementary undulating configurations. Front wall 144 on nose 14 and rear wall 156 on wear member 12 are the surfaces that primarily engage lock 16. Passage 150 is preferably open in bottom wall 51, but it could be closed if desired.

DEERE EX. B
PAGE 37

US 10,273,662 B2

9

Although point **12** is secured by only one lock **16**, the point preferably includes two passages **150**, **150'**, one along each sidewall **52**, **53**. Passages **150**, **150'** are identical except that passage **150** opens for receipt of lock **16** in top wall **50** and extends along sidewall **52**, and passage **150'** opens for receipt of lock **16** in bottom wall **51** and extends along sidewall **53**. With two passages, the point can be reversed (i.e., rotated 180° about axis **34**) and locked in place in either orientation.

When lock **16** is inserted into hole **160**, it opposes front wall **144** of nose **14** and rear wall **156** of point **12** to prevent release of point **12** from nose **14**. Accordingly, in an assembled condition, channel **140** is offset rearward of passage **150** so that front wall **144** is rearward of front wall **154**, and rear wall **146** is rearward of rear wall **156**. In the preferred construction, hole **160** narrows at it extends from open end **151**; that is, front wall **144** converges toward rear wall **156**, and side wall **142** converges toward side wall **152**, each as they extend away from open end **151**. Preferably, channel **140** and passage **150** also converge as they extend from open end **151** so that front wall **144** converges toward rear wall **146**, and front wall **154** converges toward rear wall **156**.

Lock **16** has a tapering construction with a latch such as disclosed in U.S. Pat. No. 6,993,861, incorporated herein by reference. In general, lock **16** includes a body **165** for holding point **12** to nose **14**, and a latch (not shown) for engaging stop **166** in point **12** for securing lock **16** in hole **160**. Body **165** includes an insertion end **169** that is first passed into hole **160**, and a trailing end **171**. Lock body **165** preferably tapers toward insertion end **169** with the front and rear walls converging toward each other, and sidewalls converging toward each other. This narrowing of lock **16** matches the shape of hole **160** to provide a lock that can be pried into and out of the assembly. A gap **183** is formed near trailing end **171** for insertion of a pry tool for removing lock **16** from opening **160**. A clearance space **184** is also formed in point **12** forward of open end **151** to enable a pry tool to access gap **183**.

In a second embodiment of the invention (FIGS. **13-15**), a wear assembly **210** includes a base having a nose **214** and a wear member **212** having a socket **270** for receiving the nose **214**. The nose and socket of wear assembly **210** is the same as wear assembly **10** except for the locking arrangement. In wear assembly **210**, lock **216** is received in a central passage **220** in nose **214** and corresponding holes **222** in wear member **212**. As seen in FIG. **9**, passage **220** opens in stabilizing recess **227**. A hole **222** is formed in each of the top and bottom portions of wear member **212**, in vertical alignment, to engage the lock and/or permit the wear member to be reversed on nose **214**. Alternatively, passage **220** and holes **222** could extend horizontally through the nose **214** and wear member **212**.

Lock **216** includes a wedge **224** and a spool **226** as described in U.S. Pat. No. 7,171,771, incorporated herein by reference. The wedge **224** has a rounded narrowing exterior, a helical thread **234**, and a tool engaging cavity **236**. The spool **226** is formed with arms **246** that set outside passage **220**. Each arm preferably includes an outstanding lip **247** at its outer end that fits under a relief **249** in point **212** to project ejection of the lock during use. Spool **226** includes a thread formation **242** preferably in the form a series of helical ridge segments to mate with the helical thread **234** on wedge **224**. Spool **226** has a trough **239** with a concave inner surface **240** to partially wrap around and receive wedge **224**. A resilient plug (not shown) composed of a rubber, foam or other resilient material may be provided in a hole in trough **239** to

10

press against wedge **224** and prevent loosening if desired. The spool preferably tapers toward its lower end to accommodate the preferred tapering of passage **220**. The spool may also be formed with a reduced leading end to better fit through the bottom end of passage **220** and into lower hole **222**.

In use, spool **226** presses against front wall **228** of passage **220**, and the ends of arms **246** press against the rear walls **256** in the top and bottom portions of wear member **212**. A gap normally exists between spool **226** and rear wall **230** of passage **220**. The land **258** extending between helical groove **234** of wedge **224** sets against the front wall **228** of passage **220**. An insert (not shown) may be placed between the wedge and front wall **228**. Alternatively, the spool could be placed against front wall **228** and wedge against rear walls **256**. To install lock **216**, the spool **226** and the leading end **252** of wedge **224** are loosely inserted through top hole **222** and into passage **220**. A wrench or other suitable tool is inserted into cavity **236** at the trailing end **254** of wedge **224** to turn the wedge and draw the wedge farther into the passage **220**.

Many other lock designs could be used to secure the wear member to the nose. For example, lock **16** may be a conventional sandwich pin construction, which is hammered into the assembly. Such a lock could also pass through holes in the centers of the nose and point, either vertically or horizontally, in a well-known manner.

The invention claimed is:

1. A wear assembly for excavating equipment comprising:
   a base secured to the excavating equipment, the base including a front end with a front wall and a pair of front bearing surfaces, a rear end with at least one recess defining a pair of rear bearing surfaces, and a lock bearing surface;
   a wear member including a rearward-opening socket for receiving the base, and an opening, the socket having a longitudinal axis and including (i) a front end with a front surface transverse to the longitudinal axis to bear against the front wall on the base, and a top stabilizing surface and a bottom stabilizing surface to bear against the front bearing surfaces on the base, and (ii) a rear end with a top wall, a bottom wall and side walls extending rearward from the front end, at least one of the top and bottom walls including a pair of rear stabilizing surfaces inclined relative to each other in different transverse directions so as to laterally converge inward toward a central location along the respective top or bottom wall to define an inward projection and positioned to bear against the rear bearing surfaces in the at least one recess in the base to resist both vertical and horizontal loads during excavating, said top stabilizing surface, said bottom stabilizing surface, and each said rear stabilizing surface axially extending substantially parallel to the longitudinal axis; and
   a lock received into the opening of the wear member and in contact with the lock bearing surface on the base to hold the wear member to the excavating equipment.

2. A wear assembly in accordance with claim 1 wherein the base includes a plurality of the recesses each with a pair of the rear bearing surfaces, and the top and bottom walls of the wear member each includes a pair of said rear stabilizing surfaces to define one said projection and to bear against the rear stabilizing faces in one said recess in the base.

3. A wear assembly in accordance with claim 1 wherein said pair of rear stabilizing surfaces of the wear member collectively defines a V-shaped formation.

DEERE EX. B
PAGE 38

US 10,273,662 B2

11

**4.** A wear assembly in accordance with claim **1** wherein said pair of rear stabilizing surfaces of the wear member collectively defines a curved formation.

**5.** A wear assembly in accordance with claim **1** wherein the base includes a plurality of side recesses each with a pair of side stabilizing faces, and each said side wall of the wear member includes a pair of side stabilizing surfaces inclined relative to each other in different transverse directions so as to laterally converge inward toward a central location along the respective side wall and positioned to define an inward projection and bear against a respective pair of the side stabilizing faces on the nose to resist both vertical and horizontal loads during excavating, and each said side stabilizing face and each said side stabilizing surface axially extends substantially parallel to the longitudinal axis.

**6.** A wear assembly in accordance with claim **1** wherein said pair of rear stabilizing surfaces of the wear member extends from one of the side walls to the other side wall of the socket.

**7.** A wear assembly in accordance with claim **1** wherein said top stabilizing surface, said bottom stabilizing surface, and each said rear stabilizing surface axially extends at angle of no more than about five degrees to the longitudinal axis.

**8.** A wear assembly for excavating equipment comprising:
   a base secured to the excavating equipment, the base including a front end with a front wall and front bearing surfaces, a rear end having opposite sides with a side recess in each of the sides, and a lock bearing surface;
   a wear member including a rearward-opening socket for receiving the base, and an opening, the socket having a longitudinal axis and including (i) a front end with a front surface transverse to the longitudinal axis to bear against the front wall on the base, and a top stabilizing surface and a bottom stabilizing surface to bear against the front bearing surfaces on the base, and (ii) a rear end with a top wall, a bottom wall and side walls extending rearward from the front end, the side walls each including a pair of side stabilizing surfaces inclined relative to each other in different transverse directions so as to laterally converge inward toward a central location along the respective side wall and positioned to bear against complementary surfaces in respective side recesses in the base to resist both vertical and horizontal loads during excavating, said top stabilizing surface, said bottom stabilizing surface, and each said side stabilizing surface axially extending substantially parallel to the longitudinal axis; and
   a lock received into the opening of the wear member and in contact with the lock bearing surface on the base to hold the wear member to the excavating equipment.

**9.** A wear assembly in accordance with claim **8** wherein each said pair of side stabilizing surfaces of the wear member collectively defines a V-shaped formation.

**10.** A wear assembly in accordance with claim **8** wherein each said pair of side stabilizing surfaces of the wear member collectively defines a curved formation.

**11.** A wear assembly in accordance with claim **8** wherein each said pair of side stabilizing surfaces of the wear member extends from the top wall to the bottom wall.

**12.** A wear assembly in accordance with claim **8** wherein the side stabilizing surfaces of the wear member are located near the rear end of the wear member.

**13.** A wear assembly in accordance with claim **8** wherein each said side stabilizing surface axially extends at an angle of no more than about five degrees to the longitudinal axis.

**14.** A wear member for excavating equipment comprising a rearward-opening socket for receiving a base secured to

12

the excavating equipment, and an opening for receiving a lock to releasably hold the wear member to the base, the socket having a longitudinal axis and including (i) a front end with a front surface transverse to the longitudinal axis to bear against a front wall on the base, and a top stabilizing surface and a bottom stabilizing surface to bear against front bearing surfaces on the base, and (ii) a rear end with a top wall, a bottom wall and side walls extending rearward from the front end, at least one of the top and bottom walls including a pair of rear stabilizing surfaces inclined relative to each other in different transverse directions so as to laterally converge inward toward a central location along the respective top or bottom wall to define an inward projection and bear against complementary surfaces in a recess in the base to resist both vertical and horizontal loads during excavating, said top stabilizing surface, said bottom stabilizing surface, and each said rear stabilizing surface axially extending substantially parallel to the longitudinal axis.

**15.** A wear member in accordance with claim **14** wherein the top and bottom walls each includes a pair of said rear stabilizing surfaces.

**16.** A wear member in accordance with claim **14** wherein said pair of rear stabilizing surfaces collectively defines a V-shaped formation.

**17.** A wear member in accordance with claim **14** wherein said pair of rear stabilizing surfaces collectively defines a curved formation.

**18.** A wear member in accordance with claim **14** wherein said pair of rear stabilizing surfaces extends from one of the side walls to the other side wall.

**19.** A wear member in accordance with claim **14** wherein each said side wall includes a pair of side stabilizing surfaces inclined relative to each other in different transverse directions so as to laterally converge inward toward a central location along the respective side wall to define an inward projection and bear against complementary surfaces in a recess in the base to resist both vertical and horizontal loads during excavating, and wherein each said side stabilizing surface axially extends substantially parallel to the longitudinal axis.

**20.** A wear member in accordance with claim **14** wherein each said rear stabilizing surface axially extends at an angle of no more than about five degrees to the longitudinal axis.

**21.** A wear member for excavating equipment comprising a rearward-opening socket for receiving a base fixed to the excavating equipment, and an opening for receiving a lock to releasably hold the wear member to the base, the socket having a longitudinal axis and including (i) a front end with a front surface transverse to the longitudinal axis to bear against a front wall on the base, and a top stabilizing surface and a bottom stabilizing surface to bear against front bearing surfaces on the base, and (ii) a rear end with a top wall, a bottom wall and side walls extending rearward from the front end, the side walls each including a pair of side stabilizing surfaces inclined relative to each other in different transverse directions so as to laterally converge inward toward a central location along the respective side wall to define an inward projection and bear against complementary surfaces on the base to resist both vertical and horizontal loads during excavating, said top stabilizing surface, said bottom stabilizing surface, and each said side stabilizing surface axially extending substantially parallel to the longitudinal axis.

**22.** A wear member in accordance with claim **21** wherein said pair of side stabilizing surfaces collectively defines a V-shaped formation.

DEERE EX. B
PAGE 39

US 10,273,662 B2

13

14

**23**. A wear member in accordance with claim **21** wherein said pair of side stabilizing surfaces collectively defines a curved formation.

**24**. A wear member in accordance with claim **21** wherein said pair of side stabilizing surfaces extends from the top wall to the bottom wall.

**25**. A wear member in accordance with claim **21** wherein the side stabilizing surfaces are located near the rear end.

**26**. A wear member in accordance with claim **21** wherein said top stabilizing surface, said bottom stabilizing surface, and each said side stabilizing surface axially extends at an angle of no more than about five degrees to the longitudinal axis.

\* \* \* \* \*

DEERE EX. B
PAGE 40

# EXHIBIT C

DEERE EX. C

PAGE 41

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ESCO GROUP LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 1:20-cv-01679-RGA |
| v. | ) | |
| | ) | |
| DEERE & COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**Expert Report of Tiso Panapa**

**A.    Introduction**

1.    I have been an employee of ESCO Group LLC ("ESCO") since 2012.  I currently serve as the Dimensional Gaging Engineering Team Lead.

2.    I have extensive experience and expertise in the 3D scanning of large and small steel casted ground engaging tools, including scan data acquisition, data processing, and dimensional analysis, and I routinely perform and oversee 3D scans of such products in my role with ESCO Group.  Over 10 years in this role, I have conducted 3D scans and analyses of hundreds of ground engaging tools products, and those scans and scan analyses have been used by others at ESCO in performing various engineering activities.

3.    My qualifications and training are more fully described in my curriculum vitae, which is attached to this report at Exhibit A.

4.    I was asked to 3D scan certain exemplary ground engaging tools provided to ESCO by Deere & Company ("Deere") using the scanning protocols described below, and to prepare those scans for dimensional analysis.

5.    Under my direct supervision, the exemplar ground engaging tools described in Section B were 3D scanned by Tyler Griffin, an Inspection Technician at ESCO that works for me in the Dimensional Gaging Engineering group.  I witnessed the work Mr. Griffin performed and it was consistent with industry standards and sound engineering principles.  Additionally, following 3D scanning, I prepared the scans for dimensional analysis.   The dimensional analysis work I performed was consistent with industry standards and sound engineering principles.

**B.     Handling and Description of Samples**

6.      I understand that Deere provided three sample wear assemblies from its TK Series product line, where each assembly included a wear member, adapter, and locking mechanism.

7.      I have been informed that the samples originated from Deere and were received by Kirkland & Ellis's Chicago office, and that the samples were then forwarded to ESCO.

8.      The samples were received in ESCO's Portland office on approximately May 16, 2022.  They were received by Tyler Griffin.  ESCO received TK Series wear assemblies of the following sizes: TK225, TK400, and TK450.

**C.     Materials and Methods**

9.      Consistent with industry standards and my typical process for scanning ground engaging tools in my role at ESCO Group, the following equipment and software was utilized to 3D scan the three TK Series wear assembly samples provided by Deere and also to prepare dimensional analyses of those scans:

- Make: Hexagon Romer Absolute Arm
- Software: Polyworks 2021 IR6; RDS v6.0.1.12747
- Scanner model: RA7525SEI (with upgraded RS3 scanning head)
- Scanner resolution settings: mid range 0.014mm
- Mesh profile (software processing the data):
  - Standard profile, 0.250mm sampling step
  - Noise reduction LOW (.005mm tolerance)
- Scanner accuracy:
  - Point repeatability spec: .027mm, Point repeatability attained: 0.015mm
  - Length accuracy spec: ±0.038mm, Length Accuracy attained: ±0.027mm

10.     All of the equipment and software used is available to me at ESCO, and is equipment that I use routinely for other scanning-related projects at ESCO, including the scanning of ground engaging tools.  The scanning equipment was last calibrated on September 4, 2019 and is routinely verified for accuracy using sphere and length bar artifacts consistent with accepted industry practices; the last sphere and length bar verification was performed January 11, 2023.

11.     The adapters and wear members for each the TK225, TK400, and TK450 samples were first individually scanned by Mr. Griffin with the Hexagon Romer Absolute Arm.  Polyworks software created full surface 3D models of the scanned adapters and wear members.  Those 3D model scan files are provided with this report.

12.     After each individual adapter and wear member from the samples was scanned, the TK225, TK400, and TK450 adapters and wear members were assembled in and scanned by Mr. Griffin with the Hexagon Romer Absolute Arm while the adapters

2

and wear members were positioned for various loading conditions. Ky Holland, who I understand is an outside expert for ESCO in its litigation with Deere, directed the loading conditions to be applied for purposes of scanning the assembled components. In all, Mr. Griffin performed four scans of each assembled sample: one scan of a thrust load applied to the assembly, two scans of a side load applied to the assembly, and one scan of a vertical load applied to the assembly. The TK225 scans in the side load applications were also done both with and without lock pins installed. Polyworks software created 3D models of the scanned assemblies that were subjected to these loading conditions. Those 3D model scan files are provided with this report.

13.   After scanning was complete, I used Polyworks, which I use routinely in my role at ESCO, to align the full surface scans of individual adapters and wear members to the scans of the assembled samples and then create a gap analysis for each load condition applied to the assembled TK225, TK400, and TK450 samples. The gap analysis for each loading condition is reflected by a color map. Additionally, I used Polyworks to measure several planes on the adapter and wear member samples. The gap analysis and planar analysis are reflected in the files provided with this report. In my work at ESCO, I routinely conduct similar gap and planar analysis on large ground engaging tools, and the analysis performed here was conducted consistent with industry best practices and sound engineering principles.

14.   I reviewed the gap and planar analysis I created to confirm that they were complete and that the information conveyed was accurate. I then made those files available to Mr. Holland and reviewed the files with Mr. Holland in person and via video conference. I informed Mr. Holland that the scanning process used on the Deere samples and dimensional analysis I performed were done consistent with typical procedures that I use at ESCO and industry best practices.

**D.    Compensation and Prior Testimony**

15.   I am a current employee of ESCO and therefore do not have an hourly fee for providing testimony and consultation. I am not receiving any payment or compensation other than my normal salary for purposes of this case.

16.   I have not testified as an expert at trial or by deposition in the previous four years.

**EXECUTED ON JANUARY 12, 2023.**

_____

**TISO PANAPA**

3

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ESCO GROUP LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 1:20-1679-RGA-JLH |
| v. | ) | |
| | ) | |
| DEERE & COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**EXPERT REPORT OF HEZEKIAH HOLLAND**
**REGARDING INFRINGEMENT**

DATED: January 13, 2023

DEERE EX. D
PAGE 46

**D.  Importance of Stabilization Features in the TK Series Tooth System**

51.    The TK Series Tooth system includes three main structural features that are important for its stabilization and locking system design.  First, the TK Series Tooth system uses generally parallel side stabilization features on the TK Series Tooth system that are important for bearing various loads, including horizontal, vertical, and rotational.  The second set of important features for stabilization included in the TK Series Tooth system are the top and bottom, front and rear, bearing surfaces that are generally parallel with the longitudinal axis of the point.  These features assist with bearing vertical loads, reducing and generally eliminating any transfer of load reactions to the locking mechanism.  Finally, there is a butt fit between the end of the nose and the bottom of the point cavity. This butt fit, as noted earlier, is an essential feature in hammerless systems because it provides accurate and consistent location of the tooth on the nose and the relative location of the cooperative locking surfaces, resulting in the ability to have a hammerless type lock installed and accurately aligned with its mating locking surfaces.  Deere itself touts the benefits of these stabilization features in the TK Series Tooth system, including that it has "[s]ymmetrical – nearly parallel – multi-planer nose surfaces for a fully stabilized system," and that this results in a "maximum performance," hammerless system.  (*See* DEERE_0000363.)

DEERE EX. D
PAGE 47



### E.  Scanning and 3D Analysis of the TK Series Tooth System

      *i.*    <u>*Scanning Methodology*</u>

52.    On August 16-17, 2022 I inspected three sets of TK Series Tooth sample parts at ESCO's Plant 3 Gage/Inspection Department in Portland, Oregon.  It is my understanding that Deere provided ESCO three samples of its TK Series Tooth product as part of this litigation.  The sizes of those samples are TK 250, TK 400, and TK 450.  I understand that Deere sent those samples to Kirkland & Ellis, and that the samples were then forwarded to ESCO.  I was assisted in my inspection by ESCO employees Tyler Griffin and Tiso Panapa.  Both work in the Dimensional Gaging Engineering department at ESCO.

53.    When I initially arrived at ESCO to inspect the samples, I was able to physically inspect the parts and take pictures that are provided with this report.  I first confirmed that the

DEERE EX. D
PAGE 48

product sizes at the inspection were the same as those that Deere had provided ESCO as part of this litigation.  I also confirmed with Tyler Griffin, the ESCO employee that received the samples from Kirkland & Ellis, that the samples had not been altered in any way since ESCO received them.   After confirming they had not been altered, I assembled the parts to clarify my understanding of the design of the nose, the point, the lock, and the lock insert. My visual inspection of the points and adapters confirmed that the parts fit properly and would be acceptable for a more detailed examination.

54.     My visual inspection was also intended to identify any processing that may have been performed during the manufacturing process.  It is common for cast parts such as these to be ground on and fit to quality control gauging in order to ensure that the parts meet design standards and interchangeably fit together with mating parts including locking components, replacement parts; and, parts made from various manufacturing facilities.  As shown in the below figure, and also in my inspection notes provided as Appendices to this report, I observed several places where the adapter noses had been ground. This grinding indicated a finishing and fitting activity that would have been typical of a quality control procedure to make sure that the nose met dimensional quality control requirements for a given size. ███████████████████████████

████████████████████████████████████████████████████████

DEERE EX. D
PAGE 49



55.     During my inspection of the parts I found the pins could all be installed but, in some instances, the point remained very loose, and in other cases, the point movement was limited and not representative of the full range of point movement on the mating nose during actual loading in the field.  Based on this finding I instructed that the scans be made with the point seated on the end of the nose, but the pin not installed to ensure that in the various loading orientations, the point was fully oriented to determine the location and extent of any mating stabilizing surface interactions.  I found this approach was consistent with the instructions found in ███████████ ████████████████████

56.     The scanning work began once I finished my visual inspection.  Mr. Griffin conducted the scanning work under the supervision of Mr. Panapa.  The scanning involved first scanning each individual tooth and adapter from each sample, and then scanning each combined assembly in various loading states.  I understand that Mr. Panapa is submitting an expert report explaining the equipment, software, and methodology employed to scan the three samples.

DEERE EX. D
PAGE 50



57.     As described in more detail below, I provided input on how to orient the combined assemblies in different loading states when scanning for purposes of analyzing fit between the tooth and adapter. This method of analysis between two mating parts is something I did for many years at ESCO. The method then involved putting a point on a nose or gage and pouring a flexible latex material inside the point cavity in order to create a flexible skin that would cure and be left when we disassembled the point from the adapter. These skins were extremely important because they allowed us to see gaps and areas of contact between the nose and the adapter. We used these skins to understand the fit between a tooth and adapter in various load states to improve component tooling and adjust fits to reduce the need for grinding required to meet quality control standards.

58.     In my time at ESCO I frequently conducted this type of fit analysis in ESCO's three US manufacturing plants, two Canadian manufacturing plants, its Australian licensee, and ESCO's European operations.  My analysis and conclusions allowed manufacturing technicians to determine the fit conditions of their products and make necessary adjustments to tooling.  For example, in order to account for process variation we would line up a number of adapters and

23

points from various casting heat lots to get a collection of skins to analyze. We would take measurements of the thickness of the skins in different locations to determine how parts fit and perform a statistical analysis across the sample of skins. This detailed analysis allowed us to improve the fit of the systems and speed up the final finishing of parts.

59.   For purposes of inspecting the Deere samples and understanding how they fit and interact under load, I utilized 3D scanning techniques.  These 3D scanning techniques allow for the same analysis I previously utilized by using latex skins, but is much quicker and more accurate. I discussed these 3D scanning techniques with Mr. Panapa, who explained that ESCO utilizes scanning equipment and software consistent with best industry practices for conducting fit analysis on large, steel casted ground gaging tools.

60.   The 3D scanning process began by scanning the adapters of each sample.  Multiple scans were made of these surfaces on these components and combined by software so a final detailed and complete surface was created.  (*See* Figs. 7, 8 in Attached Scanning Summaries.)  Mr. Panapa utilized Polyworks software to create best fit planes on the XY, YZ, and ZX planes of the nose of the samples so that a planar analysis could be conducted.  (*See* Figs. 3, 4 in Attached Scanning Summaries.)  Next, the points of each sample were scanned.  Each point was mounted, and the interior of the point cavity scanned as well as the outside of the point to create rear and exterior surfaces that could be used to align the interior scan with the exterior of the part. Multiple scans were made of the surfaces and combined by the software to fill in any scanning gaps so a final detailed and complete surface was created.

61.   After all individual adapters and points were scanned, the next step was to take the point and place it on the nose of the adapter and scan the point and adapter together.  As explained above, the purpose of scanning the point and adapter together was to understand how the

24

components fit together, particularly under different loading conditions.  This is consistent with the work I previously conducted as an engineer at ESCO and while working at its worldwide manufacturing facilities.  Under my direction, scanning was conducted such that the point was always seated on the end of the nose, but adjusted to four unique positions to replicate three primary loading situations: thrust only, horizontal, vertical loading (top). We used the weight of the cantilevered point as a load for the horizontal and vertical orientations.  This approach was appropriate based on my inspection of the parts and years of experience in fit analysis methods, and allowed for accurate and stable part positioning in a controlled inspection environment.  For the thrust load, the point was oriented vertically and was centered on the nose to minimize any rotational orientation to the tooth to minimize any horizontal or vertical displacement.

62.     Once the assembled samples were scanned under each given load condition, Mr. Panapa utilized Polyworks software to create a gap analysis between the nose and point cavity. The software tool produced a color-coded heat map indicating gaps between each component and the size of those gaps.  I confirmed with Mr. Panapa that the software and methods he used to create the gap analysis were consistent with current best industry standards and sound engineering principles.

ii.     _Inspection and Testing Conclusions_

63.     After reviewing the gap and planar analysis created by Mr. Panapa, I was able to draw the below conclusions about the three TK Series samples provided by Deere.  A more detailed set of conclusions for each sample that was scanned and inspected are provided in scanning summaries, which are provided with this report.  I also include with this report the 3D scan files provided to me by Mr. Panapa, which I confirmed with him were checked for completeness and accuracy.

DEERE EX. D
PAGE 53

- The scans confirm that the three samples constitute a butt fit design, and that when the wear member is seated on the adapter the front surfaces of the nose and socket both bear directly against one another. This is significant because it established both that the parts supplied were properly fitting together; and, that the location of the stabilizing surfaces along the sides, top and bottom would be correctly oriented for any conclusions about the gaps and mating surface interactions.

- The top and bottom surfaces at the front and rear of the adapter nose and wear member socket are nearly parallel to the component's longitudinal axis. Likewise, the side surfaces of the adapter nose and wear member socket are nearly parallel to the component's longitudinal axis. Based on my analysis, the side surfaces are approximately 2° from alignment to the longitudinal axis, and the top and bottom surfaces are generally less than 5° from alignment to the longitudinal axis. An example of my analysis and measurements are reflected in the images below. The first image represents the 3D scan of the TK 450 adapter. The second image reflects the best fit planes for the top, bottom, and side surfaces that were analyzed with respect to the longitudinal axis. Finally, the third image summarizes the measured angles between those given planes and the component's longitudinal axis. Although the 3D scan's planar analysis was only conducted on the adapter nose, my conclusions similarly apply to the geometry of the wear member socket. This is because the profile of the mating parts as shown in the sectioned analysis found in Figures 19 and 20 confirmed that the socket profile matched the nose profile, and the gap analysis that showed generally uniform gaps between the mating stabilizing surfaces as found in figures 9-16. The natural variation in castings, the orientation in a loading condition and the grinding on the parts all account for the gaps not being exactly uniform. In my experience designing two part cast wear part systems, the resulting mating fits were expected and necessary for providing sufficient bearing surface areas to avoid surface damage from loading.



DEERE EX. D
PAGE 54



| 450 Summary of Angles | | | |
|---|---|---|---|
| | Included Angle | Angle from X Plane (incline) | Angle of surface from Y Longitudinal Axis |
| Rear Bearing Surface - Direct Measurement | 7.169 | | **3.585** |
| Front Bearing Surface - Direct Measurement | 9.791 | | **4.896** |
| Front Bearing Surface - Plane 2 | | | **3.652** |
| Front Bearing Surface - Plane 3 | | | **3.652** |
| Left Side Upper Bearing Surface Plane 4 | | 20.269 | **2.038** |
| Left Side Lower Bearing Surface Plane 5 | | 19.330 | **2.406** |
| Right Side Upper Bearing Surface Plane 6 | | 21.064 | **2.097** |
| Right Side Lower Bearing Surface Plane 7 | | 20.519 | **2.327** |
| Angle of inside of point at Z=0 (average) | 3.866 | | **1.933** |

• Under vertical loading, the side surfaces of the adapter nose and wear member socket interacted and carried loads. This is reflected in the gap analysis and related heat maps provided in scanning summaries provided with this report. For example, for the TK 450 assembly, when subjected to a vertical load applied to the top of the wear member the nose and socket experienced contact at the front, top surface as well as portions of the side surfaces. Those areas of contact are reflected by the red portions of the heat map, which I have circled in the below image. The color red and pink indicates that those portions of the adapter and wear member were close or contacting during the given loading orientation. I expect that under additional loading, including typical loading in the field, the loading contact areas would increase.

DEERE EX. D
PAGE 55



- Under side loading, the side surfaces of the adapter nose and wear member socket interacted and carried loads.  This is reflected in the gap analysis and related heat maps provided in scanning summaries provided with this report.  For example, for the TK 450 assembly, when subjected to side loads the side surfaces of the wear member socket and adapter nose experienced contact. Those areas of contact are reflected by the red and pink portions of the heat map, which I provide below.  The color red and pink indicates that those portions of the adapter and wear member were in close or actual contact during side loading orientation. I expect that under additional loading, including typical loading in the field, the loading areas would have increased.

DEERE EX. D
PAGE 56



Figure 13 – Side Load – Right – top view

Figure 14 – Side Load – Right – bottom view

64.     Although my detailed testing only involved the three samples provided by Deere, my review of those samples and Deere's documents, including drawings and 3D CAD model renderings, confirm that my planar analysis and loading conclusions discussed above apply to all TK Series products. I make this conclusion first based on the grinding performed on each sample I was able to inspect, it is apparent that Deere and/or Black Cat has a quality control system in which adapters and wear members, regardless of size and point/adapter style, will only be released to customers after the nose and socket meet strict dimensional criteria.  This is consistent with my experience in the GET industry, and is meant to ensure that equipment fits properly and functions

29

in the field as intended.  Second, Deere's engineering drawings confirm that all sizes and styles of its TK Series product line are intended to have the same nose and socket geometry. (DEERE_0004791.)  In other words, although different adapters come in different sizes and may attach to buckets in different ways (e.g., bolt vs. weld), the geometry of the nose on each adapter is the same.  (*Compare* DEERE_0004660, DEERE_0004542, DEERE_0004891, DEERE_0004548, DEERE_0004919, DEERE_0004725.)  Likewise, TK Series wear members come in different sizes and are sold with different point designs, but the socket geometry that mates with the nose of a corresponding TK Series adapter is common across point designs.  (*Compare* DEERE_0004723, DEERE_0004879, DEERE_0004669, DEERE_0004822, DEERE_0004494, DEERE_0004499.)  Finally, my review of gauging reports for the TK Series System products shows that Deere utilizes a sophisticated manufacturing quality control system to ensure that as-manufactured adapters and wear members are manufactured consistently and within tight tolerances of its design drawings.  (E.g., DEERE_0004832; DEERE_0004730.)

## VIII.   INFRINGEMENT OF THE ASSERTED CLAIMS

### A.      Direct Infringement

65.     It is my opinion that Deere directly infringes the asserted claims in the Asserted Patents by at least selling and offering to sell the TK Series Tooth products in the United States,[1] both literally and under the doctrine of equivalents.  My detailed direct infringement analysis for each asserted claim of the Asserted Patents is set forth in claim charts provided with this report.

---

[1]   DEERE_0015370 at 400 ("TK Adapters and teeth available to OEM Bucket manufacturers across US/CA")

DEERE EX. D
PAGE 58

DATED:  January 13, 2023                          _____

                                                  HEZEKIAH HOLLAND

DEERE EX. D
PAGE 59

# EXHIBIT E

DEERE EX. E

PAGE 60

ATTORNEYS' EYES ONLY

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ESCO GROUP LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 1:20-1679-RGA-MPT |
| | ) | |
| DEERE & COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**REBUTTAL EXPERT REPORT OF DR. RICHARD W. KLOPP, P.E., F.A.S.M.E.**

DEERE EX. E
PAGE 61

ATTORNEYS' EYES ONLY

## IV.    Holland's Methodology

34.    Mr. Holland relies on three-dimensional scans of single samples of three sizes of adapters and Fanggs™ teeth of the Accused Products. In my opinion, the conclusions he draws from the scans are fatally flawed for at least the following reasons:

(1) he relies on scans done without Deere's retention pin in place;

(2) the analysis allows for mating surfaces of the nose and socket to interpenetrate significantly, which is nonphysical;

(3) the longitudinal axis is defined circularly and in relation to nose planar surfaces and associated axes in a way that violates well-known precepts of Cartesian coordinate systems;

(4) he has failed to disclose fully and properly the methods of plane fitting and axis determination sufficiently to allow others to reproduce his results and test the reliability of his findings; and

(5) the methods he has disclosed appear to be arbitrary with respect to plane fitting and axis determination.

35.    The above issues render the following conclusions of Mr. Holland unreliable:

(1) "[t]he scans confirm that the three samples [of the Accused Products] constitute a butt fit design;"[3]

(2) the scans "confirmed that the socket profile matched the nose profile;"[4]

(3) "the gap analysis … showed generally uniform gaps between mating stabilizing surfaces;"[5]

---

[3]    Holland Opening Report, ¶63.
[4]    *Ibid.*
[5]    *Ibid.*

DEERE EX. E
PAGE 62

(4) "[u]nder vertical loading, the side surfaces of the adapter nose and wear member socket interacted and carried loads;"[6]

(5) the Accused Products include a longitudinal axis as used in the Asserted Claims; and

(6) the Accused Products contain features transverse to the longitudinal axis as used in the Asserted Claims.

36.   Mr. Holland used these conclusions to support his infringement opinions that the Accused Products infringe Claims 8, 9, 12, 13, 21, 22, 25, and 26 of the '662 Patent and Claims 4-6, 13-15, and 17-20 of the '175 Patent. These infringement opinions are flawed because the conclusions are flawed.

37.   First, Mr. Holland's opinions are flawed because he relies on scans and contact analysis done without the retention pin in place. Mr. Holland states:

> *During my inspection of the parts I found the pins could all be installed but, in some instances, the point remained very loose, and in other cases, the point movement was limited and not representative of the full range of point movement on the mating nose during actual loading in the field. Based on this finding I instructed that the scans be made with the point seated on the end of the nose, but the pin not installed to ensure that in the various loading orientations, the point was fully oriented to determine the location and extent of any mating stabilizing surface interactions. I found this approach was consistent with the instructions found in 34_BC-0034-3 in Mr. John Ruvang's field report.[7]*

38.   By omitting the pin, Mr. Holland has skewed his test results, altering the gap values and obtaining contact between the surfaces of the nose and socket where it would not exist if the pin were in place. At best, Mr. Holland has analyzed infringement for the case of excavation with the retention pins missing, which is unreasonable and contrary to the use of the claimed invention outlined in the claims of the Asserted Patents. It is nonsensical to

---

[6]   *Ibid.*
[7]   Holland Opening Report, ¶55.

2207813.000 - 3800

ATTORNEYS' EYES ONLY

suggest that removing the pin would create conditions "representative of the full range of point movement on the mating nose during actual loading in the field."[8] Mr. Holland's reliance on Mr. Ruvang's field report[9] is improper because it cannot be read to suggest that excavating without a pin—much less scanning without a pin—reflects a realistic use condition.

39.  Second, absent pin notwithstanding, Mr. Holland's and Mr. Panapa's scanning process fails to distinguish surfaces that merely contact each other from those that bear against each other and resist loads. Mr. Holland only attempted to assess mere contact between the surfaces of the nose and socket because he did not apply or simulate any forces approaching actual excavation working loads. Instead, Mr. Holland only tested the Accused Product by applying the self-weight of the tooth (Figure 4).



Figure 4.    Photographs showing that adapters and wear members of the Accused Products were loaded only by self-weight during scanning [IMG_1153 (left); IMG_1164 (right)].

---

[8]    *Ibid.*
[9]    34_BC-0034.

2207813.000 - 3800

ATTORNEYS' EYES ONLY

40.    Surfaces can make contact, but that does not mean they bear excavating loads. For example, if vertical downward excavating load is applied at the tip of the tooth while the assembly is horizontal, the opposed top stabilizing surfaces forward on the nose will bear against each other and resist load, as will the bottom stabilizing surfaces rearward on the nose. Mr. Holland's scanning summary images in Figures 15 and 16 in the "Deere 225 Scanning Report Holland 2022 01 12," which I have copied below as Figure 5, indicate as much.



Figure 5.    *"Heat map" showing closest distances between corresponding surfaces on a Deere TK225 assembly under vertical downward gravity loading.[10] The red zones on the top and bottom surfaces are consistent with zones that would bear and resist loads during excavation. That is not the case of the red zone on the right side, due to the definite gap on the left side. [Annotations added.]*

---

[10]    Deere 225 Scanning Report Holland 2022 01 12, p. 9.

2207813.000 - 3800

DEERE EX. E
PAGE 65

ATTORNEYS' EYES ONLY

41.     If the TK225 tooth is centered on the nose laterally, Mr. Panapa's own data (upon which Mr. Holland relies) shows that there would be clearance between the side stabilizing surfaces under vertical loads. While Mr. Panapa apparently allowed the wear member to skew toward the left to cause possible contact on the forward right side at the location indicated in Figure 5, the opposite side shows a gap of roughly 1.5 mm.[11] Mr. Holland's notes record that this skewing was not prevented.[12] Thus, if the wear member were skewed approximately 0.75 mm to the right, there would be an approximately 0.75-mm gap on both sides. There would be no contact on the side surfaces near the front end, and no evidence that the side surfaces would bear against each other to resist vertical loads. Even with the wear member skewed to the left as in Figure 5, there are gaps on both sides toward the rear, amounting to at least 0.25 mm on the right and 0.125 mm on the left.

42.     Mr. Panapa apparently did not skew the TK400 point right or left, as indicated by gaps that he reported on both sides of the assembly while under vertical loading from the wear member's self-weight. See Figure 6, which is a copy of Figures 15 and 16 in Mr. Panapa's "Deere 400 Scanning Report Holland 2022 01 12." Mr. Panapa's data indicate that he skewed the TK450 to the left because there is possible contact on the right and an approximately 2-mm gap on the left toward the front under vertical loading (Figure 7).

---

[11]   Mr. Holland states in reference to the three Scanning Reports, "[T]he gap analysis … showed generally uniform gaps between the mating stabilizing surfaces as found in figures 9-16." [Holland Opening Report, p. 26.] That statement obviously is false; the gaps are not at all uniform.
[12]   Deere Part Scanning Notes 2023 01 12, p. 2.

DEERE EX. E
PAGE 66

ATTORNEYS' EYES ONLY



Figure 6.    *"Heat map" showing closest distances between corresponding surfaces on a Deere TK400 assembly under vertical downward gravity loading.*[13] *The pink area represents interpenetration of socket and nose surfaces, which obviously is nonphysical and corrupts the other gap values. [Annotations added.]*

---

[13]   Deere 400 Scanning Report Holland 2022 01 12, p. 9.

2207813.000 - 3800

DEERE EX. E
PAGE 67

ATTORNEYS' EYES ONLY



*Figure 7.    "Heat map" showing closest distances between corresponding surfaces on a Deere TK450 assembly under vertical downward gravity loading.[14] [Annotations added.]*

43.    Mr. Holland's analysis reported the gap as the closest distance between two opposed surfaces. The closest distance is not the relevant distance controlling whether side gaps would close under loads that are not perpendicular to said surfaces. The closest distance generally would be the distance locally perpendicular to the surfaces, but the gap distance to be closed under vertical loading is the vertical distance, for example, which is much greater for a steeply inclined plane. Consider the case of planes inclined 20° from vertical, as is nominally the case for planes 4–7 for the TK450 measured by Mr. Panapa and reported in "Deere 450 Scanning Report Holland 2022 01 12" at page 4 (copied as Figure 8 below).

---

[14]    Deere 450 Scanning Report Holland 2022 01 12, p. 9.

2207813.000 - 3800

DEERE EX. E
PAGE 68

ATTORNEYS' EYES ONLY

The situation is shown schematically in Figure 9. The relevant gap is Mr. Holland's measured value multiplied by the cosecant of 20°, which is 2.92. Therefore, if, as is apparent from colorings in Figure 7, the space between the bottom rear mating surfaces and the upper rear side mating surfaces are similar, the relevant gap at the side surfaces under vertical loading is approximately 2.9 times larger than the gap at the bottom surfaces.



Figure 8.    *Data showing the angles of planes that Messrs. Holland and Panapa fitted to the TK450 scan data for the vertical downward loading scenario, showing that the side surfaces are oriented approximately 20° off of vertical.* [15]

---

[15]   Deere 450 Scanning Report Holland 2022 01 12, p. 4.

2207813.000 - 3800

DEERE EX. E
PAGE 69

ATTORNEYS' EYES ONLY



*Figure 9.    Mr. Holland's analysis ignores the fact that the steep incline of the side surfaces amplify the relevant gap under vertical loading by the cosecant of the angle from vertical. This schematic shows that, if the angle is 20°, the relevant gap is 2.92 times Mr. Holland's reported gap.*

44.    Even if a tooth is skewed left or right so that one of the angled side surfaces makes contact and vertical load is applied (as in Mr. Panapa's situations in TK225 and TK450 measurements), the contacting side surfaces would not bear against each other and resist load. The gap on the opposing side would prevent it. The steep incline is such that the contacting surfaces would slide past each other and any tendency for the sliding to affect the lateral skew would be accommodated by the open gap on the opposing side (Figure 10).

2207813.000 - 3800

DEERE EX. E
PAGE 70

ATTORNEYS' EYES ONLY



*Figure 10.   Schematic showing that, with gaps as measured by Mr. Panapa, even when the tooth is skewed on the nose, vertical loading merely causes the steeply angled surfaces to slide past each other. They cannot bear against each other to resist load. The horizontal stabilizing surfaces, not shown in the schematic, limit the vertical motion so that the left gap remains open.*

45.   Also apparent from Figure 8 is that Mr. Holland had characterized the angles of the surfaces he identifies according to the vectors normal (perpendicular) to those surfaces, i.e., the surface normal. This will be relevant to the discussion below regarding the claim term "transverse."

46.   Mr. Holland's "heat maps" for the top front TK400 (Figure 6) and bottom rear TK450 gaps (Figure 11) shows a pink zone in the middle of the red zone. According to Mr. Holland, pink represents negative gap, i.e., interpenetration of surfaces, by up to 1.000 mm. This is nonphysical and means all the other gap measurements are corrupted for this loading condition, which is for the TK450 assembly under vertical downward self-weight. Positive gaps adjacent to the interpenetrated areas are smaller than they would be in reality, and gaps on opposite sides are larger than they would be in reality.

DEERE EX. E
PAGE 71

ATTORNEYS' EYES ONLY



*Figure 11.   Mr. Holland has allowed the bottom rear socket and nose surfaces to interpenetrate, as indicated by the pink zone at the arrow on the right. This is not a physical possibility, and the error corrupts all the gap measurements on the TK450 assembly under a top load.*

47.   Mr. Holland provided his underlying scan data, and we can replot it to show more clearly the areas where he has allowed the surfaces of the nose and socket to interpenetrate contrary to physical reality. These are shown for the TK225, TK400, and TK450 assemblies in Figure 12, Figure 13, and Figure 14, respectively. The maximum interpenetration shown is 0.6 mm (0.024 in.), which is substantial and physically impossible.

23

DEERE EX. E
PAGE 72

ATTORNEYS' EYES ONLY



*Figure 12.   "Heat map" from Mr. Holland's data replotted on a scale showing only interpenetrated areas on the TK225 assembly (with the wear member hidden) under side load and without a pin.*



*Figure 13.   "Heat map" from Mr. Holland's data replotted on a scale showing only interpenetrated areas on the TK400 assembly (with the wear member hidden) under top load and without a pin.*

24

DEERE EX. E
PAGE 73

ATTORNEYS' EYES ONLY



Figure 14.  *"Heat map" from Mr. Holland's data replotted on a scale showing only interpenetrated areas on the TK450 assembly (with the wear member hidden) under thrust load and without a pin.*

48.   Surfaces with clearance between them cannot bear load. If the tooth is pushed to one side before substantial vertical load is applied, as Mr. Holland and Mr. Panapa have done, side surfaces may make contact but they cannot support substantial vertical load because of the unfavorable, nearly vertical orientation of the contacting surfaces, which would slide past each other.

49.   If the side surface gaps like those shown in Figure 9 were narrower in the vertical direction than the gaps between the top and bottom horizontal surfaces, then, under vertical loading, the side gaps would close before the horizontal gaps, and the side surfaces would bear load. This would be undesirable, ████████████████████████████████████████

████████████████████████████████████████████████████████████████

2207813.000 - 3800

DEERE EX. E
PAGE 74

ATTORNEYS' EYES ONLY

██████████████████████████████████[16] This likely explains why the Accused Products and ESCO's own Nemisys and GeoVor do not exhibit this behavior because the side gaps (in the vertical direction) are larger than the horizontal top and bottom surface gaps.

50.     Mr. Holland relies on his nose scans to fit various mathematical planes that he claims represent front thrust surfaces, front top and bottom stabilizing surfaces, and side stabilizing surfaces. He then defines nose vertical and horizontal mid-planes based on the fitted planes. His method is arbitrary and, as far as I can determine from the available disclosures, neither reproducible nor reliable.

51.     For example, Mr. Holland apparently selected the red points on the TK225 nose surface, shown in Figure 15, and then calculated the best-fit plane to the red points. Mr. Holland fails to disclose the fitting method, which could be a least-squares method as one possibility among many, any one of which could result in identification of a different fitted plane.

---

[16]    Ruvang Deposition Transcript, 83:16-84:2.

DEERE EX. E
PAGE 75

ATTORNEYS' EYES ONLY



*Figure 15.   Red dots indicate the points that Mr. Holland selected for plane fitting on the TK225 adapter nose. He has not disclosed why he chose so many more points over a significantly larger area on the bottom right surface than any other surface, nor has he disclosed his plane-fitting method.*

52.     However, it is even more egregious that Mr. Holland has not explained the rationale for choosing the points to fit. Based on views such as that shown in Figure 15, fitted areas varied greatly in size for no apparent reason, and fitted points were not uniformly distributed over the fit area; my experience with analyzing experimental data suggests that certain areas where points are clustered have more influence on the resultant choice of plane. It appears that the points are clustered in areas where the scanned surfaces have greater curvature—that is, they are less planar. Thus, it appears that Mr. Holland allowed less planar areas to more strongly influence the resultant choice of plane fitted to the data,

2207813.000 - 3800

DEERE EX. E
PAGE 76

ATTORNEYS' EYES ONLY

meaning that the fitted planes captured the non-planar features more than the planar features.

53.   Mr. Holland defines the longitudinal axis based on his scans of the adapter noses. His definition violates the precept that the axes in a Cartesian coordinate system, which is the type of coordinate system upon which his scanning data and its analysis is based, must be orthogonal—that is, at 90° to each other. In each scanning report, he locates an X-Y-Z coordinate system at the tip of the nose.[17] (Figure 16 below is a reproduction of Figure 4 from Mr. Holland's report.) He defines the Z axis as the normal to a best-fit mid-plane between the scanned top and bottom front bearing surfaces. He defines the X axis as the normal to the mid-plane between the best-fit side surface scans. These planes and axes are shown in each scanning report.[18]

---

[17]   Deere 225 [400, 450] Scanning Report Holland 2022 01 12, p. 2.
[18]   Deere 225 [400, 450] Scanning Report Holland 2022 01 12, p. 3.

2207813.000 - 3800

DEERE EX. E
PAGE 77

**ATTORNEYS' EYES ONLY**



Figure 4 – Display of the X, Y, Z planes with the adapter not shown.

*Figure 16. X-Y-Z planes and coordinate system shown in Mr. Holland's scanning report for the TK450 product. Similar figures are found in the reports for the TK225 and TK400 products. [19] The line at the intersection of the X and Z planes would be adequate to define the Y axis, but Mr. Holland has defined it as the normal to the fitted front plane.*

54.    To be consistent with a rectangular Cartesian coordinate system demanding that the X and

Z axes be perpendicular, Mr. Holland's axis-finding exercise must rely on an additional,

unstated constraint that the mid-plane between the sides is orthogonal (oriented at 90°) to

the mid-plane fitted between the top and bottom front bearing surfaces. Otherwise, the X

and Z axes would not necessarily be perpendicular. The outcome if no verticality constraint

is applied is illustrated schematically in Figure 17. Given the apparent arbitrariness of the

selection of red fitting points and their non-uniform distribution (Figure 15), there is a high

---

[19]    Deere 225 [400, 450] Scanning Report Holland 2022 01 12, p. 3.

2207813.000 - 3800

ATTORNEYS' EYES ONLY

degree of certainty that the allegedly vertical mid-plane between the fitted side planes would not in fact be vertical, so Mr. Holland very likely has somehow applied an unstated constraint to enforce verticality.



*Figure 17.   Schematic representation showing how a skewed vertical mid-plane would result from the apparently arbitrary set of points that Mr. Holland selected for fitting side planes (Figure 15). I have exaggerated the amount of skew for purposes of visualizing the issue. A longitudinal axis is obviously definable as the line at the intersection of the mid-planes.*

55.     Regardless of whether the X and Z axes are perpendicular, the X and Z fitted planes alone would be sufficient to define the longitudinal axis in a self-consistent manner as the line at the intersection of the two fitted mid-planes. This is the green line in Figure 17. However, Mr. Holland has not done this. Instead, he defines the Y axis, which he relies on as the longitudinal axis in his analysis, as "based on scanning the end of the nose to find the end plane."[20] There is no guarantee that a plane fitted to the flat on the end of the nose would be perpendicular to the other fitted planes unless there is another constraint that Mr. Holland has failed to disclose. If we take Mr. Holland at his word and he has defined

---

[20]   Deere 225 [400, 450] Scanning Report Holland 2022 01 12, p. 2.

2207813.000 - 3800

DEERE EX. E
PAGE 79

ATTORNEYS' EYES ONLY

the Y (longitudinal) axis as he states, then the Y axis is not necessarily perpendicular to the X and Z axes, which themselves are not necessarily perpendicular.

56.     If Mr. Holland did not apply undisclosed constraints to force his analysis to provide a proper Cartesian coordinate system, then his conclusion that the front thrust surface is transverse to the longitudinal axis is circular. This is because he used the surface to define a best-fit plane and its normal, and then effectively declared that the surface is transverse to its own normal.

57.     On the other hand, if Mr. Holland has applied undisclosed constraints enforcing perpendicularity, then he has failed to provide proper evidence that the front thrust surface is indeed perpendicular to the longitudinal axis, which logically is the line of intersection between the X and Z fitted mid-planes. Mr. Holland has not ruled out the possibility that the front thrust surface is significantly skewed with respect to the longitudinal axis, because it appears that he force-fit a best-fit plane with a constraint that it be perpendicular to the longitudinal axis defined from the X and Z axes. That is, Mr. Holland has not tested whether a front surface fit done without any constraints would indeed result in a plane that is transverse to the longitudinal axis.

## V.     Alleged Infringement

58.     It is my opinion, as explained below, that the Accused Products do not practice each and every limitation of any of the Asserted Claims of either of the Asserted Patents. Accordingly, the Accused Products do not infringe any of the Asserted Claims of the Asserted Patents.

59.     Furthermore, in my opinion, as explained below, Mr. Holland fails to demonstrate that the Accused Products practice each and every limitation of any Asserted Claim of the Asserted

2207813.000 - 3800

DEERE EX. E
PAGE 80

**ATTORNEYS' EYES ONLY**



Figure 30.   Compared to the Accused Products (top left, top right), the Rev A1 design (bottom left, bottom right)

### **Finite Element Analysis**

207.   As I explain in in the following, my FEA shows that expected stresses for the Rev A1 design are insubstantially different from those of the Accused Products under the same loading conditions.[86]

208.   To evaluate and compare the stresses in the nose and socket for the alternative Rev A1 design to the Accused Products, Exponent staff performed a finite element analysis under my direction and control for both designs under a series of loading conditions. FEA is a

---

[86]   Here, insubstantially different means that the stresses are such that function and performance would be substantially the same for the Accused Product and Rev A1 designs.

2207813.000 - 3800

**DEERE EX. E**
**PAGE 81**

ATTORNEYS' EYES ONLY

widely accepted engineering analysis method for numerically solving field problems.[87, 88] Using FEA, the structural response of a system, including deformation and stresses, can be calculated for a prescribed set of input conditions.

209.    For the analysis, all finite element ("FE") model inputs and applied loads were identical for the design of the Accused Products and the alternative Rev A1 design except for the geometry of the socket. The details of the model inputs are as follows:

(1) The model geometry was created directly from a 3-D computer-aided-design (CAD) model provided by Deere. Specifically, the model geometry included the adapter (with nose), tooth (with socket), pin, and a rubber block with lock pin that engages the main pin, as shown in Figure 31. The model geometry represents the nominal dimensions and does not account for tolerance variations that exist in actual cast components. Any normal tolerance variations in components of the Accused Products components would have substantially the same effect on the FEA results as normal tolerance variations in the non-infringing alternatives.

---

[87]   Stress is a field variable, for example.
[88]   Hughes, Thomas JR. The finite element method: linear static and dynamic finite element analysis. Courier Corporation, 2012.

2207813.000 - 3800

DEERE EX. E
PAGE 82

ATTORNEYS' EYES ONLY



*Figure 31.   The Deere TK model geometry with annotated adapter, tooth, pin, lock pin, and rubber block, with part numbers and lettering on external surfaces removed.*

(2) The components were meshed using quadratic tetrahedral elements (Abaqus C3D10) with a nominal element edge length in the nose and socket regions, and pin, of 0.08 to 0.10 inches. The Deere TK model comprised 396,000 elements, and the Rev A1 model comprised 382,000 elements. The FE meshes used in the analysis are depicted in Figure 32. As described below, it was demonstrated that this mesh size is sufficient for converged analysis results, meaning that results would not change materially if a finer, more detailed mesh were applied.

2207813.000 - 3800

DEERE EX. E
PAGE 83

ATTORNEYS' EYES ONLY



Figure 32.   *FE meshes used for the analysis. The same mesh was used for the adapter and pins in both models. The tooth mesh is shown for the Deere TK model (left) and the Rev A1 model (right).*

(3) All parts were modeled using a linear elastic material model. This assumption is

reasonable for the comparison of stresses under service conditions; it was not the

goal to model material failure or other permanent deformation. The adapter, tooth,

2207813.000 - 3800

DEERE EX. E
PAGE 84

ATTORNEYS' EYES ONLY

and pins were assigned typical properties of steel, having an elastic modulus of 29,000 ksi and Poisson ratio of 0.29; the rubber block was assigned properties representing a compliant rubber-like material, having an elastic modulus of 0.5 ksi and Poisson ratio of 0.45.

(4) Interactions between components were modeled using finite sliding surface-to-surface contact. For normal (perpendicular) behavior, hard contact was defined, meaning that no penetration was allowed between surfaces. For tangential behavior, the penalty friction formulation was defined using a friction coefficient of 0.4, which is appropriate for rough casting surfaces. The rubber block was numerically bonded into the cavity in the adapter in which it nests.

(5) The boundary conditions and series of loads analyzed—applied individually for a total of five load scenarios per design—are depicted in Figure 33. The portion of the adapter that is welded to the bucket (opposite the nose end) was fixed in all degrees of freedom. A 2000-lbf (1-ton) force was applied to the tip of the tooth (a) thrust toward the nose, (b) vertically downward, (c) vertically upward, and (d) horizontally; a 6000 in-lbf (e) torsional load about the longitudinal axis of the nose was also analyzed.

(6) Each FE model was solved using the implicit solver in commercially available FEA software Abaqus/Standard 2022.[89]

---

[89]   Dassault Systèmes Simulia Corporation.

DEERE EX. E
PAGE 85

ATTORNEYS' EYES ONLY



Figure 33.   *The Deere TK model geometry with annotated constraints at the rear of the adapter and five different loads applied to the tooth tip (individually).*

210.    As shown in Figure 34, Figure 35, and Figure 36, the Rev A1 design experiences similar distributions of stress around the socket and at the base of the nose at comparable stress magnitudes as the Accused Products under the aforementioned five conditions. Figure 37 shows that the Rev A1 design also experiences similar distributions of contact pressure at comparable contact pressure magnitudes as the Deere TK product. Given the fact that the cast parts would have substantially less-sharp features, in contrast to the sharp interior and exterior corners and edges reflected in the CAD models, it would be improper to focus attention on the highest-stress regions colored red in the figures. The stresses in those regions are magnified by the sharp features, which mechanical engineers call stress concentrations. The plots are more meaningfully compared by considering the green regions, which likely would be similar if the sharp features in the models were more rounded like on a casting. Regardless, none of the stress magnitudes are of a of concern for failure of hardened steel castings at issue here under 1-ton loading on a tooth.

2207813.000 - 3800

DEERE EX. E
PAGE 86

ATTORNEYS' EYES ONLY



Figure 34.   Von Mises stress contours shown on a cross section of the assembly for each load case, with the Deere TK model on the left and the Rev A1 model on the right.

97

DEERE EX. E
PAGE 87

ATTORNEYS' EYES ONLY



*Figure 35.   Von Mises stress contours in the adapter nose for each load case, with the Deere TK model on the left and the Rev A1 model on the right.*

2207813.000 - 3800

DEERE EX. E
PAGE 88

ATTORNEYS' EYES ONLY



Figure 36.   *Max principal stress contours in the socket for each load case, with the Deere TK model on the left and the Rev A1 model on the right. Max principal stress indicates regions of tensile stress.*

2207813.000 - 3800

DEERE EX. E
PAGE 89

ATTORNEYS' EYES ONLY



Figure 37.    Contact pressure between nose and socket, with the Deere TK model on the left and the Rev A1 model on the right.

100

DEERE EX. E
PAGE 90

ATTORNEYS' EYES ONLY

211.    To confirm that the FE mesh size was sufficient for converged analysis results, the Deere TK model was analyzed for one load case (vertically downward) using two mesh densities, coarse and fine, depicted in Figure 38, and results were compared. The first mesh was the one described above, with a nominal element edge length of 0.08 to 0.10 inches in the nose and socket regions and a total of 396,000 elements. The second mesh was coarser, with a nominal element edge length of 0.16 to 0.20 inches (twice as large as the first mesh) and a total of 140,000 elements. As shown in Figure 39 and Figure 40, the stress contours are highly similar for both mesh sizes, especially bending stresses in the nose (Figure 39) and tensile stresses in the socket (Figure 40) that were the primary stresses of concern in the analysis. While some difference in maximum contact stresses (Figure 41) in highly localized regions existed between the two mesh sizes, the overall maximum value at a point location is not relevant to the comparisons made in this analysis due to the sharp features in the models; furthermore, in reality, the localized peak contact stresses in physical cast parts would depend on tolerance variations and surface roughness, among other things. As such, the nominal magnitude of contact stresses sustained over the contacting surfaces was the focus of this analysis and was found to be substantially similar for both mesh sizes. Taken together, the substantially similar stress results for both mesh sizes demonstrates that the mesh size used is sufficiently fine and detailed for this analysis.

2207813.000 - 3800

DEERE EX. E
PAGE 91

ATTORNEYS' EYES ONLY



Element edge length ~0.08 to 0.10 inch          Element edge length ~0.16 to 0.20 inch

*Figure 38.   FE meshes for the adapter (top) and tooth (bottom) for two mesh densities analyzed for one case to assess sensitivity of results to mesh size.*



Element edge length ~0.08 to 0.10 inch          Element edge length ~0.16 to 0.20 inch

*Figure 39.   Von Mises stress contours for the Deere TK under vertically downward loading for two mesh densities.*

DEERE EX. E
PAGE 92

**ATTORNEYS' EYES ONLY**



Element edge length ~0.08 to 0.10 inch     Element edge length ~0.16 to 0.20 inch

*Figure 40.   Maximum principal stress contours for the Deere TK under vertically downward loading for two mesh densities.*



Element edge length ~0.08 to 0.10 inch     Element edge length ~0.16 to 0.20 inch

*Figure 41.   Contours of contact pressure between the nose and socket for the Deere TK under vertically downward loading for two mesh densities.*

## VII.   Conclusions

212.   For at least the reasons stated above, it is my opinion that the Accused Products do not infringe any of the Asserted Claims, either literally or under the doctrine of equivalents. I further opine that Mr. Holland failed to demonstrate that the Accused Products directly infringe any of the Asserted Claims, either literally or under the doctrine of equivalents, or that Deere induced or contributed to the direct infringement of any Asserted Claims. Finally, in my opinion, each of the non-infringing alternatives discussed above would have been technically acceptable to customers in lieu of the Accused Products.

2207813.000 - 3800

**DEERE EX. E**
**PAGE 93**

ATTORNEYS' EYES ONLY

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on February 8, 2023, at Menlo Park, California

Richard W. Klopp, Ph.D.

2207813.000 - 3800

DEERE EX. E
PAGE 94

# EXHIBIT F

DEERE EX. F
PAGE 95

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ESCO GROUP LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 1:20-1679-WCB |
| v. | ) | |
| | ) | |
| DEERE & COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**REPLY EXPERT REPORT OF HEZEKIAH HOLLAND
REGARDING INFRINGEMENT**

DATED: March 3, 2023

## IV.    APPLICABLE LEGAL PRINCIPLES

14.    I am not an attorney, and do not offer an opinion on the law.  I was informed of certain legal principles by counsel for ESCO for the purpose of my opening report report.  I continue to apply those principles in connection with my opinions in this report.

## V.    DR. KLOPP MISUNDERSTANDS THE SCANNING PERFORMED

15.    Dr. Klopp criticizes a portion of my opening report based on scans of the TK System.  According to Dr. Klopp, my analysis of these scans is "fatally flawed" for several reasons, each of which I respond to in detail below.  However, I note that Dr. Klopp's finite element analysis ("FEA") of the TK System imposes artificially low loads, loads that are an order of magnitude less than those actually experienced during excavation operations.   Specifically, Dr. Klopp's analysis imposes a load of one 1-ton of force, but realistic loads experienced during excavation are in the order of 20-tons of force.

16.    Dr. Klopp's specific criticisms of the scans performed of example teeth and adapters of the TK System are also incorrect.

17.    ***First***, Dr. Klopp contends that the scans of the TK System are flawed because they were performed without "Deere's retention pin in place." Klopp Rbt. ¶ 34.  Dr. Klopp states that "[b]y omitting the pin, Mr. Holland has skewed his test results, altering the gap values and obtaining contact between the surfaces of the

5

nose and socket where it would not exist if the pin were in place. At best, Mr. Holland has analyzed infringement for the case of excavation with the retention pins missing." *Id.* ¶ 38. Dr. Klopp characterizes "remov[al] [of] the pin" as "nonsensical," and argues that my "reliance on Mr. Ruvang's field report is improper ██████████████████████████████████████████████████████████████ ███████████████████████████████████████████ *Id.* Each of Dr. Klopp's statements here is incorrect.

18. As I detailed in my opening report, it is appropriate to remove a retaining pin when performing a fitment analysis or scanning. I did not rely on ██ ██████████████████████████████████████████, as Dr. Klopp suggests. It is my own experience as a POSITA that I relied upon, and an unlocked fitment more accurately reflects the contact between interfacing surfaces of a wear member and adapter during "realistic" excavation conditions. This is because it facilitates shifting of the mating parts to different orientations that are expected under difficult to replicate field conditions for a fit analysis conducted in the lab. Loads imposed during excavation are in the order of tens of thousands of pounds, and it is not possible to identify the shifting of a wear member on an adapter, and contact and load bearing between their interfacing surfaces, under such conditions during scanning unless a lock or retention pin is removed. Further, under tens of thousands of pounds of load, a pin does not completely resist the movement of a wear member

DEERE EX. F
PAGE 98

on an adapter, which is another reason that the standard methodology is to remove a pin during scanning. Dr. Klopp's statement that such would not "reflect[] a realistic use condition" is simply incorrect, and a POSITA would understand that removing a pin or lock actually provides more accurate fitment analysis.

19.     Further, Dr. Klopp is mistaken in stating that I have somehow "alter[ed] the gap values and obtain[ed] contact between the surfaces of the nose and socket where it would not exist if the pin were in place." Again, removing the pin for scanning more accurately reflects contact during loading conditions because this allows for representative movement of a wear member on an adapter that occurs under digging loads of tens of thousands of pounds. Essentially, Dr. Klopp demands an analysis for an unrealistic condition, analyzing "gap values" and "contact" where *no* load is imposed (other than the weight of the wear member).

20.     Dr. Klopp's opinion that the scans are somehow inaccurate due to the TK System's lock or pin being omitted during scanning is simply incorrect. A POSITA would understand that my analysis is more reliable because the pin or lock was omitted during scanning.

21.     ***Second***, Dr. Klopp argues that my analysis is flawed because "Mr. Holland's and Mr. Panapa's scanning process fails to distinguish surfaces that merely contact each other from those that bear against each other and resist loads." Klopp Rbt. ¶ 39. Dr. Klopp takes issue with the fact that the scanning "d[oes] not

7

apply or simulate any forces approaching actual excavation working loads," *id.*, and writes that "[s]urfaces can make contact, but that does not mean they bear excavating loads.  For example, if vertical downward excavating load is applied at the tip of the tooth while the assembly is horizonal, the opposed top stabilizing surfaces forward on the nose will bear against each other and resist load," *id.* ¶ 40.  Dr. Klopp's opinions here are also incorrect.

22.   It is not possible for scanning to "apply or simulate any forces approaching actual excavation working loads," a fact which is confirmed by the testimony of John Ruvang, the designer of the TK System.  Specifically, Mr. Ruvang testified ███████████████████████████████████████████████

████████████████████████████████████████████████████

██████████  Ruvang Tr. at 156:3–8.  I agree, and Dr. Klopp's criticism of not applying tens of thousands of pounds of load during scanning is misplaced.

23.   Further, it is true that a "vertical downward load" would cause "oppos[ing] top stabilizing surfaces" of an adapter and a wear member's socket to "bear against each other and resist load." Klopp Rbt. ¶ 40.  But I do not understand how that helps Dr. Klopp's opinion that my analysis is somehow flawed.  In fact, it shows that my analysis is correct.  Take, for example, Dr. Klopp's "vertical downward load" condition.  Under such loading, non-parallel surfaces in the TK System relative to the vertical load are designed to bear the load imposed.  In the TK

DEERE EX. F
PAGE 100

System, those surfaces are the top stabilizing surface and the side stabilizing surfaces on each side of the adapter in the front end; opposing reaction forces are correspondingly borne by the side stabilizing surfaces and the bottom stabilizing surface in the rear of the adapter.  This is shown in the heat maps from the scans performed on as-manufactured TK parts and is consistent with every document Deere and Black Cat produced concerning the function of the TK System.

24.    I further note that Dr. Klopp captions and annotates "Figure 5" with inaccurate statements.  Dr. Klopp there admits that "red zones on the top and bottom surfaces are consistent with zones that would bear and resist loads during excavation," but argues "[t]hat is not the case of the red zone on the right side, due to the definite gap on the left side." Klopp Reb., Fig. 5.  I do not understand any basis for distinguishing "red zones" as both showing areas that would resist loads *and* also areas that would not resist loads, and Dr. Klopp has not provided any apparent explanation for his belief on this point.

25.    Dr. Klopp also identifies so-called "possible contact" and "definite gap" areas in his annotated figure. Klopp Reb. Fig. 5.  Dr. Klopp is mistaken that there is simply "possible" contact shown and "definite gap[s]" shown in the scans. The scans of the TK System definitively show contact at surfaces that would be load bearing during excavation, and there is no "definite" gap in any area identified by Dr. Klopp.  In regions that Dr. Klopp identifies as having a "definite gap," the scans

9

simply show gaps of approximately one millimeter in an unloaded condition, and Dr. Klopp fails to appreciate that those gaps would close under tens of thousands of pounds of loading imposed on a wear member and adapter.  Additionally, those gaps would also be filled with fines and other materials introduced when excavating in the field.  If anything, it is Dr. Klopp's opinion that does not consider conditions "approaching actual excavation working loads."  Klopp Rbt. ¶ 39.

26.   ***Third***, Dr. Klopp suggests that scanning of the TK System is inaccurate because "Mr. Panapa apparently allowed the wear member to skew toward the left to cause possible contact on the forward right side at the location indicated in Figure 5" and that my "notes record that this skewing was not prevented." Klopp Rbt. ¶ 41; *see also id.* ¶ 42.  Based on these assumptions, Dr. Klopp writes, "[t]here would be no contact on the side surfaces near the front end, and no evidence that the side surfaces would bear against each other to resist vertical loads" because "there would be an approximately 0.75-mm gap on both sides" if "skewing" were prevented. *Id.* Each of Dr. Klopp's statements are incorrect.  Neither I nor Mr. Panapa "skew[ed]" the TK System's wear members in any manner, and nothing from my notes indicates that "skewing" was ignored, as Dr. Klopp claims.  Rather, as I detailed in my opening report, wear members were fitted on to their respective adapters with the wear members seated on the end of the nose.  *See* Holland Op. Report, ¶ 55.  Fitment or "skewing," as Dr. Klopp calls it, between mating surfaces shown in scanning is thus

DEERE EX. F
PAGE 102

a function of as-manufactured tolerances and/or the resolution of scanning.  And more importantly, the gaps between the side features of the TK System that Dr. Klopp states show no load bearing functionality (e.g., a "0.75-mm gap" or "2-mm gap") would close to contact and "resist vertical loads" under normal excavation loading (i.e., tens of thousands of pounds).  Dr. Klopp here misrepresents the scanning conditions and methodology used, but these misrepresentations are immaterial in any event because the supposed gaps Dr. Klopp identifies would not materially impact which surfaces bear loads under normal excavation operations.

27.    ***Fourth***, Dr. Klopp criticizes my analysis by stating that "Mr. Holland's analysis reported the gap as the closest distance between two opposed surfaces.  The closest distance is not the relevant distance controlling whether side gaps would close under loads that are not perpendicular to said surfaces." Klopp Reb. ¶ 43.  Dr. Klopp continues by stating that "[t]he closest distance generally would be the distance local perpendicular to the surfaces, but the gap distance to be closed under vertical loading is the vertical distance, for example, which is much greater for a steeply inclined plane." *Id.*  Dr. Klopp opinion is incorrect.

28.    As I mentioned in my opening report, past industry practice was to form latex molds of the gaps between a wear member and adapter, and to determine gaps based on measuring those molds.  Holland Op. Report, ¶ 57.  These molds do not simply measure "vertical gaps," as Dr. Klopp believes is "controlling."  In fact, Mr.

DEERE EX. F
PAGE 103

Ruvang testified  Ruvang Tr. at 154:22–155:11. As with latex molds, gauging does not measure "vertical gaps," as Dr. Klopp believes is relevant. Instead, g

*See* Ruvang Tr. at 155:1–17 (

).

29.     There is a reason that industry practice is to measure gaps between two opposed surfaces at "the closest distance" for a given orientation of a wear assembly. Wear assemblies experience a variety of load conditions and understanding the "closest distance" gaps of surfaces over several orientations of the wear assemblies allows a POSITA to understand what surfaces would bear loads for a given load condition, not to mention that during digging operation those gaps are typically filled with fines that eliminate all gaps. Essentially, Dr. Klopp incorrectly suggests that the "vertical distance" of a gap is all that matters in understanding what load bearing is provided in a wear assembly. Dr. Klopp's opinion fails to appreciate that industry-standard gap analysis considers the closest distance between two opposing surfaces

12

for several orientations, and a POSITA would understand which surfaces would bear loads under normal excavation operations based on such analysis.

30.     Dr. Klopp's misunderstanding of gap analysis leads him to the belief that "contacting side surfaces would not bear against each other and resist load" because a "gap on the opposing side" of a wear assembly would cause surfaces to "merely slide past each other." Klopp Reb. ¶ 44, Fig. 10; *see also id.* ¶ 48. But inclined, contacting surfaces do not simply "slide past each other," particularly given that as-manufactured, cast wear parts are not perfectly smooth.  And in the TK System, any supposed, marginal amount of sliding that occurs under large loads is stopped by either the top or bottom stabilizing surfaces (i.e., for the "vertical load" assumed by Dr. Klopp; *see id.*, Fig. 10).  Once the top or bottom stabilizing surfaces engage, both the top or bottom *and* side stabilizing surfaces would bear vertical loads.  It is not the case that side stabilizing surfaces would have *no* load bearing function under vertical loads, as Dr. Klopp assumes.

31.     In fact, Dr. Klopp's belief that the side surfaces of the TK System would not bear loads and would merely "slide past each other" is ████████████████ ████████████████.  When Mr. Ruvang was asked ████████████████ ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████

13

███████████████████████████████ Ruvang Tr. at 86:6–87:21. So ██████████

██████████████████████████████ as Dr. Klopp assumes. Klopp

Rbt., Fig. 10.  Instead, the surfaces ████████████████████████████████

████████████████████████

32.    Dr. Klopp further attempts to support his belief that the side surfaces of the TK System do not bear loads by identifying an irrelevant scenario.  Specifically, Dr. Klopp writes that if "side surfaces gaps … were narrower in the vertical direction than gaps between the top and bottom horizontal surfaces, then, under vertical loading, the side gaps would close before the horizontal gaps."  Klopp Reb. ¶ 49. Dr. Klopp opines that this "would be undesirable" and "potentially break[] the socket," which is supposedly "why the Accused Products and ESCO's own Nemisys and GeoVor do not exhibit this behavior because the side gaps (in the vertical direction) are larger than the horizontal top and bottom surface gaps." *Id.*  However, the evidence does not suggest that "side surface gaps" are "narrower in the vertical direction" than "gaps between the top and bottom horizontal surfaces" so as to lead to undesirable breakage, as Dr. Klopp writes.  To the contrary, the scans of the TK System show that top and bottom stabilizing surface gaps are approximately ***equal*** to gaps on the side stabilizing surfaces.  Further, the scans show that the variance between these two types of gaps is generally less than a millimeter, a distance that would certainly close during loading, thereby resulting in vertical loads (for

14

example) be carried by ***both*** the top and bottom stabilizing surfaces ***and*** the side stabilizing surfaces.

33.     Separately, as it relates to ESCO's GeoVor and Nemisys systems, I am unaware of any analysis performed by Dr. Klopp of those systems.  I see no basis for Dr. Klopp's opinion relating to the gaps or fitments of ESCO's products.

34.     Perhaps the most important evidence contradicting Dr. Klopp's opinions concerning the functionality of the TK System are numerous Deere and Black Cat documents ███████████████████████████████████████████ ██████████████████████████m, documents which I cite throughout my opening report. *See* Holland Op. Report, Appx. A–B.  It is surprising that Dr. Klopp would criticize my analysis and repeatedly opine that the side stabilizing surfaces of the TK System do not bear loads when his opinion is disproven ███████████████ ██████████████████████.  In fact, I see nothing in Dr. Klopp's report attempting to explain ████████████████████████████████████████████████████ ██████████████████████████.

35.     ***Fifth***, Dr. Klopp faults my reliance on several aspects of Mr. Panapa's 3D scans, including his planar and gap analysis.  To start, it is common in the industry for engineers of wear parts to rely on the expertise of scanning and dimensional specialists like Mr. Panapa.  In working with Mr. Panapa, I confirmed with him that the methods he used to scan the subject components and create the

DEERE EX. F
PAGE 107

planar and gap analysis was consistent with industry standards and sound engineering principles.  I understand that Mr. Panapa is separately submitting a reply report to address Dr. Klopp's criticisms regarding the methodology underlying his planar and gap analysis.

## VI.   THE TK SYSTEM INFRINGES THE ASSERTED CLAIMS

36.     Dr. Klopp opines that the TK System does not infringe the Asserted Claims, either directly or indirectly.  I disagree with Dr. Klopp's opinions.

37.     Before addressing the limitations of the Asserted Claims, Dr. Klopp writes that my report fails to show that Deere induces others to infringe the Asserted Claims based on my "opinion seem[ing] to suggest that Mr. Holland has knowledge of Deere's state of mind." Klopp Reb. ¶ 60.  According to Dr. Klopp, my opinion also "seems to be a legal opinion rather than an engineering opinion, and is, therefore, in my view, outside his expertise and the purview of a technical expert." *Id.*  Dr. Klopp is mistaken, and I, as a POSITA, do not believe that it is within Dr. Klopp's technical purview to determine what is a "legal opinion" and what relates to "Deere's state of mind."

38.     Nevertheless, as I noted in my opening report, Deere has admitted that it was aware of the '662 Patent since at least December 20, 2020 and the '175 Patent since at least April 7, 2021.  Further, Deere has continued to sell components of the TK System while providing instructions to its customers of how to infringe the

16

## IX.   COMPENSATION AND PRIOR TESTIMONY

104.   I am being compensated for my work as an expert with respect to this litigation at my customary hourly rate of $295/hr.   My compensation is not contingent and does not depend upon the content of my opinions or the outcome of this case.

105.   I have not testified as an expert at trial or by deposition in the previous four years.


DATED:  March 3, 2023

_____

HEZEKIAH HOLLAND

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ESCO GROUP LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 1:20-cv-01679-RGA |
| v. | ) | |
| | ) | |
| DEERE & COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**Reply Report of Tiso Panapa**

**A.    Introduction**

1.      I have reviewed the February 8, 2023 rebuttal report of Richard Klopp, which was submitted on behalf of Deere & Company.  In the report, Dr. Klopp criticized several aspects of the 3D scanning undertaken in this case, including the gap and planar analyses I created.  As explained below, I disagree with Dr. Klopp's opinions. Dr. Klopp's criticisms are not well founded, and I note that he did not perform any of his own scanning.

2.      My qualifications and CV are provided with my initial expert report, and I incorporate those by reference here.

**B.    Planar Analysis**

3.      Dr. Klopp had several criticisms of the planar analysis I created.  For example, Dr. Klopp stated that I "fail[ed] to disclose the fitting method, which could be a least-squares method as one possibility among many, any one of which could result in identification of a different fitted plain."  Klopp Rpt. ¶ 51.  He also criticized the planar analysis because it appeared to him that "less planar areas [] more strongly influence the resultant choice of plane fitted to the data, meaning that the fitted planes captured the non-planar features more than the planar features."  Id. ¶ 52.  I disagree with Dr. Klopp's criticisms.   The planar analysis in question was performed consistent with industry standards and sound engineering principles.  In doing the analysis, I used industry standard software tools that I routinely use as part of my daily responsibilities as the Team Lead, Dimensional Gaging Engineering.[1]

---

[1] I also note that Dr. Klopp could have conducted the same analysis I performed to confirm my results, but did not.  For example, with my initial report I provided to Deere the raw scan files I utilized to calculate the best-fit planes.  Dr. Klopp, like me, could have used those scans to calculate



## D.    Gap Analysis

Dr. Klopp refers to "skewing" the TK450 data to the left in his ¶ 42, specifically noting that there are different gap values and possible contact points compared to the TK400.  To start, I did not "skew" any products during the scanning process.  Different pieces and samples will naturally vary depending on manufacturing process controls, and some parts, even of the same part size, will have variation in their gaps.  These unavoidable deviations caused by the manufacturing process results in pieces that fit together in ways that cannot be accounted for by their nominal designs.  For example, the TK 450 was not skewed, and any asymmetry noted by Dr. Klopp is the result of the manufacturing process.  In fact, it was noted that there was a large defect to the front of the nose on the positive X side (see where color map turns to grey because the gap is beyond the color scale).

9

DEERE EX. G
PAGE 112



Figure 7 - TK450 in top load, front view. Note manufacturing defect on left front side of this view.

13. Dr. Klopp also pointed out several examples of localized "interpenetration" that he claims is physically "impossible" in the real world, and he highlighted several examples. Dr. Klopp's criticism is misplaced, and fails to recognize that the tools utilized to create a gap analysis cannot perfectly re-create the as-manufactured product; instead, those tools seek to re-create components in digital form so that they can be analyzed. In doing so, the final digital scan file will not perfectly match the real world product. This is well understood in the industry.

14. For example, in the type of analysis conducted here, some amount of "interpenetration" is expected, due to the expectation of real world contact where clearance would be "0.00mm" and combined with physical limitations on scanner accuracy (sub .002" or ~0.050mm). Moreover, when combining two to three mating scans, the scanner accuracy limitations compound and can result in reported intersectionality of 0.005" (or about 0.127mm) from scanner accuracy limitations alone. This amounts to approximately the thickness of a human hair.

15. The various clearance colormaps produced in this case typically show minimum gaps ranging from +0.111mm (not "interpenetration") to -0.163mm (slight "interpenetration"). As discussed above, those values are generally within the error band to be expected when scanning these types of components. Dr. Klopp points out three examples, however, where there was additional, localized "interpenetration." But the presence of this "interpenetration" in those scans does not alter the validity of the gap analysis. For example, based on my years of experience and industry standards it is common when utilizing Polyworks software and Romer scanning tools to create a gap analysis where there is overlap between components, and sometimes there is localized overlap between components that exceeds the scanner accuracy limitations of approximately 0.127mm. The presence

10

DEERE EX. G
PAGE 113

of such localized areas of overlap does not reduce the validity of an overall scan or its usefulness in drawing engineering conclusions.

16.    To demonstrate that Dr. Klopp's criticisms were misplaced, I reanalyzed the two largest examples of "interpenetration" to show that such "interpenetration" had no material impact on the analysis that was conducted here (the TK400 top load with ~0.6mm intersectionality and TK225 side load no pin with ~0.4mm intersectionality). The assembly scan data that were used to align the mating parts together was carefully reviewed for any scan noise; having found some between mating parts, this data was removed. Next the fitting algorithm to fit the nose adapter to the assembly scan and the mating point scan to the assembly scan had its parameters iteratively fine-tuned to further reduce the ability of any scan noise that was not found (subsampling was changed from default 1/4 to 100%, fitting max distance reduced from default 4.0mm to 0.2 or 0.25mm, max angle reduced from default 45degrees to 20degrees). In the below figures the results show the original alignment colormap and this new refined alignment colormap. It can be seen that the "interpenetration" was removed and that the resulting colormaps provide the same material results: the points of contact and gaps are consistent between both colormaps.



Figure 8 - Top view of TK400 top load clearance showing original (left) and refined (right) alignment to remove intersectionality.

11

DEERE EX. G
PAGE 114



Figure 9 - Bottom view of TK400 top load clearance showing original (left) and refined (right) alignment to remove intersectionality.



Figure 10 - Top view of TK225 side load no pin- clearance showing original (left) and refined (right) alignment to remove intersectionality.



Figure 11 - Bottom view of TK225 side load no pin- clearance showing original (left) and refined (right) alignment to remove intersectionality.

DEERE EX. G
PAGE 115

**EXECUTED ON MARCH 3, 2023.**

**TISO PANAPA**

13

DEERE EX. G
PAGE 116

# EXHIBIT H

DEERE EX. H
PAGE 117



# Investigative Report

## ESCO Group v. Deere & Company
ESi Matter #: 95889



430 Technology Parkway NW
Peachtree Corners, GA 30092

# Investigative Report

## ESCO Group v. Deere & Company
ESi Matter #: 95889

**Report Prepared For**

Kirkland & Ellis
300 N. La Salle Street
Chicago, IL  60654

**Submitted by:**

Pierce Umberger, Ph.D., P.E.
Senior Managing Consultant/Director
GA P.E. | Expires: December 31, 2023

March 3, 2023

Date

This report and its contents are the Work Product of Engineering Systems Inc. (ESi).  This report should only be duplicated or distributed in its entirety.  This report may contain confidential or court protected information; please contact an authorized entity prior to distributing. Conclusions reached and opinions offered in this report are based upon the data and information available to ESi at the time of this report, and may be subject to revision after the date of publication, as additional information or data becomes available.

Copyright ESi © 2023 - All Rights Reserved

**Phone: 678-990-3280** | **Fax: 678-990-3285** | **Toll Free: 866-596-3994**
www.engsys.com



**ESCO Group v. Deere & Company**
ESi Matter #: 95889

## Analysis and Discussion

### TK350 3D Model Measurements

ESi was asked to evaluate the nominal gaps between the nose and the point of the TK350 assembly model that Exponent's Dr. Klopp used in his FEA. The model was imported into SolidWorks and the gaps between the top walls, side walls, and upper corner were measured at four different transverse planes along the length of the nose. These measurements are shown in Figure 4 - Figure 7. As the nose and point geometry is symmetric top-to-bottom and left-to-right in the measured sections of the model, the measured top wall gap represents the gap at both the top wall and bottom wall. Likewise, the measured side wall gap is indicative of the gap between all four sides walls.

ESi also examined the angles of the top and bottom bearing surfaces on the front end and rear end of the nose relative to the longitudinal axis of the nose. As shown in Figure 8 - Figure 9, the bearing surfaces were 4.0° off parallel from the longitudinal axis of the nose. Measurements taken of the mating bearing surfaces of the point socket, shown in Figure 10 and Figure 11, indicate these bearing surfaces were also 4.0° off parallel with the longitudinal axis of the nose. Similarly, angle measurements of the left and right side stabilizing surfaces of the nose and point indicate an angle of 3.0° off parallel with the axis of the nose, as shown in Figure 12 and Figure 13, respectively.



**Figure 4. Gap measurements between nose and point – front end.**

DEERE EX. H
PAGE 120



ESCO Group v. Deere & Company
ESi Matter #: 95889



**Figure 5. Gap measurements between nose and point – front end.**



**Figure 6. Gap measurements between nose and point – rear end.**

DEERE EX. H
PAGE 121



**ESCO Group v. Deere & Company**
ESi Matter #: 95889



**Figure 7. Gap measurements between nose and point – rear end.**



**Figure 8. Angle of front bearing surfaces of nose relative to longitudinal axis.**

DEERE EX. H
PAGE 122



ESCO Group v. Deere & Company
ESi Matter #: 95889

## Analysis of Exponent's FEA

ESi received analysis files[7] related to FEA discussed in Dr. Richard Klopp's rebuttal report.[8] Dr. Klopp analyzed five separate loading scenarios on both the Deere TK geometry and the "non-infringing alternative" "Rev A1" geometry using Abaqus, a FEA software developed by Dassault Systèmes. Dr. Klopp's Figure 32 is repeated here as Figure 14 for context on the geometries analyzed. The individual loading scenarios included a 2000 lbf load applied to the tip of the tooth as, "(a) thrust toward the nose, (b) vertically downward, (c) vertically upward, and (d) horizontally" and a torsional (twisting) load at the tip of the tooth of 6000 in-lbf.[9] No combined loading conditions were analyzed. Material properties were linear elastic, effectively simulating components with infinite material strength, rather than allowing plastic deformation of regions experiencing stresses in excess of the material strength.

## General Comments

The loading conditions chosen by Dr. Klopp are significantly less severe than the loading conditions expected in actual service. By way of example, the perpendicular tip load that could reportedly be experienced by the tooth during use is in excess of 40,000 lbf; over 20x the 2000 lbf load used by Dr. Klopp in his analysis.[10,11,12] As a result, the analyses do not deform and stress the components significantly relative to actual service limits. This means that load redistributions that might occur as the assembly deforms during normal use are not captured by the models. In addition, a number of load cases have regions with stresses approaching and exceeding the materials' elastic limit (i.e. yield strength). When a material begins to yield, it will redistribute load to the surrounding material. This phenomenon is also not captured in the FEA models.

Dr. Klopp states, "none of the stress magnitudes are of a concern for failure of hardened steel castings at issue here under 1-ton loading on a tooth."[13] In light of the fact that applied loads may be nearly 20x the load applied by Dr. Klopp and, as a result, stresses will exceed material yield, assessment of stress levels at a 2000 lbf load is not a meaningful evaluation of the behavior of the assembly throughout the design envelope.

While Dr. Klopp dismisses areas of high stress as being solely related to "sharp features, which mechanical engineers call stress concentrations,"[14] review of the FEA results show this is clearly not the case. In many instances there are high stress regions well removed from any stress concentrations, as typified in Figure 15 for the Rev A1 geometry with a vertically downward (Neg Y) load. Therefore, it is not appropriate to exclusively consider the "green regions"[15] in order to assess the expected performance in the field. There are also clear differences in load path and stress distributions between the two geometries for a given load type. As a result, areas of high

---

[7] ESi received .CAE, .INP, and .ODB files for review
[8] Rebuttal Expert Report of Dr. Richard W. Klopp, P.E., F.A.S.M.E., executed February 8, 2023, p. 91-103
[9] Rebuttal Expert Report of Dr. Richard W. Klopp, P.E., F.A.S.M.E., executed February 8, 2023, p. 95
[10] John Deere TK350C125 Bucket Tooth Adapter, TK350 Series Product Page
[11] John Deere TK350C125B: TK Tooth Adapter Product Page
[12] John Deere K-Series 655K / 755K Crawler Loaders Product Info & Specifications
[13] Rebuttal Expert Report of Dr. Richard W. Klopp, P.E., F.A.S.M.E., executed February 8, 2023, p. 96
[14] Rebuttal Expert Report of Dr. Richard W. Klopp, P.E., F.A.S.M.E., executed February 8, 2023, p. 96
[15] Rebuttal Expert Report of Dr. Richard W. Klopp, P.E., F.A.S.M.E., executed February 8, 2023, p. 96

DEERE EX. H
PAGE 123



stress would need to be assessed against design expectations and performance metrics in order to determine if the revised design would exhibit similar performance in service.

## Model Details

Review of the FEA modeling indicates that the tip load is applied to the tooth via a single point at the center of the tooth tip. This point is mathematically joined to the end-radius of the tooth via a kinematic coupling constraint, effectively distributing the load across the entire tip of the tooth. Loading for each of the five load cases is applied through this point. For the vertical and lateral load cases, a displacement constraint is also placed on this single point in addition to the applied load. The displacement boundary condition is in the direction 90° to the load (e.g. a lateral constraint when a vertical load is applied and a vertical constraint when a lateral load is applied) and is set to zero, prohibiting any movement of the tooth tip in the constrained direction. This translation constraint artificially prohibits the tooth from both translating and, because it is mathematically applied to the entire tip, rotating. Both of these restrictions to motion of the tooth are unrealistic and artificial.

While a loading approach consisting of an individual load in a single direction is not an unreasonable way to explore the reaction of the assembly to various load types, service loads will not match these simplified single-direction loadings. It should be noted that the axis of the nose is inclined at an angle of 10° relative to the coordinate system used in Dr. Klopp's analysis, and as a result, his loads are applied at an angle relative to the nose axis, as shown in Figure 16. Additionally, service loads are unlikely to be perfectly centered and evenly distributed. In addition, loads are likely going to be imparted on the tooth in a combined fashion (for instance, a combined vertical and transverse load applied with a twisting component). This means the overall stress state in the assembly will be some superposition of the individual load cases analyzed by Dr. Klopp. This could significantly amplify the stress in a given area. It may also shift the tooth on the base, altering clearance between components and resulting in different component positions and contact conditions than those analyzed by Dr. Klopp.

The modeling approach used by Dr. Klopp utilized a feature called contact stabilization in Abaqus to assist in resolving the contact between the various components. Contact stabilization adds artificial damping to the solution. When using this feature, "it is important to verify that the presence of contact stabilization does not significantly alter the physics of the problem."[16] This is done by comparing the energy dissipation due to stabilization to the internal energy in the components (in this case, strain energy). The dissipation energy should be small relative to the strain energy, as outlined in documentation published by the software developer. The models produced by Dr. Klopp do not meet this criterion. In some cases, the stabilization energy is over 1100% of the strain energy, as shown in Figure 17.

Notwithstanding the discussion above, Dr. Klopp's analysis demonstrates substantive differences between the response of the Deere TK and the Rev A1 designs as shown in Figure 34 of his report, shown as an excerpt in Figure 18 and Figure 19.

---

[16] Dassault Systèmes SIMULIA User Assistance 2022, "Postprocessing"

DEERE EX. H
PAGE 124



**ESCO Group v. Deere & Company**
ESi Matter #: 95889



**Figure 14. Dr. Klopp's Figure 32 showing the general geometries analyzed with FEA.**

**DEERE EX. H
PAGE 125**



ESCO Group v. Deere & Company
ESi Matter #: 95889



**Figure 15. Regions of high stress in BlackCat-RevA1-v3-NegY-S2S-r1 not associated with "sharp features."**



**Figure 16. Inclination of nose axis (orange) relative to FEA coordinate system orientation (red).**

DEERE EX. H
PAGE 126



ESCO Group v. Deere & Company
ESi Matter #: 95889



**Figure 17. Comparison of strain energy and artificial stabilization energy.**

DEERE EX. H
PAGE 127



ESCO Group v. Deere & Company
ESi Matter #: 95889



**Figure 18. Load path variations between Deere TK and Rev A1 designs.[17]**



**Figure 19. Load path variations between Deere TK and Rev A1 designs.[18]**

---

[17] Excerpt from Rebuttal Expert Report of Dr. Richard W. Klopp, P.E., F.A.S.M.E., executed February 8, 2023
[18] Images taken from .ODB files produced by Exponent.

DEERE EX. H
PAGE 128



**ESCO Group v. Deere & Company**
ESi Matter #: 95889

## Conclusions

The following conclusions are based on the analysis to date, as well as on prior education, training, testing, analysis, and experience.

1. Analysis of TK350 model geometry indicates that clearances exist between the top walls, bottom walls, side walls, and corners of the nose and point in a nominal centered and unloaded configuration.

2. Analysis of TK350 model geometry indicates that the angles of the top and bottom bearing surfaces of the nose relative to the longitudinal axis are within 4.0° of the longitudinal axis of the nose.

3. Analysis of TK350 model geometry indicates that the angles of mating bearing surfaces of the point socket are within 4.0° of the longitudinal axis of the nose.

4. Analysis of TK350 model geometry indicates that the angles of the left and right side stabilizing surfaces are within 3.0° of the longitudinal axis of the nose.

5. Finite element analysis performed by Dr. Klopp exhibits multiple inconsistencies with reality, including:

   a. Applied loads much lower than potential service loads.

   b. Linear elastic material properties incapable of fully capturing the response of materials under applied loads.

   c. Constraints and boundary conditions inconsistent with expected service conditions.

   d. Large fictional stabilization energy dissipation inconsistent with reality.

6. The finite element analysis performed by Dr. Klopp does not have sufficient fidelity to properly assess differences in expected service performance between the Deere TK and the Rev A1 design. The analysis, as performed, shows substantive differences in the response of the two designs to the simplified loads applied in the analysis.

ESi reserves the right to supplement or amend these findings and conclusions if additional information becomes available or based upon additional work or analysis in this matter.

⧗ **End of Report Text** ⧗

## **Appendices:**

Appendix A: CV of Author

Appendix B: Testimony History of Author

Appendix C: Materials Reviewed

DEERE EX. H
PAGE 129

# EXHIBIT I

# Clearance Evaluation on TK Teeth

E*x*

DEERE EX. I
PAGE 131

# Orientation 1



DEERE EX. I
PAGE 132

# Method



- Load was applied alternately in the vertical and horizontal directions while pressing the tooth rearward to take out axial clearance.
- A dial Indicator was used to measure the movement, if any, as shown in the pictures.
  - 3 measurements were taken at each location. The average movement is listed in the following slides.



Fully Constrained

Dial Indicator



Vertical

Dial Indicator Placed at the Tip



Dial Indicator Placed at the Tip

Horizontal

# Small



## Without pin

| Tk Small | Measurement | |
|---|---|---|
| Vertical | 1 | |
| | 2 | |
| | 3 | |
| | 1 | |
| | 2 | |
| Horizontal - At tip | 3 | |

## With pin

| Tk Small | Measurement | |
|---|---|---|
| Vertical | 1 | |
| | 2 | |
| | 3 | |
| | 1 | |
| | 2 | |
| Horizontal - At tip | 3 | |

DEERE EX. I
PAGE 134

# Medium



### Without pin

| Tk Medium | Measurement | |
|---|---|---|
| Vertical | 1 | |
| | 2 | |
| | 3 | |
| | 1 | |
| | 2 | |
| Horizontal - At tip | 3 | |

### With pin

| Tk Medium | Measurement | |
|---|---|---|
| Vertical | 1 | |
| | 2 | |
| | 3 | |
| | 1 | |
| | 2 | |
| Horizontal - At tip | 3 | |

DEERE EX. I
PAGE 135

# Large



## Without pin

| Tk Large | Measurement | |
|---|---|---|
| | 1 | |
| | 2 | |
| Vertical | 3 | |
| | 1 | |
| | 2 | |
| Horizontal - At tip | 3 | |

## With pin

| Tk Large | Measurement | |
|---|---|---|
| | 1 | |
| | 2 | |
| Vertical | 3 | |
| | 1 | |
| | 2 | |
| Horizontal - At tip | 3 | |

DEERE EX. I
PAGE 136

# Orientation 2



DEERE EX. I
PAGE 137

# Method



- Load was applied alternately in the vertical and horizontal directions while pressing the tooth rearward to take out axial clearance.
- A dial Indicator was used to measure the movement, if any, as shown in the pictures.
  - 3 measurements were taken at each location. The average movement is listed in the following slides.



Dial Indicator

Fully Constrained

Vertical



Dial Indicator Placed at the Tip

Horizontal

DEERE EX. I
PAGE 138

# Small



### Without pin

| Tk Small | Measurement |
|---|---|
| Vertical | 1 |
| | 2 |
| | 3 |
| Horizontal - At tip | 1 |
| | 2 |
| | 3 |

### With pin

| Tk Small | Measurement |
|---|---|
| Vertical | 1 |
| | 2 |
| | 3 |
| Horizontal - At tip | 1 |
| | 2 |
| | 3 |

DEERE EX. I
PAGE 139

# Medium



## Without pin

| Tk Medium | Measurement | |
|---|---|---|
| Vertical | 1 | |
| | 2 | |
| | 3 | |
| Horizontal - At tip | 1 | |
| | 2 | |
| | 3 | |

## With pin

| Tk Medium | Measurement | |
|---|---|---|
| Vertical | 1 | |
| | 2 | |
| | 3 | |
| Horizontal - At tip | 1 | |
| | 2 | |
| | 3 | |

**DEERE EX. I**
**PAGE 140**

# Large



<u>Without pin</u>

| Tk Large | Measurement | |
|---|---|---|
| Vertical | 1 | |
| | 2 | |
| | 3 | |
| Horizontal - At tip | 1 | |
| | 2 | |
| | 3 | |

<u>With pin</u>

| Tk Large | Measurement | |
|---|---|---|
| Vertical | 1 | |
| | 2 | |
| | 3 | |
| Horizontal - At tip | 1 | |
| | 2 | |
| | 3 | |

**DEERE EX. I
PAGE 141**

# EXHIBIT J

DEERE EX. J
PAGE 142

```
                                           Page 1

 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF DELAWARE
 2
                           - - - - -
 3
 4        ESCO Group LLP,                    )
                                             )
 5                     Plaintiff,            )
                                             ) Case No.
 6          vs.                              ) 20-1679-WCB-MPT
                                             )
 7        Deere & Company,                   )
                                             )
 8                     Defendant.            )
 9                         - - - - -
10                 Videotaped Deposition of:
                   HEZEKIAH R. HOLLAND, III
11                 Appearing Remotely from
                      Anchorage, Alaska
12
13
14                    March 8, 2023
                      12:04 p.m. EST
15
16
17
18
19
20         Reporter:  Kristin Wegryn, RMR, CRR
                   Appearing Remotely from
21                    Lorain County, Ohio
22
23
24
25
```

**DEERE EX. J**
**PAGE 143**

Page 172

```
1        who did and testing evaluation methods that are
2        informed from my experience that would be
3        indicative of what would happen in the field.
4              But I'd love to -- love to have a set of
5        these parts and go out and do some digging myself
6        and run into some multiple parts to have some
7        more information, but I'm betting somebody out
8        there has already got that information we could
9        ask to bring into this discussion, but I don't
10       have it.
11       Q.    So getting back to my question, though.
12             The only testing that you relied on in
13       forming your opinion on infringement in this case
14       that replicates excavation conditions is
15       Mr. Ruvang's testing; is that correct?
16             MR. ALOSH:  Same objection.
17             THE WITNESS:  Sorry, Tareq.
18       A.    No, it's not correct.
19       Q.    What other testing did you rely on that
20       replicates excavation conditions?
21       A.    I can repeat what I just went through
22       again if you'd like.
23       Q.    Just name one.
24             MR. ALOSH:  Same objection.
25       A.    The work I did in scanning was orienting
```

Page 173

```
 1          the parts in a way that I know are representing
 2          different load conditions.  The FEA analysis was
 3          intended to provide a way of modeling
 4          analytically a load applied to the parts.  So
 5          those are two examples.
 6                  And, again, how I did the physical
 7          inspection and how I did -- instructed Panapa to
 8          do the scanning inspection were informed by my
 9          time in the field that has been -- you know, I've
10          been all over the world playing with these parts
11          and I use that knowledge and judgment in what I'm
12          doing in the evaluation of what we were doing.
13          So all that was informed by field-related work.
14      Q.    But you did not do any FEA analysis,
15          Mr. Holland.
16                  MR. ALOSH:  Is that a question?
17      Q.    So how could you rely on FEA analysis to
18          replicate excavation conditions?
19                  MR. ALOSH:  Object to the form.
20      A.    You know, I was -- I agree that the FEA
21          by itself was not a complete resource to rely on,
22          although I found it useful.
23                  Mr. Klopp's analysis that I was able to
24          review provided me some of his thinking and
25          there's some sound work that was done in there.
```

Page 174

1      There's also some areas that he overlooked in

2      there in terms of he applied the load at the

3      wrong angle for how this type of analysis would

4      be done.  It's not a huge problem, but it's -- it

5      was -- he kind of hurt himself by putting the

6      load at the angle that he did.  It should have

7      been rotated a bit.

8              The friction factor is in there, some

9      stabilization, the low value that he used in that

10     was all things that, you know, I think kind of

11     limited how much you could draw from that.  But

12     that being said, it was helpful.

13             And, you know, my understanding,

14     Mr. Umberger was able to use the input files to

15     replicate that and to confirm that the results

16     that Dr. Klopp provided, you know, we could

17     replicate and see that.  And I found that the

18     part was deforming under the load, the strain

19     created from the load in a way that helped inform

20     me on how it would be operating in a field

21     condition, given that load.

22             The contact points were helpful and I

23     thought it particularly helpful to understand

24     with that model what would happen in the field in

25     terms of the alternative A that lost the

1       capability of thrust service and how that would

2       create a new interaction that I anticipated but

3       with the FEA model was able to see more clearly.

4               So those -- that FEA was certainly one

5       that I had access to both Dr. Klopp's work on

6       that to review and the work that was replicated

7       by Dr. Umberger and the information I saw there.

8               MR. ALOSH:  Paul, if this is a good

9       natural break point.  We've been going about an

10      hour.  I don't mean to interrupt your line.

11              MR. LINDEN:  Yeah, I just have to ask a

12      few more questions here before we break.

13              MR. ALOSH:  Sure.

14      Q.      Yes or no, Mr. Holland:  Did you do any

15      of your own field testing to evaluate the

16      TK-Series here?

17              MR. ALOSH:  Object to form.

18      A.      You remind me of the political lightning

19      rounds where you get yes-or-no questions to

20      nuanced challenges here.

21              No, I did not do any direct field

22      testing, you know, but I qualify that because I

23      did go to where I could see these parts and I

24      could physically inspect them.

25      Q.      You did not -- yes or no:  You did not

DEERE EX. J

PAGE 147

Page 176

1         conduct your own FEA analysis of the TK-Series

2         tooth?

3                   MR. ALOSH:  Same objection.  Form.

4              A.    Correct, I did not.

5              Q.    Yes or no:  You criticized Dr. Klopp's

6         FEA analysis because it did not apply loads seen

7         in excavating operations?

8              A.    Yes, that's correct, I did criticize

9         that method, some of his analysis.

10             Q.    Yes or no:  You criticized his FEA

11        analysis because it applied loads much lower than

12        what is seen in excavating operations?

13             A.    Yes.

14             Q.    Yes or no:  Your fitment analysis

15        applied only nominal loads?

16                  MR. ALOSH:  Object to form.

17             A.    Yes.

18             Q.    Yes or no:  Your fitment analysis did

19        not have the pin in when you conducted the test?

20             A.    The pin was in for my initial physical

21        inspection of the parts, and out, when I did --

22        well, Panapa and Griffin, when they did the

23        scanning inspection, you're correct, yes, the pin

24        was not installed for the scanning portion of

25        that work.  There were two things I did there.

DEERE EX. J

PAGE 148

# EXHIBIT K

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF DELAWARE

 3

 4

 5

      ESCO GROUP, LLC,                    )

 6                                        )

              PLAINTIFF,                   )

 7                                        )

              VS.                         ) CASE NO.

 8                                        ) 20-1679-RGA-JLH

      DEERE & COMPANY,                    )

 9                                        )

              DEFENDANTS.                 )

10      _____)

11

12

13       ***HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER***

14

15              REMOTE PROCEEDINGS OF THE

16            VIDEOTAPED EXPERT DEPOSITION OF

17          RICHARD KLOPP, Ph.D., P.E., F.A.S.M.E.

18              THURSDAY, MARCH 9, 2023

19

20

21

22

23      JOB NO.  5803958

        REPORTED BY KIMBERLY EDELEN,

24      CSR. NO. 9042, CRR, RPR.

25      PAGES 1 - 264
```

**DEERE EX. K**

**PAGE 150**

Page 76

1      Q    Did you have any conversation -- well,
2  okay.
3           So, first of all, putting aside Deere's
4  counsel, did you have any conversations with Deere
5  employees for purposes of this case?
6      A    No.
7      Q    Did you have any discussions with Black Cat
8  employees for purposes of this case?
9      A    Yes.
10     Q    Who did you speak to?
11     A    Mr. Ruvang.
12     Q    When did you speak to Mr. Ruvang?
13     A    I think it was before the first report, but
14 I don't recall exactly.
15     Q    Would it have been in 2023 or last year?
16     A    I'm pretty sure 2023.
17     Q    How many times did you speak to Mr. Ruvang?
18     A    I think it was either one or two.  I really
19 don't remember.
20     Q    Do you recall about how long you spoke to
21 him?
22     A    My guess would be in the -- you know, 15
23 minutes at the very, very most.
24     Q    So you spoke to Mr. Ruvang at most for 15
25 minutes for purposes of your report, correct?

Page 77

1     A    I think that's correct, yeah.  It's fair.

2     Q    What did you and Mr. Ruvang talk about?

3     A    I'm trying to think.

4          We -- well, we were -- I really don't

5     remember much of anything.  I don't remember -- I

6     think we -- most of it had to do with the

7     availability of samples to look at and the

8     availability of, you know, what -- what would we get

9     in terms of CAD models to be able to analyze.

10    Q    So just to recap, when you spoke to

11    Mr. Ruvang, based on your recollection, you

12    primarily spoke about the availability of samples

13    and obtaining a CAD model; is that accurate?

14    A    Well, put a plural on CAD models, but I

15    think that's reasonably accurate.

16    Q    What did Mr. Ruvang say?  Was he able to

17    provide those items?

18    A    Yes.

19    Q    Did he provide those items?

20    A    Well, either he or -- or colleagues, I

21    guess.  We did have a -- and I recall we had a

22    shipping mixup where somehow we ended up with a box

23    of juggling clubs instead of a box of wear

24    assemblies.

25    Q    A box of what?

Page 78

1      A    I think they were juggling clubs.  You
2  know, they were sort of like miniature baseball
3  bats.
4          And there -- I'm trying to remember.  There
5  might have been a phone call associated with
6  straightening that out and -- and saying, "Well,
7  wait, what is this?"
8      Q    Well, someone was either very
9  disappointed --
10     A    Yeah, we got it straightened out.
11         I'm sorry.
12     Q    Yeah, I would say someone was very
13  disappointed they didn't get their juggling bats
14  or --
15     A    They were.
16     Q    -- things I'm not aware of.
17     A    I got a text from somebody that said, "Hey,
18  you know that box of juggling bats, can" -- "can you
19  send that to us."
20     Q    Do you have any notes from your
21  conversation with Mr. Ruvang?
22     A    No.
23     Q    What -- so turning to the samples that --
24  the availability of samples that you discussed with
25  Mr. Ruvang, did you request certain samples?

Page 79

1     A     Yes.

2     Q     What did you request?

3     A     Well, TK wear assemblies.  And then he -- I
believe Mr. Ruvang brought up that they had 3D
printed models, and so we asked for those.

6           I'm trying to think what else.

7           And then, of course, the -- we asked for --
for whatever CAD models they could provide of both
the original and the -- the non-infringing
alternatives.

11    Q     When did you receive -- so, okay, just take
that in turn.

13          So it sounds like you requested samples of
the as-manufactured TK parts, correct?

15    A     Correct.

16    Q     3D printed models of the TK products,
correct?

18    A     Correct.

19    Q     And CAD models of the TK system, correct?

20    A     And -- and the -- the NIAs, yes.

21    Q     Turning to the TK samples, when did you
receive samples of the as-manufactured TK parts?

23    A     So those came in after the juggling club
mixup.  I'm trying to think.  I guess they came in
after the rebuttal and before the reply, I think.

DEERE EX. K
PAGE 154

Page 80

1   We did have a -- we did receive one tooth that was a

2   NIA tooth fairly early on.

3       Q    So the tooth you would have received

4   beforehand, that's the sample of the A1, I think

5   that's referenced in your rebuttal report?

6       A    That sounds right.

7       Q    As to the 3D printed models, when did those

8   arrive to your office?

9       A    My recollection is those were fairly early,

10  but I don't remember exactly.  It must have been

11  after opener and before rebuttal, I think.

12      Q    And then the CAD models, when did you

13  receive those?

14      A    Those came in in -- in dribs and drabs, I

15  believe, before -- just before the rebuttal.

16      Q    So the TK samples, the 3D printed models

17  and the CAD models, fair to say that those came to

18  you in 2023?

19      A    Yes.

20      Q    And that at least for the as-manufactured

21  TK parts, those came after the rebuttal report,

22  correct?

23      A    I think that's right, yes, because of that

24  juggling club fiasco with shipping.

25      Q    Was there anything that you requested from

Page 81

1   Mr. Ruvang that you were not able to obtain?

2       A    I don't -- I don't think so.  Yeah, I mean,

3   I think that we might have asked at some point for

4   some -- some kind of testing data on the Rev NIAs,

5   and I guess at least, you know, that would have been

6   similar to some of the lab testing data he

7   provided -- he -- I think it's in maybe Exhibit 50,

8   I want to say, in his deposition.  And I don't think

9   that he had something analogous.

10      Q    When you talked to Mr. Ruvang, you

11  requested testing data regarding the A1 redesign but

12  he was unable to provide that; is that correct?

13      A    I believe that's correct.

14      Q    And I think I asked this already.  Do you

15  have any notes from that conversation?

16      A    No.

17      Q    I'd like to switch gears here and now talk

18  a little bit about your infringement-related

19  opinions, so primarily your rebuttal report.

20      A    All right.

21      Q    So if you can pull that up, I think that's

22  Exhibit 2.

23           And, Dr. Klopp, before you joined, John

24  mentioned we might be doing lunch.  For you, I think

25  that's -- is it 11:00 your time right now?

Page 121

1                    REMOTE PROCEEDINGS

2            THURSDAY, MARCH 9, 2023; 12:37 P.M. PST

3

4

5            RICHARD KLOPP, Ph.D., P.E., F.A.S.M.E.,

6     having been previously duly sworn by the reporter, was

7            examined and testified further as follows:

8

9            THE VIDEOGRAPHER:  Okay.  We're back on the

10    record.  The time is 12:37 p.m., and this is the

11    start of Media Unit No. 5.

12

13                    EXAMINATION (resumed.)

14    BY MR. ROUX:

15

16

17

18

19

20

21

22

23

24

25

Page 122

11      Q    All right.  If I could direct your

12  attention to your rebuttal report again.  I want to

13  talk about the FEA analysis.

14           So please go to Page 91, Paragraph 207.

15      A    Okay.

16      Q    And in Paragraph 207, you state that "my

17  FEA shows that expected stresses for the Rev A1

18  design are insubstantially different from those of

19  the Accused Products under the same loading

20  conditions."

21           Do you see that?

22      A    Yes.  And so -- but make sure you capture

23  the footnote there, "insubstantially different means

24  that the stresses are such that function and

25  performance would not be" -- "would be substantially

Page 123

1   the same for the Accused Product and the Rev A1

2   designs."

3       Q    Okay.  So you're one step ahead of me.

4            My next question:  What do you mean by the

5   term "function and performance would be

6   substantially the same"?

7       A    The -- basically that you wouldn't see any

8   substantial difference in terms of the things I

9   talked about previously, like nose fracture, like

10  socket splitting, and when you consider that you're

11  dealing with, you know, rounded castings and not

12  perfectly sharp corners like in the CAD, in terms of

13  contact stresses as they either cause local yielding

14  or accelerated wear internal.

15      Q    So you used the word "substantially" here,

16  correct?

17      A    That's right.

18      Q    What do you mean by the term

19  "substantially"?

20      A    Well, the substance of "substantially" is

21  that there would -- any -- any differences would be

22  insubstantial.  I mean, the -- you know, you really

23  wouldn't notice that -- that -- it wouldn't cause --

24  I -- I see nothing to suggest in the FEA where the

25  customers would experience noses breaking off,

DEERE EX. K

PAGE 159

Page 124

1   sockets splitting or sockets wearing out any more so

2   than the originals.

3       Q    I take it that when you wrote "function and

4   performance would be substantially the same," you

5   understood what the term "substantially" meant,

6   correct?

7       A    Well, I think I just explained what it

8   meant.  But, yes, I understood what I wrote.

9       Q    Is there any sort of numerical range

10  associated with your use of the term "substantially"

11  here?

12              MR. BENNETT:  Objection.  Form.

13              THE WITNESS:  No.  No.  Not really, no.

14  BY MR. ROUX:

15      Q    Is there an outer limit of what constitutes

16  "substantially the same"?

17              MR. BENNETT:  Objection.  Form.

18              THE WITNESS:  It's a little bit of you'll

19  know it when you see it.

20              So if I saw high stresses at the root of

21  the nose in the Rev A1 and not in the original, then

22  I would say -- you know, especially if they were a

23  factor higher, then I might say, hey, there's

24  something -- there's substance here to higher

25  stresses and maybe the Rev A1 isn't -- isn't so hot.

Page 125

1          Likewise, if I saw massive differences in

2     the contact stresses that -- you know, bearing in

3     mind you have to -- you cannot focus on the red

4     spots in these things.  And I explain that in my

5     report, because these are rounded castings and the

6     CAD is not rounded.

7          If you saw massive differences in -- in

8     kind of regions of contact stresses, you would say,

9     wait a minute, there's a substantial difference here

10    in terms of potential wear performance.  You don't

11    see that.

12         So that, on top of the recognition that the

13    nose is identical, tells you that there shouldn't be

14    a substantial difference.

15    BY MR. ROUX:

16    Q    When determining whether the function and

17    performance would be substantially the same between

18    the accused product and the Rev A1 redesign, is it a

19    judgment call?

20    A    Well --

21         MR. BENNETT:  Objection.  Form.

22         THE WITNESS:  I mean, everything here from,

23    you know, what -- a PHOSITA will use their judgment.

24    I use my engineering judgment.  They would use their

25    engineering judgment.  So there's engineering

Page 126

1   judgment throughout any engineering, frankly.

2   BY MR. ROUX:

3       Q    Other than this FEA -- well, excuse me.

4            Other than the FEA here in your report, are

5   you relying on any other analysis or testing to

6   support your opinion that the A1 redesign is a

7   non-infringing alternative?

8       A    Well --

9            MR. BENNETT:  Objection.  Form.

10           THE WITNESS:  So the -- the answer is yes.

11  I mean, the finite element analysis doesn't do any

12  infringement analysis, so that's a separate piece.

13  BY MR. ROUX:

14      Q    Fair point.

15           Let me ask a narrower question.

16           Other than the FEA, are you relying on any

17  other analysis or testing to support your opinion

18  that the A1 redesign is an acceptable non-infringing

19  alternative?

20      A    Well, I think I've already alluded to this,

21  that it's more than the FEA.  It's engineering

22  judgment with the knowledge that the nose is exactly

23  the same, the pocket is substantially the same,

24  especially under vertical loading.  And -- and so --

25  you know, it's more than -- it's engineering -- you

Page 127

1    know, engineering -- educated engineering judgment.

2           You know, a PHOSITA could look at that and

3    say, okay, under vertical loading, same parts are

4    contacting, the same substantially parallel surfaces

5    are likely to be contacting, so the response

6    shouldn't be much different.

7       Q    I'm just trying to understand if there's

8    any other testing we need to talk about that you're

9    relying on to support the acceptability of the A1

10   redesign.

11      A    I suppose a little bit.  The -- the

12   redesigned tooth that we got, you know, comes on and

13   off the adapter identical to the original.  So in

14   terms of, you know, user handling and installing the

15   lock, it's the same thing.

16      Q    Okay.  So the testing that you're relying

17   on to support the acceptability of the A1 redesign

18   is the FEA analysis and your personal inspection of

19   putting the tooth on and off; is that accurate?

20      A    Not -- not completely.

21      Q    What additional testing?

22      A    Well, it's just the engineering analysis

23   and engineering judgment, so based on both

24   observation of the design and the CAD, as well as,

25   you know, hand manipulation of the parts, as well as

Page 128

1    the finite element analysis.

2           I mean, that -- it's all of that stuff.

3    It's not limited.  You -- I don't want you to limit

4    it to say the FEA and hand manipulation, period.

5    That's --

6       Q    Yeah, it's not a trick -- it's not a trick

7    question.  We're not trying to exclude -- yeah.  I

8    mean, I'm just trying to understand if there's any

9    testing I need to ask you about other than FEA, your

10   manipulation.

11          Did you do any other testing?  I understand

12   you did analysis, but did you do any actual testing

13   regarding the acceptability analysis?

14      A    I guess not.  You know, not formal testing.

15      Q    Are you relying on the FEA for any purpose

16   other than your non-infringing alternative opinions?

17      A    I don't think so.

18      Q    Prior to this case, have you ever conducted

19   an FEA on a wear assembly for excavation equipment?

20      A    Well, ███████████████████████, and

21   that involved massive amounts of FEA.  I believe in

22   some cases, including the teeth, but I really don't

23   recall at this point.

24      Q    As you sit here today, do you recall prior

25   to this case having ever conducted a FEA on a wear

Page 129

1    assembly for excavation equipment?

2        A    Well, not -- not like we did for -- for the

3    Rev A1.  I'll put it that way.

4        Q    All right.  Can you take a look at

5    Paragraph 209 on the next page, please.  I'm looking

6    at Subparagraph 1.

7        A    Okay.

8        Q    And you say that "The model geometry was

9    created directly from a 3-D computer-aided-design

10   model provided by Deere."

11            Do you see that?

12       A    Yes.

13       Q    Is that the CAD model that Mr. Ruvang

14   provided to you?

15       A    Yes.

16       Q    Do you know the size of the TK product

17   represented by the 3D CAD model you listed in your

18   FEA?

19       A    I'd have to go back and probably look at

20   file names.  I don't have it off the top of my head.

21       Q    Does the TK 350 sound familiar?

22       A    It does.

23       Q    In Paragraph 209(1), you state "The model

24   geometry represents the nominal dimensions and does

25   not account for tolerance variations that exist in

Page 130

1    actual cast components."

2           Do you see that?

3       A    Yes.

4       Q    Did you review any engineering drawing to

5    confirm that the CAD model in your FEA represented

6    nominal dimensions?

7       A    Well, no.  I accept that the CAD model is

8    the -- the nominal and that -- you know, actually,

9    the drawings, most likely -- at least in modern

10   engineering practice, the drawings would be derived

11   from the CAD model, so the CAD model would be

12   considered the master.

13      Q    Did anyone tell you, including Mr. Ruvang,

14   whether or not the CAD model you used represented

15   nominal dimensions?

16      A    Not directly.

17      Q    Did you ask anyone whether or not the CAD

18   model represented nominal dimensions?

19      A    I accepted that the CAD model was

20   representative of the actual parts, which no reason

21   not to expect that.

22      Q    In the last sentence of Paragraph 1, you

23   state "Any normal tolerance variations in components

24   of the Accused Products components would have

25   substantially the same effect on the FEA results as

DEERE EX. K

PAGE 166

Page 131

1    nominal tolerance variations in the non-infringing

2    alternatives."

3            Do you see that?

4       A    Yes.

5            MR. BENNETT:  Objection.  Form.

6    BY MR. ROUX:

7       Q    What do you mean by that statement?

8       A    So real castings will differ from the CAD

9    models.  There's no doubt about that.  And -- but

10   you would expect the original real castings to

11   differ from their CAD model just as much as the

12   Rev A1 real castings to differ from their CAD

13   models.

14           And, in addition, I fully expect that the

15   Rev A1 CAD model was generated from the original CAD

16   model.  So, you know, in my mind, in all likely --

17   in a reasonable degree of engineering certainty,

18   these things are, you know, the same apart from the

19   geometry tweaks in the pocket.  And any variations

20   in real castings would be substantially similar

21   between the two versions.

22      Q    Are you aware of the manufacturing

23   tolerances for the TK products?

24      A    I'm aware that drawings that I think are

25   Ruvang exhibits or -- or figures in Holland's

Page 132

1    reports have tolerances.

2             Now, you know, how those -- whether there

3    are versions of those drawings as compared to what

4    we're looking at here on the page, I couldn't tell

5    you.  As you know, drawings get updated and have

6    versions, and nobody has tracked that through, as

7    far as I know.

8        Q    So in drafting and preparing your reports

9    for this case, you did not review documentation

10   regarding tolerances for the TK products, correct?

11       A    That's not correct.  I did look at the

12   tolerances on some of the drawings that I just

13   mentioned, either Ruvang exhibits or Holland report

14   figures.  And the tolerances are consistent with

15   castings.

16            In other words, they're pretty wide,

17   because it's hard to -- to make a casting more than,

18   you know, maybe -- you know, at very, very best,

19   plus or minus five-thousandths or something like

20   that on a feature.

21       Q    Yeah.

22            So what is a typical casting, in your

23   opinion, for products like the TK product?

24            MR. BENNETT:  Objection to form.

25   \\\

Page 133

1   BY MR. ROUX:

2       Q    Yeah, I think I misspoke.  So strike that.

3            Dr. Klopp, what is a typical tolerance for

4   a product like the TK product in your experience?

5            MR. BENNETT:  Objection.  Form.

6            THE WITNESS:  It depends on what feature

7   you're talking about.

8   BY MR. ROUX:

9       Q    What about the adapter?

10           MR. BENNETT:  Objection.  Form.

11           THE WITNESS:  Again, what feature on the

12   adapter?

13   BY MR. ROUX:

14      Q    Other than reviewing the couple documents

15   in Mr. Ruvang's deposition and in Mr. Holland's

16   report, did you attempt to investigate what the

17   manufacturing tolerances were for the TK products?

18      A    I have an understanding of what foundry

19   cast tolerances can be and -- and what they

20   typically are.

21           So -- I mean, I didn't do a tolerance

22   stack-up analysis or something like that for any of

23   these products.

24      Q    So you did not do a tolerance stack-up

25   comparison for any of the products in this case,

Page 134

1    correct?

2        A    Yeah.  I mean, in my mind, not necessary,

3    and I didn't.

4        Q    In your view, is it important to understand

5    manufacturing tolerances to conduct an FEA?

6              MR. BENNETT:  Objection.  Form.

7              THE WITNESS:  It highly depends.

8    BY MR. ROUX:

9        Q    What does it depend on?

10       A    It depends.  I'm just trying to think about

11   a hypothetical.

12             I mean, if you have a failure because

13   something didn't fit correctly, then -- and you

14   wanted to do finite element analysis, then a

15   tolerance analysis would be perhaps pretty

16   important.

17             Here, we're just -- we're looking at

18   interfaces between cast parts that, first of all,

19   have to fit together.  You know, you can't have a

20   nose that's bigger than the pocket, so we know

21   there's always going to be a gap or it wouldn't be a

22   workable product.

23             The gaps might be bigger, the gaps might be

24   smaller by tolerances.  But that's almost as much as

25   you need to know.  I mean, you do know -- you at

Page 135

1    least hope that nobody makes a nose that's a half

2    inch too thin or something like that.

3            But, otherwise, just based on the knowledge

4    that these are cast products and they have to fit

5    together, you kind of have a good feel for what kind

6    of tolerances matter and whether it's worth digging

7    into them in a finite element analysis.

8            And it -- it's not.

9       Q    So is your feel for the tolerances on these

10   types of products sufficient for the FEA analysis

11   here?

12           MR. BENNETT:  Objection.  Form.

13           THE WITNESS:  Yes.  Within the objective --

14   overall objective of figuring out whether there's

15   red flags in the non-infringing alternative, that --

16   that is correct.

17   BY MR. ROUX:

18      Q    But, as you sit here today, you don't know

19   what the tolerance band is for the TK 350 product,

20   do you?

21      A    Well, we can pull up the drawing and look,

22   and it's -- as I recall, it's typical of a cast

23   product, so it's pretty wide.  And it's also a range

24   such -- such that you can put the tooth on the

25   adapter and not have any where you have to

Page 136

1    selectively fit teeth to fat adapters, for example.

2        Q    That wasn't quite my question.  Maybe I can

3    restate it.

4            It's fair to say you did not review the

5    tolerance documentation for the TK 350 before

6    running your FEA analysis; is that accurate?

7            MR. BENNETT:  Objection.  Form.

8            THE WITNESS:  I might have actually looked

9    at those tolerances before running the FEA.

10   BY MR. ROUX:

11       Q    You did or you don't recall?

12       A    I don't recall.

13       Q    So you don't recall whether or not you

14   looked at the tolerance information for the TK 350

15   before running your FEA analysis, correct?

16       A    So I -- you know, as -- as you know,

17   drawings are in Holland's report with title block

18   tolerances.  Likewise, I think they're Ruvang

19   exhibits.  I'm not positive on that.

20           And so in looking at those drawings, I

21   would have looked at the title blocks, and those

22   title blocks have tolerances.  They -- they are what

23   they are.

24       Q    Did those documents include the TK 350?

25       A    I don't recall.

Page 137

1     Q    All right.  If we could please go to

2   Page 94 of your report.  And this would be

3   Paragraph 3.

4          Are you there?

5     A    Yes.

6     Q    Okay.  And you state that "All parts were

7   modeled using a linear elastic material model.  This

8   assumption is reasonable for the comparison of

9   stresses under service loads; it was not the goal to

10  model material failure or other permanent

11  deformation."

12         Do you see that?

13    A    Yes.

14         MR. BENNETT:  Objection.  Form.

15  BY MR. ROUX:

16    Q    What did you mean by the term "service

17  conditions"?

18    A    So if you -- you know, if you know about

19  these things, they're hardened in the upper forties

20  to lower fifties Rockwell C which is very hard,

21  very, very strong, over 200,000 PSI strength.  And

22  you would not expect to exceed a global -- you know,

23  you globally yield these things under breakout

24  loads.  You just wouldn't.

25         And so you wouldn't load them up in the

1    FEA, no point, ███████████████████████

     ███████████████████████████████████████████

     ███████████     We didn't do that.  That wasn't the goal.

4    That's not the point.  It's not important to

5    deciding NIA.

6         Q    Okay.  My question is:  What did you mean

7    by the term "service conditions"?

8         A    So service conditions are where you have

9    pushed one direction, you know, in any of the

10   directions we talk about, and close gaps.

11             And service condition -- so what I mean

12   there is -- is pretty much any normal usage loads,

13   and exclusive of destructive failure loads like

14   Ruvang Exhibit 50.

15        Q    Did you review the Rockwell C of these

16   components before running your FEA?

17        A    Probably.  It's on -- it's on the drawings.

18        Q    And you reviewed the drawings before

19   conducting your FEA?

20        A    I already told you I -- more likely than

21   not, I did look at them.  But whether I looked at

22   them before or after, it doesn't matter.

23             The -- I ran the FEA fully elastic, meaning

24   no plasticity, not -- no yield, and I wouldn't

25   expect yield under service conditions, which makes

Page 139

1   sense in light of the hardness stated on the

2   drawings.

3           Now, whether I learned that before or after

4   is irrelevant.

5       Q   Okay.  So, as you sit here today, you can't

6   remember if you looked at the drawings before or

7   after you ran your FEA; is that correct?

8       A   No.  I'm pretty sure I looked at the

9   drawings, you know, even at the beginning of the

10  case.

11      Q   But you can't recall one way or the other

12  whether or not you reviewed the engineering drawings

13  prior to submitting this report, correct?

14          MR. BENNETT:  Objection.  Form.

15          THE WITNESS:  As I say, the engineering

16  drawings are -- if I remember right, are part of

17  Ruvang and they're part of Holland.  And I looked at

18  those before submitting the rebuttal report.

19  BY MR. ROUX:

20      Q   Well, Mr. Holland had submitted an

21  infringement report -- Well, strike that.

22          Okay.  In your FEA, you used a load of

23  2,000 pounds, correct?

24      A   That's correct.

25      Q   What was your basis for selecting that

Page 140

1   force?

2   A   So it's a linear elastic model, meaning no

3   yield, meaning it's fully reversible and

4   proportional.  So it doesn't matter much whether you

5   use 200 pounds, 2,000 pounds or 20,000 pounds in

6   terms of the stress patterns that you're going to be

7   looking at in this model.

8           And I think Umberger would agree.  Frankly,

9   he would have done the same things.

10          Given the strengths of these materials

11   associated with the hardness, they are going to be

12   linear elastic, and so that's why you run linear

13   elastic.

14          And if it's linear, then it doesn't matter

15   whether -- much whether it's 2,000 or 20,000 pounds

16   applied.

17   Q   Did you consider running an FEA that took

18   into account maximum service loads the TK product

19   might experience in the field?

20   A   Yeah, kind of.  So the reason to pick the

21   2,000 pounds is if you -- you think about a typical

22   bucket is going to have maybe eight teeth across it,

23   right.

24          So, you know, if you put 20,000 pounds on

25   an eight-tooth bucket evenly distributed, then those

Page 141

1   teeth are going to be looking at, you know, 20,000

2   over eight -- let's say 16,000 pounds over eight, so

3   that would be 2,000 pounds per tooth.

4           To me, that's reasonable.  You don't -- you

5   don't apply breakout force to a single tooth all day

6   long.  No way.

7       Q    So it's your opinion that you don't apply

8   breakout force to an individual wear assembly; is

9   that correct?

10      A    Not in ordinary use.  That's why there's

11  more than one tooth.

12      Q    So it's your testimony that the breakout

13  force needs to be divided equally between the teeth

14  in order to determine how much force each tooth is

15  going to be experiencing?

16          MR. BENNETT:  Objection.  Form.

17          THE WITNESS:  I'll say it again.  So in

18  ordinary use, you would in no way expect breakout

19  force on one tooth repeatedly all day long.  It can

20  happen if they design to it.  But in ordinary use,

21  you would have load distributed over multiple teeth,

22  which is why there are multiple teeth.

23  BY MR. ROUX:

24      Q    If you go to Paragraph 4, it will be on the

25  next page, 95.

Page 142

1     A    Okay.

2     Q    You applied a friction coefficient on 0.4

3  of your FEA, correct?

4     A    That's right.

5     Q    And I think you state that that's

6  appropriate for rough casting surfaces, correct?

7     A    Yes.

8     Q    Does that take into account whether there

9  could be soil or water in between the rough casting

10 surfaces?

11    A    Well, not -- not -- not really.  I can

12 accept that the friction coefficient could be lower,

13 which would only enhance the sliding.

14    Q    Would a lower friction coefficient have

15 impacted the results of your FEA?

16    A    No, not -- not in any substantial way.  I

17 mean, some numbers might have changed but nothing --

18 nothing substantial.

19    Q    Okay.  But you agree that if the friction

20 coefficient was lower, for example, some of the

21 numbers would have changed even if marginally?

22         MR. BENNETT:  Objection.  Form.

23         THE WITNESS:  Yes.

24 BY MR. ROUX:

25    Q    You applied a torsional load of

DEERE EX. K
PAGE 178

Page 143

1    6,000 inch-pounds, correct?

2         A    Yes.

3         Q    Would you agree that torsion is a load

4    applied across a lever arm?

5         A    Not exactly.  That's -- that -- load

6    applied across a lever arm is both a force and a

7    torsion -- or a force and a torque, for a moment.

8         Q    Okay.  So you disagree that applying a

9    force to a lever arm does not create a torque?

10             MR. BENNETT:  Objection.  Form.

11             THE WITNESS:  No.  I didn't say that.  I

12   wouldn't say that.

13   BY MR. ROUX:

14        Q    Okay.  Yeah.  Maybe I'm just

15   misunderstanding.

16             So is your torsional load -- could the

17   torsional load that you apply be represented as a

18   load applied to a lever arm?

19        A    A torque is what's called a couple.  So

20   it's two loads and two lever arms so that the two

21   loads cancel out and you have pure torsion.

22        Q    Right.

23             Okay.  So on -- so I want to go down to

24   Paragraph 210 on Page 96.  I'm looking at the -- I

25   think it's the third sentence, "Given the fact."

```
                                          Page 144

 1          MR. BENNETT:  I'm sorry, Jeremy.  I didn't

 2   hear you.  Where are you?

 3          MR. ROUX:  Page 96, Paragraph 210.

 4          MR. BENNETT:  Thank you.

 5   BY MR. ROUX:

 6      Q    Are you there, Dr. Klopp?

 7      A    Yes.

 8      Q    All right.  In that third sentence, you

 9   state "Given the fact that the cast parts would have

10   substantially less-sharp features, in contrast to

11   the sharp interior and exterior corners and edges

12   reflected in the CAD models, it would be improper to

13   focus attention on the highest-stress regions

14   colored red in the figures."

15          Do you see that?

16      A    Yes.

17      Q    Do you agree that in real world TK parts,

18   surface contact might occur at locations different

19   than indicated in your FEA?

20      A    Because they are castings, for sure, yes.

21      Q    Towards -- so the last sentence, you say

22   "Regardless, none of the stress magnitudes are of a

23   concern for failure of hardened steel castings at

24   issue here under 1-ton loading on a tooth."

25          Do you see that?
```

Page 145

1      A     Yes.

2      Q     Are you aware of the yield stress for the

3    parts you tested in your FEA?

4      A     Yeah.  Generally, yes.

5      Q     Generally.

6            Do you know if they are specifically?

7      A     All right.  So if you look up Rockwell C50

8    hardness, you know, in that neighborhood, which

9    is -- I forget what the range is on the drawings,

10   but it's up to Rockwell C52, and you look up the --

11   you know, you can relate the hardness to the tensile

12   strength.  And that tensile strength is well north

13   of 200,000 pounds -- or 200,000 PSI.

14           And, here, we're seeing stresses that are

15   below 30 -- 30,000 PSI.  So we're -- we're way --

16   even for sharp corners and stuff that don't exist in

17   the cast parts, your -- your stresses are -- are

18   pretty benign.

19     Q     So, in your opinion, in your FEA scenarios,

20   none of the stresses experienced by the components

21   exceeds this yield or tensile stress?

22     A     Not in the FEA, no way.

23           And bear in mind, too, that a lot of this

24   is in compression as well, so -- which is even less

25   of a problem.

Page 146

1     Q    Did you do any analysis to determine what

2    the maximum stress was experienced by the wear

3    assembly that you tested in your FEA?

4     A    Well, I mean, as far as we had gone -- at

5    least I've gone is you look -- you can see the red

6    contour plots and you can find the red zones and

7    look at the -- the thermometer scale and figure out

8    what stress that is.

9          We could have gone into the FEA and -- and

10   asked it, you know, where -- show me the exact

11   location and magnitude of the highest stress

12   anywhere.  We didn't do that.  And that's -- that's

13   not -- you don't do that, and that's not relevant,

14   and especially because this has got sharp corners

15   and real castings do not.

16    Q    So based on the FEA, would the stress

17   magnitudes and the components increase if you

18   provided loads greater than 2,000-pound?

19    A    It's linear.  Of course.  So if -- if you

20   double the load, 4,000 pounds, you would more or

21   less get double the stresses.

22    Q    I believe in your reports you used software

23   called Abaqus for your FEA, correct?

24    A    Yes.

25    Q    And I think the company that sells

Page 147

1   Abaqus -- I'm going to butcher the pronunciation,

2   probably -- is Dassault Systèmes?

3        A    Yeah.

4        Q    Is that pronunciation accurate?

5        A    It's French, and I'm not French, so...

6        Q    All right.  Fair enough.

7        A    Close enough.

8        Q    All right.  Is Abaqus a respected FEA

9   software tool in the engineering community?

10            MR. BENNETT:  Objection.  Form.

11            THE WITNESS:  Very much.  Absolutely.  Very

12   much so.

13   BY MR. ROUX:

14       Q    Are there written guidelines from Dassault

15   Systèmes regarding best practices in using Abaqus

16   software when running FEA?

17       A    Yeah.  They have all kinds of tutorials,

18   manuals and so on, courses.

19       Q    And if Dassault Systèmes had written

20   guidelines regarding FEA, you agree that an engineer

21   should follow those guidelines?

22            MR. BENNETT:  Objection.  Form.

23            THE WITNESS:  You know, I think to some

24   extent, the people we have running the software

25   would -- would be capable of writing the manuals and

Page 148

1  guidelines.

2          And so if they violate -- if they -- you

3  know, if you find -- go in there -- I'm sure you'll

4  go in there, their manual, and find some guideline

5  that we violated.  We will have a good reason for

6  it.  Put it that way.

7  BY MR. ROUX:

8      Q    Okay.  Are you familiar with the concept of

9  contact stabilization in Abaqus?

10     A    Yes.

11     Q    And what's "contact stabilization"?

12     A    Okay.  So I know what Umberger is saying

13  here.

14          So when you start the FEA, there's --

15  there's no contact.  The things are kind of in free

16  space.  The pin is unrestrained.  And so the solver

17  really can't solve because it -- the pin could back

18  out, the solver wouldn't know it, right.  So it just

19  can't solve the math.

20          And so what you do is you put in this

21  contact stabilization as one way to allow the model

22  to solve until the gaps close.  And then once the

23  gaps close, then everything is held in place by

24  friction and so on, and -- and the model can -- can

25  proceed and solve itself.

Page 149

1          The other way to do this -- and, you know,

2     I'm sure Umberger -- Umberger has to do one or the

3     other of either contact stabilization or adding a

4     constraint to the pin, for example, so it doesn't

5     fly away in the first steps of the model.

6          So we have is the contact stabilization

7     during the first step until contact closes, and then

8     it doesn't matter.

9          Q    Prior to this case, had you ever used

10    contact stabilization in an FEA?

11         A    I'm sure.

12         Q    Do you recall?

13         A    Every time you come up with contacting

14    parts, I'm sure it's used in one form or another.

15              MR. ROUX:  All right.  Corey, can you

16    introduce Tab 16, please.

17                   (Deposition Exhibit 7

18               was marked for identification.)

19              THE CONCIERGE:  It was 16, one, six?

20              MR. ROUX:  Correct.

21    BY MR. ROUX:

22         Q    Do you have the document, Dr. Klopp?

23         A    Yes.

24         Q    Okay.  Does this appear --

25              All right.  Corey, what exhibit is this?

Page 150

1          THE CONCIERGE:  Seven.

2          MR. ROUX:  Thank you.

3    BY MR. ROUX:

4      Q    Dr. Klopp, does Exhibit 7 appear to relate

5    to conducting FEA with Abaqus?

6          MR. BENNETT:  Objection.  Form.

7          THE WITNESS:  Broadly, yes.

8    BY MR. ROUX:

9      Q    All right.  If I can direct your attention

10   to Page 3, please, where it says "History plot of

11   the stabilization and internal energies."

12         Do you see that?

13     A    On Page 3?

14     Q    Yeah, the bottom.

15     A    Uh-huh.

16     Q    In the first sentence, it says "It is

17   important to verify that the presence of contact

18   stabilization does not significantly alter the

19   physics of the problem."

20         Do you see that?

21     A    Yes.

22     Q    Do you agree with that statement?

23         MR. BENNETT:  Objection.  Form.

24         THE WITNESS:  Well, this -- this is totally

25   out of context because this is talking about heavy

Page 151

1   amounts of metal plasticity of a punch forming a

2   piece of sheet metal, which is nothing at all like a

3   socket on a nose, a hardened steel socket where

4   you're all in the elastic range.

5           So it is important to verify the presence

6   of contact stabilization does not significantly

7   alter the physics of the problem.  And we are

8   confident that we did not alter the physics of the

9   problem.

10  BY MR. ROUX:

11      Q    Okay.  So just to clarify, you agree with

12  the statement that it's important to verify the

13  presence of contact stabilization that does not

14  significantly alter the physics of the problem,

15  true?

16          MR. BENNETT:  Objection.  Objection.  Form.

17          THE WITNESS:  At a broad -- you know,

18  recognizing that that statement in there is totally

19  out of context, it is a generally true statement and

20  we did obey that broad statement.

21  BY MR. ROUX:

22      Q    And if you go, yeah, the third sentence, I

23  think it is, it says "Ideally the amount of

24  stabilization energy should be a small fraction of

25  the internal energy."

Page 152

1          Do you see that?

2     A    I see that.  But, again, this is totally

3  out of context.

4     Q    Do you agree with the statement that

5  "Ideally the amount of stabilization energy should

6  be a small fraction of the internal energy"?

7          MR. BENNETT:  Objection.  Form.

8          THE WITNESS:  I think not necessarily in

9  the context of a linear elastic problem with

10  large -- relatively large starting gaps where you

11  use stabilization to hold things in place until the

12  gaps close.

13          This -- this statement is just totally out

14  of context and -- and should not be -- this is

15  inappropriate, frankly.

16          MR. BENNETT:  Also, Jeremy, I don't mean to

17  be yelling at you, I just want to make sure my

18  objections are heard.  So if I'm speaking loudly,

19  it's not out of anger toward anyone.  I'm just

20  trying to make sure.  I don't know how well you guys

21  can hear me.

22          MR. ROUX:  Yeah, you're coming through.

23          MR. BENNETT:  Okay.  Thanks.

24  BY MR. ROUX:

25     Q    So, Dr. Klopp, you disagree, then, with the

Page 153

1   statement in this document that the stabilization

2   energy should be a small fraction of the internal

3   energy does not apply to your FEA?

4           MR. BENNETT:  Objection.  Form.

5           THE WITNESS:  So if you look in Umberger's

6   report, he's -- he's got a bunch of bar charts

7   saying, ah-ha, Dr. Klopp has the stabilization

8   energy a significant fraction of the internal

9   energy.  It doesn't matter.  Irrelevant.

10          It's a linear elastic problem.  It is not a

11  metal forming problem.  And the -- if you took a

12  different approach besides stabilization to control

13  things until the gaps close and, say, added a

14  constraint, those charts would look different.  The

15  answer in terms of the rainbow plots would look

16  substantially the same.

17          And --

18  BY MR. ROUX:

19      Q    Okay.

20      A    Yeah, I'm sure -- and had we -- you know,

21  had we instead put a constraint on the pin, somebody

22  would be moaning about that instead.

23      Q    Okay.  And I wasn't asking any questions

24  about your report or -- or Dr. Umberger's report.

25  I'm just simply asking that, based on what you said

Page 154

1  previously, the statement that "the amount of

2  stabilization energy should be a small fraction of

3  the internal energy," that you disagree that that

4  applies to the situation in this case?

5           MR. BENNETT:  Objection.  Form.

6           THE WITNESS:  It doesn't affect the answer.

7  Okay.  The answer is the same.  You know, it -- it's

8  irrelevant.  This is a metal forming problem.

9           This is -- this is kind of cherry-picking

10  something that is utterly irrelevant to hardened

11  steel bucket piece sitting on noses and trying to

12  make blanket sound bites, and it's not appropriate.

13  BY MR. ROUX:

14     Q    So is the -- so the document that's labeled

15  Exhibit 7 is irrelevant to your FEA analysis in this

16  case?

17           MR. BENNETT:  Objection.  Form.

18           THE WITNESS:  So if -- if one of my staff

19  had started to run linear elastic tooth on nose

20  problem and pulled up a metal forming punch problem

21  and tried to read inferences from a metal forming

22  punch part of Abaqus -- the Abaqus manual into the

23  tooth problem, I'm sorry, but I'd have to say, "Wait

24  a minute, what are you doing?"

25  \\\

Page 155

1   BY MR. ROUX:

2       Q    Where does it say in Exhibit 7 this is a

3   metal forming punch problem?

4       A    Well, you see the -- you see the figure

5   there, the red line, it says "PUNCH-1 Node,"

6   "REFPUNCH."  And if you go to the top, it's talking

7   about taking a sheet metal blank, like, you know,

8   car fender or something, and punch-forming it, you

9   know.

10          So look at the first page, "plot the

11  deformed model shape."  You can remove the die and

12  the punch from the display and visualize just the

13  blank.  The blank is the piece's raw sheet metal

14  before it's bent.

15          So this is -- this is just completely out

16  in left field compared to modeling a hardened steel

17  casting sitting on a nose under load.

18          And then if you go to the second page --

19      Q    Yeah.  I don't believe there's a question

20  pending.

21      A    Well, I want to finish my answer.  How's

22  that.

23          So if you go to the second page, you can

24  see they're looking at equivalent plastic strains

25  and they look pretty high to me.  And so that's --

Page 156

1    yeah, plastic strain 21 percent, that's a huge

2    amount of plasticity, not elasticity.

3        Q    Okay.  So it's your opinion, then, that the

4    document that's labeled Exhibit 7 does not apply to

5    your FEA for this case, correct?

6            MR. BENNETT:  Objection.  Form.

7            THE WITNESS:  I would go find a different

8    document.

9    BY MR. ROUX:

10       Q    Are you familiar with the term

11   "displacement constraint" as it relates to doing

12   FEA?

13       A    Yes.

14       Q    Did you apply any displacement constraints

15   in your FEA scenarios?

16       A    Yes.

17       Q    Which FEA scenarios did you apply

18   displacement constraints?

19       A    All of them.

20       Q    Why did you apply displacement constraints?

21       A    Because if you don't constrain something

22   and you push on it with 1 ton of force, it will take

23   off.

24       Q    So I'd like to, I guess, focus at least the

25   vertical and horizontal load scenarios for your FEA.

1          So focusing on the vertical load scenario,
2    is it true that you applied a displacement
3    constraint such that when applying vertical load to
4    the tooth, the tooth was constrained in the lateral
5    direction?
6        A    I -- I think that is correct.  So -- and
7    that makes -- you know, that makes sense and no
8    difference, because under vertical load, it's
9    perfectly symmetric and there wouldn't be any reason
10   for the tooth to want to slide left or right when
11   you're pushing up or down.
12       Q    Did you do any analysis to determine
13   whether or not the system was perfectly symmetrical?
14       A    I mean, you can kind of tell by looking at
15   it.  What do you mean by "perfectly"?
16       Q    Well, it's your testimony that you could
17   apply a lateral constraint when applying a vertical
18   load because based on looking at it, it's
19   symmetrical.
20          But I'm wondering, did you do any analysis
21   other than looking at it to determine whether or not
22   the lateral constraint was appropriate?
23       A    No.  This again goes to the ability of the
24   solver to solve before contact makes up.  So if you
25   didn't have that constraint, as far as the computer

Page 158

1   knows, it doesn't know where the -- whether the

2   tooth belongs left, right or center.

3           And our goal is to have the tooth centered

4   to, you know, look at gaps, and so you apply that

5   constraint.  And there's nothing wrong with -- with

6   doing that.  I'm -- I'm sure, again, Dr. Umberger

7   would have done something very similar to -- to get

8   the thing to solve until contact shows up.

9       Q    Do you agree that applying a displacement

10  constraint in an FEA does not reflect how components

11  would operate in the real world?

12          MR. BENNETT:  Objection.  Form.

13          THE WITNESS:  No.  I disagree.

14  BY MR. ROUX:

15      Q    In the FEA scenario where you applied the

16  vertical load, are you aware if you removed your

17  displacement constraint whether the components would

18  shift in the lateral direction?

19      A    Well, as I mentioned, before the gaps

20  close, the thing may well not solve at all.  You

21  couldn't get an answer out of the numerics.  Once

22  the gap closes, then the constraint doesn't matter.

23          So if you took off the constraint and tried

24  to solve it, I have a funny feeling it wouldn't

25  solve -- you'd never get to first base.

DEERE EX. K

PAGE 194

Page 159

1    Q    Did you try running your FEA while removing

2  the displacement constraints?

3    A    And the answer is no based on experience

4  because we know what happens when you don't have

5  enough constraints.  It won't solve.

6    Q    But just to be clear, you did not attempt

7  to run your FEA with removing the displacement

8  constraints?

9         That's accurate?

10         MR. BENNETT:  Objection.  Form.

11         THE WITNESS:  I believe that's accurate.

12  BY MR. ROUX:

13    Q    All right.  Can you go to -- so going back

14  to your rebuttal report, if you can go to Page 97,

15  please.

16    A    Let's see, that's Exhibit 2, Tab 2?

17    Q    Correct.

18    A    Okay.

19    Q    And then on Page 97, Figure 34, you have

20  various screenshots of Von Mises stress.

21         Did I pronounce that correctly?

22    A    Von Mises.

23    Q    Okay.  Are you able to determine where

24  components in the wear assembly are making contact

25  based on the location of Von Mises stress contours?

Page 160

```
 1      A     Pretty much.  I mean, if -- if you have
 2   a -- a high stress region that is in both
 3   components -- like second row from the bottom on the
 4   left, you have red in both the pin and the base and
 5   the tooth -- most likely those are all contacting.
 6           On the other hand, you have that second row
 7   from the bottom on the left, to the left of the pin
 8   in the base, the red stops and transitions to blue
 9   in the base.  That tells you most likely those are
10   not contacting in that area.
11      Q     Yeah, can you be a little more specific
12   which image you're showing.  I'm sorry.  I'm trying
13   to follow along.
14      A     So Figure 34, second row from the bottom,
15   left-hand edge.
16      Q     So the horizontal TK?
17      A     Right.
18           So where you have red bleeding across
19   interfaces, that tells you there's contact there.
20   Because if -- if surfaces aren't touching, you can't
21   make high stresses except within the surface itself.
22           To the left side of the pin in that same
23   image, there's a sharp break between red in the pin
24   and blue in the base material.
25           Do you see that?
```

Page 161

1      Q     Yeah.

2      A     Okay.  So that tells you most likely those

3  are -- are definitely -- are not contacting because

4  there's -- there's nothing putting stress into the

5  base, and whatever pin stresses you see there are

6  due to local bending of the pin.

7      Q     So -- okay.  I think I understand that.

8            So my understanding is, then, if you have

9  two separate components and there is corresponding

10  stresses at a location between them, that indicates

11  that there's contact at that location.

12            Is that fair?

13      A     Yeah.  I mean, I just explained it.  I

14  mean, really, you just go into Abaqus and say, tell

15  me the surface stresses, which these plats are not

16  that.

17            And -- and by the surface stresses, then

18  you can tell, especially the -- you know, the

19  surface normal and surface tangential stresses.  The

20  tractions, they call them.  You can just ask for the

21  tractions and get it directly.

22            Here, you -- you kind of have to use your

23  judgment and say, okay, the red is bleeding across

24  an interface.  That means those -- most likely those

25  are contacting.  But if you want to know really

Page 162

1    accurately, go ask Abaqus directly.

2        Q    And what function in Abaqus, which

3    measurement would you go to, to see where contact is

4    occurring?

5        A    Well, you can ask it for surface -- surface

6    tractions or surface stresses.

7        Q    Did you do any analysis in your FEA to

8    determine where contacts occurs in the TK as opposed

9    to the A1 redesign?

10       A    Well, I think that, yes, the second row

11   there from the bottom is -- is very illustrative of

12   that.  So -- I mean, second row from the bottom on

13   Figure 34, I mean, you'd say, hey, it looks to me

14   like the Rev A1 is an improvement over the original

15   because the pin is -- is less stressed.

16       Q    Did you do any analysis regarding the

17   stresses the pin experienced between the TK tooth

18   and the A1 redesign in your FEA?

19       A    Well, I think I just told you, just look at

20   the -- the rainbow plots in -- in the

21   cross-sections, for example, and you can see -- I

22   guess, Figure 34 is the -- the most -- especially

23   the bottom two rows are the most -- you know, most

24   illustrative of what's going on in the pin and the

25   comparison.

Page 163

1      Q     And what is your conclusion based on
2  Figure 34 regarding the pins and the TK and A1
3  redesign?
4      A     Well, I mean, going back to the -- you
5  know, the idea, don't necessarily concentrate on the
6  red.  Look at how the green distributes.
7           The pin -- you know, if anything, to me the
8  pin is a little bit more highly stressed in the
9  original than that the Rev A1.  But both show, you
10  know, kind of similar amounts of green.  So I
11  wouldn't -- I wouldn't expect that much difference.
12           And, again, you always got to keep in mind
13  that this is perfect geometry and not castings.  So
14  if you ran a lab test for the same thing, you very
15  well could get a bit different answers.
16      Q     Did you do any analysis to the pin stresses
17  between the TK and A1 redesign when you applied
18  vertical loading?
19      A     Well, we must have.  I'm just trying to --
20  I don't necessarily see a image of it.  And I'm just
21  trying to look and see if there's anything I can
22  infer.  Let's see.  Vertical up.  Vertical down.
23           Yeah, I mean, just based on the images I
24  see here, it looks to me like those, more or less,
25  horizontal stabilizing surfaces are doing their job

DEERE EX. K
PAGE 199

Page 164

1    in vertical loading and -- and protecting the pin.

2         Q    So, as you sit here today, your opinion

3    that when the vertical load is applied to the FEA

4    model for the TK and the Rev A1 redesign, the pins

5    experience similar stresses?

6         A    I think so, but I don't have it -- I can't

7    necessarily tell based on these pictures.

8         Q    As you sit here today -- okay.  Strike

9    that.

10             If you wanted to understand the differences

11   in pin stresses in the vertical load scenario for

12   the TK and the Rev A1 redesign, what would you do?

13             MR. BENNETT:  Objection.  Form.

14             THE WITNESS:  I would -- I would basically

15   do the sections shown in the bottom two rows of

16   Figure 34 for the -- the vertical cases.

17   BY MR. ROUX:

18        Q    So if you wanted to understand the stresses

19   experienced by the pin in the vertical loading

20   scenario for the TK and the Rev A1 redesign, you

21   would take a cross-section of the assembly similar

22   to what you did in Figure 34 for the horizontal and

23   torsional loads, true?

24        A    Well, that's probably not the best way to

25   do it.  Better would be to isolate the pin.  You

1    know, basically you tell Abaqus, just don't show me

2    the -- the adapter and -- and tooth, just show me

3    the pin.  And then you can look at that from all

4    directions and see what -- see what the stresses

5    might be.

6        Q    Okay.  So the best way to determine whether

7    or not -- Well, strike that.

8            The best way to determine the stresses

9    experienced by the pin in the vertical loading

10   scenario for the TK and A1 redesign would be to

11   isolate the pin and just look at the pin, true?

12            MR. BENNETT:  Objection.  Form.

13            THE WITNESS:  So you've oversimplified it.

14            So you -- this is just in the

15   post-processing looking at the results.  And if --

16   if all you cared about was the pin, you would turn

17   off vision of the tooth and adapter and have the

18   pin, do the contour plots of whatever stress

19   components you're interested in and rotate it around

20   and then -- and see what's going on.

21   BY MR. ROUX:

22       Q    So if you wanted to focus on stresses

23   experienced by the pin in a particular loading, you

24   would isolate the pin view, true?

25       A    That would be a good way to do it.

Page 166

1          MR. BENNETT:  Hey, Jeremy, we've been going

2     about an hour.  Is now a good time for a break or do

3     you have a couple more questions you want to finish

4     with?

5          MR. ROUX:  Yeah, a break's fine.

6          THE VIDEOGRAPHER:  Okay.  We're going to go

7     off the record.  The time is 1:38 p.m., and this is

8     the end of Media Unit No. 5.

9          (Off the record from 1:38 - 1:49 p.m.)

10          THE VIDEOGRAPHER:  Okay.  We're going back

11     on the record.  The time is 1:49 p.m., and this is

12     the start of Media Unit No. 6.

13     BY MR. ROUX:

14     Q    Dr. Klopp, can you please go to Page 99 of

15     your rebuttal report.  It should be Figure 36.

16     A    Okay.

17     Q    And Figure 36 depicts "Max principal stress

18     contours," correct?

19     A    Correct.

20     Q    Can you generally describe at a high level

21     the difference between max principal stress contours

22     and Von Mises stress?

23     A    Yeah.  So the principal stress gives you a

24     little bit better indication --

25          THE REPORTER:  Yeah, there's something up

Page 167

```
 1   with your audio.
 2            MR. ROUX:  Yeah, the audio is kind of
 3   garbly.
 4            THE VIDEOGRAPHER:  Yeah.  Let's go -- do
 5   you want to go off the record, Counsel?
 6            MR. ROUX:  Yeah, please.
 7            THE VIDEOGRAPHER:  Okay.  Let's go off the
 8   record.  The time is 1:50 p.m., and this is the end
 9   of Media Unit No. 6.
10            (Off the record from 1:50 - 1:51 p.m.)
11            THE VIDEOGRAPHER:  Okay.  We're going back
12   on the record.  The time is 1:51 p.m., and this is
13   the start of Media Unit No. 7.
14   BY MR. ROUX:
15       Q   Dr. Klopp, can you please, at a high level,
16   explain the differences between max principal stress
17   contours and Von Mises stresses?  You depicted them
18   in your report.
19       A   So the maximum principal stresses here
20   are -- are showing regions of -- of tension in the
21   material which would be potentially, you know,
22   ultimately tension leads to fracture.
23            Whereas, the Von Mises stresses are looking
24   more at propensity towards permanent deformation
25   like plasticity where you deform the part and don't
```

Page 168

1   necessarily fracture it.

2         So that -- that's kind of the high-level

3   gist of what's going on here.

4      Q    That's helpful.  Thank you.

5         When looking at the max principal stress

6   contours, a similar question to what I asked before

7   about the Von Mises:  Can you conclude whether

8   there's any contact between surfaces by looking at

9   the heat map for max principal stress contours?

10     A    I -- I think to some extent with -- you

11  know, with the knowledge of what's going in these

12  pockets.

13        So, for example, Figure 36, the middle row

14  on the right, you see reasonably high max principal

15  stresses down at the -- the facet in the nose,

16  right, on the topside.  And, you know, we say here

17  "Maximum principal stress indicates regions of

18  tensile stress."

19        Well, it also indicates regions of --

20  potentially of compressive stress.  And there,

21  vertical down on that facet region, you would expect

22  that facet region to be pushing back up in reaction.

23  And that's kind of like what we see.

24        But you need a -- what would I say?  You

25  need -- and, also, in the next row up, the second

Page 169

1    row from the top on the right, you see that green

2    patch has shifted to the lower patch, and that's

3    consistent with, in that picture, pushing the tip of

4    the tooth up rather than down.

5            But to -- to try to figure this out, you

6    need a little bit more intel on what's going on with

7    the base like we had looking at the pin and looking

8    for stresses bleeding across interfaces.

9            Here, we don't see the interface, so we

10   can't completely tell.

11   Q    So you -- okay.

12           I guess similar with the max principal

13   stress contours, the best place to look would be

14   contact stress or contact pressure if you want to

15   look where actual contact was occurring?

16   A    Yeah --

17           MR. BENNETT:  Objection.  Form.

18           THE WITNESS:  Yeah.  This isn't quite the

19   right way to -- to look at it.

20           I mean, we know -- you know, again, bear in

21   mind this is ideal CAD and -- and so on and not

22   casting.  So whatever you determine for contact in

23   FEA of ideal CAD won't be exactly the same in -- in

24   real castings.

25   \\\

Page 170

1    BY MR. ROUX:

2        Q    Would the -- Strike that.

3             Would the displacement constraints that you

4    applied to your models impact the stress contours

5    that you used in your report for the FEA models?

6             MR. BENNETT:  Objection.  Form.

7             THE WITNESS:  I don't think so, no.  I

8    mean -- well, I take that back.

9             So certain of the displacement constraints

10   are absolutely necessary to keep the parts from

11   flying away in space in the computer world.  And so

12   you can't run it without -- it won't run without

13   some constraints.

14             So, I mean --

15   BY MR. ROUX:

16       Q    So --

17       A    Some of those constraints, if you didn't

18   have them, it wouldn't solve in the first place.

19       Q    Did you do any investigation -- Well,

20   strike that.

21             As we discussed previously, for your

22   vertical up and vertical down simulations, you

23   applied a lateral constraint; is that true?

24       A    Yeah.  It's like a roller bearing

25   constraint, so it really should have no effect on

 1   the results.

 2        Q    Did you do any analysis or any testing to

 3   determine that if you removed that lateral

 4   constraint, that you would get the same results that

 5   you got as reflected in your report?

 6        A    I don't think it would solve, so -- so you

 7   wouldn't get the same results.  You wouldn't get any

 8   results.

 9        Q    Did you do any testing to confirm that

10   removing the lateral constraints would result in a

11   FEA that did not run?

12        A    No.  It's a waste of time.

13        Q    All right.  Dr. Klopp, you produced in this

14   case several INP files, correct?

15        A    Yes.

16             MR. ROUX:  Corey, can you please introduce

17   Tab 15.

18                     (Deposition Exhibit 8

19                was marked for identification.)

20   BY MR. ROUX:

21        Q    This will be Exhibit 8.

22             Dr. Klopp, please let me know when you've

23   opened it up.

24        A    Okay.  I see it.

25        Q    Does Exhibit 8 reflect the INP files that

Page 172

1   you produced in this case?

2            MR. BENNETT:  Objection.  Form.

3            THE WITNESS:  Yeah.  It reflects them.

4   I'm -- I'm a little puzzled by the dot underscore at

5   the beginning of the file name.

6   BY MR. ROUX:

7       Q    Yeah.  I'll represent to you that's what we

8   received, but -- but, in any event, this looks like

9   the INP files that you produced to us in this case?

10      A    Yes.

11           MR. BENNETT:  Objection.  Form.

12   BY MR. ROUX:

13      Q    I notice that in the file name there's a

14   "v3."

15           Do you see that?

16      A    Yes.

17      Q    What does "v3" represent?

18      A    It's -- it's Version 3.

19      Q    Okay.  And how many other INP files did you

20   create for your work for this case other than these

21   v3 files?

22      A    Let's see.  So I guess the short answer is

23   I don't know.

24      Q    For what purpose did you create the other

25   INP files?

Page 173

```
1      A     So on v1 and -- and I don't believe there's
2    a v1 and v2 for all of these, or was.
3            V1 is some initial runs, most likely didn't
4    converge, didn't -- didn't solve.  And so we have to
5    add some constraints, add some damping, whatever it
6    takes to -- to get it to -- to begin to solve.
7            And then at least one of the versions, I
8    think it's v2, was the mesh sensitivity study where
9    we made sure that if we portioned the mesh, we still
10   got nominally the same answer.
11     Q     Okay.  So it sounds like there's two
12   aspects to the INP files that you did not produce.
13           First is some of the versions were INP
14   files that you did initial runs on that did not
15   converge; is that accurate?
16     A     Well, and I'm not even sure there's more
17   than one.  But, you know, there's -- there's one, at
18   least, maybe a baseline kind of a thing that -- that
19   wouldn't -- wouldn't solve, and -- and so that's
20   Version 1.
21     Q     Do you still have that file in your files?
22     A     No.
23     Q     What happened to that file?
24     A     It was overwritten.
25     Q     Okay.  Is that -- so with respect to any
```

Page 174

```
 1    INP files that you had initial runs that didn't
 2    converge, do you have any of those files still?
 3        A    Not that I know of.
 4        Q    Is it the case that all those files were
 5    overwritten?
 6        A    I don't know for sure, but they're --
 7    they're -- they're of no use and they don't support
 8    my opinions.
 9        Q    Is it possible, then, that there are INP
10    files that you ran that didn't converge that weren't
11    overwritten?
12             MR. BENNETT:  Objection.  Form.
13             THE WITNESS:  I don't know.
14    BY MR. ROUX:
15        Q    Do you know why those initial runs didn't
16    converge?
17             MR. BENNETT:  Objection.  Form.
18             THE WITNESS:  Well, it either had something
19    to do with not enough constraints or it likely had
20    something to do with not enough contact damping,
21    something like that.
22             There's a -- I mean, when you run these
23    things, there's always going to be some issue
24    that -- on a complicated geometry like this,
25    especially with lots of contact, that it won't solve
```

Page 175

1    on the first try.  It just won't.  And you're

2    extremely lucky if it does.

3    BY MR. ROUX:

4        Q    So it's fair to say that when you initially

5    tried to run your FEA on the TK and the A1 redesign,

6    your initial runs didn't converge initially, true?

7        A    They -- they stalled out.

8            MR. BENNETT:  Objection.  Form.

9            THE WITNESS:  They stalled out.  They

10   don't -- they don't solve to -- to completion.  They

11   don't get to 2,000 pounds.

12   BY MR. ROUX:

13       Q    Based on your experience with FEA and your

14   education, would you consider running an FEA on wear

15   assemblies like the TK system more complicated than

16   other types of components?

17           MR. BENNETT:  Objection.  Form.

18           THE WITNESS:  Well, all of them almost

19   invariably have some form of complication, any --

20   any model that you run of -- of real world stuff.

21           So with respect to like ████, it's just

22   the enormity and number of parts.  With respect to

23   some things, it's very complicated material

24   behavior, nonlinear polymers and rubber and things

25   like that.

Page 176

```
 1          With respect to this one, the complication
 2   comes from the contact of a socket on a sort of
 3   organically shaped nose.  And -- and that's not
 4   necessarily easy for the numerics to deal with.
 5   BY MR. ROUX:
 6      Q    Did those initial runs on the INPs that
 7   didn't converge, did those help inform you and your
 8   team in developing the v3 files that you ultimately
 9   produced in this case?
10          MR. BENNETT:  Objection.  Form.
11          THE WITNESS:  Of course.  Of course.  You
12   learn from -- you know, sort of learn from mistakes,
13   I guess, is the way you put it.
14   BY MR. ROUX:
15      Q    The second aspect to INP files that you
16   mentioned that you didn't produce, I think, relate
17   to the mesh sensitivity study; is that true?
18      A    That's -- yeah.
19      Q    And so you in your files have separate INP
20   files related to the mesh sensitivity study that you
21   include in your report, true?
22      A    Yeah.  I'm not sure whether the mesh
23   sensitivity ones are included in -- in this list in
24   Exhibit 8 or not.  That might be the r1.  Not
25   positive.  That -- that may be the case.
```

Page 177

1          Or -- or maybe it's the -- let me see.
2    Whether it's the Crs2x.  But I'm fairly confident we
3    turned over the mesh sensitivity stuff.
4         Q    Do you still have on your Exponent files
5    the mesh sensitivity INP files?
6         A    Yeah.  Like I say, I think they're in this
7    list.
8         Q    And if they weren't on this list for some
9    reason, you would have those mesh sensitivity files
10   in your files?
11        A    I don't know.  I -- I just don't know.
12        Q    We also received several OBD -- is it ODB
13   or OBD?
14        A    OBD, I believe.
15        Q    Okay.  We received several OBD and ACA
16   e-file related to this case.
17             Are there any output files that you created
18   for this case that were not provided to us?
19        A    Well, certainly with respect to the v1, v2,
20   there would have been output files that were
21   discarded.
22        Q    Any other output files that you created in
23   your work on this case that weren't included in the
24   materials produced to ESCO?
25        A    You're talking about FEA only?

Page 178

1        Q      Correct.

2        A      Not that I'm aware of.

3        Q      Okay.  And then expanding that out, so any

4    other -- so broadening from FEA, any other files

5    that you used in this case that weren't included in

6    materials that you sent to ESCO?

7               MR. BENNETT:  Objection.  Form.

8               THE WITNESS:  I guess I -- I don't know.

9    Frankly, I didn't send anything to ESCO, so I don't

10   know what the lawyers sent.

11   BY MR. ROUX:

12   ██   ████████████████████████████████████████████████

██  ████████████████████████████████████████

██   ██   ████████████████████████████████████████████████

██  ████████████████████████████████████████████████████

██  ████████████████████████████████████████████████████

██  ████████████████████████████████████████████████

██        ██████████████████████████████████

██   ██   ████████████████████████████████████████████████

██  ████████████████████████████████████████

██   ██   ██████████████████████████████████████

██   ██   ████████████████████████████████████████████████

██  ██████████████████████████████████████████████████████

██   ██████████████████████████

25              MR. BENNETT:  Objection.  Form.

DEERE EX. K
PAGE 214

```
                                                    Page 179
   1              THE WITNESS:  Yeah, I would think so.
   2              MR. ROUX:  Corey, can you pull up Tab 9,
   3     please.
   4                      (Deposition Exhibit 9
   5                  was marked for identification.)
   6     BY MR. ROUX:
   7         Q    Dr. Klopp, you can put away the file stuff.
   8              THE CONCIERGE:  Exhibit 9 is up.
   9     BY MR. ROUX:
  10         Q    Do you have the document up, Dr. Klopp?
  11         A    Yeah.  Let me just flip to the end here.
  12         Q    Yeah.  Just let me know when you're done.
  13         A    Still loading.
  14              Okay.
  15         Q    Do you recognize Exhibit 9?
  16         A    Generally, yes.
  17         Q    What is Exhibit 9?
  18         A    It seems like it's a presentation that
  19     Mr. Ruvang -- excuse me -- Mr. Ruvang made to Deere
  20     basically marketing his idea.
  21         Q    Right.
  22              So it's your understanding that Mr. Ruvang
  23     authored Exhibit 9?
  24              MR. BENNETT:  Objection.  Form.
  25              THE WITNESS:  I don't know that he authored
```

Page 197

1    prototype?

2         A    Frankly, I don't know what that is.  I

3    mean, it's just a Rev A1 tooth, as far as I know.

4         Q    You don't know one way or another whether

5    or not that's a prototype or a final version for

6    customers, correct?

7         A    Right.  I don't know.

8              MR. ROUX:  All right.  Corey, can you

9    please introduce Tab 11.

10                  (Deposition Exhibit 11

11              was marked for identification.)

12   BY MR. ROUX:

13        Q    You can put the file structure away,

14   Dr. Klopp.

15             THE CONCIERGE:  Exhibit 11 is up.

16   BY MR. ROUX:

17        Q    All right.  Let me know when you have that,

18   Dr. Klopp.

19        A    I've got it.

20        Q    Do you recognize Exhibit 10?  Well, strike

21   that.

22             Corey, what exhibit number are we on?

23             THE CONCIERGE:  11.

24             MR. ROUX:  Thanks.

25   \\\

Page 198

1    BY MR. ROUX:

2        Q    Dr. Klopp, do you recognize Exhibit 11?

3        A    Yes.

4        Q    What is Exhibit 11?

5        A    So this is a synopsis and summary of

6    mechanical measurements that we did to kind of get

7    around this -- any arguments about interpenetrated

8    scanned surfaces and whether the FEA is somehow not

9    representative of reality, to see whether under

10   vertical loads the side stabilizing, those -- those

11   kind of inward progressed side surfaces, would --

12   would bear load.  And the answer is no, they would

13   not.

14       Q    What was the last part, is that you

15   concluded that the side surfaces would not bear

16   load?

17       A    That's right.  Because if you force the tip

18   upward, you have side-to-side rattle.  If you force

19   the tip downward, you still have side-to-side

20   rattle.  And that rattle space would not close up,

21   you know, even under much, much higher loads than

22   you could possibly apply by hand or by the weight of

23   the tooth.

24       Q    Any other conclusions that you drew in

25   relation to the testing reflected in Exhibit 11?

Page 199

1      A      Well, that the -- in some cases, the pin --

2      presence of the pin or not makes a difference in how

3      much side-to-side rattle room you have, and in some

4      cases it doesn't.

5              So the pin -- I guess what that

6      demonstrates is that the scanning testing without

7      the pin is not the story, is -- you know, further

8      shows that that was -- that's not really what the

9      patents are about.  Put it that way.

10     Q      Any other conclusions that you drew from

11     this testing?

12     A      Well, you'd have to kind of read the whole

13     thing.  You can -- you can see conclusions in terms

14     of quantities of movement that -- that are

15     available.

16             But that -- that's the main gist, is that

17     if you load it upward, you got side-to-side rattle.

18     If you load it downward, you have side-to-side

19     rattle.  And there's no reason that those

20     side-to-side rattle spaces would close up under even

21     breakout load, for example.

22     Q      Is it fair to say that your clearance

23     evaluation testing does not relate to your

24     invalidity opinions?

25     A      I think that's generally fair, yes.

Page 200

1      Q    So the purpose of doing the clearance

2    evaluation was to support your infringement-related

3    opinions and your non-infringing alternative-related

4    opinions; is that accurate?

5      A    I think that's most of the focus, yes.

6      Q    When did you conduct your testing regarding

7    clearance evaluation?

8      A    That's a good question.

9           Yeah, I guess it had to be after the

10   rebuttal, and -- yeah, it was after the rebuttal but

11   before the reply, but because the reply is not about

12   infringement, that's why it's in an appendix.

13     Q    Yes.  That was another one of my questions.

14          Can you point me to anywhere in your

15   opening rebuttal or reply report that reflect the

16   opinions you drew from this clearance evaluation

17   testing you conducted?

18     A    Well, yeah.  Let's see.  Let me -- let me

19   just flip through here and see if I can find it

20   quick.  Give me a minute.

21          Yeah.  So this relates to Figures 9 and 10

22   of the rebuttal.

23     Q    Do you know what pages those are at?

24     A    21 and 22 of the rebuttal.

25     Q    Figure 9 and Figure 10 in your rebuttal

Page 201

1   report, you created those figures before conducting

2   your clearance measurements, correct?

3       A    Correct.

4       Q    So the specific testing and analysis you

5   did for the clearance rebuttal testing in

6   Exhibit 11, that was done after you created

7   Figures 9 and 10, correct?

8       A    Correct.

9       Q    So the conclusions and testing that you did

10  in your clearance evaluation testing is not

11  reflected in Figure 9 and Figure 10, true?

12      A    No.  Disagree.

13           So 9 and 10 were based on the gap

14  measurements that Holland and Panapa did with their

15  scanning, which we have issues with because of

16  the -- the interpenetration and so on.

17           But, regardless, they -- those measurements

18  support Figures 9 and 10, that there's this rattle

19  room.

20           Then the measurements are just, all right,

21  let's -- let's get around all this worry about

22  interpenetrated surface and -- and look at reality.

23  And, sure enough, it confirms Figure 9 and 10.

24      Q    Got it.

25           So I just want to understand the -- so --

Page 202

1   the timeline.

2          You created Figures 9 and 10 in your

3   rebuttal report based on measurements that

4   Mr. Panapa and Mr. Holland created, true?

5      A    Yeah.   The idea was to illustrate what's

6   going on in their figures without all the -- you

7   know, get to the bottom line gist of what's going on

8   with those inward progressed surfaces.

9      Q    And then the clearance measurement analysis

10  you conducted occurred after your rebuttal report

11  for purposes of confirming what you did in Figure 9

12  and 10, true?

13     A    Well, not just that.   It's just to, you

14  know, frankly, be able to show to a jury or a lay

15  audience that if you push the tooth up, it wiggles.

16  If you pull it down, it wiggles.

17          So those side surfaces cannot bear or

18  resist load -- vertical loads, under excavation

19  conditions.

20     Q    So --

21     A    It's a simple way to -- you know, the jury

22  will understand that.   They -- they may not

23  understand all kinds of complicated clouds and

24  interpenetrated surfaces and fitted planes and all

25  that stuff.

Page 203

1      Q    So is it fair to say that you created the
2   clearance measurement analysis because the Figures 9
3   and 10 and the other material in your rebuttal
4   report didn't contain enough information that you
5   wanted to show to the jury, true?
6      A    Not true.  The -- the problem was that 9
7   and 10 were based on -- in some ways on flawed
8   methods from Holland and Panapa.  And I want to be
9   able to say forget what they did, just let's look at
10  real pieces and -- and see what's going on.
11     Q    Is there any reason why you didn't conduct
12  your TK clearance measurements prior to your
13  rebuttal report?
14     A    Yeah, because I had juggling batons instead
15  of -- of teeth.
16     Q    If you had the proper materials that you
17  had requested before you wrote your rebuttal report,
18  could you have created the TK clearance measurements
19  prior to your rebuttal report and included it in
20  that report?
21     A    Yes.
22     Q    Okay.  If you can go back to, please --
23  well, I guess before I move off that, any other
24  locations in any of your reports that relate to the
25  clearance evaluation analysis you did other than

Page 204

1    Figures 9 and 10 in your rebuttal report?

2        A    I'd have to go dig through the whole thing.

3    I mean, it -- I'm sure it shows up in some kind of

4    summary statement somewhere.  But, otherwise, yeah,

5    I'd have to dig through the whole thing.

6        Q    So, as you sit here right now, other than

7    Figure 9 and 10 in your rebuttal report, you're not

8    aware of any other conclusions regarding the

9    clearance measurements, where they are in any of

10   your reports?

11            MR. BENNETT:  Objection.  Form.

12            THE WITNESS:  I am not aware of where they

13   are.

14   BY MR. ROUX:

15       Q    Can you please go back to Exhibit 11.

16       A    Okay.

17       Q    So I'd like to walk through the testing you

18   did.

19            Can you go to Page 3, please.

20       A    Okay.  I'm there.

21       Q    It appears that -- well, can you walk me

22   through and describe, generally, the testing

23   protocol that you employed on Page 3 of Exhibit 11.

24       A    Sure.

25            So this one is vertically downward force,

Page 205

1  and what is shown is the version without the pin,

2  but there's also a version with the pin.  And the

3  idea was you clamp the base rigidly in a -- in a big

4  huge vice on a bench, and then you have a

5  measurement device called a dial indicator which is

6  basically a probe that measures displacement.

7          And, in this case, on the left and -- and

8  middle, it's measuring the down wiggle room, and so

9  the method was to, you know, force the tooth

10  backwards into the butt fit condition, or if there's

11  a pin inhibiting that, force it backward until the

12  slack is taken out of the pin joint.

13          And then on the left and middle, move

14  the -- move the tooth up and down and measure how

15  much rattle room you have out at the tip.

16          And then as shown on the right, do the same

17  thing where you enforce the butt fit condition

18  pushing backward while letting gravity apply a

19  downward load and see if you have rattle room side

20  to side and measure it.

21          And so that's what that's doing.

22      Q   Other than the document labeled Exhibit 11,

23  do you have any other documentation, such as

24  pictures or video, showing the methodology that you

25  used for these tests?

Page 206

1      A    I think there's other pictures, and I

2    thought we turned them over.  But they're basically

3    showing a lot of the same what's shown in -- in

4    these pictures and -- yeah, I think that's -- that's

5    the extent of it.

6      Q    I don't think it's shown in these pictures.

7           And correct me if I'm wrong, do these

8    pictures reflect application of any load on the

9    tooth in -- on Page 3 of Exhibit 11?

10     A    Yes.

11     Q    What is applying the load in these

12   pictures?

13     A    The earth.

14     Q    Okay.  So you're using the self-weight of

15   the product?

16     A    Right, just like Holland and Panapa,

17   other -- except we've also -- you know, when we're

18   actually doing the slack measurement, we're

19   pushing -- by hand, pushing rearward to -- to ensure

20   either a butt fit condition or at least the slack

21   taken out at the pin joint.

22     Q    Do you have any pictures or video of

23   individuals pushing back and wiggling the tooth to

24   measure slack?

25     A    I don't think so.

Page 207

1      Q    Who was involved in the clearance

2  measurement testing you did?

3      A    So this would be Dr. Rastogi and

4  Dr. Roozbeh.  And I -- sorry, I forget his last

5  name.

6      Q    So on Page 3 still, on the right-hand

7  picture, it shows a horizontal load.  It looks

8  like -- well, actually, now that I'm examining it,

9  it looks like if you zoom out, the tooth is probably

10  on its side.

11          Is that accurate?

12      A    No.  The indicator is on the side of the

13  tooth, if you want to -- and it -- horizontal just

14  means -- it doesn't mean necessarily a load.  It was

15  back and forth, so out and into the -- more or less

16  into the -- yeah.  It's not quite accurate to say

17  plane of the page.  It's parallel to the edge of the

18  tip, in and out.

19      Q    And you say you don't have any videos of

20  this methodology or this testing?

21      A    I don't think so, no.

22      Q    Okay.  So on the -- so the picture on the

23  left side taken -- on the right-hand side of the

24  picture, there is some sort of vice that's grabbing

25  the adapter, true?

Page 208

1        A     True.

2        Q     How did you determine how to orient the

3    longitudinal axis of the tooth and the adapter?

4        A     Well, if you look at the adapter and where

5    it would be welded to the lip of the bucket, it's

6    nominally horizontal.

7             So that plane -- you know, the metal of the

8    bucket, the bottom of the bucket would be flat with

9    respect to the surface of the earth.

10       Q     Okay.  And in the left-hand image on

11   Page 3, there's no -- well, in this case, it would

12   be a downward vertical load being applied by

13   gravity; is that true?

14       A     True.

15       Q     In the middle image, what does the upward

16   vertical arrow indicate?

17       A     It just means we're -- we're moving the tip

18   up and down to measure the vertical rattle room,

19   basically, while we -- again, we push backward to

20   ensure the slack is taken out in the axial

21   direction.  So we just move it up and down and see

22   how much it wiggles.

23       Q     So the -- so the tooth is sitting

24   stationary on the adapter, and is the measuring tool

25   then zeroed out when it's at rest?

Page 209

1     A     Yeah, essentially.  I think we -- in some

2   cases, it wasn't quite zeroed out, and we just

3   subtracted that -- that net reading to get the net

4   vertical rattle.

5     Q     And then in this middle image on Page 3,

6   when it's in an at-rest location, someone would lift

7   up on the tooth in the direction of the orange

8   vertical arrow and then measure the displacement; is

9   that true?

10    A     Yeah, while making sure you also push

11  backward in the thrust direction.

12          MR. BENNETT:  Jeremy, are you close to

13  finishing this line of questions?  It's been, I

14  think, a good over an hour, if not an hour and 20

15  minutes since our last break.

16          MR. ROUX:  Give me a couple minutes.  I'll

17  finish on this page.  I have a little bit more on

18  the document, but I can get to a good breaking point

19  in a couple minutes.

20          MR. BENNETT:  Okay.

21  BY MR. ROUX:

22    Q     Dr. Klopp, did you utilize any measurement

23  tools to determine what magnitude of vertical and

24  axial loads were being applied to the nose when you

25  were making these measurements?

Page 210

1      A     No.

2      Q     Okay.  On the right-hand image, then, on

3    Page 3, there's a horizontal load.

4           I take it -- well, so the right-hand image,

5    the dial indicator, that was moved to the side of

6    the tooth, true?

7      A     True.

8      Q     And how was that zeroed out?  Did you apply

9    horizontal load to it first or was it an -- well, I

10   guess, can you describe the magnitude of measurement

11   when applying the horizontal load, how you did that?

12          MR. BENNETT:  Objection.  Form.

13          THE WITNESS:  I -- yeah.  I don't -- I

14   don't think it matters much.  I -- and I -- you'd

15   have to look, maybe, at the underlying spreadsheets

16   to see when -- when it was zeroed.

17          But, basically, the idea was that you would

18   let the self-weight pull the -- the tooth down or

19   in -- under orientation to up, push backward to take

20   out any thrust slack, push sideways into the page,

21   say, you know, in the direction of the green arrow,

22   take a reading, and then pull opposite the direction

23   of the green arrow and take a reading and subtract

24   the two.

25          So it doesn't really matter to me whether

Page 211

1   you zeroed anything anywhere as long as you just

2   took a difference.

3          MR. ROUX:  Yeah, that makes sense.

4          Okay.  Yeah.  I can do a five-, ten-minute

5   break.

6          MR. BENNETT:  Okay.  Great.

7          THE VIDEOGRAPHER:  Okay.  We're going to go

8   off the record.  The time is 2:55 p.m., and this is

9   the end of Media Unit No. 7.

10         (Off the record from 2:55 - 3:07 p.m.)

11         THE VIDEOGRAPHER:  Okay.  We are going back

12  on the record.  The time is 3:07 p.m., and this is

13  the start of Media Unit No. 8.

14  BY MR. ROUX:

15     Q    Dr. Klopp, for the clearance measurement

16  analysis you did, it looks like you ran tests on

17  three different TK size models; is that true?

18     A    Yes.

19     Q    What type of inspection, if any, did you do

20  of the samples before running these tests on it?

21     A    Other than just put them together and make

22  sure they fit and were -- you know, the pins were

23  functional, I think that was about it.  I mean --

24  yeah, that was it.

25     Q    Did you do any measurements to determine

Page 212

1  whether or not certain portions of the samples --

2  Well, strike that.

3          Did you do any measurements to determine

4  how far from nominal some of the design features

5  were in these samples prior to conducting your test?

6      A    No.

7      Q    Would it have impacted your test results if

8  certain surfaces were manufactured in such a way

9  that they were at the outer bounds of their

10 tolerance band?

11          MR. BENNETT:  Objection.  Form.

12          THE WITNESS:  Well, yeah, you can imagine

13 if -- if you had a -- a small nose in a big pocket,

14 you would have more rattle room than a -- than a big

15 nose in a small packet.  That stands to reason.

16 BY MR. ROUX:

17     Q    So, for example, it would impact your test

18 results if the nose were, I guess, LMC and the

19 socket was also LMC, true?

20          MR. BENNETT:  Objection.  Form.

21          THE WITNESS:  I think you mean nose at

22 maximum material condition, MMC.  So fattest nose

23 and -- you want fattest nose and -- no.  I guess

24 you're after smallest nose in fattest pocket,

25 perhaps?  So, yeah.

Page 213

```
 1            So LMC LMC.  I think that's right.
 2   BY MR. ROUX:
 3       Q    Okay.  Yeah, so I think you probably stated
 4   it more artfully than I did, but to -- so I guess
 5   new question.
 6            Do you agree that the different
 7   manufacturing tolerances for each of these products
 8   could potentially have an impact on the test
 9   results?
10            MR. BENNETT:  Objection.  Form.
11            THE WITNESS:  Yeah.  I -- I think if I had
12   tested several sets of the same-sized teeth, I would
13   get different rattle room on those, you know.
14   They're castings, and they're -- they're actually --
15   we know they're hand ground to -- to fit certain
16   gauges or whatever they have at the factory.
17            So you would get different answers.  No --
18   no doubt about it.
19   BY MR. ROUX:
20       Q    Did you do any inspection of how much
21   grinding was performed on these three samples, if
22   any?
23       A    Well, I've got one here I can look at.
24            So it looks -- you know, they obviously
25   have done some.  And it's, I think, consistent with
```

Page 214

1    the amount seen in -- in Holland and Panapa's

2    pictures as well.

3         Q    All right.  Can you please go to Exhibit 11

4    and go to Page 4.

5         A    Okay.  I'm there.

6         Q    Page 4 of Exhibit 11 contains test results

7    on the -- is it the smallest-sized TK sample?

8         A    Yeah.  TK 250.

9         Q    Do the results -- Well, strike that.

10        Is it accurate that your results with

11   respect to at least the TK 250 show that when the

12   pin is installed, the tooth will have more movement

13   than if there was no pin installed?

14        A    That's correct.

15        Q    Can you go down to the next page, please,

16   to the medium on Page 5.

17        A    Okay.  I'm there.

18        Q    Would you agree that for the -- Well,

19   strike that.

20        What size was the medium sample that you

21   tested?

22        A    That would be a TK 400.

23        Q    When you were testing the TK 400, is it

24   accurate to say that when applying vertical load,

25   the amount of tooth movement you saw was the same if

Page 215

1     the pin was installed and when the pin was taken

2     out?

3          A    Yes.

4          Q    When you were -- so, for example, when you

5     were doing your testing by applying vertical loads

6     to the teeth, you pushed upwards until the tooth

7     made contact with corresponding surfaces on the

8     adapter; is that true?

9          A    Well, we first pushed backward in the

10    thruster action to take out all the axial slack

11    possible, then pushed upward.

12         Q    When you were conducting your testing on

13    the TK samples, when you applied an axial load and

14    then an upwards vertical load, how were you able to

15    determine what surfaces inside of the socket were

16    making contact?

17         A    Well, let's see.

18              So in the cases where the answer is

19    different with and without the pin, that tells you

20    that the pin is at least sometimes making contact.

21              In the cases like medium here where I don't

22    think even in the horizontal the pin is really

23    making contact, that's probably more in the

24    measurement uncertainty, that we know, you know,

25    pushing up, obviously the -- those horizontal planar

Page 216

1  surfaces at the -- at the front and rear, depending

2  on which direction you load it, are making contact.

3  They're -- there's what -- they what -- they're what

4  keep the tooth from drooping, and they're what stop

5  you in the upper direction.

6            And the reason you know that is because you

7  still have side-to-side wiggle room in either of

8  those conditions.  So it can't be that the side

9  surfaces are what are limiting and contacting in the

10 upward or downward loading directions.

11     Q    When you use the word "wiggle room," is

12 that the -- is there a third step in the loads you

13 applied?

14     A    Well, yes.  So you -- like I -- I think the

15 method explains it, you could push backward to take

16 out axial slack, and then you zero the indicator in

17 the -- say, the down position, you push -- well,

18 okay.  This is for vertical movement.  You -- you

19 zero the indicator in -- rewind.  So let's talk

20 about side-to-side wiggle room.

21            You let the tooth droop down under gravity.

22 You push backward, take out any axial slack in the

23 assembly, then you take a measurement laterally,

24 push side to side, all right.  You have wiggle room.

25 That tells you that at -- at that condition, those

Page 217

1    side stabilizing surfaces are not bearing load,

2    cannot bear load because there's gaps.  Okay.

3         Then you push it upward while still pushing

4    backward and then attempt to wiggle side to side,

5    and you find out that, sure enough, you can still

6    wiggle it side to side.  So that tells you that

7    those side surfaces are not making contact and would

8    not bear load under vertical upward or downward

9    loading conditions.

10        Q    Okay.  I think I understand.

11             So let me just walk through this so it's

12   crystal clear for me and also the record.

13             For the vertical scenario, when you applied

14   that load to the samples, you zeroed out -- or

15   attempted to zero out the measuring gauge, applied

16   an axial load to the tooth, applied a vertical

17   upload to the tooth until there was resistance.  And

18   then the third step was to wiggle it side to side.

19             Fair?

20        A    Well, only when the indicator was measuring

21   side to side.  If it -- if the indicator was

22   measuring up down, we only -- we didn't try to

23   wiggle it side to side.  We just kept it more or

24   less centered and moved upward.

25        Q    Okay.  So for the vertical loading

Page 218

1   measurements on Page 5, for example, the methodology

2   was to apply axial load, push up and then measure

3   the displacement once it was up?

4       A    Right.  Relative to where it started.

5       Q    And in the vertical load, it was not --

6   there was no lateral loads applied, correct?

7       A    Right.  That was, then, a separate test.

8       Q    Okay.  And so my question for the vertical

9   load is that, when you were applying a vertical load

10  and the tooth made contact, how were you able to

11  determine where inside of the socket that contact

12  was occurring in the vertical load scenario?

13      A    Well, I think I explained it already, and

14  it's because we -- we ultimately know that we have

15  side-to-side gaps, wiggle room, up or down.  That

16  tells you that the -- the reactions cannot be on the

17  sides.  So the reactions either have to be the pin

18  or those horizontal stabilizing surfaces.

19          And I suppose they could be the slanted

20  regions between the front and rear sort of parallel

21  surfaces.  You know, we didn't go in and -- and try

22  to, you know, put -- you know, figure out where

23  contact is exactly occurring, but we know where it

24  isn't occurring.

25      Q    So it's fair to say that when you were

Page 219

1   applying the vertical and horizontal loading, you

2   didn't know exactly where contact inside the socket

3   was occurring, true?

4        A     Not exactly.

5              MR. BENNETT:  Objection.  Form.

6              THE WITNESS:  A lot of inference tells you

7   where it is and isn't.  Certainly, we know where it

8   isn't.

9   BY MR. ROUX:

10       Q     When you were conducting your testing, did

11  you attempt to apply vertical loads prior to

12  horizontal, or was there any methodology as to the

13  ordering of that?

14             MR. BENNETT:  Objection.  Form.

15             THE WITNESS:  Yeah.  I think that's what we

16  did.  So we -- in the -- in the horizontal

17  measurements, we always, you know, either let

18  gravity be the load while we pushed rearward and

19  then pushed side to side, so that had a vertical

20  load applied first.

21             And then in -- in pushing say in the up

22  direction to take out all the vertical slack, again,

23  we pushed backward first, upward and then saw if

24  there was side-to-side lateral movement.  And there

25  always was.

Page 220

1    BY MR. ROUX:

2       Q    Okay.  So this last time you said when you

3    did the vertical upward movement, you did check if

4    there was lateral side-to-side movement?

5       A    That was the horizontal at tip measurement.

6            So, I mean, you take the thing, it's

7    clamped.  You zero the indicator -- you have the

8    indicator on the side.  You -- you push back, you

9    push up -- I'm sorry.  You push back, you push, say,

10   away from yourself, look at the indicator, take a

11   reading.  Pull it toward yourself, take -- take

12   another reading, take the difference.

13           Now you push up, push it back, take a

14   reading.  Pull it forward, take a reading.  And so

15   you know the back-and-forth wiggle in the up back

16   condition and you know the wiggle in the down thrust

17   condition.

18      Q    All right.  So when you were applying the

19   vertical and horizontal, you didn't do horizontal

20   up -- well, strike that.

21           The way you describe it is you would apply

22   axial load, you would apply a horizontal load in one

23   direction --

24      A    No.  You do the thrust and then -- okay,

25   yeah, thrust, gravity, and then lateral.  Then you

Page 221

1    push thrust and up and measure lateral.

2            The lateral is always last.

3    Q    So if we're looking at Page 5, are those

4    measurements always lateral measurements?

5    A    No.  No.  So vertical is just with the

6    tooth in a neutral position, how much can it do

7    this.  All right.  The other one -- and with

8    rearward thrust.

9            The other one is rearward thrust, how much

10   can it do this under gravity.  Push it up, thrust,

11   how much can it do this, you know, with -- with

12   those forces.

13   Q    Got it.

14           So the horizontal, in some of those

15   scenarios, are you also applying a vertical load?

16   A    Yeah.  So here it is.  I go --

17           MR. BENNETT:  Objection.  Form.

18           THE WITNESS:  -- up, wiggle, down, wiggle

19   while I'm pushing back.

20   BY MR. ROUX:

21   Q    So on Page 5, what represents an up wiggle?

22   A    So I'm trying to -- oh, well, none of this

23   on Page 5.  This is all down wiggle.  This is -- if

24   you go back to the method on Page 3, it's all under

25   gravity down.  And then if you switch and go to 8,

Page 222

1   the whole thing is turned upside down and you let,

2   in effect, gravity do the up.

3         So I sort of misspoke.  So, I mean, it's

4   oversimplified to say it's up and wiggle.  It's turn

5   the whole thing upside down and let gravity do the

6   up.

7         So look at Slide 8.

8   Q    Yeah.

9   A    So here you push backward and wiggle, and

10  you don't have to force it up by hand.  You just let

11  gravity do it.

12  Q    And what -- and where in Exhibit 11 are

13  your wiggle measurements reflected?

14  A    So they are the bottom three rows of each

15  table.

16  Q    The horizontal at tip?

17  A    Correct.

18  Q    Okay.  So when you're applying the -- I

19  think I understand what you're saying.

20        When you're measuring the horizontal load,

21  you're not -- a person is not applying a vertical

22  load.  It's gravity that's applying the vertical

23  load?

24  A    Yeah.  In horizontal measurements, correct.

25  The vertical measurements --

Page 223

1      Q     Right.

2      A     -- you got to push it up and down to figure

3   it out.

4      Q     Right.

5           But in the vertical -- so in the rows that

6   say "Vertical" measurements, there's no horizontal

7   displacement reflected in those movements, correct?

8      A     Correct.

9      Q     Okay.  I think I'm back to where I started,

10  and I lost myself somewhere in the middle.  But

11  thank you for your patience on that.

12          And, again, are there -- all of the

13  pictures and documentation you have with respect to

14  this testing has been provided to Deere's counsel in

15  this case?

16     A     I believe so, yes.  I mean, you're -- you

17  can try it for yourself, I guess, what I recommend.

18     Q     Okay.  You can put that document away.

19          All right.  Let's go back to your rebuttal

20  report, so Exhibit 2.

21          Can you go to Page 34, please.

22     A     Okay.

23     Q     All right.  I'd like to talk through some

24  of your -- the non-infringement opinions that you've

25  taken.

DEERE EX. K
PAGE 242

Page 224

1          So I'll start off with Claim 8 for the '662

2    patent.

3          First, if you did not include a claim

4    limitation in your report for Claim 8, is it fair to

5    assume that you agree the accused products meet that

6    limitation?

7          MR. BENNETT:  Objection.  Form.

8          THE WITNESS:  I'd -- I'd probably have to

9    confirm on that.

10   BY MR. ROUX:

11       Q    But, as you sit here today, do you have any

12   reason to believe that if you left out a claim

13   limitation in your analysis in your rebuttal report,

14   that you have a non-infringement position on that

15   claim element?

16       A    I -- I think it's -- it's fair to say that

17   I didn't have anything to say about it if it's not

18   in the report.

19       Q    All right.  Let's go to 8.1.

20         So for Claim 8 of the '662 patent, there is

21   a requirement of a base secured to excavating

22   equipment, correct?

23       A    Yes.

24       Q    Would you agree that when Deere sells an

25   excavator with a TK series wear assembly installed,

Page 231

1    BY MR. ROUX:

2        Q    Are you there, Dr. Klopp?

3        A    Yes.

4        Q    Do you agree that the side surfaces of the

5    TK product resist horizontal loads during

6    excavating?

7        A    That appears to be the case.  Horizontal

8    loads, yes.

9        Q    And based on our prior discussion in your

10   report, your opinion is that the side surfaces of

11   the TK product do not resist vertical loads during

12   excavating, correct?

13       A    That is correct.

14       Q    Do you agree that during excavating

15   operations, it's possible for a tooth to experience

16   a load with both a vertical and horizontal

17   component?

18       A    Yes.

19            MR. BENNETT:  Objection.  Form.

20   BY MR. ROUX:

21       Q    Are you familiar with the term "eccentric

22   loading"?

23       A    Generally, yes.

24       Q    And what's your understanding of that term?

25       A    Well, it's pretty generic, but it would be

Page 232

1  basically off -- a loading off of some -- off center

2  of some -- some axis.

3     Q   Would you agree with me that an eccentric

4  load applied to a digging tooth could have a

5  vertical and horizontal component?

6         MR. BENNETT:  Objection.  Form.

7         THE WITNESS:  Well, what I would say?

8         Anything -- anything is possible.  I think

9  you need to be more specific as to what axis you're

10 eccentric to and -- and what -- you know, give me --

11 give me some examples of -- of loads.

12 BY MR. ROUX:

13    Q   Okay.  Do you have an understanding of

14 whether wear assemblies will undergo loads that

15 contain both a vertical and horizontal component

16 during excavation activities?

17    A   Yeah.  You just asked that, and the answer

18 is yes.

19    Q   Have you done any analysis regarding how

20 the TK product would react if it experienced a load

21 that had both a vertical and horizontal component?

22    A   Well, not -- not expressly.  Certainly you

23 can intuit a lot of it from the FEA, the wiggle

24 measurements and so on.

25    Q   So the answer is no, you have not done any

DEERE EX. K
PAGE 245

Page 233

1    analysis on how the TK product would react if it
2    experienced a load with a vertical and horizontal
3    component?
4        A    No.  I don't think that's a fair -- fair
5    characterization.  You can -- you can infer what's
6    going on, you know, superimpose the vertical and
7    horizontal various test results and FEA results.
8        Q    So it's your testimony that your testing
9    did not apply loads to a TK product that had both a
10   vertical and horizontal component, but you're able
11   to intuit various conclusions from your tests; is
12   that true?
13             MR. BENNETT:  Objection.  Form.
14             THE WITNESS:  No.  If you go back to the --
15   what I'll call the wiggle measurements, those had
16   both a vertical and a horizontal component.  In
17   fact, really, two horizontal components:  A thrust
18   component and a lateral component.
19   BY MR. ROUX:
20       Q    Have you done any analysis regarding how
21   the TK product would react if it experienced a load
22   with both a vertical and horizontal component at a
23   magnitude of service loading?
24             MR. BENNETT:  Objection.  Form.
25             THE WITNESS:  Well, service loading can be

DEERE EX. K

PAGE 246

Page 234

1   all over the place, so you'll have to clarify.

2   BY MR. ROUX:

3        Q    Do you have an understanding of what range

4   constitutes service loading for a wear assembly?

5        A    Yes.

6        Q    And what's that understanding?

7        A    Well, zero -- certainly zero to breakout

8   force.  And then in the opposite direction, it would

9   be kind of what -- what's the -- what's the weight

10  of -- of, you know, pushing downward with a bucket,

11  how much force does it take to lift the front of --

12  of whatever digger you're dealing with.  Okay.  So

13  that puts the limit on the upward force.

14       Q    I think -- yeah, go ahead.

15       A    And then -- and then there's -- you know,

16  the lateral force, you have to think about putting

17  the teeth into the ground and then trying to do a

18  slew type move, and that's going to be kind of all

19  over the map, depending on the friction of the

20  vehicle against the ground and its weight and

21  blabity blah.

22       Q    I think you testified earlier that you've

23  seen breakout forces that the TK tooth might

24  experience of approximately 40,000 pounds; is that

25  true?

Page 235

```
 1      A    Yes.  And that -- that's a -- that's a --
 2   that's a downward force on the tip of the tooth,
 3   basically.
 4      Q    Do you have any understanding of the
 5   magnitude of loading on the upper end of an
 6   eccentric load that a TK tooth might experience in
 7   the field?
 8           MR. BENNETT:  Objection.  Form.
 9           THE WITNESS:  Well, I guess, what do you
10   mean by "eccentric load" again?  Which -- which
11   axis, eccentric to what?
12   BY MR. ROUX:
13      Q    Eccentric to the longitudinal axis.
14           MR. BENNETT:  Objection.  Form.
15           THE WITNESS:  And this would be a vertical
16   eccentric load or horizontal eccentric load?
17   BY MR. ROUX:
18      Q    A vertical eccentric load.
19      A    So --
20           MR. BENNETT:  Objection.  Form.
21           THE WITNESS:  So it would amount to -- you
22   know, in -- in the limit, it would be the breakout
23   force times the -- and the moment applied would be
24   the breakout force times the lateral offset from
25   the -- the central axis, so it would be combined
```

Page 236

1    breakout force in the vertical direction and a --

2    and a moment equal to.

3            Like on -- on this TK 250, it would

4    probably be something like the breakout load times,

5    you know, inch and a half, something like that.

6    BY MR. ROUX:

7        Q    And that would result in a torsional load;

8    is that true?

9        A    That would be part of the load, yes.

10       Q    Have you done any testing or analysis to

11   determine how the side surfaces of the TK product

12   would react if it experienced a load with both a

13   vertical and horizontal component at the same time?

14       A    Well, again, I point to the lab

15   measurements, the -- the clearance measurements.

16   That's -- that's one.  And then the other is you can

17   infer from the FEA to some degree what -- what would

18   happen.

19       Q    Have you done any analysis to rule out that

20   when a -- Well, strike that.

21           If a tooth is displaced in the horizontal

22   direction due to a horizontal load and a vertical

23   load is then applied, have you done any analysis to

24   determine whether or not the side walls of the TK

25   tooth would resist load?

Page 237

1            MR. BENNETT:  Objection.  Form.

2            THE WITNESS:  To some degree.  So if you

3      think about the -- the 20-degree side slope there in

4      terms of like a brick on a hill, the -- you know, if

5      your friction coefficient is .4 or less, it would

6      take a really huge, more than breakout load,

7      horizontal load to effect the vertical part of

8      the -- you know, what -- what that surface is doing.

9            So because of the steep slant and because

10     of the clearances and seemingly low friction, you --

11     you would not bear significant component of the

12     vertical load due to the horizontal force.

13     BY MR. ROUX:

14        Q    Okay.  I'm not asking about bricks or

15     anything.  I'm talking about the TK product.

16            Have you done any actual testing on the TK

17     products that applied a horizontal load to displace

18     the tooth horizontally, applied a vertical load, and

19     then determined whether or not the side surfaces are

20     resisting that vertical load?

21            Have you done that testing?

22            MR. BENNETT:  Objection.  Form.

23            THE WITNESS:  So as I explained maybe

24     inartfully with the brick example, I've done the --

25     the calculation, so to speak, the -- you know,

Page 238

1    understood the friction aspect of it.  I haven't

2    done a lab test on that.

3    BY MR. ROUX:

4        Q    So you have not done a lab test applying a

5    horizontal load to displace the tooth and then

6    applying the vertical load, true?

7        A    Well, the clearance measurements were just

8    that, so you have to be more specific.

9        Q    If you go to 8. -- Page 52, please, 8.13.

10       A    Okay.

11       Q    Do you have an opinion as to whether the

12   top and bottom stabilizing surfaces of the socket

13   extend substantially parallel to the socket's

14   longitudinal axis?

15       A    Can you repeat the question.  Sorry.  I was

16   reading.

17       Q    Yeah.  Yeah.  Of course.

18            Do you have an opinion as to whether the

19   top and bottom stabilizing surfaces of the socket

20   extend substantially parallel to the socket's

21   longitudinal axis?

22       A    Well, to the extent that substantially

23   parallel is not in unlimited or indefinite, I think

24   a person of ordinary skill in the art would

25   recognize those surfaces being substantially -- you

Page 239

1  know, could -- could recognize those surfaces as

2  substantially parallel.

3      Q    And same question with the side stabilizing

4  surfaces:  Do you have an opinion as to whether the

5  side stabilizing surfaces of the socket extend

6  substantially parallel to its longitudinal axis?

7      A    Well, I think if you -- you know, if you

8  actually gave a -- an adapter to a PHOSITA who had

9  no knowledge of this case, they -- you know, they

10  might scratch their heads a little bit.

11         But I think, you know, they're -- you know,

12  it's more substantially parallel than not, I guess

13  I'll say.

14      Q    Have you done any analysis to determine

15  whether or not the side surfaces are substantially

16  parallel to the longitudinal axis of the socket?

17      A    Well, I certainly looked at Holland's angle

18  measurements.

19         Beyond that, no.

20      Q    If the CAD model that you relied on for

21  your FEA showed that the side stabilizing surfaces

22  on the socket extended approximately four degrees

23  from the longitudinal axis of the socket, would you

24  agree that that constitutes substantially parallel?

25      A    Yeah, I think --

Page 259

1    the questions that I have for you today.

2            MR. BENNETT:  I'll need to take a break.

3    Before I do that, I want to remember to say on the

4    record that we designate the entirety of the

5    transcript as highly confidential under the

6    protective order.

7            We can go on a short break, please.

8            THE VIDEOGRAPHER:  Okay.  We're going to go

9    off the record.  The time is 4:22 p.m., and it's the

10   end of Media Unit No. 9.

11           (Off the record from 4:22 - 4:39 p.m.)

12           THE VIDEOGRAPHER:  Okay.  We're going back

13   on the record.  The time is 4:39 p.m., and this is

14   the start of Media Unit No. 10.

15

16                      EXAMINATION

17   BY MR. BENNETT:

18       Q    Hi, Dr. Klopp.  I have a few questions

19   about your testimony.

20       A    Okay.

21       Q    Do you recall you were asked some questions

22   about versions 1 and 2 of certain INP files?

23       A    Yes.

24       Q    Would you consider those versions 1 and 2

25   as drafts?

Page 260

1          MR. ROUX:  Objection.  Form.

2          THE WITNESS:  Yeah.  I -- I think that's

3    fair, yes.

4    BY MR. BENNETT:

5       Q    Now, there was some testimony -- withdrawn.

6          You were asked some questions about

7    version 3.

8          Do you remember that?

9       A    A bunch.

10      Q    Yeah.

11      A    Yeah.  A bunch of questions.

12      Q    And the version 3 files were used

13   ultimately in forming certain of your opinions.

14          Was that your testimony?

15      A    Well, that is correct.

16      Q    But versions 1 and 2 of the INP files, you

17   did not consider them in forming your opinions, did

18   you?

19      A    I did not.

20          MR. ROUX:  Objection.  Leading.

21          THE WITNESS:  I did not.

22   BY MR. BENNETT:

23      Q    Well, I'll reword it.

24          Did you consider versions 1 or 2 of the INP

25   files in forming your opinions?

Page 261

1      A     I did not.

2      Q     Did you consider any of the output OBD

3   files from versions 1 or 2 of the INP files in

4   forming your opinions?

5      A     I did not.

6           MR. BENNETT:  Pass the witness.

7           MR. ROUX:  No questions.

8           So I think you're off the hook, Dr. Klopp.

9           THE WITNESS:  All right.  Thank you.

10           THE VIDEOGRAPHER:  If there is nothing

11   further, we are off --

12           MR. BENNETT:  We will read and sign.

13           THE VIDEOGRAPHER:  All right.  If there is

14   nothing further, we are off the record at 4:41 p.m.

15   Pacific Standard Time.

16           This concludes today's testimony given by

17   Dr. Richard Klopp.  The total number of media units

18   used was ten and will be retained by Veritext Legal

19   Solutions.

20               (The following proceedings were

21                 held off the video record.)

22           THE REPORTER:  Mr. Bennett, did you want a

23   copy of this?

24           MR. BENNETT:  Yes, please.

25           THE REPORTER:  And did you want a rough?

Page 262

1          MR. BENNETT:  Yes.  Thank you.

2          THE REPORTER:  And did you want it

3    expedited?  It's on a two-day expedite.

4          MR. BENNETT:  What is non-expedited?

5          THE REPORTER:  Ten business days.

6          MR. BENNETT:  Oh, yeah.  We better do

7    expedited, then, please.

8          THE REPORTER:  Okay.

9

10       (Whereupon, at 4:42 p.m., the deposition of

11    RICHARD KLOPP, Ph.D., P.E., F.A.S.M.E. was concluded.)

12

13                    ---oOo---

14

15

16

17

18

19

20

21

22

23

24

25

DEERE EX. K
PAGE 256

# EXHIBIT L

DEERE EX. L

PAGE 257

HIGHLY CONFIDENTIAL TESTIMONY

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF DELAWARE

3                          *    *    *

4    ESCO GROUP LLC,

5           Plaintiff,

6         vs.                    CASE NO. 20-1679-RGA

7    DEERE & COMPANY,

8           Defendant.

9                          *    *    *

10        Remote video-taped deposition of PIERCE

11   UMBERGER, Ph.D., P.E., Witness herein, called by

12   the Defendant for cross-examination pursuant to

13   the Rules of Civil Procedure, taken before me,

14   Kathy S. Wysong, a Notary Public in and for the

15   State of Ohio, at 430 Technology Parkway NW,

16   Peachtree Corners, Georgia, on Friday, March

17   17, 2023, at 9:59 a.m.

18                          *    *    *

19

20

21

22

23

24

25

DEERE EX. L

PAGE 258

HIGHLY CONFIDENTIAL TESTIMONY

Page 146

1  energy, which is the energy that actually goes

2  into moving and deforming the material.

3              ABAQUS provides guidance that that

4  value should be typically no more than five

5  percent of the strain energy.  So we're seeing

6  values here between twenty-two and one thousand

7  one hundred and thirty-two percent, which are

8  much, much larger.

9              The traditional way and the primary

10 way to evaluate what effect that has on the actual

11 results of a simulation is to compare contact

12 pressures and contact stresses from the simulation

13 with the contact dissipation pressures and the

14 contact dissipation stresses.  In other words, you

15 compare the material element of the solution to

16 the artificial stabilization element of the

17 solution.

18             That's something we're not able to do

19 because contact dissipation stresses and contact

20 dissipation pressures were either specifically or

21 unintentionally were not requested to be computed

22 by the solver so that data simply doesn't exist in

23 Dr. Klopp's model data so we're unable to make

24 that comparison to understand exactly how large an

25 effect this error has in the results of the

HIGHLY CONFIDENTIAL TESTIMONY

Page 147

1  simulation.

2  BY MR. LINDEN:

3          Q.   So are you saying that a high

4  ratio of contact stabilization energy

5  dissipation to strain energy necessarily means

6  that the results are incorrect -- I'm sorry,

7  the results of the analysis are incorrect?

8          A.   It absolutely indicates that you

9  need to evaluate that point.

10         Q.   No, the question is whether it

11 necessarily means that they are incorrect?

12         A.   That's something you have to

13 evaluate for the individual simulation, for the

14 individual result, for the individual scenario.

15 That's not a determination I can make in broad

16 terms.

17         Q.   So is that a determination that

18 you did make in your report?

19         A.   As I stated, it's a determination

20 that neither I nor anyone can make with this

21 data because the information necessary to

22 evaluate that was not computed as part of the

23 solution.

24         Q.   What does it mean when an FEA

25 model fails to converge?

Page 148

1          A.   It means that as the solver

2     numerically iterates to a solution, that it

3     reaches a point where either of the increments

4     or the step size required to do that

5     computation is below some sort of limit that

6     the analyst sets, or it means that there is an

7     inherent instability in the problem, such as a

8     part diverging or a part completely losing

9     contact and having no constraint.

10               There are multiple reasons for

11    lack of convergence, but simply put, what a

12    lack of convergence means is that the solver is

13    unable to develop a solution for the problem as

14    stated.

15          Q.   And based on your experience doing

16    FEA analysis, what do you do if your model

17    fails to converge?

18          A.   So the first step is to

19    investigate the reason for that lack of

20    convergence.  Sometimes that could be mesh

21    related.  Sometimes that could be load or

22    constraint related.  Sometimes that could be

23    contact formulation related.  And sometimes

24    it's just due to the complexity of the problem

25    and the step, time, size that's input or

HIGHLY CONFIDENTIAL TESTIMONY

Page 149

1    allowed by the analyst.

2         Q.   Okay.  And once you figure out

3    what the problem was, what do you do then?

4         A.   You address each of those

5    individually.  If it's a meshing issue or a

6    meshing problem, you may locally refine a mesh

7    in an area.

8              If it's a material instability

9    problem, it could be a material model issue you

10   need to correct.

11             If it's a general assembly

12   complexity problem, one of the potential

13   solutions is contact stabilization.  Another

14   potential solution is allowing the parts to

15   have something like inertia to allow them to

16   stabilize themselves with inertia-type load.

17        Q.   Is it common to have models not

18   converge at the outset of your FEA analysis?

19        A.   It depends on the complexity of

20   the analysis; but in complicated contact

21   problems with multiple parts, I would not say

22   it's at all uncommon.  It's something we run

23   into relatively frequently as mechanical

24   engineers.

25        Q.   And would you consider the FEA

HIGHLY CONFIDENTIAL TESTIMONY

Page 150

1   analysis done by Dr. Klopp to be complex?

2        A.   Relatively speaking, with respect

3   to the degree of contact and the number of

4   mating components, I would agree, this is a

5   relatively complex contact problem especially.

6             MR. LINDEN:  Okay.  Can we take a

7   ten-minute break?  Go off the record, please.

8             THE VIDEOGRAPHER:  Off the record.

9   2:20.

10            (Pause in proceedings.)

11            THE VIDEOGRAPHER:  On the record.

12   2:32.

13   BY MR. LINDEN:

14        Q.   Okay, Dr. Umberger, after a short

15   break we're back on the record.  Did you

16   discuss your testimony here today with anybody

17   during the break?

18        A.   No, I did not.

19            MR. LINDEN:  I'd like to introduce an

20   exhibit.  The document I've got labeled number

21   twenty-four in my collection, Jim, if you could

22   pull that in and label it, where are we at,

23   Exhibit 2?

24            THE CONCIERGE:  That's correct.

25            MR. LINDEN:  Okay.  Thank you.

HIGHLY CONFIDENTIAL TESTIMONY

Page 151

1                (Exhibit 2, DEERE_0000384, was marked

2    for purposes of identification.)

3    BY MR. LINDEN:

4          Q.    It should be available to you now,

5    Dr. Umberger.  Can you access Exhibit 2?

6          A.    I have just pulled it up, yes.

7          Q.    Okay.  Have you ever seen this

8    document before.

9          A.    Not before today as I sit here,

10   no.

11         Q.    Okay.  I'll represent to you that

12   it is a specification drawing for the accused

13   product.  If you look in the lower right-hand

14   corner, you'll see the part number, TK225FD.

15   Do you see that?

16         A.    I do.

17         Q.    Okay.  And it's called the fangg

18   tooth, do you see that right above there?

19         A.    I do.

20         Q.    Okay.  I'd like to draw your

21   attention to the left side of the page under

22   the notes, Number 2.  What is -- does the

23   language in Number 2 mean anything to you?

24         A.    It means that the component is

25   heat treated to a hardness of forty-seven to

# EXHIBIT M

DEERE EX. M

PAGE 265

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| **ESCO GROUP LLC,**<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>**DEERE & COMPANY,**<br><br>　　　　　　Defendant. | C.A. No. 1:20-CV-01679-WCB |

**DECLARATION OF AVA M. ABNER IN SUPPORT OF DEERE'S OPPOSITION TO
ESCO'S MOTION TO STRIKE LATE DISCLOSED OPINIONS OF DR. RICHARD
KLOPP AND TO COMPEL PRODUCTION OF MATERIALS CONSIDERED**

I, Ava M. Abner, declare as follows:

1.　　　　I am an attorney with Ulmer & Berne LLP, counsel for Defendant Deere & Company. I am a member of the Bar of the State of Ohio and am admitted *pro hac vice* to this Court. I have personal knowledge of the matters stated in this declaration and would testify truthfully to them if called upon to do so.

2.　　　　Following the opening infringement report of Mr. Holland, Ulmer & Berne LLP requested that Black Cat arrange for shipment of samples of the Accused Products from China to Dr. Klopp for testing. Due to a shipping error, Dr. Klopp received a delivery of an item unrelated to this case, rather than samples of the Accused Products.

3.　　　　Shortly after Deere served Dr. Klopp's rebuttal report, on the same day, Dr. Klopp notified Ulmer & Berne LLP that he had received the samples of the Accused Products for testing.

4.　　　　Dr. Klopp's testing on the samples of the Accused Products was produced to ESCO on March 3, 2023, contemporaneously with his reply report. Exhibit I of the appendix in support of Defendant Deere & Company's opposition to Plaintiff ESCO Group LLC's motion to exclude

to strike late disclosed opinions of Dr. Richard Klopp and to compel production of materials considered is a true and correct copy of that clearance testing.

5.     Deere produced input files for each of Dr. Klopp's FEA simulations contemporaneously with Dr. Klopp's rebuttal report.

6.     On February 20, 2023, ESCO requested that Deere also produce corresponding output database files (.odb files) and computer-aided engineering files (.cae files or "mesh"). Deere did so on February 22, 2023.

7.     Thereafter, on February 22, 2023, ESCO requested that Deere also produce earlier draft .inp files.  On February 24, 2023, Deere refused based upon its position that any such draft .inp files did not exist, were not considered by Dr. Klopp in forming his opinions, and are not discoverable under Fed. R. Civ. P. 26.

8.     On March 14, 2023, ESCO reiterated its request for draft .inp files, and the parties met and conferred on that issue on March 20, 2023.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 5, 2023.

_____
Ava M. Abner

DEERE EX. M
PAGE 267