## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ESCO GROUP LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 20-1679-WCB-MPT |
| | ) | |
| DEERE & COMPANY. | ) | **PUBLIC VERSION FILED** |
| | ) | |
| Defendant. | ) | **MAY 10, 2023** |
| | ) | |

## DEFENDANT DEERE & COMPANY'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO STRIKE EXPERT TESTIMONY OF THOMAS R. VARNER, PH.D. AND TISO PANAPA

**SAUL EWING LLP**

James D. Taylor, Jr. (#4009)
Michelle C. Streifthau-Livizos (#6584)
SAUL EWING LLP
1201 N. Market Street, Suite 2300
Wilmington, Delaware 19801
(302) 421-6800
james.taylor@saul.com
michelle.streifthau-livizos@saul.com

OF COUNSEL:

John F. Bennett (*pro hac vice*)
Paul M. Ulrich (*pro hac vice*)
Rachael L. Rodman (*pro hac vice*)
Paul J. Linden (*pro hac vice*)
Ava M. Abner (*pro hac vice*)
ULMER & BERNE LLP
312 Walnut Street, Suite 1400
Cincinnati, Ohio 45202-4029
(513) 698-5000
jbennett@ulmer.com
pulrich@ulmer.com
rrodman@ulmer.com
plinden@ulmer.com
aabner@ulmer.com

*Attorneys for Defendant*
*DEERE & COMPANY*

Dated: March 28, 2023

## <u>TABLE OF CONTENTS</u>

I.     STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ...................................1

II.    STATEMENT OF FACTS ........................................................................................................1

III.   LEGAL STANDARD..............................................................................................................6

IV.   DR. VARNER'S INAPPROPRIATE ERRATA SHOULD BE STRICKEN..................................7

V.    MR. PANAPA'S NEW REFINED MEASUREMENTS AND REANALYSIS OF HIS INITIAL INTERPENETRATION PROBLEMS SHOULD BE STRICKEN ..............................................17

VI.   CONCLUSION.....................................................................................................................20

41379910.2

# **TABLE OF AUTHORITIES**

Page(s)

**CASES**

*Abbott Lab'ys v. Lupin Ltd.*,
   C.A. No. 09-152-LPS, 2011 WL 1897322 (D. Del. May 19, 2011)...........................................6

*Allen v. Parkland School District*,
   No. 06-1560, 2007 WL 1228947 (3d Cir. 2007) ...................................................................12

*Apple, Inc. v. Motorola Mobility, Inc.*,
   No. 11-cv-178-bbc, 2012 WL 5416941 (W.D. Wis. Oct. 29, 2012) ................................15, 19

*Astellas US LLC v. Hospira, Inc.*,
   No. 2022-1878, 2022 WL 17998229 (Fed. Cir. 2022) ................................................12, 16, 20

*BearBox LLC v. Lancium LLC*,
   C.A. No. 21-534-GBW, 2022 WL 17403466 (D. Del. Nov. 23, 2022)...........................17, 20

*Boca Raton Cmty. Hosp., Inc. v. Tenet Healthcare Corp.*,
   No. 05-80183-CIV, 2006 WL 5309506 (S.D. Fla. Oct. 18, 2006) .........................................15

*Bridgestone Sports Co. Ltd. v. Acushnet Co.*,
   C.A. No. 05-132 JJF, 2007 WL 521894 (D. Del. Feb. 15, 2007)............................................7

*Dow Chem. Co. v. Nova Chems. Corp.*,
   2010 WL 2044931 (D. Del. May 20, 2010)...........................................................................7

*In re Paoli R.R. Yard PCB Litig.*,
   35 F.3d 717 (3d Cir. 1994).....................................................................................................7

*Innogenetics N.V. v. Abbott Labs.*,
   512 F.3d 1363 (Fed. Cir. 2008) ............................................................................................15

*Konstantopoulos v. Westvaco Corp.*,
   112 F.3d 710 (3d Cir. 1997)..................................................................................................7

*Meyer Intell. Properties Ltd. v. Bodum, Inc.*,
   690 F.3d 1354 (Fed. Cir. 2012)......................................................................................14, 19

*Novartis Pharm. Corp. v. Actavis, Inc.*,
   C.A. No. 12-366-RGA-CJB, 2013 WL 7045056 (D. Del. Dec. 23, 2013).......................15, 19

*Praxair, Inc. v. ATMI, Inc.*,
   231 F.R.D. 457 (D. Del. 2005) ....................................................................................13, 17, 20

*Reed v. Binder*,
    165 F.R.D. 424 (D.N.J. 1996)................................................................................14

*Robocast, Inc. v. Apple, Inc.*,
    C.A. No. 11-235-RGA, 2013 WL 7118691 (D. Del. Dec. 4, 2013)..................................12, 18

**OTHER AUTHORITIES**

Fed. R. Civ. P. 26................................................................................................*Passim*

Fed. R. Civ. P. 37................................................................................................6

41379910.2

## I.     STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

Defendant Deere & Company ("Deere") moves to strike portions of the testimony of Plaintiff ESCO Group, LLC's ("ESCO") experts, Thomas R. Varner., Ph.D. and Tiso Panapa, under Federal Rules of Civil Procedure 26(a) and 37(c).[1]  ESCO brought this case on December 10, 2020 and amended the complaint on April 7, 2021, alleging that Deere infringes two patents: U.S. Patent No. 8,844,175 ("the '175 Patent") and U.S. Patent No. 10,273,662 ("the '662 Patent") (collectively, the "Asserted Patents").  (D.I. 1, 11.)  The discovery period has closed.  Trial is set for September 18, 2023.  (D.I. 24.)

## II.     STATEMENT OF FACTS

ESCO alleges that Deere's TK Series bucket tooth wear assembly ("Accused Products") infringes the Asserted Patents, which are directed to bucket teeth wear assemblies used on excavation equipment.  (*See* D.I. 11.)  The claimed wear assemblies in both Asserted Patents include a base (or "adapter") attached to excavation equipment, a wear member with a socket that fits over the base, and a lock that secures the wear member to the base.  (*See id*.)  ESCO alleges that Deere has infringed independent claims 8 and 21 of the '662 Patent, independent claims 4, 6, 13, and 17 of the '175 Patent, and a handful of dependent claims ("Asserted Claims").

The inventions of both Asserted Patents rely in significant part on cooperating surfaces of the wear member's socket mating with corresponding surfaces of the base so that the claimed wear assembly can, inter alia, resist and bear loads applied to the assembly and limit the wear experienced by the assembly over time.  "[T]he base and wear member define a nose and socket, which are formed with complementary stabilizing surface extending substantially parallel to the longitudinal axis of the assembly to provide a stronger and more stable construction."  ('662 Pat.,

---

[1] The parties, including their respective Delaware counsel, met and conferred on the issues presented in this motion, as required under D. Del. LR 7.1.1, but no agreement could be reached.

1:48-52, Ex. B, at 34.)

The following figures depict the mating surfaces of their respective sockets and bases:



| '662 Patent | '175 Patent |
|---|---|
| **Base:** | **Base:** |
| ('662 Pat., Fig. 3, Ex. B, at 27.) | ('175 Pat., Fig. 4, Ex. A, at 7.) |
| **Socket:** | **Socket:** |
| ('662 Pat., Fig. 7, Ex. B, at 29.) | ('175 Pat., Fig. 5, Ex. A, at 8.) |
| **Assembly:** | **Assembly:** |
| ('662 Pat., Fig. 8, Ex. B, at 29.) | ('175 Pat., Fig. 2, Ex. A, at 5.) |

2

(*See also* '662 Pat., 11:35-45, Ex. B, at 39 (claim 8 recites: "[T]he side walls each including a pair of side stabilizing surfaces . . . along the respective side wall and positioned to bear against complementary surfaces in respective side recesses in the base **to resist both vertical and horizontal loads during excavating** [.]" (emphasis added)); '175 Pat., 17:25-28, Ex. A, at 21 (claim 17 recites: "[E]ach of the lateral sides including an inward, axially extending projection defined by bearing surfaces to **contact and bear against the base** [.]" (emphasis added)).

The scheduling order set out the following deadlines for expert reports: (i) "[f]or the party who has the initial burden of proof on the subject matter, the initial Federal Rule 26(a)(2) disclosure of expert testimony is due on or before [January 13, 2023]"; (ii) "[t]he supplemental disclosure to contradict or rebut evidence on the same matter identified by another party is due on or before [February 8, 2023]"; and (iii) "[r]eply expert reports from the party with the initial burden of proof are due on or before [March 3, 2023]."  (D.I. 24, ¶ 8(f)(i), twice amended by, D.I. 109 and D.I. 111, respectively.)  The scheduling order also states: "No other expert reports will be permitted without either the consent of all parties or leave of the Court."  (D.I. 24, ¶ 8(f)(i).)  Moreover, "the parties agree[d] they will not permit expert declarations to be filed in connection with motions briefing (including case-dispositive motions)."  (*Id.*, ¶ 8(f)(ii).)

ESCO has submitted expert reports from three technical experts: Mr. Panapa, Mr. Holland, and Dr. Umberger.  Mr. Holland submitted reports on January 13, 2023, February 8, 2023, and March 3, 2023, offering opinions related to infringement and invalidity, as well as non-infringing alternatives to the Accused Products.  Mr. Panapa, an ESCO employee, submitted a report on January 13, 2023 (Panapa Rpt., Ex. J, at 112) and a reply report on March 3, 2023 (Panapa Reply Rpt., Ex. P, at 168), describing the 3D scanning and dimensional analysis of the Accused Products he supervised at ESCO's facility in Portland, Oregon under the direction of Mr. Holland.  Mr.

Holland relies on Mr. Panapa's 3D scanning and dimensional analysis to attempt to establish infringement of the Asserted Patents, including whether certain surfaces of the Accused Products are "substantially parallel" to the longitudinal axis and whether other surfaces come in contact, resist loads, or bear loads.  (*See*, *e.g.*, Holland Rpt., ¶¶ 52-64, Ex. I, at 98-111; Holland Reply Rpt., ¶¶ 35, 76, Ex. O, at 162-67.)

Deere's technical expert, Dr. Klopp, criticized several aspects of the 3D scanning and dimensional analysis Mr. Panapa conducted for his January 13, 2023 report.  (Klopp Rpt., ¶¶ 34-57, Ex. M, at 135-36.)  Relevant to this motion, Dr. Klopp criticized Mr. Panapa for failing to properly explain the rationale for his planar analysis or provide a "goodness of fit" (*see*, *e.g.*, *id*., ¶ 52, Ex. M, at 151-52) and for allowing "interpenetration" of surfaces, i.e., where mating surfaces overlap, a physical impossibility in real-world applications (*see*, *e.g.*, *id*., ¶ 42 & Fig. 11, Ex. M, at 141-42, 147).  According to Dr. Klopp, these flaws corrupted Mr. Panapa's analysis of the interplay between the socket and base of the Accused Products, which, in turn, infected Mr. Holland's infringement opinion with unreliable data.  (*Id*., ¶ 34, Ex. M, at 137.)

In his March 3, 2023 reply report, Mr. Panapa did more than merely respond to Dr. Klopp's criticism.  In response to the lack of "goodness of fit" criticism, Mr. Panapa took new measurements.  (Panapa Reply Rpt., ¶ 7, Ex. P, at 171-73.)  And, in response to the "interpenetration" criticism, Mr. Panapa "reanalyzed the largest examples of 'interpenetration'" present in his initial report.  (*Id*., ¶ 16, Ex. P, at 179-180)  In other words, Mr. Panapa's reply report offers new data, new analysis, and new results, including "new refined measurements" (or "new refined planes values") and "reanalyzed" or cleaned up 3D analysis removing "scan noise" and

41379910.2

"fine-tun[ing]" parameters of the 3D scan.  (*Id.*)[2]

Turning to damages, ESCO concedes that it provided no actual or constructive notice of the Asserted Patents to Deere prior to filing its complaint and amended complaint in this matter on December 10, 2020 and April 7, 2021, respectively, and that ESCO is therefore not entitled to damages prior to December 10, 2020.  (*See* ESCO Response to Interrog. 16, Ex. D, at 50 ("ESCO is not seeking damages for infringement by Deere of the '662 Patent prior to December 10, 2020 and infringement by Deere of the '175 Patent prior to April 7, 2021.").)  ESCO seeks damages in the form of lost profits (with a residual royalty and future lost profits) or, alternatively, in the form of a reasonable royalty.  (*See* Varner Rpt., ¶¶ 12-14, Ex. H, at 86-87.)  It is ESCO's lost profits claim that is relevant to this motion.

ESCO sells two products that allegedly practice the claims of the Asserted Patents—the GeoVor products used in offshore dredging operations and the Nemisys 3-Piece System products used in mining applications.  (*See* ESCO Response to Interrog. 5, Ex. C, at 44; Stitzel Dep. at 39, 42-43, 103.)  Neither of these two products compete in the same market as the accused TK Series, which is described as a "premium" segment of the U.S. construction expendables market (e.g., bucket teeth or ground engaging tools used on construction excavation equipment).  (*See* Stitzel Dep. at 39, 42-43, 103, Ex. G, at 69, 72-73, 79; Varner Rpt., ¶ 51, Ex. H, at 89-91.)  ESCO sells a competing product in this market segment called Ultralok, but Ultralok does not practice the claims of the Asserted Patents.  (*See* Stitzel Dep. at 100-01, Ex. G., at 76-77; ESCO Response to Interrog. 24, Ex. E, at 56-57.)  ESCO's lost profits claim is based on allegedly lost sales of its Ultralok

---

[2] During his deposition, Mr. Panapa testified that Mr. Holland and he both recognized the "interpenetration" issue at the time he conducted his initial 3D scan, but chose not to fix it for his initial January 13, 2023 report.  (Panapa Dep. at 96:9-97:13, Ex. R, 222-223.)

product.  (*See* Varner Rpt., ¶ 12, Ex. H, at 86-87.)

ESCO submitted the opening report of its damages expert, Dr. Varner, on January 13, 2023.  (Varner Rpt., Ex. H, at 84-97)  Dr. Varner then submitted an "Errata" to that opening report on January 16, 2023.  (Varner Jan. Errata., Ex. K, at 119-27)  Following the rebuttal report of Deere's expert, Dr. Varner submitted a reply report on March 3, 2023.  (Varner Reply Rpt., Ex. N, at 157-61.)  Deere deposed Dr. Varner on March 13, 2023.  (Varner Dep., Ex. Q, at 182-218.)  A week later, at 5:27 pm on Sunday, March 19, 2023, ESCO served a second "Errata" to Dr. Varner's opening and reply reports.  (Varner Mar. Errata, Ex. S, at 225-29; *see also* Rodman Decl., ¶ 4, Ex. T, at 231; Mar. 19, 2023 Email, Ex. V, at 234-38.)  That second errata is the subject of this motion.

## III.   <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 26(a)(2)(B)(i) requires that an expert's report contain "a complete statement of all opinions the witness will express and the basis and reasons for them."  Fed. R. Civ. P. 26.  Further, Rule 26(a)(2)(c) provides that "a party must make these [expert] disclosures at the time and in the sequence that the court orders."  *Id*.  Although parties have an obligation under Rule 26(e)(1)(A) to supplement their expert reports when it becomes necessary to do so, "parties may not use their obligation to supplement as an excuse to violate the clear terms of a Scheduling Order, unilaterally buying themselves additional time to make disclosures, thereby unduly prejudicing other parties and potentially delaying the progress of a case."  *Abbott Lab'ys v. Lupin Ltd.*, C.A. No. 09-152-LPS, 2011 WL 1897322, at *3 (D. Del. May 19, 2011).  Under Rule 37(c)(1), a court has the power to exclude evidence as a sanction for a party's failure to comply with its obligations under the rules, including the specific deadlines and obligations imposed by a scheduling order.  Fed. R. Civ. P. 37 ("If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to support evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.").

41379910.2

To determine whether a failure to disclose is harmless, a court considers the following factors: (1) the importance of the information withheld; (2) the prejudice or surprise to the party against whom the evidence is offered; (3) the likelihood of disruption of the trial; (4) the possibility of curing the prejudice; (5) the explanation for the failure to disclose; and (6) the presence of bad faith or willfulness in not disclosing the evidence (the "*Pennypack* factors").  *See Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997).  It bears emphasis that exclusion of "critical evidence," such as an expert report on infringement, is an "extreme sanction, not normally to be imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence."  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 791-92 (3d Cir. 1994) (internal quotation marks omitted); *see Dow Chem. Co. v. Nova Chems. Corp.*, 2010 WL 2044931, at *1 (D. Del. May 20, 2010).  But "[c]ourts applying the *Pennypack* factors in the case of sophisticated, complex litigation involving parties represented by competent counsel have been less indulgent in their application and more willing to exclude evidence without a strict showing that each of the *Pennypack* factors has been satisfied."  *Bridgestone Sports Co. Ltd. v. Acushnet Co.*, C.A. No. 05-132 JJF, 2007 WL 521894, at *4 (D. Del. Feb. 15, 2007).

## IV.    DR. VARNER'S INAPPROPRIATE ERRATA SHOULD BE STRICKEN

On March 19, 2023, months after his opening report, more than two weeks after his reply report, and a week after his deposition, Dr. Varner submitted a new "Errata" to his reports, which purported to make changes to Exhibit 6 to his opening report (an identical version of which was also included in his reply report).  (Varner Mar. Errata ¶ 2 & Exhibit 6R, Ex. S, at 227-28.)  Because this so-called Errata does not comport with the requirements of Fed. R. Civ. P. 26(a) or (e) or with the Court's orders, Deere requests that it be stricken as it relates to the new Exhibit 6R and related

text.[3]  (*See id.*)

As discussed at length in Deere's March 22, 2023 brief in support of its *Daubert* motion (D.I. 194), Dr. Varner's lost profits opinion is based on an analysis of the market share for ESCO's Ultralok product (the product for which ESCO alleges it lost sales) in the "premium" segment of the U.S. construction expendables market (the market in which both the Ultralok and the accused TK Series compete).  (*See* Varner Rpt., ¶¶ 51-52, 54-55, Ex. H, at 89-94.)  For this analysis, he started with Ultralok's ███████ share of that premium segment of the market and purported to calculate what Ultralok's market share would have been if the accused TK Series were not on the market.  (*See id.*, ¶¶ 54-55, 71-72, Exhibit 6, Ex. H, at 92-94, 96-97.)  But he ignored ███████ market share of the TK Series in the relevant market and calculated Ultralok's "but for" market share using ████ market share for the TK Series.  (*See id.*, ¶¶ 55, 57, Exhibit 6, Ex. H, at 93-94, 97.)  He showed this "Market Share Analysis" for the "Premium Market" in Exhibit 6 to his report:



(*Id*, Exhibit 6, Ex. H, at 97.)  He also described this exhibit in the text of his report:  "Exhibit 6 shows existing market shares **of the premium segment of the market** for bucket tooth systems in construction equipment in the U.S.")  (*Id.*, ¶ 57, Ex. H, at 94 (emphasis added).)

Exhibit 6 did not, however, reflect the market shares in the premium segment.  While even

---

[3] Dr. Varner also updated Exhibit R3.1 because the formatting of the initial exhibit resulted in certain cells being filled with "XXXX" rather than the numbers.  (*See* Varner Mar. Errata ¶ 3 & Exhibit R.3.1, Ex. S, at 227, 229.)  Although the timing is problematic, Deere does not object to this formatting edit.

███ share for ESCO's Ultralok product lacks foundation beyond a conversation with an ESCO employee, there is no question that the TK Series does not have ███ share of the premium market.  All evidence indicates that the market share for TK in the premium segment ███ (*See*, *e.g.*, Budan Dep. at 21-22, Ex. F, at 63-64 (on which Dr. Varner relied for ███ but testifying that TK had ███ share of **only** the market for **Deere machines**); Stitzel Dep. at 131, Ex. G, at 82 (testifying that ESCO calculates the market share for TK ███); Becker Rpt., ¶¶ 287-91, Ex. L, at 131-33 (collecting evidence of a TK market share of ███); *id.*, ¶¶ 292-93, Ex. L, at 133-34 (noting that sales data alone indicated that Ultralok sales ███ ███ TK Series sales, suggesting a TK market share ███ if Ultralok actually has a market share ███); Varner Dep. at 171, Ex. Q, at 207 ("███"); *id.* at 168-69, Ex. Q, at 204-05 (Dr. Becker's calculations ███ based on sales data appear to be correct).)

Unable to maintain that the TK Series had ███ share of the premium segment, Dr. Varner took another approach.  Beginning in his reply report, Dr. Varner ignored his prior statements and instead conceded that ███ market share for TK that he used in his calculations was not the TK Series share of the premium market but rather the TK Series share of just the market for replacement parts on Deere machines.  (*See* Varner Reply Rpt., ¶¶ 58-59, Ex. N, at 160-61.)  He maintained this position throughout his deposition, making the new argument that pulling numbers from two different markets (resulting in a higher market share for ESCO and thus a higher lost profits calculation) was the proper methodology.  (*See* Varner Dep. at 163-64, 176-78, Ex. Q, at 199-200, 212-14.)  He testified extensively about his Exhibit 6, at no point indicating that there were any errors in his calculations.  (*See id.* at 143, 149-50, 156, 162-65, 177, 191, Ex. Q, at 188, 191-92, 195, 198-201, 213, 217.)  In fact, he was emphatic that his analysis and math were correct.  (*See id.*)

Deere was therefore surprised to be served—a week after his deposition and mere days before the deadline for *Daubert* motions and summary judgment motions—his Errata purporting to rework Exhibit 6 entirely.  His new Exhibit 6R drastically changes Exhibit 6 and his resulting conclusions of market share:

**Exhibit 6R  Market Share Analysis**
**Premium Market (Deere TK, ESCO UL, Hensley XS, Caterpillar Advansys)**

| Source: [1] | | Market Shares | |
|---|---|---|---|
| | Construction Expendables Top Tier | Deere Machines | But-For Market Shares |
| Deere TK ESCO UL Other | ███████ | ███████ | ███████ |
| | 100% | 100% | 100% |

(Varner Mar. Errata, Exhibit 6R, Ex. S, at 228.)  Revised Exhibit 6R still reflects an ███████ share of the premium market for Ultralok, but it now reflects ████ share of that same market for TK Series.  (*See id*.)  Notably, Dr. Varner's Errata lacks any citation to source or explanation of how he arrived ████ market share for TK Series (*see id*.), and there is nothing anywhere in the record that would support ████ market share for TK Series in this market segment.[4]  Moreover, when questioned about Deere's share of the premium market in his deposition, Dr. Varner did not "know those numbers off the top of his head," (Varner Dep. at 165:18-20, Ex. Q, at 201), but conceded, "████████████," (*id*. at 171:13, Ex. Q, at 207).[5]

In addition, Exhibit 6R now includes a separate column for the market segment comprising

---

[4] When the parties met and conferred on these issues, Deere's counsel asked ESCO's counsel for the source of ████, and ESCO's counsel was unable to provide an answer beyond a broad statement that there were a lot of documents discussing market share.  (Rodman Decl., ¶¶ 9-10, Ex. T, at 232-233.)  There are, and they all point to a TK Series share of the premium segment of the market ████████████, as discussed *supra*.

[5] He also argued that Deere's actual share of the premium market was "irrelevant for my damages analysis," (Varner Dep. at 169:9, Ex. Q, at 205), which makes his Errata adding that figure even more perplexing.

replacement expendables on Deere machines.  (Varner Mar. Errata, Exhibit 6R, Ex. S, at 228.)

Here again, Dr. Varner uses the rough estimate ███ from Mr. Budan, but he now adds ███

share of that same market for Ultralok.  (*See id.*)  Notably, ███ share is also without citation

or explanation, and it also contradicts the evidence and Dr. Varner's own deposition testimony

regarding that evidence.[6]  (*See id.*; *see also* Varner Dep. at 174:14-19, Ex. Q, at 210 (testifying

that the only document he cited as support for ███ TK Series share of the Deere machines

market—albeit only in his reply report—showed ESCO having a share ███ ).)  Dr.

Varner ends up with a new conclusion that the appropriate market share to assign ESCO ███

███ resulting in ███ decrease in his lost profits calculation.  (*See* Varner Mar. Errata, ¶ 2

& Exhibit 6R, Ex. S, at 227-28.)  He does not, however, bother to even calculate his new lost

profits number.  (*See id.*)

Here, a decrease in an improperly inflated number still results in an improperly inflated

number.  Moreover, this revised analysis does not remedy Dr. Varner's fatally unreliable opinions,

which should still be excluded in their entirety for the reasons discussed in Deere's brief in support

of its *Daubert* motion (D.I. 194).  Regardless of the disposition of that motion, however, Dr.

Varner's errata should be stricken under a *Pennypack* analysis because all factors favor exclusion.

**The importance of the information withheld.**  Although Dr. Varner's market share

analysis is critical to his lost profits opinions, he has maintained that the analysis was complete

and correct from his opening report.  Thus, it is not clear how important the information in the

Errata specifically is to ESCO.  While it appears to have some importance given this eleventh hour

---

[6] There is no explanation for or evidence to support Ultralok having ███, particularly
███ of the Deere machine market ███, particularly
given that Dr. Varner assigns Ultralok ███ of the Deere machine market than
Deere, which is nonsensical.

submission, striking the Errata does not, alone, exclude Dr. Varner's entire lost profits opinion.  It simply requires him to rely upon the opinions he gave in his opening and reply reports.  *See, e.g.*, *Astellas US LLC v. Hospira, Inc.*, No. 2022-1878, 2022 WL 17998229, at *6 (Fed. Cir. 2022) (finding an alternative theory of infringement to be not critical or of sufficient importance to outweigh other factors); *Robocast, Inc. v. Apple, Inc.*, C.A. No. 11-235-RGA, 2013 WL 7118691, at *2 (D. Del. Dec. 4, 2013) ("[I]n order to justify not being stricken, the expert's opinion must be 'critical evidence.'") (quoting *Allen v. Parkland School District*, No. 06-1560, 2007 WL 1228947, at *5 (3d Cir. 2007)).

**The prejudice or surprise to the party against whom the evidence is offered.**  Deere was unquestionably surprised.  Nothing in Dr. Varner's opening or reply report, and nothing in his deposition testimony, had indicated that he anticipated making any change to his market share analysis beyond the changes already made in his reply report.  The fact that ESCO not only served the Errata but that it also waited until a week after his deposition and days before *Daubert* and summary judgment motions were due was a further surprise.  And Deere is unquestionably prejudiced.  Deere's damages expert was able to respond only to Dr. Varner's opening report and the analysis of market share contained therein.  Deere prepared for and took Dr. Varner's deposition based upon strategies derived from the opinions stated in his opening and reply reports.  And Deere prepared its strategy for *Daubert* and constructed that motion based upon Dr. Varner's stated opinions in his reports and deposition.

**The likelihood of disruption of the trial.**  The schedule in this case is tight, and it would be difficult to maintain the trial date if any additional briefing, expert sur-rebuttals, or discovery were necessitated by ESCO's late service of this Errata.  Allowing Dr. Varner's Errata would necessitate additional expert reports, discovery, and potentially briefing to address it, putting the

12

upcoming September trial date in jeopardy.

     **The possibility of curing the prejudice.**  Although ESCO offered to allow Deere to take an additional one-hour deposition on the Errata, such a deposition creates more prejudice and cures none.  Deere would have had to either divert resources to preparing for and taking Dr. Varner's deposition in the two days before its *Daubert* motion was due or proceed with the *Daubert* motion without clarity regarding these new opinions.  Deere chose the latter, as it simply did not have time to prepare for and take a deposition of Dr. Varner while simultaneously working to complete its summary judgment and *Daubert* briefing.  And taking Dr. Varner's deposition now does not cure the prejudice caused by the Errata.  Deere has only two weeks to prepare responses to ESCO's broad summary judgment and *Daubert* motions on every issue in the case, and Deere has already been deprived of the ability to address the Errata in its opening briefing such that any information from a deposition would have to be included in Deere's reply briefing on *Daubert*.  Meanwhile, ESCO and Dr. Varner would have the benefit of understanding Deere's strategy from Dr. Varner's initial deposition and Deere's *Daubert* motion and would have the benefit of conversations between ESCO's counsel and Dr. Varner between his two depositions in preparing for a second deposition. *See, e.g.*, *Praxair, Inc. v. ATMI, Inc.*, 231 F.R.D. 457, 463 (D. Del. 2005) (noting that a report ten days before the summary judgment motions were due did not give opportunity to conduct rebuttal discovery); *id.* at 463-64 ("It is not plaintiffs' responsibility to study and analyze an expert report overnight to save defendants' discovery flaw.").

     And taking a one-hour deposition of Dr. Varner would not cure the prejudice even absent the timing issues.  Dr. Varner's Errata purports to modify his opening and reply reports.  (*See* Varner Mar. Errata ¶ 1, Ex. S, at 227.)  Deere's expert—Dr. Becker—never had an opportunity to respond to these new opinions and thus focused on ███████ market share Dr. Varner

assigned to Deere for the premium segment of the market.  Resolving prejudice would require allowing Dr. Becker to submit a sur-rebuttal, which further delays any supplemental depositions, briefing, and potentially the trial date.

A further issue contributes to the prejudice.  Even beyond the untimeliness of Dr. Varner's March 19, 2023 Errata, the Errata fails to comply with Fed. R. Civ. P 26(a)(2)(B)(i) because it does not contain "a complete statement of all opinions the witness will express and the basis and reasons for them."  As discussed *supra*, the Errata does not provide the basis for ███ market share assigned to TK Series in the premium market or ███ market share assigned to Ultralok in the Deere machines market, both of which are critical to Dr. Varner's analysis.  (*See* Varner Mar. Errata ¶ 2 & Exhibit 6R, Ex. S, at 227-28.)  Moreover, although Dr. Varner states that this would result in ████████ his lost profits calculations, he does not actually provide those updated calculations, instead requiring Deere to attempt to recreate them on its own to learn the damages ESCO seeks, which is difficult given the constantly changing inputs from Dr. Varner.

Even if Deere were to conduct another deposition of Dr. Varner, with the attendant unfairness associated therewith, Deere would be further hampered by Dr. Varner's failure to disclose the bases for these new opinions in his Errata (or even to fully disclose those new opinions).  Deere has no ability to check Dr. Varner's sources and prepare questions related to them; rather, Deere would have to ask Dr. Varner in a deposition, learn what Dr. Varner said in response, and then attempt to address it in the moment.  This is precisely why Rule 26 requires disclosure of the basis for an expert's opinions—so parties are not learning them for the first time in deposition.  "Nothing causes greater prejudice than to have to guess how and why an adversarial expert reached his or her conclusion."  *Reed v. Binder*, 165 F.R.D. 424, 430 (D.N.J. 1996); *see, e.g.*, *Meyer Intell. Properties Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1374-75 (Fed. Cir. 2012) ("The

14

purpose of [Rule 26] is 'to convey the substance of the expert's opinion . . . so that the opponent will be ready to rebut, to cross-examine, and to offer a competing expert if necessary."); *Innogenetics N.V. v. Abbott Labs.*, 512 F.3d 1363, 1376 n.4 (Fed. Cir. 2008) (Bryson, Clevenger, Moore, JJ.) ("This case aptly demonstrates the pitfalls of playing fast and loose with rules of discovery.  Conclusory expert reports, eleventh hour disclosures, and attempts to proffer expert testimony without compliance with Rule 26 violate both the rules and principles of discovery, and the obligations lawyers have to the court.").

**The explanation for the failure to disclose.**  ESCO has not articulated an explanation for its failure to previously disclose these new opinions.  When the parties met and conferred, ESCO articulated two thoughts: first, that the edits were just mathematical and, second, that it provided the Errata as soon as it could.  (*See* Rodman Decl., ¶ 8, Ex. T, at 232.)  Both explanations are simply untrue.  Dr. Varner's edits are not just corrections to math but incorporate new data, analysis, and opinions.  (*See* Varner Mar. Errata, ¶ 2 & Exhibit 6R, Ex. S, at 227-28.)  *See, e.g.*, *Novartis Pharm. Corp. v. Actavis, Inc.*, C.A. No. 12-366-RGA-CJB, 2013 WL 7045056, at * 7 (D. Del. Dec. 23, 2013) (noting that Fed. R. Civ. P. 26(e) does not permit supplemental reports to "clarify" or "bolster" an expert's opinion) (citing *Apple, Inc. v. Motorola Mobility, Inc.*, No. 11-cv-178-bbc, 2012 WL 5416941, at *28 (W.D. Wis. Oct. 29, 2012); *Boca Raton Cmty. Hosp., Inc. v. Tenet Healthcare Corp.*, No. 05-80183-CIV, 2006 WL 5309506, at *3 (S.D. Fla. Oct. 18, 2006)).

And although ESCO did not articulate **why** it allegedly could not have provided the Errata sooner (even after Deere's counsel asked that question when they met and conferred), it is clear that ESCO could have.  The Errata purports to modify both of Dr. Varner's reports—dated January 13, 2023 and March 3, 2023.  (*See* Varner Mar. Errata, ¶ 1, Ex. S, at 227.)  Dr. Varner does not articulate any newly learned information or justification for the timing of the Errata.  (*See generally*

*id.*)  He does not cite to anything new (or anything at all).  (*See generally id.*)  Dr. Varner had the

benefit of Dr. Becker's critiques of the market share analysis since February 8, 2023.  (*See* Becker

Rpt., Ex. L, at 128-34)  Dr. Varner also had the benefit of Dr. Becker's deposition prior to his own

deposition, as Dr. Becker was deposed on March 10, 2013, and Dr. Varner testified that he had, in

fact, reviewed Dr. Becker's deposition before his own deposition.  (*See* Varner Dep. at 10:21-24,

Ex. Q, at 185.)  Even if something had arisen **during** Dr. Varner's deposition somehow justifying

the Errata,[7] this deposition occurred on March 13, 2023, nearly a full week prior to the Errata.

There is simply no reasonable explanation for ESCO's waiting until March 19, 2023, days before

*Daubert* and summary judgment deadlines, to serve the Errata.  *See*, *e.g.*, *Astellas US LLC v.*

*Hospira, Inc.*, No. 2022-1878, 2022 WL 17998229, at *3 (Fed. Cir. 2022) ("There was no reason,

other than Astellas's own litigation choices, that the compounding infringement theory could not

have been asserted earlier.").

       **The presence of bad faith or willfulness in not disclosing the evidence.**  Although Deere

is reluctant to accuse ESCO of bad faith or willfulness, there is certainly no indication of good

faith here.  Dr. Varner's opinions on market share have been a moving target since his opening

report, but they should at least have been final and closed by his reply report on March 3, 2023.

In addition, other facts regarding ESCO's handling of this Errata demonstrate a lack of good faith.

       As set out above, the Court's Scheduling Order (D.I. 24), which was agreed to and proposed

by the parties, provides deadlines for opening, rebuttal, and reply reports, and it further states, "No

other expert reports will be permitted without either the consent of all parties or leave of the Court."

(D.I. 24, ¶ 8(f)(i).)  The Scheduling Order continues:  "Expert Report Supplementation.  The parties

---

[7] The only thing that occurred during Dr. Varner's deposition was questioning that elicited the fatal
flaws in Dr. Varner's opinions, but Dr. Varner is not free to modify his opinion after his deposition
simply because Deere's counsel conducted an effective deposition.

agree that they will not permit expert declarations to be filed in connection with motions briefing (including case-dispositive motions)."  (*Id.*, ¶ 8(f)(ii).)  In serving Dr. Varner's Errata, ESCO did not seek consent of Deere or leave of the Court.  And the timing of the Errata appears connected to an expected *Daubert* motion by Deere.  In fact, the Errata was served three days after Deere advised ESCO of the grounds for its *Daubert* motion for purposes of setting up a meet and confer on that motion, suggesting it may be an attempt to circumvent the agreement not to submit expert report supplementation in the form of declarations.  (*See* Rodman Decl., ¶ 3, Ex. T, at 231; *see also* Mar. 16 Email, Ex. U, at 235-36.)  *See BearBox LLC v. Lancium LLC*, C.A. No. 21-534-GBW, 2022 WL 17403466, at *2 (D. Del. Nov. 23, 2022) ("BearBox's disregard of the express terms of the Court's Scheduling Order [language identical to that in D.I. 24, ¶ 8(f)(i)] indicates bad faith which weighs in favor of exclusion."); *Praxair*, 231 F.R.D. at 463 ("[F]idelity to the constraints of Scheduling Orders and deadlines is critical to the Court's case management responsibilities.  . . . The 'flouting of discovery deadlines causes substantial harm to the judicial system.'") (internal citations omitted).

Courts may exclude evidence sparingly, but Dr. Varner's untimely Errata is a situation where exclusion is the only appropriate remedy.  There is no justification for this maneuver by ESCO, there is substantial prejudice to Deere, and there is no method to cure that prejudice.

## V.   MR. PANAPA'S NEW REFINED MEASUREMENTS AND REANALYSIS OF HIS INITIAL INTERPENETRATION PROBLEMS SHOULD BE STRICKEN

ESCO's attempt to take a second bite of the apple regarding Mr. Panapa's "new refined planes values" and his "reanalyzed" interpenetration data present in the 3D scan and dimensional analysis described in his initial report of January 13, 2013 should be excluded.  Specifically, the following should be excluded: (1) paragraph 7, including Figures 2-4 of Mr. Panapa's March 3, 2023 reply report and all underlying images thereof; (2) paragraph 16 of Mr. Panapa's March 3,

2023 reply report, including Figures 8-11 and all underlying images thereof; and (3) any anticipated testimony or demonstratives based on these paragraphs and figures.   More than simply replying to Dr. Klopp's criticism, the information sought to be excluded presents new data, new analysis, and a new result in paragraphs 7 and 16 of Mr. Panapa's reply report—which ESCO relies on to attempt to show infringement, an issue on which it holds the burden.   Reply reports are for responding to the rebuttal, not presenting new information in an attempt to fix flawed initial evidence.

The *Pennypack* factors support exclusion:

**The importance of the information withheld.**   The information Deere seeks to exclude is relevant to infringement as ESCO—through its expert Mr. Holland—attempts to rely on Mr. Panapa's 3D scanning and dimensional analysis to demonstrate that the Accused Products comply with the limitations of the Asserted Claims.   But both the new refined measurements (or "new refined planes values") and the reanalyzed interpenetration material should have been disclosed on or before January 13, 2023, when reports by the party that hold the burden on an issue were due.   Mr. Panapa's new refined measurement and reanalyzed interpenetration data were offered too late.   Excluding Mr. Panapa's untimely disclosure does not foreclose ESCO from relying on the information Mr. Panapa presented in his initial report.   In this respect, the parts of Mr. Panapa's reply report challenged here are not "critical" to ESCO.   *See Robocast*, 2013 WL 7118691, at *2 ("[I]n order to justify not being stricken, the expert's opinion must be 'critical evidence'.").

**The prejudice or surprise to the party against whom the evidence is offered.**   Absent exclusion, Deere will be prejudiced by Mr. Panapa's new refined planes values and reanalyzed interpenetration problems.   Both were first introduced in a reply report, which foreclosed Deere's expert, Dr. Klopp, from being allowed to address Mr. Panapa's untimely disclosure in a report of

18

his own for summary judgment or trial purposes.  Accordingly, Deere may be prevented from

offering any rebuttal evidence or testimony against data, analysis, and conclusion that, according

to the scheduling order, ESCO should have disclosed on or before January 13, 2023 as part of its

proof for infringement.  *Meyer Intell. Properties Ltd.*, 690 F.3d at 1374-75 ("The purpose of [Rule

26] is 'to convey the substance of the expert's opinion . . . so that the opponent will be ready to

rebut, to cross-examine, and to offer a competing expert if necessary.").

**The likelihood of disruption of the trial.**  Again, the schedule in this case is tight, and it

would be difficult to maintain the trial date if any additional briefing, expert sur-rebuttals, or

discovery were needed because of ESCO's late service of Mr. Panapa's new refined planes values

and reanalyzed interpenetration issues.  Allowing the challenged portions of Mr. Panapa's reply

report may necessitate additional expert reports, discovery, and potentially briefing to address it,

putting the upcoming September trial date in jeopardy.

**The possibility of curing the prejudice.**  ESCO offered no options to cure the prejudice

to Deere from the challenged portions of Mr. Panapa's reply report.  According to ESCO's counsel

during the meet and confer, fixing deficient or flawed data and analysis from an opening report is

what reply reports are for.  (Rodman Decl., ¶ 13, Ex. T, at 233.)  Deere has no doubt that this is

ESCO's view; the untimely disclosures in question here—both Dr. Varner's and Mr. Panapa's—

exemplify such an approach.  But that is not the purpose of reply reports; reply reports are to

respond to analysis and criticisms demonstrated in a rebuttal report, not perform wholly new tests

or fix flaws in analysis from an opening report.  The deadlines in the scheduling order are there

for a reason.  *See Novartis Pharm.*, 2013 WL 7045056, at * 7 (Fed. R. Civ. P. 26(e) does not permit

supplemental reports to "clarify" or "bolster" an expert's opinion) (citing *Apple*, 2012 WL

5416941, at *28).

19

**The explanation for the failure to disclose.**  ESCO articulated no explanation for its untimely disclosure of Mr. Panapa's new refined plane values or reanalyzed interpenetration issues; again, ESCO apparently believes fixing flawed data is the purpose of reply reports. Regarding the interpenetration question, Mr. Panapa at least was candid enough to testify during his deposition that ESCO did not want to take the extra effort to minimize the interpenetration for the initial reports and only did so after it was pointed out by Deere's expert.  (Panapa Dep., 97:3-8, Ex. R, at 223.)  But, again, not addressing flaws in the analysis was ESCO's choice, and those choices should not be allowed to work to Deere's detriment.  *See*, *e.g.*, *Astellas US*, 2022 WL 17998229, at *3 ("There was no reason, other than Astellas's own litigation choices, that the compounding infringement theory could not have been asserted earlier.").

**The presence of bad faith or willfulness in not disclosing the evidence.**  Similar to Dr. Varner's untimely disclosure, ESCO's failure to comply with the Scheduling Order by producing new data, new analysis, and new results of Mr. Panapa's 3D scan and dimensional analysis in a reply report indicates bad faith and willfulness.  *See BearBox*, 2022 WL 17403466, at *2 ("BearBox's disregard of the express terms of the Court's Scheduling Order indicates bad faith which weighs in favor of exclusion."); *Praxair*, 231 F.R.D. at 463 ("[F]idelity to the constraints of Scheduling Orders and deadlines is critical to the Court's case management responsibilities. . . . The 'flouting of discovery deadlines causes substantial harm to the judicial system.'") (internal citations omitted).

## VI.    CONCLUSION

Accordingly, for the reasons set forth above, Deere respectfully requests the Court to strike the expert testimony of Dr. Varner and Mr. Panapa.

41379910.2

OF COUNSEL:

John F. Bennett (*pro hac vice*)
Paul M. Ulrich (*pro hac vice*)
Rachael L. Rodman (*pro hac vice*)
Paul J. Linden (*pro hac vice*)
Ava M. Abner (*pro hac vice*)
ULMER & BERNE LLP
312 Walnut Street, Suite 1400
Cincinnati, Ohio 45202-4029
(513) 698-5000
jbennett@ulmer.com
pulrich@ulmer.com
rrodman@ulmer.com
plinden@ulmer.com
aabner@ulmer.com

Dated: March 28, 2023

/s/ Michelle C. Streifthau-Livizos
James D. Taylor, Jr. (#4009)
Michelle C. Streifthau-Livizos (#6584)
SAUL EWING LLP
1201 N. Market Street, Suite 2300
Wilmington, Delaware 19801
(302) 421-6800
james.taylor@saul.com
michelle.streifthau-livizos@saul.com

*Attorneys for Defendant*
*DEERE & COMPANY*

21