# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ESCO GROUP LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 20-1679-WCB-MPT |
| | ) | |
| DEERE & COMPANY. | ) | **PUBLIC VERSION FILED** |
| | ) | |
| Defendant. | ) | **MAY 10, 2023** |
| | ) | |

## OPENING BRIEF IN SUPPORT OF DEFENDANT DEERE & COMPANY'S MOTION TO EXCLUDE EXPERT TESTIMONY OF THOMAS R. VARNER, PH.D.

OF COUNSEL:

John F. Bennett (*pro hac vice*)
Paul M. Ulrich (*pro hac vice*)
Rachael L. Rodman (*pro hac vice*)
Paul J. Linden (*pro hac vice*)
Ava M. Abner (*pro hac vice*)
ULMER & BERNE LLP
312 Walnut Street, Suite 1400
Cincinnati, Ohio 45202-4029
(513) 698-5000
jbennett@ulmer.com
pulrich@ulmer.com
rrodman@ulmer.com
plinden@ulmer.com
aabner@ulmer.com

Dated: March 22, 2023

SAUL EWING LLP

James D. Taylor, Jr. (#4009)
Michelle C. Streifthau-Livizos (#6584)
SAUL EWING LLP
1201 N. Market Street, Suite 2300
Wilmington, Delaware 19801
(302) 421-6800
james.taylor@saul.com
michelle.streifthau-livizos@saul.com

*Attorneys for Defendant*
*DEERE & COMPANY*

41352700.1

**TABLE OF CONTENTS**

I. STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ............. 1

II. SUMMARY OF THE ARGUMENTS ............................................................................. 1

III. STATEMENT OF FACTS.................................................................................................. 2

IV. THE IMPROPER OPINIONS OF DR. VARNER SHOULD BE EXCLUDED ........ 3

    A. Dr. Varner's Lost Profits Opinion Relies on an Analysis of Market Share That Is Not Based on Consistent, Reliable Data ................................................................. 3

    B. Dr. Varner's Reasonable Royalty Opinion Relies on a Royalty Rate That Is Based Entirely on Evidence Unrelated to the Claimed Invention ..................................... 6

V. CONCLUSION ................................................................................................................ 11

# **TABLE OF AUTHORITIES**

Page(s)

Other Authorities

*BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*,
  1 F.3d 1214 (Fed. Cir. 1993) ................................................................................................ 1, 3
*Cisco Sys., Inc.*,
  809 F.3d 1295 (Fed. Cir. 2015) ............................................................................................ 6, 7
*Crystal Semiconductor Corp. v. TriTech Microelectronics Intern., Inc.*,
  246 F.3d 1336 (Fed. Cir. 2001) ............................................................................................ 1, 3
*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) .................................................................................................................. 3
*Georgia-Pacific Corp. v. United States Plywood Corp.*,
  318 F. Supp. 1116 (S.D.N.Y. 1970) ......................................................................................... 7
*Grain Processing Corp. v. Am. Maize-Prods.*,
  185 F.3d 1341 (Fed. Cir. 1999) ................................................................................................ 3
*In re Paoli R.R. Yard PCB Litig.*,
  35 F.3d 717 (3d Cir. 1994) ....................................................................................................... 3
*Izumi Prods. Co. v. Koninklijke Philips Electronics N.V.*,
  315 F. Supp. 2d 589 (D. Del. 2004) ..................................................................................... 4, 5
*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
  694 F.3d 51 (Fed. Cir. 2012) ............................................................................................... 1, 11
*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009) .............................................................................................. 11
*Panduit Corp. v. Stahlin Bros. Fibre Works*,
  575 F.2d 1152 (6th Cir. 1978) .................................................................................................. 3
*Procter & Gamble Co. v. Paragon Trade Brands, Inc.*,
  989 F. Supp. 547 (D. Del. 1997) .......................................................................................... 4, 5
*ResQNet.com, Inc. v. Lansa, Inc.*,
  594 F.3d 860 (Fed. Cir. 2010) .................................................................................................. 7
*Sinclair Refining Co. v. Jenkins Petroleum Process Co.*,
  289 U.S. 689 (1933) .................................................................................................................. 8
*State Indus., Inc. v. Mor-Flo Indus., Inc.*,
  883 F.2d 1573 (Fed. Cir. 1989) ......................................................................................... 3, 4, 5
*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011) ....................................................................................... 1, 7, 10
*VirnetX, Inc. v. Cisco Sys., Inc.*,
  767 F.3d 1308 (Fed. Cir. 2014) ................................................................................................ 7
*Zimmer Surgical, Inc. v. Stryker Corp.*,
  365 F. Supp. 3d 466 (D. Del. 2019) .................................................................................. 1, 11

9

Fed. R. Evid. 702 ............................................................................................................................ 3

41352700.1

**I.   STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING**

ESCO brought this case on December 10, 2020, and amended the complaint on April 7, 2021, asserting that Deere's TK Series Tooth products ("the TK Series") infringes two ESCO patents: U.S. Patent Nos. 10,273,662 and 8,844,175 ("the Asserted Patents").  (D.I. 1, 11.)  The discovery period has closed.  Trial is set for September 18, 2023.  (D.I. 24.)[1]

**II.   SUMMARY OF THE ARGUMENTS**

1.   Dr. Varner should not be permitted to testify regarding lost profits because his opinion relies on an analysis of market share that conflates two markets, pulling the most advantageous data from each to arrive at an artificially high market share for the ESCO product on which ESCO bases its claim for lost profits, *see, e.g.*, *Crystal Semiconductor Corp. v. TriTech Microelectronics Intern., Inc.*, 246 F.3d 1336, 1353 (Fed. Cir. 2001), and relies on data points unsupported by the evidence, *see, e.g.*, *BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1218 (Fed. Cir. 1993) ("An award of lost profits may not be speculative.").

2.   Dr. Varner should not be permitted to testify regarding a reasonable royalty based on an 8% royalty rate because his analysis is based entirely on information unrelated to the claimed invention, relying on analysis of the alleged value of unidentified patents for two ESCO products that do not practice the claims of the Asserted Patents and for which there is no analysis of technological or economic comparability.  *See, e.g.*, *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1316 (Fed. Cir. 2011); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 81 (Fed. Cir. 2012); *Zimmer Surgical, Inc. v. Stryker Corp.*, 365 F. Supp. 3d 466, 496 (D. Del. 2019).

---

[1] The parties, including their respective Delaware counsel, met and conferred on the issues presented in this motion, as required under D. Del. LR 7.1.1, but no agreement could be reached.

### III.    STATEMENT OF FACTS

This case arises from ESCO's assertions that Deere's TK Series product infringes the Asserted Patents. ESCO concedes that it provided no actual or constructive notice of the Asserted Patents to Deere before filing its complaint and amended complaint on December 10, 2020 and April 7, 2021 respectively, and that ESCO is therefore not entitled to damages before December 10, 2020. (*See* ESCO Resp. Interrog. 16, Ex. D, at 52.[2]) ESCO seeks damages in the form of lost profits (with a residual royalty and future lost profits) or, alternatively, in the form of a reasonable royalty. (*See* Varner Rpt. ¶¶ 12-14, Ex. I, at 99-100.)

ESCO sells two products that allegedly practice the claims of the Asserted Patents—the GeoVor products used in offshore dredging operations and the Nemisys 3-Piece System products used in mining applications. (*See* ESCO Resp. to Interrog. 5, Ex. C, at 46; Stitzel Dep. at 39:11-23, Ex. G, at 74; 42:20-43:6, Ex. G, at 77-78; 103:1-11, Ex. G, at 84.) Neither of these two products compete in the same market as the accused TK Series, which is described as a "premium" segment of the U.S. construction expendables market. (*See* Stitzel Dep. at 39:11-23, Ex. G, at 74; 42:20-43:6, Ex. G, at 77-78; 103:1-11, Ex. G, at 84; Varner Rpt. ¶ 51, Ex. I, at 105-06.) ESCO sells a competing product in this market segment called Ultralok, but Ultralok does not practice the claims of the Asserted Patents. (*See* Stitzel Dep. at 100:24-101:2, Ex. G, at 81-82; ESCO Resp. to Interrog. 24, Ex. E, at 58-59.) ESCO's lost profits claim is based on allegedly lost sales of the Ultralok product. (*See* Varner Rpt. ¶ 12, Ex. I, at 99-100.)

The parties agree that the hypothetical negotiation for a reasonable royalty would have

---

[2] All citations to the record contain a designation to the pinpoint cite in the original document, followed by the exhibit number of the document in the appendix to this brief, followed by the pinpoint cite in the appendix. For example, in this citation, the specific portion of the original document cited is the response to Interrogatory No. 16, which is included in the appendix hereto as Exhibit D, with the response to Interrogatory No. 16 appearing on page 52 of that consecutively-paginated appendix.

occurred in September 2014, when the '175 Patent issued, or if the '662 Patent is found to be invalid or not infringed, in April 2019, when the '662 Patent issued.  (*See* Varner Rpt. ¶ 78, Ex. I, at 114; Becker Rpt. ¶ 222, Ex. H, at 95-96.)

**IV.     THE IMPROPER OPINIONS OF DR. VARNER SHOULD BE EXCLUDED**

The admissibility of expert testimony in federal courts is governed principally by Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  "*Daubert* requires the district court to act as 'gatekeeper' and to assure that the scientific methodology upon which the expert opinion is founded is reliable."  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 732 (3d Cir. 1994).

**A.     Dr. Varner's Lost Profits Opinion Relies on an Analysis of Market Share That Is Not Based on Consistent, Reliable Data**

To recover lost profits, "a patent owner must prove a causal connection between the infringement and its loss of profits."  *Crystal Semiconductor*, 246 F.3d at 1353 (quoting *BIC Leisure Prods.*, 1 F.3d at 1218.  "[T]he burden rests on the patentee to show a reasonable probability that 'but for' the infringing activity, the patentee would have made the infringer's sales."  *Crystal Semiconductor*, 246 F.3d at 1353 (citations omitted).  To meet this burden, "a patentee must reconstruct the market to show, hypothetically, 'likely outcomes with infringement factored out of the economic picture.'"  *Id.* at 1355 (quoting *Grain Processing Corp. v. Am. Maize-Prods.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999)).  A hypothetical market reconstruction requires "sound economic proof of the nature of the market."  *Id*.

Because the market at issue here involves several competitors beyond ESCO and Deere, Dr. Varner's opinion relies on the slightly modified "market share" approach to the traditional lost profits test set forth by *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1156 (6th Cir. 1978).  *See also State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1578 (Fed. Cir. 1989);

3

*Izumi Prods. Co. v. Koninklijke Philips Electronics N.V.*, 315 F. Supp. 2d 589, 614 (D. Del. 2004) ("Under [the market share] approach, a patentee recovers lost profits on the percentage of infringing sales equal to its market share.") (citing *State Indus.*, *supra*); *Procter & Gamble Co. v. Paragon Trade Brands, Inc.*, 989 F. Supp. 547, 601 (D. Del. 1997) (same).

As recognized by the Federal Circuit in *State Industries*, the "market share" approach considers the patent owner's established market share and assumes that the patent owner would have captured infringing sales at the same rate as its established market share. 883 F.2d at 1578 (using patent owner's market share, which would be "cap" where, as in this case, other competitors were not infringing the patent-in-suit). Using this market share approach, Dr. Varner goes beyond ESCO's established market share and seeks to calculate a hypothetical market share that ESCO would have received "but for" the allegedly infringing TK Series sales. In doing so, Dr. Varner selectively chooses the highest numbers from two different markets to artificially inflate ESCO's market share and consequently his lost profits opinion.

Here, the parties generally agree that the market segment relevant to the Accused Products is the "premium" segment of the U.S. construction expendables market. (*See* Varner Rpt. ¶¶ 51-52, Ex. I, at 106-07; Becker Rpt. ¶ 41, Ex. H, at 89; *id*. ¶¶ 64-65, Ex. H, at 93-94.) Both the accused TK Series product and the Ultralok products for which ESCO alleges its lost sales compete in this premium market segment. (*See id*.) Dr. Varner assigns Ultralok's share of this premium market ███ based upon a conversation with Mr. Stitzel (an ESCO manager).[3] (*See* Varner Rpt. ¶ 54, Ex. I, at 110; Exhibit 6, n. [1], Ex. I, at 138.) The accused TK Series share of this premium market segment is "████████"—in the range of ██%. (*See* Varner Dep. at 171:9-13, Ex. L, at 175 ("█

---

[3] While this ██% is also based upon unreliable and contradicted evidence, Deere understands those issues (as well as many other fallacies in Dr. Varner's analysis not addressed in this motion) to more properly be the subject of cross-examination.

4

▇▇▇▇▇."); *id*. at 168:17-169:3, Ex. L, at 172-73 (conceding that Becker's calculations of ▇% to ▇% seem to be correct math).)

To conduct his market share analysis, Dr. Varner does not just use the ▇ share of the market that he assigns Ultralok, the approach endorsed by both the Federal Circuit and this District. *See State Indus.*, 883 F.2d at 1578; *Izumi Prods.*, 315 F. Supp. 2d at 614; *Procter & Gamble*, 989 F. Supp. at 601. Rather, he seeks to assign Ultralok a higher market share by removing the TK Series sales from the market and calculating the hypothetically larger share that Ultralok would have had. In doing so, however, Dr. Varner ignores what he concedes to be a "▇▇▇▇" market share for the TK Series in the relevant market and instead turns to a narrower market—the market for *only* replacement construction expendables on *only* Deere machines—to assign a higher market share of ▇% to the TK Series.[4] (Varner Rpt. ¶ 55, Ex. I, at 109-10; Exhibit 6, Ex. I, at 138; Budan Dep. 21:7-22:9, Ex. F, at 66-67.) Constructing a hypothetical market in which he was able to

---

[4] Although Dr. Varner now claims this mix and match approach was always his intention, that claim appears to be untrue. Dr. Varner's opening report purported to analyze the shares of the premium segment of the U.S. market for both Ultralok ▇▇▇ and TK Series (at ▇%). (Varner Rpt. Exhibit 6, Ex. I, at 138; *see id*. at ¶ 57, Ex. I, at 110 ("Exhibit 6 shows existing market shares of the premium segment of the market for bucket tooth systems in construction equipment in the U.S.").) Nowhere in Dr. Varner's opening report did he discuss a market segment for replacement expendables on Deere machines. (*See generally* Varner Rpt. ¶¶ 71-72, Ex. I, at 112 (discussing lost profits calculation); Exhibit 6, Ex. I, at 139; Exhibit 8.1(A), Ex. I, at 141.) Only when Deere's expert criticized Dr. Varner's reliance on a ▇% TK Series market share that was contradicted by all evidence (including the very evidence on which Dr. Varner relied for the Ultralok market share), and pointed out that the TK Series only had ▇% of the Deere machine market, did Dr. Varner attempt to explain his initial faulty analysis by claiming to have always intended to use the TK Series share from this narrower market. (*See* Varner Reply Rpt. ¶¶ 58-59, Ex. K, at 155-56.) And Dr. Varner's behavior since his Reply Report has further indicated that he appears to be making up his analysis as he goes. As discussed further in Deere's motion to strike, Dr. Varner submitted an "errata" a week after his deposition on Sunday, March 19, 2023 at 5:27 pm—nearly a full week after his March 13, 2023 deposition—that purported to rework these numbers entirely, assigning new market shares to the TK Series for the premium segment and to Ultralok for the Deere machine replacement market (both of which have no citation to or explanation of any source). (*See* Varner Mar. Errata ¶¶ 1-2 and Exhibit 6R, Ex. M, at 229-30.)

5

"remove" a ▮% share for TK and reassign that ▮% share to Ultralok and other competitors proportionately gave Ultralok ▮% of the hypothetical market rather than the smaller percentage that would have resulted from an analysis using the actual TK Series share of the premium market.

Neither Dr. Varner nor ESCO disputes these realities. (*See* Varner Reply Rpt. ¶¶ 58-59, Ex. K, at 155-56; Varner Dep. at 163:6-164:20, Ex. L, at 167-68; 176:11-177:16, Ex. L, at 180-81 (conceding he took the higher TK market share for Deere machines and the higher Ultralok market share for the entire premium segment).) Rather, Dr. Varner maintains conflating these two market segments was proper. (*See* Varner Dep. at 177:17-178:8, Ex. L, at 181-82; Varner Reply Rpt. ¶ 58, Ex. K, at 155-56).) Dr. Varner's own analysis shows the blatant fallacy of this statement. Having calculated his artificially high Ultralok market share, Dr. Varner then applies it to ***all*** TK sales in the premium segment, not just TK sales for replacement expendables on Deere machines. (*See* Varner Rpt. Exhibits 7.1(A) and 7.2(A), Ex. I, at 139-40 (calculating all Deere sales).)

These issues pervade Dr. Varner's lost profits and future lost profits calculations. (*See* Varner Rpt. ¶ 74, Ex. I, at 33 (articulating future lost profits based on a ▮ hypothetical market share for Ultralok).) Because Dr. Varner's market reconstruction analysis for lost profits improperly cherry picks numbers to result in an artificially high lost profits calculation, Dr. Varner's opinions on ESCO's lost profit damages—both past and future—must be excluded.

**B.  Dr. Varner's Reasonable Royalty Opinion Relies on a Royalty Rate That Is Based Entirely on Evidence Unrelated to the Claimed Invention**

"[D]amages awarded for patent infringement must reflect the value attributable to the infringing features of the product, and no more." *CSIRO v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) (internal quotations omitted). "Given the great financial incentive parties have to exploit the inherent imprecision in patent valuation, courts must be proactive to ensure that the testimony presented—using whatever methodology—is sufficiently reliable to support a damages

award." *Id*.

"While questions regarding which facts are most relevant for calculating a reasonable royalty are properly left to the jury, a critical prerequisite is that the underlying methodology be sound." *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1328 (Fed. Cir. 2014); *CSIRO*, 809 F.3d at 1301 ("[T]he essential requirement for reliability under *Daubert* is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product.") (internal quotations omitted). "[W]here the data used is not sufficiently tied to the facts of the case, a damages model cannot meet the substantive statutory requirement of apportionment of royalty damage to the invention's value." *CSIRO*, 809 F.3d at 1302 (quotations omitted). Thus, the Federal Circuit has held that "[a]ny evidence unrelated to the claimed invention does not support compensation for infringement but punishes beyond the reach of the statute." *Uniloc*, 632 F.3d at 1316 (quoting *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010)).

Here, Dr. Varner concludes that the parties would have agreed upon a royalty rate of 8% in a hypothetical negotiation, which the parties agree would have taken place in September 2014. (*See* Varner Rpt. ¶ 128, Ex. I, at 136.) In reaching that conclusion, however, Dr. Varner relies on information unrelated to the technology of the Asserted Patents. Although Dr. Varner conducts a surface discussion of the hypothetical negotiation factors of *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), he does not ultimately apply them to arrive at his 8% royalty rate. (*See generally* Varner Rpt. ¶¶ 84-128, Ex. I, at 116-36; Varner Dep. at 213:13-215:18, Ex. L, at 211-13.) Rather, Dr. Varner bases his 8% royalty rate on data unrelated to the claimed invention in any way.

The starting point for Dr. Varner's 8% royalty rate comes from a comparison of two ESCO products unrelated to the Asserted Patents. (*See* Varner Rpt. ¶ 125, Ex. I, at 135.) Those two

products are (1) Ultralok, which does not practice the claims of the Asserted Patents but competes in the premium segment of the U.S. construction expendables market with the accused TK Series, and (2) Super V, an ESCO legacy product that neither practices the claims of the Asserted Patents nor competes in the same market as the accused TK Series.  (*See id.*; Varner Dep. at 198:14-199:16, Ex. L, at 196-97 (conceding that Ultralok and Super V do not practice the claimed invention and stating, "I've looked at the ESCO Ultralok patents and the Super V patents as a benchmark for measuring patent protection.").)  Dr. Varner compares ESCO's profit margins on the Ultralok and Super V products in 2020, 2021, and 2022.[5]  (*See* Varner Rpt. ¶ 125, Ex. I, at 135.)  Finding that the Ultralok products had a profit margin averaging ▬▬▬ than the Super V products in 2020-22[6] (*see id.*), Dr. Varner makes two speculative leaps.  He first presumes that this ▬% difference in profit margin is entirely based on Super V products no longer being covered by patents and concludes that the value of the Ultralok patents must be ▬ of Ultralok's profitability.  (*See id.*; Varner Dep. at 194:2-195:20, Ex. L, at 192-93.)  He then presumes that the accused TK Series derives the same value from its alleged use of the invention of the Asserted Patents (i.e., because Ultralok's profit margin is ▬▬▬ than Super V, ▬ of the TK Series

---

[5] Dr. Varner's reasonable royalty opinion focused on data points from 2020-22 because that is the only period for which ESCO may recover damages, as ESCO concedes no notice was given prior to filing of the complaint on December 10, 2020.  Dr. Varner testified that he believed he was allowed to look at this future data under the "book of wisdom" concept established in *Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689 (1933).  Dr. Varner, however, provided no analysis for why he arbitrarily believed data from the damages period would have informed a hypothetical negotiation in 2014 but completely ignored data from 2014 without explanation.  (*See* Varner Rpt. ¶¶ 125-27, Ex. I, at 135-36; Varner Dep. 194:2-197:23, Ex. L, at 192-95; 212:1-213:12, Ex. L, at 210-11.)

[6] The March 19, 2023 Errata discussed *supra* is actually Dr. Varner's second errata.  His first, dated January 16, 2023, modified his January 13, 2023 opening report and changed the ▬ to ▬  (*See* Varner Jan. Errata, ¶ 11, Ex. J, at 146.)  This modification was irrelevant to Dr. Varner's analysis, demonstrating even further that Dr. Varner is not actually conducting an analysis so much as picking a rate to arrive at a higher royalty calculation.

profitability simply must be based on the Asserted Patents). (*See* Varner Rpt. ¶ 125, Ex. I, at 135.) He considered no other basis for the difference in profitability between Ultralok and Super V (e.g., Ultralok is ▮▮▮▮▮ demanded by its market; Ultralok competes in a more "premium" market; Super V is an older "legacy" product). (*See id.*; Varner Dep. at 201:22-204:4, Ex. L, at 199-202.) And he provided no analysis for how the value added by the Asserted Patents to the accused TK Series was comparable either technologically or economically to the value allegedly added by the undefined Ultralok patents. (*See* Varner Rpt. ¶ 125, Ex. I, at 135.)

From that ▮ Dr. Varner then moved to a consideration of the Super V products alone. (*See* Varner Rpt. ¶ 126, Ex. I, at 135-36.) He noted that the profitability of the Super V products had ▮▮▮ after the last patents covering that technology expired in 2013. (*See id.*) He then made the same unsupported speculative leaps, first presuming that a ▮▮ in profitability for Super V after 2013 correlated exactly to the value of the Super V patents, and then presuming that the accused TK Series must therefore derive ▮ of its profitability from the value of the Asserted Patents. (*See id.*; Varner Dep. at 201:15-202:12, Ex. L, at 199-200.) With Deere TK Series profitability averaging ▮%, he concluded that ▮% of the TK Series profitability ▮ of ▮%) was due to the Asserted Patents.[7] (*See* Varner Rpt. ¶ 126, Ex. I, at 135-36.) Again, Dr. Varner considered no other basis for the ▮ in profitability for Super V following expiration of its patents (e.g., that it was a "legacy" technology becoming ▮▮ in the market, that it was ▮▮▮, that it competed in a "legacy" market rather than the "premium"

---

[7] This, too, was modified by Dr. Varner's January 16, 2023 Errata: from ▮ to ▮ for the ▮ in gross profit for Super V, from ▮% to ▮% for Deere's profitability, and from ▮ to ▮ for the value of the Asserted Patents to the TK Series. (Varner Jan. Errata ¶ 12, Ex. J, at 147.) Again, these changes inexplicably had no impact on Dr. Varner's 8% royalty rate. This motion uses the original numbers for consistency, but the analysis is flawed regardless of what numbers are used.

9

41352700.1

market).  (*See id.* ¶ 126, Ex, I, at 135-36; Varner Dep. at 201:22-204:4, Ex. L, at 199-202; 206:7-207:2, Ex, L, at 204-05; 208:8-211:7, Ex. L, at 206-09.)  And he provided no analysis for how the alleged value of the Asserted Patents to the accused TK Series was comparable either technologically or economically to the alleged value of the Super V patents (e.g., differences in technology, accounting for the TK Series products containing features claimed by other, non-ESCO patents).  (*See* Varner Rpt. ¶ 126, Ex. I, at 135-36; Varner Dep. at 204:17-206:6, Ex. L, at 202-04)  In fact, Dr. Varner could not even identify the number of Super V patents, how many distinct inventions were covered by those patents, or what types of technology they covered.  (*See* Varner Dep. at 204:17-206:6, Ex. L, at 202-04.)

Finally, Dr. Varner looked at Deere's profitability on the Accused Products in 2019, 2020, and 2021 and concluded that Deere could pay the 8% royalty rate.  (*See* Varner Rpt. ¶ 127, Ex. I, at 136; *see also* Varner Jan. Errata ¶ 13, Ex. J, at 147 (changing the years analyzed to 2020-22).)

Dr. Varner never actually applied any of his *Georgia-Pacific* discussion to his 8% rate, but even if he had, starting from a faulty premise would negate any *Georgia-Pacific* analysis based on that faulty starting premise.  *See, e.g.*, *Uniloc*, 632 F.3d at 1317 ("Beginning from a fundamentally flawed premise and adjusting it based on legitimate considerations specific to the facts of the case nevertheless results in a fundamentally flawed conclusion.").

The data relied on by Dr. Varner are entirely unrelated to the invention claimed in the Asserted Patents.  Rather, his data points relate to the alleged value of patents that cover ESCO's Super V and Ultralok technology, neither of which practice the claims of the Asserted Patents.  (*See* Varner Rpt. ¶¶ 125-28, Ex. I, at 135-36.)  The record is devoid of any evidence that would support Dr. Varner's valuation of the Super V or Ultralok patents, let alone his speculative presumption that the value of those patents was precisely equal to the value of the Asserted Patents

to the accused TK Series. Although Dr. Varner paid lip service to the concept of technological comparability in his reply by saying he thought the Super V patents and the Asserted Patents were "blocking patents," he could not articulate what that meant, what information he based that conclusion on, or how that would result in technological comparability.[8] (*See* Varner Reply Rpt. ¶ 67, Ex. K, at 159; Varner Dep. 225:22-227:23, Ex. L, at 223-25.)

Dr. Varner's speculative leaps (both in assigning "value" to the Super V and Ultralok patents and then in assuming that value was equal to the value of the Asserted Patents to the accused TK Series) render his opinion unreliable and unhelpful to a jury, and it must be excluded. *See, e.g.*, *LaserDynamics*, 694 F.3d at 81 (excluding 6% royalty rate derived from licenses "untethered from the patented technology at issue" and ordering a new trial); *Zimmer Surgical*, 365 F. Supp. 3d at 496 (excluding reliance on license where expert had "not established that the technology and value of the patents licensed in the prior agreements are not comparable to the technology and value of the patent-in-suit") (quoting *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1331 (Fed. Cir. 2009)). Although Dr. Varner relies on unrelated products and patents instead of licenses, the principles remain the same, and Dr. Varner's reasonable royalty opinion and similarly flawed residual royalty opinion must be excluded.

## V. CONCLUSION

Accordingly, Deere respectfully requests that the Court exclude Dr. Varner's unreliable opinions on lost profits, future lost profits, residual royalty, and reasonable royalty.

---

[8] This was one of many situations in which Dr. Varner "relied" on the opinions of other experts while conceding that he had not spoken with them or even reviewed their reports prior to his "reliance". (*See, e.g.,* Varner Dep. at 184:1-187:25, Ex. L, at 188-91.) Here, he also conceded that none of ESCO's technical experts had opined on whether the Super V patent or the Asserted Patents were "blocking patents" and was unable to identify anyone who had told him that the Asserted Patents were allegedly "blocking patents." (*See* Varner Dep. at 227:1-23, Ex. L, 225.)

OF COUNSEL:

John F. Bennett (*pro hac vice*)
Paul M. Ulrich (*pro hac vice*)
Rachael L. Rodman (*pro hac vice*)
Paul J. Linden (*pro hac vice*)
Ava M. Abner (*pro hac vice*)
ULMER & BERNE LLP
312 Walnut Street, Suite 1400
Cincinnati, Ohio 45202-4029
(513) 698-5000
jbennett@ulmer.com
pulrich@ulmer.com
rrodman@ulmer.com
plinden@ulmer.com
aabner@ulmer.com

Dated: March 22, 2023

/s/ Michelle C. Streifthau-Livizos
James D. Taylor, Jr. (#4009)
Michelle C. Streifthau-Livizos (#6584)
SAUL EWING LLP
1201 N. Market Street, Suite 2300
Wilmington, Delaware 19801
(302) 421-6800
james.taylor@saul.com
michelle.streifthau-livizos@saul.com

*Attorneys for Defendant*
*DEERE & COMPANY*

12

41352700.1