IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ESCO GROUP LLC, | ) |
| | ) |
| Plaintiff, | ) **REDACTED - PUBLIC VERSION** |
| | ) |
| v. | ) C.A. No. 20-1679-WCB-MPT |
| | ) |
| DEERE & COMPANY, | ) ██████████████ |
| | ) |
| Defendant. | ) |

## ESCO'S OPPOSITION TO DEERE'S MOTION
## TO EXCLUDE EXPERT TESTIMONY OF THOMAS R. VARNER, PH.D.

OF COUNSEL:
Brian D. Sieve, P.C.
Paul D. Collier
Jeremy D. Roux
Xaviere Giroud
Tareq M. Alosh
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

Dated: April 5, 2023

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Nathan R. Hoeschen (6232)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
nhoeschen@shawkeller.com
edibenedetto@shawkeller.com
*Attorneys for Plaintiff*

## TABLE OF CONTENTS

**Page**

I.     **INTRODUCTION AND SUMMARY OF ARGUMENT** ............................................. **4**

II.    **LEGAL STANDARDS** ........................................................................................... **6**

III.   **BACKGROUND AND STATEMENT OF FACTS** ....................................................... **6**

       A.     Dr. Varner Calculated Lost Profits Damages Using the Market Share Approach. ........................................................................................................ 7

       B.     Dr. Varner Calculated a Reasonable Royalty by Applying the *Georgia-Pacific* Factors and the Specific Facts Relevant to This Case. ............................. 13

IV.   **ARGUMENT** .................................................................................................... **17**

       A.     Dr. Varner's Lost Profits Market Share Analysis Is Based on Reliable Methodology and Sufficient Data. ......................................................... 17

       B.     Dr. Varner's Reasonable Royalty Analysis Is Tied to the Specific Facts of the Case and Should Not Be Excluded. .................................................. 21

V.     **CONCLUSION** ................................................................................................. **24**

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
  805 F.3d 1368 (Fed. Cir. 2015)......................................................................15

*Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.*,
  C.A. No. 15-152-RGA, 2018 WL 5729732 (D. Del. Nov. 2, 2018)......................................20

*Comcast IP Holdings I, LLC v. Sprint Communications Company L.P.*,
  No. 12-cv-0205-RGA, 2015 WL 4730899 (D. Del. 2015).......................................20

*Crystal Semiconductor Corp. v. TriTech Microelectronics Intern., Inc.*,
  246 F.3d 1336 (Fed. Cir. 2001)...............................................................14, 15

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993)....................................................................3, 17, 20, 21

*Ericsson, Inc. v. Harris Corp.*,
  352 F.3d 1369 (Fed. Cir. 2003)...........................................................3, 15, 17, 21

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
  185 F.3d 1341 (Fed. Cir. 1999)....................................................................14

*i4i Ltd. P'ship v. Microsoft Corp.*,
  598 F.3d 831 (Fed. Cir. 2010), aff'd, 564 U.S. 91 (2011)..................................2, 3, 20

*Illinois Tool Works, Inc. v. MOC Prods. Co., Inc.*,
  No. 09CV1887, 2012 WL 3561984 (S.D. Cal. Aug. 17, 2012).......................................18, 21

*Intuitive Surgical, Inc. v. Auris Health, Inc.*,
  C.A. No. 18-1359-MN, 2021 WL 3662842 (D. Del. Aug. 18, 2021)...............................17, 21

*King Instruments Corp. v. Perego*,
  65 F.3d 941 (Fed. Cir. 1995)....................................................................1, 4

*Micro Chem., Inc. v. Lextron, Inc.*,
  317 F.3d 1387 (Fed. Cir. 2003)...............................................................17, 21

*MiiCs & Partners, Inc. v. Funai Elec. Co., Ltd.*,
  C.A. No. 14-804-RGA, 2017 WL 6268072 (D. Del. Dec. 7, 2017).......................................20

*Minerva Surgical, Inc. v. Hologic, Inc.*,
  C.A. No. 18-00217-JF-SRF, 2021 WL 3048447 (D. Del. Jul 20, 2021)...............................20

*Sonos, Inc. v. D & M Holdings Inc.*,
  297 F. Supp. 3d 501 (D. Del. 2017) (J. Bryson) ...............................................................17, 21

*State Industries, Inc. v. Mor-Flo Industries, Inc.*,
  883 F.2d 1573 (Fed. Cir. 1989)...........................................................................................4, 14, 15

*Summit 6, LLC v. Samsung Elecs. Co., Ltd.*,
  802 F.3d 1283 (Fed. Cir. 2015).............................................................................................18

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011)............................................................................................18

*Wash World Inc. v. Belanger Inc.*,
  No. 19-C-1562, 2021 WL 2856524 (E.D. Wis. July 8, 2021) .........................................17, 21

**Rules**

Fed. R. Evid. Rule 703 .............................................................................................................18

Rule 30(b)(6).....................................................................................................................1, 2, 5, 7

## I.   INTRODUCTION AND SUMMARY OF ARGUMENT

Deere's motion reflects a fundamental misunderstanding of Dr. Varner's lost profits and reasonable royalty damages opinions.   *See* D.I. 183 ("Mot").   The motion also repeatedly mischaracterizes Dr. Varner's opinions and his deposition testimony.   As explained below, Dr. Varner's lost profits and reasonable royalty damages opinions are each based on reliable methodology and data tied to the specific facts of this case.

*First*, Dr. Varner used the well-established market share approach to determine the amount of profits ESCO lost as a result of Deere's infringement of the two asserted patents.   *See, e.g.*, *King Instruments Corp. v. Perego*, 65 F.3d 941, 953 (Fed. Cir. 1995) (finding district court did not abuse its discretion in calculating lost profits based on a market share approach).   Deere's motion challenges Dr. Varner's assumptions regarding Deere's market share in the relevant market (which both parties agree is the "premium" segment of the market for bucket tooth systems used in construction applications).

In his opening report, Dr. Varner properly relied upon the deposition testimony of Mr. Michael Budan, Deere's Rule 30(b)(6) witness on market share issues.   Mr. Budan testified that Deere has ▮▮▮ of the relevant market in which the accused TK Series System products compete, and Dr. Varner accordingly used this ▮▮▮ figure in his lost profits damages calculations.

In his rebuttal report, Deere's expert (Dr. Stephen Becker) asserted that he had an undocumented conversation with Mr. Budan sometime after his deposition, in which Mr. Budan allegedly told Dr. Becker that the reference in his deposition "▮▮▮ was not an estimate of the [accused] TK Series System <u>overall</u> market share, but was [rather an] estimate of the portion of the Deere 'machine population' that is being served with TK Series products," and "that Deere is capturing only ▮▮▮ of the 'market' for teeth on its own Deere machines."   Ex. 1, Becker Rep., ¶ 286.   Despite the fact that Mr. Budan has never corrected or clarified his sworn deposition

testimony in an errata, in an effort to be conservative, Dr. Varner revised his market share analysis to address Deere's inconsistent testimony and use Mr. Stitzel's, ESCO's Rule 30(b)(6) witness on market share issues, testimony on Deere's market share (which lowered ESCO's lost profits claim). There is no basis at all to exclude Dr. Varner's opinions. To the extent Deere's criticisms have any merit (they do not), they are more appropriately addressed during cross-examination.

**Second**, in calculating a reasonable royalty, Dr. Varner relied upon the well-established *Georgia Pacific* factors and facts specific to this case. Dr. Varner carefully considered and explained how each of the relevant factors impacted his overall opinion that the parties would have agreed to a non-exclusive, 8% royalty in the hypothetical negotiation.

Instead, Deere challenges Dr. Varner's assumptions and his conclusions on certain of the factors. For example, Deere says Dr. Varner should not have considered ESCO's profit margins on its Ultralok products (which are patented and compete in the "premium" market) and its Super V products (whose patents expired and no longer compete in the "premium" market). But ESCO's profit margins on its Ultralok and Super V product lines, which compete in the same overall market for bucket tooth systems for use in construction applications as the accused TK Series System product line, are highly relevant to what the parties would have considered at the time of the hypothetical negotiation. This dispute can only be resolved through cross-examination.

All of Deere's criticisms of Dr. Varner's reasonable royalty analysis go to the weight of his testimony, not its admissibility. As the Federal Circuit explained in *i4i Ltd. P'ship v. Microsoft Corp.*, "any reasonable royalty analysis necessarily involves an element of approximation, and uncertainty." 598 F.3d 831, 857–58 (Fed. Cir. 2010). Dr. Varner is "entitled to present [his] own damages theory regarding [a reasonable royalty]" and it is "ultimately up to the jury [] to weigh

the credibility of the parties' opposing theories and evidence." *Ericsson, Inc. v. Harris Corp.*, 352 F.3d 1369, 1378 (Fed. Cir. 2003). Deere's motion has no merit and should be denied.

## II.    LEGAL STANDARDS

In challenging proffered expert testimony, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" are preferred over exclusion of the expert. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993). "When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010), aff'd, 564 U.S. 91 (2011).

## III.    BACKGROUND AND STATEMENT OF FACTS

ESCO designated Dr. Thomas Varner as an expert witness to address damages issues. Dr. Varner holds a B.S. in Architecture from California Polytechnic State University, an M.S. in Civil Engineering (Structural Engineering and Structural Mechanics) from the University of California at Berkeley and in Engineering-Economic Systems from Stanford University, an M.B.A. from the University of California at Berkeley, and a Ph.D. in Engineering-Economic Systems & Operations Research from Stanford University. *See* Ex. 2, Varner Op. Rep., ¶ 2. Dr. Varner has over 20 years of experience analyzing and testifying about damages issues, including calculating lost profits and applying the *Georgia-Pacific* factors in determining a reasonable royalty rate. *See id.*, ¶ 4. He has been retained in over 60 cases and testified in over 20 depositions and seven trials. *See id.*, App'x A.

## A.    Dr. Varner Calculated Lost Profits Damages Using the Market Share Approach.

Dr. Varner submitted his opening report on January 13, 2023.  Dr. Varner used the well-established market share approach to determine the amount of profits ESCO lost as a result of Deere's infringement of the two asserted patents.  *See, e.g.*, *King Instruments*, 65 F.3d at 953 (finding district court did not abuse its discretion in calculating lost profits based on a market share approach); *State Industries, Inc. v. Mor-Flo Industries, Inc.*, 883 F.2d 1573, 1579–80 (Fed. Cir. 1989) (finding market share approach "well established and appropriate for determining damages for patent infringement").  Specifically, Dr. Varner calculated ESCO's lost profits based on Deere's, ESCO's, and other competitors' market shares in the "premium" segment of the market for bucket tooth systems used in construction applications, which the parties agree is the relevant market.  *See* Mot. at 4.

ESCO offers a wide variety of bucket tooth systems that are used for different applications.  Two of ESCO's product lines practice the asserted patents—the GeoVor system and the 3-Piece Nemisys system.  ESCO's GeoVor system competes in the market for bucket tooth systems used in dredging applications.  *See* Ex. 3, Stitzel Dep. at 39.  ESCO's 3-Piece Nemisys system competes in the market for bucket tooth systems used in mining applications.  *See id.* at 42–43.  ESCO also offers product lines that compete in the market for bucket tooth systems used in construction applications: (1) the Ultralok system, (2) the Super V system, and (3) the MaxDRP and MaxDRP Plus systems.  Ultralok competes in the "premium" segment of the market, while Super V, MaxDRP, and MaxDRP Plus do not.  *See id.* at 98, 112–13.  There is no dispute that the accused TK Series System products compete with ESCO's Ultralok products in the "premium" segment of the market for bucket tooth systems used in construction applications.  *See* Mot. at 4 (*citing* Ex. 2, Varner Op. Rep., ¶¶ 51–52; Ex. 1, Becker Rep., ¶ 41).

Dr. Varner's market share analysis in his opening report was based, in part, on testimony provided by Mr. Michael Budan, who Deere designated as a Rule 30(b)(6) witness to testify regarding "market studies, market analyses, competitive studies, and competitive analyses for the Accused Products in the U.S."  Ex. 4, Supp. Resp. to ESCO's Rule 30(b)(6) Notice at 33; Ex. 5, 10/14/2022 3:12 PM corresp.  During his November 9, 2022 deposition, Mr. Budan testified that Deere has "about 20 percent" of "the market in which the Deere TK-Series System competes" (*i.e.*, the "premium" segment).  Deere Ex. F, Budan Dep. at 21 ("Q Do you know approximately what market share Deere has in the market in which the Deere TK-Series System competes? … [A] I would estimate ██████████.").  Mr. Budan made no corrections or changes to his deposition transcript.  Ex. 6, Errata for Budan Dep.  Thus, in his lost profit calculations, Dr. Varner used this ████ figure as Deere's market share in the "premium" segment.  Exhibit 6 to his report, which is reproduced below, shows the relevant market shares:



Ex. 2, Varner Op. Rep. at Exhibit 6.

To determine ESCO's relevant market share, Dr. Varner relied partially upon Mr. Adam Stitzel's testimony, who ESCO designated as a Rule 30(b)(6) witness regarding "assessments of the share of the market in the United States" for ESCO's products, including the Ultralok product line.  Ex. 7, Resp. to Deere's Supp. Rule 30(b)(6) Notice at 13; Ex. 8, 11/28/2022 2:07 PM corresp.  Mr. Stitzel testified that ESCO has ████████████████████ for bucket tooth systems.  Ex. 3, Stitzel Dep. at 130.  That estimate was substantiated

by ESCO's documents.  *See* Ex. 9, ESCO_00140132 at 140138.  Mr. Stitzel also testified that the "premium" segment of the market is ███████████ of the overall market.  Ex. 3, Stitzel Dep. at 184.  Based on ESCO's sales of its Ultralok and Super V products, Dr. Varner calculated that ████████████████████████████████████████████ Ex. 2, Varner Op. Rep. at Exhibit 6, n.1.  Based on Mr. Stitzel's testimony that the "premium" segment is about ███ of the overall market for bucket tooth systems, Dr. Varner estimated that ESCO's market share in the "premium" segment is "████████████████  *Id.*  As shown in Dr. Varner's Exhibit 6 above, Dr. Varner took the mid-point and used ███ as ESCO's market share in the "premium" segment.  Deere does not challenge Dr. Varner's use of ███ as ESCO's market share in the "premium" segment.

To calculate other competitors' shares in the "premium" segment, Dr. Varner subtracted ███ (Deere's market share) and ███ (ESCO's market share) from 100%, resulting in ███ of the "premium" segment being held by other competitors.  *See* Ex. 2, Varner Op. Rep. at Exhibit 6.  Dr. Varner then calculated the ratio of ESCO's market share to other competitors' market share to apportion Deere's market shares to ESCO and other competitors in the "but for" world.  *See id.* This methodology reflects the assumption that Deere would have had a 0% share of the "premium" segment of the market "but for" its release of the only product line it offers that competes in the "premium" segment of the market (*i.e.*, the accused TK Series System product line).  *See id.*[1]

On February 8, 2023, Deere's damages expert, Dr. Stephen Becker, submitted his report responding to Dr. Varner's opinions.  In his report, Dr. Becker claimed he had an undocumented

---

[1] Deere also offers "All-Makes Replacement Teeth" and the "All-Makes RVJ Tooth System" for sale.  *See* Ex. 10, DEERE_0000363.  However, none of these products compete in the "premium" segment of the market for bucket tooth systems, because (among other reasons) they are not "hammerless" systems and/or are not patent protected.  *See* Ex. 2, Varner Op. Rep., ¶¶ 51–53.

conversation with Mr. Budan sometime after Mr. Budan was deposed and after Dr. Varner submitted his report.  *See id.*, ¶ 286; *see also* Ex. 11, Becker Dep. at 65.  According to Dr. Becker: "Mr. Budan's reference to ███ was not an estimate of the TK Series <u>overall</u> market share but was Mr. Budan's estimate of the portion of the Deere 'machine population' that is being served with TK Series products" and "that Deere is capturing only ███ of the 'market' for teeth on its own Deere machines."  *Id.* (emphasis in original).  This purported conversation was inconsistent with Mr. Budan's deposition testimony.  Mr. Budan was not asked in his deposition what "portion of the Deere 'machine population' [] is being served with TK Series products" (*id.*), but "what market share Deere has in the market in which the Deere TK-Series System competes."  Deere Ex. F, Budan Dep. at 21.  Perhaps most tellingly, Mr. Budan has never submitted an errata correcting this supposed error.  Ex. 6, Errata for Budan Dep.  Nevertheless, Dr. Becker asserts that Mr. Budan's testimony was "misinterpreted."  Ex. 1, Becker Rep., ¶ 286.

Dr. Varner maintains that the factual record supports his original calculation of Deere's market share.  *See* Ex. 15, Varner Dep. at 152 ("I believe Mr. Budan was referring to Deere's percentage of the sales it makes on its own equipment. … It's not quite the same thing as the overall North American market.  But that's the information we have.  And I believe that ███ refers to not just the premium segment but all of the segments").  Nevertheless, in an effort to be conservative and take into account Deere's conflicting testimony, Dr. Varner revised his market share analysis to use Mr. Stitzel's testimony (ESCO's Rule 30(b)(6) witness designated on market share) regarding Deere's market share.  Thus, on March 19, 2023, Dr. Varner served an errata to

his opening report to reflect a lower market share for Deere in the "premium" segment.  Deere Ex. T, 3/19/2023 Varner Errata.[2]

Based on Mr. Stitzel's testimony that Deere has ███████████████ of the overall market for bucket tooth systems that the "premium" segment of the market is ███████████ of the overall market, Dr. Varner re-calculated Deere's share of the "premium" market at approximately ███.[3]  Ex. 3, Stitzel Dep. at 131, 184.  Dr. Varner corrected the values used in Exhibit 6R, as reproduced below:



Deere Ex. T, 3/19/2023 Varner Errata at Exhibit 6R.  Dr. Varner used the same methodology to apportion Deere's market shares to ESCO and other competitors after removing Deere's shares from the market, as in Exhibit 6 above.  Dr. Varner's market share apportionment methodology has remained consistent throughout all of his reports and deposition testimony and is consistent with established methodologies widely accepted by courts.  The only modification to Dr. Varner's

---

[2]  ESCO offered to make Dr. Varner available for a one-hour follow up deposition to answer any questions about the errata.  *See* Deere Ex. V, 3/19/2023 4:26 PM corresp.  Deere has ignored that offer.  Instead, on March 28, 2023, Deere filed a motion to strike the errata, claiming it was prejudiced by the timing.  Deere's motion has no merit, and ESCO will address that issue in its response to Deere's motion, which is due on April 11, 2023.

[3]  Dr. Varner took the mid-point between ███████████ and divided it by ██ (*i.e.*, the size of the "premium" segment of the market compared to the overall market) to get ██.

report was his accounting for (and taking the most conservative approach to) inconsistent testimony from Deere about its own market shares. This revision, of course, reduced ESCO's overall lost profits claim by approximately ▮. Deere Ex. T, 3/19/2023 Varner Errata, ¶ 2.

Notably, regardless of whether you look at the "premium" segment of the market (*i.e.*, "Construction Expendables Top Tier") or the segment of the market for bucket teeth on Deere's machines (*i.e.*, "Deere Machines"), ESCO's "but for" market shares are the same. Indeed, the "but for" calculation for the "premium" segment, where Deere has an ▮ market share, ESCO has a ▮ market share, and other competitors have a ▮ market share, results in a market share of ▮ for ESCO.[4] In the market for bucket teeth on Deere's machines, where Deere has a ▮ market share, ESCO would have a ▮ market share and other competitors would hold the remaining ▮.[5] The "but for" calculation for this market also results in a market share of ▮ for ESCO.[6]

It is important to note that both experts expect to offer updated damages calculations prior to trial. Deere has produced relevant financial data only through October 31, 2022. The parties

---

[4] To apportion Deere's market share to ESCO and other competitors in the "but for" calculation, Dr. Varner divided ESCO's ▮ market share by the portion of the market held by ESCO and other competitors ▮ Dr. Varner then divided ESCO's ▮ market share by ▮ which equals approximately 28%.

[5] To determine ESCO's and other competitors' shares in this market, Dr. Varner divided ESCO's ▮ market share in the "premium" market by the portion of the "premium" market held by ESCO and other competitors (*i.e.*, ▮) and multiplied the result by the portion of the market for bucket teeth on Deere machines held by ESCO and other competitors (*i.e.*, ▮). This calculation results in a market share of approximately ▮ for ESCO and ▮ for other competitors (*i.e.*, ▮).

[6] To apportion Deere's market share to ESCO and other competitors in the "but for" calculation, Dr. Varner divided ESCO's ▮ market share by the portion of the market held by ESCO and other competitors (*i.e.*, ▮) Dr. Varner then divided ESCO's ▮ market share by ▮ which equals approximately ▮.

have agreed they will each supplement their financial data on August 21, 2023, approximately one month before trial, so that Dr. Varner and Dr. Becker can provide updated calculations.  *See* Ex. 12, 3/20/2023 1:43 PM corresp.  Thus, prior to trial market share assumptions may change, and overall damages calculations certainly will change (although the methodology will not).

      **B.**      **Dr. Varner Calculated a Reasonable Royalty by Applying the *Georgia-Pacific* Factors and the Specific Facts Relevant to This Case.**

In determining a reasonable royalty for the asserted patents, Dr. Varner conducted a detailed analysis of each of the *Georgia-Pacific* factors:

| *Georgia-Pacific* Factor | Dr. Varner's Analysis |
|---|---|
| Factor 1: The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty. | Dr. Varner analyzed every license ESCO has entered into that covered, at least in-part, bucket tooth system technologies.  *See* Ex. 2, Varner Op. Rep., ¶¶ 84–97.  He ultimately concluded that because those licenses ███████████████████████████████ ████████████████ they were "not directly representative of a reasonable royalty rate in this matter."  *Id.*, ¶ 97.  The royalty rates in those licenses ranged from ████████, with most being ██████ than the ██████ royalty Dr. Varner opined on.  *See id.*, ¶¶ 84–97. |
| Factor 2: The rates paid by the licensee for the use of other patents comparable to the patent in suit. | Deere has only entered into one agreement related to bucket tooth technology—an agreement with Black Cat to design and manufacture the accused TK Series System products.  *See id.*, ¶¶ 98–99.  ███████████████████████████████ *Id.* |
| Factor 3: The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold. | For this factor, Dr. Varner concluded that "the hypothetical license to Deere for the patents-in-suit arising from the hypothetical negotiation would be on a non-exclusive basis," which "would tend to reduce the reasonable royalties."  *Id.*, ¶ 100.  Dr. Varner also determined that "the territory specified in a license arising from the hypothetical negotiation would be U.S. territory," and "[b]ecause the patents-in-suit are U.S. patents, |

| *Georgia-Pacific* Factor | Dr. Varner's Analysis |
|---|---|
| | this factor would not have an effect on the reasonable royalties." *Id.*, ¶ 101. |
| Factor 4: The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly. | Dr. Varner concluded that because ███████████ ███████████████████ "this factor will tend to increase the reasonable royalty rate." *Id.*, ¶ 102. |
| Factor 5: The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter. | Dr. Varner opined that this factor would "tend to increase the reasonable royalty rate" because Deere and ESCO are competitors. *Id.*, ¶ 103. |
| Factor 6: The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales. | For this factor, Dr. Varner noted that he was "not aware of any derivative or convoyed products that Deere sells that are generated by use of patented technology." *Id.*, ¶ 104. |
| Factor 7: The duration of the patent and the term of the license. | Dr. Varner analyzed this factor in conjunction with Factors 14 and 15, but noted that he understood "that the '662 Patent expires September 26, 2027 and the '175 Patent expires January 17, 2032." *Id.*, ¶ 105. |
| Factor 8: The established profitability of the product made under the patent; its commercial success; and its current popularity. | For this factor, Dr. Varner analyzed Deere's sales and profit ███████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████ *Id.*, ¶ 106. |
| Factor 9: The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.<br><br>Factor 10: The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention. | Dr. Varner detailed the numerous benefits enabled by the asserted patents, including: "(1) improv[ing] tooth stability by reducing 'ejection forces' created by planes at an angle to the tooth's longitudinal axis, thereby reducing stress on the tooth's locking mechanism; (2) increase[ing] the section modulus of the components (i.e., reduce stress in components for a given bending moment force); (3) increase[ing] contact point near the tooth's neutral axis, thus reduce wear on the components; (4) increase[ing] the usable area in which to install a hammerless locking |

| *Georgia-Pacific* Factor | Dr. Varner's Analysis |
|---|---|
| | mechanism without impacting mechanical performance of the tooth, and (5) reduc[ing] "rattling" of the tooth component against the adapter component, further reducing wear on the components." *Id.*, ¶ 107.  All of these features "improve[] a covered bucket tooth system's stability, reliability, longevity, and safety (by allowing more space for hammerless installation systems)." *Id.*; *see also* ███ ██ ██ ██ ███ indicates the value to Deere of using ESCO's patented technology in its TK Series System." *Id.*, ¶ 114.  Dr. Varner then concluded that "this factor would increase the reasonable royalties in this matter." *Id.*, ¶ 115. |
| Factor 11: The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use. | Relying on the sales of Deere's TK Series System and ESCO's technical expert's report discussing the importance of the patented features to the accused TK Series System, Dr. Varner concluded that "[t]his factor would tend to increase the reasonable royalties in this matter." *Id.*, ¶ 116. |
| Factor 12: The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions. | Dr. Varner noted that "Deere's Senior IP Counsel, Mr. Dellett, also testified that ███████ ████████████ ████████ but, as discussed below, Dr. Varner analyzed the difference in the profit margins between ESCO's Ultralok (patented) and Super V (not patented) product lines. *Id.*, ¶ 117. |
| Factor 13: The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer. | In addition to his analysis for Factors 9 and 10, Dr. Varner analyzed "the nature of the patents-in-suit[, that they] go to the overall stability, strength, reliability, and safety (by increasing the usable area in which to install a hammerless locking mechanism) of the bucket tooth systems covered by the patents" and "without these features, demand for the bucket tooth systems would be significantly diminished." *Id.*, ¶ 118. Dr. Varner concluded |

| *Georgia-Pacific* Factor | Dr. Varner's Analysis |
|---|---|
|  | that "this factor would tend to increase the reasonable royalty rate." *Id.* |
| Factor 14: The opinion testimony of qualified experts. | Dr. Varner "considered the expert report of Mr. Holland and have incorporated his opinions where appropriate into [his] analysis." *Id.*, ¶ 119. |

For the last factor (Factor 15), Dr. Varner determined "the amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement." *See id.*, ¶¶ 120–29. To do so, Dr. Varner first determined that "accused product net sales [would be] the royalty base" because ██████████████████████████████████████ ███████████████████████████████████ *Id.*, ¶ 120. Dr. Varner then considered "ESCO's sales of bucket tooth products to Deere." *Id.*, ¶ 125. ESCO has long been a supplier of its Super V and Ultralok product lines to Deere. As discussed above, Super V does not compete in the "premium" segment of the market. Accordingly, Dr. Varner considered ESCO's

████████████████████████████████████████████████████

from 2020 to 2022. *Id.*; *see also* Deere Ex. K, 1/16/2023 Errata. Although neither Ultralok nor Super V are covered by the asserted patents, Dr. Varner used this data as a metric for what ESCO might agree to for a reasonable royalty on one of its patented products that competes in the "premium" segment. Like its GeoVor and 3-Piece Nemisys product lines, which are both patent protected and compete in the "premium" segment of the market for bucket tooth products for use in dredging and mining applications respectively, ESCO's Ultralok product line is patent protected and competes in the "premium" segment of the market for bucket tooth products for use in construction applications. *See* Ex. 2, Varner Op. Rep., ¶ 125. Similarly, Dr. Varner looked at the difference between ESCO's profit margins on Super V before and after the patents that covered

Super V expired (*i.e.*, ███████████████ of ESCO's profit margins may be attributable to patent protection) to determine what royalty ESCO might agree to for patented product lines.  *See id.*, ¶ 126.  Dr. Varner also considered Deere's profit margins on its TK Series System to determine the impact of an 8% royalty on Deere's profits.  *See id.*, ¶ 127.  Dr. Varner concluded, after "[c]onsidering **all** of the *Georgia-Pacific* factors and factors specific to this matter," "that the parties would have agreed to a reasonable royalty rate of 8% of net sales of accused TK Series System products."  *Id.*, ¶ 128.[7]

## IV.   ARGUMENT

### A.   Dr. Varner's Lost Profits Market Share Analysis Is Based on Reliable Methodology and Sufficient Data.

Deere concedes the "market share" approach to calculating lost profits is an accepted methodology.  *See* Mot. at 3–4; *see also, e.g.*, *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1577–78 (Fed. Cir. 1989).  Deere also concedes that in using this approach, "a patentee must **reconstruct the market** to show, hypothetically, 'likely outcomes **with infringement factored out** of the economic picture.'"  *Id.* at 3 (*citing Crystal Semiconductor Corp. v. TriTech Microelectronics Intern., Inc.*, 246 F.3d 1336, 1355 (Fed. Cir. 2001) (*quoting Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999))).  Deere does not assert that Dr. Varner used a flawed methodology, nor does it challenge Dr. Varner's calculation of a ███ market share for ESCO in the "premium" segment of the market.  Instead, it appears Deere is raising two objections to Dr. Varner's work: (1) Dr. Varner reconstructed the market "but for" Deere's infringement, rather than solely basing the lost profits calculation on ESCO's ███ market share; and (2) Dr. Varner allegedly used Deere's market share for bucket tooth systems installed

---

[7]  All emphasis added unless otherwise indicated

on its own machines instead of the "premium" segment of the market.  Each of these arguments is wrong.

*First*, Deere alleges that Dr. Varner should have "just use[d] the ███ share of the market that he assigns Ultralok, the approach endorsed by both the Federal Circuit and this District," rather than calculating the adjusted market share that ESCO would have had absent Deere's infringement. Mot. at 5.  While Deere apparently concedes that ESCO is entitled to ███ of Deere's TK Series System sales, its argument is nevertheless flawed.  The Federal Circuit "ha[s] affirmed lost profits awards based on 'a wide variety of reconstruction theories in which the patentee has presented reliable economic evidence of "but for" causation.'"  *Ericsson,* 352 F.3d at 1377 (*citing Crystal Semiconductor*, 246 F.3d at 1355).   Indeed, the Federal Circuit has affirmed apportioning the infringer's market shares to the patent owner and other competing parties in the relevant market to "reconstruct the market" in a "but for" world.  *See, e.g.*, *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 805 F.3d 1368, 1379–80 (Fed. Cir. 2015) (affirming allowance of damages expert's "adjusted lost-profits analysis"); *Ericsson*, 352 F.3d at 1377–78 (same); *Crystal Semiconductor*, 246 F.3d at 1356 (finding "Crystal was entitled, as OPTi conceded, to ***at least a 21.8% market share***, or $7.4 million").  That is exactly what Dr. Varner did here.  *State Industries*, which Deere cites as alleged support for its position, does not stand for the proposition that a "patent owner's market share [is a] 'cap.'"  Mot. at 4.  To the contrary, the Federal Circuit held that, in some circumstances, a patent owner may "be[] entitled to [other] shares of the market on top of its own."  *State Industries*, 883 F.2d at 1578.

To the extent Deere takes issue with Dr. Varner's assumption that Deere would have a 0% share of the "premium" segment of the market in a "but for" world, that is a dispute better handled through cross-examination.  There is no evidence Deere has offered or will offer any other product

in the "premium" segment of the market other than the accused TK Series System product line. And as for any potential design changes that would allegedly not infringe the asserted patents, ESCO has set forth sufficient evidence to show that those design changes, including the proposed "A1 design," were not available at the time of infringement and would not be acceptable to any customers. *See, e.g.*, Ex. 13, Holland Reply Rep., ¶¶ 93–102; Ex. 14, Umberger Rep. at 11–16.

***Second***, Deere alleges Dr. Varner "selectively cho[se] the highest numbers from two different markets" by assigning a "market share of ▮▮ to the TK Series." Mot. at 4–5. Not so. As explained above, Dr. Varner initially relied on Mr. Budan's sworn deposition testimony that Deere has ▮▮▮▮▮▮▮ of "the market in which the Deere TK-Series System competes" (*i.e.*, the "premium" segment). Deere Ex. F, Budan Dep. at 21 ("Q Do you know approximately what market share Deere has in the market in which the Deere TK-Series System competes? … [A] I would estimate ▮▮▮▮▮▮."); Ex. 6, Errata for Budan Dep. Dr. Varner then revised his market share analysis because of Deere's inconsistent testimony and to use Mr. Stitzel's estimates of Deere's market share. This purported change in Mr. Budan's testimony is certainly fair game for cross-examination of both Mr. Budan and Dr. Becker at trial. But Dr. Varner's decision to take a more conservative approach by revising his assumption of Deere's relevant market share provides no basis for wholesale exclusion of his testimony. Deere's entire argument ignores both Dr. Varner's errata (which moots Deere's objection) and the fact that no errata would have been required at all, but for Dr. Becker's attempt to recast Mr. Budan's sworn deposition testimony.

Contrary to Deere's allegations, Dr. Varner never conceded that Deere has a ▮▮▮▮▮ market share in the "premium" market, nor did he concede it was ▮▮▮▮▮▮▮▮ Mot. at 4. Instead, Dr. Varner testified that "Deere's share of the total premium segment of the U.S. construction expendables market" is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Ex. 15, Varner Dep. at 171.  Nor did Dr. Varner "conced[e] that [Dr.] Becker's calculations of

███████████ are correct for the "premium" segment of the market.  Mot. at 4–5.  To the contrary,

Dr. Varner testified that Dr. Becker "got the wrong concept" because Dr. Becker's calculations of

4.1 to 4.8% are for the ***overall market*** for bucket tooth systems, not the "premium" market that is

relevant for this case.  Ex. 15, Varner Dep. at 169.

Dr. Varner is "entitled to present [his] own damages theory regarding [lost profits]" and it

is "ultimately up to the jury [] to weigh the credibility of the parties' opposing theories and

evidence." *Ericsson*, 352 F.3d at 1378.  At bottom, Deere's criticisms of Dr. Varner's market

share approach for the calculation of lost profit damages are better suited for cross-examination;

Dr. Varner certainly has "provided enough factual support for a jury to assess [Deere's] challenge

to the weight and credibility of his opinion." *Intuitive Surgical, Inc. v. Auris Health, Inc.*, C.A.

No. 18-1359-MN, 2021 WL 3662842, at *6 (D. Del. Aug. 18, 2021); *see also, e.g., Daubert*, 509

U.S. at 595 ("Vigorous cross-examination, presentation of contrary evidence, and careful

instruction on the burden of proof are the traditional and appropriate means of attacking shaky but

admissible evidence."); *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003)

("In this case, the trial court properly did not rule inadmissible Fiorito's damages testimony simply

because it was based on Micro Chemical's version of the contested facts. The defendants had ample

opportunity to rebut Fiorito's damages theory during cross-examination."); *Sonos, Inc. v. D & M

Holdings Inc.*, 297 F. Supp. 3d 501, 519 (D. Del. 2017) (J. Bryson) (declining to strike expert's

"lost profits analysis" because "whether Mr. Tate or Mr. Bone has more persuasively defined the

market is a question for the jury"); *Wash World Inc. v. Belanger Inc.*, No. 19-C-1562, 2021 WL

2856524, at *3 (E.D. Wis. July 8, 2021) ("[A]ny disagreement Wash World may have with Dr.

McDuff's opinions, data, or assumptions regarding his market share analysis may be addressed on

cross-examination."); *Illinois Tool Works, Inc. v. MOC Prods. Co., Inc.*, No. 09CV1887 JLS(MDD), 2012 WL 3561984, at *7 (S.D. Cal. Aug. 17, 2012) (expert's assumption that plaintiff held 50% market share went to weight).

        **B.**     **Dr. Varner's Reasonable Royalty Analysis Is Tied to the Specific Facts of the Case and Should Not Be Excluded.**

      Deere contends that "Dr. Varner bases his 8% royalty rate on data unrelated to the claimed invention in any way." Mot. at 7. Again, this argument has no merit. Deere is apparently attempting to narrow the scope of the data Dr. Varner can rely upon to what is contained in or explicitly references the asserted patents. There is no support for that position in the law. Indeed, *Uniloc*, on which Deere relies, states that an expert must "justif[y] the application of a general theory ***to the facts of the case***," which Dr. Varner has certainly done here. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1316 (Fed. Cir. 2011); *see also, e.g.*, *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015) ("But where the methodology is reasonable and its data or evidence are sufficiently tied to the facts of the case, the gatekeeping role of the court is satisfied, and the inquiry on the correctness of the methodology and of the results produced thereunder belongs to the factfinder."); Fed. R. Evid. Rule 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."). Deere launches several attacks on Dr. Varner's analysis, none of which merit.

      ***First***, Deere's primary objection appears to be that Dr. Varner should not have considered ESCO's profit margins on its Ultralok products (which are patented and compete in the "premium" market) and its Super V products (whose patents expired and no longer compete in the "premium" market). *See* Mot. at 7–8 (Dr. Varner "presume[d] that this ███ difference in profit margin is entirely based on Super V products no longer being covered by patents and concludes that the value of the Ultralok patents must be ███ of Ultralok's profitability.") But Dr. Varner ***never***

*made this presumption*.  As explained above, the profitability of Ultralok as compared to Super V was just one portion of Dr. Varner's analysis of the *Georgia-Pacific* factors.  *See, e.g.*, Ex. 15, Varner Dep. at 193–200.  And far from being unrelated to the facts of this case, ESCO's profit margins on its Ultralok and Super V product lines, which compete in the same overall market for bucket tooth systems for use in construction applications as the accused TK Series System product line, are highly relevant to what the parties would have considered at the time of the hypothetical negotiation.  Deere also criticizes Dr. Varner's analysis because he supposedly "considered no other basis for the difference in profitability between Ultralok and Super V (e.g., Ultralok is a more advanced technology, providing 'hammerless' functionality demanded by its market; Ultralok competes in a more 'premium' market; Super V is an older 'legacy' product)."  Mot. at 9.  To the extent this argument has any merit, it is fodder for cross-examination, not exclusion.  But the fact that Ultralok is "hammerless" and competes in the "premium" market makes it all the more relevant to the asserted patents, which enable similar features in the products that do practice the asserted patents.

**Second**, Deere quibbles with Dr. Varner's consideration of the profitability of ESCO's Super V products, which, as discussed above, compete in the overall market for bucket tooth systems used in construction applications, but not the "premium" segment of that market (because it is no longer patented and is not "hammerless").  *See* Mot. at 9.  Here too, the ███████ ███████ of Super V after its patents expired is relevant to what the parties would have considered at the time of the hypothetical negotiation.  And the reason Super V "was 'legacy' technology becoming less desired in the market, that it was no longer advertised by ESCO, [and] that it competed in a 'legacy' market rather than the 'premium' market," was in part because the

patents covering Super V expired.  *Id.*  Deere's "quarrel with the facts [Dr. Varner] used go to the weight, not admissibility, of his opinion."  *i4i*, 598 F.3d at 854.

**Third**, Deere's allegation that "Dr. Varner never actually applied any of his *Georgia-Pacific* discussion to his 8% rate" is, to be frank, absurd on its face.  Mot. at 10.  As explained above, Dr. Varner addressed every single *Georgia-Pacific* factor and explained clearly how each factor would impact the royalty rate.  Indeed, Dr. Varner's report "contain[s] more than a superficial recitation of the *Georgia-Pacific* factors and any shortcoming in the application of those factors can be addressed in cross-examination."  *Minerva Surgical, Inc. v. Hologic, Inc.*, C.A. No. 18-00217-JF-SRF, 2021 WL 3048447, at *9 (D. Del. Jul 20, 2021).  To the extent Deere is contending that Dr. Varner was required to undergo a mathematical calculation for each of the *Georgia-Pacific* factors for it to be taken into consideration in the ultimate royalty rate, such an argument is without merit.  *See, e.g.*, *i4i*, 598 F.3d at 857–58 ("[A]ny reasonable royalty analysis necessarily involves an element of approximation, and uncertainty."); *Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.*, C.A. No. 15-152-RGA, 2018 WL 5729732, at *2 (D. Del. Nov. 2, 2018) ("An expert witness must provide some explanation of both why and generally to what extent the particular factor impacts the royalty calculation, but need not demonstrate mathematical precision.") (internal citation omitted); *MiiCs & Partners, Inc. v. Funai Elec. Co., Ltd.*, C.A. No. 14-804-RGA, 2017 WL 6268072, at *5 (D. Del. Dec. 7, 2017) ("Further, in my opinion, Defendants' objection to Mr. Hampton's analysis on the basis that he did not sufficiently explain to what extent each factor impacts the final royalty rate is not the proper subject of a *Daubert* motion."); *Comcast IP Holdings I, LLC v. Sprint Communications Company L.P.*, No. 12-cv-0205-RGA, 2015 WL 4730899, *6–*7 (D. Del. 2015) ("The lack of a mathematical formula, when there is other analysis, cannot, alone, be grounds for excluding Ms. Mulhern's methodology.").

Just like his opinion regarding lost profits, Dr. Varner is "entitled to present [his] own damages theory regarding [a reasonable royalty]" and it is "ultimately up to the jury [] to weigh the credibility of the parties' opposing theories and evidence." *Ericsson*, 352 F.3d at 1378.  Here too, Deere's criticisms of Dr. Varner's analysis of the *Georgia-Pacific* factors are better suited for cross-examination. *Intuitive Surgical*, 2021 WL 3662842, at *6; *Daubert*, 509 U.S. at 595; *Micro Chem.*, 317 F.3d at 1392; *Sonos*, 297 F. Supp. 3d at 519; *Wash World*, 2021 WL 2856524, at *2; *Illinois Tool Works*, 2012 WL 3561984 at *7.

## V.   CONCLUSION

For the reasons explained above, Deere's motion to exclude Dr. Varner's testimony should be denied.

|  | /s/ Nathan R. Hoeschen |
|---|---|
|  | John W. Shaw (No. 3362) |
|  | Karen E. Keller (No. 4489) |
| OF COUNSEL: | Nathan R. Hoeschen (6232) |
| Brian D. Sieve, P.C. | Emily S. DiBenedetto (No. 6779) |
| Paul D. Collier | SHAW KELLER LLP |
| Jeremy D. Roux | I.M. Pei Building |
| Xaviere Giroud | 1105 North Market Street, 12th Floor |
| Tareq M. Alosh | Wilmington, DE 19801 |
| KIRKLAND & ELLIS LLP | (302) 298-0700 |
| 300 North LaSalle | jshaw@shawkeller.com |
| Chicago, IL 60654 | kkeller@shawkeller.com |
| (312) 862-2000 | nhoeschen@shawkeller.com |
|  | edibenedetto@shawkeller.com |
| Dated: April 5, 2023 | *Attorneys for Plaintiff* |

## CERTIFICATE OF SERVICE

I, Nathan R. Hoeschen, hereby certify that on April 5, 2023, this document was served on

the persons listed below in the manner indicated:

### BY EMAIL

James D. Taylor, Jr.
Michelle C. Streifthau-Livizos
SAUL EWING ARNSTEIN & LEHR LLP
1201 N. Market Street, Suite 2300
Wilmington, DE 19801
(302) 421-6800
james.taylor@saul.com
michelle.streifthau-livizos@saul.com

Rachael L. Rodman
ULMER & BERNE LLP
65 East State Street, Suite 1100
Columbus, OH 43215
(614) 229-0039
rrodman@ulmer.com

John F. Bennett
Paul M. Ulrich
Paul J. Linden
Ava M. Abner
ULMER & BERNE LLP
600 Vine Street, Suite 2800
Cincinnati, OH 45202
(513) 698-5000
jbennett@ulmer.com
pulrich@ulmer.com
plinden@ulmer.com
aabner@ulmer.com

*/s/ Nathan R. Hoeschen*
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Nathan R. Hoeschen (6232)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
nhoeschen@shawkeller.com
edibenedetto@shawkeller.com
*Attorneys for Plaintiff*

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ESCO GROUP LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 1:20-cv-01679-RGA-JLH |
| | § | |
| DEERE & COMPANY, | § | |
| | § | |
| Defendant. | § | |

**EXPERT REPORT OF STEPHEN L. BECKER, Ph.D.**

STEPHEN L. BECKER, Ph.D.

2/8/2023

DATE

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL

**INDEX TO EXHIBITS**

| | |
|---|---|
| Exhibit SLB-1A | Reasonable Royalty Summary |
| Exhibit SLB-1B | Reasonable Royalty Summary - '662 Patent Hypothetical Negotiation Date |
| Exhibit SLB-1.1A | Reasonable Royalty Summary - Indifference Rate Determination Through Expiration of Patents-in-Suit |
| Exhibit SLB-1.1B | Reasonable Royalty Summary - Indifference Rate Determination Through Expiration of Patents-in-Suit - '662 Patent Hypothetical Negotiation Date |
| Exhibit SLB-1.2A | Reasonable Royalty Summary - Indifference Rate Determination Through 2027 |
| Exhibit SLB-1.2B | Reasonable Royalty Summary - Indifference Rate Determination Through 2027 - '662 Patent Hypothetical Negotiation Date |
| Exhibit SLB-2 | List of Accused Products |
| Exhibit SLB-3A | Accused Products Sales Information - By Series |
| Exhibit SLB-3B | Accused Products Sales Information - By Component |
| Exhibit SLB-4 | Accused Products Sales Information - First Fit |
| Exhibit SLB-5 | Accused Products Sales Information - Total Net Sales |
| Exhibit SLB-6 | GeoVor Sales Information |
| Exhibit SLB-7 | Nemisys Sales Information |
| Exhibit SLB-8 | Super V Sales Information |
| Exhibit SLB-9A | Ultralok Sales Information - By Series |
| Exhibit SLB-9B | Ultralok Sales Information - By Component |
| Exhibit SLB-10 | Dr. Varner's Lost Profits Damages With Corrected Market Share Assumption |
| Exhibit SLB-11 | Summary of ESCO Agreements |
| Exhibit SLB-12 | Calculation of ESCO WACC (Weighted Average Cost of Capital) |
| Exhibit SLB-13 | Calculation of Deere WACC (Weighted Average Cost of Capital) |
| Exhibit SLB-14 | Estimated One-Time Cost of the A1 Non-Infringing Alternative Design |

HIGHLY CONFIDENTIAL



41.  It is important to note (as described in more detail later in this report) that none of the products
     that ESCO claims compete with Deere's accused TK Series bucket teeth practice the claims of the
     Patents-in-Suit.[78] For example, as described in the Lost Profits section of this report, ESCO, through
     its expert Dr. Varner, claims that the accused TK Series bucket teeth compete with ESCO's "Ultralok"
     tooth system.[79] ESCO considers the Ultralok system to be part of the "premium" segment of the
     bucket tooth market.[80]



[76] ESCO-00001145-214; at -149.

[77] ESCO-00001145-214; at -149.

[78] Plaintiff ESCO Group LLC's Responses to Defendant Deere & Company's First Set of Interrogatories, dated July 28, 2021, No. 9.

[79] See, for example, Varner Report, pages 20, 24, 27.

[80] See, for example, ESCO-00014614-618; at -617; Deposition of Adam Stitzel, December 16, 2022, pages 109-110, 116, 196; Deposition of Craig Wihtol, December 8, 2022, pages 114-115.

[81] ESCO-00159166-167.

[82] ESCO-00159166-167; at -166.

[83] ESCO-00159166-167; at -166.

particular, Dr. Varner's assumption that Deere's share is ███ is not only speculative but also demonstrably overstated and inconsistent with his other assumptions.

286. As noted in Dr. Varner's Exhibit 6, he relies on a statement from Mr. Budan at his deposition that the TK Series system has "████████████ based on "machine population and estimated consumption or usage patterns of those machines."[396] I discussed the nature of this estimate with Mr. Budan. Based on my discussion with Mr. Budan, I understand that Dr. Varner has misinterpreted his testimony. Based on my discussion, I understand that Mr. Budan's reference to ███ was not an estimate of the TK Series overall market share but was Mr. Budan's estimate of the portion of the Deere "machine population" that is being served with TK Series products. Stated another way, Mr. Budan estimated that Deere is capturing ████ of the "market" for teeth on its own Deere machines. Since Deere equipment (such as excavators and loaders) represent less than 100% of their respective markets, it must follow that the TK Series share of the overall market is substantially less than the ███ assumed by Dr. Varner.

287. Moreover, numerous documents and evidence in the record contradict Dr. Varner's assumptions or, at a minimum, demonstrate the highly speculative nature of his assumed shares. In particular, Dr. Varner's assumption that Deere holds a ███ market share is contradicted by numerous pieces of evidence and by the testimony of ESCO itself. Through the proper lens, this evidence is consistent with Mr. Budan's testimony.

288. For example, a 2010 Deere presentation noted that Deere's bucket tooth historical market share was ████████[397] As of November 2016, ESCO noted that Caterpillar has a "death hold on market share."[398]   An April 2017 ESCO Strategic Plan presentation similarly identified a number of competitors in the construction segment:[399]

---

[396] Dr. Varner relies on a statement from Mr. Budan at his deposition that the TK Series system has ███ market share based on "machine population and estimated consumption or usage patterns of those machines."  Mr. Budan testified that the former related to "[w]hole good machines, such as excavators or backhoes or loaders" and the latter related to "test███ … ████████████ Mr. Budan's estimate appears to be based on some combination of excavator units and tooth lifespan as of an unspecified time.  See Deposition of Michael Budan, November 9, 2022, pages 21-22.
[397] DEERE_0005125.
[398] ESCO-00138154-163; at -163.
[399] ESCO-00054783-814; at -787.

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| ESCO GROUP LLC, | C.A. No. 1:20-cv-01679-RGA |
| *Plaintiff*, |  |
| v. |  |
| DEERE & COMPANY |  |
| *Defendant*. |  |

**EXPERT REPORT OF**

**THOMAS R. VARNER, PH.D.**

Dated:  January 13, 2023

Respectfully submitted,

_____
Thomas R. Varner, Ph.D.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## I.      INTRODUCTION AND ASSIGNMENT

1.      I am an Executive Vice President in the Oakland office of Compass Lexecon, an economic consulting company with over 400 professionals and with offices throughout the U.S., Europe, and Asia.

2.      I received a B.S. in Architecture from California Polytechnic State University, San Luis Obispo, California, in 1979, an M.S. in Civil Engineering (Structural Engineering and Structural Mechanics) from the University of California at Berkeley in 1980, an M.B.A. from the University of California at Berkeley in 1987, an M.S. in Engineering-Economic Systems from Stanford University in 1993, and a Ph.D. in Engineering-Economic Systems & Operations Research from Stanford University in 1997.

3.      I have taught microeconomics, econometrics, and financial economics courses in the Economics Department at the University of California at Davis.  I specialize in economic, financial, and statistical analysis.

4.      For over 20 years, I have served as a consulting or testifying expert on legal matters including intellectual property, antitrust, and general business litigation.  I also have spoken at professional conferences and seminars on intellectual property and technology licensing.  I am a member of the American Economic Association, the National Association of Business Economics, and the Licensing Executives Society.  My hourly rate is $725.  My compensation is not dependent on the outcome of this matter.  Details of my qualifications and prior testimony are in my curriculum vitae, attached hereto as Appendix A.

5.      ESCO Group LLC, ("ESCO" or the "Plaintiff") claims in its First Amended Complaint that Deere & Company ("Deere") infringes two of its patents that relate to bucket tooth

and (4) various "prior art" references dating back to 1982.[82]  Section IX of the Expert Report of

Hezekiah Holland Regarding Infringement (the "Holland Expert Report") addresses why Deere's

proposed design changes to the patents-in-suit, Black Cat's proposed design changes to the TK

Series System products, the Caterpillar J and K Series products, and other competitor products,

and the prior art patents are not acceptable alternatives to the patents-in-suits.  (Furthermore, I

understand that, "if a device is not available for purchase, a defendant cannot argue that the device

is an acceptable non-infringing alternative for the purposes of avoiding a lost profits award."[83])

50.     Deere alleged in its response to ESCO's Interrogatory No. 11 that the following

products are commercially available, non-infringing alternatives: Caterpillar's J Series, K Series,

and Advansys systems; ESCO's Super V system; Hensley/Komatsu's Smartfit and XS systems;

MTG's Starmet system; BYG Futura's J-Clack and Futura II systems; and Liebherr's Z-System.[84]

As I discuss below, many of these products are not substitutes for the accused TK Series System

because they had different features and are sold in different segments of the U.S. market for bucket

tooth systems for construction equipment.

51.     Documents and testimony in this matter demonstrate that bucket tooth systems used

in the construction industry are viewed by both Deere and ESCO as being divided into three

different segments.  A Deere presentation describes these segments as "Good," "Better," and

---

[82] Defendant Deere & Company's Third Supplemental Objections And Answers to ESCO Group LLC's First Set of Interrogatories (Nos. 1-17) (Supplementing Nos. 2, 5-10, 13-15, and 17), 11/17/22, Response to Interrogatory No. 10, pp. 14-17.

[83] *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1571 (Fed. Cir. 1996); *see also*, *Grain Processing Corp. v. American Maize-Products Co.*, 185 F.3d 1341, 1353 (Fed. Cir. 1999) ("Acceptable substitutes that the infringer proves were available during the accounting period can preclude or limit lost profits; substitutes only theoretically possible will not.").

[84] Defendant Deere & Company's Third Supplemental Objections And Answers to ESCO Group LLC's First Set of Interrogatories (Nos. 1-17) (Supplementing Nos. 2, 5-10, 13-15, and 17), 11/17/22, pp. 14-17.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

"Best," with Deere's TK Series System, ███████████████████████████████

███████████████████████ and ESCO's Ultralok system in the "Best" segment.[85, 86]  In addition

to other performance features, a common feature of bucket tooth systems in this top segment is

that they are marketed as "hammerless" systems for changing the tooth components, that is, not

requiring a hammer to remove a securing pin, making for a safer and faster tooth replacement

process.  Mr. Christopher Carpenter, the V.P. of Innovation and Technology at ESCO, testified

that customers appreciate the added safety of a hammerless system.[87]  Deere's Program Manager

for Attachment and Compact Loaders testified that the hammerless feature of the TK Series

---

[85] DEERE_0005839-874 (Deere presentation, "Ground Engaging Tools," Aftermarket Regional Sales Training, 2017), -845.  This document also lists ESCO's SV2, Nemisys, and Posilok tooth systems in the "Best Category," however these are designed for use in the mining industry not the construction industry. *See* ESCO SV2 Product Brochure, https://g9m3s3z2.rocketcdn.me/wp-content/uploads/2022/04/P5180MIN-ENG-L.pdf, accessed 12/28/22, "ESCO SV2® Replacement Parts For Mining and Aggregate Applications."  *See* https://www.esco.weir/mining-tooth-systems/, accessed 12/28/22, "Nemisys® Mining Tooth System."  *See* https://www.directindustry.com/prod/weir-esco/product-52982-1666417.html, accessed 12/28/22, "The S-Series Posilok tooth system is specifically designed for draglines, cable shovels, large hydraulic face shovels and hoe buckets."

[86] The Deere Presentation, "Ground Engaging tools," Aftermarket Regional Sales Training, 2017, DEERE 0005839-874 at 845, also includes the ███████████ in the "Best" Segment.  However, Mr. Stitzel testified (Deposition of Adam Stitzel, 12/16/22, p. 69) that the MTG Liebherr system "lock is promoted as hammerless but yet you need a hammer to knock the lock out, and that given that it's a side lock, the customers talk about accessibility issues because sometimes the protection that goes between the teeth get in the way and so it's difficult to remove."

[87] Deposition of Christopher Carpenter, 12/5/22, pp. 28-29, ███████████████████████████████



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

System is the only distinguishing feature of the TK Series System over other bucket tooth systems on the market.[88]

52.    ESCO also describes the market for bucket tooth systems as being comprised of three segments: premium (or premier), moderate, and legacy,[89] with Ultralok being in the premier segment.[90] Mr. Stitzel testified that ESCO's Ultralok system competes with the TK Series System in the premier segment,[91] along with the Hensley XS, the Komatsu K-Max,[92] the Caterpillar Advansys,[93] and the MTG KingMet tooth systems.[94]

53.    Caterpillar's J Series and ESCO's Super V bucket tooth systems are considered legacy products that do not compete in the premium segment.[95]  Mr. Stitzel testified that the



[88] Deposition of Jason Simmons, 12/14/22, pp. 45-46 ████████████

[89] Deposition of Adam Stitzel, 12/16/22, p. 97, ████████

[90] Deposition of Adam Stitzel, 12/16/22, pp. 97-98, ████████

[91] Deposition of Adam Stitzel, 12/16/22, p. 116, ████████

[92] Deposition of Adam Stitzel, 12/16/22, p. 117, ████████

[94] Deposition of Adam Stitzel, 12/16/22, p. 119.  *See also*, p. 69, MTG Liebherr (or KingMet) system, "…the lock is promoted as hammerless but yet you need a hammer to knock the lock out, and that given that it's a side lock, the customers talk about accessibility issues because sometimes the protection that goes between the teeth get in the way and so it's difficult to remove."

[95] Deposition of Adam Stitzel, 12/16/22, p. 113, ████████

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

Hensley/Komatsu Smartfit and XS systems are relatively small participants in the market,[96] that MTG's Starmet system and BYG Futura's J-Clack and Futura II systems lacked a fully hammerless system,[97] and that Liebherr's Z-System was similar to MTG's Starmet system (*i.e.*, lacked a fully hammerless system).[98, 99]

54.     ESCO estimates that Ultralok's share of the total construction expendables market[100] in North America is between ███████████ [101] and that the premium segment of construction expendables is about ████ of the total market.[102] Exhibit 6 summarizes the market share apportionment methodology. Price differences between the products that compete in the premium segment of the U.S. construction equipment market for bucket tooth systems are



[96] Deposition of Adam Stitzel, 12/16/22, pp. 68-69, 311-313.

[97] Deposition of Adam Stitzel, 12/16/22, pp. 69-70, 311-313.

[98] Deposition of Adam Stitzel, 12/16/22, p. 312.

[99] See also Holland Expert Report, 1/13/23, Section IX.

[100] Deposition of Adam Stitzel, 12/16/22, p. 129, "█████████████████████████████████
████████████████"

[101] Deposition of Adam Stitzel, 12/16/22, pp. 129-130, ████████████████████████████████
████████████████████████████████

[102] Deposition of Adam Stitzel, 12/16/22, p. 184, ██████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

licensing its technology to third parties.[137]  Each of these licensing forms specifies, in addition to other forms of consideration, a running royalty rate multiplied by the "bona fide gross selling price" of the covered products.[138] ███████████████████████████████████

████████████████████████████████████████████████████████████████████

███████

83.   Determination of the running royalty base would have been part of the hypothetical negotiation between ESCO and Deere.  I conservatively use a running royalty base of accused product net sales, that is, the sales amount that would result in the lower sales of the two forms of royalty base specified in the parties' agreements.

### 4.   *Georgia-Pacific* Factor Analysis

a.   *"The royalties received by the patentee for the licensing of the patent-in-suit, proving or tending to prove an established royalty."*



84.

---

[137] DEERE-0048720-735 (Patent License Agreement Form); DEERE_0048736-760 (Patent and Technology License Agreement Form); DEERE_0048766-789 (Patent License Agreement Form).

[138] *See, e.g.,* DEERE-0048720-735 (Deere Patent License Agreement Form), -721.

[139] Deposition of Kevin Stangeland, 12/14/22, pp. 43-44, ██████████████████████████

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

85. 

86.

ii.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY



87. ██████████████████████████████

██████████████ ███████████████████████

████████████████████████████████████████

████████████████████ █████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

██████████████ ███████████████████████████

████████████████████████████

iii. ████████████████████████

88. ██████████████████████████████

██████████████████████████ ████████████████████



151  ESCO Corporation became ESCO Group, LLC after Weir Group PLC acquired ESCO Corporation. https://www.global.weir/newsroom/news-articles/weir-completes-acquisition-of-esco-corporation/, accessed 1/12/23.

152  "ESCO® Corporation Announces Acquisition of Austcast and Newlcast," 12/1/10, https://news.thomasnet.com/companystory/esco-corporation-announces-acquisition-of-austcast-and-newlcast-839668.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY



iv.

89.



90.

91.

92.

[162] Video interview with Mr. Steve Schad, 1/5/23.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY



v. ███████████████████ )

93. ████████████████████████

██████████████████████████████

██████████████████████████████

████████████████████ ████████████

███████████████████████

94. ████████████████████████

████████████████ █████████████████

██████████████████████████████

██████████████████████████████

vi. ████████████████████

95. ████████████████████████

██████████████████████████████



96.

97.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY



      *b.*     *"The rates paid by the licensee for the use of other patents comparable to the patent-in-suit."*

98.    Deere entered into a *Long Term Agreement*, dated March 1, 2015, with Black Cat

in which Black Cat (the "Supplier") ██████████████████████████████████

████████████████████████████████████████████████████████

The *Long Term Agreement* also specifies ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[172] DEERE_0048676-8710 (Long Term Agreement between Black Cat Blades Ltd. (Supplier) and Deere, 3/1/15); *see also,* -48702-705 (Exhibit A (John Deere Terms and Conditions)), -48704 ██████████████████████████████████████████

[173] DEERE_0048676-8710 (Long Term Agreement between Black Cat Blades Ltd. (Supplier) and Deere, 3/1/15), -48678 (Section 2.3.1.2.1); *see also,* -48678-679 (Section 2.3.1.2.2) ██████████

[174] Deposition of Stephen Dellett, 10/19/22, pp. 70-71, █████████████████████

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY



99. ██████████████████████████████████

██████████████████  Deere also stated that ████████

██████████████████████████████████████

██████  ████████████████████████████

  c.  *"The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold."*



[175] Deposition of Stephen Dellett, 10/19/22, p. 69, ████████████████

[176] Defendant Deere & Company's Third Supplemental Objections and Answers to ESCO Group LLC's First Set of Interrogatories (Nos. 1-17)  (Supplementing Nos. 2, 5-10, 13-15, and 17), 11/17/22, Answer to Interrogatory No. 3, pp. 6-7, "████████████████████

[178] Defendant Deere & Company's Third Supplemental Objections and Answers to ESCO Group LLC's First Set of Interrogatories (Nos. 1-17)  (Supplementing Nos. 2, 5-10, 13-15, and 17), 11/17/22, First Supplemental Answer to Interrogatory No. 4, pp. 7-8, ████████████████

[179] ████████████████████████

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

100.    I assume that the hypothetical license to Deere for the patents-in-suit arising from the hypothetical negotiation would be on a non-exclusive basis.  All other factors being equal, a non-exclusive license would tend to reduce the reasonable royalties.

101.    I assume that the territory specified in a license arising from the hypothetical negotiation would be U.S. territory.  Because the patents-in-suit are U.S. patents, this factor would not have an effect on the reasonable royalties.

>    d.    *"The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special circumstances designed to preserve that monopoly."*

102.



Therefore, this factor will tend to increase the reasonable royalty rate.

>    e.    *"The commercial relationship between the licensor and the licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter."*

103.    ESCO is a supplier to Deere of bucket tooth systems, including the Ultralok and the Super V systems, but ESCO and Deere both agree that: (1) Deere's TK Series System and ESCO's Ultralok bucket tooth system are competing products; and (2) both compete in the premium segment of the bucket tooth market in the U.S.  (See discussion of competitive

---

[180] Plaintiff ESCO Group LLC's Responses to Defendant Deere & Company's First Set of Interrogatories, 7/28/21, Response to Interrogatory No. 4, pp. 8-9, "The Asserted Patents are not currently licensed, nor has ESCO attempted to license them beyond preliminary discussions with Deere.  ESCO currently licenses Chilean Patent No. 49151 to a joint venture between ESCO and Elecmetal for the manufacture of certain products, and to Elecmetal to sell those products. Chilean Patent No. 49151 is related to the '662 patent."

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

relationship between ESCO and Deere in regards to their bucket tooth products in Section IV.C.2 above.  Therefore, this factor will tend to increase the reasonable royalty rate.)

> f.     *"The effect of selling the patented specialty in promoting the sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales."*

104.    I am not aware of any derivative or convoyed products that Deere sells that are generated by use of patented technology.

> g.     *"The duration of the patent and the term of the license."*

105.    I understand that the '662 Patent expires September 26, 2027 and the '175 Patent expires January 17, 2032.  I consider this factor and its effect on the reasonable royalties below.

> h.     *"The established profitability of the product; its commercial success; and its current popularity."*

106.    Exhibit 3.1 is a summary of TK Series System product sales and gross profits from November 2009 through October 2021.  Exhibit 3.1 shows that ███████████████████████ ████████████████████████████████████████ for its TK Series System products.  Exhibit 3.1 also shows gross profit margins of the accused products over the damages period to vary from ████████████████████████.  I consider the established profitability of the Deere's TK Series System, its commercial success, and continued popularity in my analysis of reasonable royalties below.

> i.     *"The utility and advantages of the patent property over the old modes and devices; if any, that had been used for working out similar results."*

> j.     *"The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention."*

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

107.     I understand from Messrs. Carpenter and Bearden that the patents-in-suit relate to the configuration of adapter and tooth components of a bucket tooth system (referred to by ESCO as the "████ design), which resulted from years of design and testing of many different bucket tooth systems.[181]  The configuration of tooth components incorporating the technology from the patents-in-suit: (1) improve tooth stability by reducing "ejection forces" created by planes at an angle to the tooth's longitudinal axis, thereby reducing stress on the tooth's locking mechanism; (2) increase the section modulus of the components (*i.e.*, reduce stress in components for a given bending moment force); (3) increase contact point near the tooth's neutral axis, thus reduce wear on the components; (4) increase the usable area in which to install a hammerless locking mechanism without impacting mechanical performance of the tooth, and (5) reduce "rattling" of the tooth component against the adapter component, further reducing wear on the components. According to Messrs. Carpenter and Bearden, these factors improved a covered bucket tooth system's stability, reliability, longevity, and safety (by allowing more space for hammerless installation systems).

108.     Messrs. Carpenter and Bearden also stated that ESCO's GeoVor dredging tooth system and Three-Piece Nemisys dry mining bucket tooth system practice the patents-in-suit. Both the GeoVor and Three-Piece Nemisys bucket tooth systems have been highly successful and profitable since they were introduced, with GeoVor sales over ████████ and gross profits over ████████ in gross profits (see Exhibit 2.3), and with Nemisys sales of over ████████ and gross profits of over ████████ (see Exhibit 2.4).

---

[181] Video interview with Chris Carpenter and Jim Bearden, 1/9/23.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

109.    Mr. Ky Holland states in his expert report that both the '175 Patent and the '665 "disclose configurations of complementary stabilizing surfaces on the wear member (tooth component) and base (adapter component).[182]  In regards to the '175 Patent, the Holland Expert Report states:

> Specifically, the '175 Patent discloses inventive stabilizing surfaces which bear against each other during excavation operations to provide increased efficiency and improved load resistance, which in turn enhances the connections between a wear assembly and its base, among other benefits…. [T]he features achieve a stronger and longer-lasting wear member by, among other things, allowing the loads generated during excavation to be carried at optimal portions of the wear assembly.[183]

110.    The Holland Expert Report states that the stabilizing features "improve the wear assembly's stability, strength, durability, and reliability," and that these "improvements, in turn, permit the use of an easily installed lock with does not compromise the strength of the wear assembly."[184]

111.    In regards to the '662 Patent, Mr. Ky Holland states in his expert report:

> Specifically, the '662 Patent discloses inventive stabilizing surfaces which bear against each other during excavation operations to provide improved load resistance, among other benefits….The '662 Patent discloses rear stabilizing surfaces which converge central to a nose and socket which are "more robust" regions, thus minimizing the formation of stress concentrations in the nose and socket.[185]

---

[182] Expert Report of Hezekiah Holland Regarding Infringement ("Holland Expert Report"), 1/13/23, Section VI.A. The '175 Patent and Section VI.AB. The '662 Patent.

[183] Expert Report of Hezekiah Holland Regarding Infringement, 1/13/23, Section VI.A. The '175 Patent.

[184] Expert Report of Hezekiah Holland Regarding Infringement, 1/13/23, Section VI.A. The '175 Patent.

[185] Expert Report of Hezekiah Holland Regarding Infringement, 1/13/23, Section VI.B. The '662 Patent.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

112.    Mr. Holland states that the stabilizing features "improve the wear assembly's stability, strength, durability, and reliability," and that these improvements, in turn, permit the use of an easily installed lock with does not compromise the strength of the wear assembly.[186]

113.    Mr. Stitzel testified that the patented technology, as used in ESCO's GeoVor tooth system, provides for a stable nose, an improved wear life and space for a hammerless lock, so it improves "safety, reliability, wear life, and maintenance" of the system.[187, 188]   Mr. Stangeland testified that the advantages of the patented technology "protects the lock, the configuration of the protected bearing surfaces, the structural areas not being in load bearing areas.[189]   Mr. Stangeland also testified that the patents-in-suit creates a bucket tooth system, that, as it "wears back, it increases and keeps the fits tight...."[190]

---

[186] Expert Report of Hezekiah Holland Regarding Infringement, 1/13/23, Section VI.A. The '175 Patent.

[187] Deposition of Adam Stitzel, 12/16/22, pp. 272-273,



[188] *See also*, First Amended Complaint, 4/7/21, p. 3, "The inventors of the '662 and '175 patents recognized that, among other features, adding complementary stabilizing surfaces to the nose and socket of a wear assembly could improve the wear assembly's stability, strength, durability, penetration, safety, and ease of replacement. The complementary stabilizing surfaces described in the '662 and '175 patents achieved a stronger and longer-lasting wear member by, among other things, allowing high loads generated during excavation to be carried by robust portions of the wear assembly's nose and not on its extreme bending fibers."

[189] Deposition of Kevin Stangeland, 12/14/22, pp. 184-185.

[190] Deposition of Kevin Stangeland, 12/14/22, pp. 185-186,

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

114.   From Deere's perspective, Deere executives testified ███████████████████



██████████████████████████████████

██████████████████████████████████

██████████████████████

115.    Given the importance of the patents-in-suit to the TK Series System, this factor would increase the reasonable royalties in this matter.

> k.    *"The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use."*

116.    I discuss the extent of sales of the TK Series System above.  Section VIII of the Holland Expert Report documents how Deere made use of the patents-in-suit in its TK Series System and Section VII.D discusses the importance of the patented "stabilization features in the TK Series Tooth System."  The Holland Expert Report also discusses in Section VI the benefits the patents-in-suit, that is, improving the wear assembly's stability, strength, durability, and reliability.  This factor would tend to increase the reasonable royalties in this matter.

> l.    *"The portion of profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions."*

117.    I am not aware of a portion of the profit or the selling price that is customary for use of the patents-in-suit.  Deere's Senior IP Counsel, Mr. Dellett, also testified that ████████ ████████████████████████████████████████████ This factor would thus have a neutral effect on reasonable royalties.

> m.    *"The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the*

---

[197] DEERE_0042486 (FY21 Bucket Teeth Review), pp. 18-19.

[198] Deposition of Stephen Dellett, 10/19/22, p. 49. ████████████████ ███████████████████████████████████████████████████████

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

> *manufacturing process, business risks, or significant features or improvements added by the infringer."*

118.    As discussed in *Georgia-Pacific* factors 9 & 10 above, the nature of the patents-in-suit go to the overall stability, strength, reliability, and safety (by increasing the usable area in which to install a hammerless locking mechanism) of the bucket tooth systems covered by the patents.  These are key attributes of bucket tooth systems as reflect in marketing literature from bucket tooth manufacturers.  I understand from Messrs. Carpenter and Bearden that, without these features, demand for the bucket tooth systems would be significantly diminished.[199]  I am not aware of any testimony from Deere indicating "significant features or improvements added by the infringer."  Consequently, this factor would tend to increase the reasonable royalty rate.

> *n.      "The opinion of qualified experts"*

119.    I have considered the expert report of Mr. Holland and have incorporated his opinions where appropriate into my analysis.

> *o.      "The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee – who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license."*

120.    Given that both parties produced license agreements that specified ███████    ███████ as consideration for the licensed technology, I find that the parties would have agreed to a hypothetical license that would have specified a reasonable royalty in the form of a running

---

[199] Video interview with Chris Carpenter and Jim Bearden, 1/9/10.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

royalty rate applied to accused product sales.  Although Deere produced technology license forms that specified gross sales, I conservatively use accused product net sales as the royalty base.

121.    I next consider Deere's options for not taking a license from ESCO for the patents-in-suit and instead working with Black Cat to develop a non-infringing substitute bucket tooth system technology.  I note in Section III.C.1 above that Deere does not have patents related to bucket tooth technology.  The design for Deere's TK Series System products was developed in conjunction with Black Cat, and subsequently licensed by Black Cat to Deere.  Ms. Judge testified that Deere's TK Series System hasn't changed since 2010.[200]

122.    Deere testimony and documents indicate



---

[200] Deposition of Steva Judge, 10/21/22, p. 61,

[202] DEERE_0042486 (FY21 Bucket Teeth Review), pp. 18-19.

[203] Deposition of Jason Simmons, 12/14/22, pp. 80-83.

[204]

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

123. █████████████████████████████████

████████████████████ █████████████████████

████████████████████████████████ ██ █

████████████████████████████████████

███████████████████████████ ████████

██████████████ ██ ███████████████████

████████████████████████████████████

██████████████████

124. ████████████████████████████

████████████████████████████████████





[205] DEERE_0042486 (FY21 Bucket Teeth Review), p. 19.

[206] Deposition of Jason Simmons, 12/14/22, p. 83,

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY



125.    I first analyze ESCO's sales of bucket tooth products to Deere.  Exhibit 4 is a summary of ESCO sales of Ultralok and Super V tooth components to Deere from 2014 to 2022. I understand that the last ESCO patent that covered the Super V bucket tooth system expired in 2013.[213]  Exhibit 4 shows that the gross profit margin premium for Ultralok over Super V tooth components was ████████████ for years 2020, 2021, and 2022 respectively.  This results in an average gross profit margin of ████ from 2020 to 2022.

126.    I understand that ESCO's Super V tooth system went off patent in 2013.  The gross profit margins of its Super V tooth components ██████████ suggesting that about one third of its gross profit margins are attributable to patent protection.  Exhibit 3.1 shows that the

---



[210] Deposition of Stephen Dellett, 10/19/22, pp. 41-42, "Q. ████████

[211] Deposition of Stephen Dellett, 10/19/22, p. 43,

[212] Deposition of Stephen Dellett, 10/19/22, p. 42,

[213] *See* U.S. Patent No. 5,469,648.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

Deere TK Series System gross margins are ███████████      Applying the ████ factor to
████████████████████████████████████████.

127.    I also note in Exhibit 3.1 that Deere's average gross profit margin on sales of its
TK Series System was ████████████████ in FY2019, FY2020, and FY2021, respectively.
Thus, Deere would have been able to pay a reasonable royalty of 8% and still achieve gross profit
margins of ████████████████ in FY2019, FY2020, and FY2021, respectively.

128.    Considering all of the *Georgia-Pacific* factors and factors specific to this matter, I
find that the parties would have agreed to a reasonable royalty rate of 8% of net sales of accused
TK Series System products.  Exhibit 91A is a summary of reasonable royalty damages in lieu of
lost profits.  Applying a reasonable royalty rate of 8% to net sales of Deere's accused TK Series
System products results in reasonable royalty damages of ████████

129.    I understand that both of the patents-in-suit enable the benefits discussed in the
analysis above, that is, they improve the wear assembly's stability, strength, durability, and
reliability;[214] consequently, the reasonable royalty rate would be the same if both of the patents-in-
suit are found to be valid and infringed by the TK Series System, or if only one of the patents-in-
suit is found to be valid and infringed by the TK Series System.

**F.    Prejudgment Interest**

130.    I understand from counsel that the Court may at its discretion award the Plaintiffs
prejudgment interest on damages that have accrued over time.  If asked to do so I will provide such
analysis using established methodologies.

---

[214] *See also*, Holland Expert Report, 1/13/23, Sections VI.A The '175 Patent, and VI.B '662 Patent.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

## V.       SIGNATURE

I declare under penalty of perjury that the forgoing is true and correct to the best of my

knowledge, information and belief.

Executed on January 13, 2023, in Oakland, California.

Signature:

Thomas R. Varner, Ph.D.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

# APPENDIX A



**Appendix A**

<span style="font-variant: small-caps">Curriculum Vitae</span>

# Thomas R. Varner, Ph.D.

<span style="font-variant: small-caps">Office:</span>    Compass Lexecon
1111 Broadway, Suite 1500
Oakland, CA 94607
510.285.1218 direct, 510.285.1245 fax
E-mail: tvarner@compasslexecon.com

## EDUCATION

1992 – 1997, *M.S. in Engineering-Economic Systems* and *Ph.D. in Engineering-Economic Systems & Operations Research*, Stanford University, Stanford, CA

1980 & 1987, *M.S. in Civil Engineering* and *MBA,* University of California, Berkeley, CA

1975 – 1979, *B.S. in Architecture with Honors,* California Polytechnic State University, San Luis Obispo, CA

## PROFESSIONAL EXPERIENCE

January 2016 – Present, *Executive Vice President*, Compass Lexecon, Oakland, CA

April 2010 – January 2016, *Senior Vice President*, Economists Incorporated, San Francisco, CA

January 2002 – April 2010, *Principal*, Cornerstone Research, Inc., San Francisco, CA

January 2004 – March 2005, *Lecturer (Economics and Finance)*, Economics Department, University of California, Davis, CA

April 2001 – November 2001, *Manager* (Financial Advisory Services), PricewaterhouseCoopers LLP, San Francisco, CA

September 1997 – April 2001, *Managing Director*, Investment & Risk Analytics, Inc., Lafayette, CA

September 1994 – September 1997, *Consulting Researcher (Valuation of Financial Instruments)*, Prof. Darrell Duffie, Graduate School of Business, Stanford University, Palo Alto, CA

September 1993 – September 1997, *Teaching Assistant and Research Assistant*, Department of Engineering-Economic Systems, Stanford University, Stanford, CA

June 1989 – September 1993, *Engineering Manager*, Dames & Moore, San Francisco, CA

June 1980 – June 1989, *Project Manager*, Forell/Elsesser, Rutherford & Chekene and Paul F. Fratessa & Assoc., San Francisco, CA

TESTIMONY/EXPERT ASSIGNMENTS

2022:  *ESCO Group LLC v. Deere & Company*, 1:20-cv-01679-RGA, U.S. District Court for the District of Delaware.  Kirkland & Ellis LLP, Chicago, IL.  Retained by plaintiff in patent infringement matter involving technology for mechanical devices.

2022: *Google LLC v. Sonos, Inc.*, 3:20-cv-06754-WHA, U.S. District Court for the Northern District of California.  Quinn, Emanuel, Urquhart & Sullivan, LLP, San Francisco, CA.  Retained by plaintiff in breach of contract and patent conversion matter involving cloud queue Wi-Fi technology.

2022: *XR Communications, LLC, dba Vivato Technologies, v. Ubiquiti Networks, Inc.*, 8:17-cv-01065, U.S. District Court for the Central District of California.  Simpson Thacher Bartlett LLP, Palo Alto, CA.  Retained by defendants and submitted expert report on damages in patent infringement matter involving Wi-Fi devices.

2020-2021: *Alicia A. Cohen v. Ronald A. Cohen*, 19-1219-MN, U.S. District Court for the District of Delaware.  K&L Gates LLP, Los Angeles, CA.  Retained on behalf of plaintiff and submitted expert report on financial analysis of documents of defendant who was accused of sexual abuse of a minor and human trafficking.

2020: *Freedom Debt Relief, LLC v. Accredited Debt Relief, LLC, et al.*, 19-CIV-01019, Superior Court of the State of California for the County of San Mateo.  Simpson Thacher & Bartlett LLP, Palo Alto, CA.  Retained by defendant and cross-plaintiff, submitted expert report, and provided deposition testimony on damages in an alleged breach of contract matter between two debt relief companies.

2020: *Adenike Graham, et al., v. National Beverage Corp.*, 19-cv-873, U.S. District Court, Southern District of New York.  K&L Gates LLP, San Francisco, CA.  Economics expert on behalf of defendant in consumer class action matter involving alleged unfair and deceptive trade practices related to defendant's claims of "all natural" ingredients.

2020-2022: *Raffel Systems, LLC v. Man Wah Holdings Ltd., Inc., and Man Wah (USA), Inc.* 2:18-cv-01765, U.S District Court, Eastern District of Wisconsin.  Mayer Brown LLP, Washington, D.C., and Arch & Lake LLP, Chicago, IL.  Retained by defendant, submitted expert report, and provided deposition and trial testimony on damages involving claims of utility patent infringement, design patent infringement, trade dress infringement, false marking, false designation of origin, unjust enrichment, and breach of contract, among other claims, related to electro-mechanical devices.

2019-2021: *American River Nutrition, LLC v. Beijing Gingko Group Biological Technology Co., Ltd, et al.*, 8:18-cv-02201-JLS-JDE, U.S. District Court, Central District of California, and *American River Nutrition, LLC v. Kyäni, Inc.*, 4:19-cv-00255-REB, U.S. District Court, District of Idaho.  Mayer Brown LLP, Washington, DC.  Retained by defendants, submitted expert report, and provided deposition testimony on damages in patent infringement matters involving biological products.

2019: *Great-West Life & Annuity Insurance Company and FASCore, LLC. v. Perry Christie and Voya Financial, Inc.*, 2018-cv-32584, District Court, Arapahoe County, Colorado.  Kellogg, Hansen, Todd, Figel & Frederick P.L.L.C., Washington, DC.  Retained by Voya Financial and submitted expert report on damages in breach of contract and misappropriation of trade secrets matter involving financial software services.

2

2019-2020: *In re EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Anti-trust Litigation*, 2:17-md-2785 and 2:17-cv-2452, U.S. District Court, District of Kansas.  Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP, Washington, DC.  Retained by Mylan Inc. and Mylan Specialty L.P., submitted expert report, and provided deposition testimony on damages in a matter in which Sanofi-Aventis US, LLC is alleged to have made false and misleading representations in violation of the Lanham Act.

2018-2019: *Boltex Mfg. Co. and Weldbend Corp. v. Ulma Forja, S. Coop. a/k/a Ulma Piping and Ulma Piping USA Corp.*, 14:17-cv-1400, U.S. District Court, Southern District of Texas.  Dechert LLP, New York, NY.  Retained by defendant, submitted expert reports, provided deposition testimony, and testified at jury trial on damages in Lanham Act false advertising matter involving domestic and imported carbon steel flanges.

2018: *Desktop Metal, Inc. v. Markforged, Inc., et al.*, 1:18-cv-10524-WGY, U.S. District Court, District of Massachusetts.  Quinn Emanuel Urquhart & Sullivan, LLP, San Francisco, CA.  Retained by defendant and counterclaim plaintiff, submitted expert report, and provided deposition testimony on damages in patent infringement and misappropriation of trade secrets matter involving 3-D metal printers.

2016-2019: *SS&C Technologies, Inc. v. Bradley Rossa and Clearwater Analytics, LLC*, 2015-CH-15891, Circuit Court of Cook County, Illinois, County Department, Chancery Division.  Kirkland & Ellis LLP, Chicago, IL.  Retained by defendants, submitted expert reports, provided deposition testimony, and testified at jury trial on damages in misappropriation of trade secrets matter involving sales and marketing information in software industry.

2016-2018: *In re: Lenovo Adware Litigation*, 5:15-md-02624-RMW, U.S. District Court, Northern District of California, K&L Gates LLP, Los Angeles, CA.  Retained by defendant and submitted expert report in consumer class action matter involving alleged consumer fraud related to computers.

2016: *DNA Genotek Inc. v. Spectrum Solutions L.L.C., et al.*, 3:16-cv-01544-JLS-NLS, U.S. District Court, Southern District of California.  Simpson Thacher & Bartlett LLP, Palo Alto, CA.  Retained by defendants, submitted expert report, and provided deposition testimony on patent infringement case involving medical devices.

2015-2016: *Alexander Stross v. Redfin Corp.*, 1:15-cv-223-SS, U.S. District Court, Western District of Texas.  Foster Pepper PLLC, Seattle, WA.  Retained by defendant and submitted expert report on damages in copyright infringement case involving photographs on real estate broker website.

2015-2016: *DNA Genotek Inc. v. Ancestry.com DNA, LLC*, 15-0355-SLR, and *DNA Genotek Inc., v. Spectrum DNA*, et al., 15-cv-00661-SLR, U.S. District Court, District of Delaware.  Fenwick & West, LLP, San Francisco, CA.  Retained by defendant, submitted expert report, and provided deposition testimony on patent infringement case involving medical devices.

2015-2016: Confidential matter before Copyright Royalty Judges.  Drinker Biddle & Reath LLP, Washington, DC.  Expert witness services on economic analysis of copyright licensing terms.

2015: *Changzhou Kaidi Electrical Co, Ltd., et al., v. Okin America, Inc., et al.*, U.S. District Court, District of Maryland, 1:13-cv-1798.  Mayer Brown LLP, Washington, DC.  Provided expert report, deposition testimony, and testified at trial on behalf of accused infringer in patent infringement matter involving mechanical actuators.

3

2015: *The Cat Ball, LLC v. FurHaven Pet Products, Inc.*, U.S. District Court, Western District of Washington, 2:14-CV-00292-MJP.  Foster Pepper PLLC, Seattle, CA.  Retained by plaintiff, submitted expert report, and provided deposition testimony on economic damages in false advertising and unfair competition matter involving pet products.

2014-2015: *Matthew Burnett, et al., v. Robert Bosch LLC USA, et al.*, U.S. District Court, Middle District of Florida, 8:14-CV-01361.  K&L Gates LLP, San Francisco, CA.  Retained by defendant, submitted expert report, and provided deposition testimony on economic issues in class certification matter involving alleged misrepresentation of selected spark plugs.

2014-2015: *Michigan State University v. Medlen & Carroll, LLP, et al.*, U.S. District Court, Western District of Michigan, 1:14-cv-00039.  Fraser Trebilcock Davis & Dunlap, P.C., Detroit, MI.  Retained by plaintiff on legal malpractice mater involving alleged failure to file foreign patents related agricultural biotechnology.

2014-2015: *Isola USA Corp. v. Taiwan Union Technology Corp.*, U.S. District Court, District of Arizona, 2:12-cv-01361-SLG.  K&L Gates, San Francisco, CA.  Retained by defendant, submitted expert report, provided deposition testimony, and testified at trial on patent infringement matter involving laminates for multilayer printed circuit boards.

2013-2014: *JS Products, Inc. v. Kabo Tool Company, et al.*, U.S. District Court, District of Nevada, 2:11-cv-01856-RCJ-GWF.  K&L Gates, LLP, San Francisco, CA.  Damages expert in patent infringement suit involving tool industry technology.

2013: *Magnate International Ltd. v. Costco Wholesale Corp.*, U.S. District Court, Central District of California, 12-cv-09208-GW.  Foster Pepper, PLLC, Seattle, WA.  Damages expert in patent infringement suit involving pump technology.

2012-2015: *QS Wholesale, Inc. v. World Marketing Inc.*, U.S. District Court, Central District of California, 8:12-cv-00451-DOC-RNB.  Covington & Burling LLP, Washington, DC.  Provided expert report, deposition testimony, and testified at trial in trademark infringement suit involving trademark in apparel industry.

2012-2014: *Hart Scott Rodino IP Rulemaking*, Project No. P989316—Notice of Proposed Rulemaking Regarding Certain Licensing Transactions in Pharmaceutical Industry.  Baker Botts L.L.P., Washington, DC.  Submitted declaration addressing economic basis for proposed premerger notification rules related to exclusive patent licensing.

2012-2015: *TransUnion Intelligence LLC, et al. v. Search America, Inc.*, U.S. District Court, District of Minnesota, 0:11-cv-01075-PJS-LFN. Baker Hostetler, Costa Mesa, CA.  Provided expert report and deposition testimony on economic issues in patent infringement suit involving software technology.

2011-2016: *Arkema Inc., et al. v. Honeywell International, Inc.*, U.S. District Court, Eastern District of Pennsylvania, 2:10-cv-02886-WY.  Kirkland & Ellis LLP, Washington, DC.  Retained by defendant, submitted expert report, and provided deposition testimony on economic issues in patent infringement matter (declaratory judgment and counterclaim patent infringement suit) involving chemical product.

2009-2010: *Angela Bates, et al. v. KB Home*, Superior Court of California, County of Alameda, RG-08- 384954. K&L Gates LLP, San Francisco, CA.  Retained by defendant and submitted expert report rebutting plaintiffs' statistical analysis of plaintiffs' class certification theory for class action involving escrow instructions given to home buyers in California.

4

2009: *In re Patent of Hee Young Yun, et al.* U.S. Patent and Trademark Office, 90/008, 143, 145, 146, and 150. McKenna Long & Aldridge LLP, Washington, DC. Provided declaration addressing economic issues related to claimed commercial success of patents for liquid crystal display (LCD) modules as part of patent reexamination process.

2007-2008: *Quantum Systems Integrators, Inc. v. Sprint Nextel Corp.*, U.S. District Court, Eastern District of Virginia, 1:07-CV-00491. Crowell & Moring LLP, Washington, DC. Retained by defendant, submitted expert report, provided deposition testimony, and testified at trial on economic damages arising out of alleged infringement of copyrighted software.

2007: *Alvarado Hospital Medical Center, Inc. v. Alan Wittgrove, M.D.*, Superior Court of California, County of San Diego, GIC 827726. C. Matthew Didaleusky, Esq., Oakland, CA. Provided testimony at arbitration hearing on economic damages arising out of alleged breach of contract.

2007: *SCI California Funeral Services, Inc. v. Five Bridges Foundation*, Superior Court of California, County of San Mateo, CIV 432392. Shartsis Friese LLP, San Francisco, CA. Provided deposition testimony on economic issues related to valuation of provisions in real estate agreement.

2006-2007: *DVD Copy Control Association, Inc. v. Kaleidescape, Inc.*, Superior Court of California, County of Santa Clara, 104CV031929. White & Case LLP, Palo Alto, CA. Provided testimony on economic damages arising out of alleged breach of contract by licensee of proprietary DVD technology.

2005: Confidential Real Estate Co. v. Confidential Law Firm, private arbitration. Nixon Peabody LLP, San Francisco, CA. Provided expert report, deposition testimony, and testified at arbitration on economic damages related to valuation of multiple appraisals for real estate leasehold contract.

2003: *Eco-Steel Fabrication, Inc. v. Markol Iron, et al.*, Superior Court of California, County of Orange. Miller, Brown & Dannis, San Francisco, CA. Provided expert report and testified at mediation on economic damages resulting from delayed construction of luxury car dealership in southern California.

PUBLICATIONS

Varner, Thomas R. & Hnath, G. M., "Patent Valuation Analysis—Patent Forward Citations and Patent Quality," retrieved from https://mp.weixin.qq.com/s/ShSYr8pOmX8igQucVcYriA, 2018, September 3.

Hnath, Gary, Jing Zhang and Thomas R. Varner, "Patent Forward Citations and Patent Quality," *Asia IP & TMT: Quarterly Review*, Second Quarter 2018.

Varner, Thomas R., "Federal Circuit Again Scrutinizes Reasonable Royalties in Patent Damages in *VirnetX v. Cisco Systems and Apple*," *The Economists Ink*, Winter 2015.

Varner, Thomas R., "Nash Bargaining May Not Be Right for Patent Damages," *Law360*, April 18, 2014.

Varner, Thomas R., "Empirical Data on 'Comparable Licenses' in Patent Infringement Suits," *The Economists Ink*, Fall 2012.

Varner, Thomas R., "An Economic Perspective on Patent Licensing Structure and Provisions," *Business Economics*, Vol. 46 (4), October 2011.

Varner, Thomas R., "*Uniloc* and the Demise of the 25 Percent Rule," *The Economists Ink*, Spring 2011.

Varner, Thomas R., "Technology Royalty Rates in SEC Filings," *les Nouvelles*, Journal of the Licensing Executives Society International, Vol. XLV, No. 3, September 2010, pp. 120-127.

Varner, Thomas R., "Reasonable Royalties and 'Comparable Licenses': Three Recent Court Rulings," *The Economists Ink*, Spring 2010.

## PROFESSIONAL AFFILIATIONS

Member, Licensing Executives Society, USA & Canada

Member, American Economic Association

Member, National Association for Business Economists

Associate Member, American Bar Association (IP Law Section)

## OTHER

Speaker on economics, damages, and technology licensing issues at Licensing Executives Society (LES), American Law Institute/American Bar Association (ALI/ABA), and Law Seminars International (LSI) seminars and conferences.

Licensed Civil Engineer and Licensed Structural Engineer (Inactive), State of California

Certificate in Hazardous Materials Management, University of California, Davis, 1990

Ph.D. Dissertation: *Strategic Investment Analysis: A Study of Indirect Effects in Optimal Portfolio Selection*, 1997

6

# EXHIBIT 3

HIGHLY CONFIDENTIAL

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF DELAWARE

3                      *   *   *

4   ESCO GROUP LLC,

5        Plaintiff,

6      vs.                CASE NO. 20-1679-RGA

7   DEERE & COMPANY,

8        Defendant.

9                      *   *   *

10       Remote video-taped deposition of ADAM D.

11  STITZEL, Witness herein, called by the Defendant

12  for cross-examination pursuant to the Rules of

13  Civil Procedure, taken before me, Kathy S. Wysong,

14  a Notary Public in and for the State of Ohio, at

15  2141 NW 25th Avenue, Portland, Oregon, on Friday,

16  December 16, 2022, at 1:56 p.m.

17                      *   *   *

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL

Page 38

1                MR. COLLIER:  No, no, that's okay.  I

2       was just going to caution you to limit your answer

3       to a yes or no, Mr. Stitzel.  That's fine.

4       BY MS. RODMAN:

5                Q.   Yes.  I never want to know what

6       you discussed with counsel so those are good

7       instructions.

8                Have you had communications about

9       this lawsuit with anyone other than counsel?

10               A.   Yes.

11               MR. COLLIER:  And, Rachel, maybe if I

12      can just ask for clarification.  Are you talking

13      about in preparation for the deposition today?

14               MS. RODMAN:  I was just asking

15      generally.

16               MR. COLLIER:  Generally, okay.  No

17      worries.  Understood.

18      BY MS. RODMAN:

19               Q.   Yeah.  And I should clarify,

20      communications with anyone other than counsel

21      during which counsel was not present.

22               A.   Yes, and it's in the context of

23      preparations.

24               Q.   Okay.  We'll talk about that in a

25      minute.  So the only communications you've had

HIGHLY CONFIDENTIAL

Page 39

1    with anyone at ESCO about this lawsuit, other

2    than communications with counsel, were in

3    preparation for this deposition?

4            A.    That's correct.

5            Q.    Okay.  All right.  We're going to

6    be talking about a number of products today and

7    I'd like to start by just making sure that we

8    have a basic understanding -- I have a basic

9    understanding of the products and the terms

10   surrounding them.

11            So I'd like to start by talking

12   about the GeoVor product.  Are you familiar

13   with ESCO's GeoVor product?

14            A.    Yes.

15            Q.    And what type of product is that?

16            A.    GeoVor is a point adapter system

17   for dredging offshore infrastructure for cutter

18   section dredges, cutter heads.

19            Q.    Okay.  It's not used in

20   construction?

21            A.    Correct.

22            Q.    And it's not used in mining?

23            A.    Correct.

24            Q.    Generally, who are the customers

25   for the GeoVor product?  And I'm not looking

HIGHLY CONFIDENTIAL

Page 40

1    for specific names, I'm looking for certain

2    types of entities.

3           A.    The customers are large global

4    dredging companies and midsize regional

5    dredging companies.  Contractors.

6           Q.    And have you personally been

7    involved with the GeoVor product?

8           A.    Yes.

9           Q.    And what has your involvement been

10   in the GeoVor product?

11          A.    Well, I served as the product

12   manager for GeoVor, as well as the director

13   of -- for that line, so been involved in

14   engineering, problem solving, marketing, as

15   well as sales.

16          Q.    When did you serve as the product

17   manager or director of GeoVor?

18          A.    That was the start of two

19   thousand -- May of 2013 was when I first --

20   moving from that regional technical job to the

21   product manager.  So I started in May of 2013.

22          Q.    And who did you report to as

23   the -- specifically as the product manager of

24   GeoVor?

25          A.    That was Ermanno Simonutti, Ian

HIGHLY CONFIDENTIAL

Page 41

1    Bingham.

2            Q.    Okay.  Were you involved in

3    development of GeoVor?

4            A.    No.

5            Q.    Were you involved at all in the

6    patent prosecution for GeoVor?

7            A.    No.

8            Q.    Were you involved in the initial

9    commercial -- commercialization of GeoVor?

10           A.    No.

11           Q.    But you were involved in sales for

12   GeoVor?

13           A.    Yes.

14           Q.    And marketing?

15           A.    Yes.

16           Q.    And then you said engineering,

17   correct?

18           A.    Correct.

19           Q.    What was your involvement in the

20   engineering for GeoVor?

21           A.    The team I -- that I led was

22   responsible for the ongoing development of

23   GeoVor, so not the core, like the fundamental

24   technology, but the improvements.  Problem

25   solving, making minor improvements to the

HIGHLY CONFIDENTIAL

Page 42

```
 1  system, new shapes, problem solving, things
 2  like that.
 3          Q.   Okay.  And what was your
 4  involvement in marketing for GeoVor?
 5          A.   We would release brochures.  We
 6  would create presentations, customer-facing
 7  presentations.  You know, maybe the occasional
 8  LinkedIn post.  Parts lit -- spec books, user
 9  manuals, maintenance manuals.  Any
10  customer-facing document that, you know,
11  promoted the product or helped them use it.
12          Q.   And what was your involvement in
13  sales for GeoVor?
14          A.   Meeting with the customer, making
15  quotations, resolving any type of issues with
16  the product, giving updates on status of
17  orders.
18          Q.   What is the -- well, sorry, strike
19  that.
20               You're familiar with the Nemisys
21  three-piece system?
22          A.   Yes.
23          Q.   And what type of product is that?
24          A.   That falls under ESCO's mining
25  expendables product range.
```

HIGHLY CONFIDENTIAL

Page 43

1          Q.    Is Nemisys three-piece used in
2    construction?
3          A.    No, not as ESCO defines it.
4          Q.    So generally, who are the
5    customers for the Nemisys three-piece system?
6          A.    Primarily direct mines.
7          Q.    Have you been personally involved
8    with the Nemisys three-piece system?
9          A.    I've been involved more recently
10   in my new position with the Nemisys three-piece
11   system.
12         Q.    And what is that involvement?
13         A.    Sales.
14         Q.    Okay.  And you're familiar --
15   well, I know you are because you've told me
16   about it -- with ESCO's Ultralok product?
17         A.    Yeah.  Yes.
18         Q.    What is the Ultralok product?
19         A.    The Ultralok product is a tooth
20   adapter lock system for construction size
21   excavators, loaders.
22         Q.    And generally, who are the
23   customers for Ultralok?
24         A.    Generally the customers -- well,
25   they -- primarily I would say distributors,

HIGHLY CONFIDENTIAL

Page 44

1    dealers, bucket manufacturers.  We have OEMs

2    that are customers of Ultralok.  Mines.  The

3    mines will use Ultralok on their smaller

4    equipment.  We've used Ultralok on dredge as

5    well on just some very small cases.

6            Q.    Who are the end users for

7    Ultralok?

8            A.    The end users are construction

9    contractors, quarries, mines, and, again, we've

10   seen it on dredge as well, dredgers.

11           Q.    Have you been personally involved

12   with the Ultralok system?

13           A.    Yes.

14           Q.    And how so?

15           A.    Well, at that -- in the director

16   position I managed the teams that -- the team

17   that -- two teams that utilized Ultralok.  So I

18   was responsible for directing kind of the

19   strategy and the engineering, as well as some

20   customer visits, a little bit of sales support

21   on Ultralok.  The position in Europe, I was

22   responsible even a little bit on the technical

23   side for Ultralok as well traveling with the

24   sales team at the site level.

25           Q.    And then currently for sales?

HIGHLY CONFIDENTIAL

Page 97

1   system.  Is premier a category that ESCO uses

2   to encompass some of its construction

3   expendable or mining expendable systems?

4          A.   I mean, I wouldn't -- I

5   wouldn't -- I'm not trying to be illusive here.

6   I wouldn't characterize it as that we -- that

7   it's a category, premier is a category.  ESCO

8   prides itself on -- that's what we do is we

9   aren't developing systems for -- you know,

10  based strictly on price, we're always looking

11  for systems -- the higher -- the higher value

12  systems so --

13         Q.   Okay.

14         A.   I'm sorry, maybe you can --

15         Q.   You do not have to apologize.

16  Have you seen any ESCO documents categorizing

17  expendable products into buckets of premier,

18  moderate, and legacy?

19         A.   Yes.

20         Q.   Okay.  And Nemisys would be a

21  premier system in that type of classification,

22  correct?

23         A.   Yes.  Yes.

24         Q.   Okay.

25         A.   Yes.

HIGHLY CONFIDENTIAL

Page 98

1          Q.    And Ultralok would also be a

2    premier system in that type of classification,

3    correct?

4          A.    That's right.  Correct.

5          Q.    And Super V would be like a legacy

6    system in that type of classification?

7          A.    That's correct.

8          Q.    Okay.  So does ESCO target

9    specific types of customers for the products

10   that it classifies in its premier category in

11   that classification?

12         A.    We -- it's not really a targeting.

13   The -- but there are -- but there are some

14   customers where the -- where the -- the

15   premier -- you know, that are price driven and

16   aren't willing to pay a lot extra, and so

17   those -- so, I mean, it's kind of a -- I

18   wouldn't say it's a target but there's a

19   self-selection out there of we know there's

20   some customers that -- that it won't resonate

21   with, the extra price.

22         Q.    Okay.  Not every customer wants

23   the high value over the price?

24         A.    That's right.  Yes.

25         Q.    Some customers want the price to

1    be low, correct?

2              A.    That's right.  Yes.

3              Q.    Okay.  Okay.  How does ESCO

4    advertise its GeoVor system?

5              A.    Much the same way as Nemisys.

6    We're -- they're promoting the -- you know, the

7    stability of the nose, which the stability

8    translates to reliability of the system.  It

9    translates to having the highest wear metal, so

10   long wear life.  The stability translates to

11   the reduced maintenance on the nose as well.

12             We promote the hammerless portion

13   of GeoVor, the safest system.  And there's some

14   other minor things that are -- that are

15   promoted in relationship to the nose on, like,

16   cutting relief, you know, just the shape so

17   that it -- and reduced wear and things like

18   that from the shape of the nose.

19             Q.    So in that premier, moderate,

20   legacy classification, do you have an

21   understanding of where GeoVor would fall?

22             A.    Premier.

23             Q.    Okay.  Let's look at Topic 13,

24   which is on page five.

25             A.    Okay.

HIGHLY CONFIDENTIAL

Page 111

1          Q.    Like your face shovel?

2          A.    Yeah.  Yeah.

3          Q.    Okay.

4          A.    And that equipment is used by a

5     lot of -- I mean, it's used in dredge as well.

6     So dredge, mining, anyone that would have a

7     backhoe.  Mining, quarries, or construction

8     contractors.  Ultralok would be used in all of

9     those.

10         Q.    What products in the market

11    compete with Ultralok?

12         A.    Deere TK.  I mean, it's a long

13    list, many that I don't know.  But Deere TK.

14    Hensley has a sytem, XS.  Komatsu has a system.

15    I believe that's called Kmax.  Cat has several

16    systems, J Series, K Series, Advansys, CapSure.

17    BYG has some systems, I believe.  They have

18    systems as well that retrofit on J Series.

19    Case has a system.  I believe there's a company

20    called Feurst that has a system.  MTG has

21    systems.  Bradken.

22         Q.    Bradken, B-R-A-D-K-E-N?

23         A.    Yes.

24         Q.    Okay.  Any other products in the

25    market that compete with Ultralok that you can

HIGHLY CONFIDENTIAL

Page 112

```
 1   remember?
 2          A.    No.
 3          Q.    Okay.  Any Deere products that
 4   compete with Ultralok other than the TK Series?
 5          A.    Not that I'm aware of.
 6          Q.    Okay.  Does the Super V compete
 7   with Ultralok in the market?
 8          A.    Yes.
 9          Q.    Does MaxDRP compete with Ultralok
10   in the market?
11          A.    Yes.  And if I may, the -- to add
12   something.  When I talk about compete, I mean
13   there's a product that will fit on the -- fit
14   on the equipment, but -- but I wouldn't -- many
15   of the products that we're talking about fall
16   in a little bit of a different category.  I
17   mean, they're -- there's a DRP style.
18              So on the -- if we talk about
19   premium, you know, it's a little bit smaller
20   list of products that actually have -- you
21   know, that can compete head to head on the
22   premium side.
23          Q.    Okay.
24          A.    So -- but in the general term,
25   compete meaning do they have a product that
```

HIGHLY CONFIDENTIAL

Page 113

1   will fit on there, not in terms of performance

2   or anything.

3           Q.    Okay.  Understood.  And that is

4   how I was asking it, so thank you for

5   clarifying.

6               So the Super V doesn't compete in

7   the premium category --

8           A.    No.

9           Q.    -- with Ultralok, correct?

10          A.    Not really.

11          Q.    And that would also be true for

12  MaxDRP, that it doesn't compete in the premium

13  category with Ultralok?

14          A.    Not really, right.  Correct.

15          Q.    Okay.  And then MaxDRP Plus, does

16  it compete with Ultralok?

17          A.    Not -- no, it doesn't have the

18  same features.  It doesn't have the same

19  benefit.  So it can -- it is a product that

20  will fit on an excavator, but it lacks -- it

21  lacks a lot.

22          Q.    What features or benefits does it

23  lack?

24          A.    MaxDRP?

25          Q.    MaxDRP Plus.

HIGHLY CONFIDENTIAL

Page 114

1          A.    Yeah, MaxDRP Plus fits on a J

2     Series nose which has no stability -- very

3     little stability at all so we have a lot of

4     problems with it that, you know, it's not that

5     reliable.

6               The side pin is -- it's got a side

7     pin that has -- you know, even though it's

8     hammerless, you know, to unlatch it, you still

9     have to take a hammer to knock it out.  And it

10    also has some accessibility issues.

11              The nose life is not very good on

12    MaxDRP Plus because it lacks the stability that

13    Ultralok has.  And you're limited on wear life

14    as well because the stability allows you to get

15    a longer bit on there, a longer wear life.

16              And I would say that statement is

17    true for many of the systems that we just

18    talked about, not all of them, but -- that's

19    why I wanted to clarify on the compete side.

20         Q.    Okay.  Thank you.  So for MaxDRP,

21    would it also have these differences in

22    features and benefits that would make it not

23    really compete with the Ultralok?

24         A.    Yes.

25         Q.    Okay.  What about Super V, does it

HIGHLY CONFIDENTIAL

Page 128

1    the very first competitor is Caterpillar,

2    correct?

3          A.    Uh-huh.  Correct.

4          Q.    And the industry markets in which

5    it lists Caterpillar as competing are mining,

6    construction, rail, and oil and gas, right?

7          A.    Yes.

8          Q.    And it also lists mining as an

9    industry of competition for MTG?

10         A.    Yes.

11         Q.    And for Hensley?

12         A.    Yes.

13         Q.    And for Ningbo?

14         A.    Correct.

15         Q.    And for BYG?

16         A.    Correct, yes.

17         Q.    But it does not list mining as an

18   area of competition for Black Cat, correct?

19         A.    Correct, it does not.

20         Q.    All right.  Okay.  All right.

21   What is ESCO's market share -- and actually,

22   strike that.

23               I want to go back to -- I don't

24   know if we ever got a clear description of what

25   is the market in which the Ultralok system

HIGHLY CONFIDENTIAL

Page 129

1    competes.  What would you call that market?

2           A.   We compete in the lower -- we call

3    it construction market here; but in reality,

4    that's oversimplified.  I would say we compete

5    in the smaller machines, under, like, eighty or

6    a hundred tons that are used by whoever uses

7    them, dredge, mining, construction, quarries.

8           Q.   Okay.  And I think you told me

9    when we started the deposition that the mining

10   expendables are machines over a hundred tons

11   and construction expendables are machines under

12   a hundred tons, is that a general --

13          A.   Generally, yes.  That's how I

14   understand it generally, yes.

15          Q.   So would it be fair to say that

16   the Ultralok system competes in the

17   construction expendables market generally?

18          A.   Yes, Ultralok is in our

19   construction expendables space.  Yes.

20          Q.   Okay.

21          A.   As we define construction

22   expendables, yeah.

23          Q.   Okay.  What is the -- I'm sorry,

24   strike that.

25               What is ESCO's market share for

HIGHLY CONFIDENTIAL

Page 130

1    the Ultralok system in the construction

2    expendables market?

3           A.   I'm sorry, could you repeat that

4    one more time, please?

5           Q.   What is ESCO's market share for

6    the Ultralok system in the construction

7    expendables market?

8           A.   I cannot remember the global

9    number off the top of my head.  We've got

10   around fourteen or fifteen percent market share

11   in North America and we have around eight or

12   nine percent market share in Europe, but I

13   can't remember the global, like for the whole

14   world number.

15          Q.   Okay.  Does ESCO have an

16   understanding of Deere's market share in the

17   construction expendables market?

18          A.   I know there's been attempts --

19   there's been some analysis on -- on -- on that,

20   yes.

21          Q.   Do you know if there have been any

22   conclusions reached from that analysis?

23          A.   Yes, there has been.

24          Q.   And what were those conclusions?

25          A.   It's -- I'm trying to -- you know,

HIGHLY CONFIDENTIAL

Page 131

```
 1   it's hard to keep all these things in my head,

 2   but we've done some analysis looking at, like,

 3   what the market share -- I'm sorry, could you

 4   repeat the question one more time, the original

 5   one?

 6         Q.  Yes.  The original question that

 7   led us here was whether ESCO has an

 8   understanding of Deere's market share in the

 9   construction expendables market.

10         A.  Construction expendables.  I

11   believe that we put the market share of Deere

12   around ██████████████, in that range.

13         Q.  And would that ███████████

     ████████include TK and other construction

15   expendables products?

16         A.  I believe that would -- that

17   number was just TK.

18             MS. RODMAN:  For the concierge, if we

19   could -- actually, I think I've lost my -- I've

20   lost my Exhibit Share.  Could you drop a link to

21   the Exhibit Share in the chat so I can get back

22   there quickly.  And then we're going to turn FF

23   into Exhibit 4, please.  Thank you.

24             (Exhibit 4, ESCO-00055684-55703, was

25   marked for purposes of identification.)
```

HIGHLY CONFIDENTIAL

Page 132

1   BY MS. RODMAN:

2           Q.    Okay.  I think it's in there now.

3   All right.  Exhibit 4 is ESCO-00055684.  Have

4   you seen Exhibit 4 before?

5           A.    I'm sorry, if I may clarify, so I

6   should exit this exhibit and go back?

7           Q.    Oh, yes.  Yes.

8           A.    Sorry.

9           Q.    You can close Exhibit 3 and open

10  Exhibit 4.

11          A.    Okay.  On my way.  One second.

12  Yes.

13          Q.    Okay.  Yes, you have seen Exhibit

14  4 before?

15          A.    That's correct.  Yes.

16          Q.    Okay.  What is Exhibit 4?

17          A.    Exhibit 4 is a -- well, a product

18  line review specific to construction

19  expendables.  So these normally would capture

20  just, again, some market data and probably a

21  little bit of strategy and then, you know,

22  where we're at financially and just some high

23  level -- it's meant to be a high level

24  communication tool for the product.

25          Q.    Okay.  And this specific one is

HIGHLY CONFIDENTIAL

Page 183

1   and Europe construction machine classes,

2   people.  Do you see that?

3           A.   Yes.

4           Q.   ███████    ████████████████

    ████████████████████████████████████████

    ███████████████████████████████████

    ████████████████████████████████████████

    ██████████████████    ████████████████

9           A.   █████

10          Q.   █████████████████████████

    ████████████████████

12          A.   ███████████████████████████

    █████████████████████████████████

    ████████████████████████████████████

    ████████████████████████████████████

    ██████████████████████████████████

    ████████████████████████    ██████████

    ██████████████████████████████████████

    ████████████████████

20          Q.   Okay.  You can put this aside.

21   All right.  When we first started talking about

22   Topic, where are we, 13 for Ultralok, you told

23   me that one of the things that ESCO evaluated

24   for Ultralok is market potential.  Do you

25   remember that?

HIGHLY CONFIDENTIAL

Page 184

1          A.    Yes.

2          Q.    Okay.  What is the market

3   potential for Ultralok in the construction

4   expendables market?

5          A.    The -- going off of memory here,

6   we've -- we put the -- I mean, there's

7   segmentation that happens.  ████████████████

    ████████████████████████████████████████

    █████████████████████████████████████████

    ████████████████████████████████████

    ██████████████████████████████████████

    ███████████████████████████████████████

    ████████████████████████████████

    ██████████████████████████████████

    ████████████████████████████████████  ██

    ███████████████████████████████

    ████████████████████████████████████

    ████████████████████████████

19                MS. RODMAN:  Give me one moment,

20   please.

21   BY MS. RODMAN:

22          Q.    All right.  Has ESCO conducted any

23   evaluation of the market in which the Super V

24   system competes?

25                A.    In the context of the broader

HIGHLY CONFIDENTIAL

Page 185

1    construction market -- sorry, I don't quite

2    under -- could you -- maybe --

3            Q.    Yeah, let me ask a different

4    question.

5            A.    Is there another way to ask it

6    or I -- sorry.

7            Q.    Yeah, that's fine.  We'll come at

8    it a different way.

9                  Super V also competes in the

10   construction expendables market, correct?

11           A.    Correct.  Yes.

12           Q.    That -- that is the market in

13   which Super V competes?

14           A.    Correct.  Yes.

15           Q.    Okay.  And Ultralok also competes

16   in that market?

17           A.    Ultralok competes in -- yeah, they

18   also -- similar customers, broadly speaking,

19   would buy Ultralok as well.

20           Q.    And the Deere TK Series competes

21   in that market?

22           A.    In construction equipment, yes.

23           Q.    Does the MaxDRP compete in that

24   market?

25           A.    Again, I'm sorry, but the word

# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ESCO GROUP LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 20-1679-RGA-JLH |
| | ) | |
| DEERE & COMPANY. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**SUPPLEMENTAL OBJECTIONS AND RESPONSES OF**
**DEFENDANT DEERE & COMPANY TO**
**PLAINTIFF ESCO GROUP LLC'S NOTICE OF RULE 30(b)(6) DEPOSITION**

Pursuant to Fed. R. Civ. P. 26 and 30, Defendant Deere & Company ("Deere") supplements its responses and objections to Plaintiff ESCO Group LLC's ("ESCO") notice of Fed. R. Civ. P. 30(b)(6) deposition of Deere as follows:

**GENERAL STATEMENT AND OBJECTIONS**

1.      Deere objects to the notice and to the definitions used in the notice to the extent they seek to impose obligations and burdens on Deere beyond those contemplated by the Federal Rules of Civil Procedure and applicable Local Civil Rules of the United States District Court for the District of Delaware.

2.      Deere objects to the matters on which examination is requested to the extent that they seek to impose duties or obligations on Deere inconsistent with prior agreements between Deere and ESCO concerning the scope of discovery.

3.      Deere objects to these matters to the extent they seek testimony about information not known or reasonably available to Deere.

the financial information and data in such documents, and the systems and personnel responsible

for the creation and maintenance of the financial information in such documents.

## DEPOSITION TOPIC NO. 27:

The manner in which Deere maintains its financial data, including but not limited to the systems used, and whether and how Deere tracks revenue, cost, and profit data related to the use of the Accused Products and/or other bucket tooth technology.

## RESPONSE AND OBJECTIONS:

Deere objects to this topic on the grounds set forth above in General Objection Nos. 1-13

and incorporates those objections by reference.  Moreover, because the topic is impermissibly

broad and vague, Deere cannot identify the area for examination, let alone the outer limits of the

area for examination; the topic therefore does not describe with reasonable particularity the matters

for examination as required by Fed. R. Civ. P. 30(b)(6), and no person or persons could possibly

testify concerning all of the information known or reasonably available to Deere concerning this

broad topic.  In addition, the use of "Deere," "including but not limited to," "related to," "Accused

Products," and "and/or other bucket tooth technology" renders the topic overly broad, vague, and

ambiguous.  Deere further objects insofar as the topic seeks information regarding extraterritorial

activities on the ground that it is not relevant to any party's claim or defense.

Subject to and without waiving any of the foregoing objections, Deere will designate one

or more persons to testify as to the manner in which Deere primarily maintains its financial data

that Deere correlates with sales of the Accused Products in the U.S.

## DEPOSITION TOPIC NO. 28:

Marketing, advertising, and/or promotion of the Accused Products and the products through which they are available, including but not limited to any market studies, market analyses, competitive studies, competitive analyses, material given to sales personnel, customers, or any other third parties, product details, and co-promotion agreements.

**RESPONSE AND OBJECTIONS:**

Deere objects to this topic on the grounds set forth above in General Objection Nos. 1-13 and incorporates those objections by reference.  Moreover, because the topic is impermissibly broad and vague, Deere cannot identify the area for examination, let alone the outer limits of the area for examination; the topic therefore does not describe with reasonable particularity the matters for examination as required by Fed. R. Civ. P. 30(b)(6), and no person or persons could possibly testify concerning all of the information known or reasonably available to Deere concerning this broad topic.  In addition, the use of "including" and "Accused Products" renders the topic overly broad, vague, and ambiguous.  Deere further objects insofar as the topic seeks information regarding extraterritorial activities on the ground that it is not relevant to any party's claim or defense.

Subject to and without waiving any of the foregoing objections, Deere will designate one or more persons to testify as to the types of marketing, advertising, and promotion by Deere of the Accused Products in the U.S. and types of any market studies, market analyses, competitive studies, and competitive analyses for the Accused Products in the U.S.

**DEPOSITION TOPIC NO. 29:**

The identity of alleged available, acceptable alternative products to the Accused Products, and why those alleged alternatives are available, acceptable, and non-infringing, including without limitation the cost, conversion or switch-over time, acceptability, and all evaluations or analyses of any such alternatives done by Deere or any third party.

**RESPONSE AND OBJECTIONS:**

Deere objects to this topic on the grounds set forth above in General Objection Nos. 1-13 and incorporates those objections by reference.  The topic also impermissibly seeks to obtain expert disclosures before they are due under either the Court's scheduling order or the Federal Rules of Civil Procedure.  Deere further objects to this topic on the ground that it seeks contentions

patent infringement cases because "the bases for contentions do not consist exclusively of relatively straightforward facts or evidence, as might be true, by contrast in a case arising out a traffic accident" and "a substantial part of 'the bases for contentions' really consists of quasi-legal argument.").  In addition, the use of "Deere" renders the topic overly broad, vague, and ambiguous.

Subject to and without waiving any of the foregoing objections, Deere is willing to meet and confer with ESCO concerning these objections and whether the topic can be modified to describe with reasonable particularity matters for examination that are relevant and otherwise proper.

**SUPPLEMENTAL RESPONSE:**

As represented by ESCO's counsel in correspondence dated September 9, 2022, ESCO withdrew this topic, for which Deere will not designate a witness.

**SAUL EWING ARNSTEIN & LEHR LLP**

/s/ *Michelle C. Streifthau-Livizos*
James D. Taylor, Jr. (# 4009)
Aubrey J. Morin (#6568)
Michelle C. Streifthau-Livizos (#6584)
1201 N. Market Street, Suite 2300
Wilmington, DE 19801
Telephone: (302) 421-6800
james.taylor@saul.com
aubrey.morin@saul.com
michelle.streifthau-livizos@saul.com

OF COUNSEL:

John F. Bennett (pro hac vice)
Paul M. Ulrich (pro hac vice)
Paul J. Linden (pro hac vice)
Ava M. Abner (pro hac vice)
ULMER & BERNE LLP
600 Vine Street, Suite 2800
Cincinnati, Ohio 45202-2409
(513) 698-5000
jbennett@ulmer.com
pulrich@ulmer.com
plinden@ulmer.com
aabner@ulmer.com

*Attorneys for Defendant DEERE & COMPANY*

Dated:  September 19, 2022

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 19, 2022, the foregoing was served on counsel of record by electronic mail to:

Karen E. Keller, Esq.
Nathan R. Hoeschen, Esq.
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
nhoeschen@shawkeller.com

Brian D. Sieve, Esq.
Paul D. Collier, Esq.
Jeremy D. Roux, Esq.
Tareq M. Alosh, Esq.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000
bsieve@kirkland.com
pcollier@kirkland.com
jeremy.roux@kirkland.com
tareq.alosh@kirkland.com

/s/ *Michelle C. Streifthau-Livizos*
Michelle C. Streifthau-Livizos (#6584)

40534181.1

# EXHIBIT 5

| From: | Abner, Ava <aabner@ulmer.com> |
|---|---|
| Sent: | Friday, October 14, 2022 3:12 PM |
| To: | Giroud, Xaviere; Roux, Jeremy D.; #ESCO_Deere KE Team; Karen Keller; Nate Hoeschen |
| Cc: | Deere-DDEL; Taylor, Jr., James D.; Morin, Aubrey J.; Streifthau-Livizos, Michelle C. |
| Subject: | RE: ESCO v.  Deere – Identification of Documents |

**This message is from an EXTERNAL SENDER**

Be cautious, particularly with links and attachments.

Xavi,

Deere is slightly modifying its designees on Topics 4, 5, and 13.

More specifically, for Topic No. 4, as modified by the parties through agreement (*see* 9/19/22 Deere's supplemental objections to ESCO's 30(b)(6) deposition notice), Deere intends to designate (1) Ms. Judge with respect to information occurring after November 2020, and (2) Jason Simmons with respect to information occurring before November 2020.  Additionally, for Topic No. 5, as modified by the parties through agreement (*see id.*), Deere intends to designate (1) Ms. Judge regarding the total number of the Accused Products manufactured by Deere or received by Deere from its manufacturers for sales in the U.S., and (2) Michael Budan regarding the total number of the Accused Products sold in the U.S.  Finally, for Topic No. 13, as modified by the parties through agreement (*see id.*), Deere no longer intends to designate Ms. Judge; rather, Deere intends to designate (1) Mr. Budan concerning the amount of U.S. sales of the Accused Products, and (2) Mr. Simmons concerning the bases for customer demand or preference for the Accused Products.

For the sake of clarity, please find at the end of this email an updated list of Deere's designees that we sent on 10/5 reflecting the above modifications.

Best,
Ava

\*\*\*

- Steva Judge (Topics **4**, **5**, 6)
  - o Topic 4 (after November 2020)
  - o Topic 5 (the total number of the Accused Products manufactured by Deere or received by Deere from its manufacturers for sales in the U.S.)
  - o Topic 6
- Stephen D. Dellett, Esq. (Topics 24, 30, 31)
  - o Topic 24
  - o Topic 30
  - o Topic 31
- Michael Budan (Topics **5**, **13**, 19-23, 25-28)
  - o Topic 5 (the total number of the Accused Products sold in the U.S.)
  - o Topic 13 (the amount of U.S. sales of the Accused Products)
  - o Topic 19

- o Topic 20
- o Topic 21
- o Topic 22
- o Topic 23
- o Topic 25
- o Topic 26
- o Topic 27
- o Topic 28
- Jason Simmons (Topics 1-3, **4**, 7, 8, **13**, 14, 29)
  - o Topic 1
  - o Topic 2
  - o Topic 3
  - o Topic 4 (before November 2020)
  - o Topic 7
  - o Topic 8
  - o Topic 13 (the bases for customer demand or preference for the Accused Products)
  - o Topic 14
  - o Topic 29

------
Ava Abner
Ulmer & Berne LLP
513.698.5022

**From:** Giroud, Xaviere <xaviere.giroud@kirkland.com>
**Sent:** Friday, October 14, 2022 12:19 PM
**To:** Roux, Jeremy D. <jeremy.roux@kirkland.com>; Deere-DDEL <Deere-DDEL@ulmer.com>; Taylor, Jr., James D. <james.taylor@saul.com>; Morin, Aubrey J. <aubrey.morin@saul.com>; Streifthau-Livizos, Michelle C. <michelle.streifthau-livizos@saul.com>
**Cc:** #ESCO_Deere KE Team <ESCO_Deere_KE_Team@kirkland.com>; Karen Keller <kkeller@shawkeller.com>; Nate Hoeschen <nhoeschen@shawkeller.com>
**Subject:** RE: ESCO v. Deere – Identification of Documents


Counsel,


Per the parties agreement regarding identifying documents for Topic No. 4 five business days prior to the deposition, ESCO identifies the following documents: DEERE_0048676, DEERE_0004904, DEERE_0004621, and DEERE_0004672.  Additionally, both Steva Judge and Jason Simmons were designated for Topic No. 13.  (*See* 10/5/22 3:58 PM A. Avner corresp.)  Please clarify whether Deere intends to designate two witnesses on Topic No. 13.


Best,

**Xavi Giroud**

She/Her/Hers

-------------------------------------

**KIRKLAND & ELLIS LLP**

300 North LaSalle, Chicago, IL 60654

**T** +1 312 862 4105  **M** +1 520 834 6878

**F** +1 312 862 2200

-------------------------------------

xaviere.giroud@kirkland.com

---

**From:** Roux, Jeremy D. <jeremy.roux@kirkland.com>
**Sent:** Wednesday, October 12, 2022 2:25 PM
**To:** Deere-DDEL <Deere-DDEL@ulmer.com>; Taylor, Jr., James D. <james.taylor@saul.com>; Morin, Aubrey J. <aubrey.morin@saul.com>; Streifthau-Livizos, Michelle C. <michelle.streifthau-livizos@saul.com>
**Cc:** #ESCO_Deere KE Team <ESCO_Deere_KE_Team@kirkland.com>; Karen Keller <kkeller@shawkeller.com>; Nate Hoeschen <nhoeschen@shawkeller.com>
**Subject:** ESCO v. Deere – Identification of Documents


Counsel,


Per the parties' agreement regarding identifying documents for Topic No. 30 five business days prior to the deposition, ESCO identifies the following documents: DEERE_0004416, DEERE_0004853, DEERE_0048676, DEERE_0048720, DEERE_0048736, DEERE_0048766, DEERE_0048762.


Jeremy


**Jeremy Roux**
-------------------------------------------------------
**KIRKLAND & ELLIS LLP**
300 North LaSalle, Chicago, IL 60654
**T** +1 312 862 3435  **M** +1 847 736 9514

**F** +1 312 862 2200
----------------------------------------------------
jeremy.roux@kirkland.com

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

# EXHIBIT 6

## Errata Sheet for the Deposition Transcript of Michael Budan
Date of Deposition: November 9, 2022
Case: ESCO Group LLC v. Deere & Company

| Page | Line | Correction/Change |
|------|------|-------------------|
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |

12/23/2022
(Date)

Michael A. Budan
(Signature)

Errata Sheet for the Deposition Transcript of Michael Budan
Date of Deposition: November 9, 2022
Case: ESCO Group LLC v. Deere & Company

| Page | Line | Correction/Change |
|------|------|-------------------|
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |
|      |      |                   |

12/23/2022                     Michael A. Budan
_____            _____
(Date)                              (Signature)

**ACKNOWLEDGMENT OF DEPONENT**

I, Michael Budan, do hereby acknowledge that

I have read and examined the foregoing testimony,

and the same is a true, correct and complete transcription

of the testimony given by me and any corrections appear

on the attached Errata sheet signed by me.

12/23/2022
(Date)

Michael A. Budan
(Signature)

# EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ESCO GROUP LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 20-1679-RGA |
| | ) | |
| DEERE & COMPANY, | ) | |
| | ) | |
| ESCO. | ) | |

### PLAINTIFF ESCO GROUP LLC'S RESPONSES AND OBJECTIONS TO DEERE & COMPANY'S SUPPLEMENTAL DEPOSITION NOTICE PURSUANT TO RULE 30(b)(6)

Plaintiff ESCO Group LLC ("ESCO") hereby provides the following objections and responses to ESCO Deere & Company's ("Deere") Notice of Deposition of ESCO Group LLC pursuant to Federal Rule of Civil Procedure 30(b)(6), served on October 27, 2022. ESCO reserves the right to further supplement or amend these objections and responses to the extent allowed by the Federal Rules of Civil Procedure and the rules of this Court.

with which ESCO's GeoVor, 3-piece Nemisys, Ultralok construction, Super-V, Max DRP, and Max DRP Plus products compete, the parties' respective shares of the market, other non-party market participant's shares of the market, projected market, and demand for ESCO's GeoVor, 3-piece Nemisys, Ultralok construction, Super-V, Max DRP, and Max DRP Plus products.

In addition to its general objections, ESCO objects to this Topic as overly broad, unduly burdensome and not proportional to the needs of the case, at least because it is not limited in time and purports to seek "*[a]ny and all* research or evaluation." ESCO further objects to this Topic as vague, specifically as to the meaning of "research or evaluation." ESCO further objects to this Topic as seeking information that is not relevant to the issues in this case. ESCO further objects to this Topic to the extent it seeks information that is more conveniently or less expensively obtained through interrogatories, document requests, or other less burdensome means. ESCO also objects to this Topic to the extent it seeks information protected from discovery by the attorney-client privilege, the work-product immunity doctrine, or other applicable privilege.

**TOPIC NO. 14:**

For each of (a) the GeoVor system, (b) the Nemisys system, (c) the Ultralok system, and (d) any other products of ESCO that compete with any of the Accused Products:

(i)     the identity of the manufacturer, its location, and contact information;

(ii)    all marketing efforts of each such product to customers and end users;

(iii)   all promotional, advertising, and marketing expenditures on a monthly, quarterly, and annual basis;

(iv)    quantities sold and gross and net sales, on a monthly, quarterly, and annual basis and all competing products in the United States on a monthly, quarterly, and annual basis, since first sale to the present;

(v)     all profit and loss data—including (A) revenue that ESCO has received, (B) number of units sold, (C) cost of goods sold, and (D) allocation of any direct or indirect costs, expense, or expenditures—on a monthly, quarterly, and annual basis, since first sale to the present;

(vi)     all assessments of the share of the market in the United States on a monthly, quarterly, and annual basis, since first sale to the present;

(vii)    the relationship between any promotional, marketing, or education efforts and sales revenue;

(viii)   identities of customers and end users, all marketing studies, customer surveys, estimates of market size, marketing materials, advertising materials, and promotional materials;

(ix)     the pricing, related price lists, pricing strategy, price determination, discounts, rebates, and all monthly, quarterly, and annual summaries or reports concerning prices; and

(x)      forecasted sales for the next two years.

**RESPONSE TO TOPIC NO. 14:**

Subject to its general and specific objections, ESCO responds as follows:

ESCO will designate one or more persons to provide non-privileged fact testimony for ESCO's GeoVor, 3-piece Nemisys, Ultralok construction, Super-V, Max DRP, and Max DRP Plus products regarding (i) the identity of the manufacturer and its location, (ii) marketing efforts of each such product to customers and end users, (iii) promotional, advertising, and marketing expenditures on a monthly, quarterly, and annual basis, (iv) quantities sold and gross and net sales in the United States, on a monthly, quarterly, and annual basis from 2014 to the present, (v) competing products in the United States, (vi) profit and loss data on a monthly, quarterly, and annual basis, from 2014 to the present, (vii) assessments of the share of the market in the United States on an annual basis, (viii) the relationship between any promotional, marketing, or education efforts and sales revenue, (ix) identities of customers and end users, (x) marketing studies, customer surveys, estimates of market size, marketing materials, advertising materials, and promotional materials, (xi) pricing, related price lists, pricing strategy, price determination, discounts, rebates, and summaries or reports concerning prices, and (xii) forecasted sales for the next two years.

13

In addition to its general objections, ESCO objects to this Topic as overly broad, unduly burdensome and not proportional to the needs of the case, at least because it is not limited in time and purports to seek "*all* marketing efforts," "*all* promotional, advertising, and marketing expenditures on a *monthly, quarterly, and annual* basis," "quantities sold and gross and net sales, on a *monthly, quarterly, and annual* basis," "*all* profit and loss data … on a *monthly, quarterly, and annual* basis," "*all* assessments … on a *monthly, quarterly, and annual* basis," "the relationship between *any* promotional, marketing, or education efforts and sales revenue," "*all* marketing studies, customer surveys, estimates of market size, marketing materials, advertising materials, and promotional materials," "*all monthly, quarterly, and annual* summaries or reports concerning prices." ESCO further objects to this Topic as seeking information that is not relevant to the issues in this case. ESCO further objects to this Topic to the extent it seeks information that is more conveniently or less expensively obtained through interrogatories, document requests, or other less burdensome means. ESCO objects to Deere's attempt to exceed the Court's limit on interrogatories by attempting to improperly seek this information from a Rule 30(b)(6) deposition. ESCO also objects to this Topic to the extent it seeks information protected from discovery by the attorney-client privilege, the work-product immunity doctrine, or other applicable privilege. ESCO objects to this Topic as duplicative of Topic Nos. 7 and 13.

**TOPIC NO. 15:**

Any and all research, testing, or evaluation performed by ESCO or on its behalf that compares any of the alleged invention(s) claimed in each Asserted Patent with the subject matter of any Prior Art, all articles, reports, publications, or other documents relating to such research, testing, or evaluation, and the identity of each person with knowledge of any such research, testing, or evaluation.

Dated: November 4, 2022                    Respectfully submitted,

                                           _/s/ Paul D. Collier_____
                                           Brian D. Sieve, P.C.
                                           Paul D. Collier
                                           Jeremy D. Roux
                                           KIRKLAND & ELLIS LLP
                                           300 North LaSalle
                                           Chicago, IL 60654
                                           (312) 862-2000
                                           brian.sieve@kirkland.com
                                           paul.collier@kirkland.com
                                           jeremy.roux@kirkland.com

                                           *Counsel for Plaintiff ESCO Group LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 4, 2022, the foregoing was served on counsel of record

by electronic mail to:

James D. Taylor, Jr.
Michelle C. Streifthau-Livizos
SAUL EWING ARNSTEIN & LEHR LLP
1201 N. Market Street, Suite 2300
Wilmington, Delaware 19801
(302) 421-6800
james.taylor@saul.com
Michelle.Streifthau-Livizos@Saul.com


John F. Bennett
Paul M. Ulrich
Paul J. Linden
ULMER & BERNE LLP
600 Vine Street, Suite 2800
Cincinnati, Ohio 45202-2409
(513) 698-5000
jbennett@ulmer.com
pulrich@ulmer.com
plinden@ulmer.com

*/s/ Sheryl Brongiel*

# EXHIBIT 8

| | |
|---|---|
| **From:** | Giroud, Xaviere |
| **Sent:** | Monday, November 28, 2022 2:07 PM |
| **To:** | Abner, Ava; Roux, Jeremy D.; kkeller@shawkeller.com; nhoeschen@shawkeller.com; #ESCO_Deere KE Team |
| **Cc:** | Bennett, John; james.taylor@saul.com; Michelle.Streifthau-Livizos@Saul.com; aubrey.morin@saul.com; Deere-DDEL |
| **Subject:** | RE: ESCO Group v. Deere & Company - Responses |

Ava,

Subject to ESCO's objections and responses, please find below the witnesses ESCO will be designating to cover Rule 30(b)(6) topics for which ESCO has agreed to provide a witness.

- **James Marten:** Topics 44-46
- **Chris Carpenter:** Topics 21, 29-36, 40 regarding the '662 Patent; Topics 47-50 regarding Pit Viper; and Topic 51
- **Chris Snyder:** Topics 6, 18, 22 regarding GeoVor; Topics 21, 29-36, 40 regarding the '175 Patent; Topic 27
- **Adam Stitzel:** Topics 1, 4-5, 7, 11-12, 14, 41-42; Topics 13, 25, 27 regarding GeoVor, Ultralok, Super-V, and Max DRP; Topic 16 regarding the '175 Patent
- **Craig Wihtol:** Topics 6, 9, 13, 18, 25 regarding Nemisys; Topic 16 regarding the '662 Patent; Topic 26
- **Kevin Stangeland:** Topics 3, 8, 10, 15, 17, 19-20, 23-24, 28, 37-39, 43; Topic 9 regarding Geovor, Ultralok, SuperV, and Max DRP; Topic 22 regarding Nemisys and Ultralok; Topics 47-50 regarding Gopher

Best,

**Xavi Giroud**
She/Her/Hers

**KIRKLAND & ELLIS LLP**
300 North LaSalle, Chicago, IL 60654
T +1 312 862 4105  M +1 520 834 6878
F +1 312 862 2200

xaviere.giroud@kirkland.com

**From:** Abner, Ava <aabner@ulmer.com>
**Sent:** Monday, November 28, 2022 1:31 PM
**To:** Giroud, Xaviere <xaviere.giroud@kirkland.com>; Roux, Jeremy D. <jeremy.roux@kirkland.com>; kkeller@shawkeller.com; nhoeschen@shawkeller.com; #ESCO_Deere KE Team <ESCO_Deere_KE_Team@kirkland.com>
**Cc:** Bennett, John <jbennett@ulmer.com>; james.taylor@saul.com; Michelle.Streifthau-Livizos@Saul.com; aubrey.morin@saul.com; Deere-DDEL <Deere-DDEL@ulmer.com>
**Subject:** RE: ESCO Group v. Deere & Company - Responses

**This message is from an EXTERNAL SENDER**

Be cautious, particularly with links and attachments.

Xavi,

In addition to Topic Nos. 8, 19, and 41, please provide ESCO's designees for Topic Nos. 10, 12, 35, 43, and 47-51.

Best,
Ava

------
Ava Abner
Ulmer & Berne LLP
513.698.5022

**From:** Abner, Ava <aabner@ulmer.com>
**Sent:** Tuesday, November 22, 2022 1:50 PM
**To:** Giroud, Xaviere <xaviere.giroud@kirkland.com>; Roux, Jeremy D. <jeremy.roux@kirkland.com>; kkeller@shawkeller.com; nhoeschen@shawkeller.com; #ESCO_Deere KE Team <ESCO_Deere_KE_Team@kirkland.com>
**Cc:** Bennett, John <jbennett@ulmer.com>; james.taylor@saul.com; Michelle.Streifthau-Livizos@Saul.com; aubrey.morin@saul.com; Deere-DDEL <Deere-DDEL@ulmer.com>
**Subject:** RE: ESCO Group v. Deere & Company - Responses

Xavi,

We'll proceed with the topics as you proposed below.

Best,

Ava

------
Ava Abner
Ulmer & Berne LLP
513.698.5022

**From:** Giroud, Xaviere <xaviere.giroud@kirkland.com>
**Sent:** Friday, November 18, 2022 9:56 AM
**To:** Abner, Ava <aabner@ulmer.com>; Roux, Jeremy D. <jeremy.roux@kirkland.com>; kkeller@shawkeller.com; nhoeschen@shawkeller.com; #ESCO_Deere KE Team <ESCO_Deere_KE_Team@kirkland.com>
**Cc:** Bennett, John <jbennett@ulmer.com>; james.taylor@saul.com; Michelle.Streifthau-Livizos@Saul.com; aubrey.morin@saul.com; Deere-DDEL <Deere-DDEL@ulmer.com>
**Subject:** RE: ESCO Group v. Deere & Company - Responses


Ava,


As we discussed during our meet and confer, ESCO agrees to designate one or more persons to testify regarding the full scope of Topic Nos. 1, 5-6, 8-9, 13, 15-16, 18-20, 23, 25, 29, 31-32, 36-38, 40-42, and 44-45 to the extent such information is not privileged and is known or reasonably available to ESCO.  ESCO will "perform a *reasonable* inquiry for [the] information that is noticed and *reasonably* available to it."  *Penn Mut. Life Ins. Co. v. Rodney Reed 2006 Ins. Trust*,

2

2011 WL 1636985, at *1 (D. Del. Apr. 29, 2011).  ESCO's designees will "not have perfect responses to each question, nor a clairvoyant ability to predict every single question that may be posed[.]"  *Estrada v. Wass*, 2012 WL 1268533, at *2 (M.D. Pa. Apr. 16, 2012).  ESCO has already designated one or more persons for Topic Nos. 1, 5-6, 9, 13, 15-16, 18, 20, 23, 25, 29, 31-32, 36-38, 40, 42, and 44-45.  We will follow-up shortly with designations for Topic Nos. 8, 19, and 41.

With respect to Topic No. 10, ESCO is willing to designate one or more persons to provide non-privileged fact testimony regarding any assessments performed by ESCO or by another party on behalf of ESCO regarding the monetary value of the Asserted Patents and its calculation.

With respect to Topic No. 12, ESCO is willing to designate one or more persons to provide non-privileged fact testimony regarding the acceptability and availability of the alleged non-infringing alternatives that Deere has identified in its response to ESCO's Interrogatory No. 10, to the extent that Deere identifies any such alleged non-infringing alternatives.  As we explained during the meet and confer, ESCO does not believe that the remainder of Topic No. 12 is relevant, nor proportional to the needs of the case.  ESCO understands that it "bears the ultimate burden of establishing it is entitled to lost profits, which includes proving that there were no acceptable non-infringing alternatives," but it is Deere's "burden to identify and provide information regarding alleged acceptable non-infringing alternatives."  *ICM Controls Corp. v. Honeywell Int'l Inc.*, 2021 WL 3403734, at *3 (N.D.N.Y. Aug. 4, 2021).  ESCO is willing to consider supplemental authority from Deere.

For Topic No. 14, ESCO is willing to designate one or more persons to provide non-privileged fact testimony for ESCO's GeoVor, 3-piece Nemisys, Ultralok construction, Super-V, Max DRP, and Max DRP Plus products regarding (i) the identity of the manufacturer and its location, (ii) marketing efforts of each such product to customers and end users, (iii) promotional, advertising, and marketing expenditures on a monthly, quarterly, and annual basis, (iv) quantities sold and gross and net sales in the United States, on a monthly, quarterly, and annual basis from 2008 to the present, (v) competing products in the United States, (vi) profit and loss data on a monthly, quarterly, and annual basis, from 2008 to the present, (vii) assessments of the share of the market in the United States on an annual basis, (viii) the relationship between any promotional, marketing, or education efforts and sales revenue, (ix) identities of customers and end users, (x) marketing studies, customer surveys, estimates of market size, marketing materials, advertising materials, and promotional materials, (xi) pricing, related price lists, pricing strategy, price determination, discounts, rebates, and summaries or reports concerning prices, and (xii) forecasted sales for the next two years.

For Topic No. 35, we appreciate your clarification that Deere is not seeking communications referencing to the embodying products, to the extent such communications do not also reference the Asserted Patents.  Accordingly, ESCO is willing to designate one or more persons to provide non-privileged fact testimony regarding ESCO's communications with each named inventor referencing each Asserted Patents.

With respect to Topic No. 43, ESCO is willing to designate one or more persons to provide non-privileged fact testimony regarding the identity and relationship to ESCO of ESCO's predecessors and present affiliates, including parent companies, subsidiaries, partnerships, joint ventures, and divisions that have been involved in the research, design, development, engineering, testing, manufacture, marketing offer for sale, or sale of the Asserted Patents or ESCO's GeoVor, 3-piece Nemisys, Ultralok construction, Super-V, Max DRP, or Max DRP Plus products.

Best,


**Xavi Giroud**

**She/Her/Hers**

------------------------------------

**KIRKLAND & ELLIS LLP**

300 North LaSalle, Chicago, IL 60654

**T** +1 312 862 4105   **M** +1 520 834 6878

**F** +1 312 862 2200

------------------------------------

xaviere.giroud@kirkland.com


**From:** Abner, Ava <aabner@ulmer.com>
**Sent:** Thursday, November 10, 2022 1:15 PM
**To:** Roux, Jeremy D. <jeremy.roux@kirkland.com>; kkeller@shawkeller.com; nhoeschen@shawkeller.com; #ESCO_Deere KE Team <ESCO_Deere_KE_Team@kirkland.com>
**Cc:** Bennett, John <jbennett@ulmer.com>; james.taylor@saul.com; Michelle.Streifthau-Livizos@Saul.com; aubrey.morin@saul.com; Deere-DDEL <Deere-DDEL@ulmer.com>
**Subject:** RE: ESCO Group v. Deere & Company - Responses


Jeremy,


Thanks for meeting with us today regarding ESCO's objections to Deere's 30(b)(6) topics.


We understand from our discussion that—except for Topic Nos. 2 (withdrawn), 10, 12, 14, 24 (withdrawn), 29, 35, 41, and 43—ESCO agrees to designate one or more persons to testify regarding the full scope of the topics as served.  With respect to Topic Nos. 10, 12, 14, 29, 35, 41, and 43, we understand that your team will discuss internally and let us know where ESCO stands.

Best,

Ava


------
Ava Abner
Ulmer & Berne LLP
513.698.5022

**From:** Roux, Jeremy D. <jeremy.roux@kirkland.com>
**Sent:** Tuesday, November 8, 2022 7:08 PM
**To:** Abner, Ava <aabner@ulmer.com>; kkeller@shawkeller.com; nhoeschen@shawkeller.com; #ESCO_Deere KE Team <ESCO_Deere_KE_Team@kirkland.com>
**Cc:** Bennett, John <jbennett@ulmer.com>; james.taylor@saul.com; Michelle.Streifthau-Livizos@Saul.com; aubrey.morin@saul.com; Deere-DDEL <Deere-DDEL@ulmer.com>
**Subject:** RE: ESCO Group v. Deere & Company - Responses




Ava -- That time works for us.


Jeremy


**Jeremy Roux**

**KIRKLAND & ELLIS LLP**
300 North LaSalle, Chicago, IL 60654
**T** +1 312 862 3435  **M** +1 847 736 9514

**F** +1 312 862 2200

jeremy.roux@kirkland.com



**From:** Abner, Ava <aabner@ulmer.com>
**Sent:** Monday, November 7, 2022 4:48 PM
**To:** Roux, Jeremy D. <jeremy.roux@kirkland.com>; kkeller@shawkeller.com; nhoeschen@shawkeller.com; #ESCO_Deere KE Team <ESCO_Deere_KE_Team@kirkland.com>
**Cc:** Bennett, John <jbennett@ulmer.com>; james.taylor@saul.com; Michelle.Streifthau-Livizos@Saul.com; aubrey.morin@saul.com; Deere-DDEL <Deere-DDEL@ulmer.com>
**Subject:** RE: ESCO Group v. Deere & Company - Responses

Jeremy,

We are available on Thursday at 10 am CT to meet and confer regarding ESCO's objections to Deere's supplemental 30(b)(6) deposition notice.  Please let us know whether ESCO is also available then, and we will circulate an invite accordingly.

Best,

Ava

------
Ava Abner
Ulmer & Berne LLP
513.698.5022

---

**From:** Brongiel, Sheryl A. <sbrongiel@kirkland.com>
**Sent:** Friday, November 4, 2022 5:57 PM
**To:** james.taylor@saul.com; Bennett, John <jbennett@ulmer.com>; Ulrich, Paul <pulrich@ulmer.com>; Linden, Paul <plinden@ulmer.com>; Michelle.Streifthau-Livizos@Saul.com; Deere-DDEL <Deere-DDEL@ulmer.com>; Abner, Ava <aabner@ulmer.com>; Rodman, Rachael <rrodman@ulmer.com>; aubrey.morin@saul.com
**Cc:** Sieve, Brian D. <bsieve@kirkland.com>; Collier, Paul D. <pcollier@kirkland.com>; Roux, Jeremy D. <jeremy.roux@kirkland.com>; kkeller@shawkeller.com; nhoeschen@shawkeller.com; Giroud, Xaviere <xaviere.giroud@kirkland.com>; Alosh, Tareq M. <tareq.alosh@kirkland.com>
**Subject:** ESCO Group v. Deere & Company - Responses

Counsel,

Attached for service, please find Plaintiff ESCO Group LLC's Responses And Objections To Deere & Company's Supplemental Deposition Notice Pursuant To Rule 30(B)(6).

**Sheryl A. Brongiel**
Senior Paralegal

**KIRKLAND & ELLIS LLP**
300 North LaSalle, Chicago, IL 60654
**T** +1 312 862 7259
**F** +1 312 862 2200

6

sheryl.brongiel@kirkland.com

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

# EXHIBIT 9



Highly Confidential



Highly Confidential

# EXHIBIT 10

# BUCKET TEETH



DEERE_0000363

# The John Deere TK-Series Tooth System

The TK-Series System is engineered to deliver maximum performance, quick and safe replacement, and superior tooth retention.

## The system

**1** Symmetrical — nearly parallel — multi-planer nose surfaces for a fully stabilized system

**2** Reusable rubber locks — held captive by the tooth — never compressed when the pin is locked for long wear life and very infrequent replacement

**3** Reusable retention pin is never loaded[i] for long wear life and very infrequent replacement

**4** Pin has both male and female ends that can be inserted from either side

**5** Full line of tooth profiles and sizes

**6** No hammers or pry bars — a simple socket or breaker bar wrench is all you need



[i]The pin only becomes loaded during back-dragging and remains in a neutral axis during all other digging or loading movements.

2

DEERE_0000364

# Why it's better

## Performance and reliability

– No hammers and no pry bars. You just need a socket or breaker bar wrench to install and remove the retention pin for quicker, safer tooth replacement

– Multi-planed nose surfaces and matching pocket surfaces absorb loads from any angle, minimizing motion for longer system life

– Optimized tooth-to-nose-length ratio for better penetration and performance

– Symmetrical design allows teeth to be flipped, with pin retention from either side for longer tooth life

– Forged pin is never under load except during back-dragging, and the rubber locks are not compressed when the pin is locked for long life and the rare need for replacement at change-outs

– Rubber locks are held captive when the tooth is retained for security and protection from direct impact

## Durability and strength

– Meets stringent quality specifications for metallurgical composition, toughness, and hardness[1]:

  – Metallurgical comparison graph shows TK-Series teeth are very similar to other competitors in the industry

  – TK-Series Rockwell Hardness range: 47–52

  – Charpy V-Notch Toughness at room temperature is >15J

  – Charpy V-Notch Toughness at –40°C/–40°F is 11J-15J

– Nearly five times stronger than older, flex-pin retention systems[2]

– Nearly a **70-percent consumption ratio**[3] means you are getting more for your money

– Over **50-percent-more usage** with heavy-duty TK-Series loader teeth[4]

– Less frequent change-outs and more uptime

– Includes a **lifetime** warranty against breakage

DEERE_0000365



Metallurgical comparison graph shows TK-Series teeth are very similar to other major competitors in the industry.

**■ TK   ■ Esco®   ■ MTG®   ■ Hensley®**

[1]Material specification comparisons against similar Esco, MTG, and Hensley tooth products prove that the TK system is a highly competitive system when looking at metallurgy, hardness, and toughness specifications. Results of lab-test comparisons show TK-Series teeth to be equally matched against these competitors for all three composition specifications.

[2]Destructive testing (March 26, 2010) of the TK225FD tooth against the TF23D tooth. The TF system began failing at a load of eight tons with failure of the pin first, followed by plastic deformation of the adapter nose. The TK225 tooth pocket failed at a load of 37 tons with no failure or deformation of the pin and no deformation of the adapter nose.

[3]Richmond, Virginia, field-test data from August 2012. A set of eight TK550LD teeth and eight TK550LDH teeth on a 90-metric-ton loader loading blasted granite was monitored and weighed at end of life. Data showed an average consumption ratio across all teeth for the LD set to be 67.18 percent, and 69.29 percent for the LDH set.

[4]Field-test data from October 2012 showed the TK550LDH (heavy-duty) teeth at end of life yielded 550 hours of production compared to an average of 254 hours for two sets of TK550LD (standard-duty) teeth tested on the same 90-metric-ton production loader in a blasted granite loading application.

DEERE_0000366

## Lock the Turn Kam pin and it stays locked

**1** Installed lock is captured by the tooth.

**2** The pin is rotated clockwise until the indicator line is horizontal.

The rubber lock will relax within the pin recess.





DEERE_0000367

# We're big on Fanggs

Since being introduced, Fanggs continue to outperform other tooth designs in general digging applications. It's the self-cleaning effect that lets dirt flow between the teeth. Moldboard-shaped sidewalls decrease friction and soil compaction. All that adds up to 22-percent less digging effort to fill the bucket.

**Quality statement**
John Deere is committed to providing high-quality ground-engagement tools that result in lower daily operating costs and increased machine uptime for our customers. To ensure this requirement, all materials used for John Deere bucket teeth and adapters have been metallurgically tested to verify they meet impact and hardness specifications. By meeting these requirements, all John Deere bucket teeth and adapters provide superior wear resistance and impact strength in all applications.

**Fanggs work harder using less effort!**

6

DEERE_0000368



DEERE_0000369

# TK-Series tooth shapes



*Fanggs™ Tooth*

FD — The FD features the proven John Deere Fanggs™ profile, an excellent choice for excavators and backhoes in general-purpose applications. The Fanggs design improves penetration capability through a 22-percent reduction in required force.  The FD features a curved shape for greater strength.



*Severe-Duty (SD) Tooth*

SD — The severe duty (SD) tooth is similar to the John Deere Fanggs profile, but with 20 percent more material for those tough jobs. This tooth is a great option for excavators in general-purpose applications, but really shines in highly abrasive applications where tooth wear is an issue. Adding more material to the tooth's high-wear areas allows the tooth to continue to perform when a standard tooth may need replacing. This means an increase in tooth life, productivity, and uptime.



*Rock Chisel Tooth*

CH — The CH, or chisel tooth, is a general-application design. It is commonly preferred in rock applications due to good penetration and a self-sharpening, symmetrical profile. The CH provides a good balance between penetration and wear.
*NOTE: Not for use on loaders.*



*Tiger Tooth*

TG — This tooth style, known throughout the industry as a tiger tooth, is designed for excavators and backhoes. The sole purpose of the TG style is maximum penetration through any material. With its symmetrical profile, the reduced area of the body of the tooth makes it an excellent choice for penetrating tightly compacted soils, clay, and even rock.

*Note: TK-Series teeth installed on new John Deere equipment are painted yellow as shown. Aftermarket TK-Series teeth are black.*



*Twin Tiger Tooth*

TT — This tooth is commonly referred to as twin tiger. Having two points rather than a single point, the cut of the TT style is much wider than a single TG tooth. It is commonly used in conjunction with TG teeth fitted to the outside corner positions of excavator and backhoe buckets to maximize clearance during the dig cycle. Like the TG tooth, the symmetrical-profile TT style is designed for optimum penetration.



*Flare Tooth*

FR — The symmetrical-profile FR style is referred to as a flare tooth. It is most commonly used in softer soils and applications that require a clean, flat-bottom surface. This tooth has great bucket-fill capability for excavators and backhoes.



*Loader Tooth*

LD — This tooth style is specifically designed for loaders. The bottom of the tooth aligns with the bottom of a level loader bucket, resulting in a clean floor. LD teeth wear primarily from the bottom up, so specific placement of tooth mass provides good penetration and long life.



*Heavy-Duty (HD) Loader Tooth*

LDH — The LDH is 38-percent heavier than the comparable-sized LD. With this profile, penetration is maintained while additional wear material is available. This tooth is ideal for high-abrasion loader applications.

## TK-Series adapter styles

*Weld-on adapter*

*Bolt-on adapter (center)*

*Bolt-on adapter (one-hole end)*

*Bolt-on adapter (two-hole end)*

DEERE_0000371

# RVJ replacement teeth

Convert existing Caterpillar J-Series adapters to
a fully hammerless solution.



**1** Insert converter
into adapter.

**2** Fit tooth over nose
and converter.

**3** Insert helical pin and
rotate 180 deg.with socket
wrench to engage lock.

| Style | Description |
|-------|-------------|
| A | Standard |
| B | Flare |
| C | Penetration Plus |
| D | Tiger |
| E | Twin Tiger |
| F | Loader |
| G | HD Abrasion |

10

DEERE_0000372



# John Deere "original line" replacement teeth

**Retention**

The two-piece pin and split-washer design makes tooth removal and installation fast and easy. Both the pin and the washer are reusable. The original line of John Deere teeth has a nose and pocket design similar to traditional Caterpillar replacement teeth.

The roll pin is an economical means of retaining teeth. The coil in the pin takes up manufacturing tolerances and keeps the tooth tight against the adapter.



| Style | Description |
|-------|-------------|
| A | Fanggs with Carbide (33 L Series) |
| B | Standard (33 L Series) |
| C | Chisel (33 L Series) |
| D | Fanggs (11 L Series) |
| E | Standard (10 L Series) |
| F | Chisel (10 L Series) |
| G | Fanggs (10 L Series) |
| H | Standard (13 Series) |
| I | Standard (11 L Series) |
| J | Fanggs (13 Series) |

DEERE_0000373

# Caterpillar replacement teeth

**Design**
The oversized pocket characteristics of these teeth with the extended adapter nosepiece provide a nose fit between the tooth and adapter, which results in strong impact resistance but a loose fit in the ramps.

**Retention**
Replacement teeth for Caterpillar equipment use a two-piece retention method, which makes tooth removal and installation fast and easy. Both the pin and the washer are reusable. The original style and "E" style are available.



| Style | Description |
|-------|-------------|
| A | Short |
| B | Fanggs Dig / Fanggs Load |
| C | Flare |
| D | Long |
| E | Penetrator |
| F | Long H-D |
| G | Abrasion |
| H | Abrasion H-D |
| I | Twin Tiger |
| J | Tiger |
| K | Rock Chisel |
| L | Rock Penetrator |

DEERE_0000374

# Hensley replacement teeth

**Design**
The parabolic (dished-out) design creates a wedging and self-tightening fit. A recessed channel on the inside side- wall of the tooth matches a tapered extension on the adapter nose-piece, forming a locking fit. The design absorbs impact loads.

**Retention**



A roll pin is used on the 156, 160, 220, and 310 Series. Smaller series teeth are retained with a vertical roll pin, allowing easy removal and installation.



The 350, 400, and 475 Series use a vertical flex pin made of two hardened steel forgings with vulcanized neoprene between. The flex pin provides a four-way locking support.



A steel key retains the 290, 330, 370, 410, 500, and 550 Series. This key provides outstanding retention in all types of applications. It is not reusable.



| Style | Description |
|-------|-------------|
| A | Fanggs Dig |
| B | Standard |
| C | Flare |
| D | Tiger |
| E | Twin Tiger |
| F | Abrasion |

13

DEERE_0000375

# H&L replacement teeth

**Design**
H&L-style teeth are designed for backhoes and excavators. They are available in a multitude of shapes offering superb performance and reliability in all digging conditions.

**Retention**
The H&L tooth is attached with a horizontal flex pin. The flex pin consists of two steel pin halves with rubber sandwiched between. This pin design withstands shock and can take up small amounts of adapter wear in order to provide the necessary tight fit between tooth and adapter.



| Style | Description |
|-------|-------------|
| A | Twin Tiger |
| B | Tiger |
| C | Star |
| D | Ripper |
| E | Long Rock |
| F | Flare |
| G | Long |
| H | Fanggs Dig |
| I | Fanggs Load |

14

DEERE_0000376

# ESCO conical replacement teeth

**Design**
The "conical design" mating system between tooth and adapter creates self-tightening action. The raised center area on the top and bottom of the adapter nosepiece fits tightly into the formed area on the top and bottom of the tooth pocket. The design reduces tooth movement both vertically and horizontally. This design absorbs impact loads.

**Retention**
All Deere replacement teeth for ESCO conical products are retained with a pin and lock. Once the pin and lock are installed, a snug fit gives this attaching system little to no movement and provides great strength throughout the life of the tooth. Pins and locks are available in the standard and ratchet versions. The ratchet style should be used in demanding conditions.



| Style | Description |
|-------|-------------|
| A | Sharp |
| B | Tiger |
| C | Twin Tiger |
| D | Flare |

DEERE_0000377

# Helilok®/Vertalok® replacement teeth

**Design**
Helilok/Vertalok teeth mount on both the Vertalok and Helilok adapters with a quarter turn and "butt" up against the adapter nose to take thrust loads head-on. The helical threads and large stabilizing flats at the end of the nose deliver maximum resistance to severe breakout forces.

**Retention**
Teeth are held on to Helilok adapters by a drive-on, one-piece Quadrilok™ retainer (reusable). With the Quadrilok, the helical threads create a locknut force that tightens under load and resists rotation under the most severe impact.

Teeth are securely fastened to Vertalok adapters with a drive-through pin, which provides maximum holding power and virtually eliminates tooth loss. The pin is held in place by a spring-loaded plug that fits snugly into a cavity in the side of the adapter nose. Both are reusable.



| Style | Description |
|-------|-------------|
| A | Standard |
| B | Chisel |

DEERE_0000378

# Super V® replacement teeth

**Design**
The Super V tooth design provides a slimmer profile for increased penetration, better loading, reduced fuel consumption, and lower maintenance requirements. Broad stabilizing flats and a large load-bearing area reduce the chance for breakage and tooth loss. The tooth twists a quarter turn onto the adapter and "butts up" against the adapter nose to match breakout forces more closely.

**Retention**
A vertical one-piece pin provides a quick and safe tooth change-out. The unique pin design delivers a positive and secure lock, yet is easily installed or removed. The pin locks to the point ear independent of the nose and is fully covered by the point ear for reduced wear.



| Style | Description |
|-------|-------------|
| A | Standard |
| B | Tiger |
| C | Twin Tiger |
| D | Flare |

DEERE_0000379

# ESCO Ultralok®

**Design**
The Ultralok tooth and adapter design provide improved penetration through smooth adapter to tooth point transitions and all-new, streamlined profile shapes. A unique triangular nose shape provides stabilized mating flats to absorb load.

**Retention**
The Ultralok system is hammerless — integrating the locking mechanism into the tooth point. The integrated locking device makes the Ultralok system two pieces, unlike a traditional three piece (tooth, pin, adapter) system. The system is locked and unlocked using a pry bar. The placement of the lock reduces wear and loading of the locking mechanism.



| Style | Description |
|-------|-------------|
| A | Chisel |
| B | Standard |
| C | Flare |
| D | Twin Tiger |
| E | Tiger |

DEERE_0000380

# Ripper/scarifier replacement teeth



| Style | Description |
|-------|-------------|
| A | Standard (ESCO) |
| B | Standard, Crimp-On (H&L) |
| C | Standard (Cat) |
| D | Ripper (Deere) |
| E | Long (Cat) |
| F | Long/Penetration (Cat) |

**Note:** *Reference GET Guide (DKEGET) for part number information.*

DEERE_0000381

This literature has been compiled for worldwide circulation. While general information,
pictures, and descriptions are provided, some illustrations and text may include finance,
credit, insurance, product options, and accessories NOT AVAILABLE in all regions.
PLEASE CONTACT YOUR LOCAL DEALER FOR DETAILS. John Deere reserves the right to
change specification and design of all products described in this literature without notice.



JohnDeere.com

DKB5022 Litho in U.S.A. (19-06)

DEERE_0000382

# EXHIBIT 11

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

1          IN THE UNITED STATES DISTRICT COURT

             FOR THE DISTRICT OF DELAWARE

2

3     ESCO GROUP LLC,                §

            Plaintiff,               §

4                                    §

                                     §     CIVIL ACTION

5     VS.                            §     NO. 20-1679-WCB-MPT

                                     §

6     DEERE & COMPANY,               §

            Defendant.               §

7

8     -------------------------------------------

9            ORAL AND VIDEOTAPED DEPOSITION OF

10                STEPHEN L. BECKER, Ph.D.

11                  MARCH 10, 2023

12                 (Reported Remotely)

13      ***HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY***

14    -------------------------------------------

15

16           ORAL AND VIDEOTAPED DEPOSITION of STEPHEN L.

17    BECKER, Ph.D., produced as a witness at the instance of

18    the Plaintiff(s), and duly sworn, was taken in the above-

19    styled and numbered cause on March 10, 2023, from 9:02

20    a.m. to 4:04 p.m., before Molly Carter, Certified

21    Shorthand Reporter in and for the State of Texas,

22    reported by machine shorthand, with all attendees

23    appearing remotely, pursuant to the Federal Rules of

24    Civil Procedure.

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 64

```
 1   reply report saying that he believes that this -- that
 2   Mr. Budan's testimony about ██ percent share is supported
 3   by the, by this new document, this Deere document, this
 4   new Deere document, if you look at that Deere document
 5   and say, okay, if Dr. Varner's going to rely on that as
 6   sort of indicative of the share in the relevant market,
 7   the problem with what Dr. Varner has done is that he
 8   reaches into that document and gets the Deere share, but
 9   he does not use the ESCO share for Ultralok that is in
10   the same document.  And it's sort of apples and oranges.
11   He's combining ESCO's overall market share of ████████
12   ████████  with the sort of what he is now I think
13   suggesting is the relevant market based on Mr. Budan's
14   testimony is the market for putting teeth on Deere
15   machines, putting, you know, adapters and teeth on Deere
16   machines.
17           You've got to be consistent in my opinion.  And
18   if you're going to be consistent and use the ████████
19   ████████  share that's indicated for Deere, the Ultralok
20   share of that particular market on -- as evidenced by
21   that document is only ████████████████████████  that
22   Mr. -- that Dr. Varner assumes.
23           So the impact -- I don't know what the dollar
24   value impact is, but I know directionally that that would
25   imply that Dr. Varner's ████████████ number is even more
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 65

1    significantly overstated because he's assuming a ████

    ████t Ultralok share when, you know, if the relevant

3    market is one where Deere has ████████, in that

4    market Ultralok only has ██████.

5       Q   Okay.  You mentioned that you had other -- you

6    mentioned that you had thoughts and positions in response

7    to Dr. Varner's use of that, that Deere document.  Beyond

8    what you just talked about, Dr. Becker, were there any

9    other thoughts and opinions that you had as it related to

10    Dr. Varner's use of that document in his reply report?

11       A   Well, I think to the extent that my prior

12    answer hasn't fully articulated this, my main thought is

13    you've got to be consistent.  It's -- what the evidence

14    indicates to me, and this document further really

15    supports this, is that if you're looking at the market

16    overall, and even the premium segment of the market, as

17    Dr. Varner implies that he's doing, the evidence is

18    pretty clear that Deere's share of that is more like ████

    ████████ And that ██████████ is consistent with

20    Mr. Budan's testimony, because when Mr. Budan said 20

21    percent, he was talking about the market for putting

22    teeth and adapters on Deere equipment.

23       So my sort of overall thought that is

24    reinforced by this new document that Dr. Varner is

25    relying on is that you've got to be consistent.  If

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 66

1    you're looking at the overall market, then the evidence

2    is pretty clear that Deere has about ████████████ to

3    ESCO's ██████████.

4          If you want to be in the narrower market where

5    Deere does have a ████████████ share, then in that

6    market Ultralok is only ████████. So you can't mix and

7    match.

8          Q    Have you conducted your own independent

9    analysis of the market share for Ultralok and TK Series

10   teeth with either the broader general market or the

11   premium segment?

12         A    I'm not sure what you mean by independent

13   analysis.  I certainly have looked at the available

14   evidence and have tried to -- you know, sitting at my

15   desk, not, not listening to somebody else saying I think

16   this is X percent, but sitting at my desk, sort of

17   looking at the, the documentary evidence, including sales

18   data from Ultralok and the TK Series, as expressed in my

19   report, I think one can use the sales data itself to

20   independently confirm that in the broader, at least in

21   the market in which Ultralok has ████████, it must

22   follow that Deere has only a ████████████████

23   ████████ share.  And that's some numbers that I crunched

24   in my report independent of anything that I've found in a

25   document.

# EXHIBIT 12

| | |
|---|---|
| **From:** | Giroud, Xavi |
| **Sent:** | Monday, March 20, 2023 1:43 PM |
| **To:** | Abner, Ava |
| **Cc:** | james.taylor@saul.com; Streifthau-Livizos, Michelle C.; Deere-DDEL; #ESCO_Deere KE Team; kkeller@shawkeller.com; nhoeschen@shawkeller.com |
| **Subject:** | RE: ESCO v. Deere |

Counsel,

I write to memorialize the parties' agreement regarding production of updated financial data before trial.  Subject to the Court's trial date, ESCO proposes that the parties exchange requested updated financial data on July 24, 2023 (two months before trial) and produce the updated data by August 21, 2023 (one month before trial).  Please confirm Deere agrees to this proposal.

Regarding ESCO's licenses, ESCO will not agree to a wholesale exclusion of those licenses at trial at this time.  As I explained on our call, we believe the concerns you expressed are more appropriate for a motion in limine, rather than a *Daubert* challenge to Dr. Varner's testimony.

Best,

**Xavi Giroud**
She/Her/Hers

----------------------------------------
**KIRKLAND & ELLIS LLP**
300 North LaSalle, Chicago, IL 60654
**T** +1 312 862 4105  **M** +1 520 834 6878
**F** +1 312 862 2200
----------------------------------------
xaviere.giroud@kirkland.com

---

**From:** Giroud, Xavi
**Sent:** Wednesday, March 15, 2023 9:18 PM
**To:** 'Abner, Ava' <aabner@ulmer.com>
**Cc:** james.taylor@saul.com; Streifthau-Livizos, Michelle C. <michelle.streifthau-livizos@saul.com>; Deere-DDEL <Deere-DDEL@ulmer.com>; #ESCO_Deere KE Team <ESCO_Deere_KE_Team@kirkland.com>; kkeller@shawkeller.com; nhoeschen@shawkeller.com
**Subject:** RE: ESCO v. Deere

Hi Ava,

While DEERE_0048761 does contain some data for FY22, it does not contain standard cost data.  Likewise, DEERE_0004659 does not contain standard cost data for FY22.  This is acknowledged by Deere's own expert: "DEERE_0048761 does not contain Standard Cost data, thus I do not calculate profitability metrics for FY 2022."  (Becker Op. Rep. at Ex. SLB-3A.)  So that profitability metrics for FY22 can be calculated, please produce standard cost data for FY22 or provide your availability to meet and confer tomorrow regarding this issue.

Thanks,

**Xavi Giroud**
She/Her/Hers

----------------------------------------

**KIRKLAND & ELLIS LLP**
300 North LaSalle, Chicago, IL 60654
T +1 312 862 4105  M +1 520 834 6878
F +1 312 862 2200

-----------------------------------
xaviere.giroud@kirkland.com

---

**From:** Abner, Ava <aabner@ulmer.com>
**Sent:** Wednesday, March 15, 2023 7:18 PM
**To:** Giroud, Xavi <xaviere.giroud@kirkland.com>
**Cc:** james.taylor@saul.com; Streifthau-Livizos, Michelle C. <michelle.streifthau-livizos@saul.com>; Deere-DDEL <Deere-DDEL@ulmer.com>; #ESCO_Deere KE Team <ESCO_Deere_KE_Team@kirkland.com>; kkeller@shawkeller.com; nhoeschen@shawkeller.com
**Subject:** Re: ESCO v. Deere

---

> **This message is from an EXTERNAL SENDER**
> Be cautious, particularly with links and attachments.

Xavi,

DEERE_0048761 contains gross sales, discounts, warranties, net sales, quantities, and prices for each accused product for *FY22*.  If you meant *FY23*, we do not see an immediate need to update the information and you fail to explain the purported urgency of your request. As you know from our previous productions of updated sales information, the information ESCO seeks is not kept in the ordinary course of business in the format reflected in DEERE_0048761.  Thus, each time ESCO requests updated sales information Deere must spend time and resources to generate an updated report.  With trial in September, we anticipate that ESCO will request another update in the months to come.  Absent justification, repeated requests for updates would cause Deere undue burden. Please explain ESCO's immediate need for an update so we can have a fully informed discussion of your request with our client.

Regards,

Ava

> On Mar 14, 2023, at 7:42 PM, Giroud, Xavi <xaviere.giroud@kirkland.com> wrote:
>
> Counsel,
>
> DEERE_0048761, on which Dr. Becker relies for Deere's profitability metrics (*see* Becker Op. Rep. at Ex. SLB-3A), does not contain data for FY2022.  This data is relevant at least to *Georgia-Pacific* Factors 8 ("The established profitability of the product made under the patent; its commercial success; and its current popularity") and 15 ("The amount that a licensor (such as the patentee) and a licensee (such as

the accused infringer) would have agreed upon (at the time the alleged infringement began) if both had been reasonably and voluntarily trying to reach an agreement").  Dr. Becker agrees that such data is relevant.  *See* Becker Rough Tr. at 193.  Given that Deere's FY2022 ended on October 31, 2022 (*see* Budan Dep. Tr. at 61; Becker Op. Rep. at Ex. SLB-3A) and that Deere's 10-Q statement for Q1 FY2023 is available and shows profitability data for Deere as a whole through January 31, 2023, Deere has access to cost data through at least January 31, 2023.  Accordingly, please produce an updated version of DEERE_0048761 that contains data through at least January 31, 2023 by Thursday, March 16, 2023.  If Deere disagrees, please provide your availability to meet and confer tomorrow.

Best,

**Xavi Giroud**

**She/Her/Hers**

------------------------------------

**KIRKLAND & ELLIS LLP**

300 North LaSalle, Chicago, IL 60654

**T** +1 312 862 4105  **M** +1 520 834 6878

**F** +1 312 862 2200

------------------------------------

xaviere.giroud@kirkland.com

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

# EXHIBIT 13

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ESCO GROUP LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 1:20-1679-WCB |
| v. | ) | |
| | ) | |
| DEERE & COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**REPLY EXPERT REPORT OF HEZEKIAH HOLLAND
REGARDING INFRINGEMENT**

DATED: March 3, 2023

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

## **TABLE OF CONTENTS**

<u>**Page**</u>

I.      Introduction ............................................................................................................. 1

II.     Summary of Opinions .......................................................................................... 3

III.    Materials considered ........................................................................................... 4

IV.     Applicable Legal Principles ............................................................................... 5

V.      Dr. Klopp Misunderstands the Scanning Performed ...................................... 5

VI.     The TK System Infringes the Asserted Claims .............................................. 16

        A.      The TK System Infringes the '662 Patent .......................................... 19

        B.      The TK System Infringes the '175 Patent ........................................... 32

VII.    The Supposed Non-Infringing Alternative is Unacceptable ........................ 43

VIII.   CAD Analysis .................................................................................................... 52

IX.     Compensation and Prior Testimony ............................................................... 54

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

respective projection in the socket." In fact, claim 17 defines that the "projection has a generally ***V-shaped configuration***." As such, Dr. Klopp's statement that the TK System has a "V-groove" demonstrates that the TK System also has a "slot corresponding in shape with" the V-shaped configuration of the TK System's projection.

## VII. THE SUPPOSED NON-INFRINGING ALTERNATIVE IS UNACCEPTABLE

93.    Dr. Klopp opines that Deere's redesign of the TK System tooth, the so-called "Rev A1 design," is a non-infringing alternative to the TK System. Dr. Klopp is incorrect.

94.    I have reviewed the expert report of Dr. Umberger and his analysis of the Dr. Klopp's FEA. To start, Dr. Klopp's FEA does not provide a full picture of how the systems would operate under the load. First, it appears that the model Dr. Klopp ran is at MMC rather than nominal. This is supported by engineering drawings produced by Deere in discovery. Second, the load Dr. Klopp used is not representative of actual working conditions and loads experienced in the field for this type of wear assembly. Third, Dr. Klopp applied laterally constrained loading perfectly on the centerline of the product without considering eccentric, realistic loading. In the field, wear assemblies will experience loading from multiple angles simultaneously. Therefore, Dr. Klopp's loading provides an artificial view of how

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

specific loading might impact these parts.  Finally, Dr. Klopp used a friction factor that is not representative of field conditions and mating part movement.  The friction factor experienced in the field is likely lower than that used by Dr. Klopp, due in part to introduction of materials between the metal components during digging operation, e.g., water, sand, soil, etc.

95.    As shown in 3-dimensional computer models of the A1 redesign, Deere has ███████████████████████████████████, which necessitates that excavation loads be carried at angled portions of the foremost contacting portion of the redesign:



HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY



96.     In this respect, the A1 redesign is much like ███████████████ of the prior art, which suffered from a tendency to eject a tooth from an adapter in reaction to any excavation loads having a force component not parallel to the longitudinal axis of the wear assembly. This ejection force must be counteracted by a locking or retaining mechanism. The imposition of loads on a retaining pin was one reason the prior art had failed to achieve a hammerless locking feature.

97.     Though Dr. Klopp contends that Deere's A1 redesign has "similar distributions of stress around the socket and at the base of the nose at comparable stress magnitudes as the Accused Products," that is simply untrue. Klopp Reb. ¶ 210.

45

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

Looking at the figures that Dr. Klopp provided in his report, the A1 redesign has regions of pronounced stresses—both greater in magnitude and area—surrounding the opening for receiving a locking mechanism. Those stresses are induced by the additional loading imposed on the lock or retaining mechanism, which is transmitted to the adapter.



HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

98.     Perhaps more important is that Dr. Klopp excludes key figures and views showing the stress contours on the lock or retaining mechanism when used with the A1 redesign.  I have reviewed figures that Dr. Umberger extracted from Dr. Klopp's FEA of the A1 redesign, and those figures prove that the A1 redesign would be unacceptable to customers of the TK System.

99.     Specifically, the figures from Dr. Umberger's report and Dr. Klopp's FEA show that the retaining mechanism when used in conjunction with the A1 rev experiences excessive loading, even under the artificially low load of 1-ton used by Dr. Klopp in his FEA.  That is, the A1 redesign shifts loads to the retention mechanism due to its wedge-shaped geometry, and the resultant stresses on the pin shown in Dr. Klopp's FEA—even under low loads—are of such a magnitude that the retaining mechanism would likely experience increased wear an reduced wear life:



HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY



100. Deformed or damaged pins would defeat the purpose of the TK System's hammerless feature which, as Mr. Simmons testified, is the feature for which customers buy the TK System. According to Mr. Simmons, the hammerless feature is the *only* reason that "makes customers buy the TK Series teeth" "over [other] teeth" available on the market. Simmons Tr. at 46:7–17. Damage and deformation would make it exceedingly difficult to remove the retention mechanism and would require either hammering or cutting in the field for removal.  Moreover, the excessive forces that would be experienced by the A1 redesign would also likely result in shorter nose life, i.e., fewer point changes before the nose is too damaged and needs to be replaced.  In short, the A1 redesign would result in concentrated loading in areas of the wear assembly that would create problems under all types of

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

loading, including torsional, horizontal, and vertical loading.  This will result in accelerated wear, localized high stresses, and a less reliable system.

101.   Side-by-side comparisons of the A1 redesign and the original TK series design highlight how the system carries load differently (both magnitude and location of the loads), which would result in meaningfully different performance between the two systems.



**HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY**



**HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY**



HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

102.   Though Dr. Klopp's FEA alone proves that the A1 redesign is not acceptable to customers of the TK System, I also understand based on the testimony of Mr. Ruvang that the A1 redesign has been tested in the field.  Ruvang Tr. at 144:7–20, 148:20–24.  I find it unusual that Dr. Klopp makes no mention of this field testing, much less offer any analysis of any results of field testing.  Field testing of components is the industry standard for determining the acceptability of any design, because real-world field conditions (e.g., impact loading, non-uniform loads, cycling, and fatigue) are exceedingly difficult to recreate using computer modeling.  Certainly, Dr. Klopp's FEA does not attempt to recreate such diverse field conditions, and instead opts for five simple load "conditions" based on a nominal design of the A1 redesign.  Klopp Reb. ¶ 210.

## VIII.  CAD ANALYSIS

103.   I have also reviewed the CAD dimensional analysis conducted by Dr. Umberger.  The CAD model that Dr. Klopp produced with his report was not available during fact discovery.  Review of the model, which the file name suggests is of a TK 350 product, reinforces the results of my analysis of Deere documents and the 3D scans of exemplar parts.  In particular, the model confirms that the stabilizing surfaces on the nose and socket are nominally designed to be 3-4° from parallel with the adapter and socket's longitudinal axis.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

## IX.   COMPENSATION AND PRIOR TESTIMONY

104.   I am being compensated for my work as an expert with respect to this litigation at my customary hourly rate of $295/hr.   My compensation is not contingent and does not depend upon the content of my opinions or the outcome of this case.

105.   I have not testified as an expert at trial or by deposition in the previous four years.

DATED:  March 3, 2023

 

_____

HEZEKIAH HOLLAND

# EXHIBIT 14



# Investigative Report

## ESCO Group v. Deere & Company
ESi Matter #: 95889

**HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY**



430 Technology Parkway NW
Peachtree Corners, GA 30092

# Investigative Report

## ESCO Group v. Deere & Company
ESi Matter #: 95889

**Report Prepared For**

Kirkland & Ellis
300 N. La Salle Street
Chicago, IL  60654

**Submitted by:**

Pierce Umberger, Ph.D., P.E.
Senior Managing Consultant/Director
GA P.E. | Expires: December 31, 2023

March 3, 2023
Date

This report and its contents are the Work Product of Engineering Systems Inc. (ESi).  This report should only be duplicated or distributed in its entirety.  This report may contain confidential or court protected information; please contact an authorized entity prior to distributing. Conclusions reached and opinions offered in this report are based upon the data and information available to ESi at the time of this report, and may be subject to revision after the date of publication, as additional information or data becomes available.

Copyright ESi © 2023 - All Rights Reserved



# Table of Contents

**Introduction**..................................................................................................................**3**

**Basis for this Report**......................................................................................................**3**

**Background**.....................................................................................................................**3**

**Analysis and Discussion**................................................................................................**6**

    TK350 3D Model Measurements ..................................................................................... 6

    Analysis of Exponent's FEA ......................................................................................... 11

        General Comments.................................................................................................... 11

        Model Details ............................................................................................................ 12

**Conclusions** ................................................................................................................**17**

**HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY**



## Analysis of Exponent's FEA

ESi received analysis files[7] related to FEA discussed in Dr. Richard Klopp's rebuttal report.[8] Dr. Klopp analyzed five separate loading scenarios on both the Deere TK geometry and the "non-infringing alternative" "Rev A1" geometry using Abaqus, a FEA software developed by Dassault Systèmes. Dr. Klopp's Figure 32 is repeated here as Figure 14 for context on the geometries analyzed. The individual loading scenarios included a 2000 lbf load applied to the tip of the tooth as, "(a) thrust toward the nose, (b) vertically downward, (c) vertically upward, and (d) horizontally" and a torsional (twisting) load at the tip of the tooth of 6000 in-lbf.[9] No combined loading conditions were analyzed. Material properties were linear elastic, effectively simulating components with infinite material strength, rather than allowing plastic deformation of regions experiencing stresses in excess of the material strength.

## General Comments

The loading conditions chosen by Dr. Klopp are significantly less severe than the loading conditions expected in actual service. By way of example, the perpendicular tip load that could reportedly be experienced by the tooth during use is in excess of 40,000 lbf; over 20x the 2000 lbf load used by Dr. Klopp in his analysis.[10,11,12] As a result, the analyses do not deform and stress the components significantly relative to actual service limits. This means that load redistributions that might occur as the assembly deforms during normal use are not captured by the models. In addition, a number of load cases have regions with stresses approaching and exceeding the materials' elastic limit (i.e. yield strength). When a material begins to yield, it will redistribute load to the surrounding material. This phenomenon is also not captured in the FEA models.

Dr. Klopp states, "none of the stress magnitudes are of a concern for failure of hardened steel castings at issue here under 1-ton loading on a tooth."[13] In light of the fact that applied loads may be nearly 20x the load applied by Dr. Klopp and, as a result, stresses will exceed material yield, assessment of stress levels at a 2000 lbf load is not a meaningful evaluation of the behavior of the assembly throughout the design envelope.

While Dr. Klopp dismisses areas of high stress as being solely related to "sharp features, which mechanical engineers call stress concentrations,"[14] review of the FEA results show this is clearly not the case. In many instances there are high stress regions well removed from any stress concentrations, as typified in Figure 15 for the Rev A1 geometry with a vertically downward (Neg Y) load. Therefore, it is not appropriate to exclusively consider the "green regions"[15] in order to assess the expected performance in the field. There are also clear differences in load path and stress distributions between the two geometries for a given load type. As a result, areas of high

---

[7] ESi received .CAE, .INP, and .ODB files for review
[8] Rebuttal Expert Report of Dr. Richard W. Klopp, P.E., F.A.S.M.E., executed February 8, 2023, p. 91-103
[9] Rebuttal Expert Report of Dr. Richard W. Klopp, P.E., F.A.S.M.E., executed February 8, 2023, p. 95
[10] John Deere TK350C125 Bucket Tooth Adapter, TK350 Series Product Page
[11] John Deere TK350C125B: TK Tooth Adapter Product Page
[12] John Deere K-Series 655K / 755K Crawler Loaders Product Info & Specifications
[13] Rebuttal Expert Report of Dr. Richard W. Klopp, P.E., F.A.S.M.E., executed February 8, 2023, p. 96
[14] Rebuttal Expert Report of Dr. Richard W. Klopp, P.E., F.A.S.M.E., executed February 8, 2023, p. 96
[15] Rebuttal Expert Report of Dr. Richard W. Klopp, P.E., F.A.S.M.E., executed February 8, 2023, p. 96

**HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY**



stress would need to be assessed against design expectations and performance metrics in order to determine if the revised design would exhibit similar performance in service.

## Model Details

Review of the FEA modeling indicates that the tip load is applied to the tooth via a single point at the center of the tooth tip. This point is mathematically joined to the end-radius of the tooth via a kinematic coupling constraint, effectively distributing the load across the entire tip of the tooth. Loading for each of the five load cases is applied through this point. For the vertical and lateral load cases, a displacement constraint is also placed on this single point in addition to the applied load. The displacement boundary condition is in the direction 90° to the load (e.g. a lateral constraint when a vertical load is applied and a vertical constraint when a lateral load is applied) and is set to zero, prohibiting any movement of the tooth tip in the constrained direction. This translation constraint artificially prohibits the tooth from both translating and, because it is mathematically applied to the entire tip, rotating. Both of these restrictions to motion of the tooth are unrealistic and artificial.

While a loading approach consisting of an individual load in a single direction is not an unreasonable way to explore the reaction of the assembly to various load types, service loads will not match these simplified single-direction loadings. It should be noted that the axis of the nose is inclined at an angle of 10° relative to the coordinate system used in Dr. Klopp's analysis, and as a result, his loads are applied at an angle relative to the nose axis, as shown in Figure 16. Additionally, service loads are unlikely to be perfectly centered and evenly distributed. In addition, loads are likely going to be imparted on the tooth in a combined fashion (for instance, a combined vertical and transverse load applied with a twisting component). This means the overall stress state in the assembly will be some superposition of the individual load cases analyzed by Dr. Klopp. This could significantly amplify the stress in a given area. It may also shift the tooth on the base, altering clearance between components and resulting in different component positions and contact conditions than those analyzed by Dr. Klopp.

The modeling approach used by Dr. Klopp utilized a feature called contact stabilization in Abaqus to assist in resolving the contact between the various components. Contact stabilization adds artificial damping to the solution. When using this feature, "it is important to verify that the presence of contact stabilization does not significantly alter the physics of the problem."[16] This is done by comparing the energy dissipation due to stabilization to the internal energy in the components (in this case, strain energy). The dissipation energy should be small relative to the strain energy, as outlined in documentation published by the software developer. The models produced by Dr. Klopp do not meet this criterion. In some cases, the stabilization energy is over 1100% of the strain energy, as shown in Figure 17.

Notwithstanding the discussion above, Dr. Klopp's analysis demonstrates substantive differences between the response of the Deere TK and the Rev A1 designs as shown in Figure 34 of his report, shown as an excerpt in Figure 18 and Figure 19.

---

[16] Dassault Systèmes SIMULIA User Assistance 2022, "Postprocessing"

**HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY**

ESCO Group v. Deere & Company
ESi Matter #: 95889





**Figure 14. Dr. Klopp's Figure 32 showing the general geometries analyzed with FEA.**

**HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY**



**ESCO Group v. Deere & Company**
ESi Matter #: 95889



**Figure 15. Regions of high stress in BlackCat-RevA1-v3-NegY-S2S-r1 not associated with "sharp features."**



**Figure 16. Inclination of nose axis (orange) relative to FEA coordinate system orientation (red).**

**HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY**





**Figure 17. Comparison of strain energy and artificial stabilization energy.**

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY





**Figure 18. Load path variations between Deere TK and Rev A1 designs.**[17]



**Figure 19. Load path variations between Deere TK and Rev A1 designs.**[18]

---

[17] Excerpt from Rebuttal Expert Report of Dr. Richard W. Klopp, P.E., F.A.S.M.E., executed February 8, 2023
[18] Images taken from .ODB files produced by Exponent.

**HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY**

# EXHIBIT 15

Page 1

1            IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF DELAWARE

3

4

5    ESCO GROUP LLC,                    )

6                   Plaintiff,    )

7         VS.                       )   NO. 20-1679-WCB-MPT

8    DEERE & COMPANY,                   )

9                   Defendant.    )

10   _____)

11

12

13   VIDEOCONFERENCE DEPOSITION OF:

14              THOMAS VARNER, PH.D.

15              MONDAY, MARCH 13, 2023

16              9:01 A.M.

17

18

19

20   REPORTED BY:

21              Sari M. Knudsen

22              CSR No. 13109

23

24

25

Page 2

1          Videoconference Deposition of THOMAS

2          VARNER, PH.D., taken on behalf of the

3          DEFENDANTS, at Oakland, California, on

4          MONDAY, MARCH 13, 2023, before Sari M.

5          Knudsen, CSR No. 13109.

6

7

8   APPEARANCES OF COUNSEL:

9

10  FOR THE PLAINTIFF:

11          KIRKLAND & ELLIS, LLP

12          BY:  XAVIERE GIROUD, ESQ.

13          300 North LaSalle

14          Chicago, Illinois  60654

15          312-862-2000

16          (VIA VIDEOCONFERENCE)

17

18

19

20

21

22

23

24

25

Page 151

1   there.

2          You determined that from the testimony of

3   Adam Stitzel.  Correct?

4      A    In part.

5          The other part comes from ESCO documents

6   talking about their overall -- ESCO's overall share

7   of the North American market for construction

8   expendables.

9      Q    So you looked at Mr. Stitzel's testimony,

10  and you looked at ESCO documents talking about its

11  market share --

12     A    Correct.

13     Q    -- for North American expendables?

14     A    That's right.  Correct.

15     Q    And based upon those sources, you

16  determined that ESCO -- ESCO's share of the premium

17  market for bucket expendables in the U.S. was

18  ██████████?

19     A    Correct.

20     Q    And then you also determined that Deere's

21  share of that market was ████████.  Correct?

22     A    Based on Deere's testimony.

23     Q    Based on the testimony of Mr. Budan.

24  Correct?

25     A    Correct.

Page 152

1   Q   Did you consider any documents in

2   determining that Deere's percentage of the market

3   was ███████████?

4   A   There -- there is market share

5   information.  Just sitting here, I can't remember if

6   I had that in mind when I was creating this or not.

7   But it -- it's a similar number.

8   Q   Okay.  Well, we'll talk through some of the

9   documents, and I think maybe we'll hit it.

10          Okay.  So my question was do you have any

11  source for Deere having █████████t of the North

12  American -- sorry -- the premium segment of the

13  North American market for bucket expendables other

14  than Mr. Budan's testimony?

15  A   Actually, I believe Mr. Budan was referring

16  to Deere's percentage of the sales it makes on its

17  own equipment.  So...

18  Q   Correct.

19  A   It's not quite the same thing as the

20  overall North American market.  But that's the

21  information we have.  And I believe that ████████████

22  refers to not just the premium segment but all of

23  the segments.  And so --

24  Q   So --

25  A   -- again, I was being very conservative

Page 153

1    here.  I could have said, well, if it's ████████

2    of all bucket teeth, if we go with what Mr. Stitzel

3    says, that ██████████ of the construction

4    expendables market is in the premium segment, I

5    could have said Deere's TK proportion is closer to

6    40 percent.  But again, I was being very

7    conservative here.

8              And I said all right.  Let's just use a

9    ████████████ and then also the ██████████, recognizing

10   that Deere's TK really should be part of the premium

11   segment.

12       Q    Okay.  So back to Mr. Budan's testimony.

13             You understand Mr. Budan's testimony

14   regarding ██████████ to be referring to Deere's

15   share of the market for replacement teeth on Deere

16   equipment.  Correct?

17       A    Why would you limit that to teeth as

18   opposed to adapters and teeth?

19       Q    I did not intend to.  So let me -- let me

20   ask that question differently.

21             You understand Mr. Budan's ██████████ of TK

22   products -- sorry.  Let me try that again.  I didn't

23   intend to limit it.  Let me see if I can ask it in a

24   way that does not so limit it.

25             You understand that Mr. Budan's ████████████

Page 168

1  Ultralok sales column of this chart accurate?

2      A    I have to check it.

3      Q    Please do.  You can check against your

4  Exhibit 2.5, I guess it is.

5      A    Okay.

6      Q    Okay.  And then the "Dr. Varner's market

7  share of Ultralok, ██████████ ," that is what you

8  determined to be the market share of Ultralok for

9  the premium segment of the U.S. construction

10 expendables market.  Correct?

11     A    Yes.

12     Q    Okay.  And then the accused product net

13 sales in the next column where it says ████████

14 for 2019, ██████████  for 2020 and █████████  for

15 2021 -- those numbers are accurate.  Correct?

16     A    They look to be about accurate.

17     Q    So you see here that Dr. Becker concludes

18 that based upon a comparison of the Ultralok sales

19 to the TK sales, the share for TK of the premium

20 segment of the U.S. construction expendables market

21 would be ████████████████████ , depending on

22 fiscal year?

23     A    ██████████████████████████████

██  ██████  ████████

25     Q    So his calculations there are correct.

Page 169

1    Right?

2        A    Looks like the math is right.  He got the

3    wrong concept though.

4        Q    Okay.  So if Ultralok has ▮▮▮▮▮ of the

5    premium segment of the construction expendables

6    market, then the TK products have ▮▮▮▮▮▮▮

7    of that market.  Correct?

8        A    If these calculations are right.  But it's

9    irrelevant for my damages analysis.

10       Q    No.  I understand that, Dr. Varner.  We'll

11   get to that.

12            Let's go back to your opening report,

13   Exhibit 2.

14       A    Okay.

15       Q    Okay.  And Exhibit 6.

16            (Whereupon Defendants' Exhibit 6

17            was marked for identification)

18   BY MS. RODMAN:

19       Q    So in Exhibit 6, you are comparing ESCO's

20   26 percent of the premium segment of the U.S.

21   construction expendables market with the ▮▮▮▮

22   for the Deere TK Series for the same market.

23       A    No.  So this is what I explained to you

24   before.  So let me go over it again.  It seems to be

25   a confusing point.

1        So what we are interested in is how many

2   sales did the -- how many sales were there of the

3   TK Series product and what percentage does that

4   comprise of all of the teeth -- tooth systems put on

5   Deere equipment.  That's the real market we are

6   looking at.

7        Then we go in.  And I went in and said,

8   okay.  It's ███████████.  Deere has ███████████ of

9   that.  That's what Mr. Budan says.  And that's

10  verified by the Deere documents.  It talks about all

11  of the products that it sold.  All of the bucket

12  teeth products that it sold.  So we are talking

13  about the ███████████ that Deere is selling.

14       Now where are those going to go.  If they

15  are not in the market, where does the ███████████ go.

16  It was going to go to the other ███████████.

17       So now I'm trying to figure out, well, what

18  portion of that other ███████████ does ESCO have.

19  Again, I'm being very conservative here and saying,

20  okay.  They are going to have ███████████ of the ██

21  ███████████ ███████████  That's where the third comes

22  from.

23       The problem with the analysis that you were

24  just talking about, Dr. Becker's analysis, is that

25  it directly contradicts the Deere TK Series

Page 171

1    ███████████  estimate from Dr. Becker's own client.

2    So it really is a question of mixing apples and

3    oranges here.

4        Q    It is indeed a question of mixing apples

5    and oranges.  But I don't think we agree on

6    precisely how.

7             So where in your opening report --

8    actually, strike that.  We'll...

9             You would agree with me, I think, that if

10   we are looking at Deere's share of the total premium

11   segment of the U.S. construction expendables market,

12   that it is ███████████████████ .  Correct?

13       A    It's ███████████████ .

14       Q    Okay.  All right.  So let's look at -- give

15   me one second.

16            Let's look -- I'm going to mark a new

17   exhibit which is going to be -- what we have as T,

18   as in Tom, will become Exhibit 6.

19            (Whereupon Defendant's Exhibit 6

20            was marked for identification)

21       THE WITNESS:  Okay.

22   BY MS. RODMAN:

23       Q    Okay.  I lost my Exhibit 6.

24            Do you recognize Exhibit 6?

25       A    It's one of the many documents that Deere

Page 172

1   produced about its TK Series teeth.

2        Q    Okay.  You looked at this document and

3   discuss it in your reply report.  Correct?

4        A    I believe it is.

5             If you go to -- what is that?  The fourth

6   page.  Can you go to the fourth page of that

7   document?

8        Q    Yeah.  Sorry.  I am.  I'm on the fourth

9   page.

10       A    Okay.  Can you go to the next page then.

11       Q    Oh, you are talking about the --

12       A    There we go.

13       Q    There we go.

14            All right.  So what -- what did you

15   determine from this document was relevant to

16   considering your market share analysis?

17       A    We can look at year-to-date sales, and we

18   can see that TK up there.  It says -- well, it

19   doesn't have the percent.  It has percent changed.

20            So the first column that says "year-to-date

21   sales," that would be the third column.  And it has

22   TK -- not sure what the units are here.  But it says

23   ████████        And then it has ESCO, Hensley and so on.

24       Q    All right.  So you looked at this page to

25   determine Deere's percentage of the market for

Page 192

1           All right.  You conclude in your reasonable

2    royalty analysis that a hypothetical negotiation

3    between the parties in 2014 would have resulted in a

4    royalty rate of 8 percent.  Correct?

5       A    That's the conclusion of this whole

6    section.

7       Q    How did you determine that reasonable

8    royalty rate of 8 percent?

9       A    Well, I lay that out in some detail in my

10   report.  I looked at all of the Georgia-Pacific

11   Factors and then I looked at -- I'll get to it.

12          I looked at in the end, this -- those are

13   the general Georgia-Pacific Factors And then I

14   looked at case-specific factors near the end of that

15   section, page 53 through 57, and reached an opinion

16   that 8 percent would be a reasonable royalty.

17          Excuse me.

18      Q    And where did the 8 percent come from?

19      A    Can you hear me now?

20      Q    Yes.

21      A    Okay.  So the 8 percent -- again, it comes

22   from looking at all the Georgia-Pacific Factors And

23   I looked at some other checks on what the parties

24   might have agreed to, what the parties would have

25   looked at -- and that's on pages 53 through

Page 193

1   57 -- to arrive at that number.

2        Q    All right.  Part of how you arrived at the

3   8 percent is that you looked at what you called a

4   profit premium between Ultralok and Super V in, I

5   think it was, 2020, 2021 and 2022.  Correct?

6        A    You are talking about paragraph 125?

7        Q    I think it starts there.  Yes.

8        A    Yes.

9        Q    So for that analysis, you looked at the

10  difference between the profits for Super V in 2020,

11  2021 and 2022 and the profits for Ultralok in those

12  same years.  Correct?

13       A    Correct.

14       Q    You determined that Ultralok's sales --

15  Ultralok's profit margin -- excuse me -- was an

16  average of ██████████████ than Super V's profit

17  margin in 2020, 2021 and 2022?

18       A    Actually, this was part of the errata.  And

19  the number isn't ████

20       Q    Oh, that's right.

21       A    ████████████████████████████ ████████

    ██  ████████████████ ██████████

23       Q    Okay.  So you determined that there was an

24  ████████████████████ for Ultralok

25  than Super V in the years 2020 to 2022?

Page 194

1      A     Correct.

2      Q     Why is the difference in ████ between

3  Super V and Ultralok in 2020, 2021 and 2022 relevant

4  to a hypothetical negotiation in 2014?

5      A     Well, it's my understanding that you can

6  look at future events.  This is the Sinclair

7  Refining case.  It goes back decades where I believe

8  it was the Supreme Court said it's reasonable to

9  consider future events.

10          And so looking back at 2014, the most

11 reasonable time to look at comparing these two is

12 over the damages period, which is 20 -- 2020 to

13 2022.

14          So just seemed to make sense to look at

15 those -- those periods to see what sort of a profit

16 difference there was between a product that was --

17 between those two products as it relates to whether

18 it was on-patent or off-patent.

19      Q     Do you have an understanding of what types

20 of information after the hypothetical negotiation

21 could be considered?

22      A     Well, I've seen all sorts of types.

23          So I -- I've never seen a restriction on

24 information that can be considered.  But I don't

25 know the body of case law as it relates to what can

Page 195

1    be considered and what cannot.

2           This seemed like a very useful comparison,

3    looking at a product that was on-patent versus

4    off-patent over the damages period.  So for me, it

5    seemed relevant to do that analysis.

6      Q    You had data to compare the profitability

7    of Super V and Ultralok in 2014.  Correct?

8      A    Yes.  We did have that data.

9      Q    Why didn't you consider a comparison in

10   2014 as opposed to a comparison in 2020, '21 and

11   '22?

12     A    Well, first, it's over the damages period.

13   And market conditions can change over time.

14          The most important question here is related

15   to damages.  The other is the profitability of the

16   Ultralok product.  It's a more mature product when

17   you get further out in time.

18          So I -- again, I would have to go back and

19   look at the specific profitability numbers to see if

20   those leveled out at an earlier period or not.

21     Q    You understand that the damages period in

22   this case is determined by solely when ESCO filed

23   the Complaint.  Correct?

24     A    That's what I understand.  That relates to

25   market.

Page 196

1      Q    So you understand that the damages period

2  being limited to 20 -- to December 10, 2020 and

3  after doesn't have anything to do with the economic

4  considerations that would have impacted the

5  parties --

6      MS. GIROUD:  Objection.  Form.

7  BY MS. RODMAN:

8      Q    -- at any point?

9      A    I -- I'm not sure of that.  It sounds like

10  a legal question.

11      Q    Would the parties to a hypothetical

12  negotiation in 2014 have known the difference in

13  profitability between Super V and Ultralok in 2020,

14  2021 and 2022?

15      A    My understanding is that they could have

16  looked into the future.  Again, it's per the

17  Sinclair Refining case.  And they would have known

18  what profitability was for these products.  And

19  that --

20      Q    And that's your understanding --

21      A    And that would have informed them about a

22  reasonable royalty.

23      Q    You would agree with me though that in

24  actuality, in reality in 2014, ESCO and Deere would

25  not have known anything about the difference in

1  profitability between Ultralok and Super V in 2020,

2  2021 and 2022?

3      A     They may have been able to make inferences

4  based on data up to that point.  But if they didn't

5  have that data, I guess you would have to say you

6  didn't have any sales data.  You wouldn't even know

7  what the sales were going to be for the TK or the

8  Ultralok or anything about the market shares.

9      Q     Have you seen any information in what you

10  looked at in this case that would indicate to you

11  that ESCO or Deere was making inferences about the

12  difference in ██████████ between Ultralok and

13  Super V in 2014 as to what that would be in '20, '21

14  and '22?

15      A     Well, I'm sure that as part of a

16  hypothetical negotiation, the question of

17  profitability of these products would have been a

18  topic of discussion and part of the negotiations.

19      Q     Why?

20      A     Because reasonable royalties relate to

21  profitability.  There's no reason to exclude

22  information about profitability as part of a

23  hypothetical negotiation.

24      Q     Reasonable royalties relate to

25  profitability of what products?

Page 198

1      A    Well, it would relate to the TK Series

2    certainly because the parties would want to know the

3    impact on the TK Series products.  The impact of

4    profitability on TK Series products due to paying a

5    royalty rate, receiving a royalty rate.

6           And as far as profitability of the ESCO

7    products, well, just a general understanding of a

8    competing product in the market, how that might

9    affect it.

10          And then finally the discussion could have

11   been around, okay.  What is patent protection worth,

12   and do we have any metrics to analyze that?  And in

13   this case, we did.

14     Q    The Super V product does not practice the

15   asserted patents.  Correct?

16     A    That's my understanding.

17     Q    And the Ultralok product doesn't practice

18   the asserted patents?

19     A    Correct.

20     Q    But in your opinion, at a hypothetical

21   negotiation in 2014, the parties would have

22   considered the ███████████ of the Super V and

23   Ultralok products?

24     A    I think they would have considered the

25   value of patent protection for products in this

1    market.  And we know that because both ESCO and

2    Deere -- there's testimony from both ESCO and Deere

3    about when different products go off-patent.  So

4    that's an important part of their consideration and

5    their strategic planning.

6              So I think there's very good to reason that

7    they would have been thinking about, okay, what do

8    you really get from patent protection in this

9    market.

10   Q    Okay.  But you didn't consider the value of

11   the asserted patents.  You considered the value of

12   the Super V patents.

13   A    I've looked at the ESCO Ultralok patents

14   and the Super V patents as a benchmark for measuring

15   patent protection.  And by extension, that also

16   makes competition in the market.

17   Q    You understand that the Nemisys three-piece

18   system practices at least one of the asserted

19   patents.  Correct?

20   A    Correct.

21   Q    And you understand that the Nemisys

22   three-piece system was replacing a prior legacy

23   product of ESCO's.  Correct?

24   A    Yeah.  I don't remember the specifics of

25   which product or products the Nemisys system was

Page 200

1    replacing.

2        Q    Did you consider a comparison of the

3    profitability of the Nemisys system to the products

4    that it replaced?

5        A    Well, it's getting pretty far afield from

6    the products that we're talking about.

7             If you've -- the Nemisys -- the three-piece

8    Nemisys relates to mining operations.  And for that

9    matter, the GeoVor relates to dredging.  Those are

10   different physical markets.  They are different

11   economic markets.

12       Q    But it's the same technology.  Correct?

13       A    It is the same technology.  But I didn't

14   give -- I didn't look at the dynamics of those two

15   markets to determine whether there was a price

16   premium or to what degree there is a price premium

17   for patent protection.

18            Instead, it makes more sense to look at the

19   actual market and look at a competing product to see

20   the effects the patent protection.

21       Q    And then you also considered that after

22   Super V went off-patent in 2013, that the gross

23   profit margins dropped by about 33 percent.

24   Correct?

25       A    I believe that was --

Page 201

1     Q    That's at 126?

2     A    Yeah.  Paragraph 126.

3     Q    Oh, you are right.  That is one that you

4  changed.

5          So it changed it in your errata to

6  24 percent.  Correct?

7     A    Yes.  That's what I was checking.

8     Q    I had a note.  And I had forgotten about it

9  anyway.

10     A    It says,

11          ████████████████████████████████████

   ████████████████████████████████████

   ████████████████████████████████████

   ███████████████████

15     Q    So for purposes of your analysis, you

16  assumed that the entirety of the ██████████████████

17  ██████████████  of Super V was attributable to the

18  patent protection.  Correct?

19     A    Yes.  After controlling for all the other

20  factors I talk about.  Especially in the reply

21  report.

22     Q    Did you consider any other reasons why

23  there might have been a reduction in the gross

24  profit margins of Super V after 2013?

25     A    Well, I did think about what other products