**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ESCO GROUP LLC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action No. 20-1679-WCB |
| | § | |
| DEERE & COMPANY, | § | **FILED UNDER SEAL** |
| | § | |
| *Defendant*. | § | |
| | § | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff ESCO Group LLC ("ESCO") brought this patent infringement action against defendant Deere & Company ("Deere"), alleging infringement of U.S. Patent No. 8,844,175 ("the '175 patent") and U.S. Patent No. 10,273,662 ("the '662 patent"). Fact and expert discovery are complete, and the parties have filed motions for summary judgment on various issues. On June 15, 2023, I held a telephonic hearing on the parties' motions.

**I.      Background**

The asserted patents in this case are directed to wear members and wear assemblies for use in excavating equipment. Various pieces of equipment, such as dredge cutterheads and excavating buckets, use teeth that are attached to the equipment to dig into the ground. Figure 1 of the '175 patent, which is reproduced below, depicts a conventional dredge cutterhead with teeth 5. '175 patent, col. 1, ll. 22–31.



FIG. 1
(Prior Art)

*Id.* at Fig. 1.

As the specification of the '175 patent explains, a tooth for excavating equipment frequently consists of a base (labeled "6" in the figure), which is "fixed to the arm[]" of the equipment; a point (labeled "7" in the figure), which is "releasably attached to the base[]"; and a lock (labeled "8" in the figure), which attaches the point to the base. *Id.* at col. 1, ll. 28–31. In the embodiments disclosed in the asserted patents, the point contains a "socket" that receives the nose of the base. *Id.* at col. 6, ll. 1–6. The asserted patents frequently refer to the point as the "wear member" and the combination of the point, base, and lock as the "wear assembly." *See id.* at col. 5, ll. 48–54; '662 patent, col. 2, ll. 60–64.

ESCO accuses Deere of infringing claims 4–6, 13–15, and 17–20 of the '175 patent, and claims 8–9, 12–13, 21–22, and 25–26 of the '662 patent. Dkt. No. 181 ¶¶ 2, 4. Claim 4 of the '175 patent is generally representative of the claims in that patent. It recites as follows:

> 4. A wear assembly for excavating equipment comprising: a base fixed to the excavating equipment; a wear member comprising a working section and a mounting section extending generally along a longitudinal axis of the wear member, the mounting section including a socket having a front stabilizing end and a rear stabilizing end, the front stabilizing end is forward of the rear stabilizing end,

2

the rear stabilizing end including a plurality of rear stabilizing surfaces, the front stabilizing end including a front thrust surface extending generally transverse to the longitudinal axis, and a top surface, a bottom surface, a first side surface, and a second side surface, each said top surface, bottom surface, first side surface, and second side surface extending rearwardly from the front thrust surface, wherein each of the first side surface and the second side surface has a transverse, inward projection in the front stabilizing end defined by bearing surfaces that are adjacent to and extend from the front thrust surface substantially parallel to the longitudinal axis in an axial direction; and an engagement system for releasably holding the wear member to the base.

'175 patent, cl. 4.

Claim 8 of the '662 patent is generally representative of the claims in that patent. It recites

as follows:

8. A wear assembly for excavating equipment comprising:

a base secured to the excavating equipment, the base including a front end with a front wall and front bearing surfaces, a rear end having opposite sides with a side recess in each of the sides, and a lock bearing surface;

a wear member including a rearward-opening socket for receiving the base, and an opening, the socket having a longitudinal axis and including (i) a front end with a front surface transverse to the longitudinal axis to bear against the front wall on the base, and a top stabilizing surface and a bottom stabilizing surface to bear against the front bearing surfaces on the base, and (ii) a rear end with a top wall, a bottom wall and side walls extending rearward from the front end, the side walls each including a pair of side stabilizing surfaces inclined relative to each other in different transverse directions so as to laterally converge inward toward a central location along the respective side wall and positioned to bear against complementary surfaces in respective side recesses in the base to resist both vertical and horizontal loads during excavating, said top stabilizing surface, said bottom stabilizing surface, and each said side stabilizing surface axially extending substantially parallel to the longitudinal axis; and

a lock received into the opening of the wear member and in contact with the lock bearing surface on the base to hold the wear member to the excavating equipment.

'662 patent, cl. 8.

Deere's accused products consist of a series of products from the "TK Series Tooth" system. Those products include bucket teeth, adapters, pins, and locks that can be used on excavating equipment. ESCO alleges that the TK Series products infringe its rights in the '175

and '662 patents.  Deere has recently developed another version of its accused wear assembly, called the "A1 design," which Deere contends does not infringe the asserted claims.  Dkt. No. 195-1, Exh. R ¶ 202.  The evidence of record does not establish whether the A1 design is commercially available at present.  *See* Dkt. No. 219-1, Exh. N ¶ 80 ("I understand that Deere has requested that Black Cat implement the A1 non-infringing alternative design into its regular production going forward."); Dkt. No. 202-7 at 122:5–10 (Deere's expert testifying that "[m]y understanding was that [the A1 redesign is available for sale to consumers], but I don't have independent evidence one way or the other.").

## II.    <u>Legal Standard</u>

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In deciding a motion for summary judgment, the court must draw all factual inferences in favor of the non-movant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In the case of an issue on which the moving party bears the burden of proof at trial, the party seeking summary judgment must establish "the absence of a genuine factual issue," and if that party does not establish such an absence, "the district court should deny summary judgment even if no opposing evidentiary matter is presented."  *Resol. Tr. Corp. v. Gill*, 960 F.2d 336, 340 (3d Cir. 1992).  However, "[o]nce a moving party with the burden of proof makes such an affirmative showing, it is entitled to summary judgment unless the non-moving party comes forward with probative evidence that would demonstrate the existence of a triable issue of fact."  *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003).

In the case of an issue on which the nonmoving party bears the burden of proof at trial, the party seeking summary judgment "bears the initial responsibility of informing the district court of

the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c) as of 1986).  The burden on the moving party in that situation can be satisfied "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.  If the moving party carries its burden, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (cleaned up); *see also* 10A Charles Alan Wright et al., *Federal Practice & Procedure* § 2727.1 (4th ed., April 2022 update).

### III.    Discussion

The parties have moved for summary judgment on various issues.  I address each issue raised in the sections below.

### A.    *Direct Infringement of the '175 Patent Claims*

Both Deere and ESCO have moved for summary judgment on the issue of direct infringement of the asserted claims of the '175 patent.  Dkt. No. 191.  Deere's non-infringement arguments focus on the claim limitations reciting "projections" at or near the front end of the socket of the wear member, i.e., the inner surface of the wear member that mates with the base.  Claim 6 of the '175 patent requires the first and second side surfaces of the socket to have "an inward projection in the front end axially extending from the front thrust surface."  '175 patent, cl. 6. Claims 4, 13, and 17 require the first and second side surfaces to have "a transverse, inward projection in the front stabilizing end defined by bearing surfaces that are adjacent to and extend from the front surface."  *Id.* at claim 4;  *see also id.* at cls. 13, 17 (reciting similar limitations).

Deere reads each of those claims to require that "the surfaces containing and defining the claimed projections must extend from the front thrust surface." Dkt. No. 195 at 6.

Under its interpretation of the claims, Deere argues that its accused products do not infringe because the accused sockets have "four large, beveled planar facets in between the accused front thrust surface and the accused side surfaces/projections." *Id.* The "planar facets" in the accused products are depicted in the image below between the surface shaded in blue and the white dotted line.



Dkt. No. 195-1, Exh. R ¶ 145.

Deere's expert, Richard Klopp, offered the opinion that the side surfaces and projections do not "extend from" the front thrust surface, but extend from the beveled planar facets. *Id.* ¶¶ 145–46. ESCO's expert, Hezekiah Holland, disagreed with Dr. Klopp's analysis, contending that the accused products satisfy the "projection" limitations of the asserted claims and rejecting Dr. Klopp's reading of the claims. Dkt. No. 195-1, Exh. O, at 16–30. Mr. Holland also offered the opinion that, even if Dr. Klopp's interpretation of the claim language were correct, the accused products would infringe under the doctrine of equivalents. *Id.* at 30.

### 1.    Construction of "Extending From"

The parties' positions with respect to this issue present a claim construction dispute regarding the term "extending from."  The court did not construe that term during the claim construction proceedings that previously occurred in this case, Dkt. No. 61 at 1–2, so I will resolve that dispute now.  Deere argues that the term "extending from" should be defined to mean "starting from" or "immediately adjacent to."  ESCO argues that the term refers merely to the direction in which the claimed projections extend.  For the reasons set forth below, Deere has the more persuasive position.

First, Deere's construction is more consistent with the plain meaning of the term "from." Under the plain and ordinary meaning of "from," it would not be proper to say, for example, that someone is traveling "from the courthouse to his office" when that person actually begins his journey three blocks away from the courthouse.  Such a statement would be proper only if the person were actually at the courthouse when beginning to travel.

Second, as Deere points out, the claims separately refer to the direction in which the claimed surfaces extend, which significantly undercuts ESCO's contention that the word "extending" refers merely to a direction.  For example, claim 4 of the '175 patent recites that the "side surfaces," which include the claimed projections, "extend[] *rearwardly* from the front thrust surface."  '175 patent, cl. 4 (emphasis added).  Likewise, the bearing surfaces that define the claimed projections are described as extending "from the front thrust surface substantially parallel to the longitudinal axis in an axial direction."  *Id.*  Thus, the word "extending" would add nothing to the claims if it were intended to refer simply to the direction in which the bearing surfaces extend.

Third, ESCO's contention that its construction is consistent with the figures of the '175 patent is unpersuasive. Figures 4 and 7 of the '175 patent appear to depict a narrow surface, which ESCO calls a "transition surface," that resides between the front thrust surface 170 and the top, bottom, and side surfaces (202a, 202b, and 202c, respectively) of the nose. '175 patent, Figs. 4, 7. Figure 4 of the '175 patent is reproduced below.



FIG. 4

*Id.* at Fig. 4. With respect to those figures, the specification explains that "the top and bottom stabilizing surfaces . . . extend rearward from their respective thrust faces." *Id.* at col. 9, ll. 50–52. However, there is no discussion in the specification of the so-called transition surface, and the figures appear to suggest that the surfaces of the nose start at the edge of the thrust face.[1] Accordingly, the more persuasive reading of the '175 patent is that the claimed surfaces include the so-called "transition surface" shown in the figures of the '175 patent.

---

[1] For example, the left edge of thrust face 170, shown in Figure 4, appears to depict the inward projections recited in the claim as ending at the thrust face. Moreover, the lines that demarcate the various surfaces (e.g., the lines defining side stabilizing surface 202c in Figure 4) appear to extend all the way to the thrust face.

ESCO also argues that accepting Deere's construction of "extending from" would read the term "adjacent to" out of the claims.  For example, claim 4 of the '175 patent recites "bearing surfaces that are *adjacent to and extend from* the front thrust surface." '175 patent, cl. 4 (emphasis added).    ESCO argues that if "extend[ing] from" were read to mean "starting from" or "immediately adjacent to," the term "adjacent to" in claim 4 would be superfluous.  It is true that "[a] claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so," *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005), and that the term "adjacent to" would add little to the claims if Deere's proposed construction of "extending from" is adopted.    However, the inference that "the use of [two] terms in close proximity in the same claim" means that "a different meaning should be assigned to each . . . is not conclusive."  *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1373 (Fed. Cir. 2004).  As the Federal Circuit has explained, "it is not unknown for different words to be used to express similar concepts, even though it may be poor drafting practice."  *Id.*  The terms "adjacent to" and "extend[ing] from" do not merely appear in close proximity in the claim, but they form a single phrase—"adjacent to and extend from."   In light of the awkwardness that would ensue from interpreting "extending from" in a manner contrary to its plain and ordinary meaning, the most persuasive reading of the disputed claim language is that the phrase "adjacent to and extend from" should be read as a single limitation requiring that the bearing surfaces start at the front thrust surface.

For those reasons, I conclude that Deere's construction of the term "extending from" is persuasive, and I therefore adopt that construction.  The term "extending from" will be construed to mean "starting from" or "immediately adjacent to."  Because the bearing surfaces in the accused products do not "extend from" the front thrust surface due to the presence of "beveled, planar

surfaces" between the front thrust surface and the bearing surfaces, Deere will be granted summary judgment that its accused products do not literally infringe the asserted claims of the '175 patent.

## 2.    Doctrine of Equivalents

Deere also moves for summary judgment that it does not infringe the asserted claims of the '175 patent under the doctrine of equivalents.  In particular, Deere argues that Mr. Holland's opinion on the doctrine of equivalents is not sufficient to support a finding of infringement, and a finding of infringement under the doctrine of equivalents is precluded due to prosecution history estoppel.  Because I find that prosecution history estoppel applies, I reach only that argument.

Amendment-based prosecution history estoppel arises "when an amendment is made to secure the patent and the amendment narrows the patent's scope."[2] *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 736 (2002).  That is because, as the Supreme Court has explained, "[a] patentee who narrows a claim as a condition for obtaining a patent disavows his claim to the broader subject matter."  *Id.* at 737.  When a proposed equivalent applies to a limitation that resulted from an amendment during prosecution, the patentee bears the burden "of showing that the amendment does not surrender the particular equivalent in question," and there is a presumption that the amendment was "a general disclaimer of the territory between the original claim and the amended claim."  *Id.* at 740.  That presumption may be rebutted by a showing that (1) the equivalent was "unforeseeable at the time of the application"; (2) the rationale underlying the amendment "bear[s] no more than a tangential relation to the equivalent in question"; or (3)

---

[2]  A related form of estoppel, "argument-based prosecution history estoppel," applies when a patent applicant "clearly and unmistakably" surrenders claim scope in arguments made to the patent examiner during prosecution.  *Amgen Inc. v. Coherus BioSciences Inc.*, 931 F.3d 1154, 1159–60 (Fed. Cir. 2019)

there is "some other reason" that the patentee "could not reasonably [have been] expected to have described the insubstantial substitute in question." *Id.* at 740–41.

During prosecution of the '175 patent, the claims in the original application recited a requirement that "at least one of the top surface and the bottom surface has a transverse, inward projection substantially parallel to the longitudinal axis." Dkt. No. 195-1, Exh. C, at ESCO-00000714. The examiner rejected those claims as obvious in view of a combination of prior art references. *Id.* at ESCO-00000707. To overcome that rejection, ESCO amended the claims to require that at least one side surface have "a transverse, inward projection in the front stabilizing end defined by bearing surfaces that are adjacent to and extend from the front thrust surface substantially parallel to the longitudinal axis in an axial direction." *Id.* at ESCO-00000714. In its remarks submitted along with the proposed amendments, ESCO explained that the prior art did not "disclose *any* inward projections in the front end that define bearing surfaces that are adjacent to and extend from the front thrust surface substantially parallel to the longitudinal axis." *Id.* at ESCO-00000721. Thus, the "adjacent to and extending from" limitation for which ESCO proposes an equivalent was added to the claims as part of an amendment during prosecution.

Because that limitation was added during prosecution, ESCO bears the burden of rebutting the presumption that prosecution history estoppel applies to its proposed equivalent. *See Festo*, 535 U.S. at 740–41. Yet, ESCO has pointed to no evidence that any of the three grounds for rebutting the presumption articulated by the Supreme Court in *Festo* apply to this case. ESCO argues only that "[n]othing in the prosecution history surrendered projections *immediately* adjacent to . . . a front thrust surface," and therefore there was not a "clear and unambiguous . . . disavowal of scope." Dkt. No. 201 at 7–8 (quoting *Cont'l Cirs. LLC v. Intel Corp.*, 915 F.3d 788, 798 (Fed. Cir. 2019)). However, the "clear and unambiguous" standard relied on by ESCO applies only to

11

argument-based prosecution history estoppel and prosecution disclaimer, a doctrine distinct from prosecution history estoppel. *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 798 F. Supp. 2d 541, 565 (D. Del. 2011) ("Both disclaimer and argument-based estoppel require actions or statements that clearly and unmistakably disavow claim scope."). ESCO's arguments fail to rebut the *Festo* presumption that applies to amendment-based prosecution history estoppel.[3]

Because ESCO has not "come forward with specific facts showing that there is a genuine issue for trial" on the issue of infringement of the '175 patent under the doctrine of equivalents, *see Matsushita*, 475 U.S. at 587, Deere will be granted summary judgment on that issue.[4]

### B.  Direct Infringement of the '662 Patent Claims

ESCO moves for summary judgment that Deere infringes the asserted claims of the '662 patent. The parties' briefing on this issue focuses heavily on the limitation of the asserted claims that requires the side stabilizing surfaces to "resist both vertical and horizontal loads during excavating." *See, e.g.*, '662 patent, cl. 8. In particular, Deere argues that its TK Series products do not infringe the '662 patent claims because the accused side stabilizing surfaces of its accused products do not bear vertical loads during excavating.

---

[3] ESCO argues in passing that the purpose of the amendment in question was to claim around a prior art reference's disclosure of "projections in the 'rear end of [a] socket.'" Dkt. No. 201 at 8. That argument could be read—although ESCO does not state so expressly—as asserting that the second situation described in *Festo* is present, i.e., the rationale underlying the amendment "bear[s] no more than a tangential relation to the equivalent in question." *Festo*, 535 U.S. at 740. But that argument, even if raised, would be unpersuasive because if that were the only rationale for the amendment, the "adjacent to and extends from" limitation would be unnecessary; presumably, it would have been sufficient to amend the claim to require no more than "a transverse, inward projection in the front stabilizing end."

[4] Although I have granted summary judgment that Deere does not infringe the '175 patent either literally or under the doctrine of equivalents, I address the validity issues relating to the '175 patent below because Deere has brought a counterclaim for invalidity of the claims of that patent. *See* Dkt. No. 15 at 7–8.

In support of its position on this issue, ESCO relies on the opinion of Mr. Holland, who stated in his report that he performed a "load analysis" and determined that "contact [was] shown between" the side surfaces of the base and the corresponding side surfaces of the socket in the accused product "when vertical loads were imposed" on the system. Dkt. No. 184-5, App'x A, at 45. ESCO also relies on a design document from Deere indicating that "[r]otational loads about the nose axis are borne by the tapered sides." Dkt. No. 184-22 at 10. In addition, ESCO points to the deposition testimony of John Ruvang, the designer of the accused products, who stated that loads applied to a point not on the center of the tooth would "induc[e] a rotational response." Dkt. No. 184-23 at 78:10–19.

Deere disputes ESCO's showing on three grounds. First, Dr. Klopp expressed the opinion that Mr. Holland's load analysis was incomplete because "simple contact between surfaces" is not necessarily "equivalent to 'resisting a load.'" Dkt. No. 211-1, Exh. X ¶ 99. Second, and relatedly, Dr. Klopp noted that Mr. Holland's analysis "did not apply or simulate any forces approaching actual excavation working loads." *Id.* ¶ 39. Third, Deere points out that elsewhere in his deposition Mr. Ruvang testified that the side surfaces in the accused products "for sure" do not bear vertical loads. Dkt. No. 211-1, Exh. S, at 83:4–8.

In view of the parties' respective showings, I find that there is a genuine dispute of material fact regarding whether the side stabilizing surfaces of the accused products bear vertical loads during excavating. Accordingly, ESCO is not entitled to summary judgment that Deere infringes the asserted claims of the '662 patent.

### C.    Indirect Infringement of the Asserted Claims

Deere moves for summary judgment that it does not indirectly infringe the asserted claims.[5] Deere raises two distinct arguments with respect to this point.  First, Deere argues that it cannot be liable for indirect infringement when it lacked pre-suit knowledge of the asserted patents.  Second, Deere argues that it does not contributorily infringe the asserted claims because its accused locks and adapters have substantial non-infringing uses and are not material components of the invention.

### 1.    Pre-Suit Knowledge

It is undisputed that Deere was first put on notice of the '662 patent on December 10, 2020, which is the date ESCO filed its original complaint in this lawsuit.  Likewise, Deere was first put on notice of the '175 patent on April 7, 2021, the date ESCO filed its first amended complaint in this case.  Deere argues that each complaint cannot serve to provide the knowledge that is required to support an inducement claim as to the patent first asserted in that complaint.

Judges in this district have addressed this question on several occasions and have reached different conclusions.  *See SoftView LLC v. Apple Inc.*, No. 10-389, 2012 WL 3061027, at *7 n.8 (D. Del. July 26, 2012) (recognizing the split in authority and collecting cases).  One line of cases holds that knowledge for purposes of an indirect infringement claim is not established where "the defendant's alleged knowledge of the asserted patents is based solely on the content of that complaint or a prior version of the complaint filed in the same lawsuit."  *ZapFraud, Inc. v.*

---

[5]  As noted above, I have granted summary judgment that the TK Series products do not directly infringe the asserted claims of the '175 patent.  That ruling would appear to preclude a finding of indirect infringement of those claims.  *See Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1326 (Fed. Cir. 2004) ("There can be no inducement or contributory infringement without an underlying act of direct infringement.").  However, because the parties' arguments regarding indirect infringement apply equally to both the '175 and '662 patents, my disposition of the indirect infringement issue is equally applicable to both patents.

*Barracuda Networks, Inc.*, 528 F. Supp. 3d 247, 252 (D. Del. 2021); *see also Xpoint Techs., Inc. v. Microsoft Corp.*, 730 F. Supp. 2d 349, 357 (D. Del. 2010); *Mallinckrodt, Inc. v. E-Z-Em Inc.*, 670 F. Supp. 2d 349, 354 n.1 (D. Del. 2009).

A contrary line of cases, including most of the more recent decisions, holds that the initial complaint may serve to provide the required knowledge for a claim of post-suit indirect infringement.  *See, e.g.*, *MG Freesites Ltd. v. ScorpCast LLC*, No. 20-1012, 2023 WL 346301, at *10 (D. Del. Jan. 20, 2023); *EyesMatch Ltd. v. Facebook Inc.*, No. 21-111, 2021 WL 4501858, at *2–3 (D. Del. Oct. 1, 2021); *IOENGINE, LLC v. PayPal Holdings, Inc.*, No. 18-452, 2019 WL 330515, at *4 (D. Del. Jan. 25, 2019); *Groove Digital, Inc. v. King.com, Ltd.*, No. 18-836, 2018 WL 6168615, at *2 (D. Del. Nov. 26, 2018); *Collabo Innovations, Inc. v. Omnivision Techs., Inc.*, No. 16-197, 2017 WL 374484, at *9 (D. Del. Jan. 25, 2017), *report and recommendation adopted*, 2017 WL 603471 (D. Del. Feb. 14, 2017); *SoftView*, 2012 WL 3061027, at *7; *Telecomm Innovations, LLC v. Ricoh Co.*, 966 F. Supp. 2d 390, 393–94 (D. Del. 2013); *Versata Software, Inc. v. Callidus Software Inc.*, 944 F. Supp. 2d 357, 362–63 (D. Del. 2013); *Execware, LLC v. Staples, Inc.*, No. 11-836,  2012 WL 6138340, at *5 (D. Del. Dec. 10, 2012); *Apeldyn Corp. v. Sony Corp.,* 852 F. Supp. 2d 568, 573–74 (D. Del. 2012); *Walker Digital, LLC v. Facebook, Inc.*, 852 F. Supp. 2d 559, 565 (D. Del. 2012).

The majority position among courts in other districts aligns with the latter line of cases. *See, e.g.*, *RightQuestion, LLC v. Samsung Elecs. Co.*, No. 2:21-cv-238, 2022 WL 507487, at *2 (E.D. Tex. Feb. 18, 2022); *Merrill Mfg. Co. v. Simmons Mfg. Co.*, 553 F. Supp. 3d 1297, 1302–03 (N.D. Ga. 2021); *Uni-Sys., LLC v. U.S. Tennis Ass'n, Inc.*, 350 F. Supp. 3d 143, 167 (E.D.N.Y. 2018); *Meetrix IP, LLC v. Cisco Sys., Inc.,* No. 1:18-cv-309, 2018 WL 8261315, at *3 (W.D. Tex. Nov. 30, 2018); *Regents of Univ. of Minn. v. AT&T Mobility LLC*, 135 F. Supp. 3d 1000, 1010–12

(D. Minn. 2015); *MyMedicalRecords, Inc. v. Jardogs, LLC*, 1 F. Supp. 3d 1020, 1024–25 (C.D. Cal. 2014). *But see, e.g.*, *GoTV Streaming, LLC v. Netflix, Inc.*, No. 2:22-cv-7556, 2023 WL 2627016, at *2–3 (C.D. Cal. Feb. 16, 2023); *Sonos, Inc. v. Google LLC*, 591 F. Supp. 3d 638, 647–48 (N.D. Cal. 2022); *Brandywine Commc'ns Techs., LLC v. T-Mobile USA, Inc.*, 904 F. Supp. 2d 1260, 1268–69 (M.D. Fla. 2012).

As I explained in the *IOENGINE* case, the issue of post-suit knowledge of a patent typically arises "when an amended complaint is filed, so that the allegations of knowledge and continuing infringement refer, at minimum, to the period between the filing of the original complaint and the filing of the amended complaint." 2019 WL 330515, at *4 n.1. However, it would serve little purpose to require the plaintiff to go through the formality of "fil[ing] an amended complaint in order to be allowed to assert knowledge of the patents during the period following the filing of the original complaint." *Id.* In addition, as Judge Stark noted in *SoftView*, to adopt the contrary view "would seem to have the effect of prohibiting patentees from stating a claim for indirect infringement when an assert[ed] patent is issued on the same date the lawsuit is filed and when an additional patent is issued during the pendency of litigation." 2012 WL 3061027, at *7 n.9. Accordingly, I will follow the majority rule as adopted in *SoftView* and *IOENGINE*. Based on that authority, I reject Deere's position that a claim of post-suit indirect infringement cannot be based on knowledge obtained from the complaint that initiated the lawsuit.

### 2. Contributory Infringement

Deere also argues that it is entitled to summary judgment of no contributory infringement because its accused locks and adapters have substantial non-infringing uses and are not material components of the invention claimed in the asserted patents. Under 35 U.S.C. § 271(c), contributory infringement occurs when an accused infringer sells or offers to sell a component of

a patented article that "constitut[es] a material part of the invention," and the accused infringer knows that the component is "especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use."

### i.    Locks

With respect to the locks, Deere argues that "the locks recited in the asserted claims can be used in noninfringing base and tooth assemblies." Dkt. No. 195 at 15. In support of that assertion, Deere cites the deposition testimony of Mr. Holland, who testified that the locks claimed in the asserted patents could be used in other wear assemblies. Dkt. No. 195-1, Exh. U, at 128:16–25, 146:8–14. Mr. Holland also explained in his report that, as used in the '662 patent, "the term 'lock' is a generic term used to describe a component 'used to releasably secure' a wear member to the nose of an adapter." Dkt. No. 195-1, Exh. N, at 202.

The problem for Deere is that the "component" referred to in section 271(c) is the component that is sold by the accused infringer. That is, it is of no moment that the term "lock," as used in the claims, is generic; the key point is whether the locks sold by Deere have substantial non-infringing uses. *See Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1363–64 (Fed. Cir. 2006) (focusing on whether the accused component, the "EMB," had a substantial non-infringing use).

Mr. Holland stated in his report that, in general, "proprietary tooth systems and their component parts are specially designed to work only in their respective proprietary system, and are not intended or optimized to be used with other systems." Dkt. No. 184-5 ¶ 75. Mr. Holland also pointed to the deposition testimony of Jason Simmons, a Deere employee, which Mr. Holland characterized as stating that "it would typically not be possible to use components from one

proprietary system (such as the TK Series Tooth system) with another system." *Id.* As to materiality, Mr. Holland offered the opinion that the asserted claims are directed to wear assemblies that comprise a base, a wear member, and a lock, all of which are material components of the inventions. *Id.* ¶ 74. And Deere's own documents confirm that the "Turn Kam pin [i.e., the accused lock] is the heart of the TK-Series system." Dkt. No. 202-4 at 53. On the basis of that evidence, a reasonable jury could conclude that the accused locks are material components of the claimed inventions and that they lack substantial non-infringing uses. Accordingly, summary judgment of no contributory infringement will not be granted with respect to the accused locks.

    *ii. Adapters*

  Deere argues that the accused adapters are compatible with Deere's redesigned A1 tooth that it contends is non-infringing, and that the adapters are not a material component of the invention. The present record, however, does not establish that the A1 tooth is commercially available such that the use of the adapters in connection with that tooth would be deemed a "substantial" non-infringing use. *See Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317 (Fed. Cir. 2009) ("[N]on-infringing uses are substantial when they are not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental."). And Mr. Holland again offered the opinion that the adapters are material components of the invention. Dkt. No. 184-5 ¶ 74. Based on that evidence, a reasonable jury could conclude that the accused adapters are material components of the claimed inventions and that they lack substantial non-infringing uses. Accordingly, summary judgment of no contributory infringement will not be granted with respect to the accused adapters.

    **D. Indefiniteness of the Asserted Claims**

  Deere has moved for summary judgment that the asserted claims of both the '175 and the '662 patent are invalid for indefiniteness because in Deere's view the term "substantially

parallel," which is recited in each asserted claim, is indefinite.  Deere also argues that the asserted claims of the '662 patent are indefinite because the phrase "to resist both vertical and horizontal loads during excavating" is indefinite.

For its part, ESCO has moved for summary judgment that several terms in the '175 and '662 patents are not indefinite.  Those terms are:  "front end," "rear end," "located near the rear end of the wear member," "lock bearing surface," "transverse," "a pair of side stabilizing surfaces inclined relative to each other in different transverse directions so as to laterally converge inward toward a central location along the respective side wall," "front thrust surface," "engagement system," "substantially conform," "generally V-shaped configuration," and "bear against."  In the section of its brief discussing indefiniteness, ESCO also asks the court to reject Deere's arguments that three of the claim limitations are not enabled.  The enablement issues are addressed separately below.

The Supreme Court has explained that a patent claim is indefinite if, in view of the patent specification and prosecution history, it "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).  That is, while the Court stated that "a patent must be precise enough to afford clear notice of what is claimed," it recognized that "absolute precision is unattainable."  *Id.* at 909–10.  In applying the indefiniteness standard set forth in *Nautilus*, the Federal Circuit has held that where a claim uses descriptive terms or terms of degree, those terms are not indefinite if the claims, written description, and prosecution history provide "objective boundaries" as to the scope of the claim.  *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1349 (Fed. Cir. 2022).

At the outset, I note that during the *Markman* proceedings in this case, both Magistrate Judge Hall and Judge Andrews rejected Deere's contention that the two terms that are the focus of

its motion for summary judgment are indefinite.  Dkt. No. 61 at 16–17, 18–19; Dkt. No. 156 at 3–4.  However, Judge Hall left open the possibility that the issues could be raised again on a more complete record.  *See* Dkt. No. 61 at 17 ("Deere has not met its burden on this record to show by clear and convincing evidence that the phrase is indefinite.").  For that reason, I will address Deere's indefiniteness arguments and not treat those arguments as already conclusively resolved.

Deere's contentions regarding indefiniteness are unpersuasive in view of the disclosures of the asserted patents and the governing law regarding indefiniteness.  Deere's positions generally appear to reflect the view that a skilled artisan must be able to ascertain the precise boundaries of the claims with near-absolute certainty.  But that standard is stricter than what the law requires. Additionally, Deere suggests that Dr. Klopp's testimony creates, at minimum, factual disputes that preclude the court from deciding issues of indefiniteness.  *See, e.g.*, Dkt. No. 210 at 13 (arguing that "factual disputes exist about whether this term is indefinite").  However, indefiniteness is a question of law that is decided by the court, frequently at the claim construction stage of a case. *See Eli Lilly & Co. v. Teva Parenteral Medicines, Inc.*, 845 F.3d 1357, 1370 (Fed. Cir. 2017); *In re Packard*, 751 F.3d 1307, 1311 (Fed. Cir. 2014); *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1331 (Fed. Cir. 2009).  The indefiniteness arguments raised by Deere can be conclusively resolved on the present record, and I do so as indicated below.

### 1.    "substantially parallel"

Deere argues that the asserted claims are invalid because the term "substantially parallel" is indefinite.  That term appears in each of the asserted claims.  For example, claim 4 of the '175 patent recites bearing surfaces that are "substantially parallel to the longitudinal axis in an axial direction."  '175 patent, cl. 4.  And claim 8 of the '662 patent recites side stabilizing surfaces "axially extending substantially parallel to the longitudinal axis."  '662 patent, cl. 8.  Deere argues

that the term is indefinite because the asserted patents do not provide an "upper limit" to the angle between the bearing surfaces (or the side stabilizing surfaces) and the longitudinal axis such that the surfaces would be considered "substantially parallel" to the longitudinal axis.  Dkt. No. 195 at 19–20.

The specifications of the asserted patents explain in some detail what is meant by the term "substantially parallel."  The specification of the '175 patent includes the following description of the term:  "The term 'substantially parallel,' as used herein in this context, is intended to include parallel surfaces as well as those that diverge rearwardly from axis 128 at a small angle (e.g., of about 1-7°) for manufacturing or other purposes." '175 patent, col. 9, ll. 54–58; *see also id.* at col. 10, ll. 51–54.  The specification of the '175 patent adds that the angle of a preferred embodiment is "no more than about 5°, and in some instances, . . . about 2–3°." *Id.* at col. 9, ll. 58–61.  The specification of the '662 patent describes the meaning of the term "substantially" using nearly identical language. '662 patent, col. 3, ll. 27–33.

In support of its contention that the term is indefinite, Deere cites the deposition testimony of Mr. Holland, who declined to identify a particular upper limit for an angle that would not be considered "substantially parallel," as that term is used in the asserted claims.  Dkt. No. 195 at 18–20 (quoting Dkt. No. 195-1, Exh. U, at 198:14–199:12, 206:16–207:21).  In view of that testimony, Deere argues that a skilled artisan would be "unable to glean even an approximate upper boundary" for what angles would be considered "substantially parallel." *Id.* at 20.  Mr. Holland, however, did not state that "it could be any angle," as Deere contends.  Dkt. No. 195-1, Exh. U, at 211:4–16.  Rather, he expressed the opinion that "the angles are intended to be small" and that "we're talking about angles that are, you know, seven-ish or five-ish or – but, most importantly, prefer[ably] two to three." *Id.*  Mr. Holland's testimony is best understood as expressing the

opinion that there is no precise upper limit for an angle to be considered "substantially parallel" with the longitudinal axis.

As Judge Hall noted during the *Markman* proceedings in this case, Deere's position would require that "the claim or specification needs to provide an exact numerical range of angles that could be considered 'substantially parallel.'" Dkt. No. 61 at 16. That standard is stricter than the standard articulated by the Supreme Court and the Federal Circuit, which merely requires that the patent provide "objective boundaries" regarding the scope of the claim and does not require "mathematical precision." *Niazi*, 30 F.4th at 1347, 1349. Indeed, courts have regularly rejected contentions that claims containing terms such as "substantially" or "generally" are indefinite. *See, e.g.*, *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1359 (Fed. Cir. 2012) ("This court has repeatedly confirmed that relative terms such as 'substantially' do not render patent claims so unclear as to prevent a person of skill in the art from ascertaining the scope of the claim."); *Mfg. Res. Int'l, Inc. v. Civiq Smartscapes, LLC*, No. 17-269, 2018 WL 4627661, at *7 (D. Del. Sept. 27, 2018) (construing "substantially parallel" to mean "approximately parallel" and holding that the term was not indefinite); *see also Maitland Co. v. Terra First Inc.*, No. 3:94-662-17, 1994 WL 773882, at *8 (D.S.C. Oct. 27, 1994) ("The term 'substantially parallel' means just that. It does not mean *exactly* parallel.").

Deere separately argues that the term "substantially parallel" is indefinite because the specifications of the asserted patents explain that surfaces that "diverge rearwardly . . . at a small angle . . . for manufacturing or other purposes" are considered substantially parallel. *See, e.g.*, '175 patent, col. 10, ll. 50–54. Deere's principal objection to that language appears to be that the phrase "manufacturing or other purposes" is vague, and therefore does not provide an objective baseline for determining which small angles would be deemed substantially parallel and which

22

would not.  *See* Dkt. No. 195 at 18–19.  The problem with that argument is that the phrase "manufacturing or other purposes" primarily serves to explain why a pair of surfaces may need to diverge at a small angle rather than being exactly parallel; it does not function to limit or expand the range of angles that may be deemed to be substantially parallel.  The asserted patents provide an approximate range of angles that would be deemed "substantially parallel"—one to seven degrees—and that range provides sufficient clarity to a skilled artisan.  *See, e.g.*, '175 patent, col. 10, ll. 53–54.  Accordingly, the term "substantially parallel," as used in each of the asserted claims, is not indefinite.

### 2.    "to resist both vertical and horizontal loads during excavating"

The asserted claims of the '662 patent each require side walls having "a pair of side stabilizing surfaces" that "bear against complementary surfaces in respective side recesses in the base to resist both vertical and horizontal loads during excavating."  *See, e.g.*, '662 patent, cl. 8.  Deere argues that the '662 patent "fails to provide sufficient guidance to determine whether a product 'resist[s] both vertical and horizontal loads during excavating.'"  Dkt. No. 195 at 20.

Deere argues that the claims require something more than the ability to resist nominal loads because the claims expressly recite that the resistance occurs "during excavating."  *Id.* at 21.  In Deere's view, however, the '662 patent "fails to explain how great a load the stabilizing surfaces must be able to 'resist.'"  *Id.*  And in his deposition, Deere complains, Mr. Holland did not provide a precise quantitative boundary for the "magnitude of force [that] resisting a load require[s]."  Dkt. No. 195-1, Exh. U, at 169:12–170:5.

The answer to Deere's argument is that in addition to reciting the function of the stabilizing surfaces, i.e., resisting loads during excavating, the claims of the '662 patent also recite structural limitations regarding those surfaces.  For example, claim 8 requires that the side stabilizing

surfaces be "inclined relative to each other in different transverse directions so as to laterally converge inward toward a central location of the side wall." '662 patent, cl. 8. That claim also requires that the side stabilizing surfaces "axially extend[] substantially parallel to the longitudinal axis." *Id.* As the Federal Circuit has explained, "functional language can promote definiteness because it helps bound the scope of the claims by specifying the operations that the claimed invention must undertake." *Nevro Corp. v. Bos. Sci. Corp.*, 955 F.3d 35, 39 (Fed. Cir. 2020) (cleaned up). In this case, the phrase "to resist vertical and horizontal loads during excavating" describes the function that the recited structure performs. I agree with Judge Hall that there is no "particular test or . . . mathematical amount of resistance [that] needs to be identified for a person of skill in the art to understand what the phrase 'to resist both vertical and horizontal loads' means." Dkt. No. 61 at 19.

Accordingly, the phrase "to resist vertical and horizontal loads during excavating" is not indefinite, and summary judgment will not be granted to Deere on that issue.

### 3. "front end"

The term "front end" is used in each of the asserted claims of the '662 patent, and in most of the asserted claims of the '175 patent. ESCO contends that the term is not indefinite, while Deere argues that it is.

In support of its contention that the term "front end" is indefinite, Deere raises two principal contentions. First, Deere argues that the point at which the front end begins and ends is unclear because some embodiments have a "sharp boundary between the front end 24 and 'body' 25," and other embodiments have a boundary that Deere characterizes as "not sharp." Dkt. No. 211-1, Exh. W ¶ 55. Second, Deere argues that two independent claims of the '662 patent, claims 8 and 21, recite a rear end having side walls that "extend rearward[] from the front end," with each side wall

24

having a pair of side stabilizing surfaces converging at a central point along the side wall. *Id.* In view of that limitation, Dr. Klopp offered the opinion that a skilled artisan "would not know with reasonable certainty just how far toward the front wall or front surface the pair of side stabilizing surfaces in the side wall may extend for purposes of the claim." *Id.*

With respect to the first point, Deere argues that Figures 13 and 14 of the '662 patent do not depict a sharp boundary between the front end and the rest of the nose. *See id.* The front end shown in those figures, however, does not differ from the front end of any of the other embodiments of the '662 patent. Figures 13 and 14 are simply directed to an embodiment that has an "alternative locking arrangement." '662 patent, col. 2, ll. 50–53. In that embodiment, the nose and socket of the wear assembly "is the same as the wear assembly" depicted in the other embodiments, "except for the locking arrangement." *Id.* at col. 9, ll. 43–45. Thus, contrary to Dr. Klopp's suggestion, Dkt. No. 211-1, Exh. W ¶ 55, there is no indication in the '662 patent that the boundary of the front end of the embodiment depicted in Figures 13 and 14 is "not sharp," while the boundary of the front end of other embodiments is "sharp."

In any event, the patents do not set forth a precise boundary for the "front end," nor is there any requirement that they do so. The front end is simply an area of the socket or nose that is closer to the front thrust surface than the rear end. The absence of a precise boundary for the front end does not make that term indefinite and the patents invalid.

With respect to the second point, Deere's position is likewise unpersuasive. It is true that two claims of the '662 patent recite a rear end having side walls that extend rearward from the front end, and under the court's construction of "extending from" set forth above, those side walls must be immediately adjacent to the front end. However, that fact does not give rise to any ambiguity as to the scope of the term "front end." The specification of the '662 patent describes

25

the front end as being "formed with top and bottom stabilizing surfaces," which "are intended to be primary surfaces for resisting loads that are applied to the nose by the point." '662 patent, col. 3, ll. 25–26; *id.* at col. 4, ll. 1–3. A skilled artisan would thus view the "front end" as referring to the portion of the socket or nose that is formed by the top and bottom stabilizing surfaces. And claims 8 and 21 of the '662 patent merely add a requirement that the side walls of the rear end extend from the front end.

Turning to the '175 patent, Deere similarly argues that "there is no clear line of demarcation to suggest where the front end stops and the body or rear end begins." Dkt. No. 211-1, Exh. W ¶ 70. In support of that assertion, Dr. Klopp pointed to Figure 2 of the '175 patent, which in his view "calls out 'front end 134' as the very front surface of the wear member," whereas Figure 7 depicts "a sharp boundary" that a skilled artisan would recognize as the "rearward boundary of the front end of the base and socket." *Id.* The problem with that argument is that the "front end" recited in the claims of the '175 patent is the front end of the socket, whereas the "front end 134" shown in Figure 2 is the front end of the wear member. Because the socket and wear member are different components, Figure 2 does not create any ambiguity as to what constitutes the front end of the socket.

For the above reasons, Deere has not shown that a skilled artisan would be unable to determine the scope of the term "front end" with reasonable certainty. The term is a common one in patent law, and Deere's arguments to the contrary are unpersuasive. Accordingly, the term "front end" is not indefinite.

### 4. "rear end"

Deere's arguments regarding the term "rear end," which is recited in the asserted claims of the '662 and '175 patents, largely mirror its arguments regarding the term "front end." *See* Dkt.

No. 210 at 5, 10.  For the same reasons that apply to "front end," the term "rear end" is not indefinite.

### 5.    "located near the rear end of the wear member"

The phrase "located near the rear end of the wear member" appears in claim 12 of the '662 patent, which depends from claim 8 of that patent.  Specifically, claim 12 recites the wear assembly of claim 8 "wherein the side stabilizing surfaces of the wear member are located near the rear end of the wear member."  '662 patent, cl. 12.  Deere argues that the phrase is indefinite because it contradicts the "rear end" limitation of claim 8, which recites a wear member having side stabilizing surfaces that are part of the rear end of the wear member.

As used in claim 8, the term "rear end" is clearly intended to mean the portion of the wear member that is generally closer to the wear assembly's base.  The rear end of claim 8 has a number of components, including a top wall, a bottom wall, and side walls.  Each side wall further comprises a pair of side stabilizing surfaces.  The clear purpose of claim 12 is to limit claim 8 to embodiments in which the side stabilizing surfaces are near the rear boundary of the wear member. That is, the term "rear end" as used in claim 12 would be understood by a skilled artisan to refer to the rear boundary of the wear member, rather than the rear portion of the wear member more generally.  Although the use of the term "rear end" for two slightly different purposes in claims 8 and 12 reflects somewhat careless drafting, a skilled artisan would be able to discern the scope of the claims based on the context in which the term "rear end" is used in each claim.  The phrase "located near the rear end of the wear member" is therefore not indefinite.

### 6.    "lock bearing surface"

The term "lock bearing surface" appears in claim 8 of the '662 patent.  Claim 8 recites, in part, a base including "a front end with a front wall and front bearing surfaces, a rear end having

opposite sides with a side recess in each of the sides, and a lock bearing surface." '662 patent, cl. 8. Deere argues that the term "lock bearing surface" is indefinite for three reasons: (1) because the term does not appear in the specification of the '662 patent; (2) because the term is unclear on its face as to "whether the inventors meant a surface that bears a lock or a surface upon which a lock bears"; and (3) because "there is no claimed structure for the surface." Dkt. No. 211-1, Exh. W ¶ 58.

It is true that the specification does not use the term "lock bearing surface." However, the specification discloses two embodiments that relate to the locking mechanism of the claimed wear assembly. In the first embodiment, the "nose 14 defines a channel 140 in side wall 22." '662 patent, col. 8, ll. 49–50. That channel "is open on its outer side and on each end, and otherwise is defined by a base or side wall 142, a front wall 144 and a rear wall 146." *Id.* at col. 8, ll. 51–53. The wear member includes a complementary passage that "generally aligns with channel 140 when point 12 is assembled onto nose 14 to collectively define an opening 160 for receiving lock 16." *Id.* at col. 8, ll. 53–56. In the second embodiment, "lock 216 is received in a central passage 220 in nose 214 and corresponding holes 222 in wear member 212." *Id.* at col. 9, ll. 45–47. In view of those disclosures, it would be clear to a skilled artisan that the "lock bearing surface" recited in claim 8 refers to channel 140 or central passage 220 of the two embodiments disclosed in the specification of the '662 patent. The term "lock bearing surface" is therefore not indefinite.

### 7. "transverse"

The term "transverse" is recited in the asserted claims of the '662 patent. For example, claim 8 recites "a front end with a front surface transverse to the longitudinal axis" and side walls having "a pair of side stabilizing surfaces inclined relative to each other in different transverse directions so as to laterally converge inward toward a central location." *Id.* at cl. 8. Dr. Klopp

expressed the opinion that the term is indefinite because the term "transverse" in the claims "includes no reference direction." Dkt. No. 211-1, Exh. W ¶ 60. Dr. Klopp also stated that the term "cannot be referring to vectors lying in the planes of the inclined surfaces, because there are infinitely many such vectors." *Id.*

The '662 patent includes several figures that depict "transverse" cross-sections of various embodiments, and in each case the term is used to refer to a surface that is generally orthogonal to the longitudinal axis. *See, e.g.*, '662 patent, col. 2, ll. 44–46 ("FIG. 8 is a partial perspective view of the wear assembly cut-away along a transverse plane immediately rearward of the lock."); *id.* at col. 2, ll. 47–48 ("FIGS. 9–12 are transverse cross sections along the top wall of the wear member . . . ."); *see id.* at Figs. 8–12. In view of those disclosures, a skilled artisan would readily recognize that the "front surface transverse to the longitudinal axis" limitation refers to a front surface that is generally orthogonal, i.e., perpendicular, to the longitudinal axis.

With respect to the stabilizing surfaces, the '662 patent describes the top and bottom stabilizing surfaces as being "oriented relative to each other" at a "transverse angle $\phi$." *Id.* at col. 5, ll. 46–59. That is, those stabilizing surfaces are "inclined to each other in a transverse direction." *Id.* at col. 5, ll. 26–28. Although the word "transverse" is not used to describe the "angle $\theta$" at which the side stabilizing surfaces are oriented relative to one another, *see id.* at col. 7, ll. 8–37, a skilled artisan would recognize, in view of the similar disclosure regarding the top and bottom stabilizing surfaces, that the term "transverse" refers to the angle at which the surfaces are oriented relative to each other. It would be clear to a skilled artisan that the phrase "a pair of side stabilizing surfaces inclined relative to each other in different transverse directions so as to laterally converge inward toward a central location" requires that the surfaces be disposed relative to each other at an

angle such that they laterally converge inward toward a central location.  Accordingly, the use of the term "transverse" does not render the asserted claims indefinite.

> ### 8. "a pair of side stabilizing surfaces inclined relative to each other in different transverse directions so as to laterally converge inward toward a central location along the respective side wall"

Deere argues that the phrase "a pair of side stabilizing surfaces inclined relative to each other in different transverse directions so as to laterally converge inward toward a central location along the respective side wall" is indefinite "[d]ue to the combined ambiguities with the terms 'transverse' and 'rear end.'"  Dkt. No. 211-1, Exh. W ¶ 63.  Additionally, Deere argues that it is not clear what is meant by the phrase "a central location along the respective side wall."  *Id.* ¶ 64.

Deere's arguments are unpersuasive.  As discussed above, the terms "transverse" and "rear end" are not indefinite.  And, as discussed in more detail below, the term "central location" is readily susceptible to construction:  It refers to a location generally in the center of the side wall.  Therefore, Deere has failed to show that the phrase Deere highlights is indefinite.

> ### 9. "engagement system"

The term "engagement system" is recited in claims 4 and 9 of the '175 patent.  Deere argues that the term is indefinite because the term "is devoid of structure and is defined purely by the function it performs."  Dkt. No. 210 at 12.  The specification of the '175 patent, however, makes it clear that an "engagement system" is equivalent to a "lock," i.e., a component that "releasably hold[s] the wear member 104 to base 102."  '175 patent, col. 5, ll. 48–51.  As the specification explains, "the lock or engagement system could be in the form of a known retainer or pin (not shown), but preferably has a construction as described [in columns 12–14 of the patent]."  *Id.* at col. 5, ll. 51–54.  In view of those disclosures, a skilled artisan would have no trouble understanding what is meant by the term "engagement system."  To be sure, the term is broad.  But

"a claim is not indefinite just because it is broad." *Niazi*, 30 F.4th at 1347.  Accordingly, the term "engagement system" is not indefinite.

### 10.  "substantially conform"

Dependent claim 5 of the '175 patent recites the wear assembly of claim 4, "wherein the base includes a nose having a front end with an exterior configuration shaped to substantially conform to a shape of the front stabilizing end of the socket." '175 patent, cl. 5.  Deere argues that the term is indefinite because a skilled artisan would not be able to determine the required "level of conformance between mating surfaces." Dkt. No. 210 at 13.

The specification of the '175 patent describes an embodiment in which the "[m]ain portion 180 [of the socket] includes an upper wall 182, lower wall 184 and sidewalls 186, 188 that generally conform to body surfaces 162–168, respectively." '175 patent, col. 8, ll. 32–34; *see also id.* at col. 10, ll. 45–47.  A skilled artisan would understand from that description that in order to infringe claim 5, the nose must have a front end that generally matches the shape of the front stabilizing end of the socket.  With respect to the use of the term "substantially," as noted above, courts have repeatedly rejected the notion that such terms are indefinite. *See, e.g.*, *Deere*, 703 F.3d at 1359.  Accordingly, Deere has failed to show that the term "substantially conform" is indefinite.

### 11.  "generally V-shaped configuration"

Claims 14 and 18 of the '175 patent require projections that have "a generally V-shaped configuration defined by a pair of the bearing surfaces." '175 patent, claims 14, 18.  Deere argues that those claims are indefinite because the term "generally V-shaped configuration" does not contain a clear definition of what angle would be "too broad or pointy to be considered V-shaped." Dkt. No. 211-1, Exh. W ¶ 80.  That contention is wholly unpersuasive.  A skilled artisan could readily recognize whether a particular arrangement of elements is "V-shaped," regardless of

31

whether the "V" is narrow or broad.  Moreover, the use of the term "generally" simply ensures that the term "V-shaped" is not understood to limit the configuration to a precise shape.  It does not inject impermissible ambiguity into the claims.  Accordingly, the term "generally V-shaped configuration" is not indefinite.

### 12.    "bear against"

Several claims of the '175 patent recite a socket having bearing surfaces that "contact and bear against the base."  '175 patent, claims 13–17, 19, 21.  Deere argues that the recitation of both "contact" and "bear against" in the claims means that "'bear against' must mean something different than 'contact.'"  Dkt. No. 211-1, Exh. W ¶ 81.  Deere further contends that there is no disclosure in the '175 patent that would allow a skilled artisan to determine the scope of the term "bear against."  *Id.*

A skilled artisan would be able to ascertain the scope of the claim using the plain and ordinary meanings of the terms "contact" and "bear against."  The term "contact" refers to two surfaces that touch one another in any respect.  *Contact*, Webster's Third New Int'l Dictionary 490 (2002) (defining the verb "contact," as relevant here, to mean "touching or meeting").  Likewise, the term "bear against" refers to a surface that applies some amount of force to another surface or object.  *Bear*, Webster's Third New Int'l Dictionary 191 (defining the verb "bear," as relevant here, to mean "to exert pressure or repose weight," or to "push on or against something").  That is, the claims make it clear that the bearing surfaces must touch the base and apply some amount of force to the base.  A skilled artisan would not be uncertain about the meanings of those terms, and the term "bear against" is not indefinite as a result.

32

### E.    Enablement of the Asserted Claims

ESCO moves for summary judgment that certain of the asserted claims are not invalid for lack of enablement.  In particular, ESCO focuses on Deere's contentions that the following claim limitations are not sufficiently enabled to satisfy the requirements of 35 U.S.C. § 112:  "lock bearing surface," "substantially parallel to the longitudinal axis," and "front thrust surface."

### 1.    "lock bearing surface"

As discussed above, a skilled artisan would be able to ascertain the scope of the term "lock bearing surface," and the term is therefore not indefinite.  Nonetheless, Deere asserts that a skilled artisan would be required to "engage in undue experimentation to determine claim scope" due to the lack of an express teaching of a "lock bearing surface" in the specification of the '662 patent. Dkt. No. 210 at 6.  The only evidence Deere identifies in support of its argument that the term "lock bearing surface" is not enabled is a single paragraph of Dr. Klopp's report.  *Id.* (citing Dkt. No. 211-1, Exh. W ¶ 58).  Most of that paragraph is devoted to the issue of indefiniteness, but Dr. Klopp includes an assertion that a skilled artisan could not "make and use the claimed invention with a lock bearing surface without undue experimentation."  Dkt. No. 211-1, Exh. W ¶ 58. Although he does not elaborate further, Dr. Klopp's opinion on enablement appears to be based on his view that the term is indefinite, i.e., that a skilled artisan would not be able to determine its scope.  Because the term is not indefinite, the premise of Dr. Klopp's enablement opinion is flawed, and his conclusion therefore fails.  Having adduced no other evidence on the issue of enablement with respect to the term, Deere has not shown that there is a genuine dispute of material fact on

that issue.  Accordingly, ESCO will be granted summary judgment that the claims are not invalid

due to lack of enablement of the "lock bearing surface."[6]

## 2.    "substantially parallel to the longitudinal axis"

Deere next argues that the asserted claims are invalid because the patents-in-suit do not

enable a skilled artisan to make and use the "full scope" of the invention with respect to the

"substantially parallel" limitations.  Dkt. No. 210 at 9.  In defining the term "substantially parallel,"

the specifications of the asserted patents do not expressly exclude surfaces that are exactly

parallel.  '662 patent, col. 3, ll. 27–30; '175 patent, col. 10, ll. 50–54.  However, the named inventor

of the '662 patent, Christopher Carpenter, testified in a deposition that "you typically do not want

parallel sides," because it would be difficult to remove such a part from the mold during the

manufacturing process.  Dkt. No. 211-1, Exh. R, at 183:5–185:9.  Deere thus argues that the

asserted patents have not enabled the "full scope" of the claimed invention, because the asserted

patents have not enabled a wear assembly with exactly parallel sides.  Dkt. No. 210 at 9; Dkt. No.

211-1, Exh. W ¶ 67.

Deere invokes the Supreme Court's recent decision in *Amgen Inc. v. Sanofi*, No. 21-757

(U.S. May 18, 2023), but that decision does not support Deere's argument.  In *Amgen*, the patent

at issue claimed an entire genus of antibodies that were capable of binding to a specific protein

and preventing that protein from binding to LDL receptors.  *Id.*, slip op. at 5.  That genus, the Court

explained, could contain "millions" of antibodies that perform the claimed function, but the patent

---

[6]  Deere asserts in passing that the term "lock bearing surface" lacks adequate written description support.  *See* Dkt. No. 210 at 6 ("Claim 8 is therefore invalid both for lacking written description support and as indefinite."); *see also* Dkt. No. 211-1, Exh. W ¶ 58 (Dr. Klopp stating, without elaboration, that a skilled artisan "would not understand that the inventors were in possession of the lock bearing surface").  That contention does not amount to a developed argument and is not sufficient to create a triable issue regarding the written description requirement.

specification disclosed only 26 specific examples.  *Id.* at 6.  The Court held that the asserted claims were not enabled because "the specification must enable the full scope of the invention as defined by its claims."  *Id.* at 13.  In outlining that standard, the Court explained that "[i]f a patent claims an entire class of processes, machines, manufactures, or compositions of matter, the patent's specification must enable a person skilled in the art to make and use the entire class."  *Id.*  The Court was careful to note, however, that a specification need not always "describe with particularity how to make and use every single embodiment within a claimed class." *Id.* at 13.

This case presents a very different factual scenario from *Amgen*, in which there were potentially millions of embodiments that had not been enabled.  In this case, there is exactly one embodiment that Deere claims is not enabled:  an embodiment in which the sides are exactly parallel with the longitudinal axis.  Putting aside the fact that in the physical world no two surfaces or axes can be perfectly parallel, there is no force to Deere's argument that such an embodiment is not enabled.  Mr. Carpenter did not say that an exactly parallel embodiment was not possible; he stated that you would "typically . . . not want" to have an embodiment with parallel sides because it may be difficult to remove from a mold during manufacturing. Dkt. No. 211-1, Exh. R, at 183:5–185:9.  Deere's contention is thus essentially that a skilled artisan may need to engage in a limited amount of testing to find the best angle for manufacturing a device such as those disclosed in the asserted patents.  As the Supreme Court noted in the *Amgen* case, however, a specification is not "necessarily inadequate just because it leaves the skilled artist to engage in some measure of adaptation or testing."  *Amgen*, slip op. at 14.

Deere points to no evidence other than Mr. Carpenter's testimony (referenced in Dr. Klopp's report) in support of its contention that the full scope of the asserted claims has not been enabled.  Dkt. No. 210 at 9.  For the reasons set forth above, Mr. Carpenter's evidence does not

create a triable issue with respect to the enablement requirement.  Accordingly, summary judgment will be granted to ESCO that the asserted claims are not invalid for lack of enablement due to the term "substantially parallel to the longitudinal axis."

### 3.    "front thrust surface"

Finally, Deere argues that the claims of the '175 patent are not enabled because the full scope of the term "front thrust surface" is not enabled by the specification of that patent.  Deere's argument on this point is similar to its argument with respect to the enablement of the term "substantially parallel to the longitudinal axis."  That is, Deere argues that a "hemispherical or rounded" thrust surface, which falls within the scope of the asserted claims, would not work in the claimed invention and therefore is not enabled.  Dkt. No. 210 at 10–11.

The specification of the '175 patent explains that "the thrust faces 142, 152 may be any desired shape (such as any shape between hemispherical to flat or even concave)."  '175 patent, col. 8, ll. 4–6.  In one example, the specification adds, "the thrust face 142 may gently curve outward . . . such that its center point (or near its center point) is the forwardmost point of the face 142."  *Id.* at col. 8, ll. 6–10.  In a deposition, the named inventor of the '175 patent, Christopher Snyder, testified that products practicing the '175 patent have a front thrust surface that is "slightly rounded," but he stated that he did not know whether a "more rounded" front surface would work.  Dkt. No. 211-1, Exh. T, at 76:23–77:23.  That was because, Mr. Snyder explained, ESCO had tested an embodiment with a fully rounded shape and found that "[t]he front of the nose was not stable for . . . the angles of loads that we were seeing while dredging."  *Id.* at 77:24–78:13.  In view of Mr. Snyder's testimony, Deere contends that an embodiment having a hemispherical thrust surface is not enabled by the specification of the '175 patent.

Deere's argument again seeks, but does not obtain, support from the Supreme Court's decision in *Amgen*. Unlike in *Amgen*, the '175 patent expressly taught how to make and use a product with a rounded front surface. Mr. Snyder's testimony established only that certain variants using rounded front surfaces would be less effective than others, and that a skilled artisan would likely need to do some experimentation to determine the appropriate amount of roundness to best suit the user's purpose. A claim can satisfy the enablement requirement of 35 U.S.C. § 112 if one skilled in the art, after reading the specification, could practice the claimed invention without undue experimentation. *In re Wands*, 858 F.2d 731, 736–37 (Fed. Cir. 1988). As the Federal Circuit has explained, "[t]hat is not to say that the specification itself must necessarily describe how to make and use every possible variant of the claimed invention, for the artisan's knowledge of the prior art and routine experimentation can often fill gaps, interpolate between embodiments, and perhaps even extrapolate beyond the disclosed embodiments, depending on the predictability of the art." *AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234, 1244 (Fed. Cir. 2003).

In any event, a further problem for Deere is that Mr. Snyder's comments were directed at one particular application of the patented wear members—dredging. Dkt. No. 211-1, Exh. T, at 77:5–13. As the specification explains, however, the claimed wear assemblies can be used on "other kinds of excavating equipment" besides a dredge cutterhead, such as "buckets or the like for construction or mining equipment." '175 patent, col. 5, ll. 34–38. And the asserted claims are not limited to wear assemblies used in dredge cutterheads. Mr. Snyder's testimony that a hemispherical front thrust surface would be impractical for dredging thus does not undercut the patent's disclosure that "the thrust faces 142, 152 may be any desired shape (such as any shape between hemispherical to flat or even concave)," which would seem to apply to all embodiments of the invention. *See id.* at col. 8, ll. 4–6. That is, the specification teaches a skilled artisan how

37

to make and use the full scope of the claimed embodiments; it is just that some of those embodiments may not be suitable for particular applications.

Deere points to no additional evidence to support its contention that an embodiment with a rounded thrust surface is not enabled. *See* Dkt. No. 210 at 10–11. On the present record, there is no genuine dispute of fact regarding whether the asserted claims of the '175 patent are enabled. Accordingly, summary judgment will be granted to ESCO on that issue.

### F.   *Anticipation and Obviousness of the '662 Patent Claims*

Deere moves for summary judgment that the asserted claims of the '662 patent are anticipated under 35 U.S.C. § 102 by U.S. Patent Pub. No. 2004/0093771 ("Carpenter '771"). For its part, ESCO moves for summary judgment that the asserted claims of the '662 patent are not anticipated by or rendered obvious in view of three references: Carpenter '771, U.S. Patent No. 5,561,925 ("Livesay '925"), and U.S. Patent No. 5,423,138 ("Livesay '138").

### 1.   Carpenter '771

In its opening brief on its motions for summary judgment, Deere sets forth the disclosures in Carpenter '771 that it contends satisfy each limitation of the asserted claims of the '662 patent. ESCO does not dispute that many of those limitations are disclosed in Carpenter '771. However, ESCO argues that Carpenter '771 does not anticipate the claims of the '662 patent for three reasons: (1) Deere's showing on anticipation impermissibly combines distinct embodiments to allege anticipation; (2) Carpenter '771 does not disclose side stabilizing surfaces that "converge inward toward a central location," as required by the asserted claims; and (3) Carpenter '771 does not disclose side stabilizing surfaces that are "substantially parallel to the longitudinal axis," as required by the claims.

>    *i.    Combined Embodiments*

ESCO first argues that in his anticipation analysis Dr. Klopp impermissibly combined multiple distinct embodiments from Carpenter '771 in expressing his opinion that the reference anticipates the asserted claims.  Specifically, ESCO argues that Deere combined the features of the embodiments depicted in Figures 8 and 14 of Carpenter '771.[7]  For example, Deere relies on the Figure 8 embodiment of Carpenter '771 as disclosing a "top stabilizing surface" and a "bottom stabilizing surface" that are "substantially parallel to the longitudinal axis."  Dkt. No. 195 at 34; Dkt. No. 195-1, Exh. T ¶¶ 86–87.  As ESCO explains in its brief, however, the Figure 8 embodiment does not contain side stabilizing surfaces that are substantially parallel to the longitudinal axis; Carpenter '771 describes the side surfaces of that embodiment as having "vertical divergence."  Dkt. No. 201 at 19 (quoting Carpenter '771 ¶ 17).  To avoid that deficiency, Deere relies on the Figure 14 embodiment of Carpenter '771 as disclosing side stabilizing surfaces that are substantially parallel to the longitudinal axis.  Dkt. No. 195-1, Exh. T ¶ 85.  Figures 8 and 14 of Carpenter '771 are reproduced below.



Carpenter '771, Figs. 8, 14.

---

[7]  The parties' briefing and Dr. Klopp's report refer to "Figure 12" of Carpenter '771, but it appears that Dr. Klopp was actually relying on Figure 8 of Carpenter '771 in support of his opinion on invalidity.  That point is made most clearly in Dr. Klopp's reply report, in which he reproduced Figure 8 of Carpenter '771 but referred to that image as "Fig. 12 from Carpenter '771." Dkt. No. 195-1, Exh. T ¶ 87 & Fig. 18.

In general, "[a] prior art reference can only anticipate a claim if it discloses all the claimed limitations 'arranged or combined in the same way as in the claim.'" *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1381 (Fed. Cir. 2015) (quoting *Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1361 (Fed. Cir. 2012)).  As the Federal Circuit has explained, however, there is no "blanket rule that two embodiments disclosed in a reference can never be considered in combination to make a finding of anticipation."  *Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 935 F.3d 1341, 1350 (Fed. Cir. 2019).  A patent challenger may combine disclosures from multiple embodiments of a reference if a skilled artisan, "reading the reference, would 'at once envisage' the claimed arrangement or combination."  *Kennametal*, 780 F.3d at 1381 (citation omitted).

In its reply brief, Deere does not appear to dispute that Dr. Klopp combined the embodiments of Figures 8 and 14 in expressing his opinion on anticipation.  *See* Dkt. No. 219 at 13–14.  However, Deere relies on Dr. Klopp's assertion that a skilled artisan "would readily envisage all elements arranged as in the claim without loss of function or incompatibility of components."  *Id.* at 14 (citing Dkt. No. 195-1, Exh. T ¶ 88).  In Dr. Klopp's view, a skilled artisan would understand that "the surfaces indicated by red lines in [Figure 8 of Carpenter '771] could extend into and out of the page substantially parallel to the longitudinal axis."  Dkt. No. 195-1, Exh. T ¶ 88.  Deere contends that ESCO has provided "no evidence" to contradict Dr. Klopp's opinion on that point.  Dkt. No. 219 at 14.

Although Mr. Holland did not expressly state that a skilled artisan would not envisage a combination of the Figure 8 and Figure 14 embodiments of Carpenter '771, a reasonable jury could find, based on Mr. Holland's testimony and the disclosures of Carpenter '771, that a skilled artisan would not do so.  As Mr. Holland notes, Figure 14 of Carpenter '771 depicts top and bottom

surfaces that are not parallel to the longitudinal axis. Dkt. No. 219-1, Exh. M ¶ 172; Carpenter '771, Fig. 14. And although the discussion of Figure 14 indicates that the side stabilizing surfaces may extend parallel to the longitudinal axis, there is no similar discussion of the top and bottom stabilizing surfaces. *See* Carpenter '771 ¶ 69 (describing "converging walls of the nose"). Based on that evidence, a jury could find that a skilled artisan would not "at once envisage" a combination of the embodiments depicted in Figures 8 and 14 of Carpenter '771. *See Kennametal*, 780 F.3d at 1381 (citation omitted).

Because the question whether the two distinct embodiments of Carpenter '771 can be combined raises a question of fact for the jury, summary judgment will not be entered for either party with respect to that issue.

### ii. *"central location"*

ESCO next argues that Carpenter '771 does not anticipate because it does not disclose side stabilizing surfaces that "converge inward toward a central location along the respective side wall," as required by the asserted claims. As ESCO points out, the surfaces identified by Deere appear to converge at a point that is slightly offset from the precise midpoint of the side wall of the socket. Dkt. No. 201 at 21 (citing Dkt. No. 184-3 ¶ 230). To illustrate that argument, ESCO provided annotations, reproduced below, of Figure 8 of Carpenter '771 (left) and Figure 8 of the '662 patent (right) in its answering brief.



Dkt. No. 201 at 21.  ESCO contends that because the surfaces in Carpenter '771 do not converge at the midpoint of the side wall, the "central location" limitation of the claims has not been disclosed by Carpenter '771.  Deere responds that the "central location" recited in the claims need not necessarily be the precise midpoint of the side wall.

The parties' positions on this issue present a claim construction dispute that was not resolved during the *Markman* proceedings in this case.  I will resolve that dispute now.  The term "central location" does not appear in the written description of the '662 patent, but the figures of the patent appear to depict the side stabilizing surfaces at the midpoint of the side wall in each case.  *See* '662 patent, Figs. 2–4, 6–7.  Nonetheless, the specification of the '662 patent indicates that the side stabilizing surfaces can be formed with "a variety of different shapes," and are "preferably planar" but "can be convex, concave, curved, or consisting of angular segments."  *Id.* at col. 8, ll. 6–10.

The plain meaning of the term "central location" suggests that the side stabilizing surfaces converge at a point generally in the central area of the side wall.  The use of the term "central location," rather than "midpoint" or "center," further suggests that the "central location" limitation of the claims does not reflect a strict requirement that the side stabilizing surfaces converge at the exact midpoint of the side wall.  As the Federal Circuit has explained, courts typically depart from the plain and ordinary meaning of a claim term only when one of two conditions is met: (1) the patentee acts as his own lexicographer, or (2) the patentee makes a "clear and unequivocal" disavowal, indicating "that the claimed invention includes or does not include a particular feature." *Poly-Am., L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016).  Neither of those conditions is present in this case.  Accordingly, the court will reject ESCO's narrowing

construction of the term "central location" and will construe that term to mean "a location generally in the center of the side wall."

### iii.    "pair of side stabilizing surfaces"

ESCO next argues that Carpenter '771 does not disclose *a pair* of side stabilizing surfaces that are substantially parallel to the longitudinal axis, as recited in the asserted claims.  The pair of side stabilizing surfaces identified by Deere in Carpenter '771 are the "lateral surface 69" and the "inner surface 71."  Dkt. No. 184-3 ¶ 230 (quoting Carpenter '771 ¶ 57).  Those surfaces of the socket correspond to the "outer faces 81 and lateral bearing faces 83" of the base.  *See* Carpenter '771 ¶ 69.  ESCO argues that Carpenter '771 does not disclose a pair of side surfaces that are parallel to the longitudinal axis because only the lateral bearing surfaces 83 are described as being "generally parallel."  Dkt. No. 201 at 23.

A close examination of the passage relied on by Deere, paragraph 69 of Carpenter '771, is warranted.  That paragraph recites, in relevant part:

> As another alternative, the nose can be provided with longitudinally extending rails 80 that include outer faces 81 and lateral bearing faces 83 (FIG. 14). The lateral bearing surfaces 83 are generally parallel to each other and to the longitudinal axis X of the tooth. In these arrangements, the depth of the rails preferably increases as the rails extend rearward; that is the converging walls of the nose form the upper or lower surfaces of the respective rails 80 even though the lateral surfaces 83 extend rearwardly in an orientation that is generally parallel to the longitudinal axis of the tooth. Nevertheless, the rails could have a constant depth and simply be spaced from the respective converging wall.  Without the divergence of the rails, the point is not rotated onto the adapter nose.

Carpenter '771 ¶ 69.  Paragraph 69 describes an embodiment in which the lateral bearing surfaces 83 are "generally parallel to each other and to the longitudinal axis," but it says nothing about the orientation of outer faces 81 relative to the longitudinal axis.  *Id.*  In an alternative configuration, however, paragraph 69 adds that "the rails could have a constant depth and simply be spaced from the respective converging wall."  *Id.*  One plausible reading of that statement is that the outer faces

81 may also be parallel to the longitudinal axis; Dr. Klopp adopted essentially that reading.  *See* Dkt. No. 184-3 ¶ 230; Dkt. No. 219-1, Exh. O ¶ 85.  But in light of the absence of an express disclosure to that effect in Carpenter '771, I conclude that it would be improper to find that the outer faces 81 disclosed in that reference are substantially parallel to the longitudinal axis, and to grant summary judgment on that basis.

This issue raises a question of fact that is not subject to summary disposition.  Summary judgment will be denied to both parties on the issue of anticipation of the asserted claims of the '662 patent by Carpenter '771.

### 2.    Livesay '925

ESCO moves for summary judgment that the asserted claims of the '662 patent are not anticipated by or obvious in view of Livesay '925.  The parties' dispute regarding this reference centers around whether Livesay '925 discloses a "pair of side stabilizing surfaces" that "bear against complementary surfaces in respective side recesses in the base to resist both vertical and horizontal loads during excavating," as required by the asserted claims.

In his report, Dr. Klopp identified the "longitudinal rib 126" of Livesay '925 as disclosing a side stabilizing surface.  Dkt. No. 184-3 ¶ 145.  As the specification of Livesay '925 explains, the longitudinal rib 126 is "formed on and project[s] inwardly from the side wall 32 of the socket 24."  Livesay '925, col. 4, ll. 1–3.  A corresponding "clearance groove 100" on the nose receives the "detent projection 124," which includes the longitudinal rib 126, when the socket is mounted to the nose.  *Id.* at col. 4, ll. 31–34.  Dr. Klopp expressed the opinion that "the longitudinal rib would bear against the clearance groove 100 during digging operations," and that the longitudinal rib would "resist both vertical and horizontal loading."  Dkt. No. 184-3 ¶¶ 148–51.  The

arrangement relied on by Dr. Klopp is best illustrated by Figures 3 and 4 of Livesay '925, which are reproduced below.



Livesay '925, Figs. 3–4.

ESCO argues that Dr. Klopp's opinions "contradict the clear disclosure" of Livesay '925, because there is no disclosure in that reference that the longitudinal rib is load bearing.  Dkt. No. 180 at 18.  Additionally, ESCO argues that the use of the word "clearance" in the term "clearance groove" means that "there is spacing between the groove and rib, and they do not contact to resist or bear any loads."  *Id.*  In support of its argument, ESCO relies principally on the decision of the Patent Trial and Appeal Board ("the Board") denying institution of an *inter partes* review of

the '662 patent claims.  *Id.*  In that decision, the Board found that Deere's showing regarding Livesay '925 did not "support sufficiently that 'detent projection 124' in the wear member of Livesay ['925] is a stabilizing surface that bears against any surface of the nose to resist both vertical and horizontal loads during excavating."  Dkt. No. 184-14 at 36.  ESCO does not contend that the Board's decision has preclusive effect against Deere, but rather cites the Board's decision as persuasive authority in support of its position regarding the disclosure of Livesay '925.

The difficulty with ESCO's argument is that Livesay '925 does not expressly state whether the longitudinal rib 126 can contact the clearance groove 100 such that the longitudinal rib bears loads during excavating.  Although the use of the word "clearance" would seem to suggest that the clearance groove 100 does not contact any other surface, the specification of Livesay '925 does not clearly establish that to be the case.[8]  And Dr. Klopp offered an opinion contrary to ESCO's position:  He stated that a skilled artisan would read Livesay '925 as disclosing a longitudinal rib that contacts the clearance groove and bears loads during excavating.  *See* Dkt. No. 184-3 ¶¶ 145–51.  That testimony is sufficient to create a genuine dispute of material fact regarding whether Livesay '925 anticipates the asserted claims of the '662 patent.

On the issue of obviousness, Dr. Klopp proposed that Livesay '925 could be modified "so as to make the rib and groove bear against each other," which in his view would "aid in bearing both vertical and horizontal loads in such a way so as to prevent any deleterious loading of the lock pin."  *Id.* ¶ 152.  In support of his proposed modification, Dr. Klopp noted that another prior art reference, "Hosmer '230," disclosed a similar feature.  *Id.*

---

[8]  Moreover, it is not necessarily the case that the word "clearance" implies that there must always be clearance between the groove and the longitudinal rib, even though such clearance may exist at certain times.  For that reason, Dr. Klopp's statement in his report on infringement that "[s]urfaces with clearance between them cannot bear load," Dkt. No. 184-7 ¶ 48, is not dispositive of the question whether Livesay '925 anticipates the asserted claims of the '662 patent.

ESCO argues that a skilled artisan would not have had a reasonable expectation of success in modifying Livesay '925 as Dr. Klopp proposed, for two reasons. First, ESCO argues that if the rib and clearance groove were re-sized to bear against each other, "it would be impossible for Livesay '925's lock pin to be inserted into its wear assembly." Dkt. No. 180 at 19. Second, ESCO argues that Dr. Klopp's proposed modification would not "prevent deleterious loading of the lock pin," as Dr. Klopp suggested, because "loads imposed on the rib of Livesay '925 would be transferred to its pin, thus 'driving it out of the wear assembly.'" *Id.* (citations omitted). In his reply report, Dr. Klopp disagreed with those two arguments, Dkt. No. 211-1, Exh. Y ¶¶ 74–75, and I find that his testimony creates a genuine dispute of material fact as to whether a skilled artisan would have reasonably expected success in modifying Livesay '925 as Dr. Klopp proposed.

Accordingly, ESCO's motion for summary judgment that the asserted claims of the '662 patent were not anticipated by and would not have been obvious in view of Livesay '925 will be denied.

### 3.    Livesay '138

ESCO moves for summary judgment that the asserted claims of the '662 patent are not anticipated by Livesay '138. As with Livesay '925, the parties' arguments focus on whether Livesay '138 discloses the "pair of side stabilizing surfaces" limitation of the asserted claims. In his report, Dr. Klopp annotated Figure 1 of Livesay '138 to indicate the pair of surfaces that he contends are the "side stabilizing surfaces" of the claims. *Id.* ¶ 298. That annotation is reproduced below.



*Id.*

ESCO provides three reasons that, in its view, Dr. Klopp's testimony does not create a genuine dispute of material fact on the issue of anticipation. First, ESCO contends that Dr. Klopp's report "essentially double-counts" the side walls of Livesay '138 as satisfying both the "side walls" and "side stabilizing surfaces" limitations of the asserted claims. Dkt. No. 180 at 22. That argument, however, overlooks the language of the '662 patent claims, which makes clear that the side walls "each includ[e] a pair of side stabilizing surfaces." *See, e.g.*, '662 patent, cl. 8. It was therefore appropriate for Dr. Klopp to identify portions of the side walls as being side stabilizing surfaces.

Second, ESCO contends that the side stabilizing surfaces do not "converge at a central location along the respective side wall" because the center of the side wall has a "clear gap." Dkt. No. 180 at 22. That argument is essentially the same as the argument that the claimed "central location" must be at the exact midpoint of the side wall, which was discussed and rejected above. Because "central location" is properly construed to mean "a location generally in the center of the side wall," a reasonable fact finder could accept Dr. Klopp's assertion that the side stabilizing surfaces converge at a central location of the side wall in Livesay '138.

Third, ESCO contends that the surfaces Dr. Klopp referred to as the side stabilizing surfaces resist only vertical loads and not horizontal loads during excavating. *Id.* In support of that argument, ESCO cites the following disclosure in Livesay '138: "Forces acting on either side of the forward portion 18 of the tip 12 is [sic] transferred from the respective sidewalls 32, 34 of the tip 12 to the sides of the forward end 72 of the nose portion 70." Livesay '138, col. 7, ll. 27–31. However, Dr. Klopp offered the opinion that a skilled artisan "would recognize that the vertical oriented surfaces adjacent to each surface 52 would also advantageously provide a horizontal load bearing function when the tip is installed onto the socket as these surfaces would bear against similar vertically oriented surfaces in the recesses of the sidewall on the adapter." Dkt. No. 184-3 ¶ 300. In view of that testimony, I find that there is a genuine dispute of material fact regarding whether the surfaces identified by Dr. Klopp bear horizontal loads during excavating.

Summary judgment will not be granted to ESCO on the issue of whether Livesay '138 anticipates the asserted claims of the '662 patent.

### G.    Anticipation and Obviousness of the '175 Patent Claims

ESCO moves for summary judgment that the asserted claims of the '175 patent are not anticipated by or obvious in view of three references:  PCT Patent Publication No. WO 2008/140993 ("Ollinger"); U.S. Patent Publication No. 2008/0256832 ("Esti"); and U.S. Patent Publication No. 2007/0193075 ("Carpenter '075").

#### 1.    Ollinger

ESCO first moves for summary judgment that the asserted claims of the '175 patent are not anticipated by Ollinger.  ESCO argues that (1) Ollinger does not disclose a front end that has inward projections, as required by the asserted claims; and (2) Ollinger is not prior art because the

49

disclosures relied upon by Deere are the work of Mr. Snyder, the named inventor of the '175 patent.

        *i.*    *"inward projections"*

The asserted claims of the '175 patent require that "each of the first side surface and the second side surface has a transverse, inward projection in the front stabilizing end" of its socket that is "defined by bearing surfaces." *See, e.g.*, '175 patent, cl. 4. Ollinger discloses a socket having a "front end . . . [that is] formed with a complementary concave and curved bearing face 64" that sets against "bearing face 60" of the nose. Ollinger ¶ 57. Figure 12 of Ollinger, which depicts a nose having a hemispherical bearing face 60, is instructive and is reproduced below.



Ollinger, Fig. 12.

In his report, Dr. Klopp identified the "front end" of Ollinger's nose as including the hemispherical bearing face and a portion of the nose extending rearwardly from the bearing face. Dkt. No. 184-3 ¶ 380. He annotated Figure 1 of Ollinger and shaded in blue the portion of the socket that he considered to be the front end. *Id.* That annotation is reproduced below.



FIG.1

*Id.* Dr. Klopp also relied on a disclosure in Ollinger that the "socket walls 78–81 are preferably convex and curved across substantially their entire widths to define projections 86 received into troughs 84." *Id.* ¶ 365 (quoting Ollinger ¶ 60). Dr. Klopp offered the opinion that, in view of that disclosure and the figures of Ollinger, that reference disclosed the "inward projection" limitation of the asserted claims. *Id.* ¶¶ 364–66.

ESCO argues that it is improper to characterize the portions highlighted by Dr. Klopp that are rearward of the hemispherical bearing face as being part of the "front end." Dkt. No. 180 at 24–25. That is so, ESCO contends, because Ollinger discloses that those portions are part of the "body 66," which is described as being "rearward of front end 58." *Id.* at 25; Ollinger ¶ 59. Essentially, ESCO contends that the front end of the socket disclosed in Ollinger is limited to bearing face 64 and may not include any surface that is rearward of that face. *See* Dkt. No. 184-4 ¶ 193 (Mr. Holland asserting that Figure 11 of Ollinger "clearly depicts" bearing face 64 as "having no projections").

The problem for ESCO is that it concedes, via its infringement positions, that the front end of the socket referred to in the asserted claims is not limited to the bearing face or front thrust face. For example, Mr. Holland identified the "front end" of the accused products as including the front face of the socket and a portion of the surfaces that extend rearwardly from that face. Dkt. No.

184-6 at 46.[9]  An annotation included in Mr. Holland's report, reproduced below, makes that point clear.



*Id.*  Moreover, the specification of the '175 patent makes it clear that the thrust face can be "any desired shape," including "hemispherical," "flat," or "concave." '175 patent, col. 8, ll. 4–6.  Thus, ESCO's infringement position, considered in view of the disclosures in the '175 patent specification, shows that the front end can include a portion of the socket that is rearward of the front face of the socket.  ESCO's position that the front end of Ollinger is limited to the hemispherical bearing face disclosed in that reference is therefore unpersuasive.

ESCO also argues that the "inward projection" limitation of the asserted claims is not disclosed by Ollinger because Ollinger does not teach inward projections that are "defined by bearing surfaces," as the claims require.  That is because, according to Mr. Holland's report, portions of the socket identified by Dr. Klopp as being inward projections do not actually contact the base.  Dkt. No. 184-4 ¶ 195.  Dr. Klopp, however, characterized Mr. Holland's opinions on that point as "irrelevant," explaining that although there "may be spacing between the adaptor and the wear member socket elsewhere in the assembly," that fact does not affect his conclusion that the inward projections "on the left and right sides of the wear member socket" are defined by

---

[9]  Citations to Dkt. No. 184-6 refer to the page numbers of the PDF document.

bearing surfaces.  Dkt. No. 211-1, Exh. Y ¶ 111.  That testimony creates a genuine dispute of material fact as to whether Ollinger teaches inward projections that are defined by bearing surfaces.

Accordingly, ESCO has not demonstrated that it is entitled to summary judgment that Ollinger fails to disclose each limitation of the asserted claims of the '175 patent.

ii.    *Whether Ollinger is Prior Art*

I next turn to ESCO's contention that Ollinger is not prior art because the portions of Ollinger relied on by Deere are, in ESCO's view, the work of Mr. Snyder, and thus do not constitute prior art.  As ESCO points out, Ollinger was published less than one year prior to the effective filing date of the '175 patent.  Ollinger therefore can qualify as prior art only if it falls with the scope of subsections (a) or (e) of the pre-America Invents Act version of 35 U.S.C. § 102.  And an invention may not be considered prior art under those subsections if "the portions of the reference relied on as prior art[] and the subject matter of the claims in question[] represent the work of a common inventive entity."  *Riverwood Int'l Corp. v. R.A. Jones & Co.*, 324 F.3d 1346, 1356 (Fed. Cir. 2003).  That is, a disclosure does not qualify as prior art under those subsections if it is "a description of the [inventor's] own work."  *Id.* (citation omitted).

The Ollinger reference has three named inventors:  Charles G. Ollinger, IV; Chris D. Snyder; and John S. Kreitzberg.  Mr. Snyder, as noted, is the sole named inventor of the '175 patent.  ESCO argues that the "inward projections relied on by Dr. Klopp" in the Ollinger reference are Mr. Snyder's work, while the hemispherical front end of the nose represented the work of Mr. Ollinger and Mr. Kreitzberg.  Dkt. No. 180 at 26.

The situation presented in *Riverwood* is quite similar to the situation presented by the Ollinger reference and the '175 patent.  In *Riverwood*, one individual, Kelley Ziegler, was a named inventor on three patents.  324 F.3d at 1356.  On one patent, Mr. Ziegler was listed as a co-inventor

with two other individuals. *Id.* The defendant asserted that patent as prior art against a second patent, on which Mr. Ziegler was the sole named inventor, and a third patent, on which Mr. Ziegler was named as a co-inventor with two different individuals. *Id.* The plaintiff argued that the first patent was not prior art because "Ziegler was the sole inventor of the subject matter of the [first] patent" on which the defendant relied on as the basis for its obviousness contentions. *Id.* The court of appeals explained that "[i]f Ziegler was the sole inventor of the portions of the [first] patent relied upon by the defendant in its obviousness arguments, then the [first] patent is not prior art to the [second] patent." *Id.* at 1357. The *Riverwood* case makes clear that the Ollinger reference would not be prior art to the '175 patent only if it is determined that Mr. Snyder is the sole inventor of the portions of Ollinger relied on by Deere.

In support of its position, ESCO relies principally on two internal documents that purportedly describe the development of the wear assemblies disclosed in Ollinger and the '175 patent. One document indicates that "John [Kreitzberg] took the approach of . . . creating a sphere on the nose to eliminate one surface gap." Dkt. No. 184-20 at 3.[10] That same document indicates that "Charlie [Ollinger] stayed with the approach of the point riding on the surface of a sphere defined by the center of rattle." *Id.* And another document, which ESCO asserts was written by Mr. Snyder alone, discusses the use of "PVX" concave grooves (i.e., inward projections) that "remained only on the rear flats" in the "spherical nose shape" embodiments, whereas other embodiments use such grooves "for the full length of the nose." Dkt. No. 184-21.

Deere contends that there are disputed factual issues regarding whether the inward projections that Dr. Klopp relies on in Ollinger were solely the work of Mr. Snyder.[11] For example,

---

[10] Citations to Dkt. No. 184-20 refer to the page numbers of the PDF document.

[11] Deere also appears to contend that ESCO should not be permitted to argue that Ollinger fails to qualify as prior art, because ESCO did not list the Ollinger reference in its response to a

the first document relied on by ESCO states that the recommendation to "bring[] the PVX feature [i.e., the inward projections] forward through the thrust face" was a recommendation of the "Dredge NPD team" rather than of Mr. Snyder alone.  Dkt. No. 184-20 at 29.  That document also states that "*[w]e* ran several hundred points across each of the[] noses over two years before settling on what *we* have today," which included "bringing the rounded contacts all the way to the thrust face."  *Id.* at 5 (emphasis added).  The use of the word "we" further implies that individuals other than Mr. Snyder may have been involved in the development of the inward projections.  And with regard to the document purportedly authored by Mr. Snyder, it appears that document may have been authored in preparation for this litigation.  *See* Dkt. No. 211-1, Exh. T, at 68:23–69:3 (Mr. Snyder testifying that he created the document "[a] year and a half ago I think.  It was when this whole process started, I was asked to pull things together.").  If that were true, the document would not be strong evidence of who originally conceived of the material described in that document.

ESCO argues that the evidence cited by Deere is not dispositive because, in ESCO's view, the evidence is clear that each of the three named inventors on the Ollinger reference designed separate prototypes that are shown in ESCO's engineering documents.  Mr. Snyder testified in his deposition that he developed a prototype referred to as the "SF," Mr. Ollinger developed a prototype referred to as "SR," and Mr. Kreitzberg developed a prototype referred to as "P."  *Id.* at 70:15–71:16, 74:1–9.  Those prototypes are depicted in one of ESCO's engineering documents,

---

contention interrogatory regarding which references ESCO would contend are not prior art.  *See* Dkt. No. 210 at 21 n.4.  As ESCO points out, however, Deere's invalidity contentions proposed that the "front end" in Ollinger was merely the "forward facing bearing face 60" and that the front end could be modified to include inward projections.  Dkt. No. 223-1 at 5, 8–9.  Because Deere now argues that the front end includes a portion of the socket that is rearward of the bearing face, it is permissible for ESCO to respond that the disclosure of that feature would not qualify as prior art.

Dkt. No. 184-20 at 5, and ESCO describes that document as "depicting the wear assemblies of the '175 patent and the Ollinger reference," Dkt. No. 180 at 26.  At the hearing on the present motions, ESCO represented that the "P" prototype, designed by Mr. Kreitzberg, is the embodiment disclosed in the Ollinger reference.  June 15, 2023, Hearing Tr. 81:24–25.  The assertion that the prototypes were designed separately by Messrs. Ollinger, Kreitzberg, and Snyder would thus support an inference that Mr. Kreitzberg at least contributed to the development of the projections identified by Dr. Klopp.

On the above evidence, a reasonable fact-finder could conclude that the surfaces in Ollinger that Dr. Klopp identified as the "inward projections" were not the sole work of Mr. Snyder.  As such, the fact-finder could conclude that those features of Ollinger qualify as prior art to the '175 patent.  Accordingly, ESCO is not entitled to summary judgment that Ollinger is not prior art.

### 2.    Esti

ESCO next moves for summary judgment that the asserted claims of the '175 patent are not anticipated by or obvious in view of Esti.  As with the Ollinger reference, ESCO's arguments focus on the limitation requiring side surfaces of the socket, each having a "transverse, inward projection in the front stabilizing end" that is "defined by bearing surfaces."  In his opening report, Dr. Klopp identified the components of Esti that he regarded as disclosing the "inward projection" limitation of the asserted claim.  Dkt. No. 211-1, Exh. W ¶¶ 490–91.  The portions highlighted by Dr. Klopp correspond to the "guide groove 22" of the socket disclosed in Esti.  *See* Esti ¶ 39 & Figs. 5–6.  In Esti, the guide grooves receive a "kerb or guide tongue 55 of the nose."  *Id.* ¶ 39. Figures 5 and 7 of Esti depict the guide groove 22 and the corresponding guide tongue 55.



Esti, Figs. 5, 7.

In his report, Dr. Klopp annotated Figures 5 and 6 of Esti to depict the portions of the socket, and in particular the guide groove, that represented the inward projections recited in the asserted claims of the '175 patent. That annotation is reproduced below, with the surfaces that Dr. Klopp identified as "inward projections" highlighted in red.



Dkt. No. 211-1, Exh. W ¶ 492.

ESCO argues that the guide grooves disclosed in Esti extend outwardly and therefore are not "inward projections." Dkt. No. 180 at 27. Dr. Klopp disagreed with that assertion, explaining in his reply report that the projections formed by the guide grooves "point inward to the interior of the wear member socket." Dkt. No. 211-1, Exh. Y ¶ 127. The question whether the projections formed by the guide grooves point inward as opposed to outward is a factual question properly reserved for trial.

ESCO also argues that the guide grooves disclosed in Esti are not defined by "bearing surfaces," as the claims require, because they do not bear loads.  In support of that assertion, ESCO relies on the following statement in Esti:  "[P]roviding for lowered zones, or recessed in the nose, and for corresponding reliefs in the pocket, *besides the presence of the side guide kerbs*, allows involving all sides of the nose and of the pocket in the coupling, with a considerable increase of the tearing strength."  Esti ¶ 52 (emphasis added).  Mr. Holland understood that statement to mean that the kerbs (and by extension, the guide grooves) do not bear loads.  Dkt. No. 184-4 ¶ 220.  Dr. Klopp disagreed, concluding that the word "besides" should be understood to mean "in addition to" rather than "with the exception of."  Dkt. No. 211-1, Exh. Y ¶ 128.  The competing testimony of the two experts raises a genuine dispute of material fact as to whether the guide grooves disclosed in Esti are load bearing.

On the issue of obviousness, Dr. Klopp offered the opinion that a person of skill in the art could also "inverse or rearrange the guide tongue 55 and pocket 12 [which includes the guide groove] relationship" to create inward projections.  Dkt. No. 211-1, Exh. W ¶ 493.  Such a modification, he explained, would have been "a mere rearrangement of parts or mere substitution of known parts in a predictable art" and "would be a simple matter of design choice."  *Id.* ¶¶ 493–94.  ESCO argues that Dr. Klopp's testimony on that point is "conclusory" and is insufficient to create a genuine dispute of fact regarding obviousness.  Dkt. No. 180 at 28.  I disagree; a reasonable fact-finder could find, based on Dr. Klopp's testimony, that such a modification would have been obvious.

Accordingly, ESCO's motion for summary judgment of no anticipation or obviousness in view of Esti will be denied.

### 3.    Carpenter '075

ESCO moves for summary judgment that the asserted claims of the '175 patent would not have been obvious in view of Carpenter '075.  ESCO's arguments again focus on the requirement that the side surfaces have a "transverse, inward projection in the front stabilizing end."  In his opening report, Dr. Klopp appeared to acknowledge that Carpenter '075 does not expressly disclose inward projections in the front end.  However, Dr Klopp offered the opinion that a skilled artisan "would be motivated to modify the lateral inward projections of Carpenter '075 to abut the front thrust surface as opposed to beginning rearward of the front stabilizing end."  Dkt. No. 211-1, Exh. W ¶ 593.  In support of that opinion, Dr. Klopp cited a disclosure in Carpenter '075 indicating that the stabilizing surfaces "could extend the entire width and depth of the nose and socket."  *Id.* (quoting Carpenter '075 ¶ 32).

ESCO challenges Dr. Klopp's reliance on that statement.  ESCO contends that Carpenter '075 uses the term "length" to refer to the dimension along the longitudinal axis, and that the terms "width" and "depth" necessarily refer to dimensions along other axes.  Dkt. No. 180 at 28–30.  It is true that the Board agreed with ESCO on this point in its decision denying institution of an *inter partes* review of the '175 patent.[12]  Dkt. No. 184-15 at 28–31.  For purposes of the present motion for summary judgment, however, Dr. Klopp's testimony is sufficient to create a genuine dispute of material fact on that question.  In particular, he observed that inward projections extending the entire vertical direction (i.e., the direction that ESCO contends is "depth") would "close the mouth of the socket, leaving no ability for the socket to mount onto [the] nose."  Dkt. No. 211-1, Exh. W

---

[12]  As noted above, ESCO acknowledges that the Board's decision declining to institute *inter partes* review was not a final decision on the merits and therefore is not entitled to collateral estoppel effect.  Thus, ESCO does not contend that Deere is barred from arguing that the word "depth" in paragraph 32 of Carpenter '075 refers to the dimension along the longitudinal axis. Rather, ESCO cites the Board's decision for its persuasive value on that issue.

¶ 593.  Thus, he concluded, the term "depth" must be referring to "the longitudinal axis of the socket."  *Id.*  That reading of Carpenter '075 is at least plausible and therefore creates a triable issue of fact as to the meaning of the disclosures in Carpenter '075.

ESCO also argues that, in any event, a skilled artisan would not have a motivation to modify the socket of Carpenter '075 to have inward projections in its front end.  Specifically, ESCO argues that Carpenter '075 teaches away from using "recesses and projections" and instead encourages the use of "'substantially parallel' surfaces that are 'formed around the entire front end 24.'"  Dkt. No. 180 at 31 (quoting Carpenter '075 ¶ 27).  Deere disagrees, arguing that Carpenter '075 expressly discloses a nose and socket that have a "more angular" shape, thereby defining "a generally parallelepiped front end with generally rectangular stabilizing surfaces."  Dkt. No. 210 at 26–27 (quoting Carpenter '075 ¶ 28).  Indeed, Carpenter '075 notes that "the general configuration of the nose . . . can vary considerably."  Carpenter '075 ¶ 28.  In view of those disclosures, I find that there is a genuine dispute of material fact as to whether a skilled artisan would be motivated to modify Carpenter '075 to have inward projections in the front end.

Accordingly, ESCO is not entitled to summary judgment that the asserted claims of the '175 patent would not have been obvious in view of Carpenter '075.

## IV.  <u>Conclusion</u>

In conclusion, Deere's motion for summary judgment is GRANTED on the issue of infringement of the '175 patent and is DENIED in all other respects.  ESCO's motion for summary judgment is GRANTED with respect to validity under 35 U.S.C. § 112 and is DENIED in all other respects.

I note that many of the materials filed in support of both parties' motions for summary judgment have been filed under seal.  Accordingly, in an abundance of caution, this order has been

filed under seal.  Within three business days of the issuance of this order, the parties are directed to advise the court by letter whether they wish any portions of the order to remain under seal, and if so which portions.  Any request that portions of the order should remain under seal must be supported by a particularized showing of need to limit public access to those portions of the order.

IT IS SO ORDERED.

SIGNED this 22nd day of June, 2023.

WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE