IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ESCO GROUP LLC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action No. 20-1679-WCB |
| | § | |
| DEERE & COMPANY, | § | |
| | § | |
| *Defendant*. | § | |
| | § | |

# ORDER

The parties have sought an order permanently sealing certain portions of the court's orders on several pretrial motions. The motions at issue are *Daubert* motions by each party seeking to strike certain testimony of the other party's experts, Dkt. No. 280, and separate motions by each party to strike additional portions of the other party's expert testimony, Dkt. No. 279. Each of those motions was initially filed under seal. At the conclusion of the two orders disposing of the motions, the court stated that it would initially file the orders under seal, subject to the parties' advising the court by letter whether they wished any portions of the orders to remain permanently under seal. The court added that any request that portions of the orders remain under seal "must be supported by a particularized showing of need to limit public access to those portions of the order." Dkt. No. 279 at 25; Dkt. No. 280 at 21.

The parties responded with a letter from Deere, to which was attached Deere's proposed redactions to the two orders. The letter noted that ESCO did not oppose Deere's proposed redactions and had no further proposed redactions of its own. The proposed redactions were addressed to information regarding profit margins on particular products (in the *Daubert* order)

1

and information regarding market shares of the sales of construction wearables (in both the *Daubert* order and the order on the motions to strike).

Deere's letter asserted that profit margin and market share information "constitute confidential business information and/or trade secrets properly protected by sealing." Dkt. No. 282 at 1. Deere added that disclosure of that information "would provide competitors in the industry access to confidential and proprietary financial and market share data from which they could deduce profit margins and adjust their marketing and pricing strategies to gain an unfair advantage in the marketplace." *Id.*

The court then entered an oral order stating that the redactions of the profit margin information would be accepted.[1] Dkt. No. 283. With respect to the proposed redactions of the market share information, however, the court stated that it was unclear whether competitors in the industry are unaware of the market share information, and whether public disclosure of that information would be competitively harmful to Deere. *Id.* Because Deere had made no such showing on either issue in its letter, the court directed Deere to "provide a particularized showing (e.g., in the form of a declaration) as to whether the market share information in the court's opinion is unknown to competitors in the industry and as to why disclosure of the market share information

---

[1] Profit margin information has routinely been held to constitute confidential business information that can properly be protected from public disclosure. Courts have ruled that such information could be damaging to a business if it were made available to competitors, by enabling the competitors to use that information to inform their competitive strategies. *See Apple Inc. v. Samsung Elecs. Co.*, 727 F.3d 1214, 1223 (Fed. Cir. 2013); *Amgen Inc. v. Amneal Pharms. LLC*, No. 16-853, 2021 WL 4133516, at *3 (D. Del. Sept. 10, 2021); *Edwards Lifesciences Corp. v. Meril Life Sciences Pvt. Ltd.*, No. 19-cv-6593, 2021 WL 5407316, at *5 (N.D. Cal. Nov. 18, 2021); *Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.*, No. 15-3183, 2018 WL 10440735, at *5 (D. Minn. June 20, 2018); *Bracco Diagnostics, Inc. v. Amersham Health Inc.*, No. 03-6025, 2007 WL 2085350, at *6 (D.N.J. July 18, 2007).

2

would place Deere at a competitive disadvantage sufficient to overcome the presumptive right of public access." *Id.*

In response to the court's order, Deere withdrew its request to redact the market share information and requested only that the profit margin information be redacted from the *Daubert* motion. Dkt. No. 284. ESCO, however, submitted a separate letter in which it asserted that ESCO's market share information is not generally known in the industry and that its disclosure would place ESCO at a competitive disadvantage. Dkt. No. 285. In its letter, ESCO "t[ook] no position as to the confidentiality of the market share data of Deere's products," but asked that in addition to redacting market share information for ESCO products, any market share calculations that reflected ESCO's market share research should also be redacted. *Id.* ESCO attached to its letter a short declaration from an ESCO executive stating (1) that ESCO monitors the relative market share of its products as compared to competitor products, (2) that market share information is not publicly available, in that ESCO cannot obtain such information from a third party that maintains market share data for the ground engaging tool industry; (3) that ESCO has a team in its marketing department that works directly with dealers and customers to estimate the relative market share of its products; (4) that understanding the market share of its products is important because it can highlight potential opportunities to make new sales and increase its market share; and (5) that ESCO does not share its market share research with third parties and considers the research highly confidential. Dkt. No. 286 ¶¶ 3–5.

Addressing the harm that would result from public disclosure of ESCO's internal market share information, the declaration asserted that disclosure would give competitors an unfair business advantage by allowing competitors to use ESCO's market share data to target specific dealers or customers without having to expend resources to research the competitive landscape.

*Id.* ¶ 4. For example, the declaration stated that "if a competitor learned that a particular dealership or customer is buying a disproportionately large share of ESCO products as compared to the rest of the industry, that competitor might specifically target those dealerships or customers as opportunities to sell more of its products." *Id*. The declarant added: "It is my experience that understanding the market share of a competitor's product allows a business to better identify customers to sell products to and is one of the primary reasons why companies like ESCO spend the time and money to research market share." *Id.*

It is not entirely clear from ESCO's letter and declaration whether ESCO is proposing the same redactions originally proposed by Deere, or whether it is proposing a more limited set of redactions that does not include the market share information for Deere products. In any event, however, the asserted harm to ESCO—that a competitor might target certain customers of ESCO that purchase disproportionately large shares of ESCO products—would not logically flow from disclosure of the market share information for Deere products.[2] Accordingly, I will treat ESCO's request as being principally directed to the market share information for ESCO products, together with information from which ESCO's market shares could be derived, and will fashion this sealing order accordingly.

\* \* \* \* \*

---

[2] Even as applied to ESCO, the harm identified in the declaration does not squarely match up with the market share information identified in the court's order. For example, the court's order states ESCO's share of the market for construction expendables generally and ESCO's share of the market for premium construction expendables. That information would not allow a competitor to conclude that "a particular dealership or customer is buying a disproportionately large share of ESCO products compared to the rest of the industry," Dkt. No. 286 ¶ 4, which is the principal harm recited in the declaration. However, as discussed in more detail below, I will accept the more general assertion that there is value in "understanding the market share of a competitor's product" and that therefore the disclosure of information about ESCO's market share could result in competitive harm to ESCO. *Id.*

4

Three legal standards govern requests to seal court records. First, the party seeking to seal materials used in a judicial proceeding must satisfy the requirements of Rule 26(c), Fed. R. Civ. P., for obtaining a protective order. That rule permits a court to enter a protective order covering certain materials to shield a party "from annoyance, embarrassment, oppression, or undue burden or expense" while balancing those interests against the public's right to obtain information concerning judicial proceedings. *In re Avandia Mktg., Sales Practices & Prods. Liability Litig.*, 924 F.3d 662, 671 (3d Cir. 2019) (quoting Fed. R. Civ. P. 26(c)(1)).[3]

Second, there is a common law right of access to judicial records, which establishes a presumption that the public has a right of access to "judicial proceedings and records." *In re Cendant Corp.*, 260 F.3d 183, 192–93 (3d Cir. 2001). While that presumption does not extend to materials exchanged during discovery or submitted in the course of discovery disputes, it applies to "all material filed in connection with nondiscovery pretrial motions, whether those motions are case dispositive or not." *Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 998 F.2d 157, 165 (3d Cir. 1993). The party seeking to have judicial records sealed "'bears the burden of showing that the material is the kind of information that courts will protect' and that 'disclosure will work a clearly defined and serious injury to the party seeking closure.'" *Cendant*, 260 F.3d at 194 (quoting *Miller v. Indiana Hosp.*, 16 F.3d 549, 551 (3d Cir. 1994)). To justify overriding the presumption of public access to judicial records, a district court "must articulate 'the compelling, countervailing interests to be protected,' make 'specific findings on the record concerning the effects of

---

[3] Although any appeal in this patent case will go to the Federal Circuit, the sealing issue does not involve substantive issues of patent law. For that reason, the law of the regional circuit, here the Third Circuit, governs the disposition of the issues now before the court. *See Apple, Inc. v. Samsung Elecs. Co.*, 727 F.3d 1214, 1220 (Fed. Cir. 2013).

5

disclosure,' and 'provide[] an opportunity for interested third parties to be heard.'" *Avandia*, 924 F.3d at 672–73 (quoting *Cendant*, 260 F.3d at 194).

While the presumption in favor of public access is strong, it is not absolute. Documents containing "trade secrets or other confidential business information may be protected from disclosure." *Leucadia*, 998 F.2d at 165; *see also Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978) (common law right of access does not extend to records such as "sources of business information that might harm a litigant's competitive standing").

Third, the First Amendment right of public access attaches to, *inter alia*, "civil trials." *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1061 (3d Cir. 1983). That right of access "requires a much higher showing than the common law right [of] access before a judicial proceeding can be sealed." *Avandia*, 924 F.3d at 673 (quoting *Cendant*, 260 F.3d at 198 n.13). However, the Third Circuit has not yet held that the First Amendment right of public access applies to materials such as summary judgment records, and by extension to records relating to other pretrial motions, such as the motions to strike and the *Daubert* motions at issue in this case. *Avandia*, 924 F.3d at 679–80.

I need not decide whether the First Amendment right of access applies to the records addressed in this order because courts that have recognized a First Amendment right to access to judicial records have also recognized an exception for confidential business materials, such as trade secrets and proprietary business information. *See, e.g.*, *Standard Inv. Chartered, Inc. v. Fin. Indus. Regul. Auth., Ind.*, 347 F. App'x 615, 617 (2d Cir. 2009) (interest in protecting confidential business information outweighs the qualified First Amendment presumption of public access); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, No. 14-MD-2542, 2023 WL 196134, at *6 (S.D.N.Y. Jan. 17, 2023); *SmartSky Networks, LLC v. Wireless Sys. Sols., LLC*, 584 F. Supp. 3d 36, 54–56 (M.D.N.C. 2022); *Bohannon v. Facebook, Inc.*, No. 12-cv-1894, 2019 WL

188671, at *3 (N.D. Cal. Jan. 14, 2019) ("[P]reventing harm to a business's competitive standing seemingly serves as a compelling interest under the First Amendment in civil cases."); *Level 3 Commc'ns, LLC v. Limelight Networks, Inc.*, 611 F. Supp. 2d 572, 581–82 (E.D. Va. 2009) (protection of trade secrets can serve as an exception to the First Amendment right of access). Because that exception is at issue in this case, the showing required to justify sealing the information in question is the same regardless of whether the First Amendment or the common law is the source of the countervailing interest in disclosure. Thus, the sealing issue comes down to whether ESCO has made a sufficient showing that the market share information it seeks to protect is confidential business information that is entitled to be shielded from public access.

Answering that question is difficult in this case, in part because the sealing requests are unopposed, as is true in the vast majority of cases in which parties seek to seal particular judicial records, and in part because, as usually happens, the parties have not provided a detailed justification for their sealing requests, even though appellate courts require that district judges make specific factual determinations before issuing sealing orders.

To begin with, there is a systemic problem with over-sealing in patent cases. In the past 12 years during which I have been sitting by designation in district courts, frequently in patent cases, I have found that patent lawyers often seek to file most of their substantive motions and accompanying exhibits under seal. In some cases, the sealing requests are the result of careful consideration of the competing interests. In many other cases, however, the requests appear to be made reflexively, without careful attention to the restrictions courts have imposed on the extent to which judicial materials can legitimately be withdrawn from the public record. The result is that there are too many requests for sealing. That practice poses difficulties for the court, unless the

court simply gives in and agrees to seal whatever the lawyers request, which can result in important portions of the decision-making process in patent cases being entirely concealed from the public.

This process is rendered difficult for the courts because most of the time sealing requests are unopposed. Both parties typically have an interest in sealing their own materials and no incentive to oppose one another's sealing requests. *See also Takeda Pharms. U.S.A., Inc. v. Mylan Pharms., Inc.*, No. 19-2216, 2019 WL 6910264, at *1 (D. Del. Dec. 19, 2019) (Judge Andrews observing that in his experience "corporate parties in complex litigation generally prefer to litigate in secret."). As a result, the court does not receive adversarial briefing on the issue and is presented with only the representations of the party that is advocating for sealing. That imposes a significant burden on the district courts, which have to conduct legal research and attempt to conduct a factual investigation into the issue from scratch, all without the assistance of an adversarial presentation.

There is a further and related problem for courts attempting to resolve sealing issues. Chief Judge Connolly has pointed out that, as a judge faced with an unopposed motion to seal, "it falls on me to scrutinize the proffered justification for the motion without the benefit of the industry knowledge that is often necessary to determine if a clearly defined and serious injury would result if I denied the motion." *In re Application of Storag Etzel GmbH*, No. 19-mc-209, Dkt. No. 40 at 2 (D. Del. Jan. 23, 2020). This case illustrates that dilemma well. While I have gained a reasonable understanding of the technology at issue in this case, I do not have a background in the industry that would put me in a position to perform a critical assessment of the ESCO executive's declaration. The declaration is not unreasonable on its face, so far as it goes, but I cannot test its reliability in light of an adversarial presentation or access to any possible contrary evidence offered by the parties or otherwise available to me.

The problems facing district judges in assessing unopposed sealing requests are amplified by the requirement imposed by appellate courts that the district judges "articulate 'the compelling, countervailing interests to be protected,' make 'specific findings on the record concerning the effects of disclosure,' and 'provide[] an opportunity for interested third parties to be heard.'" *Avandia*, 924 F.3d at 673 (quoting *Cendant*, 260 F.3d at 194).  While such requirements make sense in cases in which orders granting or denying sealing are opposed—which are the cases that the appellate courts see—they present more of a challenge for district courts in the vast majority of cases, such as this one, in which parties request that materials be sealed and their requests are unopposed.[4]

That challenge is presented by this case.  Even after prompting by the court, Deere and ESCO provided very limited briefing on the sealing issue.  ESCO's letter cites no authority and simply summarizes the two-page declaration from ESCO's executive.  Deere's initial letter in response to the court's inquiry about sealing contained a brief discussion of the case law, but still was only one page long.

Notwithstanding those impediments to reasoned decisionmaking, I am prepared to make a finding that ESCO and Deere have satisfied their burden of showing that the profit margin information and information regarding ESCO's market share constitute confidential business information that is sufficiently sensitive to overcome the presumption of public access.  As indicated above, the information regarding profit margins is plainly sensitive information that is

---

[4] Even when a request to seal is unopposed, courts in this district have applied the standard set forth in *Avandia* in evaluating whether the material should be sealed.  *See, e.g.*, *Storag Etzel*, No. 19-mc-209, Dkt. No. 40 at 2; *In re EWE Gasspeicher GmbH*, 612 F. Supp. 3d 402, 407–08 (D. Del. 2020); *Amgen Inc. v. Amneal Pharms. LLC*, No. 16-853, 2021 WL 4868555, at *1–2 (D. Del. Oct. 19, 2021); *Lipocine Inc. v. Clarus Therapeutics, Inc.*, No. 19-622, 2020 WL 4569473, at *1–3 (D. Del. Aug. 7, 2020); *Kaleo, Inc. v. Adamis Pharms. Corp.*, No. 19-917, 2019 WL 11680196, at *1–2 (D. Del. July 16, 2019).

entitled to protection. With regard to ESCO's market share information, however, the need for confidentiality is not so obvious. Nonetheless, in the absence of contrary evidence, I accept the representations of ESCO's executive that information regarding ESCO's market share in the market for construction wearables is confidential business information the public disclosure of which would result in competitive harm to ESCO.

I also find that sealing the specific information about profit margins and ESCO's market share will not have a significant adverse effect on the interests protected by the right of access to court records. Information regarding profit margins and market shares in the market for construction wearables is not a matter of general public interest. While that information might be valuable to competitors seeking to obtain a competitive advantage over ESCO, that is not an interest that is entitled to protection. Moreover, sealing the information about profit margins in the court's order on the motions to strike does not significantly interfere with the public's ability to understand the order. As to the market share information, the portion of the court's order on the motions to strike that contains the market share redactions is difficult to understand with all the redactions requested by the parties. However, as noted above, I will limit the redactions to information regarding ESCO's market share information and information from which ESCO's market share could be calculated. Limiting the redacted materials in that fashion will make it considerably easier to understand the court's order on the motions to strike than would be the case with all market share information redacted, including information regarding Deere's market share.

As to the requirement that third parties be given an opportunity to be heard on the sealing issue, there are two points to be made. First, in some instances, requests to seal involve materials owned by or affecting third parties. In those cases, allowing the affected third parties to be heard is obviously of prime importance. That is not true in this case, as there do not appear to be any

10

third parties directly affected by the sealing or disclosure of the materials at issue in this matter. Second, to the extent that any outside parties might be interested in the sealing issue in this case, they have not come forward during the more than two weeks since the orders at issue were filed. And in the event that any third party should emerge and seek to challenge the sealing order entered today, I would be prepared to entertain such a challenge. Given that the sealing ordered in this case does not have any obvious adverse effects on third parties and does not differ in kind from hundreds of sealing decisions made by order or by default in patent cases in this district every month, I believe those steps should be sufficient to satisfy the Third Circuit's requirement that third parties be given an opportunity to be heard regarding sealing decisions.

\* \* \* \* \*

In summary, the request that the profit margin information remain sealed is granted. However, some changes must be made to the proposed redacted versions submitted by the parties because the market share information that may remain sealed is limited to information as to ESCO's market share and information from which ESCO's market share could be calculated. Within seven days of this order, ESCO is directed to make the revisions in the redactions specified in this order, i.e., removing the proposed redactions of references to Deere's market shares in the order on the motions to strike and in the *Daubert* order.

With respect to the order on the motions to strike, that will entail restoring the references to Deere's market share in Exhibit 6 on page 10 of the order, on the first line of text after Exhibit 6, on the eighth and fourteenth lines of text after that; restoring all the redactions on page 11 of the order, and the redactions on lines 1, 12, 14, and 17 of page 12 as well as lines 4 and 7 of footnote 3 on page 12; restoring the redactions on lines 4, 8, 10, and 12 of page 13, as well as lines 3 and 5 of footnote 4 on page 13; restoring the redaction of Deere's market shares on Exhibit 6R on page

14, on the third line of text after Exhibit 6R and on the third and sixth lines after that; restoring the redactions on lines 5 and 8 of page 15 and the single redaction on page 15. ESCO should remove those redactions from the proposed redacted version of the court's order on the motions to strike that was submitted with the parties' June 27, 2023, joint letter to the court, Dkt. No. 282-1. The revised version should be filed as the approved redacted version of the court's order on the motions to strike.

With respect to the *Daubert* order, the references to Deere's market share should be restored on lines 1, 6, 18, and 22 of page 11 of that order. ESCO should remove those redactions from the proposed redacted version of the court's *Daubert* order that was submitted with the parties' June 27, 2023, joint letter to the court, Dkt. No. 282-2. The revised version should be filed as the approved redacted version of the court's order on the motions to strike.

IT IS SO ORDERED.

SIGNED this 10th day of July, 2023.

_____
WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE