IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ESCO GROUP LLC, | ) | |
| | ) | |
| Plaintiff, | ) | **Redacted - Public Version** |
| | ) | |
| v. | ) | C.A. No. 20-1679-WCB |
| | ) | |
| DEERE & COMPANY, | ) | ▮▮▮▮▮ |
| | ) | |
| Defendant. | ) | |

**ESCO GROUP LLC'S MOTION FOR REARGUMENT OR RECONSIDERATION OF THE COURT'S ORDER ON DEERE & COMPANY'S MOTION TO EXCLUDE EXPERT TESTIMONY OF THOMAS R. VARNER, PH.D.**

OF COUNSEL:
Brian D. Sieve, P.C.
Paul D. Collier
Jeremy D. Roux
Xaviere Giroud
Tareq M. Alosh
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

Dated: July 6, 2023

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
nhoeschen@shawkeller.com
edibenedetto@shawkeller.com
*Attorneys for Plaintiff*

**TABLE OF CONTENTS**

                                                      **Page**

I.      INTRODUCTION ................................................................................................................ 1

II.     BACKGROUND ................................................................................................................. 2

III.    ARGUMENT ....................................................................................................................... 6

         A.      Dr. Varner Compared the Super-V Patents and the Asserted Patents. ................... 6

         B.      Dr. Varner Did Not Apply the Comparison of Ultralok and Super-V Profit
               Margins to Deere's Profit Margins. ......................................................................... 9

IV.    CONCLUSION ................................................................................................................. 10

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Asetek Danmark A/S v. CMI USA Inc.*,
   852 F.3d 1352 (Fed. Cir. 2017)..................................................................................1, 10

*Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*,
   967 F.3d 1353 (Fed. Cir. 2020)....................................................................................1, 8

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993).................................................................................................1, 8, 10

*Energy Transp. Grp., Inc. v. William Demant Holding A/S*,
   697 F.3d 1342 (Fed. Cir. 2012)....................................................................................1, 7

*Intuitive Surgical, Inc. v. Auris Health, Inc.*,
   No. 18-1359, 2021 WL 3662842 (D. Del. Aug. 18, 2021).............................................8

*Micro Chem., Inc. v. Lextron, Inc.*,
   317 F.3d 1387 (Fed. Cir. 2003)........................................................................................8

*MiiCs & Partners, Inc. v. Funai Elec. Co., Ltd.*,
   No. 14-804-RGA, 2017 WL 6268072 (D. Del. Dec. 7, 2017).......................................10

*Mitutoyo Corp. v. Central Purchasing, LLC*,
   499 F.3d 1284 (Fed. Cir. 2007)......................................................................................10

*Pirelli Cable Corp. v. Ciena Corp.*,
   988 F. Supp. 424 (D. Del. 1997)..................................................................................1, 6

*Rite-Hite Corp. v. Kelley Co. Inc.*,
   56 F.3d 1538 (Fed. Cir. 1995)........................................................................................10

## I. INTRODUCTION

Reconsideration of this Court's *Daubert* Order (D.I. 280) is appropriate because it reflects a fundamental misunderstanding of Dr. Varner's use of ESCO's profit margins in his reasonable royalty analysis, which resulted in an error of "apprehension." *Pirelli Cable Corp. v. Ciena Corp.*, 988 F. Supp. 424, 445 (D. Del. 1997) (finding reargument proper where the Court "patently misunderstood" the underlying facts). The Court's Order made two critical errors.

***First***, the Order relies on the erroneous conclusion that Dr. Varner ***did not*** analyze the comparability of the Super-V patents to the asserted patents prior to reaching the "starting point" for his reasonable royalty opinion. Dr. Varner did perform that analysis by reviewing the patents, discussing with relevant ESCO employees the contributions of those patents to ESCO's products and the market's response to products covered by those patents when the patents expired, analyzing changes in market shares and profitability of products when relevant patents expired, and reviewing deposition testimony regarding the patents and the reports of ESCO's technical expert. *See* D.I. 183-1, Ex. I, ¶¶ 107-18, 125–29,[1] Ex. K, ¶¶ 65–73, Ex. L, 204:17–19, 206:20–211:7, 227:1–15. This is consistent with Federal Circuit precedent. *See, e.g.*, *Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1374 (Fed. Cir. 2020); *Asetek Danmark A/S v. CMI USA Inc.*, 852 F.3d 1352, 1362–63 (Fed. Cir. 2017); *Energy Transp. Grp., Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1357 (Fed. Cir. 2012). Thus, Dr. Varner had a sufficient factual and methodological basis for his opinions.

***Second***, the Court's Order erroneously concluded that Dr. Varner applied his comparison of ESCO's profit margins between the Ultralok and Super-V products to Deere's profit margins on the TK Series System products. But Dr. Varner ***did not*** use his analysis of Ultralok's profit

---

[1] Citations to Ex. I are to the version corrected by the January 16, 2023 Errata. D.I. 183-1, Ex. J.

margin as the "starting point" of his reasonable royalty calculation. In fact, he did not use Ultralok's profit margin *at all* in arriving at his proposed 8% reasonable royalty. Instead, Dr. Varner used that comparison simply to confirm that the decline in Super-V profit margins post patent expiration was not contradicted by ESCO's profit margins for its current patent-protected construction expendables product during the damages period (*i.e.*, Ultralok). *Compare* D.1. 183-1, Ex. I, ¶ 125 (calculating "an average difference of ▇ gross profit margin of Ultralok above Super-V" but not applying it to Deere's profit margins)[2] *with id.* at ¶ 126 (calculating "[t]he gross profit margins of its Super V tooth components dropp[ing] by about ▇" and "[a]pplying the ▇ factor to ▇ [to] result[] in a royalty of approximately 8.2%").

Those two factual errors resulted in misapprehensions about Dr. Varner's reasonable royalty analysis. Accordingly, the Court's Order excluding Dr. Varner's reasonable royalty opinions is erroneous. Deere's criticisms regarding Dr. Varner's conclusions are fair game for cross-examination, but do not warrant the extreme sanction of exclusion.

## II.  BACKGROUND

As the starting point for his reasonable royalty analysis, Dr. Varner analyzed ESCO's profit margins for its Super-V product, which it sells to Deere and competes in the overall market for construction expendables with the accused products. *See* D.I. 183-1, Ex. I, ¶¶ 125–28, Ex. K, ¶¶ 65–71. Super-V was covered by two patents: U.S. Patent No. 4,965,945, which expired in 2007,

---

[2] Dr. Varner mistakenly calculated the difference in profit margins as ▇ in his original report, but corrected it to ▇ in his January 16, 2023 Errata. *See* D.I. 183-1, Ex. J at ¶ 12. Deere acknowledged this fact (D.I. 183, 8, n.6.), but then ignored it to erroneously argue that Dr. Varner "presume[d]" that "because Ultralok's profit margin is ▇ higher than Super V [then] ▇ of the TK Series profitability simply must be based on the Asserted Patents." *Id.* at 8–9. The Court repeated this error in its Order.

2

and U.S. Patent No. 5,469,648, which expired in 2013. *Id.*, Ex. I, ¶¶ 126, Ex. K, ¶ 67, n.99. Prior to its patent expiration, Super-V was a "premium" offering.

In his report, Dr. Varner expressly discussed the comparability of the technology in the Super-V patents and the asserted patents, including that they both "relate to the configuration of the adapter-tooth configurations and the locking mechanisms" and aim to improve "stability, reliability, longevity, and safety." D.I. 183-1, Ex. I, ¶¶ 107, 109–13, 116, 118, 125, n.213, 129, Ex. K, ¶ 67, n.98, n.99. He also explained in his report that he had discussed these patents with certain ESCO employees, including Chris Carpenter, inventor of the '662 Patent and ESCO's Vice President of Innovation and Technology, and Steve Schad, Chief Technology Counsel. *Id.*, Ex. I, ¶¶ 107, 109–13, 116, 118, 125, n.213, 129, Ex. K, ¶ 67, n.98, n.99. Both are long-standing employees of ESCO with a deep knowledge of the ground-engaging technology industry, have been deposed, and are potential trial witnesses as to the technical comparability of the Super-V patents and the asserted patents. Dr. Varner also relied on the deposition testimony of ESCO's employees regarding the technology in the Super-V patents and the asserted patents. *See id.*, Ex. I, ¶¶ 113, n.187 (citing Mr. Stitzel's testimony that the "key advantages" of a product covered by the '175 Patent are "safety, reliability, wear life, and maintenance"), n.189 (citing Mr. Stangeland's testimony that the advantages of the '662 Patent include that "[i]t protects the lock, the configuration of the protected bearing surfaces, [and] the structural areas not being in load bearing areas"), n.190 (citing Mr. Stangeland's testimony that the advantages of the '175 Patent include "the relationship with bearing surfaces in the rear and the combination of the front curved section" that "keeps the fits tight"), Ex. K, ¶¶ 67, n.98 (citing Mr. Stangeland's testimony that "Super V [is] a twist-on style component that has a drive-through pin that you hammer in through the top with some rubber elastomer and some clipping mechanisms inside … . It's symmetric so you can

3

flip the teeth over.  There's a retaining slide on both sides of the tooth so it can still be pinned after you flip it."). Importantly, Dr. Varner confirmed that the Super-V patents were "blocking" patents which prevented "manufacturers from copying and selling competing products with similar technology, at least until the patents expired;" he also discussed with ESCO's employees the nature of the asserted patents and Deere's use of those patents, and he reviewed testimony from ESCO's employees and technical expert regarding the same. *Id.*, Ex. I, ¶¶ 116, 119 (citing Holland Report), Ex. K, ¶ 67, n.98, n.99, Ex. L, 227:1–15 (explaining his understanding that the asserted patents are "blocking" patents is based on "the opinions of other experts … the fact that … Deere has not … provided evidence that there is a commercially-acceptable non-infringing design around yet … that the technology at issue here relates to features that are a big part of consumer demand for the products at issue [which] would be strength, reliability, durability, safety and so on"). And, contrary to Deere's misrepresentations to the Court, Dr. Varner *did* review the Super-V patents. *Compare id.*, Ex. K, ¶ 67, n.99 (citing both Super-V patents), Ex. L, 204:17–19 ("Q: Did you do any analysis of the patents that covered the Super V product?  A: I looked at them.") *with* D.I. 278, 35:6–8 (Deere alleging "[t]here is no evidence in the record, Your Honor, at all about … how many patents covered Super V."), 35:19–22 (Deere alleging Dr. Varner "told me in his deposition that, you know, he had no idea what patents covered, for example, the Super V").

In his report, Dr. Varner concluded based on his analysis of the evidentiary record that when Super-V went off patent in 2013, ESCO's profit margins suddenly dropped from approximately ▇ to ▇ a decline of about ▇ *See* D.I. 183-1, Ex. I, ¶ 126, Ex. K, ¶ 69, n.102 (calculating "the percentage at which the margins declined"). He further found that ESCO's profit margins on Super-V have remained relatively low since 2013. *See id.* Dr. Varner spoke with ESCO's employees regarding "the value of patent protection, about the drop in profitability

4

of products when a product goes off-patent[,] the change of prices[,] the increased competition[, and] them knowing when different competing products were going off-patent." *Id.*, Ex. L, 209:10–16; *see id.*, 206:20–211:7. Based on all this information, Dr. Varner concluded in his report that "about one-fourth of [ESCO's] gross profit margins [for Super-V] are attributable to patent protection." *Id.*, Ex. I, ¶ 126. This "one-fourth" number forms the basis of his reasonable royalty "starting point" that was ultimately applied to Deere's profit margins. *Id.*

Only after determining this "starting point" did Dr. Varner separately review the profit margin for ESCO's Ultralok product. *Id.*, ¶ 125; *see also id.*, Ex. K, ¶ 71. If ESCO's profit margins on Ultralok were lower than Super-V after it lost patent protection, that would suggest the decline in profit margins for Super-V was attributable to something other than the expiration of the patents. Thus, Dr. Varner compared ESCO's profit margins for the off-patent Super-V product to the patent-protected Ultralok product during the damages period. He found that, on average for the years 2020 through 2022, ESCO's gross profit margins for Ultralok were approximately █ higher than its gross profit margins for Super-V. *Id.*, Ex. I, ¶ 125. This analysis confirmed that ESCO's profit margins are higher for its patent-protected products and that the drop in profitability of the Super-V after patent expiration was not an anomaly. *Id.* His analysis "controlled for market, geographic region, selling firm, and buying firm" because Dr. Varner analyzed ESCO's sales of Super-V and Ultralok (which both compete in the overall market for construction expendables) only to Deere. *Id.*, Ex. I, ¶ 125, Ex. K, ¶ 71. Importantly, Dr. Varner's report makes clear that he ***did not apply*** the 10.5% figure to Deere's profit margins. *Compare id.*, Ex. I, ¶ 125 *with id.*, ¶ 126.

Finally, Dr. Varner's report shows that he ***only*** applied the decline in ESCO's profit margins on its Super-V products of █ (not the comparison of Ultralok and Super-V profit

5

margins) to Deere's profit margins on the accused TK Series System products. *See id.*, Ex. I, ¶¶ 126–27. Dr. Varner determined that "Deere TK Series System gross margins are approximately ■ over the period FY2010 to FY2022" and "Deere's average gross profit margin on sales of its TK Series System was ■ ■ and ■ in FY2019, FY2020, and FY2021, respectively." *Id.*, Ex. I, ¶¶ 126–27. Applying the decline in ESCO's profit margins on its Super-V products of ■ to Deere's profit margins on the accused TK Series System product of ■ "results in a royalty of approximately 8.2% for patent protection." *Id.*

### III.  ARGUMENT

"[R]eargument may be allowed: 1) where the Court has patently misunderstood a party, 2) where the Court has made a decision outside the adversarial issues presented to the Court by the parties, or 3) where the Court has made an error not of reasoning but of apprehension." *Pirelli*, 988 F. Supp. at 445 (citing *Brambles*, 735 F.Supp. at 1241) (internal quotations omitted). Here, the Court's Order reflects a misapprehension of Dr. Varner's reasonable royalty analysis, specifically with respect to ESCO's profit margins on its Super-V and Ultralok products.

### A.  Dr. Varner Compared the Super-V Patents and the Asserted Patents.

The Court held that "Dr. Varner's analysis of the loss in profitability of the Super V product after the expiration of the patents that protected that product is not a sufficiently reliable measure of the value of the patents at issue in this case" because Dr. Varner "provide[d] no basis for comparing the value of the Super V patents to the value of the patents at issue in this case." Order at 17–18. But Dr. Varner *did* consider the comparability of the Super-V patents and the asserted patents, both in terms of their technical comparability and the protection they provided against other manufacturers from using the technology in a competing product.

*First*, contrary to Deere's briefing and its counsel's statements at the hearing (*see* D.I. 183, 10; D.I. 278, 35:6–22), Dr. Varner had extensive conversations with ESCO's employees regarding

6

the technology claimed in the Super-V patents and the asserted patents. *See* D.I. 183-1, Ex. I, ¶¶ 107, 109–13, 116, 118, 129, Ex. K, ¶ 67, n.99. ESCO's employees and technical expert explained that the Super-V patents and the asserted patents all relate to "the configuration of [the] adapter and tooth components of a bucket tooth system," including improving "stability, reliability, longevity, and safety." *Id.*, Ex. I, ¶¶ 107, 125, n.13, Ex. K, ¶ 67, n.99 ("Both of the Super-V patents relate to the configuration of the adapter-tooth configurations and the locking mechanisms."); *see also id.*, Exs. A and B (asserted patents claiming adapter-tooth configurations for improved performance). In other words, the Super-V and asserted patents both apply to the entire tooth, adapter and locking system. *See id.* Dr. Varner also relied on depositions of ESCO's employees who testified about the technology in Super-V and the asserted patents. *See id.*, Ex. K, ¶¶ 67, n. 98, 73, n.107, 113, n.187, n.189, n.190.

*Second*, Dr. Varner had conversations with ESCO's employees regarding the nature of the Super-V patents and the asserted patents and the presence of "will-fitters" in the construction expendables industry. The "nature of the invention" and the "nature of the industry," which Dr. Varner considered, are "admissible factors to show that [a] royalty [i]s reasonable." *Energy Transp. Grp.*, 697 F.3d at 1357 (finding facts "regarding the hearing aid market and industry structure … clearly relevant to the determination of a reasonable royalty rate"). ESCO's employees explained that the Super-V patents "blocked manufacturers from copying and selling competing products with similar technology, at least until the patents expired, and that without patent protection the profitability of Super V declined." D.I. 183-1, Ex. K, ¶ 67, n.98, n.99. As Mr. Carpenter explained, "when our systems come close to end of patent, there's a lot of people that do jump in and want to make those parts." *Id.*, ¶ 67, n.98 (citing Mr. Carpenter's testimony). Critically, Dr. Varner did ***not*** ignore the possibility that other factors may have been responsible

7

for the reduction in profitability of the Super-V products after they lost patent protection. For example, ESCO's profit margins for Super-V abruptly dropped in 2013 when it went off patent and have remained relatively low since then, a fact that strongly suggests the expiration of the patents caused the decline in profit margins. *See id.*, Ex. I, ¶¶ 125-126, Ex. K, ¶¶ 69, n.102, 71. In considering the scope of coverage and importance of the Super-V patents compared to the asserted patents, Dr. Varner also relied on Mr. Holland's opinions regarding Deere's infringement of the asserted patents, including how Deere made use of the asserted patents and the importance of the asserted patents to the accused TK Series System products. *See id.*, Ex. I, ¶¶ 116, 119 (citing Holland Report).

Thus, Dr. Varner established "baseline comparability" between the Super-V patents and the asserted patents. This is not a high standard. *Bio-Rad*, 967 F.3d at 1374; *see also Intuitive Surgical, Inc. v. Auris Health, Inc.*, No. 18-1359, 2021 WL 3662842, at *5 (D. Del. Aug. 18, 2021) (allowing testimony "that the patents licensed in the Schoelly Agreements and the patents-in-suit are technologically comparable because all claim 'systems and/or methods for endoscopy'"). Dr. Varner has "provided enough factual support for a jury to assess [Deere's] challenge to the weight and credibility of his opinion" and any challenge should be done by cross-examination, not exclusion. *Intuitive Surgical,* 2021 WL 3662842, at *6; *see also, e.g.*, *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595–96 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003).

### B. Dr. Varner Did Not Apply the Comparison of Ultralok and Super-V Profit Margins to Deere's Profit Margins.

Dr. Varner's comparison of ESCO's profit margins for Ultralok and Super-V during the damages period was not the "starting point" of his reasonable royalty analysis, as the Court's Order concludes. The Order also erroneously concluded that Dr. Varner "assume[d] that the difference in profit margins for the two products was attributable entirely to the fact that the Ultralok product was still patent-protected during that period … while Super V was not." Order at 13. As his expert report makes clear, Dr. Varner only used the comparison between ESCO's profit margins for Ultralok and Super-V to confirm that his conclusion regarding ESCO's profit margins for Super-V was not contradicted by profit margins for its patent-protected products during the damages period. *See* D.I. 183-1, Ex. I, ¶ 125, Ex. K, ¶ 67.

Dr. Varner ***did not*** "extrapolate[] from his assumed valuation of Ultralok's patent protection to conclude that the value to Deere of the technology in the two patents asserted in this case was at least roughly equivalent to the ▌ profitability margin on ESCO's Ultralok product over the Super V product." Order at 13–14. As an initial matter, as his expert report discloses, Dr. Varner calculated an average difference in profit margins between Ultralok and Super-V at ▌ D.I. 183-1, Ex. I, ¶ 125, Ex. J, ¶ 12, Ex. K, ¶ 71. In any event, and contrary to Deere's representations in its briefing and at the hearing, Dr. Varner ***did not*** apply this difference to Deere's profit margins. *See, e.g.*, D.I. 183, 8 (Deere alleging that Dr. Varner "conclude[d] that the value of the Ultralok patents must be ▌ of Ultralok's profitability"); D.I. 278, 34:7–15 ("The ▌ comes fundamentally from this alleged valuation of the Ultralok patent and the Super-V patent."). Dr. Varner only applied the decline in ESCO's profits for Super-V after it lost patent protection to Deere's profit margins. *Compare* D.I. 183-1, Ex. I, ¶ 125 (stating "[t]his is an average difference of ▌ gross profit margin of Ultralok above Super V from 2020 to Q3

9

2022") *with id.*, ¶ 126 ("Applying the ███ factor to ███ results in a royalty of approximately 8.2% for patent protection."). These fundamental errors affected the Court's entire analysis.

A comparison of ESCO's profit margins on Ultralok and post expiration Super-V was particularly relevant because, although ESCO's Ultralok product is not covered by the asserted patents, the technology between the patents that cover Ultralok (referred internally as the "Delta" patents) and the asserted patents (referred internally as the "PVX" or "Pit Viper" patents) is closely related. *See id.*, Ex. I, ¶ 26, Ex. K, ¶ 73. In fact, as Dr. Varner disclosed in his report and deposition, ESCO considered the asserted patents as a possible design for the Ultralok product. *See id.* This Court and the Federal Circuit has approved consideration of a patent owner's lost profits in a hypothetical negotiation framework. *See, e.g.*, *Asetek*, 852 F.3d at 1362–63 ("[A] patent owner participating in a hypothetical negotiation would consider the profits on sales it might lose as a result of granting a license."); *Mitutoyo Corp. v. Central Purchasing, LLC*, 499 F.3d 1284, 1292 (Fed. Cir. 2007) (affirming royalty rate equal to the plaintiff's profit margins); *Rite-Hite Corp. v. Kelley Co. Inc.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995) (finding it reasonable that "an unwilling patentee would only license for one-half [of] its expected lost profits"); *MiiCs & Partners, Inc. v. Funai Elec. Co., Ltd.*, No. 14-804-RGA, 2017 WL 6268072, at *4 (D. Del. Dec. 7, 2017) (finding it "not improper for Mr. Hampton to consider NEC's lost profits" in his reasonable royalty analysis). Here, of course, ESCO seeks lost profits for its Ultralok products, which the parties do not dispute compete with the accused TK Series System products in the "premium" market for construction expendables.

**IV.     CONCLUSION**

ESCO respectfully requests that the Court reconsider its order granting Deere's *Daubert* motion and permit Dr. Varner to testify regarding reasonable royalties.

|  |  |
|---|---|
|  | */s/ Nathan R. Hoeschen* |
|  | John W. Shaw (No. 3362) |
|  | Karen E. Keller (No. 4489) |
| OF COUNSEL: | Nathan R. Hoeschen (No. 6232) |
| Brian D. Sieve, P.C. | Emily S. DiBenedetto (No. 6779) |
| Paul D. Collier | SHAW KELLER LLP |
| Jeremy D. Roux | I.M. Pei Building |
| Xaviere Giroud | 1105 North Market Street, 12th Floor |
| Tareq M. Alosh | Wilmington, DE 19801 |
| KIRKLAND & ELLIS LLP | (302) 298-0700 |
| 300 North LaSalle | jshaw@shawkeller.com |
| Chicago, IL 60654 | kkeller@shawkeller.com |
| (312) 862-2000 | nhoeschen@shawkeller.com |
|  | edibenedetto@shawkeller.com |
| Dated: July 6, 2023 | *Attorneys for Plaintiff* |

11

**CERTIFICATE OF SERVICE**

      I, Nathan R. Hoeschen, hereby certify that on July 6, 2023, this document was served on the persons listed below in the manner indicated:

**BY EMAIL**

| | |
|---|---|
| James D. Taylor, Jr. | John F. Bennett |
| Michelle C. Streifthau-Livizos | Paul M. Ulrich |
| Juliana G. Clifton | Paul J. Linden |
| SAUL EWING ARNSTEIN & LEHR LLP | Ava M. Abner |
| 1201 N. Market Street, Suite 2300 | FROST BROWN TODD LLP |
| Wilmington, DE 19801 | Great American Tower |
| (302) 421-6800 | 301 East Fourth Street |
| james.taylor@saul.com | Cincinnati, OH 45202 |
| michelle.streifthau-livizos@saul.com | (513) 651-6423 |
| juliana.clifton@saul.com | jbennett@fbtlaw.com |
| | pulrich@fblaw.com |
| Rachael L. Rodman | plinden@fbtlaw.com |
| ULMER & BERNE LLP | aabner@fbtlaw.com |
| 65 East State Street, Suite 1100 | |
| Columbus, OH 43215 | |
| (614) 229-0039 | |
| rrodman@ulmer.com | |

                                                */s/ Nathan R. Hoeschen*
                                                John W. Shaw (No. 3362)
                                                Karen E. Keller (No. 4489)
                                                Nathan R. Hoeschen (6232)
                                                Emily S. DiBenedetto (No. 6779)
                                                SHAW KELLER LLP
                                                I.M. Pei Building
                                                1105 North Market Street, 12th Floor
                                                Wilmington, DE 19801
                                                (302) 298-0700
                                                jshaw@shawkeller.com
                                                kkeller@shawkeller.com
                                                nhoeschen@shawkeller.com
                                                edibenedetto@shawkeller.com
                                                *Attorneys for Plaintiff*